**50954**    **Federal Register** / Vol. 70, No. 166 / Monday, August 29, 2005 / Rules and Regulations

Code, if the service had been covered under chapter 84 of title 5, United States Code, plus interest.

(iii) The department or agency must remit the amount of Government contributions under this section to OPM at the same time it remits the employee deposit for this service to OPM in accordance with instructions issued by OPM.

(9) *Interest.* Interest must be computed as described under paragraphs (2) and (3) of 5 U.S.C. 8334(e). Interest must be computed for each distinct period of service from the midpoint of each distinct period of service. The interest accrues annually on the outstanding deposit and is compounded annually, until the deposit is paid.

(10) *Effect of deposit.* An individual completing a deposit under this section will receive retirement credit for the service covered by the deposit when OPM receives certification that the deposit has been paid in full, and the deposit payment and agency contributions are remitted to the Civil Service Retirement and Disability Fund.

(11) *Appeal rights.* When the department or agency processing an application for deposit under this section determines that the individual is not eligible to make a deposit for a period of service, it must provide the individual with a written decision explaining the reason for the decision and explaining the individual's right to appeal the decision to the Merit Systems Protection Board.

[FR Doc. 05–17053 Filed 8–26–05; 8:45 am]
**BILLING CODE 6325–39–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**8 CFR Part 103**

**[CIS No. 2245–02 and Docket No. DHS–2004–0021]**

**RIN 1615–AA88**

**Adjustment of the Appeal and Motion Fees To Recover Full Costs**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This rule adjusts the fee for filing appeals of, and motions to reopen or reconsider, any decision under the immigration laws in any type of proceeding other than those described at 8 CFR 1003.1(b), over which the Board of Immigration Appeals (BIA) in the Department of Justice (DOJ) has appellate jurisdiction. The rule also adds a non-substantive modification to the language of the fee regulation in order to enhance clarity.

This rule applies to fees for appeals and motions relating to the types of cases under the jurisdiction of the Administrative Appeals Office (AAO). The AAO is an appellate office of U.S. Citizenship and Immigration Services (USCIS). The BIA remains a component of DOJ, and has appellate jurisdiction over the orders of immigration judges, denials of relative immigrant visa petitions (Form I–130), and decisions involving administrative fines and penalties. This rule does not apply to, or affect in any manner, the fees associated with the BIA. Appeals from denials of all other types of applications, such as Applications for Temporary Protected Status (Form I–821), and petitions, such as Petitions for Amerasian, Widow(er), or Special Immigrant (Form I–360), and any subsequently filed motions, are under the jurisdiction of the AAO.

The fees, deposited into the Immigration Examinations Fee Account (IEFA), are adjusted from $110 to $385 to recover the full costs associated with the processing of an appeal, motion to reopen or motion to reconsider. Federal statutes authorize USCIS to establish and collect fees to recover the full cost of processing immigration benefit applications, rather than supporting these services with tax revenue.

Finally, the rule replaces a reference in the regulations to an obsolete form with a reference to the revised version of that form.

**DATES:** *Effective Date:* This final rule is effective September 28, 2005.

*Compliance Date:* Applications mailed, postmarked, or otherwise filed, on or after September 28, 2005 require the new fee.

**FOR FURTHER INFORMATION CONTACT:** Paul Schlesinger, Director, Office of Budget, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., 4th Floor, Washington, DC 20529, telephone (202) 272–1930.

**SUPPLEMENTARY INFORMATION:**

**I. Introduction**

USCIS published a proposed rule in the **Federal Register** on November 30, 2004, at 69 FR 69546, to adjust the fees for processing of an appeal, motion to reopen or motion to reconsider. The proposed rule was published with a 30-day comment period, which closed on December 30, 2004. USCIS received 14 comments pertaining to the adjustment of the fees for processing of an appeal or motion to reopen or motion to reconsider.

Comments were received from 13 concerned individuals and one association. All of the relevant comments were carefully considered before preparing this final rule. USCIS' responses to the concerns raised by the commenters primarily are based upon the November 2002 fee review report provided by KMPG Consulting.

The following is a discussion of the comments received for the November 30, 2004 proposed rule and USCIS' response.

**II. Summary of Comments**

*A. Why Is the Fee Increase Necessary?*

Eight comments were received expressing dissatisfaction with the size of the fee increase. Three commenters also stated that the increase in appeals and motions of 12% over the last 10 years does not justify the proposed increased fees. USCIS notes, however, that the fee increase is not based upon the 12% increase in the filing of motions and appeals. While the fees for other applications have increased more than threefold during this time, the appeal and motion fee has remained the same.

The increase in fees is necessary so that USCIS can recover the full costs of processing appeals and motions.

Three commenters asserted that the increase in fees should also increase the timeliness and quality of the decisions rendered. Similarly, one commenter suggested that the AAO be added to the USCIS backlog reduction plan, while another indicated support for the proposed increase with the stipulation that the increase be used to fund additional resources for the AAO.

USCIS agrees with commenters that the timeliness and quality of the decisions is important, as are increases in personnel and resources and notes that such considerations were taken into account during the fee review. In response to the commenter's suggestion that the AAO be added to the USCIS backlog reduction plan, we note that the AAO has been a part of the backlog reduction plan since its inception. As indicated in the proposed rule, based on the increase in motion and appeal filings from 1993 to 2002, a fee review was conducted by a consulting firm to determine the fee necessary to ensure that USCIS was able to collect the full cost for processing motions and appeals. According to Office of Management and Budget (OMB) Circular A–25, the "full

cost'' includes direct and indirect personnel costs, physical overhead, consulting, and other indirect costs (*e.g.*, material and supply costs, utilities, insurance, travel and rents), management and supervisory costs, and the costs of collection, research, and regulation. Included as part of the fee study was a determination of increased staffing necessary to meet the President's 5-year goal of processing immigration benefit applications in 6 months or less, as well as the cost of labor-intensive activities such as legal research, decision writing, and decision review.

Three commenters opposed the proposed fee increase because USCIS provides no recourse to waive fees or refund fees in order to correct an obvious error on the part of USCIS. Examples of obvious errors include an erroneous finding that an appeal or motion was not timely filed or an erroneous finding related to statutory eligibility such as age or marital status. Additionally, one commenter suggested that USCIS waive or refund fees when a decision is reversed on a motion to reconsider due to USCIS error.

In response to these comments, USCIS notes that it does have the authority to reopen a case sua sponte and utilizes this ability in instances where, in its discretion, it determines that there is an obvious error. An applicant may bring such an error to the attention of the AAO, and the AAO may reopen the case on its own motion. In such cases, the applicant does not need to submit any fee for the motion, so that waiver of the fee or refund of the fee is not an issue. In instances where an applicant pays a fee for a motion to reopen or reconsider, without first attempting to resolve the error with the AAO, the AAO may refund the fee if, in its discretion, it determines that there clearly was an error in the AAO's original decision. Service centers and district offices also have procedures in place to issue refunds in certain instances where USCIS error can be demonstrated.

One commenter stated that the administrative costs for processing one particular type of appeal should not be "anything close to" $385, because the decisions of the AAO often "fail to address the issues presented, fail to provide any legal or factual analysis, fail to cite any legal authority, inconsistently apply general principles to identical factual situations, and completely disregard various contractual obligations of the DHS." USCIS and the AAO are very careful about the quality of appellate decisions. Decisions are reviewed before issuance to ensure that there are no such failings.

Moreover, as indicated above and in the proposed rule, the $385 fee is necessary to maintain USCIS appellate operations without passing costs on to taxpayers.

*B. Why Doesn't USCIS Charge a Lower Fee for Motions to Reconsider?*

Five comments were received opposing the increase in fees for so-called "simpler" appeals and motions to reconsider, while supporting the fee increase for more complex appeals and motions to reopen. USCIS does not accept the premise that there is a standard by which the complexity of appeals can be measured, or that the differences between the two types of motions can be apportioned in order to justify separate fees.

USCIS regulations set forth a uniform appeals process. Appeals are considered on a case-by-case basis. Each case has unique substantive components that impact the ease or complexity of review. A motion to reconsider can, in a particular case, consume more USCIS resources than a motion to reopen. The process, however, is consistent throughout. In each case, the adjudicating office initially reviews each Form I–290B (Notice of Appeal to the AAO) on a case-by-case basis. The adjudicating office then decides the next appropriate step (*i.e.*, forward the matter to AAO for review, re-adjudicate and approve, or re-adjudicate and issue another request for evidence). Depending upon the timeframe and action, additional background checks may also be required.

This procedure does not vary significantly by application or petition type. It is true that in certain cases an application or petition is not forwarded to the AAO for review, but the conclusion that this path would mean a significantly lower administrative cost to USCIS does not necessarily follow. A service center or district office, after the preliminary review of the material provided, must complete many of the same tasks normally completed by the AAO: Data entry, additional review of the record, security checks, and issuance of a decision. These offices may even have to issue an additional Request For Evidence.

A more varied fee structure that accommodated perceived differences in the degree of complexity for appeals would be more difficult to administer and could, itself, increase costs. These increased costs would necessarily be reflected in higher overall fees.

Although there are 66 separate petitions or applications which may underlay the actual appeal or motion, because the processes for an appeal and motion are similar, USCIS and the

consulting firm treated them similarly for purposes of the fee review and arrived at a statistically meaningful average processing time due to the fact that the appeals and motion process is singular as set forth in the regulations.

Similarly, despite the fact that the regulations provide different eligibility requirements for the filing of a motion to reopen versus a motion to reconsider, because the process for filing and adjudicating each motion is the same, a separate fee is not warranted. It is common practice with other USCIS applications and petitions to charge one standard application processing fee despite the fact that one application or petition may be used for the adjudication of benefits under several different statutory and/or regulatory provisions and may require the demonstration of various, unique eligibility requirements.

For example, the Form I–485, Application to Register Permanent Residence or Adjust Status, covers not only family as well as employment-based and Diversity Visa adjustment of status, but also adjustment under Registry, the Haitian Refugee Immigration Fairness Act (HRIFA), the Nicaraguan Adjustment and Central American Relief Act (NACARA), the Legal Immigration and Family Equity (LIFE) Act, the Cuban Adjustment Act and others. The Form I–129, Petition for a Nonimmigrant Worker, likewise covers change or extension of nonimmigrant status as well as the beneficiary's eligibility for a variety of classifications of nonimmigrant status. Nonetheless, one application processing fee is charged. One fee will similarly be assessed for the Form I–290B.

Another commenter stated that, despite the statement to the contrary in the proposed rule, the new fee will have a negative impact on small businesses. The commenter challenges the validity of the small business analysis in the proposed rule, and recommends that USCIS "take into consideration the levels at which small companies are not appealing denials." It would be possible for USCIS to examine the percentage of denials for which no appeal is filed, but it would not be practical or cost effective for USCIS to assess the extent to which the fee for the appeal served as the basis for the decision to not file an appeal. The Regulatory Flexibility Act portion of this rule discusses more fully USCIS' perspective on how the appeal fee increase may or may not affect the decision to pursue an appeal. The commenter also recommended that the number of denials of Form I–129, Petition for Nonimmigrant Worker, be included in the analysis of the effect of

this rule on small businesses. That recommendation has been adopted.

Another comment noted that the proposed rule failed to remove reference to the obsolete Form I–290A in all pertinent areas of the regulation. The commenter is incorrect, because the listing for the Form I–290A in 8 CFR 103.7(b) was removed by the Final Rule published April 15, 2004 (69 FR 20527).

Finally, several additional comments were received that were beyond the scope of the proposed rule and, therefore, are not mentioned herein.

Accordingly, this final rule implements the new fees as outlined in the proposed rule, without substantive change. Any applications or petitions mailed, postmarked, or otherwise filed, on or after September 28, 2005 will require the new fee.

## III. Fee Adjustments

The fee adjustments, as adopted in this rule, are shown as follows:

| Description | Fee |
| --- | --- |
| Appeal/Motion Fee ........................ | $385.00 |

## IV. Technical Improvements

This rule also clarifies that the fee amount of $385 also applies when an appeal is filed based on the denial of a petition with multiple beneficiaries, provided they are all beneficiaries of the same petition, and therefore affected by the same decision. In so doing, it corrects a transcription error in the Code of Federal Regulations in 1989 that failed to amend the fee amount from $50 to $110 for two or more aliens when the aliens are covered by one decision at the same time that the base fee (for one alien) was raised from $50 to $110, as provided in the final rule dated April 4, 1989 (54 FR 13513). The error resulted in an unintended discrepancy between the base fee, and the fee for two or more aliens when the aliens are covered by one decision. Notwithstanding this transcription error, the form instructions reflected the proper fee amount. Accordingly, affected aliens have been properly charged, and the former Immigration and Naturalization Service as well as USCIS have collected the correct fee since the 1989 amendment. This rule corrects the discrepancy in 8 CFR 103.7(b)(1) and brings this fee as properly amended ($50 to $110) from $110 to $385 so that both fees are now equal as intended.

Finally, this final rule also makes a conforming change to 8 CFR 103.5(a)(1)(iii) to replace an obsolete reference to a withdrawn form, Form I–290A, with a reference to Form I–290B.

### Regulatory Flexibility Act

DHS has reviewed this regulation in accordance with 5 U.S.C. 605(b), and by approving it, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities since a majority of motions and appeals are submitted by individuals and not small entities as that term is defined in 5 U.S.C. 601(6).

DHS acknowledges, however, that some small entities, particularly those filing appeals of and/or motions to reopen or to reconsider denials of business-related petitions, such as the Form I–140, Immigrant Petition for Alien Worker; Form I–526, Immigrant Petition for Alien Entrepreneur; Form I–129, Petition for Nonimmigrant Worker; and Form I–829, Petition for Entrepreneur to Remove Conditions; may be affected by this rule. USCIS does not collect data on the size of the businesses filing appeals or motions related to employment-based petitions, and therefore does not know the exact number of small businesses that may be affected by this rule (as the majority of petitions are filed by individuals). USCIS records indicate that the following numbers of business-related petitions were denied during the Fiscal Year 2003/2004 biennial period:

Form I–140, Immigrant Petition for Alien Worker (35,866 denials)

Form I–526, Immigrant Petition by Alien Entrepreneur (217 denials)

Form I–829, Petition by Entrepreneur to Remove Conditions (174 denials)

Form I–129, Petition for Nonimmigrant Worker (171,154 denials)

Based on these figures, the volume of denied petitions that might be appealed to the USCIS over a two-year period is 207,411. During the fiscal years 2003 and 2004, the AAO received approximately 50,000 appeals.

USCIS is unable to determine how many of these petitioners are small businesses. In the past, some large employers have filed hundreds of petitions in a single year. Therefore, the number of small entities that have filed petitions and subsequently, appeals, is less than 207,411 and 50,000, respectively. Nevertheless, even assuming that all of these petitioners were small entities, economic impact on those businesses would not be substantial within the meaning of the Regulatory Flexibility Act.

According to the Bureau of Labor Statistics, the average wage of a worker in the United States in 2002 was $36,764. Cost to an employer would include benefits, social security, payroll taxes and other items not reflected in the wage itself.

It is reasonable to assume that a small business would be less likely to expend resources pursuing appeals or litigating decisions regarding lower-paid and less skilled immigrant employees. Accordingly, small businesses which choose to file appeals on behalf of immigrant employees are likely to do so only for more skilled, and therefore higher paid, immigrant employees. Such employees, presumably, would be paid in excess of the $36,764 average wage. Thus, the $275 increase in fees imposed by this rule would represent well under one percent of the total annual wage cost of the employee on whose behalf the pleading was filed and would represent an even smaller percentage of the cost of the employee's combined salary and benefits.

Moreover, based upon the appeals received by the AAO, we note that the majority of small businesses impacted by this rule would have more than one employee; in all probability, a minority of those employees would require the filing of one of the pleadings impacted by this rule. The overall economic impact of this rule on affected small businesses would therefore amount to substantially less than one percent of overall payroll and benefit expenses and an even smaller percentage of overall revenues.

Accordingly, the degree of economic impact resulting from this rule would not be deemed significant under the Regulatory Flexibility Act. Therefore, an analysis of the economic impact on a substantial number of small entities under 5 U.S.C. 603 is not required for this rule.

### Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase of costs or prices, significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based

companies to compete with foreign-based companies in domestic and export markets.

*Executive Order 12866*

This rule is considered by DHS to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. Accordingly, this rule has been submitted to the Office of Management and Budget (OMB) for review. DHS has assessed both the costs and benefits of this rule as required by section 1(b)(6) of Executive Order 12866 and has made a determination that, although increasing the fee to $385 will increase the cost to the individual applicant and/or petitioner, USCIS must establish and collect fees to recover the full costs of processing immigration benefit applications, as required by the authorizing statute, the INA. The implementation of this rule also will provide USCIS with an additional $6.7 million in FY 2005 over the fee revenue that would be collected under the current fee structure. If USCIS does not adjust the current fees to recover the full costs of processing immigration benefit applications, our programs will not be fully funded and we will not be able to process applications in a timely manner. Thus, the backlog will likely increase. The results of the review showed that if the AAO's staffing increased, processing times would likely meet the President's mandate regarding backlog reduction. The revenue increase is based on USCIS costs and projected volumes that were available at the time of this rule.

*Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, DHS has determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*Executive Order 12988: Civil Justice Reform*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or record-keeping requirements inherent in a rule. This rule does not impose any new reporting or record-keeping requirements under the Paperwork Reduction Act.

However, it should be noted that USCIS solicited public comments on the change of fees in the proposed rule that was published in the **Federal Register** on November 30, 2004. Because the change to the fees requires a change to Form I–290B, USCIS submitted a change request to OMB indicating the fee change from $110 to $385. OMB has approved changes to this form, consistent with the provisions in this final rule. The fee change is now reflected on USCIS Form I–290B.

**List of Subjects in 8 CFR Part 103**

Administrative practice and procedure, Authority delegations (government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

■ Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 2. In § 103.5(a)(1)(iii), the introductory text is revised to read as follows:

**§ 103.5  Reopening or reconsideration.**

(a) * * *

(1) * * *

(iii) *Filing Requirements*—A motion shall be submitted on Form I–290B and may be accompanied by a brief. It must be:

\*      \*      \*      \*      \*

■ 3. Section 103.7(b)(1) is amended by:
■ a. Revising the entry for the form "I–290B"; and by
■ b. Revising the fee "$110" to read "$385" wherever that fee appears in the entry for "Motion."

The revision reads as follows:

**§ 103.7  Fees.**

\*      \*      \*      \*      \*

(b) * * *

(1) * * *

\*      \*      \*      \*      \*

Form I–290B. For filing an appeal from any decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction—$385.00 (the fee will be the same when an appeal is taken from the denial of a petition with one or multiple beneficiaries, provided that they are all covered by the same petition, and therefore, the same decision).

\*      \*      \*      \*      \*

Dated: August 22, 2005.

**Michael Chertoff,**

*Secretary.*

[FR Doc. 05–17132 Filed 8–26–05; 8:45 am]

**BILLING CODE 4410–10–P**

---

**NUCLEAR REGULATORY COMMISSION**

**10 CFR Part 72**

**RIN 3150–AH70**

**List of Approved Spent Fuel Storage Casks: VSC–24 Revision, Confirmation of Effective Date**

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Direct final rule: confirmation of effective date.

**SUMMARY:** The Nuclear Regulatory Commission (NRC) is confirming the effective date of September 13, 2005, for the direct final rule that was published in the **Federal Register** on June 30, 2005 (70 FR 37647). This direct final rule amended the NRC's regulations to revise the VSC–24 cask system listing to include Amendment No. 5 to Certificate of Compliance (CoC) No. 1007.

**EFFECTIVE DATE:** The effective date of September 13, 2005, is confirmed for this direct final rule.

**ADDRESSES:** Documents related to this rulemaking, including comments received, may be examined at the NRC Public Document Room, located at One White Flint North, 11555 Rockville Pike, Rockville, MD 20852. These same documents may also be viewed and downloaded electronically via the rulemaking Web site (*http://ruleforum.llnl.gov*). For information about the interactive rulemaking Web site, contact Ms. Carol Gallagher (301) 415–5905; e-mail *CAG@nrc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Jayne M. McCausland, Office of Nuclear Material Safety and Safeguards, U.S. Nuclear Regulatory Commission, Washington, DC 20555, telephone (301) 415–6219, e-mail *jmm2@nrc.gov*.

**SUPPLEMENTARY INFORMATION:** On June 30, 2005 (70 FR 37647), the NRC published a direct final rule amending its regulations in 10 CFR Part 72 to

**4888**    **Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**8 CFR Part 103**

[CIS No. 2393–06; Docket No. USCIS–2006–0044]

**RIN 1615–AB53**

**Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to adjust the immigration and naturalization benefit application and petition fees of the Immigration Examinations Fee Account. Fees collected from persons requesting these benefits are deposited into the Immigration Examinations Fee Account. These fees are used to fund the full cost of processing immigration and naturalization benefit applications and petitions, biometric services, and associated support services. In addition, these fees must recover the cost of providing similar services to asylum and refugee applicants and certain other immigrants at no charge.

The fees that fund the Immigration Examinations Fee Account were last updated on October 26, 2005, solely to reflect an increase in costs due to inflation. The last comprehensive fee review was conducted in fiscal year 1998. U.S. Citizenship and Immigration Services conducted a new comprehensive review of the resources and activities funded by the Immigration Examinations Fee Account and determined that the current fees do not reflect current processes or recover the full costs of services that should be provided. Therefore, this rule proposes to increase the immigration and naturalization benefit application and petition fee schedule by a weighted average of 174%, from an average fee of $264 to $438. These increases will ensure sufficient funding to meet immediate national security, customer service, and standard processing time goals, and to sustain and improve service delivery. Furthermore, the rule proposes to merge the fees for certain applications so applicants will pay a single fee rather than paying several fees for related services. The rule would permit U.S. Citizenship and Immigration Services to devote certain revenues to broader investments in a new technology and business process

platform to improve substantially its capabilities and service levels.

This rule also proposes generally to allocate costs for surcharges and routine processing activities evenly across all form types for which fees are charged, and to vary fees in proportion to the amount of adjudication decision-making and interview time typically required. This rule proposes to eliminate fees for interim benefits, duplicate filings, and premium processing by consolidating and reallocating costs among the various fees. The rule also proposes to exempt applicants for T nonimmigrant status, or for status under the Violence Against Women Act from paying certain fees, and modify substantially the availability of individual fee waivers by limiting them to certain specified form types.

**DATES:** Written comments must be submitted on or before April 2, 2007.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2006–0044 by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail: OSComments@dhs.gov.* Include the docket number in the subject line of the message.

• *Facsimile:* Federal eRulemaking portal at 866–466–5370.

• *Mail:* Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS–2006–0044 on your correspondence. This mailing address may also be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529. Contact Telephone Number (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Paul Schlesinger, Chief, Office of Budget, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 4052, Washington, DC 20529, telephone (202) 272–1930.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Legal Authority and Requirements
III. The Immigration Examinations Fee Account
  A. General Background
  B. Fee Schedule History
  C. Urgency and Rationale for New Fee Schedule
  1. Delay in Performing a Comprehensive Fee Review
  2. Presidential Mandate To Eliminate the Backlog
  3. Enhanced Staffing Models
  4. Isolation of Premium Processing Fees
  5. Eliminating Perceptions of Impediments to Efficiency
  6. Program Changes To Ensure Integrity of the Immigration System
  7. USCIS' Commitment to Future Fee Reviews
  D. Programs and Services Currently Funded
  1. Adjudication Services
  2. Information and Customer Services
  3. Administration
IV. The Fee Review of Immigration Benefit Applications/Petitions and Biometric Services
  A. Methodology
  B. Assumptions
  C. Defining Processing Activities
  D. Sources of Cost Information
  E. Adjustments
  1. Non-Recurring Costs
  2. Inflation
  3. Additional Resource Requirements
  a. Service Enhancements
  b. Security and Integrity Enhancements
  c. Humanitarian Program Enhancements
  d. Infrastructure Enhancements
  4. Summary
  F. Determining Application and Petition Surcharge Costs
  1. Asylum and Refugee Costs
  2. Fee Waiver/Exemption Costs
  G. FY 2008/2009 Processing Activity Costs
V. Volumes
  A. Biometric Services
  B. Immigration Benefit Applications and Petitions
VI. Assigning Costs to Processing Activities
  A. Overhead Costs
  B. Direct Costs
VII. Assigning Processing Activity Costs to Applications and Petitions and Biometric Services
  A. Biometric Services
  B. Immigration Benefit Applications and Petitions
VIII. Assigning Surcharge Costs to Applications and Petitions
  A. Method of Assigning Costs
  B. Fee Waiver/Exemption Costs
  C. Asylum/Refugee Costs
IX. Proposed Fee Adjustments
  A. Biometric Services
  B. Immigration Benefit Applications and Petitions
X. Impact on Applicants and Petitioners
XI. Fee Waivers
XII. Statutory and Regulatory Reviews
  A. Regulatory Flexibility Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

**PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS**

**List of Acronyms and Abbreviations**

ABC—Activity-Based Costing
AAO—Administrative Appeals Office
CBP—Bureau of Customs and Border Protection
CFO Act—Chief Financial Officers Act of 1990
CFO—Chief Financial Officer
COOP—Continuity of Operations
CHEP—Cuban Haitian Entrant Program
DHS—Department of Homeland Security
FASAB—Federal Accounting Standards Advisory Board
FBI—Federal Bureau of Investigation
FY—Fiscal Year
FDNS—Fraud Detection and National Security
FOIA—Freedom of Information Act
GAO—Government Accountability Office
GPRA—Government Performance Results Act of 1993
IEFA—Immigration Examination Fee Account
ICE—Bureau of Immigration and Customs Enforcement
IIO—Immigration Information Officers
INA—Immigration and Nationality Act
IT—Information Technology
IBIS—Interagency Border Inspection System
LAP—Lease Acquisition Program
NARA—National Archives and Records Administration
NRP—National Recruitment Program
NSRV—National Security and Records Verification
NACARA—Nicaraguan Adjustment and Central American Relief Act
ORS—Office of Records Services
OMB—Office of Management and Budget
PMB—Performance Management Branch
PA—Privacy Act
TPS—Temporary Protected Status
UMRA—Unfunded Mandates Reform Act of 1995
USPS—United States Postal Service
USCIS—United States Citizenship and Immigration Services
VAWA—Violence Against Women Act

**I. Public Participation**

USCIS invites interested persons to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this proposed rule. Comments that will provide the most assistance to the Department of Homeland Security (DHS) and U.S. Citizenship and Immigration Services (USCIS) in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change.

*Instructions:* All submissions received must include the agency name and DHS Docket No. USCIS–2006–0044 for this rulemaking. All comments received will be posted without change to *http://*

*www.regulations.gov*, including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov*. Submitted comments may also be inspected at the Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529.

The docket includes additional documents that support the analysis contained in this rule to determine the specific fees that are proposed. These documents include:

• *FY 2008/2009 Fee Review Supporting Documentation;* and
• *Small Entity Analysis for Adjustment of the Immigration Benefit Application/Petition Fee Schedule.* These documents may be reviewed on the electronic docket. The budget methodology software used in computing the immigration benefit application/petition and biometric fees is a commercial product licensed to USCIS which may be accessed on-site by appointment by calling (202) 272–1930.

**II. Legal Authority and Requirements**

The Immigration and Nationality Act of 1952, as amended, (INA) provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants. INA section 286(m), 8 U.S.C. 1356(m). The costs of providing services without charge must be funded by filing fees from other application and petition types. USCIS refers to the additional charges used to pay for these services as "surcharges." The INA also states that the fees may recover administrative costs as well. *Id.* The fee revenue collected under section 286(m) of the INA remains available to provide immigration and naturalization benefits and the collection of, safeguarding of, and accounting for fees. INA section 286(n), 8 U.S.C. 1356(n).

USCIS must also conform to the requirements of the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901–03. The CFO Act requires each agency's Chief Financial Officer (CFO) to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things

of value." *Id.* at 902(a)(8). This proposed rule reflects recommendations made by the DHS CFO and USCIS CFO.

Office of Management and Budget (OMB) Circular A–25 establishes Federal policy regarding fees assessed for Government services and the basis upon which federal agencies set user charges sufficient to recover the full cost to the Federal Government. OMB Circular A–25, *User Charges* (Revised), section 6, 58 FR 38142 (July 15, 1993). Under OMB Circular A–25, the objective of the United States Government is to ensure that it recovers the full costs of providing specific services to users. Full costs include, but are not limited to, an appropriate share of—

(a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

(b) Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel and rents or imputed rents on land, buildings, and equipment; and,

(c) Management and supervisory costs.

Full costs are determined based upon the best available records of the agency. *Id. See also* OMB Circular A–11, section 31.12 (June 30, 2006) (Fiscal Year (FY) 2008 budget formulation and execution policy regarding user fees), found at *http://www.whitehouse.gov/omb/ circulars/a11/current_year/ a11_toc.html.*

When developing fees for services, USCIS also looks to the cost accounting concepts and standards recommended by the Federal Accounting Standards Advisory Board (FASAB). The FASAB defines "full cost" to include "direct and indirect costs that contribute to the output, regardless of funding sources." Federal Accounting Standards Advisory Board, *Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government* 36 (July 31, 1995). To obtain full cost, FASAB identifies various classifications of costs to be included, and recommends various methods of cost assignment. *Id.* at 33–42.

This rule proposes enhanced service levels, more complete funding of existing services, and specific cost allocation methods.

**III. The Immigration Examinations Fee Account**

*A. General Background*

In 1988, Congress established the Immigration Examination Fee Account (IEFA). Pub. L. 100–459, sec. 209, 102

**4890**    **Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules

Stat. 2186 (Oct. 1, 1988); enacting, after correction, INA sections 286(m), (n), 8 U.S.C. 1356(m), (n). Since 1989, fees deposited into the IEFA fund the provision of immigration and naturalization benefits, and other benefits as directed by Congress. In subsequent legislation, Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge. Pub. L. 101–515, sec. 210(d)(1), (2), 104 Stat. 2101, 2121 (Nov. 5, 1990).

Consequently, the immigration benefit application fees were increased to recover these additional costs. *E.g.*, 59 FR 30520 (June 14, 1994).

USCIS, with limited exceptions, prepares all fingerprint cards (and electronic fingerprint capture) used to conduct Federal Bureau of Investigation (FBI) criminal background checks on individuals applying for certain benefits under the INA. Pub. L. 105–119, tit. I, 111 Stat. 2440, 2448 (Nov. 26, 1997). This legislation also authorizes USCIS

to charge a fee for this fingerprinting service (which is now referred to as a biometric service fee). *Id.* The fees are deposited into the IEFA and are available for expenditure by USCIS to provide services. INA section 286(n), 8 U.S.C. 1356(n).

Table 1 lists, by form number, the types of immigration benefit applications and petitions for which fees are collected.[1]

TABLE 1.—TYPES OF IMMIGRATION BENEFIT APPLICATIONS AND PETITIONS

| Form No. | Description |
|---|---|
| I–90 | Application to Replace Permanent Resident Card. |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival—Departure Document. |
| I–129 | Petition for a Nonimmigrant Worker. |
| I–129F | Petition for Alien Fiancé(e). |
| I–130 | Petition for Alien Relative. |
| I–131 | Application for Travel Document. |
| I–140 | Immigrant Petition for Alien Worker. |
| I–191 | Application for Advance Permission to Return to Unrelinquished Domicile. |
| I–192 | Application for Advance Permission to Enter as Nonimmigrant. |
| I–193 | Application for Waiver of Passport and/or Visa. |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal. |
| I–290B/Motions | Appeal for any decision other than BIA; Motion to reopen or reconsider decision other than BIA. |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant. |
| I–485 | Application to Register Permanent Residence or Adjust Status. |
| I–526 | Immigrant Petition by Alien Entrepreneur. |
| I–539 | Application to Extend/Change Nonimmigrant Status. |
| I–600/600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of Orphan Petition. |
| I–601 | Application for Waiver on Grounds of Excludability. |
| I–612 | Application for Waiver of the Foreign Residence Requirement. |
| I–687 | For Filing Application for Status as a Temporary Resident. |
| I–690 | Application for Waiver of Excludability. |
| I–694 | Notice of Appeal of Decision. |
| I–695 | Application for Replacement Employment Authorization or Temporary Residence Card. |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident. |
| I–751 | Petition to Remove the Conditions on Residence. |
| I–765 | Application for Employment Authorization. |
| I–817 | Application for Family Unity Benefits. |
| I–821 | Application for Temporary Protected Status. |
| I–824 | Application for Action on an Approved Application or Petition. |
| I–829 | Petition by Entrepreneur to Remove Conditions. |
| I–881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal (pursuant to section 203 of Pub. L. 105–100) (NACARA). |
| I–905 | Application for Authorization to Issue Certification for Health Care Workers. |
| I–914 | Application for T Nonimmigrant Status. |
| N–300 | Application to File Declaration of Intention. |
| N–336 | Request for Hearing on a Decision in Naturalization Procedures. |
| N–400 | Application for Naturalization. |
| N–470 | Application to Preserve Residence for Naturalization Purposes. |
| N–565 | Application for Replacement Naturalization/Citizenship Document. |
| N–600/600K | Application for Certification of Citizenship/Application for Citizenship and Issuance of Certificate under Section 322. |
| Biometrics | Capturing and Processing Biometric Information. |

Several IEFA fees are set by statute. Section 244(c)(1)(B) of the INA, 8 U.S.C. 1254a(c)(1)(B), limits the filing fee for Temporary Protected Status (Form I–821) to $50. Section 286(u) of the INA, 8 U.S.C. 1356(u), created a Premium Processing Service for certain kinds of

employment-based applications, and set the premium fee at $1,000. Premium Processing Service guarantees that USCIS will process a petition or application within fifteen calendar days of receiving a Form I–907, Request for Premium Processing Service. 8 CFR

103.2(f). The use of premium processing fees is limited to providing premium processing services themselves and to making infrastructure improvements in adjudications and customer service processes. INA section 286(u), 8 U.S.C. 1356(u). These statutory fees relating to

---

[1] The Form I–905, Application for Authorization to Issue Certification for Health Care Workers, is represented in Table 1 and in subsequent tables for

the purpose of identifying total IEFA volume, but is not subject to the proposed fee adjustments in

this rule since the form type and associated fee has only recently been established.

immigration services are not affected by this proposed rule.

As is the case with the current fee structure, waiver applications (Form I–191, Application for Advance Permission to Return to Unrelinquished Domicile; Form I–192, Application for Advance Permission to Enter as a Non-Immigrant; Form I–193, Application for Waiver of Passport and/or Visa; Form I–212, Application to Reapply for Admission into the U.S. After Deportation; Form I–601, Application for Waiver on Grounds of Excludability; and Form I–612, Application for Waiver of the Foreign Residence Requirement) will be combined and subsequently

referenced as ''Waiver Applications.'' One universal fee applies to these application and form types.

In addition to the IEFA, USCIS receives fee funding from several smaller, specific accounts, such as the H–1B Nonimmigrant Petitioner Account under section 286(s) of the INA, 8 U.S.C. 1356(s), and the Fraud Prevention and Detection Account under section 286(v) of the INA, 8 U.S.C. 1356(v), which this proposed rule does not affect.

*B. Fee Schedule History*

The current immigration benefit application and petition fees are based on a review implemented in FY 1998, adjusted for cost of living increases and

other factors. USCIS periodically adjusts the fees for inflation with the last adjustment for inflation effective October 25, 2005. 70 FR 56182 (Sept. 26, 2005).

USCIS began charging a fee for fingerprinting services in 1998. 63 FR 12979 (Mar. 17, 1998). USCIS later adjusted the fee to recover the full costs of providing fingerprinting services. 66 FR 65811 (Dec. 21, 2001). USCIS last adjusted the biometric fee on April 30, 2004 to $70. 69 FR 20528 (April 15, 2004).

Table 2 illustrates the history of the adjustments to the IEFA fee schedule and the biometric fee schedule.

TABLE 2.—HISTORY OF IMMIGRATION BENEFIT APPLICATION AND PETITION FEES

| Form type | Prior to IEFA | | FY 1989 (dollars) | FY 1991 (dollars) | FY 1994 (dollars) | FY 1998 (dollars) | FY 2002 (dollars) | FY 2004 (dollars) | Current fees (dollars) |
|---|---|---|---|---|---|---|---|---|---|
| | FY 1985 (dollars) | FY 1986 (dollars) | | | | | | | |
| I–90 ........................... | 15 | ................. | 35 | 70 | 75 | 110 | 130 | 185 | 190 |
| I–102 ......................... | 15 | ................. | 35 | 50 | 65 | 85 | 100 | 155 | 160 |
| I–129 ......................... | 35 | ................. | 50 | 70 | 75 | 110 | 130 | 185 | 190 |
| I–129F ....................... | 35 | ................. | 40 | 75 | 75 | 95 | 110 | 165 | 170 |
| I–130 ......................... | 35 | ................. | 40 | 75 | 80 | 110 | 130 | 185 | 190 |
| I–131 ......................... | 15 | ................. | 45 | 65 | 70 | 95 | 110 | 165 | 170 |
| I–140 ......................... | 50 | 35 | 50 | 70 | 75 | 115 | 135 | 190 | 195 |
| Waiver Applications .... | 35 | ................. | 45 | 90 | 95 | 170 | 195 | 250 | 265 |
| I–290B/Motions .......... | 50 | ................. | 110 | ................. | ................. | ................. | ................. | ................. | 385 |
| I–360 ......................... | ........... | ................. | ................. | ................. | ................. | 110 | 130 | 185 | 190 |
| I–485 ......................... | 50 | ................. | 60 | 120 | 130 | 220 | 255 | 315 | 325 |
| I–526 ......................... | ........... | ................. | ................. | 140 | 155 | 350 | 400 | 465 | 480 |
| I–539 ......................... | 15 | ................. | 35 | 70 | 75 | 120 | 140 | 195 | 200 |
| I–600/600A ................ | 50 | ................. | 75 | 140 | 155 | 405 | 460 | 525 | 545 |
| I–687 ......................... | ........... | ................. | ................. | 185 | 185 | 185 | 185 | 240 | 255 |
| I–690 ......................... | ........... | ................. | ................. | ................. | ................. | ................. | 35 | 90 | 95 |
| I–694 ......................... | 50 | ................. | ................. | ................. | ................. | ................. | 50 | 105 | 110 |
| I–695 ......................... | ........... | ................. | ................. | 15 | 15 | 15 | 15 | 65 | 65 |
| I–698 ......................... | 120 | ................. | ................. | ................. | ................. | ................. | 120 | 175 | 180 |
| I–751 ......................... | ........... | ................. | 35 | 65 | 80 | 125 | 145 | 200 | 205 |
| I–765 ......................... | ........... | ................. | 35 | 60 | 70 | 100 | 120 | 175 | 180 |
| I–817 ......................... | ........... | ................. | ................. | 75 | 80 | 120 | 140 | 195 | 200 |
| I–821 ......................... | 50 | ................. | ................. | ................. | ................. | ................. | 50 | ................. | 50 |
| I–824 ......................... | ........... | ................. | ................. | 30 | 30 | 120 | 140 | 195 | 200 |
| I–829 ......................... | ........... | ................. | ................. | ................. | 90 | 345 | 395 | 455 | 475 |
| I–881 ......................... | ........... | ................. | ................. | ................. | ................. | ................. | 215 | 275 | 285 |
| I–905 ......................... | ........... | ................. | ................. | ................. | ................. | ................. | ................. | ................. | 230 |
| I–914 ......................... | ........... | ................. | ................. | ................. | ................. | ................. | 200 | 255 | 270 |
| N–300 ........................ | 15 | ................. | 50 | ................. | ................. | 50 | 60 | 115 | 120 |
| N–336 ........................ | ........... | ................. | ................. | ................. | ................. | 170 | 195 | 250 | 265 |
| N–400 ........................ | 35 | ................. | 60 | 90 | 95 | 225 | 260 | 320 | 330 |
| N–470 ........................ | 15 | ................. | 55 | ................. | ................. | 80 | 95 | 150 | 155 |
| N–565 ........................ | 15 | ................. | 50 | 50 | 65 | 135 | 155 | 210 | 220 |
| N–600/600K ............... | 35 | ................. | 60 | 90 | 100 | 160 | 185 | 240 | 255 |
| Biometrics .................. | ........... | ................. | ................. | ................. | ................. | 25 | 50 | 70 | 70 |

*C. Urgency and Rationale for New Fee Schedule*

In developing this proposed rule, USCIS reviewed its recent cost experiences, current service levels, goals for additional services, and various factors for allocating costs to particular form types. This rule proposes a fee structure that will allow USCIS to close

current funding gaps, accomplish performance goals, eliminate problematic incentives, expedite processing, and fairly allocate costs.

For FY 2008 and FY 2009, USCIS projects a continuing funding gap between revenue and expenses in the IEFA. Over the last several years, USCIS has come to rely on a combination of fee

funding from temporary programs (*e.g.*, Temporary Protected Status, penalty fees under INA section 245(i), 8 U.S.C. 1255(i)) and appropriated subsidies for temporary programs (*e.g.*, backlog elimination) to close this funding gap. With the termination of these temporary funding sources, fee adjustments are needed to prevent significant service

AR_001843

reductions, backlog increases, and reduced investment in infrastructure. While the workload associated with these temporary programs will terminate along with the termination of its funding sources, significant fixed costs that were previously recovered through the fees still remain. This includes costs that do not directly vary with this temporary workload, including USCIS Headquarters office costs and asylum and refugee operations.

USCIS has received appropriated dollars for the past several years to improve processing times as part of a five year effort to reduce a backlog of immigration applications. In FY 2006, Congress appropriated $115 million for USCIS, subject to later rescissions. Department of Homeland Security Appropriations Act, 2006, 109–90, 119 Stat. 2064, 2080 (Oct. 18, 2005). In FY 2007, Congress appropriated $181,990,000 for USCIS. Department of Homeland Security Appropriations Act, 2007, 110 Stat. 1355, 1374 (Oct. 4, 2006). During the time since the last comprehensive fee adjustment, USCIS has increased emphasis on national security and public screening of applicants, and on quality controls. At the same time, certain immigration benefit determinations have become more complex as legislation has created new programs and eligibilities. This resulted in a significant funding gap between revenues and costs that led to decreases in performance and services. Because USCIS did not conduct a comprehensive fee review earlier, it has been limited to the revenue that the current fee structure provides. This funding gap has resulted in inadequate facilities to provide services to customers, inadequate investments in infrastructure to improve service, and, most notably, inadequate case processing capacity to keep up with the volume of applications and petitions filed, creating a very significant backlog that would still exist today if not for the temporary appropriated dollars received from FY 2002 to FY 2006. However, significant backlogs will recur unless USCIS restructures its fees to provide adequate case processing capacity.

Spending reductions to meet the funding gap would result in a reversal of the considerable progress USCIS has made over the last several years to reduce the backlog of immigration benefit applications and petitions. Such a reversal would likely include increases in customer complaints, requests to expedite certain applications and petitions, litigation seeking mandamus against USCIS, and other negative consequences that consume

more resources in an ad hoc and reactive manner. This fee rule is essential to bringing fees into alignment with desired levels of service.

USCIS' security-related activities and objectives are its highest priority in allocating resources, and the effects of rising immigration benefit application backlogs could undermine these national security and public safety objectives. USCIS therefore places an emphasis on timely background checks to ensure that the United States is not placed at risk by failing to identify individuals who may be national security or public safety risks at the earliest possible time in the adjudications process. Backlogs allow some applicants and petitioners who are already in the United States to remain in the United States without authorization, and delay identification of potential risks and actions to initiate removal proceedings as appropriate.

Based on the current weighted average application/petition fee of $264 and a projected application/petition fee-paying volume of 4.742 million, immigration benefit application/petition fees will generate $1.250 billion in annual revenue for the FY 2008 and FY 2009 biennial period. For the same period, USCIS estimates the annual cost of processing those immigration and naturalization benefit applications and petitions, including additional resource requirements, will be $2.329 billion. The resulting annual funding gap between revenue and expenses is $1.079 billion, of which $524.3 million is additional resource requirements (see section IV.E for a detailed discussion of these requirements).

## 1. Delay in Performing a Comprehensive Fee Review

The fee changes proposed in this rule reflect a more robust capability to calculate, predict, and analyze costs and revenues. USCIS has not performed a comprehensive cost analysis of the IEFA since the FY 1998 Fee Review. The fact that a comprehensive fee review has been delayed for such a long period of time is a major reason why the current fee schedule is inadequate to recover the full costs of USCIS operations. This is a primary cause for the creation and growth of the immigration benefit application and petition backlog.

A Government Accountability Office (GAO) Report in January 2004 concluded that the "fees were not sufficient to fully fund [US]CIS' operations." GAO, *Immigration Application Fees: Current Fees are Not Sufficient to Fund U.S. Citizenship and Immigration Services' Operations* (GAO–04–309R, Jan. 5, 2004) at 2. GAO

stated that "[i]n part, this has resulted because (1) The current fee schedule is based on an outdated fee study that did not include all costs of [US]CIS' operations and (2) costs have increased since that study was completed due to an additional processing requirement and other actions." *Id.* GAO recommended that USCIS "perform a comprehensive fee study to determine the costs to process new immigration applications." *Id.* at 3. The fee review that is the basis for the proposed fees in this rule addresses that recommendation.

As noted by the GAO, USCIS currently incurs several significant costs that are not recovered in the current fee structure. These include a 2002 estimate of $101 million in costs incurred that any previous fee increases had not adequately addressed: Integrated Card Production System; National Customer Service Center; National Records Center; additional Adjudication Officers; and expansion of Service Center operations. *Id.* at 31. The GAO also identified the need to recover the costs of "new departmental requirements," especially expanding the number of Interagency Border Inspection System (IBIS) checks conducted as a result of the September 11, 2001 terrorist attacks. *Id.* at 33. A portion of these costs were recovered in the April 2004 fee increase. GAO also suggested that USCIS identify and recover "administrative and overhead" costs associated with the creation of USCIS as a separate component within DHS in March 2003. *Id.* at 42–44.

Since fee revenues have not been sufficient to recover full operating costs, USCIS has relied on funding from temporary programs, curtailed spending in critical areas, used premium processing funds for base infrastructure rather than for major business infrastructure improvements to the adjudication and customer-service processes, and used fees from pending applications to fund applications being processed. This insufficiency delayed investment in a new technology and business process platform to radically improve USCIS' capabilities and service levels as originally envisioned by Congress when it first established the premium processing program.

## 2. Presidential Mandate To Eliminate the Backlog

In FY 2002, the President called for an average processing time standard of six months for the adjudication of most immigration benefit applications and petitions to eliminate the backlog of pending applications and petitions at USCIS within five years (end of FY 2006). USCIS received a total of $460

million in appropriated funds for this effort. At the end of FY 2006, the backlog was significantly reduced from a high of 3.84 million cases in January 2004 to 9,482 cases. Additionally, a six-month processing time standard was achieved for fifteen out of sixteen Backlog Elimination Plan applications. In some instances, such as naturalization applications, USCIS decreased processing times to below the six-month goal. Table 3 sets out the processing times (in terms of months) for each application and petition as of September 30, 2006. This fee rule would provide the necessary resources to maintain these processing time standards and fund further improvements to USCIS business operations to continue to reduce processing times while ensuring the appropriate level of security.

### TABLE 3.—APPLICATION AND PETITION PROCESSING TIMES

| Form No. | Processing time (in months) |
|---|---|
| I–90 | 4.38 |
| I–102 | 2.91 |
| I–129 | 2.03 |
| I–129F | 2.90 |
| I–130 | 6.02 |
| I–131 | 1.97 |
| I–140 | 3.31 |
| Waiver Applications | 9.39 |
| Form I–290B/Motions | 7.73 |
| I–360 | 6.34 |
| I–485 | 7.07 |
| I–526 | 4.14 |
| I–539 | 2.07 |
| I–600/600A | 3.39 |
| I–687 | 10.59 |
| I–690 | 10.19 |
| I–694 | 4.50 |
| I–695 | 22.76 |
| I–698 | 26.85 |
| I–751 | 3.74 |
| I–765 | 1.97 |
| I–817 | 3.94 |
| I–821 | 2.54 |
| I–824 | 3.63 |
| I–829 | 38.94 |
| I–881 | 0.35 |
| I–914 | 3.64 |
| N–300 | 23.88 |
| N–336 | 6.22 |
| N–400 | 5.57 |
| N–470 | 16.18 |
| N–565 | 4.35 |
| N–600/600K | 5.27 |

The President's FY 2006 Budget prioritized USCIS resources to achieve the time standard and eliminate the backlog. After FY 2006, USCIS' budget requests for adjudication programs will be limited to fee resources, as USCIS strives to maintain the six-month or less processing time standard and identify opportunities for performance

improvements within a fee-based environment.

As mentioned previously, the significant reduction in the backlog is due to temporary appropriated dollars. These funds were not only necessary to reduce the backlog that had grown prior to FY 2002, but also to make up for the insufficiency of the fee schedule. This was clearly made apparent in the FY 2005 budget when Congress appropriated an additional $60 million towards backlog elimination efforts due to the significant impact of the September 11th attacks on the United States on the standards, procedures, and policies of USCIS. Without this temporary subsidy, not only would the pre FY 2002 backlogs continued to have grown, but the backlog would have grown even greater due to the insufficiency of the fee schedule to process incoming workload for the period FY 2002 through FY 2006.

### 3. Enhanced Staffing Models

The new fee schedule will improve service levels and ensure the security and integrity of the immigration system without causing backlogs to return. This fee review is based for the first time on an enhanced staffing model that is designed to align resources with the need to prevent future backlogs, providing for an efficient and effective workforce balance. Prior to this analysis, USCIS' distribution of adjudicators across field offices did not match the distribution of workload across field offices.

A 2001 GAO report recommended that USCIS "[d]evelop a staffing model for processing naturalization applications and expand the model to include other application types as their processes are reengineered or automated." GAO, *Immigration Benefits: Several Factors Impede Timeliness of Application Processing* (GAO–01–488, May 4, 2001) at 55. In addition, in November 2005, GAO stated that:

This kind of planning is consistent with the principle of integration and alignment that we have advocated as one of the critical success factors in human capital planning. As we have previously reported, workforce planning that is linked to strategic goals and objectives can help agencies be aware of their current and future needs such as the size of the workforce and its deployment across the organization. In addition, we have said that the appropriate geographic and organizational deployment of employees can further support organizational goals and strategies.

GAO, *Immigration Benefits: Improvements Needed To Address Backlogs and Ensure Quality of*

*Adjudications* (GAO–06–20, Nov. 21, 2005) at 34.

Historically, USCIS has been required to balance resource requirements against budgetary realities with the end result often being a staffing model based on what USCIS could afford, not what is required to meet acceptable performance standards. Following the last comprehensive fee review in FY 1998, USCIS' predecessor was only able to maintain the status quo and the backlog actually increased despite significant fee increases in FY 1998. The clear distinction between this proposed fee schedule and prior fee schedules is that the proposed fee schedule does not simply reflect costs and performance retrospectively, locking USCIS into a revenue stream that at best allows it to maintain the status quo. Instead the proposed fee schedule is designed to provide for an adequate and sustainable level of investment in staff, infrastructure, and processes designed to improve the USCIS' ability to administer the nation's immigration laws.

The staffing model identifies sufficient funding not only to meet current standard processing time goals, but also to sustain and improve service delivery by providing additional funding to handle sudden surges in workload, another reason for the growth in immigration benefit application and petition backlogs. Sufficient capacity to process workload is a problem not limited to USCIS. Capacity also relates to agencies that USCIS depends upon to meet its performance goals. For example, this rule proposes additional funding in support of FBI name checks.

### 4. Isolation of Premium Processing Fees

The current fee system has not enabled USCIS to undertake the investments in a new technology and business process platform that are needed to radically improve USCIS' capabilities and service levels. The proposed fee structure is designed to recover annual costs for facilities, information technology systems, business processes, and other capacities in a way that allows USCIS to continue improving service levels, both to applicants/petitioners and to the American public, through more effective administration of the immigration laws of the United States. Under the proposed fee schedule, premium processing revenues will be fully isolated from other revenues and devoted to the extra services provided to premium processing customers and to broader investments in a new technology and business process

**4894**       **Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules

platform to radically improve USCIS' capabilities and service levels.

Specifically, premium processing fees will be used to transform USCIS from a paper-based process to an electronic environment, making it possible to incorporate more effective processing of low risk applicants and better identification of higher risk individuals. The new operational concept will be based on the types of online customer accounts used in the private sector in order to facilitate transactions, track activities, and reduce identity fraud. The solution will also help to meet customer expectations, generated from their private sector experiences, for on-demand information and immediate real-time electronic service over the Internet.

The solution will enable applicants to apply on-line for immigration benefits by either selecting a specific benefit application process or by participating in an on-line electronic interview that will help applicants navigate the system to apply for the correct benefit in the correct manner. Individuals, employers, and representatives will establish unique accounts that will enable them to change attributes such as changes of address or name, and allow individuals to record a change in marital status, representation, or other contact information. The solution will provide enhanced and real-time case status information with e-mail capabilities to request information or inform the applicant about a pending application and to enable the entire process to be completed in an efficient paperless manner.

In short, this proposed rule would fully fund normal operations and infrastructure maintenance with standard fees so that USCIS can apply premium fees to significant infrastructure improvements, as envisioned by Congress. Currently, because of the insufficiency of the fee schedule, USCIS cannot use premium processing funds to invest in major infrastructure improvements to the adjudication and customer-service processes.

5. Eliminating Perceptions of Impediments to Efficiency

This proposed rule would restructure certain fee arrangements that are currently perceived to provide disincentives for USCIS to improve efficiency in processing. For example, USCIS has long authorized certain customers, particularly applicants for adjustment of status, to apply for certain benefits while the initial application is pending, referred to generally as "interim benefits." These include, most

importantly, employment authorization and permission to travel abroad and return to the United States to pursue the pending application. In the current fee structure, USCIS charges additional fees for interim benefits in addition to initial application fees. Thus, the longer cases take to adjudicate, the more total revenue is collected. This creates the perception that USCIS gains by processing cases slowly.

Through the provisions proposed in this rule, USCIS would eliminate its reliance on interim benefits as a significant funding source for base operations and address the problem that aliens are required to pay for services they would not need if the underlying petition were timely processed, while ineligible and fraudulent applicants receive work authorization and travel documents because of processing delays. Moreover, this change addresses the historic perception that because of the Congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow. Under the proposed fee structure, an applicant for adjustment of status will pay a single fee. If USCIS is unable to process the base application within the established processing goals, the applicant will not pay separate fees for interim benefits, no matter how long the case remains pending. For certain application types, most notably applications for adjustment of status to permanent residence (Form I–485), the most critical interim benefit is the fact that an applicant is allowed to remain in the United States while his or her application is pending. This spurs USCIS to process cases quickly and ensure that it promptly identifies those applicants who are risks to national security or public safety, resolves their cases, and initiates removal proceedings as appropriate. The restructuring proposed under this rule would create more appropriate pricing structures and eliminate perceived disincentives to process cases in a timely manner.

At the same time, USCIS recognizes that, in some cases, delays in processing applications alone will require issuance of interim benefits. Accordingly, USCIS has built into the cost model for all adjustment of status applications the cost of processing interim benefits for a percentage of applicants.

USCIS estimates that the current application fees paid by an applicant for adjustment of status with interim benefits over a multi-year time period are approximately $800. The proposed rule would increase the adjustment of status application (Form I–485) fee for an adult applicant to $905, but exempts

applicants who have paid that fee from any additional fee that otherwise might be payable to apply for advance parole or employment authorization. USCIS anticipates revising the Form I–485 accordingly, but this proposed rule would give USCIS flexibility to continue to use the Forms I–131 and I–765 for adjustment applicants. Either way, no additional fee would be charged for a Form I–485 applicant who has paid the base fee that now includes the cost of processing interim benefits.

Similarly, this rule proposes to eliminate from revenue projections separate fees from the two petitions currently required to be filed for an alien spouse abroad who will enter the United States in the K–3 nonimmigrant classification for certain spouses of United States citizens. *See* INA section 101(a)(15)(K)(ii), 8 U.S.C. 1101(a)(K)(ii); 8 CFR 214.1(a)(2). These two petitions are Form I–130, Petition for Alien Relative, and Form I–129F, Petition for Alien Fiancé(e). USCIS is working to consolidate the K–3 petitions so that separate fees will not be necessary.

The elimination of separate fees for interim benefits or the second K–3 petition affect more than adjustment of status applicants and family petitioners. The consolidation of these fees reduces the number of application types for which any fee is charged and thereby reallocates the amount of certain processing activity costs, administrative overhead and surcharge costs that must be spread across all other fee-paying application and petition types. All other fees will be increased.

6. Program Changes To Ensure Integrity of the Immigration System

Since the tragic events of September 11, 2001, a persistent issue has been that weaknesses in the integrity of the immigration system make the United States vulnerable to terrorism, crime, and the economic cost of an underground population. USCIS takes these concerns seriously and has aggressively addressed them with the creation of a new directorate for National Security and Records Verification (NSRV). This directorate is focused on preserving the integrity of the immigration system. One component of the new directorate is the Fraud Detection and National Security (FDNS) Division. FDNS fulfills its mission in a variety of ways that include conducting benefit fraud assessments, providing investigative support to Adjudication Officers, and implementing remedial processes to discourage fraud.

The current fee structure does not allow FDNS to address fraud more

broadly or to attend to USCIS' needs in national security cases. The proposed fee structure to support FDNS will fill this void. The proposed fee structure also enhances quality assurance, provides additional Adjudication Officer training, requires Adjudication Officers to attend removal proceedings when appropriate, tracks the delivery of secure documents, and enhances internal security and investigative operations. Section IV.E details these additional resource requirements.

7. USCIS' Commitment to Future Fee Reviews

USCIS is committed to update its fees through a similar analysis at least once every two years. In comparison to fee reviews over the last decade, which essentially made retrospective adjustments on a narrowly calculated fee review, future fee reviews will combine assumptions from recent experiences (which may allow for cost reductions from new efficiencies) and from prospective activity changes (such as those that may arise from additional security measures or performance changes).

*D. Programs and Services Currently Funded*

For FY 2007, the IEFA is anticipated to provide approximately 89% of USCIS' total funding. The major programs, activities and services funded by the IEFA are discussed below.

1. Adjudication Services

The Adjudication Services program is the primary program responsible for the processing of immigration benefit applications and petitions while ensuring the security of the immigration system. Through a network of 250 local offices, Application Support Centers, Service Centers, and Asylum Offices, the program funds the timely and quality processing of: (1) Family-based petitions—facilitating the process for close relatives to immigrate, gain permanent residence, work, etc.; (2) Employment-based petitions— facilitating the process for current and prospective employees to immigrate to or stay in the United States temporarily; (3) Asylum and Refugee processing— adjudicating asylum applications, conducting credible and reasonable fear screenings, and the processing of refugees; and (4) Naturalization— processing applications of those who wish to become United States citizens. The Adjudication Services program currently receives 94% of its total funding from the IEFA.

On average, USCIS annually: (1) Processes over six million applications and petitions, (2) processes close to 90,000 asylum applicants, (3) interviews approximately 70,000 refugee applicants, and (4) naturalizes approximately half a million new citizens. Adjudication Officers review applications and often conduct interviews of the applicants and petitioners. They have the dual responsibility of providing courteous service to the public while being alert to the possibility of security concerns, fraud, and misrepresentation. District Adjudications Officers are located in offices nationwide. Service Center Adjudications Officers are located only in the following Service Centers: St. Albans, VT; Lincoln, NE; Irving, TX; and Laguna Niguel, CA.

An Asylum Officer determines if an applicant for asylum qualifies for that status based on the requirements of the INA. These officers are specially trained in country conditions, interviewing techniques (including credibility determinations), and asylum law. Positions are located in eight Asylum Offices throughout the United States. The Asylum Officer Corps and new Refugee Officer Corps (which provides similar adjudicative services for refugee applications overseas) also leverage specialized resources, including professional interpreters, to deliver timely and accurate provision of legal protection to individuals who have been persecuted and displaced.

In coordination with other components of DHS and other Federal agencies, USCIS combats immigration benefit fraud through the FDNS office in the NSRV Directorate, as previously discussed. USCIS trains FDNS staff to analyze and identify fraud patterns and trends and document evidence of fraud for administrative action. USCIS will continue to implement fraud detection measures in Service Centers, field offices, and Refugee and Asylum programs, including training adjudications staff to proactively identify fraud/security profiles while considering an application. Apart from FDNS, the other major division within NSRV is the Office of Records Services (ORS), which establishes policies, procedures, and performance objectives for the USCIS Records Program. The Records Program manages over 160 million Alien-files and related records in support of the enforcement and benefits missions of the DHS. The ORS also manages the National Records Center and coordinates the USCIS Freedom of Information Act/Privacy Act (FOIA/PA) program.

2. Information and Customer Services

Through the Information and Customer Services Program, USCIS reduces the frequency of repeated, redundant applicant and petitioner contact with USCIS employees, thus improving USCIS efficiency. USCIS makes it easier for the public to get the information they need when they need it, through multiple channels of available assistance, including the USCIS Web site, toll-free call center (National Customer Service Call Center), and face-to-face appointments. On an annual basis, USCIS: (1) Handles over 14 million calls via the National Customer Service Call Centers, (2) receives 78 million "hits" on the USCIS Web site, and (3) serves approximately five million individuals through information counters at local offices. The Information and Customer Services program currently receives 52% of its total funding from the IEFA.

Each year millions of people apply for various types of benefits under the INA. The Immigration Information Officers (IIOs) provide information about immigration and nationality requirements; IIOs are not authorized to, and do not, provide legal advice to applicants and petitioners. IIOs assist with a wide variety of requests, including questions on how to complete required form types, and explain the administrative procedures and normal processing times for each application. IIOs provide a range of customer services, including certain case services and problem resolution assistance on applications and petitions. IIOs also process and make decisions on a limited array of applications and petitions. Positions are located throughout the country in Districts, Sub Offices, Asylum Offices, and Service Centers.

Through the National Customer Service Center, USCIS provides toll-free nationwide assistance to individuals calling from within the United States. Individuals can access live assistance from 8 a.m. until 6 p.m., Monday through Friday (local time; hours slightly different for those persons calling from outside the continental United States). They can also access recorded information (including information about the status of their specific case) 24 hours a day/7 days a week. Both live and recorded service are available in English and Spanish. Callers from outside the United States can access limited information through a separate toll number.

USCIS receives about 1.7 million direct information and customer service related contacts per month, or more than 20 million contacts per year.

Today, over 84% of all information and customer service interactions are self-service. The self-service options provide the public with new choices that are simpler and more effective to both the public and USCIS. They also save significant amounts of money compared to providing live assistance to all individuals.

In-person service continues, however, to be a critical component of the USCIS service model. To improve service levels, USCIS has shifted to offering most in-person service by appointment that is scheduled through USCIS' Web site. This has helped reduce long lines and wait times, and address public concerns and inquiries. USCIS also has developed and made available online a new series of focused fact sheets on available services to assist and communicate more clearly with the public.

3. Administration

Nine Headquarters offices provide administrative and mission support to Headquarters offices and USCIS field locations worldwide. The USCIS Administration program currently receives 100% of its total funding from the IEFA.

• The Office of Administration plans, develops, implements, and evaluates USCIS-wide policies and procedures for the operation of centrally managed, USCIS-wide support activities. It is responsible for programming, budgeting and oversight for the direct delivery of administrative support to USCIS in the areas of Acquisition, Procurement, Asset Management and Personal Property, Facilities and Real Property, and Logistics.

• The Office of Planning, Budget, and Finance is responsible for planning and budgeting integration and financial management activities.

• The Office of Chief Counsel consists of legal divisions advising and representing USCIS Operations both at Headquarters and in the field on behalf of the DHS General Counsel. Chief Counsel divisions include Adjudications Law, Refugee and Asylum Law, National Security, Commercial and Administrative Law, Ethics, Legislation, Field Offices, and Training, with each division responsible for reviewing, interpreting, and providing legal advice and litigation support to USCIS operational components.

• The Office of Citizenship promotes civic integration and instruction and training on citizenship responsibility for legal immigrants interested in becoming naturalized citizens of the United States, including development of educational materials and community outreach activities.

• The Office of Communications oversees and coordinates communication to internal and external stakeholders in order to empower employees with the tools needed to perform their jobs, to educate the public regarding USCIS benefits and services, and to facilitate consistent messaging for USCIS.

• The Office of Congressional Relations advises the Director on legislative matters and serves as the primary point of contact for members of Congress and congressional staffers.

• The Office of Policy and Strategy directs, prioritizes, and sets the agenda for USCIS-wide policy, strategy, and long-term planning activities, as well as research and analysis on immigration services issues.

• The Office of Security and Investigations (OSI) oversees secure communications and document storage, USCIS-wide physical and facility security programs, and security awareness training.

• The Office of Human Capital and Training manages human capital policy and operations and provides continuous professional training and career development to all USCIS employees through a variety of career, executive and managerial development programs.

**IV. The Fee Review of Immigration Benefit Applications/Petitions and Biometric Services**

The current immigration benefit application and petition fees are based on the FY 1998 Fee Review, adjusted for cost of living increases and other factors. The FY 1998 Fee Review model does not reflect today's accounting models, costs and processes have changed significantly since the FY 1998 Fee Review, and the current fees do not reflect today's costs and procedures. This proposed rule is based on a new cost model, and proposes enhanced service levels, more complete funding of existing services, and specific cost allocation methods.

*A. Methodology*

To develop this proposed rule, USCIS convened its Workload and Fee Projection Group. The Workload and Fee Projection Group is composed of subject matter experts throughout USCIS and statistical experts from the DHS Office of Immigration Statistics.

USCIS employed an Activity-Based Costing (ABC) methodology to determine the full cost of immigration and naturalization benefit applications and petitions, as well as biometric services, for which fees are charged.

This is an improved version of the same methodology used in the FY 1998 Fee Review that is the basis for the current fee structure. ABC is a business management tool that provides insight into the relationship between inputs (costs) and outputs (products and services) by quantifying how work is performed in an organization (activities).

The ABC methodology uses a two-stage approach to assigning costs. The first stage assigns costs to activities, and the second stage assigns activity costs to products. For USCIS, the products are decisions on the immigration and naturalization benefit applications and petitions and the biometric services for which fees are charged. To implement this two-stage approach, ABC requires four analytic steps:

• Identifying and defining the activities involved in processing immigration and naturalization benefit applications and petitions and biometric services;

• Examining budgetary records/execution plans and additional resource requirements to identify the resources required to process immigration and naturalization benefit applications and petitions and biometric services;

• Assigning these resources to the defined processing activities; and

• Assigning processing activity costs to defined immigration and naturalization benefit applications and petitions and biometric services for which a fee is charged.

USCIS used commercially available ABC software in computing the immigration benefit application/petition and biometric fees. This software application is designed to assign costs through activities to final products (applications/petitions and biometric services). The data entered into the software were tailored to USCIS specifications using the preexisting software structure. This new software is vastly improved over any models previously used by USCIS, particularly because it can readily accept the most up-to-date information, as well as "what-if" scenarios, on a continual and real time basis for fee review and cost management purposes.

*B. Assumptions*

As previously discussed, USCIS is assuming that it will no longer collect separate fee revenues from certain interim benefits or K–3 petitions.

In this proposed rule, USCIS is assuming no revenues from certain penalty fees. INA section 245(i), 8 U.S.C. 1255(i), permits certain aliens who otherwise would be ineligible for adjustment of status to lawful

permanent residence (primarily because of their unlawful presence) to obtain such adjustment upon payment of a $1,000 penalty in addition to the base application fee. Section 245(i) adjustment of status is available, however, only to beneficiaries of immigrant petitions or applications for labor certification filed on or before April 30, 2001. As a result of this sunset provision, USCIS has seen a steady decline in these revenues over the last several years ($66 million in FY 2001; $37 million in FY 2003; and $21 million in FY 2006) and projects that an insignificant amount of penalty fees will be collected by the time the proposed fee structure is in place given the finite and declining number of people affected by this legislation.

USCIS does not anticipate any significant new Temporary Protected Status (TPS) populations at this time, although because of the nature of TPS (including, for example, response to natural disaster) USCIS cannot make such predictions with certainty. Given the statutory requirement that TPS status be periodically reviewed and the reasonable possibility of the termination of TPS designations for long-standing, high volume countries, USCIS must build its budgets on the assumption that it cannot rely on fee revenue from such programs to fund on-going activities. INA section 244, 8 U.S.C. 1254a. For planning purposes and without intending to forecast any particular policy assessments, USCIS has assumed that the TPS Program for re-registrants of certain nationalities will not continue, which will result in a substantial decline of volumes for Form I–821 (Application for Temporary Protected Status) and associated Form I–765 (Application for Employment Authorization). This assumption eliminates a limited source of fee receipts, but also reduces a larger amount of costs distributed across all other application fees because the statutory fee ($50) does not recover the full cost of processing TPS applications.

Finally, USCIS assumes the elimination of revenues associated with the Form I–881, Nicaraguan Adjustment and Central American Relief Act—Suspension of Deportation or Application Special Rule (NACARA 203). *See* Pub. L. 105–100, sec. 203, 111 Stat. 2196 (Nov. 19, 1997), as amended by Pub. L. 105–139, 111 Stat. 2644 (Dec. 2, 1997). This program provided a benefit for a finite group of people, the vast majority of whom are Guatemalans and Salvadorans who entered the United States prior to 1991 and who had an asylum application pending by specified deadlines in 1995 and 1996.

Since enactment of NACARA, USCIS has adjudicated approximately 170,000 applications for relief under NACARA 203. USCIS projects that by the end of FY 2007, nearly all qualifying NACARA 203 applications will have been adjudicated, and that there will be virtually no filings in FY 2008 and 2009. USCIS projects a decline in the annual workload volume from approximately 22,509 applications in FY 2006, to fewer than 200 in FY 2007.

In FY 2001, the USCIS Asylum Division hired approximately 70 term employees to assist with the NACARA 203 workload. As the number of pending NACARA 203 applications and individuals still eligible to apply for this relief declined, the Asylum Division stopped back-filling term positions as they became vacant in order gradually to reduce the staffing level and budget commensurate with the decreasing workload. Thus, through attrition of the term employees, USCIS has been able to reach appropriate staffing levels for this workload. Cost adjustments associated with the workload were incorporated in the FY 2007 Enacted Budget.

USCIS also assumes no revenues from applications for T nonimmigrant status, or self-petitions under the Violence Against Women Act of 1994 (VAWA), Public Law 103–322, tit. IV, subtit. G, 108 Stat. 1796, 1902, 1953 (Sept. 13, 1994), as reauthorized and amended, as this proposed rule exempts applicants from paying the otherwise applicable fees for these benefits. T nonimmigrant status is available to aliens, and certain family members, who (in the case of principal aliens) are victims of severe forms of trafficking in persons, are physically present in the United States or a United States jurisdiction on account of the trafficking, have (if over the age of 18) complied with any reasonable requests for assistance to investigate or prosecute the trafficking, and would suffer extreme hardship involving unusual or severe harm if removed from the United States.

USCIS also assumes that the number of fee waiver requests will hold steady from FY 2006 levels. Although USCIS anticipates an increase in the number of fee waiver requests as a result of the proposed fee structure, this increase will be offset by the new fee waiver policy that limits fee waivers to certain situations as explained in section XI of this preamble. The number of fee exemption applications will increase over FY 2006 levels commensurate with new exemptions proposed in this rule (*e.g.*, certain initial applications for benefits for humanitarian reasons—VAWA or T Visa).

## C. Defining Processing Activities

In ABC, activities are the critical link to assigning costs to products (decisions on applications/petitions and biometric services for which the USCIS charges a fee). USCIS used the following activities:

• *Inform the Public*, involving receipt and response to inquires through telephone calls, written correspondence, or walk-in inquiries;

• *Capture Biometrics*, involving electronic capture of biometric (fingerprint, photograph, signature) information, and background checks performed by the FBI;

• *Intake*, involving mailroom operations, data capture and collection, file assembly, fee receipting, and file room operations;

• *Conduct Interagency Border Inspection System (IBIS) Checks*, involving comparison of information on applicants, petitioners, beneficiaries, derivatives and others against various Federal lookout systems;

• *Review Records*, involving acquisition and creation of relevant files, consolidation of files, connection of returned evidence with application or petition files, movement of files upon request, and management of file location and archives;

• *Make Determination*, involving actual adjudication of applications and petitions, requests for additional evidence, interviewing of applicants, consultation with supervisors or legal counsel and researching applicable laws and decisions on complex adjudications, and recordation of decision;

• *Fraud Detection and Prevention*, involving detection, combat, and deterrence of immigration and naturalization benefit fraud; and,

• *Issue Document*, involving production and distribution of secure documents that identify the holder's immigration status or employment authorization.

## D. Sources of Cost Information

The first step in implementing an ABC methodology is to identify the appropriate amount of FY 2008/2009 IEFA costs and assign these costs to the defined processing activities. USCIS began with the FY 2007 Enacted Budget (less non-recurring costs), adjusted for inflation for the FY 2008/2009 biennial period, and added resource requirements as the best available source of information for determining the full cost of immigration benefit applications/petitions and biometric services. The FY 2007 Enacted Budget ($1,760,000,000) best represents USCIS'

base resources since it is indicative of the costs incurred by USCIS today and adjusts the base for inflation from FY 2006 levels. Inflation is determined for this purpose by referring to Government-wide standards discussed below in section IV.E.2. The additional resource requirements are discussed below in section IV.E.3.

*E. Adjustments*

1. Non-Recurring Costs

USCIS first eliminated any spending items in the FY 2007 Enacted Budget that would not recur after FY 2007. Accordingly the base was reduced by $8.5 million associated with the temporary expansion of Application Support Centers for additional workload associated with a temporary planned program for the recall of green cards issued before 1989 and thus lacking expiration dates and up-to-date security features. After adjustment, the FY 2007 Enacted Budget has a base of $1,751,500,000.

2. Inflation

USCIS then adjusted the FY 2007 IEFA Budget ($1,751,500,000) enacted level for the FY 2008 and FY 2009 biennial period by pay (Federal employee payroll and benefits) and non-pay (contracts, utilities, rent, etc.) inflation factors used by OMB in implementing OMB Circular A–76 (Performance of Commercial Activities), found at *http://www.whitehouse.gov/omb/circulars/a076/a76_incl_tech_correction.pdf.*

The pay portion of the FY 2007 budget totals $727,600,000. The FY 2008/2009 blended pay inflation factor is 3.3%. This blended pay inflation factor is calculated using 2.2% for FY 2008 plus half of 2.2% (1.1%) for FY 2009. The pay inflation of $24,010,800 was then added to the FY 2007 base, yielding a FY 2008/2009 pay base of $751,610,800.

The non-pay portion of the President's FY 2007 Budget was $1,023,900,000. The blended non-pay inflation factor is 2.85%. The blended non-pay inflation factor is calculated using 1.9% for FY 2008 plus half of 1.9% (0.95%) for FY 2009. The non-pay inflation of $29,181,150 was then added to the FY 2007 base, yielding a FY 2008/2009 non-pay base of $1,053,081,150.

These pay and non-pay inflation projections of $53.192 million yield a FY 2008/2009 base of $1,804,691,950.

3. Additional Resource Requirements

USCIS also identified $524.3 million in additional resource requirements to fulfill legal requirements and policy

decisions. These additional resource requirements involve costs above and beyond what was presented in the FY 2007 Enacted Budget, plus inflation for the FY 2008/2009 biennial period, that are necessary for USCIS to meet its mission responsibilities. "Additional Resource Requirements" represent enhancements that are not currently funded in the FY 2007 Enacted Budget. These include: (1) Service Enhancements, (2) Security and Integrity Enhancements, (3) Humanitarian Program Enhancements, and (4) Infrastructure Enhancements.

a. Service Enhancements.

USCIS is enhancing service to provide efficient and customer-oriented immigration and naturalization benefit and information services. The following enhancements will enable USCIS to achieve and maintain timely processing of immigration and naturalization benefits; provide information resources and services to appropriate individuals and entities; foster a customer-centered approach to service delivery; and develop seamless, information technology (IT)—supported processes that efficiently support immigration and naturalization benefits adjudication and information sharing:

*Enhance adjudications and support staff to maintain application and petition processing times, officer training, additional capacity for unanticipated surges in workload, and process Notices to Appear.* Additional funding is necessary to support a staffing model designed to align resources with the need to prevent future backlogs and provide for an efficient and effective workforce balance. This includes Adjudication Officers and support staff (Supervisors, Clerks, Immigration Information Officers, Records personnel, Administration personnel, and Quality Assurance Analysts). Current funding and the staffing model it supports are not sufficient to maintain prescribed processing time requirements. USCIS' staffing model incorporates additional requirements which include: (1) Additional time required of Adjudication Officers to attend removal proceedings when appropriate; (2) additional Adjudication Officer training to provide a 5% increase in USCIS' investment in employee training in order to maintain a more appropriate balance between the commitment to production and an ongoing investment in things, such as training, designed to improve qualitative performance; and (3) providing USCIS with a small surplus production capacity that gives USCIS flexibility to adapt to temporary increases in filings without those

increases immediately affecting service levels to all applicants. USCIS' staffing model also provides capacity to improve processing times and service delivery over time rather than, at best, perpetuating current levels. This additional resource requirement addresses the need to reduce lengthy and costly waiting periods for determination of benefits and the need for relevant training and staffing to handle USCIS' substantial and complex workloads. This enhancement requires 1,004 staff and $123.8 million.

*Process Freedom of Information Act requests.* The Freedom of Information Act (FOIA), 5 U.S.C. 552, provides for the public disclosure of governmental records unless an exemption applies. USCIS' FOIA program has been historically understaffed, resulting in a growing backlog that is currently 82,000 cases. USCIS determined that approximately 82 positions (74 contractors and eight government staff) would be needed in order to reduce the backlog by 50% the first year and the remaining 50% during the second year. Also, USCIS determined that a total of 146 staff is necessary to keep pace with the average 120,000 cases per year workload. To reach the required level of staff to handle this continuing normal workload, an additional ten government staff are permanently needed. To meet the requirements of the FOIA to process 120,000 cases annually and eliminate existing while preventing new backlogs, this enhancement requires 18 staff and $8.8 million.

*Provide Change of Address (AR–11) data entry services.* Aliens, who enter the United States and are required to be registered, must notify DHS of any change of address within ten days, using Form AR–11. INA section 265, 8 U.S.C. 1305; 8 CFR 265.1. USCIS estimates that the costs to support AR–11 data entry operations will total $1 million ($83,300 per month). Over 480,000 AR–11 forms will be processed in FY 2008 (268,000 nonimmigrant and 212,000 immigrant). Additionally, system operations and maintenance costs are estimated to cost approximately $200,000 per year. This enhancement requires $1.2 million.

*Print and distribute guidebooks for new naturalized citizens.* USCIS currently prints and distributes a small quantity of two educational resources: A civics study guide, designed for naturalization applicants, that helps immigrants learn United States history and civics in preparation for the naturalization test; and the "Citizen's Almanac," a document to be given to each new citizen at his or her naturalization ceremony, which presents America's most cherished

AR_001850

founding documents, Presidential quotes on citizenship, and other civics and history content. This enhancement requires approximately $900,000 and would allow USCIS to produce a larger quantity of these documents.

*Enhance mail and file room support for the Administrative Appeals Office.* The Administrative Appeals Office (AAO) produces appellate decisions that provide fair and legally supportable resolutions of individual applications and petitions for immigration benefits. This enhancement provides needed resources for the AAO's requirements for clerical support for the office's mail and file room operations. In addition to mail and file room support, contractors answer the telephone, obtain electronic records, update information in electronic databases, provide periodic reporting of receipts and completions, and conduct workload analysis. This enhancement requires $129,000.

b. Security and Integrity Enhancements.

Consistent with the President's and the Secretary's priorities, USCIS is enhancing the security and integrity of the immigration and naturalization system. The following enhancements will enable USCIS to ensure that benefits are granted only to eligible applicants and petitioners; deter, detect, and pursue immigration and naturalization benefits fraud; and identify and communicate immigration and naturalization-related information to partners in support of DHS strategic goals:

*Establish a second, full-service card production facility and fully fund card production workload.* The Federal Information Security Management Act (FISMA), Pub. L. 107–347, 116 Stat. 2899 (Dec. 17, 2002) (40 U.S.C. 11331; 44 U.S.C. 101 note, 3541–3549), and implementing directives require compliance with National Institute of Standards and Technology principles for critical systems for contingency planning. To meet these standards, USCIS must establish a second full-service card production site. The second facility will support day-to-day production as well as be available in the event of catastrophic failure. Finally, additional funding is included to fully fund card production requirements based on workload projections. To meet these requirements, USCIS is proposing to add four staff and $32.4 million.

*Enhance fraud prevention and detection efforts.* To meet its mandated responsibilities of enhancing fraud prevention and detection efforts, USCIS created the FDNS to implement, direct, and oversee anti-fraud and detection operations throughout USCIS. By focusing efforts on such initiatives as Benefit Fraud Assessments, FDNS is better able to acquire the information needed to determine the type, causes, and amount of fraud that exist, so as to focus efforts accordingly. FDNS has developed and implemented a joint anti-fraud strategy with Immigration and Customs Enforcement (ICE) for the referral of all suspected fraud cases. Due to the volume of referrals, only those cases meeting the ICE threshold (large conspiracies, multi-party, etc.) are accepted for criminal investigation. Since the majority of referrals do not meet the threshold, they are returned to FDNS for initiation of an administrative inquiry/investigation. Additionally, FDNS identifies systemic vulnerabilities and other weaknesses that could compromise the integrity of the legal immigration system by reviewing existing regulations, policies and procedures and offering corrective remedies where deficiencies exist. This enhancement requires 170 staff and $31.3 million.

*Enhance the delivery of secure documents.* USCIS currently delivers its secure documents (Permanent Resident Cards, Employment Authorization Documents and travel documents) through the United States Postal Service (USPS) first class mail. There is no process in place that enables USCIS to track their delivery and ensure that these documents are delivered to the proper recipient. Some beneficiaries claim not to have received their documents in the mail to avoid paying document replacement fees. USCIS and the USPS have partnered to develop and implement a process wherein the documents would be delivered via USPS priority mail (two to three day delivery) with delivery confirmation. The additional funding will enable USCIS to track delivery of each document and to respond to queries from applicants regarding the status of document delivery. This enhancement requires $31.6 million.

*Pay increased costs due to the FBI for background checks.* USCIS pays the FBI for fingerprint and name checks performed on certain immigration and naturalization benefit applications. USCIS needs the additional funds to align with the projected filing increases for Forms N–400 and I–90, less the projected decrease in Form I–485. USCIS will also be expanding the biometric service to applications for travel documents and petitions to remove conditions of residence (Forms I–131 and I–751). Finally, USCIS is providing additional funds to the FBI for name check costs to enhance services. This enhancement requires $12.4 million.

*Enhance national security systems and processes.* Funding is necessary to continue the enhancement of the FDNS Data System and other supporting systems. The development effort will enable FDNS to creatively leverage new technology to enhance the ability to centrally direct and oversee the resolution of background check hits pertaining to national security, egregious public safety, and fraud investigations. These data systems will be used by all FDNS employees and will assist in the adjudication of all cases with national security and fraud implications. This enhancement is also needed to provide for major enhancements and improvements to USCIS'/FDNS national security background check process (*i.e.* software, systems development and change management and training efforts). All systems efforts will be coordinated with the USCIS Transformation Office to ensure system integration. Additionally, these systems will facilitate FDNS in its data sharing efforts with law enforcement agencies and other authorized government offices. This enhancement requires $4 million.

*Enhance Internal Security and Investigative Operations.* Internal Security and Investigative Operations includes the conduct of investigations of allegations of misconduct for approximately 15,000 USCIS federal and contract employees located throughout the United States as well as many located overseas. Additionally, this program is charged with: preparation and delivery of relevant training to all USCIS employees; specific training for and oversight of selected collateral duty "management inquiry representatives" (or fact-finders); the conduct of and follow-up to program and office inspections geared toward the integrity of personnel, products and processes; coordination of efforts with companion investigative authorities; material contribution to the USCIS counter-intelligence program; and preparation of general and specific reports to USCIS executives. There are presently only a limited number of investigators for these activities. To keep pace with demand, to ensure professional and timely investigative activity and result, and to ensure proportional capability growth, USCIS requires an additional 60 field-based and five headquarters-based investigative staff resulting in a total of 78 investigative personnel. This enhancement requires 65 staff and $15 million.

*Establish an Administrative Site Inspection Program.* Funds are necessary to support an administrative site inspection program aimed at deterring fraud when USCIS has determined a systematic vulnerability. This initiative will enable the USCIS to secure contract support to conduct preliminary site inspections that will serve as an enhancement to the existing FDNS personnel's abilities to conduct administrative investigations and enable the FDNS staff officers to focus on high risk cases. Inspections have been identified as an invaluable tool in detecting fraud. This and other USCIS anti-fraud initiatives will help restore integrity to this Nation's legal immigration system. This enhancement requires $8 million.

*Enhance Protective Security Operations.* USCIS has or operates within approximately 281 facilities, 250 of which are located within the United States and 31 located overseas. Approximately 15,000 federal and contract employees work within and are associated with these facilities. There are presently only a limited number of Field Security Officers available to provide the full range of security services to protect USCIS operations, products, personnel and facilities. Current shortfalls in this critical activity increase the risks aimed at existing USCIS personnel, facilities, products and mission success. This enhancement requires 36 staff and $8.3 million.

*Enhance existing card production program.* The USCIS document production facility utilizes contractor support for its document production activities. The prime contractor on site is responsible for securing maintenance contracts on the equipment to ensure that all equipment runs optimally, without interruptions. Many companies will not prorate their maintenance contracts and want to have them funded on an annual basis, which becomes problematic when USCIS does not issue a full year of funding to its production contractor. Current funding mechanisms do not allow for contractor support during the full period of performance reflected in the contract, and result in inefficient use of both program office contracting officer technical representative time, and contract officer and administration time, as duplicative work needs to be performed each time additional funds are placed on the contract. The additional base requirement will enable USCIS to fund the production support contract for the full 12-month period of performance. By doing this, USCIS can ensure that secure document production can continue without disruptions associated with

continuing resolutions and interim funding allocations that may develop at the beginning of new fiscal years. This enhancement requires $4.4 million.

*Enhance Emergency Preparedness Operations; Establish Crisis Management and Information Security Operations; and Enhance Technology Security Operations.* USCIS needs additional funds to prepare to continue essential operations and to recover from an event or incident and return to full operations. Funds are required to conduct Continuity of Operations (COOP) exercises and successful participation in and contribution to government COOP exercises. Continued refinement of training and presentation of that training to various audiences and at various locations is critical. Additional funding is also necessary to operate a certified full-time, real-time mission coordination and support capability for national security information control and communications throughout USCIS and with DHS and other agencies. This includes sustained operation and security of the Crisis Communications and Coordination Center on a real-time 24/7 basis to monitor USCIS operations throughout the world and to permit secure communications throughout the Federal government on behalf of USCIS executive leadership. Finally, additional funding is necessary, in conjunction with the USCIS Office of Information Technology, to review all USCIS IT efforts with specific focus on the security aspects of those efforts and systems, including expert forensic IT analyses related to internal investigations. Internal use of the data, and use of the data by external authorities, especially when required to address emergency incident situations, require an ongoing and certain commitment to the security features of its IT infrastructure and the data therein. This enhancement requires 14 staff and $3.0 million.

*Enhance Personnel Security Operations.* Additional funding is necessary to provide proper and timely security clearances for USCIS and contract employees; review of and contributions to USCIS acquisitions for goods and services; and coordination with other agencies and authorities to assure maintenance of current, accurate and complete personnel security information. This enhancement requires ten staff and $1.6 million.

c. Humanitarian Program Enhancements.

USCIS supports the United States' humanitarian commitments. This support includes fully funding the Cuban Haitian Entrant Program (CHEP).

CHEP assists the resettlement of Cubans and Haitians who are irregular arrivals or paroled into the United States, including those who are paroled directly from Cuba under the Cuban Special Migration Program. In FY 2006, two non-government grant recipients, Church World Service and the United States Conference of Catholic Bishops, provided resettlement services. The actual number of migrants served each year is unpredictable, in part because many arrive irregularly. This enhancement requires $14 million.

d. Infrastructure Enhancements.

USCIS is strengthening the infrastructure necessary to achieve USCIS' mission. The following enhancements will enable USCIS to strengthen key management processes, systems, and administrative support activities, including information technology infrastructure; enhance the organization's ability to support the mission in an environment of fluctuating workloads and new external mandates; and manage financial resources strategically, including revenue, expenditures, and capital investments:

*Upgrade and maintain the USCIS information technology environment.* Additional funds are necessary to upgrade and maintain the USCIS information technology environment, which includes several programs in support of a national security-based immigration process that is more effective and customer focused. One of the programs will provide necessary technology upgrades to the current USCIS enterprise legacy IT systems so that these comply with OMB, GAO, DHS, and other Federal regulations, law, and guidelines. Decommissioning of the legacy environment systems is a lengthy process and, in the meantime, these systems are required to be upgraded to meet minimum standards in the areas of IT security and privacy.

Another program focuses on upgrading and maintaining the USCIS IT operating environment so that it can sustain continued operations, reduce IT security risks and information sharing limitations through hardware and software standardization, and maintain USCIS' ability to process cases and support Federal enforcement organizations. By having a more reliable IT environment, USCIS staff can better support applicants and petitioners.

The third program provides USCIS with the capability to implement quick turnaround IT solutions as well as feature/functional enhancements to the enterprise legacy IT environment to address time critical needs and legislative changes that occur on a

frequent and on-going basis. Funds are also necessary for other activities to provide additional trained and experienced IT Government staff, governance capabilities, IT security, continuity of operations planning and disaster recovery, and other IT oversight capabilities. This enhancement requires 88 staff and $124.3 million.

*Rent and lease acquisition resources.* Rental payments to the General Services Administration for USCIS facilities are currently budgeted at $153 million, but are projected to increase to $168 million. Thus, additional resources are required to fund projected FY 2008/FY 2009 payments. In addition, the Lease Acquisition Program (LAP) is the USCIS' Real Property Capital Assets Investment Plan. This program will improve workplaces to better meet USCIS mission and goals and better utilize real property assets. Current USCIS real property inventory includes 188 facility leases requiring sustainment from year to year. Most leases have a 10-year term and must be either renewed or replaced at the end of the term. Recent experience shows that 11 facility projects are required each year, either as a replacement for a non-renewable lease or for a renewal in the same facility but with additional space. USCIS currently has 37 leases that have already or will expire by FY 2008. The LAP currently is funded for $16.8 million based on the lease expiration schedule; the lease funding requirement is $34.9 million. The additional funding allows USCIS to increase its investment in facilities, so that its local offices can meet appropriate standards, and applicants/petitioners and others coming to those offices can be reasonably comfortable. This enhancement requires $33.1 million.

*Enhance the training program for all USCIS employees to foster organizational individual achievement by promoting continuous learning.* The additional funds will enable USCIS to expand both mission support and professional development modules available to all USCIS employees through online technology. The USCIS Learning Management System provides mandatory training modules, mission support modules, and more than 2000 commercial, Web-based, information technology, business, and leadership courses for personal and professional development. In addition, USCIS requires resources to plan and develop a comprehensive and continuing orientation plan for all USCIS employees. This program will serve as the primary vehicle for introductory, foundational and continuous information about DHS and USCIS

leadership, mission, core values, vision, organizational structure and policies. It will also provide functional information about USCIS' business processes and practices, standard operating procedures and the cultural environment of a high-performance organization that is an employer of choice. This program will serve as a cornerstone for promoting employee career development, leadership development, and succession management. The project will also include the development of web-based orientation modules.

Finally, funds will be used to support an Enterprise Development Program that will provide USCIS government employees with an Individual Learning Account (ILA), which includes annual resources and time set aside exclusively for training. This program is seen as the primary means for employees to increase their knowledge, skill and capacity to perform their work and build careers consistent with USCIS goals for performance excellence. Such a program is designed to enhance critically needed training while taking advantage of USCIS transformational initiatives including the availability of new technologies and processes. This enhancement requires 25 staff and $41.2 million.

*Enhance resources for the Office of Chief Counsel.* Additional resources will be focused on filling the legal needs of USCIS' field offices, both district and regional, where most areas do not currently have any attorney on site. The provision of additional attorneys will allow USCIS to ensure that there is at least one attorney available in each district. All types of litigation continue to increase, including mandamus actions when USCIS is perceived to not respond to applications in a timely manner, employment, acquisition protests, and claims. Furthermore, there is a critical need to advise adjudicators and investigators on issues affecting national security concerns and citizenship qualifications. Attorney responsibilities include providing on-site legal advice on immigration benefits-related matters, adjudications involving issues of national security, visa appeal briefs, reviewing Notices to Appear, and providing litigation support to the Department of Justice's litigating divisions and United States Attorneys' Offices. Additional attorneys will also provide training to USCIS personnel on issues involving immigration related adjudications, inadmissibility and deportability. This enhancement requires 30 staff and $7.4 million.

*Transfer records to the National Archives and Records Administration.*

The National Archives and Records Administration (NARA) has determined, pursuant to 44 U.S.C. 2905, that immigration records should become permanent records of the United States. Therefore, all immigration records that become eligible for retirement based upon the year of birth will be turned over in five-year "collections." The first collection is to include records relating to persons born in 1907 or earlier. All records transferred to NARA must be inventoried. Due to the age of records and data integrity, the records must be audited and systems must be updated before the transfer. Therefore, $3.4 million is needed annually to audit the immigration records in preparation for the transfer of ownership of over 25 million records to the NARA to become permanent records. USCIS will begin transfer of all immigration records with 1907 year of birth and earlier beginning in 2008. This initiative will span a period of ten years. Future records will be transferred to NARA as they become eligible. This mandatory cost totals $3.4 million.

*Fully fund the Human Resources and Occupational Safety and Health Service Level Agreements/Programs.* Based on workload trends over the past three years, USCIS requires an additional $3 million that will allow the service provider, the Bureau of Customs and Border Protection (CBP), to provide additional capacity to handle human resources and occupational safety and health requirements. In addition, an additional $150,000 (fully-burdened costs) will allow USCIS to meet the requirement to provide every supervisor with occupational safety and health training. This enhancement requires $3.2 million.

*Conduct policy evaluation and research.* The Homeland Security Act of 2002 (HSA), Public Law 107–296, sec. 451, 116 Stat. 2135, 2195 (Nov. 25, 2002), requires that USCIS conduct policy research to develop sound information to inform and guide immigration program and policy development. In addition, the Government Performance Results Act of 1993 (GPRA), Pub. L. 103–62, 107 Stat. 285 (Aug. 3, 2003) (codified in various sections of titles 5 and 31 U.S.C.), requires agencies to evaluate pilot and experimental programs that are designed to improve mission delivery, including efficiency, national security and customer service, before implementing such programs on a large scale. USCIS requires funding to conduct targeted research and evaluation to develop and assess policy options affecting national immigration programs and policies and to assess

USCIS pilot programs. The mandated research and evaluation efforts will ensure prudent use of USCIS resources, enhanced information to inform policy options and impact assessment, and improved performance consistent with the stated GPRA and HSA requirements. This enhancement requires $3.1 million.

*Enhance internal controls, build a data warehouse for performance information, enhance budget staff, conduct competitive sourcing reviews, and provide additional financial management resources to evaluate and analyze service level agreements under the auspices of the Office of Chief Financial Officer.* In an effort to strengthen USCIS' planning and financial management functions, during FY 2006 USCIS created an Office of the Chief Financial Officer (CFO). The strengthened CFO function within USCIS ensures that reasonable internal controls exist within USCIS to safeguard assets from waste, fraud and abuse. In order to execute these duties, additional resources are necessary to review organizational program offices. The reviews require highly skilled personnel to assess internal USCIS components. The assessments identify vulnerabilities in program regulations, standard operating procedures, and work processes. This element of review is imperative as self-assessment is key to eliminating internal fraud, waste and abuse, as well as identifying

inefficiencies and recommending corrective actions. In addition, funds sought will be used for additional staff to maintain the financial health and stability of the USCIS.

Finally, DHS mandated that USCIS, ICE and CBP establish service level agreements covering several core administrative support areas. While these service level agreements have been established, USCIS needs to strengthen oversight of the services performed and received. Several of the key factors that justify service level agreements, such as cost efficiencies, consistency in operational processing, and effective cross-agency communication require better monitoring. Funds will also be used for staff to evaluate and analyze service level agreements to gauge the benefits. Currently, performance evaluations/ surveys are not initiated to ensure accountability and effectiveness or efficiency. This enhancement requires 16 staff and $3.1 million.

*Establish a National Recruitment Program.* Since its inception, USCIS has not had the resources to establish a National Recruitment Program (NRP). According to the Office of Personnel Management, the recruitment process for federal employers holds a number of challenges, one of which is the ability to replace an aging workforce. Over the next five years, over half of USCIS' workforce will be eligible for retirement.

USCIS must be positioned to compete for talent in light of the retirement wave. The primary mission of the NRP will be to help management attract the right talent in order to ensure the employment of a high-quality and diverse workforce making USCIS an employer of choice. This enhancement requires three staff and $3.0 million.

*Enhance procurement operations.* The current procurement workload requires additional contract specialists. Currently, USCIS has only ten warranted contract specialists averaging 171 actions annually. USCIS procurement staff obligated approximately $605 million in new contractual actions in FY 2005, in addition to administering $4 billion in ongoing contracts. Also, the USCIS Office of Contracting recently assumed responsibility for the USCIS portion of several large contracts formerly administered by ICE. Continued understaffing poses significant internal control issues and increases the risk that limited contract dollars will not be used as effectively as possible. This request will double the size of USCIS' Office of Procurement. This enhancement requires ten staff and $1.6 million.

### 4. Summary

Table 4 summarizes the calculation of the FY 2008 / 2009 costs at the $2.329 billion (rounded to the nearest million).

#### TABLE 4.—FY 2008/2009 IEFA COSTS

| | |
|---|---|
| FY 2007 IEFA Budget | $1,760,000 |
| Less: Non-Recurring Costs | (8,500) |
| FY 2007 Adjusted IEFA Budget | 1,751,500 |
| Plus: Inflation | 53,192 |
| Plus: Additional Resource Requirements | 524,317 |
| Total | 2,329,000 |

*F. Determining Application and Petition Surcharge Costs*

Asylum/Refugee and fee/exempt costs are referred to as "surcharges" since they are not directly related to the processing activity costs of a particular immigration benefit. These costs must be ascertained and then applied to all fee-paying applications.

1. Asylum and Refugee Costs

Congress has authorized USCIS to set its immigration benefit application and petition fees at a level that recovers sufficient revenue to provide asylum and refugee services. INA section 286(m), 8 U.S.C. 1356(m). USCIS determined the asylum and refugee surcharge costs to be $191 million or 8% (including $14 million for the

Cuban Haitian Entrant Program as identified in the "Additional Resource Requirements" section in part IV.E) of the FY 2008/2009 IEFA Costs.

2. Fee Waiver/Exemption Costs

Congress has authorized USCIS to set its immigration benefit application and petition fees at a level that recovers sufficient revenue to provide services to other immigrants at no charge. INA section 286(m), 8 U.S.C. 1356(m). Eligible applicants and petitioners are granted fee waivers if they can establish that they are unable to pay the fee. In addition, asylum and refugee applicants are exempt from paying the fee for certain immigration benefit applications and petitions. This amount also includes fees received from applicants

residing in the Virgin Islands of the United States and in Guam, since these fees are paid over to the treasuries of the Virgin Islands and Guam per section 286(m) of the INA, 8 U.S.C. 1356(m). USCIS determined the full costs of fee waivers and exemptions by subtracting the workload volume from the fee-paying volume of each application/ petition, and multiplying that amount by the proposed fee. USCIS determined the fee waiver/exempt costs to be $150 million or 6% of the FY 2008/2009 IEFA Costs.

*G. FY 2008/2009 Processing Activity Costs*

The amount of immigration and naturalization benefit application and petition and biometric costs that were

**Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules    **4903**

assigned to processing activities was determined by adjusting the FY 2008/2009 IEFA costs by the costs attributable

to the asylum/refugee and fee waiver/ exemption services.

Table 5 summarizes the total of $1.988 billion assigned to processing activities (dollars in thousands):

TABLE 5.—FY 2008/2009 PROCESSING ACTIVITY COSTS

| | |
|---|---:|
| FY 2008/2009 IEFA Costs | $2,329,000 |
| Less: Asylum and Refugee Services | (191,000) |
| Less: Fee Waiver and Exempt Services | (150,000) |
| Total | 1,988,000 |

## V. Volumes

USCIS used two types of volume data in the fee review. The first is workload volume (measured in terms of the number of incoming applications and petitions) that was used as one of the main cost drivers for assigning processing activity costs to immigration and naturalization benefit applications and petitions (explained further in section VII.B). The other is fee-paying volume data that was used as the denominator in the equation to calculate the immigration and naturalization benefit application and petition and biometric service unit costs.

### A. Biometric Services

Projected volume decreases from the FY 2006 levels include a projected decline of 304,086 in associated biometric services for TPS. As mentioned previously, USCIS will not assume that the TPS Program for re-registrants of certain nationalities will continue. USCIS also projects a workload volume decline of 22,509 associated with the conclusion of NACARA filings. In addition, USCIS projects a decrease of 119,075 in corresponding biometric service volume given the decrease in Form I–90 (130,124), less the increases in Form N–400 (4,074) and Form I–485 (6,975). This issue is explained in the next section. These decreases are offset by an increase in biometric services of 282,000 since USCIS will be expanding biometric services to the Form I–131 (Refugee Travel Document, Reentry Permit only) and Form I–751 (Petition to Remove the Conditions on Residence) in FY 2007. This was not projected in the FY 2007 IEFA budget. The overall projected decrease in biometric services from FY 2006 levels is 163,670. Given a workload volume of 3,318,000 in FY 2006, the projected FY 2008/2009 workload volume is 3,154,330. Also, given the fee-paying volume of 2,359,482 in FY 2006, the projected FY 2008/2009 fee-paying volume is 2,195,812.

### B. Immigration Benefit Applications and Petitions

As previously stated, this rule proposes to eliminate USCIS' operational dependency on certain interim benefit fees. Interim benefits are associated with the Form I–765, Application for Employment Authorization, and Form I–131, Application for Travel Document (Advance Parole only), that are issued to individuals on request while their applications for adjustment of status to permanent residence (Form I–485, Application to Register Permanent Status or Adjust Status) are pending. USCIS' analysis of interim benefits associated with a pending Form I–485 identified a total fee-paying volume decrease of 517,000 applications (317,000 Form I–765 and 200,000 Form I–131). This proposed rule eliminates separate fees for interim benefits for applicants for adjustment of status to permanent residence.

As previously mentioned, this proposed rule eliminates K–3 (certain spouses of United States citizens) petition fees associated with Form I–129F. USCIS' analysis of K–3 petitions identifies a volume decrease of 20,997 in the total number of fee-paid Form I–129F as a result of this change.

USCIS also will not assume that TPS for re-registrants of certain nationalities will continue, resulting in an assumed decline of volumes for Form I–821 (Application for Temporary Protected Status) and Form I–765. As such, USCIS projects a decrease in volume of 304,086 for each of these benefits, with the fiscal effect adjusted by the fact that there is no fee charged for the Form I–821 for re-registrants.

USCIS projects that there will be no filings for Form I–881, Nicaraguan Adjustment and Central American Relief Act—Suspension of Deportation or Application Special Rule (NACARA 203) in FY 2008 and 2009, for a workload volume decline of 22,509 (from 22,509 in FY 2006 to zero). The fee-paying volume decline is 22,487.

Projected volume increases are the product of projections from the USCIS Workload and Fee Projection Group—

similar to the FY 1998 Fee Review. USCIS leveraged a time series model based on a regression analysis over the last 15 years, with the most recent data trends given the greatest weight. USCIS then adjusted this data based on known or projected program, policy, or other factors that would impact the analysis. The Workload and Fee Projection Group mainly focused on the applications and petitions that comprise the majority of the workload. For the remainder of the workload, USCIS used FY 2006 actual volumes for the FY 2008/2009 biennial period. The Workload and Fee Projection Group did not foresee a reason to change these figures from FY 2006 levels since this was a fairly typical year.

The Workload and Fee Projection Group projected an overall decrease of 391,824 in immigration benefit application and petition volumes over FY 2006 levels due to projected decreases in Form I–129 (17,955), Form I–130 (3,189), Form I–131 (32,880), Form I–140 (5,158), Form I–539 (13,531), Form I–687 (workload of 37,778; fee-paying of 36,756), Form I–765 (162,583), Form I–90 (130,124), less increases projected in the Form I–485 (6,975), Form N–400 (4,074), and other form types (325).

Finally, USCIS is proposing to exempt applicants from paying a fee from certain initial applications for benefits for humanitarian reasons. This includes all applicants filing Form I–914 (124 fee-paying applications), Application for T Nonimmigrant Status, and Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, who seek immigrant classification under VAWA (8,813 fee-paying applications). These applications have in common the fact that they are filed by victims of crime who are often in an extremely vulnerable position. Many of these applicants are already in a position to qualify for an individual fee waiver, and waiving fees more generally for these relatively low-volume applications will save the adjudication time necessary to consider fee waivers individually, and will serve the public interest without undue cost to other applicants as a

result. The costs associated with these exemptions increase the surcharge for fee exemptions, and are added to all applications in accordance with the methodology identified in section VIII.

In sum, the overall projected workload decrease in immigration benefit applications and petitions from FY 2006 levels is 414,317. Given a total workload volume of 5,991,362 in FY 2006, the projected FY 2008/2009 total workload volume is 5,577,045. The overall fee-paying decrease is 960,204. Given the total fee-paying volume of

5,702,571 in FY 2006, the projected FY 2008/2009 total fee-paying volume is 4,742,367 (includes additional fee exemptions for humanitarian reasons outlined above).

USCIS' projections show a decline in the total volume of applications. However, staffing requirements to handle this work increase relative to current levels because the current staffing level is based on what USCIS can afford, not what is required to meet acceptable performance standards. That situation contributed to large backlogs

in the past. As stated previously, USCIS was only able to catch up temporarily through the infusion of a large temporary subsidy of appropriated dollars that allowed USCIS to temporarily acquire sufficient capacity to handle the work.

Table 6 summarizes the FY 2006 actual workload volumes, the projected FY 2008/2009 biennial workload volumes, and the difference by application/petition.

TABLE 6.—WORKLOAD VOLUMES BY APPLICATION/PETITION

| Form No. | FY 2006 actual workload volume | FY 2008/2009 projected workload volume | Difference |
|---|---|---|---|
| I–90 | 682,149 | 552,025 | (130,124) |
| I–102 | 24,139 | 24,035 | (104) |
| I–129 | 417,955 | 400,000 | (17,955) |
| I–129F | 66,177 | 66,177 | |
| I–130 | 747,012 | 743,823 | (3,189) |
| I–131 | 371,880 | 339,000 | (32,880) |
| I–140 | 140,158 | 135,000 | (5,158) |
| Waiver Applications | 45,459 | 45,459 | |
| Form I–290B/Motions | 47,645 | 47,645 | |
| I–360 | 16,086 | 16,000 | (86) |
| I–485 | 606,425 | 613,400 | 6,975 |
| I–526 | 600 | 600 | |
| I–539 | 233,531 | 220,000 | (13,531) |
| I–600/600A | 29,500 | 29,601 | 101 |
| I–687 | 38,278 | 500 | (37,778) |
| I–690 | 3,293 | 3,293 | |
| I–694 | 3,696 | 3,696 | |
| I–695 | 29 | 56 | 27 |
| I–698 | 831 | 494 | (337) |
| I–751 | 143,360 | 143,000 | (360) |
| I–765 | 1,462,583 | 1,300,000 | (162,583) |
| I–817 | 5,762 | 5,762 | |
| I–824 | 40,105 | 40,785 | 680 |
| I–829 | 88 | 88 | |
| I–881 | 22,509 | | (22,509) |
| I–905 | 2 | 10 | 8 |
| I–914 | 403 | 400 | (3) |
| N–300 | 91 | 100 | 9 |
| N–336 | 13,692 | 14,000 | 308 |
| N–400 | 730,642 | 734,716 | 4,074 |
| N–470 | 669 | 669 | |
| N–565 | 31,902 | 32,000 | 98 |
| N–600/600K | 64,711 | 64,711 | |
| Total | 5,991,362 | 5,577,045 | (414,317) |

To calculate unit costs, USCIS identified the number of fee-paying volumes for each application/petition

and biometric fee by dividing the actual fee revenues received in FY 2006 by the FY 2006 fee. USCIS then adjusted this

number to reflect the filing trends in FY 2007, which is reflected in Table 7.

TABLE 7.—FEE-PAYING VOLUMES BY APPLICATION/PETITION

| Form No. | FY 2006 actual fee-paying volume | Adjustment | FY 2008/2009 projected fee-paying volume |
|---|---|---|---|
| I–90 | 640,529 | (130,124) | 510,405 |
| I–102 | 22,486 | (104) | 22,382 |
| I–129 | 417,712 | (17,955) | 399,757 |
| I–129F | 65,728 | (20,997) | 44,731 |

TABLE 7.—FEE-PAYING VOLUMES BY APPLICATION/PETITION—Continued

| Form No. | FY 2006 actual fee-paying volume | Adjustment | FY 2008/2009 projected fee-paying volume |
|---|---|---|---|
| I–130 | 743,741 | (3,189) | 740,552 |
| I–131 | 365,048 | (232,880) | 132,168 |
| I–140 | 134,901 | (5,158) | 129,743 |
| Waiver Applications | 45,459 | | 45,459 |
| I–360 | 47,645 | | 47,645 |
| I–290B/Motions | 13,671 | (8,899) | 4,772 |
| I–485 | 548,035 | 6,975 | 555,010 |
| I–526 | 600 | | 600 |
| I–539 | 229,160 | (13,531) | 215,629 |
| I–600/600A | 29,159 | 101 | 29,260 |
| I–687 | 37,256 | (36,756) | 500 |
| I–690 | 3,293 | | 3,293 |
| I–694 | 3,696 | | 3,696 |
| I–695 | 25 | 27 | 52 |
| I–698 | 668 | (337) | 331 |
| I–751 | 130,529 | (360) | 130,169 |
| I–765 | 1,339,126 | (479,583) | 859,543 |
| I–817 | 5,762 | | 5,762 |
| I–824 | 39,551 | 680 | 40,231 |
| I–829 | 45 | | 45 |
| I–881 | 22,487 | (22,487) | |
| I–905 | 2 | 8 | 10 |
| I–914 | 124 | (124) | |
| N–300 | 83 | 9 | 92 |
| N–336 | 13,640 | 308 | 13,948 |
| N–400 | 706,387 | 4,074 | 710,461 |
| N–470 | 669 | | 669 |
| N–565 | 30,643 | 98 | 30,741 |
| N–600/600K | 64,711 | | 64,711 |
| Total | 5,702,571 | (960,204) | 4,742,367 |

## VI. Assigning Costs to Processing Activities

USCIS uses a detailed operating plan to manage its resources effectively. The plan identifies the payroll (pay and benefits, awards, overtime) and non-payroll costs (general expenses, information technology, contracts) associated with each USCIS office, as well as costs that are managed and funded centrally such as rent, information technology operations and maintenance, and service level agreements. The operating plan is a vast improvement over the cost data used in the FY 1998 Fee Review, where the information was only available at very high levels conglomerating various functions.

Each USCIS office was classified as "overhead" versus "direct." This classification was performed since direct cost items can be directly "assigned" to activities based on a relationship that is readily identifiable between the cost item and a processing activity. For example, an Adjudications Officer performs work under the "Make Determination" activity. Therefore, the costs associated with an Adjudications Officer are directly assigned to this

activity. Overhead cost items are "allocated" to activities since no direct relationship can be developed between the resource item and the activity. For example, there is no direct relationship between the Office of Planning, Budget, and Finance and the "Make Determination" activity, and as such, a portion of the costs from this office were allocated to the "Make Determination" activity based on number of government staff, as was the case with most overhead cost items.

### A. Overhead Costs

USCIS defined overhead as "the ongoing administrative expenses of a business which cannot be attributed to any specific business activity, but are still necessary for the business to function." Examples include the majority of Headquarters functions such as the Office of Planning, Budget, and Finance, the Office of Information Technology, the Office of Chief Counsel, the Congressional Relations Office, and the Office of Policy and Strategy. These offices are further identified in section III.D under the "Administration" program. Field functions classified as overhead include support positions such as management, administration,

analysts and information technology staff. Centrally managed costs such as rent, information technology operations and maintenance, and service level agreements were also classified as overhead.

Total overhead costs were identified to be $924 million, of which $183 million is payroll (20%) and $741 million is non-payroll (80%). Total overhead costs represent 39% of the FY 2008/2009 IEFA costs. This includes $41.2 million to enhance the training program, $33.1 million for rent and lease acquisition resources, and $124.3 million to upgrade and maintain the USCIS information technology environment as identified in section IV.E.3. USCIS assessed a total of $843 million ($924 million less $81 million associated with the asylum and refugee program) in overhead costs as a flat percentage of each application/petition and biometric processing activity costs. While the amount of the overhead will vary between processing activities, the percentage of cost is constant.

### B. Direct Costs

USCIS reviewed and analyzed the FY 2008/2009 IEFA costs in detail to determine which direct items could be

directly assigned to the immigration benefit application/petition and biometric service processing activities. The following depicts the major direct cost items assigned to the processing activities:

*Inform the Public.* Of the $1.988 billion assigned to immigration benefit application/petition and biometric service processing activities, $228 million or 11% is assigned directly to the "Inform the Public" activity. "Inform the Public" includes $43 million for the National Customer Service Center contract and support activities to provide nationwide assistance by telephone to individuals calling from within the United States about immigration services and benefits. Most of the $80 million in direct payroll costs (including $9.5 million of the $123.8 million to enhance adjudications and support staff as identified in section IV.E.3) are for IIOs who assist persons with information necessary to complete required form types and explain the administrative procedures and average processing times for each application/ petition.

*Intake.* Of the $1.988 billion assigned to immigration benefit application/ petition and biometric service processing activities, $86 million or 4% is assigned directly to the "Intake" activity. "Intake" includes $84 million for activities related to the mail, filing, data entry, and fee receipting at USCIS Service Centers. It also includes $2 million for the lockbox, which is an agent of the Department of Treasury that performs the electronic fee receipting, fee deposit, and initial data entry for specific form types.

*Conduct IBIS Checks.* Of the $1.988 billion assigned to immigration and naturalization benefit application and petition and biometric service processing activities, $48 million or 2% is assigned directly to the "Conduct IBIS Check" activity. Since July 2002, USCIS has added security checks to the processing of all immigration and naturalization benefit applications and petitions. "Conduct IBIS Check" includes $23 million in direct payroll costs of Adjudication Officers and other authorized personnel to compare information on applicants, petitioners, beneficiaries, derivatives and household members who apply for an immigration or naturalization benefit on a USCIS application or petition against various Federal lookout systems.

*Review Records.* Of the $1.988 billion assigned to immigration benefit application/petition and biometric service processing activities, $214 million or 11% is assigned directly to the "Review Records" activity. "Review

Records" includes $54 million in direct payroll costs to oversee records operations (including processing Freedom of Information Act (FOIA) requests) in Headquarters, the National Records Center (a centralized facility for storing alien records), and field offices. This activity covers $8.8 million in new funding to process FOIA requests (as identified in section IV.E.3), a $17 million records support contract to maintain records at local field offices, $13 million in contract support staff in support of the Harrisonburg File Facility for receipt file holdings, and the National Archives and Records Administration contract for the retirement of alien files, among other records activities.

*Make Determination.* Of the $1.988 billion assigned to immigration benefit application/petition and biometric service processing activities, $1.058 billion or 53% is assigned directly to the "Make Determination" processing activity. This activity includes $421 million in direct payroll costs for Adjudication Officers and support personnel (including $78.2 million of the $123.8 million to enhance adjudications and support staff as identified in section IV.E.3), $24 million for field office discretionary general expenses, $13 million for field office overtime, $50 million for investment technology field support contract, $3.2 million for field training, $23 million for the National Benefits Center contract, $21 million for the adjudications clerical contract in support of field offices, and $11.5 million in Application Support contract costs in direct support of processing the Form I–90 (Application to Replace Permanent Resident Card).

*Fraud Detection and Prevention.* Of the $1.988 billion assigned to immigration and naturalization benefit application and petition and biometric service processing activities, $90 million or 5% is assigned directly to the "Fraud Detection and Prevention" activity. This activity includes $50 million in payroll costs for Immigration Officers and Intelligence Research specialists to detect and combat immigration and naturalization benefit fraud. The activity also includes $31 million in additional government staff for fraud prevention and detection efforts, $8 million for a new Administrative Site Inspection Program, and $4 million in system enhancements to national security systems and processes (as identified in section IV.E.3).

*Issue Document.* Of the $1.988 billion assigned to immigration and naturalization benefit application/

petition and biometric service processing activities, $90 million or 5% is assigned directly to the "Issue Document" activity. The "Issue Document" activity involves work performed at centralized facilities to produce secure cards for certain immigration benefits. This includes $20 million for the Integrated Card Production system, including the contract, consumables, and information and technology operations and maintenance. The activity also includes $32.4 million for a backup card production facility, and $31.6 million for the enhanced delivery of secure documents (as identified in section IV.E.3).

*Capture Biometrics.* Of the $1.988 billion assigned to immigration and naturalization benefit application and petition and biometric service processing activities, $174 million or 9% is assigned directly to the "Capture Biometrics" activity. The "Capture Biometrics" activity includes $74 million in contract costs and $12.5 million in direct payroll costs (most of which is for Application Support Center managers) of operating the Application Support Centers to electronically capture applicants' fingerprints, photographs, and signatures. This activity also includes $63 million (including $12.4 million for increased costs associated with an overall increase in projected biometric workload as well as an increase in FBI background check costs passed on to USCIS through an interagency agreement, as identified in section IV.E.3) in costs paid to the FBI to conduct the appropriate background checks of fingerprints and/or applicant names (depending upon the immigration benefit). This is a change in the manner in which USCIS currently calculates the biometric fee since FBI background check costs were previously included in the immigration benefit application/petition fees. USCIS believes this is a more accurate methodology since there is a direct relationship between the biometric workload and the costs paid to the FBI. In addition, under this method, applicants and petitioners directly bear the costs of FBI background checks, as is the case today.

The FY 2008/2009 IEFA costs by processing activity are summarized in Table 8 (dollars in thousands).

TABLE 8.—FY 2008/2009 COSTS BY PROCESSING ACTIVITY

| Activity | Amount (000) |
| --- | --- |
| Capture Biometrics .................. | $174,000 |

TABLE 8.—FY 2008/2009 COSTS BY PROCESSING ACTIVITY—Continued

| Activity | Amount (000) |
|---|---|
| Inform the Public ....................... | 228,000 |
| Intake ........................................ | 86,000 |
| Conduct IBIS Checks .............. | 48,000 |
| Review Records ....................... | 214,000 |
| Make Determination ................. | 1,058,000 |
| Fraud Detection and Prevention | 90,000 |
| Issue Document ....................... | 90,000 |
| Total ................................... | 1,988,000 |

## VII. Assigning Processing Activity Costs to Applications and Petitions and Biometric Services

In ABC, the final stage in the process is assigning the processing activity costs to the products. The products are decisions on the immigration and naturalization benefit applications and petitions and biometric services for which USCIS charges fees.

### A. Biometric Services

The "Capture Biometrics" processing activity was assigned directly to the biometric fee. The unit cost for this activity, and the biometric fee, is $79 based on total costs of $174 million and a fee-paying volume of 2.196 million. The other processing activities represent the basic components of processing immigration and naturalization benefit applications and petitions.

### B. Immigration Benefit Applications and Petitions

In general, the more complex an immigration or naturalization benefit application or petition is to adjudicate, the higher the unit costs. This is because the largest processing activity cost, "Make Determination," was assigned to the various immigration and naturalization benefit applications and petitions by a factor of workload volume weighted by completion rate (hours per completion). Workload volume is the measure of how many times an activity is performed for a particular product (number of application/petitions and biometrics received in a fiscal year), and "completion rate" measures the average adjudicative time or "level of effort" needed to perform the activity for a particular product, since time is a key factor in determining immigration benefit application and petition fees. The completion rates were based on the most recent data available from the period of September 2005–August 2006. Exceptions to this general rule occur when: (1) Volumes skew the unit costs (e.g., high volume applications tend to have lower unit costs since costs are allocated over a higher volume base), (2)

additional activities were performed (e.g., some applications require the creation of secure cards); and 3) applications and petitions with low volumes were increased only by the weighted average fee increase (discussed below).

For the processing activities of "Inform the Public," "Intake," "Conduct IBIS Check," "Review Records," "Fraud Prevention and Detection" and "Issue Document," the applications and petitions reflect the same average unit processing activity costs for each activity. The "Issue Document" processing activity costs were allocated only to those applications for which a secure document is required. This is a departure from the basis of the current fees since the current unit processing activity costs vary for every immigration benefit application and petition. USCIS decided that this was the best allocation method since these processing activity costs are not particularly driven by the complexity of the application/petition, and also to minimize the dollar impact on the more complex applications and petitions (which already will carry higher fees due to their complexity).

As explained previously, USCIS assumed no separate interim benefit fees from Form I–485 applicants, and thus added interim benefit costs from the "Make Determination" activity into the cost of the Form I–485, the primary immigration benefit application for which interim benefits are relevant. USCIS accomplished this by adding the completion rates for the Forms I–765 and I–131 to the Form I–485 completion rate. As a result, the costs for the "Make Determination" activity for the Form I–485 received more of those costs, including associated overhead costs, than it normally would have without factoring in interim benefits. USCIS believes this is a fair and equitable methodology since applicants, when filing a Form I–485, would also pay for the processing costs of interim benefits, and would not be required to pay for surcharges, other processing activities, and associated overhead costs more than once as they do today. Interim benefit costs outside the "Make Determination" processing activity were distributed to the other immigration benefit applications and petitions in accordance with the general methodology. Also explained previously, in anticipating the elimination of duplication in the K–3 petition process, USCIS assumed no revenues from Form I–129F as it relates to the K–3 classification, depending instead on one petition on Form I–130. This, too, has the effect of redistributing

costs relating to the K–3 classification over all other form types.

USCIS leveraged "completion rates," reflective of hours per completion, to identify the adjudicative time required to complete specific form types. The rate for each form type represents an average, as some cases within certain form types are more complex than others. Completion rates reflect what is termed "touch time" or the time the Adjudication Officer is actually handling or touching the case. Completion rates are not reflective of "queue time" or time spent waiting, for example, for additional information or supervisory approval. "Touch time" and "queue time" are different from "processing time," which reflects the total time applicants and petitioners can expect to await a decision on their case once the application or petition is received by USCIS. Even though the completion rates for select applications and petitions have increased since the FY 1998 Fee Review, as referenced in section X, processing times have decreased for the majority of form types.

All Adjudication Officers are required to report completion rate information. In addition to using this data in determining fees, completion rates are a key factor in determining local office staffing allocations to match resources and workload since the type of workload (and amount) dictates the resource requirements. For this reason, the data are scrutinized both at the local office and regional level by management, and by the Performance Management Branch (PMB) at the Headquarters level to ensure data accuracy. When the data reported are found to be inconsistent with other offices, or inconsistent with prior reported data, PMB will contact the reporting office and make any necessary adjustments. USCIS also places confidence in the data, given the consistency of reporting it has witnessed over the last few years. The fact that this information is now available on a continual basis makes it easier for USCIS to update cost information more frequently for fee review and cost management purposes. This methodology is substantially superior to that available for the FY 1998 Fee Review, where it was necessary to use a method of physical observations (based on a statistically valid sample).

Local Office, Service Center, and the National Benefit Center completion rates, reflected in terms of hours per completion, are summarized in Table 9 by application and petition. The completion rates for Form I–914 are not identified here since this proposed rule

**4908**    **Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules

would exempt applicants from paying the fee for this form type, and the completion rates for Form I–290B/ Motions (Administrative Appeals Office) and Biometric Services (Application Support Centers) are also not identified here since specific costs can be directly assigned to these fee-based services, and therefore the factors of workload volume and completion rates are not necessary to assign processing activity costs to products.

TABLE 9.—COMPLETION RATES

| Form No. | Local offices | Service centers | National benefit center |
|---|---|---|---|
| I–90 | .93 | .50 | N/A |
| I–102 | .61 | .30 | .39 |
| I–129 | .09 | .40 | N/A |
| I–129F | 4.98 | .41 | .37 |
| I–130 | .86 | .35 | .65 |
| I–131 | .54 | .20 | .14 |
| I–140 | 2.00 | .87 | N/A |
| Waiver Applications | 1.15 | 1.10 | .85 |
| I–360 | .95 | 2.26 | N/A |
| I–485 | 2.30 | 1.30 | 2.65 |
| I–526 | 2.38 | 4.03 | N/A |
| I–539 | 1.32 | .28 | .31 |
| I–600/600A | 1.53 | N/A | N/A |
| I–687 | 2.37 | 2.89 | .27 |
| I–690 | 3.49 | 1.91 | .23 |
| I–694 | 4.00 | .72 | N/A |
| I–695 | 1.85 | 13.00 | N/A |
| I–698 | 2.43 | 2.40 | N/A |
| I–751 | 1.36 | .46 | N/A |
| I–765 | .31 | .19 | .16 |
| I–817 | 1.81 | .46 | .64 |
| I–824 | 1.10 | .39 | .69 |
| I–829 | 4.45 | 4.24 | N/A |
| N–300 | 1.67 | N/A | N/A |
| N–336 | 1.34 | N/A | N/A |
| N–400 | 1.17 | N/A | N/A |
| N–470 | 1.48 | 1.91 | N/A |
| N–565 | .58 | .60 | N/A |
| N–600/600K | .80 | 1.17 | N/A |

Table 10 displays the unit costs (processing activity costs divided by the number of fee-paying applications/ petitions) for each immigration benefit application and petition by processing activity, and the average processing activity costs. The processing activity costs were identified in Table 8, and the number of fee-paying applications/petitions was identified as 4.742 million in Table 7.

The application and petition unit costs are generally increased by varying amounts according to the form type,

mainly due to the "Make Determination" processing activity cost differences. As previously stated, the "Make Determination" processing activity unit cost generally follows the premise that the more complex the application/petition is to adjudicate, the higher the unit costs. For the processing activities of "Inform the Public," "Intake," "Conduct IBIS Check," "Review Records," "Fraud Prevention and Detection" and "Issue Document," the applications and petitions reflect the

same average unit costs for each processing activity. Since the "Issue Document" processing activity costs were allocated only to those applications for which a secure document is required, the average processing activity unit costs of $19 (based on total fee-paying volume of 4.742 million) is less than the processing activity unit costs of $41 (based on associated fee-paying volume of 2.193 million) for the associated applications.

TABLE 10.—PROCESSING ACTIVITY UNIT COSTS BY APPLICATION/PETITION

| Form No. | Inform the public (dollars) | Intake (dollars) | Conduct IBIS check (dollars) | Review records (dollars) | Make determination (dollars) | Fraud prevention and detection (dollars) | Issue document (dollars) | Total unit processing activity cost (dollars) |
|---|---|---|---|---|---|---|---|---|
| I–90 | 48 | 18 | 10 | 45 | 34 | 19 | 41 | 215 |
| I–102 | 48 | 18 | 10 | 45 | 104 | 19 | 0 | 244 |
| I–129 | 48 | 18 | 10 | 45 | 104 | 19 | 0 | 244 |
| I–129F | 48 | 18 | 10 | 45 | 239 | 19 | 0 | 379 |
| I–130 | 48 | 18 | 10 | 45 | 142 | 19 | 0 | 282 |
| I–131 | 48 | 18 | 10 | 45 | 49 | 19 | 41 | 230 |
| I–140 | 48 | 18 | 10 | 45 | 261 | 19 | 0 | 401 |
| Waiver Applications | 48 | 18 | 10 | 45 | 331 | 19 | 0 | 471 |
| I–290B/Motions | 48 | 18 | 10 | 45 | 371 | 19 | 0 | 511 |
| I–360 | 48 | 18 | 10 | 45 | 2,268 | 19 | 0 | 2,408 |
| I–485 | 48 | 18 | 10 | 45 | 647 | 19 | 41 | 828 |

TABLE 10.—PROCESSING ACTIVITY UNIT COSTS BY APPLICATION/PETITION—Continued

| Form No. | Inform the public (dollars) | Intake (dollars) | Conduct IBIS check (dollars) | Review records (dollars) | Make determination (dollars) | Fraud prevention and detection (dollars) | Issue document (dollars) | Total unit processing activity cost (dollars) |
|---|---|---|---|---|---|---|---|---|
| I–526 | 48 | 18 | 10 | 45 | 1,212 | 19 | 0 | 1,352 |
| I–539 | 48 | 18 | 10 | 45 | 84 | 19 | 0 | 224 |
| I–600/600A | 48 | 18 | 10 | 45 | 453 | 19 | 0 | 593 |
| I–687 | 48 | 18 | 10 | 45 | 495 | 19 | 0 | 635 |
| I–690 | 48 | 18 | 10 | 45 | 390 | 19 | 0 | 530 |
| I–694 | 48 | 18 | 10 | 45 | 330 | 19 | 0 | 470 |
| I–695 | 48 | 18 | 10 | 45 | 1,117 | 19 | 0 | 1,257 |
| I–698 | 48 | 18 | 10 | 45 | 1,107 | 19 | 41 | 1,288 |
| I–751 | 48 | 18 | 10 | 45 | 210 | 19 | 41 | 391 |
| I–765 | 48 | 18 | 10 | 45 | 83 | 19 | 41 | 264 |
| I–817 | 48 | 18 | 10 | 45 | 182 | 19 | 41 | 363 |
| I–824 | 48 | 18 | 10 | 45 | 126 | 19 | 0 | 266 |
| I–829 | 48 | 18 | 10 | 45 | 2,579 | 19 | 41 | 2,760 |
| N–300 | 48 | 18 | 10 | 45 | 536 | 19 | 0 | 676 |
| N–336 | 48 | 18 | 10 | 45 | 391 | 19 | 0 | 531 |
| N–400 | 48 | 18 | 10 | 45 | 378 | 19 | 0 | 518 |
| N–470 | 48 | 18 | 10 | 45 | 428 | 19 | 0 | 568 |
| N–565 | 48 | 18 | 10 | 45 | 167 | 19 | 0 | 307 |
| N–600/600K | 48 | 18 | 10 | 45 | 245 | 19 | 0 | 385 |
| Average Application/ Petition | 48 | 18 | 10 | 45 | 223 | 19 | 19 | 382 |

## VIII. Assigning Surcharge Costs to Applications and Petitions

The final step in calculating the immigration and naturalization benefit application and petition fees is to add amounts to recover asylum and refugee costs, and fee waiver and exempt costs. As previously mentioned, these costs are referred to as "surcharges" since they are not directly related to the processing activity costs of a particular immigration benefit. Surcharges are not assigned to the biometric fee.

### A. Method of Assigning Costs

USCIS used the same average unit surcharge cost for every application and petition type. This is a departure from the current allocation methodology, since the current surcharges are based upon a flat percentage of each application/petition processing activity cost and therefore vary for each case type. USCIS decided that using the same average cost is a better allocation method, since the surcharges are unrelated to the complexity of the application/petition, and this new allocation method also minimizes the dollar impact on the more complex applications and petitions (which already will carry higher fees due to their complexity).

### B. Fee Waiver/Exemption Costs

As previously stated, total fee waiver and exemption costs were determined to be $150 million. The average of $32 was derived by dividing the $150 million by the total 4.742 million application/petition fee-paying volumes.

### C. Asylum/Refugee Costs

As previously stated, the full costs of asylum and refugee operations were determined to be $191 million. The average of $40 was derived by dividing the $191 million by the total 4.742 million application/petition fee-paying volume.

Table 11 displays the amount of surcharges applied to each application and petition on a per unit basis. Unit processing activity costs average (weighted) $382 or 86% of FY 2008/ 2009 IEFA costs, while unit fee waiver/ exemption and Asylum/Refugee surcharges average $72 or 14%. This equates to a weighted average unit cost per application/petition of $454.

TABLE 11.—APPLICATION AND PETITION UNIT COSTS

| Form No. | Unit processing activity cost | Unit fee waiver/exempt surcharge | Unit asylum/refugee surcharge | Total unit cost |
|---|---|---|---|---|
| I–90 | $215 | $32 | $40 | $287 |
| I–102 | 244 | 32 | 40 | 316 |
| I–129 | 244 | 32 | 40 | 316 |
| I–129F | 379 | 32 | 40 | 451 |
| I–130 | 282 | 32 | 40 | 354 |
| I–131 | 230 | 32 | 40 | 302 |
| I–140 | 401 | 32 | 40 | 473 |
| Waiver Applications | 471 | 32 | 40 | 543 |
| I–290B/Motions | 511 | 32 | 40 | 583 |
| I–360 | 2,408 | 32 | 40 | 2,480 |
| I–485 | 828 | 32 | 40 | 900 |
| I–526 | 1,352 | 32 | 40 | 1,424 |
| I–539 | 224 | 32 | 40 | 296 |
| I–600/600A | 593 | 32 | 40 | 665 |

**4910**     **Federal Register** / Vol. 72, No. 21 / Thursday, February 1, 2007 / Proposed Rules

TABLE 11.—APPLICATION AND PETITION UNIT COSTS—Continued

| Form No. | Unit processing activity cost | Unit fee waiver/exempt surcharge | Unit asylum/ refugee surcharge | Total unit cost |
|---|---|---|---|---|
| I–687 | 635 | 32 | 40 | 707 |
| I–690 | 530 | 32 | 40 | 602 |
| I–694 | 470 | 32 | 40 | 542 |
| I–695 | 1,257 | 32 | 40 | 1,329 |
| I–698 | 1,288 | 32 | 40 | 1,360 |
| I–751 | 391 | 32 | 40 | 463 |
| I–765 | 264 | 32 | 40 | 336 |
| I–817 | 363 | 32 | 40 | 435 |
| I–824 | 266 | 32 | 40 | 338 |
| I–829 | 2,760 | 32 | 40 | 2,832 |
| N–300 | 676 | 32 | 40 | 748 |
| N–336 | 531 | 32 | 40 | 603 |
| N–400 | 518 | 32 | 40 | 590 |
| N–470 | 568 | 32 | 40 | 640 |
| N–565 | 307 | 32 | 40 | 379 |
| N–600/600K | 385 | 32 | 40 | 457 |
| Weighted Average Application/Petition | 382 | 32 | 40 | 454 |

## IX. Proposed Fee Adjustments

To arrive at the final proposed fees, the unit costs are rounded up or down to the nearest $5 increment consistent with past fee practices as reflected in 8 CFR 103.7(b).

### A. Biometric Services

The biometric fee is increased by $10, from $70 to $80, or 14%. USCIS last increased the fee by $20, from $50 to $70, or 40% in April 2004. As discussed above, a portion of this fee is paid by USCIS to the FBI for fingerprint processing and that cost may change.

### B. Immigration Benefit Applications and Petitions

The weighted average application/petition fee is increased by $223, from $231 to $454, or 96%. When combined with the biometric fee, the weighted average application/petition is increased from $264 to $491, or 86%. After consolidating the fees for adjustment of status (Form I–485) and interim benefits that previously required additional fees, the increase would only be 66%. When USCIS last performed a comprehensive fee review in FY 1998, the immigration benefit application/petition fees

increased by a weighted average of $65 or 76%, from $85 to $150.

To arrive at the proposed fees, in addition to rounding adjustments, USCIS adjusted certain low volume form types. Since some low volume form types (20,000 or less) produced particularly high unit costs as compared to the current fees (greater than 250%), USCIS decided to increase them only by the average percentage fee increase (96%) of all immigration benefit applications and petitions. The additional costs from these form types were then prorated to other applications and petitions. These form types are:

• Form I–360, Petition for Amerasian Widow(er) or Special Immigrant (with respect to those Form I–360 applicants whose fee is not removed altogether);
• Form I–690, Application for Waiver of Excludability;
• Form I–695, Application for Replacement Employment Authorization or Temporary Residence Card;
• Form N–300, Application to File Declaration of Intention; and
• Form N–470, Application to Preserve Residence for Naturalization Purposes.

USCIS did, however, use its normal methodology to increase proposed fees

for form types related to the legalization program under the Immigration Reform and Control Act of 1986, INA sec. 245A, 8 U.S.C. 1255a (Form I–694, Notice of Appeal of Decision; Form I–698, Application to Adjust Status From Temporary to Permanent Resident) and for Form I–829, Petition by Entrepreneur to Remove Conditions, although these increases were more than 250%. These applications, which relate to IRCA legalization applicants who have resided in the United States since at least 1982, or entrepreneurs seeking lawful permanent residence on the basis of investments of at least $500,000, do not appear to involve a substantial rationale for a lower fee than would otherwise be charged under the applicable methodology.

The proposed fee schedule for the immigration and naturalization benefit applications and petitions is illustrated in Table 12. The proposed rounded fee for each application or petition is compared to the current rounded fee, and the difference between the two is identified. This table omits some variations within specific form types relating to children, family caps, etc.; for these fees, please see the proposed regulation text itself.

TABLE 12.—CURRENT AND PROPOSED FEES

| Form No. | Current fee (dollars) | Proposed fee (dollars) | Difference (dollars) |
|---|---|---|---|
| I–90 | 190 | 290 | 100 |
| I–102 | 160 | 320 | 160 |
| I–129 | 190 | 320 | 130 |
| I–129F | 170 | 455 | 285 |
| I–130 | 190 | 355 | 165 |
| I–131 | 170 | 305 | 135 |

TABLE 12.—CURRENT AND PROPOSED FEES—Continued

| Form No. | Current fee (dollars) | Proposed fee (dollars) | Difference (dollars) |
|---|---|---|---|
| I–140 | 195 | 475 | 280 |
| Waiver Applications | 265 | 545 | 280 |
| I–290B/Motions | 385 | 585 | 200 |
| I–360 | 190 | 375 | 185 |
| I–485 | 325 | 905 | 580 |
| I–526 | 480 | 1,435 | 955 |
| I–539 | 200 | 300 | 100 |
| I–600/600A | 545 | 670 | 125 |
| I–687 | 255 | 710 | 455 |
| I–690 | 95 | 185 | 90 |
| I–694 | 110 | 545 | 435 |
| I–695 | 65 | 130 | 65 |
| I–698 | 180 | 1,370 | 1,190 |
| I–751 | 205 | 465 | 260 |
| I–765 | 180 | 340 | 160 |
| I–817 | 200 | 440 | 240 |
| I–824 | 200 | 340 | 140 |
| I–829 | 475 | 2,850 | 2,375 |
| I–914 | 270 | 0 | (270) |
| N–300 | 120 | 235 | 115 |
| N–336 | 265 | 605 | 340 |
| N–400 | 330 | 595 | 265 |
| N–470 | 155 | 305 | 150 |
| N–565 | 220 | 380 | 160 |
| N–600/600K | 255 | 460 | 205 |
| Weighted Average Application/Petition | 231 | 454 | 223 |

Based on the proposed fee schedule and a projected application/petition fee-paying volume of 4.742 million and biometric service volume of 2.196 million, immigration and naturalization benefit application and petition and biometric fees will generate $2.331 billion in annual revenue for the FY 2008 and FY 2009 biennial period. For the same period, the estimated FY 2008/2009 cost of processing immigration and naturalization benefit applications and petitions and biometric services is $2.329 billion. The $2 million difference is due to rounding.

## X. Impact on Applicants and Petitioners

The USCIS recognizes that this proposed rule would have an impact on persons who file the affected applications and petitions and biometric fees. The proposed fee increases range from $65 to $2,350, depending on the type of immigration or naturalization benefit for which the application or petition is submitted. Fifteen fees will increase by amounts between $65 and $200; eight fees will increase, and one will decrease, by amounts between $200 and $300; one fee will increase by amounts between $300 and $400; and six fees will increase more than $400.

USCIS is retaining the authority to waive certain fees on a case-by-case basis pursuant to 8 CFR 103.7(c). In all

fee waiver requests, applicants are required to demonstrate "inability to pay." In determining "inability to pay," USCIS officers will consider all factors, circumstances, and evidence supplied by the applicant including age, disability, household income, and qualification within the past 180 days for a federal means tested benefit. The current fees are based on a comprehensive fee review completed in FY 1998 that was based on projected FY 1998 costs and volumes, and processes that existed in FY 1996. The new fee review proposes to correctly align the fees with currently planned costs and processes. The methodology is similar to the FY 1998 Fee Review, yet improved in many areas given the more detailed and accurate data sources and improved management tools to align resources and workload (e.g., staffing model). For these reasons, the proposed fees cannot be compared to the current fees because so many of the factors that influence the costs of processing immigration benefit application and petition fees have changed over this significant amount of time. However, besides the fact that overall costs have increased dramatically, the increases in fees can mainly be explained by comparing completion rate data (termed "cycle time" in the FY 1998 Fee Review).

As stated previously, the more time or "level of effort" spent on adjudicating a particular application or petition, measured in terms of completion rates, the higher the fee. Most of the increases in completion rates are associated with the additional time devoted to the expansion of background checks to all immigration benefit applications instituted in July 2002. Examples include:

• Form I–140, Immigrant Petition for Alien Worker, fee increase is due to the threefold increase in completion rates (i.e., three times the level of effort) as compared with the FY 1998 Fee Review;

• Form I–129F, Petition for Alien Fiancé, fee increase is due to the threefold increase in completion rates as compared with the FY 1998 Fee Review;

• Waiver Applications, fee increases are due to the threefold increase in completion rates as compared with the FY 1998 Fee Review;

• Form I–485, Application to Register Permanent Status or Adjust Status, fee increase is due to the threefold increase in completion rates as compared with the FY 1998 Fee Review, as well as the manner in which interim benefits are added to this form type as explained in section VI (when comparing the fees applicants pay today for adjustment of status and interim benefits versus the proposed single fee for adjustment of

status, the difference is far less significant);

• Form N–400, Application for Naturalization, fee increase is due to the threefold increase in completion rates as compared with the FY 1998 Fee Review;

• Form I–751, Petition to Remove the Conditions on Residence, fee increase is due to the doubling in completion rates as compared with the FY 1998 Fee Review; and

• Form I–817, Application for Family Unity Benefits, fee increase is due to the threefold increase in completion rates as compared with the FY 1998 Fee Review.

Finally, even though the fee for Form I–290B/Motions was increased recently (September 28, 2005), the actual Fee Review supporting the increase was completed in November 2002. The data that were used for the current fee are outdated and costs have significantly increased. The November 2002 Fee Review was not a comprehensive analysis, as it did not analyze the full costs outside the Administrative Appeals Office that should be assigned to this form type, such as overhead, and other activities outside of the "Make Determination" activity such as "Fraud Prevention and Detection," and "Inform the Public" activities. In addition, the November 2002 Fee Review did not include the allocation of fee waiver/ exempt and asylum and refugee surcharges to the Form I–290B/Motions as this rulemaking does.

**XI. Fee Waivers**

In tandem with the proposed increase in fees, USCIS also proposes to modify and clarify eligibility for an individual fee waiver in 8 CFR 103.7(c). Where appropriate in its fee structure, USCIS waives the application/petition fee for a class of applicants/petitioners. For example, there is no fee for filing an application for asylum. The applicable rule, 8 CFR 103.7(c) provides for an individual fee waiver request in other cases. USCIS considers waiving the fee for a single individual based on his or her circumstances when all others in similar circumstances applying for the same benefit or service must pay the fee.

Every fee waiver, whether for a group of applicants done through the rate setting process or through an individual fee waiver, does not simply waive the fee for the affected individual or individuals. Since USCIS is funded from application fees, a fee waiver transfers the cost to all other fee-paying applicants. Fairness requires that there be compelling reasons when granting an individual fee waiver to one applicant while making others applying for the same benefit or service pay full cost

plus a surcharge to pay for the free service provided to the first customer.

In recent months, the number of individual fee waiver requests has risen, both in terms of total volume and as a percentage of applications filed. In addition, the proposed rate setting is based on historical data with respect to fee waivers. The higher fees proposed in this rule would likely mean more customers will apply for fee waivers as they attempt to avoid the rising costs of applying for a benefit or service. The process of considering a fee waiver request itself has a significant associated adjudication cost.

To offset this potential, this proposed rule clarifies the fee waiver process by limiting fee waivers to certain situations. The current rule permits application for a fee waiver even when such an application contradicts the basic benefit or service being requested. For example, companies can apply for a waiver of the fee when seeking to admit a foreign worker to whom they must pay appropriate wages. Similarly, individuals may apply for a fee waiver when seeking status based on a substantial investment or an extension of stay where they must demonstrate the ability to support themselves during the period of extended stay without working. Applicants for permanent residence must demonstrate they can support themselves and will not become a public charge, and those seeking to sponsor the immigration of a relative must commit to providing a financial safety net to the relative if necessary to ensure the alien does not become a public charge, yet such applicants can seek a fee waiver.

These examples illustrate situations where the basic premise of a fee waiver is wholly or largely inconsistent with the status held or benefit or service sought. The proposed rule applies this principle by limiting the possibility of a fee waiver to certain kinds of applications where a need-based waiver is not inconsistent with the status or benefit being sought. In so doing, it also clarifies and simplifies the waiver process. The proposed rule limits the list of applications for which an individual fee waiver based on inability to pay may be granted to the Form I–90; Form I–751; Form I–765; Form I–817; Form N–300; Form N–336; Form N–400; Form N–470; Form N–565; Form N–600; Form N–600k; and the Form I–290B (if relating to a motion or appeal filed with USCIS regarding one of the other waiver-eligible form types).

Finally, a fee waiver based on an inability to pay implicates other provisions of the INA. INA section 212(a)(4), 8 U.S.C. 1182(a)(4), provides

that an alien who is likely to become a public charge is inadmissible to the United States. In family-sponsored immigration, for example, this potential ground for inadmissibility may be overcome through the appropriate affidavit of support under INA section 213A, 8 U.S.C. 1183a. USCIS should not grant a waiver of a fee that indicates that the alien may be inadmissible and such affidavit of support may be suspect.

**XII. Statutory and Regulatory Reviews**

*A. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act, 5. U.S.C. 601(6), USCIS examined the impact of this proposed rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act (15 U.S.C. 632)), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people). USCIS determined which entities were small by using the definitions supplied by the Small Business Administration. The size of the companies was determined by using the *ReferenceUSA* databases at *http:// www.referenceusa.com/*. Below is a summary of the small entity analysis. A more detailed analysis is available in the rulemaking docket.

Individuals rather than small entities submit the majority of immigration and naturalization benefit applications and petitions. Entities that would be affected by this proposed rule are those that file and pay the fees for certain immigration benefit applications on behalf of an alien. These applications include the Form I–129, Petition for a Nonimmigrant Worker, and the Form I–140, Immigrant Petition for Alien Worker. USCIS conducted a statistically valid sample analysis of applicants of these form types to determine if this proposed rule has an economically significant impact on a substantial number of small entities.

Out of the 439,000 applications filed in FY 2005 for these form types, USCIS first identified the minimum sample size that was large enough to achieve a 95% confidence level. This sample size was identified as 383 (out of a total of 149,658 unique entities that filed applications in FY 2005). USCIS then randomly selected 653 entities, of which 561, or 86% were classified as small entities. Therefore, USCIS determined that a substantial number of small entities are impacted by this proposed rule.

USCIS then analyzed the economic impact on small entities of this proposed rule by (1) Identifying the number of applications filed by the small entities having sales revenue data identified by the random sample; and (2) multiplying the number of applications by the fee increase associated with the applicable form types in order to estimate the increased annual burden imposed by this rulemaking. Once USCIS determined the additional cost of this rulemaking on the randomly selected small entities, USCIS divided this total increased cost by the annual sales revenue of the entity. By comparing the cost increases imposed by this rulemaking with the sales revenue of the impacted small entities, we are able to understand the economic impact of this proposed rule on the individual small entities we have sampled. Using the *ReferenceUSA* database of business information, USCIS was able to identify annual sales revenue estimates for 273 of the 561 small entities previously sampled. Of the 273 small entities, 213 or about 78% of the small entities exhibited an impact of less than 0.1% of sales revenue, and all of the small entities sampled exhibited an impact of less than 1% of total revenue. A simple (non-weighted) average of the 273 small entities equated to an overall impact of only 0.06% of sales revenue. Therefore, USCIS believes that a substantial number of small entities are not significantly impacted economically by this proposed rule.

In summary, although the analysis shows that this rulemaking would affect a substantial number of small entities, the economic impact of this proposed rule was found to be negligible. This proposed rule has been reviewed in accordance with 5 U.S.C. 605(b), and the Department of Homeland Security certifies that this proposed rule will not have a significant economic impact on a substantial number of small entities.

### B. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) requires certain actions to be taken before an agency promulgates any notice of proposed rulemaking "that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year." 2 U.S.C. 1532(a). While this proposed rule, if finally promulgated, may result in the expenditure of more than $100 million by the private sector

annually, the rulemaking is not a "Federal mandate" as defined for UMRA purposes, 2 U.S.C. 658(6), as the payment of application and petition fees by individuals or other private sector entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States. 2 U.S.C. 658(7)(A)(ii). Therefore, no actions were deemed necessary under the provisions of the Act.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rulemaking will result in an annual effect on the economy of more than $100 million, in order to generate the revenue necessary to fully fund the increased cost associated with the processing of immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. The increased costs will be recovered through the fees charged for various immigration benefit applications.

### D. Executive Order 12866

This proposed rule is considered by the Department of Homeland Security to be an economically significant regulatory action under Executive Order 12866, section 3(f), Regulatory Planning and Review. The implementation of this proposed rule would provide USCIS with an additional $1.081 billion in FY 2008 and FY 2009 in annual fee revenue, based on a projected annual fee-paying volume of 4.742 million applications/petitions and 2.196 million requests for biometric services, over the fee revenue that would be collected under the current fee structure. This increase in revenue will be used pursuant to subsections 286(m) and (n) of the INA, 8 U.S.C. 1356(m) and (n), to fund the full costs of processing immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants at no charge. If USCIS does not adjust the current fees to recover the full costs of processing immigration benefit applications, USCIS would be forced to enact significant spending reductions resulting in a reversal of the considerable progress it has made over the last several years to reduce the

backlog of immigration benefit applications and petitions to increase the integrity of the immigration benefit system and to protect national security and public safety. The revenue increase is based on USCIS costs and projected volumes that were available at the time the proposed rule was drafted. USCIS has placed in the rulemaking docket a detailed analysis that explains the basis for the annual fee increase. Accordingly, this proposed rule has been reviewed by the Office of Management and Budget.

### E. Executive Order 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Department of Homeland Security has determined that this rulemaking does not have sufficient Federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. This rulemaking does not propose to impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

The changes to the fees will require changes to the application/petition form types to reflect the new fees. USCIS will submit a notification to OMB with respect to any such changes. In addition, this proposed rule anticipates (but is not dependent on) consolidating the Form I–131 and Form I–765 into the Form I–485 so that applicants for adjustment of status will not be required to file three separate form types in order to apply for adjustment of status, advance parole and employment authorization. This change will reduce paperwork burdens on these applicants.

### List of Subjects in 8 CFR Part 103

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information, Privacy, Reporting and

recordkeeping requirements, Surety bonds.

Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

2. Section 103.7 is amended by:
a. Removing the entry for the Form I–914 in paragraph (b)(1);
b. Revising the entries for the following forms in paragraph (b)(1);
c. Removing the fifth and sixth sentences in paragraph (c)(1); and by
d. Adding a new paragraph (c)(5).
The revision and addition read as follows:

## § 103.7   Fees.

\*      \*      \*      \*      \*

(b) \*  \*  \*

(1) \*  \*  \*

\*      \*      \*      \*      \*

For capturing biometric information. A service fee of $80 will be charged for any individual who is required to have biometric information captured in connection with an application or petition for certain immigration and naturalization benefits (other than asylum), and whose residence is in the United States.

\*      \*      \*      \*      \*

Form I–90. For filing an application for a Permanent Resident Card (Form I–551) in lieu of an obsolete card or in lieu of one lost, mutilated, or destroyed, or for a change in name—$290.

\*      \*      \*      \*      \*

Form I–102. For filing a petition for an application (Form I–102) for Arrival/Departure Record (Form I–94) or Crewman's Landing (Form I–95), in lieu of one lost, mutilated, or destroyed—$320.

Form I–129. For filing a petition for a nonimmigrant worker—$320.

Form I–129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act—$455; no fee for a K–3 spouse as designated in section 214.1(a)(2) of this chapter who is the beneficiary of an immigrant petition filed by a U.S. citizen on Form I–130.

Form I–130. For filing a petition to classify status of an alien relative for

issuance of an immigrant visa under section 204(a) of the Act—$355.

Form I–131. For filing an application for travel documents—$305.

Form I–140. For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act—$475.

Form I–191. For filing an application for discretionary relief under section 212(c) of the Act—$545.

Form I–192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case, or where the approval of the application is in the interest of the United States Government—$545.

Form I–193. For filing an application for waiver of passport and/or visa—$545.

Form I–212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense in lieu of deportation—$545.

\*      \*      \*      \*      \*

Form I–290B. For filing an appeal from any decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction—$585 (the fee will be the same when an appeal is taken from the denial of a petition with one or multiple beneficiaries, provided that they are all covered by the same petition, and therefore, the same decision).

Form I–360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant—$375, except there is no fee for a petition seeking classification as an Amerasian or as a self-petitioning battered or abused spouse, parent, or child of a U.S. citizen or Lawful Permanent Resident.

Form I–485. For filing an application for permanent resident status or creation of a record of lawful permanent residence—$905 for an applicant 14 years of age or older; $805 for an applicant under the age of 14 years; no fee for an applicant filing as a refugee under section 209(a) of the Act. No additional fee will be charged for a request for travel document (advance parole) or employment authorization by an applicant who has paid the Form I–485 application fee, regardless whether or not the Form I–131 or Form I–765 is required to be filed by such applicant to receive these benefits.

\*      \*      \*      \*      \*

Form I–526. For filing a petition for an alien entrepreneur—$1,435.

Form I–539. For filing an application to extend or change nonimmigrant status—$300.

\*      \*      \*      \*      \*

Form I–600. For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$670.

Form I–600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$670.

Form I–601. For filing an application for waiver of ground of inadmissibility under section 212(h) or (i) of the Act. (Only a single application and fee shall be required when the alien is applying simultaneously for a waiver under both those subsections.)—$545.

Form I–612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act—$545.

Form I–687. For filing an application for status as a temporary resident under section 245A (a) of the Act. A fee of $710 for each application or $570 for each application for a minor child (under 18 years of age) is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children) shall be $1,990.

Form I–690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$185.

Form I–694. For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$545.

Form I–695. For filing an application for replacement of temporary resident card (Form I–688)—$130.

Form I–698. For filing an application for adjustment from temporary resident status to that of lawful permanent resident under section 245A(b)(1) of the Act. For applicants filing within 31 months from the date of adjustment to temporary resident status, a fee of $1,370 for each application is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children (under 18

years of age living at home)) shall be $4,110. For applicants filing after thirty-one months from the date of approval of temporary resident status, who file their applications on or after July 9, 1991, a fee of $1,410 (a maximum of $4,230 per family) is required. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

\* \* \* \* \*

Form I–751. For filing a petition to remove the conditions on residence, based on marriage—$465.

Form I–765. For filing an application for employment authorization pursuant to 8 CFR 274a.13—$340.

\* \* \* \* \*

Form I–817. For filing an application for voluntary departure under the Family Unity Program—$440.

\* \* \* \* \*

Form I–824. For filing for action on an approved application or petition—$340.

Form I–829. For filing a petition by entrepreneur to remove conditions—$2,850.

\* \* \* \* \*

Form N–300. For filing an application for declaration of intention—$235.

Form N–336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act—$605.

Form N–400. For filing an application for naturalization (other than such application filed on or after October 1, 2004, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service, for which no fee is charged)—$595.

\* \* \* \* \*

Form N–470. For filing an application for benefits under section 316(b) or 317 of the Act—$305.

Form N–565. For filing an application for a certificate of naturalization or declaration of intention in lieu of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act—$380.

Form N–600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act—$460, for applications filed on behalf of a biological child and $420 for applications filed on behalf of an adopted child.

Form N–600K. For filing an application for citizenship and issuance of certificate under section 322 of the Act—$460, for an application filed on behalf of a biological child and $420 for an application filed on behalf of an adopted child.

\* \* \* \* \*

Motion. For filing a motion to reopen or reconsider any decision under the immigration laws in any type of proceeding over which the Executive Office for Immigration Review does not have jurisdiction. No fee shall be charged for a motion to reopen or reconsider a decision on an application for relief for which no fee is chargeable or for any motion to reopen or reconsider made concurrently with any initial application for relief under the immigration laws for which no fee is

chargeable. (The fee of $585 shall be charged whenever an appeal or motion is filed by or on behalf of two or more aliens and all such aliens are covered by one decision. When a motion to reopen or reconsider is made concurrently with any application for relief under the immigration laws for which a fee is chargeable, the motion is filed and, if the motion is granted, the requisite fee for filing the application for relief will be charged and must be paid within the time specified in order to complete the application.)—$585.

\* \* \* \* \*

(c) \* \* \*

(5) Except as otherwise specifically provided by this paragraph and by paragraphs (c)(2) and (c)(4) of this section, no fee relating to any application, petition, appeal, motion or request made to U.S. Citizenship and Immigration Services may be waived under this section except for the following: Form I–90; Form I–751; Form I–765; Form I–817; Form N–300; Form N–336; Form N–400; Form N–470; Form N–565; Form N–600; Form N–600K; and Form I–290B and motions filed with U.S. Citizenship and Immigration Services relating to the specified forms in this paragraph (c)(5).

\* \* \* \* \*

Dated: January 26, 2007.

**Michael Chertoff,**

*Secretary.*

[FR Doc. E7–1631 Filed 1–31–07; 8:45 am]

**BILLING CODE 4410–10–P**

electronic funds transfer or other means as specified in the loan documents.

### § 4280.54    Construction procurement requirements.

Construction, including bidding and awarding of contracts, must be conducted in a manner that provides maximum open and free competition.

### § 4280.55    Monitoring responsibilities.

(a) The Intermediary must monitor the Project to ensure that:

(1) Funds are used only for the approved purposes as specified in the legal documents;

(2) Disbursements and expenditures of funds are properly supported with certifications, invoices, contracts, bills of sale, or other forms of evidence, which are maintained on the premises of the Intermediary;

(3) Project time schedules are being met, projected work by time periods is being accomplished, and other performance objectives are being achieved; and

(4) The Project is in compliance with all applicable regulations.

(b) Rural Development may inspect and copy records and documents that pertain to the Project. The Intermediary must retain these records for the term of the Project loan plus 2 years. In addition, Rural Development may also perform Project site visits and reviews of the use of loan or Grant proceeds.

(c) Rural Development will review and monitor Grants in accordance with 7 CFR parts 3015, 3017, 3018, 3019, 3021, and 3052.

### § 4280.56    Submission of reports and audits.

(a) In addition to any reports required by 7 CFR parts 3015 and 3019, the Intermediary must submit the following monitoring reports to Rural Development:

(1) *Loan.* The Intermediary must submit Form RD 4280–1 ''Survey of Recipients of Rural Economic Development Loan and Grant Program'' to Rural Development on an annual basis until it no longer owes money to USDA under the REDLG Program.

(2) *Grant (Revolving Loan Fund).* The Intermediary must submit the Form RD 4280–1 to Rural Development on an annual basis until all projects financed with Rural Development Grant proceeds have been repaid or are otherwise retired, whichever occurs last. Thereafter, on a triennial basis until the fund is terminated, the Intermediary will submit to Rural Development the Form RD 4280–1, reporting on the activity of all loans made from the Revolving Loan Fund.

(b) If the Intermediary does not have an existing loan with RUS, the Intermediary will submit a copy of its annual audit to Rural Development within 90 days of its completion. All REDL audits must be conducted in accordance with Generally Accepted Government Auditing Standards or Generally Accepted Accounting Principles and REDG audits in accordance with 7 CFR part 3052.

(c) Rural Development may require Ultimate Recipients that receive loans financed with Grant funds provided under the REDG Program to submit annual audits to comply with Federal audit regulations. In accordance with 7 CFR part 3052, Ultimate Recipients that are nonprofit entities, or a State or local government, may be required to submit an audit subject to the threshold established in OMB Circular No. A–133.

### §§ 4280.57–4280.61    [Reserved]

### § 4280.62    Appeals.

An Intermediary may appeal any appealable adverse decision made by Rural Development that affects the Intermediary in accordance with 7 CFR part 11.

### § 4280.63    Exception authority.

Except as specified in paragraphs (a) through (c) of this section, the RBS Administrator may, on a case-by-case basis, make exceptions to any requirement or provision of this subpart, if such exception is necessary to implement the intent of the authorizing statute in a time of national emergency or in accordance with a Presidentially-declared disaster, or when such an exception is in the best interests of the Federal Government and is otherwise not in conflict with applicable law.

(a) *Applicant eligibility.* No exception to applicant eligibility can be made.

(b) *Project eligibility.* No exception to project eligibility can be made.

(c) *Rural area definition.* No exception to the definition of rural area, as defined, can be made.

### §§ 4280.64–4280.99    [Reserved]

### § 4280.100    OMB control number.

The information collection requirements contained in this regulation have been approved by the Office of Management and Budget (OMB) and have been assigned OMB control number 0575–0035. A person is not required to respond to this collection of information unless it displays a currently valid OMB control number.

Dated: May 17, 2007.

**Douglas L. Faulkner,**

*Deputy Under Secretary, Rural Development.*

[FR Doc. 07–2636 Filed 5–29–07; 8:45 am]

**BILLING CODE 3410–XY–U**

---

## DEPARTMENT OF HOMELAND SECURITY

### 8 CFR Part 103

[Docket No. USCIS–2006–0044; CIS No. 2393–06]

RIN 1615–AB53

### Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule

**AGENCY:** United States Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

---

**SUMMARY:** This rule adjusts the fee schedule for U.S. Citizenship and Immigration Services (USCIS) immigration and naturalization benefit applications and petitions, including nonimmigrant applications and visa petitions. These fees fund the cost of processing applications and petitions for immigration benefits and services, and USCIS' associated operating costs. USCIS is revising these fees because the current fee schedule does not adequately reflect current USCIS processes or recover the full costs of services provided by USCIS. Without an immediate adjustment of the fee schedule, USCIS cannot provide adequate capacity to process all applications and petitions in a timely and efficient manner. In addition, the revised fees will eliminate USCIS' dependency on revenue from interim benefits, temporary programs, and premium processing fees. This rule also merges fees for certain applications and petitions so applicants and petitioners will only have to pay a single fee. In addition, the rule expands the classes of aliens that will be exempt from paying filing fees for certain immigration benefits, and modifies the criteria for waiving the filing fee due to an individual's inability to pay. Based on comments received by USCIS during the public comment period, this rule changes the fees for adjustment of status applications, and the fee waiver and exemption eligibility criteria for several immigration benefits. This final rule will provide sufficient funding for USCIS to meet national security, customer service, and processing time goals, and to sustain and improve service delivery.

**DATES:** This rule is effective July 30, 2007. Applications or petitions mailed, postmarked, or otherwise filed, on or after July 30, 2007 must include the new fee.

**FOR FURTHER INFORMATION CONTACT:** Paul Schlesinger, Chief, Budget Division, Office of Planning, Budget and Finance, United States Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 4052, Washington, DC 20529, telephone (202) 272–1930.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
II. Final Rule
    A. Application To Register Permanent Residence or Adjust Status
    B. Intercountry Adoptions
    C. Fee Waivers and Exemptions
    D. Miscellaneous Changes and Corrections
    E. Summary of Final Fees
III. Public Comments on the Proposed Rule
    A. General Comments
    B. Relative Amount of Fees
    1. Recovery of Additional Costs and Enhancements
    2. Proposed Fees Are Unreasonably High
    3. Improve Service, Reduce Inefficiencies
    4. Increases Relative to Time
    5. Increases Relative to Other Standards
    6. Grandfathering
    7. Budget Decisions Necessary To Administer Immigration Benefits
    8. Reorganization
    C. Alternative Sources of Funding
    1. Appropriated Funds
    2. Finding Other Revenue Sources
    D. Comments on Specific Benefit Application and Petition Fees
    1. Naturalization Application
    2. Application To Register Permanent Residence or Adjust Status
    3. Employment Authorization for Students
    4. Application for Advance Processing of Orphan Petition
    5. Entrepreneurs
    6. Effect on Availability of Skilled Workers
    E. Fee Waivers and Exemptions
    1. Victims and Asylee Adjustment of Status Applications
    2. Special Immigrant—Juvenile
    3. Biometric Fee
    F. Authority To Set and Collect Fees
    1. Authority Under the INA
    2. General Authority for Charging Fees
    3. Surcharge for Asylum, Refugee and Fee Waiver/Exemption Costs
    4. OMB Circular A–25
    5. Homeland Security Act
    G. Methods Used To Determine Fee Amounts
    1. USCIS Costs
    2. Alternative Budget Modeling
    3. "Make Determination" Activity
    4. Activity-Based Costing
    5. Calculating Specific Processing Requirements
    6. Overhead Charges
    7. Recovering Deficit From Current Operations
    8. Charging a Flat Fee
    9. Financial Audits
    10. Acceptance of Electronic Payment options
    11. Other USCIS Fees
IV. Statutory and Regulatory Reviews
    A. Regulatory Flexibility Act
    B. Unfunded Mandates Reform Act of 1995
    C. Small Business Regulatory Enforcement Fairness Act of 1996
    D. Executive Order 12866
    E. Executive Order 13132
    F. Executive Order 12988
    G. Paperwork Reduction Act

**List of Acronyms and Abbreviations**

ABC—Activity-Based Costing
BSS—Biometrics Storage System
CBP—United States Customs and Border Protection
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FBI—Federal Bureau of Investigation
FDNS—Fraud Detection and National Security
FY—Fiscal Year
GAO—Government Accountability Office
GDP—Gross Domestic Product
HSA—Homeland Security Act
ICE—United States Immigration and Customs Enforcement
IEFA—Immigration Examinations Fee Account
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service
IOAA—Independent Offices Appropriation Act
LPR—Lawful Permanent Resident
OIG—Office of Inspector General
OMB—Office of Management & Budget
OPT—Optional Practical Training
PPBS—Planning Programming Budgeting System
SSA—Social Security Administration
TPS—Temporary Protected Status
USCIS—United States Citizenship and Immigration Services
VAWA—Violence Against Women Act
ZBB—Zero Based Budget

**I. Background**

On February 1, 2007, U.S. Citizenship and Immigration Services (USCIS) published a notice of proposed rulemaking proposing to adjust USCIS' immigration and naturalization benefit fee schedule. 72 FR 4888. USCIS' current fee schedule does not establish a level of funding sufficient to fully fund USCIS operations, allow for future requirements, ensure adequate staffing, or provide USCIS with funding sufficient for technological capabilities to continue or improve timely and efficient processing of immigration benefits. The fees that fund the IEFA were last updated on October 26, 2005, but merely to adjust the existing fee schedule to reflect inflation. See 70 FR 56182 (Sept. 26, 2005). The last comprehensive fee review was conducted in fiscal year 1998 by the Immigration and Naturalization Service (INS). See 63 FR 1775 (Jan. 12, 1998) (proposed rule); 63 FR 43604 (Aug. 14, 1998) (final rule fee adjustment).

In 2004, the Government Accountability Office (GAO) reported that the fees collected by USCIS were insufficient to fund USCIS operations. GAO, *Immigration Application Fees: Current Fees are Not Sufficient to Fund U.S. Citizenship and Immigration Services' Operations* (GAO–04–309R, Jan. 5, 2004). GAO recommended that USCIS "perform a comprehensive fee study to determine the costs to process new immigration applications." *Id.* at 3. In response to GAO's recommendations, USCIS undertook a comprehensive fee review to revise its application and petition fees to ensure full recovery of its operational costs.

As discussed in the proposed rule, the Immigration and Nationality Act of 1952 (INA), as amended, provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants. INA section 286(m), 8 U.S.C. 1356(m). The INA also states that the fees may recover administrative costs as well. *Id.* The fee revenue collected under INA section 286(m) remains available to provide immigration and naturalization benefits and the collection of, safeguarding of, and accounting for fees. INA section 286(n), 8 U.S.C. 1356(n).

USCIS must also conform to the requirements of the Chief Financial Officers Act of 1990 (CFO Act), 31 U.S.C. 901–03. The CFO Act requires each agency's Chief Financial Officer (CFO) to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." *Id.* at 902(a)(8). This final rule reflects recommendations made by the DHS CFO and USCIS CFO as required under the CFO Act.

Office of Management and Budget (OMB) Circular A–25 establishes Federal policy regarding fees assessed for Government services and the basis upon which federal agencies set user charges sufficient to recover the full cost to the Federal Government. OMB Circular A–25, User Charges (Revised), section 6, 58 FR 38142 (July 15, 1993) (OMB Circular A–25). Under OMB Circular A–25, the objective of the United States Government is to ensure that it recovers the full costs of providing specific services to users. Full

AR_001869

costs include, but are not limited to, an appropriate share of—

(a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

(b) Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel and rents or imputed rents on land, buildings, and equipment; and,

(c) Management and supervisory costs.

Full costs are determined based upon the best available records of the agency. *Id; see also* OMB Circular A–11, section 31.12 (June 30, 2006) (Fiscal Year (FY) 2008 budget formulation and execution policy regarding user fees), found at *http://www.whitehouse.gov/omb/ circulars/a11/current_year/ a11_toc.html.* When developing fees for services, USCIS also looks to the Federal Accounting Standards Advisory Board (FASAB) which defines "full cost" to include "direct and indirect costs that contribute to the output, regardless of funding sources." Federal Accounting Standards Advisory Board, Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government 36 (July 31, 1995). To obtain full cost, FASAB identifies various classifications of costs to be included, and recommends various methods of cost assignment. *Id.* at 33– 42.

USCIS entered supporting fee review documentation for this rulemaking and its budget methodology, including budget methodology analyses and regulatory flexibility analyses, into the public docket. *See http://www.regulations.gov,* docket number USCIS–2006–0044. A more detailed discussion of USCIS' fee review can be found in the proposed rule for this rulemaking action at 72 FR 4888.

**II. Final Rule**

This fee rule sets out fees to recover the full costs of USCIS operations. Without these fee adjustments, USCIS will not be able to maintain critical business functions, properly address fraud and national security issues, or process incoming applications and petitions in a timely manner. The revised fee schedule will close existing funding gaps and allow USCIS to take specific and demonstrable steps to strengthen the security and integrity of the immigration system, improve customer service, and modernize business operations. The fee revenue generated by the revised fee schedule will support increased security and fundamentally transform and automate

USCIS business operations, all of which will greatly strengthen the ability of USCIS to perform its mission and place USCIS in a better position to support possible future legislative reforms. This fee rule assumes that no new appropriation will be enacted.

This final rule largely implements the fee structure described in the proposed rule, but makes some adjustments to the fee schedule based on public comments received. This rule also expands the proposed fee waiver policy to include additional classes of applicants and petitioners who may apply for a waiver of certain application and petition fees for certain services. The rationale for each change is discussed in the section of the rule that discusses comments on that issue. The specific changes made are summarized as follows.

*A. Application To Register Permanent Residence or Adjust Status*

In the proposed rule, the proposed fee of $905 for an Application to Register Permanent Residence or Adjust Status, Form I–485, was based on USCIS' projected overall cost of processing the average application, regardless of the applicant's age. Under the final rule, the standard fee for filing a Form I–485 by an individual will be $930; the fee for a child under the age of fourteen years will be $600 when submitted concurrently for adjudication with the application of a parent under sections 201(b)(A)(i), 203(a)(2)(A), or 203(d) of the INA. The comments received on this issue and the rationale for making this change are discussed in section III.D.2 below.

*B. Intercountry Adoptions*

In the proposed rule, the proposed fee of $670 for filing an Application for Advance Processing of Orphan Petition, Form I–600A, was based on USCIS' projected overall cost of processing the average application. This final rule does not change that proposed fee, retaining it at $670. However, the final rule provides that the first request for extension of the approval of an Application for Advance Processing of Orphan Petition will be accepted without a fee if the request is filed in advance of the expiration of the Notice of Favorable Determination Concerning Application for Advance Processing of Orphan Petition, Form I–171H, and no Petition to Classify Orphan as Immediate Relative, Form I–600, has been filed with USCIS for adjudication. This no charge extension is limited to only one occasion. A complete application and fee must be submitted for any subsequent application.

This final rule also provides that no biometric fee will be charged for an update of an approved Application for Advance Processing of Orphan Petition. Section III.D.4. below discusses the comments received in this area and the reasons for making this change.

*C. Fee Waivers and Exemptions*

The final rule alters the proposed rule regarding fee waivers in three important ways:

• It permits an application for a fee waiver for the Application for Adjustment of Status from asylees, victims of human trafficking (T visas), victims of violent crime (U visas), and Violence Against Women Act (VAWA) self petitioners, and Special Immigrant—Juveniles.

• It provides that a "Special Immigrant—Juvenile" will not be charged a fee for submitting the Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360.

• It permits an application for fee waiver of the biometric fee.

These three changes represent a significant expansion of the fee waiver policy from what was proposed and will ensure that many applicants or petitioners, who may have faced financial hardship as a result of these fees, may now have that hardship alleviated. Section III.E. below discusses these changes and the comments received in this area more fully.

*D. Miscellaneous Changes and Corrections*

The final rule makes a few clarifying changes to the regulatory text in the proposed rule. First, as a result of a comment, USCIS found that the fee schedule contained a form that was no longer being used. As a result, references to the entry for Application for Change of Nonimmigrant Classification, Form I–506, are removed by this rule. Second, the explanation of the fee for a Motion, Form I–290B, was found to be outdated in that the section had not been updated to comport with changes that had been made to 8 CFR part 242 and 8 CFR 1003.8. This rule also clarifies that fee to reflect current procedures and policies and the applicability of the Motion fee. Finally, the maximum fee proposed for Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of Public Law 99– 603),[1] Form I–698, and Application for Status as a Temporary Resident under Section 245A of the Immigration and

[1] Immigration Reform and Control Act of 1986, Public Law 99–603, tit. II, sec. 201, 100 Stat. 3359, 3394 (Nov. 6, 1986).

**29854**    **Federal Register** / Vol. 72, No. 103 / Wednesday, May 30, 2007 / Rules and Regulations

Nationality Act, Form I–687, to be paid by a family with children under eighteen years of age living at home was removed from the final rule. The statutory eligibility requirements for adjustment of status under Public Law 99–603 preclude anyone who is currently under age eighteen from eligibility. Accordingly, that provision was obsolete.

*E. Summary of Final Fees*

The USCIS Immigration and Naturalization Benefit Application and Petition Fee Schedule, the proposed fees, and the final fees established by this rule are summarized in the attached table.

| Form No. | Description | Current fees | Proposed fees | Final fees |
|---|---|---|---|---|
| I–90 ................ | Application to Replace Permanent Resident Card ...................................... | $190 | $290 | $290 |
| I–102 ................ | Application for Replacement/Initial Non-immigrant Arrival-Departure Record (I–94). | 160 | 320 | 320 |
| I–129 ................ | Petitions for a Nonimmigrant Worker ..................................................... | 190 | 320 | 320 |
| I–129F ............... | Petition for Alien Fiancé(e) ................................................................ | 170 | 455 | 455 |
| I–130 ................ | Petition for Alien Relative ................................................................... | 190 | 355 | 355 |
| I–131 ................ | Application for Travel Document ........................................................... | 170 | 305 | 305 |
| I–140 ................ | Immigrant Petition for Alien Worker ...................................................... | 195 | 475 | 475 |
| I–191 ................ | Application for Advance Permission to Return to Unrelinquished Domicile ........... | 265 | 545 | 545 |
| I–192 ................ | Application for Advance Permission to Enter As a Nonimmigrant ...................... | 265 | 545 | 545 |
| I–193 ................ | Application for Waiver of Passport and/or Visa ......................................... | 265 | 545 | 545 |
| I–212 ................ | Application for Permission to Reapply for Admission into the United States After Deportation or Removal. | 265 | 545 | 545 |
| I–360 ................ | Petition for Amerasian, Widow(er), or Special Immigrant .............................. | 190 | 375 | 375 |
| I–485 ................ | Application to Register Permanent Residence or Adjust Status ........................ | 325 | 905 | 930 |
| I–526 ................ | Immigrant Petition by Alien Entrepreneur ............................................... | 480 | 1,435 | 1,435 |
| I–539 ................ | Application to Extend/Change Nonimmigrant Status .................................... | 200 | 300 | 300 |
| I–600/I–600A ..... | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing or Orphan Petition. | 545 | 670 | 670 |
| I–601 ................ | Application for Waiver of Grounds of Inadmissibility .................................... | 265 | 545 | 545 |
| I–612 ................ | Application for Waiver of the Foreign Residence Requirement ......................... | 265 | 545 | 545 |
| I–687 ................ | For Filing Application for Status as a Temporary Resident ............................. | 255 | 710 | 710 |
| I–690 ................ | Application for Waiver of Excludability ................................................... | 95 | 185 | 185 |
| I–694 ................ | Notice of Appeal of Decision ............................................................... | 110 | 545 | 545 |
| I–695 ................ | Application for Replacement Employment Authorization or Temporary Residence Card. | 65 | 130 | 130 |
| I–698 ................ | Application to Adjust Status from Temporary to Permanent Resident .................. | 180 | 1,370 | 1,370 |
| I–751 ................ | Petition to Remove Conditions on Residence ........................................... | 205 | 465 | 465 |
| I–765 ................ | Application for Employment Authorization ............................................... | 180 | 340 | 340 |
| I–817 ................ | Application for Family Unity Benefits ..................................................... | 200 | 440 | 440 |
| I–824 ................ | Application for Action on an Approved Application or Petition ......................... | 200 | 340 | 340 |
| I–829 ................ | Petition by Entrepreneur to Remove Conditions on Residence ........................ | 475 | 2,850 | 2,850 |
| I–881 ................ | NACARA—Suspension of Deportation or Application for Special Rule Cancellation of Removal. | 285 | 285 | 285 |
| I–914 ................ | Application for T Nonimmigrant Status ................................................... | 270 | 0 | 0 |
| N–300 ............... | Application to File Declaration of Intention .............................................. | 120 | 235 | 235 |
| N–336 ............... | Request for Hearing on a Decision in Naturalization Procedures ...................... | 265 | 605 | 605 |
| N–400 ............... | Application for Naturalization .............................................................. | 330 | 595 | 595 |
| N–470 ............... | Application to Preserve Residence for Naturalization Purposes ....................... | 155 | 305 | 305 |
| N–565 ............... | Application for Replacement of Naturalization Citizenship Document ................. | 220 | 380 | 380 |
| N–600 ............... | Application for Certification of Citizenship ............................................... | 255 | 460 | 460 |
| N–600K ............. | Application for Citizenship and Issuance of Certificate under Section 322 ........... | 255 | 460 | 460 |
| | Biometric Services ........................................................................... | 70 | 80 | 80 |

## III. Public Comments on the Proposed Rule

USCIS provided a 60-day comment period in the proposed rule and received more than 3,900 comments.[2] USCIS received comments from a broad spectrum of individuals and organizations, including refugee and immigrant service and advocacy organizations, public policy and advocacy groups, State and local governmental entities, educational and other not for profit institutions, labor organizations, corporations, and individuals. Many comments addressed multiple issues. USCIS received hundreds of comments through many distinct form letters and mass mailings that were identical or nearly identical in content. Many comments provided variations on the same substantive issues.

The comments ranged from strongly supportive of the increased fees to strongly critical. Many comments provided critiques of the methodology and the proposed fee schedule; some suggested alternative methods and funding sources.

USCIS also invited the public to access the commercial software utilized in executing the budget methodology and developing the proposed rule to facilitate public understanding of the fee modeling process explained in the supporting documentation. 72 FR 4889. USCIS received no requests for such access to the modeling program.

On February 14, 2007, the House Committee on the Judiciary, Subcommittee on Immigration, Citizenship, Refugees, Border Security,

---

[2] All comments may be reviewed at the Federal Docket Management System (FDMS) at *www.regualtions.gov,* docket number USCIS–2006–0044. The public may also review the docket upon request by contacting USCIS through the contact information listed in this rule. [0]

and Immigration Law heard testimony from the USCIS Director on the fee proposal during the public comment period. USCIS has included an unofficial transcript of that hearing in the docket. See, Proposal to Adjust the Immigration Benefit Application and Petition Fee Schedule, 110th Congress, 1st Sess. (Feb. 14, 2007).

USCIS leadership met with stakeholders and conducted "question and answer" sessions during the public comment period at various cities throughout the United States, including: Washington, DC.; Los Angeles, California; New York, New York; Chicago, Illinois; Detroit, Michigan; Boston, Massachusetts; San Francisco, California; San Jose, California; Dallas, Texas; Phoenix, Arizona; and Denver, Colorado. Participants were encouraged to submit written comments on the rule.

USCIS considered the comments received, the congressional hearing transcript, the content of the public meetings, and all other materials contained in the docket in preparing this final rule. Throughout the comment period, USCIS conducted a "rolling" review process. Comments were reviewed as soon as practical after receipt and re-reviewed in light of subsequent comments. The review process was very resource intensive and it permitted USCIS to develop a continuous understanding of the issues presented and maturation of consideration of the issues most commonly presented.

A number of comments were not relevant to the substance of the proposed rule and criticized the rule for not addressing other immigration law issues. Many commenters suggested changes in the substantive regulations implementing the immigration laws by USCIS, United States Customs and Border Protection (CBP), United States Immigration and Customs Enforcement (ICE), and other agencies. These comments are beyond the scope of this rulemaking.

The final rule does not address comments seeking changes in United States statutes, changes in regulations or applications and petitions unrelated to or not addressed by the proposed rule, changes in procedures of other components within the Department of Homeland Security (DHS) or other agencies, or the resolution of any other issues not within the scope of the rulemaking or the authority of DHS.

The public may also review any item in the docket upon request by contacting USCIS through the contact information listed in this rule.

*A. General Comments*

Numerous comments supported the rule, although many of those were qualified by expectations that the fee increase will result in better service. Many of these comments emphasized that the costly delays in case processing are far more expensive to applicants and petitioners than the cost of the discrete filing fee. Others emphasized that filing fees are often a small portion of the total cost incurred by an individual or family immigrating to the United States.

In addition, many comments criticized the level of fees and the amount of the fee increase. A significant number of comments criticized the proposed fee schedule, suggested that the fee increase would impede immigration, or argued that specific fees should not be increased at all or not by the amount proposed. Many commenters disagreed with the budget decision to fund USCIS entirely from fees and argued that USCIS should seek an appropriation from Congress.

*B. Relative Amount of Fees*

A significant number of commenters argued that the proposed fees were too low. Some expressed general concerns about immigration levels. Others argued that fees should be high enough to cover all immigration related costs, not simply application and petition processing and related USCIS costs, so taxpayers are not asked to pay for someone entering, residing, or seeking services in the United States.

1. Recovery of Additional Costs and Enhancements

Many comments suggested that even greater increases could be used to further improve customer service, stating that this result would reduce the perceived need for an individual to seek the assistance of an attorney to understand and navigate the immigration benefits application and petition process. Other comments suggested that fees should not be based on USCIS' costs of administration, but on the value of the benefit received by the applicant (e.g., United States citizenship). Additionally, some comments pointed out that many aliens make large payments to those who help them enter the United States illegally, suggesting that this demonstrated the willingness to pay more to enter and remain in this country legally or illegally.

Some comments supporting the proposed fees, or even higher increases, asserted that the fee increases are not significant when viewed in a broader context. Some cited the value of

naturalization relative to the cost. Others noted that most people must be permanent residents for five years before they can apply for United States citizenship and the proposed fee requires saving less than $10 per month toward that goal. Other examples were also cited, including the fact that the fee for a petition for a relative, fiancé, or orphan is a very small part of the total cost of bringing that person to the United States.

The filing fees proposed and established under this rule are significantly higher than applicants and petitioners pay today. These fees, however, are based only on the costs associated with adjudicating applications.

Several comments suggested that the fee increases were overdue and should have been implemented long ago. These commenters agreed with the proposed rule that the fee increases were necessary to increase the effectiveness of USCIS services. They recommended quick implementation of this rule so USCIS could begin making the planned improvements to its operations as soon as possible. As stated in the proposed rule, the current fee schedule does not generate enough revenue for USCIS to even process the current volumes of applications and petitions in a timely manner. As the Director of USCIS stated in his testimony before Congress on February 14, 2007, USCIS intends to implement this fee increase in the summer of 2007 so that it can begin its efforts to reduce average application processing times. This plan was also stated in the USCIS press release of January 31, 2007. USCIS plans to begin collecting these new fees in order to begin fully recovering its costs and obtaining the resources necessary to timely process applications. Thus, the commenters' suggestions are being recognized, but they are in line with original plans of USCIS.

Specific comments suggested that the application fee for a Petition for a Nonimmigrant Worker, Form I–129 (Nonimmigrant Worker Petition), which is filed by businesses seeking to allow aliens to work in the United States, should be increased. According to these comments, higher fees should offset or alleviate the stress that these workers placed on the infrastructure of the United States, increased demand for governmental services, impact on the American labor market, reduced opportunities for citizens, and lowered salaries for American workers. Similarly, some comments suggested that a portion of fees should reimburse States for providing job training programs.

Although a number of comments suggested that USCIS increase fees further it is important to note that the purpose of filing fees is only to recover the costs associated with providing a benefit or service. Filing fees are not designed to function like tariffs and generate general revenue to support broader policy decisions, or like fines to deter certain behaviors. The filing fees are not intended to influence public policy in favor of or in opposition to immigration, limit immigration, support broader infrastructure, or impact costs beyond USCIS.

Other comments suggested that increasing specific fees, such as for an Application to Extend/Change Nonimmigrant Status, Form I–539, would serve as a deterrent to reinstatement applications and, instead, cause more aliens to remain in the United States longer than their period of authorized stay.

USCIS considered these suggestions and others and in some cases, discussed further in this rule, made changes in response to public comments. These changes though continue to follow the President's FY 2007 Budget which called for USCIS to reform its fee structure, and the GAO recommendation that USCIS ''perform a comprehensive fee review to determine the costs to process new immigration applications.'' This rule is designed to establish fees sufficient to reimburse the full, necessary, ongoing, and projected costs of processing immigration benefit applications and petitions and the related operating costs of USCIS.

While USCIS has authority to collect fees for certain broader costs of administering the United States' immigration system, it has chosen to structure the fees to only recover the full cost of operating USCIS. USCIS believes that this decision is the most consistent with broader Administration policy on user fees and the intent of Congress in the enactment of, and amendments to, section 286(m) of the Immigration and Nationality Act (INA), 8 U.S.C. 1356(m). Accordingly, USCIS has not changed fees based on these comments.

2. Proposed Fees Are Unreasonably High

The largest number of comments opposed the proposed fee increases in general terms or highlighted particular applications and petitions and argued that the proposed fee increases would effectively exclude aliens generally, or groups of aliens, from immigration benefits and services. Some suggested that fee increases send the wrong message to people who are attempting to comply with the immigration benefit

process and United States immigration laws in good faith, and that higher fees may discourage legal immigration while encouraging aliens to attempt to enter the United States and work illegally. These comments reflect another specific position on the larger issues of immigration law and policy that aliens should be induced to immigrate to the United States. As noted above in relation to the opposite position, the purpose of the fee schedule is not to establish policy, but to recover the costs necessary to operate USCIS. Accordingly, the final rule does not adjust the fee schedule in response to these comments.

A portion of these comments argued that the fee increases would result in a decrease in applications and petitions. Contrary to the opinions expressed, USCIS records do not reflect any empirical evidence suggesting a long-term reduction in the demand for immigration benefits resulting from fee increases. While fees at an extremely high level could be a factor in whether or not someone files an application with USCIS, neither past fee increases nor the incremental increases in this rule begin to approach the level necessary to have any significant impact on the demand for USCIS benefits. USCIS acknowledges that short-term increases in applications and petitions occur after a fee increase has been announced, followed by short-term decreases in demand immediately after the fee increases become effective. This fluctuation is a normal result of an increase in the cost of any service, whether governmental or private. Generally, applicants and petitioners with the ability to file do so before fees increase. Individuals logically choose to pay a lower price for a service if and when available. However, USCIS records indicate that demand returns to normal shortly after the effective date of a fee increase. When the Immigration and Naturalization Service (INS) conducted the last comprehensive fee review in FY 1998 and fees increased, on an average percentage basis, more than they increase in this rule, the demand for immigration benefits remained fairly constant shortly thereafter. In any case, USCIS fees are generally believed to be only a portion of the total expenses incurred by a typical applicant.

These comments infer that these temporary fluctuations undercut the stability of the funding stream to be generated by the proposed fees. USCIS acknowledges that slight fluctuations will occur and will be reflected in the funding stream, but these fluctuations are not significant enough, in the

context of the overall USCIS budget, to adversely affect services.

3. Improve Service, Reduce Inefficiencies

a. Service improvement and fees.

Many comments noted lengthy waiting times to process immigration benefit applications and petitions and highlighted the need to improve overall customer service. These comments suggested that, regardless of whether the proposed fees were justified, applicants and petitioners should not be asked to pay the full fee increase until USCIS improves service. Others suggested that even if fees were increased before service level improvements were made, there should be detailed commitments to service level improvements to ensure that increased revenues are used to improve service.

Some comments stated that USCIS has increased fees before with the promise of enhanced services, but never fully delivered on that promise. Other comments indicated that the proposed rule does not outline an overall strategic plan for improvements, with measurable benchmarks and tangible goals for implementing the needed upgrades, or a specific timeline or completion schedule to assure interested parties that these improvements will actually be accomplished. One commenter complained that customer service and processing backlogs have not improved enough to justify such a steep fee increase.

These comments illustrate the main distinction between the revised fee schedule and current one in that the current fee schedule does not reflect the existing costs of performance. The current fee schedule does no more than sustain USCIS operations and provide for delivery of benefits at an unacceptable level. Historically, USCIS balanced resource requirements to allocate insufficient revenues from a fee structure that did not recover full costs. The new fee structure is designed to maintain sufficient capacity to meet appropriate performance standards and goals, while sustaining performance through investments to deliver continuous improvements into the foreseeable future. USCIS acknowledges the commenters' concerns, and believes that these concerns will be satisfied, at least in part, after implementation of the new fee structure.

USCIS is required by law to review its fees at least once every two years. 31 U.S.C. 902(a)(8). USCIS has established a dedicated staff in its Office of Planning, Budget, and Finance to conduct future comprehensive analyses. USCIS is firmly committed to seeking

improved ways of doing business and reengineering processes in order to contain costs. The new fee structure will enable USCIS to make improvements that may ultimately help avoid future increases and possibly reduce costs. Process improvements implemented over the past several years, as well as projected productivity increases, are taken into account in the current fee review, keeping fees lower than they might otherwise have been. Future productivity enhancements will produce lower costs per unit that will be reflected in future price adjustments.

The fees are based on the costs necessary to sustain the processing of applications and petitions. If fees collected remain below processing costs, the imbalance will, as it has in the past, result in a backlog. Backlogs mean customers will not receive the benefits and services for which they have applied in a timely manner. A structural deficit between costs and fees will also mean USCIS cannot effectively sustain operations because of insufficient capital to invest in improvements. Over time, a structural deficit between costs and fees will create and accelerate the growth of backlogs and deteriorate service levels. Delays caused by the inability to meet demand resulting from fees set below cost often have far more impact on the person than the discrete application or petition fee.

The proposed fee adjustments and this final rule reflect these concerns. Over the past several years, USCIS received appropriated funds to reduce processing times and meet the President's goal of a six-month or less processing time for nearly all immigration benefit applications and petitions. By the end of FY 2006, the application and petition backlog had fallen from a high of 3.8 million cases in January 2004 to less than 10,000 considered under USCIS control. The total volume of pending cases is currently less than the backlog was at its height, which shows real and substantial progress.

USCIS has also made many customer service improvements, including, but not limited to, expanding online capabilities (such as online filing, change of address and case status updates), INFOPASS appointments (providing the ability to go online to make, cancel, or reschedule appointments with a USCIS Immigration Information Officer), and introducing a broad range of fact sheets to help the public understand various benefits, eligibility criteria, and USCIS procedures. These improvements were made prior to the proposed fee increase. With the revenue generated from the

new fee schedule, USCIS will be able to deliver significant additional improvements. Until USCIS aligns its fees with costs, however, it will be unable to afford sufficient capacity to process incoming applications and petitions, resulting in backlogs.

b. Inefficiency in business-related visas.

Some comments highlighted particular inefficiencies and suggested that correcting these would mitigate the need for fee increases. An example of inefficiency mentioned by many commenters was the long processing delays for employment-based visa categories, including the immigrant employment-based classifications and the nonimmigrant classifications such as the temporary employee H nonimmigrant visa, and the intra-company transferees L nonimmigrant visa.

USCIS acknowledges that it does not always quickly and efficiently process the Immigrant Petition for Alien Worker, Form I–140 (Alien Employee Petition) for firms requesting USCIS approval to hire a foreign worker. Processing delays result from a number of factors that are beyond the control of USCIS, including extensive Federal Bureau of Investigation (FBI) name checks and retrogression of petition priority dates caused by over-subscription of the applicable visa categories. The solutions suggested by one commenter, however, such as mandatory processing times, automatic fee refunds, or automatic approval, would neither improve efficiency nor result in shorter processing time. The suggestion that delays result in refunds would merely cause more delays. Employers may use the premium processing service, if applicable, to obtain faster processing of certain employment-based petitions and applications, a process that may alleviate the commenters' concerns.

The national interest is not served and immigration laws are not complied with by automatically approving immigration benefits for persons solely as a result of the passage of time. Each applicant or petitioner must prove his or her eligibility for the benefit sought. While a backlog still exists, USCIS has achieved an average processing time for an Alien Employee Petition as of January 2007 of less than 135 days per case, which represents fifteen days faster than five years ago, but with a much higher current monthly volume. With the additional USCIS resources from this updated fee schedule, performance will be enhanced even further.

c. Multiple biometric data requests.

Many commenters pointed to the fact that applicants or petitioners must provide biometric data more than once. Some commenters considered the expiration of fingerprints submissions to be inefficient. Others suggested that it was inefficient for USCIS to again request fingerprints when they apply for sequential benefit applications. USCIS agrees that an applicant should not be required to provide biometric data multiple times for a single application. USCIS is developing the Biometrics Storage System (BSS) which will allow the re-use of fingerprints and, if an application or petition has not been adjudicated within the fifteen month validity period, USCIS will be able to simply re-submit the stored fingerprints to the FBI, without any involvement of the applicant or petitioner. See 72 FR 17172 (Apr. 6, 2007) (establishing a new system of records). Also, as a matter of policy, when an application remains pending, USCIS does not charge the applicant the biometric fee again because of a processing delay at USCIS.

In the revised fee structure, the biometric fee is not simply a fee for biometric collection or the USCIS cost of the applicant or petitioner appearing at an Application Support Center. The biometric fee also covers costs associated with the use of the collected biometrics for FBI and other background checks. Thus, an applicant will pay the biometric fee whenever he or she files another application that requires the collection, updating, or use of biometrics for background checks. At that point, USCIS can verify the identity of the applicant by comparing the newly collected biometrics with those previously submitted, providing an important security enhancement. USCIS believes that this new process may result in some decreases in costs which may offset the costs of background checks incorporated into the biometric fee, and has already factored this impact into the fee structure along with projected efficiency increases.

d. Petitions for aliens of extraordinary ability or performers.

USCIS received many comments requesting improved efficiency in the processing of visa petitions for aliens of extraordinary ability in science, art, education, business, or athletics, and their spouses and/or children (the O visa category), or aliens coming to the United States temporarily to perform at a specific athletic competition or as a member of a foreign-based entertainment group (the P visa category). Many O and P petitions are submitted on relatively short schedules, i.e. the individual/group is scheduled to

visit the United States in the near future for a specific event.

These commenters stated that lengthy and uncertain O and P visa processing periods complicated booking foreign artists for performances and requested the implementation of a thirty-day maximum processing period. This issue is not germane to this rule; however, because of the volume of comments received, a brief response is provided.

The USCIS receipt notice received by an O and P petitioner after filing states that the petition will be processed in 30–120 days, but that time is a standardized estimate for all O and P petitions for many types of performers and organizations. Still, USCIS does everything in its control to adjudicate these petitions within 60 days. In spite of this fact, cases may be delayed by a number of causes that are beyond USCIS control, most commonly a lack of response to USCIS inquiries by the sponsoring organization, labor unions and other representatives, and the prospective visa recipient. For planning purposes, current estimates of various visa classification processing times and processing dates are posted on the USCIS website.

USCIS recently published a final rule to permit petitioners to file O and P nonimmigrant petitions up to one year prior to the need for the alien's services. 72 FR 18856 (April 17, 2007). Although that rule will not resolve all of the commenters' concerns, the longer filing window will better assure O and P petitioners that they will receive a decision on their petitions in a timeframe that will allow them to secure the services of the O or P nonimmigrant when such services are needed. USCIS suggests, however, that the nature of the O and P visa classifications creates a need to carefully plan performances and book foreign entertainment acts. Fees collected after publication of this rule will be used to cover USCIS costs and will assist in more reliable and consistent adjudication of all applications and petitions, including O and P visa petitions.

e. Pre-screening applications and petitions for lawful permanent residence.

One commenter supported the recommendation of the USCIS Ombudsman to require a comprehensive prescreening of Applications to Register Permanent Residence or Adjust Status, Form I–485, prior to filing. Citizenship and Immigration Services Ombudsman, *Annual Report to Congress*, 50–55 (June 29, 2006) (Recommendation 27). Recognizing that adoption of a prescreening process would reduce revenues, the commenter posited that it

would instead promote efficiency and integrity, and enhance security.

USCIS is committed to a process that handles cases efficiently and effectively, meeting all quality requirements in a way that protects the national security and public safety of the United States. USCIS cannot, however, agree with this recommendation at this time. The suggestion for "up-front processing" is very similar to a process that came to be known as "front-desking"—a procedure followed by the INS in which employees were instructed to review certain applications in the presence of the applicant to correct facial deficiencies, incomplete responses or errors before accepting the application for filing, and not to accept those applications thought to be statutorily deficient. Front-desking effectively precluded administrative and judicial review of rejected applications because there was no formal denial to appeal— only a return of an uncorrectable document. *Reno v. Catholic Social Services*, 509 U.S. 43, 61–63 (1993). Legitimation of the concept of up-front processing would require a fundamental change in the regulations administered by USCIS and goes well beyond the scope of this rulemaking. USCIS will not adopt this proposal as a part of this rulemaking.

f. Transformation project and premium processing.

Some comments requested more information on transformation plans and how premium processing revenues will be spent. Others suggested that premium processing be expanded. Another commenter suggested that transformation from a paper to electronic process would create excessive costs and burdens that would create financial and paperwork barriers to citizenship.

As required by statute, premium processing revenues are deposited in the IEFA and will be fully isolated from other revenues and devoted to the extra services provided to premium processing customers, and to broader investments in a new technology and business process platform to radically improve USCIS capabilities and service levels. INA Section 286(u), 8 U.S.C. 1356(u). USCIS has recognized that its existing technology has not kept pace with changing demands and additional requirements placed upon USCIS. Since the previous fee structure was retrospective and did not include funds for real investments to sustain and improve USCIS infrastructure, business choices have been limited to those that can be supported by existing technology or no technology.

The premium processing fee ($1,000) is statutorily authorized for employment based applications and petitions. USCIS cannot expand the premium processing fee or the applications and petitions available for premium processing beyond the statutory limitations.

USCIS plans to transform the current paper based process into an electronic adjudicative process. This transformation will allow USCIS to better detect and deter those who seek to do harm or violate the laws of the United States, while facilitating benefits processing for eligible, low-risk persons.

USCIS acknowledges that the transition from a paper-based to an electronic adjudication system carries with it certain burdens, but believes the benefits of the new process will significantly outweigh those costs. The new adjudicative process will enable USCIS to enhance national security, improve customer service, and increase efficiency by increasing its ability to share data with immigration partners, improving security by uniquely identifying individuals, improving system integrity by creating customer accounts, and providing a single worldwide case management system. Nonetheless, as some commenters pointed out, not all applicants will have access to the Internet or other electronic means of submission. For those individuals, paper submissions will remain an option.

g. Actions planned to improve efficiency.

USCIS believes that, while sustainability of its operations focused on continuous improvement is important, so is real and substantive near-term improvement. USCIS structured the revised fee schedule to allow it to commit to specific substantial improvements over the next two years.

USCIS is committed to substantial reductions in processing times by the end of FY 2008 for four key applications: (1) Application to Renew or Replace a Permanent Resident Card, Form I–90 (Application for LPR Card); (2) Application to Register Permanent Residence or Adjust Status, Form I–485 (Adjustment of Status Application); (3) Immigrant Petition for Alien Worker, Form I–140 (Alien Employee Petition), the petition for an employer to sponsor a foreign worker for permanent residence based on its job offer; and (4) Application for Naturalization, Form N–400 (Naturalization Application), the petition to become a United States Citizen through naturalization. These four applications and petitions represent almost one-third of the USCIS total workload. By the end of FY 2008,

USCIS plans to reduce processing times for each of these cases by two months, from six months to four months (naturalization processing will be reduced from seven months to five months when the ceremony at which a person takes the oath of allegiance is included as part of the process). Thus, applicants and petitioners will see a significant improvement in the first full fiscal year following these fee adjustments. Further, as also indicated in the proposed rule, USCIS is committed to a twenty-percent average reduction in case processing times by the end of FY 2009, which will extend improvements in processing times and service delivery across the spectrum of applications and petitions.

The proposed fee structure commits USCIS to real improvements as it is not built simply on today's productivity rates, but on anticipated increases in productivity (four percent for the Adjustment of Status Application, and two percent for all other products). USCIS is accountable for these productivity increases in order for fees to support operations as intended.

Another commenter suggested that hiring more permanent employees would improve USCIS efficiency. USCIS agrees with the commenter that sufficient staffing is directly related to the ability to collect sufficient fees for service as explained in the proposed rule and this final rule. As presented in the President's FY 2008 Budget, USCIS plans to add 1,004 Adjudication Officers and support staff. However, twenty percent of the new staff will be other than permanent employees. Most of that staff will handle application and petition volume surges, a critical resource to ensure that the backlog does not increase due to sudden and unpredictable workload increases. However, the comment suggests no regulatory changes. Thus, no changes are made to the final rule.

One commenter questioned how quickly USCIS will be able to implement all of the resources outlined in the additional resource requirements. The commenter also questioned whether USCIS took into consideration ongoing expenses versus one-time expenses. USCIS has factored into the fee schedule the appropriate start up costs. USCIS did differentiate one-time costs versus recurring costs in its fee calculations. For example, one-time costs such as background investigations and computer equipment for new hires were included in the FY 2008 costs, but not in the FY 2009 costs. These calculations are accurately identified in the fee review supporting documentation.

### 4. Increases Relative to Time

Some comments suggested that some fees were excessive for certain applications and petitions relative to the time it takes to process the application or petition. As mentioned above and in the proposed rule, the primary basis of the USCIS fee model is the administrative complexity, which is the amount of time that it takes to process a particular kind of application or petition (identified as "Make Determination" activity in the proposed rule). The calculation also factors in other direct costs, such as the cost of manufacturing and delivering a document when that is part of the processing of a particular benefit.

In addition to these costs, the fee calculation model factors in the full costs of USCIS operations, including services provided to other applicants and petitioners at no charge, overhead costs (e.g., office rent, equipment, and supplies) associated with the adjudication of the application or petition, and other processing costs. These latter costs include responding to inquiries from the public ("Inform the Public" activity), application and petition data capture and fee receipting ("Intake" activity), conducting background checks ("Conduct Interagency Border Inspection System Checks" activity), the acquisition and creation of files ("Review Records" activity), preventing and detecting fraud ("Fraud Prevention and Detection" activity), and, when applicable, producing and distributing secure cards ("Issue Document" activity) and electronically capturing applicants' fingerprints, photographs, and signatures ("Capture Biometrics" activity). In total, all application and petition fees include a total of $72 in "surcharges" to recover asylum and refugee costs, and fee waiver and exemption costs.

### 5. Increases Relative to Other Standards

Many commenters suggested that the fee average or weighted average fee increases were out of line with, for example, the Social Security Administration's (SSA) 2007 basic cost of living increase, the increase in the Gross Domestic Product (GDP), or the federal General Schedule salary increase. USCIS appreciates the concerns expressed, but these external indicators of costs are not comparable with USCIS' costs. For example, SSA's basic cost of living increase is a benefit increase tied to inflation, whereas the USCIS fees recover all of the costs of operating USCIS, including enhancements required to meet congressional mandates, improve efficiency, detect fraud, secure the immigration system, and to consolidate elements such as federal salary increases into base costs. The real GDP or "real gross domestic product," on the other hand, is an estimate of the output of goods and services produced by labor and property located in the United States by the United States Department of Commerce Bureau of Economic Analysis. GDP bears no relation to the cost models that must generate the fees to be charged by USCIS.

Many commenters stated that the increase in the fee for the Application for Replacement Naturalization/ Citizenship Document, Form N–565, from $220 to $380, was unreasonable when compared with replacement of other documentation. Most of these commenters compared the fee for replacing a citizenship certificate with replacing a Social Security card, which the Social Security Administration provides for free, or replacing state documents (e.g. driver's licenses) that many states provide for a nominal charge.

Replacement of a social security card, driver's license, voter registration card, or passport is substantially different from replacement of a certificate of citizenship. USCIS incurs substantial costs in determining the validity of the naturalization for which the certificate was issued before it can issue a new certificate. As stated in the proposed rule and above, this fee schedule is based on the relative complexity of adjudication of a benefit application and reflects the average relative cost of adjudication of all such applications. The fees charged for replacing secure documents reflect the full costs incurred by USCIS in replacing those documents. Regardless of the type of change requested, USCIS must obtain the original records and issue a new certificate after the appropriate review and decisions. Charging $380 for adjudication of Form N–565 for an infant may recover more fees than that specific adjudication may require, however, $380 fails to recover the resources expended to determine the validity of the more complicated applications such as in the case of an adult who requires significant background investigation. Therefore, the Form N–565 fee was not adjusted from what was proposed.

Other comments stated that some fees should reflect validity periods with lower fees for benefits with shorter validity periods. This argument is similar to that advanced by many who advocated higher fees—that the fees should not be based just on costs, but

on the real or perceived value of the benefit. USCIS' methodology is based on the complexity of the adjudication, not the validity period. USCIS establishes maximum allowable time periods that may pass between its approval of a benefit and the applicant's receipt of the benefit based on the type of case and how passage of time influences the need for updates in the information used to make the determination. The approval validity period is not designed to generate revenue through unnecessary repeat filings. USCIS believes that the current methodology is fair and complies with Federal fee guidelines. Decreasing the fee for applications for benefits with shorter validity would only shift costs to other immigration benefit applications and petitions based on considerations that are not applicable. The comment will not be adopted.

6. Grandfathering

Some comments recommended phasing in the fee increase over a period of years, or fixing fees at current levels for those who already applied for one or more immigration benefits in the past, effectively grandfathering fees for those who are already in the USCIS system. Deferring fee increases would directly result in service delays. In addition, setting fees lower for any class of applicants or petitioners would merely transfer costs to other applicants. Thus, USCIS has not incorporated these recommendations.

7. Budget Decisions Necessary To Administer Immigration Benefits

Many comments highlighted a critical aspect of the fee structure—operations must be sustainable. The real cost of processing a type of application or petition is more than the discrete cost of processing a particular individual case today. It includes the cost of sustaining operations and making investments to continually improve service delivery and performance. The proposed fee structure is designed to meet performance standards and make continuous improvements through investments in training to ensure a high performance workforce, facilities to provide services that are more accessible to our customers, systems to support operations and performance, and resources to improve quality and performance management. These goals are consistent with the principles of Office of Management and Budget (OMB) Circular A–25.

8. Reorganization

Another commenter suggested that efficiency could be improved by

reorganizing USCIS in accordance with the recommendations of the USCIS Ombudsman. USCIS has recently reorganized its functions and expects this reorganization to provide greater efficiency once it has gained traction. *See* 71 FR 67623. Those expectations were incorporated into the proposed rule and this final rule.

*C. Alternative Sources of Funding*

Many comments did not dispute the methodology and costs, but asserted that applicants and petitioners simply should not be required to bear the burden of these fee increases. Many pointed to the benefits of immigration and assimilation and argued that because the United States benefits as a whole from immigration, as a matter of public policy immigrants should not bear the entire cost of processing. Many asserted that USCIS should find ways to keep fees down, even if it means operating at a deficit. Others suggested substituting appropriated monies for user fees to offset particular fees or activities or subsidize general USCIS operations.

1. Appropriated Funds

Many comments recommended that USCIS seek appropriated funds to close funding gaps, meaning that taxpayers should subsidize particular applications and petitions, certain processes, activities not directly related to the adjudication of the particular kind of application or petition, or fees in general. Some highlighted the public good and positive impact resulting from immigration, naturalization, or certain procedures (i.e., background checks) and argued that the public good merited the use of tax dollars to offset costs. Many comments suggested that appropriations be used to either subsidize specific benefit application or petition fees or all fees in general. Some comments suggested that fees should be the last recourse for funding immigration services; that is, USCIS should be required to have exhausted all possible means of seeking appropriated funds before imposing fee increases. One commenter faulted USCIS for not engaging Congress to cooperatively work on this issue. Others suggested funds be appropriated for discrete purposes to offset the cost of a particular activity associated with case processing or overall management of USCIS.

Other comments point out that section 286(m) of the INA, 8 U.S.C. 1356(m), authorizes the recovery of the full cost of providing immigration and naturalization services, including services provided without charge to many applicants. These comments point

out, however, that section 286(m) does not mandate full cost recovery, and that USCIS still has the option of seeking appropriations and choosing to recover less than full cost through user fees. Some commenters urged support for specific legislation that would alter the fee development process or affect this specific fee review process.

Finally, one commenter suggested that USCIS use appropriated funds to fund unusual or atypical expenses from its fee calculation. The commenter suggested that these infrastructure costs represent an ''investment'' that should not be funded by current immigration and naturalization applicants and must not be included in the fee calculation.

These comments go beyond the scope of the regulation and raise questions of whether Congress should alter the immigration laws of the United States or appropriate general funds for USCIS. In effect, these comments suggest that USCIS should take other actions outside the rulemaking and the authorization for this rulemaking under INA section 286(m), 8 U.S.C. 1356(m).

Law and policy have long supported the proposition that the costs of providing immigration benefits should be borne by those applying for those benefits. Thus, in this final rule, USCIS is adopting a fee schedule to recover its costs through user fees. While it is true that Congress has enacted intermittent appropriations to subsidize the operations of USCIS, the President's budget for FY 2008 does not request such an appropriated subsidy, except specific funds for expansion of an Employment Eligibility Verification program. Even if an appropriation were to be requested, receipt of sufficient funds (without adjusting the fee schedule) to cover the costs of USCIS operations may be doubtful. USCIS must fund the services it provides through the legal means at its disposal. Deferring the recovery of full costs while USCIS explores other funding options will delay service delivery to applicants and petitioners.

2. Finding Other Revenue Sources

Some comments suggested funding USCIS through fines assessed against employers who hire aliens who are not authorized to work in the United States. Other comments suggested a variation on the methodology, such as charging employers more than individuals or charging additional fees at the time of naturalization.

USCIS is statutorily barred from using fines assessed against employers. Unless specified in law, all fines and penalties under the immigration laws become miscellaneous United States Treasury

receipts and are deposited into the general fund, not the IEFA. INA section 286(c), 8 U.S.C. 1356(c). Those additional sources of USCIS revenue that are authorized, such as the DHS share of certain supplemental fees collected under section 286(v) of the INA, 8 U.S.C. 1356(v), have been taken into account in USCIS budgeting and fee setting.

USCIS believes that the methodology used to develop these fees—a methodology based on the complexity of the specific application or petition—is the most appropriate process to equitably allocate costs and provide long-term stable and reliable funding. Part of USCIS' funding problem has been reliance on temporary funding sources, including appropriated funding. This new fee schedule will establish a more stable source of funding. As the number of applications and petitions increases, USCIS will be better able to respond to increasing workload changes and will no longer be compelled to sacrifice customer service or rely on unreliable funding sources.

*D. Comments on Specific Benefit Application and Petition Fees*

Many comments that suggested that USCIS seek appropriated funds or other subsidies, or other means to reduce fees from the proposed levels, also emphasized issues and impacts related to particular applications and petitions. The fee development methodology is sensitive to the costs of adjudicating each type of application or petition based on the complexity of adjudicating it.

1. Naturalization Application

The fee for the Naturalization Application generated a large number of comments from a wide spectrum of commenters. The proposed rule would raise this fee from $400 to $675, including the required biometrics fee, or a 69 percent increase. Many comments highlighted the public interest in promoting citizenship and recommended reducing this fee.

USCIS understands the sentiment expressed by the commenters that becoming a citizen of the United States is an honor to be cherished. USCIS disagrees with the commenters who suggested that the proposed fee increase is inconsistent with our tradition of welcoming and integrating immigrants and that increasing the fee would send the wrong message to intending citizens.

The fee for a Naturalization Application is established at $595 in this final rule and properly reflects the intensive scrutiny with which a request for such an honor should be reviewed.

Naturalization applicants who are initially found eligible must be examined under oath to assure compliance with the many requirements for citizenship under the INA including competency in English, knowledge and understanding of United States Government and history, physical presence and maintenance of resident status in the United States, and facts and conduct reflecting their moral character and attachment to the United States Constitution and law. 8 U.S.C. 1401 *et seq.*

In adjudicating some naturalization applications, USCIS adjudicators must resolve complex subsidiary applications for certain exemptions, such as the Application to Preserve Residence for Naturalization Purposes, Form N–470, or the Medical Certification for Disability Exceptions, Form N–648 (which is processed and adjudicated without charge). Further, criminal and national security record checks are required for naturalization applications and may require the involvement of numerous USCIS personnel. In addition, the naturalization adjudication process may require multiple interviews, and solicitation and consideration of additional evidence bearing on eligibility. Finally, in the event of an adverse decision on the application or petition, the applicant is entitled to request a new hearing by a different adjudicator. All of these factors are reflected in the fee charged to recover the cost of adjudication.

Two factors in this final rule mitigate the Naturalization Application fee increase. First, the final rule maintains the current USCIS policy of permitting naturalization applicants to request an individual fee waiver. In determining inability to pay, USCIS officers consider all factors, circumstances, and evidence supplied by the applicant including age, disability, household income, and qualification within the past 180 days for a federal means tested benefit, as well as other factors associated with each specific case. For those applicants not granted a fee waiver, USCIS will charge a fee of $595 for processing naturalization applications. Additionally, the cost of fingerprints has been reduced slightly, resulting in a decreased overall cost for naturalization applicants. Accordingly, USCIS has determined that the effort and resources expended to process Naturalization Applications justifies this level of fee increase.

2. Application To Register Permanent Residence or Adjust Status

Many comments emphasized the overall size of the proposed increase for

the Adjustment of Status Application fee from $325 to $905, or 178 percent. Most of the proposed fee increase for the Form I–485 was driven by the packaging or ''bundling'' of related benefits with no separate fee. As indicated in the proposed rule, factoring in separate fees, applicants typically pay for additional services related to the Form I–485 for which they will no longer pay separately. In this rule, after consolidating the fees for the Adjustment of Status Application and the requests for interim benefits that previously required additional fees, the increase in the fee from $865 to $1,010 (17%), including the biometric fee, is significantly below the average increase for all fees.

A few comments suggested that incorporating the fee for the Application for Employment Authorization, Form I–765, (Application for EAD) and the fee for the Application for Travel Document, Form I–131, (Application for Travel Document) into the Adjustment of Status Application should only be an option. USCIS issues an Employment Authorization Document (EAD) to the alien after it approves an Application for Employment Authorization. An alien submits an Application for Travel Document to apply for a travel document, reentry permit, refugee travel document, or advance parole. EAD and travel documents are commonly referred to as ''interim benefits.''

These commenters suggested that children may not need or desire travel documents or work authorization, so the fee for an Adjustment of Status Application should be consequently reduced for a child or a family. Other comments suggested that, like refugees, asylees should not be required to pay the portion of the new Adjustment of Status Application fee attributable to the interim benefits, because eligibility to work is incident to their status. Finally, several commenters suggested that USCIS apply the fee consolidation for the Adjustment of Status Application, Application for EAD, and Application for Travel Document to all currently pending Adjustment of Status Applications.

USCIS has made no adjustment in this final rule as a result of these comments. USCIS determined that a change in the fee schedule was not justified because a type of applicant mentioned by the commenters may not need or want interim benefits. Neither does this rule adopt the suggestion to process Applications for EADs or Applications for Travel Documents for currently pending Adjustment of Status Applications without fee. USCIS records indicate that most applicants who

initially choose not to apply for an EAD or travel documents soon do so because they find that they need interim benefits almost immediately. As for asylees and refugees, asylees are authorized to work, but USCIS records indicate that most asylees and refugees obtain an EAD to provide to employers as readily accepted proof that they are authorized to work in the United States. The fees collected by USCIS for EAD Applications fund the costs incurred by USCIS for issuing EADs. USCIS incurs costs for adjudicating the Application for EAD which is a different issue from an asylee's authorization to work incident to asylee status. Further, although refugees are not required to submit a fee for their initial Adjustment of Status Application, they are required to pay the fee for an Application for EAD or for the Application for Travel Document to request a refugee travel document. Providing multiple fee options based on who typically requests interim benefits, when records indicate that the vast majority of applicants do request interim benefits, would be too complicated and costly for USCIS to administer. Applicants with a pending Adjustment of Status Application who did not pay a fee that incorporates the cost of an Application for EAD and an Application for Travel Document must continue to file separate interim benefit applications with the appropriate fee for each service.

A number of comments pointed out that the packaging of these services and the fee increase means that the total fees a family will pay for concurrently filed Adjustment of Status Applications will increase substantially, and argued for some form of family cap on the total fee to be collected. These commenters pointed out that the child fee level under the fee schedule was almost one-third lower than the adult fee, but the $100 difference under the proposed fees represents only an eleven percent differential between an adult's and a child's Adjustment of Status Application fees. These comments added that this effect exacerbated the impact of the fee changes on families. Other commenters were concerned that, while refugees are charged no fee for their Adjustment of Status Applications, the proposed rule provides that asylees must pay a fee for an Adjustment of Status Application and suggested that this treatment was disparate.

USCIS considered the suggestion that it institute a maximum fee for a family where several members submit simultaneous Adjustment of Status Applications (family cap). USCIS analyzed a number of scenarios to determine at what level a family cap

would not result in a significant transfer of the direct costs for adjudicating Adjustment of Status Applications for entire large families to individuals or smaller families. USCIS also weighed whether or not to transfer the costs of adjudicating Adjustment of Status Applications for large families to only other adjustment of status applicants or to all other benefit applications. Unfortunately, USCIS was unable to determine the size of the family at which it was no more administratively burdensome to process an Adjustment of Status Application for an additional relative when processing multiple, simultaneous Adjustment of Status Applications from family members. In the end, USCIS determined that the policy or humanitarian considerations inherent in the decisions made in this final rule to allow additional fee waivers is not sufficiently prevalent in the case of family Adjustment of Status Applications to warrant a family cap, absent such data on the requisite burden based on size. Thus, USCIS then turned to consideration of the variation in Adjustment of Status Application fees based on the applicant's age.

As pointed out by some comments, the fee for the Adjustment of Status Application was $325 for aliens fourteen years of age or older, but for aliens under fourteen years of age, the fee was $225. This amounted to a 31 percent difference in the base filing fee. In response to these comments, USCIS evaluated the difference in actual processing time and costs associated with the ''Make Determination'' activity for Adjustment of Status Applications. While the proposed fee for an Adjustment of Status Application was based on the overall cost of processing the average application, regardless of the applicant's age, the large majority of Adjustment of Status Applications are filed by persons fourteen or older. USCIS conducted an analysis of Adjustment of Status Applications submitted concurrently as part of an application from a family. For the application to be filed concurrently, the child must be a derivative applicant of the adult or the child's status must be based on the same legal authority as the adult's. This analysis found that there is a 35 percent difference in the average time it takes to process an Adjustment of Status Application filed by someone under fourteen years of age versus the time it takes to process a case filed by someone age fourteen or older. This calculation was consistent with the methodology employed by the proposed rule in that an identifiable adjudication was segregated and the relative

complexity of processing the benefit for a subset of applicants was determined. Applying this difference to the fee model reduces the fee for an Adjustment of Status Application for a family member under age fourteen from $805 to $600, and adjusts the fee for family members age fourteen and older from $905 to $930. Since the fee will drop for every concurrently-filed adjustment of status application for someone under 14, families with children who all file concurrently will see a drop in their collective adjustment fee. For example, a family of two adults and one child will see their total adjustment application fees drop by $155 relative to what they would have paid without this change, and a family with two adults and two children will see their collective fees drop by $360. A family with two adults and four children will see their fees drop by $770.

USCIS explored establishing a child discount in other immigration and naturalization benefit areas and has determined that a discount for adjudication of a child is only appropriate in the case of an Adjustment of Status Application. The Adjustment of Status Application requires adjudication of a distinct and separate application for a child, although it can be submitted simultaneously with other family members. Other benefits that require submission of a separate application from family members, but allow the family members to submit them concurrently for processing are distinguishable. For example, no fee is charged for the Registration for Classification as Refugee, I–590, and the fee for the Application for Temporary Protected Status, Form I–821, is statutorily capped at $50 per applicant, which is substantially below its adjudication costs. Similarly, besides children, there are no other subgroups of applicants for adjustment of status who possess qualities that would provide for segregation of relative adjudicative complexity that would provide sufficient data for a separate fee calculation.

Likewise, the maximum amount payable by a family was removed from the fee proposed for Application to Adjust Status from Temporary to Permanent Resident (under Section 245A of Pub. L. 99–603), Form I–698, and the Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act, Form I–687. That change was made mainly because Immigration Reform and Control Act of 1986 (Pub. L. 99–603, November 6, 1986) requires an applicant under that

Act to have entered the United States before January 1, 1982, which would exclude anyone currently under the age of 18. Further, the family cap for fees charged filing Form I–698 and Form I–687 was a policy established by INS for legalization and established at three times the fee for an individual. As explained earlier, a family cap that is not based on adjudicative complexity does not comport with the methods used for establishing the fee schedule in this rule. Therefore, beyond reducing Adjustment of Status Application fees for children, USCIS will not provide any discount for families based on size, and USCIS has decided to base Adjustment of Status Application fees on the direct costs associated with that service.

With regard to the different treatment for refugees and asylees, the exception for a fee for refugees is based on the requirement that a refugee must apply for adjustment of status within one year of admission as a refugee. INA section 209(a), 8 U.S.C. 1159(a). Further, while refugees have been affirmatively invited by the United States Government to come to the United States for permanent resettlement, asylees have sought admission of their own accord and requested to be allowed to stay. While USCIS agrees that both asylees and refugees should receive full protection from persecution, it is a reasonable policy choice to be more generous in awarding immigration benefits to those who are invited. Nonetheless, in response to comments on this subject, USCIS has decided to allow asylees to request a waiver of the Adjustment of Status Application fee on an individual basis. Section III.E addresses changes in fee waivers in more detail below.

3. Employment Authorization for Students

Many educational institutions and their representatives submitted nearly verbatim comments on the proposed fee increase for an Application for EAD. These commenters expressed significant concerns about the size of the fee and its effect on the limited financial capability of most international students in F visa status and their ability to apply for work authorization when they choose to participate in the Optional Practical Training (OPT) program. These comments noted that international students on F–1 visas are limited to 20 hours per week of on-campus employment and the money to pay the Application for EAD fee will curtail their ability to buy food and pay rent. Similarly, these same commenters, for the most part, expressed general concerns about the immigration benefit application expenses for international

students and their family members, who typically are of limited means.

For international students, F–1 status allows a student to remain in the United States as long as they are a properly registered full-time student. To maintain full-time status, a student must take at least four courses per semester at the undergraduate level, and depending on the academic program, three or four courses per semester at the graduate level. Also, under F–1 status, a student may work part-time in an on-campus job and in a "practical training" job directly related to the student's field of study for twelve months during or after the completion of studies. The OPT program mentioned by the commenters grants temporary employment authorization to provide F–1 students with an opportunity to apply knowledge gained in the classroom to a practical work experience off campus. To be eligible for OPT, a student must have been in full time student status for at least one full academic year preceding the submission of their application for OPT, be maintaining valid F–1 status at the time of the application, and intend to work in a position directly related to his or her major field of study.

The United States places a very high value on attracting international students and scholars to this country. The contributions to the academic experience for all students provided by the existence of a diverse international student body are invaluable. The resources devoted to delivering immigration benefits to deserving students show the importance of this goal to USCIS. USCIS also understands that international students already face significant hurdles, including financial hurdles, which is why the fee structure consolidated fees where consolidation made sense, and kept fees to a minimum. Nonetheless, substantial resources are expended by USCIS for adjudication of the student's eligibility for employment documents and the fee for an Application for EAD was established based on those needs. Further, while USCIS acknowledges that the salaries provided by OPT are helpful, the emphasis of OPT is on training students in their fields of study, not as a source of income. To that end, the $340 cost of requesting an Application for EAD is a very small portion of the total expenses incurred by an alien pursuing studies in the United States. EAD applicants may request an individual fee waiver based on inability to pay. For Applications for EAD that are not granted a fee waiver, USCIS will charge a fee of $340 for processing based on the effort and resources expended to process this benefit.

4. Application for Advance Processing of Orphan Petition

Many comments focused specifically on the fees for a Petition to Classify Orphan as Immediate Relative, Form I–600, and an Application for Advance Processing of Orphan Petition, Form I–600A. Several comments suggested that USCIS should reduce the fee and offer fee waivers for orphan petitions. These commenters effectively request that USCIS shift the costs of this program to other immigration benefit applications and petitions.

Adjudicating orphan petitions involves some of the most complex decision-making within immigration services because adjudication of Petitions to Classify Orphan as Immediate Relative and Applications for Advance Processing of Orphan Petition requires knowledge of many state adoption regulations and statutes and foreign country adoption requirements. Each petition must be accompanied by a home study, background checks, and evidence that must be carefully examined. Approval of parents as suitable to adopt is time sensitive as a result of the potential changes in a household that may impact the suitability of the home for an adopted orphan, such as loss of a job or divorce. Such changes often prevent reconsideration of the parents' petition. As a result of this approval expiration period, currently set at eighteen months, prospective adoptive parents must submit a new petition and all supporting documents if they wish to continue with the adoption process if they have not been matched with a child. USCIS sometimes works with a case for months, involving frequent contact with adoption agencies, social workers, and prospective adoptive parents. Finally, international orphan adoption adjudications require an investigation and information verification, and may require travel. This fee increase will allow USCIS to automate case management of adoption cases, further reducing any real or perceived delays in the manual, paper-based process currently in place.

Orphan petitioners must attest that the beneficiary will not become a public charge in order to be approved as a suitable adoptive parent. Further, the orphan petition fee is a small part of what a United States citizen petitioner chooses to accept as part of the overall process and cost of adopting a child from overseas and raising that child. The financial circumstances required to be eligible for this benefit directly contradict the rationale for shifting costs related to these applications to others,

or for offering a waiver of the fee because of inability to pay.

A significant number of comments suggested that USCIS mitigate the cost by extending the validity of approved orphan petitions and the results of background checks. Commenters complained that processing in the country from which the child comes often takes longer than the current approval validity, which creates re-work and additional fees. The length of the validity of the approval of any petitioner or applicant for a benefit was not mentioned in the proposed rule and cannot be amended by this final rule. Thus, these comments are beyond the scope of this rule.

The final rule provides, as does the current USCIS fee schedule, that when more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required. No fee is collected on additional siblings because USCIS determined that processing efficiencies provided by the ability to adjudicate two siblings simultaneously did not justify an additional fee. However, in the case of multi-child simultaneous petitions when the orphans are not siblings, USCIS requires separate fees for each child because of the processing requirements of determining eligibility of each child. In addition, if a filing fee is paid at the time of filing an Application for Advance Processing of Orphan Petition, a fee is not required again to file a Petition to Classify Orphan as Immediate Relative.

Since a large number of commenters ardently mentioned this issue as part of their comments, USCIS has decided to allow a prospective adoptive parent to receive one extension of the approval of the Application for Advance Processing of Orphan Petition at no charge. Prospective adoptive parents, who have not found a suitable child for adoption as evidenced by their failure to submit a Petition to Classify Orphan as Immediate Relative after approval of their Application for Advance Processing of Orphan Petition, will be allowed to request one extension of the approval without charge, including the biometric fee. This final rule does not change the proposed petition fee of $670. The request from the applicant for an extension of the approval must be in writing and received by USCIS prior to the expiration date of approval indicated on the Notice of Favorable Determination Concerning Application for Advance Processing of Orphan Petition, Form I–171H. This no charge extension is limited to only one occasion. A complete application and fee must be submitted for any

subsequent application. This final rule also provides that no biometric service fee will be charged for an update of the biometrics required for an extension of an approved Application for Advance Processing of Orphan Petition. The same limitations apply.

USCIS determined that the costs of processing an initial extension were minimal when it results only from the parents' inability to match with a child within the first approval period and the update process begins before expiration actually occurs. The full fee will be charged, however, for adjudicating a new application when a child has not been matched after the first extension (the second approval period). Because of the length of time involved (three years) and the need for substantial updates, the second update often involves the same complexity as the initial application. Similarly, when the approval expires and a new application is submitted as a result of the first child selected by the prospective adoptive parents not being adopted (denial of Petition to Classify Orphan as Immediate Relative, Form I–600), the resources expended to adjudicate the first Petition to Classify Orphan as Immediate Relative require a new fee for beginning the process anew for a new orphan from the same country or a different foreign country as the first application.

5. Entrepreneurs

One commenter, representing an association of affected individuals, claimed that the fee for the Immigrant Petition by Alien Entrepreneur, Form I–526, is incorrect because this benefit is only adjudicated at USCIS service centers, not at USCIS local offices as stated in the proposed rule. In addition, the commenter stated that USCIS has not shown why the percentage increase for the Immigrant Petition by Alien Entrepreneur (for EB–5 status) filing fees should be higher than others, especially when compared to the Petition by Entrepreneur to Remove Conditions, Form I–829. The commenter stated that petitions to remove conditions generally should take less time to adjudicate the original entrepreneur petition, which has a lower proposed fee. USCIS recognizes that the Immigrant Petition by Alien Entrepreneur is indeed adjudicated at local offices. USCIS service centers will refer certain cases to local offices for interview, however, the volumes of Immigrant Petition by Alien Entrepreneur filings referred are relatively small (three percent), and the resulting cost impact is minimal.

The Immigrant Petition by Alien Entrepreneur and the Petition by Entrepreneur to Remove Conditions are

two of the more labor intensive petitions that USCIS processes, as evidenced by the high completion rates in the proposed rule. As stated in the proposed rule, the more complex an immigration or naturalization benefit application or petition is to adjudicate, the higher the unit costs. Although the completion rates for the entrepreneur petition and the petition to remove conditions are approximately the same, the fees are substantially different because the costs are being spread across a smaller number of petitions (600 for immigrant entrepreneur petitions compared to 45 for Petitions By Entrepreneur to Remove Conditions), resulting in a higher unit cost for the petition to remove conditions. USCIS explained this reasoning in the proposed rule and it remains valid.

6. Effect on Availability of Skilled Workers

Some commenters specifically argued that an increase in fees will deter employers from seeking skilled workers from outside the United States to fill gaps in the workforce, adversely affecting the competitiveness of the United States. USCIS disagrees with the notion that an increase in fees will deter employers from seeking skilled workers for employment in the United States. There is no evidence suggesting that fee increases deter skilled workers from coming to the United States, as these comments suggested. In addition, this rule does not require an individual alien to pay his own petition fees since the fees for employment-based visa petitions are generally paid by the firms hiring an alien for a position. Moreover, in most employment-based visa categories, the demand for immigrants greatly exceeds the maximum number of visas permitted each year under the INA. For example, applications for H–1B visas exceeded the FY 2007 statutory cap on the first day that applications were accepted.

USCIS expects substantial demand for these visas to continue following the implementation of this rule. Similarly, there is no evidence suggesting a direct correlation between a fee increase of this magnitude for immigration benefits and illegal immigration, as some comments have suggested.

One commenter, representing an association of agricultural producers, claimed that the proposed fee for the Nonimmigrant Worker Petition is unfair because the cost to adjudicate this benefit varies greatly depending on the type of petitioner. The commenter suggested that H–2A employers are subsidizing the other, more complicated petitions of this form type. USCIS

**Federal Register** / Vol. 72, No. 103 / Wednesday, May 30, 2007 / Rules and Regulations    **29865**

recognizes that some adjudications within a particular form type are more expensive than others, and that the more complex petitions are subsidized by the simpler ones since the fee is calculated as an average. While USCIS understands the position of this commenter, it would be far too complex and expensive to administer a fee schedule based on the type of applicant or petitioner within a particular benefit. USCIS disagrees with this recommendation as it would further increase fees to recover the additional costs necessary to administer this change.

*E. Fee Waivers and Exemptions*

A number of comments focused on applicants or petitioners who would not be required to pay a filing fee for immigration benefits, relating to fee exemptions for classes of applicants or petitioners and requests for fee waivers due to inability to pay, as set forth in 8 CFR 103.7(c). Some comments argued that class fee exemptions and fee waivers should be further limited because they simply transfer costs to other applicants or petitioners. Others argued that fee waivers should be granted on a far wider basis. In response to comments, USCIS reconsidered the fee waiver provisions of the proposed rule.

A fee waiver based on inability to pay requires that other applicants or petitioners pay for the same service and for a portion of the fee being waived for that applicant or petitioner. Fee waivers represent approximately one percent of the total applications and petitions filed with USCIS each year.

Many comments implied that waiving fees in such a small percentage of cases suggests that the current fee waiver policy is far too stringent, and should be liberalized rather than further restricted. However, while the number of fee waivers USCIS grants represents a small percentage of total filings, USCIS has historically granted most of the fee waiver requests received. Another reason why the number of fee waivers may be seen by some as low is that individual fee waivers are granted in addition to fee exemptions granted to certain classes of individuals. Taken together, on a transactional basis, USCIS does not collect a fee in over seven percent of the cases received. Excluding business petitions to bring in foreign workers, nonimmigrant matters where the aliens must be able to support themselves to be eligible for status, and cases involving international travel, fee waivers represent over eight percent of the remaining workload. Given the complexity of asylum and refugee processing, from a workload perspective, fee waivers represent well over ten percent of the remaining effort.

In addition, the application fee for Temporary Protected Status (TPS) is limited by statute to $50. INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). USCIS has historically waived the filing fee for TPS status for aliens unable to pay even this statutorily capped fee. 8 CFR 244.20.

1. Victims and Asylee Adjustment of Status Applications

USCIS proposed to exempt certain classes of aliens from paying a filing fee where it believes that the incidence of fee waivers due to inability to pay would be very high. In the proposed rule, USCIS proposed to expand the class fee exemptions to three small volume programs: Victims of human trafficking (T visas), victims of violent crime (U visas), and Violence Against Women Act (VAWA) self petitioners. *See* INA sections 101(a)(15)(T) or (U), 8 U.S.C. 1101(a)(15)(T) and (U), and Public Law 109–162, secs. 811–817, 119 Stat. 2960, 3057 (Jan. 5, 2006). Those programs involve the personal well being of a few applicants and petitioners, and the decision to waive these fees reflects the humanitarian purposes of the authorizing statutes. The final rule maintains this blanket fee exemption because it is consistent with the legislative intent to assist persons in these circumstances. Anecdotal evidence indicates that applicants under these programs are generally deserving of a fee waiver. Thus, USCIS determined that these programs would likely result in such a high number of waiver requests that adjudication of those requests would overtake the adjudication of the benefit requests themselves.

After reviewing the potential numbers of such applicants, USCIS has decided to allow these classes of aliens to request a fee waiver for when filing an Adjustment of Status Application. USCIS has made this determination for all of the reasons stated above, but tempered by the fact that an application to adjust status cannot be filed for a significant time after the alien has been granted T, or U status. Accordingly, this rule provides that a Form I–485 may be subject to a fee waiver when the person's eligibility for adjustment of status stems from asylum status, T status (victims of human trafficking), U status (victims of violent crime who assist in the prosecution), self petitioners under the Violence Against Women Act, or where by law the person otherwise is not required to demonstrate that he or she will not become a public charge, including but not limited to, Adjustment of Status Applications for Special Immigrant—Juveniles, or based on the Cuban Adjustment Act, Haitian Refugee Immigration Fairness Act, and the Nicaraguan Adjustment and Central American Relief Act. This final rule does not expand fee waiver eligibility further in adjustment of status cases. The changes made to the fee waiver and exemption eligibility criteria did increase fee waiver and exemption costs somewhat, but this had no impact on the resulting fee schedule given the insignificant volume numbers associated with the affected applications and petitions.

2. Special Immigrant—Juvenile

A number of commenters suggested that "Special Immigrant—Juveniles" also should be exempt from certain fees. A "Special Immigrant—Juvenile" is an immigrant under the age of 21, unmarried, who is a ward of a court in the United States (for the most part State courts) or eligible for long-term foster care or in custody of a state agency, and judicial proceedings have determined that it would not be in that Special Immigrant—Juvenile's best interests to be returned to his or her home country.

USCIS has determined that a fee exemption for this petition would be consistent with the exemptions granted for other classes of aliens and the humanitarian purpose of the statute. Therefore, the final rule exempts "Special Immigrant—Juveniles" from the fee for submitting a Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360. This fee exemption is a change from the proposed rule in addition to the change allowing a Special Immigrant—Juvenile to apply for an individual waiver of the fee for an Adjustment of Status Application.

3. Biometric Fee

Numerous comments suggested that the biometric fee was a burden for those aliens who could not afford it. In response, USCIS conducted an analysis of the costs to USCIS if such waivers were allowed. As with any other waiver, the loss of that fee revenue would necessarily be spread across all other benefit applications and petitions, having the potential to increase those fees.

To analyze this issue, USCIS determined the total number of requests for waivers received in FY 2006, the number of fee waivers approved, and the number approved that were for applications where biometrics were required. USCIS determined that, had the biometric fee been waived for those

applicants or petitioners whose waiver request for the underlying application or petition was approved, the associated costs for collecting the biometrics spread across all paying applicants would have added only one dollar to the biometric collection fee. Because all fees are rounded to the nearest $5 increment, the model showed that allowing a fee waiver for the biometric fee would result in no increase. Therefore, USCIS decided to accept the commenters' suggestion. This final rule provides discretion to USCIS officials to waive the biometric fee, following the same general guidelines used to consider all other requests for fee waivers such as financial hardship. Beyond these limited programs, and those for asylees and refugees, USCIS has decided not to shift the costs of processing any other specific immigration benefit applications and petitions to others.

*F. Authority To Set and Collect Fees*

Some comments suggested that the proposed rule exceeded USCIS' statutory authority to collect fees. Some comments suggested that administrative and overhead costs were not related to the provision of services and should be excluded. Other comments suggested that enforcement costs should be excluded from the fees, while others posited that all of the enforcement costs of immigration and law enforcement agencies should be recovered by fees. Underlying these comments is the issue of compliance with the authorizing statute and internal Executive Branch guidance. On the other hand, one commenter particularly noted that while USCIS is permitted to fund all of its operations from fees, there is no statutory mandate requiring it to do so. These comments raise the issue of the general structure of the fee account, and whether user fees can legally recover certain costs. Accordingly, a more detailed explanation of the legislative authority and management guidance is provided.

1. Authority Under the INA

Before the IEFA was created in 1988, all activities related to case processing were funded by appropriations. Public Law 100–459, sec. 209, 102 Stat. 2186 (Oct. 1, 1988). While fees were charged prior to 1988, the fees were treated as miscellaneous receipts of United States Treasury and deposited in the general fund; those fees were not available to USCIS for spending. The fee account was created to provide an alternative to appropriations. As many of the comments stated, the law does not preclude the use of appropriations to subsidize fee receipts to fund

operations. In the absence of appropriations, however, the only funding source is fee revenue. The President's FY 2008 budget is based on user fee funding for USCIS operations (other than expansion of employment verification) and will fund all other USCIS operations from fee receipts. Accordingly, the proposed rule was issued in conjunction with the FY 2008 budget proposal.

INA Section 286(m), 8 U.S.C. 1356(m), provides that the United States may collect fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants:

Notwithstanding any other provisions of law, all adjudication fees as are designated by the [Secretary] in regulations shall be deposited as offsetting receipts into a separate account entitled "Immigration Examinations Fee Account" in the Treasury of the United States, * * *: Provided further, That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

Under this authority, user fees are employed not only for the benefit of the payor of the fee and any collateral benefit resulting to the public, but also provide a benefit to certain others, particularly asylum applicants and refugees and others whose fees are waived.

2. General Authority for Charging Fees

Comments suggested that only the activities directly relating to specific adjudications should be charged to those who apply for the benefits. These comments rely on statutory authority separate from the authority for these fees. The general authority for the federal government to collect fees stems from the Independent Offices Appropriation Act, 1952 (IOAA), 31 U.S.C. 9701(b). Under the IOAA, a "value" to the recipient is a key threshold factor and the costs of "public interest" have been effectively included within the fees. *National Cable Television Ass'n* v. *United States,* 415 U.S. 336 (1974); *FPC* v. *New England Power Co.,* 415 U.S. 345 (1974); *Seafarers Internat'l Union* v. *Coast Guard,* 81 F.3d 179, 183 (D.C. Cir. 1996). In *New England Power Co.,* the Supreme Court held that the IOAA authorizes "a reasonable charge" to be made to "each

identifiable recipient for a measurable unit or amount of Government service or property from which [the recipient] derives a special benefit." 415 U.S. at 349 (quoting Bureau of the Budget Circular No. A–25 (Sept. 23, 1959)). Such fees may be assessed even when the service redounds in part to the benefit of the public as a whole. *National Cable Television Ass'n,* 415 U.S. at 343–44. So long as the service provides a special benefit above and beyond that which accrues to the public at large to a readily-identifiable individual, the fee is permissible. *New England Power,* 415 U.S. at 349–51 & n. 3.

Prior to the enactment of section 286(m) of the INA, fees charged for immigration services were governed by the IOAA and were judicially reviewed under the IOAA. A more elementary cost analysis than that currently used was upheld by the courts. *Ayuda, Inc.* v. *Attorney General,* 661 F. Supp. 33 (D.D.C. 1987), aff'd, 880 F.2d 1297 (D.C. Cir. 1988). As the Court of Appeals in *Ayuda* stressed, the procedures were "triggered only at the instance of the individual who seeks, obviously, to benefit from them." 848 F.2d at 1301.

The United States is a nation largely built by immigrants and immigration continues to refresh this country. Accordingly, USCIS agrees that there is a certain undeniable public interest in immigration. The costs reflected in the proposed fees exist, however, because applicants and petitioners seek immigration benefits and services. There are also public interests in discrete processes such as background checks. Background checks are an integral part of determining the applicant's eligibility for a benefit, and thus, their costs are appropriate for full recovery through a fee. Were it not for the underlying application or petition for immigration benefits, these specific security checks would not have been conducted.

USCIS authority under section 286(m) of the INA is an exception to any limitation of the IOAA. 31 U.S.C. 9701(c). The relevant, second proviso was added to the INA after the Court of Appeals decided *Ayuda* under the IOAA. Public Law 101–515, sec. 210(d)(1), (2), 104 Stat. 2120, 2121 (Nov. 5, 1990). The statutory provisions in section 286(m) of the INA are broader than the IOAA, authorizing USCIS to recover the full cost of providing benefits and ensuring sufficient revenues to invest in improved service and technology. Even though the requirements of the IOAA do not apply in developing these fees, USCIS is mindful of the need to explain the

process to the general public. *Cf. Engine Manufacturers Assoc.* v. *EPA,* 20 F.3d 1177 (D.C. Cir. 1994).

### 3. Surcharge for Asylum, Refugee and Fee Waiver/Exemption Costs

Some comments questioned whether fees should include the surcharge for services USCIS provides without fee or where it waives a fee, and asserted that these costs should not be transferred to other applicants. Pursuant to section 286(m) of the INA, USCIS does include these surcharges in other application and petition fees.

USCIS could charge a specific fee to apply for asylum and that fee would be limited to the "costs in adjudicating the applications." Section 208(d)(3) of the INA, 8 U.S.C. 1158(d)(3). The humanitarian nature of the asylum process gives USCIS good reason not to exercise this authority. USCIS has never charged fees for an Application for Asylum, Form I–589. For the same reasons, asylum applicants are exempt from the requirement to submit the fee for fingerprinting with the application for asylum. 8 CFR 103.2(e)(4)(ii)(B).

### 4. OMB Circular A–25

When a service enables the beneficiary to obtain more immediate or substantial gains or values than those that accrue to the general public, a user fee is appropriate. The fact that a process benefits the public interest as well as a private party does not mean that process cannot be funded by a user fee. The entire legal immigration and citizenship process, with respect to both grants of benefits and denials for national security or other reasons, is one that benefits the public as well as private interests, but focuses on the adjudication of eligibility for individual benefits. A fee-based structure is appropriate even when the public as a whole benefits. As OMB Circular A–25 makes clear, "when the public obtains benefits as a necessary consequence of an agency's provision of special benefits to an identifiable recipient (i.e., the public benefits are not independent of, but merely incidental to the special benefits), an agency need not allocate any costs to the public and should seek to recover from the identifiable recipient either the full cost to the Federal Government of providing the special benefit or the market price, whichever applies." OMB Circular A–25, ¶ 6.a.3. Accordingly, the proposed fees do not conflict with the guidance in OMB Circular A–25.

Moreover, OMB Circular A–25 is one of a series of circulars, bulletins and memoranda issued by OMB for the internal management of the Executive Branch. To be transparent, the circulars and agency use of the circulars are often publicly spelled out in regulations and other public statements. In this case, as with any fee rule of this nature and magnitude, the proposed rule and this final rule have been considered by OMB and other Executive offices in accordance with the appropriate Executive Orders, including Executive Order 12866, as amended, and other management instructions and directives.

While section 286(m) of the INA is a separate authority for the cost analysis and fees, as stated earlier, USCIS follows the procedures outlined in OMB Circular A–25 and standard accounting procedures as discussed in the proposed rule to the extent that they are applicable. Further, the "full cost" concept also includes the amount required to manage USCIS or "overhead." The proposed rule described the types of costs that USCIS considered as overhead when determining the proposed fee levels.

One commenter provided a detailed but limiting analysis of USCIS' authority under section 286(m) of the INA, 8 U.S.C. 1356(m), suggesting that "full cost" was more limited than suggested in the proposed rule and limited to specific "activities," and suggesting that most of the enhancements fell outside USCIS authority to recover as fees. USCIS disagrees.

Section 286(m) permits USCIS wide latitude in determining the degree to which fees will be used to support operations. USCIS, in conjunction with DHS and OMB, has determined that fees should recover all, but not more, than the cost of operation for USCIS. Accordingly, the Administration has not requested an appropriation for USCIS, except specific funds for expansion of a voluntary employment verification program, for which USCIS is prohibited by statute from charging fees for this program. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, tit. IV, sec. 402(c)(1), 110 Stat. 3009–657 (Sept. 30, 1996).

The "full cost" of services may be interpreted, and USCIS interprets the full cost of services to mean all of the support costs for such service within USCIS. The activities that may be included are not strictly those with a direct effect on a specific application or petition, but may include those activities that support the determination, including determining whether fraud is being perpetrated against the immigration system and providing public information to help improve understanding of both the specific applications and petitions and the manner in which immigration benefits are adjudicated. Accordingly, USCIS believes that all of the costs identified in the proposed rule may be recovered through fees.

Finally, the costs of all of the 27 identified enhancements may be recovered. Some of these enhancements are designed to comply with Congressional mandates for the operation of the government; others are designed to ensure that USCIS operates securely and efficiently. While these costs and many other enhancements could be the basis for disagreement, USCIS acts within its discretion to account for them within the fees to be charged.

### 5. Homeland Security Act

A commenter suggested that the proposed rule, if promulgated in final form, exceeded the authority provided to DHS in the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 1135 (Nov. 26, 2002). In particular, the commenter suggested that the division of functions between USCIS under section 451 of the HSA, 6 U.S.C. 271, and the then-Under-Secretary for Border and Transportation Security under section 441 of the HSA, 6 U.S.C. 251, required a more limited scope for USCIS fees, excluding any law enforcement or national security functions under the Fraud Detection and National Security operations.

Another commenter suggested that USCIS authority was even more restricted to the functions of the former Adjudications Branch of the INS that were transferred to DHS. By contrast, another commenter conceded that while USCIS is permitted to fund all of its operations from fees, there is no statutory mandate requiring it to do so.

DHS disagrees with these suggested restrictions and agrees that it may fund, as a matter of discretion, all of USCIS operations, or more, from fees. Congress provided the Secretary with reorganization authority to allocate or reallocate functions within DHS. HSA, section 872, 6 U.S.C. 452. The division of functions transferred by the HSA is subject to the direction and management of the Secretary. HSA sections 101, 102; 6 U.S.C. 111, 112. Accordingly, the Secretary may adjust the functions within USCIS or across component lines as appropriate.

The reorganization of functions within USCIS to create the FDNS was a consolidation of specific previous functions to streamline operations. Accordingly, USCIS disagrees that the inclusion of FDNS in the fee calculation is inappropriate and will continue to fund that function through fees.

Furthermore, the functions performed by USCIS are entirely consistent with those transferred from INS to USCIS by the HSA.

Accordingly, this final rule establishes a level of fees sufficient to recover the full cost of operating USCIS. The rule has not been amended to include other costs that could be legally charged or to exclude any costs of operating USCIS.

*G. Methods Used To Determine Fee Amounts*

The cost of providing the right benefit to the right person in an appropriate amount of time without compromising security is a complex, carefully administered process. The fees promulgated in this final rule reflect the costs resulting from the complexity of the various immigration benefits that USCIS administers and the costs of the large number of benefits provided for which there is no charge. By recovering the full cost of doing business, the revised fee schedule will enable USCIS to reduce application and petition processing times and improve customer service, and in the long run, make the legal immigration process more secure, efficient, and welcoming to all immigrants.

1. USCIS Costs

A number of comments questioned or asked for additional information on the methodology used to determine USCIS costs. Others questioned the costs and calculations provided in the proposed rule, while some requested an invoice that details the costs of services. USCIS is making no changes to the final rule as a result of these comments.

Detailed information on the methodology and the cost components and calculations was provided in the proposed rule and remains on the docket of this rule, and will be provided directly by USCIS upon request. The underlying supporting elements, such as independent legal requirements, the General Schedule pay scales, or travel reimbursement rates, are all publicly available. In the notice of proposed rulemaking, USCIS offered to provide the public with an opportunity to review the functioning of the computerized cost model used by USCIS through onsite viewing on its computer system. While USCIS cannot provide complete access to the computer software purchased under license, USCIS' fee determination is, within reason, an open process, and a summary of how calculations were made and results achieved were available for review upon request.

USCIS did not receive any requests to access the modeling program.

Finally, preparation of an "invoice" would be an additional administrative task that would itself add to the costs to be recovered by the fees. The United States does not prepare such documents beyond the warrants, journals, ledgers, and books of account required to be prepared and preserved by law and Executive policy. *See,* e.g. OMB, *Financial Reporting Requirements,* OMB Circular A–136 (rev. July 24, 2006).

2. Alternative Budget Modeling

Several commenters suggested that USCIS consider alternative budget modeling. One commenter suggested using a "zero-based budget" to determine application and petition fees, stating that the enacted FY 2007 IEFA budget used by USCIS could involve inefficient expenditures that waste time and money and disserve immigrants and families who have filed applications or petitions. A "zero-based budget," or ZBB, is a planning tool in which all expenditures must be justified and analyzed. The United States attempted ZBB in the late 1970s. The first requirements for the calculation of a "current services" baseline were enacted in the early 1970s, and a variety of concepts and measures have been employed, including ZBB. USCIS believes, however, that the baseline has serious technical flaws, which compromise its ability to serve as a neutral measure. ZBB, like other systems such as Planning-Programming-Budgeting System (PPBS), can be a useful tool, but requires defined decision units that, for a service organization like USCIS, would mean a complete time and motion study of every activity, which would be very labor intensive and time consuming and which would be a cost factored into the fee requirements.

The commenters' concerns about the budgeting methods are addressed in the fee determination and budgeting methodology utilized. The Budget of the United States is developed on a "current services estimates," or "baseline" budgeting, methodology which is designed to provide a neutral benchmark against which policy proposals can be measured. The current services estimates (which include inflation) may only be changed through justification of adjustments and enhancements. Accordingly, consistent with the United States Government budget methodology, USCIS used the FY 2007 congressionally-enacted spending level as a baseline, before subtracting nonrecurring expenses and adding in inflation and additional

resource requirements, to calculate application and petition fees. This budget accurately reflects USCIS' current spending as approved by the Congress.

Consistent with its previous comprehensive fee review, USCIS used the FY 2007 budget as a baseline, before subtracting nonrecurring expenses and adding in inflation and additional resource requirements, to calculate application and petition fees. In addition, prior to the start of FY 2007, USCIS leadership conducted an extensive evaluation of its FY 2007 spending. This level of scrutiny has enabled USCIS to meet several service delivery goals, such as eliminating the application and petition backlog. The scrutiny employed in analyzing the USCIS cost structure and future needs should minimize misused resources. Thus, USCIS disagrees with the assertion that its current expenditures are inefficient.

Another commenter suggested that USCIS use the actual time it took to perform the various immigration adjudication and naturalization activities, with no analysis of whether USCIS could operate its program more efficiently and for a reduced cost to those paying fees, thereby implying that greater efficiencies could be factored into the proposed fees.

USCIS disagrees with this suggestion. To the extent practical, USCIS has factored into the fees those efficiencies that can be predicted (particularly enhancements). USCIS is firmly committed to seeking new ways of doing business and reengineering processes in order to contain costs and pass on the savings to all of our customers, and the new fee structure will enable USCIS to make improvements that will ultimately help reduce USCIS costs. Productivity enhancements that affect hours per completion calculations produce lower cost per unit. Process improvements implemented over the past several years, as well as projected productivity increases, were taken into account in the current fee review, keeping fees lower than they might otherwise have been. Specifically, this fee increase reflects USCIS' commitment to a projected four percent increase in productivity for Adjustment of Status Application processing, and a two percent increase in productivity for all other applications and petitions. USCIS will remain accountable for these projected productivity increases in order for fees to support operations as intended.

Another commenter expressed concerns about the level of scrutiny in

identifying the amount of the additional resource requirements or enhancements. These costs were subject to the same level of scrutiny as all other USCIS costs. The additional resource requirements have been carefully reviewed by both DHS and OMB to ensure accuracy, and are displayed (with assumptions) in the supporting fee review documentation on the docket. USCIS provided this detailed information for transparency purposes to facilitate public scrutiny during the sixty-day public comment period.

3. ''Make Determination'' Activity

A few commenters questioned the calculation of the ''Make Determination'' activity cost estimates as well as the volume estimates used in the fee review. As explained in the proposed rule and the fee review supporting documentation, ''Make Determination'' costs were assigned to the applications and petitions by completion rates (level of effort or complexity) and workload volume. USCIS uses the most current and accurate completion rates and workload volumes provided by the USCIS Performance Analysis System. USCIS adjusts these workload volumes to reflect filing trends in FY 2007 and projected changes for FY 2008/2009. The USCIS Workload and Fee Projection Group leverages a time series model based on a regression analysis over the last fifteen years, with the most recent data trends given the greatest weight.

The commenters quoted two particular instances of concern, one being the variance between the Application to Preserve Residence (with a completion rate of 3.39 hours and a make determination cost of $428) and Petition for Amerasian, Widow(er), or Special Immigrant (with a completion rate of 3.21 hours and a make determination cost of $2,268); and the other being the variance between the Application To Extend/Change Nonimmigrant Status, Form I–539 (with a completion rate of 1.32 hours at the local office and 0.39 hours at the service center and a make determination cost of $84), and the Petition to Remove Conditions of Residence, Form I–751 (with a completion rate of 1.36 hours at the local office and 0.46 hours at the service center and a make determination cost of $210). These variations are driven by the volumes associated with each application. In the first instance, the workload volume of Application to Preserve Residence filings is equal to the fee-paying volume (669), which means that the costs to process these applications are spread to an equal amount of applications for which a fee

is received. The fee-paying volume of the Petition for Amerasian, Widow(er), or Special Immigrant is much less than the workload volume (4,772 compared to 16,000) resulting in costs being spread to fewer applications and, consequently, a higher Make Determination cost. The second instance is simply a case of costs being spread to a greater number of applications (220,000 for Application To Extend/ Change Nonimmigrant Status compared to 143,000 for the Petition to Remove Conditions of Residence) resulting in a lower unit cost. After reviewing these comments, USCIS remains convinced that the calculations are correct.

One commenter also questioned why the costs for an Application for EAD are significantly higher than the Application for LPR Card costs, when Application for EAD completion rates for local offices, service centers, and National Benefits Center are lower than the Application for LPR Card completion rates. As stated in the proposed rule, $11.5 million in Application Support Center contract costs directly support processing an Application for LPR Card. Therefore, this cost comparison cannot be fairly analyzed by solely looking at the completion rates at local offices, service centers, or the National Benefits Center since a significant portion of the work is performed outside these offices.

4. Activity-Based Costing

A few commenters suggested that USCIS' activity-based costing analysis was flawed since USCIS included completion rates for local offices that no longer have jurisdiction or responsibility to process certain form types (e.g., Nonimmigrant Worker Petition, Form I–129; Petition for Alien Fiance(e), Form I–129F; Alien Employee Petition, Form I–140; Application To Extend/Change Nonimmigrant Status, Form I–539; Petition by Entrepreneur to Remove Conditions, Form I–829), and service centers that do not have jurisdiction or responsibility to process certain forms (e.g. Application to Preserve Residence for Naturalization Purposes, Form N–470). While it is true that certain USCIS offices have primary jurisdiction over particular form types, it is not uncommon for form types to be processed at other USCIS offices for various reasons. For example, service centers will refer cases to local offices for interview. These volumes, however, are relatively small, and, therefore, the cost impact is minimal. For example, of the 439 Application to Preserve Residence filings processed in FY 2006, USCIS processed 427 (or 97 percent) at

local offices and twelve (or 3.0 percent) at service centers.

A commenter questioned why the Naturalization Application is filed at service centers, but no completion rate data is provided for service center processing. Completion rate data is displayed for local offices instead of service centers for this benefit because the local offices perform the adjudication. Using completion rate data for benefits that are only received at Service Centers and not adjudicated would not be accurate.

Another commenter suggested that it is simply not credible that local offices spend an average of two hours processing each Alien Employee Petition, when service centers only spend 52 minutes on an Alien Employee Petition. For various reasons, more complex cases are referred to local offices for an interview, explaining why the completion rate varies from service center to local office. However, as previously stated, the volumes are relatively small for these cases, and therefore the cost impact is minimal.

A commenter also questioned the increased fee for the Application for EAD, stating that the proposed fee is inaccurate given that USCIS implemented a new policy to no longer issue interim EADs at local offices. Because local offices have higher completion rates than other offices for this benefit, the commenter stated that the fee should be re-calculated and reduced. Although USCIS has implemented a new policy to no longer issue interim EADs at local offices, the practice of where the adjudication takes place has not changed. Local offices will continue to adjudicate Application for EAD filings and, therefore, USCIS believes the fee is accurate as stated in the proposed rule.

5. Calculating Specific Processing Requirements

One commenter remodeled the costs for the fee increase for an Adjustment of Status Application and questioned the 66 percent fee increase calculation after consolidating the fees for the Application for EAD that previously required additional fees. The commenter stated that if the Adjustment of Status Application processing time is seven months as stated in the proposed rule, then applicants pay for only one Application for EAD and one Adjustment of Status Application, for fees of $675, not what USCIS assumed for two Applications for EAD and one Adjustment of Status Application, for fees of approximately $800. The processing times identified in the proposed rule represent the processing

**29870**    **Federal Register** / Vol. 72, No. 103 / Wednesday, May 30, 2007 / Rules and Regulations

times for applications and petitions within USCIS control. When including the volume of Adjustment of Status Applications that are not within USCIS control, the processing times for the Adjustment of Status Applications in total are closer to one year. With a processing time of one year, the average applicant normally would pay for two employment authorizations, not one. Therefore, the USCIS calculation is correct.

6. Overhead Charges

One commenter questioned the methodology behind incorporating overhead costs into the processing costs for each application and petition, suggesting that these costs are not connected to actually moving an application or petition forward. The goal of the fee review is to recover the resources necessary to fund the full cost of processing immigration benefit applications and petitions for which USCIS charges a fee, plus the cost of similar services provided at no cost. Overhead items, such as the rent necessary to house Adjudication Officers, are vital to the operation of USCIS and are not a means for hiding expenditures, as suggested. These costs were spread in a pro rata fashion to the processing activities based on the number of government employees and the specific schedules of required space. That is, the more government staff time associated with a processing activity, the higher the overhead costs associated with that activity. Further detail of the overhead cost calculation, including the number of government staff per office and the identification of overhead items, are provided in the fee review supporting documentation available on the docket.

7. Recovering Deficit From Current Operations

One commenter addressed the fact that USCIS is losing money on each application and petition now being filed in advance of the increase and questioned whether the increase in fees was intended to recover these losses. The fee increase is not intended to recover the losses currently being sustained by USCIS or for retiring any accumulated deficits. USCIS is currently closing a funding gap created by the insufficiency of the fee schedule by relying on spending cuts to critical programs and services, premium processing revenues, interim benefit revenues, and revenues from temporary programs to fund base operations. The fees are designed to recover the costs of operations in the future and are not retroactive.

The commenter also noted the decrease in the projected number of Application for LPR Card filings and the recent surges in Naturalization Application filings. The commenter expressed concern that USCIS did not explain the projected decline in Application for LPR Card filings and wanted to know the impact if volumes declined more than what was projected in the fee review (e.g., Naturalization Applications). As identified in the workload assumptions of the fee review supporting documentation, the decline in projected Application for LPR Card filings is due to the increase in projected Naturalization Application filings. Projections are not expected to vary widely from those in the fee review. Regardless, USCIS' new fee model enables USCIS to adjust fees in a timely manner and USCIS plans to continuously review fees. If unforeseen costs or volumes result in fees that are not recovering full costs, a new fee schedule may be proposed before the fee review that is required by OMB Circular A–25 and law to be undertaken in two years.

8. Charging a Flat Fee

At least one commenter suggested that USCIS should change its methodology and charge the same fee amount regardless of the complexity of the immigration benefit. Fees based on the complexity of the application or petition are consistent with standard cost accounting practices and are also consistent with USCIS' past fee setting practices. USCIS does not agree that charging the same fee, regardless of the benefit, is a better methodology. USCIS believes that applicants and petitioners should generally pay a reasonable fee commensurate with the level of effort required to adjudicate such application or petition.

9. Financial Audits

Some commenters suggested that USCIS' costs should be subject to an audit. Federal law already requires an annual audit of financial activity, including cost, revenues, and payments for all executive agencies. 31 U.S.C. 3521, 7501–7506. USCIS costs are included in DHS's financial statements. The DHS Office of Inspector General (OIG) employs an independent public accounting firm to audit all DHS and component financial statements. In addition, GAO and OIG conduct reviews of the effectiveness and efficiency of USCIS programs and operations, providing recommendations for improvements.

10. Acceptance of Electronic Payment Options

Several comments recommended USCIS accept credit cards for all filings, both for convenience and also to let filers take advantage of the credit aspect of the card, to pay the amount to their credit card vendor over time, pointing out that this would slightly soften the impact of the new fees. While the commenters' suggestion cannot be implemented at this time, USCIS plans to expand electronic payment acceptance over time as it shifts receipting of applications and petitions to other platforms such as lockboxes operated by the Department of the Treasury.

11. Other USCIS Fees

One commenter questioned whether USCIS is fully accounting for all its other fee revenues. The commenter noted an additional $44 million in fee revenues from other accounts as noted in the FY 2006 budget request, and asked specifically about disposition of the money from the anti-fraud fee under section 286(v) of the INA, 8 U.S.C. 1356(v). As noted in the proposed rule, in addition to the IEFA, USCIS receives fee funding from several smaller, specific accounts, such as the H–1B Nonimmigrant Petitioner Account under section 286(s) of the Act, 8 U.S.C. 1356(s), and the Fraud Prevention and Detection Account under section 286(v) of the Act, 8 U.S.C. 1356(v), which this proposed rule does not affect.

In FY 2006, the Congress enacted $31 million for activities funded from the Fraud Prevention and Detection Account. The requested amount is set by statute providing USCIS with one-third of the fraud fees collected for the H1-B, H2-B, and L visas and applied to fraud prevention and detection activities. The proposed rule addresses the costs of processing immigration and naturalization benefit applications and petitions, biometric services, and associated support services of the IEFA, which is in addition to the costs for activities funded from the Fraud Prevention and Detection Account.

**IV. Statutory and Regulatory Reviews**

*A. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 601(6), USCIS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a

small governmental jurisdiction (locality with fewer than fifty thousand people). USCIS determined which entities were small by using the definitions supplied by the Small Business Administration. The size of the companies was determined by using the *ReferenceUSA* databases at *http://www.referenceusa.com/*. Below is a summary of the small entity analysis. A more detailed analysis is available in the rulemaking docket.

Individuals rather than small entities submit the majority of immigration and naturalization benefit applications and petitions. Entities that would be affected by this rule are those that file and pay the alien's fees for certain immigration benefit applications. These applications include the Nonimmigrant Worker Petition and the Alien Employee Petition. USCIS conducted a statistically valid sample analysis of applicants of these application types to determine if this rule has an economically significant impact on a substantial number of small entities.

Out of the 439,000 applications filed in FY 2005 for these application types, USCIS first identified the minimum sample size that was large enough to achieve a 95 percent confidence level. This sample size was identified as 383 (out of a total of 149,658 unique entities that filed applications in FY 2005). USCIS then randomly selected 653 entities, of which 561 or 86 percent were classified as small entities. Therefore, USCIS determined that a substantial number of small entities are impacted by this rule. This determination was not updated based on FY 2006 or FY 2007 applications since programs have not substantially changed and the percentage of small business applicants is expected to remain fairly constant.

USCIS then analyzed the economic impact on small entities of this rule by: (1) Identifying the number of applications filed by the small entities having sales revenue data identified by the random sample and (2) multiplying the number of applications by the fee increase associated with the applicable application types in order to estimate the increased annual burden imposed by this rulemaking. Once USCIS determined the additional cost of this rulemaking on the randomly selected small entities, USCIS divided this total increased cost by the annual sales revenue of the entity. By comparing the cost increases imposed by this rulemaking with the sales revenue of the impacted small entities, USCIS was able to understand the economic impact of this rule on the individual small entities USCIS has sampled. Using the

*ReferenceUSA* database of business information, USCIS was able to identify annual sales revenue estimates for 273 of the 561 small entities previously sampled. Of the 273 small entities, 213 or about 78 percent of the small entities exhibited an impact of less than one tenth of one percent of sales revenue, and all of the small entities sampled exhibited an impact of less than one percent of total revenue. A simple (non-weighted) average of the 273 small entities equated to an overall impact of only six one hundredths of one percent of sales revenue. Therefore, USCIS believes that a substantial number of small entities are not significantly impacted economically by this rule.

One comment was received on the USCIS determination that a substantial number of small entities are not significantly impacted economically by this rule. First, the commenter suggested that the sample size used to make this determination was too small to provide an accurate picture of the rule's impact on small firms. Second, the commenter suggested that USCIS failed to consider that many firms pay for an alien's individual immigration benefit application fee in addition to those incurred by the business.

The sample size used by USCIS was statistically valid to allow USCIS to estimate the rule's impact on small entities. In the initial regulatory flexibility analysis, USCIS determined that 86 percent of the affected entities were small entities using Small Business Administration classifications. Eighty-six percent represents a significant majority. More importantly, USCIS compared the cost increases imposed by this rulemaking with the sales revenue of the impacted small entities and determined that the rule would, on average, have an impact of only 0.063 percent of sales revenue.

The commenter is correct that USCIS did not consider the effect on firms that choose to pay alien's individual immigration benefit application fee to induce the alien to accept a position with their firm. The Immigration Benefit Application and Petition Fee Schedule is established based on the assumption that an individual alien will pay his or her own application or petition fees and does not impose any regulatory requirement on a firm to pay fees for their employees. A business may choose to assist an employee in that manner; however, since it is not a direct cost imposed by USCIS on the firm, it was not a consideration for the analysis of the impacts of this rule.

The employment-based visa programs of USCIS are predominately used by small businesses, 86 percent as

determined by the initial regulatory flexibility analysis. After the changes made in this rule, the participating firms will still be predominantly small. Nonetheless, while a significant number of small businesses are affected, USCIS has determined that the effects on these small businesses are not sufficiently significant to exceed this rule's benefits or require adjustments in the rule's requirements based on the size of a petitioner's business. If fee discounts or exceptions were allowed for employment-based immigration benefits based on firm size, the predomination of small firms in the programs would result in the small percentage of larger firms that participate being required to pay an inordinate portion of the costs of adjudicating employment-based immigration petitions. Further, USCIS has determined that, even for a small entity, the amount of the fees established in the USCIS Immigration Benefit Application and Petition Fee Schedule are so small as to impose no significant financial or compliance burden on such firms.

In summary, although the analysis shows that this rulemaking would affect a substantial number of small entities, the economic impact of this rule was found to be negligible. This rule has been reviewed in accordance with 5 U.S.C. 605(b), and the Department of Homeland Security certifies that this rule will not have a significant economic impact on a substantial number of small entities. Thus, USCIS is required to take no steps to minimize or mitigate the effects of this rule on small entities.

*B. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 requires certain actions to be taken before an agency promulgates any notice of rulemaking "that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of one hundred million or more (adjusted annually for inflation) in any one year." 2 U.S.C. 1532(a). While this rule may result in the expenditure of more than one hundred million by the private sector annually, the rulemaking is not a "Federal mandate" as defined for these purposes, 2 U.S.C. 658(6), as the payment of application and petition fees by individuals or other private sector entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States.

2 U.S.C. 658(7)(A)(ii). Therefore, no actions were deemed necessary under the provisions of the UMRA.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rulemaking will result in an annual effect on the economy of more than $100 million, in order to generate the revenue necessary to fully fund the increased cost associated with the processing of immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. The increased costs will be recovered through the fees charged for various immigration benefit applications.

### D. Executive Order 12866

This rule is considered by the Department of Homeland Security to be an economically significant regulatory action under Executive Order 12866, section 3(f), Regulatory Planning and Review. The implementation of this rule would provide USCIS with an additional $1.081 billion in FY 2008 and FY 2009 in annual fee revenue, based on a projected annual fee-paying volume of 4.742 million applications/petitions and 2.196 million requests for biometric services, over the fee revenue that would be collected under the current fee structure. This increase in revenue will be used pursuant to subsections 286(m) and (n) of the Act, 8 U.S.C. 1356(m) and (n), to fund the full costs of processing immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants at no charge. If USCIS does not adjust the current fees to recover the full costs of processing immigration benefit applications, USCIS will be forced to implement significant spending reductions resulting in a reversal of the considerable progress it has made over the last several years to reduce the backlog of immigration benefit applications and petitions, to increase the integrity of the immigration benefit system, and to protect national security and public safety. The revenue increase is based on USCIS costs and projected volumes that were available at the time the proposed rule was drafted. USCIS has placed in the rulemaking docket a detailed analysis that explains

the basis for the annual fee increase. Accordingly, this rule has been reviewed by the Office of Management and Budget.

In response to the proposed rule, one commenter expressly questioned the rule's benefit and cost analysis. This commenter stated that USCIS had not conducted a sufficient analysis of the costs, benefits, and, foreseeable consequences of the fees proposed. The commenter is correct that USCIS is required under Executive Order 12866 to perform an analysis of this benefits and costs of this rule that complies with OMB Circular A–4, Regulatory Analysis (09/17/2003) (OMB Circular A–4). However, as A–4 states, "There are justifications for regulations in addition to correcting market failures. A regulation may be appropriate when you have a clearly identified measure that can make government operate more efficiently." The need for this final rule is not based on economics or a failure of the private markets to address a problem but, rather, on enhancing the ability of USCIS to advance its goal of improving the delivery of immigration programs. This rule is intended to correct breakdowns in the delivery of immigration benefit programs that have occurred as a result of the currently inadequate fee schedule. Further, as OMB Circular A–4 states, "It will not always be possible to express in monetary units all of the important benefits and costs." The net economic effects of this rule are difficult if not impossible to determine.

The public policy rationale behind the United States immigration policies are well known and the benefit of immigrants to the United States and its citizens are enormous, as reiterated in the thousands of comments received on the proposed rule. As stated throughout the proposed rule and repeated often in this final rule, the fees established by this rule are necessary to update and modernize the USCIS infrastructure. The fee amounts comport with methodology required by OMB and meet both government and private sector standards. Also, while an equilibrium analysis has not been performed, the demand for immigration benefits obviously and greatly exceeds the availability of such benefits. Thus, these fees will have no impact on application volumes or any other public behavior. If USCIS can cover its expenses, delays in processing benefits and complaints about USCIS service will abate. That is a tangible and noticeable benefit. Thus, the benefits of this rule exceed its costs. OMB has reviewed this rule and concurs in this conclusion.

One commenter stated that USCIS did not consider the potential costs and benefits of pursuing possible alternative funding sources. This comment is similar to many comments suggesting that USCIS must pursue a Congressional appropriation that were addressed earlier. With regard to the analysis of the benefits or pursuing alternative funding sources, these comments are beyond the scope of the regulation. USCIS is limited to this rulemaking as an affirmative source of addressing shortfall in its revenues under section 286(m) of the INA, 8 U.S.C. 1356(m). If Congress provides funds for USCIS operations, the benefits of that action, especially as it relates to persons who pay fees, are self evident. An in-depth economic analysis is not required for USCIS to recognize that fact. With regard to "benefits of pursuing possible alternative funding," USCIS sees no benefit and only costs to be realized from such a pursuit. Congress is well aware of the funding scheme described in this rule.

### E. Executive Order 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Department of Homeland Security has determined that this rulemaking does not warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995) (PRA), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. This rulemaking does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

The changes to the fees will require minor amendments to applications and petitions to reflect the new fees. In addition, this rule anticipates (but is not dependent on) consolidating the Application for Travel Document and Application for EAD into the Application of Adjustment of Status since applicants will not be required to

file three separate application types in order to apply for adjustment of status, travel documents, and employment authorization. This change will reduce paperwork burdens on these applicants. The necessary revisions to the approved information collection burden for any new or revised applications will be submitted to OMB for approval before being issued for use by USCIS as required under the PRA and 5 CFR 1320.

Since the forms will be amended to reflect the new fees, USCIS will submit the appropriate requests for non-substantive change to OMB to reflect the additional costs.

## List of Subjects in 8 CFR Part 103

Administrative practice and procedures; Authority delegations (government agencies); Freedom of Information; Privacy; Reporting and recordkeeping requirements; and Surety bonds.

■ Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

■ 2. Section 103.7 is amended by:
■ a. Removing the entries for "Form I–506" "Form I–914" and "Motion" in paragraph (b)(1);
■ b. Revising the entries "For capturing biometric information" and the entries for forms "I–90, I–102, I–129, I–129F, I–130, I–131, I–140, I–191, I–192, I–193, I–212, I–290B, I–360, I–485, I–526, I–539, I–600, I–600A, I–601, I–612, I–687, I–690, I–694, I–695, I–698, I–751, I–765, I–817, I–824, I–829, N–300, N–336, N–400, N–470, N–565, N–600, and N–600K"in paragraph (b)(1); and by
■ c. Adding paragraph (c)(5).

The revisions and addition read as follows:

## § 103.7   Fees.

*    *    *    *    *
(b) *    *    *
(1) *    *    *

*    *    *    *    *

For capturing biometric information (Biometric Fee). A service fee of $80 will be charged for any individual who is required to have biometric information captured in connection with an application or petition for

certain immigration and naturalization benefits (other than asylum), and whose residence is in the United States; provided that: *Extension for intercountry adoptions:* If applicable, no biometric service fee is charged when a written request for an extension of the approval period is received by USCIS prior to the expiration date of approval indicated on the Form I–171H if a Form I–600 has not yet been submitted in connection with an approved Form I–600A. This extension without fee is limited to one occasion. If the approval extension expires prior to submission of an associated Form I–600, then a complete application and fee must be submitted for a subsequent application.

*    *    *    *    *

Form I–90. For filing an application for a Permanent Resident Card (Form I–551) in lieu of an obsolete card or in lieu of one lost, mutilated, or destroyed, or for a change in name—$290.

*    *    *    *    *

Form I–102. For filing a petition for an application (Form I–102) for Arrival/Departure Record (Form I–94) or Crewman's Landing Permit (Form I–95), in lieu of one lost, mutilated, or destroyed—$320.

Form I–129. For filing a petition for a nonimmigrant worker—$320.

Form I–129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act—$455; no fee for a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a United States citizen on Form I–130.

Form I–130. For filing a petition to classify status of an alien relative for issuance of an immigrant visa under section 204(a) of the Act—$355.

Form I–131. For filing an application for travel document—$305.

Form I–140. For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act—$475.

Form I–191. For filing an application for discretionary relief under section 212(c) of the Act—$545.

Form I–192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case, or where the approval of the application is in the interest of the United States Government—$545.

Form I–193. For filing an application for waiver of passport and/or visa—$545.

Form I–212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien

enemy, or an alien who has been removed at government expense in lieu of deportation—$545.

*    *    *    *    *

Form I–290B. For filing an appeal from any decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction—$585 (the fee will be the same when an appeal is taken from the denial of a petition with one or multiple beneficiaries, provided that they are all covered by the same petition, and therefore, the same decision). *Motions.* For filing a motion to reopen or reconsider any DHS decision in any type of proceeding over which the Executive Office for Immigration Review does not have jurisdiction. This fee shall be charged whenever a motion is filed to reopen or reconsider a single decision, whether it applies to one or multiple beneficiaries—$585.

Form I–360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant—$375, except there is no fee for a petition seeking classification as: An Amerasian; a self-petitioning battered or abused spouse, parent, or child of a United States citizen or lawful permanent resident; or a Special Immigrant—Juvenile.

Form I–485. For filing an application for permanent resident status or creation of a record of lawful permanent residence—$930 for an applicant fourteen years of age or older; $600 for an applicant under the age of fourteen years when submitted concurrently for adjudication with the Form I–485 of a parent and the applicant is seeking to adjust status as a derivative of the parent, based on a relationship to the same individual who provides the basis for the parent's adjustment of status, or under the same legal authority as the parent; no fee for an applicant filing as a refugee under section 209(a) of the Act; provided that no additional fee will be charged for a request for travel document (advance parole) or employment authorization filed by an applicant who has paid the Form I–485 application fee, regardless of whether the Form I–131 or Form I–765 is required to be filed by such applicant to receive these benefits.

*    *    *    *    *

Form I–526. For filing a petition for an alien entrepreneur—$1,435.

Form I–539. For filing an application to extend or change nonimmigrant status—$300.

*    *    *    *    *

Form I–600. For filing a petition to classify an orphan as an immediate

relative for issuance of an immigrant visa under section 204(a) of the Act. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$670.

Form I–600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$670. No fee is charged if Form I–600 has not yet been submitted in connection with an approved Form I–600A if a written request from the applicant for an extension of the approval has been received by USCIS prior to the expiration date of approval indicated on the Form I–171H. This extension will require an update of the applicant's home study and a determination from USCIS that proper care will be provided to an adopted orphan. A no fee extension is limited to one occasion. If the Form I–600A approval extension expires prior to submission of an associated Form I–600, then a complete application and fee must be submitted for any subsequent application.

Form I–601. For filing an application for waiver of ground of inadmissibility under section 212(h) or (i) of the Act. (Only a single application and fee shall be required when the alien is applying simultaneously for a waiver under both sections 212(h) and (i).)—$545.

Form I–612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act—$545.

Form I–687. For filing an application for status as a temporary resident under section 245A(a) of the Act. A fee of $710 for each application is required at the time of filing with the Department of Homeland Security.

Form I–690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$185.

Form I–694. For appealing the denial of an applications under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$545.

Form I–695. For filing an application for replacement of temporary resident card (Form I–688)—$130.

Form I–698. For filing an application for adjustment from temporary resident status to that of lawful permanent resident under section 245A(b)(1) of the Act. For applicants filing within thirty-one months from the date of adjustment

to temporary resident status, a fee of $1,370 for each application is required at the time of filing with the Department of Homeland Security. For applicants filing after thirty-one months from the date of approval of temporary resident status, who file their applications on or after July 9, 1991, a fee of $1,410 is required. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

\*    \*    \*    \*    \*

Form I–751. For filing a petition to remove the conditions on residence, based on marriage—$465.

Form I–765. For filing an application for employment authorization pursuant to 8 CFR 274a.13—$340.

\*    \*    \*    \*    \*

Form I–817. For filing an application for voluntary departure under the Family Unity Program—$440.

\*    \*    \*    \*    \*

Form I–824. For filing for action on an approved application or petition—$340.

Form I–829. For filing a petition by entrepreneur to remove conditions—$2,850.

\*    \*    \*    \*    \*

Form N–300. For filing an application for declaration of intention—$235.

Form N–336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act—$605.

Form N–400. For filing an application for naturalization (other than such application filed on or after October 1, 2004, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service, for which no fee is charged)—$595.

\*    \*    \*    \*    \*

Form N–470. For filing an application for benefits under section 316(b) or 317 of the Act—$305.

Form N–565. For filing an application for a certificate of naturalization or declaration of intention in lieu of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act—$380.

Form N–600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act—$460, for applications filed on behalf of a biological child and $420 for applications filed on behalf of an adopted child.

Form N–600K. For filing an application for citizenship and issuance of certificate under section 322 of the

Act—$460, for an application filed on behalf of a biological child and $420 for an application filed on behalf of an adopted child.

\*    \*    \*    \*    \*

(c) \* \* \*

(5) No fee relating to any application, petition, appeal, motion, or request made to United States Citizenship and Immigration Services may be waived under paragraph (c)(1) of this section except for the following: Biometrics; Form I–90; Form I–485 (only in the case of an alien in lawful nonimmigrant status under sections 101(a)(15)(T) or (U) of the Act; an applicant under section 209(b) of the Act; an approved self-petitioning battered or abused spouse, parent, or child of a United States citizen or lawful permanent resident; or an alien to whom section 212(a)(4) of the Act does not apply with respect to adjustment of status); Form I–751; Form I–765; Form I–817; Form N–300; Form N–336; Form N–400; Form N–470; Form N–565; Form N–600; Form N–600K; and Form I–290B and motions filed with United States Citizenship and Immigration Services relating to the specified forms in this paragraph (c).

\*    \*    \*    \*    \*

Dated: May 3, 2007.

**Michael Chertoff,**

*Secretary.*

[FR Doc. E7–10371 Filed 5–29–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### 14 CFR Part 39

**[Docket No. FAA–2007–26857; Directorate Identifier 2006–NM–126–AD; Amendment 39–15069; AD 2007–11–12]**

**RIN 2120–AA64**

### Airworthiness Directives; Airbus Model A310 Series Airplanes

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

---

**SUMMARY:** The FAA is superseding an existing airworthiness directive (AD) that applies to all Airbus Model A310 series airplanes. That AD currently requires inspections of the lower door surrounding structure to detect cracks and corrosion; inspections to detect cracking of the holes of the corner doublers, the fail-safe ring, and the door frames of the door structures; and repair if necessary. That AD also currently

**5088**

# Proposed Rules

Federal Register

Vol. 69, No. 22

Tuesday, February 3, 2004

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF HOMELAND SECURITY

### Bureau of Citizenship and Immigration Services

**8 CFR Part 103**

**[CIS No. 2233–02]**

**RIN 1615–AA84**

### Adjustment of the Immigration Benefit Application Fee Schedule

**AGENCY:** Bureau of Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to adjust the fee schedule of the Immigration Examinations Fee Account (IEFA) for immigration benefit applications and petitions, as well as the fee for capturing biometric information of applicants/petitioners who apply for certain immigration benefit applications and petitions. Fees collected from persons filing immigration benefit applications are deposited into the IEFA and used to fund the full cost of providing immigration benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. This rule proposes to adjust the immigration benefit application fees by approximately $55 per application, and increases the biometric fee by $20, in order to ensure sufficient funding to process incoming applications.

**DATES:** Written comments must be submitted on or before March 4, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, Bureau of Citizenship and Immigration Services (BCIS), Department of Homeland Security, 425 I Street NW., Room 4034, Washington, DC 20536. To ensure proper handling, please reference CIS No. 2233–02 on your correspondence. You may also submit comments

electronically at *rfs.regs@dhs.gov*. When submitting comments electronically, you must include CIS No. 2233–02 in the subject box so that your comments can be properly routed to the appropriate office. Comments and other docketed materials (including additional information regarding the rate-setting process) are available for public inspection at the above address by calling (202) 514–3206 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Paul L. Schlesinger, Acting Budget Director, Office of Budget, U.S. Citizenship and Immigration Services, 425 I Street NW., Room 5307, Washington, DC 20536, telephone (202) 514–3206.

**SUPPLEMENTARY INFORMATION:**

### What Legal Authority Does BCIS Have To Charge Fees?

Section 286(m) of the Immigration and Nationality Act (INA) provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and other immigrants. [8 U.S.C. 1356(m).] The INA further states that the fees may recover administrative costs as well. This revenue remains available to provide immigration and naturalization benefits and the collection, safeguarding, and accounting for fees. [8 U.S.C. 1356(n).]

The BCIS must also conform to the requirements of the Chief Financial Officers Act of 1990 (CFO Act), Public Law No. 101–576, 104 Stat. 2838 (1990). Section 205(a)(8) of the CFO Act requires each agency's Chief Financial Officer to ''review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value.'' *Id.*, 104 Stat. at 2844, 31 U.S.C. 902(a)(8).

### What Federal Cost Accounting and Fee Setting Standards and Guidelines Were Used in Developing These Fee Changes?

The authority provided by section 286(m) of the INA permits BCIS to recover the full costs of providing all immigration adjudication and naturalization services, including those

services provided to individuals other than those paying fees. When developing fees for services, the BCIS also looks, to the extent applicable, to the cost accounting concepts and standards recommended by the Federal Accounting Standards Advisory Board (FASAB). The FASAB was established in 1990, and its purpose is to recommend accounting standards for the Federal Government. The FASAB defines ''full cost'' to include ''direct and indirect costs that contribute to the output, regardless of funding sources.'' Federal Accounting Standards Advisory Board, Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government 36 (July 31, 1995). To obtain full cost, FASAB identifies various classifications of costs to be included, and recommends various methods of cost assignment. *Id.* at 36–42. Full costs include, but are not limited to, an appropriate share of:

(a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

(b) Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel and rents or imputed rents on land, buildings, and equipment; and,

(c) Management and supervisory costs.

Full costs are determined based upon the best available records of the agency.

### How Is the Processing of Immigration Benefit Applications Funded and Supported?

In 1988, Congress established the IEFA. *See* Public Law No. 100–459, sec. 209, 102 Stat. at 2203. Since 1989, fees deposited into the IEFA have been the primary source of funding for providing immigration and naturalization benefits, and other benefits as directed by Congress. In subsequent legislation, Congress directed use of IEFA revenue to fund the cost of asylum processing and other services provided to immigrants at no charge. *See* Public Law No. 101–515, sec. 210(d)(2), 104 Stat. at 2121. Consequently, the immigration benefit application fees were increased to recover these additional costs.

The current immigration benefit application fees are based on the review conducted in 1997 adjusted for cost of living increases (most recently on

February 19, 2002) (66 FR 65811). The current fees also include a $5 per immigration benefit application surcharge to recover information technology and quality assurance costs. This surcharge allows BCIS to improve upon the delivery of services to its customers such as offering electronic filing for certain immigration benefit applications.

With reference to the biometric fee, the Department of Justice Appropriations Act, 1998, Public Law No. 105–119, 111 Stat. 2440, 2448 (1997), authorized the collection of a fee for fingerprinting applicants for certain immigration benefits. *Id.* The fees are deposited into the IEFA established by 8 U.S.C. 1356(m)–(p). The current fee is $50.

**How Are the Application Fees Changing in This Rule?**

*A. National Security Enhancements*

In processing immigration benefit applications, BCIS is making national security a high priority. Since July 2002, BCIS has added security checks to the processing of all immigration benefit applications to help ensure that those who receive immigration benefits have come to join the people of the United States in building a better society and not to do harm.

The process of performing security checks has been designed to compare information on applicants, petitioners, beneficiaries, derivatives and household members who apply for an immigration benefit on a BCIS immigration benefit application against various Federal lookout systems.

The purpose of conducting security checks is to help law enforcement agencies identify risks to the community and/or to national security and to prevent ineligible individuals from obtaining immigration benefits. BCIS performs two routine checks; one when the application is initially received, and one at the time of adjudication.

This change in the manner in which BCIS processes immigration benefit applications has increased processing costs because the costs of performing these checks were not factored into the initial fee schedule. As a result, existing resources have been diverted in order to perform the additional security checks until the fees could be adjusted to cover these costs.

To determine the impact on resources of the additional security checks, BCIS developed a methodology to identify the additional time or "level of effort" needed to perform the additional security checks by an adjudicator, since

time is a key factor in determining immigration benefit application fees.

In identifying the average time for the additional security checks, BCIS employed a time and motion study through on-site visits to various field offices. To collect a representative sample, BCIS reviewed adjudications at small, medium, and large-sized field offices. To ensure the integrity of the process, BCIS personnel interviewed those who performed the security checks on various immigration benefit applications, validated the times through random observations, and revalidated those times with BCIS personnel.

BCIS calculated the total time requirements using average check times, average number of checks per application, as well as application volumes (using number of applications received for the initial check and number of applications completed for the adjudications check). The total time was then converted into the total cost of performing the additional security checks.

The analysis revealed an annual cost of about $140 million to recover the costs of security enhancements. This equates to a $21 per application charge.

*B. Program Enhancements and New Activities*

The rule proposes adjusting the fees to cover an annual cost of about $46 million to support other program enhancements and new activities. This equates to a $7 per application charge. A description of these activities follow.

*Improving Refugee Processing.* Currently, the BCIS Office of Refugee Affairs (ORA) has neither the workforce nor the management structure needed to meet the processing challenges facing BCIS overseas, particularly in the wake of the September 11, 2001 terrorist attacks and the resulting security mandates. ORA relies on temporary duty personnel borrowed from other BCIS programs, in particular the Asylum Program, to meet virtually all its processing responsibilities. When refugee processing was largely confined to well-defined caseloads at limited and easily accessible locations, small numbers of temporary duty personnel were usually able to generate enough refugee approvals to meet refugee admissions goals. However, as the U.S. Refugee Program (USRP) continues to focus on more diverse, at-risk populations and to attempt to increase the responsiveness of the USRP to these populations, it is increasingly difficult for it to meet its responsibilities with the limited flexibility and resources that can be provided by other programs with

equally critical missions. Therefore, BCIS plans to establish a refugee corps with dedicated staff focused on this population.

This new structural and functional arrangement will greatly improve the quality of refugee adjudications and oversight, provide cost-effective immigration services, and significantly improve the nation's ability to secure our borders without compromising humanitarian objectives.

*Providing Naturalization Services for Military Personnel.* On November 24, 2003, the President signed the National Defense Authorization Act for Fiscal Year 2004 (Public Law 108–136). Title XVII of this Act, among other things, removes the fees for individuals eligible for expedited naturalization through military service under sections 328 and 329 of the INA, 8 U.S.C. 1439 and 1440, effective October 1, 2004. The Congressional Budget Office (CBO) estimates two-thirds (over 30,000) of the eligible persons would apply for naturalization, including an additional twenty-five positions to provide naturalization services to military personnel in overseas locations, as also authorized by Title XVII. Therefore, the rule proposes to adjust the fees to recover these additional costs. A conforming change to the reference to the N–400 fee in the rule is also made in order to implement the fee limitation provided by Title XVII.

*Office of Citizenship.* Section 451(f) of the Homeland Security Act of 2002 states, "There shall be a position of Chief of the Office of Citizenship and Immigration Services. The Chief of the Office of Citizenship and Immigration Services shall be responsible for promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens of the United States, including the development of educational materials."

*Other Activities.* BCIS is undergoing a significant competitive sourcing study for public-private job competitions of the functions performed by Immigration Information Officers and Contact Representatives. In addition, BCIS seeks to recover the annual costs of litigation settlements. These legal costs are not included in the current fee structure.

*C. Administrative Support Costs*

As previously stated, BCIS has authority under the INA to recover full costs of the program, including administrative costs. To date, these administrative costs have been funded through discretionary appropriations. In FY 2004, BCIS was appropriated $235 million of which $155 million

supported administrative costs (*e.g.* records management, forms management, human resources, procurement, budget, finance). Since these costs are associated with the processing of immigration benefit applications, BCIS proposes adjusting the fees to recover these costs in accordance with the INA. The annual amount, adjusted for FY 2004 and FY 2005, of $157 million equates to a $23 per application charge.

*D. Cost of Living*

To maintain current service levels, the current immigration benefit application fees were adjusted for cost of living increases for FY 2004 and FY 2005

based upon inflationary rates used for the President's annual budget request. This increase in the annual amount of $28 million equates to a $4 average per application charge.

**How Is the Biometric Fee Changing in This Rule?**

BCIS charges a fee to recover the operating costs of its fingerprinting program. The costs of the program have risen since 1999, the time of the last fee review. The annualized cost of the program is $96 million, which includes the capability to electronically capture and retain necessary biometrics (photo, signature, and press-print images) for certain immigration benefit applications

at the time of the applicant/petitioner's first visit to a BCIS Application Support Center. This equates to an increase of $20. Therefore, the new biometric fee will be $70.

To better describe the services provided under this fee, the proposed rule refers to it as a biometric fee rather than a fingerprinting fee.

**What Are the New Application Fees and How Do the New Fees Compare to the Current Fees?**

The proposed new immigration benefit application fees and their dollar differences are displayed in Table 1.

TABLE 1.—CURRENT VERSUS NEW APPLICATION AND PETITION FEES

| Form No. | Description | New fee | Current fee | Change |
|---|---|---|---|---|
| I–90 | Application to Replace Permanent Resident Card | $185 | $130 | $55 |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | 155 | 100 | 55 |
| I–129 | Petition for a Nonimmigrant Worker | 185 | 130 | 55 |
| I–129F | Petition for Alien Fiancé(e) | 165 | 110 | 55 |
| I–130 | Petition for Alien Relative | 185 | 130 | 55 |
| I–131 | Application for Travel Document | 165 | 110 | 55 |
| I–140 | Immigrant Petition for Alien Worker | 190 | 135 | 55 |
| I–191 | Application for Permission to Return to an Unrelinquished Domicile | 250 | 195 | 55 |
| I–192 | Application for Advance Permission to Enter as a Nonimmigrant | 250 | 195 | 55 |
| I–193 | Application for Waiver of Passport and/or Visa | 250 | 195 | 55 |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal. | 250 | 195 | 55 |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant | 185 | 130 | 55 |
| I–485 | Application to Register Permanent Residence or to Adjust Status | 315 | 255 | 60 |
| I–526 | Immigrant Petition by Alien Entrepreneur | 465 | 400 | 65 |
| I–539 | Application to Extend/Change Nonimmigrant Status | 195 | 140 | 55 |
| I–600/600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing of Orphan Petition. | 525 | 460 | 65 |
| I–601 | Application for Waiver on Grounds of Excludability | 250 | 195 | 55 |
| I–612 | Application for Waiver of the Foreign Residence Requirement | 250 | 195 | 55 |
| I–687 | For Filing Application for Status as a Temporary Resident | 240 | 185 | 55 |
| I–690 | Application for Waiver of Excludability | 90 | 35 | 55 |
| I–694 | Notice of Appeal of Decision | 105 | 50 | 55 |
| I–695 | Application for Replacement Employment Authorization or Temporary Residence Card | 65 | 15 | 50 |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident | 175 | 120 | 55 |
| I–751 | Petition to Remove the Conditions on Residence | 200 | 145 | 55 |
| I–765 | Application for Employment Authorization | 175 | 120 | 55 |
| I–817 | Application for Family Unity Benefits | 195 | 140 | 55 |
| I–824 | Application for Action on an Approved Application or Petition | 195 | 140 | 55 |
| I–829 | Petition by Entrepreneur to Remove Conditions | 455 | 395 | 60 |
| I–881 | NACARA—Suspension of Deportation or Application for Special Rule Cancellation of Removal. | 275 | 215 | 60 |
| I–914 | Application for T Nonimmigrant Status | 255 | 200 | 55 |
| N–300 | Application to File Declaration of Intention | 115 | 60 | 55 |
| N–336 | Request for Hearing on a Decision in Naturalization Procedures | 250 | 195 | 55 |
| N–400 | Application for Naturalization | 320 | 260 | 60 |
| N–470 | Application to Preserve Residence for Naturalization Purposes | 150 | 95 | 55 |
| N–565 | Application for Replacement Naturalization Citizenship Document | 210 | 155 | 55 |
| N–600 | Application for Certification of Citizenship | 240 | 185 | 55 |
| N–600K | Application for Citizenship and Issuance of Certificate under Section 322 | 240 | 185 | 55 |

BCIS is also making a number of non-substantive stylistic corrections to the fee provisions amended by this rule, and updating the cross-reference to fee regulations under the Freedom of Information Act in 8 CFR 103.7(b)(2) to

refer to Department of Homeland Security rather than Department of Justice regulations. Reference to Form I–700 has been deleted, as this form is no longer used.

**Does BCIS Have the Authority To Waive Fees on a Case-By-Case Basis?**

Yes, BCIS has the authority to waive fees on a case-by-case basis pursuant to 8 CFR 103.7(c). In all fee waiver requests, applicants are required to

demonstrate "inability to pay." In determining "inability to pay," BCIS officers will consider all factors, circumstances, and evidence supplied by the applicant including age, disability, household income, and qualification within the past 180 days for a Federal means tested benefit.

## How Will BCIS Inform the Public of Future Fee Adjustments Based Solely on Inflation?

The proposed rule provides that in subsequent years, starting with FY 2006, BCIS will adjust the current immigration benefit application fees on October 1st each year based upon the inflation level enacted by Congress. If Congress has not enacted the inflationary rate by the start of the fiscal year, BCIS will use the anticipated inflation rates used in the President's annual budget request. BCIS will inform the public of the new fee schedule through a notice published in the **Federal Register** and on its Web site.

## Regulatory Flexibility Act

This rule has been reviewed in accordance with 5 U.S.C. 605(b), and the Department of Homeland Security certifies that this rule will not have a significant economic impact on a substantial number of small entities. The majority of applications and petitions are submitted by individuals and not small entities as that term is defined in 5 U.S.C. 601(6).

BCIS acknowledges, however, that a number of small entities, particularly those filing business-related applications and petitions, such as Form I–140, Immigrant Petition for Alien Worker; Form I–526, Immigrant Petition by Alien Entrepreneur; and Form I–829, Petition by Entrepreneur to Remove Conditions, may be affected by this rule. For the FY 2004/2005 biennial time period, BCIS projects that approximately 190,000 Forms I–140, 435 Forms I–526, and 508 Forms I–829 will be filed. However, this volume represents petitions filed by a variety of businesses, ranging from large multinational corporations to small domestic businesses. BCIS does not collect data on the size of the businesses filing petitions, and therefore does not know the number of small businesses that may be affected by this rule. However, even if all of the employers applying for benefits met the definition of small businesses, the resulting degree of economic impact would not require a Regulatory Flexibility Analysis to be performed.

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will result in an annual effect on the economy of more than $100 million, in order to generate the revenue necessary to fully fund the increased cost associated with the processing of immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. The increased costs will be recovered through the fees charged for various immigration benefit applications.

## Executive Order 12866

This rule is considered by the Department of Homeland Security to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. The implementation of this interim rule would provide BCIS with an additional $232 million in FY 2004 and $394 million in FY 2005 in annual fee revenue, based on a projected annual fee-paying volume of 6.8 million, over the fee revenue that would be collected under the current fee structure. This increase in revenue will be used pursuant to subsections 286(m) and (n) of the INA to fund the full costs of processing immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants at no charge. If BCIS does not adjust the current fees to recover the full costs of processing immigration benefit applications, the backlog will likely increase. The revenue increase is based on BCIS costs and projected volumes that were available at the time the rule. Accordingly, this rule has been reviewed by the Office of Management and Budget.

## Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Department of Homeland Security has determined that this rule does not have sufficient Federalism implications to warrant the preparation of a federalism summary impact statement.

## Executive Order 12988: Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law No. 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

It should be noted that the changes to the fees will require changes to the application/petition forms to reflect the new fees. BCIS will submit a notification to OMB with respect to any such changes.

## List of Subjects in 8 CFR Part 103

Administrative practice and procedures, Authority delegations (government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

2. Section 103.7(b) is amended by:
a. Removing the entry "For fingerprinting by the Service" and adding the entry "For capturing biometric information" in its place, and by revising the entries for the following forms in paragraph (b)(1);

b. Adding the entry for ''Form N–600K'' in paragraph (b)(1);

c. Revising paragraph (b)(2); and by

d. Adding a new paragraph (b)(3).

The revisions and additions read as follows:

## § 103.7  Fees.

\*   \*   \*   \*   \*

(b) \*  \*  \*

(1) \*  \*  \*

\*   \*   \*   \*   \*

For capturing biometric information. A service fee of $70 will be charged for any individual who is required to have biometric information captured in connection with an application or petition for certain immigration and naturalization benefits (other than asylum), and whose residence is in the United States.

\*   \*   \*   \*   \*

Form I–90. For filing an application for a Permanent Resident Card (Form I–551) in lieu of an obsolete card or in lieu of one lost, mutilated, or destroyed, or for a change in name—$185.

\*   \*   \*   \*   \*

Form I–102. For filing a petition for an application (Form I–102) for Arrival/Departure Record (Form I–94) or Crewman's Landing (Form I–95), in lieu of one lost, mutilated, or destroyed—$155.

Form I–129. For filing a petition for a nonimmigrant worker—$185.

Form I–129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act—$165.

Form I–130. For filing a petition to classify status of an alien relative for issuance of an immigrant visa under section 204(a) of the Act—$185.

Form I–131. For filing an application for travel documents—$165.

Form I–140. For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act—$190.

Form I–191. For filing an application for discretionary relief under section 212(c) of the Act—$250.

Form I–192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case, or where the approval of the application is in the interest of the United States Government—$250.

Form I–193. For filing an application for waiver of passport and/or visa—$250.

Form I–212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense in lieu of deportation—$250.

\*   \*   \*   \*   \*

Form I–360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant—$185, except there is no fee for a petition seeking classification as an Amerasian.

Form I–485. For filing an application for permanent resident status or creation of a record of lawful permanent residence—$315 for an applicant 14 years of age or older; $215 for an applicant under the age of 14 years; no fee for an applicant filing as a refugee under section 209(a) of the Act.

\*   \*   \*   \*   \*

Form I–526. For filing a petition for an alien entrepreneur—$465.

Form I–539. For filing an application to extend or change nonimmigrant status—$195.

\*   \*   \*   \*   \*

Form I–600. For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$525.

Form I–600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$525.

Form I–601. For filing an application for waiver of ground of inadmissibility under section 212(h) or (i) of the Act. (Only a single application and fee shall be required when the alien is applying simultaneously for a waiver under both those subsections.)—$250.

Form I–612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act—$250.

Form I–687. For filing an application for status as a temporary resident under section 245A(a) of the Act. A fee of $240 for each application or $105 for each application for a minor child (under 18 years of age) is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children) shall be $585.

Form I–690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$90.

Form I–694. For appealing the denial of an application under sections 210 or

245A of the Act, or a petition under section 210A of the Act—$105.

Form I–695. For filing an application for replacement of temporary resident card (Form I–688)—$65.

Form I–698. For filing an application for adjustment from temporary resident status to that of lawful permanent resident under section 245A(b)(1) of the Act. For applicants filing within 31 months from the date of adjustment to temporary resident status, a fee of $135 for each application is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children (under 18 years of age living at home)) shall be $405. For applicants filing after thirty-one months from the date of approval of temporary resident status, who file their applications on or after July 9, 1991, a fee of $175 (a maximum of $525 per family) is required. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

\*   \*   \*   \*   \*

Form I–751. For filing a petition to remove the conditions on residence, based on marriage—$200.

Form I–765. For filing an application for employment authorization pursuant to 8 CFR 274a.13—$175.

\*   \*   \*   \*   \*

Form I–817. For filing an application for voluntary departure under the Family Unity Program—$195.

\*   \*   \*   \*   \*

Form I–824. For filing for action on an approved application or petition—$195.

Form I–829. For filing a petition by entrepreneur to remove conditions—$455.

Form I–881. For filing an application for suspension of deportation or special rule cancellation of removal (pursuant to section 203 of Public Law 105–100):

—$275 for adjudication by the Department of Homeland Security, except that the maximum amount payable by family members (related as husband, wife, unmarried child under 21, unmarried son, or unmarried daughter) who submit applications at the same time shall be $550.

—$155 for adjudication by the Immigration Court (a single fee of $155 will be charged whenever applications are filed by two or more aliens in the same proceedings). The $155 fee is not required if the Form I–881 is referred to the Immigration Court by the Department of Homeland Security.

\*   \*   \*   \*   \*

Form I–914. For filing an application to classify an alien as a nonimmigrant under section 101(a)(15)(T) of the Act

(victims of a severe form of trafficking in persons and their immediate family members)—$255. For each immediate family member included on the same application, an additional fee of $105 per person, up to a maximum amount payable per application of $510.

Form N–300. For filing an application for declaration of intention—$115.

Form N–336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act—$250.

Form N–400. For filing an application for naturalization (other than such application filed on or after October 1, 2004, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service, for which no fee is charged)—$320.

\*    \*    \*    \*    \*

Form N–470. For filing an application for benefits under section 316(b) or 317 of the Act—$150.

Form N–565. For filing an application for a certificate of naturalization or declaration of intention in lieu of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act—$210.

Form N–600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act—$240, for applications filed on behalf of a biological child and $200 for applications filed on behalf of an adopted child.

Form N–600K. For filing an application for citizenship and issuance of certificate under section 322 of the Act—$240, for an application filed on behalf of a biological child and $200 for an application filed on behalf of an adopted child.

\*    \*    \*    \*    \*

(2) Fees for production or disclosure of records under 5 U.S.C. 552 shall be charged in accordance with the regulations of the Department of Homeland Security, 6 CFR 5.11.

(3) The fees prescribed in paragraph (b)(1) of this section shall be adjusted at least annually on or after October 1, 2005, by publication of an inflation adjustment. The inflation adjustment will be announced by notice in the **Federal Register**, and shall be based upon the inflation rate enacted by Congress. If Congress has not enacted the inflation rate by the start of the year, BCIS will use the anticipated inflation rates used in the President's annual budget request. The prescribed fee or

charge shall be the amount prescribed in paragraph (b)(1) of this section, as amended by the latest of any such inflation adjustment. The fees have been rounded to the nearest whole $5 increment in accordance with BCIS' standard practice.

\*    \*    \*    \*    \*

Dated: January 30, 2004.

**Tom Ridge,**
*Secretary of Homeland Security.*
[FR Doc. 04–2290 Filed 1–30–04; 2:44 pm]
**BILLING CODE 4410–10–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### 14 CFR Part 71

**[Docket No. FAA–2004–16914; Airspace Docket No. 04–AAL–01]**

### Proposed Establishment of Class E Airspace; Akhiok, AK

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This action proposes to establish new Class E airspace at Akhiok, AK. A new Standard Instrument Approach Procedure (SIAP) and a new Departure Procedure are being published for the Akhiok Airport. There is no existing Class E airspace to contain aircraft executing the new instrument approach at Akhiok, AK. Adoption of this proposal would result in the establishment of Class E airspace upward from 700 feet (ft.) and 1,200 ft. above the surface at Akhiok, AK.
**DATES:** Comments must be received on or before March 19, 2004.
**ADDRESSES:** Send comments on the proposal to the Docket Management System, U.S. Department of Transportation, Room Plaza 401, 400 Seventh Street, SW., Washington, DC 20590–0001. You must identify the docket number FAA–2004–16914/ Airspace Docket No. 04–AAL–01, at the beginning of your comments. You may also submit comments on the Internet at *http://dms.dot.gov.* You may review the public docket containing the proposal, any comments received, and any final disposition in person in the Dockets Office between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Docket Office (telephone 1–800–647–5527) is on the plaza level of the Department of Transportation NASSIF Building at the above address.

An informal docket may also be examined during normal business hours at the office of the Regional Air Traffic

Division, Federal Aviation Administration, Manager, Operations Branch, AAL–530, Federal Aviation Administration, 222 West 7th Avenue, Box 14, Anchorage, AK 99513–7587.
**FOR FURTHER INFORMATION CONTACT:** Jesse Patterson, AAL–538G, Federal Aviation Administration, 222 West 7th Avenue, Box 14, Anchorage, AK 99513– 7587; telephone number (907) 271– 5898; fax: (907) 271–2850; e-mail: *Jesse.ctr.Patterson@faa.gov.* Internet address: *http://www.alaska.faa.gov/at.*
**SUPPLEMENTARY INFORMATION:**

## Comments Invited

Interested parties are invited to participate in this proposed rulemaking by submitting such written data, views, or arguments as they may desire. Comments that provide the factual basis supporting the views and suggestions presented are particularly helpful in developing reasoned regulatory decisions on the proposal. Comments are specifically invited on the overall regulatory, aeronautical, economic, environmental, and energy-related aspects of the proposal. Communications should identify both docket numbers and be submitted in triplicate to the address listed above. Commenters wishing the FAA to acknowledge receipt of their comments on this notice must submit with those comments a self-addressed, stamped postcard on which the following statement is made: "Comments to Docket No. FAA–2004–16914/Airspace Docket No. 04–AAL–01." The postcard will be date/time stamped and returned to the commenter.

All communications received on or before the specified closing date for comments will be considered before taking action on the proposed rule. The proposal contained in this notice may be changed in light of comments received. All comments submitted will be available for examination in the public docket both before and after the closing date for comments. A report summarizing each substantive public contact with FAA personnel concerned with this rulemaking will be filed in the docket.

## Availability of Notice of Proposed Rulemaking's (NPRM's)

An electronic copy of this document may be downloaded through the Internet at *http://dms.dot.gov.* Recently published rulemaking documents can also be accessed through the FAA's Web page at *http://www.faa.gov* or the Superintendent of Document's Web page at *http://www.access.gpo.gov/nara.*

Additionally, any person may obtain a copy of this notice by submitting a

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 103**

**[CIS No. 2233–02]**

**RIN 1615–AA84**

### Adjustment of the Immigration Benefit Application Fee Schedule

**AGENCY:** Department of Homeland Security, Bureau of Citizenship and Immigration Services.

**ACTION:** Final rule and confirmation of interim rules.

**SUMMARY:** This rule adjusts the fee schedule of the Immigration Examinations Fee Account (IEFA) for immigration benefit applications and petitions, as well as the fee for capturing biometric information of applicants or petitioners who apply for certain immigration benefits. Fees collected from persons filing immigration benefit applications are deposited into the IEFA and used to fund the full cost of providing immigration benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. This rule adjusts the immigration benefit application fees by approximately $55 per application, and increases the biometric fee by $20, in order to ensure sufficient funding to process incoming applications. In addition, on January 24, 2003, and February 27, 2003, the former Immigration and Naturalization Service (INS) published two interim rules that first adjusted fees lower based on section 457 of the Homeland Security Act of 2002, and then readjusted the fees to preexisting levels, based upon the repeal of section 457. Accordingly, this final rule will adopt the two interim rules as final without change, and will adopt the fee structure that was proposed on February 3, 2004.

**DATES:** This final rule is effective April 30, 2004. Applications or petitions mailed, postmarked, or otherwise filed, on or after this date require the new fee.

**FOR FURTHER INFORMATION CONTACT:** Paul L. Schlesinger, Acting Budget Director, Office of Budget, U.S. Citizenship and Immigration Services, 425 I Street, NW., Room 5307, Washington, DC 20536, telephone (202) 514–3206.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction

The Bureau of Citizenship and Immigration Services (BCIS) published a proposed rule in the **Federal Register** on February 3, 2004, at 69 FR 5088, to adjust the application fee schedule of the IEFA. The proposed rule was published with a 30-day comment period, which closed on March 4, 2004. The BCIS received 278 comments pertaining to the adjustment of the immigration benefit application fee schedule. This final rule implements the fee structure as outlined in the proposed rule, without change except for several nonsubstantive technical changes (described further below) to update references in light of the Homeland Security Act and revise references to fees that relate to Department of Justice (DOJ) proceedings in light of DOJ fee regulations at 8 CFR parts 1003 and 1103. Any applications or petitions mailed, postmarked, or otherwise filed, on or after April 30, 2004, will require the new fee.

Comments were received from a broad spectrum of individuals and organizations, including 1 caucus of members of Congress, 16 refugee and immigrant service organizations, 15 public policy and advocacy groups, 8 educational institutions, 8 attorney organizations, 2 public corporations, 37 past and present adopting parents, 2 municipalities, and 189 other concerned individuals. Many commenters addressed multiple issues in their comments, and as a result, the number of comments discussed below in reference to specific issues exceeds the total number of comments received. All of the comments were carefully considered before preparing this final rule.

In addition, on January 24, 2003 (at 68 FR 3798), and February 27, 2003 (at 68 FR 8989), the former INS published interim rules first adjusting fees lower, and then readjusting them to the preexisting levels, based upon section 457 of the Homeland Security Act of 2002, Public Law 107–296, and the subsequent repeal of section 457 in section 107 of the Homeland Security Act Amendments of 2003, Div. L. of Public Law 108–7. The former INS received five comments on the January 24 rule and one comment on the February 27 rule. Comments included urging the BCIS to seek appropriated funding to pay for asylum and refugee services instead of application fees, and contending that the high fees are putting the benefit of naturalization beyond the reach of many of our nation's immigrants. In creating the Immigration Examinations Fee Account, Congress intended that the activities supported by this account be self-sustaining, and not be funded by tax dollars (Pub. L. 100–459), with the exception of appropriated funds dedicated specifically towards backlog reduction. The BCIS has been managing this account consistent with federal law and congressional direction. Additionally, the BCIS does have the ability to waive fees on a case-by-case basis. Any applicant or petitioner who has an "inability to pay" the fees may request a fee waiver. This final rule adopts the fee structure proposed on February 3, 2004, but, in so doing, the BCIS has reviewed and considered the comments made in response to the January 24, 2003, and February 27, 2003, interim rules.

The following is a discussion of the comments received for the February 3, 2004, proposed rule and the BCIS' response.

### II. Summary of Comments

#### A. Form I–600/600A, Petition to Classify an Orphan as an Immediate Relative/Application for Advance Processing of Orphan Petitions

Forty-two comments were received expressing dissatisfaction with the fee increases associated with Forms I–600 and I–600A, Petition to Classify an Orphan as an Immediate Relative, and the Application for Advance Processing of Orphan Petition, respectively. The combined cost of the Form I–600 and Form I–600A ($525) necessarily reflects the fact that the Form I–600 and Form I–600A consist of two separate, highly labor-intensive adjudications.

Adjudication of the Forms I–600 and I–600A "orphan petitions" has been, and continues to be, a priority as evidenced by the commitment established in the regulations at 8 CFR 204.3(a)(2). Specifically, orphan petitions are filed at district offices and adjudicated by experienced District Adjudication Officers. This is due to both the complexity of the international adoption process in general and the adjudication process required by statute and regulation. In addition, because of the importance the BCIS places on international adoptions, handling these cases in district offices by experienced officers allows for personalized customer service. District Adjudication Officers may be in constant contact with the petitioner throughout the process of a U.S. citizen's effort to adopt a child from abroad. The earliest contact may be a request for information and forms, followed by the filing of the Form I–600A and the home study. The adjudication of the Form I–600A petition requires knowledge of State law requirements regarding adoptions, including pre-adoption requirements such as counseling in certain States. Each petition must be accompanied by a home study, for which there are State requirements as well as Federal

**Federal Register** / Vol. 69, No. 73 / Thursday, April 15, 2004 / Rules and Regulations **20529**

requirements. Since there is no single national standard, it makes sense to assign these petitions to adjudication officers located in district offices that are better able to stay on top of ever-changing State requirements and establish effective local liaisons.

The home study process is complex and often the adjudication officer must request that additional information be provided in the home study. When the child to be adopted is identified, further information and contact may ensue. To accommodate prospective adoptive parents, the BCIS allows petitioners to submit supporting evidence after initial filing of a Form I–600A. Thus, documentation is usually added to the petition as the adoption process progresses. It is not unusual for a case to be with the BCIS for several months, demanding an intense and protracted level of customer service. There may be frequent communications in person, telephonically, and in writing, between the BCIS, adoption agencies, social workers, and prospective adoptive parents.

The home study review makes this petition particularly labor-intensive. The adjudication officer is tasked with the careful review of the home study, perhaps 10–20 pages long, addressing a number of issues including any history of abuse or arrests. This information is carefully compared against Federal Bureau of Investigation (FBI) fingerprint checks. If the officer must request and review the arrest dispositions of petitioners with criminal records. When there are discrepancies, the home study must be revised or supplemented to include the new information and consider the impact it has on the placement.

The Form I–600 petition establishes eligibility of a child as an orphan. Adjudication of these petitions requires the BCIS to determine if the child meets the regulatory definition of an orphan. Accordingly, the adjudication officer must develop and maintain a level of expertise in the laws and processes governing adoption in countries from which children are adopted. This assessment may require working with the Department of State or BCIS offices overseas to verify the validity of documents and interpret laws regarding international adoptions in countries other than the United States.

Finally, the Form I–600 adjudication also includes a Form I–604 investigation. The Form I–604, *Request for and Report on Overseas Orphan Investigation,* is used to document the investigations that must be completed in every orphan case before the Form I–600 can be approved. It includes: The

child's birth name; date and place of birth; where the child lives; and if the child lives at an orphanage or with someone other than the biological parent(s), how and why that placement occurred; the child's physical and mental condition, and information about any known physical or mental illnesses (*e.g.*, is the child a special needs child); if the child has siblings, and if so, if the child lives with the brothers or sisters; information concerning the child's biological parents and the determination that the child is an orphan because he or she has a "sole parent" or "surviving parent" (as defined in the regulations); and any other pertinent facts that the investigation uncovers. The purpose of the investigation is to verify that the child is an orphan, address specific concerns articulated by the adjudicating officer or consular officer that can only be resolved by an investigation, and resolve significant differences between the facts presented in the advanced processing application (Form I–600A) or advanced processing of the application (a Form I–600 approved by a BCIS office in the United States) and evidence available at later stages of processing. The investigation is conducted at the overseas visa-issuing post by the BCIS, or by the Department of State if there is no BCIS office at that U.S. Embassy or Consulate. A Form I–604 investigation may require a field investigation entailing travel to a remote location to establish whether or not a child is actually an orphan.

Since the BCIS relies on fees to recover the full cost of processing immigration and naturalization benefits, the increase in fees for the Forms I–600 and I–600A to $525 is necessary to recover the full costs associated with processing orphan petitions, including security enhancements instituted post September 11, 2001. Accordingly, the BCIS will charge a fee of $525 for processing Forms I–600 and I–600A.

**B. How Will the BCIS Improve Service?**

One hundred and eighty-one comments were received opposing the increase in the fees given the current level of services provided by the BCIS. Many people noted the lengthy waiting times to process their benefit applications as well as the need to improve overall customer service.

The BCIS has made progress in many areas of customer service such as eliminating the lines at a number of its offices (including New York and Miami), introducing on-line options for certain application filing and case status updates, and establishing a bilingual, toll-free customer help-line.

Nonetheless, the BCIS is committed to taking further steps to fundamentally transform the administration of citizenship and immigration services. Over the coming year, the BCIS will prioritize customer service and improve application processing times, in addition to security. The agency has already begun implementing significant information technology and process improvements including electronic filing for certain immigration benefit applications. In FY 2002, the President launched a multi-year initiative to eliminate the application backlog and ensure a six-month processing time standard for all immigration benefit applications. The FY 2005 Budget provides an additional $60 million in appropriated funds to support this effort for a total of $160 million in funds available for the backlog efforts. The BCIS plans to achieve the President's goal by FY 2006.

A number of commenters also suggested that the high fees are putting immigration benefits beyond the reach of many of our nation's immigrants. The BCIS does have the ability to waive fees on a case-by-case basis. Any applicant or petitioner who has an "inability to pay" the fees may request a fee waiver. However, it should be noted that the biometric fee cannot be waived.

A number of commenters also made specific service improvement ideas, including extending validity periods for Employment Authorizations and Advance Parole documents beyond the current one year, issuing fewer Requests for Evidence, and using SEVIS (Student and Exchange Visitor Information System) information more broadly for other adjudication purposes. The BCIS welcomes public input in this area and will consider it as it moves forward to improve customer service. To the extent processing improvements can be adopted in the future that further increase efficiency or reduce costs, they will be taken into account in any future fee adjustments.

Lastly, a number of commenters mentioned the recent General Accounting Office (GAO) Report on *Immigration Application Fees: Current Fees Are Not Sufficient to Fund U.S. Citizenship and Immigration Services' Operations.* Comments noted that the BCIS does not have a system to track the status of each application as it moves through the process. While such a system undoubtedly would provide additional information on the cost to process pending applications, it is not necessary in order to identify the cost elements that have led to shortfalls in the IEFA, will continue to be incurred, and must be recovered for the BCIS to

process applications. Those costs, as discussed in the proposed and this final rule, are the basis for these fee adjustments. Furthermore, the GAO also concluded that the existing fee schedule is not sufficient to fully fund the BCIS's operations, that the current fee schedule is based on a fee study that did not include all costs of the BCIS's operations, and that costs have increased due to additional processing requirements and other actions not covered by current fees.

Several commenters noted the significant percentage increase in the application fees over the last several years. The vast majority of this increase is attributed to an exhaustive fee review completed in FY 1997, employing an activity-based costing (ABC) methodology to more accurately capture the direct and indirect costs of providing immigration and naturalization services. The ABC methodology represented a significantly improved methodology over previous ones employed by the former INS. This methodology involved time and motion studies to capture the cycle times of individual form types, and allowed the former INS to identify the individual costs of activities involved in the processing of each application and petition. The methodology also allowed for the recovery of costs of services provided to other immigrants at no charge, including services to refugees and asylum applicants. This improved methodology was the basis for the significant fee increases in FY 1999. A General Accounting Office report in September 1998, entitled "INS User Fee Revisions,'' reviewed this methodology and concluded that "On the basis of our discussions with OMB staff and our review of INS' efforts to identify the costs associated with processing applications, we believe that INS complied, to the extent it was able, with available OMB guidance that requires agencies to recover the full costs of providing services.'' The fee adjustments in this rule are based on an incremental increase in application costs of this established methodology.

### C. Fee Increases are Necessary

Fifty-six comments were received in favor of the fee increases. In general, these can be divided into two groups: those who supported the proposed fee increases as long as they are accompanied with actual significant improvements in processing times and other customer service, and those whose support for increased fees was not coupled with any stated concern about BCIS customer service. A few commenters stated that the fee increases

should be higher. Several others suggested expanding the premium processing fee to the Form I–485 or other BCIS applications, while still others supported sharp increases in EB–5 fees to support the regional center program. Although the reasons provided for supporting the fee increases, or for supporting higher fees, varied substantially from general concerns about immigration levels or the Federal deficit to more specific points about immigration benefit processing, several of the more frequently stated rationales included:

(1) Current fees are too low in relation to the value of the benefit received (U.S. citizenship, for example);

(2) Taxpayers should not pay for the increasing costs of providing immigration and naturalization benefits;

(3) Fee increases are necessary to enhance security;

(4) Fee increases are justified given the increasing demand for immigration and naturalization benefits over the last several years; and

(5) Fee increases are necessary in order to increase the current level of services.

The BCIS believes that the proposed fee increases will lead to and support improved services as previously stated, and disagrees with those commenters who stated that the increases are too small. The BCIS also notes that the $1,000 premium processing fee is a statutory authorization (section 286(u) of the Immigration and Nationality Act) specifically limited to employment-based applications and petitions, and does not seek in this final rule to expand the premium processing service.

### D. Why Is BCIS Raising the Fees Instead of Seeking Additional Sources of Funding?

Seventeen commenters urged BCIS to seek additional appropriated funds to cover the costs of military naturalizations, the Refugee Corps, and other immigration benefit services, especially those that the commenters perceived as not directly related to the actual adjudication of the specific application for which the fee was paid. In creating the Immigration Examinations Fee Account, Congress intended that the activities supported by this account be self-sustaining, and not be funded by tax dollars (Pub. L. 100–459), with the exception of appropriated funds dedicated specifically towards backlog reduction. The BCIS has been managing this account consistent with Federal law and congressional direction.

Some of the individual cost elements are discussed more specifically below. With respect to all of the challenged

elements, however, the costs are either: (1) Part of the full direct and indirect costs of providing the adjudication to the applicant under the principles of Office of Management and Budget (OMB) Circular A–25, which allocate costs to include, but not be limited to, an appropriate share of direct and indirect personnel costs, physical overhead, consulting, other indirect costs, and management and supervisory costs; or (2) are part of the full costs of providing services to immigrants other than the applicant, as authorized by section 286(m) of the Act; or both.

In a variant on these comments, at least one commenter suggested that because security checks and some other aspects of immigration services funded by these fees provide a public rather than a purely personal benefit, the increases are unwarranted and beyond the scope of the authorizing statutes. Security checks are an integral part of determining the applicant's eligibility for a benefit and are appropriately an item that may be fully recovered through the applicable fee under the OMB Circular A–25 guidance. In addition, the fact that a process benefits the public interest as well as a private party does not mean that it cannot be funded by a user fee paid by the private party. Rather, when the service enables the beneficiary to obtain more immediate or substantial gains or values than those that accrue to the general public, a user fee is appropriate. The entire legal immigration and citizenship process—with respect both to grants of benefits and to denials for national security or other reasons—is one that benefits the public as well as private interests, but its focus on the adjudication of eligibility for individual benefits, as confirmed by section 286(m) of the Act and other broadly-based fee authorizing provisions, makes the fee-based structure entirely lawful and appropriate even when the public as a whole benefits as a result. As OMB Circular A–25 states at paragraph 6.a.3, "when the public obtains benefits as a necessary consequence of an agency's provision of special benefits to an identifiable recipient (i.e., the public benefits are not independent of, but merely incidental to, the special benefits), an agency need not allocate any costs to the public and should seek to recover from the identifiable recipient either the full cost to the Federal Government of providing the special benefit or the market price, whichever applies.'' Furthermore, under the authority of section 286(m) of the Act, user fees may be used—and are used now—not only for the benefit of the user

who paid them and any collateral benefit resulting to the public, but also to benefit the interests of certain others, such as asylum applicants, who do not pay fees.

Some of these commenters suggested, in effect, that fees should be funding of last recourse for immigration services; that is, that the BCIS should be required to have exhausted all possible means of seeking appropriated funds before imposing fee increases. The BCIS disagrees with this characterization. The Immigration and Nationality Act authorizes the recovery of the full costs of providing immigration and naturalization services, including services provided free of charge to many applicants, through application fees. It does not require the BCIS either to seek or to obtain other sources of funding for this purpose, although the President has requested, and Congress to date has provided, appropriations to supplement fee revenues in the area of backlog reduction.

One commenter expressed surprise that the proposed rule had not cited 8 U.S.C. 1573 and other indicia of Congress's strong interest in backlog reduction and directive to the BCIS to achieve this goal. The proposed rule discussed those legal authorities most directly relevant to fee-setting authority. The BCIS agrees with the commenter that Congress desires it to reduce backlogs, and seeks in this rule to obtain a level of resources that will prevent existing backlogs actually from increasing.

### E. Litigation Settlements

Six commenters strongly objected to the inclusion of litigation costs as an element in the fee adjustment calculation. As one commenter correctly stated, "The Equal Access to Justice Act ('EAJA') mandates that government agencies pay certain costs when they take a substantially unjustified position in litigation." What the commenter describes as "certain costs" are, more specifically, attorneys' fee awards, which must be paid from agency budgets rather than from the Judgment Fund. *See* 28 U.S.C. 2412(d).

The commenters' assumption that these payments necessarily result from "lost" cases and EAJA awards by courts, though, is mistaken. Most attorneys' fee payments arise from settlements in which the government admits neither legal liability under EAJA or any other statute, nor that its position was unjustified—and in fact maintains that its course of conduct was legally correct—but in which the posture of the case, risk management concerns, and the public interest support settling the

case and putting the litigation to rest. These are cases in which settlement mutually benefits both parties, otherwise it would not happen. It is not accurate to state or imply that when the United States settles civil litigation with an agreement that includes payment of attorneys' fees it necessarily has "lost" the case or has by the fact of settlement and payment in any way conceded that its conduct was unlawful or its legal position unjustified.

The comments also fail to recognize that most attorneys' fee payments are currently paid out of fee receipts. That is the way a fee-funded agency, without appropriated funds designated for that purpose, is able to pay them. Accounting for these costs in fee-setting is not a new imposition on the fee-paying public. In other words, this fee increase only changes the form in which the fee-paying public bears the cost of attorneys' fee payments from reduced service on the back end to a very slightly higher fee payment up front.

The BCIS seeks to minimize its litigation exposure by seeking to take responsible legal positions both with respect to setting policies in the first place and the merits of lawsuits against it. The BCIS would greatly prefer not to have to pay attorneys' fees from its budget as opposed to what it would view as more productive uses of resources, but it recognizes its potential obligations under the EAJA statute. It also recognizes that it cannot avoid a measure of litigation exposure as a cost of doing the public's business, and it would not be responsible to pretend that these costs do not exist or that they have no financial effect on the agency's fee-funded operations.

Instead, the BCIS believes that the more appropriate and responsible course of action is to account for attorneys' fee awards, based on actual experience with these costs as an unavoidable element of providing immigration services. It does this so that the provision of adjudication services to fee-paying and other BCIS customers will not be negatively affected by them. To do so does not encourage taking unjustified positions in litigation.

### F. Competitive Sourcing Study

Six commenters objected to the inclusion of the cost of a competitive sourcing study. The BCIS needs to be open to new methods of providing immigration and naturalization services that may in time save the fee-paying public both time and money, and this openness from time to time requires up-front investment. Whether that is the case with outsourcing immigration information officers remains to be seen;

that is the purpose of the study. Some of the comments appear to be based upon objection to outsourcing this or other functions. While the BCIS respects that view, it disagrees that it is an appropriate basis not to continue with or to fund the study to determine whether it is a substantially valid view in this instance.

### G. Nicaraguan Adjustment and Central American Relief Act (NACARA) fees

One commenter objected to increasing fees for NACARA-related applications, primarily on the ground that as an established program with known standards for adjudication, the cost of processing should be declining. In response, the BCIS notes that the fee adjustments relate to costs, including security enhancements conducted since July 2002, that affect NACARA applicants as much as any others. In addition, the premise of the comment that experience with a particular program necessarily results in reduced processing costs is incorrect. The basic nature of a NACARA adjudication—reviewing the evidence in the application and case file (which may be voluminous) in light of relevant legal standards and conducting security and other necessary record checks—is the same now as it was when the program began.

### H. Refugee Corps

Eleven commenters objected to funding refugee processing with fee revenues. Although the commenters supported free refugee services, in their view appropriated funds should be used pay for them. This subject has frequently been discussed in former INS rule making publications relating to fees. In repealing section 457 of the Homeland Security Act of 2002 in Public Law 108–7, and thereby restoring the authority of the BCIS to set fees at a level that will recover the costs of refugee and asylum processing, fee waivers, and other free services, Congress reaffirmed its expectation that such services be paid for through the fee account, after a brief period during which it had withdrawn that authority.

### I. Inflation Adjustment

Several commenters expressed concern about the provision for inflation adjustments through future notice in the **Federal Register**, including a contention that the phrase "inflation rate enacted by Congress" was not clear or specific. This provision will permit the BCIS to adjust on a timely basis for regular, fixed increases in costs based on Federal civilian pay increases and non-pay inflationary increases. The BCIS agrees

20532 **Federal Register**/Vol. 69, No. 73/Thursday, April 15, 2004/Rules and Regulations

that the phrase should be clarified to more specifically refer to Federal civilian salary and benefits costs and non-pay costs and therefore has revised the regulation to reference the pay and non-pay inflation adjustments that the Office of Management and Budget (OMB) issues annually for agency use in implementing OMB Circular A–76,

Performance of Commercial Activities. In other words, the regulation will enable BCIS to adjust its fees and charges on an annual basis using the inflationary adjustments that the Federal government already uses under Circular A–76 to reflect the impact of inflation on agency costs. If Congress enacts a Federal civilian pay inflation

factor that is different than the factor issued by OMB for Circular A–76, BCIS may adjust for these costs in the current year or in a following year.

**III. Fee Adjustments**

The fee adjustments, as adopted in this rule, are shown as follows:

NEW APPLICATION AND PETITION FEES

| Form No. | Description | Fee |
|---|---|---|
| I–90 | Application to Replace Permanent Resident Card | $185 |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | 155 |
| I–129 | Petition for a Nonimmigrant Worker | 185 |
| I–129F | Petition for Alien Fiancé(e) | 165 |
| I–130 | Petition for Alien Relative | 185 |
| I–131 | Application for Travel Document | 165 |
| I–140 | Immigrant Petition for Alien Worker | 190 |
| I–191 | Application for Permission to Return to an Unrelinquished Domicile | 250 |
| I–192 | Application for Advance Permission to Enter as a Nonimmigrant | 250 |
| I–193 | Application for Waiver of Passport and/or Visa | 250 |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 250 |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant | 185 |
| I–485 | Application to Register Permanent Residence or to Adjust Status | 315 |
| I–526 | Immigrant Petition by Alien Entrepreneur | 465 |
| I–539 | Application to Extend/Change Nonimmigrant Status | 195 |
| I–600/600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing or Orphan Petition | 525 |
| I–601 | Application for Waiver of Grounds of Excludability | 250 |
| I–612 | Application for Waiver of the Foreign Residence Requirement | 250 |
| I–687 | For Filing Application for Status as a Temporary Resident | 240 |
| I–690 | Application for Waiver of Excludability | 90 |
| I–694 | Notice of Appeal of Decision | 105 |
| I–695 | Application for Replacement Employment Authorization or Temporary Residence Card | 65 |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident | 175 |
| I–751 | Petition to Remove the Conditions on Residence | 200 |
| I–765 | Application for Employment Authorization | 175 |
| I–817 | Application for Family Unity Benefits | 195 |
| I–824 | Application for Action on an Approved Application or Petition | 195 |
| I–829 | Petition by Entrepreneur to Remove Conditions | 455 |
| I–881 | NACARA—Suspension of Deportation or Application for Special Rule Cancellation of Removal for adjudication by the Department of Homeland Security. | 275 |
| I–881 | NACARA—Suspension of Deportation or Application for Special Rule Cancellation of Removal for adjudication by the Immigration Court. | 155 |
| I–914 | Application for T Nonimmigrant Status | 255 |
| N–300 | Application to File Declaration of Intention | 115 |
| N–336 | Request for Hearing on a Decision in Naturalization Procedures | 250 |
| N–400 | Application for Naturalization | 320 |
| N–470 | Application to Preserve Residence for Naturalization Purposes | 150 |
| N–565 | Application for Replacement Naturalization Citizenship Document | 210 |
| N–600 | Application for Certification of Citizenship | 240 |
| N–600K | Application for Citizenship and Issuance of Certificate under Section 322 | 240 |
| | For Capturing Biometric Information | 70 |

**IV. Technical Improvements**

This final rule also makes several minor, nonsubstantive changes to 8 CFR 103.7 that were not included in the proposed rule. In particular, these changes replace references to the former INS with reference to the Department of Homeland Security (DHS). In so doing, they conform the published text of the regulations with the changes already in fact made to them by the "deeming" provision (section 1512(d)) of the Homeland Security Act. The changes also remove references to Department of Justice forms and procedures now

covered by 8 CFR part 1003. The reference to the discontinued Form I–290A, which was replaced in 1996 by Forms EOIR–26 and EOIR–29, has also been removed.

The Department of Justice intends to make similar updates and improvements to its regulations in 8 CFR parts 1003 and 1103. Until conforming changes are promulgated, the fee adjustments made by this final rule shall supersede any fee amounts stated in 8 CFR 1103.7(b) with respect to any fee paid to the Department of Homeland Security by any person,

including any alien in proceedings before the Executive Office for Immigration Review, to the extent there are any inconsistencies between the fees as stated in the two regulations.

*Good Cause Exception*

Although this rule falls under the category of major rule as that term is defined in 5 U.S.C. 804(2)(A), the DHS finds that under 5 U.S.C. 808(2) and 5 U.S.C. 553(d)(3) good cause exists to make the rule take effect 15 days from the date of publication in the **Federal Register**, for the following reasons: the

BCIS must collect fee funds to provide immigration and naturalization benefits, but absent prompt change in the fee schedule, the BCIS will not have sufficient resources to process immigration benefit applications and adequately perform its mission. In particular, the security enhancements funded by the increased fees are important to the national security interests of the United States. To continue performing comprehensive security enhancements to fully meet homeland security needs, it is essential that the BCIS recover the costs of this workload as promptly as possible. In addition, implementing this rule at the earliest feasible date will assist the BCIS in enhancing its services and reducing processing times, which is to the benefit of BCIS customers and the public interest. In particular, the vast majority of customers who do not present a danger to the national security or public safety will benefit from the increased resources available in this fiscal year through more rapid implementation. Accordingly, the DHS finds that it would be contrary to the public interest for this rule to go into effect 60 days after its publication, and that there is good cause for the rule to go into effect 15 days from its publication. In order to assist the public and mitigate any potential harmful effect on customers as a result of this implementation schedule, the BCIS plans an aggressive outreach and informational campaign involving the internet and other media resources.

*Regulatory Flexibility Act*

This rule has been reviewed in accordance with 5 U.S.C. 605(b), and the Department of Homeland Security certifies that this rule will not have a significant economic impact on a substantial number of small entities. The majority of applications and petitions are submitted by individuals and not small entities as that term is defined in 5 U.S.C. 601(6).

BCIS acknowledges, however, that a number of small entities, particularly those filing business-related applications and petitions, such as Form I–140, Immigrant Petition for Alien Worker; Form I–526, Immigrant Petition by Alien Entrepreneur; and Form I–829, Petition by Entrepreneur to Remove Conditions, may be affected by this rule. For the FY 2004/2005 biennial time period, BCIS projects that approximately 190,000 Forms I–140, 435 Forms I–526, and 508 Forms I–829 will be filed. This volume represents petitions filed by a variety of businesses, ranging from large multinational corporations to small domestic

businesses. However, even if all of the employers applying for benefits met the definition of small businesses, the resulting degree of economic impact would not require a Regulatory Flexibility Analysis to be performed. None of the public comments indicated that the rule would have a significant economic impact on small entities.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will result in an annual effect on the economy of more than $100 million, in order to generate the revenue necessary to fully fund the increased cost associated with the processing of immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants, as specified in the regulation, at no charge. The increased costs will be recovered through the fees charged for various immigration benefit applications.

*Executive Order 12866*

This rule is considered by the Department of Homeland Security to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. The implementation of this final rule would provide BCIS with an additional $232 million in FY 2004 and $394 million in FY 2005 in annual fee revenue, based on a projected annual fee-paying volume of 6.8 million applications and petitions, over the fee revenue that would be collected under the current fee structure. This increase in revenue will be used pursuant to subsections 286(m) and (n) of the Immigration and Nationality Act (Act) to fund the full costs of processing immigration benefit applications and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants; and the full cost of similar benefits provided to other immigrants at no charge. Activities not directly comprising the processing of fee paid-

applications are discussed elsewhere in the preamble, such as the section of the summary of the comments entitled "Refugee Corps" and "Why is BCIS Raising the Fees Instead of Seeking Additional Sources of Funding?". If the BCIS does not adjust the current fees to recover the full costs of processing immigration benefit applications, the backlog will likely increase. The revenue increase is based on BCIS' costs and projected volumes that were available at the time of the rule. Accordingly, this rule has been submitted to the Office of Management and Budget for clearance.

*Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Department of Homeland Security has determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*Executive Order 12988: Civil Justice Reform*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

However, it should be noted that BCIS solicited public comments on the change of fees in the proposed rule which was published in the **Federal Register** on February 3, 2004. It should also be noted that the changes to the fees will require changes to the application/petition forms to reflect the new fees. OMB has approved changes to the appropriate forms, consistent with the provisions in this final rule.

**List of Subjects in 8 CFR Part 103**

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

■ Accordingly, the interim rules amending 8 CFR part 103 which were published at 68 FR 3798 on January 24, 2003, and 68 FR 8989 on February 27, 2003, are adopted as a final rule without change. In addition, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 2. Section 103.7 is amended by:
■ a. Revising paragraph (a);
■ b. In paragraph (b), by removing the entry "For fingerprinting by the Service" and adding the entry "For capturing biometric information" in its place, and by revising the entries for the forms set forth below, except for Form N–600K;
■ c. Adding the entry for "Form N–600K" and revising the entry for "Motion" the second time it appears in paragraph (b)(1);
■ d. Removing the entries "Form EOIR–40", "Form EOIR–42", "Form I–290A", "Form N–643", and "Motion" the first time it appears in paragraph (b)(1);
■ e. Revising paragraph (b)(2);
■ f. Adding new paragraphs (b)(3) and (b)(4); and by
■ g. Revising paragraph (c).

The revisions and additions read as follows:

### § 103.7   Fees.

(a) *Remittances.*
(1) Fees shall be submitted with any formal application or petition prescribed in this chapter in the amount prescribed by law or regulation. Except for fees remitted directly to the Board of Immigration Appeals pursuant to the provisions of 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any Department of Justice Executive Office for Immigration Review proceeding shall be paid to, and accepted by, any BCIS office authorized to accept fees. The immigration court does not collect fees. Payment of any fee under this section does not constitute filing of the document with the Board of Immigration Appeals or with the Immigration Court. The Department of Homeland Security shall return to the payer, at the time of payment, a receipt for any fee paid. The BCIS shall also return to the payer any documents, submitted with the fee, relating to any Immigration Court proceeding.

(2) Remittances must be drawn on a bank or other institution located in the United States and be payable in United States currency. Fees in the form of postage stamps shall not be accepted. Remittances to the Department of Homeland Security shall be made payable to the "Department of Homeland Security" except that in case of applicants residing in the Virgin Islands of the United States, the remittances shall be made payable to the "Commissioner of Finance of the Virgin Islands" and, in the case of applicants residing in Guam, the remittances shall be made payable to the "Treasurer, Guam." If an application to the Department of Homeland Security is submitted from outside the United States, remittance may be made by bank international money order or foreign draft drawn on a financial institution in the United States and payable to the Department of Homeland Security. Remittances to the Board of Immigration Appeals shall be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8. A charge of $30.00 will be imposed if a check in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn. A receipt issued by a Department of Homeland Security officer for any remittance shall not be binding upon the Department of Homeland Security if the remittance is found uncollectible. Furthermore, legal and statutory deadlines will not be deemed to have been met if payment is not made within 10 business days after notification by the Department of Homeland Security of the dishonored check.

(b)  *  *  *
(1)  *  *  *

*   *   *   *   *

For capturing biometric information. A service fee of $70 will be charged for any individual who is required to have biometric information captured in connection with an application or petition for certain immigration and naturalization benefits (other than asylum), and whose residence is in the United States.

*   *   *   *   *

Form I–90. For filing an application for a Permanent Resident Card (Form I–551) in lieu of an obsolete card or in lieu of one lost, mutilated, or destroyed, or for a change in name—$185.

*   *   *   *   *

Form I–102. For filing a petition for an application (Form I–102) for Arrival/ Departure Record (Form I–94) or Crewman's Landing (Form I–95), in lieu of one lost, mutilated, or destroyed—$155.

Form I–129. For filing a petition for a nonimmigrant worker—$185.

*   *   *   *   *

Form I–129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act—$165.

Form I–130. For filing a petition to classify status of an alien relative for issuance of an immigrant visa under section 204(a) of the Act—$185.

Form I–131. For filing an application for travel documents—$165.

Form I–140. For filing a petition to classify preference status of an alien on the basis of profession or occupation under section 204(a) of the Act—$190.

Form I–191. For filing an application for discretionary relief under section 212(c) of the Act—$250.

Form I–192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case, or where the approval of the application is in the interest of the United States Government—$250.

Form I–193. For filing an application for waiver of passport and/or visa—$250.

Form I–212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense in lieu of deportation—$250.

*   *   *   *   *

Form I–360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant—$185, except there is no fee for a petition seeking classification as an Amerasian.

Form I–485. For filing an application for permanent resident status or creation of a record of lawful permanent residence—$315 for an applicant 14 years of age or older; $215 for an applicant under the age of 14 years; no fee for an applicant filing as a refugee under section 209(a) of the Act.

*   *   *   *   *

Form I–526. For filing a petition for an alien entrepreneur—$465.

Form I–539. For filing an application to extend or change nonimmigrant status—$195.

*   *   *   *   *

Form I–600. For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$525.

Form I–600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.)—$525.

Form I–601. For filing an application for waiver of ground of inadmissibility under section 212(h) or (i) of the Act. (Only a single application and fee shall be required when the alien is applying simultaneously for a waiver under both those subsections.)—$250.

Form I–612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act—$250.

Form I–687. For filing an application for status as a temporary resident under section

245A(a) of the Act. A fee of $240 for each application or $105 for each application for a minor child (under 18 years of age) is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children) shall be $585.

Form I–690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$90.

Form I–694. For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act—$105.

Form I–695. For filing an application for replacement of temporary resident card (Form I–688)—$65.

Form I–698. For filing an application for adjustment from temporary resident status to that of lawful permanent resident under section 245A(b)(1) of the Act. For applicants filing within 31 months from the date of adjustment to temporary resident status, a fee of $135 for each application is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children (under 18 years of age living at home)) shall be $405. For applicants filing after 31 months from the date of approval of temporary resident status, who file their applications on or after July 9, 1991, a fee of $175 (a maximum of $525 per family) is required. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

\*     \*     \*     \*     \*

Form I–751. For filing a petition to remove the conditions on residence, based on marriage—$200.

Form I–765. For filing an application for employment authorization pursuant to 8 CFR 274a.13—$175.

\*     \*     \*     \*     \*

Form I–817. For filing an application for voluntary departure under the Family Unity Program—$195.

\*     \*     \*     \*     \*

Form I–824. For filing for action on an approved application or petition—$195.

Form I–829. For filing a petition by entrepreneur to remove conditions—$455.

Form I–881. For filing an application for suspension of deportation or special rule cancellation of removal (pursuant to section 203 of Public Law 100–100):

— $275 for adjudication by the Department of Homeland Security, except that the maximum amount payable by family members (related as husband, wife, unmarried child under 21, unmarried son, or unmarried daughter) who submit applications at the same time shall be $550.

— $155 for adjudication by the Immigration Court (a single fee of $155 will be charged whenever applications are filed by two or more aliens in the same proceedings). The $155 fee is not required if the Form I–881

is referred to the Immigration Court by the Department of Homeland Security.

\*     \*     \*     \*     \*

Form I–914. For filing an application to classify an alien as a nonimmigrant under section 101(a)(15)(T) of the Act (victims of a severe form of trafficking in persons and their immediate family members)—$255. For each immediate family member included on the same application, an additional fee of $105 per person, up to a maximum amount payable per application of $510.

Form N–300. For filing an application for declaration of intention—$115.

Form N–336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act—$250.

Form N–400. For filing an application for naturalization—$320. (There is no fee charged for an application filed on or after October 1, 2004, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service.)

\*     \*     \*     \*     \*

Form N–470. For filing an application for benefits under section 316(b) or 317 of the Act—$150.

Form N–565. For filing an application for a certificate of naturalization or declaration of intention in lieu of a certificate or declaration alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act—$210.

Form N–600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act—$240, for applications filed on behalf of a biological child and $200 for applications filed on behalf of an adopted child.

Form N–600K. For filing an application for citizenship and issuance of certificate under section 322 of the Act—$240, for an application filed on behalf of a biological child and $200 for an application filed on behalf of an adopted child.

\*     \*     \*     \*     \*

Motion. For filing a motion to reopen or reconsider any decision under the immigration laws in any type of proceeding over which the Executive Office for Immigration Review does not have jurisdiction. No fee shall be charged for a motion to reopen or reconsider a decision on an application for relief for which no fee is chargeable or for any motion to reopen or reconsider made concurrently with any initial application for relief under the immigration laws for which no fee is chargeable. (The fee of $110 shall be charged whenever an appeal or motion is filed by or on behalf of two or more aliens and all such aliens are covered by one decision. When a motion to reopen or reconsider is made concurrently with any application for relief under the immigration laws for which a fee is chargeable, the motion is filed and, if the motion is granted, the requisite fee for filing the application for relief will be charged and

must be paid within the time specified in order to complete the application.)—$110.

\*     \*     \*     \*     \*

(2) Fees for production or disclosure of records under 5 U.S.C. 552 shall be charged in accordance with the regulations of the Department of Homeland Security at 6 CFR 5.11.

(3) The fees prescribed in paragraph (b)(1) of this section shall be adjusted annually on or after October 1, 2005, by publication of an inflation adjustment. The inflation adjustment will be announced by notice in the **Federal Register**, and the adjustment shall be a composite of the Federal civilian pay raise assumption and non-pay inflation factor for that fiscal year issued by the Office of Management and Budget for agency use in implementing OMB Circular A–76, weighted by pay and non-pay proportions of total funding for that fiscal year. If Congress enacts a different Federal civilian pay raise percentage than the percentage issued by OMB for Circular A–76, the Department of Homeland Security may adjust the fees, during the current year or a following year to reflect the enacted level. The prescribed fee or charge shall be the amount prescribed in paragraph (b)(1) of this section, plus the latest inflation adjustment, rounded to the nearest $5 increment.

(4) For the schedule of fees relating to proceedings before the immigration judges and the Board of Immigration Appeals, *see* 8 CFR 1103.7.

(c) *Waiver of fees.* (1) Except as otherwise provided in this paragraph (c), any of the fees prescribed in paragraph (b) of this section relating to applications, petitions, appeals, motions, or requests may be waived by the Department of Homeland Security in any case under its jurisdiction in which the alien or other party affected is able to substantiate that he or she is unable to pay the prescribed fee. The person seeking a fee waiver must file his or her affidavit, or unsworn declaration made pursuant to 28 U.S.C. 1746, asking for permission to prosecute without payment of fee of the application, petition, appeal, motion, or request, and stating his or her belief that he or she is entitled to or deserving of the benefit requested and the reasons for his or her inability to pay. The officer of the Department of Homeland Security having jurisdiction to render a decision on the application, petition, appeal, motion, or request may, in his or her discretion, grant the waiver of fee. Fees for "Passenger Travel Reports via Sea and Air" and for special statistical tabulations may not be waived. The payment of the additional sum prescribed by section 245(i) of the Act

**20536**    **Federal Register** / Vol. 69, No. 73 / Thursday, April 15, 2004 / Rules and Regulations

when applying for adjustment of status under section 245 of the Act may not be waived. The fee for Form I–907, Request for Premium Processing Services, may not be waived. For provisions relating to the authority of the immigration judges or the Board to waive fees prescribed in paragraph (b) of this section in cases under their jurisdiction, *see* 8 CFR 1003.24 and 1003.8.

(2) Fees under the Freedom of Information Act, as amended, may be waived or reduced where the Department of Homeland Security determines such action would be in the public interest because furnishing the information can be considered as primarily benefiting the general public.

(3) When the prescribed fee is for services to be performed by the clerk of court under section 344(a) of the Act, the affidavit for waiver of the fee shall be filed with the district director or officer in charge of the BCIS having administrative jurisdiction over the place in which the court is located at least 7 days prior to the date the fee is required to be paid. If the waiver is granted, there shall be delivered to the clerk of court by a BCIS representative on or before the date the fee is required to be paid, a notice prepared on BCIS letterhead and signed by the officer granting the waiver, that the fee has been waived pursuant to this paragraph.

(4) Fees for applications for Temporary Protected Status may be waived pursuant to 8 CFR 244.20.

\*    \*    \*    \*    \*

Dated: April 13, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–8699 Filed 4–13–04; 3:38 pm]

**BILLING CODE 4410–10–P**

for Admission into the United States after Deportation or Removal.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–212. U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. The information furnished on Form I–212 will be used by the USCIS to adjudicate applications filed by aliens requesting consent to reapply for admission to the United States after deportation, removal or departure, as provided under section 212.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 4,200 responses at 2 hours per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 8,400 annual burden hours.

If you have additional comments, suggestions, or need a copy of the information collection instrument, please contact Richard A. Sloan, Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, 111 Massachusetts Avenue, NW., Washington, DC 20529; 202–272–8377.

Dated: September 21, 2005.

**Stephen R. Tarragon,**

*Acting Director, Regulatory Management Division, U.S. Citizenship and Immigration Services.*

[FR Doc. 05–19155 Filed 9–23–05; 8:45 am]

**BILLING CODE 4410–10–M**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2352–05]**

**RIN 1615–ZA23**

**Adjustment of the Immigration Benefit Application Fee Schedule**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This Notice announces that the Department of Homeland Security, U.S. Citizenship and Immigration Services, will increase the fees for immigration benefit applications and petitions to account for cost increases due to inflation. The fee increases will apply to applications or petitions filed on or after October 26, 2005. The average fee increase for inflation is approximately $10 per application or petition. Fees collected from persons filing immigration benefit applications and petitions are deposited into the Immigration Examinations Fee Account and are used to fund the full cost of providing immigration benefits, including the full cost of providing benefits such as asylum and refugee admission for which no fees are assessed.

**DATES:** This notice is effective October 26, 2005.

**FOR FURTHER INFORMATION CONTACT:** Paul Schlesinger, Director, Office of Budget, U.S. Citizenship and Immigration Services, 20 Massachusetts Ave., NW., Suite 4052, Washington, DC 20529, telephone (202) 272–1930.

**SUPPLEMENTARY INFORMATION:**

**Under What Legal Authority Does U.S. Citizenship and Immigration Services Have To Charge Fees?**

The Immigration and Nationality Act (INA) provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and other immigrants. 8 U.S.C. 1356(m). The INA also states that the fees may recover administrative costs as well. *Id.* This revenue remains available to provide immigration and naturalization benefits and the collection, safeguarding, and accounting for fees. *Id.* at 1356(n).

U.S. Citizenship and Immigration Services (USCIS) must also conform to the requirements of the Chief Financial Officers Act of 1990 (CFO Act), Public Law 101–576, 104 Stat. 2838 (1990) (codified at 31 U.S.C. 901–903). Section 205(a)(8) of the CFO Act requires each agency's Chief Financial Officer to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." 31 U.S.C. 902(a)(8).

**What Federal Cost Accounting and Fee Setting Standards and Guidelines Were Used in Developing These Fee Changes?**

The authority provided by section 286(m) of the INA permits USCIS to recover the full costs of providing all immigration adjudication and naturalization services, including those services provided to individuals other than those paying fees. When developing fees for services, USCIS also looks, to the extent applicable, to the cost accounting concepts and standards recommended by the Federal Accounting Standards Advisory Board (FASAB). The FASAB was established in 1990, and its purpose is to recommend accounting standards for the Federal Government. The FASAB defines "full cost" to include "direct and indirect costs that contribute to the output, regardless of funding sources." Federal Accounting Standards Advisory Board, Statement of Financial Accounting Standards No. 4: Managerial Cost Accounting Concepts and Standards for the Federal Government 36 (July 31, 1995). To obtain full cost, FASAB identifies various classifications of costs to be included, and recommends various methods of cost assignment. *Id.* at 36–42. Full costs include, but are not limited to, an appropriate share of:

(a) Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

(b) Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel and rents or imputed rents on land, buildings, and equipment; and,

(c) Management and supervisory costs.

Full costs are determined based upon the best available records of the agency.

**How Is the Processing of Immigration Benefit Applications Funded and Supported?**

In 1988, Congress established the Immigration Examination Fee Account (IEFA). *See* 100 Public Law 459, 209, 102 Stat. at 2203. Since 1989, fees deposited into the IEFA have been the primary source of funding for providing immigration and naturalization benefits, and other benefits as directed by Congress. In subsequent legislation, Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge. *See* 101 Public Law 515, 210(d)(2), 104 Stat. at 2121. Consequently, the immigration benefit application fees were increased to recover these additional costs. The current immigration benefit application fees are based on the review conducted in 1997, adjusted for cost of living increases and other factors; the fees were last changed effective April 30, 2004. 69 FR 20528. The current fees also include a $5 per immigration benefit application surcharge to recover information technology and quality assurance costs. This surcharge allows USCIS to improve upon the delivery of

**Federal Register** / Vol. 70, No. 185 / Monday, September 26, 2005 / Notices    **56183**

services to its customers such as offering electronic filing for certain immigration benefit applications.

## What Is the Authority of USCIS To Adjust Immigration Benefit Application Fees for Inflation by Federal Register Notice?

The authority for adjusting immigration benefit application fees for inflation by **Federal Register** Notice is contained in 8 CFR 103.7(b)(3):

The fees prescribed in paragraph (b)(1) of this section shall be adjusted annually on or after October 1, 2005, by publication of an inflation adjustment. The inflation adjustment will be announced by notice in the **Federal Register**, and the adjustment shall be a composite of the Federal civilian pay raise assumption and non-pay inflation factor for that fiscal year issued by the Office of Management and Budget for agency use in implementing OMB Circular A–76, weighted by pay and non-pay proportions of total funding for that fiscal year. If Congress enacts a different Federal civilian pay raise percentage than the percentage issued by OMB for Circular A–76, the Department of Homeland Security may adjust the fees, during the current year or a following year to reflect the enacted level. The prescribed fee or charge shall be the amount prescribed in paragraph (b)(1) of this section, plus the latest inflation adjustment, rounded to the nearest $5 increment.

See generally 69 FR 20528 (2004).

Beginning on October 26, 2005, the public should no longer rely on the fee schedule set forth in 8 CFR 103.7(b)(1) as the fees specified in the 103.7(b)(1) schedule do not include the inflation adjustments described in this Notice. The changes to the fees announced in this Notice will appear on the companion instructions to the application/petition forms. In addition, this information will be available to the public on the USCIS Web site at *http://www.uscis.gov*, via an agency information brochure accompanying hard copies of the forms, and by contacting the National Customer Information Center using the toll free number at 1–800–375–5283.

## What Is the Basis for the Fee Adjustments for Inflation?

The current fees are adjusted for the fiscal year (FY) 2006 and FY 2007 biennial period by pay (Federal employee payroll and benefits) and non-pay (contracts, utilities, rent, etc.) inflation factors issued by the Office of Management and Budget (OMB) used in implementing OMB Circular A–76 (Performance of Commercial Activities). OMB Circular A–76 publishes the inflation factors used in calculating pay and non-pay increases contained in the President's annual budget request. Since

Congress enacted a different federal civilian pay raise percentage than the percentage used in calculating the current fees for the FY 2004 and FY 2005 biennial period, the fees are also adjusted to reflect the congressionally-enacted levels. For example, because the fees were adjusted using a 1.7 percent pay raise factor in FY 2005, whereas Congress enacted a 3.65 percent pay raise factor the fees are raised by the difference, 1.95 percent. *See* 8 CFR 103.7(b)(3). The fees are rounded up or down to the nearest $5 increment consistent with past fee adjustment practices. *Id.* The average fee increase is $10, but the amount varies from $5–$20 relative to the amount of the application/petition fee. Even with the inflationary fee adjustments, the fees collected do not exceed the full cost of providing immigration benefits, including the full cost of providing benefits such as asylum and refugee admission for which no fees are assessed.

The methodology basically has two components: one that accounts for the difference between the enacted and projected inflation levels imbedded in the current fees for the FY 2004 and FY 2005 biennial period, and one that accounts for the projected inflation levels for the FY 2006 and FY 2007 biennial period. As an example of the methodology, an inflationary increase of $6.86 was originally built into the current $315 fee for the Form I–485 (Application to Register Permanent Residence or to Adjust Status) for the FY 2004 and FY 2005 biennial period. Based on the projected pay inflation factors of 2.3 percent (1.7 percent for three-quarters of the 2004 calendar year; 4.1 percent for one-quarter of the 2004 calendar year) and 1.7 percent (entire 2005 calendar year) versus enacted inflation factors of 4.1 percent (entire 2004 calendar year) and 3.65 percent (3.5 percent for three-quarters of the 2005 calendar year; 4.1 percent for one-quarter of the 2005 calendar year) for fiscal years 2004 and 2005, the inflationary increase should have been 3.13 percent, or $9.86. The net difference of $3.00 increases the costs of the Form I–485 from $313.63 to $316.63. However, rounding down to the nearest $5 increment did not change the $315 current fee for the Form I–485. Based on the projected pay inflation factors of 2.8 percent (2.6 percent for three-quarters of the calendar year; 3.5 percent for one-quarter of the calendar year) and 2.6 percent (entire calendar year) for fiscal years 2006 and 2007, the inflationary increase is $10.25. This increases the costs of the Form I–485 from $315 to

$325.25. Rounding down to the nearest $5 increment raises the fee by $10, from $315 to $325. The total fee increase is $10.

As stated previously, the size of the fee increase varies relative to the amount of the application/petition fee. However, rounding discrepancies account for exceptions to this general rule. For example, even though the current fee for the Form I–193 (Application for Waiver of Passport and/or Visa) is smaller than the Form I–485 fee, the fee increase is greater. This is because the Form I–193 was rounding up to the nearest $5 increment and the Form I–485 was rounding down to the nearest $5 increment. An inflationary increase of $5.25 was originally built into the current $250 fee for the Form I–193 for the FY 2004 and 2005 biennial period. Based on the projected pay inflation factors of 2.3 percent (1.7 percent for three-quarters of the calendar year; 4.1 percent for one-quarter of the calendar year) and 1.7 percent (entire calendar year) versus enacted inflation factors of 4.1 percent (entire calendar year) and 3.65 percent (3.5 percent for three-quarters of the calendar year; 4.1 percent for one-quarter of the calendar year) for fiscal years 2004 and 2005, the actual inflationary increase is $7.54. The net difference of $2.30 increases the costs of the Form I–193 from $252.02 to $254.31. In this case, rounding up to the nearest $5 increment increased the current fee for the Form I–193 from $250 to $255. Based on the projected pay inflation factors of 2.8 percent (2.6 percent for three-quarters of the calendar year; 3.5 percent for one-quarter of the calendar year) and 2.6 percent (entire calendar year) for fiscal years 2006 and 2007, the inflationary increase is $8.30. This increases the costs of the Form I–193 from $255 to $263.30. Rounding up to the nearest $5 increment raises the fee by $10, from $255 to $265. The total fee increase is $15.

Besides the normal payroll increases mandated for government employees each year, inflation-based cost increases have appeared in significant non-payroll items such as rent, physical security, investment technology, and contracts. More specifically, USCIS has observed cost increases due to inflation in some of its largest contracts including those for Service Center operations, adjudications clerical support, Application Support Centers, card production facilities, the National Records Center, the National Benefits Center, and the National Customer Service Center.

**What Are the New Application Fees and How Do the New Fees Compare to the Current Fees?**

The new immigration benefit application fees and their dollar differences are displayed in Table 1.

TABLE 1.—CURRENT VERSUS NEW APPLICATION AND PETITION FEES

| Form No. | Description | New fee | Current fee | Change |
|---|---|---|---|---|
| I–90 | Application to Replace Permanent Resident Card | $190 | $185 | $5 |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | 160 | 155 | 5 |
| I–129 | Petition for a Nonimmigrant Worker | 190 | 185 | 5 |
| I–129F | Petition for Alien Fiancé(e) | 170 | 165 | 5 |
| I–130 | Petition for Alien Relative | 190 | 185 | 5 |
| I–131 | Application for Travel Document | 170 | 165 | 5 |
| I–140 | Immigrant Petition for Alien Worker | 195 | 190 | 5 |
| I–191 | Application for Permission to Return to an Unrelinquished Domicile | 265 | 250 | 15 |
| I–192 | Application for Advance Permission to Enter as a Nonimmigrant | 265 | 250 | 15 |
| I–193 | Application for Waiver of Passport and/or Visa | 265 | 250 | 15 |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal. | 265 | 250 | 15 |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant | 190 | 185 | 5 |
| I–485 | Application to Register Permanent Residence or to Adjust Status | [1]325 | 315 | 10 |
| I–526 | Immigrant Petition by Alien Entrepreneur | 480 | 465 | 15 |
| I–539 | Application to Extend/Change Nonimmigrant Status | 200 | 195 | 5 |
| I–600/600A | Petition to Classify Orphan as an Immediate Relative/Application for Advance Processing or Orphan Petition. | 545 | 525 | 20 |
| I–601 | Application for Waiver on Grounds of Excludability | 265 | 250 | 15 |
| I–612 | Application for Waiver of the Foreign Residence Requirement | 265 | 250 | 15 |
| I–687 | For Filing Application for Status as a Temporary Resident | [2]255 | 240 | 15 |
| I–690 | Application for Waiver of Excludability | 95 | 90 | 5 |
| I–694 | Notice of Appeal of Decision | 110 | 105 | 5 |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident | [3]180 | 175 | 5 |
| I–751 | Petition to Remove the Conditions on Residence | 205 | 200 | 5 |
| I–765 | Application for Employment Authorization | 180 | 175 | 5 |
| I–817 | Application for Family Unity Benefits | 200 | 195 | 5 |
| I–824 | Application for Action on an Approved Application or Petition | 200 | 195 | 5 |
| I–829 | Petition by Entrepreneur to Remove Conditions | 475 | 455 | 20 |
| I–881 | NACARA—Suspension of Deportation or Application for Special Rule Cancellation of Removal. | [4]285 | 275 | 10 |
| I–914 | Application for T Nonimmigrant Status | [5]270 | 255 | 15 |
| N–300 | Application to File Declaration of Intention | 120 | 115 | 5 |
| N–336 | Request for Hearing on a Decision in Naturalization Procedures | 265 | 250 | 15 |
| N–400 | Application for Naturalization | 330 | 320 | 10 |
| N–470 | Application to Preserve Residence for Naturalization Purposes | 155 | 150 | 5 |
| N–565 | Application for Replacement Naturalization Citizenship Document | 220 | 210 | 10 |
| N–600 | Application for Certification of Citizenship | 255 | 240 | 15 |
| N–600K | Application for Citizenship and Issuance of Certificate under Section 322 | [6]255 | 240 | 15 |

[1] 225 for an applicant under the age of 14 years (a $10 increase from the current $215). *See* 8 CFR 103.7(b)(1).

[2] A fee of $255 for each application or $120 for each application for a minor child (under 18 years of age) is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children) shall be $630. *See* 8 CFR 103.7(b)(1).

[3] For applicants filing within 31 months from the date of adjustment to temporary resident status, a fee of $140 for each application is required at the time of filing with the Department of Homeland Security. The maximum amount payable by a family (husband, wife, and any minor children (under 18 years of age living at home) shall be $420. For applicants filing after 31 months from the date of approval of temporary resident status, who file their applications on or after July 9, 1991, a fee of $180 (a maximum of $540 per family) is required. *See* 8 CFR 103.7(b)(1).

[4] $285 for adjudication by the Department of Homeland Security, except that the maximum amount payable by family members (related as husband, wife, unmarried child under 21, unmarried son, or unmarried daughter) who submit applications at the same time shall be $570. $165 for adjudication by the Immigration Court (a single fee of $165 will be charged whenever applications are filed by two or more aliens in the same proceedings). *See* 8 CFR 103.7(b)(1).

[5] For each immediate family member included on the same application, an additional fee of $120 per person, up to a maximum amount payable per application of $540. *See* 8 CFR 103.7(b)(1).

[6] $215 for an application filed on behalf of an adopted child. 8 CFR 103.7(b)(1).

**Paperwork Reduction Act**

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a regulatory action. This Notice does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act. Appropriate paperwork will be filed with OMB to reflect the change in the annual public cost for each information collection.

Dated: September 21, 2005.

**Robert C. Divine,**

*Acting Deputy Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 05–19226 Filed 9–23–05; 8:45 am]

**BILLING CODE 4410–10–P**

# Rules and Regulations

**Federal Register**

Vol. 88, No. 248

Thursday, December 28, 2023

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

## DEPARTMENT OF AGRICULTURE

### Agricultural Marketing Service

**7 CFR Part 205**

**[Doc. No. AMS–NOP–21–0073]**

**RIN 0581–AE06**

### National Organic Program (NOP); Organic Livestock and Poultry Standards; Correction

**AGENCY:** Agricultural Marketing Service, Department of Agriculture (USDA).

**ACTION:** Final rule; correction.

**SUMMARY:** The Agricultural Marketing Service (AMS) is correcting non-substantive errors in the regulatory text of the Organic Livestock and Poultry Standards (OLPS) final rule published on November 2, 2023. The corrections are intended to improve readability and clarity.

**DATES:** Effective January 12, 2024.

**FOR FURTHER INFORMATION CONTACT:** Erin Healy, Director, Standards Division; Telephone: (202) 720–3252; Email: *erin.healy@usda.gov*.

**SUPPLEMENTARY INFORMATION:** The OLPS final rule published on November 2, 2023 (88 FR 75394), delayed December 13, 2023 (88 FR 86259), amends the USDA organic regulations related to the production of livestock, including poultry, marketed as organic. This action corrects five errors in the OLPS regulatory text published on November 2, 2023, to improve the readability and clarity of the rule. The corrections do not change the meaning of the regulations.

Section 553 of the Administrative Procedure Act, 5 U.S.C.553(b)(B), provides that, when an agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest, an agency may issue a rule without providing notice and an opportunity for public comment. AMS has determined that there is good cause

for making these corrections final without prior proposal and opportunity for comment because AMS is merely correcting minor non-substantive errors and omissions in the regulatory text. Accordingly, AMS finds that there is good cause to dispense with notice and public procedure under 5 U.S.C. 553(b)(B). With respect to the effective date, this final rule correction is not substantive in nature, and there is good cause to dispense with a 30-day delayed effective date. This final rule correction will be effective January 12, 2024, in conjunction with the entirety of the rule, as provided by FR Doc. 2023–27255 (88 FR 86259; December 13, 2023).

### Corrections

In FR Doc. 2023–23726 appearing in the **Federal Register** of November 2, 2023, at 88 FR 75394, the following corrections are made:

#### § 205.2   [Corrected]

■ 1. On page 75444, in the third column, in § 205.2, in the definition of *Cattle wattling,* "The surgical separation of two layers of the skin from the connective tissue for atop a 2-to-4-inch path" is corrected to read "The surgical separation of two layers of the skin from the connective tissue along a 2-to-4-inch path".

#### § 205.239   [Corrected]

■ 2. On page 75447, in the first column, in § 205.239, in paragraph (c)(4), "provide each animal with an average of at least 30 percent DMI" is corrected to read "provide each animal with an average of at least 30 percent dry matter intake (DMI)".

#### § 205.241   [Corrected]

■ 3. On page 75447, in the second column, in § 205.241, in paragraph (a), "including: year-round access to outdoors;" is corrected to read, "including: year-round access to the outdoors;".

■ 4. On page 75447, in the third column, in § 205.241, in paragraph (b)(4)(i), "a certifier may approve practices that provide less than 1 linear feet per 360 birds" is corrected to read, "a certifier may approve practices that provide less than 1 linear foot per 360 birds".

■ 5. On page 75448, in the second column, in § 205.241, in paragraph (d)(8), "For 4–H, National FFA Organization, and other youth projects,

provided that temporary confinement for no more than one week prior to a fair or other demonstration," is corrected to read, "For 4–H, National FFA Organization, and other youth projects, for no more than one week prior to a fair or other demonstration,".

**Erin Morris,**
*Associate Administrator, Agricultural Marketing Service.*

[FR Doc. 2023–28499 Filed 12–27–23; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 106**

**[CIS No. 2757–23; DHS Docket No. USCIS–2018–0003]**

**RIN 1615–ZC05**

### Adjustment to Premium Processing Fees

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** The Department of Homeland Security (DHS) is increasing premium processing fees charged by U.S. Citizenship and Immigration Services (USCIS) to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers. The adjustment increases premium processing fees from $1,500 to $1,685, $1,750 to $1,965, and $2,500 to $2,805.

**DATES:**
*Effective date:* This rule is effective on February 26, 2024.

*Compliance date:* Requests for premium processing postmarked on or after February 26, 2024 must include the new fee.

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Table of Abbreviations

CFR—Code of Federal Regulations
CPI—Consumer Price Index

CPI–U—Consumer Price Index for All Urban
  Consumers DHS—Department of
  Homeland Security
E.O.—Executive Order
Form I–129—Petition for a Nonimmigrant
  Worker
Form I–140—Immigrant Petition for Alien
  Workers
Form I–539—Application to Extend/Change
  Nonimmigrant Status
Form I–765—Application for Employment
  Authorization
FY—Fiscal Year
INA—Immigration and Nationality Act
NEPA—National Environmental Protection
  Act
NIW—National Interest Waiver
SBREFA—Small Business Regulatory
  Enforcement Fairness Act of 1996
USCIS—U.S. Citizenship and Immigration
  Services
USCIS Stabilization Act—Emergency
  Stopgap USCIS Stabilization Act
USCIS Stabilization Rule—Implementation of
  the Emergency Stopgap USCIS
  Stabilization Act Final Rule, published
  March 30, 2022

## I. Background and Authority

Section 286(u) of the INA, 8 U.S.C. 1356(u), provides the Secretary with authority to establish and collect a premium fee for the premium processing of certain immigration benefit types.[1] Premium processing means that DHS collects a fee in addition to the regular filing fee from persons seeking expedited processing of eligible immigration benefit requests.[2]

On October 1, 2020, the Continuing Appropriations Act, which included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), set new fees for premium processing of immigration benefit requests that had been designated for premium processing as of August 1, 2020, and expanded DHS authority to establish and collect new premium processing fees, and to use those additional funds for expanded purposes. *See* Emergency Stopgap USCIS Stabilization Act, Public Law 116–159, sec. 4102 (Oct. 1, 2020); INA sec. 286(u), 8 U.S.C. 1356(u).

On October 16, 2020, USCIS announced it would increase the fees for premium processing, as required by the USCIS Stabilization Act, effective October 19, 2020.[3] As of that date, the fee for Form I–907, Request for Premium Processing Service, increased from $1,440 to $2,500 for all immigration benefit requests that were designated for premium processing as of August 1, 2020, with the exception that the premium processing fee for petitioners filing Form I–129, Petition for a Nonimmigrant Worker, requesting H–2B or R–1 nonimmigrant status increased from $1,440 to $1,500. USCIS further announced that, while the USCIS Stabilization Act gave USCIS the ability to expand premium processing to additional forms and immigration benefit requests, USCIS was not yet taking such action and that any expansion of premium processing to other forms would be implemented as provided in the legislation.[4]

Effective May 31, 2022, DHS amended its premium processing regulations to codify the fees set by the USCIS Stabilization Act and establish new fees and processing timeframes consistent with the conditions and eligibility requirements set forth by section 4102(b)(1) of the USCIS Stabilization Act. *See* Final rule, *Implementation of the Emergency Stopgap USCIS Stabilization Act* (USCIS Stabilization Rule), 87 FR 18227 (Mar. 30, 2022); *see also* 8 CFR 106.4. The fees established by the USCIS Stabilization Act and codified by the USCIS Stabilization Rule were as follows:

○ For all immigration benefit requests that were designated for premium processing as of August 1, 2020, increased from $1,440 to $2,500, with the exception that the premium processing fee for petitioners filing Form I–129, Petition for a Nonimmigrant Worker, requesting H–2B or R–1 nonimmigrant status increased from $1,440 to $1,500.[5]

○ For those requesting premium processing for EB–1 immigrant classification as a multinational executive or manager or EB–2 immigrant classification as a member of professions with advanced degrees or exceptional ability seeking a national interest waiver (NIW) on Form I–140, Immigrant Petition for Alien Working, the fee was established as $2,500.[6]

○ For those requesting premium processing of a change of status to F–1, F–2, J–1, J–2, M–1, or M–2 nonimmigrant status or a change of status to or extension of stay in E–1, E–2, E–3, H–4, L–2, O–3, P–4, or R–2 nonimmigrant status on Form I–539, Application to Extend/Change Nonimmigrant Status, the fee was established as $1,750;[7] and

○ For those requesting premium processing for employment authorization on Form I–765, Application for Employment Authorization, the fee was established as $1,500.[8]

USCIS is now increasing those premium processing fees provided by Congress in the USCIS Stabilization Act and codified through the USCIS Stabilization Rule by the inflationary adjustment calculation provided by INA 286(u)(3)(C), 8 U.S.C. 1356(u)(3)(C). *See* USCIS Stabilization Act, Public Law 116–159 (Oct. 1, 2020).

## II. Basis for Adjustment

Section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C), provides that DHS may adjust the premium fees on a biennial basis by the percentage by which the Consumer Price Index (CPI) for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the CPI for All Urban Consumers (CPI–U) for the same month of the second preceding calendar year. *See also* 8 CFR 106.4(d) (codifying section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C) in 8 CFR part 106, USCIS Fee Schedule).

The USCIS Stabilization Act established the current premium processing fees and the authority for DHS to adjust the premium fees on a biennial basis on October 1, 2020. DHS has not adjusted the statutory premium fees since October 1, 2020. As authorized by the USCIS Stabilization Act, DHS is now increasing the statutory premium fees as provided for by the USCIS Stabilization Act by the percentage by which the CPI–U for the month of June preceding the date on which such adjustment takes effect exceeds the CPI–U for the same month of the second preceding calendar year. This rule is effective on February 26, 2024, therefore "the month of June preceding the date on which such adjustment takes effect" is June 2023. As such, June 2021 is "the same month of the second preceding calendar year," because it is two years before the June "on which such adjustment takes effect." Therefore, DHS is using the CPI–U as of June 2023 as the end point and June 2021 as the starting point for the period of inflation to establish the new premium processing fees. In June

---

[1] "Premium fees" and "premium processing fees" are used interchangeably throughout this rule.

[2] *See* 8 CFR 1.2 for the definition of "Benefit request"; *See* 8 CFR 106.4 for those immigration benefit requests currently eligible for premium processing.

[3] *See* USCIS, Premium Processing Fee Increase Effective Oct. 19, 2020, *https://www.uscis.gov/news/premium-processing-fee-increase-effective-oct-19-2020* (last visited July 19, 2023).

[4] *Id.*

[5] *See* USCIS Stabilization Act, Public Law 116–159 at sec. 4102(a) (codified as amended at 8 U.S.C. 1356(u)(3)(A) (Oct. 1, 2020); USCIS Stabilization Rule, 87 FR 18227,18231 (Mar. 30, 2022). *See also* 8 CFR 106.4(c).

[6] *See id.* at sec. 4102(b)(1)(A) (Oct. 1, 2020); USCIS Stabilization Rule, 87 FR 18227,18231 (Mar. 30, 2022). *See also* 8 CFR 106.4(c).

[7] *See id.* at sec. 4102(b)(1)(B)&(C) (Oct. 1, 2020); USCIS Stabilization Rule, 87 FR 18227,18231 (Mar. 30, 2022). *See also* 8 CFR 106.4(c).

[8] *See id.* at sec. 4102(b)(1)(D) (Oct. 1, 2020); USCIS Stabilization Rule, 87 FR 18227,18231 (Mar. 30, 2022). *See also* 8 CFR 106.4(c).

2021 the CPI–U was 271.696, and in June 2023 it was 305.109.[9] Therefore, between June 2021 and June 2023, the CPI–U increased by 12.30 percent.[10] When this percentage increase is applied to the current premium processing fees, the premium processing fees that were $1,500, increase to $1,685; the premium processing fees that were $1,750, increase to $1,965; and the premium processing fees that were $2,500, increase to $2,805.[11] *See* new 8 CFR 106.4(c).

A request for premium processing postmarked on or after February 26, 2024 must include the new fee. A premium processing request must be submitted on USCIS Form I–907, Request for Premium Processing, and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to, and in a separate remittance from, other filing fees. *See* 8 CFR 106.4(b).

USCIS is adjusting current premium processing fees to ensure that the premium processing fees keep pace with inflation as contemplated by Congress in the USCIS Stabilization Act. It is USCIS' intention that premium processing fees will be adjusted biennially to consistently protect the real dollar value of the premium processing service that USCIS provides. When making an inflationary adjustment to the premium processing fees provided by INA 286(u)(3)(C), 8 U.S.C. 1356(u)(3)(C), the adjustment is limited to the percentage by which the CPI–U for the month of June preceding the date on which such adjustment takes effect exceeds the CPI–U for the same month of the second preceding calendar year. By consistently adjusting premium processing fees biennially USCIS will fully capture any increase in inflation that could be missed by increasing premium processing fees

over periods of time greater than two years.

DHS will use the revenue generated by the premium processing fee increase to provide premium processing services; make improvements to adjudications processes; respond to adjudication demands, including reducing benefit request processing backlogs; and otherwise fund USCIS adjudication and naturalization services.

On January 4, 2023, DHS proposed new fees to replace its current fee schedule in its entirety. *See, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 88 FR 402 (Jan. 4, 2023) (2023 Proposed Fee Rule).[12] The 2023 Proposed Fee Rule proposed to republish 8 CFR 106.4(c) *Designated benefit requests and fee amounts* as it was codified in the final rule entitled, "Implementation of the Emergency Stopgap USCIS Stabilization Act," on March 30, 2022 without adjusting any of the fees for premium processing. *Id.* at 595. As the 2023 Proposed Fee Rule has not yet been finalized, this rule would replace the premium processing fees at 8 CFR 106.4(c) that were set by the USCIS Stabilization Act and codified in the USCIS Stabilization Rule. *See* new 8 CFR 106.4(c).

## III. Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act generally requires agencies to issue a proposed rule before issuing a final rule, subject to certain exceptions. *See* 5 U.S.C. 553(b). Section 286(u)(3)(C) of the INA, 8 U.S.C. 1356 (u)(3)(C), exempts DHS from the requirements of 5 U.S.C. 553. Section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C), specifically provides that "the provisions of section 553 of Title 5 shall not apply to an adjustment authorized under [section 286(u)(3)(C) of the INA, 8 U.S.C. 1356(u)(3)(C)]." Therefore, DHS is not required to issue a proposed rule when adjustment premium fees under section 286(u)(3)(C) of the INA, 8 U.S.C. 1356 (u)(3)(C).

The regulations at 8 CFR 106.4(d) provide that fees to request premium processing service may be adjusted by notice in the **Federal Register**. However, the Federal Register Act (44 U.S.C. 1510) and its implementing regulations (1 CFR part 21) provide that publishing

a Notice document in the **Federal Register** announcing a new fee amount, without amending the regulations, does not effectuate a change of the Code of Federal Regulations (CFR). Because current premium processing fees are codified in the CFR, it is necessary for DHS to publish this rule to amend the regulatory text.

### B. Other Regulatory Requirements

Because this action is not subject to the notice-and-comment requirements under the Administrative Procedure Act, a final regulatory flexibility analysis is not required. *See* 5 U.S.C. 604(a). This action is not subject to the written statement requirements of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4). Nor does it require prior consultation with State, local, and tribal government officials as specified by Executive Orders 13132 or 13175.

#### Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with Executive Order (E.O.) 12988, Civil Justice Reform. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

#### National Environmental Policy Act

The Department is not aware of any significant impact on the environment, or any change in environment that would result from the changes in fees. The Department finds that promulgation of this rule clearly fits within categorical exclusion A3, as established in DHS's National Environmental Policy Act (NEPA) implementing procedures set forth in DHS's Directive 023–01, Revision 01, and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual") Appendix A, Table 1.

This rule is a standalone rule and is not part of any larger action. This rule would not result in any major Federal action that would significantly affect the quality of the human environment. Furthermore, the Departments have determined that no extraordinary circumstances exist that would create the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

#### Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) by section 804 of SBREFA, Public Law

---

[9] The latest CPI–U data is available at *http://data.bls.gov/cgi-bin/surveymost?bls* (last visited 07/27/2023). Select CPI–U 1982–84 = 100 (Unadjusted)—CUUR0000SA0 and click the Retrieve data button.

[10] DHS calculated this by subtracting the June 2021 CPI–U (271.696) from the June 2023 CPI–U (305.109), then dividing the result (33.413) by the June 2021 CPI–U (271.696). Calculation: (305.109 − 271.696)/271.696 = .1230 × 100 = 12.30 percent.

[11] DHS generally rounds USCIS fees that it establishes by rulemaking to the nearest $5 increment. *See e.g.,* 81 FR 73292, 73303 (Oct. 24, 2016).

[12] On January 9, 2023, USCIS published a correction to the 2023 Proposed Fee Rule to correct two fees that were erroneous as the result of typographical errors. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 88 FR 1172 (Jan. 9, 2023).

**89542** **Federal Register** / Vol. 88, No. 248 / Thursday, December 28, 2023 / Rules and Regulations

104–121, 110 Stat. 847, 868, *et seq.* The Office of Information and Regulatory Affairs has determined that this rule is a major rule as defined by the CRA. DHS has complied with the CRA's reporting requirements and has sent this final rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1).

Executive Order 12866

Executive Orders 12866 (Regulatory Planning and Review), as amended by Executive Order 14094 (Modernizing Regulatory Review), and 13563 (Improving Regulation and Regulatory Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has not designated this rule a ''significant regulatory action'' as defined under section 3(f) of E.O. 12866, as amended by Executive Order 14094. Accordingly, OMB has not reviewed this rule.

DHS estimates an additional annual transfer of $184,715,135 in revenue to be collected from fee-paying applicants and petitioners (public) to DHS, due to the increase in premium processing fees subject to an adjustment for inflation (Table 1).[13]

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS OF THE FINAL RULE

| Rule provisions | Description of changes to provisions | Estimated annual form receipts | Estimated annual change in transfers |
|---|---|---|---|
| 1. Form I–129, Petition for a Nonimmigrant Worker. | This rule increased the premium processing fees for Form I–129. The premium processing fee for H–2B and R–1 nonimmigrant status will increase from $1,500 to $1,685. The premium processing fee for all other available Form I–129 classifications (E–1, E–2, E–3, H–1B, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2) will increase from $2,500 to $2,805. | Form I–129 H–2B and R–1 Classifications: 10,892. All other Form I–129 Classifications: 310,146. Total Form I–129 receipts: 321,038. | This will result in an increase in transfer payments from the Form I–129 fee-paying population to DHS of $96,609,550. |
| 2. Form I–140, Immigrant Petition for Alien Workers. | This rule increased the premium processing fees for Form I–140. The premium processing fee for employment-based (EB) classifications E11, E12, E21 (non-NIW), E31, E32, EW3, as well as recently available E13 and E21 (NIW), will increase from $2,500 to $2,805. | Form I–140 E11, E12, E21 (non-NIW), E31, E32, EW3 Classifications: 85,399. Form I–140 E13 and E21 (NIW) Classifications: 40,800. Total Form I–140 receipts: 126,199. | This will result in an increase in transfer payments from the Form I–140 fee-paying population to DHS of $38,490,695. |
| 3. Form I–539, Application to Extend/Change Nonimmigrant Status. | This rule increased the premium processing fees for Form I–539 classifications F–1, F–2, M–1, M–2, J–1, J–2, E–1, E–2, E–3, L–2, H–4, O–3, P–4, and R–2. The premium processing fee for this population will increase from $1,750 to $1,965. | Form I–539 F–1, F–2, M–1, M–2, J–1, J–2 Classifications: 11,144. Form I–539 E–2, E–3, L–2, H–4, O–3, P–4, and R–2 Classifications: 71,160. Total Form I–539 receipts: 82,304. | This will result in an increase in transfer payments from the Form I–539 fee-paying population to DHS of $17,695,360. |
| 4. Form I–765, Application for Employment Authorization. | This rule increased the premium processing fees for Form I–765. The premium processing fee for certain F–1 students will increase from $1,500 to $1,685. | Form I–765 OPT and OPT-STEM Classifications Currently Eligible: 114,116. Form I–765 Classifications Likely Eligible in the Future: 58,422. Total Form I–765 receipts: 172,538. | This will result in an increase in transfer payments from the Form I–765 fee-paying population to DHS of $31,919,530. |

---

[13] Additional revenue collected calculation: $96,609,550 + $38,490,695 + $17,695,360 + $31,919,530 = $184,715,135 for forms I–129, I–140, I–539 and I–765, respectively.

In addition to the impacts summarized above, the table below presents the prepared accounting statement showing the costs and benefits to each individual affected by this final rule.[14]

## OMB A–4 ACCOUNTING STATEMENT
[$ Millions, FY 2022; Time period: FY 2024 through FY 2025]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Monetized Benefits ............................................ | | N/A | | Regulatory Impact Analysis (''RIA'') See E.O. 12866. |
| Annualized quantified, but unmonetized, benefits | N/A | N/A | N/A | E.O. 12866. |
| Unquantified Benefits ........................................ | | N/A | | E.O. 12866. |
| **COSTS** | | | | |
| Annualized monetized costs (7%) ...................... | N/A | N/A | N/A | E.O. 12866. |
| Annualized monetized costs (3%) ...................... | N/A | N/A | N/A | |
| Annualized quantified, but unmonetized, costs ... | | N/A | | |
| Qualitative (unquantified) costs ......................... | | N/A | | E.O 12866. |
| **TRANSFERS** | | | | |
| Annualized monetized transfers ......................... | $184.7 | N/A | N/A | E.O. 12866. |
| From whom to whom? ........................................ | From the fee-paying applicants and petitioners of Form I–129, I–140, I–539, and I–765 to DHS. | | | |
| Qualitative (unquantified) transfers .................... | | None | | None. |
| *Miscellaneous Analyses/Category* ..................... | | *Effects* | | *Source Citation.* |
| Effects on State, local, or tribal governments ..... | | None | | None. |
| Effects on small businesses .............................. | | None | | None. |
| Effects on wages ............................................... | | None | | None. |
| Effects on growth .............................................. | | None | | None. |

Table 2 shows the estimated total receipts received and refunds issued by USCIS for Form I–907, Request for Premium Processing Service, from fiscal year (FY) 2018 through FY 2022. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–907 to be 406,437 for the biennial period after this rule takes effect. In addition, based on the 5-year average, the annual number of refunds issued for Form I–907 is estimated to be 297.[15]

## TABLE 2—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, RECEIPTS AND REFUNDS ISSUED, FY 2018 THROUGH FY 2022

| FY | Form I–907 receipts | | | Form I–907 refunds * | | |
|---|---|---|---|---|---|---|
| | Form I–129 | Form I–140 | Total | Form I–129 | Form I–140 | Total |
| 2018 ....................................................... | 292,297 | 78,232 | 370,529 | 123 | 101 | 224 |
| 2019 ....................................................... | 333,175 | 79,752 | 412,927 | 259 | 48 | 307 |
| 2020 ....................................................... | 276,107 | 64,529 | 340,636 | 500 | 51 | 551 |
| 2021 ....................................................... | 309,596 | 107,908 | 417,504 | 89 | 126 | 215 |
| 2022 ....................................................... | 394,015 | 96,573 | 490,588 | 167 | 22 | 189 |
| Total ................................................... | 1,605,190 | 426,994 | 2,032,184 | 1,138 | 348 | 1,486 |
| 5-year Annual Average ............................. | 321,038 | 85,399 | 406,437 | 228 | 70 | 297 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.
* **Note:** For refunds, the report reflects the most up-to-date data available at the time the system was queried. Any duplicate case information has been removed.

[14] White House, OMB, *Circular A–4* (April 6, 2023), available at *https://www.whitehouse.gov/wp-content/uploads/2023/04/DraftCircularA-4.pdf* (last viewed Aug 3, 2023).

[15] USCIS presents data on refunds issued by USCIS because 8 CFR 106 guarantees processing for premium processing requests within 15, 30 or 45 days. The required period generally begins when USCIS properly receives the correct version of Form I–907, Request for Premium Processing Service, with fee, at the correct filing address or the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS. Within the required period, USCIS will issue either an approval notice, denial notice, notice of intent to deny, or request for evidence, or open an investigation for fraud or misrepresentation.

**89544**    **Federal Register**/Vol. 88, No. 248/Thursday, December 28, 2023/Rules and Regulations

Table 3 shows the percentage of the eligible Form I–129, Petition for Non-Immigrant Worker, petitioners who opted to submit a premium processing request along with their Form I–129 from FY 2018 through FY 2022. The 5-year annual average percentage of eligible Form I–129 petitioners who choose to submit a premium processing request was 57 percent.

TABLE 3—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2018 THROUGH FY 2022

| FY | Total Form I–129 receipts | Total Form I–129 petitions submitted with Form I–907 | Percentage of Form I–907 receipts that come with Form I–129 |
|---|---|---|---|
| 2018 | 548,910 | 292,297 | 53 |
| 2019 | 551,789 | 333,175 | 60 |
| 2020 | 555,058 | 276,107 | 50 |
| 2021 | 531,851 | 309,596 | 58 |
| 2022 | 629,424 | 394,015 | 63 |
| Total | 2,817,032 | 1,605,190 | ................... |
| 5-year Annual Average | 563,406 | 321,038 | 57 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.

Table 4 shows the percentage of the eligible Form I–140, Immigrant Petition for Alien Workers, petitioners who chose to submit a premium processing request from FY 2018 through FY 2022. Through FY 2022, not all Form I–140 petitioners are eligible for premium processing; therefore, DHS only discusses the percentage of those who are eligible for premium processing during these fiscal years compared to the total number of premium processing requests submitted.[16] The 5-year annual average percentage of eligible Form I–140 petitioners who chose to submit a premium processing request was 53 percent.

TABLE 4—FORM I–140 RECEIPTS ELIGIBLE FOR PREMIUM PROCESSING, FY 2018 THROUGH FY 2022

| FY | Total Form I–140 petitions eligible for premium processing | Total Form I–140 petitions submitted with Form I–907 | Percentage of Form I–907 receipts |
|---|---|---|---|
| 2018 | 62,262 | 35,889 | 58 |
| 2019 | 70,215 | 34,958 | 50 |
| 2020 | 65,029 | 29,060 | 45 |
| 2021 | 112,521 | 65,685 | 58 |
| 2022 | 91,605 | 48,616 | 53 |
| Total | 401,632 | 214,208 | ................... |
| 5-year Annual Average | 80,326 | 42,842 | 53 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.
**Note:** Form I–140 eligible petitioners include the following classifications are currently designated for premium processing: EB–1 Aliens of extraordinary ability (E11), EB–1 Outstanding professors and researchers (E12), EB–2 Members of professions with advanced degrees or exceptional ability not seeking a National Interest Waiver (E21), EB–3 Skilled workers (E31), EB–3 Professionals (E32), and EB–3 Workers other than skilled workers and professionals (EW3).

To estimate the probability that an eligible petitioner may choose to request premium processing, DHS computes a ratio of the 5-year annual average number of requests to the 5-year annual average number of eligible petitioners. Table 5 shows that of those currently eligible for premium processing, 57 percent chose to submit a premium processing request. Based on prior agency experience,[17] DHS assumes that the demand rate will carry forward and will use this percentage to estimate the possible adoption volumes of Form I–140, Immigrant Petition for Alien Workers, Multinational Executives and Managers (E–13) and Members of professions with advanced degrees or exceptional ability seeking a national interest waiver (E–21);[18] Form I–539, Application to Extend/Change Nonimmigrant Status; and I–765, Application for Employment Authorization, applicants.

---

[16] For more information on eligibility, please see "How Do I Request Premium Processing?" *https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing* (last visited Aug 3, 2023).

[17] Table 7 in the "Implementation of the Emergency Stopgap USCIS Stabilization Act" rule at 87 FR 18241 shows that in FY 2021, when the fee was increased, Form I–129 petitioners were still willing to pay for premium processing. "This provides suggestive evidence that petitioners'

demand for premium processing is insensitive to the price increases effected by [the USCIS Stabilization] rule."

[18] The USCIS Stabilization Act, codified by the USCIS Stabilization rule, established E–13 multinational executive and manager petitioner and E–21 national interest waiver petitioners eligible for premium processing. USCIS began accepting Form I–907 applications for these petitioners beginning January 30, 2023. *See https://www.uscis.gov/*

*newsroom/alerts/uscis-announces-final-phase-of-premium-processing-expansion-for-eb-1-and-eb-2-form-i-140-petitions.* Because of the short time period USCIS has been accepting Form I–907 applications for these petitioners, USCIS uses the historical 5-year average of 57 percent submission rate to estimate their possible premium processing request adoption volumes.

TABLE 5—PERCENTAGE OF PREMIUM PROCESSING REQUESTS, FY 2018 THROUGH FY 2022

|  | 5-year annual average of Forms submitted with Form I–907 | 5-year annual average of total receipts by Form | Percentage of Form I–907 receipts |
|---|---|---|---|
| Form I–129 | 321,038 | 563,406 | 57 |
| Form I–140 | 42,842 | 80,326 | 53 |
| Total | 363,880 | 643,732 | 57 |

Source: USCIS Analysis.

(a) Form I–129, Petition for a Nonimmigrant Worker, Transfer Payments

Currently, petitioners requesting certain benefits on Form I–129, Petition for a Nonimmigrant Worker, are eligible to also submit a request for premium processing with their immigration benefit request. Table 6 shows the population of petitioners who submitted Form I–907 with Form I–129 based on the corresponding nonimmigrant classifications from FY 2018 through FY 2022.

Based on a 5-year annual average, DHS estimates the annual receipts from Form I–907 filed with Form I–129 H–2B or R–1 classifications to be 10,892. Based on a 5-year annual average, DHS estimates the annual receipts for Form I–907 associated with all other Forms I–129 to be 310,146.

TABLE 6—FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER, FY 2018 THROUGH FY 2022

| FY | Form I–129 H–2B or R–1 request receipts | Form I–129 all other visa request receipts * | Total Form I–907 receipts |
|---|---|---|---|
| 2018 | 9,127 | 283,170 | 292,297 |
| 2019 | 10,505 | 322,670 | 333,175 |
| 2020 | 7,125 | 268,982 | 276,107 |
| 2021 | 11,866 | 297,730 | 309,596 |
| 2022 | 15,838 | 378,177 | 394,015 |
| Total | 54,461 | 1,550,729 | 1,605,190 |
| 5-year Annual Average | 10,892 | 310,146 | 321,038 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.
* **Note:** All other includes the following classifications: E–1, E–2, E–3, H–1B, H–2A, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2. H–2B or R–1 equals 3.4% and All other I–129 equals 96.6%. of Total Form I–907 Receipts filed with a Form I–129 petition.

This rule increases the premium processing fees for Form I–129. The premium processing fee for H–2B or R–1 nonimmigrant status will increase from $1,500 to $1,685, an increase of $185, which is the result of a 12.3 percent increase in the CPI–U from June 2021 to June 2023.[19] The premium fee for all other available Form I–129 classifications (E–1, E–2, E–3, H–1B, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2) will increase from $2,500 to

$2,805, an increase of $305. Because the fee for premium processing for the Form I–129 H–2B and R–1 classifications will increase by a different amount than for all other Form I–129 classifications, the data for the Form I–129 H–2B and R–1 classifications data was separated from the data for all other classifications.

Based on a 5-year annual average, DHS estimates an additional $2,015,020 annually in transfer payments will be collected from these new, higher premium processing fees for Forms H–

2B and R–1.[20] DHS will collect an additional $94,594,530 annually in transfer payments from premium processing requestors filing Form I–129 for all other visa classifications to DHS, based on a 5-year annual average.[21] Accordingly, DHS estimates the total increase in transfer payments from the Form I–129 fee-paying population to DHS will be $96,609,550 (Table 7) annually, for the biennial period after this rule takes effect.

---

[19] DHS calculated this by subtracting the June 2021 CPI–U (271.696) from the June 2023 CPI–U (305.109), then dividing the result (33.413) by the June 2021 CPI–U (271.696). Calculation:

$(305.109 - 271.696)/271.696 = .1230 \times 100 = 12.3$ percent.

[20] Calculation: 10,892 annual Form I–129 H–2B or R–1 petitions * $185 ($1,685 fee − $1,500 fee) = $2,015,020.

[21] Calculation: 310,146 annual Form I–129 petitions for other than H–2B and R–1 classifications * 305 ($2,805 fee − $2,500 fee) = $94,594,530.

TABLE 7—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, FILED WITH FORM I–129, PETITION FOR A NONIMMIGRANT WORKER

| Period of analysis | 5-Year annual average receipts (FY 2018 through FY 2022) | Fee | Total annual fee revenue |
|---|---|---|---|
| Post-USCIS Stabilization Act (Baseline Costs) ............................................................... | 10,892 | $1,500 | $16,338,000 |
| 2023 CPI–U Adjustment ............................................................... | 10,892 | 1,685 | 18,353,020 |
| Change in Transfer Payments for Form I–129 H–2B and R–1 ............................... | ........................... | ..................... | 2,015,020 |
| Post-USCIS Stabilization Act (Baseline Costs) ............................................................... | 310,146 | 2,500 | 775,365,000 |
| 2023 CPI–U Adjustment ............................................................... | 310,146 | 2,805 | 869,959,530 |
| Change in Transfer Payments for Form I–129 All Other * ............................... | ........................... | ..................... | 94,594,530 |
| Total Change in Transfer Payments for Form I–129 ............................... | ........................... | ..................... | 96,609,550 |

Source: USCIS Analysis.

**\*Note:** All other includes the following classifications (E–1, E–2, E–3, H–1B, H–2A, H–3, L–1A, L–1B, LZ, O–1, O–2, P–1, P–1S, P–2, P–2S, P–3, P–3S, Q–1, TN–1, and TN–2).

(b) Form I–140, Immigrant Petition for Alien Worker, Transfer Payments

The estimated population of petitioners who submitted Form I–907, Request for Premium Processing Service, with Form I–140, Immigrant Petition for Alien Workers, based on the corresponding employment-based (EB) classifications that are currently designated for premium processing is 85,399 (Table 2) per year.[22] The fee for all Form I–140 petitioners requesting premium processing will increase from $2,500 to $2,805, based off the 12.3 percent increase in the CPI–U from June 2021 to June 2023.[23] Using the historical 5-year annual average from FY 2018 through FY 2022, DHS estimates that as a result of the increase in filing fees for premium processing the additional annual transfer payments from the Form I–140 fee-paying population to DHS will be $26,046,695 (Table 8) for the biennial period after this rule takes effect.

TABLE 8—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, CURRENTLY FILED WITH FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS *

| Period of analysis | 5-Year annual average receipts (FY 2018 through FY 2022) | Fee | Total annual fee revenue |
|---|---|---|---|
| Post-USCIS Stabilization Act (Baseline Costs) ............................................................... | 85,399 | $2,500 | $213,497,500 |
| 2023 CPI–U Adjustment ............................................................... | 85,399 | 2,805 | 239,544,195 |
| Total Change in Transfer Payments for Form I–140 ............................... | ........................... | ..................... | $26,046,695 |

Source: USCIS Analysis.

**\* Note:** Classifications: E11, E12, E21 (non-NIW), E31, E32, EW3.

As of January 30, 2023, Form I–140 petitions under an E13 multinational executive and manager classification and petitions under an E21 national interest waiver (NIW) classification are eligible to request premium processing.[24] Table 9 shows the estimated E13 multinational executive and manager classification and E21 (NIW) classification populations that are now eligible for premium processing. Based on a 5-year annual average, DHS estimates the annual average receipts of Form I–140, E13 to be 11,752 and Form I–140, E21 to be 59,827 for a total of 71,579.

TABLE 9—FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS, E13 AND E21 CLASSIFICATIONS, FY 2018 THROUGH FY 2022

| FY | E13 | E21 (NIW) | Total |
|---|---|---|---|
| 2018 ............................................................... | 13,596 | 61,650 | 75,246 |
| 2019 ............................................................... | 12,489 | 65,718 | 78,207 |
| 2020 ............................................................... | 11,220 | 53,288 | 64,508 |
| 2021 ............................................................... | 10,279 | 55,991 | 66,270 |
| 2022 ............................................................... | 11,178 | 62,487 | 73,665 |
| Total ............................................................... | 58,762 | 299,134 | 357,896 |
| 5-year Annual Average ............................................................... | 11,752 | 59,827 | 71,579 |

Sources: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.

---

[22] See supra FN 16.    [23] See supra FN 19.    [24] See supra FN 16.

Since E13 and E21 (NIW) Form I–140 applicants have only been recently eligible to request premium processing, DHS has no historical data to determine how many of the newly eligible population will take advantage of premium processing. Therefore, DHS uses the 57 percent average of Forms I–129 and Forms I–140 developed in Table 5, that request premium processing for this newly eligible population as a proxy. DHS is using the same methodology to estimate the transfers from the USCIS Stabilization Rule, because there is insufficient current data available for this population.[25]

Table 10 shows the total population by percentage for E13 and E21 (NIW) petitioners who may choose to file Form I–140. The estimated population of petitioners who are projected to submit Form I–907, Request for Premium Processing Service, with Form I–140, Immigrant Petition for Alien Workers, based on the corresponding E13 and E21 (NIW) classifications that were recently designated for premium processing is 40,800 (Table 10) per year.

TABLE 10—FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKER, ESTIMATED ANNUAL AVERAGE PETITIONS FILED FOR PREMIUM PROCESSING, BY CLASSIFICATION, FY 2018 THROUGH FY 2022

| Percent | E13 | E21 (NIW) | Total |
|---|---|---|---|
| Estimate of Eligible Form I–140 Petitions (57%) ...................................... | A 6,699 | B 34,101 | 40,800 |

A Calculation: 6,699 = 11,752 (Table 9) × 0.57.
B Calculation: 34,101 = 59,827 (Table 9) × 0.57.
Source: USCIS Analysis.

Using this historical 5-year annual average from FY 2018 through FY 2022, DHS estimates that as a result of the increase in filing fees for premium processing the additional annual transfer payments from these Form I–140 fee-paying populations to DHS will be $12,444,000 (Table 11), for the biennial period after this rule takes effect.

TABLE 11—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, CURRENTLY FILED WITH FORM I–140, IMMIGRANT PETITION FOR ALIEN WORKERS *

| Period of analysis | 5-Year Annual average receipts (FY 2018 through FY 2022) | Fee | Total annual fee revenue |
|---|---|---|---|
| Post-USCIS Stabilization Act (Baseline Costs) ........................................................ | 40,800 | $2,500 | $102,000,000 |
| 2023 CPI–U Adjustment ............................................................................................ | 40,800 | 2,805 | 114,444,000 |
| Total Change in Transfer Payments for Form I–140 ........................................ | ...................................... | .................. | 12,444,000 |

Source: USCIS Analysis.
* **Note:** Classifications: E13 and E21 (NIW).

Total estimated transfer payments for Form I–140, Immigrant Petition for Alien Worker, is $38,490,695 ($26,046,695 + $12,444,000) per year.

**(c) Form I–539, Application To Extend/Change Nonimmigrant Status, Transfer Payments**

The USCIS Stabilization Act authorized USCIS to permit premium processing for newly eligible Form I–539 filers. Per the statute, the fee was originally set at $1,750. In June 2023, USCIS announced eligibility for, F–1, F–2, J–1, J–2, M–1, and M–2 change of status filers.[26] This newly eligible population of filers are students and exchange visitors. Because premium processing was allowed for these classifications recently, DHS does not know how many currently eligible Form I–539 applicants will choose to submit a premium processing request. For purposes of this analysis, we present historical Form I–539 filing rates and use projections of the premium processing demand rates for Form I–129 and Form I–140 filers to estimate the change in transfer payments as a result of the inflationary adjustment.

Table 12 shows the 5-year annual average receipt volumes for the classifications that are now eligible for premium processing for FY 2018 through FY 2022. DHS estimates the 5-year annual average of the currently eligible F–1, F–2, J–1, J–2, M–1, M–2 classifications to be 19,550, and the 5-year annual average of the future eligible E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications to be 124,842.

TABLE 12—USCIS TOTAL OF FORM I–539, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS, RECEIPTS BY CLASSIFICATION, FY 2018 THROUGH FY 2022

| FY | F–1, F–2, J–1, J–2, M–1, M–2 Total | E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 Total |
|---|---|---|
| 2018 .................................................................................................................... | 19,464 | 124,228 |
| 2019 .................................................................................................................... | 17,565 | 123,528 |
| 2020 .................................................................................................................... | 20,005 | 141,986 |

[25] See 87 FR 18227.

[26] https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status (last visited Aug 3, 2023).

**89548**    **Federal Register** / Vol. 88, No. 248 / Thursday, December 28, 2023 / Rules and Regulations

TABLE 12—USCIS TOTAL OF FORM I–539, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS, RECEIPTS BY CLASSIFICATION, FY 2018 THROUGH FY 2022—Continued

| FY | F–1, F–2, J–1, J–2, M–1, M–2 Total | E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 Total |
|---|---|---|
| 2021 | 16,645 | 124,055 |
| 2022 | 24,072 | 110,414 |
| Total | 97,751 | 624,211 |
| 5-year Annual Average | 19,550 | 124,842 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division (PRD), CLAIMS3 and ELIS database, July 18, 2023.

DHS calculated that 19,550 of the 144,392 newly eligible applicants would be applying for F–1, F–2, J–1, J–2, M–1, M–2 classifications (14%), and the remaining 124,842 would be applying for E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications (86%). DHS uses the 57 percent averages of those requesting premium processing for Forms I–129 and I–140 for the newly eligible Form I–539 population as a proxy.

Of the 19,550 newly eligible applicants for F–1, F–2, J–1, J–2, M–1, M–2 classifications per year, DHS estimates that 11,144 applicants (57 percent of the eligible population, rounded) may submit a premium processing request along with their Form I–539 application. Of the 124,842 newly eligible applicants for E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications per year, DHS estimates that 71,160 applicants (57 percent of the eligible population, rounded) may submit a premium processing request along with their Form I–539 application as shown in Table 13.

TABLE 13—ESTIMATED ANNUAL AVERAGE PREMIUM PROCESSING REQUESTS FOR FORM I–539, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS

| Classification type | Form I–539 5-year annual average receipts (FY 2018 through FY 2022) | Pct. requesting prem. proc. | Total |
|---|---|---|---|
| F–1, F–2, J–1, J–2, M–1, M–2 classifications | 19,550 | 57 | 11,144 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications | 124,842 | 57 | 71,160 |
| Total | | | 82,304 |

Source: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023.

The fee for all Form I–539 petitioners requesting premium processing will increase from $1,750 to $1,965, based off of the 12.3 percent increase in the CPI–U from June 2021 to June 2023.[27]

Using the estimated premium processing requests developed in Table 13 above. In Table 14, DHS estimates the increase in filing fees for premium processing results in annual transfer payments from the Form I–539 fee-paying population to DHS of $17,695,360, for the biennial period after this rule takes effect.

TABLE 14—FEES FOR FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE, CURRENTLY FILED WITH FORM I–539, APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS

| Period of analysis | 5-Year annual average receipts (FY 2018 through FY 2022) | Fee | Total annual fee revenue |
|---|---|---|---|
| F–1, F–2, J–1, J–2, M–1, M–2 classifications: | | | |
| Post-USCIS Stabilization Act (Baseline Costs) | 11,144 | $1,750 | $19,502,000 |
| 2023 CPI–U Adjustment | 11,144 | 1,965 | 21,897,960 |
| Total Transfer Payments | | | 2,395,960 |
| E–1, E–2, E–3, L–2, H–4, O–3, P–4, R–2 classifications: | | | |
| Post-USCIS Stabilization Act (Baseline Costs) | 71,160 | 1,750 | 124,530,000 |
| 2023 CPI–U Adjustment | 71,160 | 1,965 | 139,829,400 |
| Total Transfer Payments | | | 15,299,400 |
| Total Change in Transfer Payments for Form I–539 | | | 17,695,360 |

Source: USCIS Analysis.

---

[27] See supra FN 19.

**(d) Form I–765, Application for Employment Authorization, Transfer Payments**

The USCIS Stabilization Act authorized USCIS to permit premium processing of the Form I–765, Application for Employment Authorization. The USCIS Stabilization Act set the fee for the premium processing of Form I–765 at $1,500.[28] USCIS began premium processing for Forms I–765 for students applying for Optional Practical Training (OPT) and students seeking science, technology, engineering, and mathematics (STEM) OPT extensions in March 2023.[29]

Table 15 shows the estimated OPT and STEM–OPT populations that are now eligible as well as the estimated population of other I–765 categories the USCIS Stabilization Rule projected to become eligible for premium processing in the near future. Based on a 5-year annual average, DHS estimates the annual average receipts of Form I–765 from the OPT and STEM–OPT populations to be 200,204 for the biennial period after this rule takes effect. Additionally, DHS estimates the annual average receipts to be 102,495 from additional categories of Form I–765 that are likely to become eligible for premium processing in the future.[30] This population is included in Table 15 because Form I–765 categories that become eligible in the near future may be impacted by the inflationary adjustments discussed in this rule. The USCIS Stabilization Rule's Regulatory Impact Analysis further projected 1,136,691 annual Form I–765 receipts belonging to classifications for which USCIS will consider, but has no immediate plans to expand premium processing eligibility as well as a final group of 802,145 belonging to I–765 classifications USCIS is unlikely to ever make eligible for premium processing.[31] These projected groups are excluded from Table 15 and this Rule's analysis because they are unlikely to be impacted by the decision to adjust premium processing fees for inflation over this biennial cycle. These impacts would be more appropriately quantified in a future inflation adjustment rule, when some reasonable expectation exists that premium processing eligibility is likely in the future.

TABLE 15—FORM I–765, APPLICATION FOR EMPLOYMENT AUTHORIZATION, CLASSIFICATIONS BY IMPLEMENTATION, FY 2017 THROUGH FY 2022

| FY | Form I–765 OPT and STEM–OPT receipts currently eligible | Form I–765 receipts likely eligible in the future |
|---|---|---|
| 2017 | | 96,806 |
| 2018 | 225,277 | 100,316 |
| 2019 | 215,212 | 110,743 |
| 2020 | 198,498 | 110,449 |
| 2021 | 173,773 | 94,160 |
| 2022 | 188,258 | |
| Total | 1,001,018 | 512,474 |
| 5-year Annual Average | 200,204 | 102,495 |

Sources: USCIS, Office of Policy and Strategy, Policy Research Division, CLAIMS3 and ELIS database, July 18, 2023; Implementation of the Emergency Stopgap USCIS Stabilization Act, 87 FR 18227 (Mar. 30, 2022).

Since Form I–765 OPT and STEM–OPT applicants have only been recently eligible to request premium processing, DHS has no historical data to determine how many of the newly eligible population will take advantage of premium processing. Therefore, DHS uses the 57 percent average of Forms I–129 and I–140 developed in Table 5, that request premium processing for this newly eligible population as a proxy for all eligible Form I–765 categories. DHS used the same methodology to estimate the transfers from the USCIS Stabilization Rule.

DHS estimates that 114,116 applicants (57 percent of the eligible population) out of the 200,204 (Table 15) Form I–765 OPT and STEM–OPT applicants who apply annually may submit a premium processing request with their Form I–765 application.[32] DHS also estimates that 58,422 applicants (57 percent of the eligible population) out of the 102,495 (Table 15) employment authorization document applicants who apply annually may become eligible to submit a premium processing request with their Form I–765 application in the near future.[33]

In Table 16, DHS uses the 114,116 and 58,422 population estimates from OPT and OPT–STEM population as well as the likely future eligible Form I–765 population to DHS to estimate transfer payments for each category. The fee for all Form I–765 applicants requesting premium processing will increase from $1,500 to $1,685, based off the 12.3 percent increase in the CPI–U from June 2021 to June 2023.[34] DHS estimates that annual transfer payments from currently eligible OPT and OPT–STEM Form I–765 applicants requesting premium processing using Form I–907 will be $21,111,460 to DHS for the biennial period after this rule takes effect. DHS estimates that annual transfer payments from likely future eligible will be $10,808,070 to DHS. Accordingly, DHS estimates that total annual transfer payments from Form I–765 applicants requesting request premium processing using Form I–907 will be $31,919,530 to DHS.

---

[28] See USCIS Stabilization Act, Public Law 116–159 at sec. 4102(b)(1)(D)(Oct. 1, 2020). See also 8 CFR 106.4(c).

[29] See https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt (last visited Aug. 3, 2023).

[30] See Implementation of the Emergency Stopgap USCIS Stabilization Act, 87 FR 18227 (Mar. 30, 2022) https://www.federalregister.gov/documents/2022/03/30/2022-06742/implementation-of-the-emergency-stopgap-uscis-stabilization-act#h-34.

[31] The Implementation of the Emergency Stopgap USCIS Stabilization Act Final Rule, published March 30, 2022 estimated the number of newly eligible applicants beginning around FY 2025 based on data from FY 2017 through FY 2021 actuals. This still serves as a reasonable measure should this population become available for premium processing in the near future. See 87 FR 18250.

[32] Calculation: 200,204 applicants * 57 percent = 114,116.

[33] Calculation: 102,495 applicants * 57 percent = 58,422.

[34] See supra FN 19.

**89550** **Federal Register** / Vol. 88, No. 248 / Thursday, December 28, 2023 / Rules and Regulations

TABLE 16—FEES FOR FORM I–765, APPLICATION FOR EMPLOYMENT AUTHORIZATION, APPLICANTS REQUESTING PREMIUM PROCESSING USING FORM I–907, REQUEST FOR PREMIUM PROCESSING SERVICE

| Period of analysis | 5-Year annual average receipts (FY 2018 through FY 2022) | Fee | Total annual fee revenue |
|---|---|---|---|
| Form I–765 OPT and OPT–STEM Receipts Currently Eligible: | | | |
| Post-USCIS Stabilization Act (Baseline Costs) .......................................... | 114,116 | $1,500 | $171,174,000 |
| 2023 CPI–U Adjustment .......................................... | 114,116 | 1,685 | 192,285,460 |
| Total Transfer Payments .......................................... | .................................. | .................... | 21,111,460 |

| Period of analysis | 5-year annual average receipts (FY 2017 through FY 2021) | Fee | Total |
|---|---|---|---|
| Form I–765 Receipts Likely Eligible in the Future: | | | |
| Post-USCIS Stabilization Act (Baseline Costs) .......................................... | 58,422 | $1,500 | $87,633,000 |
| 2023 CPI–U Adjustment .......................................... | 58,422 | 1,685 | 98,441,070 |
| Total Transfer Payments .......................................... | .................................. | .................... | $10,808,070 |
| Total Change in Transfer Payments for Form I–765 .......................................... | .................................. | .................... | $31,919,530 |

Source: USCIS Analysis.

Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule unless they are exempt. This rule does not impose any reporting or recordkeeping requirements under the Paperwork Reduction Act. USCIS will update the fee for filing USCIS Form I–907 as appropriate.

**List of Subjects in 8 CFR Part 106**

Fees, Immigration.

For the reasons set out in the preamble, the Department of Homeland Security amends 8 CFR part 106 as follows:

**PART 106—USCIS FEE SCHEDULE**

■ 1. The authority citation for part 106 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b,1304, 1356; Pub. L.107-296; 48 U.S.C 1806; Pub. L. 115–218; Pub. L. 116–159.

■ 2. Section 106.4 is amended by revising paragraph (c) to read as follows:

**§ 106.4  Premium processing service.**

*     *     *     *     *

(c) Designated benefit requests and fee amounts. Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the INA—$2,805.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the INA or section 222(a) of the Immigration Act of 1990, Public Law 101–649—$2,805.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the INA—$1,685.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the INA—$2,805.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the INA—$2,805.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the INA—$2,805.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the INA—$2,805.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the INA—$2,805.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the INA—$1,685.

(10) Application for classification of a nonimmigrant described in section 214(e) of the INA—$2,805.

(11) Petition for classification under section 203(b)(1)(A) of the INA—$2,805.

(12) Petition for classification under section 203(b)(1)(B) of the INA—$2,805.

(13) Petition for classification under section 203(b)(2)(A) of the INA not involving a waiver under section 203(b)(2)(B) of the INA—$2,805.

(14) Petition for classification under section 203(b)(3)(A)(i) of the INA—$2,805.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the INA—$2,805.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the INA—$2,805.

(17) Petition for classification under section 203(b)(1)(C) of the INA—$2,805.

(18) Petition for classification under section 203(b)(2) of the INA involving a waiver under section 203(b)(2)(B) of the INA—$2,805.

(19) Application under section 248 of the INA to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the INA—$1,965.

(20) Application under section 248 of the INA to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the INA, or to extend stay in such classification—$1,965.

(21) Application for employment authorization—$1,685.

*     *     *     *     *

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–28529 Filed 12–27–23; 8:45 am]

**BILLING CODE 9111–97–P**

**Federal Register** / Vol. 84, No. 108 / Wednesday, June 5, 2019 / Notices **26137**

| Community | Community map repository address |
|---|---|
| **Cuyahoga County, Ohio and Incorporated Areas** <br> **Docket No.: FEMA–B–1804** | |
| City of Bay Village ........................................... | Engineering Department, 350 Dover Center Road, Bay Village, OH 44140. |
| City of Cleveland ............................................. | City Hall, 601 Lakeside Avenue, Cleveland, OH 44114. |
| City of Euclid ................................................... | City Hall, 585 East 222nd Street, Euclid, OH 44123. |
| City of Lakewood ............................................. | City Hall, 12650 Detroit Avenue, Lakewood, OH 44107. |
| City of Rocky River .......................................... | City Hall, 21012 Hilliard Boulevard, Rocky River, OH 44116. |
| Village of Bratenahl ......................................... | Village Hall, 411 Bratenahl Road, Bratenahl, OH 44108. |
| **Richland County, Ohio and Incorporated Areas** <br> **Docket No.: FEMA–B–1703** | |
| City of Shelby .................................................. | City Hall, 43 West Main Street, Shelby, OH 44875. |
| Unincorporated Areas of Richland County ....... | Richland County Engineer's Office, 77 North Mulberry Street, Mansfield, OH 44902. |
| **Galveston County, Texas and Incorporated Areas** <br> **Docket No.: FEMA–B–1315 and FEMA–B–1827** | |
| City of Bayou Vista .......................................... | City Hall, 2929 State Highway 6, Bayou Vista, TX 77563. |
| City of Clear Lake Shores ............................... | City Hall, 1006 South Shore Drive, Clear Lake Shores, TX 77565. |
| City of Dickinson ............................................. | City Hall, 4103 Highway 3, Dickinson, TX 77539. |
| City of Friendswood ......................................... | City Hall, 910 South Friendswood Drive, Friendswood, TX 77546. |
| City of Galveston ............................................. | City Hall, 823 Rosenberg Street, Room 401, Galveston, TX 77553. |
| City of Hitchcock ............................................. | City Hall, 7423 Highway 6, Hitchcock, TX 77563. |
| City of Jamaica Beach ..................................... | Municipal Court, 16628 San Luis Pass Road, Jamaica Beach, TX 77554. |
| City of Kemah .................................................. | City Hall, 1401 State Highway 146, Kemah, TX 77565. |
| City of La Marque ............................................ | City Hall, 1111 Bayou Road, La Marque, TX 77568. |
| City of League City .......................................... | Building Department, 500 West Walker Street, League City, TX 77573. |
| City of Santa Fe .............................................. | City Hall, 12002 State Highway 6, Santa Fe, TX 77510. |
| City of Texas City ............................................ | Building Inspections Department, 928 5th Avenue North, Texas City, TX 77592. |
| Unincorporated Areas of Galveston County ...... | Galveston County Courthouse, Engineering Department, 722 Moody Avenue, Galveston, TX 77550. |
| Village of Tiki Island ........................................ | City Hall, 802 Tiki Drive, Tiki Island, TX 77554. |

[FR Doc. 2019–11669 Filed 6–4–19; 8:45 am]
**BILLING CODE 9110–12–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Docket ID FEMA–2019–0002; Internal Agency Docket No. FEMA–B–1912]**

### Proposed Flood Hazard Determinations for Frederick County, Maryland and Incorporated Areas

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice; withdrawal.

**SUMMARY:** The Federal Emergency Management Agency (FEMA) is withdrawing its proposed notice concerning proposed flood hazard determinations, which may include the addition or modification of any Base Flood Elevation, base flood depth, Special Flood Hazard Area boundary or zone designation, or regulatory floodway (herein after referred to as proposed flood hazard determinations)

on the Flood Insurance Rate Maps and, where applicable, in the supporting Flood Insurance Study reports for Frederick County, Maryland and Incorporated Areas.

**DATES:** This withdrawal is effective June 5, 2019.

**ADDRESSES:** You may submit comments, identified by Docket No. FEMA–B–1912, to Rick Sacbibit, Chief, Engineering Services Branch, Federal Insurance and Mitigation Administration, FEMA, 400 C Street SW, Washington, DC 20472, (202) 646–7659, or (email) *patrick.sacbibit@fema.dhs.gov*.

**FOR FURTHER INFORMATION CONTACT:** Rick Sacbibit, Chief, Engineering Services Branch, Federal Insurance and Mitigation Administration, FEMA, 400 C Street SW, Washington, DC 20472, (202) 646–7659, or (email) *patrick.sacbibit@fema.dhs.gov*.

**SUPPLEMENTARY INFORMATION:** On March 18, 2019, FEMA published a proposed notice at 84 FR 9806, proposing flood hazard determinations for Frederick County, Maryland and Incorporated

Areas. FEMA is withdrawing the proposed notice.

**Authority:** 42 U.S.C. 4104; 44 CFR 67.4.

**Michael M. Grimm,**
*Assistant Administrator for Risk Management, Department of Homeland Security, Federal Emergency Management Agency.*

[FR Doc. 2019–11673 Filed 6–4–19; 8:45 am]
**BILLING CODE 9110–12–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[OMB Control Number 1615–0116]**

### Agency Information Collection Activities; Revision of a Currently Approved Collection: Request for Fee Waiver; Exemptions

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) has submitted the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The notice is inviting additional public comments for 30-days. The purpose of this notice is to inform the public about the policy changes being effectuated by the revision of the USCIS Request for Fee Waiver, expound on the reasons for the change, and request public comments on the additional points raised in this notice.

**DATES:** The purpose of this notice is to allow an additional 30 days for public comments. Comments are encouraged and will be accepted until July 5, 2019.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, must be directed to the OMB USCIS Desk Officer via email at *dhsdeskofficer@ omb.eop.gov*. All submissions received must include the agency name and the OMB Control Number 1615–0116 in the subject line.

You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make. For additional information please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, 20 Massachusetts Avenue NW, Washington, DC 20529–2140, Telephone number (202) 272–8377 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http:// www.uscis.gov*, or call the USCIS National Customer Service Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Background**

USCIS is primarily funded by application and petition fees. Under INA 286(m), 8 U.S.C. 1356(m), DHS has the authority to establish the fees it charges for immigration and naturalization services to recover the full costs of such services, including those provided without charge, and to recover costs associated with the administration of the fees collected. Therefore, the fees are set at a level that is intended to recover the full cost of USCIS operations.

Currently, USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee. *See* 8 CFR 103.7(c). To request a fee waiver, the individual must submit a written waiver request for permission to have his or her benefit request processed without payment. Under the current regulation, the waiver request must state the person's belief that he or she is entitled to or deserving of the benefit requested and the reasons for his or her inability to pay and include evidence to support the reasons indicated. *See* 8 CFR 103.7(c)(2). The statute authorizing USCIS to establish fees does not specifically mention fee waivers and fee exemptions for any type of applicant or group, or any criteria for fee waivers. The statute does state that fees are to be set at a level that will recover the full costs of adjudication and naturalization services provided ''including the costs of similar services provided without charge to asylum applicants or other immigrants.'' INA section 286(m), 8 U.S.C. 1356(m). However, DHS must permit certain applicants to apply for fee waivers. INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

In 2011, USCIS issued policy guidance to streamline fee waiver adjudications. *See* Policy Memorandum, PM–602–0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule;* Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011) (''Fee Waiver Policy''). The Fee Waiver Policy interpreted 8 CFR 103.7(c) to provide acceptable measures of income, establish the procedures individuals must follow, and outline the documentation that may demonstrate they are unable to pay a fee. In June 2011, USCIS issued Form I–912, Request for Fee Waiver, as a standardized form with instructions to request a fee waiver in accordance with the Fee Waiver Policy. Prior to the 2011 Fee Waiver Policy, USCIS engaged in a holistic analysis of the individual's finances to determine inability to pay, which burdened USCIS officers with a preliminary financial analysis, that preceded their primary role of determining if the applicant met the requirements for the benefit requested. The 2011 Fee Waiver Policy established a streamlined process where if the individual provided proof of a means-tested benefit, the fee waiver will normally be approved for forms listed in 8 CFR 103.7(c)(3) for applicants who at time of filing the fee waiver request with the benefit application:

• Were receiving a means-tested benefit;

• Had a household income at or below 150 percent of the Federal Poverty Guidelines (FPG); or

• Were experiencing extreme financial hardship such as unexpected medical bills or emergencies.

**Proposed Changes**

USCIS is removing the means-tested benefit as a criterion in its fee waiver request determinations, requiring the submission of Form I–912 to request a fee waiver, and clarifying what the evidentiary that will be considered for a fee waiver. The proposed guidance would provide that a person may be eligible to receive a fee waiver if he or she:

• Has a household income at or below 150 percent of the FPG; or

• Is experiencing extreme financial hardship such as unexpected medical bills or emergencies.

USCIS is proposing to rescind the March 13, 2011 policy and issue new guidance clarifying what documentation may be submitted to demonstrate an individual's inability to pay a fee when requesting a fee waiver. The applications and petitions that are eligible for a fee waiver are provided in 8 CFR 103.7(c)(3) and will not be changed by this form and policy change.

USCIS notes that the proposed policy also complies with section 1238 of the Federal Aviation Reauthorization Act of 2018. Public Law 115–254 (Oct. 5, 2018). That law provides that the President, in consultation with the Governor of a State, may waive certain fees for an individual or household who lives in a federally declared disaster area, including the following USCIS fees: Form I–90; Form I–193; Form I–765; Form N–300; Form N–565; and the biometric services fee. DHS plans to carry out this permissive authority through the USCIS Director's exercise of his or her discretion to provide a specific class of fee waivers for emergency and disaster relief. 8 CFR 103.7(d).

**Reasons for the Changes**

USCIS has determined that without changes to fee waiver policy it will continue to forgo increasing amounts of revenue as more fees are waived. As a result, USCIS expects that DHS will be required to increase the fees that it charges for benefit requests for which fees are not waived. In the FY 2016/

**Federal Register** / Vol. 84, No. 108 / Wednesday, June 5, 2019 / Notices

26139

2017 fee rule, DHS noted that the estimated annual forgone revenue from fee waivers and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review. *See* 81 FR 26922 and 73307. In the FY 2016/2017 proposed rule, DHS provided notice that in the future it may revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). *See* 81 FR 26922.

In addition to curtailing the rising costs of fee waivers, this proposed policy change is intended to introduce more consistent criteria for approving all fee waivers. USCIS has found that the various income levels used in states to grant a means-tested benefit result in inconsistent income levels being used to determine eligibility for a fee waiver. Consequently, a fee waiver may be granted for one person who has a certain level of income in one state, but denied for a person with that same income who lives in another state. Therefore, USCIS has determined that fee waivers should not be based on the receipt of a means tested benefit, and the revised form will not permit a fee waiver based on receipt of a means-tested benefit. It will retain the poverty-guideline threshold and financial hardship criteria.

**Administrative Procedure Act (APA) and Paperwork Reduction Act (PRA)**

USCIS has published two **Federal Register** notices requesting public comment on these proposed changes as required by regulations at 5 CFR 1320.8(d)(1) (83 FR 49120) and 5 CFR 1320.10(a) (84 FR 13687). USCIS is in the process of responding to the comments received, but has decided to provide this additional notice and request for comments to clarify the nature of the proposed policy changes.

The current USCIS policy and the Form I–912 provide the procedures for requesting a waiver of USCIS fees based on 8 CFR 103.7(c), which provides that the party requesting the benefit is unable to pay the prescribed fee, and a fee waiver is consistent with the status or benefit sought. The APA excepts rules of agency organization, procedure or practice from notice and comment requirements. 5 U.S.C. 553(b)(A). USCIS issued its 2011 Fee Waiver Policy and Form I–912 to explain and provide instructions to adjudicators but did not create legally binding rights, obligations, or effect a change in the regulations. In addition, the USCIS form instructions for Form I–912 established procedural requirements for requesting a fee waiver. The form instructions established application procedures but

did not change the substantive standards by which USCIS evaluated applications for immigration benefit requests, just the procedural steps for such requests. An agency is not required to use the APA's notice-and-comment procedures to issue an interpretive or procedural rule that amends or repeals an interpretive [1] or procedural rule. [2]

USCIS has reviewed this policy change and determined that it will not abrogate or adversely affect any substantive rights of the affected parties. The 2011 Fee Waiver Policy provided guidelines for adjudication of requests and provided that we would accept a means tested benefit as evidence of inability to pay as required by 8 CFR 103.7(c)(2). With respect to the proposed policy change, USCIS acknowledges that a person who is receiving a means tested benefit in a state where the income level for granting the receipt of a means tested benefit is above 150 percent of the FPG (the new maximum threshold for a fee waiver), may no longer be able to have their USCIS fees waived simply by using receipt of that benefit as evidence. However, USCIS does not think that by having operated under that policy results in individuals who happen to receive a means tested benefit from a government agency inuring to a *right* to receive adjudication of their immigration benefit request for free.

Additionally, USCIS acknowledges that, while an agency can change its interpretation of a regulation at different times in its history, the interpretative changes can create no unfair surprise. [3] As stated above, USCIS acknowledges that as a result of this change there are some applicants who would be able to receive free adjudication now who will not be able to after this policy change. USCIS has, however, analyzed the potential for and taken into account serious reliance interests that may be engendered by the 2011 policies. USCIS has determined that potential applicants cannot reasonably be determined to have taken an action in detrimental reliance on USCIS continuing its 2011 policy for providing free services. Regardless of USCIS's past use of receipt of means tested benefits as a means for determining that an applicant for immigration benefits is unable to pay the fee for his or her immigration benefit request, USCIS has determined that an applicant is unlikely to have incurred

costs or been harmed based on relying on USCIS continuing that policy. Each person's decision to apply for, and eligibility to receive, a means tested benefit would be based on the need for that benefit and not because the person can use receipt of the benefit to avoid paying a USCIS immigration benefit request fee. To the extent that a person is in the process of completing and filing a request, with this notice USCIS will have provided three public notices of the impending policy and procedure change. In addition, to eliminate any impact on an applicant who is currently working on, researching, and gathering necessary evidence for an immigration benefit and planning to request a fee waiver based on receipt of a means tested benefit, USCIS will provide sufficient advance notice and transition period before the new version of Form I–912 will be a requirement for requesting a fee waiver, to permit applications that are in process to be submitted under the previous policy. To the extent that applicants who are not yet working on, researching, and gathering necessary evidence for an application may no longer receive a fee waiver after this change, USCIS has determined that the need to reduce annual forgone revenue from fee waivers and approve fee waivers using consistent income levels is still justified and necessary regardless of those affected parties being required to pay the prescribed fees. USCIS welcomes public comments on all of the effects of this change in policy.

**Comments**

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2010–0008 in the search box. Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the

---

[1] *Perez* v. *Mortgage Bankers Ass'n,* 135 S.Ct. 1199 (2015).

[2] *James* v. *Hurson Associates, Inc.* v. *Glickman,* 229 F.3d 277 (D.C. Cir. 2000).

[3] *Long Island Care at Home Ltd.* v. *Coke,* 551 U.S. 158, 171 (2007); *Christopher* v. *SmithKline Beecham Corp.,* 567 U.S. 142 (2012).

**26140**        **Federal Register** / Vol. 84, No. 108 / Wednesday, June 5, 2019 / Notices

use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Request for Fee Waiver.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–912; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses the data collected on this form to verify that the applicant is unable to pay for the immigration benefit being requested. USCIS will consider waiving a fee for an application or petition when the applicant or petitioner clearly demonstrates that he or she is unable to pay the fee. Form I–912 standardizes the collection and analysis of statements and supporting documentation provided by the applicant with the fee waiver request. Form I–912 also streamlines and expedites USCIS's review, approval, or denial of the fee waiver request by clearly laying out the most salient data and evidence necessary for the determination of inability to pay. Officers evaluate all factors, circumstances, and evidence supplied in support of a fee waiver request when making a final determination. Each case is unique and is considered on its own merits. If the fee waiver is granted, the application will be processed. If the fee waiver is not granted, USCIS will notify the applicant and instruct him or her to file a new application with the appropriate fee.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–912 is 350,000 and the estimated hour burden per response is 1.17 hours; for the information collection DACA Exemptions the estimated total number of respondents is 108 and the estimated hour burden per response is 1.17 hours; for the information collection 8 CFR 103.7(d) Director's exception request the estimated total number of respondents is 20 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 409,650 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,312,980.

**L. Francis Cissna,**

*Director, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2019–11744 Filed 6–4–19; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[OMB Control Number 1615–0047]**

**Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Employment Eligibility Verification**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** The purpose of this notice is to allow an additional 30 days for public comments. Comments are encouraged and will be accepted until July 5, 2019.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, should be directed to the OMB USCIS Desk Officer via email at *dhsdeskofficer@ omb.eop.gov.* All submissions received must include the agency name and the OMB Control Number 1615–0047 in the subject line.

You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make. For additional information please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, 20

Massachusetts Avenue NW, Washington, DC 20529–2140, Telephone number (202) 272–8377 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *http:// www.uscis.gov,* or call the USCIS Contact Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Comments**

The information collection notice was previously published in the **Federal Register** on March 1, 2019, at 84 FR 7101, allowing for a 60-day comment period. USCIS did receive 21 comments in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2006–0068 in the search box. Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection Request:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Employment Eligibility Verification.

(3) *Agency form number, if any, and the applicable component of the DHS*

whether or not a qualifying biobased product overlaps with EPA-designated re-refined lubricating oils and which product should be afforded the preference in purchasing.

**Note to paragraph (d):** Biobased gear lubricant products within this designated item can compete with similar gear lubricant products with recycled content. Under the Resource Conservation and Recovery Act of 1976, section 6002, the U.S. Environmental Protection Agency designated re-refined lubricating oils containing recovered materials as items for which Federal agencies must give preference in their purchasing programs. The designation can be found in the Comprehensive Procurement Guideline, 40 CFR 247.11.

### § 2902.48   General purpose household cleaners.

(a) *Definition.* Products designed to clean multiple common household surfaces. This designated item does not include products that are formulated for use as disinfectants. Task-specific cleaning products, such as spot and stain removers, upholstery cleaners, bathroom cleaners, glass cleaners, etc., are not included in this item.

(b) *Minimum biobased content.* The preferred procurement product must have a minimum biobased content of at least 39 percent, which shall be based on the amount of qualifying biobased carbon in the product as a percent of the weight (mass) of the total organic carbon in the finished product.

(c) *Preference compliance date.* No later than October 27, 2010, procuring agencies, in accordance with this part, will give a procurement preference for qualifying biobased general purpose household cleaners. By that date, Federal agencies that have the responsibility for drafting or reviewing specifications for items to be procured shall ensure that the relevant specifications require the use of biobased general purpose household cleaners.

### § 2902.49   Industrial cleaners.

(a) *Definition.* Products used to remove contaminants, such as adhesives, inks, paint, dirt, soil, and grease, from parts, products, tools, machinery, equipment, vessels, floors, walls, and other production-related work areas. The cleaning products within this item are usually solvents, but may take other forms. They may be used in either straight solution or diluted with water in pressure washers, or in hand wiping applications in industrial or manufacturing settings, such as inside vessels. Task-specific cleaners used in industrial settings, such as parts wash solutions, are not included in this definition.

(b) *Minimum biobased content.* The preferred procurement product must have a minimum biobased content of at least 41 percent, which shall be based on the amount of qualifying biobased carbon in the product as a percent of the weight (mass) of the total organic carbon in the finished product.

(c) *Preference compliance date.* No later than October 27, 2010, procuring agencies, in accordance with this part, will give a procurement preference for qualifying biobased industrial cleaners. By that date, Federal agencies that have the responsibility for drafting or reviewing specifications for items to be procured shall ensure that the relevant specifications require the use of biobased industrial cleaners.

### § 2902.50   Multipurpose cleaners.

(a) *Definition.* Products used to clean dirt, grease, and grime from a variety of items in both industrial and domestic settings. This designated item does not include products that are formulated for use as disinfectants.

(b) *Minimum biobased content.* The preferred procurement product must have a minimum biobased content of at least 56 percent, which shall be based on the amount of qualifying biobased carbon in the product as a percent of the weight (mass) of the total organic carbon in the finished product.

(c) *Preference compliance date.* No later than October 27, 2010, procuring agencies, in accordance with this part, will give a procurement preference for qualifying biobased multipurpose cleaners. By that date, Federal agencies that have the responsibility for drafting or reviewing specifications for items to be procured shall ensure that the relevant specifications require the use of biobased multipurpose cleaners.

### § 2902.51   Parts wash solutions.

(a) *Definition.* Products that are designed to clean parts in manual or automatic cleaning systems. Such systems include, but are not limited to, soak vats and tanks, cabinet washers, and ultrasonic cleaners.

(b) *Minimum biobased content.* The preferred procurement product must have a minimum biobased content of at least 65 percent, which shall be based on the amount of qualifying biobased carbon in the product as a percent of the weight (mass) of the total organic carbon in the finished product.

(c) *Preference compliance date.* No later than October 27, 2010, procuring agencies, in accordance with this part, will give a procurement preference for qualifying biobased parts wash solutions. By that date, Federal agencies that have the responsibility for drafting

or reviewing specifications for items to be procured shall ensure that the relevant specifications require the use of biobased parts wash solutions.

Dated: October 21, 2009.

**Pearlie S. Reed,**
*Assistant Secretary for Administration, U.S. Department of Agriculture.*

[FR Doc. E9–25756 Filed 10–26–09; 8:45 am]

**BILLING CODE 3410–GL–P**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 214, 274a, and 299**

**[CIS No. 2459–08; DHS Docket No. USCIS–2008–0038]**

**RIN 1615–AB76**

## Commonwealth of the Northern Mariana Islands Transitional Worker Classification

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Interim rule; solicitation of comments.

**SUMMARY:** The Department of Homeland Security (DHS) is creating a new, temporary, Commonwealth of the Northern Mariana Islands (CNMI)-only transitional worker classification (CW classification) in accordance with title VII of the Consolidated Natural Resources Act of 2008 (CNRA). The transitional worker program is intended to provide for an orderly transition from the CNMI permit system to the U.S. federal immigration system under the Immigration and Nationality Act (INA or Act). A CW transitional worker is an alien worker who is ineligible for another classification under the INA and who performs services or labor for an employer in the CNMI. The CNRA imposes a five-year transition period before the INA requirements become fully applicable in the CNMI. The new CW classification will be in effect for the duration of that transition period, unless extended by the Secretary of Labor. The rule also establishes employment authorization incident to CW status.

**DATES:** *Effective date:* This rule will be effective on November 27, 2009.

*Implementation date:* Beginning at 12:01 a.m. (CNMI local time) on November 28, 2009, U.S. Citizenship and Immigration Services will begin operation of this program and required compliance with this interim rule will begin. The existing CNMI permit program will be in effect through November 27, 2009.

Federal Register / Vol. 74, No. 206 / Tuesday, October 27, 2009 / Rules and Regulations    **55095**

*Comment date:* Written comments must be submitted on or before November 27, 2009.

Written comments on the Paperwork Reduction Act section of this rule must be submitted on or before December 28, 2009.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2008–0038 by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* You may submit comments directly to USCIS by e-mail at *rfs.regs@dhs.gov.* Include DHS Docket No. USCIS–2008–0038 in the subject line of the message.

• *Mail:* Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., Suite 3008, Washington, DC 20529–2210. To ensure proper handling, please reference DHS Docket No. USCIS–2008–0038 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., Suite 3008, Washington, DC 20529–2210. Contact Telephone Number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Paola Rodriguez Hale, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., 2nd Floor, Washington, DC 20529–2060 telephone (202) 272–1505.

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. DHS also invites comments that relate to the economic or federalism effects that might result from this rule. Comments that will provide the most assistance to DHS will reference a specific portion of the rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change.

*Instructions:* All submissions received must include the agency name and DHS Docket No. USCIS–2008–0038. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http:// www.regulations.gov.* Submitted comments may also be inspected at the Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, N.W., Suite 3008, Washington, DC 20529–2210.

**II. Background**

The Commonwealth of the Northern Mariana Islands (CNMI) is a U.S. territory located in the Western Pacific that has been subject to most U.S. laws for many years. The CNMI has administered its own immigration system under the terms of the 1976 Covenant with the United States. *See* A Joint Resolution to Approve the Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant Act), Public Law 94–241, sec. 1, 90 Stat. 263, 48 U.S.C. 1801 note (1976). On May 8, 2008, former President Bush signed into law the Consolidated Natural Resources Act of 2008 (CNRA). *See* Public Law 110–229, Title VII, 122 Stat. 754, 853 (2008). Title VII of the CNRA extends U.S. immigration laws to the CNMI. The intent of Congress in passing this legislation is to ensure effective border controls and properly address national security and homeland security concerns by extending U.S. immigration law to the CNMI. *See* Section 701(a) of Public Law 110–229. Title VII of the CNRA includes provisions to phase-out the CNMI's nonresident contract worker program and phase in the U.S. federal immigration system in a manner that minimizes adverse economic and fiscal effects and maximizes the CNMI's potential for future economic and business growth. *Id.* (b). Congress also intends to provide the CNMI with as much flexibility as possible to maintain existing businesses and other revenue sources and develop new economic opportunities. *Id.*

Section 702 of the CNRA was scheduled to become effective approximately one year after the date of enactment, subject to certain transition provisions unique to the CNMI. On March 31, 2009, DHS announced that the Secretary of Homeland Security, in her discretion under the CNRA, had extended the effective date of the transition program from June 1, 2009 (the first day of the first full month commencing one year from the date of enactment of the CNRA) to November 28, 2009. The transition period concludes on December 31, 2014.

Since 1978, the CNMI has admitted a substantial number of foreign workers through an immigration system that provides a permit program for foreigners entering the CNMI, such as visitors, investors, and workers. Foreign workers under this program constitute a majority of the CNMI labor force. Such workers outnumber U.S. citizens and other local residents in most industries central to the CNMI's economy. The transitional worker program implemented under this rule is intended to provide for an orderly transition for those workers from the CNMI permit system to the U.S. federal immigration system under the INA, and to mitigate potential harm to the CNMI economy as employers adjust their hiring practices and as foreign workers obtain U.S. immigrant or nonimmigrant status.

Section 702(a) of the CNRA mandates that, during this transition period, the Secretary of Homeland Security must "establish, administer, and enforce a system for allocating and determining the number, terms, and conditions of permits[1] to be issued to prospective employers" for the transitional workers and investors.[2] The statute provides that this system is for nonimmigrant workers "who would not otherwise be eligible for admission" under applicable provisions of the INA. Therefore, as discussed in section III below, nonimmigrant workers seeking CW status must demonstrate that they are ineligible for admission under another INA classification, such as an H–1B, H–2A or P–1 nonimmigrant. *See* 8 U.S.C. 1101.

Section 702(a) of the CNRA further states that transitional workers may apply to USCIS during the transition period for a change of status to another nonimmigrant classification or to adjust status to an immigrant classification in accordance with the INA. Following the end of the transition period, the transitional worker program will cease to exist and transitional workers must then adjust or change status to an immigrant or another nonimmigrant status under the INA if they want to remain legally in the CNMI. Otherwise, such transitional workers must depart the CNMI or they will become subject to removal.

---

[1] The CNRA refers to a system of permits. Note that we have retained this language when referencing the statute. However, in this context, the use of the term "permit" is synonymous with CW status and the latter term is used more extensively in this discussion.

[2] DHS will promulgate separate regulations addressing transitional measures for nonimmigrant investors in the CNMI.

The rule implementing this transitional worker program is explained below.

## III. Regulation Changes

This rule amends DHS regulations at 8 CFR 214.2 by providing a new paragraph (w). This new paragraph creates a new CNMI-only transitional worker classification for the duration of the transition period. Transitional workers will be classified using an admission code of CW-1 for principal transitional workers and CW-2 for dependents. Aliens who were previously admitted to the CNMI under the CNMI nonresident worker permit programs may be granted CW status by USCIS. To minimize adverse impact on the CNMI economy, the CW classification allows workers, who would not be eligible for any other lawful status under the INA, to enter or remain in the CNMI as a transitional worker during the transition period.[3] In this rule, DHS promulgates provisions governing CW-1 status in the section of the Code of Federal Regulations governing other INA nonimmigrant categories, and has incorporated standard elements from current nonimmigrant categories to maintain regulatory consistency, particularly with respect to petition processing procedures. This rule establishes eligibility criteria, limitations and parameters for the CW-1 nonimmigrant program as required by or consistent with an interpretation of the applicable provisions of section 702(a) of the CNRA, and prescribes procedural requirements for petitioners to follow. The specific areas that this rule implements and the rationale used by DHS are as follows:

### A. CNMI-Only Transitional Workers

As defined by the statute, a CNMI-only transitional worker is an alien worker who is ineligible for another classification under the INA during the transition period. Section 6(d)(1) or (2) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. This rule makes aliens eligible for CW-1 status only if they are ineligible for nonimmigrant classification based upon employment activities described in section 101(a)(15) of the INA. Such nonimmigrant classifications may include, but are not limited to, a

specialty occupation described in section 214(i) of the Act, temporary or seasonal agricultural work for which H–2A classification is available, and other temporary or seasonal employment for which H–2B classification is available. *See* 8 CFR 214.2(w)(2)(vi). DHS believes that this will help ensure that those who are eligible for employment-related nonimmigrant categories under the INA make use of those categories, especially the H categories, which are uncapped for employment in the CNMI during the transition period. As section 702(a) of the CNRA expressly allows transitional workers to change or adjust status under the INA, this provision is not meant to rigidly bar anyone admissible under the INA in any immigrant or other nonimmigrant category from obtaining CW-1 status. Section 6(d)(1) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. DHS envisions scenarios wherein certain professionals may not initially be eligible for H–1B status due to Federal licensing or other requirements, and believes that it is an appropriate use of the transitional worker program to allow such aliens time during the transition period to seek to satisfy such requirements. This rule does not exempt such aliens in occupations requiring licensure from complying with existing local licensure requirements. *See* 8 CFR 214.2(w)(6)(iii).

Section 702(a) further states that DHS shall set the conditions for admission to the CNMI for nonimmigrant workers. Section 6(d)(3) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. DHS is providing in this rule that, subject to numerical limitations, aliens may be classified as CW-1 nonimmigrants if, during the transition period, the alien: (1) Will enter or remain in the CNMI for the purpose of employment during the transition period in an occupational category designated by the Secretary as requiring alien workers to supplement the resident workforce; (2) has a petition submitted on his or her behalf by an employer; (3) is not present in the United States, other than the CNMI; (4) if present in the CNMI, is lawfully present in the CNMI; and (5) is not inadmissible to the United States as a nonimmigrant, except for an alien present in the CNMI who is described in section 212(a)(7)(B)(i)(II) of the Act (not in possession of valid nonimmigrant visa). *See* 8 CFR 214.2(w)(2). In order to obtain CW status, the worker must either be lawfully present in the CNMI, or must be coming from abroad to the CNMI with a CW-1 visa properly issued by the

U.S. Department of State. *See* 8 CFR 214.2(w)(2)(i).

DHS has determined that requiring lawful status in the CNMI as a prerequisite for CW-1 eligibility is the most efficient means to begin the congressionally-mandated drawdown of transitional workers to zero by the end of the transition period. Furthermore, to allow workers without lawful status in the CNMI to obtain CW-1 status would encourage noncompliance with CNMI immigration law during the period before the transition program effective date by removing the incentive for such workers with lawful status to maintain or reacquire such lawful status under CNMI law prior to the transition. In order to administer this program in a manner consistent with other employment-based INA nonimmigrant classifications, this rule requires that employers petition for aliens to obtain status. Additionally, this rule requires that aliens cannot be present in the United States other than the CNMI, which DHS believes is consistent with the statutorily-mandated geographic restriction of transitional workers to the CNMI. *See* Section 6(d)(3) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229;

8 CFR 214.2(w)(2). The transition program effective date is November 28, 2009. *See* Section 6(a)(1) and (3) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. The CW classification will cease to exist at the end of the transition period, meaning that existing grants of CW status will automatically terminate, and no new grants of CW status will be made. *See* 8 CFR 214.2(w)(23). Because of the statutory restrictions on eligibility for the CW classification and to avoid the need to seek to change status or depart the CNMI at the end of the transition period, employers of nonresident workers should seek classification under another INA classification for which the workers may be eligible instead of petitioning for CW status. *See* Section 6(d)(2) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229.

### B. Employers

As required under section 702(a) of the CNRA, DHS will not consider a business legitimate if it engages directly or indirectly in prostitution, trafficking in minors, or any other activity that is illegal under Federal or local CNMI law. Section 6(d)(5)(A) of Public Law 94–241, as added by section 702(a) of Public Law 110–229.

The CNRA provides that the determination of whether a business is legitimate will be made by the Secretary

---

[3] On March 2, 2009, USCIS opened an Application Support Center (ASC) in Saipan that offers extended services, including the ability for individuals in the CNMI to schedule an INFOPASS appointment to speak with an immigration officer regarding non-immigrant or immigrant worker eligibility requirements under the INA. Additional information regarding such eligibility requirements can be accessed at *http://www.uscis.gov.*

of Homeland Security in the Secretary's sole discretion. Section 6(d)(5)(A) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. This rule requires that eligible employers of CW transitional workers be engaged in legitimate business, and separates the definition of legitimate business into its component parts—legitimate and business. Accordingly, this rule defines legitimate business to mean "a real, active, and operating commercial or entrepreneurial undertaking which produces services or goods for profit, or is a governmental, charitable or other validly recognized nonprofit entity." *See* 8 CFR 214.2(w)(1)(v). The business must meet applicable legal requirements for doing business in the CNMI and will not be considered legitimate if it engages directly or indirectly in prostitution, trafficking in minors, or any other activity that is illegal under Federal or CNMI law. *Id.*

In addition to requiring eligible employers to be engaged in legitimate business, this rule further establishes that eligible employers must consider all available U.S. workers for positions being filled by CW–1 workers; offer terms and conditions of employment which are consistent with the nature of the occupation, activity, and industry in the CNMI; and comply with all Federal and CNMI requirements relating to employment; including, but not limited to, nondiscrimination, occupational safety, and minimum wage requirements. *See* 8 CFR 214.2(w)(4). DHS created these parameters for eligible employers to comply with congressional intent that the CW category should "promote the maximum use of, and * * * prevent adverse effects on wages and working conditions of, workers authorized to be employed in the United States." Section 6(d)(2) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229.

Congress has directed that DHS allow CW workers to transfer among employers during the transition period. Section 6(d)(4) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. This rule establishes that an employer may request, and USCIS will permit, a transfer within an alien's occupational category or another occupational category that the Secretary of Homeland Security has determined requires alien workers. *See* 8 CFR 214.2(w)(7).

The CNMI currently classifies occupations by reference to the nine occupational categories listed under the U.S. Department of Labor's Dictionary of Occupational Titles (DOT). *See* 3 N. Mar. I. Code section 4412(k). This rule incorporates all occupational categories

that are currently being utilized in the CNMI. *See* 8 CFR 214.2(w)(1)(viii).

The occupational categories in which nonresident workers may be needed include:

• Professional, technical, or management occupation;
• Clerical and sales occupation;
• Service occupation;
• Agricultural, fisheries, forestry, and related occupation;
• Processing occupation;
• Machine trade occupation;
• Benchwork occupation;
• Structural work occupation; and
• Miscellaneous occupation. *Id.*

The DOT provides examples of these occupations, including processing and benchwork occupations. *See* Employment and Training Administration, U. S. Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991) available at *http:// www.oalj.dol.gov/libdot.htm*.

As the general meaning of processing and benchwork occupations is not clear from the title alone, additional explanation of these two particular occupational categories is provided. Processing occupations include occupations concerned with refining, mixing, compounding, chemically treating, heat treating, or similarly working with materials and products. *Id.* The DOT defines benchwork occupations as those concerned with the use of hand tools and bench machines to fit, grind, carve, mold, paint, sew, assemble, inspect, repair, and similarly work relatively small objects and materials, such as jewelry, phonographs, light bulbs, musical instruments, tires, footwear, pottery, and garments. *Id.* The work is usually performed at a set position in a mill, plant, or shop, at a bench, worktable, or conveyor. *Id.* All occupations must be for a legitimate business not engaging directly or indirectly in prostitution, trafficking in minors, or any other activity that is illegal under Federal or CNMI law.

DHS notes that household domestic workers are eligible for CW–1. However, DHS also notes that the definition of "legitimate business" may have a significant impact on domestic workers directly employed by individuals, as "business" is defined to mean "a real, active, and operating commercial or entrepreneurial undertaking that produces goods or services for profit." *See* 8 CFR 214.2(w)(1)(v). Individual households employing individual domestic workers would not appear to be a commercial or entrepreneurial undertaking, nor would the individual household be producing goods or services for profit. Therefore, it is anticipated that qualifying domestic

workers likely would be employed through a "legitimate business" for placement in individual households.

The rule does not exclude any specific type of employment from the occupational categories permissible for CW–1 workers. However, there are three occupational categories—dancing, domestic workers, and hospitality workers—about which DHS has particular concern. DHS notes that women seeking employment as exotic dancers in the CNMI have been particularly prone to sexual exploitation and other abuse. *See, e.g.,* Senate Hearing 110–50, Conditions in the Commonwealth of the Northern Mariana Islands (Feb. 8, 2007) (testimony of Lauri Bennett Ogumoro and Sister Mary Stella Mangona). In a discussion between DHS officials and advocates for exploited women in Saipan in July 2008, the advocates identified so-called "cultural dancing" as a common front occupation used to import women into the CNMI for the purposes of prostitution, in addition to the category of domestic work. Additionally, waitressing and other club and restaurant hospitality work also are known paths for exploitation and abuse. *See, e.g., United States* v. *Liu,* 538 F.3d 1078 (9th Cir. 2008). DHS is considering excluding some or all of these occupations from eligibility for CW status.

DHS also is concerned about the economic effects of blanket exclusions of all dancers, domestic workers or hospitality service workers. DHS emphasizes that, regardless of the occupational category, all employers must be engaged in legitimate business, which is defined to exclude employers that engage directly or indirectly in prostitution, trafficking in minors, or any other activity that is illegal under Federal or CNMI law. DHS invites comments on the potential effect of excluding dancing from the list of eligible occupations. DHS also invites comments on whether DHS should exclude occupations, such as the hospitality industry, domestic service, or other occupations, to combat human trafficking and sexual exploitation.

*C. The CNMI-Only Transitional Worker Allocation System*

Section 702(a) of the CNRA mandates that the Secretary of Homeland Security establish, administer, and enforce a system for allocating and determining the number, terms, and conditions of permits to be issued to prospective employers for the transitional workers. Section 6(d) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. The Secretary may base the system

on any reasonable method and criteria determined by the Secretary to promote the maximum use, and to prevent adverse effects on wages and working conditions, of U.S. citizens, lawful permanent residents, and lawfully admissible freely-associated state citizen labor. *Id.* The system must also provide for a reduction in the allocation of permits for such workers on an annual basis to zero during a period not to extend beyond December 31, 2014, unless extended by the Secretary of Labor. *Id.* This rule does not, for the reasons explained below, impose a specific annual reduction in allocation of permits, but does establish the numerical limitation to be utilized initially and its underlying methodologies for setting the numerical limitation throughout the transition period.

Under section 702(a) of the CNRA, between May 8, 2008 and the transition program effective date, the CNMI government must not increase the total number of alien workers present in the CNMI. Section 6(i)(1) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. Thus, the DHS-administered system, in its initial phase, will be based on the estimate from the CNMI government of the maximum number of nonresident workers in the CNMI as of May 8, 2008. That number is 22,417.[4] This rule defines the numerical limitation as the number of persons who may be granted CW–1 status and sets that number for the initial year at no higher than 22,417. *See* 8 CFR 214.2(w)(1)(vii). DHS will assess and reduce the number of grants of CW–1 status annually based, in part, on the economic conditions in the CNMI, consultation with the government of the CNMI and other Federal government agencies, and employment opportunities available for the resident workforce. *Id.* Grants of CW–1 status will be allocated based upon the availability of CW–1 permits and a showing of eligibility based upon the requirements outlined in this rule.

Specifically, 22,417 is a composite figure that includes aliens eligible for other INA categories, aliens with employment authorization for the first two years of the transition period under the "grandfather clause" provided by section 6(e)(2) of Public Law 94–241, as added by section 702(a) of Title VII of the CNRA, and CW–1 eligible aliens. Thus, while 22,417 could theoretically reflect the total number of CW–1 eligible aliens, setting 22,417 as the total number of CW–1 workers would artificially inflate the CW–1 eligible population by presuming that there are zero "grandfathered" or other INA workers. Therefore, this rule defines "numerical limitation" to be the maximum number of persons who may be granted CW–1 status, but for the reasons explained above, it is not expected that there will actually be 22,417 CW–1 eligible aliens to whom CW–1 status will be accorded. *Id.* DHS emphasizes that this provision is not intended to, and will not have the effect of, providing any cap on the access of CNMI employers to H and other nonimmigrant workers in the INA categories.

The Governor of the CNMI has requested that DHS not reduce the number of foreign workers available to CNMI employers in the first two years of the transition program beyond the cap currently provided by section 6(i)(1) of the Covenant Act.[5] As required by section 702(a) of the CNRA, DHS considered the request of the Governor of the CNMI in creating this rule. However, in considering this request, DHS was also bound by the statutory language mandating a reduction of numbers on an annual basis. Section 6(d)(2) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229.

In light of these interests, this rule sets the maximum number of persons who may be granted CW–1 status for the first year of the transition period at 22,417. *See* 8 CFR 214.2(w)(1)(vii)(A). For the subsequent years of the transition period, the numerical limitation will be a number less than 22,417, as determined at the discretion of the Secretary. USCIS will publish the determination as a notice in the **Federal Register.** *See* 8 CFR 214.2(w)(1)(vii)(B). DHS believes that, given the lack of specific data available both on the foreign worker population, particularly with respect to eligibility for other INA categories and the number of "grandfathered" workers during the first two years of the transition period, as well as the uncertainty of future economic conditions in the CNMI, determining the CW–1 numerical limitation in this manner is prudent.

### D. Petitioning Procedures

This rule requires employers who seek to employ a CW–1 nonimmigrant worker to file a petition with USCIS requesting such status. *See* 8 CFR 214.2(w)(1)(ix). USCIS has determined that its Form I–129, Petition for a Nonimmigrant Worker, contains most of the information needed by USCIS to determine that a particular employer and its current and prospective employees are eligible as an employer and for CW–1 status, respectively. However, because the CW program is a temporary program, USCIS has decided to develop and use a separate Form I–129 called the I–129CW ("Petition for a Nonimmigrant Worker in the CNMI"), for CW petitions and will provide separate instructions for the application form for requesting CW transitional workers. The petition must be prepared in accordance with the form instructions and accompanied by the appropriate fee or a fee waiver request. USCIS will charge the current fee of $320 for Form I–129 for the Form I–129CW because the adjudicative burden is expected to be identical. In addition to the petitioning fee required for submission of a Form I–129, section 702(a) of the CNRA requires employers to pay a supplemental CNMI education funding fee of $150 per beneficiary per year. Section 6(b)(6) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229. The supplementary CNMI education funding fee is mandatory and cannot be waived.

While fee waivers are not generally available in employment-based cases, due to the unique circumstances present in the CNMI, USCIS may waive the fee for the I–129CW in certain circumstances if the petitioner is able to show inability to pay. *See* 8 CFR 103.7(c)(5)(i). Due to the inherent inconsistency between sponsoring an alien for employment and being unable to pay the requisite fee for that sponsorship, USCIS expects that the situation when an employer would adequately demonstrate an inability to pay will be extremely limited. An estimate of the information collection requirements and a request for comments are included in the Paperwork Reduction Act section of this rule. An analysis of the fee impacts of this rule are included in the summary of the costs and benefits also provided below.

Form I–129CW will require an employer to provide the full name of the beneficiaries, as well as documentation or information that is sufficient to demonstrate that the worker-beneficiaries on the petition are eligible for CW–1 status based on the criteria in this rule. This rule requires that the petitioner submit an attestation regarding the eligibility of both the employer and the beneficiary. *See* 8 CFR 214.2(w)(6)(ii). This rule requires that

---

[4] *See* Letter from Benigno Fitial, Governor of the Commonwealth of the Northern Mariana Islands, to Richard C. Barth, Assistant Secretary for Policy Development, and Stewart A. Baker, Assistant Secretary for Policy, Office of Policy, Department of Homeland Security (July 18, 2008) (Fitial letter) (available at *www.regulations.gov* under DHS Docket No. USCIS–2008–0038).

[5] *See* Fitial letter.

such an attestation certify that the petitioner meets the definition of an eligible employer, that the beneficiary is qualified for the position, and, if the beneficiary is present in the CNMI, that the beneficiary is in lawful CNMI status. *Id.* Finally, the rule requires a petitioner to attest that the position is nontemporary or nonseasonal, is in an occupational category as designated by the Secretary, and that qualified United States workers are not available to fill the position. *Id.* DHS believes that having an attestation is necessary to ensure eligibility of both the employer and of the beneficiary, and will obviate the need to affirmatively determine whether the applicant is eligible for status under every other conceivable INA category. Additionally, certain professions may require licensure in order to fully perform the duties of the occupation. In order to allow full and competent performance of such duties, this rule requires the petitioner to submit evidence of the beneficiary's licensure if the occupation requires a Commonwealth or local license. *See* 8 CFR 214.2(w)(6)(iii).

The rule allows a beneficiary to request, and obtain, a transfer to a new employer within an alien's occupational category or to another occupational category that the Secretary of Homeland Security has determined requires alien workers. *See* 8 CFR 214.2(w)(7). However, the rule requires that a petition for a change of employer must be filed by the new employer and an extension of the alien's stay must be requested if necessary for the validity period of the petition. *Id.* An alien who makes an unauthorized change of employment to a new employer has failed to maintain his or her status. *Id.* Further, the rule requires an employer to submit a new or amended petition for any material (i.e.—substantive) change in the terms and conditions of employment. *See* 8 CFR 214.2(w)(8). DHS believes that such requirements are consistent with other nonimmigrant categories allowing change of employers and ensures that aliens are properly complying with the terms of their admission in CW status while not making transfer between employers impermissible.

The rule also allows petitioners to file for multiple beneficiaries. *See* 8 CFR 214.2(w)(9). The rule permits a petitioning employer to include more than one beneficiary in a CW–1 petition if the beneficiaries will be working in the same occupational category, for the same period of time, and in the same location. *Id.* However, the rule does not allow employers to petition for unnamed beneficiaries. At the time of filing, the petition must include the name of each intended beneficiary and other required information, as indicated in the form instructions. *See* 8 CFR 214.2(w)(10). DHS believes that allowing multiple beneficiaries will ease the potential burden on petitioners associated with submitting multiple individual petitions for multiple beneficiaries. Requiring that such beneficiaries be named will allow USCIS to verify, when necessary, prior lawful status of the beneficiaries in the CNMI, as this rule requires.

The rule includes safeguards for the beneficiary in case of early termination. *See* 8 CFR 214.2(w)(11). The rule requires that the petitioning employer pay the reasonable cost of return transportation of the alien to the alien's last place of foreign residence if the alien is dismissed from employment for any reason by the employer before the end of the period of authorized admission. *Id.* This requirement is consistent with current employment practices in the CNMI. This requirement also protects the Federal government from the potential costs of removing indigent aliens from the CNMI and is within DHS's discretion to impose requirements for temporary transitional worker status under title VII of the CNRA and more generally under section 214 of the INA.

The rule states that, after consideration of all the evidence submitted, USCIS will issue an approval of the petition on a Form I–797, Notice of Action, or in another form as USCIS may prescribe. *See* 8 CFR 214.2(w)(12). The rule requires that the approval notice include the classification and name of the beneficiary or beneficiaries and the petition's period of validity, and that a petition for more than one beneficiary may be approved in whole or in part. *See* 8 CFR 214.2(w)(12)(i). However, the rule requires that petitioners will not be able to file for a beneficiary earlier than six months before the date of actual need for the beneficiary's services. *See* 8 CFR 214.2(w)(12)(ii). The rule further provides that, although USCIS may in its discretion permit petitions to be filed prior to November 28, 2009, USCIS will not grant CW–1 status or authorize the admission of any alien to the CNMI prior to such date. *Id.*

The rule also states that although the beneficiary may be admitted to the CNMI up to ten days before the validity period begins and may remain no later than ten days after the validity period ends, the beneficiary will only be able to work during the validity period of the petition. *See* 8 CFR 214.2(w)(13). DHS believes that this validity period is consistent with other nonimmigrant categories and permits the necessary flexibility for travel and living arrangements to be made both before and after period of authorized employment. Finally, this rule requires that USCIS reject a petition once the numerical limitation of 22,417 has been reached, but that in such cases the petition and accompanying fee will be returned along with notice that the numerical limitation has been reached. *See* 8 CFR 214.2(w)(20). DHS believes that this will allow for reduction in CW workers in accordance with the numerical limitation. An alien in the CNMI whose CW status terminates, or who is not granted CW status at all, is not lawfully present and is subject to removal if he or she does not have another status under U.S. immigration law or other lawful basis to remain.

*E. Obtaining CW Status*

Once the Form I–129CW petition is approved, the beneficiary will receive CW–1 status, and eligible family members may apply for CW–2 status for the spouse and dependents, as appropriate. *See* 8 CFR 214.2(w)(3). Dependents are spouses and minor children, as discussed more fully below in part G. Aliens who are abroad will need to apply for a CW–1 or CW–2 visa at a U.S. consulate. Aliens present in the CNMI must apply for status using Form I–129CW, and shall be required to provide biometrics along with an initial application for CW–1 or CW–2 status. *See* 8 CFR 214.2(w)(5) and (w)(15). When applicants apply overseas, USCIS will not require that the applicants provide biometrics along with Form I–129CW, although the Department of State may require biometrics at a U.S. consulate or embassy abroad as part of its routine visa processing procedures. Aliens present in the CNMI will not have previously supplied biometric information to the Federal government; therefore, because the federal government will not have conducted the attendant security checks on those aliens, USCIS will require aliens in the CNMI to provide biometrics. The applicable biometrics fee is $80. A fee waiver is available based upon a showing of inability to pay for the Form I–129CW and/or biometrics fees. *See* 8 CFR 103.7(b)(1); 8 CFR 103.7(c)(5)(i). Status will be evidenced using Form I–94 or other appropriate documents.

*F. Lawful Presence and Travel*

The transitional worker program will be available to two groups of aliens in general: (1) Those who are lawfully present in the CNMI; and (2) those who are abroad. The rule defines lawful

presence as status under the CNMI immigration laws before the transition program effective date, or status under the "grandfather" provision of the CNRA or U.S. immigration laws after the transition program effective date. *See* Section 6(e)(1) or (2) of Public Law 94–241, as added by sec. 702(a) of Title VII of the CNRA; 8 CFR 214.2(w)(1)(iv).

Short term visitors for business or pleasure, including individuals admitted with a Visitor Entry Permit (VEP) under CNMI law, will not be eligible to obtain CW classification, as such individuals are not part of the foreign workforce that is the subject of this rule. Once status is obtained, the CW–1 or CW–2 nonimmigrant may leave the CNMI and return, but must have the appropriate visa for readmission. *See* 8 CFR 214.2(w)(22)(ii). Such a visa requirement at the time of application for admission is consistent with current INA requirements. *See* INA sec. 212(a)(7)(B), 8 U.S.C. 1182(a)(7)(B). CW classification is valid only in the CNMI, and provides no basis for travel to any other part of the United States. *See* 8 CFR 214.2(w)(22)(i). An attempt to travel to any other part of the United States without documentation authorizing admission in another classification is a violation of the CW status that will render the alien removable. *Id.*

*G. Spouse and Minor Children of CW Transitional Worker*

Section 702(a) of the CNRA, provides that spouses and minor children of an alien in CW–1 nonimmigrant status may be authorized for admission into the CNMI as accompanying or following to join the principal CW worker, and this rule implements that authority. *See* 8 CFR 214.2(w)(3). The rule adopts the INA's definition of "child" for immigration purposes other than naturalization in section 101(b), adding a requirement that the child be under eighteen years of age since the statute refers to "minor children" rather than "children." *See* Section 6(d)(6) of Public Law 94–241, as added by sec. 702(a) of Public Law 110–229; 8 CFR 214.2(w)(1)(vi). Generally, work authorization is not permitted for accompanying spouses and children of other classes of nonimmigrants as a result of their derivative status, and this rule similarly does not provide it. *See* 8 CFR 214.2(w)(22)(iii).

*H. Consideration of Petitions and Applications*

A decision to grant or deny CW–1 or CW–2 status is discretionary and USCIS may deny petitions for failure to demonstrate eligibility or other good

cause. Consistent with procedures for other nonimmigrant categories, petitioners may appeal denials of Form I–129CW to the USCIS Administrative Appeals Office on Form I–290B, as provided by 8 CFR 103.7(b). Denials of Form I–539, Application to Change or Extend Nonimmigrant Status, are not appealable. *See* 8 CFR 214.2(w)(21).

*I. Change or Adjustment of Status*

Section 702(a) of the CNRA allows workers in the CW classification to change to another nonimmigrant status or to adjust to lawful permanent resident status throughout the transition period, if eligible. Section 6(d)(1) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. The rule provides that an alien may legitimately be present in, or come to, the CNMI for a temporary period as a CW–1 or CW–2 nonimmigrant and, at the same time, lawfully seek to become a permanent resident of the United States provided the alien intends to depart voluntarily at the end of the alien's authorized nonimmigrant stay. *See* 8 CFR 214.2(w)(19). For purposes of qualifying for CW–1 or CW–2 classification, the alien is not required to maintain a residence abroad, and dual immigrant and nonimmigrant intent is allowed. *See* 8 CFR 214.2(w)(19).

*J. Period of Admission and Extensions of Stay*

A CW transitional worker will be admitted for an initial period of one year. *See* 8 CFR 214.2(w)(16). The spouse and children accompanying or following to join a CW transitional worker will be admitted for the same period that the principal alien is in valid CW transitional worker status, or in the case of a minor child, until the age of 18. *See* 8 CFR 214.2(w)(16). Additionally, USCIS will grant extensions of CW status in one-year increments until the end of the transition period. *See* 8 CFR 214.2(w)(17). Extensions of stay are subject to the numerical limitation and section 702(a) of the CNRA further requires that the number of permits be reduced on an annual basis. *See* 8 CFR 214.2(w)(1)(vii). A one-year validity period facilitates effective management of the number of permits issued at any given time. DHS welcomes comments on the CW–1 status validity period, its potential impacts on CNMI employers and foreign workers, and ways to mitigate these impacts while complying with the statute.

*K. Post-Transition Period*

Unless extended by the Secretary of Labor, the CNMI-only transitional

worker program will end on December 31, 2014. Section 6(a)(2) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. After the end of the CNMI-only transitional worker program, the CW classification will cease to exist, as existing grants of status will automatically terminate and no new ones will be issued. *See* 8 CFR 214.2(w)(23).

**IV. Technical Changes**

This rule amends the current provisions of 8 CFR 214.2 by adding paragraph (w) CNMI–Only Transitional Worker classification. *See* 8 CFR 214.2(w).

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

The Administrative Procedure Act (APA) provides that an agency may dispense with notice and comment rulemaking procedures when an agency, for "good cause," finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." *See* 5 U.S.C. 553(b)(B). For reasons discussed below, DHS finds that prepromulgation notice and comment for this rule would be impracticable, unnecessary, and contrary to the public interest.

Although Congress provided DHS with twelve months (now eighteen months under the extended transition date) to conduct and conclude the rulemaking actions necessary to implement the requirements of the CNRA, this timeframe is a relatively short timeframe to conduct a thorough review of the CNMI's immigration system and develop the complex regulatory scheme necessary to ensure a smooth transition of the CNMI to the U.S. federal immigration system and thus avoid potential adverse impacts on the CNMI economy and aliens currently residing lawfully in the CNMI. Further, in developing these regulations, DHS required sufficient time to engage in the necessary consultations with the CNMI government, Departments of State and Interior and other required stakeholders.

Under the APA, an agency is authorized to forego notice and comment in emergency situations, or where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Institute* v. *United States,* 20 Cl. Ct. 324, 333 (Cl. Ct. 1990) *aff'd* 925 F.2d 1454 (Fed. Cir. 1991); *also National Fed'n of Fed. Employees* v. *National Treasury Employees Union,* 671 F.2d 607, 611 (D.C. Cir. 1982). "[W]hen there is a lack of specific and immediate guidance

from the agency that would create confusion, economic harm, and disruption, not only to the participants of the program, who are forced to rely on antiquated standards, but would also extend to consumers in general, the good cause exception is a proper solution to ameliorate this expected harm.'' *Woods*, 20 Cl. Ct. at 333. Under the CNRA, the transition will begin on November 28, 2009, even if regulations to guide the CNMI are not yet in place. Thus, the failure to have an effective interim regulation in place by the beginning of the transition period would serve only to harm the CNMI and aliens residing in the CNMI following the transition. This would have an adverse impact on the CNMI economy in direct contrast to congressional intent under the CNRA and would be contrary to an important public interest.

Although DHS finds that good cause exists under 5 U.S.C. 553(b) to issue this rule as an interim rule, DHS nevertheless invites written comments on this interim rule and will consider those comments in the development of a final rule in this action.

*B. Executive Order 12866*

This rulemaking is not considered ''economically significant'' under Executive Order 12866 because it will not result in an annual effect on the economy of $100 million or more in any one year. However, because this rule raises novel policy issues, it is considered significant and has been reviewed by the Office of Management and Budget (OMB) under this Order. A summary of the economic impacts of this rule are presented below. For further details regarding this analysis, please refer to the complete Regulatory Assessment that has been placed in the public docket for this rulemaking.

In this analysis, we estimate the incremental costs to society, including both the CNMI and the United States, of the rule. Given the requisite reduction in the number of grants of CW status (to zero) by the end of the transition period, the most significant economic impact of the rule may result from a decrease in available foreign labor. However, we cannot reliably measure this impact for two primary reasons: (1) DHS has yet to develop a schedule for allocating and reducing the number of grants of CW status, and (2) economic models with which to estimate this impact are largely absent or cannot be developed, given the general lack of CNMI economic and production data and the changing conditions of the CNMI economy (due to changes in the two primary industries in the CNMI: Garment manufacturing and tourism, newly imposed minimum

wage requirements, and the CNMI government's fiscal condition). Furthermore, whether the U.S. Department of Labor (DOL) will exercise its authority to extend the transition period beyond 2014 is unknown at this time.

DHS notes that despite these limitations and for purposes of illustration only, the U.S. Government Accountability Office (GAO) in a recent report has simulated a range of possible impacts on the CNMI economy (i.e., Gross Domestic Product) given varying rates of reduction in the number of visas for foreign workers and decisions made by DOL with respect to extending the transition period (*see* GAO–08–791, August 2008). We do not make any attempt to recreate, modify, or substantiate the GAO analysis in this report.

As a result, we have calculated the estimable incremental direct costs resulting from changes in the fees imposed for the visas required by the rule. Because of the data limitations discussed above, we qualitatively discuss the incremental effect of these costs on overall production and government revenue in the CNMI.

The analysis focuses solely on impacts likely to be incurred during the transition period beginning November 28, 2009, and ending December 31, 2014. There are four key assumptions that shape the framework and methodology of our cost analysis:

1. The number of grants of CW status available during the transition period ending December 31, 2014, will remain constant at 22,417 visas per year. We make this assumption because (1) DHS and USCIS have not yet established a schedule for allocating and reducing the number of grants of CW status; and (2) DOL has not yet decided whether or not to extend the transition period beyond 2014. We again note that GAO report 08–791 contains more information regarding possible impacts on CNMI GDP given varying rates of reduction in the number of CW visas for foreign workers and DOL with respect to extending the transition period.

2. The starting cap of 22,417 grants of CW status is sufficient to accommodate the number of foreign workers likely to require such status in 2009. We estimate that approximately 14,543 foreign workers (13,543 in-status and 1,000 out-of-status who may be brought into lawful status under CNMI law) will be granted CW status in 2009. This number is based on the total number of foreign workers present in the CNMI as of August 2008 (19,083), as reported by the CNMI government, after subtracting out: The number of garment factory workers

assumed to have returned to their home countries since that time (1,500); the number of foreign workers eligible for visa classifications under the INA (2,090); and the number of foreign workers ineligible for a grant of CW status (950 private domestic household workers and other ineligible workers).

3. The number of jobs currently held by foreign workers will not change during the transition period. We assume that the number of jobs currently held by foreign workers represents the future demand for foreign workers, or the number of jobs available for such workers. We make this assumption because CNMI's economic conditions are changing, and we lack the data to definitively predict the future state of the CNMI economy and its resulting impact on the labor market for foreign workers. We also do not know the rate at which resident workers would replace foreign workers.

4. The current number of out-of-status foreign workers is 1,000. The CNMI government estimates that 1,000 out-of-status foreign workers were present in the CNMI as of August 2008. The CNMI government's established cap of 22,417 CNMI foreign work permits is sufficient to allow employers to bring all of these workers into lawful status prior to the beginning of the transition period.

Collectively, these assumptions result in a scenario where no shortage of labor is anticipated. Therefore, this analysis focuses on estimating the change in costs associated with obtaining status for foreign workers from USCIS instead of from the CNMI government. However, it is also possible that annual reductions in the number of grants of CW status could result in a shortage of labor, adversely affecting the CNMI economy. As previously described, DHS will assess and reduce the number of grants of CW–1 status annually based, in part, on the economic conditions in the CNMI, consultation with the government of the CNMI and other Federal government agencies, and employment opportunities available for the resident workforce. Consequently, we are unable to determine conclusively at this time whether a shortage of labor will take place during the transition period.

These assumptions are uncertain. Depending on how DHS reduces the number of grants of CW status during the transition period, if the CNMI economy experiences a surge in the demand for the type of foreign labor that is ineligible for visa classifications under the INA and exceeds the CNMI status cap, or if the number of out-of-status foreign workers has been underestimated by the CNMI

government, the rule could have negative impacts, perhaps significant, on the CNMI economy. The absence of a defined schedule for reducing the CW status cap, combined with the general lack of CNMI economic and production data and changing conditions of the CNMI economy, preclude a reliable analysis of alternative scenarios exploring these impacts in depth.

In our analysis, DHS first estimates the current and future baseline demand for foreign workers in the absence of the rule. In this baseline analysis, we consider the prevailing economic conditions of the CNMI to estimate the future demand for foreign workers and the total number of foreign work permits that would be issued under CNMI labor law absent the rule. Next, we characterize the number and type of CW status grants and nonimmigrant worker visas available under the INA that would be issued as a result of the rule. We consider the number of affected businesses and foreign workers as well as the foreign workers' work and professional qualifications, eligibility based on employer or occupation, and current status in the CNMI. We then estimate the component costs that CNMI employers would incur to apply for and obtain the requisite work permits (baseline regulatory environment) and CW status for foreign workers (rule). We then combine this cost information with our estimates of the number of grants of CW status that would be issued to calculate the incremental direct costs of the rule. Finally, we discuss qualitatively the potential impact of changes in labor costs on the CNMI economy and the distributive effect of the rule on the revenues of the CNMI government.

We do not consider in our analysis separate costs to the CNMI or the U.S. Federal government to administer the current CNMI permit program and this rule, respectively. We assume that the fees associated with applying for and obtaining the requisite permits and visas account for the cost to each respective government of adjudicating petitions and providing the relevant documentation.

As of November 28, 2009, the beginning of the transition period and the implementation date for this regulation, we estimate that 17,583 foreign workers and 1,176 businesses in the CNMI will be subject to the rule. Based on the available data, we estimate that approximately 2,090 of these workers may qualify for a nonimmigrant work visa available under the INA, and at least 950 private domestic household and other ineligible workers will not be eligible for CW status, leaving 14,543 foreign workers eligible for CW status. In addition, we estimate that approximately 2,100 spouses and dependent children of foreign workers will apply for admission under a second CW status category.

We consider and evaluate the following four alternatives:

*Alternative 1 (the chosen alternative):* Only aliens lawfully present in the CNMI may qualify for CW status. An employer petitioner can name more than one worker or "beneficiary" on a single Form I–129CW petition if the beneficiaries will be working in the same eligible occupational category, for the same period of time, and in the same location. CW status is valid for a period of 1 year.

*Alternative 2:* Same as Alternative 1, but an employer petitioner can name

only one eligible beneficiary on each petition.

*Alternative 3:* Same as Alternative 1, but CW status is valid for a period of 2 years.

*Alternative 4:* Same as Alternative 1, but aliens lawfully present as well as aliens unlawfully present in the CNMI as of the beginning of the transition period (November 28, 2009) may qualify for CW status.

We estimate the incremental costs on an annual basis over the same period of time as the transition period, beginning with the year 2010 (to simplify our cost analysis by estimating the incremental costs on a calendar year basis, we assume the transition period begins 1 month later on January 1, 2010) and ending with the year 2014, in the absence of any extension made by DOL. In addition, we estimate costs for the 20-month period prior to the onset of the transition period (May 8, 2008, to December 31, 2009) to account for the incremental costs of issuing CNMI work permits to those foreign workers who are currently out-of-status in the CNMI, thus allowing them to be eligible for CW status or INA visa classifications under Alternatives 1, 2, and 3 of the rule.

The incremental costs represent the change in the cost of obtaining the necessary CW status and INA visas under the rule from the baseline cost of obtaining foreign work permits under the current CNMI system. We estimate that the baseline cost for issuing CNMI work permits to the 16,583 in-status foreign workers presently in the CNMI is about $4.9 million annually. Table 1 summarizes the results of the regulatory analysis.

TABLE 1—SUMMARY OF ESTIMABLE INCREMENTAL DIRECT COSTS OF THE RULE: NET PERMIT AND VISA COSTS INCURRED BY CNMI EMPLOYERS (CNMI BUSINESSES AND CNMI GOVERNMENT), 2009 DOLLARS IN MILLIONS

| Alternative | Year | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | May '08– Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
| **Undiscounted** | | | | | | | |
| Alternative 1 ......................... | $0.30 | $0.12 | −$3.4 | −$3.4 | −$2.6 | −$3.4 | .............. |
| Alternative 2 ......................... | 0.30 | 5.1 | 1.6 | 1.6 | 2.3 | 1.6 | .............. |
| Alternative 3 ......................... | 0.30 | 0.12 | −4.6 | −3.4 | −3.8 | −3.4 | .............. |
| Alternative 4 ......................... | 0 | 0.12 | −3.4 | −3.4 | −2.6 | −3.4 | .............. |
| **3% Discount Rate** | | | | | | | |
| Alternative 1 ......................... | $0.30 | $0.11 | −$3.2 | −$3.1 | −$2.3 | −$2.9 | −$11.2 |
| Alternative 2 ......................... | 0.30 | 4.9 | 1.5 | 1.4 | 2.1 | 1.3 | 11.5 |
| Alternative 3 ......................... | 0.30 | 0.11 | −4.3 | −3.1 | −3.4 | −2.9 | −13.4 |
| Alternative 4 ......................... | 0 | 0.11 | −3.2 | −3.1 | −2.3 | −2.9 | −11.5 |
| **7% Discount Rate** | | | | | | | |
| Alternative 1 ......................... | $0.30 | $0.11 | −$3.0 | −$2.8 | −$2.0 | −$2.4 | −$9.8 |

Federal Register / Vol. 74, No. 206 / Tuesday, October 27, 2009 / Rules and Regulations **55103**

TABLE 1—SUMMARY OF ESTIMABLE INCREMENTAL DIRECT COSTS OF THE RULE: NET PERMIT AND VISA COSTS INCURRED BY CNMI EMPLOYERS (CNMI BUSINESSES AND CNMI GOVERNMENT), 2009 DOLLARS IN MILLIONS—Continued

| Alternative | Year | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | May '08–Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
| Alternative 2 ........................................................ | 0.30 | 4.7 | 1.4 | 1.3 | 1.8 | 1.1 | 10.6 |
| Alternative 3 ........................................................ | 0.30 | 0.11 | −4.0 | −2.8 | −2.9 | −2.4 | −11.8 |
| Alternative 4 ........................................................ | 0 | 0.11 | −3.0 | −2.8 | −2.0 | −2.4 | −10.1 |

**Note:** Detail may not sum to total due to independent rounding. These costs do not include the CW educational fee and the H–1B visa American Competitiveness and Worker Improvement Act (ACWIA) fee because these fees represent transfer payments under Executive Order 12866 and are redistributed in the economy. Estimated costs for the period prior to the beginning of the transition period (May 2008 through December 2009) are assumed to be largely incurred in 2009; thus, these costs are not discounted to calculate their present value in 2009.

The total present value costs of Alternatives 1, 3, and 4 are projected to range from −$9.8 million to −$13.4 million depending on the validity period of CW status (1 or 2 years), whether out-of-status aliens present in the CNMI are eligible for CW status, and the discount rate applied. These negative values indicate that society will experience a net cost savings as a result of implementing one of these three alternatives instead of the baseline. These savings are attributable to the flexibility of allowing multiple beneficiaries to be included in a single Form I–129CW petition, which is in contrast to the current CNMI permit system that requires an application and fee paid for each employee. The additional costs for applying for and obtaining CW status for spouses and children and INA visas for certain qualified foreign workers do not outweigh the benefits of submitting a single petition for multiple beneficiaries seeking CW status. In comparison to the chosen alternative (Alternative 1), increasing the CW status validity period from 1 year to 2 years (Alternative 3) results in additional cost savings of about 20 percent. Additionally, allowing out-of-status workers eligibility for CW status (Alternative 4) results in additional cost savings of about 3 percent because CNMI employers would not necessarily need to bring out-of-status workers to an in-status condition (under CNMI law) prior to the beginning of the transition period.

The total present value costs of Alternative 2 are projected to range from $10.6 million to $11.5 million depending on the discount rate applied. These costs are substantially higher than the costs estimated for the other three alternatives. The positive values represent a net cost to society, which is expected given that this alternative requires a petition for each beneficiary.

The costs presented in Table 1 do not include the statutorily required fee of $150 per beneficiary per year to fund vocational education programs in the CNMI. This fee is to be paid for each beneficiary seeking CW status. The costs also do not include the ACWIA fee required for H–1B visa applicants. Although these fees represent a cost to businesses or employer petitioners in the CNMI, we consider these fees as a transfer or redistribution of funds within the CNMI and U.S. economies and not as a component of the net costs of the rule to society. We note that from the perspective of the employers, when these fees are included, Alternatives 1, 3, and 4 are a net overall cost rather than benefit.

Ideally, we would quantify and monetize the benefits of the regulation and compare them to the costs. The intended benefits of the rule include improvements in national and homeland security and protection of human rights. First, implementation of the rule assures that the admission of nonimmigrants to the CNMI is consistent with existing Federal laws and practices intended to secure and control the borders of the United States and its territories. Second, the rule would help protect foreign workers in the CNMI from abuses such as human trafficking and other illicit activity.

Due to limitations in data and the difficulty associated with quantifying national and homeland security improvements, we describe the intended benefits of the regulation qualitatively. Moreover, under the assumptions outlined previously, because three of the four alternatives analyzed, including the chosen alternative (Alternative 1), are projected to result in net cost savings to society, the rule may produce a net overall quantifiable benefit to society. Assuming that the fees collected by the CNMI government in the baseline and by USCIS under each regulatory alternative equal the costs to the CNMI and U.S. Federal governments of administering their respective programs, the results of our analysis imply that the U.S. Federal government can more cost-effectively administer the program while also providing improved security benefits.

Notwithstanding the inestimable potential broader impacts of this regulation on the CNMI economy that would result if the availability of foreign labor is affected, the results of our analysis on the incremental societal costs of the associated visa or status fees indicate that Alternative 1 provides the most favorable combination of cost and stringency. While Alternative 2 might be considered more stringent because it requires a petition for each beneficiary, the costs are substantially higher than the other three alternatives. Alternative 3 is expected to achieve more cost savings than Alternative 1, but the 1-year status validity period under Alternative 1 facilitates USCIS's effective management of the number of grants of CW status issued at any given time and the statutory reduction on an annual basis to zero by the end of the transition period. Alternative 4 is also expected to achieve more cost savings than Alternative 1, but is considered less stringent because DHS has determined that requiring lawful status in the CNMI as a prerequisite for CW eligibility is the most efficient means to begin the Congressionally mandated drawdown of transitional workers to zero by the end of the transition period. Furthermore, to allow out-of-status workers in the CNMI to obtain CW status would encourage noncompliance with CNMI immigration law during the timeframe before the transition period effective date by removing the incentive for such workers with lawful status to maintain or reacquire such lawful status under CNMI law prior to the transition.

DHS and USCIS welcome comments on this analysis and the regulatory alternatives considered.

*C. Impacts to Small Entities*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), requires Federal agencies

to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. When an agency invokes the good cause exception under the Administrative Procedure Act (APA) to make changes effective through an interim final rule, the RFA does not require an agency to prepare a regulatory flexibility analysis. This rule makes changes for which notice and comment are not necessary, and, accordingly, DHS is not required to prepare a regulatory flexibility analysis.

However, DHS and USCIS have considered the impacts of this interim rule on small entities in the CNMI. A summary of the analysis is presented below. For further details regarding this analysis, please refer to the complete Regulatory Assessment that has been placed in the public docket for this rulemaking.

*(1) Why action by the agency is being considered:* USCIS is promulgating this regulation in response to legislation by Congress imposing Federal immigration law on the CNMI. Congressional intent in enacting this legislation is "to ensure that effective border control procedures are implemented and observed, and that national security and homeland security issues are properly addressed." Please refer to Section II above for further detail.

*(2) The objectives of, and legal basis for, the rule:* On May 8, 2008, President George W. Bush signed the CNRA into law, Public Law 110–229 (CNRA). Title VII, Subtitle A of the CNRA calls for the extension of U.S. immigration laws to the CNMI, with special provisions to allow for the orderly phasing-out of CNMI's nonresident contract worker program and the orderly phasing-in of Federal responsibilities over immigration in the CNMI. Congress directs USCIS to minimize the "potential adverse economic and fiscal effects of phasing-out" CNMI's nonresident contract worker program and maximizing CNMI's "potential for future economic and business growth." The objective of the CNMI-only transitional worker program is to provide for an orderly transition from the existing CNMI foreign worker permit system to the U.S. immigration system and to mitigate potential harm to the CNMI economy as employers adjust their hiring practices and foreign workers obtain nonimmigrant and immigrant visa classifications available under the INA. Please refer to Section II above for further detail.

*(3) The type and number of small entities to which the rule will apply:* We

assume all businesses in the CNMI employ foreign workers, except those businesses with no paid employees. The data on businesses by size show that over 80 percent of businesses in the CNMI have between 1 and 19 employees. We estimate there are approximately 1,000 businesses with 1 to 19 employees in the CNMI. The 2007 economic census of the CNMI shows that businesses with 10 to 19 employees had average revenues of just over $1 million that year (smaller businesses had even lower average revenues). According to the Small Business Administration's "Table of Small Business Size Standards Matched to North American Industry Classification System Codes," other than in crop production, businesses in the vast majority of industries are considered small if they have annual revenues less than $7 million or fewer than 50 employees. In many industries, the threshold is higher. In addition, an unknown portion of the approximately 177 businesses with 20 or more employees are likely to be small according to the SBA size standards.

The CNMI government also employs foreign workers. A small governmental jurisdiction is a government representing fewer than 50,000 constituents. Under this definition, the CNMI government is not considered small, as the population of the CNMI is approximately 66,000.

Information on non-profit organizations in the CNMI is largely non-existent or incomplete. USCIS believes, however, that like virtually all entities in the CNMI, these organizations likely employ foreign workers and would likely be considered small and would be affected by this rule.

*(4) Reporting, recordkeeping and other compliance requirements:*

The forms required by this rule are expected to be submitted on paper by employers. In our analysis, we assume employees in the job category "Management of companies and enterprises" will be completing and filing these forms, which require basic administrative and recordkeeping skills. The skills required to complete the new I–129CW form are essentially the same as the skills required to complete the necessary paperwork under the current CNMI permit program.

As described in the previous section on Executive Order 12866, DHS and USCIS considered four regulatory alternatives.

*Alternative 1 (the chosen alternative):* Only aliens lawfully present in the CNMI may qualify for CW status. An

employer petitioner can name more than one worker or "beneficiary" on a single Form I–129CW petition if the beneficiaries will be working in the same eligible occupational category, for the same period of time, and in the same location. CW status is valid for a period of 1 year.

*Alternative 2:* Same as Alternative 1, but an employer petitioner can name only one eligible beneficiary on each petition.

*Alternative 3:* Same as Alternative 1, but CW status is valid for a period of 2 years.

*Alternative 4:* Same as Alternative 1, but aliens lawfully present as well as aliens unlawfully present in the CNMI as of the beginning of the transition period (November 28, 2009) may qualify for CW status.

Note that in the analysis in the previous section, fees associated with CW status were considered intra-economy transfers and were thus not considered in the estimation of net costs or net benefits to society. In this analysis of small entities, however, these status fees and the $150 educational fee are considered explicitly because the fees are a direct cost a small entity will incur and a business's annual revenue and ability to hire workers will be directly impacted by these fees.

As estimated previously, businesses may experience costs in 2008 and 2009 to bring out-of-status workers into lawful CNMI status prior to the onset of the transition period (November 28, 2009) in order to avoid having to replace those workers. In 2010, businesses will obtain visas issued under the INA for eligible workers, and they will obtain CW status for the remaining eligible workers as well as their spouses and children. For the purposes of the cost analysis, we assume the INA-eligible workers will all qualify for H–1B visas (while this group may qualify for other INA classifications, we use the cost to petition for an H–1B visa because the costs for these visas are higher than for the other classifications that foreign workers may be eligible for). The H–1B visas will be renewed in 2013, while CW status will be renewed annually or biennially, depending on the regulatory alternative. Table 2 presents the annual estimable incremental costs (*i.e.,* the costs of CW status and INA visas minus the costs of CNMI permits had the rule not come into effect) for businesses of complying with the rule under the chosen alternative, Alternative 1.

Federal Register / Vol. 74, No. 206 / Tuesday, October 27, 2009 / Rules and Regulations

**55105**

TABLE 2—DISTRIBUTION OF NET PERMIT AND VISA COSTS BY BUSINESS SIZE, ALTERNATIVE 1—CHOSEN ALTERNATIVE
(UNDISCOUNTED, $M, 2009)

| Business size (employees) | May '08–Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| No paid employees | $0 | $0 | $0 | $0 | $0 | $0 |
| 1 to 4 | 0.02 | 0.41 | 0.03 | 0.03 | 0.18 | 0.02 |
| 5 to 9 | 0.04 | 0.45 | −0.13 | −0.14 | 0.09 | −0.15 |
| 10 to 19 | 0.07 | 0.79 | −0.24 | −0.24 | 0.16 | −0.26 |
| 20 or more | 0.17 | 2.4 | −0.86 | −0.88 | 0.80 | −0.93 |
| All businesses | 0.30 | 4.1 | −1.2 | −1.2 | 1.2 | −1.3 |

**Note:** Net permit and visa costs include the CW education fee and H–1B visa ACWIA fee.

The costs of Alternative 1, as experienced by businesses, are the highest in the first year of the transition period, when businesses obtain initial INA-eligible visas for their employees in addition to CW status and providing biometrics. In most years businesses will collectively save money compared to the baseline, as the CW status, including the education fee, are less expensive than the CNMI permits on a per-worker basis, largely because multiple beneficiaries may be included on a single I–129CW petition. However, the smallest businesses, those employing 1 to 4 workers, may experience positive costs in each year.

Alternative 2 requires businesses to file separate I–129CW petitions for each of their foreign workers (multiple beneficiaries are not permitted on a single petition). These costs, distributed by business size, are shown in Table 3.

TABLE 3—DISTRIBUTION OF NET PERMIT AND VISA COSTS BY BUSINESS SIZE, ALTERNATIVE 2 (UNDISCOUNTED, $M, 2009)

| Business size (employees) | May '08–Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| No paid employees | $0 | $0 | $0 | $0 | $0 | $0 |
| 1 to 4 | 0.02 | 0.69 | 0.31 | 0.31 | 0.46 | 0.30 |
| 5 to 9 | 0.04 | 1.1 | 0.48 | 0.47 | 0.70 | 0.46 |
| 10 to 19 | 0.07 | 1.9 | 0.84 | 0.83 | 1.2 | 0.81 |
| 20 or more | 0.17 | 5.4 | 2.1 | 2.1 | 3.8 | 2.1 |
| All businesses | 0.30 | 9.0 | 3.8 | 3.7 | 6.2 | 3.6 |

**Note:** Net permit and visa costs include the CW education fee and H–1B visa ACWIA fee.

The incremental costs of Alternative 2 are positive in every year, as the transitional worker program is more expensive than the CNMI permit process in the baseline in this case. Once again, businesses face the highest costs in 2010 due to the added expense of obtaining INA visas and providing biometrics.

Under Alternative 3, CW status is valid for two years. This analysis calculates costs as if businesses will be required to pay the education fee for those two years at the same time (i.e., businesses will pay the $320 I–129CW filing fee along with $300 for two years education fee at one time). The costs of visas under existing INA classifications remain the same. The costs of Alternative 3 are shown in Table 4.

TABLE 4—DISTRIBUTION OF NET PERMIT AND VISA COSTS BY BUSINESS SIZE, ALTERNATIVE 3 (UNDISCOUNTED, $M, 2009)

| Business size (employees) | May '08–Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| No paid employees | $0 | $0 | $0 | $0 | $0 | $0 |
| 1 to 4 | 0.02 | 0.59 | −0.37 | 0.20 | −0.22 | 0.02 |
| 5 to 9 | 0.04 | 0.72 | −0.57 | 0.12 | −0.34 | −0.15 |
| 10 to 19 | 0.07 | 1.3 | −1.0 | 0.21 | −0.60 | −0.26 |
| 20 or more | 0.17 | 3.7 | −2.6 | 0.28 | −0.84 | −0.93 |
| All businesses | 0.30 | 6.2 | −4.5 | 0.8 | −2.0 | −1.3 |

**Note:** Net permit and visa costs include the CW education fee and H–1B visa ACWIA fee.

Businesses experience positive costs in the years in which they pay CW status costs as well as payment of two years of education fees. In the alternate years, businesses save money by not obtaining CNMI permits for their workers. The net effect of these costs in comparison to Alternative 1 is a slight savings for businesses, as they spend half as much on I–129CW filing fees under that alternative.

Alternative 4 presents the same cost components and timing as Alternative 1 with one exception: Because out-of-status workers will be eligible for CW status, businesses have no incentive to bring those workers into status (under CNMI law) prior to the onset of the transition period. Therefore, the annual costs after the beginning of the transition period (for our cost analysis, we assume January 1, 2010), for the two alternatives are the same; only the costs

in 2008 and 2009 differ. The costs for Alternative 4 are listed in Table 5.

TABLE 5—DISTRIBUTION OF NET PERMIT AND VISA COSTS BY BUSINESS SIZE, ALTERNATIVE 4 (UNDISCOUNTED, $M, 2009)

| Business size (employees) | May '08–Dec '09 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| No paid employees | $0 | $0 | $0 | $0 | $0 | $0 |
| 1 to 4 | 0 | 0.41 | 0.03 | 0.03 | 0.18 | 0.02 |
| 5 to 9 | 0 | 0.45 | −0.13 | −0.13 | 0.09 | −0.15 |
| 10 to 19 | 0 | 0.79 | −0.24 | −0.24 | 0.16 | −0.26 |
| 20 or more | 0 | 2.4 | −0.86 | −0.86 | 0.80 | −0.93 |
| All businesses | 0 | 4.1 | −1.2 | −1.2 | 1.2 | −1.3 |

**Note:** Net permit and visa costs include the CW education fee and H–1B visa ACWIA fee.

Under all four alternatives, businesses experience the highest net positive costs in the first year of the transition period. Therefore, we will compare these 2010 costs to the annual revenues and payrolls for businesses of each size category. Table 6 lists the number of businesses in each size category along with the average payroll and average revenue of businesses in those size categories in 2010 dollars.

TABLE 6—AVERAGE PAYROLL AND REVENUE OF BUSINESSES

| Business size (employees) | Businesses | Average payroll ($M) | Average revenue ($M) |
|---|---|---|---|
| No paid employees | 61 | 0 | 0.096 |
| 1 to 4 | 476 | 0.034 | 0.17 |
| 5 to 9 | 244 | 0.096 | 0.66 |
| 10 to 19 | 210 | 0.17 | 1.0 |
| 20 or more | 200 | 1.0 | 4.8 |
| All businesses | 1,191 | 0.23 | 1.2 |

Average payrolls range from $34,000 per business (1 to 4 employees) to $1.0 million per business (20 or more employees). Average revenue also scales with the size of the business, from $96,000 for sole proprietorships to $4.8 million for businesses with 20 or more employees. For comparison, Table 7 presents the per-business incremental costs of each alternative and the ratio of these costs to the average payroll and revenue.

TABLE 7—ESTIMATED 2010 PERMIT AND VISA COSTS PER BUSINESS AS A PERCENTAGE OF PAYROLL AND REVENUE

| Business size (employees) | Cost/business ($) | Percent payroll | Percent revenue |
|---|---|---|---|
| Alternative 1 | | | |
| No paid employees | 0 | 0 | 0 |
| 1 to 4 | 869 | 2.6 | 0.52 |
| 5 to 9 | 1,832 | 1.9 | 0.28 |
| 10 to 19 | 3,750 | 2.2 | 0.37 |
| 20 or more | 12,230 | 1.3 | 0.26 |
| All businesses (average) | 3,438 | 1.5 | 0.29 |
| Alternative 2 | | | |
| No paid employees | 0 | 0 | 0 |
| 1 to 4 | 1,451 | 4.3 | 0.86 |
| 5 to 9 | 4,313 | 4.5 | 0.66 |
| 10 to 19 | 8,881 | 5.2 | 0.87 |
| 20 or more | 27,203 | 2.8 | 0.57 |
| All businesses (average) | 7,598 | 3.3 | 0.64 |
| Alternative 3 | | | |
| No paid employees | 0 | 0 | 0 |
| 1 to 4 | 1,241 | 3.7 | 0.74 |
| 5 to 9 | 2,938 | 3.0 | 0.45 |
| 10 to 19 | 6,028 | 3.5 | 0.59 |
| 20 or more | 18,291 | 1.9 | 0.38 |
| All businesses (average) | 5,232 | 2.3 | 0.44 |

TABLE 7—ESTIMATED 2010 PERMIT AND VISA COSTS PER BUSINESS AS A PERCENTAGE OF PAYROLL AND REVENUE—
Continued

| Business size (employees) | Cost/ business ($) | Percent payroll | Percent revenue |
|---|---|---|---|
| Alternative 4 | | | |
| No paid employees .................................................................................................. | 0 | 0 | 0 |
| 1 to 4 ..................................................................................................................... | 869 | 2.6 | 0.52 |
| 5 to 9 ..................................................................................................................... | 1,832 | 1.9 | 0.28 |
| 10 to 19 ................................................................................................................. | 3,750 | 2.2 | 0.37 |
| 20 or more ............................................................................................................. | 12,230 | 1.3 | 0.26 |
| All businesses (average) ........................................................................................ | 3,438 | 1.5 | 0.29 |

**Note:** Net permit and visa costs include the CW status education fee and H–1B visa ACWIA fee.

Under all four alternatives, the additional costs imposed by the rule in 2010 represent less than 0.9 percent of annual revenues. Compared to payroll, however, the impacts are about 5 to 7 times higher. Under Alternative 1 (the chosen alternative) businesses of all sizes experience increased labor costs of 1.3 to 2.6 percent on average, depending on the size of the business. Considering that the payroll costs presented in Table 6 do not include benefits, the actual percentage increase in labor costs for 2010 are actually smaller than reported in the exhibit. In light of these results, it does not appear that the change from CNMI permits to USCIS status represents a large impact on small businesses.

The analysis to this point has focused on the impact of replacing the CNMI foreign worker permits with INA visas and the CW status. This change does not appear to have a large economic impact on small businesses. However, the rule also establishes the intent of USCIS to reduce the number of grants of CW status on an annual basis to zero at the conclusion of the transition period, unless the transition period is extended by the U.S. Department of Labor. Reducing the number of grants of CW status may have a larger impact. In addition, the ineligibility of certain workers (*e.g.,* domestic household workers employed directly by private residents) may have a notable economic impact.

(5) *Federal rules that may duplicate, overlap or conflict with the interim rule:* In 1976, the CNMI negotiated political union with the United States, agreeing to the Covenant to Establish a Commonwealth of the Northern Mariana Islands (CNMI) in Political Union with the United States. Under the Covenant, United States citizenship was conferred on legally qualified CNMI residents, and Federal law generally applies to the CNMI, with the exception of the income tax system, and until recently, the Federal minimum wage and immigration laws. This rule, when finalized, supersedes existing CNMI immigration law.

(6) *Significant alternatives to the interim rule that accomplish the stated objectives of applicable statutes and that minimize any economic impact to small entities:* As described above, USCIS evaluated four regulatory alternatives to consider changes in the admission and filing requirements, including those that minimize the incremental cost burden to CNMI employers and businesses, including small entities. To address Congress' requirement that USCIS minimize "potential adverse economic and fiscal effects of phasing-out" CNMI's nonresident contract worker program, the rule allows for multiple beneficiaries per Form I–129CW, which, as shown above, represents a cost savings over the baseline and relative to Alternative 2, where a separate Form I–129CW is required for each worker. USCIS had considered alternatives that exempt small entities from this rule; however, such alternatives would not achieve the security objective of the CNRA, which is to establish Federal responsibility over immigration throughout the CNMI, and during the transition period, provide all eligible foreign workers a temporary status to continue work in the CNMI. While USCIS cannot exempt small entities from the requirements of the rule and meet the statutory objectives of the CNRA, USCIS may grant waivers from the Form I–129CW and biometric fees on a case-by-case basis for those applicants showing an inability to pay, which has the potential to minimize the impact of the rule on small entities.

In addition, we emphasize that it is the reduction in the number of grants of CW status that will have a potentially large impact on small entities; however, the interim rule does not prescribe a schedule for allocating CW status throughout the transition period.

In summary, because the rule affects all businesses employing foreign workers, it likely affects a notable number of small entities in every industry. Based on this analysis, USCIS does not believe the requirement that businesses obtain CW status or INA visas will have a large impact on a per-business basis because it will coincide with the end of the CNMI permit program. However, the impact of the reduction in grants of available status (and thus foreign workers) is less certain. DHS and USCIS welcome comments on this analysis.

*D. Unfunded Mandates Reform Act of 1995*

Title II of the Unfunded Mandate Reform Act of 1995 (UMRA) requires agencies to assess the effects of their regulatory actions on State, local, and tribal governments and the private sector if the rule will result in expenditures exceeding $100 million (adjusted for inflation) in any one year. We estimate that this rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year. Please refer to the section above on Executive Order 12866 for further details on the potential economic impacts of this rule.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**55108**    **Federal Register**/ Vol. 74, No. 206 / Tuesday, October 27, 2009 / Rules and Regulations

*F. Executive Order 12988 Civil Justice Reform*

This rule meets the applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a regulatory action. The collections of information encompassed within this rule have been submitted to the OMB for review in accordance with the Paperwork Reduction Act of 1995, 44 U.S.C. 3507. An agency may not conduct, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number assigned by OMB.

USCIS is requiring a new form, Form I–129CW, to collect the information required for an employer to petition for CW status on behalf of one or more beneficiaries. Since this is an interim rule, this information collection has been submitted and approved by OMB under the emergency review and clearance procedures covered under the PRA. During the first 60 days, USCIS is requesting comments on this information collection until December 28, 2009. When submitting comments on this information collection, your comments should address one or more of the following four points.

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

Overview of this Information Collection:

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection is necessary to determine whether a

petitioner and beneficiary meet the eligibility criteria, limitations and parameters for the CW–1 nonimmigrant program as required by or consistent with an interpretation of the applicable provisions of section 702(a) of the CNRA.

c. *Title of Form/Collection:* Petition for a Nonimmigrant Worker in the CNMI.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–129CW; U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals and businesses.

f. *An estimate of the total number of respondents:* 1,178 respondents.

g. *Number of Responses per Respondent:* 1.34. Responses per respondent reflect the assumption that most petitioners will have to file only one I–129CW, but some petitioners will have to file multiple forms. On average, this equals 1.34 responses per respondent.

h. *Total Annual Responses:* 1,580.

i. *Hours per Response:* 3.0 hours per response.

j. *Total Annual Reporting Burden:* 4,740.

Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden may be submitted to The Department of Homeland Security, USCIS, Chief, Regulatory Products Division, Clearance Office, 111 Massachusetts Avenue, Washington, DC 20529–2210.

Besides the creation of the new Form I–129CW, the information collection requirements contained in this rule have been cleared by OMB under the provisions of the Paperwork Reduction Act. 44 U.S.C. Chapter 35; 5 CFR Part 1320.

In addition, termination of the current CNMI worker program will result in employers petitioning for those employees under another visa under the INA. Termination of the CNMI worker program will increase the number of respondents submitting Form I–129, Petition for a Nonimmigrant Worker, OMB Control Number 1615–0009, and Form I–539, Application to Extend/ Change Nonimmigrant Status, OMB Control Number 1615–0003. Accordingly, DHS submitted Form OMB 83–C, Correction Worksheet, to OMB to increase the number of respondents submitting Form I–129 and Form I–539.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Employment, Foreign Officials, Health Professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

■ Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*), E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 2. Section 103.7 is amended by:
■ a. Adding the entry "I–129CW" in proper alpha/numeric sequence, in paragraph (b)(1); and
■ b. Revising paragraph (c)(5)(i).
The revisions and additions read as follows:

**§ 103.7   Fees.**

\*      \*      \*      \*      \*

(b) \* \* \*
(1) \* \* \*

\*      \*      \*      \*      \*

Form I–129CW. For an employer to petition for CW status on behalf of one or more beneficiaries—$320 plus a supplemental CNMI education funding fee of $150 per beneficiary per year. The CNMI education funding fee cannot be waived.

\*      \*      \*      \*      \*

(c) \* \* \*
(5) \* \* \*

(i) Biometrics; Form I–90; Form I–129CW; Form I–751; Form I–765; Form I–817; I–929; Form N–300; Form N–336; Form N–400; Form N–470; Form N–565; Form N–600; Form N–600K; and Form

I–290B and motions filed with U.S. Citizenship and Immigration Services relating to the specified forms in this paragraph (c); and

\*    \*    \*    \*    \*

## PART 214—NONIMMIGRANT CLASSES

■ 3. The authority citation for part 214 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Public Law 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; Title VII of Public Law 110–229; 8 CFR part 2.

■ 4. Section 214.2 is amended by adding paragraph (w) to read as follows:

**§ 214.2    Special requirements for admission, extension, and maintenance of status.**

\*    \*    \*    \*    \*

(w) *CNMI-Only Transitional Worker (CW–1)*

(1) *Definitions.* The following definitions apply to petitions for CW status for employment in the Commonwealth of the Northern Mariana Islands (the CNMI or the Commonwealth) filed under this section:

(i) *Doing business* means the regular, systematic, and continuous provision of goods or services by an employer as defined in this paragraph and does not include the mere presence of an agent or office of the employer in the CNMI.

(ii) *Employer* means a person, firm, corporation, contractor, or other association, or organization which:

(A) Engages a person to work within the CNMI; and

(B) Has or will have an employer-employee relationship with the CW–1 nonimmigrant being petitioned for.

(iii) *Employer-employee relationship* means that the employer may hire, pay, fire, supervise, or otherwise control the work of the employee.

(iv) *Lawfully present in the CNMI* means that the alien has lawfully been admitted to the CNMI under the immigration laws of the Commonwealth in a category other than short term visitor for pleasure or business (240(c), 703(A), 703(B), or 704(B) under CNMI classifications). With respect to any application for transitional worker status filed or adjudicated after the transition program effective date, lawfully present in the CNMI means that the alien:

(A) Is an alien described in section 6(e)(1) or (2) of Public Law 94–241, as

added by section 702(a) of Public Law 110–229, other than an alien described in section 6(e)(1) who was admitted to the CNMI as a short term visitor for pleasure or business (240(c), 703(A), 703(B), or 704(B) under CNMI classifications); or

(B) Was lawfully admitted to the CNMI under the immigration laws on or after the transition program effective date, other than an alien admitted as a visitor for business or pleasure (B–1 or B–2 or under any visa-free travel provision).

(v) *Legitimate business* means a real, active, and operating commercial or entrepreneurial undertaking which produces services or goods for profit, or is a governmental, charitable or other validly recognized nonprofit entity. The business must meet applicable legal requirements for doing business in the CNMI. A business will not be considered legitimate if it engages directly or indirectly in prostitution, trafficking in minors, or any other activity that is illegal under Federal or CNMI law. The Secretary will determine whether a business is legitimate.

(vi) *Minor child* means a child as defined in section 101(b)(1) of the Act who is under the age of eighteen years.

(vii) *Numerical limitation* means the maximum number of persons who may be granted CW–1 status in a given fiscal year or other period as determined by the Secretary, as follows:

(A) For the period beginning on November 28, 2009 and ending on September 30, 2010, the numerical limitation is 22,417.

(B) For each fiscal year beginning on October 1, 2010 until the end of the transition period, the numerical limitation shall be a number less than 22,417 that is determined by the Secretary and published via Notice in the **Federal Register**. The numerical limitation for any fiscal year shall be less than the number for the previous fiscal year, and shall be a number reasonably calculated in the Secretary's discretion to reduce the number of CW–1 nonimmigrants to zero by the end of the transition period.

(C) The Secretary may adjust the numerical limitation for a fiscal year or other period at her discretion at any time via Notice in the **Federal Register**, as long as such adjustment is consistent with paragraph (w)(1)(vii)(B) of this section.

(viii) *Occupational category* means those employment activities that the Secretary of Homeland Security has determined require alien workers to supplement the resident workforce and includes:

(A) Professional, technical, or management occupations;

(B) Clerical and sales occupations;

(C) Service occupations;

(D) Agricultural, fisheries, forestry, and related occupations;

(E) Processing occupations;

(F) Machine trade occupations;

(G) Benchwork occupations;

(H) Structural work occupations; and

(I) Miscellaneous occupations.

(ix) *Petition* means USCIS Form I–129CW, Petition for a Nonimmigrant Worker in the CNMI, a successor form, or other form, any supplemental information requested by USCIS, and additional evidence as prescribed by USCIS.

(x) *Transition period* means the period beginning on the transition program effective date and ending on December 31, 2014, unless the CNMI-only transitional worker program is extended by the Secretary of Labor.

(xi) *Transition program effective date* means November 28, 2009.

(xii) *United States worker* means a national of the United States, an alien lawfully admitted for permanent residence, or a national of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau who is eligible for nonimmigrant admission and is employment-authorized under the Compacts of Free Association between the United States and those nations.

(2) *Eligible aliens.* Subject to the numerical limitation, an alien may be classified as a CW–1 nonimmigrant if, during the transition period, the alien:

(i) Will enter or remain in the CNMI for the purpose of employment in the transition period in an occupational category as designated by the Secretary as requiring alien workers to supplement the resident workforce;

(ii) Is petitioned for by an employer;

(iii) Is not present in the United States, other than the CNMI;

(iv) If present in the CNMI, is lawfully present in the CNMI;

(v) Is not inadmissible to the United States as a nonimmigrant, except for an alien present in the CNMI who is described in section 212(a)(7)(B)(i)(II) of the Act (not in possession of nonimmigrant visa); and

(vi) Is ineligible for status in a nonimmigrant worker classification under section 101(a)(15) of the Act, including but not limited to, section 101(a)(15)(H) of the Act.

(3) *Derivative beneficiaries—CW–2 nonimmigrant classification.* The spouse or minor child of a CW–1 nonimmigrant may accompany or follow the alien as a CW–2 nonimmigrant if the alien:

(i) Is not present in the United States, other than the CNMI;

(ii) If present in the CNMI, is lawfully present in the CNMI; and

(iii) Is not inadmissible to the United States as a nonimmigrant, except for an alien present in the CNMI who is described in section 212(a)(7)(B) of the Act (not in possession of nonimmigrant visa).

(4) *Eligible employers.* To be eligible to petition for a CW–1 nonimmigrant worker, an employer must:

(i) Be engaged in legitimate business;

(ii) Consider all available United States workers for the positions being filled by the CW–1 worker;

(iii) Offer terms and conditions of employment which are consistent with the nature of the occupation, activity, and industry in the CNMI; and

(iv) Comply with all Federal and Commonwealth requirements relating to employment, including but not limited to nondiscrimination, occupational safety, and minimum wage requirements.

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education fee of $150 per beneficiary per year. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with USCIS.

(6) *Accompanying evidence.* A petition must be accompanied by:

(i) Evidence demonstrating the petitioner meets the definition of eligible employer in this section.

(ii) An attestation by the petitioner certified as true and accurate by an appropriate official of the petitioner, of the following:

(A) Qualified United States workers are not available to fill the position;

(B) The employer is doing business as defined in 8 CFR 214.2(w)(1)(i);

(C) The employer is a legitimate business as defined in 8 CFR 214.2(w)(1)(v);

(D) The beneficiary meets the qualifications for the position;

(E) The beneficiary, if present in the CNMI, is lawfully present in the CNMI;

(F) The position is not temporary or seasonal employment, and the petitioner does not reasonably believe it to qualify for any other nonimmigrant worker classification; and

(G) The position falls within the list of occupational categories designated by the Secretary.

(iii) Evidence of licensure if an occupation requires a Commonwealth or local license for an individual to fully perform the duties of the occupation.

Categories of valid licensure for CW–1 classification are:

(A) *Licensure.* An alien seeking CW–1 classification in that occupation must have that license prior to approval of the petition to be found qualified to enter the CNMI and immediately engage in employment in the occupation.

(B) *Temporary licensure.* If a temporary license is available and allowed for the occupation with a temporary license, USCIS may grant the petition at its discretion after considering the duties performed, the degree of supervision received, and any limitations placed on the alien by the employer and/or pursuant to the temporary license.

(C) *Duties without licensure.* If the CNMI allows an individual to fully practice the occupation that usually requires a license without a license under the supervision of licensed senior or supervisory personnel in that occupation, USCIS may grant CW–1 status at its discretion after considering the duties performed, the degree of supervision received, and any limitations placed on the alien if the facts demonstrate that the alien under supervision could fully perform the duties of the occupation.

(7) *Change of employers.* An unauthorized change of employment to a new employer will constitute a failure to maintain status within the meaning of section 237(a)(1)(C)(i) of the Act. A CW–1 nonimmigrant may change employers if:

(i) The prospective new employer files a petition requesting the CW–1, and

(ii) An extension of the alien's stay is requested if necessary for the validity period of the petition.

(8) *Amended or new petition.* If there are any material changes in the terms and conditions of employment, the petitioner must file an amended or new petition to reflect the changes.

(9) *Multiple beneficiaries.* A petitioning employer may include more than one beneficiary in a CW–1 petition if the beneficiaries will be working in the same occupational category, for the same period of time, and in the same location.

(10) *Named beneficiaries.* The petition must include the name of the beneficiary and other required information, as indicated in the form instructions, at the time of filing. Unnamed beneficiaries will not be permitted.

(11) *Early termination.* The petitioning employer must pay the reasonable cost of return transportation of the alien to the alien's last place of foreign residence if the alien is

dismissed from employment for any reason by the employer before the end of the period of authorized admission.

(12) *Approval.* USCIS will consider all the evidence submitted and such other evidence required in the form instructions to adjudicate the petition. USCIS will notify the petitioner of the approval of the petition on Form I–797, Notice of Action, or in another form as USCIS may prescribe:

(i) The approval notice will include the classification and name of the beneficiary or beneficiaries and the petition's period of validity. A petition for more than one beneficiary may be approved in whole or in part.

(ii) The petition may not be filed or approved earlier than six months before the date of actual need for the beneficiary's services. USCIS may in its discretion permit petitions to be filed and take other actions under this paragraph prior to the transition program effective date, but in no case will USCIS grant CW–1 status or authorize the admission of any alien to the CNMI prior to such date.

(13) *Petition validity.* A beneficiary will be admitted to the CNMI for the validity period of the petition, plus up to 10 days before the validity period begins and 10 days after the validity period ends. The beneficiary may not work except during the validity period of the petition. No petition shall authorize admission as a CW–1 nonimmigrant before the transition period effective date.

(14) *Where to apply.* The beneficiary, eligible spouse and minor children may:

(i) Upon petition approval, apply for a visa at a U.S. consulate authorizing admission in CW–1 or CW–2 status, as appropriate, at a port of entry in the CNMI on or after the transition program effective date; or

(ii) If present in the CNMI, apply for classification as a CW–1 or CW–2 nonimmigrant by filing Form I–129CW (or such alternative form as USCIS may designate) with USCIS. An alien applying for CW–1 or CW–2 status is eligible for a waiver of the fee for Form I–129CW based upon inability to pay as provided by 8 CFR 103.7(c)(1).

(15) *Biometrics.* USCIS shall require a beneficiary initially applying for CW–1 or CW–2 status to submit biometric information if the beneficiary is present in the CNMI. A beneficiary present in the CNMI must pay or obtain a waiver of the biometric service fee described in 8 CFR 103.7(b)(1).

(16) *Period of admission.* (i) A CW–1 nonimmigrant will be admitted for an initial period of one year. A CW–2 spouse will be admitted for the same period as the principal alien. A CW–2

minor child will be admitted for the same period as the principal alien, but such admission shall not extend beyond the child's 18th birthday.

(ii) The temporary departure from the CNMI of the CW–1 nonimmigrant will not affect the derivative status of the CW–2 spouse and minor children, provided the familial relationship continues to exist and the principal remains eligible for admission as a CW–1 nonimmigrant.

(17) *Extension of visa petition validity and extension of stay.* (i) The petitioner may request an extension of an employee's CW–1 nonimmigrant status by filing a new petition and accompanying evidence as described in 8 CFR 214.2(w)(6)(ii).

(ii) A request for a petition extension may be filed only if the validity of the original petition has not expired.

(iii) Extensions of CW–1 status may be granted for periods of 1 year until the end of the transition period, subject to the numerical limitation.

(iv) To qualify for an extension of stay, the petitioner must demonstrate that the beneficiary or beneficiaries:

(A) Continuously maintained the terms and conditions of CW–1 status; and

(B) Remains admissible to the United States; and

(C) Remains eligible for CW–1 classification.

(v) The derivative CW–2 nonimmigrant may file an application for extension of nonimmigrant stay on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status extension may not be approved until approval of the CW–1 extension petition.

(18) *Change or adjustment of status.* A CW–1 or CW–2 nonimmigrant can apply to change nonimmigrant status under section 248 of the Act or apply for adjustment of status under section 245 of the Act, if otherwise eligible. During the transition period, CW–1 or CW–2 nonimmigrants may be petitioned for or may apply for any nonimmigrant or immigrant visa classification for which they may qualify.

(19) *Effect of filing an application for or approval of a permanent labor certification, preference petition, or filing of an application for adjustment of status on CW–1 or CW–2 classification.* An alien may legitimately come to the CNMI for a temporary period as a CW–1 or CW–2 nonimmigrant and, at the same time, lawfully seek to become a lawful permanent resident of the United States provided he or she intends to depart the CNMI voluntarily at the end of the period of authorized stay. The filing of an application for or approval of a permanent labor certification or an immigrant visa preference petition, the filing of an application for adjustment of status, or the lack of residence abroad will not be the basis for denying:

(i) A CW–1 petition filed on behalf of the alien;

(ii) A request to extend a CW–1 status pursuant to a petition previously filed on behalf of the alien; or

(iii) An application for admission as a CW–1 or CW–2 nonimmigrant.

(20) *Rejection.* USCIS may reject an employer's petition for new or extended CW–1 status if the numerical limitation has been met. In that case, the petition and accompanying fee will be rejected and returned with the notice that numbers are unavailable for the particular nonimmigrant classification. The beneficiary's application for admission based upon an approved petition will not be rejected based upon the numerical limitation.

(21) *Denial.* The ultimate decision to grant or deny CW–1 or CW–2 status is a discretionary determination, and the petition or the application may be denied for failure of the petitioner or the applicant to demonstrate eligibility or for other good cause. The denial of a CW–1 petition may be appealed to the USCIS Administrative Appeals Office. The denial of a Form I–539 application may not be appealed.

(22) *Terms and conditions of CW Nonimmigrant status.* (i) *Geographical limitations.* CW–1 and CW–2 statuses are only applicable in the CNMI. Entry, employment and residence in the rest of the United States (including Guam) require the appropriate visa or visa waiver eligibility. An alien with CW–1 or CW–2 status who enters or attempts to enter, travels or attempts to travel to any other part of the United States without the appropriate visa or visa waiver eligibility, or who violates conditions of nonimmigrant stay applicable to any such authorized status in any other part of the United States, will be deemed to have violated CW–1 or CW–2 status.

(ii) *Re-entry.* An alien with CW–1 or CW–2 status who departs the CNMI will require a CW–1 or CW–2 or other appropriate visa to be re-admitted to the CNMI.

(iii) *Employment authorization.* An alien with CW–1 nonimmigrant status is only authorized for employment in the CNMI for the petitioning employer. An alien with CW–2 status is not authorized to be employed.

(23) *Expiration of transition period.* CW–1 status expires at the end of the transition period. CW–2 nonimmigrant status expires when the related CW–1 status expires or on a CW–2 minor child's 18th birthday, if sooner, or if the alien violates his or her status. No alien will be eligible for admission to the CNMI in CW–1 or CW–2 status, and no CW–1 or CW–2 visa will be valid for travel to the CNMI, after the transition period.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

■ 6. Section 274a.12 is amended by adding and reserving paragraph (b)(22), and adding paragraph (b)(23), to read as follows:

### § 274a.12 Classes of aliens authorized to accept employment.

\* \* \* \* \*

(b) \* \* \*

(23) A Commonwealth of the Northern Mariana Islands transitional worker (CW–1) pursuant to 8 CFR 214.2(w). An alien in this status may be employed only in the CNMI during the transition period and only by the petitioner through whom the status was obtained.

\* \* \* \* \*

## PART 299—IMMIGRATION FORMS

■ 7. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103; 8 CFR part 2.

■ 8. Section 299.1 is amended in the table by adding Form "I–129CW" to the list of prescribed forms in proper alpha/numeric sequence, to read as follows:

### § 299.1 Prescribed forms.

\* \* \* \* \*

| Form No. | Edition date | Title |
|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| I–129CW ................................................ | 10–22–09 | Petition for a CNMI-Only Nonimmigrant Transitional Worker. |

| Form No. | Edition date | Title |
|----------|--------------|-------|
| * | * | * | * | * | * | * |

■ 9. Section 299.5 is amended in the table by adding the Form "I–129CW" in proper alpha/numeric sequence, to read as follows:

**§ 299.5    Display of control number.**

* * * * *

| Form No. | Form title | Currently assigned OMB control no. |
|----------|-----------|-----------------------------------|
| * | * | * | * | * | * | * |
| I–129CW ................................................................. | Petition for a CNMI-Only Nonimmigrant Transitional Worker ........................... | 1615–0111 |
| * | * | * | * | * | * | * |

**Janet Napolitano,**
*Secretary.*
[FR Doc. E9–25808 Filed 10–26–09; 8:45 am]
**BILLING CODE 9111–97–P**

---

# FARM CREDIT ADMINISTRATION

**12 CFR Part 604**

**RIN 3052–AC58**

**Farm Credit Administration Board Meetings; Sunshine Act; Effective Date**

**AGENCY:** Farm Credit Administration.

**ACTION:** Notice of effective date.

**SUMMARY:** The Farm Credit Administration (FCA or Agency), through the FCA Board (Board), issued a direct final rule under part 604 on August 31, 2009 (74 FR 44727) amending FCA's regulations on meeting announcements to provide greater flexibility to the FCA Board in scheduling meetings. In accordance with 12 U.S.C. 2252, the effective date of the final rule is 30 days from the date of publication in the **Federal Register** during which either or both Houses of Congress are in session. Based on the records of the sessions of Congress, the effective date of the regulations is October 22, 2009.

**DATES:** *Effective Date:* Under the authority of 12 U.S.C. 2252, the regulation amending 12 CFR part 604 published on August 31, 2009 (74 FR 44727) is effective October 22, 2009.

**FOR FURTHER INFORMATION CONTACT:**
Michael Wilson, Policy Analyst, Office of Regulatory Policy, Farm Credit Administration, McLean, Virginia 22102–5090, (703) 883–4498, TTY (703) 883–4434; or
Mary Alice Donner, Senior Attorney, Office of General Counsel, Farm Credit Administration, McLean,

Virginia 22102–5090, (703) 883–4020, TTY (703) 883–4020.

(12 U.S.C. 2252(a)(9) and (10))

Dated: October 22, 2009.
**Roland E. Smith,**
*Secretary, Farm Credit Administration Board.*
[FR Doc. E9–25853 Filed 10–26–09; 8:45 am]
**BILLING CODE 6705–01–P**

---

# DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2008–0979; Directorate Identifier 2008–NM–079–AD; Amendment 39–16051; AD 2009–21–12]**

**RIN 2120–AA64**

**Airworthiness Directives; Airbus Model A300–600 Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for the products listed above. This AD results from mandatory continuing airworthiness information (MCAI) originated by an aviation authority of another country to identify and correct an unsafe condition on an aviation product. The MCAI describes the unsafe condition as:

Further to initial qualification tests of the spoiler actuators currently installed in position No. 3 to 7 on A300–600 and A300–600ST aircraft fleet, a life limit [of 55,750 flight hours] has been defined by the actuator manufacturer. Initially, this life limit had no repercussions, as it was situated well beyond the initial Design Service Goal (DSG) of the aircraft. However, due to the Extended

Service Goal (ESG) activities, the spoiler actuator life limit can be reached in service, and therefore the spoiler actuators must be replaced before exceeding this limit.

In order to mitigate the risk to have aircraft on which the three hydraulic circuits would be impacted by affected spoiler actuators, which could result in the loss of controllability of the aircraft, this Airworthiness Directive (AD) requires actions to ensure that at least the level of safety of one hydraulic circuit will be restored within an acceptable timeframe.

* * * * *

We are issuing this AD to require actions to correct the unsafe condition on these products.

**DATES:** This AD becomes effective December 1, 2009.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of December 1, 2009.

**ADDRESSES:** You may examine the AD docket on the Internet at *http://www.regulations.gov* or in person at the U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Dan Rodina, Aerospace Engineer, International Branch, ANM–116, Transport Airplane Directorate, FAA, 1601 Lind Avenue, SW., Renton, Washington 98057–3356; telephone (425) 227–2125; fax (425) 227–1149.

**SUPPLEMENTARY INFORMATION:**

## Discussion

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 to include an AD that would apply to the specified products. That NPRM was published in the **Federal Register** on September 17, 2008 (73 FR 53768). That NPRM proposed to correct

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 204 and 216**

**[CIS No. 2555–14; DHS Docket No. USCIS–2016–0006]**

**RIN 1615–AC07**

## EB–5 Immigrant Investor Program Modernization

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations governing the employment-based, fifth preference (EB–5) immigrant investor classification and associated regional centers to reflect statutory changes and modernize the EB–5 program. In general, under the EB–5 program, individuals are eligible to apply for lawful permanent residence in the United States if they make the necessary investment in a commercial enterprise in the United States and create or, in certain circumstances, preserve 10 full-time jobs for qualified United States workers. This rule provides priority date retention to certain EB–5 investors, increases the required minimum investment amounts, reforms targeted employment area designations, and clarifies USCIS procedures for the removal of conditions on permanent residence. DHS is issuing this rule to codify existing policies and change certain aspects of the EB–5 program in need of reform.

**DATES:** This final rule is effective November 21, 2019.

**FOR FURTHER INFORMATION CONTACT:** Edie C. Pearson, Policy Branch Chief, Immigrant Investor Program Office, U.S. Citizenship and Immigration Services, Department of Homeland Security, 131 M Street NE, 3rd Floor, Washington, DC 20529; Telephone (202) 357–9350.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  1. Priority Date Retention
  2. Increases to the Investment Amounts
  3. TEA Designations
  4. Removal of Conditions
  5. Miscellaneous Changes
  D. Summary of Costs and Benefits
  E. Effective Date
  F. Implementation
II. Background
  A. The EB–5 Program
  B. The Regional Center Program
  C. EB–5 Immigrant Visa Process
  D. Final Rule
III. Response to Public Comments on the Proposed Rule
  A. Need for Rulemaking and Regulatory Process
  B. Priority Date Retention
  1. Proposed Standards for Retaining a Priority Date
  2. Other Comments on Priority Date Retention
  C. Increases to the Investment Amounts
  1. Increase to the Standard Minimum Investment Amount
  2. Use of CPI–U
  3. Adjustments Every Five Years Tied to CPI–U
  4. Implementation of the Increase in Investment Amount
  5. Increase to the TEA Minimum Investment Amount
  6. Investment Level Differential Between Standard Investment Amount and TEA Investment Amount
  D. Revisions to the Targeted Employment Area (TEA) Designation Process
  1. Standards Applicable to the Designation of a TEA
  2. Proposal To Eliminate State Designation of TEAs
  3. Other Comments on Proposal To Change to Special Designation of High Unemployment Area
  4. Other Comments on the TEA Designation Process
  E. Technical Changes
  1. Separate Filings for Derivatives
  2. Equity Holders
  F. Other Comments on the Rule
  1. Processing Times
  2. Visa Backlogs
  3. Timing of the Rule
  4. Material Change
  5. Comments Outside the Scope of This Rulemaking
  G. Public Comments and Responses on Statutory and Regulatory Requirements
  1. Data, Estimates, and Assumptions Used (Executive Orders 12866 and 13563)
  2. Costs (Executive Orders 12866 and 13563)
  3. Other Impacts (Executive Orders 12866 and 13563)
  4. Other Comments on the Regulatory Impact Analysis (Executive Orders 12866 and 13563)
  5. Comment on Unfunded Mandates Reform Act (UMRA)
IV. Statutory and Regulatory Requirements
  A. Executive Orders 12866 (Regulatory Planning and Review), 13563 (Improving Regulation and Regulatory Review), and 13771 (Reducing Regulation and Controlling Regulatory Costs)
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Regulatory Flexibility Act
  1. Industry Classifications/NAICS Codes To Classify Regional Centers
  2. Industry Classifications/NAICS Codes To Classify NCEs
  3. Sources of Revenue for RCs and NCEs
  4. Other Comments on the RFA
  D. Unfunded Mandates Reform Act of 1995
  E. Executive Order 13132
  F. Executive Order 12988
  G. National Environmental Policy Act
  H. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

DHS is updating its regulations governing EB–5 immigrant investors and regional centers to reflect statutory changes and codify existing policies. This final rule also changes areas of the EB–5 program in need of reform.

### B. Legal Authority

The Secretary of Homeland Security's authority for this final rule can be found in various provisions of the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, as well as the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Public Law 102–395, 106 Stat. 1828; the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, 116 Stat. 1758; and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.* General authority for issuing this final rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws, including by establishing such regulations as the Secretary deems necessary to carry out her authority; section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), which establishes that a primary mission of DHS is to ensure that the overall economic security of the United States is not diminished by the Department's efforts, activities, and programs aimed at securing the homeland; and section 102 of the HSA, 6 U.S.C. 112, which vests all of the functions of DHS in the Secretary.

The aforementioned authorities for this final rule include:

• Section 203(b)(5) of the INA, 8 U.S.C. 1153(b)(5), which makes visas available to immigrants investing in new commercial enterprises in the United States that will benefit the U.S. economy and create full-time employment for not fewer than 10 United States workers.

• Section 204(a)(1)(H) of the INA, 8 U.S.C. 1154(a)(1)(H), which requires individuals to file petitions with DHS when seeking classification under section 203(b)(5).

• Section 216A of the INA, 8 U.S.C. 1186b, which places conditions on permanent residence obtained under section 203(b)(5) and authorizes the Secretary to remove such conditions for immigrant investors who have met the applicable investment requirements, sustained such investment, and

AR_001945

otherwise conformed to the requirements of sections 203(b)(5) and 216A.

• Section 610 of Public Law 102–395, 8 U.S.C. 1153 note, as amended, which created the Immigrant Investor Pilot Program (the ''Regional Center Program''), authorizing the designation of regional centers for the promotion of economic growth, and which authorizes the Secretary to set aside visas authorized under section 203(b)(5) of the INA for individuals who invest in regional centers.

*C. Summary of the Final Rule Provisions*

DHS carefully considered the public comments received and this final rule adopts, with appropriate changes, the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the Federal Register on January 13, 2017. *See EB–5 Immigrant Investor Program Modernization; Proposed Rule,* 82 FR 4738. This final rule also relies on all of the justifications articulated in the NPRM, except as reflected below.

This rule makes the following changes as compared to the NPRM:

• The rule clarifies that the priority date of a petition for classification as an investor is the date the petition is properly filed.

• The rule clarifies that a petitioner with multiple approved immigrant petitions for classification as an investor is entitled to the earliest qualifying priority date;

• The rule retains the 50 percent minimum investment differential between a targeted employment area (TEA) and a non-TEA instead of changing the differential to 25 percent as proposed, thereby increasing the minimum investment amount in a TEA from $500,000 to $900,000 (rather than $1.35 million, as DHS initially proposed);

• The rule makes a technical correction to the inflation adjustment formula for the standard minimum investment amount and the high employment area investment amount, such that future inflation adjustments will be based on the initial investment amount set by Congress in 1990, rather than on the most recent inflation adjustment. Thus, for instance, the next inflation adjustment will be based on the initial minimum investment amount of $1,000,000 in 1990, rather than this rule's minimum investment amount of $1,800,000, which is a rounded figure. This change better implements the intent of the proposed rule; it ensures that future inflation adjustments more accurately track inflation since 1990,

rather than being based on rounded figures.

• The rule modifies the original proposal that any city or town with a population of 20,000 or more may qualify as a TEA, to provide that only cities and towns with a population of 20,000 or more *outside* of metropolitan statistical areas (MSAs) may qualify as a TEA.

• The rule modifies the application of the rule, such that amendments or supplements to any offering necessary to maintain compliance with applicable securities laws based upon the changes in this rulemaking will not independently result in denial or revocation of a petition, provided the petition meets certain criteria.

• The rule also makes other minor non-substantive and clarifying changes.

This final rule makes the following major revisions to the EB–5 program regulations:

1. Priority Date Retention

The final rule authorizes certain EB–5 petitioners to retain the priority date [1] of an approved EB–5 immigrant petition for use in connection with any subsequent EB–5 immigrant petition.[2] *See* final 8 CFR 204.6(d). Petitioners with approved immigrant petitions might need to file new petitions due to circumstances beyond their control (for instance, DHS might have terminated a regional center associated with the original petition), or might choose to do so for other reasons (for instance, due to business conditions a petitioner may seek to materially change aspects of his or her qualifying investment). This rule generally allows EB–5 petitioners to retain the priority date of a previously approved petition to avoid delays on immigrant visa processing associated with loss of a priority date. DHS believes that priority date retention may become increasingly important due to the strong possibility that the EB–5 category will remain oversubscribed for the foreseeable future.

In the final rule, DHS amends the originally proposed regulatory text by defining the term ''priority date'' to mean the date that the petition is properly filed. *See* final 8 CFR 204.6(d). DHS inadvertently left this definition out of the NPRM's proposed regulatory text, *see* 82 FR 4738, even though this definition is in the current regulation,

*see* 8 CFR 204.6(d) and acknowledged in the NPRM preamble, *see* 82 FR 4738, 4739 n. 1 (''An EB–5 immigrant petition's priority date is normally the date on which the petition was properly filed. In general, when demand exceeds supply for a particular visa category, an earlier priority date is more advantageous than a later one.''). This change is for clarity.

DHS also amends the originally proposed regulatory text by changing ''approved EB–5 immigrant petition'' to ''immigrant petition approved for classification as an investor, including immigrant petitions whose approval was revoked on grounds other than those set forth below,'' and also ''approved petition'' to ''immigrant petition approved for classification as an investor.'' The purpose of these revisions is to clarify that an investor may retain a priority date from petitions that had been approved but have since been revoked on grounds not specifically excepted in the provision. DHS further amends the originally proposed regulatory text by changing ''based upon that approved petition'' to ''using the priority date of the earlier-approved petition.'' This revision makes it clear that once a petitioner uses that approved petition's priority date to obtain conditional permanent residence, that priority date is no longer available for use on any later-filed petition.

Last, DHS amends the originally proposed regulatory text by adding the sentence: ''In the event that the alien is the petitioner of multiple immigrant petitions approved for classification as an investor, the alien shall be entitled to the earliest qualifying priority date.'' This sentence was added to mirror a similar sentence at 8 CFR 204.5(e) pertaining to other employment-based categories, and clarifies which date applies should an investor have multiple approved petitions.

2. Increases to the Investment Amounts

Pursuant to 8 U.S.C. 1153(b)(5)(C), DHS consulted with the Departments of State and Labor [3] to increase the minimum investment amounts for all new EB–5 petitioners in this final rule. *See* final 8 CFR 204.6(f). The increase will ensure that program requirements reflect the present-day dollar value of the investment amounts established by Congress in 1990. Specifically, consistent with the NPRM, the rule increases the standard minimum investment amount, which also applies to high employment areas, from $1

---

[1] An EB–5 immigrant petition's priority date is the date on which the petition was properly filed. In general, when demand exceeds supply for a particular visa category, an earlier priority date is more advantageous than a later one.

[2] This is subject to conditions and limitations described in more detail elsewhere in this rule.

[3] DHS includes in the docket for this rulemaking a letter from each department detailing the consultation.

million to $1.8 million. Final 8 CFR 204.6(f)(1), (3). This change represents an adjustment for inflation from 1990 to 2015 as measured by the unadjusted Consumer Price Index for All Urban Consumers (CPI–U), an economic indicator that tracks the prices of goods and services in the United States.[4] This rule also makes a technical correction to the inflation adjustment formula, so that future inflation adjustments will be based on the initial investment amount set by Congress in 1990, rather than on the most recent inflation adjustment.

For investors seeking to invest in a new commercial enterprise that will be principally doing business in a TEA, the proposed rule would have decreased the differential between TEA and non-TEA minimum investment amounts to 25 percent, thereby increasing the TEA minimum investment amount to $1.35 million, which is 75 percent of the increased standard minimum investment amount. However, based on a review of the comments, the final rule will retain the 50 percent differential, and only increase the minimum investment amount from $500,000 to $900,000. Final 8 CFR 204.6(f)(2).

In addition, the final rule sets the schedule for regular CPI–U-based adjustments in the standard minimum investment amount, and conforming adjustments to the TEA minimum investment amount, every 5 years, beginning 5 years from the effective date of these regulations.

### 3. TEA Designations

Congress authorized DHS to set a different minimum investment amount for investments made in TEAs, or "targeted employment areas" (*i.e.,* rural areas and areas of high unemployment). *See* INA section 203(b)(5)(C)(ii), 8 U.S.C. 1153(b)(5)(C)(ii). The final rule reforms the TEA designation process to ensure consistency in TEA adjudications and better ensure that TEA designations more closely adhere to congressional intent. Specifically, the final rule eliminates the ability of a state to designate certain geographic and political subdivisions as high unemployment areas; instead, DHS will make such designations directly, using standards described in more detail elsewhere in this final rule. *See* final 8 CFR 204.6(i). DHS believes these changes will help address inconsistencies between and within states in designating high unemployment areas, and better ensure that the reduced investment threshold is

reserved for areas experiencing sufficiently high levels of unemployment, as Congress intended.

DHS is making three changes from the NPRM, with respect to TEA designations. First, DHS is modifying its proposal on high unemployment areas to include only cities and towns with a population of 20,000 or more *outside of MSAs* as a specific and separate area that may qualify as a TEA. *See* final 8 CFR 204.6(j)(6)(ii)(A). By contrast, the NPRM proposed to allow any city or town with high unemployment and a population of 20,000 or more to qualify as a TEA, regardless of whether located within an MSA. Under the current regulatory scheme, TEA designations are not available at the city or town level, unless a state designates the city or town as a high unemployment area and provides evidence of such designation to a prospective EB–5 investor for submission with the Form I–526. *See* proposed 8 CFR 204.6(j)(6)(ii)(A). DHS recognizes the proposal was inadvertently over-inclusive because DHS intended the proposal to provide non-rural cities and towns located outside of MSAs additional methods to qualify as a TEA, but the proposal would have allowed cities and towns with high unemployment and a population of 20,000 or more located within MSAs to qualify. DHS did not necessarily intend to permit cities and towns within MSAs to qualify or to create any new distinctions between cities and towns of various populations within MSAs. The final rule modifies the proposal to include only cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that may qualify as a TEA based on high unemployment. *See* final 8 CFR 204.6(j)(6)(ii)(A).

Second, DHS is finalizing a technical change to 8 CFR 204.6(i) and (j)(6)(B) by removing the mention of "geographic and political subdivisions" for special designations. Because DHS proposed and is finalizing the census tract process for special designations, references to other subdivisions are no longer required.

Third, DHS is making an additional technical change to the description of special designation TEAs at 8 CFR 204.6(i) proposed in the NPRM, replacing "contiguous" as it is used to describe additional census tracts that can be added to the census tract(s) in which the NCE is principally doing business, with "directly adjacent." This technical change was made to mirror the description of special designation TEAs elsewhere in the rule and to minimize confusion to the public, as the term

"contiguous" could be read to include census tracts beyond those directly adjacent to the census tract(s) in which the NCE is principally doing business.

### 4. Removal of Conditions

The final rule revises the regulations to clarify that derivative family members must file their own petitions to remove conditions on their permanent residence when they are not included in a petition to remove conditions filed by the principal investor. *See* final 8 CFR 216.6(a)(1)(ii). In addition, the rule improves the adjudication process for removing conditions by providing flexibility in interview locations and updates the regulation to conform to the current process for issuing permanent resident cards. *See generally* final 8 CFR 216.6.

### 5. Miscellaneous Changes

The final rule updates the regulations to reflect miscellaneous statutory changes made since DHS first published the regulation in 1991 and clarifies definitions of key terms for the program.[5] By aligning DHS regulations with statutory changes and defining key terms, the rule provides greater certainty regarding the eligibility criteria for investors and their family members.

This final rule will apply to petitioners who file on or after the effective date. To respond to concerns regarding the potential effect of this rule on existing petitioners, DHS has clarified in the final regulatory text that DHS will not deny a petition filed prior to this rule's effective date (or revoke an approved petition) based solely on the fact that the underlying investment offerings have been amended or supplemented as a result of this rulemaking to maintain compliance with applicable securities laws. *See* final 8 CFR 204.6(n). This addresses situations in which, for instance, an investor is actively in the process of investing into an ongoing offering and filed a Form I–526 petition that is pending on the effective date of this final rule, but the documents for the offering need to be modified to ensure compliance with applicable securities laws because of the increase to the minimum investment amounts resulting from this rulemaking DHS provides further detail on this provision below.

---

[4] *See Bureau of Labor Statistics*, CPI–U Inflation Calculator, *https://www.bls.gov/data/inflation_calculator.htm.*

[5] *See* final 8 CFR 216.6(a)(4)(i) and (c)(1)(i). DHS proposed this specific change to remove references to the requirement that immigrant entrepreneurs establish a new commercial enterprise, because the requirement was removed by the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, 116 Stat. 1758. 82 FR at 4751. However, this change was inadvertently left out of the proposed regulatory text. This final rule reflects the appropriate changes.

*D. Summary of Costs and Benefits*

This final rule changes certain aspects of the EB–5 program that are in need of reform and updates the regulations to reflect statutory changes and codify existing policies. This final rule makes five major categories of revisions to the existing EB–5 program regulations. Three of these categories, which involve (i) Priority date retention; (ii) increasing the investment amounts; and (iii) reforming the TEA designations, are substantive. The two other major categories, focused on (iv) the removal of conditions; and (v) miscellaneous changes, involve generally technical adjustments to the EB–5 program. Details concerning these three major substantive and two major technical categories of changes are provided in above sections, and in Table 2 in terms of benefit-cost considerations.

Within the five major categories of revisions to existing regulations, this final rule also makes some changes from the NPRM. Most importantly, the reduced investment amount for TEAs will be raised to $900,000 instead of the proposed $1.35 million, in order that the 50 percent differential between investment tiers be maintained. The other changes between this final rule and the NPRM are not expected to create costs and are listed here:

• Clarifies that the priority date of a petition for classification as an investor is the date the petition is properly filed;

• Clarifies that a petitioner with multiple approved immigrant petitions for classification as an investor is entitled to the earliest qualifying priority date;

• Modifies the original proposal that any city or town with a population of 20,000 or more may qualify as a TEA, to provide that only cities and towns with a population of 20,000 or more *outside* of metropolitan statistical areas (MSAs) may qualify as a TEA;

• Modifies the application of the rule, such that amendments or supplements to any offering necessary to maintain compliance with applicable securities laws based upon the changes in this rulemaking will not independently result in denial or revocation of a petition, provided the petition meets certain criteria;

• Makes a technical correction to the inflation adjustment formula for the standard minimum investment amount and the high employment area investment amount, such that future inflation adjustments will be based on the initial investment amount set by Congress in 1990, rather than on the most recent inflation adjustment; and

• Makes minor non-substantive and clarifying changes.

DHS analyzed the five major categories of revisions carefully. EB–5 investment structures are complex, and typically involve multiple layers of investment, finance, development, and legal business entities. The interconnectedness and complexity of such relationships make it very difficult to quantify and monetize the costs and benefits. Furthermore, since demand for EB–5 investments incorporate many factors related to international and U.S. specific immigration and business, DHS cannot predict with accuracy changes in demand for the program germane to the

major categories of revisions that increase the investment amounts and reform the TEA designation process. DHS has no way to assess the potential reduction in investments either in terms of past activity or forecasted activity, and cannot therefore quantitatively estimate any impacts concerning job creation, losses or other downstream economic impacts driven by these major provisions. DHS provides a full qualitative analysis and discussion in the Executive Orders 12866 and 13563 section of this final rule.

There are several costs involved in the final rule for which DHS has conducted quantitative estimates. For the technical revision that clarifies that derivative family members must file their own petitioners to remove conditions on their permanent residence when they are not included in the principal investor's petition, we estimate costs to be approximately $91,023 annually for those derivatives. Familiarization costs to review the rule are estimated to be $629,758 annually.

In addition, DHS has prepared a Final Regulatory Flexibility Analysis (FRFA) under the Regulatory Flexibility Act (RFA) to discuss any potential impacts to small entities. As discussed further in the FRFA, DHS cannot estimate the exact impact to small entities. DHS, however, does expect some impact to regional centers and non-regional center projects. As it relates to the FRFA, each of 1,570 business entities involved in familiarization of the rule would incur costs of about $401.

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS

| Current policy | Adopted change | Impact |
|---|---|---|
| **Priority Date Retention** | | |
| Current DHS regulations do not permit investors to use the priority date of an immigrant petition approved for classification as an investor for a subsequently filed immigrant petition for the same classification. | DHS will allow an EB–5 immigrant petitioner to use the priority date of an immigrant petition approved for classification as an investor for a subsequently filed immigrant petition for the same classification for which the petitioner qualifies, unless DHS revokes the petition's approval for fraud or willful misrepresentation by the petitioner, or revokes the petition for a material error. | Benefits:<br>• Makes visa allocation more predictable for investors with less possibility for large fluctuations in visa availability dates due to regional center termination.<br>• Provides greater certainty and stability regarding the timing of eligibility for investors pursuing permanent residence in the U.S. and thus lessens the burden of unexpected changes in the underlying investment.<br>• Provides more flexibility to investors to contribute to more viable investments, potentially reducing fraud and improving potential for job creation.<br>Costs:<br>• None anticipated. |

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS—Continued

| Current policy | Adopted change | Impact |
|---|---|---|
| **Increases to Investment Amounts** | | |
| The standard minimum investment amount has been $1 million since 1990 and has not kept pace with inflation—losing almost half its real value.<br>Further, the statute authorizes a reduction in the minimum investment amount when such investment is made in a TEA by up to 50 percent of the standard minimum investment amount. Since 1991, DHS regulations have set the TEA investment threshold at 50 percent of the minimum investment amount. Similarly, DHS has not increased the minimum investment amount for investments made in a high employment area beyond the standard amount. | DHS will account for inflation in the investment amount since the inception of the program. DHS will raise the minimum investment amount to $1.8 million to account for inflation through 2015, and includes a mechanism to automatically adjust the minimum investment amount based on the unadjusted CPI–U every 5 years.<br>DHS will retain the TEA minimum investment amount at 50 percent of the standard amount. The minimum investment amount in a TEA will initially increase to $900,000.<br>DHS is not changing the equivalency between the standard minimum investment amount and those made in high employment areas. As such, DHS will set the minimum investment amounts in high employment areas to be $1.8 million, and follow the same mechanism for future inflationary adjustments. | Benefits:<br>• Increases in investment amounts are necessary to keep pace with inflation and real value of investments;<br>• Raising the investment amounts increases the amount invested by each investor and potentially increases the total amount invested under this program.<br>• For regional centers, the higher investment amounts per investor will mean that fewer investors will have to be recruited to pool the requisite amount of capital for the project, so that searching and matching of investors to projects could be less costly.<br>Costs:<br>• Some investors may be unable or unwilling to invest at the higher levels of investment.<br>• There may be fewer jobs created if significantly fewer investors invest at the higher investment amounts.<br>• For regional centers, the higher amounts could reduce the number of investors in the global pool and result in fewer investors, thus potentially making the search and matching of investors to projects more costly.<br>• Potential reduced numbers of EB–5 investors could prevent certain projects from moving forward due to lack of requisite capital.<br>• An increase in the investment amount could make foreign investor visa programs offered by other countries more attractive. |
| **TEA Designations** | | |
| A TEA is defined by statute as a rural area or an area that has experienced high unemployment (of at least 150 percent of the national average rate). Currently, investors demonstrate that their investments are in a high unemployment area in two ways:<br>(1) Providing evidence that the Metropolitan Statistical Area (MSA), the specific county within the MSA, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business, has experienced an average unemployment rate of at least 150 percent of the national average rate; or<br>(2) submitting a letter from an authorized body of the government of the state in which the new commercial enterprise is located, which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. | DHS will eliminate state designation of high unemployment areas. DHS also amends the manner in which investors can demonstrate that their investments are in a high unemployment area.<br>(1) DHS will add cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that may qualify as a TEA based on high unemployment.<br>(2) DHS will amend its regulations so that a TEA may consist of a census tract or contiguous census tracts in which the new commercial enterprise is principally doing business if<br>• the new commercial enterprise is located in more than one census tract; and<br>• the weighted average of the unemployment rate for the tract or tracts is at least 150 percent of the national average.<br>(3) DHS will also amend its regulations so that a TEA may consist of an area comprising the census tract(s) in which the new commercial enterprise is principally doing business, including any and all adjacent tracts, if the weighted average of the unemployment rate for all included tracts is at least 150 percent of the national average. | Benefits:<br>• Rules out TEA configurations that rely on a large number of census tracts indirectly linked to the actual project tract by numerous degrees of separation.<br>• Potential to better stimulate job growth in areas where unemployment rates are the highest, consistent with congressional intent.<br>Costs:<br>• This TEA provision could cause some projects and investments to no longer qualify as being in high unemployment areas. DHS presents the potential number of projects and investments that could be affected in Table 5. |
| Current technical issues:<br>• The current regulation does not clearly define the process by which derivatives may file a Form I–829 petition when they are not included on the principal's petition.<br>• Interviews for Form I–829 petitions are generally scheduled at the location of the new commercial enterprise.<br>• The current regulations require an immigrant investor and his or her derivatives to report to a district office for processing of their permanent resident cards. | DHS will amend its regulations to include the following technical changes:<br>• Clarify the filing process for derivatives who are filing a Form I–829 petition separately from the immigrant investor.<br>• Provide flexibility in determining the interview location related to the Form I–829 petition.<br>• Amend the regulation by which the immigrant investor obtains the new permanent resident card after the approval of his or her Form I–829 petition because DHS captures biometric data at the time the immigrant investor and derivatives appear at an ASC for fingerprinting.<br>• Add 8 CFR 204.6(n) to allow certain investors to remain eligible for the EB–5 classification if a project's offering is amended or supplemented based upon the final rule's effectiveness. | Conditions of Filing:<br>Benefits:<br>• Adds clarity and eliminates confusion for the process of derivatives who file separately from the principal immigrant investor.<br>Costs:<br>• Total cost to applicants filing separately will be $91,023 annually.<br>Conditions of Interview:<br>Benefits:<br>• Interviews may be scheduled at the USCIS office having jurisdiction over either the immigrant investor's commercial enterprise, the immigrant investor's residence, or the location where the Form I–829 petition is being adjudicated, thus making the interview program more effective and reducing burdens on the immigrant investor. |

AR_001949

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS—Continued

| Current policy | Adopted change | Impact |
|---|---|---|
| | | • Some petitioners will benefit by traveling shorter distances for interviews and thus see a cost savings in travel costs and opportunity costs of time for travel and interview time.<br>Costs:<br>• None anticipated.<br>Investors obtaining a permanent resident card:<br>Benefits:<br>• Cost and time savings for applicants for biometrics data.<br>Costs:<br>• None anticipated.<br>Eligibility Following Changes to Offering:<br>Benefits:<br>• An amendment to a project's offering based on the final rule's provisions might not result in the denial or revocation of a petition.<br>Costs:<br>• None anticipated. |
| **Miscellaneous Changes** | | |
| Current miscellaneous items:<br>• 8 CFR 204.6(j)(2)(iii) refers to the former U.S. Customs Service.<br>• Public Law 107–273 eliminated the requirement that alien entrepreneurs establish a new commercial enterprise from both INA section 203(b)(5) and INA section 216A.<br>• 8 CFR 204.6(j)(5) introductory text and (j)(5)(iii) reference "management";<br>• Current regulation at 8 CFR 204.6(j)(5) has the phrase "as opposed to maintain a purely passive role in regard to the investment";<br>• Public Law 107–273 allows limited partnerships to serve as new commercial enterprises;<br>• Current regulation references the former Associate Commissioner for Examinations.<br>• 8 CFR 204.6(k) requires USCIS to specify in its Form I–526 decision whether the new commercial enterprise is principally doing business in a targeted employment area.<br>• Sections 204.6 and 216.6 use the term "entrepreneur" and "deportation." These sections also refer to Forms I–526 and I–829.<br>• 8 CFR 204.6(i) and (j)(6)(ii)(B) use the phrase "geographic or political subdivision" in describing state designations of high unemployment areas for TEA purposes.<br>• The priority date of a petition for classification as an investor is the date the petition is properly filed. | DHS will amend its regulations to make the following miscellaneous changes:<br>• DHS is updating references at 8 CFR 204.6(j)(2)(iii) from U.S. Customs Service to U.S. Customs and Border Protection.<br>• Removing references to requirements that alien entrepreneurs establish a new commercial enterprise in 8 CFR 216.6.<br>• Removing references to "management" at 8 CFR 204.6(j)(5) introductory text and (j)(5)(iii);<br>• Removing the phrase "as opposed to maintain a purely passive role in regard to the investment" from 8 CFR 204.6(j)(5);<br>• Clarifies that any type of entity can serve as a new commercial enterprise;<br>• Replacing the reference to the former Associate Commission for Examinations with a reference to the USCIS AAO.<br>• Amending 8 CFR 204.6(k) to specify how USCIS will issue a decision.<br>• Revising sections 8 CFR 204.6 and 216.6 to use the term "investor" instead of "entrepreneur" and to use the term "removal" instead of "deportation."<br>• Removing references to "geographic or political subdivision" in 8 CFR 204.6(i) and (j)(6)(ii)(B).<br>• Providing clarification in 8 CFR 204.6(d) that the petitioner of multiple immigrant petitions approved for classification as an investor generally is entitled to the earliest qualifying priority date. | These provisions are technical changes and will have no impact on investors or the government. |

In addition to the above, applicants will need to read and review the rule to become familiar with the final rule provisions. Familiarization costs to read and review the rule are estimated at $629,758 annually.

### E. Effective Date

This final rule will be effective on November 21, 2019, 120 days from the date of publication in the **Federal Register**. DHS has determined that this 120-day period is reasonable to ensure that EB–5 petitioners and the EB–5 market have time to adjust their plans to the changes made under this rule. DHS believes it will be able to implement this rule in a manner that will balance the equities of stakeholders and avoid delays of processing these and other petitions.

### F. Implementation

The changes in this rule will apply to all Immigrant Petition by Alien Investor (Form I–526) petitions filed on or after the effective date of the final rule. Form I–526 petitions filed prior to the effective date of the rule will be allowed to demonstrate eligibility based on the regulatory requirements in place at the time of filing of the petition. DHS has determined that this manner of implementation best balances operational considerations with fairness to the public.

### II. Background

#### A. The EB–5 Program

As part of the Immigration Act of 1990, Public Law 101–649, 104 Stat. 4978, Congress established the EB–5 immigrant visa classification to incentivize employment creation in the United States. As enacted by Congress, the EB–5 program makes lawful permanent resident (LPR) status available to foreign nationals who invest at least $1 million in a new commercial enterprise (NCE) that will create at least 10 full-time jobs in the United States. *See* INA section 203(b)(5), 8 U.S.C. 1153(b)(5). The INA permits DHS to

specify a higher investment amount if the investment is in a high employment area or a lesser investment amount if the investment is in a TEA, defined to include certain rural areas and areas of high unemployment. *Id.*; 8 CFR 204.6(f). The INA allots 9,940 immigrant visas each fiscal year for foreign nationals seeking to enter the United States under the EB–5 classification. *See* INA section 201(d), 8 U.S.C. 1151(d); INA section 203(b)(5), 8 U.S.C. 1153(b)(5). Not less than 3,000 of these visas must be reserved for foreign nationals investing in TEAs. *See* INA section 203(b)(5)(B), 8 U.S.C. 1153(b)(5)(B).

*B. The Regional Center Program*

Enacted in 1992, section 610 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Public Law 102–395, 106 Stat. 1828, established a pilot program that requires the allocation of a limited number of EB–5 immigrant visas to individuals who invest through DHS-designated regional centers. The Regional Center Program was initially designed as a pilot program set to expire after 5 years, but Congress has continued to extend the program to the present day. *See, e.g.,* Public Law 115–141, Div. M, Tit. II, sec. 204 (Mar. 23, 2018).

Under the Regional Center Program, foreign nationals base their EB–5 petitions on investments in new commercial enterprises located within "regional centers." DHS regulations define a regional center as an economic unit, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. *See* 8 CFR 204.6(e). While all EB–5 petitioners go through the same petition process, those petitioners participating in the Regional Center Program may meet statutory job creation requirements based on economic projections of either *direct* or *indirect* job creation, rather than only on jobs directly created by the new commercial enterprise. *See* 8 CFR 204.6(m)(3). In addition, Congress authorized the Secretary to give priority to EB–5 petitions filed through the Regional Center Program. *See* section 601(d) of Public Law 102–395, 106 Stat. 1828, as amended by Public Law 112–176, Sec. 1, 126 Stat. 1326 (Sept. 28, 2012).

Requests for regional center designation must be filed with USCIS on the Application for Regional Center Designation Under the Immigrant Investor Program (Form I–924). *See* 8 CFR 204.6(m)(3)–(4). Once designated, regional centers must provide USCIS with updated information to

demonstrate continued eligibility for the designation by submitting an Annual Certification of Regional Center (Form I–924A) on an annual basis or as otherwise requested by USCIS. *See* 8 CFR 204.6(m)(6)(i)(B). USCIS may seek to terminate a regional center's participation in the program if the regional center no longer qualifies for the designation, the regional center fails to submit the required information or pay the associated fee, or USCIS determines that the regional center is no longer promoting economic growth. *See* 8 CFR 204.6(m)(6)(i). As of September 10, 2018, there were 886 designated regional centers.

*C. EB–5 Immigrant Visa Process*

A foreign national seeking LPR status under the EB–5 immigrant visa classification must go through a multi-step process during which the investor must sustain the investment. The individual must first file an Immigrant Petition by Alien Investor (Form I–526, or "EB–5 petition") with USCIS. The petition must be supported by evidence that the foreign national's lawfully obtained capital is invested (*i.e.,* placed at risk), or is actively in the process of being invested, in a new commercial enterprise in the United States that will create full-time positions for not fewer than 10 qualifying employees.[6] *See* 8 CFR 204.6(j).

If USCIS approves the EB–5 petition, the petitioner must take additional steps to obtain LPR status. In general, the petitioner may either apply for an immigrant visa through a Department of State (DOS) consular post abroad or, if the petitioner is already in the United States and is otherwise eligible to adjust status, the petitioner may seek adjustment of status by filing an Application to Register Permanent Residence or Adjust Status (Form I–485, or "application for adjustment of status") with USCIS. Congress has imposed limits on the availability of such immigrant visas, including by capping the annual number of visas available in the EB–5 category and by separately limiting the percentage of immigrant visas that may be issued on an annual basis to individuals born in any one country.

To request an immigrant visa while abroad, an EB–5 petitioner must apply

at a U.S. consular post. *See* INA sections 203(e) and (g), 221 and 222, 8 U.S.C. 1153(e) and (g), 1201 and 1202; *see also* 22 CFR part 42, subparts F and G. The petitioner must generally wait to receive a visa application packet from the DOS National Visa Center to commence the visa application process. After receiving this packet, the petitioner must collect required information and file the immigrant visa application with DOS. As noted above, the wait for the visa depends on the demand for immigrant visas in the EB–5 category and the petitioner's country of birth.[7] Generally, DOS authorizes the issuance of a visa and schedules the petitioner for an immigrant visa interview for the month in which the priority date will be current. If the petitioner's immigrant visa application is ultimately approved, he or she is issued an immigrant visa and, on the date of admission to the United States, obtains LPR status on a conditional basis. *See* INA sections 211, 216A, and 221, 8 U.S.C. 1181, 1186, and 1201.

Alternatively, an EB–5 petitioner who is in the United States in lawful nonimmigrant status generally may seek LPR status by filing with USCIS an application for adjustment of status, Form I–485. *See* INA section 245, 8 U.S.C. 1255; 8 CFR part 245. Before filing such an application, however, the EB–5 petitioner must wait until an immigrant visa is "immediately available." *See* INA section 245(a), 8 U.S.C. 1255(a); 8 CFR 245.2(a)(2)(i)(A). Generally, an immigrant visa is considered "immediately available" if the petitioner's priority date under the EB–5 category is earlier than the relevant date indicated in the monthly DOS Visa Bulletin. *See* 8 CFR 245.1(g)(1).

Whether obtained through the issuance of an immigrant visa or adjustment of status, LPR status based on an EB–5 petition is granted on a conditional basis. *See* INA section 216A(a)(1), 8 U.S.C. 1186a(a)(1). Within the 90-day period preceding the second anniversary of the date the immigrant investor obtains conditional permanent resident status, the immigrant investor must file with USCIS a Petition by Investor to Remove Conditions on Permanent Resident Status (Form I–829). *See* INA section 216A(c) and (d),

---

[6] Under current USCIS policy, the investor must sustain these actions through the end of the sustainment period (2 years from the date the investor obtains conditional resident status). The total amount of time will vary, however, depending on when the investor firsts invests or becomes actively in the process of investing as well as the amount of time the investor may wait to obtain status due to oversubscription for the investor's nationality.

[7] When demand for a visa exceeds the number of visas available for that category and country, the demand for that particular preference category and country of birth is deemed oversubscribed. The Department of State (DOS) publishes a Visa Bulletin that determines when a visa may be authorized for issuance. *See* U.S. Dep't of State, Bureau of Consular Aff., Visa Bulletin, *available at https:// travel.state.gov/content/visas/en/law-and-policy/ bulletin.html.*

8 U.S.C. 1186b(c) and (d); 8 CFR 216.6(a)(1). Failure to timely file Form I–829 results in automatic termination of the immigrant investor's conditional permanent resident status and the initiation of removal proceedings. *See* INA section 216A(c), 8 U.S.C. 1186b(c); 8 CFR 216.6(a)(5). In support of the petition to remove conditions, the investor must show, among other things, that the commercial enterprise was established, that he or she invested or was actively involved in investing the requisite capital, that he or she sustained those actions for the period of residence in the United States, and that job creation requirements were met or will be met within a reasonable time. *See* 8 CFR 216.6(a)(4). If approved, the conditions on the investor's permanent residence are removed as of the second anniversary of the date the investor obtained conditional permanent resident status. *See* 8 CFR 216.6(d)(1).

*D. Final Rule*

In response to the proposed rule, DHS received 849 comments during the 89-day public comment period. In addition, DHS reviewed 11 comments submitted to the docket USCIS–2016–0008, EB–5 Immigrant Investor Regional Center Program, an advance notice of proposed rulemaking (ANPRM) published in the **Federal Register** two days prior to the proposed rule,[8] but which contained content relevant to the proposed rule. As a result, DHS considered a total of 860 comment submissions in response to the proposed rule. Approximately 560 of the comments were letters submitted through mass mailing campaigns and 290 comments were unique submissions. Commenters consisted primarily of individuals, including some investors, but also included anonymous submissions, law firms, advocacy groups, EB–5 job-creating entities, EB–5 new commercial enterprises, regional centers, non EB–5 entity companies, industry professional associations, industry trade/business associations, community or social organizations, members of Congress, and representatives from state and local governments.

Following careful consideration of public comments received, DHS made some modifications to the regulatory text proposed in the NPRM. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to these regulatory amendments, except where new or supplemental rationale is reflected below. Section III of this final rule preamble includes a summary and analysis of public comments that are pertinent to the proposed rule. A brief summary of comments DHS deemed to be out of scope or unrelated to this rulemaking, making a substantive response unnecessary, is provided at the end of Section III. Comments may be reviewed at *http://www.regulations.gov,* docket number USCIS–2016–0006.

**III. Response to Public Comments on the Proposed Rule**

DHS reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule, grouped by subject area. DHS does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the changes to 8 CFR 204.6 and 216.6 proposed in the NPRM. This final rule does not resolve issues outside the scope of this rulemaking.

*A. Need for Rulemaking and Regulatory Process*

*Comments:* Multiple commenters expressed support for general integrity reforms and measures that deter fraud, but recommended the legislative process to reform the program. A few commenters urged DHS to withdraw the proposed rule because the proposed reforms should be under the purview of Congress, as they stated that the reforms are better addressed through the legislative process. The commenters stated that the legislative process generally requires consensus building and input from various stakeholders. One commenter stated that legislative reform would be more comprehensive, address interconnected impacts, and provide for needed reforms that go beyond the statutory authority for regulatory reform. The commenter also expressed concern that pending EB–5 legislation has conflicting changes that, if passed, would supersede many or most of the proposed regulatory changes or render them moot. Another commenter stated that collecting comments on this rule prior to the reauthorization of the EB–5 Regional Center Program was premature; the commenter asserted that a legislative solution could address the issues in the proposed rule without the need for rulemaking. These commenters called for the withdrawal of the proposed rule and asserted that even if these changes were effected through regulation, any regulatory changes should be drafted from scratch under the new

administration. Another commenter suggested that the proposed regulation exceeds the scope of legislative changes recently discussed by Congress.

*Response:* DHS disagrees with commenters that it was premature to propose the rule prior to the reauthorization of the EB–5 Regional Center Program and that the issues addressed in the final rule are best resolved through the legislative process. The final rule addresses overarching issues concerning the EB–5 program generally, not just the Regional Center Program. Additionally, the Regional Center Program has been reauthorized numerous times in recent years, without reform. *See, e.g.,* Public Law 115–123 (Feb. 9, 2018); Public Law 115–120 (Jan. 22, 2018); Public Law 115–96 (Dec. 22, 2017); Public Law 115–31 (May 5, 2017); Public Law 114–254 (Dec. 10, 2016); Public Law 114–223 (Sept. 29, 2016); Public Law 114–113 (Dec. 18, 2015). DHS has worked diligently to provide technical assistance to Congress since 2014 to reform the EB–5 program through legislation. To date, Congress has not passed comprehensive EB–5 reform legislation.[9] In fact, some members of Congress have specifically requested that ''because Congress has failed to reform or end this program, we call on the Department of Homeland Security to expeditiously finalize regulations that would reduce the widespread abuses of the EB–5 program.'' [10] DHS would, of course, faithfully implement any new legislation, if passed.

DHS agrees with the members of Congress who requested taking this regulatory action because of the lack of legislative reforms. DHS is finalizing this NPRM to implement needed regulatory reforms in a timely manner. Although the legislative process has certain benefits, the regulatory process is transparent and includes the solicitation of input from the public. These regulatory reforms do not require new legislation; the statutory authority underlying these regulatory reforms is

---

[8] The ANPRM is titled, "EB–5 Immigrant Investor Regional Center Program" and was published on January 11, 2017 at 82 FR 3211. The eleven comments from the ANPRM docket considered were 0002, 0005, 0006, 0007, 0008, 0009, 0015, 0018, 0021, 0024, and 0025.

[9] A number of pieces of legislation have been introduced. *See generally* S.1501, the "American Job Creation and Investment Promotion Reform Act of 2015", 114th Congress (2015–2016); S.2415, the "EB–5 Integrity Act", 114th Congress (2015–2016); S.2122, the "Invest in Our Communities Act", 114th Congress (2015–2016); H.R. 5992, the "American Job Creation and Investment Promotion Reform Act of 2016", 114th Congress (2015–2016); and S.727, the "Invest in Our Communities Act", 115th Congress (2017–2018).

[10] Website of U.S. Senator Charles Grassley, *Grassley, Goodlatte Call on DHS to Finalize EB–5 Regulations End Unacceptable Status Quo,* (Mar. 22, 2018), *available at https:// www.grassley.senate.gov/news/news-releases/ grassley-goodlatte-call-dhs-finalize-eb-5- regulations-end-unacceptable-status-quo.*

set forth at length in the preamble to the proposed rule and elsewhere in this preamble. For example, when creating the EB–5 program, Congress clearly intended that the administering agency may periodically raise the minimum investment amounts. The INA provides that the Secretary of Homeland Security "in consultation with the Secretary of Labor and the Secretary of State, may from time to time prescribe regulations increasing" the $1,000,000 minimum investment amount.[11] Yet, even though the Immigration and Naturalization Service had recommended before the creation of the EB–5 program that the minimum investment amount in an investor visa program be "adjusted periodically based on some criteria such as the Consumer Price Index,"[12] this has never been done in the quarter century since the program's creation. Nor do the regulatory reforms require revision solely by virtue of a change in administration. Finally, promulgation of these regulatory reforms does not preclude legislative reform of the EB–5 program by Congress.

*Comments:* Other commenters disagreed with the approach to bifurcate EB–5 issues into an NPRM and an ANPRM, stating that the issues contained in both were interconnected and must be addressed together. The commenters asked DHS to withdraw the NPRM and amend the ANPRM to include the issues addressed in the NPRM (namely the designation of TEAs and minimum investment levels), as issues for an extended public comment process prior to rulemaking. In doing so, the commenters said DHS should also extend the comment period for the ANPRM for 60 days, in order to solicit more meaningful and data-driven comments.

*Response:* DHS disagrees with the commenters. The NPRM focused on issues common to all EB–5 petitioners, whether or not they are associated with a regional center. The ANPRM focused exclusively on the Regional Center Program. DHS believed bifurcating the proposals was critical for two reasons: (1) The EB–5 program is in need of reform related to the issues addressed in the NPRM and this final rule; and (2) DHS believed the agency had sufficient data to support the changes proposed in the NPRM for the entire EB–5 program at the time of publication, whereas DHS desired to solicit additional data from stakeholders regarding potential

changes to the Regional Center Program. DHS decided to publish an ANPRM to gather this additional information. As DHS did not merge the two proposals, DHS believes an extension to the almost 90-day comment period was not warranted.

*B. Priority Date Retention*

1. Proposed Standards for Retaining a Priority Date

*Comments:* Many commenters discussed the proposed standards for retaining a priority date. Several commenters expressed general support for the proposal to allow EB–5 investors to retain the original filing date of their Form I–526 petition as logical and necessary, especially with "retrogression" or oversubscription of the category (*i.e.,* lengthening of the period of time before a priority date assigned to a Form I–526 petition becomes current and an EB–5 visa becomes available for issuance). They asserted that priority date retention would provide flexibility to investors as conditions change and may encourage investment in the United States by protecting EB–5 petitioners from having to "restart the clock" on their petition due to circumstances outside of their control. One commenter stated that this change will mitigate otherwise catastrophic results that would occur to some petitioners stuck in the visa queue. One commenter stated that preserving the priority date can give the investor an incentive to reinvest in a project. DHS agrees that priority date retention would protect petitioners and encourage investment.

Several commenters stated that all EB–5 petitions should retain the priority date, even if the EB–5 petition is not yet approved, but did not provide any additional justification for this statement. Other commenters proposed that the priority date also be retained for those petitions that were denied due to no fault of the petitioner—for instance, if an associated regional center is terminated before adjudication of the petition due to its failure to meet program requirements—because circumstances can change as a result of potentially lengthy Form I–526 processing times. One commenter suggested that DHS use the same standard as INA section 245(i) to determine whether an EB–5 petitioner may retain a priority date from an earlier filed EB–5 petition, where benefits attach if a petition was approvable when filed, defined by the commenter as properly filed, meritorious in fact, and non-frivolous. This commenter also recommended

DHS allow a supplemental Form I–526 filing and priority date retention for petitioners if, under USCIS policy, a material change to an investment project would require the filing of a new Form I–526 petition, as long as the petition was approvable when filed.

*Response:* The final rule requires that the Form I–526 petition be approved for an EB–5 petitioner to retain the priority date associated with that petition. DHS disagrees with commenters' proposals that a priority date should attach when the petition is filed, rather than when it is approved (including (1) where the pending petition is denied through no fault of the petitioner, or (2) the petition was approvable when filed but a new petition is required due to the USCIS material change policy). Section 203(e) of the INA provides that immigrant visas must be issued to *eligible* immigrants in the order in which a petition on behalf of each such immigrant is filed. USCIS determines such eligibility through its approval of petitions. *See also, e.g.,* INA section 203(b)(5) and (f), 8 U.S.C. 1153(b)(5) and (f); INA section 204(a)(1)(H) and (b), 8 U.S.C. 1154(a)(1)(H) and (b); 8 CFR 103.2(b)(8)(i). Requiring approval of the petition prior to establishment of a priority date is consistent with DHS's historical interpretation of eligibility with respect to order of consideration for visa issuance under INA section 203(e), the Department of State's regulation on priority dates for visa issuance, and DHS's priority date retention regulation for other employment-based categories. *See* 8 CFR 103.2(b)(1) (mandating eligibility from time of filing through adjudication); 22 CFR 42.53(a); 8 CFR 204.5(e) (priority date retention). USCIS determines a petitioner's eligibility as part of adjudication of the petition, and USCIS's approval of the petition along with the filing date establishes the order of consideration for a visa.

Additionally, the commenters' proposals to revise USCIS's material change policy would have implications beyond priority date retention and the scope of this rulemaking. DHS did not propose to revise its material change policy as part of the proposed rule for this action. Rather, DHS solicited public feedback on potential changes to the policy in the EB–5 Immigrant Investor Regional Center Program ANPRM. *See* 82 FR 3211 (Jan. 11, 2017).

Moreover, allowing petitioners to establish a priority date prior to the adjudication of the petition has negative policy and operational implications. DHS believes that assigning a priority date to a pending Form I–526 petition would incentivize frivolous petition

[11] INA section 203(b)(5)(C)(i).
[12] *Legal Immigration Reforms: Hearing Before the Subcomm. on Immigration and Refugee Affairs of the Senate Comm. on the Judiciary,* S. Hrg. 100–990 at 90 (1987) (INS responses to questions by Senator Paul Simon) (1987).

filings solely to establish an earlier priority date. By assigning priority dates only upon petition approval, DHS hopes to eliminate the possibility that investors may file a petition that is unlikely to be approved purely to lock-in an earlier priority date, which may lead to further delays in adjudication. Additionally, allowing petitioners to retain priority dates for unapproved petitions that may have been approvable when filed would present an operational burden that would complicate and prolong the adjudications process, as USCIS would need to determine whether priority date retention is possible for these petitions separate from its normal adjudications framework.

For these reasons, the final rule will only allow an EB–5 petitioner to retain the priority date from an *approved* Form I–526 petition. Priority date retention is not available in cases involving fraud or willful misrepresentation of a material fact by the petitioner, or when DHS determines that it approved the petition based on a material error. *See* final 8 CFR 204.6(d). DHS believes this change will address situations in which petitioners whom USCIS has already determined meet eligibility requirements may become ineligible through circumstances beyond their control (*e.g.*, the termination of a regional center) as they wait for their visa priority date to become current as well as provide investors with greater flexibility to deal with changes to business conditions.

In contrast to the proposed rule, this final rule also clarifies that an investor may retain a priority date from a petition that had been approved but has since been revoked on grounds not specifically described in the provision. The final rule also clarifies that if an investor has multiple approved petitions, the investor is entitled to the earliest qualifying priority date. *See* final 8 CFR 204.6(d).

*Comment:* One commenter stated that some EB–5 investors with pending Form I–526 petitions may have already invested their funds and created jobs, but their petitions may no longer be approvable due to circumstances outside of their control, such as regional center termination. The commenter stated that the proposal would be unfair due to processing times, as some investors awaiting approval may have already achieved the goals of the program, but cannot retain the priority date, while other similarly situated investors will retain their priority dates simply because their petitions were approved.

*Response:* As explained above, DHS is only providing priority date retention to EB–5 investors with approved Form I–526 petitions for a range of reasons. DHS also notes that no law, regulation, or DHS policy requires that the petitioner's capital be invested prior to petition approval. On the contrary, INA section 203(b)(5)(A)(i) provides that an investor can qualify for EB–5 status by showing that he or she is "actively in the process of investing." *See also* 8 CFR 204.6(j)(2). Nothing prevents a petitioner from holding his or her contribution of capital in escrow until the petitioner has obtained conditional permanent resident status.[13]

*Comments:* Several commenters stated the proposal does not protect victims of EB–5 scams where investment capital was diverted, misappropriated, or subjected to an asset freeze. Some commenters suggested that such victims be allowed to choose another project for re-investment and retain the filing date of the pending Form I–526 petition as the priority date. They suggested that, because currently many investors who are victims of various EB–5 scams and other criminal activities conducted by regional centers and project managers, the victims cannot withdraw and reinvest their funding because they would lose their original priority date. One commenter suggested that allowing victims to reinvest and retain the priority date would provide fairness to investors and prevent deliberate EB–5 scams in the future since investors would not be forced to maintain their investment in a fraudulent project just to preserve a priority date.

*Response:* For the reasons explained above, DHS is only providing priority date retention to EB–5 investors with approved Form I–526 petitions. Although DHS is sympathetic to petitioners with pending petitions who are victims of scams and other criminal activities conducted by regional centers and project managers, a petitioner must be eligible at the time of filing and remain eligible until the petition is adjudicated. Retention of a priority date does not relieve petitioners of their burden to meet the relevant eligibility requirements, including their statutory burden of investing the required minimum investment pursuant to INA 203(b)(5)(A)(i).

In addition, certain changes to a pending Form I–526 petition, including a change in regional center and certain changes relating to the new commercial enterprise or job-creating entity, may

constitute a material change to the petition.[14] A change is material if the changed circumstances would have a natural tendency to influence or are predictably capable of affecting the decision.[15] Material changes prior to the approval of an EB–5 investor's Form I–526 petition would render the petition ineligible for the benefit sought. Similarly, material changes after the approval of the Form I–526 but before the petitioner has obtained conditional permanent residence, would constitute good and sufficient cause to issue a notice of intent to revoke, which if not overcome would constitute good cause to revoke the petition's approval.[16] This rule provides petitioners faced with revocation of an approved petition due to a material change the means to retain the priority date of that approved petition when filing a new petition, except in cases of fraud, misrepresentation, or material error. *See* final 8 CFR 204.6(d). DHS did not propose to change its current material change policy, either with respect to pending petitions or its ability to revoke approved petitions, and does not intend to do so in this final rule. Rather, the final rule provides certain petitioners with the opportunity to retain the priority date of their approved petitions if they submit another Form I–526 petition for which they are qualified. *See* final 8 CFR 204.6(d). This additional protection helps reduce the impact of material changes to EB–5 investors with approved petitions due to changed business conditions.

*Comments:* Some commenters recommended that investors who may be ineligible for EB–5 status due to circumstances outside their control, specifically fraud or force majeure (established by showing any extreme circumstance beyond anyone's control), should not lose the benefit of any period for which the age of the investor's child has been frozen under the Child Status Protection Act (CSPA) such that the child might "age-out." Other commenters suggested "freezing" the child's age at the time the EB–5 applicant files his or her Form I–526 without specific reference to the CSPA. Several commenters expressed specific concerns regarding the children of Chinese investors aging out of the program due to the visa backlogs, which may ultimately cause potential investors with young children to invest in other countries.

---

[13] *See* USCIS Policy Manual, 6 USCIS–PM G (Jun. 14, 2017).

[14] *See* USCIS Policy Manual, 6 USCIS–PM G (Jun. 14, 2017).

[15] *Id.*

[16] USCIS Policy Manual, 6 USCIS–PM G (Nov. 30, 2016).

*Response:* While DHS appreciates the commenters' concerns regarding minor beneficiaries who may age out during the process, DHS does not intend to change its guidance regarding the applicability of the CSPA. DHS notes that, by statute, once a person turns 21, he or she is no longer a "child" for purposes of the INA, subject to certain statutory exceptions by which individuals who surpass that age are or may be considered to remain a "child" by operation of law. *See* INA sections 101(b)(1) and 203(h), 8 U.S.C. 1101(b)(1) and 1153(h). The CSPA was enacted on August 6, 2002, and provides continuing eligibility for certain immigration benefits to the principal or derivative beneficiaries of certain benefit requests after such beneficiaries reach 21 years of age. *See* Public Law 107–208; INA sections 201(f), 203(h), 204(k), 207(c)(2), and 208(b)(3), 8 U.S.C. 1151(f), 1153(h), 1154(k), 1157(c)(2), and 1158(b)(3).[17]

The CSPA, among other things, protects minor beneficiaries from aging out of their beneficiary status due to the length of time that it takes DHS to adjudicate petitions.[18] By contrast, the priority date retention provision in this rule is meant to protect investors with approved petitions from losing a priority date while awaiting an immigrant visa. Protection against fraud or force majeure is beyond the scope of the CSPA. DHS has not been presented with any evidence of reduced interest in the EB–5 program due to its application of the CSPA, and has no way of determining in what manner application of the CSPA will affect future investment levels under the EB–5 program. DHS notes, however, that some children of principal beneficiaries of EB–5 petitions may benefit from priority date retention in that, if there is a visa backlog, they may spend a shorter amount of time in the queue, thus reducing the possibility they will reach an age that they no longer qualify as derivative beneficiaries.

*Comments:* Some commenters suggested that DHS allow an EB–5 investor to freely gift and transfer his or her priority date from an approved petition to another family member (either by switching the principal investor or having a family member file a new Form I–526), such as a child, to prevent a child from aging out, or losing the ability to immigrate if he or she

turns 21 while waiting for an immigrant visa to become available.[19] A commenter also suggested DHS allow priority dates to transfer to a petitioner's heir if the petitioner is deceased.

*Response:* As stated previously, section 203(e) of the INA provides that immigrant visas must be issued to eligible immigrants in the order in which a petition on behalf of each such immigrant is filed. USCIS determines such eligibility through its approval of petitions and establishment of priority dates. Determination of eligibility for one immigrant cannot be substituted for another; each petitioning immigrant must qualify on his or her own merit. INA 203(e); *see* 8 CFR 103.2(b)(1) ("An *applicant or petitioner* must establish that *he or she* is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." (emphasis added)).[20] For that reason, the final rule explicitly states that a priority date is not transferable to another alien. *See* final 8 CFR 204.6(d).

*Comment:* One commenter suggested extending priority date retention benefits to investors who have already obtained conditional LPR status to alleviate the burden on investors who will otherwise be unable to obtain permanent LPR status through no fault of their own. The commenter also asserted that delays in adjudicating I–829 petitions increase the risk to the investor that "situations in which petitioners may become ineligible through circumstances beyond their control (*e.g.*, the termination of a regional center) may occur.

*Response:* As explained in the NPRM, DHS proposed priority date retention to provide flexibility to deal with changes to business conditions in light of oversubscription of the program (*i.e.*,

demand that outpaced the supply in visa numbers). 82 FR at 4756. Absent priority date retention, petitioners who may have met all of the requirements to participate in the EB–5 program may face harsh consequences upon losing their place in the immigrant visa queue if a material change occurs through no fault of the investor. Once a visa becomes available and a petitioner becomes a conditional permanent resident, oversubscription is no longer a concern. DHS believes there are other protections already in place for individuals who are conditional permanent residents and who seek to remove conditions. For example, an immigrant investor may proceed with the petition to remove conditions and present documentary evidence demonstrating that, notwithstanding deviation from the business plan contained in the initial Form I–526 petition, the requirements for the removal of conditions have been satisfied.[21] Further, a priority date cannot generally be re-used in other employment-based or family-based preference categories once the individual becomes a lawful permanent resident. Thus, consistent with DHS's treatment of individuals who obtain permanent residence under other immigrant classifications, DHS declines to create an anomalous carve-out for one class of immigrants allowing them to repeatedly jump to the beginning of the visa queue ahead of others who may have endured a lengthy wait to obtain a visa. Once a priority date is used by virtue of the petitioner becoming a conditional permanent resident, he or she will have obtained the benefit connected to the priority date, and DHS will not permit the priority date to be retained for further use.

## 2. Other Comments on Priority Date Retention

*Comment:* One commenter requested that USCIS clarify that priority dates for EB–5 petitions are determined based on the date of filing the initial petition.

*Response:* DHS agrees with the commenter and has added language that was inadvertently left out of the NPRM to the final regulatory text. *See* final 8 CFR 204.6(d) ("The priority date of a petition for classification as an investor is the date the completed, signed petition (including all initial evidence and the correct fee) is properly filed.").

*Comment:* One commenter expressed concern with DHS proposing priority date retention along with changes to the investment amounts and TEA

---

[17] Guidance on the agency's application of the CSPA to visa petitions can be found in the USCIS Policy Manual. *See* USCIS Policy Manual, 7 USCIS–PM A (Nov. 30, 2016).

[18] *See* INA section 203(h); USCIS, *Child Status Protection Act, https://www.uscis.gov/greencard/child-status-protection-act.*

[19] INA section 203(d) allows a spouse or child as defined in INA section 101(b)(1)(A), (B), (C), (D), or (E), 8 U.S.C. 1101(b)(1)(A), (B), (C), (D), or (E), to accompany or follow to join a spouse or parent as a family-preference, employment-based, or diversity immigrant. INA section 101(b)(1) defines a child as an unmarried person under 21 years of age. Consequently, if a primary immigrant's child has turned 21 and has not yet immigrated, that child is no longer eligible to accompany or follow to join the primary immigrant.

[20] In addition, INA 203(b)(5)(A) provides that visas shall be made available to qualified immigrants seeking to enter the United States "for the purpose of engaging in an NCE . . . in which such *alien* has invested or is actively in the process of investing . . . ." And INA 203(e) states that immigrant visas made available under subsection (a) or (b) of this section shall be issued to "eligible immigrants in the order in which a petition *in behalf of each such immigrant* is filed." DHS believes that these provisions, taken together, are best read as contemplating eligibility by a single petitioner whose visa is made available in the order in which such individual petitioned and established eligibility.

[21] USCIS Policy Manual, 6 USCIS–PM G (Nov. 30, 2016).

designation process. The commenter recommended that if DHS finalizes the priority date retention provision, the following information will also need to be clarified for investors during a transition period: (1) The amount of money investors need to invest during the transition period if they want to move their investment dollars to a different qualifying project (*i.e.*, must they reinvest the amounts required under this rule or may they reinvest at the same investment level permitted before the new regulatory requirements take effect); and (2) whether if investors who are able to reinvest at the earlier levels and retain their priority date would be able to reinvest that money into a project that was located within a TEA in place before the new regulatory requirements have taken effect at the amounts then authorized for investment in TEAs. The commenter expressed a preference for allowing investment consistent with the regulatory regime in existence prior to this rule becoming effective, and allowing investment opportunities in any type of project, regardless of the project's future TEA status once a final rule takes effect.

*Response:* DHS appreciates the commenter's concerns and has clarified the effective date and implementation process in this final rule preamble in Sections I.E and I.F. The changes in this rule will apply to any Form I–526 filed on or after the effective date of the rule, including any Form I–526 filed on or after the effective date where the petitioner is seeking to retain the priority date from a Form I–526 petition filed and approved prior to the effective date of this rule. A Form I–526 petitioner can retain the priority date from an approved Form I–526 petition filed prior to the effective date of this rule, so long as the petitioner is not lawfully admitted to the United States as a conditional permanent resident based on that earlier-approved petition, and USCIS did not revoke the approval based on the petitioner's fraud or willful misrepresentation or because USCIS determined that it approved the petition based on material error. This rule becomes binding on petitioners on the effective date; beginning at that time, any new petition, regardless of whether the petitioner had previously filed a Form I–526, must meet the eligibility requirements in place at the time of filing. *See* 8 CFR 103.2(b)(1). DHS believes it would be operationally burdensome to set and adjudicate different eligibility requirements for investors who want to move their investment dollars to a different qualifying project and must file a new

petition. The regulatory requirements, including the minimum investment amounts and TEA designation process, in place at the time of filing the petition will govern the eligibility requirements for that petition, regardless of the priority date. DHS believes this manner of implementation best balances the needs of investors, parity of treatment among investors, and operational concerns.

*Comment:* One commenter stated that the priority date proposal would create unexpected delays to petitioners who had done their due diligence and chosen a successful project. The commenter believes that roughly 15 percent of projects are failing or have failed. The commenter argued that, if priority dates can be retained, then most petitioners in failed projects are likely to re-file through a different project, thus causing petitioners already in the queue to wait longer for a visa that otherwise would have become available due to the failed projects. The commenter recommended that priority date retention be restricted to projects where Form I–829 petitions would be denied only because of fraud committed by the "EB–5 sponsors," rather than assisting investors whose projects fail for other reasons. Another commenter stated that innocent investors should not be punished by fraud and scams committed by the investment project.

*Response:* As contemplated by Congress, the immigrant investor visa was a way to provide aliens an immigration incentive for investing and creating jobs in the United States. For petitioners with approved petitions who invest in projects that appear unlikely to succeed after petition approval and while the investor is awaiting visa availability, priority date retention provides further incentive for them to reinvest in another project in the United States as opposed to withdrawing their investment in the United States. In addition, providing for priority date retention only where a Form I–526 petition has been approved is consistent with Congress's goal of issuing visas to eligible immigrants in the order petitions were filed, in that it allows investors to remain in the queue only if the agency had deemed them eligible for EB–5 classification. Although DHS acknowledges the commenter's point that priority date retention could potentially result in a longer wait in the visa queue for some petitioners, the final rule provides equitable relief to those EB–5 petitioners described in the comment who find that, through no fault of their own, their approved Form I–526 cannot be used to seek admission to the United States as lawful

permanent residents. The final rule is also intended to produce parity in priority date retention between EB–5 petitioners and beneficiaries of petitions under other employment-based categories.

In response to commenter concerns that a fraudulent project or sponsor could affect an innocent petitioner, DHS clarifies in the final rule that the fraud or willful misrepresentation of a material fact must be done by the petitioner. *See* final 8 CFR 204.6(d)(1).

*Comment:* One commenter suggested that because a petition must be approvable both at the time it was filed and also on the date it is adjudicated, the priority date retention proposal would create the potential for the retroactive application of the regulations to pending Form I–526 and Form I–829 petitions as well as to current conditional permanent residents. Citing to *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 471 (1998), the commenter argued that there is no precedent for retroactive application of regulations.

*Response:* The final rule does not change the longstanding requirement at 8 CFR 103.2(b)(1) that a petitioner demonstrate eligibility at the time of filing and throughout adjudication, and thus it does not result in a retroactive application of regulations. The preamble to this final rule also clarifies the effective date of this rule, as well as implementation procedures in Sections I.E and I.F. As explained above, the changes in this rule will apply to all Form I–526 petitions filed on or after the effective date of the final rule. Petitions filed before the effective date will be adjudicated under the regulations in place at the time of filing. As the final rule will only apply to petitions filed on or after the effective date, DHS does not anticipate that the final rule will be applied retroactively.

### C. Increases to the Investment Amounts

#### 1. Increase to the Standard Minimum Investment Amount

*Comments:* Multiple commenters stated that the proposed standard minimum investment amount is too high because it would greatly reduce the number of investors in the EB–5 program, but did not suggest an alternative. Similarly, many commenters agreed that the minimum investment amount should increase, but stated that $1.8 million was too high because, combined with the TEA designation changes, the increase will result in many projects that could previously have been funded with $500,000 individual investments now

**35762**      **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

needing $1.8 million individual investments. Several commenters noted that the proposed amounts far exceed those proposed and under consideration by Congress, and one commenter suggested reducing the standard and TEA minimum investment amounts by half of the current amount. Other commenters suggested DHS consider investment amounts ranging from $500,000 to $1.5 million. One commenter stated that the amount set in 1990 was too high as evidenced by the program not being fully utilized before 2014 and suggested that setting the investment amount too high will repeat the mistake. The commenter asserted that job creation was the most important principle and the investment amount was just a ''gate keeping mechanism,'' but did not provide additional support for these assertions.

Several commenters expressed support for the proposal to increase the standard investment amount to $1.8 million; some expressed support for the proposed increase, but did not focus on a specific amount. Commenters supporting the proposed minimum investment increases stated that the market can handle an increase in the minimum investment amounts and that leading investor visa programs in other countries require investment amounts higher than those recommended by DHS. Several commenters agreed with updating the minimum investment amount to account for inflation. One commenter agreed with the proposal to increase the minimum investment amount to account for inflation, and stated the increase was necessary to realistically achieve the goal of sustaining 10 full-time employees in light of the increases in national average salaries from 1990 to 2015. Some members of Congress noted that the increase is important in order for the program to recapture the real 1990 investment value and infuse additional capital in to the United States. They further stated that the failure to adjust the minimum investment amount for inflation has cost the U.S. economy billions of dollars each year in potential investment funds, ultimately requiring developers to attract more foreign investors than needed in order to raise the desired amount of capital.

*Response:* In 1990, Congress set the minimum investment amount for the program at $1 million and authorized the Attorney General (now the Secretary of Homeland Security) to increase the minimum investment amount, in consultation with the Secretaries of State and Labor. INA section 203(b)(5)(C)(i), 8 U.S.C. 1153(b)(5)(C)(i). Neither the former INS nor DHS has

exercised its authority to increase the minimum investment amount. As a result, over time, inflation has eroded the present-day value of the minimum investment required to participate in the EB–5 program—leaving it at little more than half its real value when the program was created. Thus, after consulting with the Departments of State and Labor, DHS proposed in the NPRM to increase the minimum investment amount consistent with increases in the CPI–U during the intervening period, for a new minimum investment amount of $1.8 million.

DHS disagrees with the commenter who suggested that lower utilization of the program is evidence that the investment amount was set too high prior to 2014, because DHS has reason to believe other factors significantly contributed to lower utilization of the program. For example, in 2009, a CIS Ombudsman's recommendation for the EB–5 program discussed various reasons for the program's lower utilization related to administrative obstacles and uncertainties that undermined stakeholder confidence, including uncertainty in the program, changes in guidance, concerns of insider access, as well as suspicions of abuse, misrepresentation, and fraud.[22] The Ombudsman also cited to a 2005 Government Accountability Office (GAO) report which attributed ''low participation to a series of factors that led to uncertainty among potential investors. These factors include an onerous application process; lengthy adjudication periods; and the suspension of processing of over 900 EB–5 cases—some of which date to 1995—precipitated by a change in [USCIS'] interpretation of regulations regarding financial [qualifications].'' [23] Although neither the Ombudsman nor the GAO expressly reviewed statutory requirements such as the Congressionally-set minimum investment amount, and were instead focused on USCIS implementation of the EB–5 program and how that may have contributed to low participation, both reports give DHS reason to believe the program's lower utilization in the past is due to a range of reasons.

In addition, DHS notes that other trends led to higher utilization of the program over the last 10 years. For example, the reduction of available

U.S.-based commercial lending funds due to the U.S. financial crisis in 2008 led to interest in alternative funding sources, such as the EB–5 program.[24] The commenter who claimed that lower utilization of the program in the past was due to the investment amount being too high also acknowledged that the demand for EB–5 funds from eligible projects is not dependent on the level of investment set by DHS. The commenter claimed that demand was instead set by market factors totally independent of EB–5, most notably risk tolerance of primary lenders and the level of the premium charged by commercial lenders.

Regardless of what factors ultimately accounted for higher utilization of the program, the reality is that the program has become and remains hugely oversubscribed at current investment levels, DHS disagrees with commenters who assert that raising the minimum investment amount would necessarily cause the number of EB–5 investors to return to the levels in the earliest days of the program, or even to fall below the number necessary to ensure full utilization of the 9,940 visas available a year, as demand is related to a range of internal and external factors.[25]

The program makes available 9,940 immigrant visas a year, and as of December 1, 2018, there are 40,017 beneficiaries (principals and immediate family members) of approved EB–5 petitions[26] waiting for the availability of immigrant visas. According to the Department of State's Visa Bulletin for December 2018, petitioners from mainland China must have a priority date (the date of filing of the I–526 petition with USCIS) before August 22, 2014, in order for an immigrant visa to be available.[27] In addition, as of

---

[22] CIS Ombudsman, *Employment Creation Immigrant Visa (EB–5) Program Recommendations,* March 18, 2009, *available at https://www.dhs.gov/ xlibrary/assets/CIS_Ombudsman_EB-5_ Recommendation_3_18_09.pdf.*

[23] GAO, *Immigrant Investors: Small Number of Participants Attributed to Pending Regulations and Other Factors,* p.3 GAO–05–256 (Apr. 2005).

[24] ''A Roadmap to the Use of EB–5 Capital: An Alternative Financing Tool for Commercial Real Estate Projects,'' Professor Jeanne Calderon and Guest Lecturer Gary Friedland of the NYU Stern School of Business (May 22, 2015) (''Despite the Program's enactment by Congress in 1990, for many years EB–5 was not a common path followed by immigrants to seek a visa. However, when the traditional capital markets evaporated during the Great Recession, developers' demand for alternate capital sources rejuvenated the Program. Since 2008, the number of EB–5 visas sought, and hence the use of EB–5 capital, has skyrocketed. EB–5 capital has become a capital source providing extraordinary flexibility and attractive terms, especially to finance commercial real estate projects.'').

[25] To the extent that the changes made by this rule reduce the number of investors, the INA provides that unused visas would be allocated to different employment-based categories. *See generally* INA section 203(b), 8 U.S.C. 1153(b).

[26] According to internal program office and adjudication records.

[27] U.S. Dep't of State, Bureau of Consular Aff., *Visa Bulletin for December 2018, available at*

December 1, 2018, USCIS had 13,125 pending I–526 petitions that had yet to be adjudicated.[28] Using the average of 1.81 derivative beneficiaries for each EB–5 principal who received an immigrant visa over fiscal years 2014–2016[29] and assuming that about 10% of petitions filed will be denied, terminated, or withdrawn, this would represent 33,193 potential beneficiaries. Thus, there are already in the pipeline approximately 73,000 beneficiaries or potential beneficiaries—representing over seven years' worth of EB–5 immigrant visas as allocated by Congress.

The inevitable result has been ever growing wait times for immigrant visas to become available for EB–5 petitioners with approved petitions born in mainland China (and their derivative beneficiaries). The annual EB–5 visa cap was reached for the first time in fiscal year 2014.[30] In May 2015, the State Department found it necessary to establish a waiting list for petitioners with approved petitions born in mainland China, when it announced that immigrant visas were available only for such petitioners (with investments in regional center projects and/or projects in TEAs) whose priority dates were earlier than May 1, 2013.[31] That waiting list has since grown, so that EB–5 visas are only now available for petitioners born in mainland China with priority dates before August 22, 2014—which represents a wait of over 40 months. As there are over seven years' worth of beneficiaries in the pipeline, the wait time will likely only grow.

Given that over 80% of EB–5 petitioners who receive immigrant visas do not adjust their status from within the United States, but receive their visas overseas,[32] many potential EB–5

investors may choose not to wait for such an extended period of time before they can immigrate to the United States, especially considering that most petitioners invest the required capital well before their petitions are approved. This might at least in part account for the fact that the number of petitions filed has fallen each year since reaching a high water mark in fiscal year 2015. By fiscal year 2018, the number of petitions filed had fallen by more than half.[33] In the future, the number of foreign investors impacted by the per-country cap and the resultant waiting list for EB–5 visas who choose to file petitions may well further decline to the point that total petitions filed each year may not even account for the 9,940 visas allocated. This decline, of course, would be independent of the particular minimum investment amounts required by regulation, but may mitigate any decline that might be associated with such amounts. This is because some prospective petitioners who might have foregone use of the program due to increases in the investment amounts would have already foregone use of the program due to overall waitlist issues.

To commenters who suggest that DHS establish a new standard minimum investment amount below the $1 million threshold, DHS notes that the current investment amounts are the minimum set by statute, and DHS does not have authority to reduce them beyond those amounts.

*Comments:* Many commenters suggested that the proposed increase would make the EB–5 program less competitive with other countries' programs. Several commenters suggested that the proposed rule's comparisons to other investor visa programs were flawed and failed to account for the differences between the programs other than the investment amount, highlighting that the EB–5 program stands alone in requiring investors to place their investment at-risk. Two commenters questioned DHS' comparison to Canada's closed Immigrant Investor Venture Capital Program, which they described as having failed because it required a high capital contribution and funds that must be placed at risk, instead of focusing on its Quebec Program. One commenter

noted that the comparison failed to account for other investor immigration programs with minimum investment amounts ranging from $40,000 USD to $1.8 million USD, including programs in Antigua and Barbuda, Austria, Belgium, Cayman Islands, Cyprus, Dominica, Grenada, Hong Kong, Ireland, Jersey, Malaysia, Malta, Monaco, Portugal, and Singapore.

*Response:* Even with the increase, the EB–5 program will remain competitive with other countries' visa programs as discussed in the NPRM.[34] In the NPRM, DHS compared the EB–5 program to the United Kingdom's Tier 1 Investor Visa, Australia's Significant and Premium Investment Programs, Canada's Immigrant Investor Venture Capital Pilot Program, and New Zealand's Investor 1 Resident Visa. *See* 82 FR at 4757. DHS noted in the NPRM that it has no means of ascertaining an investor's preference for a given program, but believes an investor's decision would be based in part on the investment amount and country-specific investment risk preferences of each investor. *Id.* DHS focused on the UK, Australia, Canada, and New Zealand because these countries offer similar program requirements, immigration benefits, and comparable financial risk to the United States.

DHS disagrees with the comment suggesting that these programs do not carry risk. While the types of investments allowed in each program differ, they carry varying levels of financial risk. The UK requires

---

*https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2019/visa-bulletin-for-december-2018.html.*

[28] According to internal program office and adjudication records.

[29] *See* DHS, *2016 Yearbook of Immigration Statistics* (table 7); DHS, *2015 Yearbook of Immigration Statistics* (table 7); DHS, *2014 Yearbook of Immigration Statistics* (table 7).

[30] *DHS, 2014 Yearbook of Immigration Statistics* (table 7).

[31] U.S. Dep't of State, Bureau of Consular Aff., *Visa Bulletin for May 2015, available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2015/visa-bulletin-for-may-2015.html.* This is a result of the interaction between the employment-based green cards per-county caps and the fact that the overwhelming majority of EB–5 visas (75% in fiscal year 2017) go to beneficiaries born in maintain China. *See* section 202 of the INA, 8 U.S.C. 1152; Bureau of Consular Affairs, U.S. State Department, *Report of the Visa Office Fiscal Year 2017* (table V (part 3)).

[32] In fiscal year 2017, 83% of EB–5 visas were issued overseas. See DHS, *2017 Yearbook of Immigration Statistics* (table 7).

[33] In fiscal year 2015, USCIS received 14,373 EB–5 petitions; in fiscal year 2016, 14,147; in fiscal year 2017, 12,165; and in fiscal year 2018, 6,424. *See* U.S. Citizenship and Immigration Services, *Number of Form I–526, Immigrant Petition by Alien Entrepreneur, by Fiscal Year, Quarter, and Case Status 2008–2018, available at https://preview.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I526_performancedata_fy2018_qtr4.pdf.*

[34] The United Kingdom's Tier 1 Investor visa requires a minimum investment of £2,000,000 (approximately $2.7 million USD), and offers permanent residence to those who have invested at least £5,000,000 (approximately $8.1 million USD). *Tier 1 (Investor) Visa,* Gov. UK, *https://www.gov.uk/tier-1-investor/overview.* Australia's Significant and Premium Investment Visa Programs require AU $5 million (approximately $3.9 million USD) and AU $15 million (approximately $11.8 million USD), respectively; its ''investor stream'' visa program requires an AU $1.5 million (approximately $1.2 million USD) investment and a host of other requirements. *Business Innovation and Investment Visa,* Australian Government, *http://www.homeaffairs.gov.au/Trav/Visa-1/188-.* Canada's Immigrant Investor Venture Capital Pilot Program required a minimum investment of CDN $2 million (approximately $1.6 million USD) and a net worth of CDN $10 million (approximately $8 million USD) or more. *Immigrant Investor Venture Capital Pilot Program,* Government of Canada, *https://www.canada.ca/en/immigration-refugees-citizenship/services/immigrate-canada/immigrant-investor-venture-capital/eligibility.html.* New Zealand's Investor 1 Resident Visa requires a NZ $10 million (approximately $7.1 million USD) investment, and its Investor 2 Resident Visa requires a NZ $3 million (approximately $2.1 million USD) investment. *Investor Visas,* New Zealand Now, *https://www.newzealandnow.govt.nz/move-to-nz/new-zealand-visa/visas-to-invest/investor-visa.* Currency exchange calculations are as of January 2018.

investments in government bonds, share capital, or loan capital.[35] Australia permits investment in a variety of options, including bonds, stocks, and equity funds.[36] Canada required investment into an at-risk Immigrant Investor Venture Capital Fund for 15 years.[37] New Zealand's investment options include government bonds, residential property development, and equity in public or private New Zealand firms.[38] Such investments present levels of risk that are generally comparable to the level of risk associated with many EB–5 investments.

With respect to the Quebec Program, DHS does not believe it is comparable to the EB–5 program. The Quebec program requires a CDN $800,000 (approximately $620,000 USD), 5-year non-interest bearing investment.[39] While this amount is lower than the new EB–5 minimum investment amounts, that program also has numerous other primary requirements in order to qualify. These include requirements that the applicant have net assets of CDN $1.6 million (approximately $1.2 million USD), experience in management, as well as a requirement that the investor intends to settle in the Province of Quebec. The EB–5 program does not have additional experience requirements. Additionally, the EB–5 program does not require settlement in a particular location in the United States, which would be highly restrictive. The investor simply loans his or her money to the Canadian government for 5 years. While there is no risk posed to the investor in terms of losing some or all of the principal, the zero-interest condition means that investors in the Quebec program do incur an opportunity cost of investing, as the present value of their investment would be discounted for the five-year period.[40]

DHS reviewed each of the countries where government-provided information was readily available.[41] Some countries may require a lower investment amount, but include additional requirements that the EB–5 program does not require. For example, to be considered for a visa/entry permit to enter the Hong Kong Special Administrative Region for investment as an entrepreneur, the applicant must, among meeting other requirements, have a "good education background, normally a first degree in a relevant field." [42] In general, DHS found that none of the countries raised by commenters present a straight-line comparison to the EB–5 program. There is no way to quantify an individual's desire to resettle in the United States or any other country. Each country has varying requirements, and there is no universal standard of success for an immigrant investor program. That said, DHS believes the increase is reasonable when the minimum investment amount is compared to the investor visa programs of similarly developed economies, such as the United Kingdom, Canada, Australia, and New Zealand, which typically require higher investment thresholds than what DHS proposes.[43]

*Comments:* A few commenters suggested the increase would favor continued participation by wealthy investors only, instead of encouraging innovative, forward-thinking entrepreneurs, small businesses, and younger investors.

*Response:* Congress enacted the investor visa program to attract entrepreneurs and job-creators into the U.S. economy [44] and infuse new capital into the country.[45] Congress did not specify any particular type of investor it was seeking.[46] As discussed previously, DHS believes that the increase to the minimum investment amount is appropriate because inflation has eroded the present-day value of the minimum investment required to participate in the EB–5 program since Congress set the initial investment amounts in 1990, and this final rule is an effort at remedying that erosion. In addition, DHS believes the increased amount will attract the same type of investment levels that Congress intended to attract in 1990.

DHS recognizes that many EB–5 petitioners do not necessarily take an entrepreneurial role in the operations of their new commercial enterprise; however, the EB–5 program has been and may continue to be used by petitioners who do take an entrepreneurial role in the operations of their new commercial enterprise. Moreover, under the current regulatory and statutory regime, the EB–5 program contains no specific entrepreneurship requirements. DHS does not differentiate between and collects no data on petitioners who take an entrepreneurial role in the operations of their new commercial enterprise relative to those who do not. Accordingly, DHS has no data to support and there is no persuasive reason to believe that raising the minimum investment amount would disproportionately decrease the number of petitioners who take an entrepreneurial role in their new commercial enterprise relative to those who do not.

*Comments:* Several commenters stated that the proposed increase to the standard investment amount would result in long wait times for projects involving Chinese EB–5 investors due to currency control efforts in China that limit the transfer of funds, and concluded that the increase therefore will undermine almost any legitimate project. One commenter estimated the proposed increases in investment amounts would extend the transfer time

---

[35] *Tier 1 (Investor) Visa,* Gov.UK, *available at* https://www.gov.uk/tier-1-investor/overview.

[36] *Business Innovation and Investment Visa,* Australian Government, *available at* http://www.homeaffairs.gov.au/Trav/Visa-1/188-.

[37] *Determine your eligibility—Immigrant Investor Venture Capital Pilot Program,* Government of Canada, *available at* https://www.canada.ca/en/immigration-refugees-citizenship/services/immigrate-canada/immigrant-investor-venture-capital/eligibility.html.

[38] *Investor Visas,* New Zealand Now, *available at* https://www.newzealandnow.govt.nz/move-to-nz/new-zealand-visa/visas-to-invest/investor-visa.

[39] *Investor Program,* Government of Quebec, *available at* http://www.immigration-quebec.gouv.qc.ca/en/immigrate-settle/businesspeople/applying-business-immigrant/three-programs/investors/index.html.

[40] We refer to the Quebec program in the present tense because although it had been terminated several years ago, it was reopened recently (2018) for a temporary period.

[41] *Citizenship by Investment,* Antigua & Barbuda, *available at* http://cip.gov/ag; *Persons of Independent Means and Investors,* Cayman Islands, *available at* http://www.immigration.gov.ky/portal/page/portal/immhome/livinghere/independentmeans; *Citizenship by Investment,* Commonwealth of Dominica, *available at* http://cbiu.gov.dm/faqs; *Investment as Entrepreneurs,* Hong Kong Immigration Department, *available at* http://www.immd.gov.hk/eng/services/visas/investment.html; *Investor and Entrepreneur Schemes,* Department of Justice and Equality, Irish Naturalisation and Immigration Service, *available at* http://www.inis.gov.ie/en/INIS/Pages/New%20Programmes%20for%20Investors%20and%20Entrepreneurs; *Jersey Immigration Rules,* States of Jersey, *available at* https://www.gov.je/travel/informationadvice/visitors/documents/ld%20immigration%20rules%20jin%20130217.pdf; *Individual Investor Programme,* Republic of Malta, *available at* http://iip.gov.mt/.

[42] Investment as Entrepreneurs, Immigration Department, The Government of the Hong Kong Special Administrative Region; *available at* http://www.immd.gov.hk/eng/services/visas/investment.html.

[43] *See* Madeleine Sumption and Kate Hooper, "Selling Visas and Citizenship: Policy Questions from the Global Boom in Investor Immigration", Migration Policy Institute (October 2014) at 7, *available at* https://www.migrationpolicy.org/research/selling-visas-and-citizenship-policy-questions-global-boom-investor-immigration ("Among the popular English-speaking destinations, the United Kingdom has the highest minimum threshold at GBP 1 million, followed by New Zealand and Australia which require US $1.2 million and US $1.3 million respectively. The United States' minimum is significantly cheaper, at US $500,000, but requires a more risky investment (in private-sector businesses rather than government bonds).").

[44] 136 Cong. Rec. S35,615 (Oct. 26, 1990).
[45] S. Rept. 101–55, p. 21 (1989).
[46] 136 Cong. Rec. S35,615.

by at least 5 times and another commenter suggesting the transfer time would be close to 11 months. Other commenters suggested a more limited increase to encourage investors from countries other than China to continue to participate in the program. Another commenter stated the proposed increase in investment amounts would render the program dependent on investors from China.

*Response:* DHS does not believe it is appropriate to limit the increase to the minimum investment amount below what was proposed in order to attempt to attract investment from specific countries, nor does DHS believe that the policies of any specific country should dictate the adjustment of the EB–5 program. DHS believes the increase to the minimum investment amount based on inflation is appropriate and justified for the reasons discussed.

2. Use of CPI–U

*Comments:* Multiple commenters provided input on the methodology used to calculate the proposed investment amount increases or provided alternative approaches. Several commenters stated that DHS should increase the minimum investment amount by the annual household income growth rate because it is a better gauge of job creation over time than an unadjusted CPI metric and would better link the increase to job creation. Another commenter commented that DHS should link the investment amount increase to average wage level because changes in wages better show the amount required to create the requisite number of jobs. Other commenters stated that the increase should consider changes in exchange rates since 1990, and how those changes have affected foreign investors. For instance, one commenter stated that a $1 million investment would have cost 17 million Indian rupees in 1990, but would cost 65 million Indian rupees in 2017. Another commenter stated that the rule should compare the value in U.S. dollars of the currency of the country where the investor has earned or otherwise accumulated his or her capital, because there are several countries where the current minimum investment amount is now higher than it was in 1990, in inflation-adjusted local currency.

Some commenters agreed with the use of CPI–U to calculate the proposed increase, but disagreed with calculating the increase from 1990. Some of these commenters noted that the standard investment amount has never been competitive. They stated that the TEA investment amount only became

competitive in 2008, when the price of the investment program began to match demand and the number of petitions began to increase, or in 2011 when the visa allocation was fully utilized. Several commenters noted that 2011 was the first year the number of Form I–526 petitions filed represented nearly the supply of visas available (thus, visa supply nearly equaled visa demand). These commenters recommended that DHS calculate the adjustment to the minimum investment amounts from a base year later than 1990, such as 2008 or 2011.

In addition, one commenter suggested DHS attempt some analysis of the price elasticity of demand for EB–5 visas before adjusting the minimum investment amount based on the CPI–U for the past 25 years in one adjustment.

*Response:* DHS considered a number of different measures upon which to base the proposed adjustment and future adjustments. DHS considered both the average household income and average wage level as potential bases for the proposed adjustments as the commenters suggested; however, both only look at one factor to determine inflation. DHS acknowledges that job creation outcomes depend on multiple factors in addition to the wage level. Such factors may include, but are not limited to, the perceived level of economic stability and growth potential, taxation, workforce availability, level of infrastructure development and price stability.

DHS chose the unadjusted All Items Consumer Price Index for All Urban Consumers (CPI–U) for the U.S. City Average (BLS CPI Series Id: CUSR0000SA0) because it considers multiple inflationary factors over time.[47] DHS appreciates that singular factors such as average wage and income changes can reflect and influence inflation, but because such factors are narrower in focus, DHS does not believe that they translate to the overall cost of doing business in today's economy as well as the CPI–U does. The unchained CPI–U (BLS CPI Series Id: CUSR0000SA0) for all items is the "broadest and most comprehensive CPI," and is the most widely used measure of inflation.[48] Because the CPI–U is an indicator of the change in costs of goods and services necessary for

adequate capitalization of an EB–5 enterprise, DHS believes that the CPI–U also provides an appropriate reference point for the purpose of ensuring the statutorily required level of job creation. DHS therefore believes that, as proposed, the CPI–U is an appropriate measure for changes to the minimum investment amount.

DHS recognizes that other alternative measures may provide a broader or more accurate measure of inflation for certain purposes, but DHS also notes that the government uses CPI–U for a range of inflation adjustments. The technical change that DHS made to the inflation adjustment formula in this rule (tying the adjustment back to 1990, rather than to the prior adjustment) will ensure that disparities between different measures are not exacerbated over time. Thus, DHS believes the CPI–U is the most appropriate reference point for purposes of establishing the new investment amount with respect to determining the present-day cost to the investor.

Some commenters recommended using average household income or average wage level. The commenters stated that those measurements may better reflect the amount required to create the requisite number of jobs. However, as stated above, DHS believes an adequately capitalized enterprise (as determined by the costs of goods or services required to do business) also strongly correlates to job creation, and the CPI–U is valuable in this regard because it is appropriately reflects the change in costs of goods and services. DHS also believes it is appropriate to adjust the minimum investment amount upward based on inflation without directly correlating the minimum investment amount to the statutory requirement to create a minimum of 10 jobs. As DHS stated in the NPRM, Congress did not provide for adjustments in the investment threshold to be directly related to the EB–5 job creation requirements.[49] Indeed, the controlling statutory authorities permit varying investment amounts in various circumstances (*e.g.,* investment in TEAs or high employment areas) while maintaining the requirement that 10 jobs be created.

DHS also disagrees with comments that suggest it should determine the impact of the minimum investment amount on the U.S. economy by considering the relative value of another country's currency, or the relative value of U.S. currency in other countries. The EB–5 program encourages investment in the United States and thus it is

---

[47] CPI–U measures the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services. Bureau of Labor Statistics, Consumer Price Index: Frequently Asked Questions, available at *http://www.bls.gov/ cpi/cpifaq.htm;* Bureau of Labor Statistics, Consumer Price Index: Addendum to Frequently Asked Questions, available at *http://www.bls.gov/ cpi/cpiadd.htm#2_1.* (last accessed June 28, 2018).

[49] 82 FR at 4744.

**35766** **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

appropriate to use the value of U.S. currency in the United States as the focal point. Although some commenters claim that in many source countries, the contribution amount has gone up since 1990 when their own currencies, adjusted for inflation, are referenced, DHS believes it is more reasonable to focus on the U.S. economy rather than take into account currency value fluctuations from certain source countries, or currency values worldwide. DHS notes that the statute set specific minimum investment amounts that are meant to apply to all investors.

DHS also disagrees with calculating the adjustment from a later year than 1990. Commenters who recommend using a later year rely on a supply and demand rationale, arguing that the investment amounts—or ''price'' of the program–only started to match demand around 2008 or 2011, depending on the commenter. As stated earlier, DHS disagrees that prior lower utilization of the program was due primarily to the investment amounts being set too high. Both the CIS Ombudsman and the GAO pointed out programmatic problems that contributed to the lower utilization of the program. Therefore, DHS does not believe it is reasonable to assume that supply and demand reached equilibrium simply due to the ''cost'' having dropped in present-day values; rather, multiple factors contributed to the program's lower utilization in the early years and its later oversubscription. DHS believes that calculating the increase to account for inflation from 1990 will ensure the program requirements reflect the present-day dollar value of the investment amount established by Congress in that year.

Regarding commenters' concern that the increased investment amounts will shrink demand for the EB–5 visa to levels experienced in the 1990s and early 2000s, DHS believes these suppositions fail to fully account for the range of factors that contribute to demand (or lack thereof) for the program. As discussed in the sections in the NPRM detailing potential benefits and costs, and now updated for this Final Rule, DHS appreciates that the minimum investment amount is one key factor that could affect utilization of the program, and the increase in the minimum investment amount might deter some investors, or otherwise make an investment under the EB–5 program no longer affordable for some potential investors. DHS does not anticipate, however, that the demand for the EB–5 visa will likely revert to 1990 levels, or even fall to levels that fail to fully

account for the 9,940 visas available a year, solely because of the increase in the minimum investment amount, due to the numerous other factors involved, including those that have led to higher utilization of the program since 2008. Notably, no commenters provided concrete evidence to support the speculation that demand would decrease so dramatically.

Finally, with respect to the commenter's suggestion that an analysis of the price elasticity of demand for the EB–5 visa would offer valuable information regarding investor demand for the EB–5 visa and their price sensitivity, DHS observes that the commenter erroneously assumes DHS has access to certain data and can control certain variables. Since the inception of the program in 1990, the required minimum investment amounts, for a standard investment or an investment in a TEA, have never changed. Calculating a price elasticity of demand for the EB–5 visa would require that DHS know the ratio of the percent change in EB–5 visa demand to the percent change in the investment amount. However, there are likely numerous factors that have influenced the growth of EB–5 investor applications over the past several decades. DHS cannot develop a model that controls for all of the specific variables nor predicts future unforeseeable events. DHS could not accurately measure the influence of the two investment levels on demand for past and future EB–5 investment applications.

3. Adjustments Every Five Years Tied to CPI–U

*Comments:* Some commenters supported increasing the minimum investment amounts every five years. One commenter agreed with the general concept of periodically increasing the minimum investment amount to prevent past practice from repeating. One commenter stated that applying the overall inflation in the U.S. economy to the minimum investment amount every 5 years would compound the damaging impact of raising the minimum investment amount to $1.8 million now. Another commenter suggested developing a different model that would allow the minimum investment amount to increase or decrease based on overall demand for EB–5 immigrant visas and differences in demand between TEA and non-TEA investments (though this commenter acknowledged that the statute does not allow for decreases in the minimum investment amount below the statutory minimum). Two other commenters suggested that an increase

should not be automatic every five years, but instead DHS should evaluate whether an increase is appropriate at that time and how the increase would affect investment and job creation.

*Response:* DHS agrees with the commenters who stated that it is important to include a periodic inflation-adjustment mechanism to avoid a recurrence of the current situation, where the minimum investment amount remains unchanged for a lengthy period and is eroded by inflation, and thus provides for adjustment based on the change in the cumulative annual percentage change in CPI–U. DHS disagrees with basing the amount on the overall demand of the program, as the statute does not specify that demand be the primary (or even a necessary) factor in making a determination to increase the minimum investment amount. Moreover, demand could fluctuate for a variety of reasons outside of the minimum investment amount and thus does not provide a reliable, consistent metric that would permit USCIS and stakeholders to anticipate adjustments (if any) to the minimum investment amount for purposes of consistent adjudication and investment structuring. Further, because the minimum investment amount has not been adjusted since the program's inception, DHS does not have adequate data to propose adjustment of the minimum investment amount based on the impact of such adjustments on overall demand of the program.

DHS also disagrees with the suggestion to evaluate how an increase would affect investment and job creation prior to making future adjustments, rather than utilizing an automatic increase. First, Congress did not explicitly tie the statutory investment amount to the aggregate level of investors, investment, or job creation. The statute contains only individualized requirements for each investor to invest the specified minimum amount of capital and create at least 10 jobs. It is therefore reasonable for adjustments to the individual investment amount to keep pace with inflation, as discussed elsewhere in this rule, rather than be tied to total investors, investment, or job creation.

Moreover, DHS believes that an automatic adjustment based on CPI–U affords greater certainty for investment decisions because stakeholders can predict the level of adjustment on the readily available CPI–U. As noted by the Organization for Economic Co-operation and Development (OECD):

The aim of policies for attracting foreign direct investment must necessarily be to

provide investors with an environment in which they can conduct their business profitably and without incurring unnecessary risk. Experience shows that some of the most important factors considered by investors as they decide on investment location are: A predictable and non-discriminatory regulatory environment and an absence of undue administrative impediments to business more generally.[50]

Given that uncertainty and perceived risk affect investment decisions, DHS believes that an automatic adjustment of the minimum investment amount that occurs every five years provides predictability and consistency to stakeholders so they can tailor business plans accordingly, without needing to wait for DHS' determination.

This rule also makes a technical correction to the inflation adjustment formula for the standard minimum investment amount and the high employment area investment amount, such that future inflation adjustments will be based on the initial investment amount set by Congress in 1990, rather than on the most recent inflation adjustment. Thus, for instance, the next inflation adjustment will be based on the initial minimum investment amount of $1,000,000 in 1990, rather than this rule's minimum investment amount of $1,800,000, which is a rounded figure. This change better implements the intent of the proposed rule; it ensures that future inflation adjustments more accurately track inflation since 1990, rather than being based on rounded figures.

4. Implementation of the Increase in Investment Amount

*Comments:* Multiple commenters provided suggestions on how to implement the increase in the minimum investment amounts, with most of these commenters advocating a phased-in approach. One commenter suggested a transition period to ensure the minimum investment amount catches up to the ideal minimum investment amount without drying up access to capital. Other commenters recommended an incremental approach because the market responds better to smaller increases over time rather than a single increase, and it would also minimize disruptions in EB–5 program activity. Several commenters encouraged DHS to implement a reasonable, stepped increase over the next 5 years.

---

[50] Christiansen, Hans, *Checklist for Foreign Direct Investment Incentive Policies,* Investment and Services Division, OECD Committee on International Investment and Multinational Enterprises (CIME) OECD, 2003, *available at* https://www.oecd.org/daf/inv/investment-policy/2506900.pdf.

*Response:* DHS considered phasing in the minimum investment amount over the next five years, including increasing the amount every year or every other year. However, DHS believes constantly changing amounts would present challenges to the EB–5 market, in that continual, frequent increases would commonly require different investment amounts for different petitioners within the same investment project over a period of time. Such differences would require frequent adjustments to offering documents that could overly complicate adjudications and place burdens on the EB–5 market, including EB–5 petitioners. Most importantly, a phased-in approach or transition period means the minimum investment amount would not fully account for the change in inflation for another five years. DHS believes it is important to take steps to revise the program by making the adjustment now rather than continuing to delay the impact of the inflation-adjusted increase.

5. Increase to the TEA Minimum Investment Amount

*Comments:* Some commenters expressed support for the proposed increase to the TEA minimum investment amount from $500,000 to $1.35 million. A commenter stated that the demand for EB–5 visas is high and the program is oversubscribed, and a higher minimum investment per visa will "increase the overall funding flow and relieve some of the pressure/challenge" to create 10 jobs per visa.

Many commenters stated that the proposed TEA investment amount was too high. Many of these commenters argued that the proposed increase would be detrimental to the future viability of the EB–5 program, especially in light of the fact that the vast majority of historical investments have been made in TEA investments. Many commenters made similar arguments against the proposal to increase the TEA minimum investment amount as they made against the proposal to increase the standard minimum investment amount, such as: The proposed increase would make the EB–5 program less competitive with the immigration investment programs of other countries; the proposed increase would result in minimum investment amounts far exceeding those under consideration by Congress; the proposed increase would have the unintended consequence of severely limiting the participation of many successful mid-career professionals and entrepreneurs; and the proposed increase would especially burden investors from China due to currency control restrictions. Another

commenter recommended that the TEA investment amount not be increased in light of a recent GAO study, which found that rural America only accounted for 3 percent of the projects under the EB–5 program. Some commenters said that an increased TEA investment amount provides a disincentive for the type of projects in areas of high unemployment and rural areas that the program should encourage, and would disproportionately and negatively affect areas needing investment the most.

Commenters proposed several alternative increases to the TEA minimum investment amount. A commenter suggested investment levels "somewhat less than" the levels proposed in recent legislation (*e.g.,* H.R. 5992, the American Job Creation and Investment Promotion Reform Act, which proposed a TEA minimum investment amount of $800,000) because such levels would not shock the investor market, would maintain the competitiveness of the U.S. program relative to the costs of entry for similar investment-related immigration programs in other nations, and could "be reasonably supported by data comparable to that cited by" another commenter. The commenter did not identify which of the other commenter's data it found most relevant, and how data comparable to the other commenter's data would be used to support an $800,000 minimum investment amount.

One commenter suggested setting the TEA investment amount at $650,000 now and gradually increasing the amount to adjust for inflation. This commenter stated that the EB–5 market would not withstand an increase as dramatic as the one proposed; according to the commenter, because the majority of investments are currently made at the $500,000 level, increasing the amount to $1.35 million will significantly reduce the investor pool and make the EB–5 program an unattractive investment when compared with other countries. Other commenters suggested TEA minimum investment amounts ranging from $600,000 to $1 million, similarly arguing that the proposed investment amounts are too high.

One commenter argued for applying an inflation-based increase to the TEA minimum investment amount, rather than the standard investment amount, so that the TEA minimum investment amount would be $900,000. The commenter argued that if a further policy goal is to reduce the TEA versus non-TEA differential to 25 percent instead of the current 50 percent, then

**35768**   **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

the minimum for non-TEA investment amount would become $1.2 million.

*Response:* DHS considered the comments received on this proposed change and, for the reasons explained in the *Investment Level Differential Between Standard Investment Amount and TEA Investment Amount* section below, it will retain the 50 percent differential between TEA and non-TEA investment amounts.

DHS agrees with commenters who supported the proposed increase to $1.35 million in that DHS also believes a higher minimum investment per visa would "increase the overall funding flow and relieve some of the pressure/challenge" to create 10 jobs per visa. DHS notes that an increase from $500,000 to $900,000, though not as high as $1.35 million, will have a similar benefit.

Many commenters, however, asserted that the proposed minimum investment amount for TEAs was too high, or higher than Congress has considered in recent legislation. The proposed increase in the minimum investment amount for TEAs was intended in part to remedy the imbalance referred to in comments, where the vast majority of investments are currently in entities in TEAs, contrary to the balance Congress appears to have expected.[51] While DHS continues to have some concern about the imbalance, the reforms to the designation process for high unemployment TEAs finalized in this rule will better ensure that, even if some imbalance remains, it is benefiting truly deserving communities, as Congress intended. Also, it should be kept in mind that Congress set aside thousands of EB–5 visas a year for those investors (and their immediate family members) investing in TEAs. In fact, while no less than 3,000 visas must be so set aside each year, Congress left DHS with the discretionary ability to set aside even more.[52] Congress did not reserve visas for investors investing in non-TEA projects. These features of the program provide additional indication that Congress considered the goal of incentivizing investments in rural and high-unemployment areas of crucial importance. This set-aside, along with the provision authorizing DHS to institute a substantial investment

differential between the TEA and non-TEA investments, are the primary tools that Congress gave the administering agency to achieve this goal.[53] Ultimately, DHS believes in a meaningful incentive to invest in rural areas and areas of true high-unemployment, and thus, upon careful consideration of the comments related to this issue, DHS opted to retain the differential between TEA and non-TEA investments at 50 percent.

With regard to commenters' suggestions that the current utilization and oversubscription of the program are mainly a result of the fact that presently a significant number of investors can afford to invest at the TEA level amount of $500,000, DHS believes that minimum investment levels represent only one of a range of factors that likely influence demand for the program, including as compared to other countries' investor visa programs. Commenters did not discuss other factors, referenced earlier in this preamble, that likely account for the program's current and past utilization.

DHS considered commenters' other objections that repeated those expressed regarding the increase to the standard minimum investment (the increase will make the EB–5 program less competitive against the immigration investment programs of other countries; the increase represents amounts far exceeding those under consideration by Congress; the increase would have the unintended consequence of severely limiting the participation of many successful mid-career professionals and entrepreneurs; and the increase would especially burden investors from China due to currency control restrictions). DHS disagrees with these commenters for the same reasons stated earlier in this preamble.[54] DHS likewise disagrees with the commenter suggesting that the TEA minimum investment should be implemented gradually for the same reasons described earlier in this preamble related to phasing-in the standard minimum investment amount.

DHS agrees with commenters who assert that not enough EB–5 investment has gone to rural areas and areas of truly

high unemployment, but disagrees that this rule will discourage investment in such areas. On the contrary, DHS believes that the changes made in this rule to the TEA investment amounts and the TEA designation process will increase total investment in rural and high unemployment areas. As discussed in greater detail below, the changes to the TEA designation process made by this final rule will help ensure that areas eligible for the lesser investment amounts as areas of high unemployment are actually areas of high unemployment. DHS also maintains the 50 percent investment level differential between the TEA minimum investment amount and the standard minimum investment amount—rather than reducing it to 25 percent as proposed—in order to continue to incentivize investments in TEAs. DHS believes that the increase in the minimum investment amount in TEAs, while less than proposed, and the reforms to the TEA designation process will result in more overall infusion of capital into rural and high unemployment areas.

DHS considered the alternatives proposed by commenters for the level of the TEA minimum investment amount, such as setting the amount at a number ranging from $600,000 to $1 million. However, having determined to increase the standard minimum investment to $1.8 million based on the CPI–U inflation rate for reasons explained elsewhere in this preamble, investments in TEAs below $900,000 are not permissible under the controlling statute.

DHS also disagrees with the proposal to first adjust the TEA minimum investment amount for inflation, and then determine the standard minimum investment amount based on that. In the statute, Congress set the standard minimum investment amount and gave DHS the authority to increase it. With respect to targeted employment areas, Congress authorized DHS to specify a minimum investment amount that is less than, but no less than half of, the standard amount. Consistent with the mechanism for determining TEA minimum investments under the authorizing statute, in this final rule DHS initially sets the standard amount and then establishes a lesser minimum investment amount for targeted employment areas. INA section 203(b)(5)(C), 8 U.S.C. 1153(b)(5)(C). In addition, if the minimum investment amount for TEAs were adjusted for inflation first and the 25 percent differential were maintained, as the commenter suggests, the differential between the two investment tiers would have been only $300,000, which is

---

[51] *See* 136 Cong. Rec. S36,615 (Oct. 26, 1990) (statement of Sen. Simon). Senator Simon stated: "The general rule-and the vast majority of the investor immigrants will fit in this category-is that the investor must invest $1 million and create 10 U.S. jobs," but he was also "mindful" of the need to target investments in rural areas and noted that the higher the differential, the more encouragement there would be to invest in TEAs).

[52] Section 203(b)(5)(B)(i) of the INA.

[53] Congress also gave DHS the ability to set the minimum investment amount in non-rural areas with very low unemployment rates at up to three times the standard minimum investment amount (or up to $5,400,000 under the revised initial minimum investment amounts under this rule). Section 203(b)(5)(C)(iii) of the INA. This tool has never been utilized, but would be an option to explore in the future.

[54] DHS also received comments on the investment level differential between the standard minimum investment amount and minimum investment amount for TEAs, which will be addressed in the following section.

appreciably smaller than the differential initially proposed ($450,000). As discussed further below, the $300,000 differential could reduce the incentive to invest in TEAs. Therefore, the final rule applies the CPI–U-based increase to the standard minimum investment first. *Id.*

While DHS disagrees with some of the commenters' bases for setting the minimum investment amount for a TEA, DHS will ultimately set the amount lower than proposed for the reasons discussed below. The final rule does not reduce the differential between the standard minimum investment amount and the TEA minimum investment amount from 50 percent to 25 percent as proposed. Rather, this final rule sets the TEA minimum investment amount at $900,000, making the difference between the two investment tiers $900,000.

### 6. Investment Level Differential Between Standard Investment Amount and TEA Investment Amount

*Comments:* Some commenters expressed support for the proposed investment level differential, reasoning that it will maintain a meaningful incentive for foreign investors to invest in a TEA. One commenter stated that the adjustment to a TEA minimum investment amount that is 75 percent of the standard minimum investment amount will continue to attract investors to investments in TEAs since the relative proportion of EB–5 investments that are made in TEAs is already very high. Multiple commenters stated that the differential between the standard minimum investment amount and the minimum investment amount for TEAs should be decreased to encourage non-TEA investments. Referencing anecdotal evidence, a commenter recommended a differential no greater than $200,000 to create an active market for non-TEA investments and demand at both price points. Another commenter recommended that the percentage discount for TEAs should be no more than 20 percent as the only way to make a non-TEA investment feasible. One commenter recommended that the minimum investment amount for a TEA investment should be two-thirds of the standard minimum investment amount, but did not supply any data to support this differential.

Another commenter recommended a more gradual decrease in the relative difference between the standard minimum investment amount and the TEA minimum investment amount to "reduce the severity of the shift of

capital" between TEA and non-TEA investments.

Other commenters recommended that the current 50 percent differential should be maintained. One of these commenters argued that a substantial differential is essential as an effective incentive to make investments in TEAs, and that a substantial differential reflects congressional intent. Another commenter stated that the rule should maintain the 50 percent differential between TEA and non-TEA minimum investment amounts, or at the very least maintain the $500,000 differential by raising the minimum investments amounts to $750,000 in a TEA and $1.25 million outside of a TEA (which would represent a 40 percent differential). Several commenters felt that revisions to the designation of a high unemployment TEA would be effective in directing funds to rural and high unemployment areas without changing the differential between the two minimum investment amount levels.

One commenter agreed with DHS that the 50 percent differential between the standard investment amount and the TEA investment amount has not struck the balance that Congress intended, but believes DHS's proposed solution to this problem would substitute one static differential for another, which is not nearly as market driven as what the commenter would propose to be implemented—a changeable differential (the commenter acknowledged that such a differential would require congressional action). This commenter also encouraged DHS to support legislative resolution of this issue, contending that such solutions would be much more effective in improving the program's reputation and operability.

*Response:* After reviewing the comments, DHS decided that the final rule should maintain the 50 percent minimum investment amount differential between TEAs and non-TEAs. In order to address the imbalance between TEA and non-TEA investments, DHS had originally proposed reducing the differential between the investment amounts to 25 percent in addition to changing the way certain high unemployment TEAs are designated. DHS was concerned that maintaining the current differential of 50 percent, a reduction of $900,000 from the increased standard investment amount, might not adequately correct the current imbalance between TEA and non-TEA investments where the vast majority of investments are in TEAs, many of which have been criticized as

gerrymandered as discussed below.[55] DHS was also concerned that maintaining the 50 percent differential may result in too large of a dollar difference that may create unintended distortions in investment decisions, and that maintaining the differential at a dollar amount similar to the one that previously existed ($500,000 to $450,000) could soften the impact of the multiple changes that will impact TEA investments. Thus, DHS settled on a midpoint between the maximum discount allowed by Congress of 50 percent, and no discount at all.

DHS continues to recognize that addressing the imbalance between TEA and non-TEA investments is worthwhile; however, it must balance that concern with a continued interest in providing a strong incentive to attract investments to rural areas and areas of true high unemployment under the modified TEA designation standards, in order to promote those congressional aims. As noted by one of the commenters, the NPRM quoted Senator Rudolph Boschwitz and Senator Paul Simon, both of whom expressed in 1990 the importance of attracting investment to rural locations and areas with particularly high unemployment.[56] Notably, Senator Simon stated that the lower the investment level for TEAs, the more encouragement there would be for investments in those areas.[57] The same commenter quotes an April 6, 2017 letter from Senator Charles Grassley and other lawmakers to Senator Mitch McConnell and others identifying rural and distressed urban areas as "the very communities this program was originally intended to benefit."[58] DHS finds the comment that a substantial differential is essential as an effective incentive to make investments in TEAs, and that a substantial differential is consistent with congressional intent, to be persuasive. DHS also feels that

---

[55] *Cf.* 136 Cong. Rec. S35,615 (Oct. 26, 1990) (statement of Sen. Simon) ("The general rule—and the vast majority of the investor immigrants will fit in this category—is that the investor must invest $1 million and create 10 U.S. jobs.").

[56] *See* 135 Cong. Rec. S7858–02 (July 13, 1989) (statement of Sen. Boschwitz that the amendment's purpose was to "attract significant investments to rural America."); 136 Cong. Rec. S35,615 (Oct. 26, 1990) (statement of Sen. Simon: "[W]e are mindful of the need to target investments to rural America and areas with particularly high unemployment—areas that can use the job creation the most . . . America's urban core and rural areas have special job creation needs.")

[57] *Id.*

[58] Letter from Senator Grassley, Senator Leahy, Senator Feinstein, Representative Goodlatte, and Representative Conyers to Senator McConnell, Speaker Ryan, Senator Schumer, and Representative Pelosi (Apr. 6, 2017), *available at https://d2xxgpo46qfujt.cloudfront.net/downloads/letter-to-leadership.pdf.*

**35770** **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

maintaining the 50% differential is responsive to commenters who suggested lower differentials and discounts, as well as commenters who suggested gradual implementation of the differential change, since the differential will no longer be changing over time. Further, DHS is satisfied that the reform to TEA designations and the move away from deferring to state TEA designations will address the concerns about gerrymandering that contribute to the imbalance between TEA and non-TEA investments: That investors may choose TEA investments because the designated areas are affluent, due to gerrymandering. It is possible that the percentage of petitioning investors seeking to invest in projects in TEAs will decrease simply because they no longer will have the ability to invest in projects in affluent areas and at the same time reap the benefits of investing in TEA areas. The GAO found that of a random sample of petitioning investors (filing petitions in the fourth quarter of fiscal year 2015) investing in high-unemployment TEAs, 90% were investing in projects that relied on combining census tracts or census block groups.[59] GAO also found that, for those petitioners that elected to invest in a high unemployment TEA, the unemployment rate in the census tract(s) where the projects were physically located was:

- 0–2% in 7% of EB–5 petitioners,
- greater than 2–4% in 29% of EB–5 petitioners,
- greater than 4–6% in 41% of EB–5 petitioners,
- greater than 6–8% in 12% of EB–5 petitioners,
- greater than 8–10% in 3% of EB–5 petitioners,
- greater than 10–12% in 3% of EB–5 petitioners, and
- greater than 12% in 6% of EB–5 petitioners.[60]

Joint commenters noted that GAO's findings indicate that only 12 percent of EB–5 petitioners that qualified for the lower investment amount based on being in high-unemployment TEAs were actually investing in projects physically located in census tracts with unemployment rates of greater than 8 percent. However, the national unemployment rate in the fourth quarter of 2015 averaged 5.15 percent. The commenters stated that given that, under section 203(b)(5)(B)(ii) of the INA, "high unemployment" means "at least 150 percent of the national average

rate," these projects would have had to show an unemployment rate in the neighborhood of 7.725 percent.[61] Accordingly, if DHS had looked at the actual physical location of the projects, few would have qualified as being in high unemployment areas.

Congress authorized DHS to create a multi-leveled investment framework with different minimum investment amounts for investments in TEAs. This final rule retains the current 50 percent differential between TEA and non-TEA investment amounts. DHS believes it is reasonable to conclude, as a matter of common sense, that the revisions to the high unemployment TEA designation standards and process finalized in this rule will likely ameliorate the current imbalance between TEA and non-TEA investments, although some investors may continue to favor investments in more affluent urban areas. Even if the imbalance remains, keeping the current 50 percent differential for TEA investments will benefit the areas intended by Congress by preserving the incentive for investments in rural and high unemployment areas. DHS acknowledges the commenter's concern that a static differential is not market driven. DHS also notes that this final rule in no way affects Congress's ability to pursue a legislative change, for which the commenter advocated.

### D. Revisions to the Targeted Employment Area (TEA) Designation Process

#### 1. Standards Applicable to the Designation of a TEA

##### 1.1. Proposal To Allow Designation of a City or Town With High Unemployment and a Population of 20,000 or More

*Comments:* Several commenters discussed the proposal to allow cities and towns with a population of 20,000 or more to be independently designated as a TEA if the average unemployment rate for the city or town is at least 150 percent above the national average. Most of these commenters supported the proposal. Two commenters stated this was a logical extension of the current policy. One commenter said that setting clear guidelines will help clear up discrepancies and inconsistencies in the EB–5 immigration process. One commenter stated that the addition of municipalities will lead to robust economic growth and opportunities for communities that need it most. One commenter opposed to the proposal contended that the proposal limits areas that can independently qualify as TEAs by removing the TEA possibility for all

cities and towns with populations less than 20,000 that can currently qualify through state designation. The commenter further added that the proposal mistakenly confused the population criteria for TEAs because the 20,000 population requirement pertains to cities and towns residing in counties outside of MSAs that do not meet the requirements for rural TEA status. The commenter stated the population criteria should be 25,000 and not 20,000 because BLS data is only published for cities and towns with populations of 25,000 or more.

*Response:* DHS disagrees with the commenter opposing this proposal but recognizes that the proposal was inadvertently over-inclusive, because DHS intended the proposal to provide additional options for non-rural cities and towns outside of MSAs to qualify as a TEA. DHS did not intend to create an additional option for cities and towns within MSAs. And DHS did not intend to create an artificial distinction between cities and towns within MSAs that have a population of 20,000 or more, on the one hand, and cities and towns within MSAs that have a population under 20,000, on the other. The current regulations do not contain such a distinction.

Accordingly, the final rule only finalizes a portion of the proposal. The final rule allows designation of cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that may qualify as a TEA based on high unemployment. *See* final 8 CFR 204.6(j)(6)(ii)(A). DHS is not finalizing the aspect of the proposal that allowed such designation for cities and towns with a population of 20,000 or more within an MSA. The statute expressly excludes cities and towns with populations of 20,000 or more as well as MSAs from qualifying as "rural" TEAs and existing regulations have permitted MSAs to independently qualify as TEAs based on high unemployment, but non-rural cities and towns with a population of 20,000 or more outside of MSAs have had only one expressly identified means to qualify as TEAs, *i.e.*, based on the unemployment levels of the county in which they are located.[62] In order to

---

[59] GAO, *Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas,* GAO–16–749R, at 7 (figure 2) (Sept. 19, 2016).

[60] *Id.* at 8 (table 1).

[61] *Id.*

[62] Under the current regulatory framework, cities and towns with a population of 20,000 or more inside an MSA can qualify as a high unemployment area through either their county or their MSA. However, cities and towns with a population of 20,000 or more outside an MSA can qualify as a high unemployment area only through their county. Under the final rule, cities and towns with a population of 20,000 or more will each have two options to qualify as a high unemployment— through the county or MSA if inside an MSA or through the city/town or county if outside an MSA.

address this lack of parity with respect to TEA options available to NCEs principally doing business in non-rural areas outside of MSAs, DHS is finalizing the rule to expressly include cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that could independently qualify as a TEA if the average unemployment rate is at least 150 percent of the national average. *See* final 8 CFR 204.6(j)(6)(ii)(A).

Under the EB–5 statute, cities and towns with a population of 20,000 or more cannot qualify as "rural" TEAs, INA section 203(b)(5)(B)(iii), 8 U.S.C. 1153(b)(5)(B)(iii), and DHS believes that maintaining the population criterion at 20,000 for cities and towns outside of MSAs to qualify as a high unemployment area TEA comports with the overall statutory framework. Additionally, while DHS appreciates the comment regarding data availability from the Bureau of Labor Statistics, DHS further notes that publicly available unemployment data for those cities or towns with a population between 20,000 and 25,000 can be found within other government sources of unemployment data, such as the U.S. Census Bureau's American Community Survey (ACS).[63]

Lastly, DHS notes that other geographic areas with high unemployment that are not specifically mentioned above and in the final rule can pursue TEA designation through the census tract approach.

### 1.2. Definition of Rural Area

Some commenters commented on DHS's proposed amendment to the definition of "rural area" clarifying that qualification as a rural area is based on data from the most recent decennial census of the United States. One commenter supported the proposed clarification on the definition of "rural area."

*Comments:* Some commenters stated that there has been a larger legislative discussion about the definition of what qualifies as "rural" for purposes of a TEA, and accordingly, that "regulatory discussion should be held" until a legislative resolution is enacted. Another commenter said proposed 8 CFR 204.6(j)(6)(i) must be revised for consistency with the definition of "rural area" that appears in both Section 203 of the INA and the substantive definition of "rural area" at 8 CFR 204.6(e), as well as an Office of Management and Budget (OMB) directive that states that many counties

included in an MSA "contain both urban and rural territory and populations."[64] The commenter suggested replacement text for 8 CFR 204.6(j)(6)(i).

*Response:* DHS disagrees with the commenters. The agency is bound by the statutory framework established by Congress in 1990 when it defined a "rural area" for TEA designation purposes as "any area *other than an area within a metropolitan statistical area* or within the outer boundary of any city or town having a population of 20,000 or more". 8 U.S.C. 1153(b)(5)(B)(iii); INA 203(b)(5)(B)(iii). Although, arguably, MSAs may include rural territory and populations, for purposes of the EB–5 program and this regulation, DHS will continue to mirror the statutory language. The final rule revises the existing regulatory text to conform with that statutory framework as interpreted by the agency. *See* final 8 CFR 204.6(e). Further, this final rule in no way adversely affects Congress's ability to enact relevant legislation. With respect to consistency between the definition of "rural area" at 8 CFR 204.6(e) and (j)(6)(i), the final rule revises the definition of "rural area" at 8 CFR 204.6(e) to be consistent with both the existing and revised regulations at 8 CFR 204.6(j)(6)(i). DHS appreciates the commenter's proposed changes to 8 CFR 204.6(j)(6)(i), but believes the revisions to the definition of "rural area" at 8 CFR 204.6(e) achieves consistency between applicable regulatory requirements without disturbing the existing agency interpretation as found in both the current and revised regulatory requirements at 8 CFR 204.6(j)(6)(i).

### 1.3. Alternative Proposals for How To Designate a TEA

Several commenters offered alternative proposals for TEA definitions for purposes of designation.

*Comments:* A couple of commenters indicated that public infrastructure projects, where the borrower and beneficiary of the EB–5 capital is solely a governmental body, should be automatically included in the definition of a TEA. These commenters were concerned that without expressly designating public infrastructure projects as TEAs, use of the EB–5 program by public infrastructure projects could be hampered because the

project necessarily spans multiple census tracts, counties, and state boundaries. One commenter said the TEA definition should be expanded to include an area that is within the boundaries of a state or federally defined economic development incentive program, as each of these designations is based on a multi-variable formula. Another commenter asserted that some states have rural cities with populations as low as a few hundred residents each, but that these cities fail to qualify for the rural TEA designation because they sit on the outskirts of a county that falls within a large MSA. The commenter suggested that the rule discriminates against rural cities that happen to be in bigger states, and argued that "a rural city should be a rural city" no matter where it is located. One commenter stated that TEA opportunities could be expanded by granting rural TEA status to all census tracts not within an urbanized area with a population of 50,000 or more, as defined by the most recent decennial census data, if the individual census tract meets a predetermined minimum size and maximum population density criteria, such as greater than 100 square miles and population density of fewer than 25 people per square mile. Another commenter suggested the definition could be broadened to include regions with high level of rent burden or provide flexibility on the job creation requirement if the investor provides affordable housing in the development. Another commenter stated that TEA status should only be given to rural and high poverty areas in the urban MSAs. Some of these commenters opposed the entire idea of a TEA. These commenters suggested that the non-TEA investment amount has never been competitive and that visa set-asides would provide the necessary incentives for rural and distressed urban areas.

*Response:* DHS is bound by the statutory definition of a TEA and rural area at section 203(b)(5)(B) of the INA and DHS cannot redefine a TEA in a manner that is inconsistent with these statutory parameters. The statute defines a TEA as a "rural area or an area which has experienced high unemployment (of at least 150 percent of the national average rate)" and, in turn, defines rural area as "any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States)." While several comments suggested areas that may be in need of investment, Congress set the parameters within

---

[63] *Available at https://www.census.gov/programs-surveys/acs/geography-acs/areas-published.html.*

[64] OMB, Revised Delineations of Metropolitan Statistical Areas, Micropolitan Statistical Areas, and Combined Statistical Areas, and Guidance on Uses of the Delineations of These Areas, OMB Bulletin No. 15–01 (July 15, 2015), *available at https://obamawhitehouse.archives.gov/sites/default/files/omb/bulletins/2015/15-01.pdf.*

which DHS may define a TEA; the final rule fits within the statutory framework. Each of the different alternative criteria suggested are not reasonable interpretations of the statute because they either (1) are not limited to areas as defined by the statute (public infrastructure projects focus on activities rather than areas), (2) are contrary to the existing statutory definitions (smaller cities and towns in outlying areas of a county within an MSA are still within an MSA and thus cannot be rural), or (3) contain criteria that go beyond those mandated by the statute (high rent burden, high poverty (or low income) areas and population density are not based on unemployment or absolute population and areas with a population of 50,000 or more exceeds the population criterion of 20,000 or more set by statute). For USCIS to base TEAs on economic indicators other than unemployment data or to allow local designations based on such indicators would require a statutory change. Finally, while DHS has the discretion to adjust the minimum investment amount for investments within TEAs, the statute nonetheless reserves 3,000 visas for investment into TEAs and, therefore, DHS may not eliminate TEAs entirely. *See* INA sec. 203(b)(5)(B)(i), 8 U.S.C. 1153(b)(5)(B)(i).

### 1.4. Other Comments on the Proposed Standards for Designating TEAs

*Comment:* One commenter stated that the proposal aims to tighten the TEA definition, but hobbles the TEA incentive by decreasing the monetary differential between TEA and non-TEA investment amounts. The commenter stated that industry studies indicate that tightening the TEA definition could, by itself, have the effect of making a majority of EB–5 projects subject to the standard investment level. The commenter mentioned one study that notes that over 80 percent of EB–5 projects in the study's database of large-scale EB–5 projects would not qualify as a TEA by solely changing the TEA standard for special designations of high unemployment areas.

*Response:* DHS agrees with the commenter that decreasing the monetary differential between TEA and non-TEA investment amounts undermines the incentive to invest in TEAs. As discussed above, Senator Rudolph Boschwitz and Senator Paul Simon both expressed in 1990 the importance of attracting investment to rural locations and areas with particularly high unemployment. Notably, Senator Simon stated that the lower the investment level for TEAs, the more encouragement there would be for investments in those areas.[65]

The commenter cites to a publication by Jeanne Calderon and Gary Friedland of New York University's Stern School of Business, who state that

[T]he two essential ingredients to a meaningful TEA incentive are (1) a narrowly defined area that limits the number of projects that may qualify for the TEA discount, and (2) a sufficiently wide TEA spread between the minimum amount required for a TEA project location and other location.[66]

DHS agrees with the commenter that although the reforms to high unemployment TEA designation and process address the first ingredient, reducing the differential undermines the second ingredient. Thus, in the final rule, DHS maintains a 50 percent differential between the TEA investment amount and non-TEA investment amount in order to encourage development outside of affluent areas and increase investment in TEAs.

Additionally, many TEAs have been criticized as being "gerrymandered" to qualify for the reduced threshold amount.[67] DHS believes the best solution to deter "gerrymandered" TEAs and to more effectively utilize the congressionally mandated TEA incentive is to reform both the TEA definitions and designation process while maintaining the 50 percent differential. DHS believes these changes will more optimally incentivize targeted investment into areas of need that Congress sought when establishing the TEA provisions of the EB–5 program.

### 2. Proposal To Eliminate State Designation of TEAs

Multiple commenters discussed the proposed shift of TEA designation from the states to DHS. Of those, most but not all opposed the proposal to shift all TEA designation from the states to USCIS.

*Comments:* Several commenters provided support for the proposal to shift the TEA designation authority from the states to DHS as written. Several of these commenters supported the proposal because it would standardize and streamline the TEA designation process, provide much needed transparency, and align the TEA designations process with congressional intent. One commenter noted that most TEA projects are not actually located in rural or economically distressed areas because states have had such a high degree of flexibility to designate a TEA. Many commenters argued that the states have the most expertise with local employment and unemployment data, as well as knowledge of local demographics and economies to make TEA designation determinations. In addition, some commenters indicated their appreciation of working with local officials and that such coordination has mutual benefits for the project and the local economic development agencies, which they felt would be lost if states were removed from the designation process. One commenter stated that a state-based perspective is more likely to capture an accurate reality of unemployment and the rural conditions of Indian tribes.

*Response:* DHS recognizes that states may possess expertise in local demographics and economies and that states may play an important role in facilitating EB–5 projects. However, DHS must weigh such expertise against transparency in TEA designations and a state's natural self-interest in promoting economic development.[68] This self-interest has resulted in the application of inconsistent rules for designation of high unemployment areas by the states. This inconsistency results in acceptance of TEAs that are criticized as "gerrymandered."[69] TEA designations made by states under the existing system thus do not reliably fulfill the congressional intent of the program to

---

[65] *See* 136 Cong. Rec. S35,615 (Oct. 26, 1990) (statement of Sen. Simon).

[66] Gary Friedland and Joanne Calderon, *EB–5 Prescription for Reform: Legislation or Regulation?*, NYU Stern School of Business, June 19, 2017, page 11 *available at* http://www.stern.nyu.edu/sites/default/files/assets/documents/EB-5%20Prescription%20for%20Reform%20-%20Legislation%20or%20Regulation%206.19.2017%20draft.pdf.

[67] For instance, one industry participant expressed a belief that a clear majority of EB–5 capital was going to projects relying on "some form of gerrymandering" to qualify for the reduced minimum investment requirement. Eliot Brown, "How a U.S. Visa-for-Cash Plan Funds Luxury Apartment Buildings; Program Meant to Spur Jobs in Poor Areas Largely Finances Developments in Affluent Neighborhoods," *Wall St. J.*, Sept. 9, 2015, *available at* https://www.wsj.com/articles/how-immigrants-cash-funds-luxury-towers-in-the-u-s-1441848965 (last visited Dec. 17, 2018) (citing Michael Gibson, managing director, *USAdvisors.org*).

[68] *The Distortion of EB–5 Targeted Employment Areas: Time to End the Abuse: Hearing Before the S. Comm. On the Judiciary*, 114th Cong. 12 (2016) (statement by Gary Friedland, Scholar-in-Residence, N.Y. Univ., Stern School of Bus.) ("Compounding the problem, often the state agency that is charged with making the TEA determination is the same agency that promotes local economic development.") .

[69] *See, e.g.*, "Eliot Brown, Swanky New York Condo Project Exploits Aid Program," *Wall St. Journal*, Oct. 13, 2015, http://www.wsj.com/articles/posh-tower-proposed-for-struggling-new-york-neighborhood-central-park-south-1444728781; Patrick McGeehan and Kirk Semple, "Rules Stretched as Green Cards Go to Investors," *New York Times*, Dec. 18 2011, *available at* https://nyti.ms/2FgZoQq.

AR_001967

incentivize the investment of EB–5 capital in actual high unemployment areas. To better adhere to this congressional intent, DHS believes the EB–5 program is best served by shifting the designation of high unemployment areas from the states to DHS.

DHS also rejects the commenter's assertion that states are better positioned to determine the unemployment of Indian tribal areas. The commenter failed to provide any data to support the claim that a state-based perspective is more likely to capture an accurate reality of unemployment in and the rural conditions of Indian tribal areas. The U.S. Census Bureau conducts outreach to Indian tribes to collect information, including unemployment rates, from Indian tribes.[70]

*Comment:* One commenter stated that because USCIS adjudications of TEA designations are not within the agency's area of immigration-law expertise, such adjudications would not receive deference under *Chevron USA* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), if challenged in federal court. The commenter suggested that the possibility of litigation over such adjudications was ''another reason to give serious consideration to allowing the states to retain the authority to make [TEA] determination[s].''

*Response:* DHS disagrees with the commenter's interpretation of the case law, but in any case has elected to move forward with its proposal for the reasons expressed elsewhere in this preamble.

*Comments:* Some commenters expressed concerns about the impact of the proposal on processing times. Some commenters argued that states have the resources and capacity to process high unemployment designation letters relatively quickly, whereas shifting the high unemployment designation authority to DHS would exacerbate processing backlogs and delay investments and project progress. Some commenters explained that DHS must be committed to a speedy TEA designation process, as the TEA designation must be secured early in the process of analyzing whether a particular project is suitable for EB–5 investment. One commenter stated that currently, almost all states are able to

provide a TEA designation in two weeks or less. The commenter questioned DHS's ability to process TEA requests in under 30 days, which the commenter claimed is what would be required to make the system viable. One commenter noted that developers often seek multiple TEA designation letters from states as part of their due diligence, further compounding the adjudication demands on DHS. One commenter expressed concern about resources at USCIS being moved from Form I–526 and Form I–829 adjudications to TEA designation determinations, which would further increase petition backlogs for all EB–5 forms. Two commenters said it is unclear whether there will be any ability for TEA designations to be made prior to adjudication of the Form I–526 petition or Form I–924 application. The commenters stated that TEA designations should be available to projects prior to filing of the Form I–526 or Form I–924. One commenter stated that DHS should allow the filing of Forms I–924 and Forms I–526 while a TEA designation is pending, arguing that if the DHS process is uniform and predictable, investors and market participants can proceed on an efficient parallel track to expedite projects.

*Response:* The framework detailed in the NPRM and finalized in this rule should not add a significant additional burden to petitioners or to DHS in the adjudication process. DHS is committed to providing timely TEA designation decisions as part of the adjudication process. DHS does not foresee an increase in petition backlogs based on handling high unemployment area designations as the agency already reviews state designation evidence provided by petitioners As in the current process, EB–5 petitioners will be required to provide evidence to demonstrate the area in which the new commercial enterprise into which they are investing is principally doing business is a TEA. The new framework, while implementing a new methodology, still requires petitioners to demonstrate that the area specified in the regulations in which the NCE is principally doing business has the requisite unemployment level. DHS will still review this data as it currently reviews high unemployment area designation letters from states, by reviewing the area for which TEA designation is sought to confirm it complies with the new methodology for including census tracts. As DHS has now set the parameters for the size of a TEA, something states previously did, there is no longer a role for the states. The new methodology allows

petitioners to determine on their own whether the proposed location is a TEA by reviewing the census tract and, if necessary, the adjoining tracts.

This rule does not establish a separate application or process for obtaining TEA designation from USCIS prior to filing the EB–5 immigrant petition and USCIS will not issue separate TEA designation letters for areas of high unemployment. DHS will make the determination as part of the existing adjudication process and does not anticipate an impact to the overall timing of the adjudication process.

DHS recognizes that this final rule represents a shift from the current process by which designations of certain high unemployment areas may be obtained from states in advance of filing. If a regional center prefers to seek TEA determination in advance of investor petition filings, the regional center may file an exemplar application as part of a Form I–924 adjudication. If the exemplar application is approved, the approval (including the TEA determination) will receive deference in individual investor petition filings associated with that exemplar in accordance with existing USCIS policy (for example, absent a material change in facts affecting the underlying favorable determination or its applicability to eligibility for the individual investor). For non-regional center investors, unemployment data is readily available by which they can determine if an investment in a particular area satisfies applicable TEA designation requirements. As a result of the clearer, more objective designation standards under this final rule, this rule should provide sufficient certainty regarding the amount and timing of an investment to establish eligibility when filing their petitions.

DHS notes that this change harmonizes the process for all types of TEAs—including rural areas, for which no preliminary determination process exists. In any event, if necessary, DHS could raise associated fees to bring on board additional adjudicators.

*Comments:* Some commenters said it is clear from the **Federal Register** and the Adjudicator's Field Manual that congressional intent was to allow states to have the right to issue high unemployment area designations. These commenters referenced the issuance of the EB–5 regulations in 1991 where legacy INS previously decided to delegate the TEA designation process to the states and further cited the now-superseded Adjudicator's Field Manual that explained how the agency provided deference to decisions made by the states, emphasizing that USCIS has no

---

[70] *See Tribal Consultation Handbook: Background Materials for Tribal Consultations on the 2020 Census,* Fall 2015, U.S. Department of Commerce, U.S. Census Bureau, *available at* https://www.census.gov/content/dam/Census/library/publications/2015/dec/2020_tribal_consultation_handbook.pdf. See also My Tribal Area, a collection of American Community Survey data for tribal areas, *available at* https://www.census.gov/tribal/.

**35774**    **Federal Register**/Vol. 84, No. 142/Wednesday, July 24, 2019/Rules and Regulations

role in the determination process. One commenter said that DHS assuming the role of high unemployment area designation overturns two decades of allowing the formulation of high unemployment areas to be determined by states. One commenter stated that the proposal is directly contrary to the government's asserted priority to transfer authority from the Federal Government to the states, while another commenter expressed concern that the shift would ''politicize'' the designation process.

*Response:* DHS disagrees with the assertion that the congressional intent of the EB–5 program was to allow states to designate high unemployment areas. Commenters referenced no statutory text or legislative history to this effect. Regulations promulgated by the legacy Immigration and Naturalization Service (INS), the predecessor to USCIS, and not INA section 203(b)(5), authorized the role of states in the TEA designation process. It is clear that the congressional intent of the TEA provision was to incentivize EB–5 investment in areas of actual high unemployment. Currently, as a result of each state's interest in promoting investment with its borders, the states' role in designating high unemployment areas for purposes of the EB–5 program has resulted in instances when high unemployment area designations include areas far outside of actual distressed areas that many have called ''gerrymandered.'' [71] For these reasons, DHS has determined that it is necessary to shift the high unemployment area designation from the states to DHS.

DHS recognizes that eliminating the state role in high unemployment area designation represents a significant change from the existing regulations.[72] However, as pointed out in the NPRM, allowing states to make high unemployment area designations has resulted in the application of inconsistent rules by various states in order to facilitate EB–5 funding to increase economic development within those states.[73] The result is that 97

percent of all EB–5 petitions filed in 2015 were within state-designated high unemployment areas, and according to the GAO's analysis of I–526 petitions from the fourth quarter of fiscal year 2015, the vast majority of EB–5 petitioners who purported to invest in areas of high unemployment had invested in projects physically located in a census tract or tracts with unemployment levels below the 150% of the national unemployment rate threshold for high unemployment.[74] DHS believes that this is inconsistent with clear congressional aims in enacting the EB–5 program and therefore warrants a change in policy mandating high unemployment area designations by DHS rather than by the states.

DHS disagrees with the proposition that removing states from the high unemployment area designation process will ''politicize'' the designation process. DHS has proposed a clear and objective high unemployment area designation framework allowing high unemployment areas consisting of a census tract, or contiguous census tracts, in which the new commercial enterprise is principally doing business, if the weighted average of the unemployment rate for the tract or tracts is at least 150 percent above the national average. Such determinations will not be based on subjective or political factors. DHS will make high unemployment designation determinations based solely on publicly available data. DHS believes this final rule makes the process more transparent and uniform and less subject to political whims by eliminating the current political pressures within each state associated with the current process.

*Comments:* One commenter said shifting designation responsibility to the Federal Government will invariably make it harder for direct investments (*i.e.,* non-regional center investments) to

compete with larger, better funded regional centers. Another commenter suggested issuance of TEA designation by DHS would be appropriate for regional center projects because these projects can cross state lines and the size allows for more financial resources to pay for independent economic studies. The commenter stated that, on the other hand, TEA designation by DHS is not appropriate for direct investment projects because the projects tend to be smaller and in the same state, and because coordinating with the local government provides the project with valuable economic and demographic data.

*Response:* DHS rejects the notion that its administration of the TEA designation process will make it harder for direct investment projects. This final rule lays out a TEA designation process easily navigated by any petitioner— whether associated with a regional center or not—for little or no cost. The data necessary for the TEA designation determination is publicly available from the Bureau of Labor Statistics or U.S. Census Bureau. A TEA designation request alternatively can be supported with other data, public or private, provided that DHS can validate that data. The TEA designation process will not require additional costly studies, or steps beyond what is already required as part of the Form I–526 petition, that would make TEA designation unviable for direct investment projects. More importantly, whereas DHS has laid out a transparent process for all new commercial enterprises to use, each state has a different high unemployment area designation process that petitioners must satisfy. Investigating and complying with a particular state's requirements beyond those specified in the regulations, or with multiple states' different requirements for direct investments that are either not location-specific or located in multiple jurisdictions, is likely to require more financial resources than adhering to a single, uniform set of standards and processes through DHS. DHS thus is not persuaded that changes made by this rule will be detrimental to or disproportionately affect direct investment projects. Nothing in this rule would inhibit their ability to coordinate with units of local government.

*Comments:* Several commenters suggested that DHS clearly communicate to the states a program-wide set of well-defined, technically sound, and transparent guidelines, standards, and rules, such as providing a limit of census tracts, or particular data the state must use for the designation. This would allow the states

---

[71] *See, e.g.,* Eliot Brown, ''Swanky New York Condo Project Exploits Aid Program,'' *Wall St. Journal,* Oct. 13, 2015, *http://www.wsj.com/articles/posh-tower-proposed-for-struggling-new-york-neighborhood-central-park-south-1444728781;* Patrick McGeehan and Kirk Semple, ''Rules Stretched as Green Cards Go to Investors,'' *New York Times,* Dec. 18 2011, *https://nyti.ms/2FgZoQq.*

[72] DHS notes that no comments on this change from any state government were submitted.

[73] *Is the Investor Visa Program an Underperforming Asset?: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 62 (2016) (statement of Matt Gordon, Chief Exec. Officer, E3 Inv. Group) (''Generally, States quickly learned to be as permissive as possible in an attempt to attract ever greater amounts of EB–5 capital.''); *see also*

*The Distortion of EB–5 Targeted Employment Areas: Time to End the Abuse: Hearing Before the S. Comm. on the Judiciary,* 114th Cong. 12 (2016) (statement of Gary Friedland, Scholar-in-Residence, N.Y. Univ., Stern School of Bus.) (''USCIS' continued delegation to the states of the TEA authority without guidelines results in the application of inconsistent rules by the various states. More important, each state has the obvious self-interest to promote economic development within its own borders. Delegation presents an opportunity for the states to establish lenient rules to enable project locations to qualify as a TEA. Compounding the problem, often the state agency that is charged with making the TEA determination is the same agency that promotes local economic development. As a consequence, virtually every EB–5 project location qualifies as a TEA.'').

[74] *See* GAO, *Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas,* GAO–17–487T, at 8 (Mar. 8, 2017).

to continue to be the designators of high unemployment areas, but would require the states to operate in a more streamlined manner.

*Response:* DHS rejects the proposal. While the changes in this rule to the definition of a high unemployment area that qualifies as a TEA could provide the rules for state designators, DHS would still need to make individual determinations on each state designation as to whether it complies with those rules. DHS believes it would be duplicative and wasteful, administratively burdensome, and more difficult to evaluate the individualized determinations of the various states than to implement and administer a nationwide standard on its own.

3. Proposal To Change Special Designation of a High Unemployment Area

Some commenters supported the proposed changes to the special designation of a high unemployment area. Several commenters said the changes align with congressional intent to provide an incentive for projects located in a truly high unemployment area and reduce TEA gerrymandering and manipulation. Other commenters emphasized that TEA gerrymandering and manipulation has been well documented and criticized by Congress, the media, scholars, and industry insiders. Other commenters appreciated the proposal as a reasonable ''compromise'' to the possible definitions of the geographic area that could constitute a TEA.

3.1 Alternatives—Use of Census Tracts vs. Block Groups

*Comments:* Multiple commenters suggested the use of block groups, which are the smallest geographic configuration for which employment and unemployment data is available, instead of, or in addition to, census tracts. Commenters listed several benefits to using block groups instead of census tracts. One commenter indicated block groups allow TEAs to better reflect true high unemployment areas that using larger areas will not allow (*e.g.,* in smaller pockets of high unemployment inner city areas). Another commenter noted that, in urban areas, block group high unemployment areas are more equitable because resident demographics can change drastically from one city block to the next. Commenters indicated that more than 15 states currently use census block groups as allowable sub-municipal building blocks in the design of areas for high unemployment area approval, and many other states have

indicated a willingness to consider a census block approach for defining high unemployment area TEAs. In proposing the use of census blocks, commenters generally suggested a limitation regarding the number of census block groups that could be used to define a high unemployment area, as long as the limitation reflected the fact that census block groups are a significantly smaller area. Commenters offered examples, such as San Antonio's limitation to 24 block groups and Houston's 60-block-group limitation.

*Response:* DHS disagrees with commenters supporting the use of census block groups in lieu of or in addition to census tracts. While data is available for both census block groups and census tracts in 5-year estimates,[75] census tract boundaries are delineated with the intention of being maintained over a long period of time so that statistical comparisons can be made from census to census.[76] While census tracts are occasionally split due to population growth or merged as a result of substantial population decline, such changes are generally reflected in census tract numbering to preserve continuity for comparison purposes. Census block groups do not offer the same longevity analysis and census blocks are not delineated based on population. In fact, many census blocks are unpopulated.[77] Thus, census tract data is ultimately more reliable for purposes of designating areas of high unemployment, as census tracts, unlike census blocks, generally contain certain levels of population at any given time, which strengthens the reliability of the unemployment data collected for that population.[78] As DHS reviews areas to determine whether they qualify for high unemployment area designation at the time of investment or at the time of filing the EB–5 petition, as appropriate, DHS believes the use of census tracts provides both petitioners and the

industry with an overall more statistically reliable area for high unemployment area designation.

Commenters indicated some states are currently utilizing census block groups in their high unemployment area designations and suggested that numerical limitations could be placed on the number of census blocks that may be utilized, yet neither the use by states nor numerical limitations address the issues presented by census blocks relative to census tracts discussed above. The final rule contains a consistent and clear adjudication framework to reduce these issues.

*Comments:* Some commenters stated that limiting high unemployment area configurations to census tracts would negatively affect the many states that currently utilize both block groups and census tracts. These commenters stated that the exclusion of census block groups would particularly affect states in the western United States, where less densely populated areas can result in census tracts that are several tens of square miles, even hundreds of square miles, in size.

*Response:* While DHS appreciates the concerns raised, DHS disagrees with the commenters' concerns about the impact to the western United States and believes that because the final rule will eliminate the states' role in the high unemployment area designation process, it will result in uniform application across the United States. As discussed elsewhere, census tracts are drawn based on the total population within the area. Tracts that are hundreds of square miles in size often would not require a high unemployment area designation based on the census tract, but would instead qualify as a rural area, and thereby be eligible for TEA designation even if ineligible under the high unemployment area criteria. Further, even if such a large tract was not rural, any concentrated urban area within that tract that is a city or town of sufficient population size could independently qualify on that basis. Finally, because the census tract is based on population size, the size of the area of the tract is ultimately irrelevant. No matter the tract size, the methodology for determining whether the tract (or combination of tracts) constitutes a TEA is the same, based on the unemployment rate, with the calculation being unaffected by the size of the tract.

3.2. Alternative—Commuter Patterns

*Comments:* Numerous commenters stated that the designation of a high unemployment TEA should include a ''commuter pattern'' analysis that would

---

[75] *See* U.S. Census Bureau, *American Community Survey (ACS): When to Use 1-year, 3-year, or 5-year Estimates, available at https://www.census.gov/programs-surveys/acs/guidance/estimates.html* (last accessed June 27, 2018).

[76] *See* U.S. Census Bureau, *Geographic Terms and Concepts—Census Tract, available at https://www.census.gov/geo/reference/gtc/gtc_ct.html* (last accessed June 27, 2018).

[77] *See* U.S. Census Bureau, *Census Blogs: What are Census Blocks?* Available at *https://www.census.gov/newsroom/blogs/random-samplings/2011/07/what-are-census-blocks.html* (last accessed June 27, 2018).

[78] *See* U.S. Census Bureau, *Geographic Terms and Concepts—Census Tract, available at https://www.census.gov/geo/reference/gtc/gtc_ct.html* (last accessed June 27, 2018); U.S. Census Bureau, *Geographic Terms and Concepts—Block Groups, https://www.census.gov/geo/reference/gtc/gtc_bg.html* (last accessed June 27, 2018).

**35776**    **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

focus on defining a high unemployment area as encompassing the area in which workers may live and be commuting from, rather than just where the investment is made and where the NCE is principally doing business.

Multiple commenters stated that the rule should recognize the relationship between job locations and where workers live and that urban centers where the jobs are located are not necessarily a measure of where unemployed residents reside. These commenters stated that limiting TEA designation to the project's census tracts and any immediately adjacent tracts (sometimes called "spooled tracts" or "donuts") is unnecessarily restrictive, fails to take into account the linear economic development of cities following a block-by-block path and/or transit lines, and would make many large job-creating projects in highly concentrated urban areas ineligible because the non-contiguous worker-supplying areas (where significant job benefits would accrue) would be excluded from the TEA designation calculations. Two commenters said the rule inappropriately ignores that EB–5 investment projects benefit U.S. workers outside the specific project location who use regional mass transit to commute to urban centers of employment. One of these commenters asserted that, if the proposed TEA definitions are implemented, many large-scale urban projects that meet current requirements and have benefited from significant foreign investment would no longer qualify for EB–5 investment. Similarly, some individuals wrote that the proposal to limit TEAs in urban cores to a single census track or cluster of "spooled" census tracts would unfairly disadvantage "the most economically viable urban projects"—described by the commenters as those that create jobs for workers commuting from the greater metropolitan area.

Commenters offered various suggestions to implement a commuter-based approach. Two commenters recommended employing the contiguous model approach with a state-defined limit of census tracts, which would limit the area that could be utilized, but still provide a wide enough perimeter to allow for commuting pattern approach. Two commenters recommended that the rule include high unemployment, non-contiguous census tracts (or block groups, as discussed above) in the TEA designation. One commenter recommended a statistically driven, replicable commuter-based methodology for urban "high unemployment areas" that would combine ACS unemployment data with

the census's best available commuting data (which the commenter noted is already used for current high unemployment designations) and also merge ACS unemployment data with the Federal Highway Administration's online Census Transportation Planning Products (CTPP). The commenter said its proposed "9-step" approach was consistent with statutory text, but encouraged closer analysis and refinement of the proposed approach by industry and government experts.

*Response:* DHS disagrees with these commenters. The statutory language regarding TEA designations provides that the targeted employment area (*i.e.,* the area experiencing high unemployment or rural area) must be the area in which the new commercial enterprise will create jobs.[79] The proposals put forth by the commenters were either the same approach previously analyzed by DHS and already deemed inappropriate or similar approaches that nonetheless presented the same unresolved issues. While DHS appreciates the arguments made by commenters regarding economic development and commuting patterns, DHS believes that the commuter-based approaches presented do not adequately address the issue of selectively choosing among high unemployment commuting areas rather than more comprehensively including all areas to and from which an individual may commute (including areas of low unemployment), which may ultimately result in merely a different form of the same type of "gerrymandering" that DHS seeks to address with this regulation. Moreover, DHS believes that the statutory incentive for the reduced investment amount in a targeted employment area is best effectuated by restricting its application to investments in new commercial enterprises that create jobs in the actual area experiencing high unemployment or rural area—not in non-rural areas without high unemployment that are physically distant or otherwise disconnected from selected outlying areas with high unemployment from which prospective workers may commute. Moreover, as discussed in the NPRM, the commuter pattern approach previously considered by DHS was deemed too operationally burdensome to implement as it posed challenges in establishing standards to determine the relevant commuting area

that would fairly account for variances across the country.[80] In addition, DHS could not identify a commuting-pattern standard that would appropriately limit the geographic scope of a TEA designation consistent with the statute and the policy goals of this regulation to address "gerrymandering" concerns and more closely link the locus of investment and job-creation with areas actually experiencing high unemployment.

Assuming that a commuting patterns model might result in jobs being created for workers residing in high-unemployment areas, the only way to demonstrate that this is the case would be to require that petitioners provide W–2s or other evidence demonstrating where the workers lived. Even where such evidence could be provided, it would be too complex and operationally burdensome to determine which cases would be impacted and to review such evidence and link each worker to a separate area of high unemployment for each petitioner.

In any event, commuter pattern analysis would unduly limit the effects of TEA investments on the areas that Congress most intended to benefit. For instance, the Leadership Conference on Civil and Human Rights has argued that "it is imperative that Investor Visa funds go directly into building infrastructure in communities in West

---

[79] INA 203(b)(5)(B)(i) states: "No less than 3,000 of the visas made available under this paragraph for each fiscal year shall be reserved for qualified immigrants who invest in a new commercial enterprise described in subparagraph (A) *which will create employment in a targeted employment area*" (emphasis added).

[80] DHS reviewed a proposed commuter pattern analysis incorporating the data table from the Federal Highway Administration, "CTPP 2006–2010 Census Tract Flows," *available at http://www.fhwa.dot.gov/planning/census_issues/ctpp/data_products/2006-2010_tract_flows/* (last updated Mar. 25, 2014). DHS also reviewed the CTTP updated status report (January 2018) entitled "Small and Custom Geography Policy Change Announcement CTPP Oversight Board is Discontinuing Census TAZ for Small Geography Data Reporting and Urging the Transportation Planning Community to Engage in 2020 Census Participant Statistical Areas Program (PSAP)," which is available at: *https://www.fhwa.dot.gov/planning/census_issues/ctpp/status_report/sr0118/fhwahep18046.pdf,* which will phase in slight methodological changes over the next year. DHS found the required steps to properly manipulate the Census Transportation Planning Product (CTPP) database might prove overly burdensome for petitioners with insufficient economic and statistical analysis backgrounds. Further, upon contacting the agency responsible to manage the CTPP data, DHS was informed that the 2006–2010 CTPP data is unlikely to be updated prior to FY2018 to incorporate proposed changes to the data table. U.S. Census is currently reviewing the CTPP proposed changes. As an alternative methodology for TEA commuter patter analysis, DHS reviewed data from the U.S. Census Tool, On the Map, *available at http://onthemap.ces.census.gov,* which is tied to the U.S. Census Bureau's American Community Survey. Although the interface appeared to be more user-friendly overall, using this data would be operationally burdensome, potentially requiring hours of review to obtain the appropriate unemployment rates for the commuting area.

Baltimore and the South Bronx and the like. Projects in neighboring areas will leave these communities of concentrated poverty no better off in terms of development and infrastructure after their conclusion.'' [81] In comments to the proposed rule, the Leadership Conference similarly suggested that a commuter pattern analysis would be misused to continue the practice of cobbling together census tracts in order to get the TEA discount for an area that is not in fact a high poverty area.

DHS considers a variety of officially recognized areas (e.g., metropolitan statistical areas and counties) for determining whether a given area has experienced high unemployment. Under both the final rule and existing regulations, petitioners may demonstrate that the metropolitan statistical area in their new commercial enterprise is principally doing business has the requisite unemployment; MSA designation is based in part on commuting ties among related counties.[82] Thus, petitioners are not entirely without options to achieve TEA designation in non-rural areas that account for commuter patterns and that does not present the same issues as the other approaches discussed above.

*Comments:* Several commenters stated that it would be inconsistent for DHS to dismiss a commuter-based TEA option in the urban context because ''rural'' TEAs rely on key OMB and Census Bureau definitions that depend on commuting ties. These commenters point to the U.S. Census Bureau's definition of a core based statistical area (CBSA) as defined by the U.S. Census Bureau:

A statistical geographic entity defined by the U.S. Office of Management and Budget (OMB), consisting of the county or counties associated with at least one core (urban area) of at least 10,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties with the counties containing the core. Metropolitan and micropolitan statistical areas are the two types of CBSAs.[83]

*Response:* DHS is bound by the statutory framework defining what constitutes a TEA. As explained above, the statute specifically defines what constitutes a rural area and the final rule

conforms to the statutory definition. With respect to areas experiencing high unemployment, petitioners may demonstrate that the metropolitan statistical area in which their new commercial enterprise is principally doing business has the requisite unemployment. Because metropolitan statistical areas themselves are defined by reference to commuting patterns, petitioners have a TEA option for non-rural areas that is reasonably commuter-based.

### 3.3. Alternative—Tract/Block Limitation

*Comments:* Multiple commenters stated that the proposed TEA definition should be limited to a single census tract, the tract in which the project is located. The commenters stated that this would reduce the chance that the TEA status of a project location might be based on the economic condition of a remote tract that does not reflect the characteristics of the project tract. However, these commenters also suggested that if DHS is determined to allow contiguous/adjacent census tracts to be included, all contiguous/adjacent tracts should be taken into account rather than allowing the applicant to ''pick and choose'' any single contiguous/adjacent tract that, taken together with the project tract, would meet the high unemployment test.

*Response:* DHS appreciates the concerns raised by the commenters. While DHS believes that a single-tract approach would be operationally efficient to implement, DHS appreciates the concerns held by many other commenters regarding the changes to the TEA designation process. Allowing petitioners the flexibility to incorporate those tracts adjacent to the tract(s) in which the new commercial enterprise is principally doing business helps meet the policy goals of reducing inconsistencies and inequities in adjudications while also recognizing that a single-tract approach may itself be inequitable to particular businesses with close connections to adjacent areas that may cross census tract boundaries. DHS believes the compromise to allow for the inclusion, as needed, of adjacent census tracts will provide for some flexibility in business and economic development while still providing significant incentive to invest in a high unemployment area as Congress intended.

*Comment:* While supporting some sort of tract limitation to prevent gerrymandering, several commenters argued that there should be unlimited configurations of census blocks, block groups, or other political subdivisions if the high unemployment area is located

entirely within either an MSA or county. To further prevent attempts to gerrymander TEAs for projects close to the border of MSA regions, some commenters said the rule could include a limit to the number of sub-municipal areas (e.g., a limit of 12 or 15 sub-municipal areas) if the TEA were to cross an MSA or county boundary.

*Response:* DHS disagrees with these commenters. The final rule continues the existing policy of allowing an entire MSA or county to be designated as a TEA. Further, the final rule clarifies that a city or town with a population of 20,000 or more outside of an MSA can be designated entirely as a TEA if otherwise eligible. Where a new commercial enterprise is principally doing business in a non-rural area that cannot qualify at the MSA, county, or city/town outside of an MSA level, the final rule offers the smaller geographic area of a census tract(s) and the adjacent census tracts to qualify as a TEA. As previously explained, DHS believes the census tract is the most appropriate and smallest geographic area from which relevant, reliable data can be obtained regarding unemployment statistics. DHS rejects the use of census blocks, block groups, or other smaller sub-municipal areas for the reasons stated above. Allowing unlimited census tracts within an MSA or county would wholly or substantially continue the existing practice of certain states along with the attendant concerns regarding high unemployment area designation inconsistencies and inequities that the final rule eliminates.

### 3.4. Alternative—California Approach

*Comments:* Several commenters supported the approach implemented by California, which limits the geographic or political subdivision to 12 contiguous census tracts. One commenter said all gerrymandering concerns can be fully addressed by limiting the number of combined areas to 12, or to some other agreed-upon number when a TEA crosses MSA (or county) boundaries. One commenter said the stated goal of uniformity can be attained by imposing a single federal standard for TEA determinations, such as California's rule which has a limit of no more than 12 contiguous census tracts. The commenter also said that the concerns about gerrymandering can be adequately addressed by requiring the responsible state agency to articulate a reasonable basis for its determination that investment at the project site will have a beneficial job-creating impact across the entire area of the TEA. One commenter supported the California

---

[81] Nancy Zirkin, Executive Vice President, Leadership Conference on Civil and Human Rights, ''Is the Investor Program an Underperforming Asset?'' U.S. House of Representatives, 3–4, (Feb. 11, 2016), *available at https://docs.house.gov/meetings/JU/JU00/20160211/104454/HHRG-114-JU00-20160211-SD004.pdf*.

[82] 2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas; Notice, 75 FR 37246 (June 28, 2010).

[83] 76 FR 53042.

approach, but suggested a limit of 15 contiguous census tracts.

*Response:* DHS disagrees with the commenters that gerrymandering concerns would be fully addressed by limiting the number of combined areas when a high unemployment area crosses MSA or county lines. DHS expressed concerns in the NPRM that the use of a limitation approach, such as the one espoused by the California Governor's Office of Economic and Business Development, would not be appropriate for nationwide application. In particular, given the disparity in the size and shape among potentially includable tracts across various regions in the United States, DHS continues to believe that the type of limitations on the number of tracts used as suggested by the commenters would still result in projects in certain regions being much farther removed from each of its constituent tracts than in other regions, ultimately undermining the very purpose of reforming the high unemployment area designation process. The final rule does not adopt a numerical limitation on the number of tracts used to ensure that the analysis is focused specifically on the area in which job creation is occurring, taking into account both the population density and geographic area.

3.5. Alternative—New Markets Tax Credit Program and Other Suggestions

*Comments:* Several commenters stated that a better approach to defining TEAs would be to utilize the criteria established under another proven federal economic development program called the New Markets Tax Credit (NMTC) program, rather than a single criterion (unemployment rate). A commenter stated that NMTCs may be applied based on three criteria,[84] but because they do not focus solely on unemployment rates, Congress would have to act in order to recognize the NMTC criteria for determining a non-rural area as a TEA. One commenter asserted that the use of single-variable definition (unemployment rate) is contrary to economic development principles practiced elsewhere in the Federal Government, such as measures used by HUD to establish beneficial geographies for the NMTC Program. Another commenter provided potential guidelines and definitions within the NMTC framework that could be adopted in the TEA designation context, suggested allowing use of an unlimited

amount of census tracts or block groups, and suggested the incorporation of the "urban cluster." Another commenter suggested use of the NMTC criteria as an alternative to the proposed rule's limited geographic area for high unemployment area designation, together with use of a single dataset to determine the unemployment rate. One commenter requested that DHS allow a Gateway City[85] TEA designation.

*Response:* While DHS appreciates these suggestions, the statutory definitions of a TEA includes rural areas and areas experiencing high unemployment (of at least 150 percent of the national average rate). DHS believes the statute is best interpreted as limiting consideration to these two factors.

4. Other Comments on Proposal To Change to Special Designation of High Unemployment Area

Approximately 45 commenters provided other input on the proposed special designation process for high unemployment areas.

*Comments:* One commenter stated that in the preamble to the proposed rule, DHS incorrectly defined how the weighted average of the unemployment rate is calculated, noting that all official unemployment rate calculations derived by BLS and individual states utilize the civilian labor force concept, not the total/full labor force (which includes military personnel). Another commenter stated that the rule presents an oddly complicated manner of calculating a weighted average, asserting that the calculation for a TEA's unemployment is simple: Sum the number of unemployed people across all of the tracts, sum the number of people in the Civilian Labor Force across all of the tracts, and divide the number of unemployed by the Civilian Labor Force.

*Response:* DHS appreciates these technical comments regarding the unemployment data calculations. While the commenter references BLS unemployment rate figures, BLS does not make unemployment data publicly available for geographic areas with populations less than 25,000.

DHS mistakenly indicated in the NPRM that it would consider labor force to be "civilians ages 16 and older who are employed or employed, plus active duty military", thus appearing to rely solely on total labor force. *See* 82 FR at 4748 n.41. Elsewhere, DHS referenced

the U.S. Census Bureau's American Community Survey (ACS) data as an example in the NPRM because the survey provides publicly available unemployment data at smaller geographic area levels such as the census-tract level, *see* 82 FR at 4749; ACS's unemployment data is based on its calculation of the civilian labor force. Thus, the NPRM was not intended to require the use of total labor force. Similarly, the final rule does not provide one specific set of data from which petitioners can draw to demonstrate their investment is being made in a TEA. Rather, the burden is on the petitioner to provide DHS with evidence documenting that the area in which the petitioner has invested is a high unemployment area, and such evidence should be reliable and verifiable. DHS believes that the unemployment data provided to the public by both ACS and BLS qualify as reliable and verifiable data for petitioners to reference in order to carry their evidentiary burden.

Regardless of which reliable and verifiable data petitioners choose to present to DHS, the data should be internally consistent. For example, DHS notes that although both BLS and the Census Bureau rely on the concept of the civilian labor force in their unemployment rate calculations, they employ different methodologies. If petitioners rely on ACS data to determine the unemployment rate for the requested TEA, they should also rely on ACS data to determine the national unemployment area to which the TEA is compared.

Finally, DHS opted to use the methodology in the final rule to ensure proper weight is given to the more heavily populated tracts. The method suggested by the commenter reduces the effect that a more densely populated area may have on the average.

*Comment:* Several commenters suggested that USCIS should publish a single dataset covering the entire country that practitioners must use for TEA unemployment calculations to standardize the process and enhance predictability in designations.

*Response:* DHS disagrees with these commenters, as DHS believes there is already data available to the public to use in calculating the unemployment rate for particular areas, such as the data provided by the U.S. Census Bureau in the American Community Survey. To invest at the reduced amount, petitioners will be required to demonstrate that their investment is within a TEA using reliable and verifiable data such as data from ACS or

---

[84] The criteria used to determine low income communities for the purposes of the NMTC are (1) median income levels of either the urban distressed area or rural area; (2) poverty rate of the area; or (3) unemployment rate of the area.

[85] As an example of what the commenter means by Gateway City, see an explanation of the Massachusetts Gateway City Initiative *available at http://www.worcestermass.org/city-initiatives/gateway-cities-initiative.*

BLS to qualify under the requirements of a high unemployment area.

*Comments:* One commenter stated that the methodology presented for deriving the unemployment rate uses ACS data that is insufficiently current for EB–5 purposes, and asserted that all states properly use ACS data in conjunction with the latest available official county estimates in order to best reflect current economic status. One commenter stated that the proposed rule did not specify which dataset should be used for TEA calculations, recommending that USCIS follow the guidance given by the BLS Local Area Unemployment Statistics (LAUS) branch in their Technical Memo S–10–20. Another commenter presumed that USCIS would utilize the most current unemployment datasets and the census-share methodology—ACS and BLS—to create a mapping system that would enable the user to readily determine whether a project location qualifies as a TEA. A commenter urged the selection of a single dataset from which the unemployment statistics are obtained, recommending the ACS 5-year estimates.

*Response:* DHS appreciates these suggestions. DHS recognizes that ACS data for census tracts is currently provided in five-year estimates and that states may have more recent data at the census tract level. However, given that—as the commenter acknowledged—states utilize different methodologies than ACS and BLS, petitioners may not be able to compare the state census tract data to a national unemployment rate that utilizes the same methodology. Although DHS recognizes that there are benefits to limiting the unemployment statistics to a single dataset, the final rule does not provide one specific set of data from which petitioners can draw to demonstrate their investment is being made into a TEA because currently no one dataset is perfect for every scenario. Thus, the burden is on the petitioner to provide DHS with evidence documenting that the area in which the petitioner has invested is a high unemployment area, and such evidence should be reliable and verifiable. DHS believes that the unemployment data provided to the public by the U.S. Census Bureau's American Community Survey as well as data available from the Bureau of Labor Statistics qualify as reliable and verifiable data for petitioners to reference in order to carry their evidentiary burden, though, as noted above, the data relied upon should be internally consistent. For instance, if petitioners rely on ACS data to determine the unemployment rate for

the requested TEA, they should also rely on ACS data to determine the national unemployment area to which the TEA is compared.

*Comments:* Some commenters asserted that there is limited or no evidence that even the most egregious gerrymanders have done anything less than create needed jobs for high unemployment regions. One commenter wrote that "Manhattan for instance, a big area of controversy for TEA critics, has in fact had projects with gerrymandered TEAs. Even the most luxurious developments in Manhattan that boast condos with no less than $3 million price tag per unit, have created much needed jobs for construction workers in the Bronx, Queens, Brooklyn, Harlem, and Long Island. If the agency can find any research out there that shows otherwise, please provide that research before any final rule on the TEA issue."

*Response:* DHS appreciates these comments regarding gerrymandering concerns. In addition to the DHS data analysis detailed in the NPRM, the Government Accountability Office (GAO) completed an audit of EB–5 TEA data in 2016.[86] GAO's review determined that approximately 90 percent of petitioners from the fourth quarter of FY 2015 who elected to invest in a high unemployment TEA did so in an area not consisting of a single census tract, census block group, or county. Of those petitioners, 38 percent combined 11 or more tracts in order to demonstrate the project was in a high unemployment area, with 12 percent utilizing more than 100 census tracts. DHS believes the high percentage of petitioners utilizing so many census tracts gives rise to a significant concern that congressional intent relating to TEA investments is too often not being met. DHS believes this is because the percentages likely reflect efforts to artificially construct areas that meet the unemployment threshold requirement to qualify for the reduced investment amount incentive rather than an intention to locate the investment in the area actually experiencing high unemployment. DHS recognizes that many investment projects regardless of location will create jobs, some of which might even be filled by individuals from outlying areas experiencing high unemployment (though verifying whether jobs are being created for such individuals would be a significant challenge). Still, DHS continues to

believe that congressional intent for the reduced investment amount incentive is best served by locating investment into areas actually experiencing high unemployment rather than other locations strung together to such areas and to which individuals from such areas could potentially commute for employment. In order to best assist in the revitalization of those areas, the actual development must be located there. The final rule provides clear criteria for the designation and eliminates state involvement to ensure that the TEA incentive is not afforded to gerrymandered areas where high unemployment may not truly exist.

*Comments:* A few commenters said the proposed revisions to the method of determining a high unemployment area would disproportionately favor rural areas over urban areas and even further disadvantage the more densely populated urban areas. One commenter stated that the approach in the rule skews in favor of certain American towns and cities while disfavoring other urban markets simply because they vary in population density, arguing that population density does not provide a rational basis to prefer certain urban TEAs to the detriment of others.

Another commenter cited Census Tract 99 in New York County—a tract that is the site of some EB–5 projects—to illustrate some of the commenter's key concerns about DHS's TEA proposal in the NPRM. The commenter argued that BLS and ACS data, as well as data made available through the U.S. Census Bureau's Longitudinal Employer-Household Dynamics (LEHD) tool, show that high unemployment tracts within New York County are well within standard commuting distances to Census Tract 99. The commenter stated that "[a]ccording to the NYC MTA, a person could board the subway at the north end of Manhattan Island and travel to a subway station in the middle of Census Tract 99 in 30–50 minutes for $2.75 or less one-way. The DHS proposal should recognize that an unemployed person is unlikely to object to that kind of commute." The commenter also pointed out that a focus on unemployment rates in a particular area, rather than total numbers of unemployed persons, potentially obscures the impact that DHS's proposal could have on economically distressed urban areas. The commenter stated that in 2014, New York County had on average 55,387 unemployed workers, as compared to 75,259 unemployed workers statewide for Iowa, and 14,302 for Vermont. The commenter concluded that any proposal should not seek to "fix" the lack of rural and highly

---

[86] GAO, *Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas,* GAO–16–749R, Published Sept. 19, 2016, *available at http://www.gao.gov/products/GAO-16-749R.*

distressed urban project deal flow in the EB–5 program by establishing rules that discourage investment in some urban areas. Rather, TEA designations should encourage new investment and new job creation under the EB–5 program in a fair and predictable way, with positive inducements for projects to locate in rural or distressed urban areas. The commenter ultimately supported the "New Markets Tax Credit"-like approach that DHS has addressed elsewhere in this preamble.

Another commenter stated that DHS should strive to ensure that both urban and rural projects have "equal opportunity" to improve their respective communities.

*Response:* DHS believes the final rule does ensure that both urban and rural projects have equal opportunity to improve their respective communities. Petitioners have overwhelmingly obtained TEA designation in urban (*i.e.,* non-rural) areas in recent years.[87] Although projects in more affluent urban areas may have created employment for employees living in high unemployment areas within a reasonable commuting distance, DHS notes that it is challenging to verify this, and would require the provision of W–2 forms or other sufficient documentation for direct jobs. In addition, allowing such areas to qualify as a TEA may have deterred direct EB–5 funding in areas truly experiencing high unemployment and in dire need of revitalization. Also, developers of projects in affluent urban areas may be able to market the projects to potential EB–5 investors as more likely to (1) result in the investors receiving green cards because the projects are less likely to fail, (2) result in the investors seeing their capital returned because they are less likely to fail, and (3) deliver a higher rate of return on the investors' investments.[88] These factors could more than compensate for the higher required investment amount. In fact, to the extent that a higher rate of return and more safety for invested capital are expected, foreign investors might actually prefer to increase the amount of capital they

invest in these projects above the minimums required. Foreign investors may also see investments in projects in affluent urban areas to be more prestigious. In addition, to the extent that projects in affluent areas that can no longer attract EB–5 capital still proceed with other sources of capital, while more projects in poor or rural areas receive EB–5 capital without which they could not proceed, overall investment in the U.S. economy may increase.

The final rule clarifies the requirements for TEA designation in high unemployment areas and also eliminates state involvement in the high unemployment area designation process to better ensure consistent, equitable adjudications across the country. DHS is bound by the statutory framework defining rural areas and areas of high unemployment (based on unemployment rate greater than 150 percent of the national average rather than total number of unemployed individuals). By utilizing the census tract (and/or adjacent tract(s)) in which the new commercial enterprise is principally doing business, DHS is regulating consistent with the statutory framework to ensure that the area most directly affected by the investment and in which jobs are created is the focus regardless of population size or density.

**5. Other Comments on the TEA Designation Process**

Multiple commenters provided other input on the TEA designation process.

*Comments:* Numerous commenters recommended grandfathering the existing TEA methodology, including suggestions to allow for a "meaningful" transition period, or at least allow petitioners who properly filed prior to the change to continue to qualify. Several of these commenters asserted that the rule should include a transition or phase-in period or delayed effective date to enable projects that are presently in the market to make the necessary changes in their operations going forward. One commenter expressed uncertainty in how the revised TEA designation process would be implemented, particularly with respect to its effect on current projects and conditional permanent residents, pending Form I–526 and Form I–829 petitions, and exemplars approved by DHS prior to the effective date of the rule.

*Response:* DHS believes that an extension to the transition period is appropriate, given the potential impacts of the TEA designation changes on current projects and investors. DHS is therefore providing for an effective

date that is 120 days after publication of this rule, *i.e.,* 90 days beyond the minimum implementation period required by 5 U.S.C. 553(d), and 60 days beyond the minimum implementation period required for major rules under 5 U.S.C. 801(a)(3). The implementation period is intended to provide additional time for EB–5 petitioners and the EB–5 market to adjust investment plans. Even those commenters that requested specific implementation periods longer than 120 days (*e.g.,* six months or one year) did not provide clear, actionable data underlying such recommendations. An implementation period longer than 120 days would likely place an additional burden on agency operations and potential petitioners, because it would likely result in an influx of new petitions prior to the effective date that could lengthen adjudication delays and visa backlogs. Such an influx would generally be consistent with past experience during times when petitioners anticipate significant changes to the program.

DHS has detailed how it will implement the rule in Sections I.E and I.F of this preamble, and elsewhere in this rule. As explained elsewhere, the changes in this rule will apply to all Form I–526 petitions filed on or after the effective date of the final rule. Petitions filed before the effective date will be adjudicated under the regulations in place at the time of filing. DHS disagrees with the commenter's request that TEA designations be available prior to Form I–924 and Form I–526 filings. In accordance with the statutory framework, under which TEA designation must be determined "at the time of the investment," INA section 203(b)(5)(B)(ii), 8 U.S.C. 1153(b)(5)(B)(ii), and consistent with longstanding policy, a TEA determination is made at the time the Form I–526 petitioner makes his or her investment or at the time the Form I–526 petition is filed for petitioners who are actively in the process of investing. As with the existing process, DHS will review the TEA designation evidence with the Form I–526 petitioner's filing to determine eligibility at that time. For petitioners who have a pending or approved Form I–526, already received conditional permanent resident status, or a pending Form I–829 petition based on a previously approved Form I–526, a TEA determination will have already been made or will be made based on the regulations in place at the time of filing of those Form I–526 petitions.

*Comments:* A few commenters said the final rule should clarify that the TEA designation is honored from when the funds are actually invested, not

---

[87] *See* GAO, *Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas,* GAO–16–749R, Published Sept. 19, 2016, *available at http://www.gao.gov/products/ GAO-16-749R* (showing that approximately 97% of petitioners from the fourth quarter of fiscal year 2015 were estimated to have invested into a high unemployment TEA).

[88] "Foreign investors see glitzy projects in gateway cities as more secure investments, both for getting their money back and for getting their green cards." Jeff Collins, "Need a Fast Track to Citizenship? Invest in These Orange County Luxury Hotels," *Orange County Register,* (Oct. 13, 2015) (quoting Pat Hogan, president of CMB Regional Centers).

when the funds are placed in escrow, because a location's TEA designation is subject to change based on changed circumstances.

*Response:* DHS disagrees with the commenters. Section 203(b)(5)(B)(ii) of the INA provides that the area must qualify as a TEA at the time of investment. However, section 203(b)(5)(A)(i) of the INA also provides that to be eligible for an EB–5 visa, a petitioner may either have invested or be actively in the process of investing capital into an NCE. Applicable administrative precedent decisions have further clarified that petitioners must demonstrate that the NCE into which they have invested or are actively in the process of investing is principally doing business in a TEA at the time of filing the petition.[89] To make the TEA determination in a manner consistent with the statutory provisions and the precedent decisions, and promote predictability in the capital investment process, DHS has implemented a policy of making the TEA determination as follows:

• If the petitioner has invested capital into the NCE, and the capital has been made available to the job-creating entity (JCE) in the case of investment through a regional center, prior to the filing of the Form I–526 petition, then the TEA analysis focuses on whether the NCE, or JCE in the case of an investment through a regional center, is principally doing business in a TEA at the time of investment.

• If, at the time of filing the Form I–526 petition, the petitioner is actively in the process of investing capital into the NCE but the capital has not been made available to the JCE in the case of investment through a regional center, then the TEA analysis focuses on whether the NCE, or JCE in the case of investment through a regional center, is principally doing business in a TEA at the time of filing the Form I–526 petition.[90]

The final rule does not change this policy. DHS believes that this policy is consistent with the relevant statutory provisions and precedent decisions and is the most fair to individual investors because it provides predictability for the

capital investment process. If the commenters' suggestion was followed, it would be unclear at what point the area in which the NCE is principally doing business needs to qualify as a TEA. The moment at which the investor who was actively in the process of investing at time of filing has completed that process can vary depending on a number of factors—including at some point after the adjudication of the Form I–526 petition. In other words, because investments need to be structured prior to filing the Form I–526 petition but may continue after the adjudication of the Form I–526 petition, the commenters' proposed policy would lead to circumstances where it could not be known whether the area would qualify as a TEA until after the Form I–526 petition has been adjudicated. This would create an untenable degree of uncertainty in the capital investment process. Furthermore, DHS would have no basis for determining TEA eligibility at either the time of filing or at the time of adjudication because the petitioner would have no basis to demonstrate TEA eligibility at such times. DHS recognizes the commenters' concern that it is possible that some project tracts that qualify as a TEA at the time of filing of the petition might not qualify as a TEA when a petitioner who was actively in the process of investing at time of filing has completed that process. The change in policy suggested by the commenters would create uncertainty and unpredictability in the capital investment process; and would render DHS incapable of determining TEA eligibility in cases where the petitioner is actively in the process of investing at the time of filing the petition.

*Comments:* Some commenters said the TEA process should be eliminated, along with the increased minimum investment at the two-tier level, and instead should be replaced by a set-aside of visas for the desired targets (rural, high unemployment, infrastructure, and manufacturing). One commenter suggested that DHS incentivize the creation of direct jobs by allowing projects that do so to be exempt from the necessity of being in a TEA to be subject to the lower minimum investment amount.

*Response:* DHS declines to adopt the commenters' suggestions regarding TEAs. DHS lacks the authority to make some of the changes requested by these commenters given the current statutory framework of the EB–5 program. DHS cannot completely eliminate TEA designations because 3,000 visas are statutorily set aside for investment in

TEAs (rural and high unemployment areas).

DHS could eliminate the differential between the standard minimum investment amount and the TEA minimum investment amount, thereby eliminating the two-tier investment amount system currently in place, leaving the visa set aside as the only incentive for investment in TEAs. However, DHS declines to do so and has decided to maintain the 50 percent differential to continue to incentivize investment in rural and high unemployment areas. Removing the differential and leaving in place only the visa set aside as an incentive would not leave a sufficient incentive in place for investment in TEAs. Congress permitted DHS to offer a two-tier investment system, with reduced minimum investment amounts in TEAs relative to outside of TEAs. DHS is addressing the current imbalance in which almost all investments are made in potentially gerrymandered TEAs by revising the designation of areas of high unemployment that may qualify as a TEA. This change, in combination with maintaining the 50 percent differential, will maintain a sufficient incentive for investment in TEAs while ensuring that the TEAs benefiting from the incentives align with congressional intent.

Finally, DHS does not have the statutory authority to reduce the minimum investment amount for investments in a new commercial enterprise that creates direct jobs. The statute only authorizes a lower minimum investment amount for investments made in a TEA.

*E. Technical Changes*

1. Separate Filings for Derivatives

*Comments:* Many commenters supported the proposal that derivatives file their own separate Form I–829 petitions if not included in the principal's Form I–829 petition for reasons other than the death of the principal. The commenters stated this would protect derivatives against termination of their conditional permanent residence when the principal investor's conditional permanent residence is abandoned. One commenter disagreed with the proposal, recommending that USCIS retain what the commenter believed to be the current practice of allowing the spouse's or child's biographical documents to be "interfiled" when a family member is not included in the investor's Form I–829 petition. The commenter stated that because the filings would be identical to the investor's filing, USCIS would not need to review project documents filed

---

[89] *See Matter of Soffici,* 22 I&N Dec. 158, 159 (Assoc. Comm. 1998) ("A petitioner has the burden to establish that his enterprise does business in an area that is considered 'targeted' as of the date he files his petition."); *see also Matter of Izummi,* 22 I&N Dec. 169, 173 n. 3 (Assoc. Comm. 1998) ("A petitioner must establish that certain areas are targeted employment areas as of the date he files his petition; just because a particular area used to be rural many years ago, for example, does not mean that it still is.").

[90] USCIS Policy Manual, 6 USCIS–PM G, Chapter 2.

with the spouse or child's petition and USCIS should not charge a filing fee since it will not be re-adjudicating the I–829 project documents.

*Response:* DHS believes the commenter who disagreed with the proposal misunderstands the proposed change. DHS did not propose to change the current process, under which derivatives may still request to be added to a principal's pending Form I–829 if they pay the biometric fee, and are otherwise eligible to be classified as the principal's derivatives. Such derivatives may be added to the pending Form I–829 even in case of divorce during the conditional residence period. Instead, DHS proposed to standardize the process for those derivatives who file an individual Form I–829 petition and cannot be included on the principal's Form I–829, generally because the principal fails or refuses to file a Form I–829. Under these circumstances, the final rule clarifies the current DHS practice of requiring all derivatives connected to a single principal investor to file separately. Thus, for example, if there are two derivatives (either a spouse and child, or two children) and the principal refuses to file a Form I–829 petition, each derivative is required to file a separate Form I–829 petition. This final rule only allows derivatives to apply together on a single Form I–829 petition when the principal is deceased, because INA 204(l) directs DHS to adjudicate "notwithstanding the death of the qualifying relative." Because the principal would have had the option to file a single Form I–829 on behalf of the whole family, the option remains even though the principal is deceased. This rule does not change the current DHS practice, and DHS is simply clarifying the language in 8 CFR 216.6(a)(1) to avoid a situation where derivatives filing separately do so incorrectly, causing their petition to be rejected.

### 2. Equity Holders

*Comment:* DHS received one comment on the proposal to consider equity holders in a new commercial enterprise as sufficiently engaged in policymaking if the equity holder is provided with the rights, duties, and powers normally provided to equity holders in those types of entities. This commenter indicated there is a difference between equity holders that manage the company and third party managers that manage the company, which should be clarified in the rule. The commenter asserted that this clarification is important in the context of limited liability companies (LLCs), which, unlike limited partnerships, do not have a General Partner and Limited

Partners; or a corporation, which has officers and directors. The commenter stated that an LLC will either be member managed or manager managed.

*Response:* DHS believes the language in the rule at final 8 CFR 204.6(j)(5)(iii) is broad enough to encompass a variety of different possible ownership and management structures, including members of both member-managed LLCs and manager-managed LLCs because each of those types of LLCs normally provide their respective members (equity holders) with different rights, duties, and powers. In the future, DHS may consider issuing policy guidance to provide additional clarification if deemed necessary.

### F. Other Comments on the Rule

#### 1. Processing Times

*Comments:* Multiple commenters discussed current USCIS processing times or the impact the proposed rule would have on processing times. Many commenters expressed frustration with USCIS processing times, stating that current wait times are harming investors. Commenters recommended electronic submissions and premium processing to decrease delays.

*Response:* DHS appreciates the concerns raised by these comments regarding USCIS processing times. DHS is considering ways to improve the EB–5 program to decrease processing times. However, DHS does not believe that the changes made by this rule will have an adverse effect on processing times. With respect to Form I–526 petitions, this rule only raises the investment amounts and provides more specific requirements for petitioners investing in targeted employment areas. These changes should not increase adjudication times. With respect to Form I–829 petitions, this rule clarifies when derivative family members must file their own petition and seeks to improve the adjudication process by providing flexibility in interview locations. DHS does not anticipate this will adversely affect Form I–829 processing times because the adjudication standards remain the same. The recommendation regarding electronic submissions and premium processing to decrease delays is outside the scope of this rulemaking.

*Comments:* Numerous commenters expressed concerns about processing times in TEA designations as DHS takes over the designation process from the states.

*Response:* DHS is committed to providing timely TEA decisions as part of the adjudication process. DHS does not foresee an increase in petition

backlogs based on handling TEA designations, because the agency currently reviews the TEA designation evidence provided by petitioners to determine TEA statutory eligibility. The framework detailed in the NPRM and finalized in this rule should not increase the burden to petitioners or to DHS in the adjudication process. As in the current process, EB–5 petitioners will be required to provide evidence to demonstrate the area in which the new commercial enterprise into which they are investing is principally doing business is a TEA. The new framework requires petitioners to identify the census tract(s) in which the NCE is doing business and provide population and unemployment statistics for that tract and any other adjacent tracts that are relevant to the determination. USCIS will review this data in a manner similar to how USCIS currently reviews high unemployment area designation letters from states; it will review the proposed area to confirm it is the area in which the NCE is principally doing business and review the underlying data and methodology associated with the statistics provided.[91] In fact, the use of a uniform methodology for all TEA designations could improve the efficiency of these determinations as adjudicators will be more familiar with the new framework. As such, DHS does not anticipate a negative impact to the overall timing of the adjudication process.

#### 2. Visa Backlogs

*Comments:* Many commenters discussed visa backlogs in the EB–5 program. Multiple commenters stated that the current visa backlog was negatively affecting participation in the EB–5 program. Several commenters argued that if DHS intends to increase the minimum investment amount, it should focus on fixing the visa backlog first or at the same time.

*Response:* Congress, not DHS, has set the annual visa allocation for the EB–5 program. These concerns should more properly be addressed to Congress.

#### 3. Timing of the Rule

*Comments:* Most commenters were concerned about the implementation and timing of the rule and its impact on previously filed EB–5 petitions and current projects. Many commenters argued that the proposed rule, if finalized, should not apply retroactively, and USCIS should grandfather currently approved and pending petitions and applications, or

---

[91] USCIS Policy Manual, 6 USCIS–PM G, Chapter 2.

grandfather in entire projects such that future EB–5 petitioners in grandfathered projects would only need to invest at the lowered investment thresholds in place prior to the effective date. Several commenters requested a transition period before the rule's effective date to provide a grace period for the change and prevent a chilling effect on the EB–5 investment market, and one commenter suggested twelve months to allow certain projects additional time to complete fundraising. Some commenters requested clarification on how the rule would affect current projects. One commenter stated that the petitions filed up to the date of promulgation of the rule should only be subject to the new requirements if they are denied by USCIS because of project discrepancies, when adjudicated after the date of enactment. Conversely, another commenter stated that due to the current visa backlog, DHS should apply the rule to pending EB–5 applications because otherwise changes would not affect the EB–5 program for several years.

*Response:* This final rule will become effective 120 days after publication, as outlined earlier in this preamble. Specifically, the provisions of this final rule will apply to Form I–526 petitions filed on or after that effective date. Form I–526 petitions filed prior to the effective date of the rule will be allowed to demonstrate eligibility based on the regulatory requirements in place at the time of filing of the petition.

With respect to the commenter suggesting this rule be applied only to denied petitions that fail to remedy project discrepancies prior to the effective date of the rule, any petition filed on or after the date of this implementation will be required to establish eligibility under the new rules. This seems to reflect the commenter's suggested approach.

DHS disagrees with the comments suggesting grandfathering approved projects under the current rules. Grandfathering of approved projects would result in unequal treatment of petitions filed after the rule is in effect and would be overly burdensome operationally. Further, grandfathering approved projects would have the effect of delaying the application of this rule for a substantial number of petitioners, which would tend to undermine the immediate effectiveness of the policy aims of this rule. It would grant existing projects in affluent urban areas that have been marketed as TEAs an unfair competitive advantage against new projects in such areas, which would need to attract investors at the higher minimum investment amount. It would

also thwart congressional intent by allowing such projects to continue to attract investors using the incentives that Congress intended for high unemployment and rural areas only, potentially reducing the amount of EB–5 capital going to those areas. While DHS appreciates the comment suggesting that pending petitions be subject to this rule due to the current backlog, implementation would be difficult because petitioners for each pending petition would have to make material changes to their petitions to meet the new standards, including by investing additional amounts that they did not anticipate. DHS believes this would unfairly harm investors that filed based on the eligibility requirements in place at that time and invested in projects that had been planned and initiated with the investment amounts in place at the time. For example, in addition to the fact that resulting project changes would likely be considered material changes, requiring pending petitions to increase their investment could provide a project with too much capital, and in turn potentially precipitate a misappropriation of excess funds. DHS believes applying the new rules to petitions filed on or after the effective date is the best way to implement this rule. As such, and as mentioned above, DHS will apply the regulatory scheme in place at the time of filing when adjudicating Form I–526 petitions, which means that this final rule will apply to Form I–526 petitions filed on or after the effective date.

While DHS is declining commenters' suggestion to grandfather approved projects, DHS has considered how pending petitions associated with existing projects could be affected and is making one revision to the regulations in this final rule to address a problem that could affect some pending petitions as a result of this regulatory change. DHS is adding one regulatory text clarification at 8 CFR 204.6(n) regarding how this rule will be implemented with respect to petitioners with pending or approved petitions who filed prior to the effective date of the final rule. Investment offering documents are typically associated with a particular number of investors investing a specific dollar amount. Projects that are still accepting new investors after the effective date of this rule may have to change their offering documents to account for the new minimum investment amounts, or to maintain compliance with other securities regulations. The change in offering documents also could provide existing investors with pending petitions with

an option to withdraw their investment as a result of applicable securities laws. Accordingly, the offering documents associated with a Form I–526 petition filed before the effective date of this rule may be affected, and such modifications normally would likely result in a denial of the petition based on a material change. The regulatory text at final 8 CFR 204.6(n) provides that amendments or supplements to offerings made to maintain compliance with applicable securities laws, based solely upon this rule's effectiveness, will not independently result in ineligibility of petitioners with pending or approved Form I–526 petitions who filed prior to this rule's effective date and who remain invested, or who are actively in the process of investing, and who have no right to withdraw or rescind their investment or commitment to invest into such offering when their petition is adjudicated. This addition clarifies that petitioners will not be adversely affected by a change to offering documents, necessitated by this final rule's changes, so long as the petitioner's investment remains at risk through adjudication and the petitioner continues to meet program requirements. Additionally, the provision that changes to offering documents should not include a right to withdraw or rescind at the time of adjudication allows petitioners to remove or reject such provisions because of changes necessitated by this regulation without penalty, in accordance with the existing material change policy.

4. Material Change

*Comment:* One commenter recommended expanding the NPRM to incorporate the material change portion of the policy memorandum (PM–602–0083) issued May 30, 2013, to avoid confusion and codify the material change policy. The commenter asserted that this change would make clear that an investor who obtained conditional LPR status may proceed with the I–829 petition, and provide evidence that the requirements for the removal of conditions have been satisfied, without the need to file a new Form I–526 petition if there have been changes to the business plan since the Form I–526 was filed. The same commenter suggested that DHS expand its material change policy to allow those with approved Form I–526 petitioners to remain eligible for adjustment of status even if material changes occur in the interim.

*Response:* DHS believes existing policy guidance on material change is sufficiently clear, specifically that

USCIS does not deny Form I–829 petitions based solely on the failure to adhere to the business plan contained in the Form I–526 petition,[92] and thus will not codify the policy into regulation at this time. DHS also does not intend to change its material change policy through this final rule, but did solicit public feedback on potential changes to the policy in the EB–5 Immigrant Investor Regional Center Program ANPRM.[93]

### 5. Comments Outside the Scope of This Rulemaking

DHS received many comments outside the scope of this rulemaking. For instance, some comments suggested potential ways to improve the EB–5 program as a whole or sought guidance regarding existing requirements that would have been unaffected by the proposed rule. Because these comments are outside the scope of this rulemaking, DHS is not providing responses to these comments. To the extent that the suggestions for program improvements do not require congressional action to change the statutory authority governing the EB–5 program, DHS may consider these suggestions when developing the proposed rule that DHS plans to issue following the ANPRM or in future guidance materials. With respect to comments requesting guidance on current requirements, DHS may consider including clarifications in future guidance materials.

Comments from the public outside the scope of this rulemaking concerned the following issues:

• Allowing stand-alone program petitioners to count indirect jobs, as indirect jobs relate to the impact of the investment on the community where the project is located;

• Creating a more balanced and fair approach to counting direct job creation for stand-alone projects;

• Encouraging more stand-alone EB–5 investment projects "where actual, full-time, permanent jobs are more likely to be created," rather than regional center construction projects which frequently depend on indirect jobs to satisfy the job creation requirement;

• Requiring that investors show that jobs established through indirect modeling methodologies are full-time jobs and that the investors have actually created the requisite number of jobs;

• Eliminating projects that rely solely on "tenant occupancy" to fulfill the job creation requirements in which regional center funding is used to construct or renovate office or retail space;

• Placing meaningful limits on the number of jobs created by non-EB–5 capital that can be attributed to EB–5 investors;

• Setting different differentials for regional center petitioners investing in TEAs, and non-regional center investors investing in TEAs;

• Clarifying which indirect jobs may count towards the job creation requirement;

• Clarifying how the adjudications backlog affects the job creation requirement. The commenter stated that many construction jobs are temporary and disappear prior to the investor establishing conditional residency, putting many investors at risk of having their petitions denied for failing to create 10 jobs;

• Revamping or completely eliminating the job-creating entity process in favor of making qualified investments in individual state-approved infrastructure projects;

• Amending the regulations to clearly state that the I–924 amendments are not necessary to amend the geography of a previously filed I–924, or that a Form I–526 petition may be filed subject to the expansion of a previously filed and pending Form I–924;[94]

• Allowing Forms I–924 to be perfected after filing because, the commenter states, the critical point for demonstrating full eligibility is at time of adjudication;

• Authorizing expedited processing for Form I–526 petitions and Form I–924 applications;

• Allowing parole for all investors who have already invested and filed a Form I–526 petition;

• Allowing concurrent filing of the Form I–526 petition and the Form I–485, Application to Register Permanent Residence or Adjust Status;

• Requiring practitioners who prepare source of funds documents to file an attestation with the Form I–526 petition stating that they performed certain due diligence checks;

• Making regional center exemplar filings mandatory and prohibiting an investor from filing a Form I–526 petition in connection with a regional center until an exemplar is provisionally approved;[95]

• Encouraging more public infrastructure projects to participate in the EB–5 program to facilitate the flow of much-needed capital to public infrastructure projects nationally, in order to save taxpayer dollars and fuel improvement initiatives that might otherwise be delayed by funding challenges;

• Prohibiting the use of publicly tradeable securities, such as municipal bonds, to qualify as an eligible use of EB–5 capital;

• Allowing only investors who come from countries that enforce similar labor and financial laws as the United States;

• Precluding roll-over of the required 3,000 visas set aside for TEAs into the regular EB–5 visa pool and instead requiring the set-aside to remain available only for investments in rural and depressed areas;

• Precluding reauthorization of the Regional Center Program because of its potential for fraud;

• Expanding the Regional Center Program to help spur the private market;

• Changing requirements to allow a petitioner to remain eligible despite regional center termination;

• Creating a mandatory administrative appeals process for the EB–5 program, requiring investors to exhaust their administrative remedies prior to going to the judicial system;[96]

• To ensure transparency, requiring third-party administration of the investment funds that are being used in the EB–5 projects to show the investor that there is compliance with the business plan;

• Prioritizing non-Chinese petitions because there is a low likelihood that any visas for Chinese investors will be available in the near future;

• Removing conditions on residence for investors with a visa backlog of more than two years;

• Modifying 8 CFR 204.6(j) to provide that the list of evidence of property transferred from abroad for use in a U.S. enterprise is a list of possible, but not required, evidence;

• Not counting 2,000 EB–5 cases that the commenter indicated were processed late due to USCIS oversight toward the visa quota because it would

---

[92] USCIS Policy Manual, 6 USCIS–PM G (Aug. 23, 2017).

[93] 82 FR 3211 (Jan. 11, 2017).

[94] Please refer to existing DHS policy guidance addressing these commenters' concerns. *See* Form I–924 Instructions, available at *http://www.uscis.gov/I-924; see also* Update to March 3, 2017 Stakeholder Engagement Remarks, *available at https://www.uscis.gov/sites/default/files/USCIS/Working%20in%20the%20US/alert2017_march.pdf.*

[95] DHS solicited public comment on the issue of mandatory exemplar filings in the January 11, 2017 ANPRM (82 FR 3211).

[96] Note that EB–5 petitioners can appeal decisions related to their Form I–526 petitions to the Administrative Appeals Office (AAO) within USCIS. USCIS, When to Use Form I–290B, Notice of Appeal or Motion, *available at https://www.uscis.gov/i-290b/jurisdiction* (last visited June 22, 2018).

unfairly penalize investors for USCIS's error;

• Modifying Department of State's Visa Bulletin;

• Reducing visa wait times for Chinese nationals;

• Increasing the number of EB–5 visas to 30,000 or 50,000, or modifying the number of visas through administrative remedies or legislation;

• Adjusting the EB–5 visa limit from 10,000 individuals to 10,000 petitions, 30,000 individuals, or 10,000 families (excluding EB–5 derivatives from the EB–5 visa quota);

• Increasing the number of visas allocated to TEAs;

• Allocating 10,000 EB–5 visas for rural areas, high unemployment urban areas, and manufacturing and infrastructure projects;

• Increasing administration fees;

• Allocating visas from other visa categories; and

• Recapturing unused visas in any given year.

Approximately 20 commenters discussed fraud and integrity measures in the EB–5 program. Most of the commenters supported the proposed rule, but many urged USCIS to go further to prevent fraud in the program. Several commenters generally encouraged USCIS to take action to address fraud in the EB–5 program. Example areas of fraud identified by commenters include the following:

• Document fraud and money laundering;

• EB–5 applicants applying for federal public benefits; and

• Evasion of U.S. taxes through failure to disclose fully business profits earned overseas.

Several commenters recommended additional measures USCIS could implement to address fraud in the EB–5 program, including the following:

• Audits and site visits not only for regional center projects, but for standalone projects as well;[97]

• Securities and Exchange Commission oversight and regulation of broker/dealers and agent activities anywhere investors are being sought;

• Prohibit the sale or rental of regional centers;

• Mandatory interviews of immigrant investors within 90 days of filing their Form I–829;

• Disclosure and accounting of commissions paid by developers to raise capital on annual Form I–924A filings;

• Monitor and regulate regional centers; and

---

[97] DHS notes that site visits are currently conducted on both regional center and standalone projects.

• Offer defrauded investors remedies, such as parole in place, employment authorization, and age-out protections for minors.

DHS appreciates these proposals to improve program integrity and combat fraud. DHS, however, did not address these issues in the proposed rule, and therefore these suggestions fall outside of the scope of this rulemaking. As such, DHS will not address these suggestions in this final rule. DHS, however, is committed to strengthening the security and integrity of the immigration system through efficient and consistent adjudications of benefits and fraud detection.

### G. Public Comments and Responses on Statutory and Regulatory Requirements[98]

#### 1. Data, Estimates, and Assumptions Used (Executive Orders 12866 and 13563)

*Comments:* Multiple commenters discussed the data, estimates, and assumptions utilized by USCIS to ascertain the costs of the rule. A commenter stated that stakeholders require additional time to provide data-based estimates regarding economic impacts of the new investment amounts and impacts on jobs. Some commenters suggested that until additional data collection and analysis is conducted, the rulemaking should not move forward. Likewise, several commenters recommended that DHS withdraw the proposed rule so that the impacts of the rule can be more thoroughly studied, including how the proposed rule might hinder the job benefits estimated by a study conducted by the Commerce Department. A commenter suggested that DHS did not calculate an expected cost to stakeholders or the EB–5 program goals based on the proposed investment level and TEA definition. The commenter concluded that, given enough time, it was willing to work with its members to quantify the impacts of the new investment levels on ongoing and proposed projects and associated projects.

*Response:* DHS disagrees with commenters suggesting that either more time for comments is required or that it should withdraw the entire rule to allow

---

[98] As noted above, numerous commenters expressed concerns that the proposed investment amount increase and TEA reform would disrupt the program and reduce the number of projects and investments under the program. DHS has addressed these claims in the appropriate portions of the preamble above. DHS also addresses some of these comments in the following discussion, because the claims made by the commenters specifically allege potential economic impacts, such as effects on investment and job creation.

further study of the effects of the rule. DHS recognizes that EB–5 investment structures are complex and typically involve multiple layers of investment, finance, development, and legal business entities. Further, DHS acknowledges that data limitations preclude a detailed analysis of the potential quantitative costs of this rule. However, DHS does not see how extending the timeline for implementing the rule would be beneficial. Additional time would not allow DHS to estimate with accuracy how many investors or projects might be affected by the proposal. When the NPRM was published, DHS invited public participation, in the form of comments, data, and other information, from EB–5 stakeholders. DHS specifically sought comments on all aspects of the NPRM, including the economic analysis included in the NPRM. DHS believes the 90-day comment period was an adequate amount of time during which stakeholders could have submitted data-based estimates and information on any or all proposals of the NPRM, as exemplified by the fact that some commenters submitted data-based comments. All stakeholders, however, had the same opportunity and nearly three months to provide data-based estimates of the potential effects of the rule. DHS notes that Section 6 of E.O. 12866 recommends that, in most cases, the comment period be not less than 60 days. In this case, DHS provided the public with approximately 30 more days than recommended, and more time than it has in recent years for other rules. Because DHS believes the changes to the EB–5 program made by this final rule are valuable for the reasons described above, it will not delay further the effectiveness of the rule in response to commenters' requests. DHS appreciates all stakeholder feedback it received on the NPRM.

#### 2. Costs (Executive Orders 12866 and 13563)

#### 2.1. General Economic Costs of the Rule

*Comments:* Many commenters submitted comments concerning the economic costs of the rule, including loss of jobs and adverse economic impacts. Some commenters believed the rule's proposals would have a negative impact on industry, generally impairing the flow of EB–5 capital to projects in the U.S. and hindering job creation and economic growth. A commenter anticipated the proposal would adversely affect current and future EB–5 projects, while other commenters generally lamented the potential loss of U.S. jobs. One commenter cited the

Commerce Department study that analyzed the job-creating impact of the investor visa program,[99] noting the study found 11,000 immigrant investors provided $5.8 billion in capital for the FY 2012 and FY 2013, supporting an estimated 174,039 jobs in the United States. The commenter stated that these positive economic impacts of the EB–5 program are threatened by the rule's proposal to increase the minimum investment amount, because such increases would ''discourage investment in American job markets that need it most. Investors will have the option of going to Australia, or Canada—high income countries with lower visa monetary requirements.'' The commenter stated that ''USCIS has been unable to determine the possible impact of the new rules.'' One commenter stated that the proposed increase to the minimum investment amount was too high and would effectively stop the flow of $2.5 billion in foreign direct investments to the United States.

*Response:* DHS believes it is reasonable to increase the minimum investment amount to account for inflation to ensure the required minimum investment amounts reflect the present-day dollar value of the investment amounts established by Congress. Given that the minimum investment amounts have not been increased since the program's inception, and multiple factors have contributed to increased or decreased utilization of the program in the past, DHS cannot accurately predict how the increase to the minimum investment amounts will affect demand on the program. DHS acknowledges that it is reasonable to assume some number of investors will be unwilling or unable to invest at the increased investment amount. However, their capital contributions may very well be more than replaced by other investors investing at the higher minimum investment levels. In addition, given the oversubscription of the program—as long as a sufficient number of investors file petitions each year to account for the allotment of visas provided by Congress, the program's overall contribution of capital to the U.S. economy will increase. However, commenters who claim that the increases to investment amounts will have a significant negative impact (*e.g.,* the claim that the investment increase would stop $2.5 billion in foreign direct

investments into the U.S.) provided no objective data to support those claims. Like DHS, commenters can only speculate as to precisely how the increases will affect the EB–5 market. DHS believes factors other than the investment amount significantly contribute to the program's utilization. Though the precise impact of the increases on the EB–5 market is unknowable, DHS believes it is reasonable to increase the investment amounts based on the CPI–U to reflect the present-day value of the amounts set by Congress in 1990 for the reasons discussed earlier in this preamble.

In addition, DHS acknowledges the Commerce Department study cited by one commenter that analyzed the job-creating impact of the investor visa program. The study did estimate that for FY 2012 and FY 2013, 11,000 immigrant investors provided $5.8 billion in capital that was ''*expected to create* an estimated 174,039 jobs,'' [100] but the study was based on forecasts made in economic impact analyses provided by petitioners, and not verification of jobs actually created.[101] DHS notes that the majority of EB–5 investments have been made through regional centers (approximately 92 percent, as discussed below). Regional center investments use methodologies that rely on indirect job creation. Such indirect job creation estimates accrue to numerous downstream industries, and therefore, it is not possible to verify exactly how many new jobs could be attributed to a specific EB–5 investment once it is made (it is also possible that indirect job forecasts may overstate actual job creation linked to any specific investment). The study also includes jobs associated with non-EB–5 investor sources of capital, which is allowed under current regulations.[102] Relatedly, the GAO's audit of EB–5 TEA data in 2016 revealed that in the GAO's sampling from the fourth quarter of fiscal year 2015, the median percentage of total potential EB–5 investment in petitioner projects was only 29 percent of the total estimated project cost, and the estimated mean percentage was 40 percent.[103] Because jobs created by non-EB–5 funding can be credited to EB–5 investors, and many projects could still be viable without EB–5 funding given that such funding makes up only a portion of overall funding, DHS does not believe it is reasonable to assume

that a certain loss of EB–5 investment necessarily translates to a commensurate loss of jobs. Notably, the Commerce Study does not conclude that the predicted number of jobs expected to be created through EB–5 funding would not be created but for the EB–5 funding. Thus, the Commerce Department study was not helpful in evaluating the impacts of the final rule.

2.2. Costs to Investors, Regional Centers and New Commercial Enterprises

*Comments:* Multiple commenters discussed costs to investors, regional centers, and NCEs, generally expressing concern regarding the impacts the proposed changes would have on various aspects of the EB–5 program and ability of investors to participate in the program. A commenter warned that the proposed changes to the minimum investment amounts would create an influx of investment at the current lower minimum investment level (in the hope of filing prior to the effective date of the increase). The commenter asserted that this rush to invest at the current minimum investment levels would be costly to investors, giving them less time to evaluate projects and trapping the investors in underperforming projects. Relatedly, some commenters expressed concern that changes to the program would increase both the petition processing times and the financial burden of obtaining visas, which will further discourage investment in American job markets as investors look to other options.

*Response:* DHS appreciates the comments, but notes that it is an individual investor's decision as to the appropriate timing for his or her investment and the individual's responsibility to evaluate and decide whether to invest in specific projects. No provision in this rule requires investors to make anything less than fully considered and informed investment decisions based on individual circumstances at the time of the investment. DHS also disagrees that the provisions in this rule will increase processing times. USCIS works diligently to adjudicate and process EB–5 petitions in a timely manner and will continue to do so following the changes made in this final rule. In addition, USCIS has considered its staffing needs following the promulgation this rule, and will remain attentive to such needs in the course of implementation of this rule.[104] Finally, as mentioned in several

---

[99] *Estimating the Investment and Job Creation Impact of the EB–5 Program,* Economics & Statistics Administration, Office of the Chief Economist, U.S. Department of Commerce (2017), *available at https://www.commerce.gov/sites/commerce.gov/files/migrated/reports/estimating-the-investment-and-job-creation-impact-of-the-eb-5-program_0.pdf.*

[100] *Id.* at 1–2.

[101] *Id.* at 7.

[102] 8 CFR 204.6(g)(2).

[103] GAO, *Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas,* GAO–16–749R, Published Sept. 19, 2016, *available at http://www.gao.gov/products/GAO-16-749R.*

[104] *See* USCIS, EB–5 National Stakeholder Engagement Talking Points by IPO Acting Chief Julia Harrison (hereinafter ''Harrison Talking Points'') (Nov. 7, 2017), *available at http://ilw.com/*

earlier instances, DHS believes the increase in the investment amount is appropriate and that the EB–5 program will remain competitive relative to other countries' immigrant investor programs.

*Comments:* Several commenters stated that they anticipated that a reduction in investors caused by the increased investment amount would ultimately put several of the regional centers out of business, noting that one of the costs laid out by DHS in the NPRM is that some investors may not be able or willing to invest at the proposed higher investment level. Similarly, one commenter suggested that raising the investment amount increases an investor's perception of risk in the investment, which would reduce interest in the program, therefore forcing regional centers out of business. However, the commenters did not provide verifiable evidence or data to support the claims.

*Response:* In the NPRM, DHS discussed the difficulties of quantifying the impacts of the rule's provisions on EB–5 entities due to the absence of data, such as data on regional center operating revenues. DHS wrote that it is reasonable to assume that the changes in the investment amounts may affect some regional centers, but that it was not possible to predict the extent of those impacts. In the Final Regulatory Flexibility Analysis (FRFA) accompanying this final rule, DHS again discusses the rule's potential impacts on regional centers, albeit mainly in the context of whether or not regional centers can be classified as small entities. That discussion, however, is relevant to the commenter's concerns. In that section, DHS recognizes that the increase in the investment amount could deter some investors, but asserts that it cannot determine with accuracy the quantitative effects of the rule, because it is not possible to know exactly how many potential investors may be deterred from the program due to the rule's provisions or how regional centers may respond if some investors may be unable or unwilling to invest at the higher minimum investment amounts.

### 2.3. Costs of Increasing the Investment Amounts

*Comments:* Many commenters discussed the costs of increasing the investment amounts. Overall, the majority of commenters suggested that changing the investment amounts would result in a contraction of the EB–5 program and lead to job loss, with commenters writing that the future marketability of the program is in jeopardy. A commenter noted that raising minimum investment amounts could possibly result in lower investment levels in absolute terms depending on how much demand is reduced by raising the minimum investment amount. The same commenter noted giving the largest price hike to investors in targeted employment areas may not be wise from an economic perspective, as those are likely to be the more price-sensitive investors.

*Response:* DHS recognizes that it is possible that the absolute amount of investment could decrease if the proportionate decline in investments outweighs the proportionate increase from the higher investment amount. Of course, it could also increase. For example, there were an average of 9,238 approved Form I–526 petitions annually from 2015–2017. If the 80 percent higher levels of required investment do not lead to a reduction in the number of EB–5 investments, the absolute amount of investment would increase by 80 percent.[105] As is described in the preamble above, DHS considered the public comments and as a result, this final rule will retain the 50 percent differential between the general and reduced investment amount and set the latter at $900,000. In response to the comment, a general analysis conducted by DHS reveals that it would take a substantial reduction in the number of investors in order for TEA investment to decline taken in total. Adjusting the 9,238 investments total from above for the TEA portion of all investments, 96 percent (discussed below), yields 8,868 annual TEA investments amounting to $4.43 billion in investment. At the TEA investment amount of $900,000 in this final rule, this same level of total TEA investment would be achieved with 4,927 investors, which represents 44 percent fewer investors. Furthermore, small and even moderate reductions in investors actually stand to generate growth in total investment. For example, investor declines of 10, 20, and 30 percent would grow aggregate TEA investment 62, 44, and 26 percent, respectively. Investor declines would however result in reductions in the total numbers of jobs required to be created. We emphasize that this analysis does not reflect DHS predictions about what will happen to investment levels or job creation, but is intended to convey, generally, that based on the number of investors alone, it would take a substantial reduction to actually reduce TEA total investment from recent levels.

Thus, while DHS believes it is possible that some investors may be deterred from investing at the higher amount, evidence or data has not been provided by commenters to suggest that the decrease in demand would be as significant as claimed. In the absence of data indicating whether the final rule will lead to a decrease in overall investment, and by how much, DHS believes it is reasonable to raise the minimum investment amounts, which have remained unchanged for decades, for the reasons already addressed.

Finally, as it pertains to the reduced investment amount of $1.35 million in the proposed rule and the $900,000 amount contained in this final rule, DHS does not have enough information or data to predict the likely difference in aggregate investment as a result of DHS's determination to use the $900,000 amount. Total TEA investment at the $900,000 level this rule finalizes could be greater or smaller than at the initially proposed $1.35 million.

*Comments:* One commenter cites to a specific report, the *2016 World Wealth Report,* and stated that 90 percent of high net worth individuals globally have a net worth of $5 million or less. The commenter further stated that such individuals will allocate up to 25

---

*immigrationdaily/news/20171206.pdf* ("[w]e had just created a division of Adjudicators and Economists who would focus on the I–829 adjudications and customer service inquiries. I am happy to share that this restructuring has paid off. The collaboration and cross training of the Adjudications Officer and Economist have contributed to a reduction in the I–829 processing time. It's just one month so far but I expect that trend to continue in FY2018 . . . A year ago it took us on average 20 days to resolve a customer inquiry. Now it takes us about 5 days to respond to inquiries, some of which are resolved within that time frame . . . Building on the success of the I–829/Customer Service team, during the last half of FY2017, IPO launched a multidisciplinary team made up of Economists and Adjudications Officers to focus on the Form I–526 adjudication . . . Some of the near term benefits gained from the new team include: The potential for an increase in staffing capacity and knowledge gained through training and the expansion of current employees' skill sets. This will allow IPO to better meet our mission.").

[105] This calculation assumes that the proportion of TEA and non-TEA investments will be the same going forward. Based on an average of 9,238 annual investments, with 96 percent in TEAs and 4 percent not in TEAs yields 8,868 investments made at $500,000 and 370 made at $1,000,000, for a total of $4.80 billion. Taking these same numbers of investments made at the new amounts, 900,000 and 1,800,000, respectively, yields a new amount of $8.65 billion in investment, which is an 80 percent increase (calculation: (8.65/4.80) − 1). There could be variation to these amounts. If, for example, a higher percentage of investments were in non-TEA projects (since fewer projects would qualify for TEA status under the new standard), the increase in total investment would be even higher. If, due to this rule or other circumstances, a higher proportion of investments are made into TEAs, then total investment could decline, although more investment would flow to targeted areas. Since DHS cannot accurately forecast the ultimate effects on projects or their composition in terms of targeted areas, both possibilities exist.

**35788** **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

percent of their net worth to "long term, low yield" investment. The commenter recognized that EB–5 investors do not necessarily have the same investment preferences (e.g., EB–5 investors "may well commit a significantly higher amount just to reach their goal of U.S. permanent residence"). The commenter estimated based on the above, and practical experience, that investors with a net worth as low as $1.5 million have been willing to commit $500,000 in support of their immigration goals. The commenter suggested that if DHS increases the minimum investment amounts as proposed, "most in this category will not be willing to participate in the program."

*Response:* DHS disagrees that the commenter's assumptions about the willingness of investors to invest at the increased investment amounts is sufficiently supported by the source cited. The comment relies on the report for the finding that 90 percent of high net-worth individuals have a net worth of $5 million or less, and states, without support, that the majority of EB–5 investors fall into this category. The commenter also relies on either the report or unnamed studies for the assertion that such investors will allocate up to 25 percent of their net worth to "this type of investment (long-term, low-yield)", and states, without accompanying citations or other support, that EB–5 investors would be willing to invest up to one-third of their total net worth. DHS believes the commenter's assumptions are inadequately supported. In addition, the commenter does not explain why EB–5 investments can be accurately described as long-term[106] and low yield or how EB–5 investments are comparable to other types of investments, and also fails to quantify the other factors that may motivate an EB–5 investment based on objective data. Thus, the comment does not establish a clear relationship between the report cited and the quantitative estimates provided in the comment.

*Comments:* Some commenters contended that DHS's proposed increases to the minimum investment amounts would cause the number of EB–5 investors interested in participating in the program to return to the levels from the 1990s. These commenters pointed to low utilization of the program during that time and stated that even the reduced minimum investment amount of $500,000 was too

high for investors. Based on those assumptions, the commenters estimated that the number of petitions would drop by 88 percent when compared to the number of petitions filed in 2011 and 97 percent when compared to the number of petitions filed in 2016. The commenters concluded that the reduced interest would be damaging to the U.S. economy and reduce the number of jobs created by the EB–5 program.

In addition, one commenter stated that it had asked "many potential investors and others about the impact of [the proposed] investment amounts on their interest and/or ability to invest in the [United States]." The commenter reported that "[t]he proposed increase would drastically reduce potential investors' interest and ability to invest." DHS notes that the commenter referenced the specific proposed investment level of $1.35 million, but our response is not different in the context of finalizing the reduced investment level of $900,000.

*Response:* DHS disagrees with the commenters' basic premise that lower utilization of the program in the 1990s was solely because even the reduced minimum investment amount was too high for investors. Rather, as discussed in previous sections, DHS has reason to believe use of the program over time has been affected by a range of factors, including administration of the program, stakeholder confidence, and changes in the U.S. economy. For example, the CIS Ombudsman concluded in 2009 that the lower utilization level was "principally caused by significant regulatory and administrative obstacles, as well as uncertainties that undermine investor and stakeholder confidence."[107] In addition, Congress never chose to decrease the minimum required investment amounts during the years in which the program was undersubscribed for any reason, including in order to specifically encourage more utilization of the program. And as the minimum investment amounts have not changed since the program's inception, DHS cannot predict with certainty what the impacts of the changes will be, with respect to both the number of investors willing to participate in the program and any changes in potential job creation. DHS acknowledges that the higher investment amounts could deter some portion of investors. However, the commenters do not support their

assertions that demand would fall to a specific historical level based on price alone with a valid methodological approach.

Similarly, a commenter reported that, based on an informal survey of potential investors, the proposed increases would reduce investors' ability and willingness to participate in the program. Although the commenter does not provide substantive data or analysis to support their claim, DHS recognizes that many potential EB–5 investors may prefer to have as small a required investment amount as possible, but may be prepared to invest more if necessitated by law. DHS also acknowledges that there could be a decline in investors. However, in the absence of objective evidence on the impacts of the proposed increases on demand, DHS believes that it is reasonable to increase the minimum investment amounts to account for inflation for the reasons stated elsewhere, and to make future inflation adjustments based on the initial amount set by Congress in 1990.

## 2.4. Costs of Shifting the TEA Designation Responsibility From States to USCIS

*Comment:* One commenter suggested that the proposal to eliminate state involvement in the TEA designations has the potential to reduce costs for the industry. The same commenter, however, wrote that USCIS should consider some process for local involvement in unusual circumstances.

*Response:* DHS agrees that the change in the process for TEA designation has the potential to reduce costs for the industry. DHS, however, rejects the commenter's suggestion that there should continue to be local involvement in TEA designation. As discussed in earlier comment responses, congressional intent of the TEA provision was to incentivize EB–5 investment in areas of *actual* high unemployment. Currently, the states' dual role in both TEA designation and promoting investment within their borders incentivizes states to secure TEA designations through "gerrymandering" without due regard for whether the designated area truly is experiencing high unemployment. For these reasons, DHS has determined that it is necessary to shift the TEA designation mechanism from the states to DHS.

## 2.5. Costs to USCIS

*Comments:* A few commenters provided input on potential costs to USCIS. One commenter noted that the rulemaking would extend processing times, requiring an increase in USCIS

---

[106] In fact, to be eligible for removal of conditions on their permanent residence status, EB–5 investors need only sustain their investment for the two-year period of conditional residence beginning on the date they obtain that status.

[107] CIS Ombudsman, *Employment Creation Immigrant Visa (EB–5) Program Recommendations,* March 18, 2009, at *17, *available at https:// www.dhs.gov/xlibrary/assets/CIS_Ombudsman_EB-5_Recommendation_3_18_09.pdf.*

adjudicator staffing. Similarly, another commenter wrote the rule would add TEA designation to an already overwhelmed and short-staffed adjudications team. Conversely, a few commenters suggested that the increased investment amounts will drastically reduce the number of investors, which would in turn reduce the workload for USCIS adjudicators. Regarding the proposal to eliminate state involvement in the designation of high unemployment areas, a commenter suggested DHS consider the increase in USCIS workload that would result. The commenter stated that USCIS should publish a "census tract-based depiction of the entire U.S, so regional centers and developers can begin planning for the implementation of the new regulation." The commenter suggested that USCIS should consider the resources required to produce such a publication.

*Response:* DHS appreciates commenters' concerns over USCIS staffing issues, but conveys to the public that at a very broad level, staffing and adjudication time were considered when the rule was proposed. Additionally, USCIS conducts a fee study on a biennial basis which takes into consideration volume projections of forms and staffing levels, among other things.[108] USCIS staffing level plans are, in part, based on these studies in conjunction with anticipated regulatory changes. Further, as noted above, USCIS' Immigrant Investor Program Office (IPO) has restructured into multidisciplinary teams, which reduced Form I–829 adjudication times, and launched a similar initiative for Form I–526 adjudications in late 2017.[109] Finally, DHS rejects the commenter's suggestion that USCIS create and publish a census tract-based depiction of the entire United States. Foremost, census tract maps and unemployment data are otherwise publicly available, and it will be up to the petitioner to submit reliable and verifiable evidence to demonstrate that his or her investment is within a TEA. *See* final 8 CFR 204.6(j)(6)(ii)(B). In addition, the commenter raises concerns over the increased workload to DHS involved in taking over TEA designations from states, but does not say how publishing a map would increase or decrease the

workload. DHS therefore believes the operational burden for USCIS to create and publish a census tract-based map of the United States would be prohibitive and redundant given that this type of data is publicly available to use in calculating the unemployment rate for a particular area.

3. Other Impacts (Executive Orders 12866 and 13563)

3.1. Impacts on the Number of Projects Receiving EB–5 Capital

*Comments:* Some commenters discussed impacts the proposed regulation would have on the number of projects receiving EB–5 capital. Commenters, including regional centers and individuals, expressed general concern that the increase in minimum investment amount would adversely affect current and future EB–5 projects by decreasing capital available to the EB–5 program participants. A couple of other commenters expressed concern that the lack of EB–5 investors would prevent projects from moving forward due to the lack of needed capital.

*Response:* As mentioned in the NPRM, due to the absence of data, DHS is unable to determine the number of current or future projects that may be negatively affected by the rule's provisions. This is in large part because DHS does not have data to estimate how this rulemaking or other factors may influence potential future investors' behavior. In the NPRM, DHS acknowledges that it is reasonable to suggest that some individuals may be deterred from investing at the increased investment amounts, and therefore some projects may be affected. DHS notes, however, that at the increased investment amounts projects will have to recruit fewer EB–5 investors to meet the same capital funding needs. DHS also notes that, even where a project may not be able to obtain the full amount of EB–5 capital originally contemplated, there may be other sources of potential capital that could be drawn upon to satisfy a given project's capital needs (for example, bank financing, non-EB–5 equity investment, etc.), although the financing from other sources could be costlier in terms of interest and other fees. One of the prime advantages of EB–5 capital for developers is that it can entail a low cost of capital. "Many of such projects could easily have been financed on the private market, according to [New York University Stern School of Business scholar-in-residence] Gary Friedland. . . . 'It's a profit

enhancement. . . .' "[110] EB–5 capital has also been characterized as "lower-cost capital with favorable terms."[111] Further, DHS has no way to estimate when and how such other sources of capital may be used to offset any potential loss of EB–5 capital investment. DHS further believes the increases in the investment amount will bring the investment amounts from 1990 in line with their real values today and EB–5 capital will continue to be an important source of investment for projects.

3.2. Impacts on Particular Sectors of the Economy and Geographic Areas

*Comments:* Some commenters discussed sectors of the economy and geographic areas that may be disproportionately affected by the proposed rule. One commenter worried that certain industries, such as transportation and non-profit industries, "where conventional capital is almost impossible," have utilized EB–5 capital in order to survive and create jobs. Some commenters expressed concern that the proposed rulemaking (specifically, removing the ability for states to designate TEAs) would negatively affect job growth and wellbeing of areas that need economic development the most, notably rural areas and high unemployment areas. Another commenter suggested that the proposed increase for TEA projects would unfairly affect the ability of rural projects to compete with projects in wealthy census blocks of the U.S. cities, as well as other countries, and proposed that the TEA investment amount increase to no more than $800,000, and be maintained at 50% of the standard investment amount.

*Response:* Business plans and economic analyses submitted to DHS associated with EB–5 petitions involve many industries and project types, and DHS does not dispute the commenter's claim that conventional financing may be difficult to obtain in some sectors. However, the commenter submitted no credible information or data to support the claim that the proposed changes to the program would cause a significant reduction in investment and job creation to a particular industry or the economy overall. DHS reiterates that the popularity and growth of the EB–5 program has likely been driven by

---

[108] In accordance with the requirements and principles of the Chief Financial Officers Act of 1990, 31 U.S.C. 901–03, (CFO Act), and Office of Management and Budget (OMB) Circular A–25, USCIS reviews the fees deposited into the Immigration Examinations Fee Account (IEFA) biennially.

[109] *See* Harrison Talking Points, *available at* http://ilw.com/immigrationdaily/news/20171206.pdf.

[110] Eliot Brown, "How a U.S. Visa-for-Cash Plan Funds Luxury Apartment Buildings; Program Meant to Spur Jobs in Poor Areas Largely Financed Developments in Affluent Neighborhoods," *Wall St. J.,* Sept. 9, 2015, *available at* https://www.wsj.com/articles/how-immigrants-cash-funds-luxury-towers-in-the-u-s-1441848965 (last visited Dec. 17, 2018).

[111] *Id.*

numerous factors, including but not limited to, its sourcing of capital funding for projects across U.S. industries. GAO's analysis—taken from a random sample of 200 of the 6,652 petitions submitted by petitioners to participate in the EB–5 program in the fourth quarter of fiscal year 2015—estimated that of the 99% of EB–5 petitioners who elected to invest in a TEA, about 3% chose to invest in rural areas and about 97% chose to invest in a high unemployment area (GAO noted that the percentages do not add up to 99 due to rounding), and of the EB–5 petitioners who elected to invest in high unemployment areas, only 12% invested in projects actually located in census tracts where the unemployment rate was over 8%.[112] Thus, given that only a small minority of investments are currently being made in either a rural area or a project located in census tracts with an unemployment rate of over 8%, even though over 30% of visas (3,000 out of 9,940) are statutorily reserved for investments in TEAs, it is very possible that the reforms contained in this rule will increase the percentage of EB–5 capital going towards rural areas and areas of true high unemployment.

Additionally, and as discussed in earlier comment responses, DHS agrees that not enough EB–5 investment has gone to rural areas and areas of truly high unemployment. The changes made in this rule to the TEA designation process, and DHS's decision to maintain the differential between the investment tiers at 50% (as one commenter suggested), or $900,000, were intended to better reflect Congressional intent with respect to incentivizing investments in these areas.. In addition, the higher minimum investment amount will mean that more capital per investor is being infused into those areas, and with the changes to the TEA designation process, DHS expects that more capital overall will be infused in areas of truly high unemployment.

3.3. Impacts of Change in the TEA Designation Standard

*Comments:* Several commenters addressed impacts of the proposed changes to the TEA designation standard. A commenter stated that the proposed TEA requirement would arbitrarily exclude lower unemployment areas that would otherwise attract a significant number, if not the majority, of their workers from nearby higher unemployment areas. The commenter stated that the proposed designation

requirements lacked a sound economic or labor market rationale or basis, and would result in loss of economic projects, investment, and potential job creation opportunities. Some commenters stated that the increased investments and designation for TEAs would ''destroy'' the EB–5 program. Another commenter proposed that the TEA designation requirements should ensure that urban and rural projects are provided equal opportunity to improve their communities through job creation.

*Response:* DHS disagrees with the commenter that the new TEA requirements are arbitrary or would randomly exclude high unemployment areas. On the contrary, DHS believes the new high unemployment area designation standard brings clarity and consistency to a process that lacked uniformity nationwide. In developing the proposed high unemployment area standard, DHS sought to ensure the designation is made in a transparent and objectively defined manner, and not one in which the rules are subject to shifting applications by the states or other interested entities based on economic, political, or other rationales, some of which may be unrelated to incentivizing EB–5 investment in areas of true high unemployment. DHS disagrees that the new TEA designation standard, as it applies to either or both the TEA geography reform or the TEA investment amount increase, will destroy the EB–5 program, and notes that the commenter provides no credible evidence or information to support their assertion. As noted in other instances in the preamble, we believe there will continue to be sufficient interest in the EB–5 program notwithstanding the changes. Additionally, DHS adopts the new requirements to better align TEA designation requirements with Congressional intent and to ensure both urban and rural areas are provided appropriate opportunity to be designated as TEAs (and qualify for the reduced minimum investment incentive) in order to attract EB–5 capital funding.

3.4. Other Comments on Impacts

*Comments:* One commenter stated that increasing the investment amounts would negatively affect the ability of mid-career professionals and entrepreneurs to participate in the EB–5 program and this impact would deprive the economy of potential contributions of these younger investors. The commenter presented anecdotal evidence to support the claim that investors would be less interested and less able to invest at the higher investment amounts.

*Response:* As noted above, Congress enacted the investor visa program to attract entrepreneurs and job-creators into the U.S. economy[113] and infuse new capital into the country.[114] Congress did not specify any particular type of investor it was seeking.[115] As discussed previously, DHS believes that the increase to the minimum investment amount is appropriate because inflation has eroded the present-day value of the minimum investment required to participate in the EB–5 program since Congress set the initial investment amounts in 1990, and this final rule is an effort at remedying that erosion. In addition, DHS believes the increased amount will attract the same type of investment levels that Congress intended to attract in 1990.

DHS recognizes that many EB–5 petitioners do not necessarily take an entrepreneurial role in the operations of their new commercial enterprise; however, the EB–5 program has been and may continue to be used by petitioners who do take an entrepreneurial role in the operations of their new commercial enterprise. Moreover, under the current regulatory and statutory regime, the EB–5 program contains no specific entrepreneurship requirements. DHS does not differentiate between and collects no data on petitioners who take an entrepreneurial role in the operations of their new commercial enterprise relative to those who do not. Accordingly, DHS has no data to support and there is no persuasive reason to believe that raising the minimum investment amount would disproportionately decrease the number of petitioners who take an entrepreneurial role in their new commercial enterprise relative to those who do not.

4. Other Comments on the Regulatory Impact Analysis (Executive Orders 12866 and 13563)

*Comments:* Approximately 10 commenters provided other input on the Regulatory Impact Analysis. One commenter asserted that DHS has not fulfilled its obligation, under Executive Orders 12866 and 13563, to share how it weighed the option to pursue regulatory action as opposed to not taking action while Congress works to pursue partial reforms using the legislative process. According to the commenter, it is counterproductive to revise vital components of the program while Congress is debating possible program reforms. Another commenter

---

[112] GAO, Immigrant Investor Program: Proposed Project Investments in Targeted Employment Areas, GAO–17–487T, at 4–5, 8 (table 1) (Mar. 8, 2017).

[113] 136 Cong. Rec. 35,615 (Oct. 26, 1990).
[114] S. Rept. 101–55, p. 21 (1989).
[115] 136 Cong. Rec. 35,615.

said the impact analysis should be rejected as being an incomplete and not fully-considered analysis of the implications of the proposed increases in the proposed minimum investment amounts.

*Response:* The commenters appear to misunderstand the requirements of the Executive Orders. Executive Order 12866 is an exercise of the President's authority to manage the Executive Branch of the United States under Article II of the Constitution. The implementation of the Executive Orders and OMB Circulars, and other internal guidance, is a matter of Executive Branch consideration and discretion.

The fact that preparation of a regulatory impact analysis (RIA) under Executive Order 12866 is a matter of Executive Branch discretion is underscored by the terms of Executive Order 12866, section 10, which provides that nothing in the Executive order shall affect any otherwise available judicial review of agency action. The Executive Order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

The internal, managerial nature of this and other similarly worded Executive Orders has been recognized by the courts, and actions taken by an agency to comply with the Executive Order are not subject to judicial review. *Cal-Almond, Inc.* v. *USDA,* 14F.3d 429, 445 (9th Cir. 1993) (citing *Michigan* v. *Thomas,* 805 F.2d 176,187 (6th Cir. 1986)).

DHS made a good faith effort to analyze the impacts of this rule. DHS reviewed numerous studies and requested comment from the public but received no credible data or information that would provide a more accurate estimate of the impacts.

DHS also disagrees that the current rulemaking is counterproductive when legislative reforms are under consideration. As mentioned in an earlier comment response, some members of Congress, commenting on this rule, requested that DHS take this regulatory action in part because of Congress' inability to enact legislative reforms over the 114th and 115th Congresses. In fact, the Chairs of the House and Senate Judiciary Committees noted that "Congress has failed to reform" the EB–5 program.[116] DHS is

finalizing this NPRM to implement needed reforms in a timely manner. Promulgation of these regulatory change does not preclude legislative changes by Congress.

### 5. Comment on Unfunded Mandates Reform Act (UMRA)

*Comment:* One commenter disagreed with DHS that no unfunded mandates exist in the proposed rule. According to the commenter, states have developed systems to track and review portions of the EB–5 program as it relates to their state. The commenter provided background regarding the State of California's process for analyzing regional center information and determining census tracts that would qualify as areas of high unemployment. The commenter suggested that the proposed federalization of the designation of high unemployment areas would eliminate the state-based processes. The commenter urged DHS to consult with California and other states with unique regulatory frameworks prior to transitioning, and suggested governors and mayors also be consulted to determine the needs of their respective states and cities.

*Response:* DHS disagrees with the commenter that unfunded mandates are imposed by this final rule. The UMRA's written statement requirements apply when a Federal mandate is likely to result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any 1 year. 2 U.S.C. 1532(a). A federal intergovernmental mandate means any provision in legislation, statute, or regulation that would impose an enforceable duty upon State, local, or tribal governments (except certain conditions of Federal assistance or duties arising from participation in a voluntary Federal programs). 2 U.S.C. 658(5)(A). While one state might have voluntarily developed a system to track and review portions of the EB–5 program, this rule does not create any enforceable duties. *See id.;* 2 U.S.C. 1555. Furthermore, by eliminating state designation of high unemployment areas, DHS is assuming the administrative burden (and relieving states of the burden) of determining which areas qualify as TEAs, rather than relying on state designations.

*Regulations, End Unacceptable Status Quo,* (March 22, 2018) available at *https://judiciary.house.gov/press-release/goodlatte-grassley-call-dhs-finalize-eb-5-regulations-end-unacceptable-status-quo/.* Senator Grassley had noted a few days earlier that members of Congress had been working on reform aggressively for years, but to no avail. *See* 164 Cong. Rec. S1778 (March 19, 2018).

Additionally, for the purposes of the UMRA of 1995, this rule does not impose costs exceeding the threshold of $100 million (or the inflation-adjusted value equivalent of $100 million in 1995 dollars).

## IV. Statutory and Regulatory Requirements

*A. Executive Orders 12866 (Regulatory Planning and Review), 13563 (Improving Regulation and Regulatory Review), and 13771 (Reducing Regulation and Controlling Regulatory Costs)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 13771 ("Reducing Regulation and Controlling Regulatory Costs") directs agencies to reduce regulation and control regulatory costs.

This rule has been designated a "significant regulatory action"—although not an economically significant regulatory action—under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget. This rule is a regulatory action under Executive Order 13771.

(1) Summary

This final rule changes certain aspects of the EB–5 program that are in need of reform and updates the regulations to reflect statutory changes and codify existing policies. This final rule makes five major categories of revisions to the existing EB–5 program regulations. Three of these categories, which involve (i) priority date retention; (ii) increasing the investment amounts; and (iii) reforming the TEA designations, are substantive. The two other major categories focused on (iv) procedures for removal of conditions on lawful permanent residence; and (v) miscellaneous changes, involve generally technical adjustments to the EB–5 program. Details concerning these three major substantive and two major technical categories of changes are provided in above sections, and in Table 2 in terms of benefit-cost considerations.

Within the five major categories of revisions to existing regulations, this

---

[116] U.S. Senator Charles Grassley, U.S. Representative Bob Goodlatte, *Press Release: Grassley, Goodlatte Call on DHS to Finalize EB–5*

**35792**    **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

final rule also makes some changes from the NPRM. Most importantly, the reduced investment amount for TEAs will be raised to $900,000 instead of the proposed $1.35 million, in order that the 50 percent differential between investment tiers be maintained. The other nonsubstantive changes between this final rule and the NPRM are listed here:

• Clarification that the priority date of a petition for classification as an investor is the date the petition is properly filed;

• Clarification that a petitioner with multiple approved immigrant petitions for classification as an investor is entitled to the earliest qualifying priority date;

• Modifying the original proposal that any city or town with a population of 20,000 or more may qualify as a TEA, to provide that only cities and towns with a population of 20,000 or more *outside* of metropolitan statistical areas (MSAs) may qualify as a TEA;

• Adding that amendments or supplements to any offering necessary to maintain compliance with applicable securities laws based upon the changes in this rulemaking will not independently result in denial or revocation of a petition, provided the petition meets certain criteria; and

• Additional minor non-substantive and clarifying changes.

DHS analyzed the five major categories of revisions carefully. EB–5 investment structures are complex, and typically involve multiple layers of investment, finance, development, and legal business entities. The interconnectedness and complexity of such relationships make it very difficult to quantify and monetize the costs and benefits. Furthermore, since demand for EB–5 investments incorporate many factors related to international and U.S. specific immigration and business, DHS cannot predict with accuracy changes in demand for the program germane to the major categories of revisions that increase the investment amounts and reform the TEA designation process. DHS has no way to assess the potential increase or reduction in investments either in terms of past activity or forecasted activity, and cannot therefore quantitatively estimate any impacts concerning job creation, losses or other downstream economic impacts driven by these major provisions.

There are several costs involved in the final rule for which DHS has conducted quantitative estimates. For the technical revision that clarifies that derivative family members must file their own petitions to remove conditions on their permanent residence when they are not included in the principal investor's petition, we estimate costs to be approximately $91,023 annually for those derivatives. Familiarization costs to review the rule are estimated to be $629,758 annually.

In addition, DHS has prepared a Final Regulatory Flexibility Analysis (FRFA) under the Regulatory Flexibility Act (RFA) to discuss potential impacts to small entities. As discussed further in the FRFA, DHS cannot estimate the exact impact to small entities. DHS, however, does expect some impact to regional centers and non-regional center projects. As it relates to the FRFA, each of 1,570 business entities involved in familiarization of the rule would incur costs of about $401.

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS

| Current policy | Adopted change | Impact |
|---|---|---|
| **Priority Date Retention** | | |
| Current DHS regulations do not permit investors to use the priority date of an immigrant petition approved for classification as an investor for a subsequently filed immigrant petition for the same classification. | DHS will allow an EB–5 immigrant petitioner to use the priority date of an immigrant petition approved for classification as an investor for a subsequently filed immigrant petition for the same classification for which the petitioner qualifies, unless DHS revokes the petition's approval for fraud or willful misrepresentation by the petitioner, or revokes the petition for a material error. | Benefits:<br>• Makes visa allocation more predictable for investors with less possibility for large fluctuations in visa availability dates due to regional center termination.<br>• Provides greater certainty and stability regarding the timing of eligibility for investors pursuing permanent residence in the U.S. and thus lessens the burden of unexpected changes in the underlying investment.<br>• Provides more flexibility to investors to contribute to more viable investments, potentially reducing fraud and improving potential for job creation.<br>Costs:<br>• None anticipated. |

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS—Continued

| Current policy | Adopted change | Impact |
|---|---|---|
| **Increases to Investment Amounts** | | |
| The standard minimum investment amount has been $1 million since 1990 and has not kept pace with inflation—losing almost half its real value. Further, the statute authorizes a reduction in the minimum investment amount when such investment is made in a TEA by up to 50 percent of the standard minimum investment amount. Since 1991, DHS regulations have set the TEA investment threshold at 50 percent of the minimum investment amount. Similarly, DHS has not increased the minimum investment amount for investments made in a high employment area beyond the standard amount. | DHS will account for inflation in the investment amount since the inception of the program. DHS will raise the minimum investment amount to $1.8 million to account for inflation through 2015, and includes a mechanism to automatically adjust the minimum investment amount based on the unadjusted CPI–U every 5 years. DHS will retain the TEA minimum investment amount at 50 percent of the standard amount. The minimum investment amount in a TEA will initially increase to $900,000. DHS is not changing the equivalency between the standard minimum investment amount and those made in high employment areas. As such, DHS will set the minimum investment amounts in high employment areas to be $1.8 million, and follow the same mechanism for future inflationary adjustments. | Benefits:<br>• Increases in investment amounts are necessary to keep pace with inflation and real value of investments;<br>• Raising the investment amounts increases the amount invested by each investor and potentially increases the total amount invested under this program.<br>• For regional centers, the higher investment amounts per investor will mean that fewer investors will have to be recruited to pool the requisite amount of capital for the project, so that searching and matching of investors to projects could be less costly.<br>Costs:<br>• Some investors may be unable or unwilling to invest at the higher levels of investment.<br>• There may be fewer jobs created if fewer investors invest at the higher investment amounts.<br>• For regional centers, the higher amounts could reduce the number of investors in the global pool and result in fewer investors, thus potentially making the search and matching of investors to projects more costly.<br>• Potential reduced numbers of EB–5 investors could prevent certain projects from moving forward due to lack of requisite capital.<br>• An increase in the investment amount could make foreign investor visa programs offered by other countries more attractive. |
| **TEA Designations** | | |
| A TEA is defined by statute as a rural area or an area that has experienced high unemployment (of at least 150 percent of the national average rate). Currently, investors demonstrate that their investments are in a high unemployment area in two ways:<br>(1) providing evidence that the Metropolitan Statistical Area (MSA), the specific county within the MSA, or the county in which a city or town with a population of 20,000 or more is located, in which the new commercial enterprise is principally doing business, has experienced an average unemployment rate of at least 150 percent of the national average rate; or<br>(2) submitting a letter from an authorized body of the government of the state in which the new commercial enterprise is located, which certifies that the geographic or political subdivision of the metropolitan statistical area or of the city or town with a population of 20,000 or more in which the enterprise is principally doing business has been designated a high unemployment area. | DHS will eliminate state designation of high unemployment areas. DHS also amends the manner in which investors can demonstrate that their investments are in a high unemployment area.<br>(1) DHS will add cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that may qualify as a TEA based on high unemployment.<br>(2) DHS will amend its regulations so that a TEA may consist of a census tract or contiguous census tracts in which the new commercial enterprise is principally doing business if<br>• the new commercial enterprise is located in more than one census tract; and<br>• the weighted average of the unemployment rate for the tract or tracts is at least 150 percent of the national average.<br>(3) DHS will also amend its regulations so that a TEA may consist of an area comprising the census tract(s) in which the new commercial enterprise is principally doing business, including any and all adjacent tracts, if the weighted average of the unemployment rate for all included tracts is at least 150 percent of the national average. | Benefits:<br>• Rules out TEA configurations that rely on a large number of census tracts indirectly linked to the actual project tract by numerous degrees of separation.<br>• Potential to better stimulate job growth in areas where unemployment rates are the highest, consistent with congressional intent.<br>Costs:<br>• This TEA provision could cause some projects and investments to no longer qualify as being in high unemployment areas. DHS presents the potential number of projects and investments that could be affected in Table 5. |

TABLE 2—SUMMARY OF CHANGES AND IMPACT OF THE ADOPTED PROVISIONS—Continued

| Current policy | Adopted change | Impact |
|---|---|---|
| Current technical issues:<br>• The current regulation does not clearly define the process by which derivatives may file a Form I–829 petition when they are not included on the principal's petition.<br>• Interviews for Form I–829 petitions are generally scheduled at the location of the new commercial enterprise.<br>• The current regulations require an immigrant investor and his or her derivatives to report to a district office for processing of their permanent resident cards. | DHS will amend its regulations to include the following technical changes:<br>• Clarify the filing process for derivatives who are filing a Form I–829 petition separately from the immigrant investor.<br>• Provide flexibility in determining the interview location related to the Form I–829 petition.<br>• Amend the regulation by which the immigrant investor obtains the new permanent resident card after the approval of his or her Form I–829 petition because DHS captures biometric data at the time the immigrant investor and derivatives appear at an ASC for fingerprinting.<br>• Add 8 CFR 204.6(n) to allow certain investors to remain eligible for the EB–5 classification if a project's offering is amended or supplemented based upon the final rule's effectiveness. | Conditions of Filing:<br>Benefits:<br>• Adds clarity and eliminates confusion for the process of derivatives who file separately from the principal immigrant investor.<br>Costs:<br>• Total cost to applicants filing separately will be $91,023 annually.<br>Conditions of Interview:<br>Benefits:<br>• Interviews may be scheduled at the USCIS office having jurisdiction over either the immigrant investor's commercial enterprise, the immigrant investor's residence, or the location where the Form I–829 petition is being adjudicated, thus making the interview program more effective and reducing burdens on the immigrant investor.<br>• Some petitioners will benefit by traveling shorter distances for interviews and thus see a cost savings in travel costs and opportunity costs of time for travel and interview time.<br>Costs:<br>• None anticipated.<br>Investors obtaining a permanent resident card:<br>Benefits:<br>• Cost and time savings for applicants for biometrics data.<br>Costs:<br>• None anticipated.<br>Eligibility Following Changes to Offering:<br>Benefits:<br>• An amendment to a project's offering based on the final rule's provisions might not result in the denial or revocation of a petition.<br>Costs:<br>• None anticipated. |
| **Miscellaneous Changes** | | |
| Current miscellaneous items:<br>• 8 CFR 204.6(j)(2)(iii) refers to the former U.S. Customs Service.<br>• Public Law 107–273 eliminated the requirement that alien entrepreneurs establish a new commercial enterprise from both INA section 203(b)(5) and INA section 216A.<br>• 8 CFR 204.6(j)(5) introductory text and (j)(5)(iii) reference "management";<br>• Current regulation at 8 CFR 204.6(j)(5) has the phrase "as opposed to maintain a purely passive role in regard to the investment";<br>• Public Law 107–273 allows limited partnerships to serve as new commercial enterprises;<br>• Current regulation references the former Associate Commissioner for Examinations.<br>• 8 CFR 204.6(k) requires USCIS to specify in its Form I–526 decision whether the new commercial enterprise is principally doing business in a targeted employment area.<br>• Sections 204.6 and 216.6 use the term "entrepreneur" and "deportation." These sections also refer to Forms I–526 and I–829.<br>• 8 CFR 204.6(i) and (j)(6)(ii)(B) use the phrase "geographic or political subdivision" in describing state designations of high unemployment areas for TEA purposes.<br>• The priority date of a petition for classification as an investor is the date the petition is properly filed. | DHS will amend its regulations to make the following miscellaneous changes:<br>• DHS is updating references at 8 CFR 204.6(j)(2)(iii) from U.S. Customs Service to U.S. Customs and Border Protection.<br>• Removing references to requirements that alien entrepreneurs establish a new commercial enterprise in 8 CFR 216.6.<br>• Removing references to "management" at 8 CFR 204.6(j)(5) introductory text and (j)(5)(iii);<br>• Removing the phrase "as opposed to maintain a purely passive role in regard to the investment" from 8 CFR 204.6(j)(5);<br>• Clarifies that any type of entity can serve as a new commercial enterprise;<br>• Replacing the reference to the former Associate Commission for Examinations with a reference to the USCIS AAO.<br>• Amending 8 CFR 204.6(k) to specify how USCIS will issue a decision.<br>• Revising sections 8 CFR 204.6 and 216.6 to use the term "investor" instead of "entrepreneur" and to use the term "removal" instead of "deportation."<br>• Removing references to "geographic or political subdivision" in 8 CFR 204.6(i) and (j)(6)(ii)(B).<br>• Providing clarification in 8 CFR 204.6(d) that the petitioner of multiple immigrant petitions approved for classification as an investor generally is entitled to the earliest qualifying priority date. | These provisions are technical changes and will have no impact on investors or the government. |

In addition to the above, applicants will need to read and review the rule to become familiar with the final rule provisions. Familiarization costs to read and review the rule are estimated at $629,758 annually.

**(2) Background and Purpose of the Final Rule**

The preceding sections of the preamble review key historical aspects and goals of the program, and specific justifications for the particular provisions in the final rule. This section supplements and provides additional points of analysis that are pertinent to this regulatory impact assessment.

A person wishing to immigrate to the United States under the EB–5 program must file an Immigrant Petition by Alien Investor (Form I–526). Each individual immigrant investor files a Form I–526 petition containing information about their investment.[117] The investment must be made into either an NCE within a designated regional center in accordance with the Regional Center Program or a standalone NCE outside of the Regional Center Program ("non-regional center" investment). The NCE may create jobs directly (required for non-regional center investments), or pool immigrant investors' funds into associated NCEs that in turn undertake job-creating activities directly or, more typically, indirectly through JCEs which receive EB–5 capital from the regional center (RC)-associated NCEs. With respect to regional center investors, once a regional center has been designated, affiliated investors can submit Form I–526 petitions in the concurrent year and in future years, provided the regional center maintains its designation. Each year, the stock of approved regional centers represents the previous year's approved total, plus new regional centers approved during the current year, minus regional centers that are terminated in the concurrent year.[118]

DHS analysis of Form I–526 filing data for FY 2014–2016 indicates that on average, 13,016 Form I–526 petitions were filed annually. Investments in regional centers accounted for an average of 12,042 such petitions annually, or 92 percent of all submitted Form I–526 petitions, while non-regional center investments accounted for an average of 1,062 Form I–526 petitions annually, or about 8 percent.

EB–5 filings grew rapidly starting in 2008, when the U.S. financial crisis reduced available U.S.-based commercial lending funds and alternative funding sources, such as the EB–5 program, were sought. Based on the type of projects that Form I–526 petitions describe, it appears that EB–5 capital has been used as a source of financing for a variety of projects, including a large number of commercial real estate development projects to develop hotels, assisted living facilities, and office buildings.

In general, DHS databases do not track the total number of investment projects associated with each individual EB–5 investment by petitioners, but rather track the NCE associated with each individual investment. Any given NCE could fund multiple projects. DHS analysis of filing data reveals that for FY 2014–2016, on average per year, 1,461 unique NCEs were referenced in the Form I–526 petitions submitted. On average 51 percent of the overall number of unique NCEs were found in petitions associated with regional centers, and 49 percent of the overall number of NCEs, were found in non-regional center-associated petitions. This suggests that on average, unique NCEs are more common in non-regional center filings, as 92 percent of individual petitioner filings are associated with regional centers.[119]

DHS obtained and analyzed a random sample of Form I–526 petitions that were submitted in FY 2016. The files in the sample were pending adjudicative review at IPO in May 2016.[120] As the results obtained from analysis of this random sample are utilized in forthcoming sections of this regulatory analysis, it henceforth will be referred to as the "2016 NCE sample" for brevity. A key takeaway from the review of the sample is that a majority of all NCEs (80

percent) blended program capital with capital from other sources. For regional center NCEs sourced with blended capital, the EB–5 portion comprised 40 percent of the total capital outlay, while for non-regional center NCEs sourced with blended capital, the EB–5 portion comprised 50 percent of the total capital outlay.

**(3) Baseline Program Forecasts**

DHS produced a baseline forecast of the total number of Form I–526 receipts, beginning in the first year the rule will take effect and extending for 10 years for the period FY 2017–2026.[121] This Form I–526 forecast includes the historical trend of Form I–526 receipts from FY 2005 to FY 2015, the filing projections from the USCIS Volume Projections Committee (VPC), and input from IPO. The VPC projects that the high rate of growth in EB–5 investment filings, which averaged 39 percent annually since FY 2008, will slow to about 3.3 percent over the next 3 years and will subsequently level off. The program grew exponentially starting in 2008 with the economic downturn. At that time, commercial lending was extremely difficult to obtain. As the U.S. economy has improved, commercial lending is now more viable, resulting in fewer overall petitions. In addition, in the past, USCIS has experienced significant spikes in filings in anticipation of the possibility that Congress would either allow the Regional Center Program to sunset or implement new legislative reforms that would increase the required minimum investment amounts, as investors sought to "beat" the new levels. These spikes have occurred around the program's anticipated sunset (*e.g.,* September 2015, December 2015, and September 2016). USCIS believes that the filing growth rate will level off once the program is extended for longer than one year at a time. DHS used this information to inform a forecasting model based on a logistic function that captures the past increase in receipts from a low baseline, the exponential growth that the program experienced from FY 2008–2015, and a very small rate of growth anticipated for the next 3 years leading to a leveling off of future growth. The technical details are provided in the accompanying footnote, and as can be seen in the graph, the DHS estimation technique closely fits past

---

[117] To be eligible at the time of the Form I–526 petition's filing, investors must demonstrate either that they have already invested their funds into the NCE or that they are actively in the process of investing. Some investors choose to demonstrate commitment of funds by placing their capital contribution in an escrow account, to be released irrevocably to the NCE upon a certain trigger date or event, such as approval of the Form I–526 petition.

[118] Between May 2008 and July 2017, 128 regional centers have been terminated. USCIS, Immigrant Investor Regional Centers, *available at http:// www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers.*

[119] IPO NCE data records indicate that the disparity in the regional center petitioner filings compared to unique NCEs—92 percent of total petitioner filings compared to 49 percent of unique NCEs—exists because regional center projects include 18 investors on average, while non-regional center investments include only 1.5 investors on average.

[120] The figures for yearly volumes of Form I–526 filings are publicly available under DHS performance data: USCIS, Number of Form I–526 Immigrant Petitions by Alien Entrepreneurs by Fiscal Year, Quarter, and Case Status 2008–2016, *available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I526_performancedata_fy2017_qtr2.pdf.* The NCE data were obtained from file tracking data supplied by IPO. Because the NCE file submissions contain detailed business plan and investor information, the NCE data are not captured in formal DHS databases that are provided publicly, but rather in internal program office and adjudication records.

[121] DHS did not attempt a similar forecast for Form I–924 receipts, because DHS does not have a sound basis for predicting how the rule will affect such receipts.

filings and captures the expected trends alluded to earlier.[122]

Figure 1 graphs the volume of "past" actual Form I–526 filings from 2005 to 2016, compared with the past receipts for the same period estimated by our forecasting function, plus the forecasts thereafter for future filings.

Additionally, changes in receipts driven by this rule could cause variations in the future receipts that are not reflected in the present forecasts.



**Figure 1. DHS Estimate and Forecast of I-526 Filings**

The forecast values are listed in Table 3:

TABLE 3—DHS FORECASTS FOR INVESTOR FORM I–526 RECEIPTS AND NCES

| FY | Investors | NCEs |
|---|---|---|
| 2017 ...................... | 15,241 | 1,481 |
| 2018 ...................... | 15,685 | 1,524 |
| 2019 ...................... | 15,925 | 1,547 |
| 2020 ...................... | 16,052 | 1,560 |
| 2021 ...................... | 16,119 | 1,566 |
| 2022 ...................... | 16,153 | 1,570 |
| 2023 ...................... | 16,171 | 1,571 |
| 2024 ...................... | 16,181 | 1,572 |
| 2025 ...................... | 16,185 | 1,573 |
| 2026 ...................... | 16,188 | 1,573 |
| 10-year total .. | 159,900 | 15,538 |
| Annual Average ............ | 15,990 | 1,554 |

The last column of Table 3 provides estimates of the total number of NCEs. An assumption of the NCE forecasts is that there is no change in the relationship between the number of NCEs and the number of Form I–526 filings over time.[123] The impact of these provisions will be described in the relevant sections of this analysis.

(4) Economic Impacts of the Major Rule Provisions

a. Retention of Priority Date

This rule will generally allow an EB–5 immigrant petitioner to use the priority date of an approved EB–5 petition for any subsequently filed EB–5 petition for which the petitioner qualifies. Provided that petitioners have not yet obtained lawful permanent residence pursuant to their approved petition and that such petition has not been revoked on certain grounds, petitioners will be able to retain their priority date and therefore retain their place in the visa queue. DHS is allowing priority date retention to: Address situations in which petitioners may become ineligible through circumstances beyond their control (e.g.,

the termination of a regional center) as they wait for their EB–5 visa priority date to become current; and provide investors with greater flexibility to deal with changes to business conditions. For example, investors with an approved petition involved with an underperforming or failing investment project will be able to move their investment funds to a new, more promising investment project without losing their place in the visa queue.

There will be an operational benefit to the investor cohort because priority date retention will make visa allocation more predictable with less possibility for massive fluctuations due to regional center termination that could, in the case of some large regional centers, negatively affect investors who are in the line at a given time. This change will provide greater certainty and stability for investors in their pursuit of permanent residence in the United States, helping lessen the burden of situations unforeseen by the investor related to their investment. In addition,

---

[122] DHS utilized a logistic function of the format, $(C/(\lambda + \beta e^{-\rho t}))$ where input $t$ is the time year code (starting with zero), $e$ is the base of the natural logarithm, and $C$, $\lambda$, $\beta$, and $\rho$ are parameters such that $C/\lambda$ asymptotically approaches the maximum level of the predicted variable, the Form I–526 receipts. The parameters $\beta$ and $\rho$ jointly impact the inflection and elongation of the sigmoidal curve. DHS did not attempt an estimation procedure

focused on minimizing the sum of squared errors (such as least squares regression) or other fitting technique, and instead chose the parameters to reflect the past trend of actual receipts and the expected leveling off in their growth rate. For the final forecast run, the specific calibration was C = 17,000, λ = 1.05, β = 180, and ρ = .66. The maximum expected level of receipts (equal to 17,000/1.05 which is approximately 16,200) was

determined via input from EB–5 program management.

[123] In other words, the assumption is that the current number of investors per NCE holds in the future. For the NCE projections, the 2016 value is set at the 2014–2016 average of 1,404. For each year thereafter, the figure is based on the growth rate of predicted Form I–526 receipts.

by allowing priority date retention, investors obtain greater flexibility in moving their investment funds out of potentially risky projects, thereby potentially reducing fraud and improving the potential for job creation in the United States. DHS cannot quantify or monetize the net benefits of the priority date retention provision or assess how many past or future investors might be affected.

b. Investment Amount Increase

DHS will raise the standard minimum investment amount from the current $1 million to $1.8 million to account for the rate of inflation from the program's inception in 1990 until the time of the proposed rule. DHS will also raise the reduced investment amount for TEA projects to $900,000, which is 50 percent of the general investment amount.[124] DHS will further adjust the minimum investment amounts every 5 years. The standard level will be adjusted for inflation based on the 1990 level and the reduced amount will be adjusted to maintain 50 percent of the standard minimum investment amount. These increases are needed because the investment amounts have never been adjusted to keep pace with inflation, thereby eroding the real value of the investments.

DHS believes it is reasonable to assume that some prospective investors under the current rule may be unable or unwilling to invest at either of the higher levels of investment under the new rule. However, DHS is unable to estimate the potential reduction in investments either in terms of past activity or forecasted activity, and cannot therefore estimate any impacts concerning job creation, losses or other downstream economic impacts driven by the investment amount increases. DHS evaluates the source of investor funds for legitimacy but not for

information on investor income, wealth, or investment preferences. DHS therefore cannot estimate how many past investors would have been unable or unwilling to have invested at the new amounts, and hence cannot make extrapolations to potential future investors and projects. However, as noted earlier, it would take a substantial reduction in investors to actually reduce total investment below current levels. If the 80 percent higher levels of required investment do not lead to a reduction in the number of EB–5 investments, the absolute amount of investment would increase by 80 percent. There is currently about $4.43 billion in annual TEA investment under the program. At the TEA investment amount of $900,000 in this final rule, this same level of total TEA investment would be achieved with 44 percent fewer investors. Furthermore, small and even moderate reductions in investors actually stand to generate growth in total investment. It is entirely possible that total investment will actually increase, even if the number of investors were to decrease.

In addition to the effect on investors, it is reasonable to assume that the changes to the investment amounts will also affect regional centers. If the higher amounts reduce the number of investors in the global pool, competition for fewer investors may make it more costly for regional centers to identify and match with investors. However, the net effect on regional center costs is not something DHS can forecast with accuracy.

DHS also believes that for both regional center and non-regional center investments, the projects and the businesses involved could be affected. A reduced number of EB–5 investors could preclude some projects from going forward due to outright lack of requisite capital. Other projects will likely see an increase in the share of non-EB–5 capital, such as capital sourced to domestic or other foreign sources. As alluded to in Section Two of this analysis, analysis of the 2016 NCE sample reveals that 80 percent of NCEs blend EB–5 capital with other sources of capital. DHS believes that the costs of capital and return to capital could be different depending on the

source of the capital. As a result, a change in the composition of capital could change the overall profitability for one or more of the parties involved; however, if the project on the whole promises net profitability, taking into account risk and potential returns from other investments, it may proceed as planned. The specific impact on each party for each project will vary on a case-by-case basis, and will be dependent on, among other things, the particular financial structures and agreements between the regional center, investors, NCE, and project developer. It will also be determined by local and regional investment supply and demand, lending conditions, and general business and economic factors.

DHS also considers that an increase in the investment amount could make other countries' foreign investor visa programs more attractive and therefore there could be some substitution into such programs. The decision to invest in another country's program will depend in part on the investment and country-specific risk preferences of each investor. While DHS has no means of ascertaining such preferences, it is possible that some substitution into non-U.S. investor visa programs could occur as a result of the higher required investment amounts. However, according to DHS research, substitution into another country's immigrant investor program will likely be more costly for investors than investing in the EB–5 program even with increases in the EB–5 investment amounts. DHS has laid out some of the comparisons to other countries' immigrant investor programs earlier in the preamble.

There are numerous ancillary services and activities linked to both regional center and direct investments, such as, but not limited to, business consulting and advising, finance, legal services, and immigration services. However, DHS is not certain how the rule will affect these services. Similarly, DHS does not have information on how the revenues collected from these types of activities contribute to the overall revenue of the regional centers or direct investments.

---

[124] The adjustment to the standard minimum investment amount is based on the CPI–U, which, as compared to a base date of 1982–1984, was 130.7 in 1990 and 237.017 in 2015. The actual increase in prices for the period was approximately 81.34 percent, obtained as (($CPI–U_{2015}$/$CPI–U_{1990}$) − 1)). The $1.8 million investment amount is rounded. *See generally* Bureau of Labor Statistics, Inflation & Prices, *available at* http://www.bls.gov/data/#prices.

35798    **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

In summary, DHS believes that the increase in the minimum investment amount will bring the investment amounts in line with real values. DHS recognizes that some of the investment increase benefits could be offset if some investors are deterred from investing at the higher amounts. DHS does not have the data or information necessary to attempt to estimate such mitigating effects. It is possible that the higher investment amounts could deter some investors from EB–5 activity and therefore negatively affect regional center revenue in some cases, although the magnitudes and net effects of these impacts cannot be estimated. It is also possible that the higher investment amounts could attract additional capital overall and stimulate projects to get off the ground that otherwise might not. Due to the complexity of EB–5 financial arrangements and unpredictability of market conditions, DHS cannot forecast with confidence how many projects would be affected by the increased investment amounts through a change in the number of individuals investing through the EB–5 program. Some projects could be forgone while others will proceed with a higher composition of non-EB–5 capital, with resultant changes in profitability and rates of return to the parties involved. An overall decrease in investments and projects will potentially reduce some job creation and result in other downstream effects.

c. Periodic Adjustments to the Investment Amounts

In addition to initially raising the investment thresholds to account for inflation, DHS will adjust the standard investment threshold every 5 years (as compared to $1,000,000 in January 1990 at the program's inception) to account for future inflation, and to adjust the reduced investment threshold for TEAs to keep pace with the standard amount. DHS projected the effects of this methodology using a relatively low, recent inflation index (1.5 percent) and a more moderate inflation index (3.2 percent). DHS made two separate projections based on two different indexes because DHS cannot predict with certainty what the future inflation index will be. The 1.5 percent estimate is based on the average rate of inflation for the period 2009–2017, which economists generally consider to be relatively low compared to earlier periods. The 3.2 percent estimate used for the higher-end projection is based on the 3.2 percent inflation rate in 2011, which was the highest annual inflation rate observed from the 2009 to 2017 period. DHS believes it is appropriate to characterize the 3.2 percent rate as a ''moderate'' inflation baseline, because although it is higher than the average annual rate since 2009, it is not considered by economists to be high as compared to other historical periods.[125]

Table 4 lists the general minimum investment amounts and reduced investment amounts after 5 and 10 years if the amounts are raised initially as finalized in this rule. The figures are in millions of U.S. dollars and are rounded to the nearest fifty-thousandth. DHS notes that estimates are slightly different than those provided in the proposed rule due to the modification to the inflation adjustment.

### TABLE 4—PROJECTED INVESTMENT AMOUNTS AT 5-YEAR REVISIONS

[Figures are in millions of $]

| Provision: Initial increase | Revision (year) | Projected investment amount | |
|---|---|---|---|
| | | Based on average inflation scenario, 1.5 percent | Based on moderate inflation scenario, 3.2 percent |
| Standard Investment Amount = $1.8 Million in 2018 ................................................ | 5 | 1.95 | 2.12 |
| | 10 | 2.10 | 2.48 |
| Minimum Investment Amount = $900,000 in 2018 ................................................ | 5 | .98 | 1.06 |
| | 10 | 1.05 | 1.24 |

DHS attempted to assess the costs of these changes. As described earlier, the potential cost of the higher amounts may result in a reduction in the number of investors and projects and a lower share of EB–5 capital for some projects, which could result in capital losses, fewer jobs created, and other reductions in economic activity. Or, there could be an increase in overall EB–5 capital flowing into the economy, which could result in more jobs created and increases in economic activity. DHS is not able to predict how many investors and projects will be affected, nor can we predict the impact to the capital available for projects.

d. Targeted Employment Areas

Under the current regulations, a state may designate an area in which the enterprise is principally doing business as a high unemployment TEA if that area is a geographic or political subdivision of a metropolitan statistical area (MSA) or of a city or town with a population of 20,000 or more. As is the current practice, state determinations for TEAs define the appropriate boundaries of a geographic or political subdivision that constitutes the TEA, although it is the responsibility of the petitioner to provide the supporting data and methodology involved in the state TEA determination. DHS ensures state designations comply with the statutory requirement that the proposed area designated by the state has an unemployment rate of at least 150 percent above the national average by reviewing state determinations of the unemployment rate and assessing the method or methods by which the state authority obtained the unemployment statistics.[126] Currently DHS does not

[125] Allan Meltzer, "A Slow Recovery with Low Inflation," Hoover Inst., Econ. Working Paper No. 13,110 (2013), *available at http://www.hoover.org/sites/default/files/13110_-_meltzer_-_a_slow_recovery_with_low_inflation.pdf; see also* Michael T. Kiley, *Low Inflation in the United States: A Summary of Recent Research*, FEDS Notes, Board of Governors of the Federal Reserve System (Nov. 23, 2015), *available at http://www.federalreserve.gov/econresdata/notes/feds-notes/2015/low-inflation-in-the-united-states-a-summary-of-recent-research-20151123.html;* Mary C. Daly and Bart Hobijn, *Downward Nominal Wage Rigidities Bend the Phillips Curve,* Fed. Reserve Bank S.F., Working Paper No. 2013–08 (2014), *available at http://www.frbsf.org/economic-research/files/wp2013-08.pdf.* The inflation rates reflect the yearly seasonally adjusted average for the consumer price index for all urban consumers (CPI–U) and are found at: *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201808.pdf.*

[126] USCIS Policy Manual, 6 USCIS–PM G, Chapter 2.A(5).

**Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations     **35799**

limit the number of census tracts that a state can aggregate as part of a high unemployment TEA designation. TEA configurations that DHS has evaluated from state designations have included the census tract or tracts where the NCE is principally doing business ("project tract(s)"), one or more directly adjacent tracts, and others that are further removed, resulting in configurations resembling a chain-shape or other contorted shape. This final rule will remove states from the high unemployment area designation process; instead, investors will be required to provide sufficient evidence to DHS in order to qualify for the reduced investment threshold. Under this final rule, DHS will generally limit the number of census tracts that could be combined for this purpose.[127] Specifically, DHS will allow for a high unemployment area to consist of an area comprised of the census tract(s) in which the new commercial enterprise is principally doing business, including any and all adjacent tracts, if the weighted average of the unemployment rate for all included tracts is at least 150 percent of the national average. Additionally, DHS will allow cities and towns with a population of 20,000 or more outside of MSAs to qualify as a TEA based on high unemployment. See final 8 CFR 204.6(j)(6)(ii)(A).

In order to assess the impacts of the changes to the TEA designation requirements, DHS performed further analysis on the 2016 NCE sample. First, DHS determined, based on the sample,

that 98 percent of regional center investments and 68 percent of non-regional center investments are made into TEAs. Because the 2016 sample significantly over-represents non-regional center investments, DHS also determined the percentage of investments overall that were applied to TEAs. DHS found that 96 percent of investments and 83 percent of NCEs were applied to TEAs.[128] About 9 percent of investments that were made into TEAs were made into rural TEAs. The non-regional center share of rural TEA investments was slightly higher than that of regional centers, at 9 and 11 percent, in order.

DHS then parsed the TEA filings comprising the 2016 NCE sample into specific cohorts. Specifically, DHS is interested in the number and share of projects and NCEs that would likely be affected by the rule. DHS thus split the sample of NCEs into regional center and non-regional center groups, and then broke these into two subgroups each. The first subgroup is the number of filings that comprised rural, and then high unemployment TEA filings that did not rely on state designations to qualify. The TEAs in this cohort did not require state designations because the project was located in a specific geographical unit that met the unemployment threshold.[129] These TEAs would be unaffected by the changes being finalized in this rule as they pertain to TEA reform. This first subgroup also adds the filings that relied on one or two census tracts,

respectively. These too will be unaffected by the specific TEA changes proposed in this rule. Hence the first subgroup represents filings that would not be affected by the rule. The second subgroup is the remainder—those filings into high unemployment TEAs that relied on three or more census tracts. This final rule will potentially affect some of the designations in this second subgroup.

Having broken out the filings to identify the segment that would potentially be affected, DHS proceeded to estimate the shares of investments and NCEs potentially impacted, as well as the actual numbers, on an annual basis. There are two caveats to our analysis. Foremost, we emphasize that the figures presented represent potential and likely maximum impacts for the following reason. Some of the group that relied on three or more tracts may have been configured in a manner that could meet the new provision. The data that DHS analyzed only contained the number of tracts, not the raw data to evaluate the actual geographical configuration and to determine if it would meet the provision in the final rule. Second, the figures for investments and NCEs apply to petitions filed and thus not to actual approvals made. The weighted percentages and figures applicable are summarized in the Table 5 below, noting that the amounts are based on the average of filings for FY 2014–2016; potential changes in future filing patterns are discussed later.

TABLE 5—TEA METRICS

| TEA cohort | Investments | | NCEs | |
|---|---|---|---|---|
| | Amount | Share (percent) | Amount | Share (percent) |
| Not affected by the rule ........................................................................... | 6,207 | 46 | 832 | 57 |
| Potentially affected by the rule ................................................................ | 7,075 | 54 | 628 | 43 |

[127] According to USCIS policy in effect at the time of issuance of this rulemaking:

A new commercial enterprise is principally doing business in the location where it regularly, systematically, and continuously provides goods or services that support job creation. If the new commercial enterprise provides such goods or services in more than one location, it will be principally doing business in the location most significantly related to the job creation.

Factors considered in determining where a new commercial enterprise is principally doing business include, but are not limited to, the location of:

• Any jobs directly created by the new commercial enterprise;

• Any expenditure of capital related to the creation of jobs;

• The new commercial enterprise's day-to-day operation; and

• The new commercial enterprise's assets used in the creation of jobs.

USCIS Policy Manual, 6 USCIS–PM G (Nov. 30, 2016).

[128] To account for the over-representation on non-regional center investments, DHS uses a weighted average approach to increase precision in the estimates. In the 2016 NCE sample non-regional center NCE investments constitute exactly half, but more broadly they account for less than a tenth (8 percent) of submitted investments. This bias is not a feature of the sampling methodology but rather an inherent feature of the population, because non-regional center investments comprise almost half, 49 percent, of all NCEs. Note that there is a slight sampling discrepancy in NCEs as well but it is very

slight, at 1 percent. The weighted average for TEA investments is the sum of the regional center share of investments (.92) multiplied by the TEA share found in the sample (.98), and the non-regional share of investments (.08) multiplied by the TEA share in the sample (.68). The resulting weighting equation is .90 + .06 = .96 or 96 percent. The weighted average for TEA NCEs is the sum of the regional center share of NCEs (.51) multiplied by the TEA share found in the sample (.98), and the non-regional share of NCEs (.49) multiplied by the TEA share in the sample (.68). The resulting weighting equation is .50 + .33 = .83.

[129] For the TEA geographies that met the high unemployment threshold in the sample analyzed, 90 percent utilized MSAs and the remaining 10 percent utilized counties.

As the table reveals, just over half (54 percent) of investments, or about 7,075 annually, could potentially be affected, though we stress again that this is an upper bound estimate. In reality, some portion of the maximum cohort for projects and NCEs will have continued to qualify for TEA designation under the changes by this rule. However, currently DHS does not have reliable, statistically valid information from which DHS can more accurately estimate the share and number of projects and NCEs likely to be affected by the rule. Slightly under half, 43 percent, of NCEs could be impacted.

DHS obtained Census Bureau data on adjacent tracts that were utilized in studies unrelated to the current rulemaking provision.[130] From the population of 74,001 tracts provided in the Census dataset, DHS randomly sampled 390 tracts, which is slightly more than the 383 needed for 95 percent confidence and a 5 percent margin of error. The average number of adjacent tracts was 6.4 and the median was 6, with a maximum of 11, a minimum of 3, and a range of 8. Since "partial" tracts are not viable under the EB–5 program, the average was rounded to the nearest whole number and 1 tract was added to account for the primary tract for which the adjacencies were counted, to yield an average of 7 total tracts. This suggests that it may not be unusual for a TEA designation of three or more tracts to satisfy the adjacency requirements of this final rule.

The benefit of this aspect of the final rule is that it will prevent certain TEA configurations that rely on a large number of census tracts indirectly linked to the actual project tract(s) by multiple degrees of separation. As a result, some investments may be re-directed to areas where unemployment rates are truly high, according to the 150 percent threshold, and therefore may stimulate job creation where it is most needed.

DHS also considered an alternative provision, under which TEA designations would be subject to a twelve-tract limit. This limit is used by the State of California in its TEA certifications. DHS considered this limit as an alternative approach because it is

the only case in which a state limits the number of census tracts to a specific number. Analysis of the NCE sample revealed that for tract configurations with two or more tracts, the average number of tracts aggregated was 16, but the median was 7. The figures are slightly higher at 17 and 8, respectively, when the cohort is isolated to three or more multiple tract configurations. The difference in the mean and median indicates that the distribution is right-skewed, characterized by a small number of very large-tract number compilations, evidenced by a sample range of 198 tracts. DHS notes that there is sufficient variation in the data to preclude state locational bias, as 21 states and the District of Columbia were represented in the 2016 NCE sample. Ultimately, DHS did not choose this alternative option because it is not necessarily appropriate for nationwide application, as the limitation to 12 census tracts may be justifiable for reasons specific to California but may not be apt on a national scale.

DHS stresses that the maximum cohorts presented in Table 5 overstate the number and shares of future investments and NCEs that will be affected by the TEA reform provision because some of the configurations that relied on multiple tracts (3 or more) may be able to meet the requirements of the rule. Furthermore, the number of affected investments and NCEs is also likely to be lower because regional centers may be able to replace forgone projects in places that will not meet the high unemployment criteria under the final rule with other projects that will in fact qualify. For example, a regional center seeking to locate a project on one city block that will no longer qualify as a TEA may opt to locate the project on another block that could qualify as a TEA under the new rule. In that sense, the final rule may provide additional incentive for investments in rural areas, because such investments will be unaffected by this rule, or in areas that are more closely associated with high unemployment. DHS believes that some regional centers will not be able to make such a substitution and that there may be costs in the forms of forgone investments and projects, and accompanying reductions in job creation and other economic activity (unless other investments and projects create compensatory or more than compensatory economic activity).

DHS has described some of the possible negative consequences of a reduced number of investors. A decrease in investments and projects may potentially reduce some job

creation and have other downstream effects.

In addition to the amendments examined in the preceding analysis, DHS will allow cities and towns with a population of 20,000 or more outside of MSAs as a specific and separate area that may qualify as a TEA based on high unemployment. This is a narrower change than was introduced in the NPRM, where it was proposed to allow any city or town with a population of 20,000 to qualify as a TEA based on high unemployment. DHS cannot estimate the additional number of NCEs that will qualify as principally doing business in a TEA and creating jobs in a TEA based on this amendment. However, DHS anticipates the change will provide benefits in that additional areas may qualify as a TEA based on high unemployment, potentially offering investors more opportunities to invest in a TEA at the reduced investment amount, and encouraging job creation in more areas of high unemployment.

e. Other Provisions

DHS has also analyzed the other provisions in the rule:

*Removal of Conditions Filing.* DHS is revising its regulations to clarify that, except in limited circumstances, derivative family members must file their own petitions to remove conditions from their permanent residence when they are not included in a petition to remove conditions filed by the principal investor. Generally, an immigrant investor's derivatives are included in the principal immigrant investor's Form I–829 petition. However, there have been cases where the derivatives are not included in the principal's petition but instead file one or more separate Form I–829 petitions. This final rule clarifies that, except in the case of a deceased principal, derivatives not included in the principal's Form I–829 petition cannot use one petition for all the derivatives combined, but must each separately file his or her own Form I–829 petition. Based on IPO review of historical filings for this group, on average over a 3-year period about 24 cases per year involved such circumstances. Biometrics are currently required for the joint Form I–829 petition submissions, so the provision requiring separate filings will not impose any additional biometric, travel, or associated opportunity costs. The only costs expected from this specific provision in the final rule will be the separate filing fee and associated opportunity cost. DHS has attempted to quantify these new costs as follows. The filing fee for a Form I–829 petition is $3,750. DHS estimates that the form

---

[130] As of 2016, the Census Bureau records show 73,057 Tracts in the United States, including the District of Columbia but not counting U.S. Territories. U.S. Census Bureau, 2010 Census Tallies of Census Tracts, Block Groups and Blocks, *available at* https://www.Census.gov/geo/maps-data/data/tallies/tractblock.html. The data utilized in this analysis is currently available publicly from Brown University's (Providence, RI) American Communities Project website at *http://www.s4.brown.edu/us2010/Researcher/Pooling.htm.*

takes 4 hours to complete. DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy of time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.66 to estimate the opportunity cost of time for dependent spouses. The value of $10.66 per hour represents the Federal minimum wage with an upward adjustment multiple of 1.47 for benefits.[131] Each applicant will face a time cost burden of $42.64, which when added to the filing fee, is $3,792.64. Extrapolating the past number of average annual filings of 24 going forward, total applicant costs will total $91,023.36 annually.[132]

*Removal of Conditions Interview.* In addition to the separate filing requirement discussed earlier, DHS is improving the adjudication process relevant to the investor's Form I–829 interview process by providing flexibility in interview scheduling and location. Section 216A(c)(1)(B) of the INA, 8 U.S.C. 1186b(c)(1)(B), generally requires Form I–829 petitioners to be interviewed prior to final adjudication of the petition, although DHS may waive the interview requirement at its discretion. *See* INA section 216A(d)(3), 8 U.S.C. 1186b(d)(3). Under this rule, DHS is giving USCIS greater flexibility to require Form I–829 interviews and determine the appropriate location for such an interview. Additionally, current DHS regulations allow for Form I–829 petitioners to be interviewed prior to final adjudication of a Form I–829 petition, but require the interview to be conducted at the USCIS District Office holding jurisdiction over the immigrant investor's new commercial enterprise. However, there is no requirement that the immigrant investor reside in the same location as the new commercial enterprise, and DHS has determined through some preliminary surveys conducted by IPO that many immigrant investors are located a considerable distance from the new commercial enterprise. Therefore, DHS clarifies that USCIS has authority to schedule an interview at the USCIS office holding jurisdiction over either the immigrant investor's commercial enterprise, the immigrant investor's residence, or the location in which the Form I–829 petition is being adjudicated. DHS cannot currently determine how many petitioners will potentially be affected by these changes. From fiscal years 2012 to 2016, DHS received an average of 2,137 Form I–829 petitions. While not all of these petitioners will require an interview or face hardship to travel for an interview, some of this maximum population may be affected.[133] Some petitioners will benefit by traveling shorter distances for interviews and thus save a cost savings in travel costs and opportunity costs of time for travel and interview time.

*Process for Issuing Permanent Resident Cards.* DHS also amends regulations governing the process by which immigrant investors obtain their new permanent resident cards after the approval of their Form I–829 petitions. Current regulations require the immigrant investor and his or her derivatives to report to a district office for processing of their permanent resident cards after approval of the Form I–829 petition. This process is no longer necessary in light of intervening improvements in DHS's biometric data collection program.[134] DHS now captures the required biometric data while the Form I–829 petition is pending, at the time the immigrant investor and his or her derivatives appear at an Application Support Center for fingerprinting, as required for the Form I–829 background and security checks. DHS then mails the permanent resident card directly to the immigrant investor by U.S. Postal Service registered mail after the Form I–829 petition is approved. Accordingly, there is generally no need for the immigrant investor and his or her derivatives to appear at a district office after approval of the Form I–829 petition.

DHS does not estimate any additional costs for this provision. This provision will likely benefit immigrant investors and any derivatives, including by providing savings in cost, travel, and time, since this regulation will no longer require them to report to a district office for processing of their permanent resident cards. DHS also benefits by removing a process that is no longer necessary.

*Petitioner Eligibility Following a Change in a Project's Offering.* DHS also modifies its regulations to indicate that amendments or supplements made to an EB–5 project's offering in order to maintain compliance with securities laws based upon the final rule's changes to 8 CFR 204.6 shall not independently result in denial or revocation of an investor's petition. DHS does not estimate any additional costs for this provision. This allowance will likely benefit certain investors whose eligibility for the EB–5 classification may have been at risk, absent this provision, because of an amendment to offering documents based on the changes made in this final rule. The petitions for this narrowly defined population of investors will not be denied or revoked under the circumstances put forth at new 8 CFR 204.6(n), provided the investors were eligible at the time of filing their petitions and remain eligible at the time of adjudication.

*Miscellaneous Other Changes.* DHS is also making a number of other technical changes to the EB–5 regulations. First, DHS is updating a reference to the former United States Customs Service, so that it will now refer to U.S. Customs and Border Protection. Second, DHS is conforming DHS regulations to Public Law 107–273, which eliminated the requirement that immigrant entrepreneurs establish a new commercial enterprise from both section 203(b)(5) and section 216A of the INA. Accordingly, DHS removes references to this requirement in 8 CFR 216.6. Third, DHS is further conforming DHS regulations to Public Law 107–273 by removing the references to "management" at 8 CFR 204.6(j)(5) introductory text and (j)(5)(iii). Fourth, DHS is removing the phrase "as opposed to maintaining a purely passive role in regard to the investment" from 8 CFR 204.6(j)(5). Fifth, DHS is allowing any type of entity to serve as a new commercial enterprise. Sixth, DHS is amending 8 CFR 204.6(k) to remove the requirement on USCIS to specify in the decision on the EB–5 petition whether the new commercial enterprise is principally doing business in a TEA. Finally, DHS is making revisions to otherwise unaffected sections of section 204.6 and 216.6 to replace the term "entrepreneur" with the term "investor."

Since the NPRM, DHS is making six additional miscellaneous changes to (1)

---

[131] *Minimum Wage,* U.S. DOL, *available at http://www.dol.gov/dol/topic/wages/minimumwage.htm* (indicating the Federal Minimum Wage is $7.25 per hour). The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour). See Economic News Release, U.S. Department of Labor, Bureau of Labor Statistics, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (June 2018), *available at https://www.bls.gov/news.release/archives/ecec_06082018.pdf.*

[132] Calculation: The burdened wage of $10.66 per hour multiplied by 4 hours.

[133] USCIS, Number of I–829 Petitions by Entrepreneurs to Remove Conditions by Fiscal Year, Quarter, and Case Status 2008–2016, *available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/Employment-based/I829_performancedata_fy2017_qtr2.pdf.*

[134] DHS already has authority to collect this information under 8 CFR part 103.

remove references to "geographic or political subdivision" in 8 CFR 204.6(i) and (j)(6)(ii)(B), (2) provide clarification in 8 CFR 204.6(d) that the petitioner of multiple immigrant petitions approved for classification as an investor is entitled to the earliest qualifying priority date, (3) changing "approved EB–5 immigrant petition" to "immigrant petition approved for classification as an investor, including immigrant petitions whose approval was revoked on grounds other than those set forth below," and "approved petition" to "immigrant petition approved for classification as an investor," (4) changing "based upon that approved petition" to "using the priority date of the earlier-approved petition" in final 8 CFR 204.6(d), (5) clarifying that a TEA may include census tracts directly adjacent to the census tract(s) in which the NCE is primarily engaged in business, and (6) making a technical correction to the inflation adjustment formula for the standard minimum investment amount and the high employment area investment amount, such that future inflation adjustments will be based on the initial investment amount set by Congress in 1990, rather than on the most recent inflation adjustment. All of these provisions are technical changes and will have no impact on investors or the government. Therefore, the benefits and costs for these changes were not estimated.

*Miscellaneous Costs.* Familiarization costs: DHS assumes that there will be familiarization costs associated with this rule. To estimate these costs, DHS relied on several assumptions. First, DHS believes that each approved regional center will need to review the rule. Other than regional centers, the NCEs will also need to be familiar with the final rule. Based on the 851 regional centers as having approved Forms I–924 and 719 non-regional center NCEs when this analysis was conducted (July 3, 2017), a total of at least 1,570 identified entities will likely need to review the rule. DHS believes that lawyers will likely review the rule and that it will take about 4 hours to review and inform any additional parties of the changes in this final rule. Based on the BLS "Occupational Employment Statistics (OES)" dataset, the current mean hourly wage for a lawyer was $68.22.[135] DHS burdens this rate by a multiple of 1.47 to account for other compensation and benefits, to arrive at an hourly cost of

$100.28. The total cost of familiarization is $629,758.4 annually based on the current number of approved regional centers and non-regional center NCEs in the recent past.[136]

*B. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets. However, as some small businesses may be affected under this regulation, DHS has prepared a Final Regulatory Flexibility Analysis under the Regulatory Flexibility Act.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, 5 U.S.C. 601–612, requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. An "individual" is not defined by the RFA as a small entity, and costs to an individual from a rule are not considered for RFA purposes. In addition, the courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities.[137] Consequently, any indirect impacts from a rule to a small entity are not costs for RFA purposes.

However, the changes proposed by DHS to modernize and improve the EB–5 program may have the potential to affect several types of business entities involved in EB–5 projects. Therefore, DHS prepared an Initial Regulatory Flexibility Analysis (IRFA) under the RFA in the proposed rule because some

of the entities involved may be considered small entities.

In the IRFA of the NPRM, DHS explained that there were four main types of business entities involved in EB–5 that could be affected by the proposed rule changes: Immigrant Investors, Regional Centers (RCs), New Commercial Enterprises (NCEs), and Job-Creating Entities (JCEs). DHS explained that the investors who invest funds and file Form I–526 petitions are individuals who voluntarily apply for immigration benefits on their own behalf and thus do not meet the definition of a small entity. Therefore, the EB–5 investors were not considered further for purposes of the RFA.

DHS also explained in the IRFA that the complex, multi-layered structure of most EB–5 investments, coupled with a lack of data concerning revenue and employment, made it impossible for DHS to determine if NCEs and JCEs were small entities. These constraints still apply and DHS cannot determine if these entities are small in terms of the RFA. DHS sought public feedback on the topic but did not receive data or information that could facilitate an appropriate small entity analysis for this final rule.

In the IRFA, DHS explained that RCs were difficult to analyze because of the lack of official data concerning employment, income, and industry classification of the regional center itself. First, DHS explained that the bundled investments that RCs typically pool and structure as loans do not constitute revenue. Second, RCs typically report the North American Industry Classification (NAICS) codes associated with the sectors they plan to direct investor funds toward, but these codes do not generally apply to the RCs business themselves. In addition, information provided to DHS concerning RCs generally does not explicitly include revenues or employment.[138] As a result, DHS was unable to make a determination concerning the small entity status of RCs in the IRFA.

Since the IRFA, DHS was able, despite data constraints, to obtain some information under some specific assumptions to develop a methodology to analyze the small entity status of RCs, as will be explained in detail under section D. Therefore, DHS presents this Final Regulatory Flexibility Analysis (FRFA), which includes this additional

---

[135] The wage figure reflects the May 2017 update from Bureau of Labor Statistics, Occupational Employment Statistics (OES) data set, provided in HTML format *available at https://www.bls.gov/oes/2017/may/oes_nat.htm#23-0000.*

[136] Calculation: 1,570 entities × 4 hours each × burdened hourly wage of $100.28.

[137] *A Guide for Government Agencies How to Comply with the Regulatory Flexibility Act,* May 2012 page 22. *See* Direct versus indirect impact discussion, *available at https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

[138] DHS conducted a small entity analysis on EB–5 regional centers for the 2016 comprehensive fee rule, which went into effect on December 23, 2016. *See* 81 FR 73292. However, the same data constraints as described in the NPRM of this rule made it impossible to draw any conclusions.

analysis. In summary, DHS was able to determine that a significant number of RCs may be small entities. However, DHS was still not able to conclusively determine the impact of this final rule on those small entities.

Final Regulatory Flexibility Analysis

Small entities that may incur additional indirect costs by this rule are the RCs that pool immigrant investors' funds into associated NCEs that in turn undertake job-creating activities directly or, more typically, indirectly through JCEs that receive EB–5 capital from the RC-associated NCEs (most often through loans). RC activity has grown substantially since 2008, and as of July 3, 2017, there were 851 approved RCs. RC-affiliated Form I–526 petitions accounted for 13,103, or 92 percent, of Form I–526 petitions submitted annually from 2014–2016. Since RCs, NCEs, and JCEs all have a role to play in the EB–5 program, the regulatory changes promulgated in this final rule notice could affect all three types of entities. However, as was discussed in the IRFA of the NPRM, DHS does not have a way of knowing if NCEs and JCEs are small entities.

*1. A Statement of the Need for, and Objectives of, the Rule.*

DHS is updating its EB–5 regulations to modernize aspects of the EB–5 program and improve areas of the program in need of reform. The rule will also reflect statutory changes and codify existing policies. Elsewhere in this preamble, DHS provides further background and explanation for changes being made in this final rule.

*2. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, A Statement of the Assessment of the Agency of Such Issues, and A Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments.*

DHS received several comments on the IRFA analysis provided with the proposed rule. These comments are summarized and addressed as follows:

1. Industry Classifications/NAICS Codes To Classify Regional Centers

A commenter that represents multiple regional centers stated that according to its members, RCs typically are classified under NAICS code 523, Securities, Commodity Contracts, and Other Financial Investments and Related Activities. According to the commenter, subsector 523 is identified in the Small Business Administration's (SBA) size standard list as a small entity based on a revenue level of $38.5 million or less. *See* 13 CFR 121.201. The commenter

suggested that DHS should review such data, and that if most regional centers are small businesses, additional analysis is needed to assess potential changes to the course of the regulatory process.

DHS appreciates the commenter's suggestion on using the size standard revenue found in NAICS subsector 523 to determine the small entity status of RCs. However, DHS disagrees that subsector 523, and its corresponding size standard revenue, is the only appropriate industry in which to classify RCs. Subsector 523 primarily engages in underwriting, brokering, or providing other services related to securities, commodity contracts, and other financial investments and related activities.[139] However, other NAICS categories might also apply to certain RCs. For instance, DHS determined that some RCs could be classified under NAICS code 522310, Mortgage and Nonmortgage Loan Brokers, given the prevalence of the NCE to JCE loan model and the role that RCs typically occupy in facilitating such loans. NAICS industry 522310 is comprised of establishments primarily engaged in arranging loans by bringing borrowers and lenders together on a commission or fee basis.[140] The small business size standard for NAICS industry 522310 is based on a revenue level of $7.5 million or less. Regardless of which NAICS code applies to some RCs, however, DHS reiterates that the revenue of RCs is still difficult to determine because of the lack of official data concerning income and employment of the RC. Therefore, even if a NAICS code allows for industry classification of the RC itself, application of the size standard is more challenging. The information provided by RC applicants as part of the Form I–924 and I–924A processes does not include RC revenues or employment, which would be necessary to compare against the SBA size standard.

2. Industry Classifications/NAICS Codes To Classify NCEs

One commenter stated that if most NCEs and JCEs consider projects within a few industries, it would not be burdensome for DHS to review IPO annual reports to make the most economically sound conclusions as to the NAICS codes for most EB–5 program NCEs and JCEs.

As described in the proposed rule and similar to challenges with identifying RCs as small entities, DHS had challenges in trying to identify NCEs and JCEs as small entities. The multiplicity of ways in which an NCE can engage in the job creating activity make it difficult to assign a NAICS code to any particular entity that constitutes or comprises part of what is considered the NCE. Additionally, DHS does not require RC applicants or petitioners to submit on their applications or petitions the type of revenue and employment data appropriate for analysis, regardless of the type of NCE or how it is structured. Also, due to data capture limitations, it is not feasible for DHS to reliably estimate the number of JCEs at this time. DHS anticipates forthcoming form revisions that may collect additional data on JCEs that receive EB–5 capital, and expects to be able to examine this more closely in the future.

3. Sources of Revenue for RCs and NCEs

A commenter stated that although revenue and employee numbers for RCs and NCEs are not collected on the Form I–924A for Annual Certification, the revenue and employee numbers are contained in supplementary papers filed annually with the Form I–924A.

DHS reiterates that the information provided by RC applicants as part of the Form I–924 and I–924A processes does not include adequate data to allow DHS to reliably identify the small entity status of individual RCs or businesses entities, such as NCEs and JCEs, under their purview. Information provided to DHS concerning RCs generally does not include RC revenues or employment of the RCs themselves.

4. Other Comments on the RFA

There were several other comments concerning the RFA. One commenter claimed that individual investors should be considered small entities for purposes of this RFA. A second claimed that although DHS has acknowledged its responsibilities under the RFA, it is actually not compliant with the RFA because of the lack of detailed analysis. A third claimed that the rule would cause significant impacts on many small businesses, but that DHS did not seriously consider any alternative proposals. These commenters suggest that the rule should not be implemented until a more detailed analysis of small entity impacts can be undertaken and evaluated.

DHS appreciates the commenters' concerns but disagrees with the premise that DHS did not comply with the RFA. DHS has fully complied with the requirements of the RFA, which are

---

[139] 2017 NAICS Definition of Subsector 523 Securities, Commodity Contracts, and Other Financial Investments and Related Activities, *available at* https://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=523&search=2017 NAICS Search.

[140] 2017 NAICS Definition of 522310, Mortgage and Nonmortgage Loan Brokers, *available at* https://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=522310&search=2017 NAICS Search.

**35804**    **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

procedural in nature. Sections 603 and 604 of the RFA describe what information needs to be included in an IRFA and FRFA. DHS has provided that information. DHS notes the RFA provides analytical flexibilities to agencies and does not contain a requirement for a detailed analysis; for instance, section 607 of the RFA states a quantitative analysis is not required to comply with the RFA's analytical requirements.[141]

DHS explained in the proposed rule and in this final rule the reasons why this data is difficult to obtain and assess. Since the proposed rule, however, DHS has attempted to seek some additional data on RCs and has included that analysis in this final regulatory flexibility analysis. This additional analysis provides an estimated percentage of RCs that may be considered small entities. As DHS has described in this analysis and in the published NPRM, DHS was not able to obtain additional data on JCEs. Additionally, aside from the suggestion to review investor and RC filings (which, as described above, DHS has done), commenters did not provide any data sources that would allow small entity analysis for JCEs.

DHS disagrees with the commenter that investors must be considered under the RFA. An investor who wishes to immigrate to the United States through the EB–5 program must file an Immigrant Petition by Alien Investor (Form I–526). Individuals who file Form I–526 petitions apply for immigration benefits on their own behalf and thus do not meet the definition of a small entity. Therefore, DHS reiterates that investors need not be considered further for purposes of regulatory flexibility analysis.

Finally, although the commenters claimed that there would likely be significant costs to small entities, they did not provide credible data or analysis to support the claim. As it pertains to compliance with regulatory flexibility analysis requirements, DHS complied with such requirements. For instance, DHS considered several alternatives, and determined that a significant share

of affected business entities could be small entities, as described below.

*3. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments.*

No comments were filed by the Chief Counsel of Advocacy of the SBA.

*4. A Description and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available.*

As mentioned above, DHS was able to obtain some additional information on RCs since the publication of the NPRM. RCs file Form I–924 with DHS that includes a plan of operations for the RC and information regarding fees and surcharges paid to the RC. Additionally, individuals investing through the RC program file Form I–526 with DHS based on a specific NCE, which are affiliated with a specific RC. For this analysis, DHS manually consulted internal file tracking datasets on Form I–526 and NCE submissions for RC investors. NCEs can have multiple investors, but each individual investor must file a unique Form I–526. DHS searched for filed Forms I–526 and grouped them according to NCE. Then, DHS connected the identified NCEs to the unique regional center. Through this process, DHS obtained the number of investors and year of each investment for each of the approved RCs.

When reviewing Forms I–924 submitted by RCs to DHS, adjudicators and economists prepare economic due diligence reports (EDD) as part of the adjudication process. These EDDs are not captured in formal DHS databases. However, for this analysis, DHS manually obtained EDDs for 574 regional centers with approved Forms I–924 in FY 2017. The EDDs contain data from the Form I–924 submission, such as the administrative fee that the RC may charge to investors as well as plans and projections concerning investors. DHS assumes that these administrative fees contribute to the revenues of RCs.[142] While the RCs submit projections of anticipated numbers of investors, the actual investments and related Form I–526 filings submitted

under the purview of RCs can only be determined after the Form I–924 is approved. Thus, DHS cannot rely on these early projections in determining RC revenue. But DHS can multiply the administrative fees by the number of associated EB–5 investors. Therefore, in an effort to reach a more accurate count of RC revenue, DHS manually matched each RC EDD to the corresponding investors from the Form I–526.

Through the process described in the preceding paragraph, DHS obtained the number of investors per RC and proceeded to refine the RC cohort by removing RCs that did not have relevant data, RCs that have been terminated, and those RCs that had no affiliated Form I–526 petitions associated with them (as those would present no information that could be used in the analysis). For those RCs included in the analysis, DHS notes that the numbers of Forms I–526 filed under a specific RC (and related administrative fee payments) are not spread evenly across years, as some years have more Form I–526 submissions than others. This posed substantial challenges for DHS analysis, because there is no natural cutoff (such as a fiscal year or calendar year) for analyzing the data and it does not allow DHS to capture the number of unique investors to each RC. If DHS were to extend the analytical cohort back to earlier approvals in order to capture the total number of investors unique to the RC, the timeframe for analysis would span multiple years.[143] Therefore, this makes DHS' ability to accurately assess RC revenue against the SBA standards difficult.[144]

To address the timing issue, DHS analyzed the time-distribution of the filing of Form I–526 petitions associated with designated RCs and found that the clear bulk of filings—exactly four-fifths—were made in the first year and the second year after a RC was designated, while only 7 percent of filings were made in the same year the RC was designated. Moreover, a larger share, 13 percent, were made in the first half of 2017), as is reported in Figure 2:

---

[141] Section 607 of the RFA, Preparation of Analyses, states that in complying with the provisions of sections 603 and 604 of this title, an agency may provide either a quantifiable or numerical description of the effects of a proposed rule or alternatives to the proposed rule, or more general descriptive statements if quantification is not practicable or reliable.

[142] The administrative fees charged to the investor may cover various charges related to the economic impact analysis, legal fees, business plan development, and immigration services fees.

[143] *See* "How to Comply with the Regulatory Flexibility Act," (2017) U.S. Small Business Administration, Office of Advocacy, available at page. 114, *available at https://www.sba.gov/sites/default/files/advocacy/How-to-Comply-with-the-RFA-WEB.pdf.*

[144] The SBA Table of Small Business Size Standards is found at: *https://www.sba.gov/sites/default/files/files/Size.*



Figure 2: Average share I-526 filings annually for RCs approved in 2014

For the purposes of this analysis, DHS assumes that each Form I–526 filed under an RC represents an instance in which the RC will receive an administrative fee that will contribute to the RC's revenue. Although DHS cannot assume that administrative fees are paid when the forms are filed, this analysis assumes the fees will be paid eventually.

DHS believes that the Form I–526 filings made through RCs that were designated in 2014 are a reasonable benchmark for analysis that mitigate the aforementioned constraints as best as possible.

For the RCs approved in 2014 that had EDDs with viable information, and were non-terminated and "active" (meaning that they actually had Form I–526 filings in 2016), we obtained a cohort of 95 RCs that were associated with 6,308 individual investors. DHS analysis reveals that the number of investors per RC varies substantially, with a range of 2,272. The distribution is highly right-skewed, with a mean of 85, a median of 39, and a skewness value of 8. These results indicate suggest that the median is a proper measure for central location. Next, DHS analyzed the administrative fees in the cohort. The distribution is tight (or clustered closely together) with both the mean and median at $50,000. Next DHS estimated revenues for each RC in the analytical cohort by multiplying the total number of investors who filed a Form I–526 for each RC by its actual administrative fee reported on the EDD, which yielded a median revenue amount of $1,250,000 over the period considered. DHS recognizes that by using the total number of investors who filed a Form I–526 for each RC over the course of 2014, when the RC was designated, FYs years 2015 and 2016,

and the first half of 2017 does not exactly match the SBA size standard time-frame, which is based on a single calendar year. However, DHS believes that this is the best analysis that can be conducted given the uniqueness of regional centers. DHS believes that our modified methodology provides a reasonable estimate of RC revenue.[145]

To determine the appropriate size standard for the RCs, DHS extensively reviewed various NAICS codes. DHS determined that NAICS code 522310, Mortgage and Nonmortgage Loan Brokers defined as an "industry [that] comprises establishments primarily engaged in arranging loans by bringing borrowers and lenders together on a commission or fee basis," may be an appropriate NAICS industry in which RCs might be found given the typical activities undertaken by RC-associated NCEs (loaning EB–5 capital to the JCEs) and the role typically undertaken by RCs in facilitating those activities. The SBA size standard for the NAICS category chosen is based on a revenue of $7.5 million. DHS compared the revenues of the 95 RCs against this size standard and concludes that approximately 89 percent of RCs may be small entities for the purposes of this FRFA. Extrapolating this share to the 864 approved RCs would mean that approximately 769 RCs may be small entities.

DHS evaluated the suggestion from a commenter that regional centers should

be classified under NAICS code subsection 523, as either "an entity engaged in miscellaneous investment activities" or "an entity engaged in miscellaneous intermediation." However, DHS believes that the coding we chose is the most appropriate to use in the analysis because it applies to the majority of regional center projects, and thus is a more accurate reflection of the regional center entities.[146]

DHS again caveats that due to the uniqueness of the RC business operation system and constraints on data, this analysis incorporates some modifications to the typical methodology that DHS utilizes in its rulemakings. Namely, DHS had to use a three-and-a-half-year timeframe instead of the standard one-year timeframe and was compelled to assign an industry code based on a description of RCs that is our best knowledge of how RCs tend to function. Lastly, we note that the number of investors utilized likely understates the true time-independent revenue of RCs since there will generally be forthcoming investments (and associated fee payments) not measurable at the point in time when the analysis was conducted.

While DHS believes the methodology described in this section can lead to reasonable assumptions on the number of small entities that may be RCs, DHS still cannot determine the exact impact of this rule on those small entities. Part of this issue is due to the fact that DHS is not sure how many, if any, investors will be deterred from the EB–5 program

---

[145] An additional assumption in this FRFA analysis is that the only source of regional center revenue is administrative fees charged to each investor. DHS believes that some regional centers may also obtain revenue from charges made to NCEs for management, consulting, or loan arrangements. DHS does not have data on these fees and thus relies on the aforementioned assumption of the single revenue stream accruing to administrative fees charged to investors.

[146] DHS points out for the administrative record that even though a large majority of regional centers would be small entities under the analysis undertaken, both classifications recommended by the commenter would involve revenue based size standards of $38.5 million, which means that an even larger share of regional centers would be small entities.

due to the increased investment amounts and the new TEA requirements. DHS cannot estimate the full potential impact of this rule on RC revenue.

*5. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record.*

The final rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Forms I–526, I–829 or I–924. The rule does not require any new professional skills for reporting. However, the rule may create some additional time burden costs related to reviewing the proposed provisions, as is discussed earlier. As noted, DHS believes that lawyers would likely review the rule and that it would take about 4 hours to review and inform any additional parties of the changes in this rule. As was discussed above under "Miscellaneous Costs," the current benefits-burdened hourly wage of a lawyer is $100.28. At this rate each reviewing entity would face a familiarization cost of $401.12

While DHS has estimated these costs, and assumes that they may affect some small entities, for reasons stated previously, data limitations prevent DHS from determining the extent of the impact to the small entities.

*6. A Description of the Steps the Agency Has Taken to Minimize the Significant Economic Impact on Small Entities Consistent with the Stated Objectives of Application Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected.*

While DHS has determined, via the preceding analysis, that a significant share of regional centers may be considered small entities, DHS does not have enough data to determine the impact that this rule may have on those entities. Therefore, while many regional centers may be small entities, DHS cannot determine whether this rule will have a substantial impact, positive or negative, on those small entities.

DHS considered several alternatives to reform the TEA designation process, but found that they did not adequately accomplish the objective of INA section 203(b)(5)(B)(ii). One alternative DHS considered was limiting the geographic

or political subdivision of TEA configurations to an area containing up to, but no more than, 12 contiguous census tracts, an option currently used by the state of California in its TEA designation process.[147] However, DHS is not confident that this option is necessarily appropriate for nationwide application, as the limitation to 12 census tracts may be justifiable for reasons specific to California but may not be practical on a national scale. Another significant alternative DHS considered that would be relatively straightforward to implement and understand would be to limit the geographic or political subdivision of the TEA to the actual project tract(s). While this option would be easy to put in practice for both stakeholders and the agency, it was considered too restrictive in that it would exclude immediately adjacent areas that would be affected by the investment.

DHS also considered options based on a "commuter pattern" analysis, which focuses on defining a TEA as encompassing the area in which workers may live and be commuting from, rather than just where the investment is made and where the new commercial enterprise is principally doing business. The "commuter pattern" proposal was deemed too operationally burdensome to implement as it posed challenges in establishing standards to determine the relevant commuting area that would fairly account for variances across the country.[148] In addition, DHS could not

identify a commuting-pattern standard that would appropriately limit the geographic scope of a TEA designation consistent with the statute and the policy goals of this proposed regulation.

With respect to the minimum investment amount provision, DHS proposed an alternative to setting the reduced TEA investment amount to half of the standard minimum amount ($900,000 instead of $1,350,000), consistent with the existing regulatory framework.[149] DHS initially proposed a reduction to 75 percent rather than 50 percent of the standard minimum amount to better balance the Congressional aim of incentivizing investment in TEAs with the goal of encouraging greater investment in the United States more generally. History suggests that a 50 percent reduction coincides with an imbalance in favor of TEA investments. DHS continues to have some concern about the imbalance, though Congress granted DHS explicit authority to create this "imbalance" to incentivize investments in targeted employment areas. 8 U.S.C. 203(b)(5)(C)(ii). However, the reforms to the designation process for certain high unemployment TEAs finalized in this rule will ensure that, even if some imbalance remains, it is benefiting truly deserving communities as Congress intended. Ultimately, DHS believes in a meaningful incentive to invest in rural areas and areas of true high-unemployment, and thus, upon careful consideration of the comments related to this issue, DHS opted to retain the differential between TEA and non-TEA investments at 50 percent.

*D. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2016 levels by the Consumer Price Index for

---

[147] *See* Cal. Governor's Office of Bus. and Econ. Dev., EB–5 Investor Visa Program, *available at* http://business.ca.gov/International/EB5Program.aspx.

[148] In the NPRM and development of this final rule, DHS reviewed a proposed commuter pattern analysis incorporating the data table from the Federal Highway Administration, "CTPP 2006–2010 Census Tract Flows," *available at* (http://www.fhwa.dot.gov/planning/census_issues/ctpp/data_products/2006-2010_tract_flows/) (last updated Mar. 25, 2014). DHS also reviewed the CTTP updated status report (released in January 2018), entitled "CTPP Oversight Board is Discontinuing Census TAZ for Small Geography Data Reporting and Urging the Transportation Planning Community to Engage in 2020 Census Participant Statistical Areas Program (PSAP)," *available at* https://www.fhwa.dot.gov/planning/census_issues/ctpp/status_report/sr0118/fhwahep18046.pdf, which will phase in slight methodological changes over the next year. DHS found that the required steps to properly manipulate the Census Transportation Planning Product (CTPP) database might prove overly burdensome for petitioners with insufficient economic and statistical analysis backgrounds. As an alternate methodology for TEA commuter pattern analysis, DHS reviewed data from the U.S. Census tool, On the Map, *available at* http://onthemap.ces.census.gov/, which is tied to the U.S. Census Bureau's American Community Survey. Although the interface appeared to be more user-friendly overall, using this data would be

operationally burdensome, potentially requiring hours of review to obtain the appropriate unemployment rates for the commuting area.

[149] The current reduced minimum investment amount ($500,000) is 50 percent of the standard minimum investment amount ($1,000,000).

All Urban Consumers (CPI–U) is $157 million.

As noted above, this rule does not include any unfunded Federal mandates. The requirements of Title II of the UMRA, therefore, do not apply, and DHS has not prepared a statement under the UMRA.

*E. Executive Order 13132*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988*

This rule meets the applicable standards set forth in sections (3)(a) and (3)(b)(2) of Executive Order 12988.

*G. National Environmental Policy Act*

DHS Directive (Dir.) 023–01 Rev. 01 and Instruction (Inst.) 023–01–001 Rev. 1 establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508. The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions which experience has shown do not individually or cumulatively have a significant effect on the human environment ("categorical exclusions") and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4.

Inst. 023–01–001 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Inst. 023–01–001 Rev. 01 section V.B (1)–(3).

This final rule amends the regulations implementing the EB–5 immigrant visa program. The final rule purely relates to the agency's administration of the EB–5 program. DHS does not believe that NEPA applies to this action as any

attempt to analyze a potential environmental impact associated with changes to the agency's administration of the EB–5 program contemplated by this rule would be largely, if not completely, speculative. Specifically, this rule changes a number of eligibility requirements and introduces priority date retention for certain immigrant investor petitioners. It also amends existing regulations to reflect statutory changes and codifies existing EB–5 program policies and procedures. Additionally, the rule does not affect the number of visas which can be issued and for this reason as well would have no impact on the environment. DHS does not know where new commercial enterprises will be established, or where petitioners will invest or live. To the degree that it is possible to ascertain reasonably foreseeable impacts, DHS knows only that this rule does not change the number of visas Congress initially authorized in 1990. Public Law 101–649. With a current population in excess of 323 million and a land mass of 3.794 million square miles, an unchanged 10,000 visas annually is insignificant by any measure.

While DHS believes that NEPA frequently does not apply to USCIS rules, that analysis is unnecessary here because DHS has determined that if NEPA were to apply, this rule fits within categorical exclusions number A3(a) in Inst. 023–01–001 Rev. 01, Appendix A, Table 1: "Promulgation of rules . . . strictly of an administrative or procedural nature" and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this proposed rule is categorically excluded from further NEPA review.

*H. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). USCIS is revising one information collection in association with this rulemaking action: Immigrant Petition by Alien Entrepreneur (Form I–526), consistent with the changes proposed in the NPRM, and is making conforming changes to two information collections: Petition by Entrepreneur to Remove Conditions on Permanent Resident

Status, Form I–829, Application for Regional Center Designation Under the Immigrant Investor Program, approved OMB Control Number 1615–0045; and Form I–924, Annual Certification of Regional Center, and Form I–924A, Supplement to Form I–924, approved under OMB Control Number 1615–0061.

Specifically, the Form I–526 will collect additional information about the targeted employment area and the new commercial enterprise into which the petitioner is investing to determine the eligibility of qualified aliens to enter the United States to engage in commercial enterprises. In accordance with the final regulatory text, DHS is changing the title of Form I–526 to "Immigrant Petition by Alien Investor" from "Immigrant Petition by Alien Entrepreneur."

DHS is also making two additional conforming changes. First, DHS will update the references to the Form I–526, which will now be entitled "Immigrant Petition by Alien Investor" in Forms I–829, I–924, and I–924A. Second, as this final rule replaces references to "entrepreneur" with "investor," DHS will replace the references to "entrepreneur" with "investor" in the Forms I–829, I–924, and I–924A. Accordingly for Forms I–829, I–924, and I–924A, USCIS will submit a Form OMB 83–C, Correction Worksheet, and amended form and instructions to OMB for review and approval in accordance with the PRA.

Overview of Information Collection-Form I–526

(1) *Type of Information Collection:* Revision to a currently approved information collection.

(2) *Title of the Form/Collection:* Immigrant Petitioner by Alien Entrepreneur.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–526; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals. Form I–526 is used by the USCIS to determine if an alien can enter the U.S. to engage in commercial enterprise

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection is 15,799 and the estimated hour burden per response is 1hour and 50 minutes.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 28,912 hours.

**35808**    **Federal Register** / Vol. 84, No. 142 / Wednesday, July 24, 2019 / Rules and Regulations

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $17,378,900.

**List of Subjects**

*8 CFR Part 204*

Administrative practice and procedure, Adoption and foster care, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 216*

Administrative practice and procedure, Aliens.

**Regulatory Amendments**

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 204—IMMIGRANT PETITIONS**

■ 1. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 2. Section 204.6 is amended by:
■ a. Revising the section heading and paragraphs (a), (c), and (d);
■ b. In paragraph (e):
■ i. Removing the terms "entrepreneur" and "entrepreneur's" and adding in their place "investor" and "investor's," respectively, in the definitions for *Capital, Invest,* and *Qualifying employee;*
■ ii. Removing the terms "Immigrant Investor Pilot" and "Pilot" and adding in their place the term "Regional Center" in the definitions for *Employee* and *Full-time employment;*
■ iii. Adding a definition for *Regional Center Program* in alphabetical order;
■ iv. Revising the definitions for *Rural area* and *Targeted employment area;*
■ v. Removing "entrepreneur's Form I–526" and adding in its place "investor's EB–5 immigrant petition" in the definition for *Troubled business;*
■ c. Revising paragraphs (f)(1), (2), and (3);
■ d. In paragraph (g)(1), removing the term "entrepreneur" and adding in its place the term "investor";
■ e. Revising paragraphs (g)(2), (i), (j)(2)(iii), (j)(5) introductory text, (j)(5)(iii), (j)(6)(i) and (ii), and (k); and
■ f. Adding paragraph (n).
The revisions and additions read as follows:

**§ 204.6   Petitions for employment creation immigrants.**

(a) *General.* An EB–5 immigrant petition to classify an alien under section 203(b)(5) of the Act must be

properly filed in accordance with the form instructions, with the appropriate fee(s), initial evidence, and any other supporting documentation.

*       *       *       *       *

(c) *Eligibility to file and continued eligibility.* An alien may file a petition for classification as an investor on his or her own behalf.

(d) *Priority date.* The priority date of a petition for classification as an investor is the date the completed, signed petition (including all initial evidence and the correct fee) is properly filed. The priority date of an immigrant petition approved for classification as an investor, including immigrant petitions whose approval was revoked on grounds other than those set forth below, will apply to any subsequently filed petition for classification under section 203(b)(5) of the Act for which the alien qualifies. A denied petition will not establish a priority date. A priority date is not transferable to another alien. In the event that the alien is the petitioner of multiple immigrant petitions approved for classification as an investor, the alien shall be entitled to the earliest qualifying priority date. The priority date of an immigrant petition approved for classification as an investor shall not be conferred to a subsequently filed petition if the alien was lawfully admitted to the United States for permanent residence under section 203(b)(5) of the Act using the priority date of the earlier-approved petition or if at any time USCIS revokes the approval of the petition based on:

(1) Fraud or a willful misrepresentation of a material fact by the petitioner; or

(2) A determination by USCIS that the petition approval was based on a material error.

(e) *       *       *

*Regional Center Program* means the program established by Public Law 102–395, Section 610, as amended.

*Rural area* means any area other than an area within a standard metropolitan statistical area (as designated by the Office of Management and Budget) or within the outer boundary of any city or town having a population of 20,000 or more based on the most recent decennial census of the United States.

*Targeted employment area* means an area that, at the time of investment, is a rural area or is designated as an area that has experienced unemployment of at least 150 percent of the national average rate.

*       *       *       *       *

(f) *       *       *

(1) *General.* Unless otherwise specified, for EB–5 immigrant petitions

filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in the United States is one million eight hundred thousand United States dollars ($1,800,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, based on the cumulative annual percentage change in the unadjusted All Items Consumer Price Index for All Urban Consumers (CPI–U) for the U.S. City Average reported by the Bureau of Labor Statistics, as compared to $1,000,000 in 1990. The qualifying investment amount will be rounded down to the nearest hundred thousand. DHS may update this figure by publication of a technical amendment in the **Federal Register**.

(2) *Targeted employment area.* Unless otherwise specified, for EB–5 immigrant petitions filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in a targeted employment area in the United States is nine hundred thousand United States dollars ($900,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, to be equal to 50 percent of the standard minimum investment amount described in paragraph (f)(1) of this section. DHS may update this figure by publication of a technical amendment in the **Federal Register**.

(3) *High employment area.* Unless otherwise specified, for EB–5 immigrant petitions filed on or after November 21, 2019, the amount of capital necessary to make a qualifying investment in a high employment area in the United States is one million eight hundred thousand United States dollars ($1,800,000). Beginning on October 1, 2024, and every five years thereafter, this amount will automatically adjust for petitions filed on or after each adjustment's effective date, based on the cumulative annual percentage change in the unadjusted All Items Consumer Price Index for All Urban Consumers (CPI–U) for the U.S. City Average reported by the Bureau of Labor Statistics as compared to $1,000,000 in 1990. The qualifying investment amount will be rounded down to the nearest hundred thousand. DHS may update this figure by publication of a technical amendment in the **Federal Register**.

(g) *       *       *

(2) *Employment creation allocation.* The total number of full-time positions created for qualifying employees shall be allocated solely to those alien investors who have used the

establishment of the new commercial enterprise as the basis for a petition. No allocation must be made among persons not seeking classification under section 203(b)(5) of the Act or among non-natural persons, either foreign or domestic. USCIS will recognize any reasonable agreement made among the alien investors in regard to the identification and allocation of such qualifying positions.

*    *    *    *    *

(i) *Special designation of a high unemployment area.* USCIS may designate as an area of high unemployment (at least 150 percent of the national average rate) a census tract or contiguous census tracts in which the new commercial enterprise is principally doing business, and may also include any or all census tracts directly adjacent to such census tract(s). The weighted average of the unemployment rate for the subdivision, based on the labor force employment measure for each census tract, must be at least 150 percent of the national average unemployment rate.

(j) *    *    *
(2) *    *    *
(iii) Evidence of property transferred from abroad for use in the United States enterprise, including U.S. Customs and Border Protection commercial entry documents, bills of lading, and transit insurance policies containing ownership information and sufficient information to identify the property and to indicate the fair market value of such property;

*    *    *    *    *

(5) *Petitioner engagement.* To show that the petitioner is or will be engaged in the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, the petition must be accompanied by:

*    *    *    *    *

(iii) Evidence that the petitioner is engaged in policy making activities. For purposes of this section, a petitioner will be considered sufficiently engaged in policy making activities if the petitioner is an equity holder in the new commercial enterprise and the organizational documents of the new commercial enterprise provide the petitioner with certain rights, powers, and duties normally accorded to equity holders of the new commercial enterprise's type of entity in the jurisdiction in which the new commercial enterprise is organized.

(6) *    *    *
(i) In the case of a rural area, evidence that the new commercial enterprise is principally doing business within an area not located within any standard metropolitan statistical area as designated by the Office of Management and Budget, nor within any city or town having a population of 20,000 or more as based on the most recent decennial census of the United States; or

(ii) In the case of a high unemployment area:

(A) Evidence that the metropolitan statistical area, the specific county within a metropolitan statistical area, the county in which a city or town with a population of 20,000 or more is located, or the city or town with a population of 20,000 or more outside of a metropolitan statistical area, in which the new commercial enterprise is principally doing business has experienced an average unemployment rate of at least 150 percent of the national average rate; or

(B) A description of the boundaries and the unemployment statistics for the area for which designation is sought as set forth in paragraph (i) of this section, and the reliable method or methods by which the unemployment statistics were obtained.

(k) *Decision.* The petitioner will be notified of the decision, and, if the petition is denied, of the reasons for the denial. The petitioner has the right to appeal the denial to the Administrative Appeals Office in accordance with the provisions of part 103 of this chapter.

*    *    *    *    *

(n) *Offering amendments or supplements.* Amendments or supplements to any offering necessary to maintain compliance with applicable securities laws based upon changes to this section effective on November 21, 2019 shall not independently result in denial or revocation of a petition for classification under section 203(b)(5) of the Act, provided that the petitioner:

(1) Filed the petition for classification under section 203(b)(5) of the Act prior to November 21, 2019;

(2) Was eligible for classification under 203(b)(5) of the Act at the time the petition was filed; and

(3) Is eligible for classification under 203(b)(5) of the Act, including having no right to withdraw or rescind the investment or commitment to invest into such offering, at the time of adjudication of the petition.

## PART 216—CONDITIONAL BASIS OF LAWFUL PERMANENT RESIDENCE STATUS

■ 3. The authority citation for part 216 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1154, 1184, 1186a, 1186b, and 8 CFR part 2.

■ 4. Amend § 216.6 by:

■ a. Revising the section and paragraph (a)(1);

■ b. Removing and reserving paragraph (a)(4)(i);

■ c. Removing "entrepreneur" and adding in its place "investor" in paragraph (a)(4)(iv);

■ d. Revising paragraphs (a)(5) and (6) and (b);

■ e. Removing and reserving paragraph (c)(1)(i); and

■ f. Revising paragraphs (c)(2) and (d). The revisions read as follows:

## § 216.6 Petition by investor to remove conditional basis of lawful permanent resident status.

(a) *    *    *

(1) *General procedures.* (i) A petition to remove the conditional basis of the permanent resident status of an investor accorded conditional permanent residence pursuant to section 203(b)(5) of the Act must be filed by the investor with the appropriate fee. The investor must file within the 90-day period preceding the second anniversary of the date on which the investor acquired conditional permanent residence. Before the petition may be considered as properly filed, it must be accompanied by the fee required under 8 CFR 103.7(b)(1), and by documentation as described in paragraph (a)(4) of this section, and it must be properly signed by the investor. Upon receipt of a properly filed petition, the investor's conditional permanent resident status shall be extended automatically, if necessary, until such time as USCIS has adjudicated the petition.

(ii) The investor's spouse and children may be included in the investor's petition to remove conditions. Where the investor's spouse and children are not included in the investor's petition to remove conditions, the spouse and each child must each file his or her own petition to remove the conditions on their permanent resident status, unless the investor is deceased. If the investor is deceased, the spouse and children may file separate petitions or may be included in one petition. A child who reached the age of 21 or who married during the period of conditional permanent residence, or a former spouse who became divorced from the investor during the period of conditional permanent residence, may be included in the investor's petition or must each file a separate petition.

*    *    *    *    *

(5) *Termination of status for failure to file petition.* Failure to properly file the petition to remove conditions within the 90-day period immediately preceding the second anniversary of the date on which the investor obtained lawful

permanent residence on a conditional basis shall result in the automatic termination of the investor's permanent resident status and the initiation of removal proceedings. USCIS shall send a written notice of termination and a notice to appear to an investor who fails to timely file a petition for removal of conditions. No appeal shall lie from this decision; however, the investor may request a review of the determination during removal proceedings. In proceedings, the burden of proof shall rest with the investor to show by a preponderance of the evidence that he or she complied with the requirement to file the petition within the designated period. USCIS may deem the petition to have been filed prior to the second anniversary of the investor's obtaining conditional permanent resident status and accept and consider a late petition if the investor demonstrates to USCIS' satisfaction that failure to file a timely petition was for good cause and due to extenuating circumstances. If the late petition is filed prior to jurisdiction vesting with the immigration judge in proceedings and USCIS excuses the late filing and approves the petition, USCIS shall restore the investor's permanent resident status, remove the conditional basis of such status, and cancel any outstanding notice to appear in accordance with 8 CFR 239.2. If the petition is not filed until after jurisdiction vests with the immigration judge, the immigration judge may terminate the matter upon joint motion by the investor and DHS.

(6) *Death of investor and effect on spouse and children.* If an investor dies during the prescribed 2-year period of conditional permanent residence, the spouse and children of the investor will be eligible for removal of conditions if it can be demonstrated that the conditions set forth in paragraph (a)(4) of this section have been met.

(b) *Petition review*—(1) *Authority to waive interview.* USCIS shall review the petition to remove conditions and the supporting documents to determine whether to waive the interview required by the Act. If satisfied that the requirements set forth in paragraph (c)(1) of this section have been met, USCIS may waive the interview and approve the petition. If not so satisfied, then USCIS may require that an interview of the investor be conducted.

(2) *Location of interview.* Unless waived, an interview relating to the petition to remove conditions for investors shall be conducted by a USCIS immigration officer at the office that has jurisdiction over either the location of the investor's commercial enterprise in the United States, the investor's residence in the United States, or the location of the adjudication of the petition, at the agency's discretion.

(3) *Termination of status for failure to appear for interview.* If the investor fails to appear for an interview in connection with the petition when requested by USCIS, the investor's permanent resident status will be automatically terminated as of the second anniversary of the date on which the investor obtained permanent residence. The investor will be provided with written notification of the termination and the reasons therefore, and a notice to appear shall be issued placing the investor in removal proceedings. The investor may seek review of the decision to terminate his or her status in such proceedings, but the burden shall be on the investor to establish by a preponderance of the evidence that he or she complied with the interview requirements. If the investor has failed to appear for a scheduled interview, he or she may submit a written request to USCIS asking that the interview be rescheduled or that the interview be waived. That request should explain his or her failure to appear for the scheduled interview, and if a request for waiver of the interview, the reasons such waiver should be granted. If USCIS determines that there is good cause for granting the request, the interview may be rescheduled or waived, as appropriate. If USCIS waives the interview, USCIS shall restore the investor's conditional permanent resident status, cancel any outstanding notice to appear in accordance with 8 CFR 239.2, and proceed to adjudicate the investor's petition. If USCIS reschedules that investor's interview, USCIS shall restore the investor's conditional permanent resident status, and cancel any outstanding notice to appear in accordance with 8 CFR 239.2.

(c) * * *

(2) If derogatory information is determined regarding any of these issues or it becomes known to the government that the investor obtained his or her investment funds through other than legal means, USCIS shall offer the investor the opportunity to rebut such information. If the investor fails to overcome such derogatory information or evidence that the investment funds were obtained through other than legal means, USCIS may deny the petition, terminate the investor's permanent resident status, and issue a notice to appear. If derogatory information not relating to any of these issues is determined during the course of the interview, such information shall be forwarded to the investigations unit for appropriate action. If no unresolved derogatory information is determined relating to these issues, the petition shall be approved and the conditional basis of the investor's permanent resident status removed, regardless of any action taken or contemplated regarding other possible grounds for removal.

(d) *Decision*—(1) *Approval.* If, after initial review or after the interview, USCIS approves the petition, USCIS will remove the conditional basis of the investor's permanent resident status as of the second anniversary of the date on which the investor acquired conditional permanent residence. USCIS shall provide written notice of the decision to the investor. USCIS may request the investor and derivative family members to appear for biometrics at a USCIS facility for processing for a new Permanent Resident Card.

(2) *Denial.* If, after initial review or after the interview, USCIS denies the petition, USCIS will provide written notice to the investor of the decision and the reason(s) therefore, and shall issue a notice to appear. The investor's lawful permanent resident status and that of his or her spouse and any children shall be terminated as of the date of USCIS' written decision. The investor shall also be instructed to surrender any Permanent Resident Card previously issued by USCIS. No appeal shall lie from this decision; however, the investor may seek review of the decision in removal proceedings. In proceedings, the burden shall rest with USCIS to establish by a preponderance of the evidence that the facts and information in the investor's petition for removal of conditions are not true and that the petition was properly denied.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2019–15000 Filed 7–23–19; 8:45 am]

**BILLING CODE 4410–10–P**

(i) Cover page. Include the lead agency for administering the plan and an abstract of 200 words or less for each proposed project.

(ii) Project purpose. Clearly state the specific issue, problem, interest, or need to be addressed. Explain why each project is important and timely.

(iii) Potential Impact. Discuss the number of people or operations affected, the intended beneficiaries of each project, and/or potential economic impact if such data are available and relevant to the project(s).

(iv) Financial Feasibility. For each project, provide budget estimates for the total project cost. Indicate what percentage of the budget covers administrative costs.

(v) Expected Measurable Outcomes. Describe at least two or three, discrete, quantifiable, and measurable outcomes that directly and meaningfully support each projects purpose. The outcome measures must define an event or condition that is external to the project and that is of direct importance to the intended beneficiaries and/or the public.

(vi) Goal(s). Describe the overall goal(s) in one or two sentences for each project.

(vii) Work Plan. Explain briefly how each goal and measurable outcome will be accomplished for each project. Be clear about who will do the work. Include appropriate time lines.

(viii) Project Oversight. Describe the oversight practices that provide sufficient knowledge of grant activities to ensure proper and efficient administration.

(ix) Project Commitment. Describe how all grant partners commit to and work toward the goals and outcome measures of the proposed project(s).

(x) Multi-state Projects. If the project is a multi-state project, describe how the States are going to collaborate effectively with related projects with one state assuming the coordinating role.

### § 1290.7  Review of grant applications.

(a) Applications will be reviewed and approved for conformance with the provisions in § 1290.6. AMS may contact the applicant for additional information or clarification.

(b) Incomplete applications as of the deadline for submission will not be considered.

### § 1290.8  Grant agreements.

(a) After approval of a grant application, AMS will enter into a grant agreement with the State department of agriculture.

(b) AMS grant agreements will include at a minimum the following:

(1) The activities in the approved State plan.

(2) Total amount of Federal financial assistance that will be advanced.

(3) Terms and conditions pursuant to which AMS will fund the project(s).

### § 1290.9  Reporting and oversight requirements.

(a) An annual performance report will be required of all State department's of agriculture within 90 days after the completion of the first year of the project(s), until the expiration date of the grant period. If the grant period is one year or less, then only a final performance report (see paragraph (b) of this section) is required. The annual performance report shall include the following:

(1) Briefly summarize activities performed, targets, and/or performance goals achieved during the reporting period to meet project outcome measures.

(2) Note unexpected delays or impediments as well as favorable or unusual developments.

(3) Outline work to be performed during the next reporting period.

(4) Comment on the level of grant funds expended to date.

(b) A final performance report will be required by the State department of agriculture within 90 days following the expiration date of the grant period. The final progress report shall include the following:

(1) An outline of the issue, problem, interest, or need.

(2) How the issue or problem was approached via the project.

(3) How the annual outcome measures of the project were achieved.

(4) Results, conclusions, and lessons learned.

(5) How progress has been made to achieve long term outcome measures.

(6) Additional information available (e.g. publications, Web sites).

(7) Contact person for each project with telephone number and e-mail address.

(c) A final SF–269A "Financial Status Report (Short Form)" (SF–269 "Financial Status Report (Long Form)" if the project(s) had program income) is required within 90 days following the expiration date of the grant period.

(d) AMS will monitor States, as it determines necessary, to assure that projects are completed in accordance with the approved State plan. If AMS, after reasonable notice to a State, finds that there has been a failure by the State to comply substantially with any provision or requirement of the State plan, AMS may disqualify, for one or more years, the State from receipt of future grants under the SCBGP.

(e) States shall diligently monitor performance to ensure that time schedules are being met, project work within designated time periods is being accomplished, and other performance measure are being achieved.

### § 1290.10  Audit requirements.

Each year that a State receives a grant under the SCBGP, a State is required to conduct an audit of the expenditures of SCBGP funds in accordance with Government auditing Standards (Government Auditing Standards 2003 Revision GAO–03–673G). The audit shall be conducted no later than 60 days after the expiration date of the grant period. The State shall submit to AMS not later than 30 days after completion of the audit, a copy of the audit results with an executive summary.

Dated: April 14, 2006.

**Lloyd C. Day,**

*Administrator, Agricultural Marketing Service.*

[FR Doc. E6–5944 Filed 4–19–06; 8:45 am]

**BILLING CODE 3410–02–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

### 8 CFR Parts 103 and 299

**[DHS Docket No. USCIS–2005–0062]**

**RIN 1615–AB19**

### Establishment of a Genealogy Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** This rule proposes to establish a Genealogy Program within U.S. Citizenship and Immigration Services to process requests for historical records of deceased individuals. Currently, such requests are processed as Freedom of Information Act requests by the Freedom of Information Act/Privacy Act program adding unnecessary delays to the process. A separate Genealogy Program would ensure a timely response to requests for genealogical and historical records.

**DATES:** Written comments must be submitted on or before June 19, 2006.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2005–0062, by one of the following methods:

• Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

**20358**    **Federal Register** / Vol. 71, No. 76 / Thursday, April 20, 2006 / Proposed Rules

• E-mail: You may submit comments directly to USCIS by e-mail at *rfs.regs@dhs.gov*. Include DHS Docket No. USCIS–2005–0062 in the subject line of the message.

• Mail: The Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS–2005–0062 on your correspondence. This mailing address may also be used for paper, disk, or CD–ROM submissions.

• Hand Delivery/Courier: U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529. Contact Telephone Number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Ave Maria Sloane, Chief—Genealogy Program, Office of Records Services (ORS), U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., Washington, DC 20529, telephone (202) 272–8240.

**SUPPLEMENTARY INFORMATION:**

Part I—Public Participation
Part II—Background and Purpose
  A. Historical Records
  B. Genealogical Research Requests
Part III—New Program Functions
  A. Operation of the New Genealogy Program
  B. Index Search Request
  C. Historical Records Request
  D. Procedures for Requesting an Index Search or Search for Historical Records
  E. Personal Information Concerning Children of the Subject of the Record
  F. Requests by Historical and Genealogical Researchers Falling Outside the Genealogy Program
  G. Reference Services Provided by This New Program
  H. Users of Genealogy Program Services
  I. Requests for Historical Records and the FOIA/PA Program
  J. Requests for Records Where the Requester is Not Sure the Records are Historical
Part IV—Determination of Fees
  A. Number of Requests
  B. Processing Tracking
  C. Description of Two Services
  D. Estimating Requests and Receipts
  E. Record Copy Fee Where the Copy is Illegible
  F. Fee Waivers
Part V—Regulatory Requirements
  A. Regulatory Flexibility Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act
List of Subjects
PART 103—Powers and Duties; Availability of Records
PART 299—Immigration Forms

**Part I—Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of the proposed rule. The Department of Homeland Security (DHS) and U.S. Citizenship and Immigration Services (USCIS) also invite comments that relate to the economic, privacy, or federalism affects that might result from this proposed rule. Comments that will provide the most assistance to USCIS in developing these procedures will make reference to a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change.

*Instructions:* All submissions received must include the agency name and DHS docket No. USCIS–2005–0062 for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov*, including any personal information provided. See **ADDRESSES** above for information on how to submit comments.

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov*. Submitted comments may also be inspected at the Office of the Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 3rd Floor, Washington, DC 20529.

**Part II—Background and Purpose**

The demand for historical records by historical and genealogical researchers, as well as other members of the public, has grown dramatically over the past several years. Currently, USCIS processes requests for historical records under USCIS' Freedom of Information Act (FOIA)/Privacy Act (PA) program. Historical records that are the subject of a FOIA request usually are released in full because the subjects of the requested documents are deceased and therefore no FOIA exemptions apply to withhold the information. *Cf.* OMB Guidelines, 40 FR 28948, 28951 (1975). The only exception is for classified historical records, which can only be released after being declassified. *See* Executive Order 12958, as amended by Executive Order 13292, 68 FR 15315 (March 28, 2003). Classified information is information that requires protection against unauthorized disclosure in the interest of national security. *See id.* The large volume of genealogical requests (average of 10,000 combined search and records requests per year over the last 4 years) received by USCIS FOIA/PA offices contributes to the USCIS FOIA/PA backlog. For this reason, it became apparent that the FOIA/PA program was not the most efficient means of processing requests for historical records.

A separate Genealogy Program would create a dedicated program to serve this unique category of requesters. Removing genealogy research from the immense FOIA group of "all" requesters would improve service to historical researchers, genealogists, and other members of the public. It would also greatly reduce the number of FOIA requests and improve the ability of USCIS to respond to requests for other non-historical records and materials. Requesters making a request that qualifies as a genealogical research request for historical records under this rule would submit such a request directly with the Genealogy Program. If the Genealogy Program determines that the request does not qualify as a genealogical research request, it would return the request (along with any fees submitted with the request) to the requester and inform the requester to resubmit the request to the USCIS FOIA/PA office for processing under the FOIA. Conversely, if a requester would send a request to the USCIS FOIA/PA office that is determined by that office to qualify as a genealogical research request, the USCIS FOIA/PA office would return the request to the requester and inform the requester to resubmit the request to the Genealogy Program for processing. In proposed 8 CFR 103.40(a), this rule defines the term, "genealogical research request." In proposed 8 CFR 103.39, this rule describes what records qualify as historical. The terms, "historical records" and "genealogical research request" are discussed below.

*A. Historical Records*

The USCIS Genealogy Program will apply to "historical records," a new term introduced by this proposed rule. Historical records are files, forms, and documents collected by the Immigration and Naturalization Service (INS) and maintained by USCIS that include:

• Naturalization Certificate Files;
• Forms AR–2;
• Visa Files;
• Registry Files; and
• A-Files numbered below 8 million.

Naturalization Certificate Files (C-Files) are records from September 27, 1906 to April 1, 1956, relating to U.S.

**Federal Register** / Vol. 71, No. 76 / Thursday, April 20, 2006 / Proposed Rules    **20359**

naturalizations and the issuance of evidence of naturalization or citizenship. Forms AR–2 are Alien Registration Forms on microfilm that were completed by all aliens age 14 and older who resided in or entered the United States between August 1, 1940 and March 31, 1944. These forms contain identification information, as well as information regarding the alien's employment and arrival to the United States. Visa Files are records from July 1, 1924 to March 31, 1944 containing the arrival information of immigrants admitted for permanent residence from July 1, 1924 to March 31, 1944 under the Immigration Act of 1924. Registry Files are records from March 2, 1929 to March 31, 1944 containing arrival information of immigrants who entered the United States prior to July 1, 1924, and for whom no arrival records could later be found. A-Files are case files on individuals that all immigration records created or consolidated since April 1, 1944 to the present. This rule

only deems historical those A-File records numbered below 8 million and containing documents dated prior to May 1, 1951. Other A-File records, therefore, will be subject to the FOIA/PA program. USCIS chose these two criteria as the dividing line because May 1, 1951 is the date that the 8 million series began, and is within the decade that the last record series prior to the advent of the A-File, C-Files, was closed.

Designation of a record as historical neither speaks to the value or worth of any given record, nor relates to what the Archivist of the United States might designate as worthy of permanent preservation. Rather, this convention was employed by USCIS solely to identify records of advanced age for which there is high demand from genealogical researchers. Any record filed within any record system other than one identified as historical by this proposed rule, regardless of the date of the record or the subject's date of birth,

will not be available under the Genealogy Program. Those records outside the scope of the Genealogy Program can still be requested through the FOIA/PA or other available programs.

*B. Genealogical Research Requests*

This proposed rule defines a genealogical research request as a request from a member of the public for searches and/or copies of historical records relating to a deceased person. Requests to locate USCIS documents to support a separate application or petition for benefits from USCIS would not meet this definition. For example, requests to replace a lost naturalization certificate would not qualify as genealogical research requests.

The chart below lists the records that the public would be able to request from the Genealogy Program versus the records that the public would be able to request from the FOIA/PA office.

| Genealogy program | FOIA/PA office |
|---|---|
| Files of deceased subjects ................................................ | Files of living subjects. |
| C-Files from 9/27/1906 to 4/1/1956 ................................. | Naturalization records on or after 4/1/1956. |
| Visa Files from 7/1/1924 to 5/1/1951 ............................... | Visa records on or after 5/1/1951 in A-Files. |
| A-Files below 8 million and documents therein dated prior to 5/1/1951. | A-Files above 8 million and documents therein dated on or after 5/1/1951 |
| Registry Files from 3/2/1929 to 3/31/1944 and registry records from 4/1/1944 to 4/30/1951. | Registry records on or after 5/1/1951 in A-Files. |
| AR–2 Files from 8/1/1940 to 3/31/1944 and Alien Registration Forms from 3/31/1944 to 4/30/1951 in A-Files. | Alien Registration Forms on or after 5/1/1951 in A-Files. |

**Part III—New Program Functions**

Currently, all requests for historical records are processed by the USCIS FOIA/PA program. The FOIA/PA program depends upon the Office of Records Services/Office of Records Management (ORS/ORM) offices to search indices and locate and retrieve responsive records and files. If ORS/ORM does not find any records that respond to the FOIA request, ORS/ORM will transmit a "no record" response to FOIA/PA and FOIA/PA will inform the requester that no records have been found that respond to the FOIA request. If ORS/ORM provides responsive records to the FOIA/PA program, FOIA/PA professionals review the documents for any issues arising under the Freedom of Information or Privacy Acts and mail copies of the records to the requester. Genealogical requests are identified as "third party" requests (requests from other than the subject), and since the subjects of the requests are deceased, the deceased subjects themselves no longer have privacy interests in the records. *See* OMB Guidelines, 40 FR 28948, 28951

(deceased persons do not enjoy Privacy Act protections); Department of Justice, Office of Information and Privacy, Freedom of Information Act Guide (May 2004) (noting "longstanding FOIA rule that death extinguishes one's privacy rights"), available at *http:// www.usdoj.gov/oip/ exemption6.htm#privacy. But cf. National Archives and Records Admin.* v. *Favish,* 541 U.S. 157 (2004) (holding that surviving relatives may have protectible privacy interest in "death images of the deceased," personal details about circumstances surrounding individual's death, and other information concerning deceased where disclosure would cause "a disruption of the relatives' peace of minds"). As a result, genealogical requests for unclassified records routinely pass through the FOIA/PA program without requiring any analysis for exemption application under FOIA, and serve only to contribute to the FOIA/PA backlog.

The new Genealogy Program would search indices and locate and retrieve responsive records and files. Once a requester has demonstrated that the

subject of the record is deceased by providing a death certificate, obituary, or other form as proof of death, routine record copies and information would be reviewed and mailed directly to the requester.

The new Genealogy Program would serve the public demand in a more expeditious fashion. The program would put requesters and the genealogy staff in direct communication thus providing a dedicated queue and point of contact for genealogists and other researchers seeking access only to those records described as historical records as defined under 8 CFR 103.39.

Finally, the new Genealogy Program would either release historical records as requested, or, rather than deny release, redirect the requester to the FOIA/PA Program for further consideration of the request. If the FOIA/PA Program ultimately denies the requested information, the requester may seek an appeal of the FOIA/PA denial under the current procedures specified in 6 CFR 5, 8 CFR 103.10(c), and 8 CFR 103.10(d)(3).

## A. Operation of the New Genealogy Program

Due to the nature of historical records, it is hard to predict what types of records (if any) exist on a given immigrant. ORS/ORM must search various indices before determining whether any record exists, how many separate records exist, and where those records might be located. The actual location and retrieval of records involves a separate process, which itself varies according to record format (microfilm or textual). Combining both activities (index searching and record retrieval/processing) into one request would result in extraordinarily high fees for historical and genealogical researchers, especially for those for whom no record is found. For this reason, USCIS proposes separating index search requests from record copy requests, and proposes that each be requested separately from the Genealogy Program.

Researchers would choose from one of two types of requests depending on the amount of information they have available regarding records of their immigrant ancestor. They could: (1) Request a search of the index if they are unable to identify a specific historical record, or (2) request that they be provided copies of historical records the requester can identify by file number.

## B. Index Search Request

Most researchers would begin with a request for a search of the index in order to obtain the information necessary to request a specific record. Upon receipt of an index search request, the Genealogy Program would search the indices for references to the subject named in the request. If found, it would send all pertinent information about each record indicated (*i.e.*, file number, location, or other identifying information) to the researcher. If no record is found, the researcher would be notified.

Genealogy Program index searches may result in locating records no longer maintained by USCIS. The public would be able to contact the Genealogy Program for information regarding which records are no longer maintained by USCIS. Search results indicating a naturalization record in USCIS custody also will contain information directing researchers to alternate sources for copies of court naturalization records held by the National Archives or by state and local courthouses. Search results indicating a Visa File also will contain information allowing a researcher to locate ship passenger arrival list records at the National

Archives. All index information about all records would be provided to the requester.

## C. Historical Records Request

Using information obtained from the index search (or found during prior research), researchers also could submit a request for records in which they identify the record sought to the Genealogy Program Office. In response to a record request, the Genealogy Program Office would retrieve the specified record for duplication, review, and release.

## D. Procedures for Requesting an Index Search or Search for Historical Records

Requests could be submitted via the Internet at a genealogy Web site to be developed for this purpose or by mailing a completed Form G–1041, Genealogy Search Request, or Form G–1041A, Genealogy Record Request, to the Genealogy Program Office.

The success of each index search request would depend on the amount and accuracy of information provided by the researcher. No search could be initiated regarding an individual without at least a full name, year of birth, and country of birth. In cases of immigrants with common names, an exact date and place of birth, alternate spellings of the name and aliases, as well as an approximate date of arrival and/or the immigrant's residence at the time of naturalization, may be necessary to ensure a successful and definitive search.

Records stored in different file series are located using a variety of methods, most of which require a specific file number. The most reliable record requests would be based on, and include, specific file identification data received from previous index search requests. The success of record requests submitted from researchers without any previous index search would depend entirely upon whether the researcher provides the exact information needed to retrieve the specific record sought. Full instructions on what information is needed to retrieve specific files would be available on the USCIS genealogy Web site and in pamphlet form.

In addition, when a request is made for records of an immigrant whose date of birth is less than 100 years ago, the researcher would have to provide documentary evidence that the subject is deceased. For the purposes of the Genealogy Program, USCIS presumes that immigrants born more than 100 years ago are deceased. See *Schrecker* v. *U.S. Dep't of Justice,* 349 F.3d 657, 664–65 (D.C. Cir. 2003). Thus, when the subject of a record request was born less

than 100 years prior to the date of the request, primary or secondary documentary evidence of the subject's death would be required. The requestor would bear the burden of establishing to the satisfaction of the Genealogy Program Office that the subject is deceased. Acceptable documentary evidence includes, but is not limited to death records, published obituaries, published death notices or published eulogies, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits. No records would be released in the case of an immigrant born less than 100 years prior to the request date until evidence of the subject's death is received.

## E. Personal Information Concerning Children of the Subject of the Record

Information about a subject's children may be found in many historical records and may consist of the child's name, date of birth, place of birth, and residence as of the date of the record. The Genealogy Program will not release personal information concerning a subject's children.

## F. Requests by Historical and Genealogical Researchers Falling Outside the Genealogy Program

Due to the history of individual immigrants, immigration and nationality benefits, and recordkeeping, some old immigrant records now exist within A-Files numbered above 8 million. As previously noted, A-Files numbered above 8 million are not considered historical records and could not be made available under the Genealogy Program. Researchers seeking A-Files numbered 8 million or above, or records dated after May 1, 1951, would have to request their ancestors' files under the FOIA/PA program. The Genealogy Program would provide those requesters the information necessary to submit a FOIA/PA request to the appropriate office.

## G. Reference Services Provided by This New Program

In addition to standard information and instructions printed on USCIS Genealogical Search and Request forms (G–1041 and G–1041A), USCIS would provide reference materials in pamphlet form and on the USCIS Web site. Information for genealogists would include a review of various DHS record series, the information typically contained in those records, and instructions for filing requests. In addition, DHS would direct genealogists to resources containing information regarding immigration and

naturalization records not in USCIS custody.

Information for historical researchers would include descriptions of resources available at USCIS or the National Archives and Records Administration (NARA) that support the study of immigration records history, as well as the history of U.S. immigration law and policy.

*H. Users of Genealogy Program Services*

The primary user of the Genealogy Program would be individuals seeking records of their ancestors for genealogical and family history purposes. Additionally, USCIS anticipates a small number of requests to come from historians and social scientists seeking historical records of individual immigrants whom they can identify by name, date of birth, place of birth, or by file number, and from professional genealogists and researchers involved in their location.

*I. Requests for Historical Records and the FOIA/PA Program*

Under this proposed rule, all requests for records designated as historical records would no longer fall under the FOIA/PA program and would have to be submitted to the new Genealogy Program Office. The experience of the FOIA/PA program office is that those records identified as historical records in 8 CFR 103.39 are routinely released without need for redaction or withholding. This is why this new program is being proposed to serve customers who seek historical records.

Once the final rule is published and effective, the FOIA/PA program will return all FOIA/PA requests for historical records and direct the researcher to submit a genealogy request. Of course, some genealogists will seek records not included within the definition of historical records, thus some genealogists will continue to be served by the FOIA/PA program office.

As discussed above, with implementation of the Genealogy Program to satisfy requests for older, historical records, the FOIA/PA program will be able to focus on more current records presenting FOIA and privacy issues.

*J. Requests for Records Where the Requester Is Not Sure the Records Are Historical*

The Genealogy Program Office would accept search requests in which the subject likely is to be found in an historical record. If the search results reference any record not included within the definition of historical records, the Genealogy Program Office

would transmit the file index information to the requestor and also include instructions for requesting that file under USCIS FOIA/PA guidelines.

**Part IV—Determination of Fees**

This rule proposes fee ranges for index searches and for copies of historical records as described in 8 CFR 103.7(b)(1). USCIS invites the public to comment on the proposed fee ranges, considering in particular USCIS's estimated costs to run the Genealogy Program and the fees charged by other agencies providing similar services. In a final rule, USCIS will set one fee amount for each type of service. As provided by statute, these fees would be deposited into the Immigration Examinations Fee Account. *See* 8 U.S.C. 1356(n), (t).

The search fee recovers the full cost of the search. The costs involved in searching the DHS indices and transmitting search results to a requester are the same whether or not any record is found. Thus, the Genealogy Program Office could not refund the search fee if the requested records are not found by USCIS.

Similarly, the Genealogy Program Office would charge a fee for all record services in which the requested record is located, regardless of whether or not it is determined that the record is subject to release. The Genealogy Program Office would refund a fee when the record request is based upon file information previously provided by the Genealogy Program Office in response to an index search request, or if the Genealogy Program Office is unable to locate the file when later requested under a Genealogy Record request.

The fee ranges were set in accordance with section 286(t) of the INA, 8 U.S.C. 1356(t), which authorizes USCIS to set fees for providing research and information services at a level that will ensure the recovery of the full costs of providing all such services. Charts setting forth the full costs that formed the basis for the fee ranges proposed in this rule are included below. The full cost includes items such as management and personnel costs (salaries and benefits), physical overhead, consulting, materials and supplies, utilities, insurance, travel, and rent of building space and equipment. Full costs also include the cost of research and information collection, establishment of procedures and standards, and issuance of regulations. The fees also were set in accordance with Office of Management and Budget (OMB) Circular A–25, which requires that user fees recover the full cost of services provided.

*A. Number of Requests*

The estimated total number of requests under the new program is projected at or in excess of 26,000 per year. The total number includes an estimated 15,250 search requests, 6,619 requests for copies of microfilmed records, and 4,728 requests for copies from textual files. These estimates are based on the annual number of genealogical FOIA/PA requests received in previous years and anticipated growth in requests. In the last four-year period, the USCIS FOIA/PA program received an average of 10,000 genealogical requests per year. These requests are for a combined index search and copy of records. These figures will be far greater in the Genealogy Program since the program will count a request for an index search separately from a request for a record copy. NARA receives a similar number of requests for copies of immigration records each year (*i.e.*, 11,000 to 12,000 per year). While some requests may be discouraged by the imposition of fees, other potential users have informed the FOIA/PA program they would submit one or more genealogical request(s) if they could be assured a more expeditious response. Finally, USCIS expects in the short-term to receive requests from individuals who previously filed requests with the FOIA/PA program to request a second search under the new program. For these reasons, we expect the actual number of genealogical requests to increase, rather than decrease, under the new program.

*B. Processing Tracking*

USCIS has studied the methodologies to respond to search and retrieval requests. A number of efficiencies were proposed to better process the searches and request tracking. An automated system is being developed which will allow for quicker and more comprehensive searches, customer request and response tracking, and provide for better metrics to measure productivity.

*C. Description of Two Services*

USCIS proposes two separate costs for the separate services to be offered by the Genealogy Program.

• The first cost relates to the index search service, which, in addition to the paperwork and data entry standard to processing all requests, requires a detailed search of the master index microfilm and other related microfilm indices.

• The second cost relates to the retrieval, reproduction, and processing of historical records and files. This

**20362**    **Federal Register** / Vol. 71, No. 76 / Thursday, April 20, 2006 / Proposed Rules

activity includes: Processing standard requests, identifying records stored on microfilm or at Federal Record Centers, preparing and submitting requests for those files at the Federal Record Centers to be pulled and shipped to the Genealogy Program Office, copying of records from microfilm or paper and the processing of those copies, reassembling files, shipping of files from and to a storage facility, and per-file fees paid to NARA for retrieving and refiling hard copy records.

*D. Estimating Requests and Receipts*

The estimate for requests and receipts is based on USCIS's experience in processing genealogical-type requests under the FOIA/PA program and the experience of other organizations offering genealogical resources. USCIS used weighted risk analysis to project the number of requests for searches, microfilm records, and textual records. USCIS also projected a five percent annual growth. The results of the

analysis indicate that USCIS would receive about: 15,500 search requests in the first year; 6,500 requests for microfilmed records; and 5,000 requests for textual records.

After determining the cost of different services and estimating the number of requests for each service submitted each year, it was possible to calculate annual costs over 2 years, as well as the start-up costs required to launch the new program.

START-UP AND RECURRING COSTS

| Cost category | Start-up | Annual operating costs (acutal dollars) | |
|---|---|---|---|
| | | Year 1 | Year 2 |
| Office Furnishings | $20,000 | $0 | $0 |
| Personnel/Costs | 15,000 | 675,000 | 675,000 |
| Office Equipment | 150,000 | 3,000 | 3,000 |
| Travel | 2,000 | 2,000 | 2,000 |
| Training | 8,375 | 5,000 | 5,000 |
| Website and Lockbox fees | 2,000 | 4,000 | 4,000 |
| Postage | ................ | 41,665 | 43,748 |
| Equipment Repairs and Maintenance | ................ | 2,000 | 2,000 |
| Subscriptions/Publications/Association fees | 500 | 1,000 | 1,000 |
| Supplies | ................ | 4,400 | 4,400 |
| Design and Development | 5,000 | 2,000 | 2,000 |
| Operation and Maintenance of the search system for 10 users | ................ | 260,250 | 270,660 |
| Software Maintenance | ................ | 3,000 | 3,000 |
| Marketing | 5,000 | 10,000 | 6,000 |
| Subtotal | 207,875 | 1,013,315 | 1,021,808 |
| NARA charges (record request costs only) | ................ | 34,000 | 35,000 |
| Total | 207,875 | 1,047,315 | 1,056,808 |

Fees to cover estimated costs were determined by computing the start-up costs and operating costs for the first 2 fiscal years. The total cost for each service was divided by the expected

volume of requests over the same two-year period. The fees for the records request portion were adjusted (accounting for the slightly higher fee for record requests) by also factoring in

the costs directly attributable, such as NARA pull fees for record requests and off-site record retrievals.

| Service | Approximate requests— 2 years | | Costs (actual dollars)—2 years | | | | User fees (rounded) |
|---|---|---|---|---|---|---|---|
| | Volume | Percent | Yearly NARA costs for record requests only | Allocated by percentage | Total | | |
| | | | | | Yearly costs (except NARA) | Start-up | |
| Index Search | 31,000 | 57 | ................ | $1,160,020 | $118,489 | $1,278,509 | $41.00 |
| Record Request: | | | | | | | |
| Micro-film | 13,000 | 24 | 0.00 | 488,430 | 49,890 | 538,320 | 41.00 |
| Textual | 10,000 | 19 | 69,000 | 386,673 | 39,496 | 495,169 | 50.00 |
| Total | 54,000 | ................ | 69,000 | 2,035,123 | 207,875 | 2,311,998 | ................ |

Based upon this calculation and consideration of fees charged by other agencies for comparable services, discussed below, this rule proposes an estimated user fee range as follows:

(1) *Index search service:* This service is designed for customers who are unsure whether USCIS has any record of their ancestor, or who suspect a record

exists but cannot identify that record by number. The index search service would identify any historical records relating to the subject and provide the researcher with all the information needed to request the record(s). The proposed fee range for this service is $16.00 to $45.00.

(2) *Record/file services:* This service is designed for customers who can identify a specific record or file to be retrieved, copied, reviewed, and released. Customers may identify one or more files in a single request. However, separate fees would apply to each file requested. The proposed fee range for this service is $16.00 to $45.00 for each

file on microfilm retrieved, and $26.00 to $55.00 for each textual file retrieved.

The Genealogy Program fee ranges proposed under this rule are comparable to the fees of similar institutions providing similar services. As previously noted, a flat fee both to search and/or retrieve all historical records would be excessively high in comparison to that of other agencies. For this reason, the Genealogy Program proposes to offer both a search service and a record retrieval service, each of which is based on the cost of providing that specific service and thus providing the requester the option of obtaining the additional information desired. The proposed fee ranges were set to provide the best possible service to the public, including enhanced photocopies, other suggested sources to find information, and a better description of the information received than is now possible under the existing FOIA/PA processing.

While USCIS considered the fees charged by similar organizations, no other organization provides exactly the same service because they do not hold precisely the same variety or volume of records. A description of comparable organizations, as well as the fees they charge, is provided as follows:

The NARA field facilities hold Federal court copies of naturalization records and will search them, court by court, for a fee ranging from $1 to $10, depending on the rules of the facility. Several state archives hold state court copies of naturalization records and charge fees for searching those records, then charge additional fees for copying and shipping. State archive fees differ from state to state. For example, the North Dakota archives charge a $5 search fee, the Pennsylvania archives charge $10 per search, and the Connecticut archives charge non-residents $15 for searches. Still, many court copies of naturalization records are not centralized in any Federal or state archive but remain scattered among county and municipal courthouses. Some clerks of the court will provide records free, others charge fees ranging from $1 to $25, and others do not provide search assistance.

USCIS also considered the fees to those paid by researchers to two other Federal agencies: NARA and the Social Security Administration (SSA). NARA collects a fee of $17.25 to search immigrant passenger arrival records, but only if the requester can name a specific ship list to be searched. SSA charges a fee of $27 for copies of original Social Security Number applications if the requester provides the Social Security Number, and $29 for copies of original

Social Security Number applications if the requester does not provide the Social Security Number. SSA also offers electronic extracts of the same records for $16 and $18 respectively. In all such cases, when SSA provides these services, they apply to only one series of records (unlike a USCIS search and retrieval of multiple record series).

Lower fees on the part of some organizations result from the fact that some or all of their indices and/or records are automated. Higher fees generally were charged for locating, retrieving and copying hard copy files. USCIS historical record series are comprised of hard copy C-Files, Visa Files, Registry Files, and A-Files numbered below 8 million and records therein dated before May 1, 1951. The National Archives fee to copy a similar textual file in its entirety is $37.

Genealogy fees will be reviewed biennially and will likely be adjusted to more accurately reflect the actual cost as work is performed under new processes and procedures of the Genealogy Program. Furthermore, the initial start-up cost must be recovered over the first 2 years of the program. After 2 years, the fee review will reflect retirement of that debt and be adjusted accordingly.

### E. Record Copy Fee Where the Copy Is Illegible

If requesters receive an illegible copy of a record, the Genealogy Program would charge the requester the same record copy fee. The costs involved in locating, retrieving, reproducing, and reviewing an historical record remain the same regardless of the quality of the copy. Some historical records exist on deteriorating microfilm, and those images have faded over time. The Genealogy Program would make every effort to produce the best possible reproduction of all microfilm records. Accordingly, the program would provide researchers with a record printed directly from the film rather than a copy of a print, or a scanned copy of a print. Prints taken directly from the old microfilm are generally the best quality copy available. In many cases, researchers will find they can improve the legibility of microfilm prints themselves using a photocopy machine's darker or lighter settings. The Genealogy Program also will have the benefit in sharing with enhanced technology as it is implemented in the USCIS Records program.

### F. Fee Waivers

Due to the small amount of the fees, the normally discretionary nature of these requests, and the general authority of section 286(t) of the INA, 8 U.S.C.

1356(t), to recover full costs, DHS has determined that fee waivers will not be granted in this program.

## Part V—Regulatory Requirements

### A. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 605(b)), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.*, small businesses, small organizations, and small governmental jurisdictions). Section 605 of the RFA allows an agency to certify a rule, in lieu of preparing an analysis, if the proposed rulemaking is not expected to have a significant economic impact on a substantial number of small entities.

This proposed rule affects professional genealogists and other members of the public requesting historical records from USCIS. As discussed below, the main source of genealogy requests is from individuals doing personal research, rather than from small entities, such as professional genealogists. Genealogy was described as a $200 million per year industry by The Wall Street Journal, ranging from individual researchers to multimillion-dollar companies; in addition, the growth of the Internet has spurred interest and a rapidly growing number of hobbyists pursuing genealogy. According to the "Occupational Outlook Quarterly," (Bureau of Labor Statistics, Fall 2000), a 1997 survey of certified genealogists found that 57 percent work part-time, 34 percent work full-time, and 9 percent are hobbyists. In 2001 there were over 300 certified genealogists and currently, the Association of Professional Genealogists has a membership of 1,500 (*http://www.apgen.org/publications/press/1500.htm*). As the National Genealogical Society notes, "Aside from librarians, archivists, and publishers, most professional genealogists have other sources of income and may 'moonlight' as genealogists until they become established. Those who make a living purely from client research in genealogy probably number no more than a few dozen." (*http://www.ngsgenealogy.org/eduprofessional.htm*)

With the growth of the Internet in recent years, the number of individuals and hobbyists has grown at a much faster rate. In fact, *http://www.myfamily.com*, one of the larger online information sources for genealogy, announced in 2004 a paid subscriber base of more then 1.5 million

members. Much of the growth in genealogy as a sector arises from providing individuals the means of conducting their own family history research through online databases and research tools. The growing dominance of individual hobbyists suggests that individuals rather than professionals are the primary requesters of historical records. Professional genealogists tend to be hired when individuals hit a ''brick wall,'' or a particular problem that they cannot resolve. This suggests that professional researchers tend to focus on aspects of genealogy research other than the standard index searches or record requests that would be submitted to USCIS's Genealogy Program.

Over the past 4 years, USCIS has received an average of 10,000 combined index search and/or records requests for historical records per year. Each request for an index search, record search, or both an index and record search was counted as one request to make up the 10,000. Based on an estimated increase in the demand for historical information, and the fact that the Genealogy Program will treat index search requests and records requests as separate rather than combined requests, DHS expects total requests to reflect a significantly higher number than when the FOIA Program handled genealogical requests. DHS estimates that it will receive 15,250 index search requests, 6,619 requests for microfilm records, and 4,728 requests for textual records for a combined total of 26,597 requests, totaling a cost ranging from $468,832 to $1,232,895 under the proposed fee structure.

DHS has determined that requests for historical records are being made by individuals and has not found any evidence that professional genealogists submit FOIA requests to USCIS for their clients. If professional genealogists and researchers have submitted such requests, they are not identifying themselves as a commercial requester and thus cannot be segregated in the data. Genealogists typically advise clients on how to submit their own requests. Reasons for this practice include the time required for a response to the request and the belief that records are more releasable to a relative rather than an unrelated third party. Based on discussions with professional genealogists, requests generated by professional genealogists and researchers who fall under the approved definition from the Small Business Association of a small entity in this category, All Other Professional, Scientific, and Technical Services with annual average receipt of $6 million or

less, are well below 5 percent of the total number of requests. If it is assumed that professional genealogists and researchers account for 5 percent of the requests, and these costs are borne exclusively by the 1,500 members of the Association of Professional Genealogists, the average impact would be $28.49 per year. The average impact would be even lower still once the universe of professional genealogists is expanded to include entities who are not members of the Association of Professional Genealogists.

These practices arise from the nature of the genealogy sector. Professional genealogists charge anywhere from $10 to $100 per hour, with an average of $30 to $60 per hour, according to the Association of Professional Genealogists (*http://www.apgen.org/articles/hire.html*). Expenses, such as record requests and copies, often are charged to the client as an additional expense. Specialists typically charge a relatively higher fee (*http://www.progenealogists.com/compare.htm*). In addition, many professionals require a retainer of $300 to $500. See Sue P. Morgan, ''What You Should Know before Hiring a Professional Genealogist,'' available at *http://www.genservices.com/docs/HiringAPro.htm*. Depending on the depth of the research, the fees for a genealogical study can be substantial. At a retainer of $300, the proposed fee range of $16 to $45 for an index search by the Genealogical Program is only 5.3 to 15 percent of the retainer, and it is typically paid directly by the client, not the researcher. This does not suggest a substantial burden on researchers. Given the low number of professional genealogists and researchers that would be impacted by this rule, the resulting degree of economic impact would not require a Regulatory Flexibility Analysis to be performed. Consequently, DHS certifies that this proposed rule will not have a significant economic impact on a substantial number of small entities.

### B. Unfunded Mandates Reform Act of 1995

This proposed rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and will not significantly or uniquely effect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This proposed rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This proposed rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets. In the previous four fiscal years, USCIS received an average of 10,000 combined search and record requests that fell under the definition of genealogy. To do a search and provide a record for each of these requests, USCIS would generate between $468,832 to $1,232,895 in offsetting revenue. These requests are currently handled through the USCIS FOIA/PA program at no recoverable cost to USCIS. Private vendors also do genealogical research and there are various historical documents maintained by private companies. The Genealogy Program will have no impact on these companies since we are only offering the same legacy INS documents as we provided previously at no charge.

### D. Executive Order 12866

Executive Order 12866, ''Regulatory Planning and Review'' (58 FR 51735, October 4, 1993), requires a determination whether a regulatory action is ''significant'' and therefore subject to review by OMB and subject to the requirements of the Executive Order. USCIS has determined that this proposed rule is a ''significant regulatory action'' under Executive Order 12866, section 3(f). Accordingly, it has been submitted to OMB for review and approval.

USCIS assessed both the costs and benefits of this proposed rule as required by Executive Order 12866, section 1(b)(6), and has determined that the benefits of this regulation justify its costs. The anticipated benefits of this proposed rule include: (1) Relieve the FOIA/PA program from burdensome requests that require no FOIA/PA expertise; (2) place requesters and the Genealogy staff in direct communication; (3) provide a dedicated queue and point of contact for genealogists and other researchers seeking access to those records described as historical records; (4) generate sufficient revenue to cover expenses as a fee for service program and, (5) reduce the time to respond to these requests.

The cost to the public of this proposed rule ranges from a $16 to $45 fee for index search requests, $16 to $45 fee for requests for a copy of a file on microfilm, or $26 to $55 fee for requests for a copy of a textual file. USCIS is authorized to charge a fee to recover the full costs of providing research and information services under section 286(t) of the INA, 8 U.S.C. 1356(t). Other sources exist for many types of genealogical research and it is not evident that every search by a genealogist would require access to the Genealogy Program at USCIS. Based upon these proposed fees, it is possible to approximate the impact of fees on individual and professional genealogists and researchers. USCIS expects to receive in the future approximately 15,250 genealogical (name) index search requests per year, which, at $16 to $45 per search, would yield $240,000 to $675,000; in addition, there would be a total of 6,619 requests for microfilmed records and 4,728 requests for textual records (*i.e.*, hard copy files). A fee range of $16 to $45 for microfilmed records would yield $105,904 to $297,855. A fee range of $26 to $55 to pull textual records would yield $122,928 to $260,040. Therefore, the total fees collected by the Genealogy Program would yield $468,832 to $1,232,895.

Establishing the new Genealogy Program will benefit both individuals and researchers making genealogy requests for historical records as well those seeking information under the current FOIA/PA program by allowing a more timely response for both sets of requests. USCIS estimates that it processed an average of 10,000 combined index search and record requests for genealogical information over the past 4 fiscal years through the existing FOIA/PA program. These can be released without redaction or withholding, eliminating the need for FOIA/PA analysis. A new program specifically designed to handle these requests would expedite the process and improve services to historical researchers, genealogists and the general public. For example, the proposed rule does not increase information collection requirements of the rule. In fact, the introduction of e-filing presents an opportunity to simplify the information collection process and expedite handling. At the same time, the resources of the FOIA/PA program could be applied more efficiently to requests more directly related to immigration, citizenship, or naturalization benefits that require more detailed FOIA/PA analysis.

### E. Executive Order 13132

Executive Order 13132 requires DHS to develop a process to ensure "meaningful and timely input by State and local officials in the development of regulatory policies that have Federalism implications." Such policies are defined in the Executive Order to include rules that have "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

USCIS analyzed this proposed rule in accordance with the principles and criteria in the Executive Order and has determined that it would not have a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, USCIS has determined that this proposed rule does not have federalism implications. It provides for alternate document handling procedures that do not implicate state government.

### F. Executive Order 12988

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988. That Executive Order requires agencies to conduct reviews, before proposing legislation or promulgating regulations, to determine the impact of those proposals on civil justice and potential issues for litigation. The Executive Order requires that agencies make reasonable efforts to ensure the regulation clearly identifies preemptive effects, effects on existing Federal laws and regulations, identifies any retroactive effects of the proposal, and other matters. DHS has determined that this proposed regulation meets the requirements of Executive Order 12988 because it does not involve retroactive effects, preemptive effects, or other matters addressed in the Order.

### G. Paperwork Reduction Act

This proposed rule requires the submission of Form G–1041 or Form G–1041A when requesting a search or record from the USCIS. The Forms G–1041 and G–1041A are considered an information collection. Accordingly, the Department of Homeland Security, U.S. Citizenship and Immigration Services has submitted the following information collection request for review and clearance in accordance with the Paperwork Reduction Act of 1995. The information collection is published to obtain comments from the public and

affected agencies. Comments are encouraged and will be accepted for sixty days until June 19, 2006.

Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, should be directed to the Department of Homeland Security (DHS), USCIS, Director, Regulatory Management Division, Clearance Office, 111 Massachusetts Avenue, 3rd floor, Washington, DC 20529. Comments may also be submitted to DHS via facsimile to 202–272–8352 or via e-mail at *rfs.regs@dhs.gov*. When submitting comments by e-mail please make sure to add Form Number G–1041 or G–1041A (whichever is appropriate) in the subject box. Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* New information Collection.

(2) *Title of the Form/Collection:* Genealogy Search Request and Genealogy Record Request.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form G–1041, and G–1041A, U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and households. Form G–1041 is provided as a convenient means for persons to provide data necessary to perform a search of historical agency indices. Form G–1041A provides a convenient means for persons to identify a particular record desired under the

Genealogy Program. Forms G–1041 and G–1041A will be used by researchers, historians, and social scientists seeking ancestry information for genealogical, family history and heir location purposes. The forms may also be used by United States citizens seeking historical records to support a foreign application for dual citizenship.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 16,000 responses (Form G–1041, 10,000 responses, and Form G–1041A, 6,000 responses) at 30 minutes (.50) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 8,000 annual burden hours.

If you have additional comments, suggestions, or need a copy of the proposed information collection instrument with instructions, or additional information, please visit the USCIS Web site at: *http://uscis.gov/graphics/formsfee/forms/pra/index.htm.*

If additional information is required, contact: USCIS, Regulatory Management Division, 111 Massachusetts Avenue, 3rd Floor, Washington, DC 20529, (202) 272–8377.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS**

1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*), E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

2. Section 103.7 is amended by:

• Adding the entries "G–1041" and "G–1041A", in proper alpha/numeric sequence, in paragraph (b)(1); and by

• Revising the next to last sentence in Paragraph (c)(1).

The additions and revisions read as follows:

**§ 103.7 Fees.**

\*    \*    \*    \*    \*

(b) \*   \*   \*

(1) \*   \*   \*

\*    \*    \*    \*    \*

Form G–1041. For filing requests for searches of indices to historical records to be used in genealogical research. There is a fee of $16 to $45 for each index search request.

Form G–1041A. For filing requests for copies of historical records to be used in genealogical research. There is a fee of $16 to $45 for each file copy from microfilm requested and a fee of $26 to $55 for each textual file copy requested.

\*    \*    \*    \*    \*

(c) \*   \*   \*

(1) \* \* \* The fees for Form I–907, Request for Premium Processing Services, and for Forms G–1041 and G–104A, Genealogy Program request forms, may not be waived.

\*    \*    \*    \*    \*

3. Section 103.38 is added to read as follows:

**§ 103.38   Genealogy program.**

(a) *Purpose.* The Department of Homeland Security, (DHS) U.S. Citizenship and Immigration Services (USCIS) Genealogy Program is a fee-for-service program designed to provide genealogical and historical records and reference services to genealogists, historians, and others seeking documents maintained within the historical record systems.

(b) *Scope and limitations.* Sections 103.38 through 103.41 comprise the regulations of the Genealogy Program. The regulations apply only to searches of and records maintained within those record series determined by the Genealogy Program Office (GPO) to be historical records as described in 8 CFR 103.39. The regulations set forth the procedures by which individuals may request searches for historical records and, if responsive records are located, obtain copies of those records.

4. Section 103.39 is added to read as follows:

**§ 103.39   Historical records.**

Historical Records are files, forms, and documents now located within the following records series:

(a) *Naturalization Certificate Files (C-Files), from September 27, 1906 to April 1, 1956.* Copies of records relating to all U.S. naturalizations in Federal, state, county, or municipal courts, overseas military naturalizations, replacement of old law naturalization certificates, and the issuance of Certificates of Citizenship in derivative, repatriation, and resumption cases. The majority of

C-Files exist only on microfilm. Standard C-Files generally contain at least one application form (Declaration of Intention and/or Petition for Naturalization, or other application) and a duplicate certificate of naturalization or certificate of citizenship. Many files contain additional documents, including correspondence, affidavits, or other records. Only C-Files dating from 1929 onward include photographs.

(b) *Microfilmed Alien Registration Forms, from August 1, 1940 to March 31, 1944.* Microfilmed copies of 5.5 million Alien Registration Forms (Form AR–2) completed by all aliens age 14 and older, resident in or entering the United States between the dates given. The two-page form called for the following information: Name; name at arrival; other names used; street address; post-office address; date of birth; place of birth; citizenship; sex; marital status; race; height; weight; hair and eye color; date, place, vessel, and class of admission of last arrival in United States; date of first arrival in United States; number of years in United States; usual occupation; present occupation; name, address, and business of present employer; membership in clubs, organizations, or societies; dates and nature of military or naval service; whether citizenship papers filed, and if so date, place, and court for declaration or petition; number of relatives living in the United States; arrest record, including date, place, and disposition of each arrest; whether or not affiliated with a foreign government; signature, and fingerprint.

(c) *Visa Files, from July 1, 1924 to March 31, 1944.* Original arrival records of immigrants admitted for permanent residence under provisions of the Immigration Act of 1924. Visa forms contain all information normally found on a ship passenger list of the period, as well as the immigrant's places of residence for 5 years prior to emigration, names of both the immigrant's parents, and other data. Attached to the visa in most cases are birth records or affidavits. Also attached may be marriage, military, or police records.

(d) *Registry Files, from March 2, 1929 to March 31, 1944.* Original records documenting the creation of immigrant arrival records for persons who entered the United States prior to July 1, 1924, and for whom no arrival record could later be found. Most files also include documents supporting the immigrant's claims regarding arrival and residence (*i.e.*, proofs of residence, receipts, employment records).

(e) *A-Files numbered below 8 million (A8000000), and documents therein dated prior to May 1, 1951.* Individual

alien case files (A-files) became the official file for all immigration records created or consolidated since April 1, 1944. A-numbers ranging up to approximately 6 million were issued to aliens and immigrants within or entering the United States between 1940 and 1945. The 6 million and 7 million series of A-numbers were issued between circa 1944 and May 1, 1951. Any documents dated after May 1, 1951, though found in an A-File numbered below 8 million, will remain subject to FOIA/PA restrictions.

5. Section 103.40 is added to read as follows:

### § 103.40  Genealogical research requests.

(a) *Nature of requests.* Genealogy research requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Manner of requesting genealogical searches and records.* Requests must be submitted on Form G–1041, Genealogy Search Request, or Form G–1041A, Genealogy Record Request, and mailed to the address listed on the form. Requests may also be submitted via the Internet at a genealogy Web site to be developed for this purpose. A separate request on Form G–1041 must be submitted for each individual searched, and that form will call for the name, aliases, and all alternate spellings relating to the one individual immigrant. Form G–1041A may be submitted to request one or more separate records relating to separate individuals.

(c) *Information required to perform index search.* As required on Form G–1041, all requests for index searches to identify records of individual immigrants must include the immigrant's full name (including variant spellings of the name and/or aliases, if any), date of birth, and place of birth. The date of birth must be at least as specific as a year, and the place of birth must be at least as specific as a country (preferably the country name as it existed at the time of the immigrant's immigration or

naturalization). Additional information about the immigrant's date of arrival in the United States, residence at time of naturalization, name of spouse and names of children may be required to ensure a successful search.

(d) *Information required to retrieve records.* As required on Form G–1041A, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record. C-Files must be identified by naturalization certificate number. Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number. Visa Files must be identified by the Visa File Number. Registry Files must be identified by Registry File Number (for example, R–12345).

(e) *Information required for release of records.* Subjects will be presumed deceased if their birth date is more than 100 years prior to the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of the Genealogy Program Office that the subject is deceased. As required on Form G–1041A, primary or secondary documentary evidence of the subject's death will be required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits). All documentary evidence must be attached to Form G–1041A or submitted in accordance with instructions provided on Form G–1041A.

(f) *Processing of index search requests.* Each request for index search services will generate a search of the indices to determine the existence of responsive historical records. If no record is found, the researcher will be notified. If records are indicated, the researcher will be provided with search results including the type of record found and the file number or other information identifying the record that is required to support a request for record copies.

(g) *Processing of record copy requests.* Upon receipt of requests identifying specific records by number or other identifying information, the requested record(s) will be retrieved, duplicated, reviewed, and mailed to the requester. If a document is located and found but is not subject to release, the document(s) will be transferred to the FOIA/PA program for treatment as a FOIA/PA request as described in 8 CFR 103.10. Document retrieval charges will apply in all cases where documents are retrieved.

6. Section 103.41 is added to read as follows:

### § 103.41  Genealogy request fees.

(a) *Genealogy search fee.* A fee of $16 to $45 will be charged for filing each search request. The fee is not refundable.

(b) *Genealogy records fees.* For the retrieval, duplication, review, and release of each historical record, a fee of $16 to $45 for records on microfilm or a fee of $26 to $55 for textual records will be charged. The Genealogy Program Office will refund this fee only when the record request is based upon file information previously provided by the Genealogy Program Office in response to an index search request, and the Genealogy Program Office is unable to locate the file when later requested under a Genealogy Record request.

(c) *Manner of submission.* All fees must be submitted in the exact amount with Form G–1041 or Form G–1041A, remitted in accordance with 8 CFR 103.7(a)(1).

## PART 299—IMMIGRATION FORMS

7. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103; 8 CFR part 2.

8. Section 299.1 is amended in the table by adding Form "G–1041" and Form "G–1041A", in proper alpha/numeric sequence, to read as follows:

### § 299.1  Prescribed forms.

\*    \*    \*    \*    \*

| Form No. | | | Edition date | | | Title | |
|---|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* | \* |
| G–1041 .............................................. | | | .............................................................. | | | Genealogy Search Request. | |
| G–1041A ............................................ | | | .............................................................. | | | Genealogy Records Request. | |
| \* | \* | \* | \* | \* | \* | \* | \* |

9. Section 299.5 is amended in the table by adding Form "G–1041" and

Form "G–1041A", in proper alpha/numeric sequence, to read as follows:

### § 299.5  Display of control numbers.

\*    \*    \*    \*    \*

**20368**    **Federal Register** / Vol. 71, No. 76 / Thursday, April 20, 2006 / Proposed Rules

| Form No. | Form title | Currently assigned OMB control No. |
|---|---|---|
| * | * | * | * | * | * | * |
| G–1041 ............................................ | Genealogy Search Request ......................................................................................... | 1615–XXXX |
| G–1041A .......................................... | Genealogy Records Request ....................................................................................... | 1615–XXXX |
| * | * | * | * | * | * | * |

Dated: April 13, 2006.

**Michael Chertoff,**

*Secretary.*

[FR Doc. E6–5947 Filed 4–19–06; 8:45 am]

**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 23

**[Docket No. CE242; Notice No. 23–06–02–SC]**

### Special Conditions: Approved Model List Installation of AmSafe Inflatable Restraints in Normal and Utility Category Non-23.562 Certified Airplanes

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Proposed special conditions; request for comments.

**SUMMARY:** This notice proposes special conditions for the installation of an AmSafe, Inc., Inflatable Two-, Three-, Four or Five-Point Restraint Safety Belt with an Integrated Airbag Device on various airplane models. These airplanes, as modified by AmSafe, Inc., will have novel and unusual design features associated with the lap belt or shoulder harness portion of the safety belt, which contains an integrated airbag device. The applicable airworthiness regulations do not contain adequate or appropriate safety standards for this design feature. These special conditions contain the additional safety standards that the Administrator considers necessary to establish a level of safety equivalent to that established by the existing airworthiness standards.

**DATES:** Comments must be received on or before May 22, 2006.

**ADDRESSES:** Comments on these special conditions may be mailed in duplicate to: Federal Aviation Administration (FAA), Regional Counsel, ACE–7, Attention: Rules Docket, Docket No. CE242, 901 Locust, Room 506, Kansas City, Missouri 64106, or delivered in duplicate to the Regional Counsel at the

above address. Comments must be marked: CE242. Comments may be inspected in the Rules Docket weekdays, except Federal holidays, between 7:30 a.m. and 4 p.m.

**FOR FURTHER INFORMATION CONTACT:** Mr. Mark James, Federal Aviation Administration, Aircraft Certification Service, Small Airplane Directorate, ACE–111, 901 Locust, Kansas City, Missouri, 816–329–4137, fax 816–329–4090, e-mail *mark.james@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

### Comments Invited

Interested persons are invited to participate in the making of these proposed special conditions by submitting such written data, views, or arguments as they may desire. Communications should identify the regulatory docket or notice number and be submitted in duplicate to the address specified above. All communications received on or before the closing date for comments will be considered by the Administrator. The proposals described in this notice may be changed in light of the comments received. All comments received will be available in the Rules Docket for examination by interested persons, both before and after the closing date for comments. A report summarizing each substantive public contact with FAA personnel concerning this rulemaking will be filed in the docket. Commenters wishing the FAA to acknowledge receipt of their comments submitted in response to this notice must include a self-addressed, stamped postcard on which the following statement is made: "Comments to CE242." The postcard will be date stamped and returned to the commenter.

### Background

On August 19, 2005, AmSafe, Inc., Aviation Inflatable Restraints (AAIR) Division, 1043 North 47th Avenue, Phoenix, AZ 85043, applied for a supplemental type certificate for the installation of an inflatable restraint in various airplane models certificated before the dynamic structural

requirements as specified in 14 CFR part 23, section 23.562 took effect.

The inflatable restraint system is either a two-, three-, four, or five-point safety belt restraint system consisting of a shoulder harness and a lap belt with an inflatable airbag attached to either the lap belt or the shoulder harness. The inflatable portion of the restraint system will rely on sensors to electronically activate the inflator for deployment. The inflatable restraint system will be made available on the pilot, co-pilot, and passenger seats of these airplanes.

In the event of an emergency landing, the airbag will inflate and provide a protective cushion between the occupant's head and structure within the airplane. This will reduce the potential for head and torso injury. The inflatable restraint behaves in a manner that is similar to an automotive airbag, but in this case, the airbag is integrated into the lap or shoulder belt. While airbags and inflatable restraints are standard in the automotive industry, the use of an inflatable restraint system is novel for general aviation operations.

The FAA has determined that this project will be accomplished on the basis of providing the same current level of safety of the airplanes original certification basis. The FAA has two primary safety concerns with the installation of airbags or inflatable restraints:

• That they perform properly under foreseeable operating conditions; and

• That they do not perform in a manner or at such times as to impede the pilot's ability to maintain control of the airplane or constitute a hazard to the airplane or occupants.

The latter point has the potential to be the more rigorous of the requirements. An unexpected deployment while conducting the takeoff or landing phases of flight may result in an unsafe condition. The unexpected deployment may either startle the pilot, or generate a force sufficient to cause a sudden movement of the control yoke. Either action could result in a loss of control of the airplane, the consequences of which are magnified due to the low operating altitudes during these phases of flight. The FAA has considered this

**28026** **Federal Register** / Vol. 73, No. 95 / Thursday, May 15, 2008 / Rules and Regulations

employee or create a conflict, or apparent conflict, of interest.

Sections 733.103 and 733.104 of Title 5, Code of Federal Regulations, do not apply to individuals, such as career senior executives and employees of the Federal Bureau of Investigation, who are employed in the agencies or positions listed in 5 CFR 733.105(a). These individuals are subject to the more stringent limitations described in 5 CFR 733.105 and 733.106.

Individuals who require advice concerning specific political activities, and whether an activity is permitted or prohibited under 5 CFR 733.103– 733.106, should contact the United States Office of Special Counsel at (800) 854–2824 or (202) 254–3650. Requests for Hatch Act advisory opinions may be made by e-mail to: hatchact@osc.gov.

Fauquier County will be listed after Falls Church, Virginia, and before Herndon, Virginia, at 5 CFR 733.107(c).

**E.O. 12866, Regulatory Review**

This regulation has been reviewed by the Office of Management and Budget in accordance with E.O. 12866.

**Regulatory Flexibility Act**

I certify that this regulation will not have a significant economic impact on a substantial number of small entities because the changes will affect only employees of the Federal Government.

**List of Subjects in 5 CFR Part 733**

Political activities (Government employees).

Office of Personnel Management.

**Linda M. Springer,**
*Director.*

■ Accordingly, the Office of Personnel Management amends 5 CFR Part 733 as follows:

**PART 733—POLITICAL ACTIVITY— FEDERAL EMPLOYEES RESIDING IN DESIGNATED LOCALITIES**

■ 1. The authority citation for part 733 continues to read as follows:

**Authority:** 5 U.S.C. 7325; sec. 308 of Pub. L. 104–93, 109 Stat. 961, 966 (Jan. 6, 1996).

■ 2. Section 733.107(c) is amended by adding Fauquier County, Virginia, alphabetically to the list of designated Virginia municipalities and political subdivisions as set forth below.

**§ 733.107    Designated localities.**

\*    \*    \*    \*    \*

(c) \* \* \*

In Virginia

\*    \*    \*    \*    \*

Fauquier County

\*    \*    \*    \*    \*

[FR Doc. E8–10774 Filed 5–14–08; 8:45 am]
**BILLING CODE 6325–48–P**

---

**DEPARTMENT OF AGRICULTURE**

**Agricultural Marketing Service**

**7 CFR Parts 56 and 70**

**[Docket No. AMS–PY–08–0030; PY–06–002]**

**Increase in Fees and Charges for Egg, Poultry, and Rabbit Grading; Correction**

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Correcting amendments.

**SUMMARY:** This document contains corrections to the final regulations that were published in the **Federal Register** on Wednesday, March 14, 2007 (72 FR 11773) related to the fees and charges for Federal voluntary egg, poultry, and rabbit grading found in sections 7 CFR 56.54(a)(2), 7 CFR 70.76(a)(2) and 7 CFR 70.77(a)(5). The final regulations that are the subject of these corrections were to increase the minimum fees for rabbit grading and for non-resident egg and poultry grading services that had been effective since September 25, 2005. Although the increases were included in the supplementary information, they were inadvertently omitted in the regulatory language.

**DATES:** *Effective Date:* May 15, 2008.

**FOR FURTHER INFORMATION CONTACT:** David Bowden, Jr., Chief, USDA, AMS, PY, Standards, Promotion and Technology Branch (202) 690–3148.

**SUPPLEMENTARY INFORMATION:** The docket provides correcting amendments to Marketing Orders 56 and 70, found respectively at 7 CFR part 56 and part 70.

**List of Subjects**

*7 CFR Part 56*

Eggs and egg products, Food grades and standards, Food labeling, Reporting and recordkeeping requirements.

*7 CFR Part 70*

Food grades and standards, Food labeling, Poultry and Poultry products, Rabbits and rabbit products, Reporting and recordkeeping requirements.

■ Accordingly, 7 CFR, parts 56 and 70 are corrected by making the following correcting amendments:

---

**PART 56—VOLUNTARY GRADING OF SHELL EGGS**

■ 1. The authority citation for part 56 continues to read as follows:

**Authority:** 7 U.S.C. 1621–1627.

**§ 56.54    [Amended]**

■ 2. In § 56.54. paragraph (a)(2) is amended by removing the figure ''$260'' and adding the figure ''$275'' in its place.

**PART 70—VOLUNTARY GRADING OF POULTRY PRODUCTS AND RABBIT PRODUCTS**

■ 3. The authority citation for part 70 continues to read as follows:

**Authority:** 7 U.S.C. 1621–1627.

**§ 70.76    [Amended]**

■ 4. In § 70.76, paragraph (a)(2) is amended by removing the figure ''$260'' and adding the figure ''$275'' in its place.

**§ 70.77    [Amended]**

■ 5. In § 70.77, paragraph (a)(5) is amended by removing the figure ''$260'' and adding the figure ''$275'' in its place.

Dated: May 9, 2008.

**Lloyd C. Day,**
*Administrator, Agricultural Marketing Service.*

[FR Doc. E8–10821 Filed 5–14–08; 8:45 am]
**BILLING CODE 3410–02–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103 and 299**

**[CIS No. 2074–00; DHS Docket No. USCIS– 2005–0013]**

**RIN 1615—AB19**

**Establishment of a Genealogy Program**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This rule establishes a fee-for-service Genealogy Program within U.S. Citizenship and Immigration Services (USCIS) to streamline and improve the process for acquiring historical records of deceased individuals. Currently, USCIS processes such requests through its Freedom of Information Act/Privacy Act (FOIA/PA) program, thereby adding unnecessary delays to the process.

USCIS expects that this Genealogy Program will ensure a timely response to requests for genealogical and historical records and will relieve

USCIS' FOIA/PA program of requests that do not require FOIA/PA expertise. It will put researchers in touch with the correct staff persons within USCIS, and it will create a dedicated queue for genealogists and other researchers seeking access to historical records.

**DATES:** This rule is effective August 13, 2008.

**FOR FURTHER INFORMATION CONTACT:** Marian L. Smith, Office of Records Services (ORS), U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., Washington, DC 20529, telephone (202) 272–8367.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background and Purpose
II. Discussion of Comments
    A. Summary of Comments
    B. Response to Comments, Generally
    C. Response to Comments about Fees
III. Regulatory Analyses
    A. Regulatory Flexibility Act
    B. Unfunded Mandates Reform Act of 1995
    C. Small Business Regulatory Enforcement Fairness Act of 1996
    D. Executive Order 12866
    E. Executive Order 13132
    F. Executive Order 12988
    G. Paperwork Reduction Act

**I. Background and Purpose**

USCIS currently processes requests for historical records of deceased individuals (i.e., genealogical requests) under USCIS' FOIA/PA program. However, the demand for historical records by historical and genealogical researchers, as well as other members of the public, has grown dramatically over the past several years. The volume of genealogical requests has contributed to the USCIS FOIA/PA backlog. USCIS believes that removing genealogy research from the immense FOIA group of ''all'' requesters would improve service to historical researchers, genealogists, and other members of the public. It would also greatly reduce the number of FOIA requests and improve the ability of USCIS to respond to requests for other non-historical records and materials.

On April 20, 2006, the Department of Homeland Security published a proposed rule in the **Federal Register** (71 FR 20357), soliciting comments from the public on the establishment of a fee-for-service Genealogy Program in USCIS. As discussed in the proposed rule, the Genealogy Program would accept genealogical research requests directly from requesters. There would be two types of requests: (1) Requests for searching the index of records if the requester is unable to identify a specific historical record; and (2) requests for

making copies of historical records the requester can identify by file number. To make a request, the requester would need to submit to the Genealogy Program the appropriate request form, accompanied by any supporting documentation and the applicable fee. The Genealogy Program would handle the entire request/retrieval process.

**II. Discussion of Comments**

*A. Summary of Comments*

The comment period for the April 20, 2006 proposed rule closed on June 19, 2006. USCIS received a total of thirty-three comments, including thirty-one comments from individuals identified as either hobbyists or professional genealogists. One of the comments came from an umbrella organization for numerous genealogical societies worldwide. There were twenty-eight positive remarks in favor of USCIS establishing a Genealogy Program. In addition, USCIS received three negative comments that objected to USCIS' establishment of a Genealogy Program.

Of the positive comments, seven requested that the Genealogy Program have an online search capability with public access to the index. Nine supported USCIS' proposal to remove genealogy research from the FOIA program. One of the commenters, an umbrella organization for genealogical societies that was in favor of creating a dedicated fee-for-service Genealogy Program, noted the benefits of such a program. The program would permit individuals to make requests over the Internet, remove these requests from the FOIA program (thereby eliminating the excessive waiting time), and support the creation of a dedicated staff that the public can contact. This commenter noted that the organization and its members approved of a fee-based system and expressed hope that USCIS would balance the final fee range with the issue of affordability for individuals seeking records.

Five commenters discussed the range of fees that USCIS proposed. One commenter stated that fees above $10 will limit access to the documents. A second commenter suggested that the proposed fees would make USCIS-held records ''records of last resort,'' because a researcher would only submit a request if it were impossible to find the naturalization or immigration information elsewhere. A third commenter opined that the proposed range of fees would substantially dampen people's interest in obtaining such records and stop people from continuing their genealogy research. This commenter further stated that most

of the people who do genealogy research are over 50 years old or are senior citizens with finite financial resources. The fourth commenter wrote that the proposed fees were too high for the average genealogy researcher and suggested that fees in the $15 to $25 range would be more affordable. The fifth commenter expressed concern that the proposed fee range of $26 to $55 for a copy of textual documentation is much too high for the average person to afford.

*B. Response to Comments, Generally*

USCIS will establish the Genealogy Program as a fee-for-service program. USCIS will not expend any of its financial resources. which are dedicated to its overall mission for the administration of immigration and naturalization adjudication functions and establishing immigration services, policies, and priorities.

In many cases, USCIS is the only government agency that will have certain historical records that provide the missing link for which genealogists or family historians are searching. An example is the Visa File packet, which contains the original arrival record of immigrants admitted for permanent residence under provisions of the Immigration Act of 1924. The packet contains information and documents of the immigrant's exact date and place of birth, names of parents and children, all places of residence for five full years prior to immigration, and photographs. In addition, some Visa packets contain birth, marriage, and military records. USCIS will join other Federal agencies that provide record search and document production services (for a fee) to family researchers and genealogists.

*C. Response to Comments About Fees*

In the proposed rule, USCIS provided a detailed analysis about fees and specifically requested comment on the issue of fees. 71 FR at 20363. Several commenters provided input on fees, and those comments are summarized above. In response, USCIS provides the following explanation on its basis for establishing fees and setting the amounts of the fees.

In the proposed rule, USCIS proposed a fee range of $16 to $45 for an index search and $16 to $45 for a record/file services request. 71 FR at 20362. USCIS had calculated these proposed fees in accordance with Office of Management and Budget (OMB) Circular A–25, which requires that user fees recover the full cost of services provided. OMB Circular A–25, User Charges (Revised), section 6, 58 FR 38142 (July 15, 1993) (OMB Circular A–25). Full cost under

OMB Circular A–25 includes items such as management and personnel costs (salaries and benefits), physical overhead, consulting, materials and supplies, utilities, insurance, travel, and rent of building space and equipment. As was discussed in the proposed rule, the services to be provided under the USCIS Genealogy Program will be significantly enhanced from what is currently provided under existing FOIA/PA processing.

The fees that USCIS will charge to provide services that are described in this rule will cover the costs of that enhanced service as well as overhead items as required by OMB Circular A–25. The full cost of this service will include the cost of research and information collection, a description of the document, suggestions of where to locate records from other federal or state agencies, establishment of procedures

and standards, and the issuance of regulations. Thus, the fees must be established at a level that recovers these costs.

OMB Circular A–25 also provides that, when costs are not known, such as when an agency is developing and implementing a new fee for a service program, an agency may establish fees based on a study and comparison of other comparable fee-based services provided by other governmental entities. Since the genealogy program is new, USCIS utilized this method of fee determination in addition to analyzing the actual costs projected to carry out the program. No other organization provides exactly the same service, because no other organization holds precisely the same variety or volume of records. USCIS, however, considered the fees charged by a few similar organizations. As stated in the proposed

rule, USCIS considered the fees charged by the Social Security Administration, the National Archives and Records Administration, the Department of Interior's Bureau of Land Management, and a few state agencies.

After considering the comments received on the proposed rule, the costs of providing this service, OMB requirements, and the fees charged for similar services, USCIS has decided to set the search and document reproduction fees for the Genealogy Program as follows:

*Index Search:* $20.

*Copy of Document from Microfilm:* $20.

*Copy of Textual File:* $35.

Chart 1 lists the records that the public would be able to request from the Genealogy Program versus the records that the public would be able to request from the FOIA/PA program.

CHART 1

| Genealogy program | FOIA/PA program |
|---|---|
| Files of deceased subjects. (Provided files are defined as historical records). | Files of living subjects. |
| Naturalization Certificate Files (C-Files) from 9/27/1906 to 4/1/1956 ...... | Naturalization records on or after 4/1/1956. |
| Visa Files from 7/1/1924 to 3/31/1944 and Visa records from 3/31/1944 to 5/1/1951 in A-files. | Visa records on or after 5/1/1951 in A-Files. |
| A-Files below 8 million and documents therein dated prior to 5/1/1951 | A-files above 8 million and documents therein dated on or after 5/1/1951. |
| Registry Files from 3/2/1929 to 3/31/1944 and registry records from 4/1/1944 to 4/30/1951 in A-files. | Registry records on or after 5/1/1951 in A-Files. |
| AR–2 Files from 8/1/1940 to 3/31/1944 and Alien Registration Forms from 3/31/1944 to 4/30/1951 in A-Files. | Alien Registration Forms on or after 5/1/1951 in A-Files. |

## III. Regulatory Analyses

### A. Regulatory Flexibility Act

In accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities because of the following factors:

This rule affects professional genealogists and other members of the public requesting historical records from USCIS. The main source of genealogy requests comes from individuals doing personal research, rather than from small entities, such as professional genealogists. "The Washington Post" reported that seventy-three percent of Americans have an interest in their family history, according to a 2005 study conducted by Market Strategies, Inc., a syndicated research firm based in Livonia, Michigan, and MyFamily.com, an online network of genealogical tools based in Provo, Utah. "The Wall Street Journal" described genealogy as a $200 million per year industry ranging from

individual researchers to multi-million dollar companies.

In addition, the growth of the Internet has spurred interest in genealogy and a rapidly growing number of hobbyists pursuing genealogy. According to the "Occupational Outlook Quarterly" (Bureau of Labor Statistics, Fall 2000), a 1997 survey of certified genealogists found that 57 percent work part-time, 34 percent work full-time, and 9 percent are hobbyists. In 2001, there were over 300 certified genealogists, and currently, the Association of Professional Genealogists has 1,600 members worldwide (*http://www.apgen.org*). The National Genealogical Society notes:

Some professional genealogists are employed as librarians, archivists, editors or research assistants to established professionals; others work for genealogical firms. Most, however, choose self-employment-learning business principles to ensure the success of their genealogical practice. As with other entrepreneurial fields, most make the move gradually from their original field of employment, building a practice—be it a client base, writing outlets, or some other venue—before moving full-

time into genealogy. Some make this career switch in mid-life. Others choose genealogy as a second career upon retirement from their first one. Because genealogical degree programs are still relatively rare, only a few enjoy the opportunity to make genealogy their first career. No accurate count exists for the number of individuals employed as genealogists, full-time and part-time (*http://www.ngsgenealogy.org/articles/profession.cfm*).

With the growth of the Internet, the number of individuals and hobbyists has grown at a much faster rate. Much of the growth in genealogy as a sector arises from providing individuals with the means of conducting their own family history research through online databases and research tools. The growing dominance of individual hobbyists suggests that individuals rather than professionals are the primary requesters of historical records. Professional genealogists tend to be hired when individuals hit a "brick wall," or encounter a particular problem that they cannot resolve. This suggests that professional researchers tend to focus on aspects of genealogy research

other than the standard index searches or record requests that would be submitted to the USCIS Genealogy Program.

In each of the past 4 years, USCIS has received an average of 10,000 combined index search and/or records requests for historical records through the FOIA program. For purposes of counting records, USCIS counts each request for a record search as one request. Based on an estimated increase in the demand for historical information and the fact that the Genealogy Program will treat index search requests and records requests as separate rather than combined requests, DHS expects the total number of genealogy requests to be significantly higher than when the FOIA Program handled genealogical requests. DHS estimates that it will receive a combined total of 26,597 genealogy requests, including 15,250 index search requests, 6,619 requests for microfilm records, and 4,728 requests for textual records.

DHS has determined that individuals make requests for historical records. If professional genealogists and researchers have submitted such requests, they are not identifying themselves as commercial requesters and thus cannot be segregated in the data. Genealogists typically advise clients on how to submit their own requests. Reasons for this practice include the time required for a response to the request and the belief that records are more releasable to a relative rather than an unrelated third party.

Based on discussions with professional genealogists, USCIS believes that professional genealogists and researchers who fall under the approved definition from the Small Business Association definition of a small entity in this category (i.e., All Other Professional, Scientific, and Technical Services with annual average receipts of $6 million or less) generate well below 5 percent of the total number of requests. If USCIS assumes that professional genealogists and researchers account for 5 percent of the requests, and these costs are borne exclusively by the 1,600 members of the Association of Professional Genealogists, the average impact would be $18.84 per year. This figure was derived by multiplying the total cost of the rule $602,860 by .5% (the percentage of small entities) and divided by 1,600 (the number of small entities.)

These practices arise from the nature of the genealogy sector. Professional genealogists charge from $10 to $100 per hour, with an average of $30 to $60 per hour, according to the Association of Professional Genealogists (*http://*

*www.apgen.org/articles/hire.html*). Expenses, such as record requests and copies, are often charged to the client as an additional expense. The fees established with this rule could be passed along as a direct expense to the professional genealogists' client, thus no significant economic impact would be borne by the professional genealogist. Specialists typically charge a relatively higher fee. (*http:// www.progenealogists.com/ compare.htm*). In addition, many professionals require a retainer of $300 to $500. See Sue P. Morgan, ''What You Should Know Before Hiring a Professional Genealogist,'' available at *http://www.genservices.com/docs/ HiringAPro.htm*.

Depending on the depth of the research, the fees for a genealogical study can be substantial. This does not suggest a substantial burden on researchers. Given the low number of professional genealogists and researchers that would be impacted by this rule, the resulting degree of economic impact would not require DHS to perform Regulatory Flexibility Analysis.

## B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## D. Executive Order 12866

It has been determined that this rule is not a significant regulatory action under section 3(f) of Executive Order 12866, Regulatory Planning and Review. Nonetheless, USCIS has assessed both the costs and benefits of this rule and has determined that the benefits of this regulation justify its costs. The

anticipated benefits of this rule are: (1) Relieve the FOIA/PA program from burdensome requests that require no FOIA/PA expertise; (2) place requesters and the Genealogy staff in direct communication; (3) provide a dedicated queue and point of contact for genealogists and other researchers seeking access to those records described as historical records; (4) generate sufficient revenue to cover expenses as a fee for service program; and (5) reduce the time it takes for USCIS to respond to these genealogy requests.

The cost to the public of this rule will be $20 for a request for an index search, $20 for a request for a copy of a file on microfilm, and $35 for a request for a copy of a textual file. USCIS is authorized to charge a fee to recover the full costs of providing research and information services under section 286(t) of the Immigration and Nationality Act, 8 U.S.C. 1356(t). Other sources exist for many types of genealogical research, and it is not evident that every search by a genealogist would require access to the Genealogy Program at USCIS.

Based upon these fees, it is possible to approximate the impact of fees on individual and professional genealogists and researchers. USCIS expects to receive approximately 15,250 genealogical (name) index search requests per year, which, at $20 per search, would yield $305,000; in addition, there would be a total of 6,619 requests for microfilmed records, and 4,728 requests for textual records (i.e., hard copy files). The fee for microfilmed records would yield $132,380. The fee to pull textual records would yield $165,480. Therefore, the total fees collected by the Genealogy Program should yield $602,860.

Establishing the Genealogy Program will benefit both individuals and researchers making genealogy requests for historical records as well as those seeking information under the current FOIA/PA program, because it will allow for a more timely response for both sets of requests. USCIS estimates that it received an average of 10,000 combined index search and record requests per year for genealogical information in each of the past 4 fiscal years through the existing FOIA/PA program. USCIS can release these records without redaction or withholding, eliminating the need for FOIA/PA analysis. A program specifically designed to handle these requests would expedite the process and improve services to historical researchers, genealogists and the general public. For example, the rule does not increase information collection

requirements of the rule. In fact, the introduction of e-filing presents an opportunity to simplify the information collection process and expedite handling. At the same time, the resources of the FOIA/PA program could be applied more efficiently to requests more directly related to immigration, citizenship, or naturalization benefits that require more detailed FOIA/PA analysis.

*E. Executive Order 13132*

This rule will not have a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, USCIS has determined that this rule does not have federalism implications to warrant the preparation of a federalism summary impact statement. It provides for alternate document handling procedures that do not implicate state government.

*F. Executive Order 12988*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

The Office of Management and Budget approved the information collection requirements for the use of Forms G–1041, Genealogy Search Request, and G–1041A, Genealogy Records Request, contained in this rule. The OMB control number for this collection is 1615–0096.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

■ Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*), E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 2. Section 103.7 is amended by:

■ a. Adding the entries "Form G–1041" and "Form G–1041A" in proper alpha/numeric sequence, in paragraph (b)(1); and by

■ b. Revising the fifth sentence in paragraph (c)(1).

The additions and revision read as follows:

**§ 103.7  Fees.**

\*        \*        \*        \*        \*

(b) \*  \*  \*
(1) \*  \*  \*

\*        \*        \*        \*        \*

Form G–1041. For filing a request for a search of indices to historical records to be used in genealogical research—$20. The search fee is not refundable.

Form G–1041A. For filing a request for a copy of historical records to be used in genealogical research—$20 for each file copy from microfilm or $35 for each file copy from a textual record. In some cases, the researcher may be unable to determine the fee, because the researcher will have a file number obtained from a source other than the USCIS Genealogy Program and therefore not know the format of the file (microfilm or hard copy). In this case, if USCIS locates the file and it is a textual file, the Genealogy Program will notify the researcher to remit the additional $15. The Genealogy Program will refund the records request fee only when it is unable to locate the file previously identified in response to the index search request.

\*        \*        \*        \*        \*

(c) \*  \*  \*

(1) \* \* \* The fees for Form I–907, Request for Premium Processing Services, and for Forms G–1041 and G–1041A, Genealogy Program request forms, may not be waived.

\*        \*        \*        \*        \*

■ 3. Section 103.38 is added to read as follows:

**§ 103.38  Genealogy Program.**

(a) *Purpose.* The Department of Homeland Security, U.S. Citizenship and Immigration Services Genealogy Program is a fee-for-service program designed to provide genealogical and historical records and reference services to genealogists, historians, and others seeking documents maintained within the historical record systems.

(b) *Scope and limitations.* Sections 103.38 through 103.41 comprise the regulations of the Genealogy Program. These regulations apply only to searches for and retrieval of records from the file series described as historical records in 8 CFR 103.39. These regulations set forth the procedures by which

individuals may request searches for historical records and, if responsive records are located, obtain copies of those records.

■ 4. Section 103.39 is added to read as follows:

**§ 103.39  Historical Records.**

Historical Records are files, forms, and documents now located within the following records series:

(a) *Naturalization Certificate Files (C–Files), from September 27, 1906 to April 1, 1956.* Copies of records relating to all U.S. naturalizations in Federal, State, county, or municipal courts, overseas military naturalizations, replacement of old law naturalization certificates, and the issuance of Certificates of Citizenship in derivative, repatriation, and resumption cases. The majority of C–Files exist only on microfilm. Standard C–Files generally contain at least one application form (Declaration of Intention and/or Petition for Naturalization, or other application) and a duplicate certificate of naturalization or certificate of citizenship. Many files contain additional documents, including correspondence, affidavits, or other records. Only C–Files dating from 1929 onward include photographs.

(b) *Microfilmed Alien Registration Forms, from August 1, 1940 to March 31, 1944.* Microfilmed copies of 5.5 million Alien Registration Forms (Form AR–2) completed by all aliens age 14 and older, residing in or entering the United States between August 1, 1940 and March 31, 1944. The two-page form called for the following information: Name; name at arrival; other names used; street address; post-office address; date of birth; place of birth; citizenship; sex; marital status; race; height; weight; hair and eye color; date, place, vessel, and class of admission of last arrival in United States; date of first arrival in United States; number of years in United States; usual occupation; present occupation; name, address, and business of present employer; membership in clubs, organizations, or societies; dates and nature of military or naval service; whether citizenship papers filed, and if so date, place, and court for declaration or petition; number of relatives living in the United States; arrest record, including date, place, and disposition of each arrest; whether or not affiliated with a foreign government; signature; and fingerprint.

(c) *Visa Files, from July 1, 1924 to March 31, 1944.* Original arrival records of immigrants admitted for permanent residence under provisions of the Immigration Act of 1924. Visa forms contain all information normally found on a ship passenger list of the period,

as well as the immigrant's places of residence for 5 years prior to emigration, names of both the immigrant's parents, and other data. In most cases, birth records or affidavits are attached to the visa, and in some cases, marriage, military, or police records may also be attached to the visa.

(d) *Registry Files, from March 2, 1929 to March 31, 1944.* Original records documenting the creation of immigrant arrival records for persons who entered the United States prior to July 1, 1924, and for whom no arrival record could later be found. Most files also include documents supporting the immigrant's claims regarding arrival and residence (e.g., proofs of residence, receipts, and employment records).

(e) *Alien-Files numbered below 8 million (A8000000), and documents therein dated prior to May 1, 1951.* Individual alien case files (A–files) became the official file for all immigration records created or consolidated after April 1, 1944. The United States issued A–numbers ranging up to approximately 6 million to aliens and immigrants who were within or entered the United States between 1940 and 1945. The United States entered the 6 million and 7 million series of A–numbers between circa 1944 and May 1, 1951. Any documents dated after May 1, 1951, though found in an A–File numbered below 8 million, will remain subject to FOIA/PA restrictions.

■ 5. Section 103.40 is added to read as follows:

**§ 103.40    Genealogical Research Requests.**

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Manner of requesting genealogical searches and records.* Requests must be submitted on Form G–1041, Genealogy Index Search Request, or Form G–1041A, Genealogy Records Request, and mailed to the address listed on the form. Beginning on August 13, 2008, USCIS will accept requests electronically through its Web site at *http://www.USCIS.gov.* A separate request on Form G–1041 must be submitted for each individual searched, and that form will call for the name, aliases, and all alternate spellings relating to the one individual immigrant. Form G–1041A may be submitted to request one or more separate records relating to separate individuals.

(c) *Information required to perform index search.* As required on Form G–1041, all requests for index searches to identify records of individual immigrants must include the immigrant's full name (including variant spellings of the name and/or aliases, if any), date of birth, and place of birth. The date of birth must be at least as specific as a year, and the place of birth must be at least as specific as a country (preferably the country name as it existed at the time of the immigrant's immigration or naturalization). Additional information about the immigrant's date of arrival in the United States, residence at time of naturalization, name of spouse, and names of children may be required to ensure a successful search.

(d) *Information required to retrieve records.* As required on Form G–1041A, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record. C–Files must be identified by a naturalization certificate number. Forms AR–2 and A–Files numbered below 8 million must be identified by Alien Registration Number. Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(e) *Information required for release of records.* Subjects will be presumed deceased if their birth dates are more than 100 years prior to the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of the Genealogy Program Office that the subject is deceased. As required on Form G–1041A, primary or secondary documentary evidence of the subject's death will be required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits). All documentary evidence must be attached to Form G–1041A or submitted in accordance with instructions provided on Form G–1041A.

(f) *Processing of index search requests.* This service is designed for customers who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number. Each request for index search services will generate a search of the indices to determine the existence of responsive historical records. If no record is found, USCIS will notify the customer accordingly. If records are found, USCIS will provide the customer with the search results, including the type of record found and the file number or other information identifying the record.

The customer can use this information to request a copy of the record(s).

(g) *Processing of record copy requests.* This service is designed for customers who can identify a specific record or file to be retrieved, copied, reviewed, and released. Customers may identify one or more files in a single request. However, separate fees will apply to each file requested. Upon receipt of requests identifying specific records by number or other identifying information, USCIS will retrieve, review, duplicate, and then mail the record(s) to the requester. It is possible that USCIS will find a record that contains data that is not releasable to the customer. An example would be names and birth dates of persons who might be living. The FOIA/PA only permits release of this type of information when the affected individual submits a release authorization to USCIS. Therefore, the Genealogy Program Office will contact and inform the customer of this requirement. The customer will have the opportunity to submit the release authorization. The customer can also agree to the transfer of the document request to the FOIA/PA program for treatment as a FOIA/PA request as described in 6 CFR Part 5. Document retrieval charges will apply in all cases where documents are retrieved.

■ 6. Section 103.41 is added to read as follows:

**§ 103.41    Genealogy request fees.**

(a) *Genealogy search fee.* See 8 CFR 103.7(b)(1).

(b) *Genealogy records fees.* See 8 CFR 103.7(b)(1).

(c) *Manner of submission.* When a request is submitted online, credit card payments are required. These payments will be processed through the Treasury Department's Pay.Gov financial management system. Cashier's checks or money orders in the exact amount must be submitted for requests submitted with Form G–1041 or Form G–1041A in accordance with 8 CFR 103.7(a)(1). Personal Checks will not be accepted.

**PART 299—IMMIGRATION FORMS**

■ 7. The authority citation for part 299 continues to read as follows:

    **Authority:** 8 U.S.C. 1101 and note, 1103; 8 CFR part 2.

■ 8. Section 299.1 is amended in the table by adding "G–1041" and "G–1041A", in proper alpha/numeric sequence, to read as follows:

**§ 299.1    Prescribed forms.**

\*    \*    \*    \*    \*

**28032** **Federal Register** / Vol. 73, No. 95 / Thursday, May 15, 2008 / Rules and Regulations

| Form No. | | | Edition date | | Title | | |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |
| G–1041 ........................................................................................ | | | 11/15/06 | Genealogy Index Search Request. | | | |
| G–1041A ...................................................................................... | | | 11/15/06 | Genealogy Records Request. | | | |
| * | * | * | * | * | * | * | * |

■ 9. Section 299.5 is amended in the table by adding entries for Forms "G–1041" and "G–1041A", in proper alpha/numeric sequence, to read as follows:

**§ 299.5    Display of control numbers.**

\*    \*    \*    \*    \*

| Form No. | | | Form title | | | Currently assigned OMB control No. |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| G–1041 ...................................................................... | | | Genealogy Index Search Request ........................................ | | | 1615–0096 |
| G–1041A .................................................................... | | | Genealogy Records Request .............................................. | | | 1615–0096 |
| * | * | * | * | * | * | * |

**Michael Chertoff,**
*Secretary.*
[FR Doc. E8–10651 Filed 5–14–08; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 71**

**[Docket No. FAA–2007–0310; Airspace Docket No. 07–AEA–21]**

**Amendment of Class E Airspace; Bradford, PA**

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Final rule, confirmation of effective date.

**SUMMARY:** This action confirms the effective date of a direct final rule published in the **Federal Register** (73 FR 9443) that modifies Class E Airspace at Bradford, PA. The modified controlled airspace from nearby Bradford Regional Airport will now adequately support the Area Navigation (RNAV) Global Positioning System (GPS) Special Instrument Approach Procedure (IAP) developed for medical flight operations for the University of Pittsburgh.

**DATES:** Effective 0901 UTC, June 05, 2008. The Director of the Federal Register approves this incorporation by reference action under title 1, Code of Federal Regulations, part 51, subject to the annual revision of FAA Order 7400.9 and publication of conforming amendments.

**FOR FURTHER INFORMATION CONTACT:**
Melinda Giddens, System Support Group, Eastern Service Center, Federal Aviation Administration, P.O. Box 20636, Atlanta, Georgia 30320; Telephone (404) 305–5610; Fax (404) 305–5572.

**SUPPLEMENTARY INFORMATION:**

**Confirmation of Effective Date**

The FAA published this direct final rule with a request for comments in the **Federal Register** on February 21, 2008 (73 FR 9443), Docket No. FAA–2007–031 0; Airspace Docket No. 07–AEA–21. The FAA uses the direct final rulemaking procedure for a non-controversial rule where the FAA believes that there will be no adverse public comment. This direct final rule advised the public that no adverse comments were anticipated, and that unless a written adverse comment, or a written notice of intent to submit such an adverse comment, were received within the comment period, the regulation would become effective on June 5, 2008. No adverse comments were received, and thus this notice confirms that effective date.

Issued in College Park, Georgia, on April 21, 2008.

**Lynda G. Otting,**
*Acting Manager, System Support Group, Eastern Service Center, Air Traffic Organization.*
[FR Doc. E8–10430 Filed 5–14–08; 8:45 am]
**BILLING CODE 4910–13–M**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 71**

**[Docket No. FAA–2007–0277; Airspace Docket No. 07–AEA–17]**

**Establishment of Class E Airspace; Seneca, PA**

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Final rule, confirmation of effective date.

**SUMMARY:** This action confirms the effective date of a direct final rule published in the **Federal Register** (73 FR 8595) that establishes Class E Airspace at Seneca, PA to support a new Area Navigation (RNAV) Global Positioning System (GPS) Special Instrument Approach Procedure (IAP) that has been developed for medical flight operations into the University of Pittsburgh Medical Center (UPMC) Northwest Heliport.

**DATES:** Effective 0901 UTC, June 5, 2008. The Director of the Federal Register approves this incorporation by reference action under title 1, Code of Federal Regulations, part 51, subject to the annual revision of FAA Order 7400.9 and publication of conforming amendments.

**FOR FURTHER INFORMATION CONTACT:**
Melinda Giddens, System Support Group, Eastern Service Center, Federal Aviation Administration, P.O. Box 20636, Atlanta, Georgia 30320; telephone (404) 305–5610.

**SUPPLEMENTARY INFORMATION:**

**7493**

# Rules and Regulations

**Federal Register**

Vol. 86, No. 18

Friday, January 29, 2021

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 211, 212, 214, 216, 217, 223, 235, 236, 240, 244, 245, 245a, 248, 264, 274a, 286, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, and 392**

**[CIS No. 2627–18; DHS Docket No. USCIS–2019–0010]**

**RIN 1615–AC18**

### U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notification of preliminary injunction.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) is issuing this document to inform the public of two preliminary injunctions ordered by Federal district courts affecting the Department of Homeland Security's (the Department, or DHS) final rule entitled "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements."

**DATES:** The court orders were effective September 29, 2020 and October 8, 2020.

**FOR FURTHER INFORMATION CONTACT:** For technical questions only: Kika Scott, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20588–0009, telephone (240) 721–3000.

**SUPPLEMENTARY INFORMATION:** On August 3, 2020, the Department published a final rule in the **Federal Register** at 85 FR 46788 entitled "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the

"Final Rule"). The Final Rule was to be effective October 2, 2020.

On August 20, 2020, the Immigrant Legal Resource Center and other plaintiffs filed a lawsuit in the U.S. District Court for the Northern District of California, *Immigration Legal Resource Center et al.*, v. *Wolf, et al.*, 20–cv–05883–JWS ("*ILRC* v. *Wolf*"), seeking a court order to prohibit the Department from implementing or enforcing the Final Rule. Plaintiffs subsequently filed a motion for a preliminary injunction and stay of the effective date of the Final Rule.

On September 3, 2020, Northwest Immigrant Rights Project (NWIRP) and other plaintiffs in *Nw. Immigrant Rts. Project, et al.*, v. *USCIS*, No. 19–cv–3283 (RDM) ("*NWIRP* v. *USCIS*"), filed a motion in the U.S. District Court for the District of Columbia requesting postponement of the effective date of the Final Rule, stay of any implementation or enforcement of the Final Rule, and for a preliminary injunction against implementation or enforcement of the Final Rule.

On September 29, 2020, the U.S. District Court for the Northern District of California, in *ILRC* v. *Wolf,* preliminarily enjoined DHS from implementing or enforcing any part of the Final Rule. *See Immigration Legal Resource Center et al.*, v. *Wolf, et al.*, No. 20–cv–05883–JWS, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020).

On October 8, 2020, the U.S. District Court for the District of Columbia granted NWIRP's motion for a preliminary injunction. *See NWIRP* v. *USCIS*, No. CV 19–3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020).

The Department is complying with the terms of these orders and is not enforcing the regulatory changes set out in the Final Rule. USCIS will continue to accept the fees that were in place prior to October 2, 2020, and follow the guidance in place prior to October 2, 2020 to adjudicate fee waiver requests as provided under the Adjudicator's Field Manual (AFM) Chapters 10.9 and 10.10.

Any further guidance and updates regarding the subject litigation will be posted on the USCIS website *https://www.uscis.gov/news/news-releases/uscis-response-to-preliminary-*

*injunction-of-fee-rule* on an ongoing basis.

**Tracy L. Renaud,**

*Senior Official Performing the Duties of the Director.*

[FR Doc. 2021–02044 Filed 1–28–21; 8:45 am]

**BILLING CODE 9111–97–P**

## FEDERAL HOUSING FINANCE AGENCY

**12 CFR Parts 1209, 1217, and 1250**

**RIN 2590–AB14**

### Rules of Practice and Procedure; Civil Money Penalty Inflation Adjustment

**AGENCY:** Federal Housing Finance Agency.

**ACTION:** Final rule.

**SUMMARY:** The Federal Housing Finance Agency (FHFA) is adopting this final rule amending its Rules of Practice and Procedure and other agency regulations to adjust each civil money penalty within its jurisdiction to account for inflation, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

**DATES:** *Effective* January 29, 2021, and applicable beginning January 15, 2021.

**FOR FURTHER INFORMATION CONTACT:** Frank R. Wright, Assistant General Counsel, at (202) 649–3087, *Frank.Wright@fhfa.gov* (not a toll-free number); Federal Housing Finance Agency, 400 7th Street SW, Washington, DC 20219. The telephone number for the Telecommunications Device for the Deaf is: (800) 877–8339 (TDD only).

**SUPPLEMENTARY INFORMATION:**

## I. Background

FHFA is an independent agency of the Federal government, and the financial safety and soundness regulator of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises), as well as the Federal Home Loan Banks (collectively, the Banks) and the Office of Finance under authority granted by the Federal Housing Enterprises Financial Safety and Soundness Act of

**20398**      **Federal Register** / Vol. 86, No. 73 / Monday, April 19, 2021 / Notices

and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.)

**Robert J. Fenton,**

*Senior Official Performing the Duties of the Administrator, Federal Emergency Management Agency.*

[FR Doc. 2021–07928 Filed 4–16–21; 8:45 am]

**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2684–21; DHS Docket No. USCIS–2021–0004]**

**RIN 1615–ZB87**

### Identifying Barriers Across U.S. Citizenship and Immigration Services (USCIS) Benefits and Services; Request for Public Input

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Request for public input.

**SUMMARY:** The Department of Homeland Security (DHS) is seeking comments from the public on how U.S. Citizenship and Immigration Services (USCIS) can reduce administrative and other barriers and burdens within its regulations and policies, including those that prevent foreign citizens from easily obtaining access to immigration services and benefits. This effort will help DHS identify process improvements for USCIS, with benefits for state, local, and tribal governments, for businesses (including small businesses and startups), for educational institutions of all kinds, for nonprofits, and for individuals.

**DATES:** Written comments are requested on or before April 19, 2021. Late-filed comments will be considered to the extent practicable.

**ADDRESSES:** You may submit comments, identified by docket number USCIS–2021–0004, through the *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS or USCIS officials, may not be reviewed by DHS. Please note that DHS and USCIS cannot accept any comments that are hand delivered or couriered. In addition, USCIS cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. Due to

COVID–19, USCIS is also not accepting mailed comments at this time. If you cannot submit your comment by using *http://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at 240–721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Regulatory Coordination Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, DHS, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Interested persons are invited to comment on this notice by submitting written data, views, or arguments using the method identified in the **ADDRESSES** section.

*Instructions:* All submissions must include the agency name and docket number for this notice. All comments received will be posted without change to *http://www.regulations.gov including any personal information provided.*

*Docket:* For access to the docket to read background documents or comments, go to *http://www.regulations.gov.*

### II. Background

On February 2, 2021, President Biden issued Executive Order (E.O.) 14012, ''Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans.''[1] In E.O. 14012, President Biden announced his objective to encourage ''full participation by immigrants'' and directed responsible Federal agencies to identify strategies that promote ''integration, inclusion, and citizenship'' and ''identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits.'' Executive Order 13707, ''Using Behavioral Science Insights to Better Serve the American People'' (Sept. 18, 2015), states that ''the Federal Government should design its policies

and programs to reflect our best understanding of how people engage with, participate in, use, and respond to those policies and programs.''[2] President Biden's Memorandum on Restoring Trust in Government through Scientific Integrity and Evidence-Based Policymaking (Jan. 27, 2021), refers to Executive Order 13707 and calls for ''the evidence-based and iterative development and the equitable delivery of policies, programs, and agency operations,'' including approaches ''that may be informed by the social and behavioral sciences and data science.''[3]

To achieve President Biden's objectives, DHS is soliciting public input to better understand and identify administrative barriers and burdens (including paperwork requirements, waiting time, and other obstacles) that impair the functions of the USCIS process and unnecessarily impede access to USCIS immigration benefits. The relevant burdens might be imposed on state, local, and tribal governments; businesses, including small businesses and startups; educational institutions; nonprofits; households; and individuals. DHS is also seeking input to help identify current USCIS processes or those previously in place that promote equity and inclusion and learn how USCIS might leverage and incorporate those successes and lessons learned in other immigration benefits and adjudication processes.

Independent of the current Request for Public Input, DHS continually evaluates its regulatory program for rules that are candidates for retrospective review. DHS does so through legally mandated retrospective review requirements (for example, Unified Agenda of Planned Regulatory Actions reviews and reviews under section 610 of the Regulatory Flexibility Act, 5 U.S.C. 610) and through informal and long-established mechanisms (for example, use of Advisory Councils, feedback from DHS field personnel, input from internal working groups, and outreach to regulated entities). Today's notice is separate from these existing DHS retrospective review efforts.

### III. Request for Input

#### A. Importance of Public Feedback

To achieve the objectives outlined in E.O. 14012, E.O. 13707, and the Presidential Memorandum on Restoring

---

[1] ''Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,'' 86 FR 8277 (Feb. 5, 2021).

[2] ''Using Behavioral Science Insights to Better Serve the American People,'' 80 FR 56365 (Sept. 18, 2015).

[3] ''Restoring Trust in Government through Scientific Integrity and Evidence-Based Policymaking,'' 86 FR 8845 (Feb. 10, 2021).

Federal Register / Vol. 86, No. 73 / Monday, April 19, 2021 / Notices    **20399**

Trust in Government through Scientific Integrity and Evidence-Based Policymaking, it is critical that public input helps drive process improvements in strategies, processes, and planning. Because the impacts and effects of immigration benefits tend to be widely dispersed in society, members of the public—especially regulated stakeholders and those that typically participate in USCIS rulemakings—are likely to have useful information, data, and perspectives on the benefits and burdens of our existing processes. When processes are especially burdensome, members of the public may have unique knowledge. Given that unique knowledge, a primary factor that will improve the USCIS immigration process is public feedback.

*B. Maximizing the Value of Public Feedback*

This notice contains a list of questions, the answers to which will assist DHS in identifying potential USCIS immigration processes that may benefit from DHS review with the goal of reducing burdens on the public, saving costs for both the public and USCIS, increasing navigability, saving time, reducing confusion and frustration, promoting simplification, improving efficiency, and/or removing barriers that unnecessarily impede access to immigration benefits. DHS encourages public comment on these questions and seeks any other information or data commenters believe are relevant to this notice. The type of feedback that is most useful to DHS will identify *specific regulations and/or processes,* and include *actionable* information and/or *data* and/or provide *viable alternatives,* that meet statutory obligations and regulatory objectives and requirements. Public feedback that simply states that a stakeholder feels strongly that USCIS should change its processes but does not contain specific information on what change should be considered or how a proposed change will reduce barriers, or otherwise improve existing processes, is less useful to USCIS.

We highlight a few of those points here, noting that comments that will be most useful to DHS are those that are guided by the below principles. Commenters should consider these principles as they answer and respond to the questions in this notice:

• Commenters should identify, with specificity, the regulation or immigration process at issue, providing the Code of Federal Regulation (CFR) and/or USCIS Policy Manual citation where available or applicable. (If a new regulation is being suggested addressing

a subject matter that is not currently codified in regulations, it should be identified with as much specificity as possible and with references to the program/process and statutory authority.)

• Commenters should provide, in as much detail as possible, an explanation why a USCIS regulation, form or information collection, or immigration process should be modified, streamlined, expanded, or repealed, as well as specific suggestions about how USCIS can better achieve its regulatory objectives and reduce unnecessary burdens on public institutions, the private sector, households, individuals, or other stakeholders.

• To the extent feasible, commenters should provide specific data that document the costs, burdens, and benefits of existing requirements and/or how proposed changes would reduce costs and burdens, and/or increase benefits to USCIS or the public. Commenters might also address how USCIS can best obtain and consider accurate, objective information and data about existing regulations, processes and procedures, and whether there are existing sources of data that USCIS can use to evaluate the post-promulgation effects of DHS regulations USCIS administers over time to help identify inefficiencies and actually or potentially unwarranted barriers to those interacting with or affected by USCIS.

• Comments should emphasize any burdensome processes that have been in effect for enough time to warrant a fair evaluation, in most cases for more than one year.

• Comments that reiterate substantive issues already raised in public comments submitted on recently issued rules will be less useful, unless they provide new information—by, for example, pointing to new studies or data, or offering novel alternatives.

*C. List of Questions for Commenters*

The below non-exhaustive list of questions is meant to assist members of the public in formulating comments, and is not intended to restrict the feedback that members of the public may provide:

(1) Are there any regulations; policies; precedents or adopted decisions; adjudicatory practices; forms, form instructions, or information collections; or other USCIS procedures or requirements that you consider to be unjustified or excessive barriers that impede easy access to legally authorized immigration benefits and fair, efficient adjudications of these benefits? Please provide specific examples identifying the specific program or subject matter

(for example, adjustment of status, naturalization, H–1B nonimmigrant status, refugee status, asylum, parole).

(a) With respect to the identified regulations; policies; precedents or adopted decisions; adjudicatory practices; forms, form instructions, or information collections; or other USCIS procedures or requirements that you have identified as potential barriers, are the barriers you perceive created by duplication, overlap, or inconsistency of requirements? If so, please specify.

(2) Are there any USCIS regulations or processes that are not tailored to impose the least burden on society, consistent with achieving the regulatory objectives?

(3) Are there USCIS regulations or processes that disproportionally burden disadvantaged, vulnerable, or marginalized communities? If so, please specify the regulation and/or process, to include any applicable CFR and/or USCIS Policy Manual citation, providing a description of the specific burden to the relevant communities.

(4) Are there USCIS regulations or processes that disproportionally burden a specific industry or sector of the economy, geographic location within the US, or government type (*e.g.* a specific tribal or territorial government or a specific local government)?

(5) What aspects of the immigrant and nonimmigrant perspectives or experiences should USCIS be aware of that could better inform our qualitative and quantitative analyses when identifying actually or potentially excessive administrative burdens, or when evaluating regulatory impacts in general?

(6) Are there existing sources of data that USCIS can use to evaluate the post-promulgation effects of regulations and administrative burdens over time?

(7) Are there instances where the costs of USCIS regulations to the public far surpass the benefits, for reasons that were not anticipated or discussed during the rulemaking process?

(8) Are there instances where the administrative burdens imposed in USCIS regulations are not cost-effective, in the sense that a different approach would achieve regulatory goals with significantly lower burdens?

(9) Are there instances where current regulations may have added unintended or unanticipated costs, or imposed unintended or unanticipated administrative barriers, and in which those costs and barriers may not have been adequately considered in previous assessments of the regulation's direct costs?

(10) Are there USCIS regulations that are still necessary, but have not

operated as well as expected, such that a modified approach is justified to reduce unnecessary administrative burdens? For example, are there current regulations, policies, or procedures, specifically related to citizenship and naturalization, family-based immigration (including intercountry adoptions), educational opportunities in the United States, employment-based immigrant/nonimmigrant programs, adjustment of status, or humanitarian programs that could be modernized, streamlined, or otherwise improved?

(11) Is there information you believe USCIS currently collects that it does not need or that USCIS does not use effectively to achieve regulatory objectives?

(12) Are there data-sharing activities in which individual DHS components (for example, USCIS, U.S. Customs and Border Protection, and/or U.S. Immigration and Customs Enforcement) should engage, so that repetitive collections of the same data do not occur from one component to the next?

(13) Are there data-sharing activities in which DHS components should engage with other Federal Government agencies (such as the Departments of State, Justice, Labor, or Health and Human Services) so that repetitive collections of the same data do not occur from one agency to the next?

(14) Are there areas where DHS components' regulations (including those of USCIS) create duplicative, conflicting, or difficult to navigate situations for individuals also navigating regulatory requirements of another Federal Government agency (such as those from the Departments of State, Justice, Labor, or Health and Human Services), such that consideration of greater cooperation or coordination would be warranted?

(15) Are there regulations or forms that have been overtaken by technological developments or that should be amended as part of USCIS' eProcessing initiative?[4]

(16) Are there new technologies that USCIS should consider leveraging to modify, streamline, or do away with

---

[4] USCIS' eProcessing initiative aims to increase public availability to digital services and forms across USCIS benefits and better integrate existing USCIS systems for filing, storage, and adjudication; *see* Citizenship and Immigration Services Ombudsman, U.S. Dep't of Homeland Security, "Annual Report 2019," pages 62–69, (July 12, 2019), *https://www.dhs.gov/sites/default/files/publications/cisomb/cisomb_2019-annual-report-to-congress.pdf* (last viewed Feb. 23, 2021); *see also* U.S. Citizenship and Immigration Servs., U.S. Dep't of Homeland Security, "USCIS Accelerates Transition to Digital Immigration Processing" (May 22, 2019), *https://www.uscis.gov/news/news-releases/uscis-accelerates-transition-to-digital-immigration-processing* (last viewed Feb. 24, 2021).

existing regulatory or form requirements?

(17) Are there "bright spots," in the form of existing USCIS regulations and/or processes—or processes previously in place—that are not burdensome, and that you recommend DHS/USCIS look to as examples it can emulate in other program areas?

## IV. Review of Public Feedback

DHS will use the public's feedback to help initiate strategic plans, consider reforms, and execute reports pursuant to President Biden's requests of DHS outlined in E.O. 14012. DHS will also use the public's feedback to consider reduction of administrative burdens more broadly. This notice is issued solely for information and program-planning purposes. Public input provided in response to this notice does not bind DHS to any further actions, to include publishing a formal response or agreement to initiate a recommended change. DHS will consider the feedback and make changes or process improvements at its sole discretion. Commenting on this notice is not a substitute for commenting on other ongoing DHS rulemaking efforts. To be considered as part of a specific rulemaking effort, comments on DHS rules must be received during the comment period identified in the relevant rule published in the **Federal Register**, and in the manner specified therein. Finally, comments submitted in response to this notice will not be considered as petitions for rulemaking submitted pursuant to 5 U.S.C. 553(e) unless they comply with DHS regulations at 6 CFR part 3, *Petitions for Rulemaking.*

**Tracy L. Renaud,**
*Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.*

[FR Doc. 2021–07987 Filed 4–16–21; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6255–N–02]**

## Notice of Intent To Prepare a Draft Environmental Impact Statement (EIS) for the One San Pedro Specific Plan Project in Los Angeles City, California; Correction

**AGENCY:** Office of the General Counsel, HUD.

**ACTION:** Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS), correction.

---

**SUMMARY:** On April 5, 2021, HUD published a Notice of Intent in the **Federal Register** entitled "Notice of Intent To Prepare a Draft Environmental Impact Statement (EIS) for the One San Pedro Specific Plan Project in Los Angeles City, California." The Notice of Intent, as required by the National Environmental Policy Act (NEPA) and the California Environmental Quality Act (CEQA), notified the public of a second Public Scoping Meeting on April 27, 2021 to discuss a combined Environmental Impact Report (EIR) and Environmental Impact Statement (EIS) for the Rancho San Pedro public housing redevelopment project, located in Los Angeles, California. The notice provided the incorrect Zoom link and call-in information for the Public Scoping Meeting. Today's notice provides the correct Zoom link and call-in information for the public to use for the Tuesday, April 27, 2021 Public Scoping Meeting.

**DATES:** The Public Scoping Meeting to satisfy NEPA requirements will be held virtually on Tuesday, April 27, 2021, from 5 p.m. to 6:30 p.m. Pacific Time, at *https://zoom.us/j/92936528288?pwd=RmN5NFJ0bVlVYi8wS2JLWXd1ekpnZz09* or by calling (669) 900–6833 (Meeting ID: 929 3652 8288, Passcode: 392390).

**FOR FURTHER INFORMATION CONTACT:** With respect to this technical correction, contact Aaron Santa Anna, Associate General Counsel for Legislation and Regulations, Department of Housing and Urban Development, 451 7th Street SW, Room 10238, Washington, DC 20410; telephone number 202–708–1793 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at 800–877–8339 (this is a toll-free number).

**SUPPLEMENTARY INFORMATION:** On April 5, 2021 (86 FR 17621) (FR Doc. 2021–06929), HUD published a Notice of Intent in the **Federal Register** entitled "Notice of Intent To Prepare a Draft Environmental Impact Statement (EIS) for the One San Pedro Specific Plan Project in Los Angeles City, California." For projects that require an Environmental Impact Statement (EIS), the Responsible Entity, as defined in 24 CFR 58.2(a)(7), must provide a Notice of Intent (NOI) to begin the public scoping process in accordance with the National Environmental Policy Act of 1969, as amended, 42 U.S.C. 431 *et. seq.* (NEPA); the Council of Environmental Quality (CEQ) NEPA Regulations at 40 CFR parts 1500–1508; and HUD

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 1, 100, 103, 204, 207, 208, 209, 211, 212, 213a, 214, 223, 235, 236, 238, 240, 241, 244, 245, 245a, 248, 264, 265, 270, 274a, 287, 292, 299, 301, 310, 312, 316, 319, 320, 322, 324, 325, 328, 329, 330, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 343a, 343b, 343c, 392, and 499**

**[CIS No. 2481–09; DHS Docket No. USCIS–2009–0022]**

**RIN 1615–AB83**

## Immigration Benefits Business Transformation, Increment I

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** The Department of Homeland Security (DHS) is amending its regulations to enable U.S. Citizenship and Immigration Services (USCIS) to migrate from a paper file-based, non-integrated systems environment to an electronic customer-focused, centralized case management environment for benefit processing. This transformation process will allow USCIS to streamline benefit processing, eliminate the capture and processing of redundant data, and reduce the number of and automate its forms. This transformation process will be a phased multi-year initiative to restructure USCIS business processes and related information technology systems. DHS is removing references to form numbers, form titles, expired regulatory provisions, and descriptions of internal procedures, many of which will change during transformation. DHS is also finalizing interim rules that permitted submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form and that removed references to filing locations for immigration benefits. In addition, in this rule DHS is publishing the final rule for six other interim rules published during the past several years, most of which received no public comments.

**DATES:** *Effective date:* This rule is effective November 28, 2011.

*Comment date:* Written comments must be submitted on or before October 28, 2011.

**ADDRESSES:** You may submit comments, identified by DHS docket number USCIS–2009–0022 by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* You may submit comments directly to USCIS by e-mail at *uscisfrcomment@dhs.gov.* Include DHS docket number USCIS–2009–0022 in the subject line of the message.

• *Mail:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. To ensure proper handling, please reference DHS docket number USCIS–2009–0022 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. Contact Telephone Number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Dan Konnerth, Policy Chief, Office of Transformation Coordination, U.S. Citizenship and Immigration Services, Department of Homeland Security, 633 Third St., NW., Washington, DC 20529–2210. Contact Telephone Number is (202) 233–2381.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Background
  A. Introduction
  B. Authority
  C. USCIS Transformation Initiative
  D. How Transformation Will Work
  E. Other Regulatory Changes Necessary for the Transformation Initiative
III. The Changes Made by This Rule
  A. Removing References to Form Numbers and Form Titles
  B. Removing References to Position Titles Within USCIS
  C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices
  D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests
  E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes
  F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency and To Remove Duplicative Information
IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule
V. Discussion of Other Interim Final Rules Being Finalized
  A. Application for Refugee Status; Acceptable Sponsorship Agreement
  Guaranty of Transportation, RIN 1615–AA24
  B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57
  C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96
  D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32
  E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14
  F. Revoking Grants of Naturalization, RIN 1615–AA30
VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule
VII. Regulatory Requirements
  A. Administrative Procedure Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866
  E. Executive Order 13132
  F. Executive Order 12988 Civil Justice Reform
  G. Paperwork Reduction Act
  H. Regulatory Flexibility Act

## I. Public Participation

Interested persons are invited to submit written data, views, or arguments on all aspects of this rule. Comments that will provide the most assistance to USCIS in developing these procedures will reference a specific portion of this rule, explain the reason for any recommended change, and include data, information, or authority that support the recommended change.

*Instructions:* All submissions must include the component name and DHS docket number USCIS–2009–0022. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http:// www.regulations.gov.* Submitted comments may also be inspected at the Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020.

## II. Background

### A. Introduction

U.S. Citizenship and Immigration Services (USCIS) receives approximately six million immigration benefit requests each year, comprised of more than fifty types of applications and petitions. USCIS historically accepted paper applications and depended on paper files. These applications and

paper files were the only means for USCIS to adjudicate applications and petitions and that paper-based process, by contemporary standards, was inefficient. Until recently, USCIS processed on paper all immigration benefits, verified the identity of applicants, and provided other government agencies with the information required to quickly identify criminals and possible terrorists.

USCIS is modernizing its processes and systems in light of the development of technology to accommodate and encourage greater use of electronic data submission, to include e-filing and electronic interaction. USCIS will not eliminate paper filing at this time but will convert the data from paper filing to an electronic medium when the completed form is received. USCIS will then operate in an electronic environment fostering greater operational efficiency, provide transparency, and improve access to information through online accounts for those who do business with USCIS.

The Department of Homeland Security (DHS) and USCIS began the transformation of USCIS operations by eliminating regulatory references to filing locations for immigration benefits, thereby permitting USCIS to more rapidly adjust filing locations to meet demand and operational needs and to provide that information on petition and application forms and through other means, such as on the USCIS Web site. *See Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision to Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms,* 74 FR 26933 (June 5, 2009) ("Filing Location Rule").

DHS is expanding on the Filing Location Rule by affording additional flexibility for applicants and petitioners to file, and for USCIS to receive and process, benefit requests, biometrics, and supporting documentation in an electronic environment. For example, amendments in this rule to 8 CFR 103.2(a)(1) (relating to filing), 8 CFR 103.2(a)(7) (relating to receipt dates), and 8 CFR 103.8 (relating to delivery of notices) each replace language geared solely to paper files and benefit requests with language that is equally applicable in a paper or electronic environment.

*B. Authority*

The Government Paperwork Elimination Act (GPEA), Public Law 105–277, tit. XVII, section 1703, 112 Stat. 2681, 2681–749 (Oct. 21, 1998), 44 U.S.C. 3504 note, provides that, when possible, Federal agencies use electronic forms, electronic filing, and electronic submissions to conduct agency business with the public. GPEA establishes the means for the use and acceptance of electronic signatures. This rule will significantly enhance the ability of USCIS to fully implement GPEA. The Homeland Security Act of 2002, Public Law 107–296, section 102, 116 Stat. 2135 (Nov. 25, 2002), 6 U.S.C. 112, and the Immigration and Nationality Act of 1952, as amended (INA or Act), section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security with administration and enforcement of the immigration and naturalization laws. DHS implemented an electronic signature provision for immigration benefit filings with USCIS in 2003. *Electronic Signature on Applications for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). The Secretary promulgates this final rule under the broad authority to administer the Department of Homeland Security, and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority.

DHS is also adding new fees to the USCIS fee regulations as required by recent legislation. Effective August 13, 2010, Public Law 111–230 imposes additional fees on certain H–1B and L–1 nonimmigrants. 124 Stat. 2485 (Aug. 13, 2010); New 8 CFR 103.7(b)(1)(v).

*C. USCIS Transformation Initiative*

USCIS is engaged in an enterprise-wide transformation effort to implement new business processes and to improve service, operational efficiency, and national security. USCIS's new operational environment will employ online accounts, such as those used by many private sector organizations.

Applicants and petitioners will be able to access individualized accounts that will provide electronic access to information on how to apply for benefits, allow easier filing, and permit applicants and petitioners, and their representatives, to track the status of open applications and petitions. Applicants and petitioners will be able to use a secure USCIS Internet Web site to access accounts "on-demand" in an electronic service environment available at all times.

USCIS will develop new automated case management tools to access data electronically, prevent the loss of information, and provide adjudicators with a comprehensive view of an alien's immigration history. USCIS's electronic environment will facilitate and expedite information collection, reduce benefit fraud and result in more consistent and efficient decisions. USCIS is supplementing existing paper filing options by adding more user-friendly electronic filing options.

USCIS will improve many of its internal security, operational efficiency, and public service capabilities as transformation proceeds. USCIS will first allow the creation of accounts for various applicants, followed by enhanced e-filing and case management capabilities, and then improve reporting and Freedom of Information Act (FOIA), 5 U.S.C. 552, tools. Once deployed, these tools will be applied and made available to the immigrant, humanitarian, and nonimmigrant applicant populations.

USCIS's transformation to an electronic environment is based on three objectives and long-term benefits: enhanced national security and integrity of filings, public service, and operational efficiency. USCIS's transformation will use modern electronic audit and investigative methods to improve national security and integrity by identifying potential fraud and other risks by effectively collecting, analyzing and sharing information used to verify an alien's or other individual's identity and eligibility for various immigration benefits. USCIS will use a more complete picture of an alien's immigration history by analyzing information across benefit applications, thus exposing those attempting to perpetrate fraud or who are otherwise ineligible for immigration benefits. For example, an applicant's or beneficiary's marital or employment history in an existing agency file or in another pending application may provide relevant information that differs from the information in the application or petition being adjudicated. A responsible and transparent approach toward the handling of such personal information protects the rights of individuals and organizations interacting with USCIS and thereby fosters their trust and cooperation. At the same time, this approach facilitates authorized sharing of information with partner components of DHS—such as U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—in a secure environment that better protects against unauthorized disclosures. This approach will facilitate authorized sharing of information with partner agencies—such as the Department of State (DOS) and the Department of Justice (DOJ). In addition, electronic transmission and storage of information is faster, less costly and more secure than the physical movement of paper files.

USCIS will improve public service by adjudicating requests for benefits more accurately and quickly, and by providing more timely and accurate information about immigration benefits and the status of benefit requests. Applicants, petitioners, and their representatives will have access to relevant forms, instructions, case status, and other actions and information through online accounts that organize information and transactions to meet their needs. DHS will continue to ensure the confidentiality of its immigration records in accordance with the requirements of the law, including the Privacy Act, 5 U.S.C. 552a,[1] and 8 CFR 208.6. USCIS's transformation to an electronic environment will enable it to become an innovative and agile organization that better understands its workload and best uses all available resources, investing in its people and infrastructure to ensure cost-effective and consistent results.

### D. How Transformation Will Work

USCIS adopted a "person-centric" business approach to transformation based on establishing various types of individual and organizational accounts. The key to this approach is encouraging individual applicants, petitioners, beneficiaries, organizations, legal representatives, and others who interact with USCIS to access their own online accounts. Applicants, petitioners, and others will be able to electronically submit benefit requests with supporting documentation, access status information regarding pending benefit requests, change their addresses and contact information, obtain FOIA-related materials, and comply with some registration requirements of the Immigration and Nationality Act.

USCIS's transformation will create an end-to-end electronic adjudicative process encompassing an alien's entire immigration lifecycle, unlike the current process that uses multiple systems and focuses on each individual benefit request. Data initially provided by account holders will be reused, if appropriate, to reduce data entry required for subsequent benefit requests. Additional and revised data will be used to update and enhance account information. Account data submitted to support various immigration benefit transactions will be verified, where feasible and appropriate, through links to other internal and external data systems, potentially reducing the need for applicants and petitioners to provide certain forms of supporting evidence and reducing potential requests for evidence from USCIS.

USCIS's transformation will eventually affect all aspects of USCIS benefit processing operations and technology. This operational concept is intended to standardize processes across USCIS operations relating to case intake, biometrics, background checks, adjudication, scheduling, and notifications. USCIS benefit adjudication operations will be changed incrementally from a paper- and hard copy file-based process to an electronic process, making it possible to process benefit requests more efficiently. With the implementation of these improvements, USCIS will enhance the overall process.

### E. Other Regulatory Changes Necessary for the Transformation Initiative

DHS anticipates that additional regulatory changes will be required over the next several years as the transformation of USCIS to an electronic environment progresses. DHS expects, for example, to revise regulations pertaining to filing and handling of immigrant benefit requests to lead to computer system enhancements applied to immigrant applications and benefits. DHS will not make transformation-related changes to 8 CFR part 214 at this time, but will publish a separate rulemaking to address business transformation as well as reorganizing and simplifying that part.

### III. The Changes Made by This Rule

DHS is amending those parts of chapter I of 8 CFR that regulate affidavits of support, citizenship and naturalization, employment authorization, nonimmigrant benefits (other than part 214) and related waivers, permanent resident documents, refugee and asylum processing, Temporary Protected Status, and travel documents. These amendments are best understood by the changes effected, rather than as individual amendments to the regulations.

### A. Removing Form Title and Number References, and Adding Filing Definitions

DHS is removing references to form numbers and form titles. At this time, USCIS will continue to accept paper submission of most applications, petitions, and benefit requests, although it will phase out references to mandatory use of specific forms for specific purposes in the regulations. Mandating in regulations specific form numbers reduces USCIS's ability to modify its business processes to reflect filing procedures in an electronic environment. Form names and numbers will continue to exist for reference purposes but will not be specifically referenced in the regulations. This rule is an early step in the transformation process and purposely does not remove all form references from all regulations affecting USCIS procedures at this time. Forms identified by number will continue to appear until other parts of DHS regulations are amended to address transformation requirements. The list of prescribed forms will be removed from 8 CFR parts 299 and 499, although USCIS will continue to refer to form numbers on its Internet Web site, at *http://www.uscis.gov,* and public information telephone scripts. DHS components ICE, and CBP will likewise continue to refer to form numbers on their Internet Web sites, *http://www.ice.gov,* and *http://www.cbp.gov.*

In most instances, DHS is removing form names and numbers by replacing the form reference with a generic statement, such as "the form designated by USCIS." Removal of these references from a paragraph or section in some instances, however, requires changes which cannot be achieved through replacement of a term or phrase. In those instances, the entire paragraph is revised.

DHS is removing references to the specific forms known by form numbers: AR–11, G–28, G–325, I–90, I–94, I–102, I–129, I–130, I–131, I–191, I–192, I–193, I–212, I–290B, I–407, I–512, I–539, I–551, I–566, I–589, I–590, I–601, I–602, I–607, I–644, I–688, I–730, I–765, I–797, I–797A, I–797B, I–821, I–854, I–864, I–864A, I–864P, I–865, I–907, I–914, I–917, I–918, N–300, N–400, N–426, N–565, N–600, and N–643. This list is not intended to be exhaustive, nor are all references to the listed forms removed by this final rule. Additional references to these and other USCIS forms will be phased out in subsequent rules. DHS is not removing references to forms that primarily affect the functions of DHS components other than USCIS.

Enumerating OMB control numbers for USCIS information collection requirements in regulations is no longer necessary and, therefore, 8 CFR 100.7 is being removed. OMB control numbers continue to be displayed on USCIS forms pursuant to the Paperwork

---

[1] The Privacy Act grants United States citizens and lawful permanent residents the right to access and amend their records. DHS policy, as a matter of discretion, permits nonimmigrant aliens equivalent ability to access and correct records. *Memorandum for Directorate and Component Leadership from Hugo Teufel III, Chief Privacy Officer, DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons,* Memorandum 2007–1 (January 19, 2007), found at *http://www.dhs.gov/xlibrary/assets/privacy/privacy_policyguide_2007-1.pdf.*

Reduction Act, 44 U.S.C. 3512, and on the USCIS Internet Web site.

DHS is adding new definitions for "application," "petition," and "benefit request" to transition from "forms" to either paper or electronic instruments used to seek various immigration benefits. The terms "application" and "petition" are used together, separately, and interchangeably in many sections of chapter I of the 8 CFR and this rule does not affect every reference to those terms. The term "benefit request" is often used in the sections amended by this rule in place of application or petition in the interest of economy of words, to reduce the ambiguity and confusion resulting from the constant use of both terms, improve readability, and to add flexibility for describing what a particular capability may be called when it is converted to an electronic interaction. No substantive change results from defining these terms in this rule.

As the USCIS transformation initiative progresses, electronic versions of forms and digital images of supporting documents will largely replace paper forms and documents for adjudication and records retention purposes. USCIS will specify the process and standards for the transmission of electronic benefit requests and supporting documents on its Internet Web site, but it is intended that these standards will accommodate the technology in most home and public computers so as to be widely accessible.

DHS is adding a definition of "form instructions" to establish that the term refers to the most recent, approved version of such instructions available through the USCIS Internet Web site, regardless of the fact that other editions of these instructions may exist and be in circulation through other sources. Whether published in paper form or on the USCIS web site, all form and form instructions will continue to comply with Paperwork Reduction Act requirements, including public notice and comment periods. 44 U.S.C. 3507. In addition to traditional instructions appended to a USCIS form, the term as defined by this rule encompasses the process information (*e.g.,* filing locations, instructions on the process for submission of supporting documents) that USCIS publishes on its Internet Web site in addition to those traditional instructions, and may also include non-form and non-substantive guidance such as appendices, exhibits, guidebooks, or manuals.

USCIS does not publish its Registration for Classification as Refugee, Form I–590, with instructions for the U.S. Refugee Admissions Program (USRAP), for general public use. Access to the USRAP is managed by DOS, and implemented by its overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Registration for Classification as Refugee. As such, the term "form instructions" includes process information that USCIS publishes about the USRAP.

DHS is adding a definition for the terms "execute" or "executed" when referring to completion of an application or petition to expand a benefit to ensure consistency across paper and electronic media.

*B. Removing References to Position Titles Within USCIS*

Wherever possible, DHS is removing references to official position titles used within DHS or used in the past by the former Immigration and Naturalization Service (INS). These titles include director, district director, and commissioner as well as position descriptions such as examiner or adjudicator. Both position titles and delegated authority to perform specific duties assigned to USCIS employees are subject to change, potentially rendering regulatory references inaccurate or delaying implementation of planned operational changes. DHS is revising those titles and position descriptions with USCIS, DHS, or other component names, as appropriate and necessary to provide DHS with the operational flexibility required to facilitate adjudication in an electronic environment. DHS is also replacing obsolete references to the Attorney General, substituting the Secretary where appropriate.

DHS is, for example, amending 8 CFR 103.7(d) by removing the specific titles of USCIS employees who are designated to certify official immigration records. DHS and USCIS will delegate authority to appropriate officials who may be required to fulfill this responsibility.

*C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices*

The definition of "Service" in newly designated 8 CFR 1.2 is amended to provide flexibility and promote the goals of transformation. The regulations in chapter I of the 8 CFR contain provisions that, to varying degrees, govern facets of all of the immigration components of DHS—CBP, ICE, and USCIS. Where DHS has determined that the section being amended by this rule applies only to USCIS, that defined acronym is inserted to replace the

previously named office, position, title, or component. Where the section pertains to an action that may have been taken by INS, or a function that is the purview of or shared with another component, the term "the Service" is retained or inserted. Thus, "the Service" in 8 CFR may refer to any immigration-related component of DHS, including USCIS, ICE, or CBP. As DHS does not purport to revise every paragraph within 8 CFR, the absence of a change to an existing usage of "Service" in a particular context does not necessarily indicate a position with respect to component authority in that context. Similarly, remaining references to the former Immigration and Naturalization Service and the acronym INS are replaced by more accurate terms.

*D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests*

Some parts of the regulations include details of the internal processing and handling of benefit requests or descriptions relating to submission of paper versions of benefit request forms. Administrative filing requirements, locations, and procedures will not be prescribed in regulations but will be outlined in more flexible methods of conveying instructions. This modification will not change eligibility criteria or evidentiary standards. *See, e.g.,* 8 CFR 212.7(a)(3) ("* * * If the application is approved the director shall complete Form I–607 for inclusion in the alien's file."). *See also* 8 CFR 214.2(l)(5)(ii)(E), ("* * * The consular officer shall also endorse all copies of the alien's Form I–129S with the blanket L–1 visa classification and return the original and one copy to the alien. When the alien is inspected for entry into the United States, both copies of the Form I–129S shall be stamped to show a validity period not to exceed three years and the second copy collected and sent to the appropriate Regional Service Center for control purposes.") These details are not essential to the regulations, do not add substantive requirements or impose limitations, and unnecessarily burden the text of the regulations. To the extent that this information is required to be published, 5 U.S.C. 552(a)(1)(A), (B), DHS will publish an organization and functions rule in part 2 of 8 CFR. DHS is removing these types of provisions because they are subject to change during transformation and because such information is more appropriately included within field manuals and other instructional materials that USCIS can readily revise and describe in more detail.

Terms such as "in writing," "written decision," and "written notice" have not been removed because an electronic transmission constitutes a valid writing. GPEA provides: "Electronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form." Public Law 105–277, tit. XVII, section 1707, 112 Stat. at 2681–751 (Oct. 21, 1998) . GPEA defines electronic signature as "* * * a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message; and indicates such person's approval of the information contained in the electronic message." *Id.* Thus, as provided in GPEA, a notice on the status of a request for benefits, a request for additional evidence, and a notice of approval or denial of a request for benefits may be effected by electronic communication if that method is requested by the person who has requested the benefit, notwithstanding a regulatory provision that requires such notice to be "in writing." Nonetheless, for clarity's sake, 8 CFR 103.8 provides that electronic delivery of notices suffices in appropriate circumstances. *See* new 8 CFR 103.8.

*E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes*

DHS is also removing regulatory provisions that have expired because of statutory lapses or self-executing time limits, or that are obsolete, and to make non-discretionary corrections to provisions affected by statutory amendments or extensions of time. In addition, DHS revises obsolete statutory and regulatory citations.

DHS is adding three paragraphs to USCIS fee regulations to reflect statutory fees which are already collected but which were not previously included in regulations. *See* new 8 CFR 103.7(b)(1)(i)(CCC)–(EEE). The additions provide the $1500 or $750 fee for filing certain H–1B petitions required by the American Competitiveness and Workforce Improvement Act (ACWIA), the additional fee of $500 for filing certain H–1B and L petitions established by Section 426 of the Visa Reform Act of 2004, and the additional $150 fee for H–2B petitions required by the Real ID Act of 2005. *See,* respectively, INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B); INA section 214(c)(12)(C), 8 U.S.C. 1184(c)(12)(C); INA section

214(c)(13)(C), 8 U.S.C. 1184(c)(13)(B). These fees are used, generally, for training, scholarships, and fraud detection and prevention. INA sections 286(s), (v), 8 U.S.C. 1356(s), (v). USCIS determines liability for both of these fees and calculates the amount due through a series of questions on the H and L petition form. The determination process is unchanged by this rulemaking. Provisions are also added to prescribe a fee of $2000 for certain H–1B nonimmigrants or $2250 for certain L–1 nonimmigrants as required by recent legislation. Public Law 111–230, section 402, 124 Stat. 2488 (Aug. 13, 2010). Fees collected pursuant to these sections are deposited in the General Fund of the Treasury. *Id,* at section 402(c). DHS is not required to publish these fees in the CFR since the statute is clear in requiring their collection and use. Nevertheless, most USCIS stakeholders know to refer to 8 CFR 103.7 for the proper USCIS fees, and DHS believes it is a better practice to make sure that these statutorily mandated fees are also clearly delineated along with the fees established administratively by DHS through rulemaking.

Section 209.1(f) is a companion provision to match the existing provision in 8 CFR 209.2(b), which sets out the process and standards for asylees seeking adjustment of status who require a waiver of inadmissibility. Since both refugees and asylees applying for adjustment of status are subject to identical standards for waivers of inadmissibility these standards are now reflected in this section addressing both types of applicants. INA section 209(c), 8 U.S.C. 1159(c).

Since the statutory cap on adjustment by asylees has been removed, the text referencing that cap—at 8 CFR 209.1(a)(1)(vi) and the sentence that follows—are removed. For the same reason, 8 CFR 209.2(a)(2) is revised by removing the last three sentences of the paragraph. *See* Public Law 109–13, tit. I, section 101(g), 119 Stat. 302 (May 11, 2005), 8 U.S.C. 1101 note.

DHS is revising 8 CFR 209.2(d) to clarify that a medical examination, including compliance with vaccination requirements, is required of asylees applying for adjustment of status. The vaccination supplement no longer exists as a stand-alone document but rather is incorporated into the medical examination. Form instructions provide detailed guidance regarding the medical examination requirement.

DHS is removing 8 CFR 212.8 and 212.9, relating to nonpreference investor visas and to former third and sixth

preference employment-based visas, because the provisions are obsolete. The provisions of the Act that provided for these visas were repealed by section 111 of the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (Nov. 29, 1990).

DHS is removing 8 CFR 212.11, which regards the admissibility of an alien who has been convicted of a violation of a law relating to a controlled substance because it is redundant. This section provided that in determining the admissibility of an alien who has been convicted of a violation of any law relating to a controlled substance, the term controlled substance as used in section 212(a)(23) of the Act shall mean the same as that referenced in the Controlled Substances Act, 21 U.S.C. 801, *et seq.* Section 212(a)(2) of the Act governs inadmissibility for criminal acts and Section 212(a)(2)(A)(i)(I) specifically includes violations of the Controlled Substance Act. INA section 212(a)(2)(A)(i)(II), 8 U.S.C. 1182(a)(2)(A)(i)(II).

DHS revised Section 244.17 to reflect current policies and procedures for re-registration of TPS beneficiaries.

DHS is removing 8 CFR 245.1(e)(2) as obsolete. This section provided for the adjustment of status of certain nonimmigrant registered nurses in accordance with the Immigration Nursing Relief Act of 1989, Public Law 101–238, 103 Stat. 2099 (Dec. 18, 1989), 8 U.S.C. 1182 note. The application period for this provision ended on March 20, 1995, and USCIS no longer has pending applications related to this provision. This regulation also makes related conforming changes to 8 CFR 245.1(g)(1) and 245.2(a)(5)(ii).

Section 245.9 is removed. This section provided for adjustment of status for certain Chinese nationals pursuant to the Chinese Student Protection Act, Pub. L. 102–404, 106 Stat. 1969 (Oct. 9, 1992). The application period for this provision ended June 30, 1994, and USCIS no longer has pending applications related to this provision. *Id.*

Section 245.12 is removed. This section provided for adjustment of status for certain Polish and Hungarian parolees pursuant to section 646 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996). Persons eligible for benefits under this provision must have been paroled into the U.S. prior to December 31, 1991. USCIS has not received applications pursuant to this section for several years and is unlikely to receive any in the future. Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996).

Section 245.13 is removed. This section provided for adjustment of status for certain nationals of Nicaragua and Cuba pursuant to section 202 of the Nicaragua Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2160, 2193 (Nov. 19, 1997). The application period for benefits under this provision ended April 1, 2000. USCIS no longer has pending applications pursuant to this provision. *Id.*

Section 245.20 is removed . This section provided for adjustment of status of Syrians granted asylum under the Syrian Adjustment Act, Public Law 106–378, 114 Stat. 1442 (Oct. 27, 2000). Eligibility under this provision required entry prior to Dec. 31, 1991. USCIS no longer has pending applications pursuant to this provision and is unlikely to receive any in the future.

Section 245.21 is revised because the Consolidated Appropriations Act of 2005 amended the Indochinese Parolee Act to eliminate the 3-year filing window and 5,000 visa limit.

Parts 264 and 265 are revised to encompass management of fingerprinting, registration, and address reporting requirements in an electronic environment and to remove obsolete references.

This rule adds 8 CFR 316.6 and revises 8 CFR 316.5, 8 CFR 322.2, and 8 CFR 341.5 to conform to the amendments to the Act by the National Defense Authorization Act (NDAA 2008), Public Law 110–181, 122 Stat. 3 (Jan. 28, 2008). The NDAA 2008 provides certain immigration benefits for any qualifying spouse or child of a member of the Armed Forces. Specifically, the NDAA 2008 amended section 319(e) of the Act; 8 U.S.C. 1430(e), to allow certain spouses of members of the Armed Forces to count any qualifying time abroad as continuous residence and physical presence in the United States for purposes of naturalization and to permit such naturalization to occur outside the United States. INA section 319(e), 8 U.S.C. 1430(e); INA section 322(d), 8 U.S.C. 1433(d); 8 U.S.C. 1443a.

This rule revises 8 CFR 319.3 to conform to the amendments to the INA by the National Defense Authorization Act (NDAA 2004), Public Law 108–136, 117 Stat. 1565 (Nov. 24, 2003), which provides certain immigration benefits relating to the naturalization of any qualifying surviving child or parent of a member of the Armed Forces. Specifically, NDAA 2004 provides for the naturalization of any qualifying surviving child or parent of a member of the Armed Forces who dies during a period of honorable service, a benefit

only previously afforded to surviving spouses. INA section 319(d), 8 U.S.C. 1430(d).

This rule revises 8 CFR 322.3 to conform to the various legislative amendments to the Act. Specifically, 8 CFR 322.3(a) was revised to conform to the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, enacted on November 2, 2002, which amended section 322 of the Act to allow U.S. citizen grandparents and U.S. citizen legal guardians to apply for naturalization on behalf of a child born and residing outside of the United States. Public Law 107–273, 116 Stat. 1758 (Nov. 2, 2002); *see* INA section 322, 8 U.S.C. 1433(a). Such an application by the U.S. citizen grandparent or U.S. citizen legal guardian can be made within 5 years of the death of a U.S. citizen parent of a child who could otherwise have been the beneficiary of an application for naturalization under section 322 of the Act. *See Id.* This change will conform the regulations to legislation and current practice.

In addition, current 8 CFR 322.3(a) requires the citizen parent (or, as appropriate, grandparent or guardian) to include with the application a request concerning when the applicant would like to have the child's naturalization interview scheduled. The form instructions elicit the information needed to schedule the interview. Therefore, there is no need for a separate provision on this point in 8 CFR 322.3(a).

This rule revises 8 CFR 322.3(b) to conform to the amendments to the Act made by the Intercountry Adoption Act of 2000, Public Law 106–279, which added a definition of certain adoptees to section 101(b)(1)(G) of the Act on October 6, 2000. 114 Stat. 825 (Oct. 6, 2000). The new definition describes children adopted in a foreign state that is a party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption of May 22, 1993. INA section 101(b)(1)(G), 8 U.S.C. 1101(b)(1)(G). That definition under section 101(b)(1)(G) of the Act corresponds to the visa categories IH–3 and IH–4 and became effective when the Hague Adoption Convention entered into force in the United States on April 1, 2008. *See id.* USCIS implemented the Intercountry Adoption Act by publishing an interim rule, "Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention," on October 4, 2007. *See* 72 FR 56831 (Oct. 4, 2007). The additional changes in this rule conform

to the requirements codified on that date and which have been followed since April 1, 2008.

In addition, several expired and obsolete naturalization-related regulatory provisions have been removed, including 8 CFR: 312.3(a) (standardized citizenship testing), 329.5 (natives of the Philippines with active duty service during World War II), 332.2 (establishment of photographic studios), 334.16–334.18 (naturalization petitions), 335.11–335.13 (naturalization petitions), 338.11 and 338.12 (naturalization court processes), 339.2(c) (reports relating to petitions filed prior to October 1, 1991), and 340.1 (reopening of a naturalization application by a district director pursuant to section 340(h) of the Act).

In 8 CFR 312.3, paragraph (a) is removed because the "standardized citizenship testing" for applicants for naturalization ended on August 30, 1998. *See* 63 FR 25080 (May 6, 1998).

Section 329.5 is removed because the filing period for submitting an application for naturalization under section 405 of the Immigration Act of 1990, the corresponding statutory naturalization authority, expired on February 3, 1995. *See* 8 CFR 329.5(e).

Sections 334.16–334.18, 335.11–335.13, and 339.2(c) are removed because they relate to any "petition for naturalization" filed prior to October 1, 1991. Such petitions were under the jurisdiction of the naturalization court until that date. *See* 8 CFR 310.4; INA section 310, 8 U.S.C. 1421.

*F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency, and To Remove Duplicative Information*

DHS is reorganizing 8 CFR part 1 (Definitions) and 8 CFR part 103 (Immigration Benefits, Biometric Requirements, Availability of Records), without substantive change. The reorganization of these sections does not introduce new obligations, requirements, or procedures. The reorganization is designed to simplify and rearrange existing regulatory requirements in a manner which is easier for the public to identify and understand. This rulemaking also removes regulatory provisions which repeat statutory or other regulatory information or which restate filing information that USCIS routinely includes in its form instructions. None of the changes made effect a substantive change in the law. DHS is also reorganizing certain parts of 8 CFR without substantive change. DHS intends, in the recodification of these regulations, to conform to the understood policy, intent, and purpose of the original regulations, with such

amendments and corrections as will remove ambiguities, contradictions, and other imperfections.

The regulations pertaining to filing and adjudication of immigration benefits are contained in 8 CFR 103.2. That section also incorporates the specific requirements contained in USCIS form instructions. *See* 8 CFR 103.2(a)(1). Repeating or paraphrasing parts of this information within other regulations that relate to specific benefits is unnecessary, possibly confusing, and may be inaccurate. Such repetition can lead the reader to conclude that a provision is somehow uniquely applicable to that particular benefit type. For example, "* * * The director shall consider all the evidence submitted and such other evidence as he or she may independently require to assist his or her adjudication" is repetitive information found within another regulation. *See* 8 CFR 214.2(h)(9)(i). Or, "* * * A copy of a document submitted in support of a visa petition filed pursuant to section 214(d) of the Act and this paragraph may be accepted, though unaccompanied by the original, if the copy bears a certification by an attorney, typed or rubber-stamped, in the language set forth in § 204.2(j) of this chapter. However, the original document shall be submitted if requested by the Service" is both repetitive and inaccurate because the referenced paragraph and procedure no longer exist. *See also* 8 CFR 214.2(k)(1).

This rule organizes 8 CFR part 103 into four subparts: subpart A—Applying for Benefits, Surety Bonds, Fees; subpart B—Biometric Requirements; subpart C—Reserved; and subpart D—Availability of Records.

Section 103.1 is removed. The delegation of authority, formerly found in 8 CFR 103.1(a), was redundant of authority specified in 8 CFR 2.1. Section 103.2(a) is revised, primarily to describe alternate procedures for electronic submission of benefit requests with digital images of supporting documentation. With the definition of "benefit request" added in 8 CFR part 1, the terms "application" and "petition" are being replaced by the term "benefit request" to reduce possible confusion regarding the use of specific paper versions of forms traditionally required to apply for benefits. As stated earlier, the terms "petition" and "application" are not being replaced throughout the rest of this chapter I and will be accorded the meaning now ascribed to them in 8 CFR part 1. Although this paragraph was recently revised, the additional changes made by this rule will clarify filing procedures for both the current

environment and the electronic environment.

Section 103.2, paragraph (a)(7) is revised to describe establishment and recordation of filing dates for benefit requests in an electronic environment. That paragraph had previously described procedures that reflected regular mail, hand delivery, and internal actions of USCIS for physically handling paper, such as stamping files with dates by hand. Specific internal procedures for determining how receipt dates and times are to be associated with a particular benefit request for which date and time are appropriate, or even essential, will be established for requests that will be received electronically, in paper format, or both. USCIS realizes that the date of filing is very important when a benefit request has a deadline or a date-specific impact on eligibility. Such benefit requests are not affected by this rule because the date the benefit request is received by USCIS will still be recorded in the system. While the internal process for recording the date when a request is received or complete will not be promulgated, the ability of filers of a benefit request to obtain a definitive receipt date will not be affected by removing the requirement for USCIS to stamp receipt dates.

In addition, 8 CFR 103.2(a)(7) is revised to eliminate possible inconsistency with 8 CFR 103.2(a)(1), clarifying that USCIS may reject a benefit request if data have not been entered in required fields. Further, 8 CFR 103.2(a)(7)(iii) is added to codify the current policy that there is no appeal when a case is rejected in accordance with this section. In USCIS parlance, the term "rejected" means that the benefit request and fee payment are returned for failure to comply with all filing requirements without being fully considered, and can be re-filed when properly completed, while "denied" means that the request is fully adjudicated and considered, and the applicant is determined ineligible for the benefit sought. Appeals of rejections are generally returned without consideration. Therefore, this change is only clarifying and has no substantive effect.

Section 103.2(b)(1) is revised to update terminology and to clarify that every applicant or petitioner must remain eligible for the benefit request at the time of adjudication and that every benefit request must be submitted with all prescribed supporting documentation. USCIS longstanding policy and practice, as well as a basic tenet of administrative law, is that the decision in a particular case is based on

the administrative record that exists at the time the decision is rendered. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402 (1972). Thus, the granting of any benefit request by DHS is not based solely on what is provided at the time of the initial request and is contingent on the fact that circumstances will not change during the processing of a benefit request in such a way so as to render the applicant ineligible. This change will reduce any confusion that may exist for those who believe that eligibility is based solely on what is provided at the time of the initial request and instead will clarify that eligibility is subject to change if circumstances change while processing occurs. This clarification may be especially important in the transformed electronic environment. This revision is not a substantive change in eligibility criteria and is thus appropriate for this final rule.

Sections 103.2, paragraphs (b)(4) and (b)(5) are revised to refer applicants and petitioners to form instructions and other sources for information on the format in which supporting documentation must be submitted. It is generally unnecessary to specify the form that an evidentiary document must be in unless a higher degree of authenticity is required than a photocopy or reasonably legible facsimile. The form instructions for a benefit request will clearly spell out when a copy, original, certified, notarized, or other specific type of document is required to meet the applicable evidentiary standard. In its transformation initiative, DHS wants to accept and use scanned or electronic documents whenever possible and believes that this approach will also be the most convenient method for the public. As stated, regulatory provisions that reflect a paper application process impede that goal. Allowing a digital format instead of a copy would not affect a person's eligibility for a benefit. Thus, this change is made without prior public comment.

This rule also eliminates express reference to Form G–884, currently used to request the return of original documents, and advises the public to follow USCIS instructions for requesting such documents. Eliminating reference to a specific form promotes greater regulatory flexibility and better accommodates future processing efficiencies. USCIS anticipates using the current form for several days during the transformation process and will continue to provide instructions for requesting the return of paper documents retained in DHS files through its Internet Web site, the USCIS

Customer Service Center, or other methods. *See* new 8 CFR 103.2(b)(4).

Section 103.3 is amended by revising the term ''shall file'' to read ''must submit'' and revising the phrase ''with the office where the unfavorable decision was made'' to read ''as indicated in the applicable form instructions'' in the last sentence in paragraph (a)(2)(i). This change will make this section more consistent with the changes made and terminology used in the Filing Location Rule. The word ''shall'' is less clear than ''must'' so substituting ''must'' clarifies the provision without changing the clear meaning. While the terms ''file'' and ''filing'' are not changed throughout 8 CFR by this rule, the amendment is apt in this instance for clarity because the term ''file'' seems to imply a paper environment, as opposed to ''submit,'' which lends itself more clearly to both paper and electronic submissions. The provision requiring submission to a certain office location is removed in favor of form instructions which, as defined in this rule, will provide the flexibility to centralize or otherwise shift appeals based on future needs and developments. No substantive change is made to eligibility requirements.

As transformation progresses, USCIS develops system interfaces with other government information systems, reducing reliance on various forms of documentation currently supplied by benefit applicants. For example, proof of military service is more readily obtained by USCIS directly from the Department of Defense than from the applicant. Section 103.2, paragraph (b)(5) has been amended to clarify that USCIS may waive submission of documentation that it may obtain through direct interfaces.

Section 103.5a is redesignated as 103.8 and revised. This revision provides for electronic delivery of notices instead of paper notices in appropriate circumstances at the petitioner's or applicant's request. Absent such a request, a mailed paper notice remains the default option at this time. Amendments to the descriptions of routine and personal service used for delivery of notices now include a specific provision for the use of electronic media for such purposes. For consistency of process, this rule amends other sections to remove specific requirements of the notice and instead cross references the notice and service provisions in 8 CFR 103.8.

Section 103.5b is redesignated as 103.9 and revised. References to Form I–824, currently used to request further action on an approved benefit request, are removed. As transformation progresses, it is envisioned that the need

for this form will diminish because account holders will request the services currently provided by the form by accessing their own accounts.

Section 103.7, paragraph (d) is amended to remove specific references to officials authorized to certify immigration records. This change will give USCIS flexibility to delegate authority for this activity to various officials as necessary for efficiency.

Section 103.2, paragraph (e), relating to fingerprint requirements, is revised and redesignated as sections 103.16 and 103.17. These sections have been reorganized and revised to reflect that most USCIS biometric collection is now accomplished digitally at USCIS offices. Paragraph (c) of 8 CFR 103.2, explaining the consequences of failure to provide biometric information, must be read in conjunction with 8 CFR 103.2(b)(13), which provides standard exceptions for such failure. This regulation removes references to specific offices where applicants must report for biometrics collection to allow USCIS greater flexibility for handling such matters. USCIS will continue to provide such information through other means.

Newly designated 8 CFR 103.17 describes biometric service fee collection requirements formerly described in 8 CFR 103.2(e). Revisions to this section more clearly reflect existing regulatory requirements regarding the authorized collection of biometrics.

Sections 103.8 through 103.11 and sections 103.21 through 103.36, which pertain to Freedom of Information and Privacy Act requests, are removed because they are outdated. Current DHS policies and procedures on these subjects are contained in 6 CFR part 5. New 8 CFR 103.42 has been added to direct readers to the DHS regulations.

Regulations relating to submission and consideration of benefit requests are located at 8 CFR 103.2(a)(1) (general filing instructions), 8 CFR 103.2(b)(1) (demonstrating eligibility for the benefit), 8 CFR 103.2(b)(16)(ii) (consideration of evidence in discretionary decisions), and in the form instructions such as for Form I–129 ''* * * By signing this form you have stated, under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form are true and correct. You have also authorized the release of any information from your records that USCIS may need to determine eligibility for the benefit you are seeking and consented to USCIS verification of such information.'' Accordingly, because processing and handling information which is broadly applicable to all USCIS

benefit types is set forth in both 8 CFR 103.2 and in the instructions to various forms, USCIS is removing such information from regulations governing consideration of specific benefits.

Section 207.1(a) is revised to instruct prospective applicants to ''submi[t] an application, including biometric information, in accordance with form instructions.'' The term ''form instructions'' is in turn defined in 8 CFR 1.2 as those prescribed by USCIS on its official Internet Web site currently, notwithstanding other versions in circulation, and may also include non-form guidance such as appendices, exhibits, guidebooks, or manuals. In the context of the U.S. Refugee Admissions Program (USRAP), USCIS does not publish its Form I–590, with instructions, for general public use. Instead, access to the USRAP is managed by the DOS, and implemented by its contracted overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Form I–590. As such, the term ''form instructions,'' as defined in 8 CFR 1.2 and used in 8 CFR 207.1(a), does not refer to traditional instructions appended to a USCIS form, but rather the process information that USCIS publishes about the USRAP.

Sections 207.1, paragraphs (b) and (c) are revised by consolidating the existing firm resettlement rule in paragraph (b) and removing paragraph (c). To emphasize the legal relevance of the firm resettlement analysis, this revision moves the third sentence of original paragraph (b) to the forefront. This consolidated provision more clearly articulates that the ''considerations'' enumerated in new paragraphs (b)(1) through (b)(3) apply to the firm resettlement analysis generally and not, as may be misconstrued from the existing, bifurcated structure, only to an analysis of whether an applicant is ''not firmly resettled.'' No substantive changes are made by these structural modifications of the firm resettlement rule.

Re-numbered paragraph 207.2(a) has also been re-titled from ''hearing'' to ''interview,'' to better reflect the nature of USCIS interaction with refugee applicants. No substantive change is intended.

Section 207.7(d) is amended by eliminating an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation, this rule eliminates an express

requirement that "separate" petitions be filed for each qualifying family member, in favor of guidance that petitioners file "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members. This change will accommodate the adoption of such efficiencies without need for a future rulemaking.

Section 207.7(f)(3) is amended by adding an opening phrase to the last sentence, "[f]or a derivative inside or arriving in the United States." While this section, entitled "Benefits," applies to both paragraphs (f)(1) (derivative in the United States) and (f)(2) (derivative outside the United States), the last sentence was added to clarify that the benefit of employment authorization, incident to refugee status, becomes available to overseas beneficiaries, not upon approval of the family petition, but upon travel and their admission into the United States as refugees.

Section 208.1(b) is revised by replacing "The Director of International Affairs" with "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)" where it first appears and with "Associate Director of RAIO" in later references. Similarly, section 208.2(a) is revised by replacing "Office of International Affairs" in the title with "Refugee, Asylum, and International Operations (RAIO)," and by replacing "the Office of International Affairs" wherever it appears with "RAIO." As stated earlier this rule removes specific officers' titles, functions, and authorities where possible, and employee authorities are generally established pursuant to 8 CFR section 2.1. However, DHS has determined that the roles, functions, and authorities of asylum officers and who they report to are sufficiently distinct as provided in the INA so as to preclude substitution of USCIS for those titles where they appear in the Code of Federal Regulations. For example, INA section 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), under the expedited removal statute, defines "asylum officer" as an "* * * immigration officer who (i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and (ii) is supervised by an officer who meets the conditions described in clause (i) and has had

substantial experience adjudicating asylum applications." Retaining these titles is not expected to impair USRAP and RAIO from applying the principles of transformation to their operations in the future.

Section 208.5(b)(1)(ii) is revised to perfect an amendment made in the Filing Location Rule. In that rule, 8 CFR 208.4(b) was revised by referring applicants to the instructions on the Form I–589 for specific filing information and thereafter by eliminating specific instructions contained in former sections 208.4(b)(1)–(5). This rule implements a conforming amendment to that earlier revision by removing the phrase "pursuant to § 208.4(b)" in the last sentence of 8 CFR 208.5(b)(1)(ii).

Moreover, the Filing Location Rule replaced the term "district director" with "DHS office" in two locations. With the elimination of the reference to the "district director" in former 8 CFR 208.4(b)(5) (relating to asylum applications filed with the district director), the remaining reference to "the DHS office" in new 8 CFR 208.5(b)(1)(ii) lacks an anchor to an earlier reference. To avoid confusion as to whether a specific DHS office is empowered under this provision, 8 CFR 208.5(b)(1)(ii) is revised by replacing "the DHS office" with simply "DHS" wherever it appears.

Section 208.7(c) is amended by replacing a mandatory requirement (if applicable) to submit "proof that he or she had continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review." In anticipation of future system efficiencies afforded by transformation that may allow USCIS to gather the data directly from the Executive Office for Immigration Review (EOIR) within the Department of Justice and federal courts, USCIS is modifying this provision by replacing the mandatory production requirement with more flexible text: "* * * USCIS may require that an alien establish * * *". Until such time that system improvements are in place, USCIS will continue to require production of such evidence and will communicate such requirements through form instructions, as defined in 8 CFR 1.2.

Section 208.21(c) is amended by removing an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation,

this rule eliminates an express requirement that "separate" petitions be filed for each qualifying family member, in favor of "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members.

Section 208.21(d) is revised similar to section 208.21(c) and for the same reasons.

Section 209.1(c) is amended by removing the last clause relating to a vaccination supplement completed by a designated civil surgeon. USCIS recently consolidated the separate vaccination supplement and record of the medical examination into one form, Report of Medical Examination and Vaccination Record. Thus the language referring to a separate supplement is outdated. Relevant guidance will continue to be available in form instructions. This language is also deleted in anticipation of future processing efficiencies wherein civil surgeons may have online accounts through which they may submit reports directly to USCIS instead of completing paper forms.

Section 209.2(e) is revised by removing the first two sentences of the original paragraph, retaining only the last sentence. In the original paragraph, there was an internal inconsistency between the first sentence (requiring interview of all applicants) and the third sentence (allowing USCIS to determine whether an interview was warranted). This revision retains only the sentence that allows USCIS to determine on a case-by-case basis whether an interview is warranted. This result is consistent with the companion paragraph at existing 8 CFR 209.1(d) (refugee adjustment interviews) and current USCIS practice.

Section 209.2(f) is revised for purposes of plain language. To align with the companion paragraph at 8 CFR 209.1(e), text was added stating that USCIS will notify a denied applicant of the right to renew an adjustment request in removal proceedings before EOIR. Otherwise, no substantive change is intended.

Section 223.2 is reorganized and revised for clarity in addition to removing references to forms. The revision also clarifies existing authority to accept and process requests for refugee travel documents overseas.

Several paragraphs within 8 CFR part 264 are revised and reorganized for

**Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations    **53773**

clarity. Section 264.1 (registration and fingerprinting requirements) is revised and reorganized, removing obsolete instructions, general information duplicated in 8 CFR 103.2, and fingerprinting requirements now described in 8 CFR 103.16. Section 264.5, paragraph (d) (replacement of permanent resident cards for conditional residents) is revised to remove information included on the form instructions for Form I–90. New 8 CFR 264.5(h) is added to replace information previously located in 8 CFR 264.1(h). Section 264.6 is revised to remove obsolete instructions and for clarity.

**IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule**

DHS published an interim rule with request for comments revising 8 CFR 103.2(a)(2) to permit submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form. *Electronic Signature on Applications and Petitions for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). That rule implemented the electronic filing and the acceptance of electronic signatures requirement of GPEA and meet the requirements of section 461 of the Homeland Security Act of 2002 for a study of the feasibility of online filing and to establish an electronic tracking system for applications in order to provide applicants with access to the status of their applications. Public Law 107–296 title IV, subtitle E, section 461, 118 Stat. 2202 (Nov. 22, 2002), 6 U.S.C. 278.

USCIS received 13 public comments relating to the interim rule. Virtually all commenters supported the use of electronic signatures and urged USCIS to do more to promote a more robust and user-friendly electronic filing environment. Several of the commenters made specific proposals recommending enhancements to the current limited electronic filing procedures available to applicants and petitioners. Various commenters suggested enhancements to the electronic filing process, such as acceptance of credit cards for electronic payment, re-use of data for subsequent transactions, interfaces and compatibility with commercial immigration software, standards for electronic submission of supporting documents, provisions for attorney-client electronic collaboration in the preparation of benefit requests, improvements to current biometric collection procedures, and protection of the privacy of data. DHS encourages

these types of comments in response to this rulemaking. The comments will not be addressed here individually because they exceed the scope of the interim rule, which was limited to the electronic signature process. The broad subject of the comments, electronic filing of USCIS benefit requests, will be more fully addressed as the USCIS transformation progresses.

Several commenters raised concerns about the security of electronic signatures and described the pros and cons of various existing technologies. The interim rule did not specify the technology which will be employed by USCIS for the capture and verification of electronic signatures. As the transformation initiative is implemented, USCIS will explore alternatives and adopt an appropriate solution which is fully compliant with DHS security standards and ensures privacy. Therefore, no changes are made to the interim rule as a result of the comments received and the interim rule is adopted as final without change.

**V. Discussion of Other Interim Final Rules Being Finalized**

USCIS conducted a review of current and past agency regulatory activities and identified six interim rules for which no public comments were received and which were never completed as final rulemakings. Because some of the provisions of these interim rules are now either expired or further modified by this rulemaking, DHS is adopting them as final and, where appropriate, removing or revising the regulatory language. The interim rules that are adopted as final include:

• Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, 64 FR 27660 (May 21, 1999);

• Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, 66 FR 27445 (May 17, 2001);

• Eliminating the Numerical Cap on Mexican TN Nonimmigrants, 69 FR 11287 (March 10, 2004);

• Allocation of H–1B Visas Created by the H–1B Visa Reform Act of 2004, 70 FR 23775 (May 5, 2005);

• Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and Baltic States as Employment-Based Immigrants, 70 FR 21129 (April 25, 2005); and

• Revoking Grants of Naturalization, 65 FR 17127 (March 31, 2000).

A summary of, the legal authority for, the public comments received on, and the changes made to each of these interim rules is as follows:

*A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615– AA24*

This interim rule required that all sponsorship agreements be secured before an applicant is granted admission as a refugee at a U.S. port-of-entry (POE). This is a separate decision from whether or not such persons can be admitted to the U.S. in refugee status. This rule permits advantageous treatment for applicants for refugee status who have their eligibility interviews with a DHS officer scheduled before a sponsorship agreement has been secured.

This rule implemented section 702 of the Immigration Act of 1990 (IMMACT 90), Public Law 101–649, 104 Stat. 4978 (Nov. 29, 1990). It allowed a U.S. citizen, a lawful permanent resident petitioner, or an alien applicant for permanent resident status to seek an exemption from the general prohibition against approval of immigration benefits based upon a marriage entered into while the beneficiary or applicant was under deportation, exclusion or related judicial proceedings. The rule established procedures to allow persons with bona fide marriages to obtain immigration benefits without complying with the two year foreign residency requirements instituted by the Immigration Marriage Fraud Amendments of 1988 (IMFA). This rule amended 8 CFR 204.2 and 245.1. USCIS is not modifying these provisions in the current rule.

The Act authorized the Attorney General to admit refugees to the United States under certain conditions. INA section 207, 8 U.S.C. 1157. There is no requirement for an applicant to have secured sponsorship in advance of a determination that he or she meets the Act's definition of refugee. INA section 101(a)(42), 8 U.S.C. 1101(a)(42). This rule clarified that sponsorship is a requirement separate and apart from the determination that an applicant is classified as a refugee.

USCIS received no comments on this interim final rule.

The interim rule amended 8 CFR 207.2. That section is revised further by this rule to accommodate transformation by removing form numbers, job titles, extraneous provisions, and internal procedure. USCIS has not changed the substance of the provisions added by the interim rule.

*B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57*

This rule provided adjustment of status to lawful permanent residents for

certain nationals of Syria. The interim rule discusses the eligibility requirements and sets forth procedures for the application of persons wanting to adjust their status.

The Act provides that all aliens granted asylum are eligible to apply for adjustment of status 1 year after being granted asylum, subject to a maximum of 10,000 per year. INA section 209, 8 U.S.C. 1159. Pub. L. 106–378, 114 Stat. 825 (Oct. 27, 2000), waived the annual limit for a group of Jewish Syrian nationals who were allowed to depart Syria and enter the United States after December 31, 1991, and who were subsequently granted asylum in the United States.

No public comments were received.

This final rule removes 8 CFR 245.20 which was added by the interim rule. That provision is obsolete because no eligible applicants remain.

### C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96

This interim rule eliminated the annual numerical cap on Mexican Professionals under the North American Free Trade Agreement (NAFTA). It also eliminated the petition for a Mexican-based NAFTA professional and the corresponding labor condition application (LCA) requirement. Mexican citizens who come to the U.S. under a TN classification must apply directly to DOS for a visa. DOS will then adjudicate the alien's eligibility for TN classification. Upon approval and issuance of a visa, the alien may then apply for admission to the United States. These changes to the regulations are consistent with NAFTA's requirement that the annual numerical cap and petition provisions for Mexican professionals sunset by January 1, 2004.

On December 17, 1992, the United States, Canada and Mexico signed the North American Free Trade Agreement (NAFTA), which entered into force on January 1, 1994. Public Law 103–182, title I, section 101, 107 Stat. 2061 (1993), 19 U.S.C. 3311. NAFTA allows for the temporary entry of qualified businesspersons from each of the parties to the agreement. *See* Public Law 103–182, title III, section 341(a), 107 Stat. 2116 (1993), 19 U.S.C. 3341. Professionals under the NAFTA are admitted to the United States as Trade NAFTA (TN) nonimmigrant aliens. INA section 214(e), 8 U.S.C. 1184(e). In Appendix 1603.D.4 of NAFTA, NAFTA established an annual numerical ceiling of 5,500 on Mexican TN admissions for a period of 10 years. NAFTA Appendix 1603.D.4, INA section 214(e)(4), (5), 8 U.S.C. 1184(e)(4), (5). The interim rule

eliminated the annual numerical cap for citizens of Mexico seeking a TN visa as required by expiration of the 10-year period. *Id.*

No public comments were received.

This rule finalizes the interim rule without change.

### D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32

This interim rule implemented changes made by the Omnibus Appropriations Act for Fiscal Year 2005 to the numerical limits of H–1B nonimmigrant visa category and the fees for filing of H–1B petitions. It also: (1) Informed the public of procedures USCIS used to allocate in fiscal year 2005, as well as for the future fiscal years starting with fiscal year 2006; (2) amended and clarified the process that USCIS will use in the future in allocating all petitions subject to numerical limitations under the Act; and (3) alerted the public about additional fees that must accompany certain H–1B petitions.

An H–1B nonimmigrant is an alien employed in a specialty occupation or a fashion model of distinguished merit and ability. INA section 101(a)(15)(H), 8 U.S.C. 1101(a)(15)(H); 8 CFR 214.2(h)(4). A specialty occupation requires theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree in the specific specialty as a minimum qualification for entry into the United States. *Id.* The Act provides that the number of nonimmigrants who may be issued H–1B visas or granted H–1B status may not exceed 65,000 per fiscal year. INA section 214(g), 8 U.S.C. 1184(g). The 65,000 cap does not include H–1B employees of institutions of higher education, nonprofit research organizations, or governmental research organizations. The H–1B Visa Reform Act of 2004 added a third exception to the 65,000 limit, by providing that an additional 20,000 visas would be available for an alien who has earned a master's or higher degree from a United States institution of higher education. Omnibus Appropriations Act for Fiscal Year 2005, Public Law 108–447, div. J, title IV, 118 Stat. 2809 (Dec. 8, 2004); INA section 214(g)(5)(C), 8 U.S.C. 1184(g)(5)(C). This law also raised the American Competitiveness and Workforce Improvement Act of 1998 fee (ACWIA) to $1,500 or $750, depending on the size of the employer, and imposed a $500 fraud prevention and detection fee (fraud fee) on certain employers filing H–1B petitions. *Id;* INA section 214(c)(9), 8 U.S.C. 1184(c)(9).

These fees are required in addition to the base USCIS filing fee.

No public comments were received.

This rule finalizes the interim rule without change.

### E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14

This interim rule codified the new sunset date of September 30, 2006, for the Soviet Scientists Immigration Act of 1992 (SSIA). The SSIA allowed USCIS to allot visas to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states with expertise in nuclear, chemical, biological, or other high-technology field or defense projects. The rule also codified a new numerical limit of 950 visas (excluding spouses and children if accompanying or following to join).

The SSIA provided that up to 950 immigrant visas may be allotted to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states if the scientists or engineers had expertise in nuclear, chemical, biological or other high technology fields or were working on such high technology defense projects, as defined by the Attorney General. Public Law 102–395, title VI, section 610, 106 Stat. 1874 (Oct. 6, 1992); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A). This program expired on October 24, 1996. The Foreign Relations Authorization Act, Fiscal Year 2003 reinstated the program and, among other changes not applicable to this interim rule, provided that it would expire 4 years from the date of enactment. Public Law 107–228, div. B, title XIII, section 1304(d), 116 Stat. 1437 (Sept. 30, 2002); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A).

No public comments were received.

This rule removes provisions pertaining to the SSIA because they have expired. 8 CFR 204.10.

### F. Revoking Grants of Naturalization, RIN 1615–AA30

This rule amended the process by which the Service would administratively reopen and revoke a grant of naturalization. This interim rule changed the burden of proof that the Service would use in revocation proceedings and made other changes to the administrative process. 65 FR 17127 (March 31, 2000).

The Secretary has sole authority to grant a person naturalization as a United States citizen. INA section 310(a), 8 U.S.C. 1421(a). The Act also provides

DHS with the authority "to correct, reopen, alter, modify, or vacate an order naturalizing [a] person" as a United States citizen. INA section 340(h), 8 U.S.C. 1451(h). The interim rule was promulgated under this authority.

No public comments were received.

This rule removes regulations that were invalidated on July 20, 2000, by the Ninth Circuit Court of Appeals in a nationwide class action lawsuit. *Gorbach* v. *Reno,* 219 F.3d 1087 (9th Cir. 2000) (en banc). That decision held that the Attorney General lacked the statutory authority to promulgate regulations permitting revocation of citizenship of a naturalized citizen through administrative proceedings. *Id. See also* INA sections 310(a), 340(a), (h), 8 U.S.C. 1421(a), 1451(a), (h). The government did not seek Supreme Court review of that decision, thus USCIS is precluded from using those regulations to revoke naturalization. This rule removes the applicable regulations from 8 CFR 340.10.

## VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule

On June 5, 2009, DHS published an interim rule in the **Federal Register** "Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision To Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms." The rule revised many sections of the 8 CFR, many of which are further revised by this rulemaking.

USCIS received only three comments in response to this rulemaking: one from an immigration practitioner, one from an organization of immigration practitioners, and one from an organization representing businesses which frequently rely on international personnel. A discussion of those comments follows.

One commenter noted that the revision to 8 CFR 214.2(l)(2)(i) apparently unintentionally added to the petitioner's burden by requiring that "the petitioner shall advise * * * whether *a previous petition has been filed* for the same beneficiary * * *" whereas the original language stated "the petitioner shall advise * * * whether *it has filed* a petition for the same beneficiary." (Emphasis in original). Although this change was inadvertent and not intended to affect any right, the requirement as revised is entirely consistent with both the INA and the current form instructions. The Act limits the amount of time an alien can spend in the United States as an L–1 or H nonimmigrant (not just for a

particular petitioner). *See* section 214(c)(2)(D) of the Act, 8 U.S.C. 1184.2(c)(2)(D). The current Form I–129, Supplement L, question 2 requires submission of copies of USCIS-issued documents relating to periods of H or L stay in the United States during the past seven years. It does not limit such submission to documents relating to the current petitioner. Accordingly, USCIS has not adopted the commenter's suggestion that we revert to the prior language.

The commenter made an additional comment regarding the omission of the word "of" from the first sentence in 8 CFR 214.2(l)(2)(ii). USCIS appreciates notification by the commenter of the typographical error which will be corrected in this rule. As previously discussed, 8 CFR part 214 will be reorganized in a future transformation-related rulemaking.

Another commenter suggests that USCIS avail itself of the opportunity to revise 8 CFR 212.7 to reflect the fact that K nonimmigrants may apply for a waiver only pursuant to section 212(d)(3) of the Act and that such persons may only apply for a waiver under section 212(h) or 212(i) of the Act at the time of application for adjustment of status. The commenter noted that both the regulation and form instruction for Form I–601, Application for Waiver of Ground of Inadmissibility, are incorrect. USCIS appreciates the comment and the commenter's suggestions may be addressed in a future rulemaking or with a form revision. However, the interim rule was limited to removing filing jurisdiction limitations from regulations. Thus the commenter's suggestion exceeds the scope of the changes made and will not be adopted in this rulemaking.

The final commenter addressed the removal of filing jurisdictions from regulations. The commenter expresses its concern that an accelerated process for changing filing locations could have an adverse impact on the public. The commenter was especially concerned about situations involving statutory or regulatory deadlines for filing where the public may have insufficient notice of the proposed change.

The same commenter, while supportive of USCIS' transformation efforts, offered several suggestions to minimize the potential adverse impacts of this rulemaking. The commenter recommended that, at each place the regulations are amended, to direct the public to "instructions on the form," and that USCIS add a phrase to explain that form instructions will be available on line, that any change to the filing instructions will be provided to the

public by formal announcement no less than 30 days in advance of the change, and that when a filing jurisdiction changes, USCIS offices formerly designated to receive such filings continue to accept them for at least 180 days after the effective date of the change.

USCIS understands and appreciates the commenter's concerns. We realize that numerous changes in filing instructions and locations may be confusing. It is our intent to reduce filing locations and complexity, and change them less often, not more. In the case of time-sensitive benefit requests, USCIS will keep such factors in mind when making changes and make adjustments to the change schedule so as to not result in missing a deadline because of the filing location change.

The commenter suggested that the preamble language describing the USCIS National Customer Service Center (NCSC) as a source of information regarding filing locations be removed because its membership has not gotten consistently reliable information from this source. The commenter recommended that USCIS customer service representatives be directed to consult the online form instructions before offering any advice to applicants regarding filing location. USCIS regrets any incorrect information that may be provided and always endeavors to provide the NCSC staff with information regarding filing requirements so questions may be answered. USCIS encourages the public to report possible erroneous or outdated messages so that they may be corrected. No change to the interim rule is made as a result of this comment.

The commenter also suggests that information about changes to form and filing instructions be posted in a consistent and prominent location on USCIS Web site along with a chronological list of all changes to form instructions, including filing location changes. As the interim rule stated, filing locations are provided on USCIS form instructions. The current official version of the form and instructions are the versions on the USCIS Internet Web site for forms, *http://www.uscis.gov/ forms.* Also, the USCIS home page will alert the public and stakeholders of any recent or planned filing location changes. In addition, USCIS will continue to publicize filing location changes with press releases. Additional suggestions for improving the Web site and information sharing are welcome.

The commenter also suggested that regulations mandate a 180-day transition period for filing location changes, during which USCIS would

accept such benefit requests at both the prior and new filing location. USCIS works to ensure that benefit requests are not rejected as a result of abrupt changes in filing location. USCIS announces filing changes well in advance and generally includes a transition period considering all factors and circumstances surrounding the change. However, forwarding mail from offices that formerly handled requests to the new office is very expensive and an inefficient use of USCIS fee revenue. USCIS will provide as much lead time as possible before making filing changes and will implement the changes in such a way so as to minimize the impacts of the change. However, a 180 day implementation period for each filing change is impracticable and will not be adopted.

The commenter also expressed a concern that USCIS intends to stop producing and distributing a paper version of its form instructions. As transformation continues, the filing of paper forms is expected to decrease substantially as USCIS expects electronic means to become the preferred filing method. As was the goal of GPEA and has been the experience of other Federal agencies that provide electronic filing options, in the future certain forms or requests may lend themselves to a totally electronic submission with no paper option. Nevertheless, at this time, as stated elsewhere in this preamble, USCIS will continue to provide paper versions of most forms and instructions as well as portable document format or other electronic versions through its Internet Web site. Further, the electronic versions of form instructions will parallel the written form instructions precisely, so the method chosen should cause no inconsistencies in benefit eligibility or adjudication.

The commenter also suggested that USCIS provide access to earlier versions of forms and instructions. Following a form's revisions, USCIS often provides that previous version of the form are acceptable until further notice or for a prescribed period. However, when changes are made to a form because eligibility criteria are changed by law or regulation, the previous version of a form may be outdated, incomplete, and unacceptable. Further, for ease of administration and consistency in adjudication, USCIS prefers to receive the most current version so the employee reviewing the form knows where to look for the required data elements. Thus USCIS sees little value in providing previous versions of forms as a general policy or requirement, and

the commenter's suggestion has not been adopted.

The commenter also suggested that any elimination of geographically-based jurisdiction should be coupled with a new model for determining such jurisdiction. The interim rule gave USCIS greater flexibility to alter filing locations, but it does not change how internal responsibilities for adjudicating benefit requests are prescribed. For many benefit requests, notwithstanding their removal from the CFR, filing locations will seldom or not change. USCIS will continue to make changes in filing, appearance or jurisdictional requirements with the convenience of and service to applicants, petitioners, and beneficiaries as a primary concern. Thus, in response to this comment, methods of determining jurisdiction are not revised in this rule.

## VII. Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act (APA) requires DHS to provide public notice and seek public comment on substantive regulations. *See* 5 U.S.C. 553. The APA, however, excludes certain types of regulations and permits exceptions for other types of regulations from the public notice and comment requirement. DHS issues this rule without providing the opportunity for prior notice and comment for the reasons described below. DHS nevertheless invites comments on this rule and will consider all timely comments submitted during the public comment period as described in the "Public Participation" section.

*Removal of form numbers and titles, position titles, and procedural guidance, and reorganization and clarification of 8 CFR.* The Administrative Procedure Act (APA) excepts from the prior notice and opportunity for comment requirements "* * * rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A). This rule removes form numbers and titles, position titles, and procedural guidance, reorganizes and clarifies parts of 8 CFR, and makes changes such as removing Form I–129, district director, instructions for retaining copies of documents, and instructions for forwarding of files. Accordingly, to the extent that this rule adopts rules of agency organization, procedure or practice, those portions of the rule are excepted from the notice-and-comment requirements under 5 U.S.C. 553(b)(A).

*Remove and update outdated provisions.* This rule removes provisions of 8 CFR where statutory authorization has expired, corrects

provisions required by statutory amendments or extensions, removes extraneous or outdated provisions, and corrects erroneous references. For example, this rule removes references to the Irish Peace Process Cultural and Training Program Act because that law was repealed in 2005 and removes nonpreference investor visas and third and sixth preference employment-based visas because authorization for these visas was repealed in 1990. This rule is a ministerial action necessary to conform regulations with law. Therefore, advance public notice and an opportunity for public comment is unnecessary and not in the public interest. *See* 5 U.S.C. 553(b)(3)(B).

### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies and export markets.

### D. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office

of Management and Budget has not reviewed it under Executive Order 12866.

There will be no additional costs incurred by any individual or business as a result of the changes in this rule. The rule will clarify and revise existing regulations and does not alter the regulations in a significant manner. Once transformation is complete, USCIS applicants, petitioners, representatives, and others will realize a significant savings in time and effort when submitting immigration benefit requests, seeking case status information, and communicating with USCIS.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 Civil Justice Reform*

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting or recordkeeping requirements inherent in a rule. Public Law 104–13, 109 Stat. 163 (May 22, 1995). This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

*H. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. When an agency makes changes effective through a final rule for which notice and comment are not necessary, the RFA does not require an agency to prepare a regulatory flexibility analysis. Accordingly, USCIS has not prepared a regulatory flexibility analysis.

**List of Subjects**

*8 CFR Part 1*

Administrative practice and procedure, Immigration.

*8 CFR Part 100*

Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 207*

Immigration, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 209*

Aliens, Immigration, Refugees.

*8 CFR Part 211*

Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213a*

Administrative practice and procedure, Aliens, Immigrants.

*8 CFR Part 223*

Immigration, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 238*

Air Carriers, Aliens, Government contracts, Maritime carriers.

*8 CFR Part 240*

Administrative practice and procedure, Immigration.

*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 244*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Reporting and recordkeeping requirements.

*8 CFR Part 265*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 270*

Administrative practice and procedure, Aliens, Employment, Fraud; Penalties.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 292*

Administrative practice and procedure, Immigration, Lawyers, Reporting and recordkeeping requirements.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 301*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 310*

Citizenship and naturalization, Courts.

*8 CFR Part 312*

Citizenship and naturalization, Education.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 319*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 320*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 322*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 324*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 325*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 328*

Citizenship and naturalization, Military personnel, Reporting and recordkeeping requirements.

*8 CFR Part 329*

Citizenship and naturalization, Military personnel, Veterans.

*8 CFR Part 330*

Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 332*

Citizenship and naturalization, Education, Reporting and recordkeeping requirements.

*8 CFR Part 333*

Citizenship and naturalization.

*8 CFR Part 334*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 335*

Administrative practice and procedures, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 336*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 337*

Citizenship and naturalization, Courts.

*8 CFR Part 338*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 339*

Citizenship and naturalization, Courts.

*8 CFR Part 340*

Citizenship and naturalization, Law enforcement.

*8 CFR Part 341*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 342*

Administrative practice and procedure, Citizenship and naturalization.

*8 CFR Part 343*

Citizenship and naturalization.

*8 CFR Part 343a*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 343b*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 343c*

Archives and records, Citizenship and naturalization, Courts.

*8 CFR Part 392*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 499*

Citizenship and naturalization.

Accordingly, the interim rules published at 68 FR 23010, on April 29, 2003; 64 FR 27660 on May 21, 1999; 66 FR 27445 on May 17, 2001; 69 FR 11287 on March 10, 2004; 70 FR 23775 on May 5, 2005; 70 FR 21129 on April 25, 2005; and 65 FR 17127 on March 31, 2000 are adopted as final without change, and chapter I of title 8 of the Code of Federal Regulations is amended as follows.

■ 1. Part 1 is revised to read as follows:

## PART 1—DEFINITIONS

Sec.
1.1    Applicability.
1.2    Definitions.
1.3    Lawfully present aliens for purposes of applying for Social Security benefits.

**Authority:** 8 U.S.C. 1101; 8 U.S.C. 1103; 5 U.S.C. 301; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.*

### §1.1  Applicability.

This part further defines some of the terms already described in section 101 and other sections of the Immigration and Nationality Act (66 Stat. 163), as amended, and such other enactments as pertain to immigration and nationality. These terms are used consistently by components within the Department of Homeland Security including U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.

### §1.2  Definitions.

As used in this chapter I, the term:

*Act* or *INA* means the Immigration and Nationality Act, as amended.

*Aggravated felony* means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition applies to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.

*Application* means benefit request.

*Arriving alien* means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.

*Attorney* means any person who is eligible to practice law in, and is a member in good standing of the bar of,

the highest court of any State, possession, territory, or Commonwealth of the United States, or of the District of Columbia, and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law.

*Benefit request* means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose.

*Board* means the Board of Immigration Appeals within the Executive Office for Immigration Review, Department of Justice, as defined in 8 CFR 1001.1(e).

*Case,* unless the context otherwise requires, means any proceeding arising under any immigration or naturalization law, Executive Order, or Presidential proclamation, or preparation for or incident to such proceeding, including preliminary steps by any private person or corporation preliminary to the filing of the application or petition by which any proceeding under the jurisdiction of the Service or the Board is initiated.

*CBP* means U.S. Customs and Border Protection.

*Commissioner* means the Commissioner of the Immigration and Naturalization Service prior to March 1, 2003. Unless otherwise specified, references after that date mean the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Day,* when computing the period of time for taking any action provided in this chapter I including the taking of an appeal, shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday.

*Department or DHS,* unless otherwise noted, means the Department of Homeland Security.

*Director or district director* prior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to

such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

*EOIR* means the Executive Office for Immigration Review within the Department of Justice.

*Executed* or *execute* means fully completed.

*Form* when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in paper format or in an electronic format as prescribed by USCIS on its official Internet Web site. The term Form followed by an immigration form number includes an approved electronic equivalent of such form as may be prescribed by the appropriate component on its official Internet Web site.

*Form instructions* means instructions on how to complete and where to file a benefit request, supporting evidence or fees, or any other required or preferred document or instrument with a DHS immigration component. Form instructions prescribed by USCIS or other DHS immigration components on their official Internet Web sites will be considered the currently applicable version, notwithstanding paper or other versions that may be in circulation, and may be issued through non-form guidance such as appendices, exhibits, guidebooks, or manuals.

*ICE* means U.S. Immigration and Customs Enforcement.

*Immigration judge* means an immigration judge as defined in 8 CFR 1001.1(l).

*Immigration officer* means the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention

enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

*Lawfully admitted for permanent residence* means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. Such status terminates upon entry of a final administrative order of exclusion, deportation, or removal.

*Petition.* See Benefit request.

*Practice* means the act or acts of any person appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with DHS.

*Preparation,* constituting practice, means the study of the facts of a case and the applicable laws, coupled with the giving of advice and auxiliary activities, including the incidental preparation of papers, but does not include the lawful functions of a notary public or service consisting solely of assistance in the completion of blank spaces on printed DHS forms, by one whose remuneration, if any, is nominal and who does not hold himself or herself out as qualified in legal matters or in immigration and naturalization procedure.

*Representation* before DHS includes practice and preparation as defined in this section.

*Representative* refers to a person who is entitled to represent others as provided in 8 CFR 292.1(a)(2) through (6) and 8 CFR 292.1(b).

*Respondent* means an alien named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with 8 CFR 242.1 (1997) as it existed prior to April 1, 1997.

*Secretary,* unless otherwise noted, means the Secretary of Homeland Security.

*Service* means U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and/or U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Service counsel* means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

*Transition program effective date as used with respect to extending the immigration laws to the Commonwealth of the Northern Mariana Islands* means November 28, 2009.

*USCIS* means U.S. Citizenship and Immigration Services.

### §1.3 Lawfully present aliens for purposes of applying for Social Security benefits.

(a) *Definition of the term an "alien who is lawfully present in the United States."* For the purposes of 8 U.S.C. 1611(b)(2) only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in 8 U.S.C. 1641(b);

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending removal proceedings under section 240 of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(b)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) of Pub. L. 99–603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status;

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) *Non-issuance of a Notice to Appear and non-enforcement of deportation, exclusion, or removal orders.* An alien may not be deemed to be lawfully present solely on the basis of DHS's decision not to, or failure to:

(1) Issue a Notice to Appear; or

(2) Enforce an outstanding order of deportation, exclusion or removal.

## PART 100—STATEMENT OF ORGANIZATION

■ 2. The authority citation for part 100 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

### §100.7 [Removed]

■ 3. Section 100.7 is removed.

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 4. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.*; E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 5. The heading for part 103 is revised as set forth above.

■ 6. In part 103, §§ 103.1 through 103.10 are designated under the following subpart A heading:

### Subpart A—Applying for Benefits, Surety Bonds, Fees

### §103.1 [Removed and Reserved]

■ 7. Section 103.1 is removed and reserved.

■ 8. Section 103.2 is amended by:
■ a. Removing the phrases "petition or application" and "application or petition" and adding in its place the phrase "benefit request"; and by removing the phrase "petitions and applications" and adding in its place the phrase "benefit requests" whenever they appear in the following places:
■ i. Paragraph (a)(2);
■ ii. Paragraph (a)(3);
■ iii. Paragraph (a)(7)(ii);

■ iv. Paragraph (b)(6);
■ v. Paragraph (b)(7);
■ vi. Paragraph (b)(8)(i);
■ vii. Paragraph (b)(8)(ii);
■ viii. Paragraph (b)(8)(iii);
■ ix. Paragraph (b)(9) introductory text;
■ x. Paragraph (b)(9)(ii);
■ xi. Paragraph (b)(10)(i);
■ xii. Paragraph (b)(10)(ii);
■ xiii. Paragraph (b)(11);
■ xiv. Paragraph (b)(12);
■ xv. Paragraph (b)(13)(i);
■ xvi. Paragraph (b)(13)(ii);
■ xvii. Paragraph (b)(14);
■ xviii. Paragraph (b)(15); and
■ xix. Paragraph (b)(18); and
■ b. Revising the section heading;
■ c. Revising paragraph (a)(1);
■ d. Revising the term "BCIS" to read "USCIS" in paragraph (a)(2) last sentence;
■ e. Revising the term "§ 1.1(f)" to read "§ 1.2" in paragraph (a)(3) first sentence;
■ f. Revising paragraph (a)(6);
■ g. Revising paragraph (a)(7)(i) and adding paragraph (a)(7)(iii);
■ h. Revising paragraph (b)(1);
■ i. Revising paragraph (b)(4);
■ j. Revising the phrase "by submitting a properly completed and signed Form G–884 to the adjudicating USCIS office" to read "in accordance with instructions provided by USCIS" in paragraph (b)(5) last sentence;
■ k. Revising the term "application, petition" to read "benefit request" in paragraph (b)(7) last sentence;
■ l. Revising the term "in writing" to read "communicated by regular or electronic mail" in paragraph (b)(8)(iv) first sentence;
■ m. Revising the second sentence in paragraph (b)(17)(i);
■ n. Revising paragraph (b)(19); and
■ o. Removing paragraph (e).

The revisions and addition read as follows:

### §103.2 Submission and adjudication of benefit requests.

(a) *Filing.* (1) *Preparation and submission.* Every benefit request or other document submitted to DHS must be executed and filed in accordance with the form instructions, notwithstanding any provision of 8 CFR chapter 1 to the contrary, and such instructions are incorporated into the regulations requiring its submission. Each benefit request or other document must be filed with fee(s) as required by regulation. Benefit requests which require a person to submit biometric information must also be filed with the biometric service fee in 8 CFR 103.7(b)(1), for each individual who is required to provide biometrics. Filing fees and biometric service fees are non-refundable and, except as otherwise

provided in this chapter I, must be paid when the benefit request is filed.

\* \* \* \* \*

(6) *Where to file.* All benefit requests must be filed in accordance with the form instructions.

(7) *Receipt date.* (i) *Benefit requests submitted.* A benefit request which is not signed and submitted with the correct fee(s) will be rejected. A benefit request that is not executed may be rejected. Except as provided in 8 CFR parts 204, 245, or 245a, a benefit request will be considered received by USCIS as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format. The receipt date shall be recorded upon receipt by USCIS.

\* \* \* \* \*

(iii) *Rejected benefit requests.* A benefit request which is rejected will not retain a filing date. There is no appeal from such rejection.

(b) *Evidence and processing.* (1) *Demonstrating eligibility.* An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication. Each benefit request must be properly completed and filed with all initial evidence required by applicable regulations and other USCIS instructions. Any evidence submitted in connection with a benefit request is incorporated into and considered part of the request.

\* \* \* \* \*

(4) *Supporting documents.* Original or photocopied documents which are required to support any benefit request must be submitted in accordance with the form instructions.

\* \* \* \* \*

(17) \* \* \*

(i) \* \* \* These records include alien and other files, arrival manifests, arrival records, Department index cards, Immigrant Identification Cards, Certificates of Registry, Declarations of Intention issued after July 1, 1929, Permanent Resident Cards, or other registration receipt forms (provided that such forms were issued or endorsed to show admission for permanent residence), passports, and reentry permits. \* \* \*

\* \* \* \* \*

(19) *Notification of decision.* The Service will notify applicants, petitioners, and their representatives as defined in 8 CFR part 1 in writing of a decision made on a benefit request. Documents issued based on the approval of a request for benefits will be sent to the applicant or beneficiary.

\* \* \* \* \*

**§ 103.3    [Amended]**

■ 9. Section 103.3 is amended by:
■ a. Revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2)(i); and
■ b. Revising the term "§ 103.9(a) of this part" to read "8 CFR 103.10(e)" in paragraph (c) last sentence.

**§§ 103.8 through 103.11    [Removed]**

■ 10. Sections 103.8 through 103.11 are removed.

**§ 103.5a    [Redesignated as § 103.8]**

■ 11. Section 103.5a is redesignated as § 103.8.

■ 12. Newly redesignated § 103.8 is amended by:
■ a. Revising the section heading;
■ b. Revising the paragraph (a) heading;
■ c. Revising paragraphs (a)(1);
■ d. Removing the "." at the end of paragraph (a)(2)(iv), and adding a "; or" in its place; and by
■ e. Adding paragraph (a)(2)(v).
The revisions and addition read as follows:

**§ 103.8    Service of decisions and other notices.**

\* \* \* \* \*

(a) *Types of service*—(1) *Routine service.* (i) Routine service consists of mailing the notice by ordinary mail addressed to the affected party and his or her attorney or representative of record at his or her last known address, or

(ii) If so requested by a party, advising the party of such notice by electronic mail and posting the decision to the party's USCIS account.

(2) \* \* \*

(v) If so requested by a party, advising the party by electronic mail and posting the decision to the party's USCIS account.

\* \* \* \* \*

**§ 103.5b    [Redesignated as § 103.9]**

■ 13. Section 103.5b is redesignated as § 103.9.

■ 14. Section 103.7 is amended by:
■ a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(1);
■ b. Adding new paragraphs (b)(1)(i)(CCC), (DDD), and (EEE).
The revisions and addition read as follows:

**§ 103.7    Fees.**

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(CCC) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* $1500 or $750 for filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions.

(DDD) *Fraud detection and prevention fee.* $500 for filing certain H–1B and L petitions, and $150 for H–2B petitions as described in 8 CFR 214.2(h)(19).

(EEE) *Public Law 111–230 fee.* Petitioners who are required to submit the Fraud Detection and Prevention Fee described in paragraph (b)(1)(i)(DDD) of this section are also required to submit an additional $2000 for an H–1B petition or an additional $2250 for an L–1 petition if:

(*1*) The petitioner employs 50 or more persons in the United States;

(*2*) More than 50 percent of those employees are in H–1B or L–1 status; and

(*3*) The petition is filed prior to the expiration of section 402 of Public Law 111–230.

\* \* \* \* \*

■ 15. Newly redesignated § 103.9 is revised to read as follows:

**§ 103.9    Request for further action on an approved benefit request.**

(a) *Filing a request.* A person may request further action on an approved benefit request as prescribed by the form instructions. Requests for further action may be submitted with the original benefit request or following the approval of such benefit.

(b) *Processing.* The request will be approved if the requester has demonstrated eligibility for the requested action. There is no appeal from the denial of such request.

**§ 103.12    [Removed]**

■ 16. Section 103.12 is removed.

**§ 103.37    [Redesignated as § 103.10]**

■ 17. Section 103.37 is redesignated as § 103.10.

■ 18. Newly redesignated § 103.10 is amended by:
■ a. Redesignating paragraphs (g), (h), and (i) as paragraphs (b), (c), and (d) respectively;
■ b. Revising the term "paragraph (f) of this section" to read "paragraph (c) of this section or 8 CFR 1003.1(h)(2)" in newly redesignated paragraph (c)(2); and by
■ c. Adding paragraph (e).
The addition reads as follows:

**§ 103.10    Precedent decisions.**

\* \* \* \* \*

(e) *Precedent decisions.* Bound volumes of designated precedent

decisions, entitled "Administrative Decisions under Immigration and Nationality Laws of the United States," may be purchased from the Superintendent of Documents, U.S. Government Printing Office. Prior to publication in volume form, current precedent decisions are available from the Department of Justice, Executive Office for Immigration Review's Virtual Law Library at: *http://www.justice.gov/ eoir/vll/libindex.html.*

■ 19. Section 103.16 is added under an added subpart B heading to read as follows:

## Subpart B—Biometric Requirements

### § 103.16   Collection, use and storage of biometric information.

(a) *Use of biometric information.* Any individual may be required to submit biometric information if the regulations or form instructions require such information or if requested in accordance with 8 CFR 103.2(b)(9). DHS may collect and store for present or future use, by electronic or other means, the biometric information submitted by an individual. DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws.

(b) *Individuals residing abroad.* An individual who is required to provide biometric information and who is residing outside of the United States must report to a DHS-designated location to have his or her biometric information collected, whether by electronic or non-electronic means.

■ 20. Section 103.17 is added under subpart B to read as follows:

### § 103.17   Biometric service fee.

(a) *Required fees.* DHS will charge a fee, as prescribed in 8 CFR 103.7(b)(1), for collecting biometric information at a DHS office, other designated collection site overseas, or a registered State or local law enforcement agency designated by a cooperative agreement with DHS to provide biometric collection services, to conduct required law enforcement checks, and to maintain this biometric information for reuse to support other benefit requests. Requests for benefits must be submitted with the biometric service fee for all individuals who are required to submit biometric information and a biometric services fee and who reside in the United States at the time of filing for the benefit.

(b) *Non-payment of biometric service fee.* (1) If a benefit request is received by DHS without the correct biometric service fee, DHS will notify the applicant, petitioner, and, when appropriate, the applicant or petitioner's representative, of the deficiency, and no further action will be taken on the benefit request until payment is received. Failure to submit the correct biometric service fee in response to a notice of deficiency within the time allotted in the notice will result in denial of the benefit request. There is no appeal from the denial of a benefit request for failure to submit the correct biometric service fee. A motion to reopen a benefit request denied for failure to submit the correct biometric service fee will be granted only on proof that:

(i) The correct biometric service fee was submitted at the time of filing the benefit request;

(ii) The correct biometric service fee was submitted in response to the notice of deficiency within the time allotted in the notice; or

(iii) The notice of deficiency was sent to an address other than the address on the benefit request or the notice of representation, or the applicant or petitioner notified DHS, in writing, of a change of address or change of representation subsequent to filing and before the notice of deficiency was sent and the DHS notice of deficiency was not sent to the new address.

(2) If the reason for the deficiency in the biometric service fee is that a check or financial instrument used to pay the biometric service fee is returned as not payable, the remitter must be allowed 14 calendar days to pay the fee and any associated service charges. If the fee and charges are not paid within 14 calendar days, the benefit request will be denied.

### §§ 103.20–103.36   [Removed and Reserved]

■ 21. Sections 103.20 through 103.36 are removed.

## Subpart C—[Reserved]

■ 22. Add reserved subpart C.

■ 23. Sections 103.38 through 103.41 are designated under the following subpart D heading:

## Subpart D—Availability of Records

\*    \*    \*    \*    \*

■ 24. In § 103.41, paragraph (c) is revised to read as follows:

### § 103.41   Genealogy request fees.

\*    \*    \*    \*    \*

(c) *Manner of submission.* The application and fee must be submitted in accordance with form instructions.

■ 25. Section 103.42 is added under subpart D to read as follows:

### § 103.42   Rules relating to the Freedom of Information Act (FOIA) and the Privacy Act.

Immigration-related regulations relating to FOIA and the Privacy Act are located in 6 CFR part 5.

## PART 204—IMMIGRANT PETITIONS

■ 26. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255, 1641; 8 CFR part 2.

### § 204.3   [Amended]

■ 27. Section 204.3 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter" to read "8 CFR 103.16" and the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear in paragraph (c)(3); and by
■ b. Revising the term "BCIS" to read "USCIS", the term "Form I–600" to read "petition", and the term "I–600A" to read "advance processing request" wherever the terms appear in paragraph (h)(3)(ii).

### § 204.4   [Amended]

■ 28. Section 204.4 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter to read "8 CFR 103.16" in the second sentence in paragraph (d)(1); and by
■ b. Removing the phrase ", Form I– 360," in the last sentence in paragraph (d)(1).

### § 204.6   [Amended]

■ 29. In § 204.6, paragraph (l) is removed and reserved.

### § 204.10   [Removed and Reserved]

■ 30. Section 204.10 is removed and reserved.

### § 204.302   [Amended]

■ 31. In § 204.302, paragraph (b), first sentence, is amended by revising the term "8 CFR 1.1(i), (j) and (m)," to read "8 CFR 1.2."

### § 204.310   [Amended]

■ 32. In § 204.310, paragraph (b), first sentence, is amended by revising the term "8 CFR 103.2(e)" to read "8 CFR 103.16".

## PART 207—ADMISSION OF REFUGEES

■ 33. The authority citation for part 207 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

■ 34. Section 207.1 is revised to read as follows:

## § 207.1   Eligibility.

(a) *Filing.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by submitting an application, including biometric information, in accordance with the form instructions, as defined in 8 CFR 1.2.

(b) *Firmly resettled.* Any applicant (other than an applicant for derivative refugee status under 8 CFR 207.7) who has become firmly resettled in a foreign country is not eligible for refugee status under this chapter I. A refugee is considered to be ''firmly resettled'' if he or she has been offered resident status, citizenship, or some other type of permanent resettlement by a country other than the United States and has traveled to and entered that country as a consequence of his or her flight from persecution. Any applicant who claims not to be firmly resettled in a foreign country must establish that the conditions of his or her residence in that country are so restrictive as to deny resettlement. In determining whether or not an applicant is firmly resettled in a foreign country, the officer reviewing the matter shall consider the conditions under which other residents of the country live:

(1) Whether permanent or temporary housing is available to the refugee in the foreign country;

(2) Nature of employment available to the refugee in the foreign country; and

(3) Other benefits offered or denied to the refugee by the foreign country which are available to other residents, such as right to property ownership, travel documentation, education, public welfare, and citizenship.

(c) *Immediate relatives and special immigrants.* Any applicant for refugee status who qualifies as an immediate relative or as a special immigrant shall not be processed as a refugee unless it is in the public interest. The alien shall be advised to obtain an immediate relative or special immigrant visa and shall be provided with the proper petition forms to send to any prospective petitioners. An applicant who may be eligible for classification under sections 203(a) or 203(b) of the Act, and for whom a visa number is now available, shall be advised of such eligibility but is not required to apply.

■ 35. Section 207.2 is revised to read as follows:

## § 207.2   Applicant processing.

(a) *Interview.* Each applicant 14 years old or older shall appear in person before an immigration officer for inquiry under oath to determine his or her eligibility for admission as a refugee.

(b) *Medical examination.* Each applicant shall submit to a medical examination as required by sections 221(d) and 232(b) of the Act.

(c) *Sponsorship.* Each applicant must be sponsored by a responsible person or organization. Transportation for the applicant from his or her present abode to the place of resettlement in the United States must be guaranteed by the sponsor.

■ 36. Section 207.3 is revised to read as follows:

## § 207.3   Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved.

(b) *Filing requirements.* An applicant may request a waiver by submitting an application for a waiver in accordance with the form instructions. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial if the application is denied. There is no appeal from such decision.

■ 37. Section 207.4 is revised to read as follows:

## § 207.4   Approved application.

Approval of a refugee application by USCIS outside the United States authorizes CBP to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved. There is no appeal from a denial of refugee status under this chapter.

■ 38. Section 207.5 is revised to read as follows:

## § 207.5   Waiting lists and priority handling.

Waiting lists are maintained for each designated refugee group of special humanitarian concern. Each applicant whose application is accepted for filing by USCIS shall be registered as of the date of filing. The date of filing is the priority date for purposes of case control. Refugees or groups of refugees may be selected from these lists in a manner that will best support the policies and interests of the United States. The Secretary may adopt appropriate criteria for selecting the refugees and assignment of processing priorities for each designated group based upon such considerations as reuniting families, close association with the United States, compelling humanitarian reasons, and public interest factors.

■ 39. Section 207.7 is amended by:
■ a. Revising the term ''U.S. Attorney General'' to read ''Secretary'' in paragraph (b)(5);
■ b. Revising paragraph (d);
■ c. Removing the last two sentences in paragraph (e); and
■ d. Revising paragraph (f).
The revisions read as follows:

## § 207.7   Derivatives of refugees.

\*    \*    \*    \*    \*

(d) *Filing.* A refugee may request accompanying or following-to-join benefits for his or her spouse and unmarried, minor child(ren) (whether the spouse and children are inside or outside the United States) by filing a petition in accordance with the form instructions. The petition may only be filed by the principal refugee. Family members who derived their refugee status are not eligible to request derivative benefits on behalf of their spouses and child(ren). A petition must be filed for each qualifying family member within 2 years of the refugee's admission to the United States, unless USCIS determines that the filing period should be extended for humanitarian reasons. There is no time limit imposed on a family member's travel to the United States once the petition has been approved, provided that the relationship of spouse or child continues to exist and approval of the petition has not been subsequently revoked. There is no fee for this petition.

\*    \*    \*    \*    \*

(f) *Approvals.* (1) *Spouse or child in the United States.* When a spouse or child of a refugee is in the United States and the petition is approved, USCIS will notify the refugee of such approval. Employment will be authorized incident to status.

(2) *Spouse or child outside the United States.* When a spouse or child of a refugee is outside the United States and the petition is approved, USCIS will notify the refugee of such approval. USCIS will send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the refugee's spouse or child is located.

(3) *Benefits.* The approval of the petition shall remain valid for the duration of the relationship to the refugee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the

principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of a refugee. For a derivative inside or arriving in the United States, USCIS will issue a document reflecting the derivative's current status as a refugee to demonstrate employment authorization, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization.

*    *    *    *    *

■ 40. Section 207.9 is revised to read as follows:

### § 207.9    Termination of refugee status.

The refugee status of any alien (and of the spouse or child of the alien) admitted to the United States under section 207 of the Act will be terminated by USCIS if the alien was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission. USCIS will notify the alien in writing of its intent to terminate the alien's refugee status. The alien will have 30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why the alien's refugee status should not be terminated. There is no appeal under this chapter I from the termination of refugee status by USCIS. Upon termination of refugee status, USCIS will process the alien under sections 235, 240, and 241 of the Act.

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 41. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 208.1    [Amended]

■ 42. Section 208.1 is amended by:
■ a. Revising in the last sentence of paragraph (a)(1) the term "8 CFR parts 3 and 103, where applicable" to read "8 CFR parts 103 and 1003, as applicable"; and
■ b. Revising in paragraph (b) the term "The Director of International Affairs" to read "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)".

### § 208.2    [Amended]

■ 43. Section 208.2 is amended in paragraph (a) by revising the paragraph heading to read: "Refugee, Asylum, and International Operations (RAIO)" and by revising the terms "the Office of

International Affairs" and "The Office of International Affairs" to read: "RAIO" wherever they appear.

### § 208.5    [Amended]

■ 44. Section 208.5 is amended by:
■ a. Removing the phrase ", pursuant to § 208.4(b)," in the last sentence of paragraph (b)(1)(ii);
■ b. Revising the phrase "The DHS office" to read "DHS" and by revising the phrase "the DHS office" to read "DHS" in paragraph (b)(1)(ii); and
■ c. Revising the term "Attorney General" to read "Secretary" in paragraph (b)(2).

■ 45. Section 208.7 is amended by:
■ a. Revising the phrase "submit a Form I–765, Application for Employment Authorization" to read "request employment authorization" in paragraph (a)(1), first sentence;
■ b. Revising the term "Form I–765" to read "employment authorization request" in paragraph (a)(1), last sentence;
■ c. Revising the phrase "the Service" to read "USCIS" in paragraph (a)(2), first sentence;
■ d. Revising the phrase "the Commissioner" to read "USCIS" in paragraph (b), introductory text; and
■ e. Revising paragraph (c), introductory text.

The revision reads as follows:

### § 208.7    Employment authorization.

*    *    *    *    *

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must request employment authorization in accordance with the form instructions. USCIS may require that an alien establish that he or she has continued to pursue an asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting one of the following, depending on the stage of the alien's immigration proceedings:

*    *    *    *    *

### § 208.9    [Amended]

■ 46. In § 208.9, paragraph (b) is amended by removing the phrase "electronically or through any other means designated by the Attorney General".

### § 208.10    [Amended]

■ 47. Section 208.10 is amended by revising the term "the Office of International Affairs" to read "USCIS" in the third sentence.

### § 208.12    [Amended]

■ 48. In § 208.12, paragraph (a) is amended by revising the term "the Office of International Affairs, other Service offices," to read "other USCIS offices".

### § 208.14    [Amended]

■ 49. In § 208.14, paragraph (b) is amended by revising the term "Office of International Affairs" to read "RAIO".
■ 50. Section 208.21 is amended by revising paragraphs (c) and (d) to read as follows:

### § 208.21    Admission of the asylee's spouse and children.

(c) *Spouse or child in the United States.* When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's application, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, regardless of the status of that spouse or child in the United States, in accordance with the form instructions. The petition must be filed by the asylee for each qualifying family member within 2 years of the date in which he or she was granted asylum status, unless it is determined by USCIS that this period should be extended for humanitarian reasons. Upon approval of the petition, USCIS will notify the asylee of such approval. Employment will be authorized incident to status. To demonstrate employment authorization, USCIS will issue a document reflecting the derivative's current status as an asylee, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization. The approval of the derivative benefits petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

(d) *Spouse or child outside the United States.* When a spouse or child of an alien granted asylum is outside the United States, the asylee may request accompanying or following-to-join benefits for his or her spouse or child(ren) by filing a separate petition for each qualifying family member in accordance with the form instructions. A petition for each qualifying family member must be filed within 2 years of the date in which the asylee was granted asylum, unless USCIS determines that the filing period should be extended for

humanitarian reasons. When a petition is approved, USCIS will notify the asylee of such approval. USCIS will also send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located. The approval of the petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

\*    \*    \*    \*    \*

■ 51. Section 208.24 is amended by:

■ a. Revising paragraph (a) introductory text;

■ b. Revising paragraph (b) introductory text; and by

■ c. Revising the term "§ 3.2 or § 3.23 of this chapter" to read 8 CFR 1003.2 and 8 CFR 1003.23'' and by revising the term "the Service" to read "USCIS", wherever the term appears in paragraph (f).

The revisions read as follows:

### § 208.24   Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by USCIS.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of USCIS if, following an interview, the asylum officer determines that:

\*    \*    \*    \*    \*

(b) *Termination of withholding of deportation or removal by USCIS.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of USCIS if the asylum officer determines, following an interview, that:

\*    \*    \*    \*    \*

■ 52. Section 208.30 is amended by revising paragraph (d)(3) to read as follows:

### § 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*    \*    \*    \*    \*

(d) \* \* \*

(3) The alien may be required to register his or her identity.

\*    \*    \*    \*    \*

### § 208.31   [Amended]

■ 53. In § 208.31, paragraph (a) is amended by revising the term "The Service" to read "USCIS" in the last sentence.

## PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

■ 54. The authority citation for part 209 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 55. Section 209.1 is amended by:

■ a. Revising paragraph (a)(1);

■ b. Revising paragraph (b);

■ c. Removing from paragraph (c) last sentence the phrase ", by submitting with the adjustment of status application a vaccination supplement, completed by a designated civil surgeon in the United States'';

■ d. Revising paragraphs (d) and (e); and

■ e. Adding paragraph (f).

The revisions read as follows:

### § 209.1   Adjustment of status of refugees.

\*    \*    \*    \*    \*

(a) *Eligibility.* (1) Every alien in the United States who is classified as a refugee under 8 CFR part 207, whose status has not been terminated, is required to apply to USCIS one year after entry in order for USCIS to determine his or her admissibility under section 212 of the Act, without regard to paragraphs (4), (5), and (7)(A) of section 212(a) of the Act.

\*    \*    \*    \*    \*

(b) *Application.* Upon admission to the United States, every refugee entrant will be notified of the requirement to submit an application for permanent residence one year after entry. An application for the benefits of section 209(a) of the Act must be submitted along with the biometrics required by 8 CFR 103.16 and in accordance with the applicable form instructions.

\*    \*    \*    \*    \*

(d) *Interview.* USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(e) *Decision.* USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request for permanent residence in removal proceedings under section 240 of the Act. If the applicant is found to be admissible for permanent residence under section 209(a) of the Act, USCIS

will approve the application, admit the applicant for lawful permanent residence as of the date of the alien's arrival in the United States, and issue proof of such status.

(f) *Inadmissible Alien.* An applicant who is inadmissible to the United States as described in 8 CFR 209.1(a)(1), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions.

■ 56. Section 209.2 is amended by:

■ a. Revising the term "the director" to read "USCIS" whenever that term appears in paragraph (a)(2);

■ b. Removing the undesignated paragraph at the end of paragraph (a)(1);

■ c. Removing the second, third, and last sentences in paragraph (a)(2); and

■ d. Revising paragraphs (b) through (f).

The revisions read as follows:

### § 209.2   Adjustment of status of aliens granted asylum.

\*    \*    \*    \*    \*

(b) *Inadmissible Alien.* An applicant who is not admissible to the United States as described in 8 CFR 209.2(a)(1)(v), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions. An applicant for adjustment under this part who has had the status of an exchange alien nonimmigrant under section 101(a)(15)(J) of the Act, and who is subject to the foreign resident requirement of section 212(e) of the Act, shall be eligible for adjustment without regard to the foreign residence requirement if otherwise eligible for adjustment.

(c) *Application.* An application for the benefits of section 209(b) of the Act may be filed in accordance with the form instructions. If an alien has been placed in removal, deportation, or exclusion proceedings, the application can be filed and considered only in proceedings under section 240 of the Act.

(d) *Medical examination.* For an alien seeking adjustment of status under section 209(b) of the Act, the alien shall

submit a medical examination to determine whether any grounds of inadmissibility described under section 212(a)(1)(A) of the Act apply. The asylee is also required to establish compliance with the vaccination requirements described under section 212(a)(1)(A)(ii) of the Act.

(e) *Interview.* USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(f) *Decision.* USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request in removal proceedings under section 240 of the Act. If the application is approved, USCIS will record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application, but not earlier than the date of the approval for asylum in the case of an applicant approved under paragraph (a)(2) of this section.

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

■ 57. The authority citation for part 211 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

■ 58. Section 211.1 is amended by:
■ a. Revising paragraph (b)(3); and
■ b. Removing paragraph (d).
  The revision reads as follows:

### § 211.1  Visas.

(b) * * *

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an unexpired immigrant visa, permanent resident card, or reentry permit, the alien may file an application for a waiver of this requirement with the DHS officer with jurisdiction over the port of entry where the alien arrives. To apply for this waiver, the alien must file the designated form with the fee prescribed in 8 CFR 103.7(b)(1). If the alien's permanent resident card was lost or stolen and the alien has been absent for less than one year, rather than the waiver application the alien must apply for a replacement card as described in 8 CFR 264.5. In the exercise of discretion, the DHS officer who has jurisdiction over the port of entry where the alien arrives may waive the alien's lack of an immigrant visa, permanent

resident card, or reentry permit and admit the alien as a returning resident if DHS is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, permanent resident card, or reentry permit. Filing a request to replace a lost or stolen card will serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

*        *        *        *        *

### § 211.2  [Amended]

■ 59. In § 211.2, paragraph (b) is amended in the second sentence by revising the phrase "file Form I–193, Application for Waiver of Passport and/or Visa", to read "apply on the form specified by USCIS".

■ 60. Section 211.3 is amended by:
■ a. Revising the section heading; and
■ b. Revising the term "Form I–551" to read "a permanent resident card" whenever the term appears in the first sentence.
  The revision reads as follows:

### § 211.3  Expiration of immigrant visa or other travel document.

*        *        *        *        *

### § 211.5  [Amended]

■ 61. Section 211.5 is amended by:
■ a. Revising the phrase "Form I–551 or I–688 shall become" to read "the alien's permanent resident card becomes" in the last sentence in paragraph (b); and
■ b. Revising the term "on Form I–90" to read "in accordance with 8 CFR 264.5" in the last sentence of paragraph (c).

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 62. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255; 8 U.S.C. 1185 note (Pub. L. 108–458, § 7209, 118 Stat. 3638; Public Law 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 212.1  [Amended]

■ 63. In § 212.1, paragraph (n) is removed and reserved.

### § 212.2  [Amended]

■ 64. Section 212.2 is amended by revising the term "the Form I–212" or "Form I–212" to read "the application" wherever it appears in the following places:
■ a. Paragraph (b)(1);

■ b. Paragraph (b)(2);
■ c. Paragraph (e), in the last sentence;
■ d. Paragraph (f);
■ e. Paragraph (i)(1) introductory text; and
■ f. Paragraph (i)(2).

■ 65. Section 212.2 is further amended by:
■ a. Revising the term "sections 212(a)(17) and 212(d)(3)(A) of the Act and § 212.4 of this part" to read "sections 212(a)(9)(A) and 212(d)(3)(A) of the Act and 8 CFR 212.4" in the second sentence of paragraph (b)(1);
■ b. Revising the phrase "Form I–212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal," to read "an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions," in the last sentence of paragraph (b)(1);
■ c. Revising the phrase "an application on Form I–212" to read "the application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions" in paragraph (c)(1)(ii);
■ d. Revising the phrase "the Form I–212 to the Service office with jurisdiction over the area within which the consular officer is located" to read "the application to the designated USCIS office" in paragraph (c)(2);
■ e. Revising the phrase "Form I–212" to read "the waiver request on the form designated by USCIS" in the first sentence in paragraph (d);
■ f. Revising the phrase "Form I–601, Application for Waiver of Grounds of Excludability, must be filed simultaneously with the Form I–212" to read "he or she must file both waiver requests simultaneously on the forms designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the last sentence in paragraph (d).
■ g. Revising the phrase "Form I–212, Application for Permission to Reapply" to read "the application on the form designated by USCIS" in the second sentence in paragraph (e);
■ h. Revising the phrase "file Form I–212" to read "apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence in paragraph (g)(1) introductory text;
■ i. Removing the last sentence in paragraph (g)(1) introductory text;
■ j. Removing paragraphs (g)(1)(i) and (ii);
■ k. Revising the term "8 CFR 245.15(t)(2)" to read "8 CFR 245.15(t)(2) or 8 CFR 245.13(k)(2)" in the first sentence of paragraph (g)(2);

■ l. Revising the phrase ''Form I–212 or Form I–601 concurrently with the Form I–131, Application for Travel Document'' to read ''waiver form concurrently with the parole request'' in the first sentence in paragraph (g)(2);

■ m. Removing the last sentence in paragraph (g)(2); and by

■ n. Revising the phrase ''section 212(a)(16) or (17) of the Act'' to read ''section 212(a)(9)(A) of the Act'' in the second sentence of paragraph (j).

### §212.3    [Amended]

■ 66. In § 212.3, paragraph (a) is amended by revising the phrase ''Form I–191, Application for Advance Permission to Return to Unrelinquished Domicile'' to read ''the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions''.

### §212.4    [Amended]

■ 67. Section 212.4 is amended by:

■ a. Revising the term ''Form I–192 to the district director in charge of the applicant's intended port of entry prior to the applicant's arrival in the United States'', to read ''the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), and in accordance with the form instructions'' in the first sentence in paragraph (b);

■ b. Removing the term ''of Form I–854, Inter-Agency Alien Witness and Informant Record,'' in the first sentence of paragraph (j)(1); and

■ c. Revising the phrase ''the Commissioner shall'' to read ''USCIS will'' in the first sentence in paragraph (j)(1);

■ d. Revising the phrase ''The Commissioner'' or ''the Commissioner'' to read ''USCIS'' wherever the term appears in the second and third sentences in paragraph (j)(1); and

■ e. Revising the phrase ''the Commissioner'' to read ''USCIS'' in the second sentence in paragraph (j)(2).

### §212.5    [Amended]

■ 68. In § 212.5, paragraph (f) is amended by revising the term ''Form I–512'' to read ''an appropriate document authorizing travel''.

■ 69. Section 212.7 is amended by:

■ a. Revising the section heading;

■ b. Revising the paragraph (a)(1);

■ c. Revising the paragraph (a)(3);

■ d. Revising in paragraph (a)(4), fourth sentence, the phrase ''deportable in a deportation proceeding'' to read ''deportable in deportation proceedings or removable in removal proceedings'';

■ e. Revising the paragraph (b)(1);

■ f. Removing paragraph (b)(3);

■ g. Revising in the first sentence in paragraph (b)(4)(i) the phrase ''section

212(a) (1) or (3) (because of mental retardation or because of a past history of mental illness)'' to read ''section 212(a)(1)(A)(iii) of the Act'' and the phrase ''an executed Form I–601 to the consular or Service office'' to read ''a waiver request'';

■ h. Removing the last sentence in paragraph (b)(4)(i);

■ i. Redesignating paragraphs (b)(4) and (5) as paragraphs (b)(2) and (3), respectively;

■ j. Revising the term ''Form I–612'' to read ''the form designated by USCIS'' in paragraph (c)(5);

■ k. Revising the term ''the Service'' to read ''USCIS'' in the last sentence in paragraph (c)(9)(vi) introductory text;

■ l. Removing the phrase ''with the Service'' in the first sentence in paragraph (c)(9)(vi)(B); and

■ m. Revising the term ''Form I–797 (and/or I–797A and I–797B)'' to read ''the USCIS approval notice'' in paragraph (c)(9)(vi)(B)(*1*).

The revisions are made as follows:

### §212.7    Waiver of certain grounds of inadmissibility.

(a) *Filing and adjudication of waivers under sections 212(g), (h), or (i) of the Act.* (1) *Application procedures.* Any alien who is inadmissible under sections 212(g), (h), or (i) of the Act who is eligible for a waiver of such inadmissibility may file on the form designated by USCIS, with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. When filed at the consular section of an embassy or consulate, the Department of State will forward the application to USCIS for a decision after the consular official concludes that the alien is otherwise admissible.

\*    \*    \*    \*    \*

(3) *Decision.* USCIS will provide a written decision and, if denied, advise the applicant of appeal procedures in accordance with 8 CFR 103.3.

\*    \*    \*    \*    \*

(b) *Section 212(g) waivers for certain medical conditions.* (1) *Application.* Any alien who is inadmissible under section 212(a)(1)(A)(i), (ii), or (iii) of the Act and who is eligible for a waiver under section 212(g) of the Act may file an application as described in paragraph (a)(1) of this section. The family member specified in section 212(g) of the Act may file the waiver application for the applicant if the applicant is incompetent to file the waiver personally.

\*    \*    \*    \*    \*

### §212.8    [Removed and Reserved]

■ 70. Section 212.8 is removed and reserved.

### §212.9    [Removed and Reserved]

■ 71. Section 212.9 is removed and reserved.

■ 72. Section 212.10 is revised to read as follows:

### §212.10    Section 212(k) waiver.

Any applicant for admission who is in possession of an immigrant visa, and who is inadmissible under section 212(a)(5)(A) or 212(a)(7)(A)(i) of the Act, may apply at the port of entry for a waiver under section 212(k) of the Act. If the application for waiver is denied, the application may be renewed in removal proceedings before an immigration judge as provided in 8 CFR part 1240.

### §212.11    [Removed and Reserved]

■ 73. Section 212.11 is removed and reserved.

### §212.14    [Amended]

■ 74. Section 212.14 is amended by:

■ a. Revising the phrase ''a completed Form I–854, Inter-Agency Alien Witness and Informant Record,'' to read ''an application for S nonimmigrant status on the form designated for such purposes'' in paragraph (a)(1)(i);

■ b. Revising the phrase ''a completed Form I–854'' to read ''the completed application'' in the first sentence of paragraph (a)(2)(iii);

■ c. Revising the phrase ''Form I–854 requesting'' to read ''completed application for'' in the second sentence of paragraph (a)(2)(iii); and

■ d. Revising the phrase ''a Form I–854'' to read ''the application'' in paragraph (a)(2)(iii), last sentence.

### §212.15    [Amended]

■ 75. Section 212.15 is amended by:

■ a. Revising the phrase ''shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers'' to read ''must apply on the form designated by USCIS in accordance with the form instructions'' in the first sentence of paragraph (j)(1) introductory text;

■ b. Revising the phrase ''As required on Form I–905, the'' to read ''The'' in the last sentence of paragraph (j)(1), introductory text;

■ c. Revising the term ''shall submit Form I–905'' to read ''must apply'' in the first sentence of paragraph (j)(2)(i);

■ d. Revising the phrase ''shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers with the appropriate fee contained in 8 CFR 103.7(b)(1)'' to read ''must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in

accordance with the form instructions'' in the first sentence in paragraph (j)(2)(ii);

■ e. Revising the phrase "After receipt of Form I–905, USCIS shall, in all cases,'' to read "USCIS will'' in paragraph (j)(3)(i);

■ f. Removing the phrase "to the Associate Commissioner for Examinations'' from paragraph (j)(3)(iii);

■ g. Revising the phrase "a Form I–905 requesting,'' to read "a request for'' in the second sentence of paragraph (l); and

■ h. Revising the term "Form I–905'' to read "the request'' in the second sentence of paragraph (m)(2) introductory text.

### § 212.16    [Amended]

■ 76. Section 212.16 is amended by
■ a. Revising the term "Form I–192'' to read "the request on the form designated by USCIS'', by revising the term "the Service'' to read "USCIS'', and by revising the phrase "completed Form I–914 application package'' to read "application'' in paragraph (a);
■ b. Revising the terms "the Commissioner'', "The Service'', and "the Service'' to read "USCIS'' wherever those terms appear in paragraph (b); and by
■ c. Revising the term "The Commissioner'' to read "USCIS'' in paragraph (d).

■ 77. Section 212.17 is amended by:
■ a. Revising paragraph (a); and by
■ b. Revising the term "Form I–192'' to read "the waiver'' wherever the term appears in paragraph (b).

The revision reads as follows:

### § 212.17    Applications for the exercise of discretion relating to U nonimmigrant status.

(a) *Filing the waiver application.* An alien applying for a waiver of inadmissibility under section 212(d)(3)(B) or (d)(14) of the Act (waivers of inadmissibility), 8 U.S.C. 1182(d)(3)(B) or (d)(14), in connection with a petition for U nonimmigrant status being filed pursuant to 8 CFR 214.14, must submit the waiver request and the petition for U nonimmigrant status on the forms designated by USCIS in accordance with the form instructions. An alien in U nonimmigrant status who is seeking a waiver of section 212(a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B) (unlawful presence ground of inadmissibility triggered by departure from the United States), must file the waiver request prior to his or her application for reentry to the United States in accordance with the form instructions.

\*    \*    \*    \*    \*

## PART 213A—AFFIDAVITS OF SUPPORT ON BEHALF OF ALIENS

■ 78. The authority citation for part 213a continues to read as follows:

**Authority:** 8 U.S.C. 1183a; 8 CFR part 2.

### § 213a.1    [Amended]

■ 79. Section 213a.1 is amended by:
■ a. Revising in the definition of *household income* the phrase "signed a U.S. Citizenship and Immigration Services (USCIS) Form I–864A, Affidavit of Support Contract Between Sponsor and Household Member'' to read "signed the form designated by USCIS for this purpose'';
■ b. Revising in the definition of *household size,* in the second sentence in paragraph (1), the term "Form I–864'' to read "affidavit of support'', wherever the term appears;
■ c. Revising in the definition of *joint sponsor* the term "a Form I–864'' to read "an affidavit of support'';
■ d. Revising in the definition of *sponsor* the term "a Form I–864'' to read "an affidavit of support''; and
■ e. Revising in the definition of *substitute sponsor* the term "a Form I–864'' to read "the affidavit of support'' and the term "the Form I–130 or I–129F'' to read "a relative or fiancé(e) petition''.

■ 80–82. Section 213a.2 is amended by:
■ a. Revising paragraphs (a)(1)(i) through (a)(1)(v)(A);
■ b. Revising the phrase "Form I–864 or Form I–864A'' to read "affidavit of support or required affidavit of support attachment form'' in the first sentence of paragraph (a)(1)(v)(B);
■ c. Revising the phrase "Form I–864 and any Form I–864A'' to read "affidavit of support and any required affidavit of support attachment'' in the last sentence of paragraph (a)(1)(v)(B);
■ d. Revising the phrase "the Form I–130 or Form I–600 immigrant visa petition (or the Form I–129F petition, for a K nonimmigrant seeking adjustment)'' to read "relative, orphan or fiancé(e) petition'' in the first sentence of paragraph (b)(1);
■ e. Revising the phrase "in Form I–864P Poverty Guidelines'' to read "the Poverty Guidelines'' in paragraph (c)(2)(i)(A);
■ f. Revising the term "Form I–864'' to read "affidavit of support'' in paragraph (c)(2)(iii)(A)(*2*);
■ g. Revising paragraph (c)(2)(iii)(C);
■ h. Revising the phrase "filed USCIS Form I–407, Abandonment of Lawful Permanent Resident Status'' to read "abandoned permanent resident status, executing the form designated by USCIS for recording such action'' in paragraph (e)(2)(i)(C);

■ i. Revising the phrase "Form I–864 or Form I–864A'' to read " affidavit of support and any required attachments'' wherever the term appears in paragraph (f);
■ j. Revising the phrase "the signed Form(s) I–864 (and any Form(s) I–864A)'' to read "any relevant affidavit(s) and attachments'' in paragraph (g)(1); and
■ k. Revising paragraphs (g)(2)(i) and (ii).
■ l. Section 213a.2 is further amended by revising the terms "Form I–864'', "the Form I–864'', and "a Form I–864'' to read "an affidavit of support'' wherever those terms or phrases appear in the following places:
■ i. Paragraph (b), introductory text;
■ ii. Paragraph (b)(1);
■ iii. Paragraph (b)(2);
■ iv. Paragraph (c)(1)(ii)(B);
■ v. Paragraph (c)(2)(i)(A);
■ vi. Paragraph (c)(2)(i)(B);
■ vii. Paragraph (c)(2)(i)(C)(*2*);
■ viii. Paragraph (c)(2)(i)(C)(*4*);
■ ix. Paragraph (c)(2)(i)(D);
■ x. Paragraph (c)(2)(ii)(C);
■ xi. Paragraph (c)(2)(iii)(D);
■ xii. Paragraph (c)(2)(v);
■ xiii. Paragraph (c)(2)(vi);
■ xiv. Paragraph (d);
■ xv. Paragraph (e)(1);
■ xvi. Paragraph (e)(2)(i) introductory text;
■ xvii. Paragraph (e)(2)(i)(D);
■ xviii. Paragraph (e)(2)(ii);
■ xix. Paragraph (e)(3); and
■ xx. Paragraph (f) heading.
■ m. Section 213a.2 is further amended by revising the terms "Form I–864A'', "the Form I–864A'', or "a Form I–864A'' to read "an affidavit of support attachment'' wherever those terms or phrases appear in the following places:
■ i. Paragraph (c)(2)(i)(C)(*1*);
■ ii. Paragraph (c)(2)(i)(C)(*2*);
■ iii. Paragraph (c)(2)(i)(C)(*3*);
■ iv. Paragraph (c)(2)(i)(C)(*4*);
■ v. Paragraph (c)(2)(i)(C)(*5*);
■ vi. Paragraph (c)(2)(i)(D);
■ vii. Paragraph (c)(2)(iii)(B) introductory text;
■ viii. Paragraph (c)(2)(v);
■ ix. Paragraph (c)(2)(vi);
■ x. Paragraph (e)(1);
■ xi. Paragraph (e)(2)(i) introductory text;
■ xii. Paragraph (e)(2)(i)(D);
■ xiii. Paragraph (e)(2)(ii);
■ xiv. Paragraph (e)(3); and
■ xv. Paragraph (f) heading.
The revisions read as follows:

### § 213a.2    Use of affidavit of support.

(a) *Applicability of section 213a affidavit of support.* (1)(i)(A) In any case specified in paragraph (a)(2) of this section, an intending immigrant is

inadmissible as an alien likely to become a public charge, unless the qualified sponsor specified in paragraph (b) of this section or a substitute sponsor and, if necessary, a joint sponsor, has executed on behalf of the intending immigrant an affidavit of support on the applicable form designated by USCIS in accordance with the requirements of section 213A of the Act and the form instructions. Each reference in this section to the affidavit of support or the form is deemed to be a reference to all such forms designated by USCIS for use by a sponsor for compliance with section 213A of the Act.

(B) If the intending immigrant claims that, under paragraph (a)(2)(ii)(A), (C), or (E) of this section, the intending immigrant is exempt from the requirement to file an affidavit of support, the intending immigrant must include with his or her application for an immigrant visa or adjustment of status an exemption request on the form designated by USCIS for this purpose.

(ii) An affidavit of support is executed when a sponsor signs and submits the appropriate forms in accordance with the form instructions to USCIS or the Department of State, as appropriate.

(iii) A separate affidavit of support is required for each principal beneficiary.

(iv) Each immigrant who will accompany the principal intending immigrant must be included on the affidavit. See paragraph (f) of this section for further information concerning immigrants who intend to accompany or follow the principal intending immigrant to the United States.

(v)(A) Except as provided for under paragraph (a)(1)(v)(B) of this section, the Department of State consular officer, immigration officer, or immigration judge will determine the sufficiency of the affidavit of support based on the sponsor's, substitute sponsor's, or joint sponsor's reasonably expected household income in the year in which the intending immigrant filed the application for an immigrant visa or for adjustment of status, and based on the evidence submitted with the affidavit of support and the Poverty Guidelines in effect when the intending immigrant filed the application for an immigrant visa or adjustment of status.

\*     \*     \*     \*     \*

(c) \*  \*  \*
(2) \*  \*  \*
(iii) \*  \*  \*

(C) *Joint sponsor.* A joint sponsor must execute a separate affidavit of support on behalf of the intending immigrant(s) and be willing to accept joint and several liabilities with the

sponsor or substitute sponsor. A joint sponsor must meet all the eligibility requirements under paragraph (c)(1) of this section, except that the joint sponsor is not required to file a visa petition on behalf of the intending immigrant. The joint sponsor must demonstrate his or her ability to support the intending immigrant in the manner specified in paragraph (c)(2) of this section. A joint sponsor's household income must meet or exceed the income requirement in paragraph (c)(2)(iii) of this section unless the joint sponsor can demonstrate significant assets as provided in paragraph (c)(2)(iv)(A) of this section. The joint sponsor's household income must equal at least 125 percent of the Poverty Guidelines for the joint sponsor's household size, unless the joint sponsor is on active duty in the Armed Forces and the intending immigrant is the joint sponsor's spouse or child, in which case the joint sponsor's household income is sufficient if it equals at least 100 percent of the Poverty Guidelines for the joint sponsor's household size. An intending immigrant may not have more than one joint sponsor, but, if the joint sponsor's household income is not sufficient to meet the income requirement with respect to the principal intending immigrant, any spouse and all the children who, under section 203(d) of the Act, seek to accompany the principal intending immigrant, then the joint sponsor may specify on the affidavit that it is submitted only on behalf of the principal intending immigrant and those accompanying family members specifically listed on the affidavit. The remaining accompanying family members will then be inadmissible under section 212(a)(4) of the Act unless a second joint sponsor submits an affidavit(s) on behalf of all the remaining family members who seek to accompany the principal intending immigrant and who are not included in the first joint sponsor's affidavit. There may not be more than two joint sponsors for the family group consisting of the principal intending immigrant and the accompanying spouse and children.

\*     \*     \*     \*     \*

(g) \*  \*  \*

(2)(i) To avoid inadmissibility under section 212(a)(4) of the Act, an alien who applies for an immigrant visa, admission, or adjustment of status as an alien who is following-to-join a principal intending immigrant must submit a new affidavit(s) of support, together with all documents or other evidence necessary to prove that the new affidavits comply with the

requirements of section 213A of the Act and 8 CFR part 213a.

(ii) When paragraph (g)(2)(i) of this section requires the filing of a new affidavit for an alien who seeks to follow-to-join a principal sponsored immigrant, the same sponsor who filed the visa petition and affidavit of support for the principal sponsored immigrant must file the new affidavit on behalf of the alien seeking to follow-to-join. If that person has died, then the alien seeking to follow-to-join is inadmissible unless a substitute sponsor, as defined by 8 CFR 213a.1, signs a new affidavit that meets the requirements of this section. Persons other than the person or persons who signed the original joint affidavits on behalf of the principal sponsored immigrant may sign a new joint affidavit on behalf of an alien who seeks to follow-to-join a principal sponsored immigrant.

\*     \*     \*     \*     \*

■ 83. Section 213a.3 is revised to read as follows:

### § 213a.3  Change of address.

(a) *Submission of address change.* (1) *Filing requirements.* If the address of a sponsor (including a substitute sponsor or joint sponsor) changes while the sponsor's support obligation is in effect, the sponsor shall file a change of address notice within 30 days, in a manner as prescribed by USCIS on its address change form instructions.

(2) *Proof of mailing.* USCIS will accept a photocopy of the change of address form together with proof of the form's delivery to USCIS as evidence that the sponsor has complied with this requirement.

(3) *Electronic notices.* USCIS will provide the sponsor with a receipt notice for an address change.

(4) *Alien sponsors.* If the sponsor is an alien, the sponsor must still comply with the requirements of 8 CFR 265.1 to notify USCIS of his or her change of address.

(b) *Civil penalty.* If the sponsor fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(A) of the Act. Except, if the sponsor, knowing that the sponsored immigrant has received any means-tested public benefit, fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(B) of the Act. The procedure for imposing a civil penalty is established at 8 CFR part 280.

**53790**    **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

## § 213a.4  [Amended]

■ 84. Section 213a.4 is amended by:
■ a. Revising the term "8 CFR 103.5a(a)(2)" to read "8 CFR 103.8(a)(2)" in paragraph (a)(1)(i); and
■ b. Revising the phrases "a Form I–864 or Form I–864A" and "the Form I–864 or Form I–864A" to read "an affidavit of support" in the first sentence in paragraph (a)(3).

■ 85. Section 213a.5 is revised to read as follows:

## § 213a.5  Relationship of this part to other affidavits of support.

Nothing in this part precludes the continued use of other affidavits of support provided by USCIS in a case other than a case described in § 213a.2(a)(2). The obligations of section 213A of the Act do not bind a person who executes such other USCIS affidavits of support. Persons sponsoring an Amerasian alien described in section 204(f)(2) of the Act remain subject to the provisions of section 204(f)(4)(B) of the Act and 8 CFR 204.4(i), as appropriate.

## PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

■ 86. The authority citation for part 223 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

■ 87. Section 223.2 is revised to read as follows:

## § 223.2  Application and processing.

(a) *Application.* An applicant must submit an application for a reentry permit, refugee travel document, or advance parole on the form designated by USCIS with the fee described in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(b) *Filing eligibility.* (1) *Reentry permit.* An applicant for a reentry permit must file such application while in the United States and in status as a lawful permanent resident or conditional permanent resident.

(2) *Refugee travel document.* (i) Except as provided in paragraph (b)(2)(ii) of this section, an applicant for a refugee travel document must submit the application while in the United States and in valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act or is a permanent resident who received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept a refugee travel document application from an alien not within the United States.* As a matter of discretion, the Service office with jurisdiction over a port-of-entry or pre-flight inspection location where the alien is seeking admission, or the overseas Service office where the alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who departed from the United States without having applied for such refugee travel document, provided the officer:

(A) Is satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States;

(B) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(C) The alien has been outside the United States for less than 1 year since his or her last departure.

(c) *Ineligibility.* (1) *Prior document still valid.* An application for a reentry permit or refugee travel document will be denied if the applicant was previously issued a reentry permit or refugee travel document which is still valid, unless it was returned to USCIS or it is demonstrated that it was lost.

(2) *Extended absences.* A reentry permit issued to a person who, since becoming a permanent resident or during the last five years, whichever is less, has been outside the United States for more than four years in the aggregate, shall be limited to a validity of one year, except that a permit with a validity of two years may be issued to:

(i) A permanent resident described in 8 CFR 211.1(a)(6) or (a)(7);

(ii) A permanent resident employed by a public international organization of which the United States is a member by treaty or statute, and his or her permanent resident spouse and children; or

(iii) A permanent resident who is a professional athlete who regularly competes in the United States and worldwide.

(3) *Permanent resident entitled to nonimmigrant diplomatic or treaty status.* A permanent resident entitled to nonimmigrant status may under section 101(a)(15)(A), (E), or (G) of the Act because of occupational status may only be issued a reentry permit if the applicant executes and submits with the application, or has previously executed

and submitted, a written waiver as required by 8 CFR part 247.

(d) *Effect of travel before a decision is made.* Departure from the United States before a decision is made on an application for a reentry permit or refugee travel document will not affect the application.

(e) *Processing.* USCIS may approve or deny a request for a reentry permit or refugee travel document as an exercise of discretion. If it approves the application, USCIS will issue an appropriate document.

(f) *Effect on proceedings.* Issuance of a reentry permit or refugee travel document to a person in exclusion, deportation, or removal proceedings shall not affect those proceedings.

(g) *Appeal.* Denial of an application for a reentry permit or refugee travel document may be appealed in accordance with 8 CFR 103.3.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 88. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 U.S.C. 1185 note (Pub. L. 108–458, § 7209, 118 Stat. 3638).

## § 235.3  [Amended]

■ 89. In § 235.3, paragraph (b)(1)(i) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".

## § 235.8  [Amended]

■ 90. In § 235.8, paragraph (e) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 91. The authority citation for part 236 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

## § 236.2  [Amended]

■ 92. In § 236.2, paragraph (a) is amended by revising the term "§ 103.5a(c) of this chapter" to read "8 CFR 103.8(c)".

## § 236.16  [Amended]

■ 93. Section 236.16 is amended by revising the phrase "using Form I–131, Application for Travel Document" to read "in accordance with 8 CFR

**Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations    **53791**

223.2(a)'' in the first sentence and revising the phrase ''the district director'' to read ''USCIS'' in the second sentence.

§ 236.18    [Amended]

■ 94. In § 236.18, paragraph (b) is amended by revising the term ''§ 103.5a of this chapter'' to read ''8 CFR 103.8(a)(2)'' wherever that term appears.

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

■ 95. The authority citation for part 238 continues to read as follows:

**Authority:** 8 U.S.C. 1228; 8 CFR part 2.

■ 96. In § 238.1, paragraph (b)(2)(i) is amended by revising the term ''§§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter'' to read ''8 CFR 103.8''.

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 97. The heading for part 240 is revised as set forth above.

■ 98. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sections 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; section 902, Pub. L. 105–277, 112 Stat. 2681; 8 CFR part 2.

■ 99. Section 240.67 is amended by revising paragraph (a) introductory text to read as follows:

### § 240.67    Procedure for interview before an asylum officer.

(a) *Fingerprinting requirements.* USCIS will notify each applicant 14 years of age or older to appear for an interview only after the applicant has complied with fingerprinting requirements pursuant to 8 CFR 103.16, and USCIS has received a definitive response from the FBI that a full criminal background check has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:

\*    \*    \*    \*    \*

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

■ 100. The authority citation for part 241 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1228, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4); Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101, et seq.); 8 CFR part 2.

§ 241.4    [Amended]

■ 101. In § 241.4, paragraph (d)(2), first sentence is amended by revising the term ''8 CFR 103.5a'' to read ''8 CFR 103.8''.

■ 102. Section 241.5 is amended by revising paragraph (a)(5) to read as follows:

### § 241.5    Conditions of release after removal period.

(a) \* \* \*

(5) A requirement that the alien provide DHS with written notice of any change of address in the prescribed manner.

\*    \*    \*    \*    \*

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 103. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

§ 244.3    [Amended]

■ 104. Section 244.3 is amended by:
■ a. Revising the term ''the Service'' to read ''USCIS'' in the first sentence in paragraph (b);
■ b. Removing the phrase ''of grounds of inadmissibility on Form I–601 (Application for waiver of grounds of excludability)'' in the second sentence in paragraph (b);
■ c. Revising the term ''The Service'' to read ''USCIS'' in paragraph (c) introductory text.

§ 244.4    [Amended]

■ 105. In § 244.4, paragraph (b) is amended by revising the term ''section 243(h)(2) of the Act'' to read ''section 208(b)(2)(A) of the Act''.

§ 244.5    [Amended]

■ 106. In § 244.5, paragraph (a) is amended by revising the term ''the Attorney General'' to read ''DHS'' wherever the term appears.

■ 107. Section 244.6 is revised to read as follows:

### § 244.6    Application.

(a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific Federal Register notice that announces the procedures for TPS registration or re-registration, and 8 CFR 103.2, except as otherwise provided in this section, with the appropriate fees and biometric information as described in 8 CFR 103.7(b)(1), 103.16, and 103.17.

(b) An applicant for TPS may also request employment authorization

pursuant to 8 CFR 274a. Those applicants between the ages of 14 and 65 who are not requesting authorization to work will not be charged a fee for an application for employment authorization.

§ 244.7    [Amended]

■ 108. Section 244.7 is amended by:
■ a. Revising the phrase ''Form I–821, Application for Temporary Protected Status'' to read ''the form designated by USCIS with any prescribed fees and in accordance with the form instructions'' in paragraph (a); and
■ b. Revising the term ''Attorney General'' to read ''DHS'' in paragraph (b).

§ 244.9    [Amended]

■ 109. In § 244.9, paragraph (a)(4) is amended by revising the phrase ''Form I–551 or Form I–94'' to read ''evidence of admission for lawful permanent residence or nonimmigrant status''.

■ 110. Section 244.10 is amended by:
■ a. Revising the section heading; and
■ b. Revising paragraphs (a), (b) (c) and (d).

The revisions read as follows:

### § 244.10    Decision and appeal.

(a) *Temporary treatment benefits.* USCIS will grant temporary treatment benefits to the applicant if the applicant establishes prima facie eligibility for Temporary Protected Status in accordance with 8 CFR 244.5.

(b) *Temporary Protected Status.* Upon review of the evidence presented, USCIS may approve or deny the application for Temporary Protected Status in the exercise of discretion, consistent with the standards for eligibility in 8 CFR 244.2, 244.3, and 244.4.

(c) *Denial.* The initial decision to deny Temporary Protected Status, a waiver of inadmissibility, or temporary treatment benefits shall be in writing served in person or by mail to the alien's most recent address provided to the Service and shall state the reason(s) for the denial. Except as otherwise provided in this section, the alien will be given written notice of his or her right to appeal. If an appeal is filed, the administrative record shall be forwarded to the USCIS AAO for review and decision, except as otherwise provided in this section.

(1) If the basis for the denial of the Temporary Protected Status constitutes a ground for deportability or inadmissibility which renders the alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c), the decision shall

include a charging document which sets forth such ground(s).

(2) If such a charging document is issued, the alien shall not have the right to appeal the USCIS decision denying Temporary Protected Status as provided in 8 CFR 103.3. However, the decision will also apprise the alien of his or her right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(d) *Administrative appeal.* The appellate decision will be served in accordance with 8 CFR 103.8. If the appeal is dismissed, the decision must state the reasons for dismissal.

(1) If the appeal is dismissed on appeal under 8 CFR 244.18(b), the decision shall also apprise the alien of his or her right to a *de novo* determination of eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(2) If the appeal is dismissed, USCIS may issue a charging document if no charging document is presently filed with the Immigration Court.

(3) If a charging document has previously been filed or is pending before the Immigration Court, either party may move to re-calendar the case after the administrative appeal is dismissed.

*    *    *    *    *

### § 244.11   [Amended]

■ 111. Section 244.11 is amended by revising the term "§ 3.3 of this chapter" to read "8 CFR 1003".

### § 244.12   [Amended]

■ 112. Section 244.12, is amended by:
■ a. Revising the term "the INS" to read "USCIS" in paragraphs (a) and (c); and
■ b. Revising the phrase "appealed to the Administrative Appeals Unit" to read "pending administrative appeal" in paragraph (d).

### § 244.14   [Amended]

■ 113. Section 244.14 is amended by:
■ a. Revising the term "*director*" to read "*USCIS*" in paragraph (a) heading;
■ b. Revising the term "The director" to read "USCIS" in paragraph (a) introductory text;
■ c. Revising the term "the district director" to read "USCIS" in paragraph (a)(2) last sentence;
■ d. Revising the term "Attorney General" to read "DHS" in paragraph (a)(3);
■ e. Revising the term "*director*" to read "*USCIS*" in paragraph (b) heading; and by

■ f. Revising the term "§ 240.14(a)(3)" to read "8 CFR 244.14(a)(3)" and the term "§ 103.5a of this chapter" to read "8 CFR 103.8(a)(2)" in paragraph (b)(1).

### § 244.16   [Amended]

■ 114. In § 244.16, the term "the Department of Justice" is revised to read "DHS".

■ 115. Section 244.17 is revised to read as follows:

### § 244.17   Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS. Applicants for periodic re-registration must apply during the registration period provided by USCIS. Re-registering applicants will not need to re-pay the TPS application fee that was required for initial registration except that aliens requesting employment authorization must submit the application fee for employment authorization. The biometric service fee described in 103.7(b), or an approved fee waiver, will be required of applicants age 14 and over. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests them to do so.

(b) If an alien fails to register without good cause, USCIS will withdraw Temporary Protected Status. USCIS may, for good cause, accept and approve an untimely registration request.
■ 116. Section 244.18 is amended by revising paragraphs (b) and (d) to read as follows:

### § 244.18   Issuance of charging documents; detention.

*    *    *    *    *

(b) The filing of the charging document by DHS with the Immigration Court renders inapplicable any other administrative, adjudication or review of eligibility for Temporary Protected Status. The alien shall have the right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18. Review by the Board of Immigration Appeals shall be the exclusive administrative appellate review procedure. If an appeal is already pending before the Administrative Appeals Office (AAO), USCIS will notify the AAO of the filing of the charging document, in which case the pending appeal shall be dismissed and the record of proceeding returned to

the jurisdiction where the charging document was filed.

*    *    *    *    *

(d) An alien who is determined by USCIS deportable or inadmissible upon grounds which would have rendered the alien ineligible for such status as provided in 8 CFR 244.3(c) and 8 CFR 244.4 may be detained under the provisions of this chapter pending removal proceedings. Such alien may be removed from the United States upon entry of a final order of removal.

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 117. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 118. Section 245.1 is amended by:
■ a. Revising the term to "section 214(k)" to read: "section 214(l)" in the last sentence in paragraph (c)(2);
■ b. Removing and reserving paragraph (e)(2);
■ c. Revising the third sentence in paragraph (g)(1); and by
■ d. Removing the fourth sentence in paragraph (g)(1).
The revision reads as follows:

### § 245.1   Eligibility.

*    *    *    *    *

(g) *    *    *    *

(1) *    *    *  A preference immigrant visa is considered available for accepting and processing if the applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current). *    *    *

*    *    *    *    *

### § 245.2   [Amended]

■ 119. Section 245.2 is amended by removing the phrase ", except when the applicant has established eligibility for the benefits of Public Law 101–238" in the second sentence in paragraph (a)(5)(ii).

■ 120. In § 245.7, paragraph (a) is revised to read as follows:

*§ 245.7   Adjustment of status of certain Soviet and Indochinese parolees under the Foreign Operations Appropriations Act for Fiscal Year 1990 (Pub. L. 101–167).* (a) *Application.* Each person applying for benefits under section 599E of Public Law 101–167, 103 Stat. 1195, 1263, must file an application on the form prescribed by

USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

*    *    *    *    *

### § 245.9  [Removed and Reserved]

■ 121. Section 245.9 is removed and reserved.

■ 122. In § 245.10, paragraph (n)(2) is revised to read as follows:

### § 245.10  Adjustment of status upon payment of additional sum under Public Law 103–317.

*    *    *    *    *

(n) *  *  *

(2) To demonstrate physical presence on December 21, 2000, the alien may submit copies of documents issued by the former INS or EOIR such as arrival-departure forms or notices to appear in immigration court.

*    *    *    *    *

■ 123. In § 245.11, remove the last two sentences in paragraph (f) and add a new sentence to read as follows:

### § 245.11  Adjustment of aliens in S nonimmigrant classification.

*    *    *    *    *

(f) *  *  * The applicant may request employment authorization or permission to travel outside the United States while the application is pending by filing an application pursuant to 8 CFR 274a.13 or 8 CFR 223.2.

*    *    *    *    *

### § 245.12  [Removed and Reserved]

■ 124. Section 245.12 is removed and reserved.

### § 245.13  [Removed and Reserved]

■ 125. Section 245.13 is removed and reserved.

■ 126. Section 245.15 is amended by:
■ a. Revising the phrase "Advance Authorization for Parole (Form I–512)" to read "advance parole authorization" and revising the phrase "Advance Authorization for Parole" to read "authorization" in paragraph (c)(4)(ii);
■ b. Revising paragraph (g)(1);
■ c. Revising paragraph (n)(1);
■ d. Revising the phrase "the Director of the Nebraska Service Center verifies that Service" to read "USCIS verifies that DHS" and by revising the term "the Director may approve" to read "USCIS may approve" in the first sentence in paragraph (n)(2);
■ e. Revising the term "the Service" to read "USCIS" in the second sentence in paragraph (n)(2);
■ f. Revising paragraph (s)(1);
■ g. Revising paragraph (t)(1);
■ h. Revising the phrase "an Application for Travel Document (Form I–131) with the Nebraska Service Center, at P.O. Box 87245, Lincoln, NE 68501–7245" to read "a request on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence of paragraph (t)(2)(i); and
■ i. Revising the term "Form I–485" to read "application for adjustment of status" in the second sentence in paragraph (t)(2)(i).

The revisions read as follows:

### § 245.15  Adjustment of Status of Certain Haitian Nationals under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA).

*    *    *    *    *

(g) *  *  *

(1) *Filing of applications with USCIS.* USCIS has jurisdiction over all applications for the benefits of section 902 of HRIFA as a principal applicant or as a dependent under this section, except for applications filed by aliens who are in pending immigration proceedings as provided in paragraph (g)(2) of this section. All applications filed with USCIS for the benefits of section 902 of HRIFA must be submitted on the form designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. After proper filing of the application, USCIS will instruct the applicant to appear for biometrics collection as prescribed in 8 CFR 103.16.

*    *    *    *    *

(n) *  *  *

(1) *Application for employment authorization.* An applicant for adjustment of status under section 902 of HRIFA who wishes to obtain initial or continued employment authorization during the pendency of the adjustment application must file an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The applicant may submit the application either concurrently with or subsequent to the filing of the application for HRIFA benefits.

*    *    *    *    *

(s) *Action of immigration judge upon referral of decision by a notice of certification.* (1) *General.* Upon the referral by a notice of certification of a decision to deny the application, in accordance with paragraph (r)(3) of this section, the immigration judge will conduct a hearing to determine whether the alien is eligible for adjustment of status under section 902 of HRIFA in accordance with this paragraph (s)(1).

*    *    *    *    *

(t) *  *  *

(1) *Travel from and return to the United States while the application for adjustment of status is pending.* If an applicant for benefits under section 902 of HRIFA desires to travel outside, and return to, the United States while the application for adjustment of status is pending, he or she must file a request for advance parole authorization on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Unless the applicant files an advance parole request prior to departing from the United States and USCIS approves such request, his or her application for adjustment of status under section 902 of HRIFA is deemed to be abandoned as of the moment of departure. Parole may only be authorized pursuant to the authority contained in, and the standards prescribed in, section 212(d)(5) of the Act.

*    *    *    *    *

■ 127. Section 245.18 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (d)(1);
■ c. Revising the term "the Service" to read "USCIS" in paragraph (d)(2); and
■ d. Revising the last sentence in paragraph (k).

The revisions read as follows:

### § 245.18  Physicians with approved employment-based petitions serving in a medically underserved area or a Veterans Affairs facility.

*    *    *    *    *

(d) *Employment authorization.* (1) Once USCIS has approved a petition described in paragraph (a) of this section, the alien physician may apply for permanent residence and employment authorization on the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

*    *    *    *    *

(k) *  *  * Such physicians may apply for advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

*    *    *    *    *

### § 245.20  [Removed and Reserved]

■ 128. Section 245.20 is removed and reserved.

■ 129–130. Section 245.21 is amended by:
■ a. Adding the word "and" at the end of paragraph (a)(3);
■ b. Removing paragraph (a)(4);
■ c. Redesignating paragraph (a)(5) as paragraph (a)(4);
■ d. Revising paragraph (b);
■ e. Revising the second sentence in paragraph (d)(1);

■ f. Revising paragraph (d)(2);
■ g. Revising the last sentence in paragraph (f);
■ h. Revising paragraph (h);
■ i. Revising paragraph (i);
■ j. Revising the terms, "Service" and "Service's" to read "USCIS'" in paragraph (j);
■ k. Removing paragraph (m); and
■ l. By revising the terms "The Service" and "the Service" to read "USCIS" wherever the terms appear in the following paragraphs;
■ i. Paragraph (a) introductory text;
■ ii. Paragraph (c);
■ iii. Paragraph (d) introductory text;
■ iv. Paragraph (d)(4);
■ v. Paragraph (g)(3);
■ vi. Paragraph (j);
■ vii. Paragraph (k); and
■ viii. Paragraph (l).
The revisions read as follows:

### § 245.21 Adjustment of status of certain nationals of Vietnam, Cambodia, and Laos.

\*    \*    \*    \*    \*

(b) *Application.* An applicant must submit an application on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Applicants who are 14 through 79 years of age must also submit the biometrics service fee described in 8 CFR 103.17.

\*    \*    \*    \*    \*

(d) \*  \*  \*
(1) \*  \*  \* An alien who is eligible for adjustment of status under section 586 of Public Law 106–429 may request a stay of removal during the pendency of the application. \*  \*  \*
(2) DHS will exercise its discretion not to grant a stay of removal, deportation, or exclusion with respect to an alien who is inadmissible on any of the grounds specified in paragraph (m)(3) of this section, unless there is substantial reason to believe that USCIS will grant the necessary waivers of inadmissibility.

\*    \*    \*    \*    \*

(f) \*  \*  \* In order to obtain a waiver for any of these grounds, the applicant must submit an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\*    \*    \*    \*    \*

(h) *Employment authorization.* Applicants who want to obtain employment authorization based on a pending application for adjustment of status under this section may apply on the form specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.
(i) *Travel while an application to adjust status is pending.* An applicant

who wishes to travel outside the United States while the application is pending must obtain advance permission by filing the application specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\*    \*    \*    \*    \*

■ 131. In § 245.22, paragraph (c) is revised to read as follows:

### § 245.22 Evidence to demonstrate an alien's physical presence in the United States on a specific date.

\*    \*    \*    \*    \*

(c) *DHS-issued documentation.* An applicant for permanent residence may demonstrate physical presence by submitting DHS-issued (or predecessor agency-issued) documentation such as an arrival-departure form or notice to appear in immigration proceedings.

\*    \*    \*    \*    \*

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 132. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a, and 1255a note.

■ 133. The heading for part 245a is revised as set forth above.

### § 245a.4 [Amended]

■ 134. In § 245a.4, paragraph (b)(16), third sentence is amended by revising the term "§ 103.5a(b) of this Act" to read "8 CFR 103.8(b)".

### § 245a.12 [Amended]

■ 135. In § 245a.12, paragraph (b) introductory text, third sentence is amended by revising the term "fingerprinting as prescribed in § 103.2(e) of this chapter" to read "fingerprinting as prescribed in 8 CFR 103.16".

### § 245a.37 [Amended]

■ 136. In § 245a.37, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8" wherever that term appears.

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 137. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

### § 248.1 [Amended]

■ 138. Section 248.1 is amended by:

■ a. Revising the term "the Service" to read "USCIS" in paragraph (b) introductory text;
■ b. Revising the term "the Service" to read "USCIS" in paragraph (b)(1);
■ c. Revising the phrase "The district director or service center director shall" to read "USCIS will" in the second sentence in paragraph (c)(1);
■ d. Revising the phrase "The district director or service center director" to read "USCIS" in the last sentence in paragraph (c)(3); and
■ e. Removing the phrase "before the Service" in the last sentence in paragraph (c)(3).
■ 139. Section 248.3 is amended by:
■ a. Adding introductory text;
■ b. Revising paragraph (a);
■ c. Revising paragraph (b);
■ d. Revising the phrase "Form I–539 and be accompanied by a Form I–566, completed and endorsed in accordance with the instructions on that form" to read "the prescribed application accompanied by the appropriate endorsement from the Department of State recommending the change of status" in the second sentence in paragraph (c);
■ e. Removing and reserving paragraph (d);
■ f. Revising the term "sections 101(a)(15)(E), (H), (I), (J), (L), or (Q)(ii) of the Act" to read "sections 101(a)(15)(E), (H), (I), (J), or (L) of the Act" in paragraph (e)(2);
■ g. Revising the term "the district director" to read "USCIS" in the last sentence in paragraph (f); and
■ h. Revising the phrase "Form I–539, Application to Extend/Change Nonimmigrant Status, with the appropriate fee, and Form I–854, Inter-Agency Alien Witness and Informant Record, with attachments" to read "the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (h) introductory text.
The revisions read as follows:

### § 248.3 Petition and application.

Requests for a change of status must be filed on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b) and in accordance with the form instructions.

(a) *Petition by employer.* An employer must submit a petition for a change of status to E–1 treaty trader, E–2 treaty investor, H–1C, H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–2, P–3, Q–1, R–1, or TN nonimmigrant.

(b) *Application by nonimmigrant.* (1) *Individual applicant.* Any nonimmigrant who seeks to change status to:

(i) A dependent nonimmigrant classification as the spouse or child of

a principal whose nonimmigrant classification is listed in paragraph (a) of this section, or

(ii) Any other nonimmigrant classification not listed in paragraph (a) of this section must apply for a change of status on his or her own behalf.

(2) *Multiple applicants.* More than one person may be included in an application where the co-applicants are all members of a single family group and either all hold the same nonimmigrant status or one holds a nonimmigrant status and the co-applicants are his or her spouse and/or children who hold derivative nonimmigrant status based on the principal's nonimmigrant status.

\*      \*      \*      \*      \*

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 140. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1201a, 1301–1305; 8 CFR part 2.

■ 141. Section 264.1 is amended by:
■ a. Removing the entry for Form "I–485A" from the table in paragraph (a);
■ b. Removing the entries for Forms "I–688", "I–688A" and "I–688B" from the table in paragraph (b);
■ c. Adding the entries for "Form I–862" and "Form I–863" in proper numerical sequence in the table in paragraph (b);
■ d. Revising paragraph (c);
■ e. Revising the term "Service" to read "USCIS" in paragraph (d);
■ f. Revising paragraph (g); and
■ g. Removing paragraphs (h) and (i).
The revisions read as follows:

### § 264.1   Registration and fingerprinting.

\*      \*      \*      \*      \*

(b) \* \* \*

Form No. and Class

\*      \*      \*      \*      \*

Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

\*      \*      \*      \*      \*

(c) *Replacement of alien registration.* Any alien whose registration document is not available for any reason must immediately apply for a replacement document in the manner prescribed by USCIS.

\*      \*      \*      \*      \*

(g) *Registration and fingerprinting of children who reach age 14.* Within 30

days after reaching the age of 14, any alien in the United States not exempt from alien registration under the Act and this chapter must apply for registration and fingerprinting, unless fingerprinting is waived under paragraph (e) of this section, in accordance with applicable form instructions.

(1) *Permanent residents.* If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, he must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. USCIS will issue the alien new evidence of alien registration.

(2) *Others.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration.

### § 264.2   [Amended]

■ 142. In § 264.2, paragraph (d) is amended by revising the term "be fingerprinted on Form FD–258, Applicant Card, as prescribed in § 103.2(e) of this chapter" to read "be fingerprinted as prescribed in 8 CFR 103.16."

■ 143. Section 264.5 is amended by:
■ a. Revising paragraph (a);
■ b. Revising the term "Form I–90" to read "the designated form" wherever the term appears in paragraphs (c)(1) and (2);
■ c. Revising paragraph (d) introductory text;
■ d. Revising paragraph (e);
■ e. Revising paragraph (g) and by
■ f. Adding paragraphs (h) and (i).
The revisions read as follows:

### § 264.5   Application for replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 103.7(b)(1); except that no fee is required for an application filed pursuant to paragraphs (b)(7) through (9) of this section, or paragraphs (d)(2) or (4) of this section.

\*      \*      \*      \*      \*

(d) *Conditional permanent residents required to file.* A conditional permanent resident whose card is expiring may apply to have the conditions on residence removed in accordance with 8 CFR 216.4 or 8 CFR

216.6. A conditional resident who seeks to replace a permanent resident card that is not expiring within 90 days may apply for a replacement card on the form prescribed by USCIS:

\*      \*      \*      \*      \*

(e) *Supporting documentation.* (1) The prior Permanent Resident Card must be surrendered to USCIS if a new card is being requested in accordance with paragraphs (b)(2) through (5) and (b)(8) and (9) of this section.

(2) A request to replace a Permanent Resident Card filed pursuant to paragraph (b)(4) of this section must include evidence of the name change such as a court order or marriage certificate.

(3) A request to replace a Permanent Resident Card in order to change any other biographic data on the card must include documentary evidence verifying the new data.

\*      \*      \*      \*      \*

(g) *Eligibility for evidence of permanent residence while in deportation, exclusion, or removal proceedings.* A person in deportation, exclusion, or removal proceedings is entitled to evidence of permanent resident status until ordered excluded, deported, or removed. USCIS will issue such evidence in the form of a temporary permanent resident document that will remain valid until the proceedings are concluded. Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings.

(h) *Temporary evidence of registration.* USCIS may issue temporary evidence of registration and lawful permanent resident status to a lawful permanent resident alien who is departing temporarily from the United States and has applied for issuance of a replacement permanent resident card if USCIS is unable to issue and deliver such card prior to the alien's contemplated return to the United States. The alien must surrender such temporary evidence upon receipt of his or her permanent resident card.

(i) *Waiver of requirements.* USCIS may waive the photograph, in person filing, and fingerprinting requirements of this section in cases of confinement due to advanced age or physical infirmity.

■ 144. Section 264.6 is revised to read as follows:

### § 264.6   Application for a nonimmigrant arrival-departure record.

(a) *Eligibility.* USCIS may issue a new or replacement arrival-departure record to a nonimmigrant who seeks:

(1) To replace a lost or stolen record;

(2) To replace a mutilated record; or

(3) Was not issued an arrival-departure record pursuant to 8 CFR 235.1(h)(1)(i), (iii), (iv), (v), or (vi) when last admitted as a nonimmigrant, and has not since been issued such record but now requires one.

(b) *Application.* A nonimmigrant may request issuance or replacement of a nonimmigrant arrival-departure record by applying on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(c) *Processing.* A pending application filed under paragraph (a) of this section is temporary evidence of registration. If the application is approved, USCIS will issue an arrival-departure document. There is no appeal from the denial of this application.

## PART 265—NOTICES OF ADDRESS

■ 145. The authority citation for part 265 is revised to read as follows:

**Authority:** 8 U.S.C. 1103 and 1305.

■ 146. Section 265.1 is revised to read as follows:

### § 265.1   Reporting change of address.

Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register under section 262 of the Act must report each change of address and new address within 10 days of such change in accordance with instructions provided by USCIS.

## PART 270—PENALTIES FOR DOCUMENT FRAUD

■ 147. The authority citation for part 270 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, and 1324c; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 104–134, 110 Stat. 1321.

### § 270.2   [Amended]

■ 148. Section 270.2 is amended by revising the term ''§ 103.5a(a)(2) of this chapter'' to read ''8 CFR 103.8(a)(2)'' wherever that term appears in the following places:

■ a. Paragraph (d) and

■ b. Paragraph (i).

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 149. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

■ 150. Section 274a.12 is amended by:

■ a. Revising the term ''BCIS'' to read ''USCIS'' wherever that term appears in paragraph (a)(5);

■ b. Revising paragraph (b)(6)(iv);

■ c. Revising the term ''BCIS'' to read ''USCIS'' in paragraph (c) introductory text;

■ d. Revising paragraph (c)(1);

■ e. Revising paragraph (c)(4); and

■ f. Removing and reserving paragraph (c)(23).

The revisions read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(6) \* \* \*

(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17-month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or

\*　　\*　　\*　　\*　　\*

(c) \* \* \*

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

\*　　\*　　\*　　\*　　\*

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

\*　　\*　　\*　　\*　　\*

■ 151. Section 274a.13 is amended by:

■ a. Revising paragraph (a);

■ b. Removing the term ''INS'' in paragraph (b); and

■ c. Revising paragraph (d).

The revision reads as follows:

### § 274a.13   Application for employment authorization.

(a) *Application.* Aliens authorized to be employed under sections 274a.12(a)(3), (4), (6) through (8), (a)(10) through (15), and (a)(20) must file an application in order to obtain documentation evidencing this fact.

(1) Aliens who may apply for employment authorization under 8 CFR 274a.12(c), except for those who may apply under 8 CFR 274a.12(c)(8), must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR 274a.12(c)(8), are within the discretion of USCIS. Where economic necessity has been identified as a factor, the alien must provide information regarding his or her assets, income, and expenses.

(2) An initial employment authorization request for asylum applicants under 8 CFR 274a.12(c)(8) must be filed on the form designated by USCIS in accordance with the form instructions. The applicant also must submit a copy of the underlying application for asylum or withholding of deportation, together with evidence that the application has been filed in accordance with 8 CFR 208.3 and 208.4. An application for an initial employment authorization or for a renewal of employment authorization filed in relation to a pending claim for asylum shall be adjudicated in accordance with 8 CFR 208.7. An application for renewal or replacement of employment authorization submitted in relation to a pending claim for asylum, as provided in 8 CFR 208.7, must be filed, with fee or application for waiver of such fee.

\*　　\*　　\*　　\*　　\*

(d) *Interim employment authorization.* USCIS will adjudicate the application within 90 days from the date of receipt of the application, except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days. Such authorization will be subject to any conditions noted on the employment authorization document. However, if USCIS adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the interim employment authorization granted under this section will automatically terminate as of the date of the adjudication and denial.

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

■ 152. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; Homeland Security Act of

Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations    53797

2002, Pub. L. 107–296 (6 U.S.C. 1, *et seq.*); 8 CFR part 2.

## § 287.5  [Amended]

■ 153. Section 287.5 is amended by:
■ a. Removing the phrase "as defined in 8 CFR 103.1(b)" in paragraph (a) introductory text;
■ b. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(1)(viii); and
■ c. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(2)(viii).

## § 287.7  [Amended]

■ 154. In § 287.7, paragraph (b)(8) is amended by revising the term "the BCIS" to read "USCIS".

## PART 292—REPRESENTATION AND APPEARANCES

■ 155. The authority citation for part 292 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1252b, 1362.

## § 292.1  [Amended]

■ 156. Section 292.1 is amended by revising the terms "§ 1.1(f) of this chapter" and "8 CFR 1.1(f)" to read "8 CFR 1.2" wherever the term appears in the following places:
■ a. Paragraph (a)(1); and
■ b. Paragraph (a)(6) first sentence.

## § 292.3  [Amended]

■ 157. Section 292.3 is amended by revising the terms "8 CFR 1.1(f)" and "8 CFR 1.1(j)", to read "8 CFR 1.2" in paragraph (a)(2);
■ 158. Section 292.4 is amended by revising paragraph (b) to read as follows:

## § 292.4  Appearances.

*    *    *    *    *

   (b) A party to a proceeding and his or her attorney or representative will be permitted to examine the record of proceeding in accordance with 6 CFR part 5.

## PART 299—IMMIGRATION FORMS

■ 159. The authority citation for part 299 continues to read as follows:

   **Authority:** 8 U.S.C. 1101 and note, 1103; 8 CFR Part 2.

■ 160. Section 299.1 is revised to read as follows:

## § 299.1  Prescribed forms.

   A listing of USCIS, ICE, and CBP approved forms referenced in chapter I can be viewed on the Office of Management and Budget Web site at *http://www.reginfo.gov.* A listing of approved USCIS forms can also be viewed on its Internet Web site.

## § 299.3  [Removed and Reserved]

■ 161. Section 299.3 is removed and reserved.

## § 299.5  [Removed and Reserved]

■ 162. Section 299.5 is removed and reserved.

## PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH

■ 163. The authority citation for part 301 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1401; 8 CFR part 2.

■ 164. Section 301.1 is amended by revising paragraph (a)(1) to read as follows:

## § 301.1  Procedures.

   (a) *  *  *
   (1) As provided in 8 CFR part 341, a person residing in the United States who desires to be documented as a United States citizen pursuant to section 301(h) of the Act may apply for a passport at a United States passport agency or may submit an application on the form specified by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). The applicant will be notified when and where to appear before a USCIS officer for examination on his or her application.

*    *    *    *    *

## PART 310—NATURALIZATION AUTHORITY

■ 165. The authority citation for part 310 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1421, 1443, 1447, 1448; 8 CFR 2.1.

## § 310.2  [Amended]

■ 166. Section 310.2, first sentence, is amended by revising the term "The Service" to read "USCIS" and the term "Service district" to read "Service district, as defined in 8 CFR 316.1,"

## PART 312—EDUCATIONAL REQUIREMENTS FOR NATURALIZATION

■ 167. The authority citation for part 312 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1423, 1443, 1447, 1448.

■ 168. Section 312.1 is amended by revising paragraph (c) to read as follows:

## § 312.1  Literacy requirements.

*    *    *    *    *

   (c) *Literacy examination.* (1) *Verbal skills.* The ability of an applicant to speak English will be determined by a designated immigration officer from the applicant's answers to questions normally asked in the course of the examination.
   (2) *Reading and writing skills.* Except as noted in 8 CFR 312.3, an applicant's ability to read and write English must be tested in a manner prescribed by USCIS. USCIS will provide a description of test study materials and testing procedures on the USCIS Internet Web site.

■ 169. Section 312.2 is amended by revising paragraph (c) to read as follows:

## § 312.2  Knowledge of history and government of the United States.

*    *    *    *    *

   (c) *History and government examination.* (1) *Procedure.* The examination of an applicant's knowledge of the history and form of government of the United States must be given orally in English by a designated immigration officer, except:
   (i) If the applicant is exempt from the English literacy requirement under 8 CFR 312.1(b), the examination may be conducted in the applicant's native language with the assistance of an interpreter selected in accordance with 8 CFR 312.4 but only if the applicant's command of spoken English is insufficient to conduct a valid examination in English;
   (ii) The examination may be conducted in the applicant's native language, with the assistance of an interpreter selected in accordance with 8 CFR 312.4, if the applicant is required to satisfy and has satisfied the English literacy requirement under 8 CFR 312.1(a), but the officer conducting the examination determines that an inaccurate or incomplete record of the examination would result if the examination on technical or complex issues were conducted in English, or
   (iii) The applicant has met the requirements of 8 CFR 312.3.
   (2) *Scope and substance.* The scope of the examination will be limited to subject matters prescribed by USCIS. In choosing the subject matters, in phrasing questions and in evaluating responses, due consideration must be given to the applicant's:
   (i) Education,
   (ii) Background,
   (iii) Age,
   (iv) Length of residence in the United States,
   (v) Opportunities available and efforts made to acquire the requisite knowledge, and
   (vi) Any other elements or factors relevant to an appraisal of the adequacy of the applicant's knowledge and understanding.

■ 170. Section 312.3 is revised to read as follows:

### § 312.3   Testing of applicants who obtained permanent residence pursuant to section 245A of the Act.

An applicant who has obtained lawful permanent resident alien status pursuant to section 245A of the Act, and who, at that time, demonstrated English language proficiency in reading and writing, and knowledge of the government and history of the United States through either an examination administered by USCIS or the INS or a standardized section 312 test authorized by the USCIS or the INS for use with Legalization applicants as provided in section 245A(b)(1)(D)(iii) of the Act, will not be reexamined on those skills at the time of the naturalization interview. However, such applicant, unless otherwise exempt, must still demonstrate his or her ability to speak and understand English in accordance with 8 CFR 312.1(c)(1) and establish eligibility for naturalization through testimony in the English language.

## PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

■ 171. The authority citation for part 316 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1427, 1443, 1447; 8 CFR part 2.

■ 172. Section 316.1 is revised to read as follows:

### § 316.1   Definitions.

As used in this part, the term:

*Application* means any form, as defined in 8 CFR part 1, on which an applicant requests a benefit relating to naturalization.

*Residence in the Service district where the application is filed* means residence in the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization, regardless of where or how USCIS may require such benefit request to be submitted, or whether jurisdiction for the purpose of adjudication is relocated or internally reassigned to another USCIS office.

*Service district* means the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization.

### § 316.2   [Amended]

■ 173. In § 316.2, paragraph (a)(5) is amended by removing the end the phrase '', and in which the alien seeks to file the application''.

■ 174. Section 316.4 is amended by:

■ a. Revising paragraph (a);

■ b. Removing paragraph (b); and

■ c. Redesignating paragraph (c) as paragraph (b).

The revision reads as follows:

### § 316.4   Applications; documents.

(a) The applicant will apply for naturalization in accordance with instructions provided on the form prescribed by USCIS for that purpose.

\*    \*    \*    \*    \*

■ 175. Section 316.5 is amended by adding paragraph (b)(6) to read as follows:

### § 316.5   Residence in the United States.

\*    \*    \*    \*    \*

(b) \* \* \*

(6) *Spouse of military personnel.* Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as residence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(i) The spouse of a member of the Armed Forces;

(ii) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(iii) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

\*    \*    \*    \*    \*

■ 176. Section 316.6 is added to read as follows:

### § 316.6   Physical presence for certain spouses of military personnel.

Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as physical presence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(a) The spouse of a member of the Armed Forces;

(b) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(c) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

## PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS

■ 177. The authority citation for part 319 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1430, 1443.

### § 319.1   [Amended]

■ 178. In § 319.1, paragraph (a)(5) is amended by removing the phrase ''and in which the alien has filed the application''

■ 179. Section 319.3 is amended by revising paragraph (a) to read as follows:

### § 319.3   Surviving spouse, child, or parent of a United States citizen who died during a period of honorable service in an active duty status in the Armed Forces of the United States.

(a) *Eligibility.* To be eligible for naturalization under section 319(d) of the Act, the surviving spouse, child, or parent of a United States citizen must:

(1) Establish that his or her citizen spouse, child, or parent died during a period of honorable service in an active duty status in the Armed Forces of the United States and, in the case of a surviving spouse, establish that he or she was living in marital union with the citizen spouse, in accordance with 8 CFR 319.1(b), at the time of the citizen spouse's death;

(2) At the time of examination on the application for naturalization, reside in the United States pursuant to a lawful admission for permanent residence;

(3) Be a person of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States; and

(4) Comply with all other requirements for naturalization as provided in 8 CFR 316, except for those contained in 8 CFR 316.2(a)(3) through (6).

\*    \*    \*    \*    \*

■ 180. Section 319.11 is amended by revising paragraph (a) introductory text to read as follows:

### § 319.11   Filing of application.

(a) *General.* An applicant under this part must submit an application for naturalization in accordance with the form instructions with the fee required by 8 CFR 103.7(b)(1). An alien spouse applying for naturalization under section 319(b) of the Act who is described in 8 CFR 319.2 must also submit a statement of intent containing the following information about the

citizen spouse's employment and future intent:

\* \* \* \* \*

## PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP

■ 181. The authority citation for part 320 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 182. Section 320.3 is amended by:
■ a. Revising paragraph (a); and
■ b. Revising paragraph (b)(1) introductory text.

The revisions read as follows:

### § 320.3  How, where, and what forms and other documents should be filed?

(a) *Application.* Individuals who are applying for a certificate of citizenship on their own behalf should submit the request in accordance with the form instructions on the form prescribed by USCIS for that purpose. An application for a certificate of citizenship under this section on behalf of a child who has not reached the age of 18 years must be submitted by that child's U.S. citizen biological or adoptive parent(s), or legal guardian.

(b) *Evidence.* (1) An applicant under this section must establish eligibility as described in 8 CFR 320.2. An applicant must submit the following supporting evidence unless such evidence is already contained in USCIS administrative file(s):

\* \* \* \* \*

■ 183. Section 320.5 is revised to read as follows:

### § 320.5  Decision.

(a) *Approval of application.* If the application for the certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship.

(b) *Denial of application.* If the decision of USCIS is to deny the application for a certificate of citizenship under this section, the applicant will be advised in writing of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an applicant for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP

■ 184. The authority citation for part 322 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

### § 322.1  [Amended]

■ 185. Section 322.1 is amended, in the definition of "adopted child" by revising "section 101(b)(1)(E) or (F)" to read "section 101(b)(1)(E), (F) or (G)".
■ 186. Section 322.2 is amended by:
■ a. Revising the section heading; and by
■ b. Adding paragraph (c) to read as follows:

### § 322.2  Eligibility.

\* \* \* \* \*

(c) *Exceptions for children of military personnel.* Pursuant to section 322(d) of the Act, a child of a member of the Armed Forces of the United States residing abroad is exempt from the temporary physical presence, lawful admission, and maintenance of lawful status requirements under 8 CFR 322.2(a)(5), if the child:

(1) Is authorized to accompany and reside abroad with the member of the Armed Forces pursuant to the member's official orders; and

(2) Is accompanying and residing abroad with the member of the Armed Forces.

■ 187. Section 322.3 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (a);
■ c. Revising paragraph (b)(1)(viii);
■ d. Revising paragraph (b)(1)(xi);
■ e. Revising paragraph (b)(1)(xii);
■ f. Revising paragraph (b)(1)(xiii); and
■ g. Revising paragraph (b)(2), the first sentence.

The revisions read as follows:

### § 322.3  Application and supporting documents.

(a) *Application.* A U.S. citizen parent of an alien child (including an adopted child) may file an application for the child to become a citizen and obtain a certificate of citizenship under section 322 of the Act by submitting an application on the form prescribed by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). If the U.S. citizen parent has died, the child's U.S. citizen grandparent or U.S. citizen legal guardian may submit the application, provided the application is filed not more than 5 years after the death of the U.S. citizen parent.

(b) \* \* \*
(1) \* \* \*

(viii) Evidence that the child is present in the United States pursuant to a lawful admission and is maintaining such lawful status, or evidence establishing that the child qualifies for an exception to these requirements as provided in 8 CFR 322.2(c) pursuant to section 322(d) of the Act. Such evidence may be presented at the time of interview when appropriate;

\* \* \* \* \*

(xi) For adopted orphans applying under section 322 of the Act, a copy of notice of approval of the orphan petition and supporting documentation for such petition (except the home study) or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IR–3 (Orphan adopted abroad by a U.S. citizen) or IR–4 (Orphan to be adopted by a U.S. citizen);

(xii) For a Hague Convention adoptee applying under section 322 of the Act, a copy of the notice of approval of the Convention adoptee petition and its supporting documentation, or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IH–3 (Hague Convention Orphan adopted abroad by a U.S. citizen) or IH–4 (Hague Convention Orphan to be adopted by a U.S. citizen); and

(xiii) Evidence of all legal name changes, if applicable, for the child, U.S. citizen parent, U.S. citizen grandparent, or U.S. citizen legal guardian.

(2) If USCIS requires any additional documentation to make a decision on the application, the parents may be asked to provide that documentation under separate cover or at the time of interview. \* \* \*

■ 188. Section 322.4 is revised to read as follows:

### § 322.4  Interview.

The U.S. citizen parent and the child must appear in person before a USCIS officer for examination on the application under this section. If the U.S. citizen parent is deceased, the

child's U.S. citizen grandparent or U.S. citizen legal guardian who filed the application on the child's behalf must appear.

■ 189. Section 322.5 is revised to read as follows:

### §322.5   Decision.

(a) *Approval of application.* If the application for certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship. The child is a citizen as of the date of approval and administration of the oath of allegiance.

(b) *Denial of application.* If the USCIS decision is to deny the application for a certificate of citizenship under this section, the applicant will be furnished with the reasons for denial and advised of the right to appeal in accordance with the provisions of 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

■ 190. The authority citation for part 324 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

### §324.2   [Amended]

■ 191. In § 324.2, paragraph (b) is amended by revising the term ''N–400, as required by § 316.4 of this chapter'' to read ''the form designated by USCIS in accordance with the form instructions and with the fee prescribed in 8 CFR 103.7(b)(1) as required by 8 CFR 316.4''.

### §324.3   [Amended]

■ 192. In § 324.3, paragraph (b)(1) is amended by revising the phrase ''an Application for Naturalization, form N–400, to USCIS'' to read ''an application for naturalization on the form prescribed by USCIS''.

■ 193. Section 324.5 is revised to read as follows:

### §324.5   Former citizen of the United States whose naturalization by taking the oath is authorized by a private law.

A former citizen of the United States whose naturalization by taking the oath before any naturalization court or office of USCIS within the United States is authorized by a private law must submit an application on the form specified by USCIS, without fee, in accordance with the form instructions.

## PART 325—NATIONALS BUT NOT CITIZENS OF THE UNITED STATES; RESIDENCE WITHIN OUTLYING POSSESSIONS

■ 194. The authority citation for part 325 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1436, 1443.

### §325.4   [Amended]

■ 195. In § 325.4, paragraph (b)(3) is amended by revising the term ''Service district in the United States where the application is filed'' to read ''Service district, as defined in 8 CFR 316.1,''.

## PART 328—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH 1 YEAR OF SERVICE IN THE UNITED STATES ARMED FORCES

■ 196. The authority citation for part 328 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1439, 1443.

■ 197. Section 328.4 is revised to read as follows:

### §328.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 328 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 328.2(a) or (b) will be established only by the certification of honorable service by the executive department under which the applicant served or is serving.

## PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH ACTIVE DUTY OR CERTAIN READY RESERVE SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES

■ 198. The authority citation for part 329 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

■ 199. Revise § 329.4 to read as follows:

### §329.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 329 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 329.2(a), (b), or (c)(2) will be established only by a certification of honorable service by the executive department under which the applicant served or is serving.

### §329.5   [Removed]

■ 200. Section 329.5 is removed.

## PART 330—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SEAMEN

■ 201. The authority citation for part 330 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

### §330.2   [Amended]

■ 202. In § 330.2, paragraph (a) is amended by revising the phrase ''Application for Naturalization, Form N–400.'' to read ''application on the form designated by USCIS.''.

## PART 332—NATURALIZATION ADMINISTRATION

■ 203. The authority citation for part 332 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 204. Section 332.1 is revised to read as follows:

### §332.1   Designation of USCIS employees to administer oaths and conduct examinations and hearings.

(a) *Examinations.* All USCIS officers are hereby designated to conduct the examination for naturalization required under section 335 of the Act, provided that each officer so designated has received appropriate training.

(b) *Hearings.* Section 336 of the Act authorizes USCIS officers who are designated under paragraph (a) of this

section to conduct hearings under that section.

(c) *Depositions.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to take depositions in matters relating to the administration of naturalization and citizenship laws.

(d) *Oaths and affirmations.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to administer oaths or affirmations except for the oath of allegiance as provided in 8 CFR 337.2.

§§ 332.2, 332.3, and 332.4 [Removed and Reserved]

■ 205. Sections 332.2, 332.3, and 332.4 are removed and reserved.

## PART 333—PHOTOGRAPHS

■ 206. The authority citation for part 333 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 207. In § 333.1, paragraph (a) is revised to read as follows:

### § 333.1  Description of required photographs.

(a) Every applicant who is required to provide photographs under section 333 of the Act must do so as prescribed by USCIS in its form instructions.

\*     \*     \*     \*     \*

■ 208. Section 333.2 is revised to read as follows:

### § 333.2  Attachment of photographs to documents.

A photograph of the applicant must be securely and permanently attached to each certificate of naturalization or citizenship, or to any other document that requires a photograph, in a manner prescribed by USCIS.

## PART 334—APPLICATION FOR NATURALIZATION

■ 209. The authority citation for part 334 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 210. In § 334.2, paragraph (a) is revised to read as follows:

### § 334.2  Application for naturalization.

(a) An applicant may file an application for naturalization with required initial evidence in accordance with the general form instructions for naturalization. The applicant must include the fee as required in 8 CFR 103.7(b)(1).

\*     \*     \*     \*     \*

■ 211. Section 334.11 is amended by:
■ a. Revising the term "Form N–300" to read "the form specified by USCIS, in accordance with the form instructions" in paragraph (a); and by

■ b. Revising paragraph (b).
The revision reads as follows:

### § 334.11  Declaration of intention.

\*     \*     \*     \*     \*

(b) *Approval.* If approved, USCIS will retain the application in the file and advise the applicant of the action taken.

\*     \*     \*     \*     \*

### §§ 334.16–334.18  [Removed]

■ 212. Sections 334.16 through 334.18 are removed.

## PART 335—EXAMINATION ON APPLICATION FOR NATURALIZATION

■ 213. The authority citation for part 335 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 214. Section 335.2 is amended by:
■ a. Revising the term "Service" to read "USCIS" and the term "§ 332.1 of this chapter" to read "8 CFR 332.1" in paragraph (a);
■ b. Revising the terms "The Service" and "Service" to read "USCIS" wherever that term appears in paragraph (b) introductory text;
■ c. Revising paragraph (b)(3);
■ d. Revising the terms "the Service officer", "The Service officer" and "the Service" to read "USCIS" wherever the terms appear in paragraph (c);
■ e. Revising paragraph (d)(2);
■ f. Revising the term "Service" to read "USCIS" wherever the term appears in paragraph (e); and
■ g. Revising the term "Service" to read "USCIS" and the term "§ 312.4 of this chapter" to read "8 CFR 312.4" wherever the terms appear in paragraph (f).

The revisions read as follows:

### § 335.2  Examination of applicant.

\*     \*     \*     \*     \*

(b) \* \* \*

(3) Confirmation from the Federal Bureau of Investigation that the fingerprint data submitted for the criminal background check has been rejected.

\*     \*     \*     \*     \*

(d) \* \* \*

(2) *Service of subpoenas.* Subpoenas will be issued on the form designated by USCIS and a record will be made of service. The subpoena may be served by any person over 18 years of age, not a party to the case, designated to make such service by USCIS.

\*     \*     \*     \*     \*

### § 335.3  [Amended]

■ 215. Section 335.3 is amended by revising the terms "The Service officer" and "the Service officer" to read

"USCIS" wherever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).

### § 335.4  [Amended]

■ 216. Section 335.4 is amended by revising the phrase "the Service officer designated in § 332.1 of this chapter" to read "the USCIS officer described in 8 CFR 332.1".

### § 335.5  [Amended]

■ 217. Section 335.5 is amended by revising the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear.

■ 218. Section 335.6 is amended by revising the term "the Service" to read "USCIS" wherever the term appears in the following places:
■ a. Paragraph (a);
■ b. Paragraph (b); and
■ c. Paragraph (c).

■ 219. Section 335.7 is revised to read as follows:

### § 335.7  Failure to prosecute application after initial examination.

An applicant for naturalization who has appeared for the examination on his or her application as provided in 8 CFR 335.2 will be considered as failing to prosecute such application if he or she, without good cause being shown, either failed to excuse an absence from a subsequently required appearance, or fails to provide within a reasonable period of time such documents, information, or testimony deemed by USCIS to be necessary to establish his or her eligibility for naturalization. USCIS will deliver notice of requests for appearance or evidence as provided in 8 CFR 103.8. In the event that the applicant fails to respond within 30 days of the date of notification, USCIS will adjudicate the application on the merits pursuant to 8 CFR 336.1.

### § 335.9  [Amended]

■ 220. Section 335.9 is amended by:
■ a. Revising the phrase "Service office to the Service office" to read "USCIS office to the USCIS office" in paragraph (a); and
■ b. Revising the term "district director" to read "USCIS" and the term "the Service's" to read "USCIS'" in paragraph (b).

### § 335.10  [Amended]

■ 221. Section 335.10 is amended by revising the terms "the Service" and "the district director" to read "USCIS" wherever the terms appear.

**§§ 335.11 through 335.13    [Removed]**

■ 222. Sections 335.11 through 335.13 are removed.

## PART 336—HEARINGS ON DENIALS OF APPLICATIONS FOR NATURALIZATION

■ 223. The authority citation for section 336 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447, 1448.

**§ 336.1    [Amended]**

■ 224. Section 336.1 is amended by:
■ a. Revising the phrase "the Service shall" to read "USCIS will" in the first sentence in paragraph (a); and
■ b. Revising the phrase "may be made in person or by certified mail to the applicant's last known address" to read "must be by personal service as described in 8 CFR 103.8" in paragraph (c).

■ 225. Section 336.2 is revised to read as follows:

**§ 336.2    USCIS hearing.**

(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

(b) Upon receipt of a timely request for a hearing, USCIS will schedule a review hearing, within a reasonable period of time not to exceed 180 days from the date upon which the appeal is filed. The review will be with an officer other than the officer who conducted the original examination or who rendered determination upon which the hearing is based, and who is classified at a grade level equal to or higher than the grade of the examining officer. The reviewing officer will have the authority and discretion to review the application for naturalization, to examine the applicant, and either to affirm the findings and determination of the original examining officer or to re-determine the original decision in whole or in part. The reviewing officer will also have the discretion to review any administrative record which was created as part of the examination procedures as well USCIS files and reports. He or she may receive new evidence or take such additional testimony as may be deemed relevant to the applicant's eligibility for naturalization or which the applicant seeks to provide. Based upon the complexity of the issues to be reviewed or determined, and upon the necessity of conducting further examinations with

respect to essential naturalization requirements, such as literacy or civics knowledge, the reviewing immigration officer may, in his or her discretion, conduct a full *de novo* hearing or may utilize a less formal review procedure, as he or she deems reasonable and in the interest of justice.

(c) *Improperly filed request for hearing.* (1) *Request for hearing filed by a person or entity not entitled to file.* (i) *Rejection without refund of filing fee.* A request for hearing filed by a person or entity who is not entitled to file such a request must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Request for hearing by attorney or representative without proper Form G–28.* If a request for hearing is filed by an attorney or representative who has not properly filed a notice of entry of appearance as attorney or representative entitling that person to file the request for hearing, the appeal will be considered as improperly filed. In such a case, any filing fee will not be refunded regardless of the action taken. The reviewing official will ask the attorney or representative to submit a proper notice of entry within 15 days of the request. If such notice is not submitted within the time allowed, the official may, on his or her own motion, under 8 CFR 103.5(a)(5)(i), make a new decision favorable to the affected party without notifying the attorney or representative. The request for hearing may be considered properly filed as of its original filing date if the attorney or representative submits a properly executed notice entitling that person to file the request for hearing.

(2) *Untimely request for hearing.* (i) *Rejection without refund of filing fee.* A request for hearing which is not filed within the time period allowed must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Untimely request for hearing treated as motion.* If an untimely request for hearing meets the requirements of a motion to reopen as described in 8 CFR 103.5(a)(2) or a motion to reconsider as described in 8 CFR 103.5(a)(3), the request for hearing must be treated as a motion and a decision must be made on the merits of the case.

■ 226. Section 336.9 is amended by:
■ a. Revising the term "the Service" to read "USCIS" in paragraph (a);
■ b. Revising paragraph (b); and
■ c. Revising the term "Service" to read "USCIS" in paragraph (d).
The revision reads as follows:

*    *    *    *    *

(b) *Filing a petition.* Under these procedures, an applicant must file a

petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with Chapter 7 of Title 5, United States Code, within a period of not more than 120 days after the USCIS final determination. The petition for review must be brought against USCIS, and service of the petition for review must be made upon DHS and upon the USCIS office where the hearing was held pursuant to 8 CFR 336.2.

*    *    *    *    *

## PART 337—OATH OF ALLEGIANCE

■ 227. The authority citation for part 337 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1448; 8 CFR Part 2.

■ 228. Section 337.2 is revised to read as follows:

**§ 337.2    Oath administered by USCIS or EOIR.**

(a) *Public ceremony.* An applicant for naturalization who has elected to have his or her oath of allegiance administered by USCIS or an immigration judge and is not subject to the exclusive oath administration authority of an eligible court pursuant to section 310(b) of the Act must appear in person in a public ceremony, unless such appearance is specifically excused under the terms and conditions set forth in this part. Such ceremony will be held at a time and place designated by USCIS or EOIR within the United States (or abroad as permitted for certain applicants in accordance with 8 U.S.C. 1443a) and within the jurisdiction where the application for naturalization was filed, or into which the application for naturalization was transferred pursuant to 8 CFR 335.9. Naturalization ceremonies will be conducted at regular intervals as frequently as necessary to ensure timely naturalization, but in all events at least once monthly where it is required to minimize unreasonable delays. Naturalization ceremonies will be presented in such a manner as to preserve the dignity and significance of the occasion.

(b) *Authority to administer oath of allegiance.* The Secretary may delegate authority to administer the oath of allegiance prescribed in section 337 of the Act to such officials of DHS and to immigration judges or officials designated by the Attorney General as may be necessary for the efficient administration of the naturalization program.

(c) *Execution of questionnaire.* Immediately prior to being administered the oath of allegiance, each applicant must complete the questionnaire on the

form designated by USCIS. USCIS will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, USCIS will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and he or she will not be administered the oath.

### § 337.3  [Amended]

■ 229. Section 337.3 is amended by revising the terms ''the Service'' and ''the district director'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a) introductory text;
■ b. Paragraph (a)(4);
■ c. Paragraph (b); and
■ d. Paragraph (c).

### § 337.7  [Amended]

■ 230. Section 337.7 is amended by revising the terms ''the Service'' and ''Service'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).
■ 231. Section 337.8 is revised to read as follows:

### § 337.8  Oath administered by the courts.

(a) *Notification of election.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.2(d) must notify USCIS at the time of the filing of, or no later than at the examination on, the application of his or her election to have the oath of allegiance administered in an appropriate court having jurisdiction over the applicant's place of residence.

(b) *Certificate of eligibility.* (1) *Exclusive jurisdiction.* In those instances falling within the exclusive jurisdiction provision of section 310(b)(1)(B) of the Act, USCIS will notify the court of the applicant's eligibility for admission to United States citizenship by notifying the clerk of the court within 10 days of the approval of the application.

(2) *Non-exclusive jurisdiction.* In those instances in which the applicant has elected to have the oath administered in a court ceremony, USCIS will notify the clerk of the court in writing that the applicant has been determined by the USCIS to be eligible for admission to United States citizenship upon taking the requisite oath of allegiance and renunciation in a public ceremony. If a scheduled hearing date is not available at the time of notification, USCIS will notify the applicant in writing that the applicant has been approved but no ceremony date is yet available.

(c) *Preparation of lists.* (1) At or prior to the oath administration ceremony, the representative attending the ceremony will submit to the court, in duplicate, lists of persons to be administered the oath of allegiance and renunciation. After the ceremony, and after any required amendments and notations have been made to the lists, the clerk of the court will sign the lists.

(2) The originals of all court lists specified in this section will be filed permanently in the court, and the duplicates returned by the clerk of the court to USCIS. The same disposition will be made of any list presented to, but not approved by, the court.

(d) *Personal representation of the government at oath administration ceremonies.* An oath administration ceremony must be attended by a representative of USCIS who will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, the USCIS representative will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and the court will not administer the oath to such applicant.

(e) *Written report in lieu of personal representation.* If it is impractical for a USCIS representative to be present at a judicial oath administration ceremony, written notice of that fact will be given by the USCIS to the court. The list of persons to be administered the oath of allegiance and renunciation, forms, memoranda, and certificates will be transmitted to the clerk of the court, who will submit the appropriate lists to the court.

(f) *Withdrawal from court.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.3(d) who has elected to have the oath administered in a court oath ceremony may, for good cause shown, request that his or her name be removed from the list of persons eligible to be administered the oath at a court oath ceremony and request that the oath be administered by an immigration judge or USCIS. Such request must be in writing to the USCIS office which granted the application and must cite the reasons for the request. USCIS will consider the good cause shown and the best interests of the applicant in making a decision. If it is determined that the applicant will be permitted to withdraw his or her name from the court ceremony, USCIS will give written notice to the court of the applicant's withdrawal, and the applicant will be scheduled for the next available oath ceremony, conducted by an Immigration

Judge or USCIS, as if he or she had never elected the court ceremony.

### § 337.9  [Amended]

■ 232. In § 337.9, paragraph (a) is amended by removing the phrase '', administered either by the Service or an immigration judge''.

## PART 338—CERTIFICATE OF NATURALIZATION

■ 233. The authority citation for part 338 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 234. Section 338.1 is revised to read as follows:

### § 338.1  Execution and issuance of certificate.

(a) *Issuance.* When an applicant for naturalization has taken and subscribed to the oath of allegiance in accordance with 8 CFR part 337, USCIS will issue a Certificate of Naturalization at the conclusion of the oath administration ceremony.

(b) *Contents of certificate.* The certificate must be issued to the applicant in accordance with section 338 of the Act in his or her true, full, and correct name as it exists at the time of the administration of the oath of allegiance. The certificate must show, under ''country of former nationality,'' the name of the applicant's last country of citizenship, as shown in the application and USCIS records, even though the applicant may be stateless at the time of admission to citizenship.

### § 338.3  [Amended]

■ 235. Section 338.3 is amended by revising the terms ''the Service'' and the term ''the district director'' to read ''USCIS''.
■ 236. Section 338.5 is revised to read as follows:

### § 338.5  Correction of certificates.

(a) *Application.* Whenever a Certificate of Naturalization has been delivered which does not conform to the facts shown on the application for naturalization, or a clerical error was made in preparing the certificate, an application for issuance of a corrected certificate may be filed, without fee, in accordance with the form instructions.

(b) *Court-issued certificates.* If the certificate was originally issued by a clerk of court under a prior statute and USCIS finds that a correction is justified and can be made without mutilating the certificate, USCIS will authorize the issuing court to make the necessary correction and to place a dated endorsement of the court on the reverse

of the certificate explaining the correction. The authorization will be filed with the naturalization record of the court, the corrected certificate will be returned to the naturalized person, and the duplicate will be endorsed to show the date and nature of the correction and endorsement made, and then returned to USCIS. No fee will be charged the naturalized person for the correction.

(c) *USCIS-issued certificates*. If the certificate was originally issued by USCIS (or its predecessor agency), and USCIS finds that a correction was justified, the correction shall be made to the certificate and a dated endorsement made on the reverse of the certificate.

(d) *Administrative actions*. When a correction made pursuant to paragraphs (b) or (c) of this section would or does result in mutilation of a certificate, USCIS will issue a replacement Certificate of Naturalization and destroy the surrendered certificate.

(e) *Data change*. The correction will not be deemed to be justified where the naturalized person later alleges that the name or date of birth which the applicant stated to be his or her correct name or date of birth at the time of naturalization was not in fact his or her name or date of birth at the time of the naturalization.

### §§ 338.11 through 338.13    [Removed and Reserved]

■ 237. Sections 338.11 through 338.13 are removed and reserved.

## PART 339—FUNCTIONS AND DUTIES OF CLERKS OF COURT REGARDING NATURALIZATION PROCEEDINGS

■ 238. The authority citation for part 339 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1448.

### § 339.1    [Amended]

■ 239. Section 339.1 is amended by revising the phrase "the Service pursuant to § 338.1 of this chapter" to read "USCIS in accordance with 8 CFR 338.1".

■ 240. Section 339.2 is revised to read as follows:

### § 339.2    Monthly reports.

(a) *Oath administration ceremonies*. Clerks of court will on the first day of each month or immediately following each oath ceremony submit to USCIS a report listing all oath administration ceremonies held and the total number of persons issued the oath at each ceremony, in accordance with USCIS instructions. The report will include a list of persons attending naturalization oath ceremonies during the month, and

certified copies of any court orders granting changes of name.

(b) *Petitions filed for de novo hearings*. The clerk of court must submit to USCIS a monthly report of all persons who have filed *de novo* review petitions before the court. The report shall include each petitioner's name, alien registration number, date of filing of the petition for a *de novo* review, and, once an order has been entered, the disposition.

(c) *Other proceedings and orders*. The clerk of court must forward to USCIS copies of the records of such other proceedings and other orders instituted on or issued by the court affecting or relating to the naturalization of any person as may be required from time to time.

(d) *Use of reports for accounting purposes*. State and federal courts may use the reports as a monthly billing document, submitted to USCIS for reimbursement in accordance with section 344(f)(1) of the Act. USCIS will use the information submitted to calculate costs incurred by courts in performing their naturalization functions. State and federal courts will be reimbursed pursuant to terms set forth in annual agreements entered into between DHS and the Administrative Office of United States Courts.

## PART 340—REVOCATION OF NATURALIZATION

■ 241. The authority citation for part 340 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

### § 340.1    [Removed and reserved]

■ 242. Section 340.1 is removed and reserved.

■ 243. Section 340.2 is revised to read as follows:

### § 340.2    Revocation proceedings pursuant to section 340(a) of the Act.

(a) *Recommendations for institution of revocation proceedings*. Whenever it appears that any grant of naturalization may have been illegally procured or procured by concealment of a material fact or by willful misrepresentation, and a prima facie case exists for revocation pursuant to section 340(a) of the Act, USCIS will make a recommendation regarding revocation.

(b) *Recommendation for criminal prosecution*. If it appears to USCIS that a case described in paragraph (a) of this section is amenable to criminal penalties under 18 U.S.C. 1425 for unlawful procurement of citizenship or naturalization, the facts will be reported to the appropriate United States

Attorney for possible criminal prosecution.

## PART 341—CERTIFICATES OF CITIZENSHIP

■ 244. The authority citation for part 341 continues to read as follows:

**Authority:** Pub. L. 82–414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

■ 245. Section 341.1 is revised to read as follows:

### § 341.1    Application.

An application for a certificate of citizenship by or in behalf of a person who claims to have acquired United States citizenship under section 309(c) of the Act or to have acquired or derived United States citizenship as specified in section 341 of the Act must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the instructions on the form.

■ 246. Section 341.2 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Revising the phrase "at the district director's option" to read "at the discretion of USCIS" in paragraph (b)(1);
■ c. Revising the phrase "A district director shall assign an officer of the Service to" to read "USCIS will" in the first sentence in paragraph (d);
■ d. Removing the phrase "to the district director" in the last sentence in paragraph (d); and
■ e. Removing paragraph (g).
The revision reads as follows:

### § 341.2    Examination upon application.

(a) * * *

(1) *When testimony may be omitted*. An application may be processed without interview if the USCIS officer adjudicating the case has in the administrative file(s) all the required documentation necessary to establish the applicant's eligibility for U.S. citizenship, or if the application is accompanied by one of the following:

*    *    *    *    *

### § 341.3    [Amended]

■ 247. Section 341.3 is amended by revising the phrase "an officer of the Service or a United States consular official" to read "a DHS or Department of State official".

■ 248. Section 341.5 is revised to read as follows:

### § 341.5    Decision.

(a) *Adjudication*. USCIS may adjudicate the application only after the

appropriate approving official has reviewed the report, findings, recommendation, and endorsement of the USCIS officer assigned to adjudicate the application.

(b) *Approval.* If the application is granted, USCIS will prepare a certificate of citizenship and, unless the claimant is unable by reason of mental incapacity or young age to understand the meaning of the oath, he or she must take and subscribe to the oath of renunciation and allegiance prescribed by 8 CFR 337 before USCIS within the United States. Except as provided in paragraph (c), delivery of the certificate in accordance with 8 CFR 103.2(b)(19) and 8 CFR 103.8 must be made in the United States to the claimant or the acting parent or guardian.

(c) *Approval pursuant to section 322(d) of the Act.* Persons eligible for naturalization pursuant to section 322(d) of the Act may subscribe to the oath of renunciation and allegiance and may be issued a certificate of citizenship outside of the United States, in accordance with 8 U.S.C. 1443a.

(d) *Denial.* If USCIS denies the application, the applicant will be furnished the reasons for denial and advised of the right to appeal in accordance with 8 CFR 103.3.

(e) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion to reopen or reconsider in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7.

## §§ 341.6 and 341.7    [Removed]

■ 249. Sections 341.6 and 341.7 are removed.

## PART 342—ADMINISTRATIVE CANCELLATION OF CERTIFICATES, DOCUMENTS OR RECORDS

■ 250. The authority citation for part 342 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1453.

■ 251. Section 342.2 is revised to read as follows:

### § 342.2    Service of notice.

The notice required by 8 CFR 342.1 must be by personal service as described in 8 CFR 103.8(a)(2).

## PART 343—CERTIFICATE OF NATURALIZATION OR REPATRIATION; PERSONS WHO RESUMED CITIZENSHIP UNDER SECTION 323 OF THE NATIONALITY ACT OF 1940, AS AMENDED, OR SECTION 4 OF THE ACT OF JUNE 29, 1906

■ 252. The authority citation for part 343 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1443, 1454, and 1455.

### § 343.1    [Amended]

■ 253. Section 343.1 is amended in the first sentence by revising the term "therefor on Form N–580" to read: "in accordance with USCIS instructions".

## PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

■ 254. The authority citation for part 343a is revised to read as follows:

**Authority:** 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

■ 255. Section 343a.1 is amended by:
a. Revising the phrase "shall apply on Form N–565 for a new paper in lieu thereof" to read "must apply on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (a);
■ b. Revising the phrase "shall apply on Form N–565" to read "must apply" in paragraph (b); and
■ c. Revising paragraph (c).
The revision reads as follows:

### § 343a.1    Application for replacement of or new papers relating to naturalization, citizenship, or repatriation.

* * * * *

(c) *Adjudication and disposition.* (1) *Interview.* The applicant shall only be required to appear in person for interview under oath or affirmation in specific cases. Those cases which necessitate an interview enabling an officer to properly adjudicate the application at the office having jurisdiction will be determined by USCIS.

(2) *Approval.* If an application for a new certificate of naturalization, citizenship, or repatriation or a new declaration of intention is approved, the new certificate or declaration will be issued and delivered by personal service in accordance with 8 CFR 103.8(a)(2). If an application for a new certified copy of the proceedings under the Act of June 25, 1936, as amended, or under section

317(b) of the Nationality Act of 1940, or under section 324(c) of the Immigration and Nationality Act, or under the provisions of any private law is approved, a certified photocopy of the record of the proceedings will be issued. If, subsequent to naturalization or repatriation, the applicant's name was changed by marriage, the certification of the photocopy will show both the name in which the proceedings were conducted and the changed name. The new certified copy will be delivered to the applicant in accordance with 8 CFR 103.8(a)(2).

(3) *Denial.* If the application is denied, the applicant shall be notified of the reasons for the denial and of the right to appeal in accordance with 8 CFR 103.3.

### § 343a.2    [Amended]

■ 256. Section 343a.2 is amended by revising the terms "Service" and "the Service" to read "USCIS" and the term "Form N–565" to read "an application" wherever those terms appear.

## PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

■ 257. The authority citation for part 343b continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1454, 1455.

### § 343b.1    [Amended]

■ 258. Section 343b.1 is amended by revising the term "Form N–565" to read "the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions".
■ 259. Section 343b.3 is revised to read as follows:

### § 343b.3    Interview.

When the application presents a prima facie case, USCIS may issue a certificate without first interviewing the applicant. In all other cases, the applicant must be interviewed. The interviewing officer must provide a complete written report of the interview before forwarding the application for issuance of the certificate.
■ 260. Section 343b.4 is revised to read as follows:

### § 343b.4    Applicant outside of United States.

If the application is received by a DHS office outside the United States, an officer will, when practicable, interview the applicant before the application is forwarded to USCIS for issuance of the certificate. When an interview is not practicable, or is not conducted because the application is submitted directly to USCIS in the United States, the

**53806**     **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

certificate may nevertheless be issued and the recommendation conditioned upon satisfactory interview by the Department of State. When forwarding the certificate in such a case, USCIS will inform the Secretary of State that the applicant has not been interviewed, and request to have the applicant interviewed regarding identity and possible expatriation. If identity is not established or if expatriation has occurred, the Department of State will return the certificate to USCIS for disposition.

■ 261. Section 343b.11 is revised to read as follows:

### §343b.11   Disposition of application.

(a) *Approval.* If the application is granted, USCIS will prepare a special certificate of naturalization and forward it to the Secretary of State for transmission to the proper authority of the foreign state in accordance with procedures agreed to between DHS and the Department of State, retain the application and a record of the disposition in the DHS file, and notify the applicant of the actions taken.

(b) *Denial.* If the application is denied, the applicant will be notified of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3.

## PART 343c—CERTIFICATIONS FROM RECORDS

■ 262. The authority citation for part 343c is revised to read as follows:

**Authority:** 5 U.S.C. 552; 8 U.S.C. 1103.

### §343c.1   [Amended]

■ 263. Section 343c.1 is amended by revising the term ''Form G–641'' to read ''the form designated by USCIS in accordance with the form instructions''.

## PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES

■ 264. The authority citation for part 392 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440 and note, and 1440–1; 8 CFR part 2.

■ 265. In § 392.2, paragraph (d)(2) is revised to read as follows:

### §392.2   Eligibility for posthumous citizenship.

\*     \*     \*     \*     \*

(d) \* \* \*

(2) The certification required by section 329A(c)(2) of the Act to prove military service and service-connected death must be requested by the applicant on the form designated by USCIS in accordance with the form instructions. The form will also be used to verify the decedent's place of induction, enlistment, or reenlistment.

■ 266. Section 392.3 is amended by:
■ a. Revising the term ''the Service'' to read ''USCIS'' in the last sentence in paragraph (a)(2);
■ b. Revising paragraph (b); and
■ c. Revising paragraph (c).

The revisions read as follows:

### §392.3   Application for posthumous citizenship.

\*     \*     \*     \*     \*

(b) *Application.* An application for posthumous citizenship must be submitted on the form designated by USCIS in accordance with the form instructions.

(c) *Application period.* An application for posthumous citizenship must be filed no later than two years after the date of the decedent's death.

\*     \*     \*     \*     \*

■ 267. In § 392.4, paragraphs (a) and (e) are revised to read as follows:

### §392.4   Issuance of a certificate of citizenship.

(a) *Approval of application.* When an application for posthumous citizenship under this part has been approved, USCIS will issue a Certificate of Citizenship to the applicant in the name of the decedent.

\*     \*     \*     \*     \*

(e) *Replacement certificate.* An application for a replacement Certificate of Citizenship must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

## PART 499—[REMOVED]

■ 268. Part 499 is removed.

**Janet Napolitano,**
*Secretary.*
[FR Doc. 2011–20990 Filed 8–26–11; 8:45 am]
**BILLING CODE 9111–97–P**



# Rules and Regulations

**Federal Register**

Vol. 76, No. 229

Tuesday, November 29, 2011

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 207, 208, 211, 212, 213a, 244; 245, 324; 335**

**[CIS No. 2481–09; Docket No. USCIS–2009–0022]**

**RIN 1615–AB83**

**Immigration Benefits Business Transformation, Increment I; Correction**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule; correction.

---

**SUMMARY:** The Department of Homeland Security (DHS) makes technical corrections to a final rule published in the **Federal Register** on August 29, 2011. The final rule amended DHS regulations to enable U.S. Citizenship and Immigration Services (USCIS) to transform its business processes. The final rule also finalized seven interim rules.

**DATES:** This final rule is effective November 28, 2011.

**FOR FURTHER INFORMATION CONTACT:** Dan Konnerth, Policy Chief, Office of Transformation Coordination, U.S. Citizenship and Immigration Services, Department of Homeland Security, 633 Third St. NW., Washington, DC 20529–2210; telephone (202) 233–2381.

**SUPPLEMENTARY INFORMATION:**

### Need for Correction

On August 29, 2011, the Department of Homeland Security (DHS) issued a final rule that amended more than fifty parts of Title 8 of the Code of Federal Regulations and finalized seven interim rules. *Immigration Benefits Business Transformation, Increment I,* 76 FR 53764 (Aug. 29, 2011). The final rule removed form titles, number references, and position titles. The final rule also removed obsolete and expired

regulatory provisions and corrected provisions that were affected by statutory changes.

DHS provided a 60-day public comment period and a 90-day effective date to provide the public with an opportunity to review the regulatory text and point out any errors made in the published final rule before it becomes effective. DHS has reviewed the public comments on the docket of this final rule and determined that several errors and omissions require correction. Specifically, through technical drafting oversights, DHS:

- Instructed the removal of the phrase "petitions and applications" instead of instructing the removal of the phrase "applications or petitions" and "applications and petitions" in 8 CFR 103.2;
- Omitted the substitution of "benefit request" for "application or benefit" in 8 CFR 103.2(b)(5);
- Incorrectly amended the second sentence of 8 CFR 103.2(b)(19) by removing the term "petitioner" and inserting "beneficiary";
- Omitted instructional text for reserving 8 CFR 103.20 through 103.36 after they are removed;
- Omitted the substitution of "USCIS" for the terms "The USCIS", "the BCIS", and "The BCIS" in 8 CFR 103.2;
- Omitted references to the title of the form required for accompanying or following-to-join derivatives of refugees in 8 CFR 207.7 and for admission of asylee spouses and children in 8 CFR 208.21;
- Omitted the substitution of "Permanent Resident Card" for "permanent resident card" in 8 CFR 211.5(c);
- Provided conflicting instructions affecting paragraph (b)(1) of 8 CFR 212.2;
- Incorrectly instructed that the heading for 8 CFR 212.7 be revised;
- Incorrectly instructed to revise terms in the second sentence of the introductory text of paragraph (m)(2) of 8 CFR 212.15;
- Omitted the term "a" from the amendatory text being revised in 8 CFR 213.2a;
- Incorrectly included the term "in" in the text being revised in 8 CFR 213.2a(c)(2)(i)(A);
- Omitted instructional text for revising the following terms in 8 CFR 213a.2:

  ○ The terms "Form I–864 or I–864A", "a Form I–864 or I–864A", "Form I–864 and I–864A" to read "affidavit of support";
  ○ The terms "any Forms I–864A" to read "affidavit of support and any required attachments";
  ○ The term "any Form I–864A" to read "any affidavit of support or required attachment";
  ○ The term "Forms I–864" to read "affidavits of support";
  ○ The term "I–864A" to read "affidavit of support attachment"; and
  ○ The term "A Form I–864" to read "An affidavit of support".

- Omitted the term "Form" from the text being revised in 8 CFR 324.2;
- Omitted the term "the" from the text being revised in 8 CFR 244.7(b) and 8 CFR 244.14(a)(3);
- Provided conflicting instructions affecting 8 CFR 245.21(j); and
- Erroneously instructed to change the term "district director" to read "USCIS" and omitted instructions to revise the term "the Service" to read "USCIS" in 8 CFR 335.9.

### Correction of Publication

Accordingly, the publication on August 29, 2011 (76 FR 53764) of the final rule that was the subject of FR Doc. 2011–20990 is corrected as follows:

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

### Subpart A—Applying for Benefits, Surety Bonds, Fees

**§ 103.2 [Corrected]**

■ 1. On page 53780, second column, revise amendatory 8a. to read as follows:
"8 * * *

■ a. Removing the phrases "applications and petitions" and "applications or petitions" and adding in their place the term "benefit requests"; removing the term "an application or petition" and adding in its place "a benefit request"; removing the term "application or petition" and adding in its place "benefit request"; and removing the terms "the BCIS", "The BCIS", and "The USCIS" and adding in their place the term "USCIS" as they appear in the following portions of the final rule:".

■ 2. On page 53780, third column, amend amendatory instruction 8j. by adding at the end before the semicolon

''and revising the term ''application or benefit'' to read ''benefit request'' in the third sentence of paragraph (b)(5)''.

■ 3. On page 53780, third column, revise amendatory instruction 8k. to read as follows:

''8. * * *

■ k. Revising the term ''application, petition or document'' to read ''a benefit request'' in paragraph (b)(7);''

■ 4. On page 53781, first column, in paragraph (b)(19), remove the word ''beneficiary'' from the end of the paragraph and add ''petitioner'' in its place.

### § 103.7    [Corrected]

■ 5. On page 53781, second column, revise amendatory instruction 14a. to read as follows:

■ ''14. Revising the terms ''The BCIS'' and ''BCIS'' to read ''USCIS'' wherever that term appears in paragraph (a)(1);''.

### §§ 103.20–103.36    [Corrected]

■ 6. On page 53782, second column, revise amendatory instruction 21 to read as follows:

■ ''21. Sections 103.20 through 103.36 are removed and reserved.''.

## PART 207—ADMISSION OF REFUGEES

■ 7. On page 53783, third column, amendment 39, revise the amendatory language for the revisions to paragraphs (d) and (f) to read as follows:

### § 207.7    Derivatives of refugees.

* * * * *

(d) *Filing.* A refugee may request accompanying or following-to-join benefits for his or her spouse and unmarried, minor child(ren) (whether the spouse and children are inside or outside the United States) by filing a separate Request for Refugee/Asylee Relative in accordance with the form instructions for each qualifying family member. The request may only be filed by the principal refugee. Family members who derived their refugee status are not eligible to request derivative benefits on behalf of their spouse and child(ren). A separate Request for Refugee/Asylee Relative must be filed for each qualifying family member within two years of the refugee's admission to the United States unless USCIS determines that the filing period should be extended for humanitarian reasons. There is no time limit imposed on a family member's travel to the United States once the Request for Refugee/Asylee Relative has been approved, provided that the relationship of spouse or child continues to exist and approval of the Request for Refugee/Asylee Relative has not been subsequently revoked. There is no fee for this benefit request.

* * * * *

(f) *Approvals.* (1) *Spouse or child in the United States.* When a spouse or child of a refugee is in the United States and the Request for Refugee/Asylee Relative is approved, USCIS will notify the refugee of such approval. Employment will be authorized incident to status.

(2) *Spouse or child outside the United States.* When a spouse or child of a refugee is outside the United States and the Request for Refugee/Asylee Relative is approved, USCIS will notify the refugee of such approval. USCIS will send the approved request to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the refugee's spouse or child is located.

(3) *Benefits.* The approval of the Request for Refugee/Asylee Relative will remain valid for the duration of the relationship to the refugee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved Request for Refugee/Asylee Relative will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of a refugee. For a derivative inside or arriving in the United States, USCIS will issue a document reflecting the derivative's current status as a refugee to demonstrate employment authorization, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization.

* * * * *

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 8. On page 53784, third column, amendment 50, revise the amendatory language for paragraphs (c) and (d) to read as follows:

### § 208.21    Admission of the asylee's spouse and children.

* * * * *

(c) *Spouse or child in the United States.* When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's benefit request, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, by filing for each qualifying family member a Request for Refugee/Asylee Relative, with supporting evidence, and in accordance with the form instructions, regardless of the status of that spouse or child in the United States. A separate Request for Refugee/Asylee Relative must be filed by the asylee for each qualifying family member within two years of the date in which he or she was granted asylum status, unless it is determined by USCIS that this period should be extended for humanitarian reasons. Upon approval of the Request for Refugee/Asylee Relative, USCIS will notify the asylee of such approval. Employment will be authorized incident to status. To demonstrate employment authorization, USCIS will issue a document reflecting the derivative's current status as an asylee, or the derivative may apply, under 8 CFR 274a.12(a), for employment authorization. The approval of the Request for Refugee/Asylee Relative will remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved Request for Refugee/Asylee Relative will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

(d) *Spouse or child outside the United States.* When a spouse or child of an alien granted asylum is outside the United States, the asylee may request accompanying or following-to-join benefits for his or her spouse or child(ren) by filing a separate Request for Refugee/Asylee Relative for each qualifying family member in accordance with the form instructions. A separate Request for Refugee/Asylee Relative for each qualifying family member must be filed within two years of the date in which the asylee was granted asylum, unless USCIS determines that the filing period should be extended for humanitarian reasons. When the Request for Refugee/Asylee Relative is approved, USCIS will notify the asylee of such approval. USCIS also will send the approved request to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located. The approval of the Request for Refugee/Asylee Relative will remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved Request for Refugee/Asylee Relative will cease to confer immigration benefits after it has been used by the beneficiary for

admission to the United States as a derivative of an asylee.

\* \* \* \* \*

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

### § 212.2 [Corrected]

■ 9. On page 53786, second column, remove amendment 64.a and redesignate 64b through f as 64a through e accordingly.

### § 212.7 [Corrected]

■ 10. On page 53787, first column, remove amendment 69.a. and redesignate 69b through m as 69a through l accordingly.

### § 212.15 [Corrected]

■ 11. On page 53788, first column, revise amendatory instruction 75h. to read as follows:

75. \* \* \*
■ h. "Revising the term "Form I–905" to read "the request" in paragraph (m)(2).".

## PART 213a—AFFIDAVITS OF SUPPORT ON BEHALF OF ALIENS

### § 213a.2 [Corrected]

■ 12. On page 53788, second column, revise amendatory instruction 80–82d. to read as follows:

"80–82 \* \* \*
■ d. Revising the phrase "the Form I–130 or Form I–600 immigrant visa petition (or the Form I–129F petition, for a K nonimmigrant seeking adjustment)" to read "a relative, orphan or fiancé(e) petition" in the first sentence of paragraph (b)(1);".
■ 13. On page 53788, second column, revise amendatory instruction 80–82e. to read as follows:

"80–82 \* \* \*
■ e. Revising the phrase "Form I–864P Poverty Guidelines" to read "the Poverty Guidelines" in paragraph (c)(2)(i)(A);".
■ 14. On page 53788, third column, revise the introductory text to amendatory instruction 80–82l. to read as follows:

"80–82 \* \* \*
■ l. Section 213a.2 is further amended by revising the term "Forms I–864" to read "affidavits of support" and the term "A Form I–864" to read "An affidavit of support" and the terms "Form I–864" and "the Form I–864" to read "an affidavit of support" wherever those terms appear in the following places:"
■ 15. On page 53788, third column, amendment 80–82, add new instructions n. and o. to read as follows:

■ n. Section 213a.2 is further amended by revising the terms "any Forms I–864A" to read "any affidavit of support attachments" and the term "any Form I–864A" to read "any affidavit of support attachment" wherever those terms appear in paragraphs (a)(1)(ii), (iii), (iv), and (v).
■ o. Section 213a.2 is further amended by revising the term "Form I–864 or I–864A" to read "affidavit of support and any required attachments"; the term "I–864A" to read "affidavit of support attachment"; and the term "a Form I–864 or I–864A" to read "an affidavit of support and any required attachments" wherever those terms appear in the following places:

i. Paragraph (a)(1)(v)(A);
ii. Paragraph (c)(2)(v); and
iii. Paragraph (e)(2)(i)(D).".

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

### § 244.7 [Corrected]

■ 16. On pages 53791, third column, revise amendatory instruction 108.b. to read as follows:

"108. \* \* \*
■ b. Revising the term "the Attorney General" to read "DHS" in paragraph (b);"

### § 244.14 [Corrected]

■ 17. On pages 53792, second column, revise amendatory instruction 113.d. to read as follows:

"113. \* \* \*
■ d. Revising the term "the Attorney General" to read "DHS" in paragraph (a)(3);".

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

### § 245.21 [Corrected]

■ 18. On page 53794, first column, amendment 129–130, remove instruction j. and redesignate instructions k. and l. as j. and k., respectively.

■ 19. On page 53794, first column, revise the introductory text to newly redesignated amendatory instruction 129–130k to read as follows:

"129–130. \* \* \*
■ k. By revising the terms "Service", "The Service" and "the Service" to read "USCIS" and the term "Service's" to read "USCIS's" wherever the terms appear in the following paragraphs:".

## PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

### § 324.2 [Corrected]

■ 20. On page 53800, first column, revise amendatory instruction 191 to read as follows:

■ "191. In § 324.2, paragraph (b) is amended by revising the term "Form N–400, as required by § 316.4 of this chapter" to read "the form designated by USCIS in accordance with the form instructions and with the fee prescribed in 8 CFR 103.7(b)(1) as required by 8 CFR 316.4".".

## PART 335—EXAMINATION ON APPLICATION FOR NATURALIZATION\

### § 335.9 [Corrected]

■ 21. On page 53801, third column, revise amendatory instruction 220.b. to read as follows:

"220. \* \* \*
b. Revising the terms "district director", "The district director", "the district director", and "the Service" to read "USCIS" and the term "Service's" to read "USCIS's".".

**Christina E. McDonald,**
*Associate General Counsel for Regulatory Affairs.*
[FR Doc. 2011–30510 Filed 11–28–11; 8:45 am]
**BILLING CODE 9111–97–P**

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

### 14 CFR Part 39

[Docket No. FAA–2011–0908; Directorate Identifier 2010–NM–251–AD; Amendment 39–16870; AD 2011–24–06]

**RIN 2120–AA64**

### Airworthiness Directives; BAE SYSTEMS (Operations) Limited Airplanes

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are superseding an existing airworthiness directive (AD) that applies to all BAE SYSTEMS (Operations) Limited Model BAe 146–100A, –200A, and –300A airplanes; and Model Avro 146–RJ70A, 146–RJ85A, and 146–RJ100A airplanes. This AD results from mandatory continuing

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, and 274a**

**[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]**

**RIN 1615–AC04**

## International Entrepreneur Rule

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations to implement the Secretary of Homeland Security's discretionary parole authority in order to increase and enhance entrepreneurship, innovation, and job creation in the United States. The final rule adds new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 30 months (which may be extended by up to an additional 30 months) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States.

**DATES:** This final rule is effective July 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Changes From the Notice of Proposed Rulemaking
  E. Summary of Costs and Benefits
  F. Effective Date
II. Background
  A. Current Framework
  B. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority
  C. Significant Public Benefit
  D. Definitions
  E. Application Requirements
  F. Parole Criteria and Conditions
  G. Employment Authorization
  H. Comments on Parole Process
  I. Appeals and Motions To Reopen
  J. Termination of Parole
  K. Opposition to the Overall Rule
  L. Miscellaneous Comments on the Rule
  M. Public Comments on Statutory and Regulatory Requirements
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), confers upon the Secretary of Homeland Security the discretionary authority to parole individuals into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the final rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid growth and job creation that they would provide a significant public benefit to the United States. In all cases, whether to parole a particular individual under this rule is a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS

expects to facilitate the use of parole in this area.

Under this final rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS believes that such potential would be indicated by, among other things, the receipt of (1) significant capital investment from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State, or local government entities. The final rule also includes alternative criteria for applicants who partially meet the thresholds for capital investment or government awards or grants and can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant must also show that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this final rule will encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation, and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this final rule will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

### B. Legal Authority

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), expressly authorizes the

Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission temporarily on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

### C. Summary of the Final Rule Provisions

This final rule adds a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this final rule:

1. *Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. An entity may be considered recently formed if it was created within the 5 years immediately preceding the date of the filing of the initial parole application. *See* 8 CFR 219.12(a)(2), 8 CFR 103.2(a)(7).

2. *Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial

grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. *See* final 8 CFR 212.19(a)(1). Such an applicant cannot be a mere investor.

3. *Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, or job creation. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* The final rule provides alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and compelling evidence that they would provide a significant public benefit to the United States. Such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

This final rule states that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children,[2] if any) generally may be

considered under this rule for a discretionary grant of parole lasting up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant will be required to file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with applicable fees. Applicants will also be required to appear for collection of biometric information. No more than three entrepreneurs may receive parole with respect to any one qualifying start-up entity.

USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators will be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

If parole is granted, the entrepreneur will be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, will not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, will be permitted to apply for employment authorization consistent with new 8 CFR 274a.12(c)(34). DHS retains the authority to revoke any such grant of parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS has reason to believe that the approved application involves fraud or misrepresentation. *See* new 8 CFR 212.19(k).

As noted, the purpose of this parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may

---

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

[2] The terms "child" and "children" in this proposed rule have the same meaning as they do

under section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1) (defining a child as one who is unmarried and under twenty-one years of age).

benefit from such development and expansion, including through increased capital expenditures, innovation, and job creation. The final rule allows individuals granted parole under this rule to be considered for re-parole for an additional period of up to 30 months (2.5 years) if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation.

An applicant under this rule will generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

1. *Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant may be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

2. *Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 5 percent) ownership interest in the entity at the time of adjudication of the grant of re-parole; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital investment by selling ownership interest during their initial years of operation.

3. *Significant U.S. Investment/ Revenue/Job Creation.* The applicant further validates, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Additional Investments or Grants.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant

awards or grants from U.S. government entities that regularly provide such funding to start-up entities; or a combination of both. An applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investment that the applicant is relying upon as evidence that the investment criterion has been met must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from U.S. federal, state or local government entities with expertise in economic development, research and development, or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity created at least 5 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, the final rule includes alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole will continue to provide a significant public benefit. As discussed above, such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

As indicated above, an applicant who generally meets the above criteria and merits a favorable exercise of discretion may be granted an additional 30-month period of re-parole, for a total maximum period of 5 years of parole under 8 CFR 212.19, to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States. No more than three

entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To be re-paroled, adjudicators will be required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If the applicant is re-paroled, DHS retains the authority to revoke parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involved fraud or made material misrepresentations.

The entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. At any time prior to reaching the 5-year limit for parole under this final rule, such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or as a lawful permanent resident pursuant to an EB–2 National Interest Waiver). Because parole is not considered an admission to the United States, parolees are ineligible to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. For example, if such individuals are approved for a nonimmigrant or employment-based immigrant visa classification, they would generally need to depart the United States and apply for a visa with the Department of State (DOS) for admission to the United States as a nonimmigrant or lawful permanent resident.

Finally, DHS is making conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The final rule amends 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of

Case No. 1:24-cv-00762-CNS    Document 22-2    filed 06/24/24    USDC Colorado    pg 243 of 439

aliens authorized for employment incident to their immigration status or parole, and (2) providing temporary employment authorization for those applying for re-parole. The final rule amends 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The final rule amends 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[3] The final rule also amends 8 CFR 103.7(b)(i) by including the fee for the new Application for Entrepreneur Parole form.

### D. Summary of Changes From the Notice of Proposed Rulemaking

Following careful consideration of public comments received, including relevant data provided by stakeholders, DHS has made several modifications to the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on August 31, 2016. *See* 81 FR 60129. Those changes include the following:

• *Minimum Investment Amount.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 212.19(b)(2)(ii)(B)(*1*), a provision that identifies the qualifying investment amount required from one or more qualified investors. In the NPRM, DHS proposed a minimum investment amount of $345,000. Based on data provided by the public, DHS is revising this figure to $250,000. Thus, under the final rule, an applicant would generally be able to meet the investment standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. In addition, DHS has increased the timeframe during which the qualifying investments must be received from 365 days to 18 months immediately preceding the filing of an application for initial parole.

• *Definition of Entrepreneur: Ownership Criteria.* In the final rule,

DHS is revising proposed 8 CFR 212.19(a)(1), a provision that defines the term "entrepreneur," and establishes a minimum ownership percentage necessary to meet the definition. In the NPRM, DHS proposed that the entrepreneur must have an ownership interest of at least 15 percent for initial parole, and 10 percent for re-parole. In response to public comment, DHS is modifying this requirement to allow individuals who have an ownership interest of at least 10 percent in the start-up entity at the time of adjudication of the initial grant of parole, and at least a 5 percent ownership interest at the time of adjudication of a subsequent period of re-parole, to qualify under this definition.

• *Qualified Investment Definition.* DHS is revising proposed 8 CFR 212.19(a)(4), which establishes the definition of a qualified investment. In the NPRM, DHS proposed that the term "qualified investment" means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of equity or convertible debt issued by such entity. In response to public comment, DHS is modifying this definition to include other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry.

• *Qualified Investor Definition.* DHS is revising proposed 8 CFR 212.19(a)(5), which establishes the definition of a qualified investor. In the NPRM, DHS proposed that an individual or organization may be considered a qualified investor if, during the preceding 5 years: (i) The individual or organization made investments in start-up entities in exchange for equity or convertible debt in at least 3 separate calendar years comprising a total within such 5-year period of no less than $1,000,000; and (ii) subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. In this final rule, the minimum investment amount has been decreased from the originally proposed $1,000,000 to $600,000. The requirement that investments be made in at least 3 separate calendar years has also been removed from this final rule. DHS is also making revisions to the form of investment made by the individual or organization consistent

with the change to the qualified investment definition by adding "or other security convertible into equity commonly used in financing transactions within their respective industries."

• *Start-up Entity Definition.* In the final rule, DHS is revising the definition of a start-up entity as proposed in 8 CFR 212.19(a)(2). In the NPRM, DHS proposed that an entity may be considered recently formed if it was created within the 3 years preceding the date of filing of the initial parole request. In response to public comment, DHS is modifying this provision so that an entity may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the initial parole request. Additionally, for purposes of paragraphs (a)(3) and (a)(5) of this section, which pertain to the definitional requirements to be a qualified investor or qualified government award or grant, respectively, DHS made corresponding changes in this final rule such that an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

• *Job Creation Requirement.* In the final rule, DHS is revising proposed 8 CFR 212.19(c)(2)(ii)(B)(*2*), a provision that identifies the minimum job creation requirement under the general re-parole criteria. In the NPRM, DHS proposed that an entrepreneur may be eligible for an additional period of parole by establishing that his or her start-up entity has created at least 10 qualified jobs during the initial parole period. In response to public comment, DHS is modifying this provision so that an entrepreneur may qualify for re-parole if the start-up entity created at least 5 qualified jobs with the start-up entity during the initial parole period.

• *Revenue Generation.* In the final rule, DHS is clarifying proposed 8 CFR 212.19(c)(2)(ii)(B)(*3*), a provision that identifies the minimum annual revenue requirement under the general re-parole criteria. DHS has clarified that for the revenue to be considered for purposes of re-parole, it must be generated in the United States.

• *Parole Validity Periods.* In the final rule, DHS is revising proposed 8 CFR 212.19(d)(2) and (3), which are provisions that identify the length of the initial and re-parole periods. In the NPRM, DHS proposed (1) a potential initial period of parole of up to 2 years beginning on the date the request is approved by USCIS and (2) a potential period of re-parole of up to 3 years beginning on the date of the expiration

---

[3] Additionally, DHS is making a technical change to this section by adding the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240) to the regulatory text and to the "List C" listing of acceptable documents for Form I–9 verification purposes. This rule departs from the Notice of Proposed Rulemaking by not adding "or successor form" after Form FS–240. DHS determined that inclusion of the phrase is unnecessary and may cause confusion in the future.

of the initial parole period. First, DHS revised 8 CFR 212.19(d)(2) to correct that the initial parole period would begin running on the date the individual is initially paroled into the United States. Second, in response to public comment, DHS revised 8 CFR 212.19(d)(2) and (3) to provide 2 potential parole periods of up to 30 months each, rather than an initial 2-year period followed by a potential 3-year period of re-parole. Specifically, 8 CFR 212.19(d)(2) now provides that an applicant who meets the eligibility criteria (and his or her spouse and minor, unmarried children, if any) may be considered under this rule for a discretionary grant of an initial parole period of up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. DHS also revised in this final rule the period of re-parole in 8 CFR 212.19(d)(3) to reduce the period of re-parole from 3 years to 30 months in order to extend the initial parole period, while still maintaining the overall 5-year period of parole limitation.

• *Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(a)(10), a provision that defines material changes. The final rule adds the following to the definition of material changes: "a significant change with respect to ownership and control of the start-up entity." This reflects a change from the originally proposed language of any significant change to the entrepreneur's role in or ownership and control in the start-up entity or any other significant change with respect to ownership and control of the start-up entity. Additionally, the final rule at 8 CFR 212.19(a)(1) adds language that permits the entrepreneur during the initial parole period to reduce his or her ownership interest, as long as at least 5 percent ownership is maintained. This provision was revised in response to a number of public comments that requested that DHS reconsider how and when material changes should be reported.

• *Reporting of Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(j), a provision that describes reporting of material changes. DHS is revising 8 CFR 212.19(j) to allow DHS to provide additional flexibility in the future with respect to the manner in which material changes are reported to DHS. The final rule also makes conforming changes based on changes to the definition of entrepreneur.

• *Termination of Parole.* In the final rule, DHS is revising proposed 8 CFR 212.19(k)(2), a provision that describes automatic termination of parole. The final rule makes conforming revisions to this provision based on changes to the definition of entrepreneur and to the material change provisions.

*E. Summary of Costs and Benefits*

DHS does not anticipate that this rule will generate significant costs and burdens to private or public entities. Costs of the rule stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur notify DHS of any material changes.

DHS estimates that 2,940 entrepreneurs will be eligible for parole annually and can apply using the Application for Entrepreneur Parole (Form I–941). Each applicant for parole will face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,591, resulting in a total cost of $4,678,336 (undiscounted) for the first full year the rule will take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant will be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole will face a total cost of $765 per applicant,[4] for a total aggregate cost of $2,474,914.[5] Additionally, spouses who apply for work authorization via an Application for Employment Authorization (Form I–765) will incur a total additional cost of $446 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses[6] will incur total costs of $1,311,830 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-

filing costs is estimated to be $8,136,571 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit will advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this rule will encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

*F. Effective Date*

This final rule will be effective on July 17, 2017, 180 days from the date of publication in the **Federal Register**. DHS has determined that this 180-day period is necessary to provide USCIS with a reasonable period to ensure resources are in place to process and adjudicate Applications for Entrepreneur Parole filed by eligible entrepreneurs and related applications filed by eligible dependents under this rule without sacrificing the quality of customer service for all USCIS stakeholders. USCIS believes it will thus be able to implement this rule in a manner that will avoid delays of processing these and other applications.

**II. Background**

*A. Discretionary Parole Authority*

The Secretary of Homeland Security has discretionary authority to parole into the United States temporarily "under conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any individual applying for admission to the United States," regardless of whether the alien is inadmissible. INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[7] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those

---

[4] On October 24, 2016, U.S. Citizenship and Immigration Services published a final rule establishing a new fee schedule for immigration benefits and services (81 FR 73292). The new filing fees for Form I–131 and Form I–765, $575 and $410, respectively, will be effective on December 23, 2016. This final rule uses those new filing fees in estimating costs to potential applicants under this rule.

[5] For parole requests for children under the age of 14, only the filing fee will be required, as such children do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photographs and signatures captured.

[6] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

---

[7] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally,* 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by restricting its use with respect to two classes of applicants for admission: (1) Aliens who are refugees (unless the Secretary determines that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled . . . rather than be admitted as a refugee" under INA section 207, 8 U.S.C. 1157), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) certain alien crewmen during a labor dispute in specified circumstances (unless the Secretary "determines that the parole of such alien is necessary to protect the national security of the United States"), INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. To exercise its parole authority, DHS must determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[8] In making such discretionary determinations, USCIS considers all relevant information, including any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[9]

DHS regulations at 8 CFR 212.5 generally describe DHS's discretionary parole authority, including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee

will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an individual who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by individuals who seek authorization to depart the United States and return to the country pursuant to parole in the future. *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in, for example, a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Advance authorization of parole by USCIS does not guarantee that the individual will be paroled by CBP upon his or her appearance at a port of entry.[10] Rather, with a grant of advance parole, the individual is issued a document authorizing travel (in lieu of a visa) indicating "that, so long as circumstances do not meaningfully change and the DHS does not discover material information that was previously unavailable, . . . DHS's discretion to parole him at the time of his return to a port of entry will likely be exercised favorably." [11]

Currently, upon an individual's arrival at a U.S. port of entry with a parole travel document (*e.g.,* a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parolee's

authorized parole period. *See* 8 CFR 235.1(h)(2). CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible under section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not provide a parolee with nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing a Form I–765 application with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an employment authorization document (EAD) with an expiration date that is commensurate with the period of parole on the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole will terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

### B. Final Rule

Following careful consideration of public comments received, DHS has made several modifications to the regulatory text proposed in the NPRM (as described above in Section I.C.). The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to these regulatory amendments. Section III of this final rule includes a detailed summary and analysis of public comments that are pertinent to the proposed rule and DHS's role in

---

[8] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii); *Bolante* v. *Keisler,* 506 F.3d 618, 621 (7th Cir. 2007).

[9] The grounds for termination set forth in 212.19(k) are in addition to the general grounds for termination of parole described at 8 CFR 212.5(e).

[10] *See Matter of Arrabally,* 25 I. & N. Dec. at 779 n.6 (citing 71 FR 27585, 27586 n.1 (May 12, 2006) ("[A] decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry, should DHS determine that parole is no longer warranted.")).

[11] *Id.*

administering the International Entrepreneur Rule. A brief summary of comments deemed by DHS to be out of scope or unrelated to this rulemaking, making a detailed substantive response unnecessary, is provided in Section III.K. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov,* docket number USCIS–2015–0006.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received 763 comments during the 45-day public comment period. Of these, 43 comments were duplicate submissions and approximately 242 were letters submitted through mass mailing campaigns. As those letters were sufficiently unique, DHS considered all of these comment submissions. Commenters consisted primarily of individuals but also included startup incubators, companies, venture capital firms, law firms and representatives from State and local governments. Approximately 51 percent of commenters expressed support for the rule and/or offered suggestions for improvement. Nearly 46 percent of commenters expressed general opposition to the rule without suggestions for improvement. For approximately 3 percent of the public comments, DHS could not ascertain whether the commenter supported or opposed the proposed rule.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Legal Authority

*Comments.* One commenter supported DHS's stated authority for promulgating this regulation and said that the INA grants the Secretary of Homeland Security the authority to establish policies governing parole and that efforts to reduce barriers to entrepreneurship via regulatory reform directly addresses DHS's mandate, "to ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." On the other hand, some commenters questioned DHS's authority to implement this rule. A commenter asserted that the rule created a new visa category which is under the exclusive purview of Congress, and therefore an illegal extension of authority by the

executive branch. Another commenter indicated that the proposed rule is too vague regarding whether "the agency intends to grant parole to aliens already present in the United States," and questioned whether the proposed exercise of parole authority is supported by legislative history, is consistent with the INA's overall statutory scheme, and whether "significant public benefit parole" as outlined in this rule is "arbitrary and capricious."

*Response.* DHS agrees with the commenter that contended that the Secretary has authority to promulgate this rule. As noted above, DHS's authority to promulgate this rule arises primarily from sections 101(b)(1)(F) and 402(4) of the HSA; sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3); section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5); and section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B). The Secretary retains broad statutory authority to exercise his discretionary parole authority based upon "significant public benefit."

DHS disagrees with the comment asserting that the proposed rule would effectively create a new visa category, which only Congress has the authority to do. *See* INA section 101(a)(15), 8 U.S.C. 1101(a)(15) (identifying nonimmigrant categories). Congress expressly empowered DHS to grant parole on a case-by-case basis, and nothing in this rule uses that authority to establish a new nonimmigrant classification. Among other things, individuals who are granted parole—which can be terminated at any time in the Secretary's discretion—are not considered to have been "admitted" to the United States, *see* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and cannot change to a nonimmigrant category as a parolee, *see* INA section 248(a), 8 U.S.C. 1258(a). Nor does parole confer lawful permanent resident status. To adjust status to that of a lawful permanent resident, individuals generally must, among other things, be admissible to the United States, have a family or employment-based immigrant visa immediately available to them, and not be subject to the various bars to adjustment of status. *See* INA section 245(a), (c), (k); 8 U.S.C. 1255(a), (c), (k); 8 CFR 245.1.

DHS further disagrees with the comment that this rule is inconsistent with the legislative history on parole. Under current law, Congress has expressly authorized the Secretary to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. The statutory language in place today is somewhat

more restrictive than earlier versions of the parole authority, which did not always require case-by-case review and now includes additional limits on the use of parole for refugees and certain alien crewmen. *See* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B) (refugees); INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A) (alien crewmen); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, sec. 602(a)–(b), 110 Stat. 3009–689 (1996) (changing the standard for parole). But the statute clearly continues to authorize the granting of parole. Across Administrations, moreover, it has been accepted that the Secretary can identify classes of individuals to consider for parole so long as each individual decision is made on a case-by-case basis according to the statutory criteria. *See, e.g.,* 8 CFR 212.5(b) (as amended in 1997); Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007). This rule implements the parole authority in that way.

In addition to the concerns described above, one commenter argued that the proposed rule did not clearly explain whether "the agency intends to grant parole to aliens already present in the United States." DHS believes it is clear under this rule that an individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA sections 212(d)(5)(A), 235(a)(1); 8 U.S.C. 1182(d)(5)(A), 1225(a)(1). As further discussed in section III.H. of this rule, moreover, DHS does not contemplate using this rule to grant requests for parole in place for initial requests for parole.

*Comment:* A commenter objected to the extension of employment authorization by this rule to entrepreneur parolees for the sole purpose of engaging in entrepreneurial employment, stating that DHS is barred from doing so given the comprehensive legislative scheme for employment-based temporary and permanent immigration.

*Response:* DHS disagrees with the commenter. Under a plain reading of INA section 103(a), 8 U.S.C. 1103(a), the Secretary is provided with broad discretion to administer and enforce the Nation's immigration laws and broad authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the [INA]," *see* INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Further, the specific definitional

provision at section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which was raised by the commenter, presumes that employment may be authorized by the Secretary and not just by statute. *See Arizona Dream Act Coal.* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1048, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). The fact that Congress has directed the Secretary to authorize employment to specific classes of foreign nationals in certain statutory provisions does not diminish the Secretary's broad authority under other statutory provisions to administer the immigration laws, including through the extension of employment authorization. *See generally* 8 CFR 274a.12 (identifying, by regulation, numerous "classes of aliens authorized to accept employment").

C. Significant Public Benefit

*Comment:* One commenter stated that the quality of the jobs created should be a factor in determining whether the entrepreneur's parole will provide a significant public benefit. The commenter suggested formalizing some form of priority criteria.

*Response:* Under this final rule, evidence regarding job creation may be considered in determining whether to parole an individual into the United States for "significant public benefit." An entrepreneur may be considered for an initial period of parole if the entrepreneur's start-up entity has received a qualifying investment or grant. Alternatively, if the entity has received a lesser investment or grant amount, the entrepreneur may still be considered for parole by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS in determining whether the evidence, when combined with the amount of investment, grant or award, establishes that the entrepreneur will provide a significant public benefit to the United States. As with initial parole determinations, evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS to determine whether the entrepreneur should be granted re-parole.

Given the way job creation will already be considered, DHS believes it is unnecessary to make "job quality" its own separate criterion in determining whether to grant parole or re-parole. It is also unclear how the commenter believes DHS should apply any such criterion. Under this final rule, DHS will evaluate the totality of the circumstances, including the evidence about job creation, in determining whether to parole an individual into the United States for significant public benefit.

D. Definitions

1. Entrepreneur—Ownership Criteria

*Comments:* Several commenters expressed concern with the 15 percent "substantial ownership interest" requirement in the definition of "entrepreneur" in the proposed rule. One such commenter said the 15 percent "substantial ownership interest" requirement is only reasonable for smaller startups and proposed that the rule also separately include a dollar amount to satisfy the "substantial ownership interest" requirement (*e.g.,* 15 percent ownership interest or ownership interest valued at $150,000 or more). Several commenters recommended that the final rule reduce the initial parole threshold from 15 to 10 percent and reduce the re-parole threshold from 10 to 5 percent. Other commenters suggested that 10 percent ownership per individual would be a more appropriate threshold because some start-ups may be founded by teams of founders that need to split equity and requiring more than 15 percent ownership might be too restrictive and limit business creativity and growth.

*Response:* Consistent with the commenters' concerns and suggestions, DHS is revising the definition of entrepreneur in this final rule to reduce the ownership percentage that the individual must possess. *See* 8 CFR 212.19(a)(1). Based on further analysis, DHS believes that the thresholds from the proposed rule could have unnecessarily impacted an entrepreneur's ability to dilute his or her ownership interest to raise additional funds and grow the start-up entity. In this final rule, an individual may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. DHS believes that the revised

ownership percentage requirements in this final rule adequately account for the possibility of equity dilution, while ensuring that the individual continues to have a substantial ownership interest in, and assumes more than a nominal financial risk related to, the start-up entity.

Given that this is a new and complex process, DHS declines to adopt a separate option of establishing substantial ownership interest based on a valuation of the entrepreneur's ownership interest. DHS believes that the percentages provided within the final rule offer clear guidance to stakeholders and adjudicators as to what constitutes a substantial ownership interest regardless of the industry involved. Reliance upon valuations of an owner's interest would unnecessarily complicate the adjudicative review process, could potentially increase fraud and abuse, and may be burdensome for the applicant to obtain from an independent and reliable source. DHS, therefore, believes that the best indicator of an entrepreneur's ownership interest is the individual's ownership percentage since that is easy for an applicant to establish and provides an objective indicator for DHS to assess. DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

2. Other Comments on Entrepreneur Definition

*Comment:* One commenter stated that, in defining who counts as an "entrepreneur," the rule should take into account whether an individual has been successful in the past, including by having previously owned and developed businesses, generated more than a certain amount of revenue, created more than a certain number of jobs, or earned at least a certain amount.

*Response:* Under this final rule, evidence regarding an entrepreneur's track record may be considered in determining whether to parole an individual into the United States for "significant public benefit." The final rule's definition of entrepreneur requires the applicant to show that he or she both: (1) Possesses a substantial ownership interest in the start-up entity, and (2) has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. *See* new 8 CFR 212.19(a)(1). Some of the factors suggested by the commenter are

relevant evidence that the applicant can submit to show that he or she is well-positioned to substantially assist the entity with the growth and success of its business. DHS will also evaluate the totality of the evidence to determine whether an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. Given the way an entrepreneur's track record may already be considered on a case-by-case basis, DHS believes it is unnecessary to make the specific factors identified by the commenter their own separate criteria in determining whether to grant parole or re-parole.

*Comment:* A few commenters recommended that DHS clarify the term "well-positioned" as used in the definition of "entrepreneur." *See* final 8 CFR 212.19(a)(1) (requiring an international entrepreneur to prove that he or she "is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business"). The commenters believe that the proposed rule did not explain how an applicant would demonstrate that he or she is "well-positioned." The commenters recommend that the "substantial ownership interest" test in the same provision should provide a rebuttable presumption that the entrepreneur is "well-positioned" and that the "significant capital financing" requirements reflect the market demand for the entrepreneur to grow the business.

*Response:* DHS believes that both the proposed rule and this final rule sufficiently explain how an applicant may establish that he or she is "well-positioned" to grow the start-up entity. An applicant may generally establish that he or she is well-positioned to advance the entity's business by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole, and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor. The applicant must be central to the entity's business and well-positioned to actively assist in the growth of that business, such that his or her presence would help the entity create jobs, spur research and development, or provide other benefits to the United States. Whether an applicant has an "active and central

role," and therefore is well-positioned to advance the entity's business, will be determined based on the totality of the evidence provided on a case-by-case basis. Such evidence may include:

• Letters from relevant government agencies, qualified investors, or established business associations with an understanding of the applicant's knowledge, skills or experience that would advance the entity's business;

• news articles or other similar evidence indicating that the applicant has received significant attention and recognition;

• documentation showing that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• documentation showing that the applicant has played an active and central role in the success of prior start-up or other relevant business entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business;

• documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise;

• a position description of the applicant's role in the operations of the company; and

• any other relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States.

Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain applicants meet the "well-positioned" requirement. The burden of proof remains with the applicant.

*Comment:* One commenter representing a group of technology companies recommended that DHS add the term "intellectual property" as a metric that an adjudicator would take into consideration when determining the "active and central role" that the international entrepreneur performs in the organization. The commenter noted that it had several member companies that have non-citizen inventors on a key patent application, and have had core intellectual property developed by non-citizens, often within the university environment. In many of these situations, the non-citizen inventors were unable to obtain work

authorization and join the emerging startup company, resulting in loss of key technical ability, delay, and additional cost for the startup company to achieve market success. The commenter believes this rule could alleviate this investment risk.

*Response:* As discussed above, an applicant for parole under this rule may provide any relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States. Such evidence includes documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise. DHS will consider such evidence to determine whether the applicant performs, or will perform, an active and central role in the start-up entity.

Given the breadth of evidence that can already be considered in these determinations, DHS declines to amend the definition of "entrepreneur" in 8 CFR 212.19(a)(1) to include some consideration of "intellectual property" as a specific metric to determine if the applicant will have an active and central role in the start-up entity. DHS believes it is appropriate to allow for sufficient flexibility in the definition for adjudicators to evaluate each case on its own merits. Given the considerable range of entrepreneurial ventures that might form the basis for an application for parole under this rule, DHS believes that such flexibility is important to ensure that cutting edge industries or groundbreaking ventures are not precluded from consideration simply because of an overly rigid or narrow definition of "entrepreneur."

*Comment:* One commenter noted that DHS's inclusion of criteria in section IV.B.1. of the NPRM, "Recent Formation of a Start-Up Entity," is reminiscent of criteria used in the O–1 nonimmigrant classification for individuals with extraordinary ability, except for the focus on entrepreneurial endeavors. The commenter especially welcomed the final "catch-all" that referenced "any other relevant, probative, and credible evidence indicating the entity's potential for growth." The commenter asserted that as it pertains to "newspaper articles," one of the major difficulties of the O–1 petition process is the lack of awareness by adjudicators of tech-press publications, such as Recode or TechCrunch. The commenter explained that coverage in these publications is very valuable to startups, and forcing startups to garner traditional media coverage in publications like the *Wall Street Journal* or the *New York*

Times is often counterproductive towards the entrepreneur's success.

*Response:* DHS agrees with the commenter that the list of evidence provided in the preamble to the NPRM and this final rule provides an illustrative, non-exhaustive list of the types of evidence that might be submitted by an applicant to establish that he or she meets the definition of entrepreneur in 8 CFR 212.19(a)(1). Applicants may submit any relevant, probative and credible evidence that demonstrates the entity's potential for growth, including tech-press publications.

*Comment:* One commenter recommended broadening the proposed requirement that the parolee play a central role in operations. The commenter noted that the DHS November 2014 memorandum,[12] which initially directed USCIS to develop a proposed rule under the Secretary's parole authority, refers to researchers, not just managers or founders. The commenter stated that in the technology world, "technical founders" are key employees who lead the research and development phase, and recommended that these technical founders be included even if they are not managing overall operations. To keep this expansion targeted, the commenter recommended requiring a technical founder to have an advanced degree in a STEM field from a U.S. institution of higher education.

*Response:* DHS agrees that "technical founders" are often key employees who play an important role in the development and success of a start-up entity. DHS disagrees, however, with the commenter's assertion that the definition of entrepreneur in 8 CFR 212.19(a)(1) does not sufficiently encompass technical founders. Technical founders can perform a central and active role in the operations of their start-up entity, and may be well-positioned, due to their knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. The definition of "entrepreneur" is not limited to those individuals who manage the overall operations of the start-up entity. Thus, DHS believes it is unnecessary to broaden the definition of "entrepreneur" in the way the commenter suggests.

*Comment:* One commenter suggested that the rule should provide a clear-cut definition of a typical entrepreneur.

This commenter asserted that the draft rule does not adequately account for situations where a typical entrepreneur partially qualifies or does not qualify for parole, but nevertheless seeks to start a business in the United States. The commenter stated that USCIS and the White House should plan to have a separate case study team to evaluate each application.

*Response:* DHS believes that the rule provides a reasonable and clear definition of an entrepreneur. This rule is not designed or intended to provide parole to everyone who seeks to be an entrepreneur, but will instead provide a framework for case-by-case determinations based upon specified criteria for determining that a grant of parole in this context provides a significant public benefit. The framework in this rule is consistent with DHS's parole authority under INA section 212(a)(5), 8 U.S.C. 1182(a)(5), and is based on the statutory authorization to provide parole for significant public benefit. Each application for parole under this rule will be adjudicated by an Immigration Services Officer trained on the requirements for significant public benefit parole under 8 CFR 212.19. DHS believes that a separate case-study team could unnecessarily complicate and delay adjudications and declines to adopt the commenter's suggestion.

3. Definition of Start-Up Entity—"Recently-Formed" and the 3-year Limitation

*Comment:* Several commenters expressed concern with the definition of "start-up entity" and the requirement that an entity, in order to satisfy that definition, must have been created within the 3 years immediately preceding the parole request filing date. A few individual commenters said that the 3-year limitation could be inadequate in certain situations, such as when investing in an inactive business with other co-founders to initiate the start-up, or when investing in high-priority areas like healthcare, biotechnology, and clean energy that have long gestation times. A couple of individual commenters said that the 3-year limitation may not be necessary given the other, more stringent requirements in the proposed rule. Some commenters provided the following recommendations relating to the 3-year limitation: Eliminate the limitation, lengthen the period to 5 years, lengthen the period to 10 years, or include a case-by-case provision allowing for submissions that may satisfy the definition of "start-up entity." One commenter recommended

that "recently formed" should include entities formed within the last 10 years, and also requested that where applicable, DHS accept alternative evidence to determine and establish that the company is a "start-up" entity, such as letters of attestation from investors, industry experts within a particular niche field, and government agencies that speak to the average growth cycle of a new company within a particular area. A few commenters stated that the 3-year limitation was appropriate.

*Response:* In response to these comments, DHS revised proposed 8 CFR 212.19(a)(2) and the definition of "start-up entity" in this final rule to require that the entity must have been formed within the 5 years immediately preceding the filing of the initial parole application, rather than 3 years as proposed. DHS believes that this definition appropriately reflects that given some entities, particularly given the industry in which the entity operates, may require a longer gestation time before receiving substantial investment, grants, or awards. This 5-year limitation continues to reflect the Department's intention for parole under this final rule: To incentivize and support the creation and growth of new businesses in the United States, so that the country may benefit from their substantial potential for rapid growth and job creation. DHS recognizes that the term "start-up" is usually used to refer to entities in early stages of development, including various financing rounds used to raise capital and expand the new business, but the term "goes beyond a company just getting off the ground." [13] Limiting the definition of "start-up" in this proposed rule to entities that are less than 5 years old at the time the parole application is filed is a reasonable way to help ensure that the entrepreneur's entity is the type of new business likely to experience rapid growth and job creation, while still allowing a reasonable amount of time for the entrepreneur to form the business and obtain qualifying levels of investor financing (which may occur in several rounds) or government grants or awards.

4. Other Comments on the Definition of Start-Up Entity

*Comment:* One commenter said that formation should be defined to be either the creation of a legal entity under which the activities of the business

---

[12] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https:// www.dhs.gov/sites/default/files/publications/14_ 1120_memo_business_actions.pdf.*

[13] U.S. Small Business Administration, Startups & High Growth Businesses, available at *https:// www.sba.gov/content/startups-high-growth-businesses* ("In the world of business, the word 'startup' goes beyond a company just getting off the ground.").

would be conducted or the effective date of an agreement between the entrepreneur and an existing business to launch the business activities as a start-up, branch, department, subsidiary, or other activity of an existing business entity. Another commenter suggested that DHS consider restructuring (*e.g.,* use successor-in-interest rules) and other pivots (in terms of changes in the service or product, as well as markets) during the 3-year period immediately preceding the filing of the parole application and at time of application for re-parole.

*Response:* DHS appreciates the commenters' suggestions and notes that recent formation within the definition of "start-up entity" in 8 CFR 212.19(a)(2) is already limited to the creation of the entity within the 5 years immediately preceding the filing date of the alien's initial parole request. DHS further declines to amend 8 CFR 212.19(a)(2) to broaden what may be considered "recently formed" to include the effective date of an agreement between the entrepreneur and an existing business to launch new business activities, restructurings and other pivots. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter suggested that start-up entities under this rule should be limited to businesses that fill a need that is currently not being fulfilled in the United States.

*Response:* One of the goals of this final rule is to increase and enhance entrepreneurship, innovation, and job creation in the United States; and, under this rule, evidence regarding the expected contributions of a start-up entity will be considered in determining whether to parole an individual into the United States. A successful start-up entity, particularly one with high-growth potential, will fulfill an identified business need. For example, the entrepreneur may be starting the business to alter an existing industry through innovative products or processes, innovative and more efficient methods of production, or cutting-edge research and development to expand an existing market or industry. It is also unclear from the commenter's suggestion how "business need" would be defined, and DHS believes that attempting to do so in this rule could result in an overly restrictive definition that fails to account for future innovation, would be unnecessarily rigid, and would lessen the rule's ability

to retain and attract international entrepreneurs who will provide a significant public benefit to the United States.

*Comment:* An individual commenter requested that staffing companies be included as a type of startup.

*Response:* In this final rule, and for purposes of parole under this program, DHS defines a "start-up entity" as a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(a)(2). The rule requires that entities meet certain specified criteria for obtaining parole, but the rule does not specifically exclude staffing companies from participating if they otherwise meet these criteria. DHS therefore will not revise the definition of start-up entity in this rule as requested by the commenter.

*Comment:* One commenter asserted that the rule fails to specify how a start-up entity can demonstrate that it has "lawfully done business" or "has substantial potential for rapid growth and job creation." The commenter recommended revising the definition to more closely align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) by instead requiring evidence that the entity is or will be engaged in the regular, systematic, and continuous provision of goods or services. This commenter suggested that the submission of expert witness testimony by a reputable third party, such as a recognized professor or leader in the start-up entity's proposed field, should be given deference and treated under the final rule as a rebuttable presumption establishing that the start-up "has substantial potential for rapid growth and job creation."

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. DHS believes that an applicant can demonstrate the start-up entity's lawful business activities through many different means and will keep this requirement flexible to account for the many differences among start-up entities. Such evidence might include, but is not limited to, business permits, equipment purchased or rented, contracts for products or services, invoices, licensing agreements, federal tax returns, sales tax filings, and evidence of marketing efforts.

DHS believes that the rule provides a clear framework for establishing that a start-up entity has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(b)(2)(ii) and (iii). An applicant generally must satisfy the criteria in 8 CFR 212.19(b)(2)(ii) to be

considered for parole under this rule. An applicant who only partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii) may still be eligible for consideration for parole under this rule if the applicant provides additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS recognizes that the rule does not provide specific evidence that must be submitted in order to satisfy the alternative criteria in 8 CFR 212.19(b)(2)(iii). DHS believes that providing a specific set of evidence would have the unintended effect of narrowing a provision that was designed to allow for the submission of any evidence that the applicant believes may establish the substantial potential of his or her start-up entity, recognizing that such evidence may vary depending on the nature of the business and the industry in which it operates. DHS believes that it is important to retain criteria that provide flexibility to the applicant and DHS. Such flexibility is consistent with DHS's parole authority and the case-by-case nature of each parole determination as required by statute. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

DHS does not believe that the rule should be revised to align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H). The requirements set forth in 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) relate specifically to eligibility for classification as an L–1 nonimmigrant and are not necessarily relevant to the requirements set forth in this rule, which are specifically designed to provide the framework by which USCIS will determine whether to grant parole to certain individuals for significant public benefit. Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain entities have substantial potential for rapid growth and job creation. The burden of proof remains with the applicant.

5. Qualified Government Award or Grant

*Comment:* One commenter stated that the rule's grant-based criteria for consideration focused too narrowly on awards made by government entities The commenter noted that entrepreneurs seek grants from a variety of sources and that funding from non-profits or not-for-profit entities (such as U.S. universities) can be significant sources of start-up capital. The

**Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations **5249**

commenter requested that the rule be revised to allow entrepreneurs of non-profit start-up entities to qualify for parole under this program based on the receipt of charitable grants.

*Response:* DHS appreciates the commenter's suggestion, but declines to adopt the suggestion in this final rule to include charitable grants as a type of qualifying grant or award under 8 CFR 212.19(a)(3). DHS believes, given the nature of charitable grants, that they would not present the same level of validation regarding the entity's high-growth potential as would a grant or award from a Federal, State, or local government entity with expertise in economic development, research and development, or job creation. Since the validating quality of a substantial government grant or award is an important factor DHS will rely upon to determine if the entrepreneur will provide a significant public benefit to the United States, and since that same validating quality does not necessarily extend to charitable grants or awards, DHS declines to adopt the commenter's suggestion. DHS notes, however, that nothing in this final rule prohibits entrepreneurs from accepting charitable grants or pointing to such funding as evidence that parole would be justified and that they merit a favorable exercise of discretion. Moreover, given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter noted that the definition of qualified government award or grant and the phrase "federal, state, or local government entity," are ambiguous as to whether an entrepreneur may qualify under the rule based on a grant by a foreign government. According to the commenter, the rule does not explicitly state that the "federal, state, or local government entity" needs to be restricted to entities in the United States. The commenter encouraged USCIS to adopt a broad approach in determining which kinds of grants may qualify and to allow entrepreneurs to qualify if their start-up entity attracts substantial foreign government financing. The commenter also suggested that USCIS and CBP should again emphasize that parole may be discretionarily denied in cases that could risk national security or impair international relations.

*Response:* While DHS always maintains the ability to deny parole in its discretion, including in those cases where there may be a national security

or foreign relations concerns, DHS declines to expand the definition of qualified government grant or award to include grants or awards from a foreign governmental entity. To eliminate potential confusion, DHS is revising the definition as proposed to specifically exclude foreign government entities. The receipt of significant funding from certain U.S. federal, state or local government entities is an important factor that DHS will weigh in determining if the entrepreneur will provide a significant public benefit to the United States. DHS believes that significant funding from certain U.S. federal, state or local governmental entities is a strong indicator of a start-up entity's substantial potential for rapid growth, including through enhancing innovation, generating revenue, obtaining significant additional investments of capital, and creating jobs. Such government entities regularly evaluate the potential of U.S. businesses, so the choice to provide a significant award or grant to a particular start-up entity can be a compelling indicator of that start-up's substantial potential for rapid growth and job creation. Because these government entities are formed to serve the U.S. public, their choice to fund a particular business may be more indicative than that of a foreign government as to whether the business's operations would provide a significant public benefit in the United States. DHS believes that the reliability and weight of the independent assessment performed by certain U.S. federal, state or local governmental entities before issuing a grant or award does not necessarily extend to grants or awards made by foreign governmental entities. DHS therefore declines to adopt the commenter's suggestion to revise the rule to include funding from foreign governmental entities as one of the criteria in 8 CFR 212.19(a)(3).

### 6. Qualified Investment

*Comment:* Some commenters suggested that DHS define "capital" broadly to include cash, cash equivalents, secured or unsecured loan proceeds, payments for or obligations under binding leases, the value of goods, equipment, and intangible property such as patent rights, trademarks, trade secrets, and distinctive "know how."

*Response:* DHS declines to adopt the commenters' suggestions. "Qualified investment" as a general criterion for parole is limited to a specific monetary investment in the form of equity or convertible debt, to ensure that the investment is easily valued as well as

significant in nature. This promotes fair and efficient administration of the process under this rule, while also ensuring the integrity of that process. In addition, equity investments and convertible debt investments both involve a distinctive level of expert review, due diligence, and oversight. For example, according to the Small Business Administration, venture capital firms and angel investors typically review a business plan and evaluate a start-up's management team, market, products and services, operating history, corporate governance documents, and financial statements before making an equity investment.[14] Such investment generally also involves active monitoring via board participation, strategic marketing, governance, and capital structure.[15] While non-monetary contributions made to a start-up entity may not be considered as a qualified investment for purposes of the general criteria of a parole determination under this rule, the rule does not prohibit such contributions and they may be considered as evidence under the alternative criteria at 8 CFR 212.19(b)(2)(iii) and (c)(2)(iii) to establish that the start-up entity has, or continues to have, substantial potential for rapid growth and job creation.

*Comment:* One commenter stated that the requirement that start-up capital must be equity or convertible debt may be too limiting given the venture finance markets today. The commenter said that other investment instruments are commonly used by sophisticated market participants, and that such investments might not technically be considered equity or convertible debt even though they are bona fide capital investments. The commenter recommended that the definition be made "future-proof" by creating a catch-all for other investment instruments that are convertible, exchangeable, or exercisable for equity in the start-up, regardless of the name of the investment instrument.

*Response:* DHS understands that the regulatory text may not capture all possible future investment instruments and has amended the regulatory text to capture other commonly used convertible securities now and in the future. The final rule defines "qualified investment" as an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up

---

[14] Venture Capital, *https://www.sba.gov/starting-business/finance-your-business/venture-capital/venture-capital.*

[15] *Id.*

entity that is a purchase from such entity of its equity, convertible debt or other security convertible into its equity commonly used in financing transactions within such entity's industry. DHS believes that this definition, in practice, will apply to other securities convertible into equity (other than convertible debt) that are or become commonly used within the start-up entity's industry, and DHS may issue additional guidance in the future regarding such securities as necessary. Given that this program is new and complex, DHS has decided to take an incremental approach and will consider potential modifications in the future after it is able to assess implementation of the rule and its impact on operational resources.

7. Qualified Investor

*Comment:* Several commenters, including associations and individual commenters, stated that the proposed "qualified investor" definition is more stringent than the "accredited investor" definition adopted by the Securities and Exchange Commission (SEC). Several commenters stated that many angel investors, especially newer investment firms and angels, would not be considered "qualified investors" under this rule. One of these commenters suggested revising the definition of a qualified investor using the guidelines set forth by AngelList, which requires all syndicate leads on their site to have registered as accredited investors, to have made at least two direct investments in technology start-ups, and to have attracted additional funding beyond the syndicate lead. Some commenters generally stated that many potentially high-growth firms started by international entrepreneurs will not qualify for parole or re-parole because the business did not receive an investment from a qualified U.S. investor, and encouraged the rule to be more flexible to allow for additional sources of capital.

*Response:* In response to comments received, DHS is revising proposed 8 CFR 212.19(a)(5), which provides the definition of a qualified investor. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years, the individual or organization made investments in start-up entities in exchange for equity or convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS has

removed the proposed requirement that the total investment amount be made in 3 separate calendar years and, consistent with its analysis of relevant investment data, reduced the amount from $1,000,000 to $600,000.[16] DHS is also making revisions consistent with the change to the qualified investment definition by adding "other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry." DHS agrees with commenters that the qualified investor requirement is more stringent than the SEC "accredited investor" definition, but believes the additional parameters for qualified investors under the rule are appropriate. The "accredited investor" definition for SEC purposes is focused on the investing entity's assets or the individual investor's net worth or annual income,[17] not on the investor's

track record of successfully investing in start-up entities. An investor's successful track record of investing in start-up entities provides an important measure of objective validation that DHS will rely upon as part of evaluating whether granting parole to a particular individual would provide a significant public benefit.

DHS also declines to adopt the investor track record criteria associated with AngelList's requirements, as DHS believes that the past success of qualified investors can be demonstrated sufficiently by utilizing the criteria set forth in the final rule. DHS has maintained the requirements under 8 CFR 212.19(a)(5)(ii) as evidence that the investor has had previous successful investments, which are similar to certain criteria for a start-up entity to demonstrate eligibility for re-parole under this rule. *See* final 8 CFR 212.19(a)(5)(ii).

*Comment:* A joint submission from an advocacy group and a non-profit organization proposed that DHS create a "whitelist" of qualified investors and modify the rule such that any start-up receiving an investment from a whitelisted investor proceed through an expedited review process. The commenter said that this would both streamline the parole process and diminish the burden on adjudicators to analyze the merits of often complicated technology companies. The commenter said that the qualification process for such an investor whitelist could be significantly more robust than the rule's proposed definition of "qualified investor" and should be updated on an annual or biannual basis. Another joint submission suggested the creation of a "Known Qualified Investor" program, similar to the "Known Employer" pilot program recently created by DHS in a different context, to assist the overall adjudication process.

*Response:* DHS appreciates the commenters' suggestions. The Known Employer program referenced by the commenter remains in a pilot stage. DHS will assess the effectiveness of the Known Employer program after the pilot is complete, and then determine whether the program should be made permanent. If the program is successful, DHS will assess whether it may be expanded to other adjudication contexts. Committing to use a similar program in the context of this rulemaking would thus be premature. DHS also declines to adopt the commenters' suggestion to create a "whitelist of qualified investors" and an expedited process for applications based on investment from such investors at this time. Given that this is a new and

---

[16] To arrive at this level, DHS relied on the $250,000 median seed round for active firms that successfully exited accelerators, as is described more fully in in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule notice. Second, DHS multiplied this figure by 2.4, which is an estimate of the average number of investments made over a five-year period by qualified investors. DHS arrived at the figure for average investments over five years using the following methodology. DHS used the "investor graph" section of the Seed DB data set to extract investment round information for investors that have invested in various startup accelerators' portfolio companies. The search engine is not set up in a manner in which random sampling can be done, so DHS obtained data for nine accelerators chosen from the 2016 Seed Accelerator Rankings project (SARP), the report of which is found at: *http://seedrankings.com/pdf/ sarp_2016_accelerator_rankings.pdf*. SARP ranks accelerators via a composite scoring system based on various metrics, including funding value averages and exit performance, and produces a list of the top-rated accelerators, although there is no pre-set number of accelerators that can appear in the ranking list each year. In the 2016 SARP report there were twenty-three Seed Accelerators ranked out of a total of 160 that the program tracks. DHS was able to extract investment round data from nine of the twenty-three SARP ranked accelerators, for a total of about 3,600 individual investment rounds. Next, DHS grouped these rounds for the five-year period October 2011–November 2016 to result in 3,085 records. Next, DHS removed duplicates to parse the list into records for unique investor names. As a result, 1,329 unique investors remained. Dividing the 3,085 by 1,329 investors yields an average of 2.4, which DHS used as a reasonable estimate of the average number of investments that qualified investors made in a five year period, at least for the specific accelerators involved. DHS notes that there are several caveats to this analysis. First, the data only includes investments made through accelerators. If non-accelerator investments were included, for which DHS could not obtain data, the average would likely be higher. Second, some rounds did not include an amount and some investor names appeared with variations. DHS conducted several data runs based on different filtering techniques and generally the range of average investments was between 2.32 and 2.5.

[17] 17 CFR 230.501(a).

complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after the Department has assessed the implementation the process and its impact on operational resources.

## 8. Evidence Required To Establish Qualified Investor

*Comment:* Several commenters expressed concern about the burden of proving that investors have met the revenue and job creation criteria in the definition of qualified investor, which the commenters said could prevent investors from participating. One commenter stated that early-stage investors usually do not keep records of employees or the revenues of their portfolio companies, and that those companies would not be inclined to respond to paperwork requests from their investors that do not relate to their own success. Another commenter said that some investors do not make their investments known publicly and the vast majority of investors do not make public their returns (let alone the number of jobs created). Another commenter said that the rule should only require evidence of publicly available information, concluding that it would be too invasive to require disclosure of confidential employee data or other confidential financial information of third-party companies that have no ties to the start-up entity related to the parole applicant. A few commenters requested that DHS allow venture capitalists, accelerators, and incubators to register so that they would not be required to produce the evidence of their qualifications with each parole application.

*Response:* DHS does not believe that providing evidence of revenues generated or jobs created by entities in which the investor previously invested is overly burdensome or would require the investor to publicly reveal otherwise sensitive information. DHS believes, given the significance of an investor's track record of successful investment in start-ups to the determination of significant public benefit, that the need for this evidence outweighs the potential burden on the applicant and investor to compile and submit it. However, as DHS continues to assess the implementation of the process once the rule is final, the Department will consider potential ways to modify the process given the kinds of issues raised by these comments.

## 9. Foreign Funding/Investment

*Comment:* Several commenters provided input on the proposed requirement that "qualified investor"

funds must come from either U.S. citizens, lawful permanent residents, or entities that are majority owned and controlled by U.S. citizens or lawful permanent residents. Nearly all commenters on this topic expressed concerns about this requirement as a major limiting factor of the rule. Some commenters focused on the potential economic benefits of broadening the definition of "qualified investor" to include foreign investment. These commenters asserted that it would be economically beneficial to allow non-U.S. investments, as there are many experienced investors from outside the United States that could bring direct foreign investment into the country and create jobs. Another commenter stated that, by limiting qualification to domestic investors, DHS is foregoing a critical opportunity to attract foreign entrepreneurs and their investments.

*Response:* DHS disagrees with the assertion that this rule precludes or otherwise discourages foreign investment. This rule does not preclude entrepreneurs from seeking and obtaining investment from any number of sources, whether that is foreign investment, personal funds, or funds from friends and family. This rule, however, does limit the types of investment that will be considered by DHS as a qualifying investment for purpose of determining if the entrepreneur and his or her start-up entity meet the requirements for consideration for parole set out in 8 CFR 212.19. DHS believes it is important to limit the type and source of investment that will be considered a qualifying investment, since the investment is meant to serve in part as an objective way to help ensure and validate that the start-up entity's activities will benefit the United States. DHS does not believe investments from foreign sources—which are significantly more difficult for DHS to evaluate for legitimacy and screen for indicators of fraud and abuse—would provide the same measure of objective validation.

*Comment:* Multiple commenters stated that eligibility criteria should focus exclusively on the location of the start-up entity and its related growth and job creation, not on the citizenship and residence of the investor. Some commenters stated that excluding foreign investors from the definition of "qualified investors" is unduly limiting, because many high-potential international entrepreneurs might not have a pre-existing relationship with a U.S.-based investor. Commenters state that such entrepreneurs, especially if living in other countries, would have difficulty attracting investment from

U.S. investors and becoming eligible for parole under this rule. Another commenter cited data concluding that foreign entrepreneurs currently outside of the United States are at a particular disadvantage, as they lack access to U.S.-based angel and venture funding.

*Response:* DHS agrees that the U.S. location of the start-up entity and its related growth and job creation should be a critical component of eligibility under this rule in order to help ensure the exercise of parole is justified by significant public benefit to the United States. DHS believes, however, that the "qualifying investor" must also be a U.S. citizen or lawful permanent resident or an entity that is majority owned or controlled by U.S. citizens or lawful permanent residents. DHS can evaluate more rapidly, precisely, and effectively whether these investors have an established track record of prior investments, in part due to greater access to relevant and reliable records. Such investors will also be subject to the laws of the United States, which provides some additional assurance that the entrepreneurs they back will provide a significant public benefit to the United States.

DHS is not prohibiting foreign investors from investing in the entrepreneur's start-up entity, but rather is simply limiting those investors that can serve as "qualified investors" for purposes of establishing the entrepreneur's eligibility for parole under this rule. DHS anticipates that entrepreneurs living outside the United States will be able to demonstrate eligibility for parole consideration under this rule, whether based on investment from U.S. investors, grants or awards from certain U.S. Government entities, or a mixture of alternative criteria. For all the reasons above, the definition of "qualified investor" will help DHS manage an efficient process for adjudicating requests under this rule while appropriately screening for potential fraud or abuse and ensuring that each grant of parole is justified by significant public benefit to the United States.

*Comment:* Other commenters focused on specific ways that DHS might allow applicants to use foreign investment to establish their eligibility for parole consideration, including by limiting such investment to the entrepreneur's country of origin, or to only those foreign investors who do not present a national security concern. A few commenters asserted that DHS has the capability to verify the bona fides of foreign investors through, for example, the following mechanisms: Making inquiries through U.S. embassy officials,

requesting resumes and the investment history for foreign angel investors, requesting similar documentation used by EB–5 petitioners to establish their lawful source of funds, and consulting publicly available data on reputable foreign investors with a history of successful investments in various countries. Some commenters provided suggestions for alternative or revised definitions relating to foreign investors that could remain easily verifiable by DHS, with the burden being on the investor, including (1) professionally managed funds with at least $10 million under management and registered with the local jurisdiction, and (2) angel investors that have made credible investments in U.S. companies under the same standards as U.S. "qualified investors." Finally, an individual commenter expressed concerns that even investments from U.S. sources could be suspect, and could serve as a pass-through for ineligible investors such as the entrepreneur's family or foreign nationals.

*Response:* While DHS understands that international entrepreneurs can attract legitimate investment capital from non-U.S. sources, DHS believes— as explained at greater length above— that it is appropriate and important to require that a "qualified investment" come from a U.S. source as one of the general criteria to establish that the start-up entity has the substantial potential for rapid growth and job creation. DHS is prepared to monitor the bona fide nature of such U.S.-based investments, as described in greater detail above. Moreover, the rule neither precludes an applicant from securing funding from non-U.S. sources nor precludes such funding from being considered, non-exclusively, under the alternative criteria at 8 CFR 212.19(b)(2)(iii) or (c)(2)(iii). Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

### 10. Self-Funding/"Bootstrapping"

*Comment:* Several commenters argued that entrepreneurs should be able to demonstrate eligibility for parole under this rule not only through funding from U.S. investors or U.S. Government entities, but also through self-financing (known as "bootstrapping"). One commenter noted that many highly successful start-up founders initially grew their companies through bootstrapping, not by raising capital from external investors.

*Response:* DHS declines to expand the definition of "qualified investment" to

include self-funding by the entrepreneur applicant. DHS believes that this definition should include only those investors who have a history of making similar investments over a 5-year period and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue or job creation. *See* final 8 CFR 212.19(a)(5). DHS believes that the investment of a substantial amount of capital by qualified investors in an entrepreneur's start-up entity can serve as a strong indication of the entity's substantial and demonstrated potential for rapid business growth and job creation. Self-funding, while a rational financing strategy for many entrepreneurs, does not provide the same objective and external validation that DHS requires in assessing whether granting parole to an individual is justified based on significant public benefit.

### 11. Other Comments on Qualified Investors

#### a. Crowdfunding

*Comment:* Several commenters stated that the rule should allow crowdfunding as a qualified investment. These commenters noted that entrepreneurs have raised over a billion dollars in investments through various types of crowdfunding platforms, which serve to broaden the base of available investors and demonstrate a venture's potential growth. Commenters also cited the Jumpstart Our Business Startups Act (JOBS Act) of 2012, which created a national regulatory framework for securities-based crowdfunding platforms in particular, along with public statements suggesting that securities-based crowdfunding is recognized by Congress and the Administration as a valuable and increasingly-used investment tool. One commenter also stated that allowing the use of crowdfunding platforms would increase the pool of potential applicants for entrepreneurial parole and could provide a workable intermediary for foreign investment in eligible start-up entities. One commenter suggested potential requirements that would facilitate the use of crowdfunding investment sources, such as setting a threshold amount for eligible crowdfunding investments and confirming that such investments have been deposited in the start-up entity's bank account after the end of the crowdfunding campaign.

*Response:* DHS appreciates the commenters' suggestions. Investments made in a start-up entity through an

SEC-compliant intermediary, such as an SEC-compliant crowdfunding platform, will be treated no differently for purposes of this rule than had the investments been made directly. In order to promote the integrity of adjudications under this rule, DHS declines to make changes to the definition of "qualified investor" that would effectively treat funds generated through crowdfunding platforms as a different class of eligible investment. DHS notes, however, that evidence of a successful donation-based or securities-based crowdfunding campaign could be provided under the rule's alternative eligibility criteria.

#### b. Established U.S. Investors

*Comment:* One commenter questioned the requirement that capital be received "from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities." The commenter stated that the requirement increases the relative bargaining power of established investors working with entrepreneurs seeking parole under this rule, while diminishing that of new venture capital firms, new angel investors, and new start-up accelerators. The commenter stated that if it is kept in its current form, the rule is not clear whether an investment from a non-established investor would jeopardize the parole eligibility of an entrepreneur whose start-up entity is also funded by established investors.

*Response:* The definition of "qualified investor, including the requirement that an investor have a history of substantial investment in successful start-up entities, is intended to help ensure that such investors are bona fide and not concealing fraud or other illicit activity—and thus protect the integrity of the parole process under this rule. The definition is also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit.

DHS emphasizes that the rule does not prohibit investment from U.S. investors who do not have an established track record of substantial investment in start-up entities under the rule's definition of "qualified investor." Any investment from an investor who is not a qualified investor, however, will not count toward the minimum investment criteria associated with the initial parole period or re-parole period. DHS will, of course, monitor all

elements of an application for evidence of fraud or other illegal or illicit activities. It will also assess the totality of the evidence in evaluating whether granting parole to an entrepreneur is justified by significant public benefit.

### c. Approved Regional Centers

*Comment:* One commenter requested that USCIS-approved Regional Centers (based on an approved Form I–924) be allowed to qualify as established U.S. investors. The commenter stated that investment by a Regional Center in a U.S. start-up entity would be a natural extension of what Regional Centers already do, since Regional Centers pool investment for qualified EB–5 visa projects.

*Response:* DHS believes it is important to limit qualifying investors to those who have an established record of successful investments in start-up entities. DHS believes that such a record would include, during the 5-year period immediately preceding the filing of the parole application, one or more investments in other start-up entities in exchange for equity or convertible debt comprising a total of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS will require monetary commitments, rather than non-monetary commitments such as credit for in-kind value (*e.g.,* credit for services), given the difficulty of valuing such commitments and the potential for fraud and abuse. The applicant would also need to show that, subsequent to such investment by the investor, at least 2 such entities each created at least 5 qualified jobs or achieved at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. *See* final 8 CFR 212.19(a)(5)(ii).

As described in greater detail above, these criteria are intended to ensure that investors are bona fide and thus protect the integrity of the parole process under this rule. They are also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit. DHS declines to adopt a special provision for regional centers approved to participate in the EB–5 visa program. Although such centers are not categorically excluded from the definition of "qualified investor" under this rule, they would need to meet all the same criteria as any other qualified investor.

### 12. Qualified Jobs

#### a. Qualifying Employee

*Comments:* Two commenters recommended that DHS broaden the definition of the term "qualifying employee." One commenter stated that the term should include any individual authorized to work in the United States, regardless of immigration status, to avoid creating a conflict for employers who are prohibited from discriminating based on an individual's citizenship or immigration status. Another commenter advocated for the inclusion of independent contractors in the definition of qualifying employee.

*Response:* DHS declines to expand the definition of qualifying employee, which already includes a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. *See* final 8 CFR 212.12(a)(7). DHS believes that creating jobs for these individuals is more likely to provide a significant public benefit given their stronger ties to the United States. Similarly, DHS believes that entrepreneurs and start-up entities that create positions for employees are more likely to provide a significant public benefit than those who rely only on arrangements with independent contractors. Such arrangements would generally have a weaker nexus to the start-up entity, may not have been created as a direct result of the start-up entity's activities, and could be more difficult to validate. Nothing in this rule either supersedes or conflicts with nondiscrimination laws enacted under the Immigration Reform and Control Act (IRCA).[18] Under existing law, it would generally be an unfair immigration-related employment practice for an entity to discriminate against someone authorized to work in the United States because of that person's national origin or, in the case of a "protected individual," citizenship status. *See* 8 U.S.C. 1324b(a) (generally prohibiting such practices, subject to specific exceptions, and defining "protected individual" to include U.S. citizens, lawful permanent residents, and certain other immigrants). This rule does not permit any such otherwise prohibited practices. Instead, it uses the creation of jobs for U.S. citizens, permanent residents, and other authorized immigrants as one indication of the

benefit created by an entrepreneur's start-up entity.[19]

#### b. Full-Time Employment

*Comments:* Several commenters said that the rule should have a more flexible definition of "full-time employment." One commenter said that the definition of the term should not require the job to be filled for at least a year and should include job-sharing arrangements. Another commenter recommended that the definition of full-time employment include combinations of part-time positions.

*Response:* DHS declines to expand the definition of full-time employment to include jobs filled for less than a year by a qualifying employee, job-sharing arrangements, and combinations of part-time jobs. DHS believes that the creation of long-term and full-time positions is a more reliable indicator that an entrepreneur's start-up entity is continuing to yield significant public benefit. Jobs filled for less than a year could be temporary or seasonal, thus limiting the duration and impact of the benefit. Additionally, including job-sharing or combinations of part-time positions could significantly complicate adjudications. The final rule, moreover, already reduces by half the threshold number of jobs to qualify for a re-parole period, making it all the more reasonable to require that each of such jobs be full-time positions as part of the criteria for ensuring that granting parole to an international entrepreneur is justified by significant public benefit.[20]

### 13. Material Change

*Comment:* One commenter recommended that the final rule expressly exempt from the definition of "material change" transitions that are typical within start-ups, such as a company's (1) pivoting its products or services; (2) bringing on board a significant round of funding that could dilute the entrepreneur's ownership interest; (3) changing the role of a founder to meet the needs of the growing company; or (4) by virtue of a foreseeable stock or asset acquisition, executing a merger into or with a related or unrelated entity, or some other form of corporate restructuring. A few

---

[18] Public Law 99–603 section 102, 100 Stat. 3359 (Nov. 6, 1986); INA section 274B.

[19] It is important to note that job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

[20] As explained earlier, job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

commenters recommended that DHS clarify what constitutes a "material change" given the rapidly evolving nature of start-ups.

*Response:* DHS appreciates the concerns expressed by commenters regarding the material change definition in the NPRM. This final rule reflects changes that help clarify what constitutes a material change, with the understanding that start-up entities are likely to experience a variety of transitions as part of their legitimate development and growth. DHS disagrees, however, that all of the events listed by commenters should be specifically exempted from the definition of material change. Some changes to the start-up entity can clearly impact the determination of whether the entrepreneur provides, or will continue to provide, a significant public benefit to the United States. It is essential to the rule's integrity that such material changes are clearly defined and reported to DHS. In the final rule, DHS has outlined those changes that DHS believes are critical to the continuing eligibility of the entrepreneur to be granted parole based on a significant public benefit to the United States. Specifically, the final rule maintains that the following changes are material: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution, or cessation of operations of the start-up entity; and the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity. DHS has revised the definition of "material change" to include the cessation of the entrepreneur's qualifying ownership interest in the start-up entity.

DHS recognizes that not all changes to the ownership structure of a start-up entity constitute a change of such significance that it would reasonably affect the outcome of the determination of whether the entrepreneur provides, or

continues to provide, a significant public benefit to the United States. DHS has revised the final rule to limit material change regarding ownership changes only to "a significant change with respect to ownership and control of the start-up entity." For example, a significant change with respect to ownership and control of the start-up entity may include a transfer of equity in the start-up entity that results in an owner or owners not previously identified on the Application for Entrepreneur Parole (Form I–941) collectively acquiring a controlling stake in the entity. DHS recognizes that achieving a significant round of funding for the start-up entity during the initial parole period may often constitute the very qualifying investment that renders the entrepreneur eligible for a re-parole period under this rule's significant public benefit test, despite diluting the entrepreneur's ownership interest. While DHS will make these determinations on a case-by-case basis, DHS does not anticipate that such significant changes with respect to ownership and control of the start-up entity will often result in termination of parole. A full vetting of new investors with a significant ownership interest, however, can provide DHS with additional insights into the start-up entity's activities in the United States and will help DHS ensure the entrepreneur is continuing to provide a significant public benefit to the United States. In the future, DHS may issue additional guidance on the scope of such significant changes in ownership interest if deemed necessary.

DHS believes these changes are sufficient to clarify the definition of "material change" in regulation and to provide entrepreneurs with sufficient detail about the kinds of changes that could impact their eligibility and must be reported. Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

### E. Application Requirements

#### 1. Application for Entrepreneur Parole

*Comments:* One commenter supported the Application for Entrepreneur Parole (Form I–941), and called it "ideal" because without the form applicants must attempt to list information on existing application forms that do not specifically relate to entrepreneurs. Another commenter requested that the application process resemble the Canadian express entry immigration system and be simplified

so that the assistance of an attorney is not required.

*Response:* DHS agrees with the comment that the Form I–941 is beneficial for capturing information specific to parole requests filed under this rule. DHS declines to model the application process for parole under this rule after the Canadian express entry program as that program is a points system designed to manage applications for permanent residence under certain Canadian federal economic immigration programs.[21] DHS has attempted to develop the Form I–941 to be as simple as possible for applicants while capturing sufficient information to enable adjudicators to make appropriate case-by-case decisions under the statutory and regulatory requirements for parole.

#### 2. Submissions of Documentary/ Supporting Evidence

*Comment:* Two commenters expressed concern that the evidentiary requirements were excessive and that start-up entities operating in "stealth-mode" would not be able to provide letters or media articles. Both commenters suggested that evidence of a significant capital investment from a qualified investor should be sufficient to demonstrate the potential for rapid growth and job creation.

*Response:* As an initial matter, DHS recognizes there may be legitimate reasons for operating a start-up in a manner that does not attract significant public attention. In part for this reason, this final rule extends the definition of start-up entity to include entities formed within the 5 years immediately preceding the filing date of the applicant's initial parole request. DHS believes that start-up entities that are seeking to operate without significant public attention will generally have sufficient time to emerge from that status prior to the parole application.

DHS agrees with the commenters that evidence of having received substantial investment from a qualified investor may be sufficient to establish that the start-up entity has the potential for rapid growth and job creation (one factor in making parole determinations under this rule). *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). DHS understands that other evidence that may be required to establish eligibility for parole consideration under this rule, including whether the applicant is well-positioned to advance the entity's business, may not be a matter of public record. DHS believes, however, that even an entrepreneur operating a company in

---

[21] *http://www.cic.gc.ca/english/express-entry/.*

"stealth mode" should generally be able to provide such evidence for purposes of satisfying the requirements of this rule. Indeed, for entrepreneurs to be paroled under this rule, they must persuade adjudicators, based on the totality of the evidence, that they will provide a significant public benefit.

3. Application Requirements of Spouses and Minor Children

*Comment:* DHS received a few comments supporting the provision in the proposed rule allowing the spouse and children of an entrepreneur granted parole under this rule to also apply for and be granted parole in the United States in order to accompany or ultimately join the entrepreneur. One commenter also supported the proposal to allow the spouse, if granted parole, to obtain employment authorization in the United States in order to work and help support the entrepreneur's family.

*Response:* DHS agrees with these comments. Each spouse or child seeking parole must independently establish eligibility for parole based on significant public benefit (or, alternatively, for urgent humanitarian reasons), and that the individual merits a favorable exercise of discretion. In a case in which an entrepreneur has been granted parole based on significant public benefit under this rule, DHS may consider granting parole to the entrepreneur's spouse and children who provide a significant public benefit by maintaining family unity and thereby further encouraging the entrepreneur to operate and grow his or her business in the United States—and to provide the benefits of such growth to the United States.

Under this final rule, spouses of entrepreneur parolees who wish to obtain employment authorization must apply for an EAD pursuant to 8 CFR 274a.12(c)(34), consistent with current parole policy that allows parolees to apply for employment authorization. DHS agrees with the commenter that allowing spouses of entrepreneurs to apply for work authorization may alleviate a significant portion of the potential economic burdens that entrepreneurs and their families may face, such as paying for education expenses for their children, and to ensure that they satisfy the condition on their parole that they maintain household income that is greater than 400 percent of the Federal poverty line, as they grow and develop their start-up entities. Moreover, extending employment authorization to the spouse may further incentivize an international entrepreneur to bring a start-up entity to the United States—along with new jobs,

innovation, and growth—rather than create it in another country.

4. Other Comments on Application Requirements

*Comment:* One commenter asked that DHS clarify the application procedures for Canadians and whether they may apply at the border or whether they must visit a U.S. consulate prior to requesting to be paroled at a U.S. port of entry.

*Response:* Canadians and applicants from other countries may apply for parole under this rule while inside or outside of the United States. If the applicant's parole request is approved, the applicant would request to be paroled by Customs and Border Protection at a U.S. port of entry after arriving from outside the United States. Canadian nationals who will be appearing at a U.S. port of entry directly from Canada will not have to visit a U.S. consulate prior to appearing at the port of entry and requesting that CBP grant parole. Canadian nationals who will not be appearing at a U.S. port of entry directly from Canada, and will instead be travelling to the United States from another country abroad to request a grant of parole may, similar to other applicants, have to visit a U.S. consulate first in order to obtain travel documentation (*e.g.,* a boarding foil) that allows the individual to travel to a U.S. port of entry. In all cases, however, the individual must have an approved Form I–941 before the individual may appear at the port-of-entry to request a grant of parole.

*F. Parole Criteria and Conditions*

1. Minimum Investment

*Comment:* Numerous commenters— including advocacy groups, law firms, associations, and individual commenters—argued that the proposed rule's minimum investment criterion for the initial parole period would set too high an eligibility bar for many high-potential entrepreneurs. Citing a range of different kinds of evidence, several commenters argued that the proposed $345,000 threshold represented significantly more capital than is actually needed by most start-ups initially and would unnecessarily exclude from consideration some entrepreneurs whose entities would create significant public benefit in the United States.

*Response:* In response to public comments, DHS is reducing the proposed minimum investment of $345,000 to $250,000 in the final rule. *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). Multiple public comments

recommended setting the threshold at $250,000, and DHS's further analysis of seed and angel investment data indicates that this level is reasonable. As is described more fully in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule, DHS's analysis of investments received by a set of new firms that graduated from startup accelerator programs revealed that the median seed investment was $250,000.[22] Following the intent of this final rule to increase and enhance entrepreneurship, innovation, and job creation in the United States, DHS determined that investment amounts that entrepreneurs would need to meet to be considered for parole under this rule should be more in line with typical early investment rounds, rather than the higher investment levels typical of later rounds. In each individual case, DHS must be persuaded that granting parole would provide a significant public benefit and that the person requesting parole merits a favorable exercise of discretion.

*Comment:* One commenter stated that there should not be a minimum investment amount and suggested that the rule instead establish minimum revenue amounts. Several other commenters suggested that evidence of rapid revenue growth should be a standalone eligibility criterion for the initial parole period under 8 CFR 212.19(b)(2)(ii).

*Response:* DHS disagrees with the suggestion that there should not be a minimum investment amount. Establishing a minimum investment amount based on available data provides a clear and predictable benchmark for how an applicant may demonstrate that a start-up entity has substantial potential for rapid growth and job creation (one factor in making parole determinations under this rule). If international entrepreneurs are unable to meet the threshold investment amount but have received some qualified investments or qualified government awards or grants, they may alternatively qualify for parole consideration under this rule if they partially meet the threshold criteria and provide "other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." *See* final 8 CFR 212.19(b)(2)(iii).

---

[22] The data utilized by DHS is provided publicly by SeedDB: *http://seed-db.com/accelerators,* as well as the Angel List: *https://angel.co/,* and the Angel Capital Association (ACA): *https://www.angelcapitalassociation.org/.*

DHS disagrees with the suggestion that evidence of rapid revenue growth or generation of a certain amount of revenue should be a separate criterion under 8 CFR 212.19(b)(2)(ii). In setting threshold criteria, DHS intends to identify reliable indicators of a start-up entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole would provide in an individual case. DHS does not believe that revenue should be the sole external validation factor as compared to substantial funding from qualified U.S. investors and government entities for initial parole applications. DHS reiterates, however, that a start-up entity's revenue may be taken under consideration, both under the "alternative criteria" test and as part of the totality of evidence relevant to whether the grant of parole in an individual case would be justified by significant public benefit and the person requesting parole deserves a favorable exercise of discretion. *See* 8 CFR 219.2(b)(2)(iii), 219.2(c)(2)(B)(iii).

*Comment:* Several individual commenters recommended that the investment threshold be based upon the type of business activity.

*Response:* In an effort to provide a reasonable level of simplicity and predictability in the final rule, DHS decided to utilize a single investment threshold rather than several amounts based on the type of business activity. DHS believes that determining multiple investment thresholds based on business activity or industry would be unduly complicated, making adjudications more labor-intensive and increasing processing times. DHS believes that using a single investment threshold, backed by available data, is a reasonable approach and provides a clearer benchmark for applicants, investors, and adjudicators.

*Comment:* Some commenters provided input on the requirement that funding be received within the preceding 365 days. A CEO roundtable agreed that the $345,000 threshold was an appropriate amount, but questioned the 365-day requirement, recommending that the rule be changed to require that only 65 percent of the investment to have occurred within the last 365 days. A trade association and a joint submission from a professional association and a non-profit organization recommended that the investment occur within a 3-year window. As an alternative, the trade association stated that some of a start-up entity's capital that would otherwise count toward the qualified investment amount should do so even if its ultimate receipt by the start-up entity is contingent upon the approval of parole.

*Response:* DHS is revising the proposed requirement that the substantial investment be received within the 365 days immediately preceding the filing of the application for initial parole. The final rule increases this period from 12 months (365 days) to 18 months. DHS made this change based on feedback that it often takes longer than 12 months for a start-up to secure and receive investment funding. This revised requirement still ensures that a qualified investor or government entity has recently validated (within 18 months) the start-up entity's potential for rapid growth and job creation. With respect to the comment suggesting that DHS accept funding contingent upon approval of parole toward the qualified investment amount, DHS believes that funds contingent on the occurrence of a future event, such as a grant of parole to the entrepreneur, would not satisfy the general criteria in 8 CFR 212.19(b)(2)(ii). DHS notes, however, that such funds may be considered under the alternative criteria in 8 CFR 212.19(b)(2)(iii) if the entrepreneur partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii)(B), since DHS may consider such contingent funds as other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Given that this process is a new and complex one, DHS has decided to take an incremental approach and will consider the suggested modification in the future after assessing the implementation of the rule and its impact on operational resources.

2. Minimum Government Grants or Awards

*Comment:* Several commenters argued that DHS should require less than $100,000 to meet the eligibility criteria based on a start-up entity's receipt of government grants and awards. An individual commenter said that most government grants were well beneath the $100,000 minimum threshold in the proposed rule. Another individual commenter recommended a $50,000 government grant threshold. By contrast, one commenter stated that the $100,000 minimum investment for government grants and awards is too low to start a meaningful business and suggested increasing the amount to $500,000 or more. Several commenters stated that the $100,000 grant threshold aligns with the timing of the Federal Small Business Innovation Research (SBIR)[23] and Small Business Technology Transfer (STTR) awards and dollar amounts.

*Response:* DHS declines to make the suggested changes to the minimum government grant or award threshold. In light of the range of comments received on increasing or decreasing the minimum grant amount, DHS believes its proposed minimum grant amount is reasonable. Because government entities regularly evaluate the potential of U.S. businesses, the choice to provide a significant award or grant to a particular start-up entity will often be a strong indicator of that start-up's substantial potential for growth and job creation. Additionally, because government entities are by definition formed to serve the public, the choice by such an entity to fund a particular business generally indicates the government entity's independent assessment that the business's operations would provide a significant public benefit—and can be a strong indicator of a start-up entity's substantial potential for rapid growth and job creation. The specific $100,000 minimum government funding threshold identified in this final rule is based in part on the fact that seed funding awards ("Phase I" awards) from the Federal SBIR/STTR program are generally below $150,000.

3. Initial Parole Alternative Criteria

*Comment:* Several commenters offered suggestions for the factors to be considered by DHS under the rule's alternative criteria for the initial parole period, such as adding a metric for number of users or customers of the entrepreneur's start-up entity, the start-up entity's social impact, and the start-up entity's national scope or location in a low- or middle-class neighborhood. Other commenters proposed the following factors: The applicant's academic degree; participation in or training from a start-up accelerator; prior success as demonstrated by market share from patented innovations, annual sales volume, or job creation; and

---

[23] The Small Business Innovation Research (SBIR) program is coordinated by the Small Business Administration to seed capital for start-up businesses. It is designed to stimulate technological innovation among small private-sector businesses, and it is the largest source of seed capital in the United States for technology driven start-ups, funding between 5,000 and 7,000 projects a year. The "first phase" award is an innovation grant made for initial eligibility and corresponds to the start-up of the commercial business and proof of "concept phase"—the average award amounts vary by department, but most SBIR Phase I awards are made at or below $150,000. The Phase I awards are geared towards financing the startup of the private commercial entity and also the innovation and research and development (R&D) that the enterprise undertakes.

demonstrated success using alternative funding platforms.

*Response:* DHS agrees with these suggestions. DHS may consider the following additional types of evidence, among others, as factors under the alternative criteria for those applicants who partially satisfy 8 CFR 212.19(b)(2)(ii):

• number of users or customers;
• revenue generated by the start-up entity;
• social impact of the start-up entity;
• national scope of the start-up entity;
• positive effects on the start-up entity's locality or region;
• success using alternative funding platforms, including crowdfunding platforms;
• the applicant's academic degrees;
• the applicant's prior success in operating start-up entities as demonstrated by patented innovations, annual revenue, job creation, or other factors; and
• selection of the start-up entity to participate in one or more established and reputable start-up accelerators or incubators.

With respect to start-up accelerators and incubators, DHS expects to evaluate them on several relevant factors, including years in existence, graduation rates, significant exits by portfolio start-ups, significant investment or fundraising by portfolio start-ups, and valuation of portfolio start-ups.

DHS understands that some applicants will be able to establish that their start-up entity is likely to grow rapidly and create jobs based on other factors beyond only the amount of capital investment or government funding received, which is why DHS has not limited the types of evidence that may be considered under the alternative criteria at 8 CFR 212.19(b)(2)(iii) for those who only partially meet the initial threshold criteria at 8 CFR 212.19(b)(2)(ii)(B).

*Comment:* One commenter suggested linking the rule's application to applications for other initiatives, such as National Minority Supplier Development Council Certification and, when applicable, Minority Women Based Entrepreneur Certification.

*Response:* DHS appreciates the commenters' suggestions but declines to adopt these factors as evidence of substantial potential for rapid business growth or job creation. Nothing in this rule prohibits or discourages entrepreneurs from participating in initiatives or certification processes designed to help promote more diverse and inclusive entrepreneurship. DHS does not believe, however, that such initiatives and certifications

independently provide sufficient external validation that a start-up entity has the substantial potential for rapid growth or job creation and meets the "significant public benefit" requirement under this rule. Evidence that the start-up is involved with certain initiatives in the public interest can, however, be considered a positive factor in determining whether an entrepreneur merits a grant of parole as a matter of discretion. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said the term "reliable and compelling evidence" in proposed 8 CFR 212.19(b)(2)(iii), with respect to the start-up entity's substantial potential for rapid growth and job creation, is too vague and should be elaborated on further in the regulatory text.

*Response:* DHS disagrees with the commenter's suggestion to elaborate further in 8 CFR 212.19(b)(2)(iii) on the type of evidence that may be submitted and considered as reliable and compelling. DHS believes that this alternative criterion should be flexible so as not to restrict the types of evidence that may be submitted and relied upon to determine if the start-up entity has substantial potential for rapid growth and job creation. DHS believes that such flexibility is important given the case-by-case nature of these discretionary parole determinations. An applicant for parole under this rule who does not meet the threshold capital investment or government funding criteria in 8 CFR 212.19(b)(2)(ii)(B) may submit any evidence that the applicant believes is reliable and compelling to support the claim that the applicant's start-up entity has substantial potential for rapid growth and job creation. DHS, after reviewing the application and all of the evidence submitted in support of the application, will make a determination as to whether the applicant is eligible for parole consideration under the relevant statutory and regulatory standards, and as to whether the person seeking parole merits a favorable exercise of discretion.

*Comment:* One commenter asserted that securing an investment from a U.S. investor or obtaining a U.S. government grant or award is not a viable option for most people.

*Response:* DHS believes that qualified investments or government funding are appropriate factors to consider when assessing the ability of a start-up entity to achieve rapid growth and job creation

(one factor in making parole determinations under this rule). DHS, however, understands that some start-up entities with the potential to yield significant public benefit may have legitimate economic or strategic reasons to not pursue or accept capital investment or government funding at the levels set forth in 8 CFR 212.19(b)(2)(ii)(B). Therefore, DHS has provided in the rule an alternative criterion for further consideration of those applications where the applicant only partially satisfies the capital investment or government funding thresholds, but provides additional reliable and compelling evidence that establishes the substantial potential of the start-up entity for rapid growth and job creation.

*Comment:* A commenter suggested that, instead of focusing on capital investment and job creation criteria, DHS should focus on whether the start-up entity would be in industries in traded sectors. The commenter proposed that the following industries would qualify: Manufacturing, software publishers, Internet publishing, and research and development services.

*Response:* While DHS recognizes the benefits of increased exports to the U.S economy, it declines to limit eligible start-up entities to traded sectors, since start-up entities in a much wider set of industries can yield significant public benefit to the United States through rapid growth and job creation.

*Comment:* A commenter requested that DHS form an advisory group of industry experts to recommend alternative criteria.

*Response:* DHS afforded an opportunity for notice and comment on the NPRM and expressly sought proposals for alternative criteria from the public. DHS does not believe that forming a new advisory group is necessary at this time.

*Comment:* One commenter suggested that the term "rapid growth" should be determined based on factors pertaining to the start-up entity's industry, normal business growth in the industry, geographic area, and the amount of investment in the entity. The commenter also recommended that the term "substantial potential" take into account the start-up entity's particular geographic area rather than a national scale.

*Response:* While the industry- and geography-specific factors suggested by the commenter may be taken into consideration by DHS as part of the totality of the circumstances for a given application, DHS believes that the general and alternative eligibility criteria provided in the final rule are

sufficient to determine if a start-up entity has the substantial potential for rapid growth and job creation, and provide a more predictable framework by which these parole applications will be adjudicated than would a more mechanical and unduly rigid consideration of the variables suggested by the commenter.

### 4. Re-parole Criteria

#### a. Minimum Investment or Grants/Awards

*Comment:* Several commenters discussed the proposed re-parole eligibility criteria at 8 CFR 212.19(c)(2)(ii)(B)(*1*), namely that the applicant's start-up entity has received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period. Most commenters argued that this funding level was unduly high, especially given the duration of the initial parole period.

*Response:* DHS declines to adjust the $500,000 funding threshold. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS believes that $500,000 is a reasonable level for re-parole. An industry report on startups shows the median seed investment round for the first half of 2016 was $625,000, which rose from $425,000 in 2015. This figure is valuable because it includes seed rounds for firms that participate with accelerators and that often start out with investment rounds below $100,000.[24] The median for angel group seed investments is reported at $620,000 as the annual average over 2013–2015, which rose sharply to $850,000 in 2015 from a median of $505,000 from the previous two years. Venture capital round sizes are even larger, as the 2014 median round size for both seed and startup stage venture rounds was $1,000,000.

DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to seek and receive qualified investments or government funding, to meet the re-parole criteria. If an entrepreneur is unable to meet the minimum funding

criterion, moreover, he or she may still be eligible for re-parole based on revenue generated or jobs created. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*) and (*3*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

#### b. Minimum Annual Revenue

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*3*), which establishes an eligibility threshold when the applicant's start-up entity has reached at least $500,000 in annual revenue and averaged 20 percent in annual revenue growth during the initial parole period. Most commenters suggested alternative approaches, arguing that start-ups are often legitimately focused on the development of an innovative product or service, and not on generating early revenue. Another commenter stated that the revenue criterion is reasonable.

*Response:* DHS declines to adjust these criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS chose $500,000 in revenue and 20 percent annual revenue growth as threshold criteria because, after consulting with SBA, DHS determined these criteria: (1) Would be reasonable as applied across start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for rapid growth and job creation (and that such entity is not, for example, a small business created for the sole or primary purpose to provide income to the owner and his or her family). As noted, DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to meet the minimum revenue threshold for re-parole. If an entrepreneur is unable to meet the minimum revenue requirement, he or she may still be eligible under the minimum investment or job creation criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*) and (*2*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

*Comment:* An individual commenter suggested that DHS should include in the rule a criterion for user growth, rather than revenue growth, as many

start-ups focus more on growing their number of users in their early years.

*Response:* DHS declines to include user growth as a stand-alone criterion for establishing eligibility for re-parole. DHS, however, may consider user growth as a factor when evaluating an entrepreneur's eligibility under the alternative criteria provision. The list of factors provided in the preamble to the proposed rule was intended only to illustrate the kinds of factors that DHS may consider as reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

As noted in the NPRM, DHS is not defining in regulation the specific types of evidence that may be deemed "reliable and compelling" at this time, because DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. DHS believes, however, that such evidence would need to be compelling to demonstrate that the entrepreneur's presence in the United States would provide a significant public benefit. DHS will evaluate on a case-by-case basis whether such evidence—in conjunction with the entity's substantial funding, revenue generation, or job creation—establishes that the applicant's presence in the United States will provide a significant public benefit during a re-parole period.

*Comment:* An individual commenter suggested that the minimum annual revenue threshold for re-parole be set as just enough to sustain the entrepreneur's salary and continue business operations.

*Response:* The final rule states that the start-up entity must be of a type that has the substantial potential to experience rapid growth and job creation, including through significant levels of capital investment, government awards or grants, revenue generation, or job creation during the re-parole period. These factors are intended to help DHS identify the types of start-up entities that are most likely to provide a significant public benefit, while excluding entities without such potential—such as a business with limited growth potential created by an entrepreneur for the sole or primary purpose of providing income to the entrepreneur and his or her family.[25] Because this latter type of business is less likely to experience rapid growth

---

[24] The report on the seed median is published as a newsletter by Crunchbase and is found at: *https://techcrunch.com/2016/09/07/crunchbase-sees-rise-in-average-seed-round-in-2016/*. The Angel group median round size is obtained from the Angel Resource Institute's annual (2015) "Halo Report," found at *http://angelresourceinstitute.org/reports/halo-report-full-version-ye-2015.pdf*. The venture capital figures are obtained from the Ernst and Young Venture Capital Insights Report (4th quarter 2014) and are found at: *http://www.ey.com/Publication/vwLUAssets/Venture_Capital_Insights_4Q14_-_January_2015/%24FILE/ey-venture-capital-insights-4Q14.pdf*.

[25] Erik Hurst & Benjamin Wild Pugsley, "What Do Small Businesses Do?" (Aug. 2011), *available at http://www.brookings.edu/~/media/files/programs/es/bpea/2011_fall_bpea_papers/2011_fall_bpea_conference_hurst.pdf*.

and job creation, DHS believes it is unlikely that the entrepreneur of such a business would be able to meet the significant public benefit requirement for a grant of parole. Establishing a minimum annual revenue threshold for re-parole that would, by definition, cover only an entrepreneur's salary and continue business operations would not likely help identify whether an entrepreneur's activity in the United States would provide a significant public benefit. DHS therefore declines to adopt the commenter's suggestion.

c. Minimum Jobs Created

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*2*), which establishes an eligibility threshold for applicants whose start-up entities have created at least 10 qualified jobs within the start-up entities during the initial parole period. Most commenters argued that this job creation requirement was unduly high or that the time period for compliance was too short.

*Response:* Based on comments received, DHS has lowered the job creation criterion for re-parole from 10 to 5 qualified jobs. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*). DHS agrees with commenters that requiring 10 jobs to satisfy this criterion may be unduly high for many start-ups, even those with demonstrated substantial potential for rapid growth and job creation. DHS believes that the creation of 5 qualifying jobs during the initial period of parole is sufficient to determine that the start-up entity continues to have substantial potential for rapid growth and job creation, particularly in light of the substantial capital investment, government funding, or other reliable and compelling evidence that supported the initial parole determination. In each case, DHS must be persuaded that re-parole is justified by significant public benefit and that the person seeking re-parole merits a favorable exercise of discretion. As discussed elsewhere in this preamble, DHS has also extended the initial period of parole from 2 years to 30 months, in order to allow additional time for start-up entities to grow, obtain additional substantial funding, generate substantial revenue, or create jobs. *See* 8 CFR 212.19(c)(2)(iii).

d. Re-Parole Alternative Criteria

*Comment:* One commenter suggested that DHS should consider taxes paid by a start-up entity as a criterion for re-parole, leaving the task to DHS to define the threshold of the amount and type of taxes paid.

*Response:* DHS declines to adopt the commenter's suggestion. DHS believes that a start-up entity would have to generate a significant level of revenue or job creation (which are already criteria under this rule) to meet any separate, standalone tax-based threshold. Any such additional criterion would therefore be unlikely to be particularly probative in determining whether re-parole is justified by significant public benefit or the person seeking re-parole merits a favorable exercise of discretion. DHS therefore declines to include the payment of taxes as a stand-alone eligibility criterion.

*Comment:* A commenter suggested that if DHS lowers the funding and job creation thresholds for re-parole, there should be no need for alternative criteria.

*Response:* While DHS did reduce the job creation threshold for re-parole in the final rule, DHS believes that parolees should have the flexibility to present other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Examples of such evidence are provided above, in the discussion on alternative criteria for the initial parole period. DHS believes that it is important to retain such flexibility in the final rule, consistent with the case-by-case nature of these parole determinations. DHS, therefore, has not adopted the commenter's suggestions.

5. Authorized Periods of Parole

*Comment:* Several commenters discussed the initial 2-year parole period at 8 CFR 212.19(d)(2). Most commenters argued that the 2-year period was unduly short, as start-ups with significant potential for rapid growth and job creation may require more time to meet re-parole eligibility requirements. Some commenters suggested having a 3-year initial period of parole and a 2-year period of re-parole. Other commenters suggested a range for initial parole from 3 to 5 years. A number of comments discussed the overall duration of the parole periods, the majority of which advocated for longer periods ranging from 6 to 10 years in total. Some of these commenters based the need for an extended parole period on the typical duration of the start-up growth path from seed funding to venture capital financing to exit (through an initial public offering or a merger or acquisition).

*Response:* Based on the comments received, DHS is changing the maximum periods for initial parole and re-parole to 30 months (2.5 years) each, for a total maximum parole period under this rule of up to 5 years. The additional time for the initial parole period will provide entrepreneurs with more time to receive additional qualified investments or government funding, increase revenue, or create qualified jobs sufficient to meet the eligibility criteria for an additional period of parole. While this change does reduce the length of the re-parole period, DHS believes that this approach is necessary to provide additional time during the initial period of parole while maintaining the same maximum overall parole period of 5 years. DHS further believes that a 5-year total maximum parole period is consistent with the amount of time successful start-up entities generally require to realize rapid growth and job creation potential. Moreover, an entrepreneur of a start-up entity that is almost 5 years old when the parole application is filed would have the possibility to obtain up to 5 years of parole, which would allow the entity to realize its rapid growth and job creation potential by the time it is 10 years old—and to provide those benefits in the United States.[26] DHS retains the discretion to provide any length of parole to an applicant, including a period shorter than 30 months where appropriate. DHS also notes that although USCIS would designate an appropriate initial parole period upon approval of the Application for Entrepreneur Parole, CBP would retain its authority to deny parole to an applicant or to modify the length of parole authorized by USCIS upon issuing parole at the port of entry, consistent with CBP's discretion with respect to any advance authorization of parole by USCIS.

---

[26] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs; your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (Feb. 2013), available at *http://www.kauffman.org/~/ media/kauffman_org/ research%2Oreports%20and%20covers/2013/02/ startup_visa_impact_final.pdf;* "*CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M,*" Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/ 14/crunchbase-reveals-the-average-successful- startup-raises-41m-exits-at-242-9m/;* see also TruBridge Capitol Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO,* Forbes, Apr. 15, 2015, available at *http://www.forbes.com/ sites/truebridge/2015/04/15/why-next-billion- dollar-startup-not-always-next-ipo/* ("From 2001– 2004, the average age of a company at its public exit was 5.4 years. . . . From 2009–2012, the average age was 7.9.").

## 6. Limitation on Number of Entrepreneurs

*Comment:* Several commenters addressed 8 CFR 212.19(f) in the proposed rule, which states that no more than three entrepreneurs may be granted parole based on the same start-up entity. Most commenters on this provision recommended that DHS increase the number of entrepreneurs, with suggestions to increase the maximum number to 4 or 5. Several other commenters, including a trade association and a professional association, supported the proposed rule's limit of 3 entrepreneurs obtaining parole under this rule based on the same start-up entity. An individual commenter stated that DHS should allow for additional entrepreneurs to qualify for parole based on the same start-up entity, not only at the time of application but also at a later date, asserting that it is very common for technology companies to introduce multiple co-owners over time that are key personnel vital to the operations of the start-up entity.

*Response:* DHS appreciates the comments regarding this limitation and recognizes that some start-ups may initially have more than 3 founders or owners. After reviewing all comments, DHS declines to increase the number of entrepreneurs permitted to request parole related to the same start-up entity, and will retain the current limit of no more than 3 eligible entrepreneur applicants per start-up entity. *See* final 8 CFR 212.19(f). As an initial matter, DHS believes it would be difficult for a larger number of entrepreneurs associated with the same start-up entity to each meet the eligibility criteria and comply with the conditions on parole while ultimately developing a successful business in the United States. A higher number of entrepreneurs associated with the same start-up entity may affect the start-up's ability to grow and succeed, and may even result in the startup's failure, thus preventing the goals of the parole process under this rule from being realized.[27] Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that each entrepreneur's

parole will provide a significant public benefit.

The limitation, moreover, will help strengthen the integrity of the international entrepreneur parole process in various ways. Among other things, limiting the number of individuals with that may be granted parole under this rule in connection with the same start-up entity will provide an additional safeguard against an entity being used as a means to fraudulently allow individuals to come to the United States. Such a limit diminishes, for example, the incentive to dilute equity in the start-up entity as a means to apply for parole for individuals who are not bona fide entrepreneurs. Finally, DHS clarifies that the rule does not require that additional entrepreneurs, up to 3 entrepreneurs per start-up entity, apply for parole based on the same start-up entity at the same time.

## 7. Income-Related Conditions on Parole

*Comment:* Several commenters discussed the proposed rule's provision requiring that entrepreneurs paroled into the United States must maintain a household income that is greater than 400 percent of the Federal poverty line for their household size, as defined by the Department of Health and Human Services. Many of these commenters discussed the financial difficulties faced by start-ups and argued that the income requirements were unduly high or suggested other alternatives. The majority of commenters on this issue stated that entrepreneurs in start-up endeavors typically do not take a salary or take a minimal salary in the early years. Several commenters recommended lowering this income threshold, with many suggesting lowering it to 100 percent, while others suggested alternatives of 125 percent, 200 percent, or 250 percent of the Federal poverty level. An individual commenter recommended that DHS institute a minimum yearly income requirement of $80,000, while another individual commenter stated that DHS should adopt a more nuanced approach that takes into account factors like standard of living, unemployment rates, and economic growth by state. Other commenters recommended that DHS allow for other types of compensation, in the form of benefits or rewards, in addition to salary to satisfy the income-related conditions on parole. Another individual commenter stated that DHS should use the income threshold already established by the Affidavit of Support,[28] which is set at 125 percent

above the poverty guidelines. Lastly, one commenter said the "significant public benefit" determination should not just be applied to entrepreneurs who meet a particular income or wealth criterion, but should be liberally applied to all entrepreneurs who are seeking to build and grow a business.

*Response:* DHS appreciates the concerns raised by these commenters, but declines to adopt the commenter's suggestion to eliminate or alter the income-related condition on parole. Establishing this income-related condition on parole is consistent with the Secretary's discretionary authority to grant parole "under conditions as he may prescribe." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). As stated in the NPRM, DHS established this income threshold to ensure that applicants seeking parole under this rule will have sufficient personal economic stability to make significant economic and related contributions to the United States. Those policy goals remain valid and are appropriate in guiding the decision to retain the requirement that the household income of an entrepreneur requesting parole under this rule be greater than 400 percent of the Federal poverty line.

Under this rule, DHS will take steps to ensure that each grant of parole will provide a positive net benefit to the economy of the United States, consistent with the statutory framework authorizing parole only for significant public benefit absent urgent humanitarian issues. In addition to considering all the other positive evidence—from job creation to investment to growth—DHS includes the income threshold as an additional safeguard that the entrepreneur and his or her family will not be eligible to draw upon Federal public benefits or premium tax credits under the Health Insurance Marketplace of the Affordable Care Act. Furthermore, Secretary Johnson indicated in his memorandum titled "Policies Supporting U.S. High-Skilled Business and Workers" that such thresholds would be created so that individuals would not be eligible for these public benefits or premium tax credits in light of the purpose of the policy.[29]

DHS emphasizes that the funding amounts received by a start-up entity from governmental sources or from

---

[27] Max Marmer, Bjoern Lasse Herrmann, Ertan Dogrultan, Ron Berman, *Startup Genome Report Extra on Premature Scaling,* Startup Genome Report: Premature scaling v.1.2 (Mar. 2012 ed.) (explaining that "hiring too many people too early" in a start-up's development is one of several reasons that most start-ups fail), available at *https://s3.amazonaws.com/startupcompass-public/StartupGenomeReport2_Why_Startups_Fail_v2.pdf.*

[28] Affidavits of Support, filed using Form I–134 or I–864, are required for certain immigrants to

show that they have adequate means of financial support and are not likely to rely on the U.S. government for financial support.

[29] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

qualified investors in order to meet the rule's eligibility thresholds are distinct from the possible sources of salary payments to the individual entrepreneur. Nothing in this rule prevents a start-up entity from raising higher funding levels than the minimum parole eligibility thresholds, and from a wider set of funders than those in the rule's definitions of qualified investors and government entities. DHS intends for the eligibility criteria for parole to be useful independent validation tools for assessing the significant growth and job creation potential of the start-up entity. While there is certainly validity to the arguments made by some of the commenters that many entrepreneurs do not take large salaries, choosing instead to re-invest available funds back into the start-up entity or to take other forms of non-cash compensation, DHS must establish criteria that protect the overall policy goals of this rule in accordance with the requirements of the INA. The income-related criteria offer a clear and predictable mechanism for DHS to have a strong measure of confidence that the entrepreneur and his or her family, while paroled into the United States under this rule, will be net positive contributors to the American economy.

8. Reporting of Material Changes

*Comment:* Several commenters discussed the proposed requirement that entrepreneurs report any material changes during a parole period to DHS by submitting a new application for parole. Most commenters argued that such a requirement would be onerous given the constantly changing nature of start-ups. A law firm argued that requiring entrepreneurs to report and reapply when there are pending actions against the start-up entity or entrepreneur would be unfair, as both are entitled to due process, and suggested a reporting requirement only if an adverse judgment were issued. An individual commenter stressed that a $1,200 fee to report every material change would create a major financial burden for entrepreneurs.

*Response:* DHS recognizes that the nature of start-up entities involves constant change. DHS also appreciates the concerns regarding the administrative and financial burden placed on entrepreneurs by additional filings. DHS believes, however, that the revised definition of material change in the final rule will help to clarify the situations in which the entrepreneur must notify the agency of material changes, and thus limit the administrative and financial burdens on the entrepreneur. Specifically, DHS

understands that start-ups may have frequent ownership changes over the course of successive funding rounds, and thus has revised the definition of "material change" regarding ownership changes to cover only those that are "significant" in nature. Clarifying the scope of the material change definition also limits the reporting requirement, which should help reduce the anticipated burden on entrepreneurs. DHS also emphasizes that the rule requires notification of pending actions only in the context of a criminal case or other action brought by a government entity, while actions brought by private individuals or entities are not considered "material changes" until a settlement, judgment, or other final determination is reached. DHS does not believe that the material change reporting requirement under this rule will impact an individual's due process or would otherwise be unfair. DHS believes, however, that it is important for an entrepreneur granted parole under this rule to immediately inform USCIS if certain actions are brought against the entrepreneur or his or her start-up entity.

*Comment:* One commenter recommended that the process of addressing material changes would be improved if DHS were to implement a policy similar to the "deference" policy it applies in the EB–5 investor program. Such a policy provides that DHS will defer to prior determinations regarding certain documentary evidence used to establishing program eligibility requirements absent fraud, misrepresentation, a mistake of law or fact, or a material change.

*Response:* As discussed above, DHS decided to narrow and clarify the definition of "material change" in order to address commenters' concerns about reporting burdens. In the absence of specific suggestions, DHS could not ascertain from this comment what aspect of the EB–5 deference policy could be applied under this rule. DHS believes it is important for this rule to provide mechanisms, including the requirement to report material changes, to ensure that parole continues to be justified by significant public benefit in each particular case.

*Comment:* A joint submission from a professional association and a non-profit organization stated that, where a material change filing is mandated by the rule, the entrepreneur should only be required to file an update with USCIS, instead of being required to re-file an entire parole or re-parole application.

*Response:* As explained above, while DHS appreciates that a new filing may

appear burdensome to the entrepreneur, DHS believes that a new filing is necessary in order to re-evaluate the entrepreneur's eligibility when such material changes occur. Material changes, by their definition, may affect the entrepreneur's ability to demonstrate that the start-up entity has potential for rapid growth and job creation, and whether the entrepreneur will continue to provide a significant public benefit to the United States. Therefore, at present, the entrepreneur must file a new application to allow DHS the opportunity to determine the entrepreneur's continued eligibility for parole. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

9. Other Comments on Parole Criteria and Conditions

*Comment:* Several comments expressed concern that the rule did not require that the entrepreneur receive prevailing wages for their work, with some commenters expressing concern that the only wage requirements relate to the Federal Poverty Level.

*Response:* DHS appreciates commenters' concerns regarding prevailing wages. Unlike some employment-based visa classifications, however, the intention of this parole process is not to address labor shortages in the United States. Rather, it is to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States. DHS believes that requiring the parolee to maintain a household income of greater than 400 percent of the Federal Poverty Level adequately ensures that he or she will have sufficient personal economic stability to provide a significant public benefit to the United States through entrepreneurial activities.

*Comment:* One commenter recommended that DHS should not require an applicant's start-up entity to receive investment prior to the initial application for parole; that DHS should recognize cash infusions during the growth period of a start-up entity as eligibility criteria for re-parole; and that at the end of the initial parole period, if the venture is deemed successful, no additional funding milestones should be required for re-parole eligibility.

*Response:* DHS appreciates the comment but declines to revise the rule as suggested. DHS believes that the alternative criteria provided in this rule to determine if the start-up entity has

substantial potential for rapid growth and job creation provide sufficient flexibility for those entrepreneurs who may have received amounts of qualified investments or government funding that are less than those required to satisfy the general criteria for parole consideration under this rule. The determination that the entity has substantial potential for rapid growth and job creation will be made based on the evidence in the record at the time the parole application is adjudicated, rather than the possibility that the entity may receive cash infusions at some point in the future. If cash infusions from various sources are received by the start-up entity during the period of initial parole, evidence of such cash infusions may be taken into consideration if the entrepreneur applies for re-parole. DHS, however, does not believe that cash infusions into the start-up entity during the initial parole period will independently suffice to establish that the entity continues to have the significant potential for rapid growth and job creation. Infusions of cash, as a general matter, do not have the same validating qualities as do evidence of additional investment from qualifying investors, grants or awards from qualifying government entities, significant revenue growth, or job creation.

*Comment:* One commenter asserted that entrepreneurs who have left their start-up entity should not have their parole status immediately revoked. The commenter suggested that DHS issue guidance and options for entrepreneurs who leave their start-up entity but have contributed to the significant public benefit of the United States. A similar comment recommended that individuals be able to remain in the United States under parole and qualify for re-parole if a second start-up meets the requirements of the rule. Another related comment argued that entrepreneurs whose start-up entities fail should be given a second chance, in order to account for the dynamism and uncertainty inherent in new businesses.

*Response:* DHS appreciates the comments but declines to adopt the commenters' suggestions. As a matter of statutory authority, once, in the opinion of DHS, the purpose of parole has been served, parole should be terminated. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS emphasizes that the purpose of granting parole under this rule is to allow an entrepreneur to grow a start-up entity in the United States with substantial potential for rapid growth and job creation, by working in an active and central role for the entity. Accordingly, DHS will not continue

parole for entrepreneurs who are no longer actively working in a central role with the start-up entity that served as the basis for the initial parole application. The individual's activity through a new start-up entity, however, could serve as a basis for a new grant of parole if all requirements for such parole are met.

*Comment:* One commenter suggested that DHS should utilize the same methodology for granting parole for entrepreneurs as defined in a proposed nonimmigrant visa classification in a Senate bill, S. 744, 113 Cong. section 4801(2013).

*Response:* DHS appreciates the comment but declines to adopt the commenter's suggestion. Under this rule, DHS has identified a process for implementing the Secretary's existing statutory authority to grant parole consistent with section 212(d)(5) of the INA. DHS does not believe it is advisable to import in this rule the standards from unenacted legislation focused on nonimmigrant visas rather than discretionary grants of parole.

### G. Employment Authorization

#### 1. Automatic Employment Authorization Upon Parole

*Comment:* One commenter suggested that if employment authorization were deemed incident to parole, rather than through a follow-up application, then the regulations governing employment verification would need to be amended to permit employment by the parolee and spouse without an EAD.

*Response:* DHS agrees that the employment verification provisions of the regulations should be appropriately revised. In this final rule, and as proposed, DHS is revising the employment eligibility verification regulations by expanding the foreign passport and Form I–94 document combination described at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include Forms I–94A containing an endorsement that an individual is authorized to work incident to parole. This document combination was previously acceptable only for certain nonimmigrants authorized to work for a specific employer incident to status pursuant to 8 CFR 274a.12(b), which the final rule amends to include those paroled into the United States as entrepreneurs under this rule. *See* final 8 CFR 274a.12(b)(37).

However, in this final rule, and as proposed, only the entrepreneur parolee is accorded employment authorization incident to his or her parole. *See* final 8 CFR 274a.12(b). Given the basis for parole, it is essential to limit any delays

in the entrepreneur's own employment authorization. Such delays could create difficulties for the entrepreneur's operation of the start-up entity, as he or she would be prohibited from working until work authorization was approved, and would frustrate the very purpose for paroling the entrepreneur into the United States. As an entrepreneur's spouse would not be coming for the same kind of specific employment purpose, DHS does not believe there is a similar need to provide him or her work authorization incident to parole. Instead, this rule adds a new provision making the spouse of an entrepreneur parolee eligible to seek employment authorization. *See* final 8 CFR 274a.12(c)(34). Based on this provision and 8 CFR 274a.13(a), an entrepreneur's spouse seeking employment authorization under this rule would need to file an Application for Employment Authorization (Form I–765) with USCIS in accordance with the relevant form instructions.

*Comment:* One commenter expressed concern that the proposed employment authorization provision is too narrow in scope. The commenter stated that DHS should clarify that employment with an entity that is under common control as the start-up entity, such as a subsidiary or affiliate, would be permissible.

*Response:* Under the final rule, the entrepreneur parolee's employment authorization is limited to the specific start-up entity listed on the Application for Entrepreneur Parole, Form I–941. This limitation helps ensure that the entrepreneur's work is consistent with the purposes for which parole was granted, especially since parole applications will be evaluated based in part on the activities and performance of that particular start-up entity. DHS appreciates that there are certain circumstances in which some flexibility could further the purpose of encouraging entrepreneurship, innovation, economic growth, and job creation in the United States. Given that this is a new process however, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

*Comment:* One commenter stated that difficulties obtaining a work visa have caused many entrepreneurs to move out of the United States.

*Response:* DHS agrees with the commenter's statement. While this rule does not address all of the difficulties that entrepreneurs may face, or make legislative changes that only Congress can make, DHS believes it will encourage international entrepreneurs

to develop and grow their start-up entities—and provide the benefits of such growth—in the United States. Entrepreneurs paroled under this rule will be authorized to work for the start-up entity for the duration of the parole (and any re-parole) period.

## 2. Spousal Employment

*Comment:* Several commenters, including a business incubator, asserted that spouses should be granted employment authorization and argued that spouse employment authorization will entice more entrepreneurs to come to the United States. Several other commenters stated that, in order to attract the best entrepreneurial talent, spouses of entrepreneur parolees should automatically receive work authorization incident to status without the need to apply separately.

*Response:* DHS agrees with commenters that extending employment authorization to spouses of entrepreneur parolees is important to help attract entrepreneurs to establish and grow start-up entities in the United States. For reasons provided above, however, DHS disagrees that these spouses must be provided with employment authorization incident to their parole. Instead, these spouses may seek employment authorization under 8 CFR 274a.12(c)(34).

*Comment:* A few commenters stated opposition to permitting employment authorization for the spouses of international entrepreneurs.

*Response:* DHS disagrees with the commenters' opposition to allowing an entrepreneur's spouse to apply for employment authorization. Permitting spouses to seek employment authorization is an important aspect of the rule's intent to attract international entrepreneurs who may provide a significant public benefit by growing their start-up entities in the United States.

*Comment:* One commenter objected to spousal employment authorization unless it is restricted to the same new high-potential start-up entity that served as the basis for the parole.

*Response:* DHS disagrees with the suggestion that spousal employment should be authorized only for employment with the start-up entity that served as the basis of parole for the entrepreneur. Nothing in this rule prevents people married to each other from applying for parole associated with the same start-up entity. But DHS believes that it is not appropriate or necessary to limit the employment of an entrepreneur's spouse to that entity. Making those spouses eligible to seek

employment from a broader range of employers can further the central purpose of the rulemaking—encouraging international entrepreneurs to develop and grow their start-up entities within the United States and provide the benefits of such growth to the United States. It may also encourage entrepreneurs to create more jobs outside the family through the start-up entity, furthering the benefits provided to others in the United States. DHS therefore declines to revise the rule as suggested.

## H. Comments on the Parole Process

### 1. Ability of Individuals To Qualify for Parole Under This Rule

*Comment:* Two individual commenters asked what kind of immigration status or visa an international entrepreneur should maintain in order to be eligible to apply for parole under this rule. The commenters expressed concern about the types of activities that would need to be conducted in the United States prior to a parole application in order to establish a business, obtain funds from investors, and otherwise qualify for the parole under this rule. These commenters also expressed concern about requiring prior investment as a condition for parole, and that investors would be hesitant to make such an investment in a start-up entity if the entrepreneur lacked an immigrant or nonimmigrant visa. A professional association stated that, since parole does not constitute formal admission to the United States, it will likely be very difficult for international entrepreneurs without formal immigration status to enter into long-term contracts, raise significant investment capital, and employ people.

*Response:* This final rule aims to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are in turn expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy. Under this final rule, an international entrepreneur may request parole in accordance with the form instructions. The final rule provides that individuals seeking initial parole under this program must present themselves at a U.S. port of entry to be paroled into the United States; there is no requirement that an international entrepreneur currently be in the United States or maintain any prior immigration status. DHS notes, however, that under the statute governing parole authority, individuals

who have already been admitted to the United States are ineligible to be considered for parole inside the United States because only applicants for admission are eligible to be considered for parole. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Individuals who have been admitted in a nonimmigrant classification, and are currently in the United States pursuant to that admission, may not be paroled, even if they have overstayed their admission, unless they first depart the United States.

DHS appreciates that international entrepreneurs may face many challenges in starting and growing a business in the United States, including attracting investment capital or government grants or awards. DHS disagrees with the premise, however, that qualifying investors will be very reluctant to make a qualifying investment in a start-up entity that is wholly or partially owned by an individual that will be seeking a grant of parole under this rule. DHS believes that there are a myriad of factors that go into a decision to invest significant funds in a start-up entity. While the underlying immigration status, or lack thereof, of the start-up entity's owner(s) may be a factor presenting a degree of additional risk, DHS believes that this rule will effectively mitigate some of that risk by providing a known framework under which certain significant public benefit parole requests will be reviewed and adjudicated. This final rule provides investors and entrepreneurs with greater transparency into the evaluation process and manner in which such requests will be reviewed, so that those individuals and entities can weigh the various risks and benefits that might apply to the particular investment decision being considered. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

### 2. Waiver for Entrepreneurs Presently Failing To Maintain Status

*Comment:* An individual commenter stated that international entrepreneurs already in the United States should be able to receive a waiver in order to establish eligibility for parole under this rule if they do not have a valid prior immigration status. Another commenter suggested that immigration status violations, such as unauthorized employment, should not be grounds for denying parole under this rule and, if parole is granted, any prior

unauthorized employment that was used to meet the requirements for parole should be disregarded for purposes of any future immigration applications.

*Response:* As discussed above, eligibility for parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5), is not wholly dependent upon an individual's current immigration status. Unauthorized employment or a prior status violation will not necessarily preclude an individual from qualifying for parole under this rule. However, the fact that an entrepreneur has worked without authorization, is out of status, or not legally present in the United States would be considered in determining whether DHS should grant parole under its discretionary authority. All requests for a discretionary grant of parole are adjudicated on a case-by-case basis and ultimately determined by evaluating all positive and negative factors.

DHS will not adopt the commenter's suggestion to disregard, for purposes of any future immigration applications, any prior unauthorized employment that was used to meet the requirements for parole. DHS believes that such a provision would require a statutory change, as eligibility for certain benefits is barred by statute if the applicant previously worked without authorization.[30]

3. Relationship Between Parole and Various Nonimmigrant Visa Classifications

a. Pathway for Current Nonimmigrants To Use Entrepreneur Parole

*Comment:* Some commenters expressed concern that it would be challenging for foreign students, recent graduates of U.S. universities, and other nonimmigrants presently in the United States to meet this rule's requirements for parole consideration under the constraints of their current visas. These commenters said that the rule should allow these individuals a realistic and clear pathway to easily utilize parole, and should clarify that potential applicants currently in the United States in nonimmigrant status will not be violating their existing visa status when taking the necessary steps to establish eligibility for significant public benefit parole. One commenter requested that students in F–1 nonimmigrant status and eligible to work on Curricular Practical Training (CPT) or Optional Practical Training (OPT) should become eligible for parole under the rule if they founded a start-up and raised $100,000 in capital.

*Response:* DHS appreciates that some entrepreneurs who are present in the United States and who might otherwise qualify for parole under this program may be unable to engage in certain activities given the limitations placed on their nonimmigrant status, making it difficult, for example, for them to raise significant capital for a start-up entity. DHS, however, disagrees with the commenters' assertion that individuals present in the United States in F–1 nonimmigrant status will be unable to meet the requirements for parole under this program, such as starting a business and raising significant investment, without violating their F–1 nonimmigrant status. For example, an individual in F–1 status who has obtained OPT employment authorization may start and work for his or her own business in the United States. The OPT employment, and thus the business, must relate to the F–1 nonimmigrant's program of study and can occur either before (pre-completion OPT) or after the completion of a program of study (post-completion OPT).[31] Additional requirements apply to F–1 nonimmigrants who are otherwise eligible for a STEM OPT extension, such as establishing that their STEM OPT employer will have a valid employer-employee relationship with the F–1 OPT nonimmigrant, but those additional requirements do not pertain to the initial 12-month OPT period, and in any event do not present an absolute bar against entrepreneurial activities. DHS believes that it is certainly realistic that an F–1 nonimmigrant in the United States can start a business during his or her OPT period, and during that time can take steps to obtain significant investment in the start-up entity, which the individual may then rely upon if applying for parole under this rule. DHS declines to adopt the commenters' suggestion to include in this rule a blanket provision stating that potential applicants currently in the United States in nonimmigrant status will not be violating their existing status when taking steps to establish eligibility for parole. Such changes would pertain to the statutory and regulatory limitations placed on various nonimmigrant classifications and are outside the scope of this rule.

DHS believes that this final rule provides a realistic and clear option for certain entrepreneurs to actively grow their qualifying start-up entity in the United States. As discussed below, parole is not a nonimmigrant status, and individuals present in the United States

in a nonimmigrant status will not be able to change status or otherwise be granted parole without first departing the United States and appearing at a U.S. port of entry for inspection and parole. Under this final rule, however, an individual present in the United States in a nonimmigrant status may apply for and obtain an approval of the Application for Entrepreneur Parole (Form I–941). Filing and obtaining approval of a Form I–941 application under this rule will not, by itself, constitute a violation of the individual's nonimmigrant status. After approval of the Form I–941 application, if the individual decides to rely upon parole to actively grow his or her business in the United States, the individual will need to appear at a U.S. port of entry for a final parole determination to allow him or her to come into the United States as a parolee.

This final rule already provides appropriate criteria under which all applications will be reviewed, including those submitted by any F–1 nonimmigrants. As indicated in this final rule, one basis on which an individual may be considered for parole under this rule is if he or she has raised at least $250,000 in investment capital from a qualifying investor (and meets certain other criteria). Individuals who raise a substantial amount of capital from a qualifying investor, but less than $250,000, may still qualify for and be granted parole under other criteria identified in the rule—including the receipt of a qualifying government grant or award or other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

b. Switching Between Nonimmigrant Status and Parole

*Comment:* Several commenters raised questions or provided suggestions regarding switching from a nonimmigrant status to parole, or from parole to a nonimmigrant status. Specifically, one commenter asked what her status would be if she were in the United States as an H–4 nonimmigrant, authorized to work pursuant to an EAD, but nevertheless pursued parole under this rule. Another commenter suggested that DHS should include a provision in this rule that expressly allows someone to switch from nonimmigrant status to parole, and from parole to nonimmigrant status, similar to DHS's policy to terminate and restore the H–1B or L–1 status of certain individuals who have temporarily departed the United States but came back using an advance parole document that was

[30] *See, e.g.,* INA section 245(c), 8 U.S.C. 1255(c).

[31] *https://studyinthestates.dhs.gov/training-opportunities-in-the-united-states.*

issued based on a pending Form I–485 application for adjustment of status.

*Response:* DHS declines to adopt a provision in this rule allowing individuals to change between nonimmigrant status and parole while in the United States. An individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Moreover, an individual who has been paroled into the United States cannot change to nonimmigrant status without leaving the United States, as INA section 248, 8 U.S.C. 1258, only permits individuals who are maintaining nonimmigrant status to change to another nonimmigrant status. If an individual who has been paroled into the United States under this rule has a petition for nonimmigrant classification approved on his or her behalf, he or she would have to leave the United States and pursue consular processing of a nonimmigrant visa application before seeking to return to the United States.

c. Entrepreneur Pathways and Entrepreneur Parole

*Comment:* One commenter stated that the international entrepreneur parole rule should complement and not supplant prior USCIS policy pertaining to entrepreneurs, including those reflected on the USCIS Entrepreneur Pathways Web site.[32] The commenter, while expressing concerns with aspects of existing policies pertaining to entrepreneurs and this rule, suggested that if an entrepreneur cannot qualify for parole under this rule, USCIS should encourage the entrepreneur to seek a visa associated with his or her start-up entity under the existing immigrant or nonimmigrant visa system. Specifically, the commenter suggested that the final rule should expressly include an amendment to the H–1B regulations to allow approval of an H–1B petition under the policies articulated on the Entrepreneur Pathways Web site, and that USCIS adjudicators should see an express statement in the final rule that, notwithstanding the existence of this rule, the H–1B visa remains available for working owners of start-up entities. The commenter noted that the USCIS Entrepreneur Pathways Web site also provides guidance for entrepreneurs to use other existing nonimmigrant visa classifications (*e.g.,* L–1, O, and E visas) that could be more advantageous to the

entrepreneur than the parole rule, so adjudicators should continue to approve petitions in that spirit. The commenter asserted that the unique requirements under the parole rule, such as a threshold investment amount, should not be allowed to ''bleed into and taint'' the adjudicatory process for securing employment-based visas traditionally used by entrepreneurs.

*Response:* DHS appreciates the commenter's suggestions, but the suggested changes to the H–1B regulations are outside the scope of this rulemaking. DHS agrees with the commenter that parole under this program is intended to complement, and not supplant, other options that may already exist for entrepreneurs under other immigrant and nonimmigrant visa classifications. This rule does not alter existing rules or policies regarding the ability of entrepreneurs to qualify for any immigrant or nonimmigrant status. This rule does, however, provide an additional avenue for entrepreneurs to consider when exploring options that may be available to them to grow a start-up entity in the United States.

4. Travel Document Issuance

*Comment:* A commenter urged DHS to grant multiple-entry parole to foreign nationals so that they may travel internationally and return to the United States, as this is not explicit in the regulation. The commenter stated that this ability is essential to ensure that entrepreneurs can raise additional funds and market innovations worldwide. In addition, this commenter stated that some foreign nationals may begin their businesses and seek entrepreneur parole while in nonimmigrant status in the United States, such as in F–1 or H–1B nonimmigrant status (and thus seek to depart the United States with advance parole and then request parole from CBP upon their return to a U.S. port of entry). The commenter suggested that the regulation clarify how these foreign nationals will be able to return to the United States.

*Response:* DHS notes that individuals who have been admitted to the United States, such as those in nonimmigrant status, are not eligible to be granted parole unless they first depart the United States. DHS clarifies that any immigration status violations by any applicant for parole, including those related to their entrepreneurial efforts, will be taken into account as negative factors in the case-by-case determination of whether the applicant merits an exercise of discretion to grant parole, though they will not necessarily

prohibit the individual from obtaining a grant of parole under this rule.

DHS recognizes that international travel can be essential for the success of some start-up entities. Under existing law, an individual's authorized period of parole ends each time he or she departs the United States. *See* 8 CFR 212.5(e)(1)(i). DHS may, however, authorize advance parole before departure and can specify that such authorization is valid for multiple uses. An entrepreneur granted advance parole would be able to leave the country, present himself or herself at a port of entry upon return, and request a subsequent grant of parole for the remaining period of his or her initially granted parole period. At such time, DHS must then inspect the individual and determine whether or not to grant parole into the United States.[33] If the individual is granted parole, he or she may only be paroled for up to the time initially granted. Any time spent outside the United States after the parole period is initiated will count against the total period of parole, so that the total time period of the parole period remains consistent with the date of initial parole granted by CBP.

5. Parole in Place

*Comment:* Several commenters requested that DHS allow parole-in-place under this rule. Some of these commenters stated that parole-in-place should be added so that individuals already in the United States in a nonimmigrant status, such as H–1B or F–1 nonimmigrant status, can apply for and be granted parole under this rule without having to depart the United States. Several other commenters noted that DHS has the jurisdiction to allow parole-in-place for spouses or dependents, as they do for military family members, and that this could be applied to the International Entrepreneur Rule. Some commenters argued that the requirement to be out of the country to apply for parole under this rule puts an unnecessary financial burden on applicants who are already residing in the United States.

*Response:* DHS appreciates, but declines to adopt, the commenters' suggestions that parole-in-place be allowed under this rule for individuals already in the United States in H–1B or F–1 nonimmigrant status. Only applicants for admission are eligible to

---

[32] *See https://www.uscis.gov/eir.*

[33] This process is not appropriately described as ''multiple-entry parole.'' Parole does not constitute an admission to the United States, INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and parole terminates upon the individual's departure from the United States, 8 CFR 212.5(e)(1)(i).

be considered for parole, thus precluding individuals who have already been admitted from being considered for parole inside the United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing ''applicants for admission''). Such individuals are not eligible for parole, regardless of whether they have overstayed their admission, unless they first depart the United States.

6. Comments on Options After 5-Year Total Parole Period Ends

*Comment:* Many commenters provided views on the options available to entrepreneurs who have exhausted their up to 5 years of eligibility for parole under this rule. Some commenters were concerned that the rule does not provide a direct path to lawful permanent residence, which could limit the investment prospects for start-up entities. Other commenters were concerned that including such a path could exacerbate current immigrant visa backlogs and thus disadvantage those already in the queue for immigrant visa numbers.

A number of commenters were more broadly concerned that the overall uncertainty inherent in parole may discourage entrepreneurs from using this rule to start and grow their businesses in the United States. One particular commenter expressed concerns about an entrepreneur's ability to demonstrate nonimmigrant intent for purposes of a visa that does not permit dual intent. Others wanted DHS to consider entrepreneurs who have completed a 5-year parole period, and whose start-ups continue to demonstrate growth, as eligible for an EB–2 immigrant visa with a National Interest Waiver based upon the economic benefit to the United States. Other commenters urged DHS to establish *prima facie* eligibility for lawful permanent residence based on 3 years of parole under this rule. Still others wanted assurance that an individual who is the beneficiary of an approved immigrant petition would keep his or her priority date for purposes of receiving lawful permanent residence if he or she were granted parole under this rule.

*Response:* DHS appreciates the wide range of comments about immigration options for entrepreneurs after the end of their authorized period or periods of parole under this rule. Nothing in this rule forecloses otherwise available options for international entrepreneurs who are granted parole. DHS further notes that this rule does not impact existing rules and policies pertaining to

retention of priority dates in the immigrant petition context. The rule does not, however, establish a direct path to lawful permanent residence by creating a new immigrant visa classification for international entrepreneurs, which could only be done by Congress.

As discussed in the NPRM, the entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. Such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or lawful permanent residence through employer sponsorship). Individuals who are granted parole under this rule may ultimately be able to qualify for an EB–2 immigrant visa with a National Interest Waiver. If an entrepreneur is approved for a nonimmigrant or employment-based immigrant visa classification, he or she would generally be required to depart the United States and apply for a visa at a U.S. embassy or consulate abroad. As noted above, because parole is not considered an admission to the United States, parolees will be unable to apply to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. DHS does not believe that merely being granted parole under this rule would prevent an individual from demonstrating nonimmigrant intent for purposes of obtaining a subsequent nonimmigrant visa for entry into United States. DHS believes that this rule presents sufficient clarity and predictability for many individuals who want to establish and grow their businesses in the United States, and will contribute significantly to economic growth and job creation here. Such positive outcomes may be relevant in the event that entrepreneurs granted parole under this rule later seek to apply for an existing nonimmigrant or immigrant visa.

*I. Appeals and Motions To Reopen*

*Comment:* Several commenters requested that applicants be allowed to file appeals or motions to reconsider adverse parole decisions. A business association requested that submissions of motions to reopen or motions for reconsideration result in uninterrupted employment authorization for the parolee.

*Response:* DHS appreciates but declines to adopt these suggestions.

DHS has concluded that granting a right of appeal following a decision to deny entrepreneur parole would be inconsistent with the discretionary nature of the adjudication and contrary to how DHS treats other parole decisions. The final rule also precludes applicants from filing motions to reopen or for reconsideration under 8 CFR 103.5(a)(1). DHS retains its authority and discretion, however, to reopen or reconsider a decision on its own motion as proposed. *See* 8 CFR 212.19(d)(4). Applicants may alert DHS, through existing customer service channels, that they believe that a decision to deny parole was issued in error and include factual statements and arguments supporting such claims.

Because the determination to grant or deny a request for parole is discretionary, the parole process in this final rule may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner. Parole determinations would continue to be discretionary, case-by-case determinations made by DHS, and parole may be revoked or terminated at any time in accordance with the termination provisions established by this rule at 8 CFR 212.19(k). Parolees under this final rule would assume sole risk for any and all costs, expenses, opportunity costs, and any other potential liability resulting from a revocation or termination of parole. A grant of parole would in no way create any reliance or due process interest in obtaining or maintaining parole or being able to remain in the United States to continue to operate a start-up entity or for other reasons.

*J. Termination of Parole*

1. Discretionary Authority To Revoke/Terminate Parole

*Comments:* One commenter expressed concern that the basis for terminating parole is subjective, particularly with respect to reporting material changes. This commenter suggested that USCIS should limit such reporting to adverse judgments, since entrepreneurs and start-up entities are entitled to due process. Other commenters requested that USCIS adjudicators be specifically trained on entrepreneurship issues so that they can make the most informed decisions regarding parole.

*Response:* USCIS is committed to providing sufficient training on entrepreneurship issues for those adjudicators who will be assigned to adjudicating entrepreneur parole

requests. DHS does not believe that further revisions to the rule are necessary to protect against possible unfair or inconsistent determinations among adjudicators. By statute, parole decisions are discretionary and must be made on a case-by-case basis. This rule establishes transparent parameters for termination of parole, including automatic termination and termination on notice. Automatic termination applies at the expiration of parole, or upon written notification to DHS from the entrepreneur parolee that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. *See* final 8 CFR 212.19(k)(2). Termination on notice with an opportunity for the entrepreneur to respond is authorized by 8 CFR 212.19(k)(3). These bases for termination are tied to objective facts regarding eligibility for parole, thereby placing all parolees on the same footing.

The commenter expressed particular concern regarding terminations based on material changes. DHS believes that this concern is sufficiently addressed by the parameters set by this rule's definition of material change. Under this rule, material change means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. *See* final 8 CFR 212.19(a)(10). This rule provides further guidance by listing several examples illustrating material changes, including: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up

entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity. *See* final 8 CFR 212.19(a)(10).

2. Notice and Decision

*Comments:* A couple of commenters suggested that DHS provide notice and opportunity to respond before terminating parole.

*Response:* DHS agrees with the commenters that providing the entrepreneur parolee with notice and an opportunity to respond prior to termination is reasonable in certain scenarios, such as when grounds for termination require an assessment of the underlying case by the adjudicator. However, where no such assessment is required, DHS believes that automatic termination is appropriate. The NPRM provided for termination at DHS's discretion, including automatic termination in limited circumstances and termination on notice under a range of circumstances deemed appropriate by DHS. This rule finalizes that proposal without change. *See* final 8 CFR 212.19(k)(2) and (3). Under this rule, therefore, DHS will generally provide notice of termination and an opportunity to respond where it believes that:

(1) The facts or information contained in the request for parole were not true and accurate;

(2) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(3) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess the required ownership stake in the start-up entity;

(4) The alien otherwise violated the terms and conditions of parole; or

(5) Parole was erroneously granted.

Automatic termination will apply upon the expiration of parole or if DHS receives written notice from the parolee informing DHS that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. DHS believes that these bases for automatic termination clearly evidence that the entrepreneur no longer qualifies for parole under this rule; therefore, notice and opportunity to respond are unnecessary. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. This rule also finalizes the provision indicating that the

decision to terminate parole may not be appealed, that USCIS will not consider a motion to reopen or reconsider a decision to terminate parole, and, upon its own motion, USCIS may reopen or reconsider a decision to terminate. *See* final 8 CFR 212.19(k)(4).

3. Other Comments on Application Adjudication and Parole Termination

*Comments:* Multiple commenters suggested an expedited or premium processing option for entrepreneur parole applicants. Some of these commenters suggested a maximum 30-day adjudication time period.

*Response:* While DHS appreciates the concern for timely adjudications, at this time DHS declines to include premium or expedited processing as part of the final rule. DHS may consider the possibility of premium processing or expedited processing after assessing implementation of the rule and an average adjudication time for processing requests for parole under this rule has been determined.

*K. Opposition to the Overall Rule*

*Comment:* Multiple commenters expressed overall opposition to the rule, stating that there is no reason to add an additional parole process for highly trained and talented entrepreneurs when visa and residency pathways already exist, such as the O nonimmigrant visa, EB–5 immigrant visa, or EB–2 immigrant visa based on a National Interest Waiver. Other commenters asserted that the United States needs to limit immigration, not create more immigration programs. Several individual commenters argued that the U.S. Government should reform other visa programs, such as the H–1B nonimmigrant classification, and address the current immigrant visa backlog before creating more programs. Several individual commenters asserted that taxpayer money should be used on domestic issues, such as reviving the American economy, rebuilding infrastructure, promoting national security, and supporting veterans, rather than on administering a parole process for international entrepreneurs.

*Response:* DHS disagrees with the commenters' assertions that sufficient avenues for international entrepreneurs already exist. DHS believes that this final rule will, by further implementing authority provided by Congress, reduce barriers standing in the way of innovation and entrepreneurial activity that will benefit the U.S. economy.[34]

---

[34] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the U.S. is a struggle,* The
Continued

**5268**   **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

This final rule provides an avenue for innovative entrepreneurs to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of this rule, these innovative entrepreneurs might be delayed or discouraged altogether in contributing innovation, job creation, and other benefits to the United States.

DHS also disagrees with the commenters' assertions that reforms should be made to the H–1B nonimmigrant classification and that the immigrant visa backlog should be addressed before this rule is finalized. Parole is an entirely separate option within the Secretary's authority to allow individuals to come to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. While DHS appreciates the commenters' sentiment that changes should be made in other contexts, the exact changes contemplated by the commenters are unclear, are outside the scope of this rulemaking, or would require congressional action.

DHS also disagrees with the assertion that taxpayer funds will be misallocated to process applications for parole under this final rule. Applicants for parole under this rule will be required to submit a filing fee to fully cover the cost of processing of applications.

*L. Miscellaneous Comments on the Rule*

1. Additional Suggested Changes to the Rule

*Comments:* A number of commenters suggested additional changes to the final rule that are beyond the scope of this rulemaking. These comments proposed changes to the regulations governing certain nonimmigrant programs, namely: Employment of F–1 nonimmigrant students through Optional Practical Training (OPT); annual H–1B numerical limitations; "period of stay" duration for L–1 nonimmigrants starting a new office in the United States; and merging significant public benefit parole with the O–1 visa program. A commenter suggested providing Employment Authorization Documents or lawful permanent resident status to individuals who obtained their Master's degrees in the United States. Other commenters

Guardian, Sept. 14, 2014, available at *http:// www.theguardian.com/business/2014/sep/14/ foreign-tech-entrepreneurs-visa-us-struggle;* Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals,* April 11, 2014, available at *http:// immigrationimpact.com/2014/04/11/majority-of-u- s-patents-granted-to-foreign-individuals/* ("Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.").

suggested providing tax incentives to established U.S. corporations that would agree to mentor immigrant entrepreneurs, or establishing a system of compensation for certain senior citizens in the United States to mentor immigrant entrepreneurs. Other commenters recommended balancing parole for entrepreneurs with refugee admissions.

*Response:* DHS thanks commenters for these suggestions but declines to make changes to the rule as these comments are outside the scope of this rulemaking.

*Comment:* A joint submission from an advocacy group and professional association recommended that DHS consider parole for individuals who work in social services fields that do not command a high income or who might otherwise perform work in the national interest.

*Response:* This final rule is aimed at international entrepreneurs who will provide a significant public benefit to the United States—which could include entrepreneurs whose startup entities operate in the field of social services, so long as they meet the criteria for parole in this final rule. Furthermore, this rule does not limit the Secretary's broader authority to grant parole to other applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

2. Information/Guidance

*Comment:* One commenter recommended that DHS make parole data from the program publicly available.

*Response:* While DHS did not propose to disclose parole data related to this rule, DHS appreciates the commenter's suggestion, and may consider making such data publicly available after this rule is implemented.

*Comment:* Other commenters suggested that DHS provide additional guidance to those granted parole under this rule and to provide resources for small start-ups interested in applying for the rule.

*Response:* DHS will evaluate whether to provide additional guidance following publication of this final rule and an assessment of its implementation.

*Comment:* One commenter suggested that DHS add a provision to the rule for retrospective review, in order to analyze the effects of the rule's implementation.

*Response:* DHS agrees with the commenter's suggestion that the effects of the rule, after its implementation, should be reviewed; however, DHS does not believe adding a provision to the final regulatory text requiring such

review is necessary. DHS intends to review all aspects of this parole rule and process subsequent to its implementation and consistent with the direction of Executive Order 13563. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said these rules should serve as a guide, but that companies and entrepreneurs should be analyzed on case-by-case basis.

*Response:* DHS may grant parole on a case-by-case basis under this rule if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion.

*Comment:* An individual commenter suggested that DHS should, as part of its assessment of parole applications under this rule, evaluate the performance of applicants' prior start-ups in their home countries.

*Response:* DHS agrees with the commenter and believes that the performance of applicants' prior start-ups in their home countries is the type of evidence already contemplated by the final rule both under the alternative criteria provisions and as part of the determination as to whether an applicant merits a favorable exercise of discretion. The alternative criteria allow an applicant who partially meets one or more of the general criteria related to capital investment or government funding to be considered for initial parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation. DHS is not defining the specific types of evidence that may be deemed "reliable and compelling" at this time, as DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant DHS's exercise of discretion in granting parole based on significant public benefit.

3. Comments Regarding the E–2 Nonimmigrant Classification

*Comment:* Several commenters submitted comments regarding the E–2 nonimmigrant classification. The majority supported the inclusion of E–2 businesses into the parole process under this rule. Several companies and an individual commenter further recommended that the rule should

accommodate E–2 businesses already in the United States.

*Response:* The final rule lays out specific criteria for determining the kind of start-up enterprise that has substantial potential for job growth and job creation, and for assessing whether an individual entrepreneur's parole would be justified by significant public benefit. DHS believes it is unnecessary to identify these enterprises even more specifically than in this final rule. DHS notes that the rule does not prevent individuals who might otherwise qualify for an existing immigrant or nonimmigrant classification from applying for parole under this rule.

*Comment:* One commenter stated that the proposed rule is much more complicated than the E–2 nonimmigrant classification, and that DHS should incorporate elements of the E–2 program into this rule's parole process.

*Response:* DHS disagrees with the commenter's suggestion.[35] A grant of parole under this rule is based on a determination that the individual will provide a significant public benefit to the United States. Eligibility for E–2 nonimmigrant classification is based on different standards, and DHS believes that applying E–2 requirements would not suffice to meet the statutory requirements for parole and establish that an individual merits a favorable exercise of discretion. DHS therefore declines to adopt the commenter's suggestion.

*Comment:* A commenter suggested that the proposed rule is unnecessary since the E–2 program already supports international entrepreneurs.

*Response:* DHS disagrees with the commenter's statement. The E–2 program allows nationals of a treaty country (a country with which the United States maintains a qualifying Treaty of Friendship, Commerce and Navigation or its equivalent) to be admitted to the United States when investing a substantial amount of capital in a U.S. business. Foreign entrepreneurs from nontreaty countries, such as Brazil, China, India, Israel, or Russia, are currently not eligible for an E–2 nonimmigrant visa. Also, the E–2 category requires the entrepreneur to invest his or her own funds, and is therefore not applicable to entrepreneurs relying upon funds from investors or government entities to build and grow their business. DHS believes that this rule provides a viable option,

consistent with the Secretary's parole authority, to allow entrepreneurs to build and grow their businesses in the United States, providing significant public benefit here.

### 4. Usefulness of the Rule

*Comment:* Multiple commenters argued that this rule will not necessarily help international entrepreneurs succeed, because there are too many restrictions in place for foreign residents to qualify. One commenter asserted that the rule as proposed is too complex and its goals will be impossible to achieve.

*Response:* DHS disagrees with these assertions. DHS acknowledges that this final rule will not benefit all international entrepreneurs seeking to enter or remain in the United States. As several commenters have stated, the final rule does not and cannot create a new visa classification specifically designed for international entrepreneurs, which is something that can only be done by Congress. This final rule, however, provides an additional option that may be available to those entrepreneurs who will provide a significant public benefit to the United States. This parole option complements, but does not supplant, current immigrant and nonimmigrant visa classifications for which some international entrepreneurs might qualify to bring or keep their start-up entities in the United States.

The requirements governing eligibility for consideration for parole under this rule establish a high evidentiary bar that must be met in order to assist DHS in its determination that the individual will provide a significant public benefit to the United States. DHS, however, does not agree with the commenter's assertion that the requirements are impossible for all entrepreneurs to meet. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

### 5. Include On-Campus Business Incubators in the Rule

*Comment:* One commenter urged USCIS to tie eligibility for parole to an applicant's participation in business incubators and accelerators located on U.S. university and college campuses that allow international entrepreneurs to grow start-up companies. The commenter stated that these programs meet the goal of the rule while providing benefits on a local and national scale. The commenter elaborated that the proposed rule only contemplates a traditional start-up arrangement, which creates

requirements based on ownership interest, type of investor, and amount of money invested. The commenter asserted that international entrepreneurs that engage with campus-based incubators cannot meet these requirements because the structure and opportunities provided by a higher education institution do not follow the traditional models. The commenter urged DHS to create alternative criteria to recognize the role higher education plays in fostering international entrepreneurs.

*Response:* DHS appreciates the comment but will not adopt changes to the rule in response. DHS recognizes and values the important role that incubators and accelerators located on a U.S. university or college campuses perform in the entrepreneur community. DHS believes, however, that the framework provided by this rule does allow DHS to consider, in its discretionary case-by-case determination, the fact that the start-up entity is participating in such an incubator or accelerator. DHS believes that evidence of such participation is one factor to be weighed for those individuals who do not fully meet the general capital investment or government funding criteria and are relying on additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS believes that reliable and compelling evidence may, depending on all the circumstances, include evidence that the start-up entity is participating in a reputable incubator or accelerator located on a U.S. university or college campus.

### 6. Objection to Use of the Word "Parole"

*Comment:* Multiple commenters objected to the use of the word "parole" to describe the provisions in this rule. Commenters are concerned that use of the word in an immigration context will be confused with the use of the word in the criminal context. A commentator suggested using the term "conditional status" or "provisional status."

*Response:* DHS declines to accept the commenters' suggestion. "Parole" is a term established by statute at section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). The use of that term in the INA should not be confused with the word's usage in non-immigration contexts. Use of alternative terms as suggested by the commenter would be misleading.

---

[35] The E–2 nonimmigrant classification allows a national of a treaty country (a country with which the United States maintains a treaty of commerce and navigation) to be admitted to the United States when investing a substantial amount of his or her own capital in a U.S. business.

7. Concern Over Possible Exploitation of Entrepreneurs

*Comment:* Two commenters suggested that international entrepreneurs would be vulnerable to exploitation by venture capital investors under this rule. The commenters compare the influence of venture capitalists over entrepreneurs granted parole to the influence of employers over H–1B employees. One commenter expressed concern that the rule could allow a venture capitalist almost total dominance over the international entrepreneur's life, through the threat of withdrawing funding and thereby triggering termination of parole.

*Response:* DHS disagrees with the commenters' assertions that the final rule will facilitate such exploitation of international entrepreneurs by venture capital investors. As a general matter, venture capitalists and other investors cannot easily withdraw funding from a start-up entity once this investment transaction has been duly executed. Once an entrepreneur has applied for parole on the basis of prior investment, and has been granted such parole, the investor will not be in a position to directly interfere with the entrepreneur's continued eligibility during the parole period. The final rule will not create additional new conditions for exploitation that do not already exist currently for international entrepreneurs—or for that matter, domestic entrepreneurs—in the United States.

*Comment:* One commenter stated that the United States should be mindful of what may happen to poorer countries when the United States attracts their best entrepreneurs.

*Response:* DHS stresses that application for parole under this rule is voluntary and has the primary goal of yielding significant public benefit for the United States. DHS believes that applicants will assess economic and business conditions both in the United States and in other countries and will consider these conditions, along with numerous others, in the decision to apply for parole under this rule. DHS does not believe that the rule itself, which authorizes parole only for a limited period of time and under specific limited circumstances, will create significant negative consequences for poorer countries. Additionally, positive spillovers from new innovations are not limited to the specific country in which they were developed. Parole under this rule in no way prevents an entrepreneur contributing to the economy of his or her home, including through remittance

payments or upon return. Furthermore, individuals may be interested in returning to their home countries in the future for a variety of reasons, including the temporary nature of parole.

*M. Public Comments on Statutory and Regulatory Requirements*

1. *Regulatory Impact Analysis*
*Comment:* Two commenters suggested alternative estimates for the number of applicants that could apply to this rule. One commenter estimated that 5,000 international entrepreneurs will apply for parole under this rule. This estimate was approximately 2,000 more entrepreneurs than the estimate provided by DHS. Another commenter stated that the rule's eligibility criteria are narrow and therefore, the rule would cause fewer than 3,000 people to apply.

*Response:* DHS recognizes that uncertainty in business and economic conditions, as well as data limitations, make it difficult to accurately predict how many entrepreneurs will apply for parole under this rule. However, as discussed in the "Volume Projections" section of this rule, DHS utilized limited data available to estimate that approximately 2,940 entrepreneurs could seek parole each year. This estimate was bolstered by an alternative estimate based on accelerator investment round data that DHS analyzed. Given limits on DHS's information about such entrepreneurs and that this is a new process, DHS does not know how many people within the estimated eligible population will actually apply. Additionally, fluctuations in business and economic conditions could cause the number of applications to vary across years.

While one commenter estimates that the eligible number of entrepreneurs will be higher than the DHS estimate, another commenter estimates it will be lower. Neither of the commenters provided a basis or data from which their figures were derived. DHS reaffirms that the estimate provided in this rule is reasonable. The assessment is based on analysis of data and publicly available information, and reflects, where data and analysis allow, reasonable medians or averages.

*Comment:* One commenter argued that the rule would only benefit certain special-interest venture capitalists.

*Response:* DHS respectfully disagrees with this commenter. Fundamentally, this rule is designed to yield significant public benefit to the United States—including through economic growth, innovation, and job creation—and not to any particular private-sector interest group. While some venture capital firms may benefit from the rule by having new

opportunities to invest in start-up entities that would not have otherwise been able to locate in the United States, this is also true for a range of other "qualified investors" as defined in the rule. Moreover, many international entrepreneurs may qualify for parole under this rule without having raised private-sector capital investment at all, since funding from government entities is also an eligibility criterion.

*Comment:* Several commenters stated that the rule would provide significant economic benefits.

*Response:* DHS agrees with these commenters that the rule will provide significant economic benefits to the United States. As discussed in the proposed rule and elsewhere in this section, DHS believes that this rule will help the United States compete with programs implemented by other countries to attract international entrepreneurs. International entrepreneurs will continue to make outsized contributions to innovation and economic growth in the United States.

*Comment:* Several commenters provided feedback on the costs of applications. One commenter stated that the fees were reasonable. Another commenter suggested allowing market prices to determine parole costs, essentially allowing those entrepreneurs with more likelihood of success to invest in parole opportunities. Still other commenters stated that the application fee was too high, especially compared to various visa applications.

*Response:* DHS appreciates commenters' feedback on the costs for applications. DHS determines the costs of applications through a biennial fee study it conducts, which reviews USCIS' cost accounting process and adjusts fees to recover the full costs of services provided by USCIS. The established fees are necessary to fully recover costs and maintain adequate service by the agency, as required by INA section 286(m); 8 U.S.C. 1356(m).

*Comment:* Several commenters generally stated support for the rule because it will likely improve innovation for local and regional economic areas. Another commenter stated support for the rule because it would increase intangible assets.

*Response:* DHS concurs with this expectation that the rule will foster innovation at the local and regional level. Studies on entrepreneurs reveal that they are key drivers of innovation throughout the United States, and that such innovation benefits local, regional, and the national economy through technical progress and improvements in efficiency and productivity. The rule's

eligibility criteria focus on start-ups with high growth potential, and DHS expects that new firms started by entrepreneurs covered by the rule will conduct research and development, expand innovation, and bring new technologies and products to market in addition to creating jobs in the United States. These activities will produce benefits that will spill over to other firms and sectors.

DHS also agrees with the commenter on impacts to intangible assets. Intangible assets are generally integrated into a firm's or sector's total assets and have become important in broad analyses of productivity and efficiency. Such assets can include proprietary software, patents, and various forms of research and development. This rule is intended to attract the types of ventures that will increase intangible assets.

a. Job Creation

*Comment:* Many commenters agreed that this rule would help create jobs and significantly benefit the U.S. economy. A commenter noted that immigrants have helped to found one quarter of U.S. firms and therefore allowing more international entrepreneurs would result in new job creation. Commenters also mentioned that immigrants have historically been successful in creating and establishing new businesses, which in turn create jobs in the United States. Commenters also more specifically endorsed the need to provide more investment opportunities for venture capitalists and angel investors who indirectly create jobs. Finally, commenters from the technology industry stated that attracting entrepreneurs to the Unites States to operate in high unemployment areas could provide access to new jobs where they are most needed.

*Response:* DHS appreciates the commenters' support of this rule with regard to attracting international entrepreneurs, and emphasizes that job creation for U.S. workers is one of the rule's primary goals, as discussed in the Regulatory Impact Analysis (RIA).

b. Impact on Native U.S. Entrepreneurs and Native U.S. Workers

*Comment:* Several commenters suggested the rule will have negative consequences for native U.S. entrepreneurs and native U.S. workers. These commenters were concerned that the rule would be disadvantageous to native U.S. entrepreneurs and would create incentives for venture capital firms to find international entrepreneurs instead of investing in native U.S. entrepreneurs. The commenters argued that job creation could be accomplished

through investment of native U.S. entrepreneurs instead of foreign entrepreneurs. Several commenters also stated that the government should assist U.S. entrepreneurs and workers before helping international entrepreneurs. Commenters also mentioned that the need for international innovators was overstated and that the number of native U.S. innovators is already adequate. Finally, these commenters asserted that foreign workers are often exploited for cheap labor and harm job prospects for native U.S. workers.

*Response:* DHS disagrees with these commenters' assertion that the rule will have negative impacts on native U.S. entrepreneurs and native U.S. workers. This rule focuses on identifying entrepreneurs associated with start-up entities with significant potential for bringing growth, innovation, and job creation in the United States. Much research supports the conclusion that high-growth firms drive job creation for workers in the United States, including for native U.S. workers. As discussed in further detail in the RIA, research also shows that immigrants have been outsized contributors to business ownership and entrepreneurship in the United States and abroad. Self-employment rates for immigrants are higher than for the native U.S. population. As discussed in the RIA, although one economic study has suggested that a very small number of native U.S. entrepreneurs may be displaced by international entrepreneurs, other researchers have noted that the finding simply raises the possibility that such displacement could occur without providing evidence that it actually does.[36] DHS reiterates, moreover, that the numbers of entrepreneurs who may be eligible for parole under this rule is limited and that the aim of the rule is to increase overall entrepreneurial activity and significant economic benefit throughout the United States. In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

---

[36] Compare Fairlie, R.W., and B.D. Meyer. ''The effect of immigration on native self-employment.'' *Journal of Labor Economics* 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf*, with, *e.g.,* Magnus Lofstrom, ''Immigrants and Entrepreneurship,'' Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf.*

c. Impact on Innovation

*Comment:* Several commenters provided feedback on the rule's impact on innovation. Two commenters stated that this type of international entrepreneurship supports innovation in the United States. Another commenter stated that the rule would not help foreign innovators because of complications with patents and modeling designs.

*Response:* DHS agrees with the commenters that stated that this rule supports innovation in the United States. Entrepreneurs tend to engage in research and development in order to develop and commercialize new products and technologies, and often stimulate patents and other intellectual capital linked to these efforts. DHS does not agree with the commenter that stated the rule is not helpful to foreign innovators because of issues with patents and modeling designs, and DHS sees no basis for this comment. Nothing in the rule poses specific burdens or constraints on the ability of entrepreneurs to seek and obtain patents or other intellectual capital.

2. Review Under the National Environmental Policy Act (NEPA)

*Comment:* An advocacy organization stated that all rules, including immigration rules, are subject to review under the National Environmental Policy Act. The commenter suggested that, at minimum, an Environmental Assessment be conducted to account for the growth-inducing impacts that would occur with an influx in population under this rule.

*Response:* DHS agrees that NEPA applies to this, as to every, final rulemaking. As explained in section IV.E of this preamble, the rule has been reviewed for environmental effects and found to be within two categorical exclusions from further review because experience has shown rules of this nature have no significant impacts on the environment. DHS also notes that any entrepreneurial ventures undertaken will be governed by local, state and federal laws and regulations, including those protecting human health and the environment. We disagree with the commenter's assertion that an Environmental Assessment is required.

3. Proposed Information Collections Under the Paperwork Reduction Act

a. Employment Eligibility Verification, Form I–9

*Comment:* An individual commenter suggested that List A documents should be updated include the verified

driver's licenses (sample attached and included in the file) that meet federal guidelines and require the presentation of the same documentation needed to obtain a passport. The commenter stated that it is no longer reasonable for those who receive a verified license and who paid the premium necessary for the processing of the extra documents, to have to locate their birth certificate and social security card in order to complete the Form I–9 process.

*Response:* DHS presumes that by "verified driver's licenses" the commenter is referring to State driver's licenses that comply with the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 302. The specific suggestion about amending List A on Form I–9, which would have wide-ranging effect and not be limited to entrepreneurs under this rule, is outside the scope of this rulemaking. This rule and accompanying form revisions limit changes to List A of Form I–9 to the modification of an existing document specified at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include individuals authorized to work incident to parole.

b. Application for Entrepreneur Parole, Form I–941

*Comment:* DHS received a public comment that stated that the time burden estimate of 1.33 hours for the respondent to complete the information collection was too low.

*Response:* DHS appreciates and agrees with this comment. Based on further review of the information collection and public comments on this specific issue, DHS is revising the estimated time burden from 1.33 hours to 4.7 hours for Form I–941 respondents.

4. Comments and Responses to Impact on Small Businesses

*Comment:* The U.S. Small Business Administration, Office of Advocacy (SBA) commented by supporting the goals of this rule, but expressed concern that the rule could significantly impact small entities. The SBA commented that the proposed rule was erroneously certified under the Regulatory Flexibility Act (RFA). The SBA stated that the only international entrepreneurs eligible for this parole program are those with significant ownership stakes in a start-up entity formed in the previous three years. The SBA also stated that the thresholds to qualify for parole were directly tied to the ability of the entrepreneur's start-up to produce significant public benefit to the United States. The SBA noted that under the proposed rule, an entrepreneur is not permitted to transfer work authorization to another start-up

entity, and that these restrictions could impact start-up entities if the entrepreneur were no longer eligible to stay in the United States. For these reasons, SBA concluded that this rule directly impacts start-up entities. The SBA recommended that DHS submit a supplemental analysis on the impact of the final rule on small entities.

*Response:* DHS has concluded that a RFA certification statement for this final rule is appropriate. This final rule does not regulate small entities nor does it impose any mandatory requirements on such entities. Instead, it provides an option for certain individual entrepreneurs to seek parole on a voluntary basis. There are no compliance costs or direct costs for any entity, small or otherwise, imposed by this rule since it does not impose any mandatory requirements on any entity. Historically, when an employer petitions on behalf of an individual or employee, DHS has provided an RFA analysis for the impact to small businesses. However, under this rule, a small entity or an employer does not apply for parole on behalf of an employee; instead, an entrepreneur applies for parole on a voluntary basis on his or her own behalf, and only those eligible individuals seeking parole would be subject to the anticipated costs of application. Entrepreneurs with an ownership stake in a start-up make the cost-benefit decision to voluntarily apply for parole.

In both the RFA and SBA's Guide for Government Agencies on the RFA, government agencies are required to consider significant alternatives to the rule when providing a full RFA analysis. Among the kinds of alternatives that SBA suggests considering include "the exemption for certain or all small entities from coverage of the rule, in whole or in part." [38] Even if this rule directly impacted small entities and DHS were required to engage in an analysis to minimize negative impacts of the rule on small entities by exempting them from the rule, that alternative would only harm small entities, which would no longer be able to benefit from the rule's allowing entrepreneurs to seek parole and work authorization.

The SBA also commented on various policy issues on the eligibility of entrepreneurs in this rule. Notwithstanding DHS' belief that entrepreneurs when filing for parole are not small entities, DHS has carefully

considered all those comments and has made policy changes in this final rule to address the comments. Specifically, the SBA commented that thresholds to qualify for parole are directly tied to the ability of the international entrepreneur's start-up to produce significant public benefit for the United States. DHS has considered this comment along with other public comments on this issue and has made the decision to lower the eligible threshold investment amount for initial parole from the proposed $345,000 in the NPRM to $250,000 in the final rule. Additionally, in the NPRM and in this final rule, DHS has provided some flexibility and alternative criteria for those entrepreneurs meeting partial eligibility requirements, as described in further detail in the preamble.

SBA also commented that the rule only allows the entrepreneur to work for the business identified on the parole application without providing leniency in transferring the work authorization to another entity. The SBA further comments that the start-up entity may be imperiled if the entrepreneur is no longer eligible to stay in the United States. The eligibility criteria for consideration for parole under this rule require an entrepreneur to have recently formed a new entity in the United States with substantial potential for rapid growth and job creation. Before an application for parole under this rule is approved, USCIS must make a discretionary determination that the entrepreneur is well-positioned to provide a significant public benefit to the United States. Therefore, these eligibility criteria are not limiting entrepreneurs, but aimed at ensuring that only those entrepreneurs with high growth potential are eligible for parole consideration under this rule. DHS has also provided avenues for an additional parole period specifically to prevent instability of a start-up entity.

DHS reiterates that RFA guidance allows an agency to certify a rule, instead of preparing an analysis, if the rule is not expected to have a significant economic impact on a substantial number of small entities.[39] DHS reiterates that this rule does not regulate small entities. Any costs imposed on businesses will be driven by economic and business conditions and not by the

---

[38] The Regulatory Flexibility Act, 5 U.S.C. 603(c)(4). The Small Business Administration's RFA Guide for Government, p. 38, available at *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

[39] *See* SBA, Office of Advocacy, "A Guide for Government Agencies; "How to Comply with the Regulatory Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272" (May 2012), available at: *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

voluntary participation for benefits from this rule.

## IV. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2015 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $155 million.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155 million in 2015 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

### C. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action'' under section 3(f) of

Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

1. Summary

This final rule is intended to add new regulatory provisions guiding the use of parole with respect to individual international entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential is indicated by, among other things, the receipt of significant capital financing from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. The regulatory amendments will provide the general criteria for considering requests for parole submitted by such entrepreneurs.

DHS assesses that this final rule will, by further implementing authority provided by Congress, reduce a barrier to entry for new innovative research and entrepreneurial activity in the U.S. economy.[40] Under this final rule, some additional international entrepreneurs will be able to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of the rule, these innovative entrepreneurs might be delayed or discouraged altogether in bringing innovation, job creation, and other benefits to the United States.

Based on review of data on startup entities, foreign ownership trends, and Federal research grants, DHS expects that approximately 2,940 entrepreneurs, arising from 2,105 new firms with investment capital and about 835 new firms with Federal research grants, could be eligible for this parole program annually. This estimate assumes that each new firm is started by one person despite the possibility of up to three owners being associated with each start-up. DHS has not estimated the potential for increased demand for parole among foreign nationals who may obtain

substantial investment from U.S. investors and otherwise qualify for entrepreneur parole, because changes in the global market for entrepreneurs, or other exogenous factors, could affect the eligible population. Therefore, these volume projections should be interpreted as a reasonable estimate of the eligible population based on past conditions extrapolated forward. Eligible foreign nationals who choose to apply for parole as an entrepreneur will incur the following costs: A filing fee for the Application for Entrepreneur Parole (Form I–941) in the amount of $1,200 to cover the processing costs for the application; a fee of $85 for biometrics submission; and the opportunity costs of time associated with completing the application and biometrics collection. After monetizing the expected opportunity costs and combining them with the filing fees, an eligible foreign national applying for parole as an entrepreneur will face a total cost of $1,591. Any subsequent renewals of the parole period will result in the same previously discussed costs. Filings to notify USCIS of material changes to the basis for the entrepreneur's parole, when required, will result in similar costs; specifically, in certain instances the entrepreneur will be required to submit to USCIS a new Form I–941 application to notify USCIS of such material changes and will thus bear the direct filing cost and concomitant opportunity cost. However, because the $85 biometrics fee will not be required with such filings, these costs will be slightly lower than those associated with the initial parole request and any request for re-parole.

Dependent spouses and children who seek parole to accompany or join the principal applicant by filing an Application for Travel Document (Form I–131), will be required to submit biographical information and biometrics as well. Based on a principal applicant population of 2,940 entrepreneurs, DHS assumes a total of 3,234 spouses and children will be eligible for parole under this rule. Each dependent will incur a filing fee of $575, a biometric processing fee of $85 (if 14 years of age and over) and the opportunity costs associated with completing the Form I–131 application and biometrics collection.[41] After monetizing the expected opportunity costs associated with providing biographical information to USCIS and submitting biometrics and combining it with the biometrics

---

[40] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the US is a struggle*, The Guardian, Sept. 14, 2014, available at *http:// www.theguardian.com/business/2014/sep/14/ foreign-tech-entrepreneurs-visa-us-struggle*; Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals*, April 11, 2014, available at *http:// immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* (''Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.'').

[41] The filing fees have been updated and reflect those promulgated in the 2016 Fee Rule (1615–AC09, CIS No. 2577–15 DHS Docket No. USCIS–2016–0001).

processing fee, each dependent applicant will face a total cost of $765. DHS is also allowing the spouse of an entrepreneur paroled under this rule to apply for work authorization. Using a one-to-one mapping of principal filers to spouses, the total population of spouses eligible to apply for work authorization is 2,940. To obtain work authorization, the entrepreneur's spouse will be required to file an Application for Employment Authorization (Form I–765), incurring a $410 filing fee and the opportunity costs of time associated with completing the application. After monetizing the expected opportunity costs and combining it with the filing fees, an eligible spouse will face a total additional cost of $446 (rounded). DHS expects that applicants will face the above costs, but does not anticipate that this rule will generate significant additional costs and burdens to private entities, or that the rule will generate additional processing costs to the government to process applications. While applicants may face a number of costs linked to their business or research endeavors, these costs will be driven by the business and innovative activity that the entrepreneur is engaged in and many other exogenous factors, not the rule itself or any processes related to the rule. Thorough review of academic, business, and policy research does not indicate that significant expected costs or negative consequences linked to attracting international entrepreneurs are likely to occur. As such, DHS expects that the negative consequences, if any, will be greatly exceeded by the positive effects of this rule.

In each case in which an entrepreneur will be granted parole under this rule, DHS will have made a determination that parole will yield a significant public benefit and that the person requesting parole merits a favorable exercise of discretion. Consistent with those decisions, the rule is expected to produce broad economic benefits through the creation of new business ventures that otherwise would not be formed in the United States. These businesses are likely to create significant additional innovation, productivity, and job creation. It is reasonable to conclude that investment and research spending on new firms associated with this rule will directly and indirectly benefit the U.S. economy and create jobs for American workers. In addition, innovation and research and development spending are likely to generate new patents and new technologies, further enhancing innovation. Some portion of the international entrepreneurs likely to be

attracted to this parole process may develop high-growth and high-impact firms that can be expected to contribute disproportionately to U.S. job creation. In summary, DHS anticipates that this rule will produce positive effects that would greatly exceed any negative consequences.

Using an estimate of 2,940 annual applications for significant public benefit entrepreneur parole as developed in the ensuing volume projections section of this analysis, DHS anticipates the total cost of this rule for principal filers who face a total per applicant cost of $1,591 to be $4,678,336 (undiscounted) annually for any given year. (These estimates focus only on principal initial filers, not entrepreneurs who might be eligible for a re-parole period of up to 30 months, or their spouses.) Dependent spouses and children who must submit the Form I–131 application and biometrics will face a per-applicant cost of $765, for a total cost of $2,474,914 (undiscounted). Dependent spouses who apply for employment authorization will face a per applicant cost of $446, which DHS projects will total $1,311,830 (undiscounted). Adding together the costs for the principal filers and family members—including filing costs, costs of submitting biometrics, and monetized opportunity costs—yields a total cost of this rule for the first year, 2017 and subsequently 2018, of $8,465,080 (undiscounted). The total annual cost of the rule of $8,465,080 can be expected for each subsequent year in the ten-year period. The total ten-year undiscounted cost is $84,650,081.

## 2. Background and Purpose of the Rule

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole applicants for admission into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, research and development and other forms of innovation, and job creation in the United States. The rule will establish general criteria for the use of parole with respect to individual entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States.

The purpose of the rule is to attract talented entrepreneurs to the United States who might otherwise choose to pursue such innovative activities abroad, or otherwise be significantly delayed in growing their companies in the United States, given the barriers they presently face. In addition to the benefits associated with entrepreneurial innovation, including new products, business networks, and production efficiencies that such activities are likely to generate, entrepreneurs have been and remain vital to economic growth and job creation in the United States and have generated a cohort of high-growth firms that have driven a highly disproportionate share of net new job creation.[42]

A body of research documents both the importance of entrepreneurial activity to the U.S. economy and its link to immigration. In this background section, DHS does not attempt to comprehensively summarize this large body of work but instead focuses on specific aspects central to the purpose of the rule and to its potential impacts.[43] In summary, DHS focuses on the role of new entrepreneurial firms in job creation in the United States, and the role that immigrant entrepreneurs have played in innovation and the high technology sector.

The labor market of the United States is highly dynamic. DHS analysis of data published by the U.S. Department of Labor's Bureau of Labor Statistics (BLS) indicates that between 2004 and 2013, on average about 847,000 firms were "born" each year and 784,000 "died."[44] To illustrate the extent of the labor market churn, since 1980 the private sector has generated about 16.3 million gross jobs annually but an average of only about 1.4 million net jobs annually. In both general business cycle expansions and contractions, large numbers of jobs are created and destroyed, comprising a key dynamic in the forces of creative destruction.[45]

---

[42] See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment-growth firms: Defining and counting them*, Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1–2, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf*.

[43] DHS notes that the body of research concerning immigration in general and its impact on the labor market, most notably germane to earnings and employment of domestic workers, is not addressed in the present analysis.

[44] Figures were obtained from the BLS, Business employment Dynamics, Table 8, "Private sector establishment births and deaths, seasonally adjusted;" available at *http://www.bls.gov/news.release/cewbd.t08.htm*. Firm "births" in these data only include new firms and thus exclude new franchises and expansions of existing firms.

[45] See Ryan Decker, John Haltiwanger, Ron Jarmin, and Javier Miranda, *The Role of*

Research into the highly dynamic and volatile labor market in the United States has evolved. Earlier focuses on small- and new-firm size as the primary co-determinants of job creation has been reoriented to focus on the role of a relatively small subset of entrepreneurial firms.

This rule focuses on identifying entrepreneurs associated with types of start-up firms that are more likely to experience high growth, contribute to innovation, and create jobs in the United States. This deliberate focus is critical to ensuring that parole in individual cases is justified by significant public benefit. Research has shown that the average start-up company does not survive long.[46] Most new firms do not add much net job creation either, as they are not focused on achieving high growth. By some estimates, the vast majority—as much as 95 percent—of all new firms are not substantial job creators or innovators.[47] About 95 percent of new firms start with fewer than 20 employees, and about the same percentage ultimately close with fewer than 20 employees, indicating that business turnover is heavily influenced by small firms.[48]

There is significant research, however, demonstrating that a small subset of new firms tends to be highly dynamic and to contribute disproportionately to net job creation. The BLS has highlighted the role of the small subset of high-growth firms that comprise about 2 percent of all firms but have accounted for 35 percent of gross job gains in recent years. "High-growth firms" are defined by the BLS and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. As of 2012, there were 96,900 high-growth firms in the United States that had created about 4.2 million jobs.[49] A key finding by the BLS is that high-growth firms especially add jobs in their first ten years, though they generally continue to add a diminishing number of new jobs even after that period of time to the extent they survive. Job creation in the United States for the last several decades has been driven primarily by high-growth firms that tend to be young and new, and by a smaller number of surviving high-growth firms that age for a decade or more.[50]

This highly disproportionate, "up or out" dynamism of high-growth firms has been substantiated by many researchers. The SBA reported that about 350,000 "high impact firms"— defined as enterprises whose sales have at least doubled over a 4-year period and which have an employment growth quantifier of 2 or more over the same period—generated almost all net new jobs in the United States between 1994 and 2006.[51] The Kauffman Foundation, a leading institute on research, data collection, and advocacy for entrepreneurial activity, reports that the top-performing one percent of firms generates roughly 40 percent of new job creation, and, the fastest of them all—the "gazelles"—comprising less than one percent of all companies, generated roughly ten percent of new jobs.[52] The same general result has been found internationally; the OECD reports that between three percent and six percent of all firms can be considered high-growth firms but about one percent can be considered the even more high-performing "gazelles."[53]

Despite the finding across a large number of studies that small new firms tend to exhibit an "up or out" dynamic in which a small number survive to age five to become high-growth firms or "gazelles," other key findings that have emerged in the literature suggest that the growth and performance of new firms, even high-growth firms, vary substantially (as indicated by metrics that include labor productivity, profitability, revenue, and research and development intensity).[54] Models that can sort out various business characteristics and economic conditions to predict high-growth probabilities are still in nascent stages. Nevertheless, this rule includes threshold criteria for parole consideration meant to identify entrepreneurs associated with the kinds of promising start-up entities that appear more likely to contribute to American innovation, economic development, and job creation. As described in more detail below, businesses started and run by immigrants have propelled these kinds of broadly shared economic benefits for many years.

Broadly speaking, high-growth entrepreneurs engage in research and development (R&D) in order to develop and commercialize new products and technologies. Several studies have found that such entrepreneurs tend to engage in R&D spending in the first year, tend to attract patents and other forms of intellectual capital, and tend to attract venture capital financing.[55]

*Entrepreneurship in U.S. Job Creation and Economic Dynamism,* Journal of Economic Perspectives—Vol. 28, Number 3 (Summer 2014), pp. 3–24, available at: *http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.28.3.3.*

[46] According to BLS findings, "20 percent of newly created establishments don't survive their first year in business, 32 percent don't survive their first two years, and 50 percent don't survive their first 5 years." *See* Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment-growth firms: Defining and counting them,* Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.*

[47] *See* Jason Wiens and Chris Jackson, *The Importance of Young Firms for Economic Growth,* Ewing Marion Kauffman Foundation (2014), pp. 1–2, available at: *http://www.kauffman.org/~/media/kauffman_org/resources/2014/entrepreneurship%20policy%20digest_september2014.pdf; see also* Hurst, Erik, and Benjamin Wild Pugsley. 2011; *What Do Small Businesses Do?* Brookings Paper on Economic Activity, no. 2 (2011), pp. 73–142.

[48] *See* Headd, Brian, *An Analysis of Small Business and Jobs,* SBA Office of Advocacy (2010), p. 6, available at: *https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.*

[49] *See* R. Clayton et al. (June 2013), supra n. 50, p. 2–4. For a description of the methodology utilized to measure high growth firms, see OECD, *OECD-Eurostat Manual on Business Demography Statistics* (2007), pp. 59–65, available at: *http://www.oecd.org/std/39974460.pdf.*

[50] For specific detailed information on survival rates and employment creation at various intervals along the HGF life span, see R. Decker et al. (2014), *supra* n. 53, pp. 6–24. The BLS and others use the term "gazelles" to differentiate the fastest growing HGFs.

[51] *See* Spencer Tracy, Jr., *Accelerating Job Creation in America: The Promise of High-Impact Companies,* SBA Office of Advocacy (2011), pp. 1–4, available at: *https://www.sba.gov/sites/default/files/advocacy/HighImpactReport.pdf; see also* Acs, Zoltan, William Parsons, and Spencer L. Tracy, Jr, *High-Impact Firms: Gazelles Revisited; Study* prepared for the SBA, Office of Advocacy (2008), p. 1, available at: *http://www.sba.gov/advo/research/rs328tot.pdf.* The SBA high-impact cohort is about 6.3% of all firms, which is higher than the 2% high-growth category found in the BLS studies. The SBA cohort is larger because the criteria are slightly less restrictive and it includes older firms.

[52] *See* Dane Stangler, *High-Growth Firms and the Future of the American Economy, Kauffman Foundation Research Series: Firm Formation and Economic Growth* (2010), p. 2, available at: *http://www.kauffman.org/~/media/kauffman_org/*

research%20reports%20and%20covers/2010/04/highgrowthfirmsstudy.pdf.

[53] David B. Audretsch, *Determinants of High-Growth Entrepreneurship,* report prepared for the OECD/DBA International Workshop on High-growth firms: local policies and local determinants, OECD, p. 2–5, available at: *http://www.oecd.org/cfe/leed/Audretsch_determinants%20of%20high-growth%20firms.pdf.*

[54] *See* R. Decker et al (2014), *supra* n. 53, pp. 5–7; *see also* Davis, Steven J., R. Jason Faberman, John Haltiwanger, Ron Jarmin, and Javier Miranda, *Business Volatility, Job Destruction, and Unemployment.* American Economic Journal: Macroeconomics 2(2) (2010): 259–87. Research and development intensity is typically measured as the ratio of research and development spending to revenue, net income, or overall costs.

[55] *See* Shah, Sonali K. and Winston Smith, Sheryl and Reedy, E. J., *Who are User Entrepreneurs? Findings on Innovation, Founder Characteristics, and Firm Characteristics,* The Kauffman Firm Survey (Feb. 2012), pp. 2–5, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2012/02/whoareuserentrepreneurs.pdf.*

**5276**    **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

Immigrants have been central contributors to business ownership and entrepreneurship in the United States and abroad. According to OECD data, self-employment rates for immigrants are higher than those of the native-born populations in many counties, including in the United States.[56] Based on the most recent data available from the U.S. Census Bureau, 12.9 percent of the United States population was foreign-born. Their rate of self-employment is about 30 percent higher than that of the native-born population (7.7 percent vs. 5.9 percent; n=1.8 million). The Census Bureau's 2012 Survey of Business Owners showed that 14.4 percent of U.S. firms were owned by at least one person not born a citizen of the United States.[57] Two studies based on samples of U.S firms found slightly higher r foreign-born ownership rates.[58]

Many high-growth firms are involved in activities classified in the STEM (science, technology, engineering, and math) fields. The high concentration of immigrant entrepreneurs in these industries has garnered much attention. Between 2006 and 2012, one-third of companies financed with venture capital that made an initial public offering had an immigrant founder, a sharp rise from seven percent in 1980. These companies have generated 66,000 jobs and $17 billion in sales.[59] A survey

of entrepreneurs in technology-oriented privately held companies with venture backing also showed about one-third were foreign born, and 61 percent held at least one patent.[60]

Further evidence points to similar findings. Between 1995 and 2005, 25 percent of science and technology focused businesses founded in the United States had a foreign-born chief executive or lead technologist. In 2005, those companies generated $52 billion in sales revenue and employed 450,000 workers. In Silicon Valley, the share of immigrant-founded start-ups increased to 52 percent by 2005. In 2006, foreign nationals residing in the United States were involved (as inventors or co-inventors) in about 26 percent of patent applications filed that year. Immigrant founders of Silicon Valley firms tend to be highly educated, with 96 percent holding bachelor's degrees and 74 percent holding advanced degrees, and with three-quarters of the latter in STEM fields. As of 2010, according to one study, more than 40 percent of the Fortune 500 companies had been founded by an immigrant or the child of an immigrant.[61]

To reiterate, high-growth firms tend to be new and young, and one of their primary contributions to the highly dynamic labor market of the United States has been through job creation. High-growth firms tend to innovate and focus on developing new products and services. The intense involvement of immigrant entrepreneurs in successful technology-driven activities suggests substantial economic contributions. While measuring the precise value and impact of innovation is difficult and still at a nascent stage in research, many economists believe innovation creates positive externalities and spillover effects that further drive economic growth.[62]

Notwithstanding the research on the positive effects of high-growth entrepreneurship, there is some evidence of a long-term slowing in start-up dynamism and entrepreneurial activity in the United States; this trend began several decades ago, driving many economists to advocate for policies that attract more entrepreneurs in general.[63] Many business entrepreneurial

advocacy centers have also advocated in recent years for the United States to enact a formalized pathway for immigrant entrepreneurs. DHS is aware of one estimate of the potential benefits of a theoretical start-up visa (which, as an entirely new visa classification, only Congress can create). A Kauffman Foundation study (2013) estimated that, under certain conditions, the establishment of a start-up visa program could lead to the creation of between 500,000 and 1.6 million new jobs after ten years.[64] The potential benefits of attracting immigrant entrepreneurs have not gone unnoticed internationally. Thirteen of the thirty-five nations that are part of the Organization of Economic Cooperation and Development (OECD) have enacted special immigration programs for entrepreneurs, although the eligibility criteria vary among them to a significant extent.[65]

### 3. Population of Entrepreneurs Potentially Eligible

DHS cannot precisely predict the volume of new businesses that will start in the United States due to this rule. DHS has instead examined available data to provide a broad estimate of the population of individual entrepreneurs who may be eligible to request parole consideration under this rule. Given limits on DHS's information about such entrepreneurs, DHS does not know how many people within the estimated eligible population will actually seek such consideration; the estimates contained in this section represent an approximation to the size of the eligible population. DHS has estimated the population of entrepreneurs potentially eligible for parole under this rule based on two sub-groups: (1) Foreign individuals who seek to come to the United States to start a new business with financial backing from a qualified U.S. investor; and (2) foreign individuals who seek to come to the United States to start a new business as recipients of U.S. funded and awarded

---

[56] OECD, *Migrant Entrepreneurship in OECD Countries*, prepared by Maria Vincenza Desiderio (OECD) and Josep Mestres-Domènech for the Working Party on Migration (2011), pp. 141–144, available at: *http://www.oecd.org/els/mig/Part%20II_Entrepreneurs_engl.pdf*. This, and many other similar studies and analyses are based on self-employment rates, which are a proxy, but not a perfect measure, of business ownership, because some ownership structures such as partnerships, that could involve a foreign-born owner, are generally not considered to be proprietary.

[57] The categorization of "foreign-born" does not differentiate between lawful permanent residents and naturalized citizens. It also does not provide details of the firm history, implying that some firms owned by persons not born in the United States could have been founded by U.S. citizens and sold to foreign-born persons.

[58] *See* David M. Hart, Zoltan J. Acs, and Spencer L. Tracy, Jr., *High-tech Immigrant Entrepreneurship in the United States.;* report developed under a contract with the Small Business Administration, Office of Advocacy (2009), page 8, available at: *https://www.sba.gov/sites/default/files/advocacy/rs349tot_0.pdf;* see also Robert W. Fairlie and Magnus Lofstrom, *Immigration and Entrepreneurship*, Institute for the Study of Labor (2013), p. 1, available at: *http://ftp.iza.org/dp7669.pdf*. The foreign born ownership rates for U.S. firms reported in these papers is 16% and 18.2%, in order.

[59] This information is found from various sources and found in Stuart Anderson, *American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy*, National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–7.

[60] *Id.* at pp. 2–5.

[61] Vivek Wadhwa, *Foreign-Born Entrepreneurs: An Underestimated American Resource*, Ewing Marion Kauffman Foundation (2008), pp. 2–6, available at: *http://www.kauffman.org/~/media/kauffman_org/z_archive/article/2008/11/wadhwatbook09.pdf*.

[62] *See SMEs, Entrepreneurship and Innovation*, OECD (2010), pp 26–28, available at: *http://www.oecd.org/berlin/45493007.pdf*.

[63] *See* R. Decker et al. (2014), supra n. 53, p. 16–22.

[64] *See* Dane Stangler and Jared Konczal, *Give Me your Entrepreneurs, Your innovators; Estimating the Employment Impact of a Startup Visa*, Ewing Marion Kauffman Foundation, (Feb. 2013), pp. 1–3, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_finalsada*. The estimates are based on a fixed pool of 75,000 startup visas for a 10-year period, in which firm deaths each year cycle some of visa to new entrants.

[65] Most programs have been enacted after 2010. A country list and some descriptive data can be found at Jean-Christophe Dumont, *Investor Visas in OECD Countries*, OECD Conference on Global High-Skilled Immigration Policy, The National Academies Board on Science, Technology and Economic Policy (2014), available at: *http://sites.nationalacademies.org/cs/groups/pgasite/documents/Web page/pga_152202.pdf*.

research grants and who intend to conduct the concomitant research in the United States. DHS assumes that each member of the eligible population will start a business and that the general criterion for investment from a qualified investor (*e.g.*, venture capital firms, angel investors, or accelerators or incubators) be set at $250,000, while for government grants or awards the general criterion will be $100,000. Based on these amounts, DHS analyzed various past endeavors for the potential sources of funds. DHS estimates that approximately 2,940 foreign nationals annually could be eligible to apply for parole under this rule. Table 1 summarizes the analysis by source of funds.

#### TABLE 1—NUMBER OF ENTRE-PRENEURS POTENTIALLY ELIGIBLE

| Sub-group | Annual eligibility |
|---|---|
| New firms funded with investment capital ................ | 2,105 |
| New firms funded with U.S. grants or awards ............... | 835 |
| Total ................................ | 2,940 |

DHS has no way of predicting with certainty the actual number of foreign nationals who will seek parole under this rule over time, as the size of the eligible population could change significantly. DHS acknowledges that the estimate of eligible individuals annually is an approximation based on past foreign ownership and start-up capital amounts. The analysis utilized to estimate the potential eligible population is also based implicitly on assumptions that: (1) the rule will not significantly change the frequency of U.S. funded grant applications from international researchers; and (2) that the rule will not significantly affect the market for international entrepreneurs and the market for the types of investment structures the rule will involve. Based on these assumptions and the data limitations, DHS projects that for the first full year that the rule will be effective, annual eligibility will be approximately 2,940.[66] DHS projects

that this number will hold steady for the second year as well. The next section provides key data and analytical approaches utilized to arrive at the estimates of eligible individuals. DHS first considers volume estimates of eligible individuals based on official U.S. data. The resulting estimates based on official data are those utilized for the cost projections of the rule. Due to particular constraints in the data, DHS follows with an alternative method of volume estimation of eligible individuals that adds robustness to the official estimate.

Volume Projections Data and Methodology

A. Grants

Because U.S.-funded research grants may be a qualifying investment under this rule, DHS obtained publicly available data on federally funded grants for fiscal years 2013–2015.[67] Although numerous agencies within the Federal Government award grants to foreign-born individuals, most are humanitarian or development focused.[68] For this reason DHS parsed the very large data set comprising 1.7 million records to obtain a viable analytical cohort. First, the records were filtered to capture Federal Government agencies that award grants to both United States and foreign-born recipients. Secondly, the records were sorted to only include the Federal Government agencies that award grants focused on "projects," thereby excluding block and assistance grants.[69] The foreign-born cohort used for the eligibility projections excluded grants made to recipients in U.S. territories, as such recipients may be subject to special considerations outside the

parole parameters.[70] DHS also excluded grant amounts recorded as negative, zero, and trivial amounts of less than $1,000—such values were recorded if grants were rescinded or for some other reason not ultimately funded. On average, 138,447 grants comprised the annual resulting analytical cohort derived from the above filtering procedures. Of that total, a small portion, 2,043 grants, or 1.5 percent, were awarded to foreign-born individuals. Having determined a reasonable eligibility threshold of $100,000, DHS proceeded to the next step, to determine the potential annual eligible population of grant-sourced researchers. Over the period of analysis, 41 percent of the Federal grants awarded to foreign recipients equaled or surpassed the $100,000 benchmark, for an average of 835 annually.

B. Investment Capital

To estimate the number of potential new entrepreneurial start-ups, DHS obtained and analyzed data from the BLS and the Census Bureau. From the BLS Business Employment Dynamics (BED) data suite, DHS obtained the number of private establishments aged 1 year or less for nine broad sectors likely to be involved in innovative activity, in order to focus on entrants.[71] Although a reasonable proxy, the number of establishments aged 1 year or less is not a perfect measure of firm start-ups (births). The chosen metric may

---

[66] DHS emphasizes that the total is a broad estimate, as the Department has no means to determine the demand for entrepreneurial parole, changes in the eligible population that the rule may cause, time-variant possibilities, and application preferences. These conditions could change, if, for example, some foreign researchers see parole as attractive and apply for federally funded grants that they otherwise might not have applied for in the absence of the rule. In addition, volume estimates should be interpreted to apply to only initial applications, not considerations for re-parole at some future point in time. Lastly, the market for the

types of investments involved, such as venture capital, are fluid and becoming more global in scope. DHS has no means to determine how the evolution of these investment markets will affect, or be affected by, the rule.

[67] The data were obtained from USASpending.gov: *https://www.usaspending.gov/Pages/Default.aspx*. From the homepage, the data can be accessed from the linked "data download" section. The files were obtained on April 20, 2015.

[68] It is certainly the case that U.S. State governments and other governmental entities issue research grants that foreign recipients could potentially utilize for parole eligibility. However, DHS is not aware of any database that collects and provides such data publicly.

[69] The Federal entities that awarded scientific focused research to foreign recipients were: Agricultural Resource Service, National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration, Department of Defense, National Aeronautics and Space Administration, National Oceanic and Atmospheric Administration, National Institute of Standards and Technology, and National Science Foundation. The U.S. Department of State and the Agency for International Development (USAID) were excluded from the analysis.

[70] There is a particular way in which the data germane to foreign grants were parsed and analyzed. There are two possible foreign indicators listed for each grant. One is the "principal place" involving the research and the other is the "recipient country." The incumbent volume projections are based on the latter because this indicator generally implies that the grant was made to a person or institution outside the United States. The former is not used because this indicator could apply to grants awarded to U.S. or foreign persons in order to conduct the ensuing research outside the United States. Implicit in this analysis is that persons awarded U.S.-funded grants that are overseas could conduct their research and innovation in the United States, and are not otherwise precluded from doing so, even if the focus of such research is in a foreign country.

[71] The BLS data is found at *http://www.bls.gov/bdm/bdmage.htm*. DHS utilized the "Establishment age and survival BED data for nation by major industry" set and figures from Table 5, "Number of private sector establishments by age," for the nine major sectors shown in Table 2. The BLS does provide figures on firm births that could be used in the present analysis. However, DHS chose establishment age data because it is broken down in a way that corresponds precisely to the innovating sectors, discussed below. The firm birth data is not categorized in the exact same manner. The nine major sectors were chosen to envelope the approximately 430 individual activities that DHS considers to involve "science, technology, engineering, and math" (STEM). The full list based on the 2012 update can be found at: *http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf*.

**5278**    **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

overstate births, by including expansions and new franchises of existing businesses. Conversely, it may understate the actual number of start-ups, because some fraction of firms does not survive the first year (the data are tabulated in March of the respective year such that the establishments aged 1 year and less are those that opened within the previous year but remained in business as of March of the following year), and those that opened in the previous year and were still in business but had not reached 2 years of age. DHS utilized the relevant figure for March 2015, because the latter is the most recent figure reported in the BED dataset.

For each sector, DHS obtained the corresponding share of firms owned by a person "not born a citizen of the United States" from the Census Bureau's Survey of Business Owners

data set.[72][73] For brevity, we utilize the term "foreign" here to describe such firms. The foreign share was obtained by dividing the number of foreign-owned private firms in a sector by the total number of reporting firms in the same sector. This share applies to firms that have a least one owner who was not born in the United States but does not differentiate between various types of ownership structures. The figure for new firms obtained from the BLS BED data was multiplied first by the foreign share to generate an estimate of firms per sector started by a person not born in the United States.

Next, DHS attempted to calculate how many of the firms were started with at least $250,000, the minimum investment threshold that the rule sets. The SBO data provides ranges of such startup capital amounts but DHS could not conduct a precise estimate because

the data do not provide a category bound by the threshold minimum. In fact, the encompassing tranche is very large, from $249,500 to $1 million in range. The SBO does not provide actual cohort data or other information from which DHS could evaluate the distribution and, therefore, DHS has no way of ascertaining how many firms in this large range will occupy the $250,000 to $1 million segment. As a result, DHS relied on the share of firms in this tranche and the additional tranches over $1,000,000 relative to the share of all firms reporting for the sector, and recognizes that the volume projection is likely larger than is realistic. An additional assumption is that the startup threshold is the same for businesses with native and foreign-born founders. The relevant data and estimates per sector are shown in Table 2.

## TABLE 2—SUMMARY OF ENTREPRENEUR ESTIMATES

| Sector | New firms | Foreign share (%) | Start-up threshold (%) | Annual eligible |
|---|---|---|---|---|
| Agriculture | 10,182 | 4.9 | 2.5 | 12 |
| Utilities | 1,204 | 10.8 | 5.5 | 7 |
| Manufacturing | 29,883 | 11.0 | 5.4 | 178 |
| Information | 22,855 | 11.9 | 2.0 | 55 |
| Professional Services * | 165,425 | 12.8 | 1.2 | 248 |
| Management | 7,334 | 7.3 | 20.2 | 108 |
| Waste Services | 66,161 | 16.4 | 0.9 | 94 |
| Education | 15,226 | 11.9 | 0.7 | 13 |
| Health Care | 210,977 | 18.0 | 3.7 | 1,391 |
| Total | ................. | ................. | ................. | 2,105 |

* Abbreviation for "Professional, Scientific, and Technical Services".

As is discussed in the preamble, DHS has revised two substantive components of the eligibility criteria for this final rule. Foremost, the general investment amount requirement has been lowered from $345,000 to $250,000. DHS believes that the volume estimate of entrepreneurs based on investment capital will be higher than the 2,105 presented above but cannot make a determination of exactly how much higher. The reason is that the lower investment amount will allow some firms to be created that otherwise would not at the higher amount proposed initially, but the Census Bureau capital

size bin relevant to the level proposed is the $249,500 to $1 million in range, which includes both figures. Because DHS does not have data on the distribution of amounts within this range, the entire bin was included in the proposed estimates and is retained in the final estimates. However, as is described below, DHS has conducted an alternative method of estimation—to include updates from the initial proposal based on new information and data—that compares very closely to the estimated total volume of 2,940. Specifically, an alternative estimate of total volume annually is 2,920.

## C. An Alternative Estimate of Entrepreneurs Based on Investment Structures

DHS recognizes the imperfections in estimating the potential population of eligible entrepreneurs based on extrapolating past conditions of foreign ownership rates and capital thresholds. The main benefit of this method is that it is based on official data. A main limitation is that it assumes that the annual crop of firms created are entrepreneurial and the types of firms covered by the parole process in the rule. In practice, some, but not all, will

[72] The Census SBO data are found at: *http:// www.census.gov/data/tables/2012/econ/sbo/2012-sbo-characteristics.html.* The foreign ownership figures per sector are found under "Characteristics of Business owners," Table SB1200CSBO11: "Statistics for Owners of Respondent Firms by Whether the Owner Was Born in the United States by Gender, Ethnicity, Race, and Veteran Status for the U.S." and the startup capital data are found under Characteristics of Businesses, Table SB1200CSB16: "Statistics for All United States

Firms by Total Amount of Capital Used to Start or Acquire the Business by Industry, Gender, Ethnicity, Race, and Veteran Status for the United States: 2007." The foreign ownership share of firms is provided in the table and thus did not need to be calculated by DHS. The SBO data are part of the 2012 survey for which data was released publicly between February and June 2016.

[73] A possible source of upward bias in the foreign ownership share and hence the estimate of eligible entrepreneurs is that this share does not

differentiate between foreign owners who came to the United States to open a business and those who acquired one after being in the United States for some period of time (*e.g.*, lawful permanent residents or naturalized citizens). A general finding among the literature on this topic is that many foreign-born business owners were driven to start a business by "push" factors in the labor market after arrival in the United States. DHS does not have a means to parse out the ownership rate in a more granular way to account for such differences.

be innovators, even though the present analysis focuses on the sectors of the economy linked to STEM activity (DHS is not aware of any methods or data that can allocate a research-innovation share of firms to each sector). A second limitation is that the DHS method of measuring new firms in the context of the rule is imprecise. The final rule revised the definition of "start-up entity" in 8 CFR 212.19(a)(2) to include firms that were formed up to 5 years prior to the filing of the application for parole, compared to three years as proposed in the NPRM. However, the BLS cohort of new firms utilized for the volume projections is 1 year of age or less, not five or even three years, and is thus a smaller estimate of the number of new firms that could be eligible. This limitation cannot be overcome because of the manner in which the survival cohorts are presented.[74] Because the volume projections are derived from information obtained from official sources—the BLS and Census Bureau— DHS retains them for purposes of the costs and volume estimates of the rule. DHS believes, however, that an alternative method of estimation will inform readers and strengthen the regulatory analysis by providing a viable comparison to the official projections. In this alternative approach, DHS focuses on business accelerators and incubators (described together as "accelerators" for brevity). By analyzing the foreign component of these structures, data permitting, an alternative estimate of entrepreneurs can be obtained for comparison purposes.

DHS obtained publicly available information from Seed-DB, which provides data on U.S. accelerators collected from industry associations and fee-based data providers such as Crunchbase, which is a large data provider for venture capital, angel investors, and accelerators.[75] From the Seed-DB Web site DHS utilized the link to "firms that have exited" to collect the cohort of firms that underwent accelerators and then exited via an acquisition or public offering. Next, DHS parsed the data to capture firms that reported total funding, exit value, and were not recorded as "dead" (last accessed on Nov. 7, 2016). The parsing described above yielded a cohort of 89 firms. DHS followed the Seed-DB links to Crunchbase for each firm and extracted the seed round, recording its value.[76] Analysis of the investment rounds reveals that the median is $250,000. Having determined a median seed round size from the data, DHS next attempted to estimate a foreign share of accelerated firms. The exit cohort from which the median was calculated did not provide such information, hence DHS turned to the Seed-DB data suite that lists the total number of companies incubated for each accelerator and the countries that the companies were located in. Since there is wide variation in the number of companies per incubator, ranging from 1 to over a thousand, DHS grouped the incubators by country and then weighted each one for its share of total companies. The resulting weighted average indicates that one quarter of incubated companies were foreign.[77] Having determined a median seed round and a foreign share estimate, the final point required is the number of firms to apply these figures to. Based on the most recent data from the Center for Venture Research, the 2013–2015 annual average for angel financed firms in the seed and startup phase was 33 percent, which equals 23,336 firms annually. Multiplying this average number of firms by 0.25 to capture the foreign share and then by 0.5 to reflect the median and also the investment level DHS has set yields an annual estimate of 2,920.

This estimate compares well to the official total volume estimate of 2,940. The accelerator data captures seed rounds that involve venture capital, angel, accelerator investments, and grants, which is why it is compared to the total volume estimate.

### D. Potential Variability in the Volume Projections

This section discusses several potential cohorts involving entrepreneurial activity that is difficult to estimate.

In light of the potential benefits to the U.S. economy and job creation, DHS is proposing this rule to provide a mechanism that, consistent with the requirements of the INA, encourages international entrepreneurs described herein to form and create innovative firms in the United States. In 2011, DHS began outreach and stood up the Entrepreneurs in Residence initiative to try to encourage entrepreneurship among foreign nationals.[78] DHS began tracking the number of foreign nationals who indicated interest in starting up an entrepreneurial endeavor at some point during their admission as an H–1B nonimmigrant. Over four fiscal years (FY 2010–2013), an average of 77 foreign nationals indicated such interest. In light of the relatively small numbers of foreign nationals who indicated their entrepreneurial intentions, DHS believes that considering parole requests under this rule will promote further innovation and other economic benefits in addition to those created by existing programs and policies used by foreign nationals to pursue high-growth entrepreneurial activity in the United States. When the rule is effective, there could be some small substitution effects as some portion of this cohort could switch to seeking parole instead of relying on other existing nonimmigrant programs and policies. DHS, however, does not believe such substitution will occur on a large scale because the ability to be admitted to the United States as a nonimmigrant offers materially more benefits and protections than parole.

In addition, the rule lists a number of ancillary conditions for eligibility—and conversely a number of conditions that

---

[74] Specifically, the BLS BED provides the number of firms surviving to a specific age and below. For example, the five year cohort includes all firms started within five years surviving up to that point, and so on for younger cohorts. However, the data does not count the number of firms within each survival cohort by their true age. Hence, the five year survivals do not include firms that started up and may have died after three years that could have been eligible at one time. Therefore, the five year survival cohort significantly undercounts the number of firms that will potentially have been considered new in the context of the final rule. Conversely, adding up the survival cohorts to a point, say year five, will significantly over-count the number of firms considered new in the context of the final rule. The reason is that a firm that survived four years and went on to age five will be included in both the five and four year cohort, not to mention the younger ones. Thus, adding the two (age four and five) cohorts together would double count the survivor. This problem is less onerous for firms aged one or zero.

[75] The Seed-DB information is found at *www.seed-db.com/*.

[76] For most of the firms in the exit cohort, the initial round of investment date-wise was also the smallest round in terms of value and labeled as the "seed" or "angel" round. For about 10 percent of the firms however, determining which round to use for the analysis was not straightforward and DHS had to utilize some discretion. For example, for some firms the seed round was listed after other rounds, such as venture capital or Series A rounds. For others, the seed round was not the smallest round recorded. DHS does not know why these anomalies are present but proceeded to choose the "seed round" regardless of its dating or amount. The only exception was in the few cases in which the seed round post-dated other rounds and was larger in amount. In these few cases the initial round was chosen, regardless of what investment type it was.

[77] This foreign share found by DHS in the analysis corresponds strongly to a finding in a study of high technology firms that found that 24 percent of such firms were founded by a foreign born person. *See America's New Immigrant Entrepreneurs*, Vivek Wadhwa, AnnaLee Saxenian, Ben Rissing, and Gary Gereffi, available at: *http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf*.

[78] Source: "USCIS Announces 'Entrepreneurs in Residence Initiative,' " available at: *http://www.uscis.gov/news/public-releases-topic/business-immigration/uscis-announces-entrepreneurs-residence-initiative; see also http://www.uscis.gov/eir/visa-guide/entrepreneur-visa-guide*.

**5280**    **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

will leave individuals unlikely or unable to be paroled into the United States (or continue to be paroled in the country). Because ancillary conditions can be considered for eligibility, the actual volume may be smaller than the estimates herein. Two examples are that, under the rule, applicants must maintain household income greater than 400 percent of the poverty line and that the qualifying start-up capital cannot come from family members. The volume estimates presented in this analysis assume all ancillary eligibility conditions are met.

Finally, two potential elements of the eligible population are considered. First, as alluded to in the summary, the volume estimates and ensuing cost estimates assume one individual owner for each new firm; under the rule, DHS will allow up to three individuals per firm to seek parole but does not attempt to estimate how many of the startups could have more than one owner. Second, the volume estimate for grants is based on Federal awards only. DHS will consider eligibility based on State or local grants and awards, including those from State or local Economic Development Corporations (EDCs). However, unlike in the case of Federal awards, there is not a database capturing State and local grants or the transmission mechanisms through which some Federal grants are distributed to other entities, such as EDCs, and as such DHS was unable to estimate the number of entrepreneurs potentially eligible for parole as a result of receiving State and local grants.

4. Costs

A. Principal Filer Costs

The rule will permit certain foreign nationals to apply for a 30-month (2.5-year) initial period of parole into the United States provided they meet the eligibility criteria. Those who seek such parole into the United States will face the costs associated with the application, which involve a $1,200 application fee plus other costs, detailed below. The costs will stem from filing fees and the opportunity costs of time associated with filing the Application for Entrepreneur Parole (Form I–941).

The filing fee for the Form I–941 application is $1,200. The fee is set at a level intended to recover the anticipated processing costs to DHS.[79]

In addition, DHS is proposing that applicants for parole as an entrepreneur submit biometrics and incur the $85 biometric services fee. Because entrepreneurs could start firms in any number of occupations, DHS believes it is appropriate to utilize the mean hourly wage for all occupations, which is $22.71.[80] In order to anticipate the full opportunity cost to petitioners, DHS multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, for a total of $33.16 per hour.

DHS estimates that the application will take 4.7 hours to complete. After DHS receives the application and fees, if the applicant is physically present in the United States, USCIS will send the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with the $85 biometric services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity cost of traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[81] By applying the

$33.16 hourly time value for applicants to the total biometrics-related time burden, DHS finds that the opportunity cost for a principal applicant to travel to and from an ASC, and to submit biometrics, will total $121.68.[82] In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[83] DHS assumes that each individual will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants.

DHS estimates that each principal parole applicant will incur the following costs: $1,285 in filing fees to cover the processing costs for the application and biometrics; $306.27 after summing the monetized cost of travel to submit biometrics, the total opportunity costs of time of the initial applications, biometrics, and estimated travel costs, resulting in a total cost of $1,591.27 per application, rounded to $1,591.[84] If DHS receives 2,940 applications from persons eligible to apply, DHS anticipates that such applications will result in annual filing fee transfers of $3,777,900 (undiscounted), which comprise the application fee and cost of submitting biometrics, and opportunity and other burden costs of $900,436 for a total annual cost of $4,678,366. Any subsequent renewal of the parole period will result in costs similar to those previously discussed, with the exceptions of travel costs, since the applicant will not be required to depart the United States and re-enter. Similarly, the same costs will result for material changes requiring the filing of amended applications, with the exception of the travel costs noted above and costs associated with biometrics collections, including the time and travel to an ASC.

---

[79] USCIS calculates its fees to recover the full cost of USCIS operations, including meeting national security, customer service, and adjudicative processing goals. As with other fees, USCIS uses Activity Based Costing (ABC) to assign costs to specific benefit requests. This model uses completion rates (actual or estimated depending on whether the benefit type is already being

adjudicated) to calculate a fee or fee adjustment for a benefit type. A completion rate reflects an average time an adjudicator spends actually working on a case but does not include ''queue'' or wait times. Because parole under this rule has not yet been implemented, the completion rate used is based on a 4-hour estimate provided by USCIS' subject matter experts. At this time, USCIS has estimated that 30 additional staff will be required to satisfy the forecasted workload associated with this rule. However, USCIS requires adjudicators to report actual adjudication hours and case completions by benefit type. This reporting will occur after this rule is implemented. Adjudication hours will be divided by the number of completions for the same time period to determine the *actual* average completion rate. This rate will be used in future fee adjustments and will help determine future staffing allocations necessary to handle the projected workload for parole under this rule.

[80] Please see U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program, National Occupational Employment and Wage Estimates, United States (May 2014), available at: *http://www.bls.gov/oes/ 2014/may/oes_nat.htm.*

[81] Foreign nationals who submit their applications from outside the United States will still be required to pay the $85 biometric processing fee and travel to a USCIS office abroad, if available, or a U.S. embassy or consulate office for biometric processing at the time of travel document issuance. Due to data limitations, and to capture general

impacts of the rule, DHS has estimated costs of submitting biometrics under the assumption that all applicants are traveling to an ASC in the United States.

[82] Calculation: $33.16 * 3.67 hours = $121.68.

[83] Calculation: 50 miles multiplied by $0.575 per mile equals $28.75. See 79 FR 78437 (Dec. 30, 2014) for GSA mileage rate.

[84] Calculation: $1,285 + 306; $1,285 is the sum of the direct cost of the $1,200 filing fee and the $85 cost of biometrics. The $306(rounded) figure is obtained by adding the cost of travel ($28.75) plus the total opportunity cost of $277, the latter of which is the product of the total time burden (8.37 hours) and the average burdened hourly wage ($33.16).

## B. Dependent Spouses and Children

The rule will require all dependent family members (spouses and children) accompanying or joining the entrepreneur to file an Application for Travel Document (Form I–131), and will require all spouses and children 14 years of age through age 79 to submit biometrics.[85] Those spouses and children will face the costs associated with filing the application and submitting biometrics. DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy of time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.59 to estimate the opportunity cost of time for dependent spouses. The value of $10.59 per hour represents the Federal minimum wage with an upward adjustment for benefits.[86] The value of $10.59 per hour is consistent with other DHS rulemakings when estimating time burden costs for those who are not authorized to work.[87]

DHS will require dependents of parole applicants (spouses and children of the parole applicant) to file an Application for Travel Document (Form I–131). There is a $575 filing fee associated with the Form I–131 application, and DHS estimates it will take 3.56 hours to complete each submission. In addition to filing the Form I–131 application, each dependent spouse and child 14 years of age and over will be required to submit biometric information (fingerprints, photograph, and signature) by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics processing fee is $85.00 per applicant. In addition to the $85 biometrics services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity and mileage costs of

traveling to an ASC, and the opportunity cost of submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours.[88] DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[89] DHS has assumed that each applicant will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants. DHS also assumed all children were over the age of 14 for the purposes of this analysis and, therefore, this cost estimate may be slightly overestimated.

DHS projects that approximately 3,234 dependents will be required to file a Form I–131 application and submit biometrics, based on the estimate of 2,940 principal applicants and using a multiplier for expected family members of 1.1.[90] The total cost for those spouses and children requesting parole under this program includes the filing fee, biometrics processing fee, travel costs associated with biometrics processing, and the opportunity cost of filing the Form I–131 application and submitting

biometrics. The total time burden is 7.23 hours. At the cost-burdened wage, the total opportunity cost is $76.53. Adding the $28.75 cost of travel, the total non-filing cost is estimated to be $105.28, and the total cost per applicant is $765.28. At the projection of 3,234 applicants, the non-filing cost is $340,474 (undiscounted), and combined with filing costs of $2,134,440, the total estimated cost for dependents germane to the Form I–131 application is $2,474,914.

In addition, DHS is allowing independent employment authorization for spouses of entrepreneurs granted parole under this rule. DHS will permit these individuals to apply for employment authorization by filing a Form I–765 application. To estimate the number of potential persons applying for employment authorization, DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

The current filing fee for the Form I–765 application is $410.00. The fee is set at a level to recover the processing costs to DHS. Based on the projection of 2,940 applicants, the total filing cost is $1,205,400 (undiscounted). DHS estimates the time burden of completing the Form I–765 application is 3.42 hours.[91] At the cost-burdened wage, the total opportunity cost is $36.20. At the projection of 2,940 applicants, the non-filing cost is $106,430 (undiscounted) and combined with filing costs of $1,205,400 the total estimated cost for spouses germane to the Form I–765 application is $1,311,830.

In addition to the filing costs, applicants for parole may face other costs associated with their entrepreneurial activities. These could include the administrative costs of starting up a business, applying for grants, obtaining various types of licenses and permits, and pursuing qualified investments. However, these costs apply to the entrepreneurial activity and the business activity that the applicant has chosen to be involved in and are not driven by the parole process or other governmental functions attributable to the rule itself. Hence, DHS does not attempt to estimate, quantify, or monetize such costs.

Lastly, DHS recognizes that some individuals who were lawfully admitted in the United States in certain nonimmigrant classifications may seek

---

[85] Note: If a child under the age of 14 requires a travel document, he or she will need to appear for biometrics by traveling to an ASC, but will not be required to pay a biometrics fee.

[86] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009. Available at *http://www.dol.gov/dol/topic/wages/minimumwage.htm.* The calculation for total employer costs for employee compensation for dependent spouses and children of principals with an approved Form I–140: $7.25 per hour × 1.46 = $10.59 per hour.

[87] *See* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[88] DHS has estimated travel distances and ensuing travel times at 2.5 hours in prior rulemakings. *See, e.g.,* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[89] *See* U.S. General Services Administration Web site for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *http://www.gsa.gov/portal/content/100715* (accessed Aug. 8, 2015).

[90] The multiplier of 1.1 was obtained from DHS estimates of the average historical ratio of principal versus dependent recipients of lawful permanent resident status. DHS studies based on statistics obtained from office of Immigration Statistics reveal that multipliers for the employment preference categories EB–1, EB–2, and EB–3 range from 2.04 to 2.27. DHS believes that 2.1. is a reasonable multiplier for the estimates and utilized this multiplier in regulatory assessments involved in American Competitiveness in the Twenty-First Century Act. (AC21) provisions, specifically: "Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers" (RIN 1615–AC05), rule. Because the Form I–131 filings relevant to this rule do not apply to principals, only spouses and dependent children, DHS believes it is valid to subtract 1 from the 2.1 multiplier to yield the final multiplier of 1.1.

[91] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–765 (OMB control number 1615–0040). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201502-1615-004.*

parole. Individuals who are present in the United States at the time their parole application is approved, based on admission as a nonimmigrant, will have to depart the United States and appear at a U.S. port of entry in order to be granted parole since USCIS is unable to grant parole to individuals who are not applicants for admission. *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5). These individuals will be ineligible for a change of status under section 248 of the INA, 8 U.S.C. 1258. Such applicants will therefore bear the travel costs of exit and returning to a port of entry. However, because there are no similar programs for comparison, DHS cannot determine the demand for parole or substitution effects from other classifications and thus cannot estimate, quantify, or monetize such potential travel costs. Finally, because the program allows for re-parole under conditions that DHS has set, entrepreneurs and their spouse and children, if applicable, will likely face filing and opportunity costs associated with applying for re-parole. However, DHS has no means of estimating the share of the potential eligible population that will seek and be eligible for re-parole, hence re-parole conditions are not included in this analysis. In summary, DHS believes that it is possible that there could be some substitution into the parole program from other programs and such applicants and dependents will incur travel and possible other costs related to exit and requesting a grant of parole at a U.S. port of entry.

C. Potential for Negative U.S. Labor Market Impacts

DHS does not expect the rule to generate significant costs or negative consequences. Extensive review of information relevant to immigrant entrepreneurship indicates that while much about the impact of such entrepreneurship is not known, there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers, are likely. The possibility that immigrant entrepreneurs may displace ("crowd-out") native entrepreneurs has been raised by a few researchers. One study indicated that a very small number of native entrepreneurs were possibly displaced by immigrant entrepreneurs.[92] However, because of difficulties in controlling for a large amount of variables related to

entrepreneurship, other researchers have noted that this finding only raises the possibility that displacement could not be ruled out completely, but did not actually provide evidence that it had actually occurred.[93] Another study, conducted by the Brookings Institution, did not find displacement but acknowledged that more research and refined control techniques, along with longitudinal data, will need to be studied before ruling out the possibility completely.[94] In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

DHS recognizes that the potential inclusion of spouses can incur labor market implications and possibly impact U.S. workers. As was noted in previous sections of the regulatory impact analysis, DHS did not attempt to assess or measure the labor market impact of the estimated entrepreneurs potentially eligible for parole because as founders of firms, these persons will not affect the labor market in the same way as other workers. Although spouses could have labor market impacts as new labor market entrants, DHS believes such potential impacts will be negligible. The main reason is that the size of the potential new cohort is very small. As of the end of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[95] Consequently, the estimated "new" available workers in the first year will represent approximately 0.001 percent of the overall U.S. civilian labor force.[96] DHS believes this fraction is too small

to have a significant impact on the labor market.

While the figures above apply to the general U.S. labor force, DHS recognizes that concentration of new labor force entrants can impact specific labor markets. DHS believes that any such potential impacts linked to this rule will be insignificant. The NVCA and other sources of information that DHS reviewed indicates that while the area of California known as Silicon Valley has traditionally been, and continues to be, the primary recipient geographically for technology startup capital, other large urban centers on the East Coast and, even more recently, parts of the Mid- and Mountain West have seen increased technology startup activity. To provide just one example of a potential area-specific impact, DHS considered the San Jose-San Francisco-Oakland (CA) Combined Statistical Area (CSA) conjoining the seven Metropolitan Statistical Areas (MSAs) and nine encompassed counties constituting the economic linkages of Silicon Valley. Based on data from the BLS, the population of this CSA is about 8.6 million (as of May 2014) and the employed population (a narrower measure of the labor market than the labor force) about 3.75 million. If the share of new entrants is based on the proportion of venture capital to the area, which is 42 percent, then 2,746 spousal entrants could impact the area.[97] Assuming such entrants gain employment, this cohort represents just 0.02 percent of the employed population of the specific CSA.

D. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of the Form I–941 application based on notional application filing volumes and estimated resource commitments. During the biennial fee review, DHS

---

[92] Fairlie, R.W., and B.D. Meyer, *The effect of immigration on native self-employment*, Journal of Labor Economics 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf*.

[93] *See* Magnus Lofstrom, *Immigrants and Entrepreneurship*, Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf*.

[94] *See* Zoltan J. Acs and David M. Hart, *Immigration and High-Impact, High-Tech Entrepreneurship*, Brookings, Issues in Technological innovation (Feb. 2011), available at *http://www.brookings.edu/research/papers/2011/02/immigration-hart-acs*.

[95] *See* News Release, United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment–2015 Annual Averages, Table 1 "Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages" (Mar. 24, 2016), available at *http://www.bls.gov/news.release/pdf/srgune.pdf*.

[96] Source: United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistic. Figure applies to seasonally adjusted level for December 2014, available at: *http://data.bls.gov/timeseries/LNS11000000*. Calculation for new worker labor force share: 1813/157,130,000.

[97] The employment figures are provided by the BLS, Occupational Employment Statistics (OES), found at: *http://www.bls.gov/oes/current/oes_42100.htm*. The population data is provided by the Census Bureau, which tabulates CSAs: "Combined Statistical Area Totals Dataset: Population and Estimated Components of Change: April 1, 2010 to July 1, 2014" (CSV), 2014 Population Estimates. United States Census Bureau, Population Division. March 2015. The information on the venture capital share for the region is found in the NVCA 2015 yearbook, and is found in figure 8, p. 14. The calculation is as follows: (.42 ×1813) = 761, which is then divided by the CSA population of 3,750,000.

will examine whether the fee is sufficient to recover the full costs of adjudication, as required by the INA.

5. Benefits

As referenced previously, evidence suggests that innovation-focused start-ups contribute disproportionately to job creation. The rule will reduce entry barriers, and thus support efforts by international entrepreneurs to generate entrepreneurial activity in the United States.

The rule is expected to generate important net benefits to the U.S. economy. For one, expenditures on research and development by the grant-based researchers that DHS has identified that could qualify for entrepreneur parole will generate direct and indirect jobs. In addition, this research-focused spending could potentially generate patents, intellectual property, licensing, and other intangible assets that can be expected to contribute to innovation and technological advances and spill over into other sectors of the overall economy. DHS acknowledges that it is extremely difficult to gauge the precise economic value of such assets and that peer-reviewed research in this area is still nascent. Despite the nascent stage of the research and the difficulty of measuring quantitatively the benefit of innovation driven by new high technology firms, a large body of research indicates that the innovation driven by entrepreneurs contributes directly to economic growth, generates important efficiencies and cost reductions for firms that utilize such innovation, and increases productivity and profitability for firms that benefit indirectly through new products generated by such innovation.

Lastly, DHS believes that many of the start-up firms operated by international entrepreneurs during the parole period could eventually become high-growth firms that generate exceptionally high levels of economic activity and contribute disproportionately to job creation in the United States.

*D. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601(6), DHS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people).

In the proposed rule, DHS certified that this rule would not have a significant impact on a substantial number of small entities. DHS made this determination based on the following facts: This is not a mandatory rule; this rule only impacts those individual entrepreneurs who make the voluntary decision to apply for parole; and this rule does not regulate the business entities in any way. After reviewing public comments, including the formal letter submitted on the record by the U.S. Small Business Administration's Office of Advocacy (Advocacy), DHS maintains its certification that the rule does impose a significant impact on a substantial number of small entities. For a full discussion of the DHS response to the letter submitted by Advocacy, please see Section III.M.4 of this preamble.

Individuals are not defined as a "small entity" by the RFA. The rule will not mandate that all individuals apply for parole. This rule provides flexibilities and options that do not currently exist for individuals who wish to establish or operate a start-up business in the United States. Importantly, the rule does not require any individuals or businesses, including those created by foreign nationals, to seek parole—either generally or as a specific condition for establishing or operating a business in the United States. Rather, as mentioned previously, this rule is intended to provide an additional flexibility for foreign individuals who are unable to obtain another appropriate nonimmigrant or immigrant classification, in order to facilitate the applicant's ability to oversee and grow the start-up entity. If any individual believes this rule imposes a significant economic impact, that individual could simply choose not to seek parole under the rule and thus incur no economic impact. As discussed previously, this rule imposes direct filing costs of $1,285 (which includes the $1,200 application fee and the $85 biometrics fee), plus $194 in time-related opportunity costs for those individuals who do choose to apply for parole as entrepreneurs under the rule. This cost is relatively minor when considering the costs of starting up a new business and the capital necessary to start a business.

Under the general term "entrepreneur," DHS includes those who desire to form firms with investment funds from certain U.S. investors. For purposes of the RFA, the regulatory requirements place compliance costs and establish eligibility criteria for the individual requesting consideration for parole under this rule. DHS believes that the costs of application for parole will burden the individual applicant, and not the entrepreneurial venture (firm). This rule will not alter or change the normal procedure for fundraising or other start-up administrative costs that occur in forming a business entity. Such costs are not direct costs of this rule and could include, but are not limited to, business application fees, legal fees, and licensing that precede significant infusions of investment, the latter of which are primarily utilized for operational and capital expenses in order to produce goods or services.

It is possible that some of the 2,940 estimated entrepreneurs who could be eligible for parole annually could involve business structures in which the filing fees are paid by a business entity. In the event that small business entities are impacted by this rule because they choose to pay the filing fees on behalf of an individual entrepreneur, DHS believes that the filing cost of $1,285 per application will be insignificant compared to such entities' annual gross revenues, potential for revenue, and other economic activity.

For businesses that may pay the filing costs, the expected impact to such businesses will be small. For businesses that utilize either the minimum threshold of $100,000 for a qualifying government grant or award or $250,000 in capital investment to source the filing costs, such costs will constitute 1.3 percent and 0.4 percent, respectively, of the total capital amount. These relatively low cost proportions apply to those firms that only obtain the minimum investment amounts and have no other source of funding or revenues. In addition, DHS analyzed the cost impact relative to more typical RFA indices. DHS analysis of Census Bureau data on the smallest firms found that the average revenue based on sales receipts for firms with no paid employees is $309,000, while the average for firms with one to four paid employees is $411,000.[98] The filing cost relative to these averages is 0.42 percent and 0.31 percent, respectively.

DHS also analyzed the average revenue for new firms. Since the rule defines a new firm as one that is less than five years old at the time the initial parole application is filed, DHS grouped private sector firms for the 2012 survey as those responding that the year of

---

[98] The data utilized for the analysis are found in the SBO Table SB1200CSA09, "Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012, 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/ 2012-sbo.html*. The file location is: *http:// factfinder.census.gov/faces/tableservices/jsf/pages/ productreview.xhtml?pid=SBO_2012_ 00CSA09&prodType=table*. The figures are rounded from $309,279 and $410,900, respectively.

establishment was either 2012, 2011, 2010, 2009, or 2008. DHS obtained the average revenue per firm and then weighted the average by the yearly proportion of firms. Based on the resulting weighted average of $162,000, such new firms will face a filing-cost burden of 0.8 percent.[99] DHS notes that there is a large difference between the revenue of new firms with paid employees and those without such employees (*i.e.,* sole proprietors). For the latter, average revenues are about $34,000, and the cost burden will be 3.8 percent. However, because a central component of this parole program requires a demonstration of significant public benefit in the form of economic activity and job growth, DHS does not anticipate that sole proprietors will be eligible to participate in this program.

In summary, DHS believes that per-applicant costs will be primarily incurred by the individual (which is not covered by the RFA), any direct cost due to this rule will be relatively minor, and these costs will only be borne by those who voluntarily choose to apply for parole under this rule. While the applicant for parole may be the owner of a firm that could be considered small within the definition of small entities established by 5 U.S.C. 601(6), DHS considers the applicants to be individuals at the point in time they are applying for parole, particularly since it is the individual and not the entity that files the application and it is the individual whose parole must provide a significant public benefit under this rule. Furthermore, even if firms do voluntarily decide to incur the compliance costs on behalf of the individual requesting consideration for parole under this rule, the only compliance costs those businesses will be permitted to incur will be the filing costs for the applications. As indicated previously, based on the comparison metric used, those costs are expected to be insignificant.

Based on the evidence presented in this RFA section and throughout this preamble, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

---

[99] The data utilized for the analysis are found in the SBO Table SB1200CSCB11, "Statistics for All U.S. Firms by Year the Business Was Originally Established or Self-Employment Activity Begun by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2012: 2012 Survey of Business Owners: *http://census.gov/library/publications/ 2012/econ/2012-sbo.html.* The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/ pages/productview.xhtml?pid=SBO_2012_ 00CSCB11&prodType=table.* The average revenue figure is rounded from $162,293.

### E. National Environmental Policy Act

DHS Directive (Dir) 023–01 Rev. 01 establishes the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA. 40 CFR parts 1500 through 1508.

The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Directive 023–01 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Dir. 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Directive 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

DHS analyzed this action and does not consider it to significantly affect the quality of the human environment. This rule provides criteria and procedures for applying the Secretary's existing statutory parole authority to entrepreneurs in a manner to assure consistency in case-by-case adjudications. DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within two categorical exclusions under DHS Directive 023– 01 Rev. 01, Appendix A, Table 1. Specifically, the rule fits within Categorical Exclusion number A3(a) for rules strictly of an administrative or procedural nature and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Fewer than 3,000 individuals, an insignificant number in the context of the population of the United States, are projected to receive parole through this program. Furthermore, any ventures will be governed by local, state and federal laws and regulations, including those protecting the human health and the environment. Therefore, this rule is categorically excluded from further NEPA review.

### F. Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule involves a new information collection and makes revisions to the existing information collections as follows:

Overview of Information Collection, Application for Entrepreneur Parole, Form I–941

This final rule requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941, and is considered a new information collection under the PRA. USCIS did receive one comment regarding the time burden of this form and, upon review of the work involved to review the form, gather necessary information to support the submission, and the time required to complete and submit the form, USCIS has revised the estimated hour burden per response to 4.7 hours.

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals, other than those filing an application on the basis of a material change, are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole, Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Businesses and other for profit; Not-for-profit Institutions.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 4.7 hours; the estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 17,258 hours.

Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013

DHS is revising this collection by including spouses and children seeking parole on the basis of an entrepreneur parolee.

In addition to revising the form and form instructions, DHS is revising the estimate of total burden hours has increased due to the addition of this new population of Application for Travel Document, Form I–131, filers, and the increase of burden hours associated with the collection of biometrics from these applicants.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document, Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document, Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 594,324.

The total number of respondents includes the additional population of 3,234 individuals as estimated previously in the analysis in Section IV.C.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.9 hours; the estimated hour burden per response for the biometric processing is 1.17 hours; the estimated hour burden per response for the passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 1,372,928 hours.

Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047

In accordance with new 8 CFR 274a.2(b)(1)(v)(A)(*5*), DHS is revising the Employment Eligibility Verification, Form I–9, Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2). With these changes the acceptable List A document is described as the following: For an individual authorized to work for a specific employer because of his or her status or parole, a foreign passport and Form I–94 (or Form I–94A) that has the same name as the passport and has an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole. DHS is also updating the Lists of Acceptable Documents, List C so that the most current version of the certification or report of birth issued by the Department of State is acceptable for Form I–9.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection:* Employment Eligibility Verification.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Business or other for-profit; Individuals or households; State, local or Tribal Government.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals. (The total number of responses will be only 78 million responses. Each response involves an employer and an individual who is being hired.)

g. *Hours per response:*
• Time Burden for Employees—20 minutes (.33 hours) total;
• Time Burden for Employers—10 minutes (.17 hours) total;
• Time Burden for Recordkeeping—5 minutes (.08 hours) total

h. *Total Annual Reporting Burden:* Approximately 40,600,000 total annual burden hours.

Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040

DHS is making minor revisions to the form instructions to reflect changes made by this final rule that allow spouses of an entrepreneur parolee to request employment authorization.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization, specifically a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 2,139,523.

This total represents the aggregate estimate for this information collection, to include the additional estimate of 2,940 respondents under this rule.

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42 hours; the estimated hour burden per response for biometric processing is 1.17 hours; the estimated hour burden per response for Form I–765 WS is .5 hours; the estimated hour burden per response for passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 8,985,859 hours.

### Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change.

### List of Subjects

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

### PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(KKK) to read as follows:

### § 103.7   Fees.

\*      \*      \*      \*      \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) \*  \*  \*

(KKK) *Application for Entrepreneur Parole (Form I–941).* For filing an application for parole for entrepreneurs: $1200.

\*      \*      \*      \*      \*

### PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Add § 212.19 to read as follows:

### § 212.19   Parole for entrepreneurs.

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Entrepreneur* means an alien who possesses a substantial ownership interest in a start-up entity and has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. For purposes of this section, an alien may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. During the period of initial parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of initial parole, maintain at least a 5 percent ownership interest in the entity. During the period of re-parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of parole, maintain an ownership interest in the entity.

(2) *Start-up entity* means a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. An entity that is the basis for a request for parole under this section may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the alien's initial parole request. For

purposes of paragraphs (a)(3) and (5) of this section, an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

(3) *Qualified government award or grant* means an award or grant for economic development, research and development, or job creation (or other similar monetary award typically given to start-up entities) made by a federal, state, or local government entity (not including foreign government entities) that regularly provides such awards or grants to start-up entities. This definition excludes any contractual commitment for goods or services.

(4) *Qualified investment* means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of its equity, convertible debt, or other security convertible into its equity commonly used in financing transactions within such entity's industry. Such an investment shall not include an investment, directly or indirectly, from the entrepreneur; the parents, spouse, brother, sister, son, or daughter of such entrepreneur; or any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest.

(5) *Qualified investor* means an individual who is a U.S. citizen or lawful permanent resident of the United States, or an organization that is located in the United States and operates through a legal entity organized under the laws of the United States or any state, that is majority owned and controlled, directly and indirectly, by U.S. citizens or lawful permanent residents of the United States, provided such individual or organization regularly makes substantial investments in start-up entities that subsequently exhibit substantial growth in terms of revenue generation or job creation. The term "qualified investor" shall not include an individual or organization that has been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with any entity involved in the offer or sale of securities or provision of such

services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years:

(i) The individual or organization made investments in start-up entities in exchange for equity, convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000; and

(ii) Subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent.

(6) *Qualified job* means full-time employment located in the United States that has been filled for at least 1 year by one or more qualifying employees.

(7) *Qualifying employee* means a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. This definition shall not include independent contractors.

(8) *Full-time employment* means paid employment in a position that requires a minimum of 35 working hours per week. This definition does not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

(9) *U.S. business entity* means any corporation, limited liability company, partnership, or other entity that is organized under federal law or the laws of any state, and that conducts business in the United States, that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments.

(10) *Material change* means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination

concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity.

(b) *Initial parole*—(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file an Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for parole under this section if the alien demonstrates that a grant of parole will provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (b)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien is an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity is a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received, within 18 months immediately preceding the filing of an application for initial parole, a qualified investment amount of at least $250,000 from one or more qualified investors; or

(*2*) Received, within 18 months immediately preceding the filing of an application for initial parole, an amount of at least $100,000 through one or more qualified government awards or grants.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (b)(2)(ii)(A) of this section and partially meets one or both of the criteria in paragraph (b)(2)(ii)(B) of this section may alternatively meet the standard described in paragraph (b)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(c) *Additional periods of parole*—(1) *Filing of re-parole request form.* Prior to the expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file the Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for re-parole under this section if the alien demonstrates that a grant of parole will continue to provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (c)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien continues to be an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity continues to be a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period;

(*2*) Created at least 5 qualified jobs with the start-up entity during the initial parole period; or

(*3*) Reached at least $500,000 in annual revenue in the United States and averaged 20 percent in annual revenue growth during the initial parole period.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (c)(2)(ii)(A) of this section and partially meets one or more of the criteria in paragraph (c)(2)(ii)(B) of this section may alternatively meet the standard

described in paragraph (c)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(d) *Discretionary authority; decision; appeals and motions to reopen*—(1) *Discretionary authority.* DHS may grant parole under this section in its sole discretion on a case-by-case basis if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. In determining whether an alien's presence in the United States will provide a significant public benefit and whether the alien warrants a favorable exercise of discretion, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to, evidence of criminal activity or national security concerns.

(2) *Initial parole.* DHS may grant an initial period of parole based on the start-up entity listed in the request for parole for a period of up to 30 months from the date the individual is initially paroled into the United States. Approval by USCIS of such a request must be obtained before the alien may appear at a port of entry to be granted parole, in lieu of admission.

(3) *Re-parole.* DHS may re-parole an entrepreneur for one additional period of up to 30 months from the date of the expiration of the initial parole period. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval shall be considered a grant of re-parole. If the alien is outside the United States at the time that USCIS approves the request for re-parole, the alien must appear at a port of entry to be granted parole, in lieu of admission.

(4) *Appeals and motions to reopen.* There is no appeal from a denial of parole under this section. USCIS will not consider a motion to reopen or reconsider a denial of parole under this section. On its own motion, USCIS may reopen or reconsider a decision to deny the Application for Entrepreneur Parole (Form I–941), in accordance with 8 CFR 103.5(a)(5).

(e) *Payment of biometric services fee and collection of biometric information.* An alien seeking parole or re-parole under this section will be required to pay the biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C). An alien seeking an initial grant of parole will be required to submit biometric information. An alien seeking

re-parole may be required to submit biometric information.

(f) *Limitations.* No more than three entrepreneurs may be granted parole under this section based on the same start-up entity. An alien shall not receive more than one initial grant of entrepreneur parole or more than one additional grant of entrepreneur re-parole based on the same start-up entity, for a maximum period of parole of five years.

(g) *Employment authorization.* An entrepreneur who is paroled into the United States pursuant to this section is authorized for employment with the start-up entity incident to the conditions of his or her parole.

(h) *Spouse and children.* (1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file an Application for Travel Document (Form I–131). Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. A biometric services fee is required to be filed with the application. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

(2) The spouse and children of an entrepreneur granted parole under this section may be granted parole under this section for no longer than the period of parole granted to such entrepreneur.

(3) The spouse of the entrepreneur parolee, after being paroled into the United States, may be eligible for employment authorization on the basis of parole under this section. To request employment authorization, an eligible spouse paroled into the United States must file an Application for Employment Authorization (Form I–765), in accordance with 8 CFR 274a.13 and form instructions. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship.

(4) Notwithstanding 8 CFR 274a.12(c)(11), a child of the entrepreneur parolee may not be authorized for and may not accept employment on the basis of parole under this section.

(i) *Conditions on parole.* As a condition of parole under this section, a parolee must maintain household income that is greater than 400 percent of the federal poverty line for his or her household size as defined by the Department of Health and Human Services. USCIS may impose other such

reasonable conditions in its sole discretion with respect to any alien approved for parole under this section, and it may request verification of the parolee's compliance with any such condition at any time. Violation of any condition of parole may lead to termination of the parole in accordance with paragraph (k) of this section or denial of re-parole.

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee (not including any biometric fees), in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

(k) *Termination of parole*—(1) *In general.* DHS, in its discretion, may terminate parole granted under this section at any time and without prior notice or opportunity to respond if it determines that the alien's continued parole in the United States no longer provides a significant public benefit. Alternatively, DHS, in its discretion, may provide the alien notice and an opportunity to respond prior to terminating the alien's parole under this section.

(2) *Automatic termination.* Parole granted under this section will be automatically terminated without notice upon the expiration of the time for which parole was authorized, unless the alien timely files a non-frivolous application for re-parole. Parole granted under this section may be automatically terminated when USCIS receives written notice from the entrepreneur parolee that he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity in accordance with paragraph (j) of this section. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. If parole is terminated, any employment authorization based on that parole is automatically revoked.

(3) *Termination on notice.* USCIS may terminate on notice or provide the entrepreneur or his or her spouse or children, as applicable, written notice of

its intent to terminate parole if USCIS believes that:

(i) The facts or information contained in the request for parole were not true and accurate;

(ii) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(iii) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity;

(iv) The alien otherwise violated the terms and conditions of parole; or

(v) Parole was erroneously granted.

(4) *Notice and decision.* A notice of intent to terminate issued under this paragraph should generally identify the grounds for termination of the parole and provide a period of up to 30 days for the alien's written rebuttal. The alien may submit additional evidence in support of his or her rebuttal, when applicable, and USCIS will consider all relevant evidence presented in deciding whether to terminate the alien's parole. Failure to timely respond to a notice of intent to terminate will result in termination of the parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. Any further immigration and removal actions will be conducted in accordance with the Act and this chapter. The decision to terminate parole may not be appealed. USCIS will not consider a motion to reopen or reconsider a decision to terminate parole under this section. On its own motion, USCIS may reopen or reconsider a decision to terminate.

(l) *Increase of investment and revenue amount requirements.* The investment and revenue amounts in this section will be automatically adjusted every 3 years by the Consumer Price Index and posted on the USCIS Web site at *www.uscis.gov.* Investment and revenue amounts adjusted under this paragraph will apply to all applications filed on or after the beginning of the fiscal year for which the adjustment is made.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Section 274a.2 is amended by:

■ a. Revising paragraphs (b)(1)(v)(A)(*5*) and (b)(1)(v)(C)(*2*);

■ b. Removing paragraph (b)(1)(v)(C)(*3*); and

■ c. Redesignating paragraphs (b)(1)(v)(C)(*4*) through (*8*) as paragraphs (b)(1)(v)(C)(*3*) through (*7*).

The revisions read as follows:

### § 274a.2  Verification of identity and employment authorization.

\*    \*    \*    \*    \*

(b) \*  \*  \*
(1) \*  \*  \*
(v) \*  \*  \*
(A) \*  \*  \*

(*5*) In the case of an individual who is employment-authorized incident to status or parole with a specific employer, a foreign passport with an Arrival/Departure Record, Form I–94 (as defined in 8 CFR 1.4) or Form I–94A, bearing the same name as the passport and containing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole;

\*    \*    \*    \*    \*

(C) \*  \*  \*

(*2*) Certification or report of birth issued by the Department of State, including Forms FS–545, DS–1350, FS–240;

\*    \*    \*    \*    \*

■ 7. Section 274a.12 is amended by:

■ a. Revising paragraph (b) introductory text;

■ b. Removing the word ''or'' at the end of paragraph (b)(24);

■ c. Removing the period at the end of paragraph (b)(25) and adding ''; or'' in its place;

■ d. Adding and reserving paragraphs (b)(26) through (36);

■ e. Adding paragraph (b)(37);

■ f. Revising paragraph (c)(11); and

■ g. Adding paragraph (c)(34).

The revisions and additions read as follows:

### § 274a.12  Classes of aliens authorized to accept employment.

\*    \*    \*    \*    \*

(b) *Aliens authorized for employment with a specific employer incident to*

*status or parole.* The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

\*    \*    \*    \*    \*

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240-day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) \*  \*  \*

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

\*    \*    \*    \*    \*

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

Jeh Charles Johnson,
*Secretary of Homeland Security.*
[FR Doc. 2017–00481 Filed 1–13–17; 8:45 am]
**BILLING CODE 9111–97–P**

# Rules and Regulations

**Federal Register**

Vol. 82, No. 131

Tuesday, July 11, 2017

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, under the heading which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

# DEPARTMENT OF HOMELAND SECURITY

## 8 CFR Parts 103, 212 and 274a

[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]

**RIN 1615–AC04**

## International Entrepreneur Rule: Delay of Effective Date

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.
**ACTION:** Final rule with request for comment; delay of effective date.

**SUMMARY:** The Department of Homeland Security (DHS) is temporarily delaying the effective date of the International Entrepreneur Final Rule (82 FR 5238). This delay will provide DHS with an opportunity to obtain comments from the public regarding a proposal to rescind the rule pursuant to Executive Order (E.O.) 13767, "Border Security and Immigration Enforcement Improvements."

**DATES:** The effective date of the regulation entitled International Entrepreneur Rule, published in the **Federal Register** on January 17, 2017, 82 FR 5238, is delayed from July 17, 2017 to March 14, 2018, except for amendatory instruction 6.a revising 8 CFR 274a.2(b)(1)(v)(C)(2), which will go into effect on July 17, 2017. Written comments must be received on or before August 10, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2015–0006, by any one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail:* You may submit comments directly to U.S. Citizenship and Immigration Services (USCIS) by sending correspondence to Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy

and Strategy, UCSIS, DHS, 20 Massachusetts Avenue NW., Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS–2015–0006 in your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, USCIS, DHS, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; telephone (202) 272–8377.
**SUPPLEMENTARY INFORMATION:**

## I. Background

On August 31, 2016, the Department of Homeland Security (DHS or Department), U.S. Citizenship and Immigration Services (USCIS) published the International Entrepreneur Notice of Proposed Rulemaking in the **Federal Register**. See 81 FR 60129. On January 17, 2017, DHS published the International Entrepreneur Final Rule (the IE Final Rule) in the **Federal Register**. The effective date is July 17, 2017. *See* 82 FR 5238.

The IE Final Rule amended DHS regulations to include criteria that would guide the implementation of the Secretary of Homeland Security's discretionary case-by-case parole authority as applied to international entrepreneurs. Specifically, it applied to international entrepreneurs who can demonstrate that their parole into the United States under section 212(d)(5) of the Immigration and Nationality Act (INA) would provide a significant public benefit to the United States. In accordance with the final rule's criteria, such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. In addition to defining criteria for the favorable exercise of the Secretary's discretionary parole authority, the IE Final Rule established a period of initial parole stay of up to 30 months (which may be extended by up to an additional 30 months) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States.

On January 25, 2017, the President issued Executive Order (E.O.) 13767,

*Border Security and Immigration Enforcement Improvements,* prescribing improvements to border security and immigration enforcement. *See* 82 FR 8793 (Jan. 25, 2017). Section 11(d) of the E.O. requires the DHS Secretary to "take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole."

After review of E.O. 13767, DHS decided to delay the effective date of the IE Final Rule, to further consider it in light of E.O. 13767. The new effective date for the IE Final Rule, with one minor exception, is March 14, 2018. Additionally, DHS will issue a Notice of Proposed Rulemaking soliciting public comments on the proposal to rescind the IE Final Rule. The delayed effective date will provide an opportunity for the notice and comment rulemaking to take place.

As indicated above, DHS is not delaying the effective date with respect to one provision in the IE Final Rule. In the IE Final Rule, DHS revised 8 CFR 274a.2(b)(1)(v)(C)(2) to add the Department of State Consular Report of Birth Abroad (Form FS–240) to the regulatory text and to the "List C" listing of acceptable documents for Form I–9 verification purposes. *See* 82 FR 5238, 5241 & n.3. As part of the IE Final Rule, DHS also revised the accompanying form instructions to reflect this change. As this provision is unrelated to entrepreneur parole under the IE Final Rule, this one provision will go into effect on July 17, 2017, as originally provided.

## II. Administrative Procedure Act

The Administrative Procedure Act (APA) authorizes agencies to issue a rule without notice and comment upon a showing of good cause. 5 U.S.C. 553(b)(B). The APA's good cause exception to public participation applies upon a finding that those procedures are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B).

DHS has good cause to forego notice and comment rulemaking to delay the effective date for the implementing provisions of the IE Final Rule, because

notice and comment rulemaking would be contrary to the public interest. For the same reason, DHS has good cause to dispense with the 30-day delayed effective date. DHS, however, is nevertheless soliciting post-promulgation public comments on the decision to delay the IE Final Rule.

Undertaking notice and comment rulemaking to delay the IE Final Rule is contrary to the public interest for multiple reasons. If DHS does not delay the effective date immediately, USCIS would be required to expend limited agency resources to implement the IE Final Rule. Those resources are otherwise needed for USCIS to effectively and efficiently carry out its many existing immigration benefit programs facilitating lawful migration into United States. For example, implementing the program would require USCIS to establish a new business line for the processing of entrepreneur parole applications, hiring and training additional adjudicators, modifying intake and case management information technology systems, modifying application and fee intake contracts, developing guidance for the adjudicators, and communicating with the public. Given that DHS will be proposing to rescind the IE final rule, and may ultimately eliminate the program, the expenditure of these resources is unlikely to ever be recouped from filing fees under the new program. USCIS derives approximately 96 percent of its operating budget from fees, and would be required to absorb the costs of the IE program within its existing operating budget, possibly impacting efficiency and effectiveness in other programs. An inefficient use of limited resources is not conducive to the security and economic interests of the United States. Therefore, it is necessary for DHS to immediately suspend the effective date of the IE Final Rule.

Undertaking notice and comment rulemaking to delay the IE Final Rule while DHS considers rescinding the rule also would be contrary to the public interest for other reasons: doing so would sow confusion and would likely cause the waste of resources by multiple stakeholders with interests in this rulemaking. *See generally Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C. Cir. 1987) (observing that exceptions to notice and comment, although construed narrowly, are designed for "situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in

expense") (quotation marks omitted). Courts have found "good cause" under the APA when an agency is moving expeditiously to eliminate uncertainty or confusion that, if left to linger, could cause tangible harm or hardship to the agency, the program, program users, or other members of the public. *See Mid-Tex Elec. Coop. v. FERC,* 822 F.2d 1123, 1133–34 (D.C. Cir. 1987) (agency had good cause to promote continuity and prevent "irremedial financial consequences" and 'regulatory confusion").

Allowing the IE Final rule to go into effect while the agency undertakes notice and comment rulemaking to delay its effective date in order to consider a rescission would lead the public to continue to rely on the rule. Such reliance would include expending significant effort and resources in order to establish eligibility under the criteria promulgated by the IE Final Rule. These criteria include establishing a start-up entity in the United States and demonstrating that the entity has secured significant U.S. capital investment or government funding. In the event the IE Final Rule is rescinded—which the Department believes is highly likely—individuals who satisfied these and other requirements of the IE Final Rule would quite possibly do so without being able to reap benefits from the rule. Therefore, providing notice and comment in this case is contrary to public interest.

## III. Executive Order 12866, Regulatory Planning and Review

This rule is not "significant" under E.O. 12866, *Regulatory Planning and Review.*

## IV. Paperwork Reduction Act

DHS is delaying the effective date for all proposed changes to the Form I–131, I–765, and I–941, from July 17, 2017, to March 14, 2018. Proposed changes to the Form I–9, with the exception to those changes specific to IE parole, will be effective July 17, 2017.

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule involves a new information collection and makes revisions to the existing information collections as follows:

*A. Overview of Information Collection, Application for Entrepreneur Parole, Form I–941*

The IE Final Rule published on January 17, 2017, requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941 which is a new information collection under the PRA. USCIS did receive one comment regarding the time burden of this form and, upon review of the work involved to review the form, gather necessary information to support the submission, and the time required to complete and submit the form, USCIS revised the estimated hour burden per response to 4.7 hours. The Form I–941 is being delayed until March 14, 2018.

a. *Type of information collection:* New information collection.

b. *Abstract:* If implemented, this collection would be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and new 8 CFR 212.19. Such individuals, other than those filing an application on the basis of a material change, would be subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole, Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Businesses and other for profit; Not-for-profit Institutions.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 4.7 hours; the estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 17,258 hours.

*B. Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013*

The IE Final Rule published by DHS on January 17, 2017 revised this information collection (*i.e.* Form I–131) by including spouses and children seeking parole on the basis of an entrepreneur parolee.

In addition to revising the form and form instructions, the IE Final Rule revised the estimate of total burden

hours which had increased due to the addition of this new population of Application for Travel Document, Form I–131, filers, and the increase of burden hours associated with the collection of biometrics from these applicants. The changes made to Form I–131 are being delayed until March 14, 2018.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* If implemented, this collection would be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and new 8 CFR 212.19. Such individuals would be subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document, Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document, Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 594,324.

The total number of respondents includes the additional population of 3,234 individuals as estimated previously in the analysis in Section IV.C.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.9 hours; the estimated hour burden per response for the biometric processing is 1.17 hours; the estimated hour burden per response for the passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 1,372,928 hours.

*C. Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047*

In accordance with revised 8 CFR 274a.2(b)(1)(v)(C)(2), the IE Final Rule published on January 17, 2017 updated the Employment Eligibility Verification (Form I–9) Lists of Acceptable Documents, List C and the Document Title table to reflect the most current version of the certification or report of birth issued by the Department of State, Form FS–240 Consular Report of Birth Abroad. DHS also made clarifying changes in the form instructions by removing "the end of" when describing the day on which Form I–9 completion is required and revising the Office of

Special Counsel for Immigration-Related Unfair employment Practices to its new name of Immigrant and Employee Rights Section (IER) in the Department of Justice's Civil Rights Division. These changes to the Form I–9 will go into effect on July 17, 2017 as currently scheduled.

The changes made to Form I–9 and instructions associated with new 8 CFR 274a.2(b)(1)(v)(A)(5, promulgated by the IE Final Rule are being delayed until March 14, 2018. Those changes concern the acceptable List A document described as the following: for an individual authorized to work for a specific employer because of his or her status or parole, a foreign passport and Form I–94 (or Form I–94A) that has the same name as the passport and has an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole. Specific changes to the form that are being delayed until March 14, 2018 also include revisions to the Form I–9 Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2).

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection: Employment Eligibility Verification.*

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Business or other for-profit; Individuals or households; State, local or Tribal Government.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals. (The total number of responses will be only 78 million responses. Each

response involves an employer and an individual who is being hired.)

g. *Hours per response:*
☐ Time Burden for Employees—10 minutes (.17 hours) total;
☐ Time Burden for Employers—20 minutes (.33 hours) total;
☐ Time Burden for Recordkeeping—5 minutes (.08 hours) total.

h. *Total Annual Reporting Burden:* approximately 40,600,000 total annual burden hours.

*D. Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040*

The IE Final Rule published on January 17, 2017 made minor revisions to the form instructions to reflect changes made by that rule that allow spouses of an entrepreneur parolee to request employment authorization. Those changes to Form I–765 are being delayed until March 14, 2018.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* If implemented, this collection would be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and new 8 CFR 212.19. Such individuals would be subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization, specifically a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 2,139,523.

This total represents the aggregate estimate for this information collection, to include the additional estimate of 2,940 respondents under this rule.

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42

hours; the estimated hour burden per
response for biometric processing is
1.17 hours; the estimated hour burden
per response for Form I–765 WS is .5
hours; the estimated hour burden per
response for passport-style photographs
is .5 hours.

h. *Total Annual Reporting Burden:*
The total estimated annual hour burden
associated with this collection is
8,985,859 hours.

**John F. Kelly,**

*Secretary.*

[FR Doc. 2017–14619 Filed 7–10–17; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF ENERGY**

**10 CFR Parts 429 and 431**

**[EERE–2014–BT–TP–0054]**

**RIN 1904–AD43**

**Energy Conservation Program: Test
Procedures for Compressors**

**AGENCY:** Office of Energy Efficiency and
Renewable Energy, Department of
Energy.

**ACTION:** Request for information (RFI).

**SUMMARY:** On January 4, 2017, the U.S.
Department of Energy ("DOE")
published a final rule establishing new
test procedures for certain varieties of
compressors. The final rule established
definitions, materials incorporated by
reference, sampling plans,
representations requirements,
enforcement provisions and test
procedures for certain varieties of
compressors. Since that time, DOE has
received correspondence, raising
concerns that certain issues and
information may not have been fully
considered during the original
rulemaking proceeding and also
indicating further clarification may be
needed to implement the rule as
adopted. As a result, by this RFI, DOE
is soliciting further data and
information regarding the compressor
test procedure and announcing that
DOE will not seek to enforce the test
procedure rule for 180 days (*i.e.,* until
December 30, 2017) while it considers
the data and information already
submitted and any further material
submitted in response to this request for
information.

**DATES:** Comments: DOE will accept
comments, data, and information
regarding this RFI until September 11,
2017.

**ADDRESSES:** Interested parties are
encouraged to submit comments using
the Federal eRulemaking Portal at

*www.regulations.gov.* Any comments
submitted must identify the request for
information concerning the test
procedures for compressors. You may
submit comments, identified by Docket
Number, EERE–2014–BT–TP–0054, by
any of the following methods:

• *Federal eRulemaking Portal: http://
www.regulations.gov.* Follow the
instructions for submitting comments.
• *Email:*
*AirCompressors2014TP0054@
ee.doe.gov.* Include the docket number,
EERE–2014–BT–TP–0054 in the subject
line of the message. Submit electronic
comments in WordPerfect, Microsoft
Word, PDF, or ASCII file format, and
avoid the use of special characters or
any form of encryption.

• *Postal Mail:* Appliance Standards
Program, U.S. Department of Energy,
Building Technologies Office, Mailstop
EE–5B, Compressor TP RFI Docket
Number: EERE–2014–BT–TP–0054,
1000 Independence Avenue SW.,
Washington, DC 20585–0121.
Telephone: (202) 585–6636. If possible,
please submit all items on a compact
disc (CD), in which case it is not
necessary to include printed copies.

• *Hand Delivery/Courier:* Appliance
and Equipment Standards Program, U.S.
Department of Energy, Building
Technologies Office, 950 L'Enfant Plaza
SW., 6th Floor, Washington, DC 20024.
Telephone: (202) 585–6636. If possible,
please submit all items on a CD, in
which case it is not necessary to include
printed copies.

No telefacsimiles (faxes) will be
accepted. For detailed instructions on
submitting comments and additional
information on the rulemaking process,
see section II of this document (Public
Participation).

**FOR FURTHER INFORMATION CONTACT:** Mr.
James Raba, U.S. Department of Energy,
Office of Energy Efficiency and
Renewable Energy, Building
Technologies Office, EE–5B, 1000
Independence Avenue SW.,
Washington, DC 20585–0121.
Telephone: (202) 585–8654. Email:
*ApplianceStandardsQuestions@
ee.doe.gov.*

Ms. Mary Greene, U.S. Department of
Energy, Office of the General Counsel,
GC–33, 1000 Independence Avenue
SW., Washington, DC 20585–0121.
Telephone: (202) 585–1817. Email:
*Mary.Greene@hq.doe.gov.*

For further information on how to
submit a comment, or review other
public comments and the docket,
contact the Appliance and Equipment
Standards Program staff at (202) 586–
6636 or by email:
*ApplianceStandardsQuestions@
ee.doe.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Authority and Background
   A. Coverage Determination
   B. Test Procedure
   C. Questions Raised About Test Procedure
   D. Request for Information and
      Enforcement Forbearance
II. Public Participation
   A. Submission of Comments
III. Approval of the Office of the Secretary

**I. Authority and Background**

*A. Coverage Determination*

Title III of the Energy Policy and
Conservation Act of 1975, as amended
("EPCA"), sets forth a variety of
provisions designed to improve energy
efficiency. (42 U.S.C. 6291, *et seq.*) Part
C of Title III, which for editorial reasons
was re-designated as Part A–1 upon
incorporation into the U.S. Code (42
U.S.C. 6311–6317), establishes the
"Energy Conservation Program for
Certain Industrial Equipment." EPCA
provides that DOE may include a type
of industrial equipment, including
compressors, as covered equipment if it
determines that to do so is necessary to
carry out the purposes of Part A–1. (42
U.S.C. 6311(2)(B)(i) and 6312(b)). The
purpose of Part A–1 is to improve the
efficiency of electric motors and pumps
and certain other industrial equipment
in order to conserve the energy
resources of the Nation. (42 U.S.C
6312(a)) On November 15, 2016, DOE
published a Notice of Final
Determination of Coverage, classifying
compressors as covered equipment. The
final coverage determination became
effective on December 15, 2016. 81 FR
79991.

*B. Test Procedure*

DOE may develop test procedures to
measure the energy efficiency, energy
use, or estimated annual operating cost
of each covered equipment. (42 U.S.C.
6314). Manufacturers of covered
equipment must use the prescribed DOE
test procedure as the basis for certifying
to DOE that their equipment complies
with the applicable energy conservation
standards adopted under EPCA and
when making any representations
regarding the energy use or efficiency of
that equipment. (42 U.S.C. 6295(s),
6316(a) and 6314(d)).

On January 4, 2017, DOE published a
final rule to establish new test
procedures for certain varieties of
compressors. 82 FR 1052. The final rule
established definitions, materials
incorporated by reference, sampling
plans, representations requirements,
enforcement provisions and test
procedures for certain varieties of

**60307**

# Rules and Regulations

**Federal Register**

Vol. 84, No. 217

Friday, November 8, 2019

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

# DEPARTMENT OF HOMELAND SECURITY

## 8 CFR Part 103

[CIS No. 2652–19; DHS Docket No. USCIS–2019–0006]

**RIN 1615–AC36**

## Registration Fee Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap Subject Aliens

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations to require petitioners seeking to file H–1B cap-subject petitions to pay a $10 fee for each registration they submit to U.S. Citizenship and Immigration Services (USCIS) for the H–1B cap selection process.

**DATES:** This final rule is effective December 9, 2019.

**FOR FURTHER INFORMATION CONTACT:** Charles Nimick, Chief, Business & Foreign Workers Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. The H–1B Registration System
  B. Legal Authority
  C. Registration Fee
II. Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. General Support for the Proposed Rule
  C. General Opposition to the Proposed Rule
  D. Establishment of Registration Fee
  1. Fee Payment System
  2. Fee Amount ($10 per registration)
  3. Fraud Deterrent
  4. Equity of Registration Fee
  E. Impact on Small Entities
  F. Paperwork Reduction Act
  G. Implementation Timeframe
  H. Out of Scope
III. Statutory and Regulatory Requirements
  A. Executive Order 12866 and 13563
  B. Regulatory Flexibility Act
  C. Other Regulatory Requirements
  D. Paperwork Reduction Act

## I. Background

### A. The H–1B Registration System

On January 31, 2019, DHS published a final rule requiring petitioners seeking to file H–1B cap-subject petitions, including those eligible for the advanced degree exemption, to first electronically register with USCIS during a designated registration period, unless the requirement is suspended ("H–1B registration final rule").[1] USCIS stated in the H–1B registration final rule that it was suspending the registration requirement for the fiscal year 2020 cap season to complete required user testing of the new H–1B registration system and otherwise ensure the system and process work correctly.

Once USCIS implements the system and requires registration, USCIS will not consider an H–1B cap-subject petition to be properly filed unless it is based on a valid registration selection for the applicable fiscal year. See 8 CFR 214.2(h)(8)(iii)(A)(1), and (h)(8)(iii)(D). USCIS will reject or deny H–1B cap-subject petitions that are not properly filed. 8 CFR 214.2(h)(8)(iii)(D).

### B. Legal Authority

The Immigration and Nationality Act (INA) authorizes DHS to establish and collect fees for adjudication and naturalization services to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." INA section 286(m), 8 U.S.C. 1356(m). Through the collection of fees established under that authority, USCIS is primarily funded by immigration and naturalization fees charged to applicants, petitioners, and other requestors. See INA sections 286(m) and (n), 8 U.S.C. 1356(m) and (n); 8 CFR 103.7(b)(1)(i)(USCIS fees). Fees collected from individuals and entities filing immigration benefit

requests are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the cost of processing immigration benefit requests.[2] Consistent with that authority and USCIS' reliance on fees for its funding, DHS is amending its regulations to require a fee for submitting H–1B registrations.

### C. Registration Fee

On September 4, 2019, DHS published a notice of proposed rulemaking seeking public comments on its proposal to require a $10 fee per H–1B registration. See 84 FR 46460. DHS is amending its regulations to require a $10 fee for each registration submitted to register for the H–1B cap selection process. See 8 CFR 103.7(b)(1)(i)(NNN). As stated in the proposed rule, USCIS operations are funded by fees collected for adjudication and naturalization services, and USCIS must expend resources to implement and maintain the registration system. Therefore, DHS is requiring a fee for submitting H–1B registrations to recover those costs.

## II. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received 22 comments during the 30-day public comment period. There were no duplicate submissions or letters submitted through mass mailing campaigns. DHS considered all of these comment submissions. Commenters consisted of individuals (including U.S. workers), law firms, professional organizations, and advocacy groups. Some commenters expressed support for the rule and/or offered suggestions for improvement. Two commenters expressed general opposition to the rule, suggesting that DHS should not impose a fee for registration. For many of the public comments, DHS could not ascertain whether the commenter supported or opposed the proposed rule. A number of comments received addressed subjects beyond those covered by the proposed rule, and were deemed out of scope.

DHS has reviewed all of the public comments received in response to the proposed rule and is addressing relevant comments in this final rule. DHS's responses are grouped by subject area,

---

[1] See 84 FR 888 (Jan. 31, 2019); 8 CFR 214.2(h)(8)(iii)(A)(1).

[2] See 81 FR 26904, 26905 (May 4, 2016).

with a focus on the most common issues and suggestions raised by commenters. DHS is not addressing comments seeking changes in U.S. laws, regulations, or agency policies, that are out of scope and unrelated to the changes proposed on September 4, 2019, or to the H–1B registration system generally.

## B. General Support for the Proposed Rule

*Comment:* Two commenters stated that they agreed with the proposed fee without providing any additional or substantive rationale. While DHS appreciates the input, a response to these general support comments is not necessary.

## C. General Opposition to the Proposed Rule

*Comment:* Two commenters said the rule would cause an unnecessary financial obstacle to an already tedious and burdensome process for prospective immigrants. One commenter said that the additional fee would oppress minorities and put unnecessary financial barriers on families and extend the time it takes for them to receive clearance. The commenter explained that the process to become a legalized citizen is already an extensive process and extending it further could turn away families from receiving legalization.

*Response:* The H–1B classification is an employment-based nonimmigrant classification that allows U.S. employers to temporarily employ foreign workers in specialty occupations. DHS notes that this rule is not addressing the process of obtaining an immigrant visa or lawful permanent resident status. Rather, this rule addresses the fee for filing an H–1B registration which is a prerequisite to being able to file a nonimmigrant petition for a foreign worker in the H–1B nonimmigrant classification. The fee paid for the registration is a responsibility of the petitioning employer, not the foreign worker. DHS believes that a $10 fee for each registration a U.S. employer chooses to submit would not be overly burdensome for employers, especially when considering the benefits of not having to submit a full, paper-based petition as required for possible selection under the current cap selection process. Moreover, the nominal fee would assist DHS in recovering the cost of administering the electronic registration process. Requiring such a fee would not have any impact on the time to adjudicate an immigration benefit request.

## D. Establishment of Registration Fee

### 1. Fee Payment System

#### Pay.gov

*Comment:* A few commenters asked DHS to explain with specificity in the final rule how the payment system and payment mechanics will work. The comments related to *pay.gov* are as follows:

• Will DHS utilize *pay.gov* for the payment portal? If an employer is already registered in *pay.gov*, will that registration control for the H–1B registration fee payment?

• Is submission of the registration fee payment via *pay.gov* limited to employers, or may attorneys also submit payments via *pay.gov* on behalf of their U.S. employer clients? The commenter stated that attorneys should be able to submit registration fee payments via the *pay.gov* portal for their U.S. employer clients.

• A professional association stated that, given the limited familiarity of stakeholders with the *pay.gov* portal, USCIS should conduct stakeholder outreach and provide guidance and trainings on how to utilize the *pay.gov* portal well in advance of the initial registration period.

*Response:* DHS will use *pay.gov* for the payment portal. DHS is using the *pay.gov* architecture to process the payment on the back end, however, petitioners do not need to create a *pay.gov* account to pay the fee. Registrants only have to enter in checking/savings account information to do an ACH (Automated Clearing House) or credit/debit card information to pay via card.[3] G–28 Representatives will be able to pay on *pay.gov* as well, given that there is no need for an account. just basic payment details. USCIS is planning to conduct stakeholder outreach and provide training on how to use the *pay.gov* portal and will announce these trainings on the USCIS website.

#### Payment Sources

*Comments:* The comments on payment sources include the following:

• An advocacy group asked if *pay.gov* would allow access to payment via computerized access to bank account and ACH payment systems. This commenter also asked if there would be a one-time registration per user of banking and *pay.gov* information.

• A professional association stated that it appears that the registration fee

payment can be paid with either a debit or credit card, or with a withdrawal from a checking or savings account, but USCIS only provides a screen shot in the workflow document for the credit card payment transaction. The commenter urged USCIS to allow for the registration fee to be paid with a withdrawal from a checking or savings account (ACH), as this is a common method of payment and will better accommodate U.S. employers and immigration practitioners submitting registrations on behalf of a high volume registrants.

• A business association asked if there would be an ACH processing fee associated with using this method of payment. If so, the commenter asked if USCIS incorporated those costs into how it factored the $10/registration fee such that it would be covered by the $10 fee or in addition to the $10 fee. If the processing fee is separate from the $10 registration fee, the commenter asked how much these processing fees would add onto the $10 fee.

*Response:* The registration system will permit payments to be made from a bank account (checking or savings), a credit card, or debit card. No ACH fee will be charged. The registration fee cannot be made using cash, a certified (bank) check, or money order.

#### Batch Payments

*Comments:* The comments on batch payments include the following:

• A couple of commenters asked if employers would be able to batch payments for multiple registrations.

• A business association supported the ability of the employer or representative to file registrations for more than one beneficiary under one account, but said the NPRM does not indicate how many registrations a petitioner can file at the same time or exactly how the payment system will operate. Similarly, another commenter asked whether the payment system would limit the amount of beneficiaries that can be batched for simultaneous payment at any given time.

• Another commenter also stated that they support the ability to bundle the H–1B registration fees for multiple registrations into one payment, but said it is unclear whether the *pay.gov* portal would permit a registrant to make several bundled registration fee payments on multiple occasions over a period of several days, or if only one bundled registration fee could be submitted during the registration period. Because large U.S. employers will likely submit registrations throughout the registration period, the commenter recommended that the

---

[3] Per 8 CFR 103.7(a)(2), remittances must be drawn on a bank or other institution located in the United States and be payable in United States currency.

system should allow registrants to make several bundled registration fee payments through the *pay.gov* portal.

• A business association said the final H–1B Registration Rule stated that employers would not be required to enter their corporate information for each potential beneficiary. The commenter asked if employers would be able to file information regarding the corporation, the authorized employee of the corporation, and the payment method/information used to pay the fees one time throughout this process, and if so, how that would be done.

*Response:* The registration system will allow for batch payments to pay the fee for multiple registrations submitted simultaneously. For example, one registrant may submit five registrations at one time and make one payment of $50 for the cost of the five registrations. There is no limit to the number of registrations that can be submitted at one time. Registrants would be able to submit as many registrations in as many batches as they see fit during the registration period. For example, a registrant could submit five registrations and pay a $50 fee on March 2, a batch of five registrations on March 5 and pay another $50 fee, and a batch of eight registrations with an $80 fee on March 15.

Registrants will not be required to enter their corporate information for each potential beneficiary. Corporate and payment information will only need to be entered one time for each batch of registrations and associated payments. However, the corporate and payment information will not carry over between subsequent batches of registrations and fees.

Other Comments/Questions on Fee Payment Processing

*Comments:* Additional comments on fee payment processing are as follows:

• A business association stated that they were concerned about the lack of specificity regarding how the $10 fee will be collected. The commenter wrote that, as USCIS moves to finalize this proposal, the agency should clearly lay out how employers will have to use the H–1B registration's system payment mechanism.

• An advocacy group asked how far in advance of the registration period would registration be permitted for the payment portal.

*Response:* DHS will use *pay.gov* for the payment portal, however, there is no need to register with *pay.gov* in order to pay for an H–1B registration. The *pay.gov* architecture is used only to process the payments. USCIS will advise registrants of the location of the

H–1B registration portal, and any deadlines or other restrictions that will apply. The H–1B registration system will contain clear instructions for completing and submitting registrations and fees.

2. Fee Amount ($10 per Registration)

*Comment:* Two commenters wrote that the proposed fee was too low without providing an alternative amount. One commenter noted that they were in favor of requiring a fee for H–1B petitions, but that it should be a larger fee. This commenter wrote that a fee free H–1B application and the lower wages paid to those granted H–1B status provides incentive to hire non-U.S. citizens for U.S. based careers. One commenter suggested a $500 fee, while another suggested a $1,000 fee. One commenter said that based upon the assertion that the registration would be a 7-minute additional time burden, the $10 registration fee is appropriate and can be considered a nominal expense for most petitioners.

*Response:* First, DHS notes that the $10 registration fee is separate from and in addition to the H–1B petition filing fee.[4] The registration fee will be charged regardless of whether the potential petitioner's registration is selected; *i.e.* even if the petitioner may not ultimately file an H–1B petition. As stated in the NPRM, USCIS lacks sufficient data to precisely estimate the costs of the registration process. DHS proposed a $10 fee to provide an initial stream of revenue to mitigate potential fiscal effects on USCIS. Following implementation of the registration fee provided for in this rule, USCIS will gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery.

3. Fraud Deterrent

*Comment:* One commenter asked how the nominal fee will prevent large outsourcing companies from gaming the

H–1B system, when their revenue is in the billions. A professional association stated that the addition of a $10 registration fee will not sufficiently deter speculative and/or fraudulent filings. Another commenter noted that requiring employers to pay a more substantial fee may protect employees from predatory employers and that we should include a provision barring employers from passing the fee on to their employees or garnishing it from their wages.

*Response:* As stated in the proposed rule, the purpose of the registration fee is to recover the costs of the registration system and process; however, the fee may have an added benefit of deterring frivolous registrations. USCIS will monitor the system for potential fraud and abuse (*e.g.* monitoring the system to determine if employers are submitting many registrations but filing petitions based on selected registrations at a significantly lower rate, which could reflect gaming of the system to unfairly improve their odds of being selected). Further, DHS will require registrants to attest that they intend to file an H–1B petition for the beneficiary in the position for which the registration is filed. This attestation is intended to ensure that each registration is connected with a bona fide job offer and, if selected, will result in the filing of an H–1B petition.

In response to a commenter's proposal to bar employers from passing the fee on to the beneficiary (foreign worker), DHS is not adopting this suggestion because it is unnecessary and already prohibited by DOL regulations as an unauthorized deduction. See 20 CFR 655.731(b)(9)(ii) (". . . except that the deduction may not recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer, *e.g.*, preparation and filing of LCA and H–1B petition); . . ."). DHS notes that this prohibition encompasses the costs of an H–1B registration.

*Comment:* A professional association recommended that, in its calculations for how many registrations will be selected in the registration lottery, USCIS take into consideration that there may be a significantly higher rate of selected registrations resulting in unfiled, denied, or revoked petitions. This commenter also recommended that USCIS reserve enough unselected registrations that could be invited to file in the situation where the H–1B petition approval rate will not result in meeting the H–1B numerical limitations for FY 2021.

---

[4] As stated in the proposed rule, H–1B petitioners currently pay a $460 filing fee per petition. In addition to the filing fee, certain H–1B petitions may have to pay up to $6,300 in statutory fees. DHS does not have the authority to adjust the amount of these statutory fees. USCIS does not retain most of the revenue. CBP receives 50 percent of the $4,000 9–11 Response and Biometric Entry-Exit fee and the remaining 50 percent is deposited into the General Fund of the Treasury. USCIS retains 5 percent of the $1,500 or $750 American Competitiveness and Workforce Improvement act (ACWIA) fee. The remainder goes to the Department of Labor and the National Science Foundation. USCIS retains one third of the $500 Fraud Detection and Prevention fee, while the remainder is split between the Department of State and the Department of Labor. *See* 84 FR 46462–46463.

*Response:* When registration is not required, USCIS randomly selects a certain number of H–1B cap-subject petitions projected as needed to meet the numerical allocations. USCIS makes projections on the number of H–1B cap-subject petitions necessary to meet the numerical limits, taking into account historical data related to approvals, denials, revocations, and other relevant factors.[5] USCIS uses these projections to determine the number of petitions to select to meet, but not exceed, the 65,000 regular cap and 20,000 advanced degree exemption, although the exact percentage and number of petitions may vary depending on the applicable projections for a particular fiscal year. Similarly, in years when USCIS will use the registration system, it will project how many registrations need to be selected in order to meet, but not exceed the numerical limitations. Unselected registrations will remain on reserve for the applicable fiscal year. If USCIS determines that it needs to increase the number of registrations projected to meet the regular cap or advanced degree exemption, and select additional registrations, USCIS would select from among the registrations that are on reserve a sufficient number to meet the cap or advanced degree exemption, or re-open the registration period if additional registrations are needed to meet the new projected amount.

4. Equity of Registration Fee

*Comment:* A commenter stated that H–1B petitioners have established willingness and ability to pay the nominal H–1B registration fee. The commenter stated a $10 fee is justifiable because the employers are the ones who pay existing H–1B related filing fees rather than investing this money to cultivate the knowledge of existing employees to better their business.

*Response:* DHS agrees that a $10 fee for each registration will not be overly burdensome for employers and will assist DHS in recovering the cost of administering the registration process.

*E. Impact on Small Entities*

*Comment:* Two commenters addressed the proposal's impact on small entities. A business association said USCIS stated that the $10 registration fee might minimize the possibility that larger employers could flood the system crowding out smaller, compliant firms. The commenter said it remains concerned about how the overall H–1B registration system will impact small businesses and urged USCIS to monitor and report on the

[5] *See* 8 CFR 214.2(h)(8)(ii)(B).

filings. One commenter said that they were concerned there were not enough safeguards in place to prevent unscrupulous petitioners from flooding the H–1B system. This commenter wrote that DHS should conduct additional outreach consistent with the Regulatory Flexibility Act (RFA), especially to small business entit es, so that concerns about potential flooding of the registration system can be addressed prior to implementation.

*Response:* DHS has already put several safeguards in place to prevent employers from flooding the H–1B registration system, and will monitor the system throughout the registration process. As noted in the H–1B registration final rule, DHS believes it is too speculative to conclude that the H–1B registration system would result in large entities crowding out smaller entities for H–1B prospective employees. With the registration system, and the lower nominal fee, the barrier to entry associated with the registration system could result in increased participation by small entities in the competition for H–1B cap-subject nonimmigrant visas As noted in the proposed rule, the new fee will impose a nominal compliance cost for any entity, including small entities, that choose to compete for an H–1B cap-subject visa. DHS maintains that the proposed fee will not impose a significant impact on small entities.

*F. Paperwork Reduction Act*

*Comment:* A professional association stated that USCIS' estimate of a 7-minute additional time burden for reading the instructions and completing the electronic fee payment was "extremely low" and appears to assume that stakeholders are familiar with the *pay.gov* portal, rather than first time users. However, the commenter stated that many U.S. emp oyers and attorneys have little or no experience using the *pay.gov* portal. The commenter wrote that USCIS should recalculate the total public burden (in time) to take into consideration that in many, if not most cases, registrants will be accessing and navigating the *pay.gov* portal for the very first time when submitting initial H–1B registrations.

*Response:* The *pay.gov* screen will be seamlessly linked to the registration platform and will not require a separate log in, password, or navigation to a separate website. Paying the $10 fee will be very similar to paying for events or airline tickets, merchandise, and other orders placed online, and USCIS anticipates it will be a straightforward process for the public. In addition and as noted above, USCIS intends to

conduct outreach and training on how to use the registration system, including making payments on the *pay.gov* portal, and will announce these trainings on the USCIS website. USCIS has received approval from OMB–OIRA to discontinue the approval of this collection of information as guidance found at the website *pra.digital.gov* stated that such payment transactions are not subject to the PRA.

*G. Implementation Timeframe*

*Comment:* Two commenters addressed the implementation timeframe for the proposed fee or the H–1B registration process more generally and expressed concern about the lack of a definitive decision from USCIS to implement the new H–1B registration requirement to which the $10 registration fee will be attached. These commenters asked that USCIS notify the public as soon as possible with a final decision on whether usability testing supports proceeding with the registration tool. One commenter stated that, without a final decision and proper notice being provided to stakeholders at this point in time, many business have already begun expending resources in the preparation of various supporting documents for the cap-subject H–1B petitions as they normally would, thus negating the cost savings intended by the rule. One commenter noted that if USCIS does not announce that it will proceed with registration until shortly before the FY2021 cap season begins in April 2020, it will likely be most harmful to the interests of smaller employers who have less overall resources to deal with new regulatory requirements in a short period of time. A few commenters stated that, no later than November 1, 2019, USCIS should publicly announce its decision to implement the registration system in the Spring of 2020 for FY 2021 cap-subject H–1B cases. An advocacy group stated that this notice could be posted on the agency's website or could come with the publication of the H–1B registration fee final rule, so it can be announced in the **Federal Register** months before any registration period would be opened. This commenter also said USCIS should indicate as early as possible the dates when the specific registration period will occur and should consider a registration period longer than the 2-week minimum registration period identified in the final rule.

*Response:* USCIS intends to implement the registration process for FY 2021, subject to continued testing of the system. DHS will publish a notice in the **Federal Register** to announce the initial implementation of the H–1B

registration process in advance of the cap season in which it will first implement the requirement. USCIS will notify the public about the implementation timeframe of the registration system and the initial registration period as soon as possible, and will provide stakeholders with plenty of notice prior to implementing the registration requirement.

*Comment:* One commenter asked that as DHS moves to finalize and implement the H–1B registration fee, it continue public outreach on usability testing as a means to further assess the technical details of the registration mechanics. A business association said USCIS should (1) engage stakeholders and fully vet the new platform before instituting the electronic registration system and (2) extend the registration period to at least 30 days to account for any system outages, difficulties in entering data, or other unforeseen problems.

*Response:* USCIS intends to continue stakeholder outreach and training prior to the initial implementation of the registration system to allow stakeholders the opportunity to familiarize themselves with the electronic registration process. USCIS will provide guidance on how to use the registration system and edit registrations prior to opening the registration system for the initial registration period. DHS will announce the duration of the initial registration period in the **Federal Register** notice.

## H. Out of Scope

DHS received many comments that were unrelated to the proposed revisions regarding the registration fee. Many of these comments would require Congressional action or additional regulatory action by DHS unrelated to the H–1B registration fee requirement. Although DHS has summarized the comments it received below, DHS is not providing substantive responses to those comments as they are beyond the scope of this rulemaking. To the extent that comments are seeking further revisions to the H–1B program, DHS recognizes that additional regulatory changes could improve the H–1B program and intends to propose a separate rule to strengthen the H–1B visa classification. As stated in the Unified Agenda of Proposed Regulatory Actions, 83 FR 57803, DHS plans to propose to revise the definition of specialty occupation to increase focus on obtaining the best and the brightest foreign nationals via the H–1B program, and revise the definition of employment and employer-employee relationship to better protect U.S. workers and wages. In addition, DHS will propose

additional requirements designed to ensure employers pay appropriate wages to H–1B nonimmigrant workers.

Comments from the public outside the scope of this rulemaking concerned the following issues:

• Some commenters provided suggestions for improvement of the H–1B program in general, including to raise the H–1B salary minimum.

• Some commenters said DHS should review the B–1, [Optional Practical Training] OPT, EB–", H–4, [Employment Authorization Document] EAD, and L–1/L–2 visa programs to address unfairness, reduce fraud and abuse within the programs, address specific companies known for abuses, and protect wages of American workers.

• One commenter expressed safety concerns that H–1B workers are managing critical infrastructure due to an influx of H–1B workers in the fields of IT, human resources, and contracting.

• Another commenter said H–1B is a "legalized scam."

*Response:* DHS appreciates these suggestions, however, DHS did not propose to address these issues in the proposed rule, therefore these suggestions fall outside of the scope of this rulemaking.

As discussed previously, DHS is finalizing this rule as proposed.

## IV. Statutory and Regulatory Requirements

### A. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs, benefits, and transfers of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Information and Regulatory Affairs (OIRA) has not designated this rule a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, OIRA has not reviewed this rule. As this rule is not a significant regulatory action, this rule is exempt from the requirements of Executive Order 13771. See OMB's Memorandum "Guidance Implementing Executive Order 13771, Titled 'Reducing Regulation and Controlling Regulatory Costs' " (April 5, 2017).

### 1. Summary

DHS will amend its regulations to require a fee for each registration submitted to register for the H–1B cap selection process. DHS will require a fee of $10 per registration to recover some of the costs that are associated with implementing and maintaining the H–1B cap registration system. USCIS suspended the registration requirement for the FY 2020 H–1B cap selection process. DHS recognizes that the registration requirement was established to provide efficiency savings to both USCIS and H–1B cap-subject petitioners associated with the current paper-based cap selection process. In the H–1B registration final rule, DHS estimated significant cost savings for both USCIS and those H–1B petitioners. DHS stands by that analysis and believes that USCIS will still reap significant efficiency and cost savings when comparing an electronic registration process relative to the current paper filing and cap selection process. DHS acknowledges that the $10 registration fee will reduce some of the estimated cost savings for unselected H–1B cap-subject petitioners as described in the H–1B registration final rule. As discussed in the Regulatory Review section, DHS does not believe that the proposed registration fee will significantly factor into the decision-making of potential H–1B petitioners, nor does DHS believe that the fee will be perceived as being cost-prohibitive by these potential H–1B petitioners. After the registration requirement is implemented and reviewed over the coming years, DHS will consider the costs associated with the system as required during biennial fee reviews and adjust the registration fee accordingly via notice-and-comment rulemaking.

### 2. Analysis of Costs and Benefits

When registration is required, all petitioners seeking to file an H–1B cap-subject petition, including those eligible for the advanced degree exemption, must first electronically register with USCIS during a designated registration period. A separate registration must be submitted for each worker on whose behalf a petitioner seeks to file an H–1B cap-subject petition. Only those petitioners whose registrations are selected will be eligible to file an H–1B cap-subject petition during an associated filing period for the applicable fiscal year. By means of this rule, DHS will require payment of a $10 registration fee for each registration, which will be due and payable at the time of registration submission. A registration will not be considered as

properly submitted until the fee is paid.[6] In the analysis accompanying the H–1B registration final rule, DHS estimated that 192,918 H–1B cap-subject registrations will be submitted annually based on 5-year historical average Form I–129 petition filings.[7] That estimate will form the baseline for the analysis of costs associated with the $10

registration fee. As DHS acknowledged in the H–1B registration final rule, the use of this historical average to form the baseline estimate does not factor in the possibility that the registration's lower barrier to entry could result in increasing the number of registrations that USCIS receives.[8] To account for this possibility, this analysis will

present a range analysis of annual costs up through an escalator of 30 percent increase over the baseline estimate.

Table 1 presents the annual, undiscounted, aggregate costs associated with the $10 registration fee using a range of escalations over the baseline estimate of registrations.

TABLE 1—UNDISCOUNTED AGGREGATE COST ESTIMATES BY PROJECTED REGISTRATIONS

| | Number of registrations | Annual cost—undiscounted |
|---|---|---|
| Baseline | 192,918 | $1,929,180 |
| Baseline Plus 10% | 212,210 | 2,122,100 |
| Baseline Plus 20% | 231,502 | 2,315,020 |
| Baseline Plus 30% | 250,793 | 2,507,930 |

USCIS is required to review the cost of its operations on a biennial basis and recommend fee adjustments as necessary. USCIS may adjust the filing fees for immigration benefits and services through notice-and-comment rulemaking. DHS used a 5-year period of analysis to account for a potential time lag of the fee review and the actual adjustment that occurs during the rulemaking cycle. Therefore, it is reasonable to conclude that a 5-year period is a sufficient period for DHS to base the analysis of the estimated impact of the registration fee.

In addition to the $10 registration fee, USCIS projects there will be an additional 7-minute time burden associated with reading the instructions and completing the electronic fee payment. In the H–1B registration final rule, DHS monetized time burdens based on who is expected to submit the registration: A human resources (HR) specialist; an in-house lawyer; or an outsourced lawyer.[9] The relevant wage is currently $32.11 [10] per hour for an HR specialist and $69.34 [11] per hour for an in-house lawyer. DHS accounts for

worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier using the Department of Labor, BLS report detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS estimates that the benefits-to-wage multiplier is 1.46 and, therefore, is able to estimate the full opportunity cost per applicant, including employee wages and salaries and the full cost of benefits such as paid leave, insurance, and retirement.[12] DHS multiplied the average hourly U.S. wage rate for HR specialists and lawyers by 1.46 to account for the full cost of employee benefits and overhead, for a total of $46.88 [13] per hour for an HR specialist and $101.24 [14] per hour for an in-house lawyer. DHS recognizes that a firm may choose, but is not required, to outsource the preparation of these registrations and, therefore, has presented two wage rates for lawyers. To determine the full opportunity costs if a firm hired an outsourced lawyer, DHS multiplied the average hourly U.S. wage rate for lawyers by 2.5 for a total of $173.35 [15] to approximate an hourly

billing rate for an outsourced lawyer.[16] The monetized equivalent time burden for 7 minutes (0.12 hours) is $5.63,[17] $12.15,[18] and $20.80 [19] for an HR specialist, in-house lawyer, and outsourced lawyer, respectively.

Based on a review of historical filings, USCIS determined that approximately 75 percent of H–1B cap-subject petitions are filed by an attorney or accredited representative.[20] This analysis will carry that finding forward to estimate the time burden costs for complying with the registration fee requirement. In other words, the analysis of time burden costs presented assumes that 25 percent of the registrations will be completed by an HR specialist or representative, and 75 percent of the registrations will be completed by an attorney, either in-house or outsourced. Table 2 presents the annual, undiscounted, time burden or opportunity costs associated with paying the registration fee electronically, assuming 7 minutes of time burden, over a range of estimated numbers of registrations and according to who submits the H–1B registration.

[6] *See* 8 CFR 103.2(a)(1) and 8 CFR 214.2(h)(8)(iii)(A)(1).

[7] *See* 84 FR at 925.

[8] *Id.*

[9] *See* 84 FR at 929.

[10] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2018, Human Resources Specialist": *https://www.bls.gov/oes/2018/may/oes131071.htm.* Visited October 2, 2019.

[11] Bureau of Labor Statistics, U.S. Department of Labor, "Occupational Employment Statistics, May 2017, Lawyers": *https://www.bls.gov/oes/2018/may/oes231011.htm.* Visited October 2, 2019.

[12] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/ (Wages and Salaries per hour). *See* Economic News

Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (June 2019), available at *https://www.bls.gov/news.release/archives/ecec_09172019.pdf* (viewed October 2, 2019). The ECEC measures the average cost to employers for wages and salaries and benefits per employee hour worked.

[13] Calculation: $32.11 * 1.46 = $46.88 total wage rate for HR specialist.

[14] Calculation: $69.34 * 1.46 = $101.24 total wage rate for in-house lawyer.

[15] Calculation: $69.34 * 2.5 = $173.35 total wage rate for an outsourced lawyer.

[16] *See* 83 FR at 24914 (May 31, 2018). The DHS analysis in, "Exercise of Time-Limited Authority To Increase the Fiscal Year 2018 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program" used a multiplier of 2.5 to convert in-house attorney wages to the cost of outsourced attorney wages. DHS believes the methodology used in the Final Small Entity Impact Analysis remains sound for using 2.5 as a multiplier for outsourced labor wages in this rule.

[17] Calculation: $46.88 hourly wage rate for HR specialist * 0.12 hours = $5.63.

[18] Calculation: $101.24 hourly wage rate for in-house lawyer * 0.12 hours = $12.15.

[19] Calculation: $173.35 hourly wage rate for outsourced lawyer * 0.12 hours = $20.80.

[20] *See* 84 FR at 925.

TABLE 2—ANNUAL TIME BURDEN COST (UNDISCOUNTED) BY PROJECTED REGISTRATIONS & TYPE OF SUBMITTER, ROUNDED

| | Number of registrations | HR specialist [21] | In-house lawyer [22] | Outsourced lawyer [23] |
|---|---|---|---|---|
| Baseline | 192,918 | $271,532 | $1,757,965 | $3,009,521 |
| Baseline Plus 10% | 212,210 | 298,686 | 1,933,764 | 3,310,476 |
| Baseline Plus 20% | 231,502 | 325,839 | 2,109,562 | 3,611,431 |
| Baseline Plus 30% | 250,793 | 352,991 | 2,285,351 | 3,912,371 |

Note that the cost estimates in Table 2 are overstated because they do not account for the scenario of fewer unique entities submitting registrations for multiple workers. DHS assumes that in those cases, the registration submissions would be done at the same time so the fee payment could be bundled, thus reducing the overall time burden associated with submitting separate payments. The DHS analysis in the H–1B registration final rule found that, on average, each employer submitted five petitions.[24] Thus, the estimate of undiscounted costs in Table 2, which is based on the assumption of one petitioning employer filing one petition, is likely overstated by approximately 80 percent. Estimates that are more likely to reflect the current business behavior of five petitions per employer, are presented in Table 3.

TABLE 3—ANNUAL TIME BURDEN COST (UNDISCOUNTED) BY PROJECTED REGISTRATIONS & TYPE OF SUBMITTER, LESS 80%

| | Number of registrations | HR specialist | In-house lawyer | Outsourced lawyer |
|---|---|---|---|---|
| Baseline | 192,918 | $54,306 | $351,593 | $601,904 |
| Baseline Plus 10% | 212,210 | 59,737 | 386,753 | 662,095 |
| Baseline Plus 20% | 231,502 | 65,168 | 421,912 | 722,286 |
| Baseline Plus 30% | 250,793 | 70,598 | 457,070 | 782,474 |

Therefore, the total, undiscounted, aggregate annual costs of both the registration fee and time burden costs are presented in Table 4. The figures in Table 4 are found by adding the proportional costs presented in Table 1 (in other words, assume 25 percent of registrations are completed by HR specialist and 75 percent of registrations are completed by lawyers either in-house or outsourced) with the estimated costs for entities submitting registrations in Table 3.

TABLE 4—AGGREGATE COST (UNDISCOUNTED) BY PROJECTED REGISTRATIONS & TYPE OF SUBMITTER

| | Number of registrations | HR specialist (table 3 + 25% of table 1) | In-house lawyer (table 3 + 75% of table 1) | Outsourced lawyer (table 3 + 75% of table 1) |
|---|---|---|---|---|
| Baseline | 192,918 | $536,601 | $1,798,478 | $2,048,789 |
| Baseline Plus 10% | 212,210 | 590,262 | 1,978,328 | 2,253,670 |
| Baseline Plus 20% | 231,502 | 643,923 | 2,158,177 | 2,458,551 |
| Baseline Plus 30% | 250,793 | 697,581 | 2,338,018 | 2,663,422 |

The lower bound aggregate cost estimate of complying with the registration fee requirement is found by summing the estimated cost of using an HR specialist with the cost estimate of using in-house lawyers to complete the registration. The upper bound aggregate cost estimate is found by summing the estimated cost of using an HR specialist with the cost estimate of using outsourced lawyers to complete the registration. Table 5 presents the lower bound and upper bound aggregate cost estimates over the projected number of registrations for a 5-year period, discounted at 3 and 7 percent.

[21] Calculation: Number of Registrations * 25 percent * $5.63 (figures presented in the table are rounded to the nearest dollar).

[22] Calculation: Number of Registrations * 75 percent * $12.15 (figures presented in the table are rounded to the nearest dollar).

[23] Calculation: Number of Registrations * 75 percent * $20.80 (figures presented in the table are rounded to the nearest dollar).

[24] See 84 FR at 948 (January 31, 2019) for the FY 2016 cohort of H–1B cap-subject petitions selected. Of the 95,839 petitions selected, there were only 20,046 unique entities that filed those petitions. Calculation: 95,839/20,046 = 4.78.

**60314**    **Federal Register** / Vol. 84, No. 217 / Friday, November 8, 2019 / Rules and Regulations

TABLE 5—AGGREGATE COST ESTIMATES BY PROJECTED REGISTRATIONS OVER 5-YEAR PERIOD, DISCOUNTED AT 3% AND 7%

|  | Number of registrations | 5-Year discounted costs, 3%, ($ millions) | | 5-Year discounted costs, 7%, ($ millions) | |
|---|---|---|---|---|---|
|  |  | Lower bound | Upper bound | Lower bound | Upper bound |
| Baseline | 192,918 | $10.7 | $11.8 | $9.6 | $10.6 |
| Baseline Plus 10% | 212,210 | 11.8 | 13.0 | 105.0 | 11.7 |
| Baseline Plus 20% | 231,502 | 12.8 | 14.2 | 11.5 | 12.7 |
| Baseline Plus 30% | 250,793 | 13.9 | 15.4 | 12.4 | 13.8 |

As discussed previously, while this initial registration fee of $10 per registration may not recover the full costs associated with implementing and maintaining the H–1B registration system, it would allow for USCIS to recover some of the costs, thus lessening the fiscal impact to USCIS. DHS does not anticipate the required registration fee to represent a significant business expense for those employers that seek to employ cap-subject H–1B workers. The total costs for each registration would range from $15.63 to $30.80 for a registration, depending on who the petitioner uses to submit the registration. Even with the addition of the registration fee requirement, as discussed previously in the preamble, the registration process is still anticipated to result in a net benefit relative to the paper-based cap selection process.

The registration fee may also provide some unquantified benefits to the extent that the fee may help to deter frivolous registrations. DHS makes no conclusions on the impact that a $10 fee would have on the number of registrations and has no way to estimate such an impact. As stated in the H–1B registration final rule, however, commenters on the H–1B registration proposed rule expressed various concerns about potential "flooding" of the registration system. While there is no way to estimate if a small fee would further deter such acts, beyond the measures identified in the H–1B registration final rule (e.g., the attestation requirement), DHS believes that it is reasonable to conclude that the existence of a $10 fee could reduce the likelihood that frivolous registrations would be submitted to flood or otherwise game the registration system. In any event, such a benefit would only be tangential to the fee's primary purpose of recovering USCIS costs.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,

Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. The term "small entities" comprises of small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. An "individual" is not defined by the RFA as a small entity and consequently an individual from a rule are not considered for RFA purposes. In addition, the courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities. Consequently, any indirect impacts from a rule to a small entity are not considered as costs for RFA purposes.

In the proposed rule, DHS provided a factual basis in certifying the registration fee requirement would not pose a significant impact on small entities for public comment. DHS received no challenges to the certification statement under the RFA, nor to the factual basis presented in support of said certification. DHS is reproducing the factual basis, with updates to correct costs estimates due to calculation errors, in certifying this final rule will not pose a significant impact on small entities.

This final rule will directly impact those entities that petition on behalf of H–1B cap-subject workers. Generally, H–1B petitions are filed by a sponsoring employer; by proxy, once the online registration requirement is implemented, registrations would likewise be submitted by a sponsoring employer or their authorized representative. The employer intending to petition for an H–1B cap-subject worker will incur the registration fee costs of $10 per registration. Therefore, DHS examines the direct impact of this final rule on small entities in the analysis that follows.

In the H–1B registration final rule, DHS estimated that approximately 78 percent of selected H–1B petitioners

were small entities after conducting an analysis of a statistically significant sample.[25] DHS believes it is reasonable to carry this finding through and assume that approximately 78 percent, a majority, of H–1B registrations would be submitted by small entities. Thus, for purposes of the RFA, this final rule is expected to impact a "substantial" number of small entities.

To determine whether the impact of the required registration filing fee would be "significant," DHS must consider the estimated fee impacts of individual petitioning small entities. In the H–1B registration final rule, DHS found that the majority of petitioning employers tended to submit petitions for multiple employees. Based on a review of filings received in 2016, DHS determined that for every one unique petitioning employer, there were an average of 4.78 petitions submitted.[26] For purposes of this analysis, DHS is rounding that figure up to form a baseline assumption that for every one petitioning employer, a total of five H–1B cap-subject workers are requested. Therefore, it is reasonable to conclude that on average each petitioning employer that is a small entity will face a total fee impact of $50, plus a one-time monetized time burden impact ranging from $5.63 to $20.80, as a result of the required H–1B registration fee.[27]

In that same statistically valid sample study, DHS was able to determine the top 10 industries that petitioned for cap-subject H–1B workers.[28] The industry data, using the North American Industry Classification System (NAICS), is self-reported on USCIS Form I–129, Petition for Nonimmigrant Worker, which petitioning employers use to petition for H–1B workers. Table 6 shows a list of the top 10 NAICS industries that

[25] *See* 84 FR at 948–49.

[26] *See* 84 FR at 948, explaining that, for the FY 2016 cohort, 20,046 unique entities filed the 95,839 H–1B cap-subject petitions that were selected. Calculation: 95,839/20,046 = 4.78.

[27] Calculation: $10 (registration fee) × 5 registrations (one for each H–1B worker being entered into the registration) = $50 total fee impact for employers.

[28] *See* 84 FR at 950.

submitted H–1B cap-subject petitions in the sample study, and the corresponding size standard according to the SBA.

TABLE 6—TOP 10 NAICS INDUSTRIES SUBMITTING FORM I–129, SMALL ENTITY ANALYSIS RESULTS

| Rank | NAICS code | NAICS U.S. industry title | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|---|
| 1 | 541511 | Custom Computer Programming Services | $27.5 | |
| 2 | 541512 | Computer Systems Design Services | 27.5 | |
| 3 | 561499 | All Other Business Support Services | 15.0 | |
| 4 | 541330 | Engineering Services | 15.0 | |
| 5 | 511210 | Software Publishers | 38.5 | |
| 6 | 541611 | Administrative Management and General Management Consulting Services | 15.0 | |
| 7 | 334413 | Semiconductor and Related Device Manufacturing | | 1,250 |
| 8 | 541618 | Other Management Consulting Services | 15.0 | |
| 9 | 541690 | Other Scientific and Technical Consulting Services | 15.0 | |
| 10 | 325412 | Pharmaceutical Preparation Manufacturing | | 1,250 |

Source: USCIS analysis based on small business size standards.

**Note:** The Small Business Administration (SBA) has developed size standards to carry out the purposes of the Small Business Act and those size standards can be found in 13 CFR, section 121.201.

SBA's monetary size standard is based on the average annual receipts of the business entity. As discussed previously, DHS has determined that the majority of H–1B petitioning employers would be classified as "small" for purposes of the RFA. However, comparing the expected total fee impact of $55.63 on the low-end for every small entity (assuming each entity submits approximately five registrations) results in a negligible cost impact relative to average annual receipts. In fact, for a cost of $55.63, a company would need to have annual receipts of only $5,563 for the cost of the registration fee for five registrations to equal 1 percent of the annual receipts. If a company used an outsourced lawyer to petition for a visa at a cost of $70.80 (assuming each entity uses an outsourced attorney to submit five registrations) the company would need to have annual receipts of only $7,080 for the cost of the fee to equal 1 percent of the annual receipts.

SBA guidance on additional measures to determine whether a rule would have a significant impact suggest comparing the compliance cost to the labor costs.[29] In that guidance, SBA states that an impact could be significant if the compliance cost "exceeds 5 percent of the labor costs of the entities in that sector."[30] In the annual report to Congress on the characteristics of H–1B workers for fiscal year 2017, USCIS determined the median annual compensation for initial employment

across all occupations was $75,000.[31] Furthermore, the median annual compensation for initial employment across known occupations ranged from a low of $42,000 to a high of $160,000.[32] This final rule is estimated to result in compliance costs that represent much less than 5 percent of the H–1B labor costs.

Based on these findings, DHS certifies that while this final rule could impact a substantial number of small entities, the impact that would arise from the $10 registration fee would not result in a significant impact. Therefore, the Secretary certifies that this final rule will not cause a significant impact to a substantial number of small entities.

### C. Other Regulatory Requirements

This final rule is not a "major rule" as defined by the Congressional Review Act, 5 U.S.C. 804(2), and thus is not subject to a 60-day delay in the rule becoming effective. This action is not subject to the written statement requirements of the Unfunded Mandates Reform Act of 1995 (UMRA) (Pub. L. 104–4). Nor does it require prior consultation with State, local, and tribal government officials as specified by Executive Order 13132 or 13175. This final rule also does not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(2) ii) and 1508.4. This action would not affect the quality of the human environment and fits within Categorical Exclusion number A3(d) in

Dir. 023–01 Rev. 01, Appendix A, Table 1, for rules that interpret or amend an existing regulation without changing its environmental effect.

### D. Paperwork Reduction Act

DHS is submitting the information collection requirements in this rule to OMB for review and approval in accordance with requirements of the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–3512. DHS and USCIS are revising this information collection to report a change in the estimated annual cost to the Federal government as a result of this final rule. Additionally, the information collection instrument has been revised to include language about the new registration fee. The notice of proposed rulemaking stated that DHS proposed a revision to the USCIS Electronic Fee Payment Processing information collection, former OMB Control Number 1651– 0131. DHS and USCIS have determined that the collection of information related to fee payment processing is exempt from the Paperwork Reduction Act and that collection of information is not required to be included in this rulemaking.[33] DHS is revising the following USCIS information collection:

#### H–1B Registration Tool

DHS and USCIS are revising this information collection to report a change in the estimated annual cost to the Federal government as a result of this rule. Additionally, the information collection instrument has been revised to include language about the new registration fee.

[29] *See* U.S. Small Business Administration, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act,* The RFA threshold analysis: Can we certify? at Pg. 19, *https://www.sba.gov/sites/default/files/advocacy/ How-to-Comply-with-the-RFA-WEB.pdf.* Visited Apr. 16, 2019.

[30] *Id.*

[31] *See* U.S. Citizenship and Immigration Services, *Characteristics of H–1B Specialty Occupation Workers, Fiscal Year 2017 Annual Report to Congress,* at Table 11, *https://www.uscis.gov/sites/ default/files/reports-studies/Characteristics-of- Specialty-Occupation-Workers-H-1B-Fiscal-Year- 2017.pdf.* Visited Apr. 16, 2019.

[32] *Id.*

[33] See *https://pra.digital.gov/do-I-need-clearance/* Stating, "Doesn't need PRA Clearance: Information for voluntary commercial transactions, like payment and delivery details.")

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* H–1B Registration Tool.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* No Agency Form Number; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Business or other for-profit. USCIS uses the data collected on this form to determine which employers will be informed that they are eligible to submit a USCIS Form I–129, Petition for a Nonimmigrant Worker, to petition for a cap-subject beneficiary in the H–1B classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection H–1B Registration Tool is 192,918 and the estimated hour burden per response is 0.5 hours. Any additional time burden for fee payment processing is captured in the information collection USCIS Electronic Fee Payment Processing (OMB 1615–0131).

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 96,459 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total cost burden for purchases of equipment or services to achieve compliance with the information collection requirements of this rule (not including providing information to or keeping records for the government, or kept as part of customary and usual business or private practices), are $0.[34] There are no capital, start-up, operational or maintenance costs to respondents associated with this collection of information.

**List of Subjects in 8 CFR Part 103**

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

Accordingly, DHS is amending chapter I of title 8 of the Code of Federal Regulations as follows:

[34] As stated elsewhere in this rule, the annual transfer for registrants associated with the proposed $10 fee is $1,929,180.

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 135C, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 1C7–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.C. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54, 125 Stat 550.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(NNN) to read as follows:

**§ 103.7  Fees.**

\*    \*    \*    \*    \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) \*  \*  \*

(NNN) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-suEject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $10. This fee will not be refunded if the registration is not selected or is withdrawn.

\*    \*    \*    \*    \*

**Kevin K. McAleenan,**

*Acting Secretary.*

[FR Doc. 2019–24292 Filed 11–7–19; 8:45 am]

**BILLING CODE 9111–97–P**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 217**

**RIN 1601–AA94**

**Designation of Poland for the Visa Waiver Program**

**AGENCY:** Office of the Secretary, Department of Homeland Security (DHS).

**ACTION:** Final rule; technical amendment.

**SUMMARY:** Eligible citizens, nationals, and passport holders from designated Visa Waiver Program countries may apply for admission to the United States at U.S. ports of entry as nonimmigrant aliens for a period of ninety days or less for business or pleasure without first obtaining a nonimmigrant visa, provided that they are otherwise eligible for admission under applicable statutory and regulatory requirements. On October 31, 2019, the Secretary of Homeland Security, in consultation with the Secretary of State, designated Poland as a country that is eligible to participate in the Visa Waiver Program.

Accordingly, this rule updates the list of countries designated for participation in the Visa Waiver Program by adding Poland.

**DATES:** This final rule is effective on November 11, 2019.

**FOR FURTHER INFORMATION CONTACT:** Erik Rye, Department of Homeland Security, Visa Waiver Program Office, (202) 282–9907.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. The Visa Waiver Program*

Pursuant to section 217 of the Immigration and Nationality Act (INA), 8 U.S.C. 1187, the Secretary of Homeland Security (the Secretary), in consultation with the Secretary of State, may designate certain countries as Visa Waiver Program (VWP) countries [1] if certain requirements are met. Those requirements include, without limitation: (1) A U.S. Government determination that the country meets the applicable statutory requirement with respect to nonimmigrant visitor visa refusals for nationals of the country; (2) an official certification that it issues machine-readable, electronic passports that comply with internationally accepted standards; (3) a U.S. Government determination that the country's designation would not negatively affect U.S. law enforcement and security interests; (4) an agreement with the United States to report, or make available through other designated means, to the U.S. Government information about the theft or loss of passports; (5) a U.S. Government determination that the government accepts for repatriation any citizen, former citizen, or national not later than three weeks after the issuance of a final executable order of removal; and (6) an agreement with the United States to share information regarding whether citizens or nationals of the country represent a threat to the security or welfare of the United States or its citizens.

The INA also sets forth requirements for continued eligibility and, where appropriate, probation and/or termination of program countries.

[1] All references to "country" or "countries" in the laws authorizing the Visa Waiver Program are read to include Taiwan. *See* Taiwan Relations Act of 1979, Public Law 96–8, section 4(b)(1) (codified at 22 U.S.C. 3303(b)(1)) (providing that "[w]henever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan"). This is consistent with the United States' one-China policy, under which the United States has maintained unofficial relations with Taiwan since 1979.

**DEPARTMENT OF HOMELAND
SECURITY**

**8 CFR Part 274a**

[CIS No. 2714–22; DHS Docket No. USCIS–
2022–0002]

**RIN 1615–AC78**

**Temporary Increase of the Automatic
Extension Period of Employment
Authorization and Documentation for
Certain Renewal Applicants**

**AGENCY:** U.S. Citizenship and
Immigration Services, DHS.
**ACTION:** Temporary final rule with
request for comments.

**SUMMARY:** This rule temporarily amends
existing Department of Homeland
Security (DHS) regulations to provide
that the automatic extension period
applicable to expiring Employment
Authorization Documents (Forms I–766
or EADs) for certain renewal applicants
who have filed Form I–765, Application
for Employment Authorization, will be
increased from up to 180 days to up to
540 days from the expiration date stated
on their EADs. This increase will be
available to eligible renewal applicants
with pending Forms I–765 as of May 4,
2022, including those applicants whose
employment authorization may have
lapsed following the initial 180-day
extension period, and any eligible
applicant who files a renewal Form I–
765 during the 540-day period
beginning on or after May 4, 2022, and
ending October 26, 2023. In light of
current processing times for Forms I–
765, DHS is taking these steps to help
prevent renewal applicants from
experiencing a lapse in employment
authorization and/or documentation
while their applications remain pending
and solutions are implemented to return
processing times to normal levels.

**DATES:**

*Effective date:* This temporary final
rule is effective May 4, 2022, through
October 15, 2025.

*Submission of public comments:*
Written comments must be submitted
on or before July 5, 2022. The electronic
Federal Docket Management System
will accept comments prior to midnight
eastern time at the end of that day.

**ADDRESSES:** You may submit comments
on the entirety of this temporary final
rule package, identified by DHS Docket
No. USCIS–2022–0002, through the
Federal eRulemaking Portal: *https://
www.regulations.gov.* Follow the
website instructions for submitting
comments.

Comments submitted in a manner
other than the one listed above,

including emails or letters sent to USCIS
or DHS officials, will not be considered
comments on the temporary final rule
and may not receive a response. Please
note that USCIS cannot accept any
comments that are hand-delivered or
couriered. In addition, USCIS cannot
accept comments contained on any form
of digital media storage devices, such as
CDs/DVDs and USB drives. USCIS is not
accepting mailed comments at this time.
If you cannot submit your comment by
using *https://www.regulations.gov,*
please contact Samantha Deshommes,
Chief, Regulatory Coordination
Division, Office of Policy and Strategy,
U.S. Citizenship and Immigration
Services, Department of Homeland
Security, by telephone at 240–721–3000
(not a toll-free call) for alternate
instructions.

**FOR FURTHER INFORMATION CONTACT:**
Melissa Lin, Branch Chief, Policy
Development and Coordination
Division, Office of Policy and Strategy,
U.S. Citizenship and Immigration
Services, Department of Homeland
Security, 5900 Capital Gateway Drive,
Camp Springs, MD 20746; telephone
240–721–3000 (not a toll-free call).

Individuals with hearing or speech
impairments may access the telephone
numbers above via TTY by calling the
toll-free Federal Information Relay
Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

DHS invites you to participate in this
rulemaking by submitting written data,
views, or arguments on all aspects of
this temporary final rule. Comments
providing the most assistance to DHS
will reference a specific provision of the
temporary final rule, explain the reason
for any recommended change, and
include data, information, or authority
that supports the recommended change.
Comments submitted in a manner other
than explicitly provided above,
including emails or letters sent to USCIS
or DHS officials, will not be considered
comments on the temporary final rule
and may not receive a response.

*Instructions:* All submissions should
include the agency name and DHS
Docket No. USCIS–2022–0002 for this
rulemaking. Providing comments is
entirely voluntary. DHS will post all
submissions, without change, to the
Federal eRulemaking Portal at *https://
www.regulations.gov* and will include
any personal information you provide.
Because the information you submit
will be publicly available, you should
consider limiting the amount of
personal information in your
submission. DHS may withhold

information provided in comments from
public viewing if it determines that such
information is offensive or may affect
the privacy of an individual. For
additional information, please read the
Privacy Act notice available through the
link in the footer of *https://
www.regulations.gov.*

*Docket:* For access to the docket and
to read comments received, go to
*https://www.regulations.gov,* referencing
DHS Docket No. USCIS–2022–0002.
You may also sign up for email alerts on
the online docket to be notified when
comments are posted or subsequent
rulemaking is published.

**II. Background**

Operational challenges, exacerbated
by the emergency measures USCIS
employed to maintain its operations
through the height of the COVID–19
pandemic in 2020, which greatly
affected operations and staffing,
combined with a sudden increase in
Form I–765 filings, have resulted in
processing times for Form I–765
increasing to such a level that the 180-
day automatic extension period for
Form I–765 renewal applicants'
employment authorization and/or EADs
is temporarily insufficient. For some
applicants, the extension has already
expired, while for many others, it is in
imminent danger of expiring. As a
result, renewal applicants are losing
their jobs and employers suddenly are
faced with finding replacement workers
during a time when the U.S. economy
is experiencing more job openings than
available workers.[1] DHS has determined
that it is imperative to immediately
increase the automatic extension period
of employment authorization and/or
EADs for eligible Form I–765 renewal
applicants for a temporary period. This
temporary increase to the automatic
extension period will avoid the
immediate harm that otherwise would
affect tens of thousands of EAD renewal
applicants and their U.S. employers in
those cases where USCIS is unable to
process applicants' EAD renewal
applications before the end of the
current 180-day automatic extension
period. USCIS is already taking steps to
more permanently address its backlogs
for EAD applications and other form
types, and this temporary increase will
provide a temporary extension while

---

[1] Bureau of Labor Statistics data show that, as of
December 2021, there were 0.6 unemployed persons
per job opening. U.S. Department of Labor, U.S.
Bureau of Labor Statistics, *Number of unemployed
persons per job opening, seasonally adjusted* (Jan.
2007 through Jan. 2022), *https://www.bls.gov/
charts/job-openings-and-labor-turnover/unemp-per-
job-opening.htm* (last visited Mar. 14, 2022).

USCIS works to return to pre-pandemic processing times.

## A. Legal Authority

The Secretary of Homeland Security's (Secretary) authority for the regulatory amendments made in this TFR are found in: section 274A(h)(3)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. 1324a(h)(3)(B), which recognizes the Secretary's authority to extend employment authorization to noncitizens in the United States; and section 101(b)(1)(F) of the Homeland Security Act, 6 U.S.C. 111(b)(1)(F), which establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." In addition, section 103(a)(3) of the INA, 8 U.S.C. 1103(a)(3), authorizes the Secretary to establish such regulations as the Secretary deems necessary for carrying out the Secretary's authority under the INA, and section 214 of the INA, 8 U.S.C. 1184, including section 214(a)(1), 8 U.S.C. 1184(a)(1), authorizes the Secretary to prescribe, by regulation, the terms and conditions of the admission of nonimmigrants.

## B. Legal Framework for Employment Authorization

1. Types of Employment Authorization: 8 CFR 274a.12(a), (b), and (c)

Whether or not a noncitizen is authorized to work in the United States depends on the noncitizen's immigration status or other conditions that may permit employment authorization (for example, having a pending application for asylum or a grant of deferred action). DHS regulations outline three classes of noncitizens who may be eligible for employment in the United States, as follows:[2]

• Noncitizens in the first class, described in 8 CFR 274a.12(a), are authorized to work "incident to status" for any employer, as well as to engage in self-employment, as a condition of their immigration status or circumstances. Although authorized to work as a condition of their status or circumstances, certain classes of noncitizens must apply to USCIS in order to receive a Form I–766 EAD as

evidence of that employment authorization;[3]

• Noncitizens in the second class, described in 8 CFR 274a.12(b), also are authorized to work "incident to status" as a condition of their immigration status or circumstances, but generally the authorization is valid only for a "specific employer;"[4] and

• Noncitizens in the third class, described in 8 CFR 274a.12(c), are required to apply for employment authorization and may work only if USCIS approves their application. Therefore, they are authorized to work for any employer, as well as to engage in self-employment, upon approval, in the discretion of USCIS, of Form I–765, Application for Employment Authorization, so long as their EAD remains valid.[5]

2. The Application Process for Obtaining Employment Authorization and EADs: 8 CFR 274a.13(a)

For certain eligibility categories listed in 8 CFR 274a.12(a) (the first class) and all eligibility categories listed in 8 CFR 274a.12(c) (the third class), as well as additional categories specified in form instructions, an Application for Employment Authorization (Form I–765) must be properly filed with USCIS (with fee or fee waiver as applicable) to receive employment authorization and/or the Form I–766 EAD.[6] If granted, such employment authorization and EADs allow noncitizens to work for any U.S. employer or engage in self-employment, as applicable. Certain noncitizens may file Form I–765 concurrently with a related benefit request if permitted by the form instructions or as announced by USCIS.[7] In some instances, the underlying benefit request, if granted, would form the basis for eligibility for employment authorization.

For eligibility categories listed in 8 CFR 274a.12(a) and (c), USCIS has the

discretion to establish a specific validity period for the EAD.[8]

3. Automatic Extensions of EADs for Renewal Applicants: 8 CFR 274a.13(d)

a. Renewing Employment Authorization and/or EADs

EADs are not valid indefinitely, but instead expire after a specified period of time.[9] Noncitizens within eligibility categories listed in 8 CFR 274a.12(c) must obtain a renewal of employment authorization and their EAD before the expiration date stated on the current EAD, or the noncitizen will lose the eligibility to work in the United States unless the noncitizen has obtained an immigration status or belongs to a class of individuals with employment authorization incident to that status (or class) since obtaining a current EAD. The same holds true for some classes of noncitizens authorized to work incident to status whose EADs' expiration dates coincide with the termination or expiration of their underlying immigration status. Other noncitizens authorized to work incident to status, such as asylees, refugees, and Temporary Protected Status (TPS) beneficiaries, may have immigration status that confers employment authorization that continues past the expiration date stated on their EADs. Nevertheless, such individuals may wish to renew their EAD in order to have valid evidence of their continuous employment authorization for various purposes, such as presenting evidence of employment authorization and identity to their employers for completion of the Employment Eligibility Verification (Form I–9), or to obtain benefits such as a driver's license from a State motor vehicle agency.[10] Failure to renew their EADs prior to the expiration date may result in job loss if such individuals do not have or cannot present alternate evidence of employment authorization, as employers who continue to employ individuals without employment

---

[2] There are several employment-eligible categories that are not included in DHS regulations but instead are described in the form instructions to Form I–765, Application for Employment Authorization. Employment-authorized L nonimmigrant spouses are an example. See INA sec. 214(c)(2)(E), 8 U.S.C. 1184(c)(2)(E).

[3] See 8 CFR 274a.12(a).

[4] See 8 CFR 274a.12(b). These noncitizens are issued an Arrival-Departure Record (Form I–94) indicating their employment-authorized status in the United States and do not file separate requests for evidence of employment authorization.

[5] See 8 CFR 274a.12(c); Matter of Tong, 16 I&N Dec. 593, 595 (BIA 1978) (holding that the term "employment" is a common one, generally used with relation to the most common pursuits," and includes "the act of being employed for one's self").

[6] See 8 CFR 103.2(a) and 8 CFR 274a.13(a). Applicants who are employment authorized incident to status (e.g., asylees, refugees, TPS beneficiaries) will file Form I–765 to request a Form I–766 EAD. Applicants who are filing within an eligibility category listed in 8 CFR 274a.12(c) must use Form I–765 to request both employment authorization and an EAD.

[7] See 8 CFR 274a.13(a).

[8] See 8 CFR 274.12(a) and (c).

[9] See 8 CFR 274a.13(b) and 274a.14(a).

[10] For example, the status of asylees generally continues unless and until it is adjusted to lawful permanent resident status, and asylees are employment authorized incident to status. Therefore, asylees' employment authorization typically will continue beyond the expiration date on the EAD, which is issued in 2-year increments. On the other hand, a K–1 fiancée, while also employment authorized incident to status, will receive only a 90-day period in K–1 nonimmigrant status upon admission to the United States. The expiration date of EADs issued to K–1 fiancées will coincide with the 90-day admission period.

authorization may be subject to civil money penalties.[11]

Those seeking to renew previously granted employment authorization and/ or EADs must file the renewal request on Form I–765 with USCIS in accordance with the form instructions.[12]

**Module A. b. Minimizing the Risk of Gaps in Employment Authorization and/or EAD Validity Through Automatic Extensions**

If an eligible noncitizen is not able to renew their employment authorization and/or EAD before it expires, the noncitizen and the employer may experience adverse consequences. For the noncitizen, the lack of renewal could cause job loss, gaps in employment authorization, and loss of income to the noncitizen and their family member(s). For the noncitizen's employer, the disruption may cause instability with business continuity or other financial harm. Beyond the financial and economic impact that gaps in employment create for the employer and the noncitizen, if the noncitizen engages in unauthorized employment, such activity may render a noncitizen removable,[13] render a noncitizen ineligible for future benefits such as adjustment of status,[14] and/or may subject the employer to civil and criminal penalties.[15]

Before 2016, USCIS regulations indicated that USCIS would "adjudicate an application [for an EAD] within 90 days" from the date USCIS received the application.[16] If USCIS did not adjudicate the application within that timeframe, the applicant was eligible to be issued an interim document evidencing employment authorization with a validity period not to exceed 240 days. On November 18, 2016, as part of

DHS's efforts to implement the flexibilities provided to noncitizens and employers by the American Competitiveness in the Twenty-first Century Act of 2000 (AC21), as amended, and the American Competitiveness and Workforce Improvement Act of 1998, DHS published a final regulation [17] removing the provision and replacing it with the current 8 CFR 274a.13(d).

Under the current provision, certain employment eligibility categories receive an automatic extension of employment authorization and EAD for up to 180 days if certain conditions (outlined below) are met.[18] DHS created the provision to prevent gaps in employment authorization and related consequences for certain renewal applicants,[19] and in light of processing times and possible filing surges.[20] To significantly mitigate the risks of and consequences related to gaps in employment authorization for renewal applicants, DHS changed its regulations at 8 CFR 274a.13(d) to provide certain categories of renewal applicants with an automatic extension of their EADs and, if applicable, related employment authorization, for up to 180 days from the expiration date on the EAD if:

• The renewal applicants timely file an application to renew their employment authorization and/or EAD on Form I–765 before the EAD expires;[21]

• The renewal Form I–765 is based on the same employment authorization category on the front of the expiring EAD or is for an individual approved for TPS whose EAD was issued pursuant to 8 CFR 274a.12(c)(19);[22] and

• The noncitizen's eligibility to apply for employment authorization continues notwithstanding the expiration of the EAD and is based on an employment authorization category that does not require the adjudication of an underlying application or petition before the adjudication of the renewal application, as announced on the USCIS website.[23]

The following classes of noncitizens filing to renew an EAD may be eligible to receive an automatic extension of their employment authorization and/or EAD for up to 180 days, which USCIS discusses in detail at *https:// www.uscis.gov/eadautoextend:*[24]

• Noncitizens admitted as refugees (A03).[25]

• Noncitizens granted asylum (A05).[26]

• Noncitizens admitted as parents or dependent children of noncitizens granted permanent residence under section 101(a)(27)(I) of the INA, 8 U.S.C. 1101(a)(27)(I) (A07).[27]

• Noncitizens admitted to the United States as citizens of the Federated States

[11] For an initial hire, the employee must present the employer with acceptable documents evidencing identity and employment authorization. The lists of acceptable documents can be found on the last page of the Form I–9. *See https:// www.uscis.gov/sites/default/files/document/forms/ i-9.pdf* (last updated Oct. 21, 2019). An employer that does not properly complete Form I–9, which includes reverifying continued employment authorization, or continues to employ an individual with knowledge that the individual is not authorized to work may be subject to civil money penalties. *See https://www.uscis.gov/i-9-central/ handbook-for-employers-m-274/100-unlawful-discrimination-and-penalties-for-prohibited-practices/108-penalties-for-prohibited-practices* (last updated Apr. 27, 2020).

[12] *See https://www.uscis.gov/sites/default/files/ document/forms/i-765instr.pdf* [08/25/20 edition). In reviewing the Form I–765, USCIS ensures that the fee was paid, a fee waiver was granted, or a fee exemption applies.

[13] *See, e.g.,* INA sec. 237(a)(1)(C), 8 U.S.C. 1227(a)(1)(C).

[14] *See* INA sec. 245(c), 8 U.S.C. 1255(c).

[15] *See* INA sec. 274A, 8 U.S.C. 1324a.

[16] *See* 8 CFR 274a.13(d) (2016).

[17] *See* Final Rule, *Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers,* 81 FR 82398 (Nov. 18, 2016) ("AC21 Final Rule"). The final rule was issued after a proposed rule was published in the **Federal Register**. *See* Not ce of Proposed Rulemaking, *Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers,* 80 FR 81899 (Dec. 31, 2015) "AC21 NPRM").

[18] *See* 81 FR at 82455–82463 (AC21 Final Rule).

[19] *See* 80 FR at 81927 ("DHS proposes to amend its regulations to help prevent gaps in employment authorization for certain employment-authorized individuals who are seeking to renew expiring EADs. . . . These provisions would significantly mitigate the risk of gaps in employment authorization and require documentation for eligible individuals, thereby benefitting them and their employers.").

[20] *See* 80 FR at 81927 ("DHS believes that this time period [of up to 180 days] is reasonable and provides more than ample time for USCIS to complete the adjudication process based on USCIS's current 3-month average processing time for Applications for Employment Authorization."); *id.* at 81927 n.77 ("Depending on any significant surges in filings, however there may be periods in which USCIS takes longer than 2 weeks to issue Notices of Action (Forms −797C).").

[21] 8 CFR 274a.13(d)(1)(ii). TPS beneficiaries must file during the designated period in the applicable **Federal Register** notice. In addition, the TPS and TPS-related documentation, including EADs, of certain TPS beneficiaries under the TPS designations for Haiti, El Salvador, Sudan, Nicaragua, Honduras, and Nepal are continued

subject to current court orders and litigation compliance **Federal Register** notices. *See* 86 FR 50725 (Sept. 10, 2021) (continuing TPS and TPS-related documentation for eligible beneficiaries of the TPS designations for the noted six countries through December 31, 2022, and further noting that DHS will issue future such notices as necessary to comply with court orders in *Ramos, et al. v. Nielsen, et al.,* No. 18–cv–01554 (N.D. Cal. Oct. 3, 2018) ("*Ramos*"); *Saget, et al. v. Trump, et al.,* No. 18–cv–1599 (E.D.N.Y. Apr. 11, 2019) ("*Saget*"); and *Bhattarai v. Nielsen,* No. 19–cv–00731 (N.D. Cal. Mar. 12, 2019) ("*Bhattarai*"). DHS also will comply with any superseding court orders in these lawsuits. This TPR will be construed in harmony, to the extent possible, with the existing and any future court orders in this referenced litigation.

[22] *See* 8 CFR 274a.13(d)(1)(ii) (exempting individuals approved for TPS with EADs issued pursuant to 8 CFR 274a.12(c)(19) from the requirement that the employment authorization category on the face of the expiring EAD be the same as on the request for renewal (Form I–765)). *See also* DHS, USCIS, *Employment Authorization for Certain H–4, E, and L Nonimmigrant Dependent Spouses,* PA–2021–25 (Nov. 12, 2021), *https:// www.uscis.gov/sites/default/files/document/policy-manual-updates/20211112-Employment Authorization.pdf* (explaining that certain H–4, E, or L dependent spouses may submit a document combination including an unexpired Form I–94 indicating H–4, E, or L–2 nonimmigrant status alongside Form I–797C).

[23] *See* 8 CFR 274a.13(d)(iii).

[24] *See* DHS, USCIS, *Automatic Employment Authorization Document (EAD) Extension, https:// www.uscis.gov/eadautoextend* (last updated Nov. 12, 2021).

[25] *See* 8 CFR 274a.12(a)(3).

[26] *See* 8 CFR 274a.12(a)(5).

[27] *See* 8 CFR 274a.12(a)(7).

AR_002143

of Micronesia or the Marshall Islands pursuant to agreements between the United States and the former trust territories (A08).[28]

• Noncitizens granted withholding of deportation or removal (A10).[29]

• Noncitizens granted TPS, regardless of the employment authorization category on their current EADs (A12 or C19).[30]

• Noncitizen spouses of E–1/2/3 nonimmigrants (Treaty Trader/Investor/Australian Specialty Worker) (A17).[31]

• Noncitizen spouses of L–1 nonimmigrants (Intracompany Transferees) (A18).[32]

• Noncitizens who have properly filed applications for TPS and who have been deemed *prima facie* eligible for TPS under 8 CFR 244.10(a) and have received an EAD as a "temporary treatment benefit" under 8 CFR 244.10(e) and 274a.12(c)(19) (C19).[33]

• Noncitizens who have properly filed applications for asylum and withholding of deportation or removal (C08).[34]

• Noncitizens who have filed applications for adjustment of status to lawful permanent resident under section 245 of the INA, 8 U.S.C. 1255 (C09).[35]

• Noncitizens who have filed applications for suspension of deportation under section 244 of the INA (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the INA, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (C10).[36]

• Noncitizens who have filed applications for creation of record of lawful admission for permanent residence (C16).[37]

• Noncitizens who have properly filed legalization applications pursuant to section 210 of the INA, 8 U.S.C. 1160 (C20).[38]

• Noncitizens who have properly filed legalization applications pursuant to section 245A of the INA, 8 U.S.C. 1255a (C22).[39]

• Noncitizens who have filed applications for adjustment of status

28 *See* 8 CFR 274a.12(a)(8).
29 *See* 8 CFR 274a.12(a)(10).
30 *See* 8 CFR 274a.12(a)(12) or (c)(19).
31 *See* INA sec. 214(e)(2), 8 U.S.C. 1184(e)(2).
32 *See* INA sec. 214(c)(2)(E), 8 U.S.C. 1184(c)(2)(E).
33 *See* 8 CFR 274a.12(c)(19).
34 *See* 8 CFR 274a.12(c)(8).
35 *See* 8 CFR 274a.12(c)(9).
36 *See* 8 CFR 274a.12(c)(10).
37 *See* 8 CFR 274a.12(c)(16).
38 *See* 8 CFR 274a.12(c)(20).
39 *See* 8 CFR 274a.12(c)(22).

pursuant to section 1104 of the Legal Immigration Family Equity Act (C24).[40]

• Noncitizen spouses (H–4) of H–1B nonimmigrants with an unexpired Form I–94 showing H–4 nonimmigrant status (C26).[41]

• Noncitizens who are the principal beneficiaries or qualified children of approved VAWA self-petitioners, under the employment authorization category "(c)(31)" in the form instructions to Form I–765 (C31).

Currently, the extension automatically terminates the earlier of up to 180 days after the expiration date of the EAD, or upon issuance of notification of a decision denying the renewal request.[42] An EAD that has expired on its face is considered unexpired when combined with a Form I–797C indicating a timely filing of the application to renew the EAD.[43] Therefore, when the expiration date on the front of the EAD is reached, a noncitizen who is continuing in their employment with the same employer and relying on their extended EAD to show their employment authorization must present to the employer the Form I–797C to show continued employment authorization, and the employer must update the previously completed Form I–9 to reflect the extended expiration date based on the automatic extension while the renewal is pending. For new employment, the automatic extension date is recorded on the Form I–9 by the employee (if applicable) and employer in the first instance. In either case, the reverification of employment authorization or the EAD occurs when the automatic extension period terminates.[44]

USCIS policy generally permits the filing of a Form I–765 renewal application up to 180 days before the current EAD expires.[45] If the renewal application is granted, the employment authorization and/or EAD generally will be valid as of the date of approval of the application. If the application is denied, the employment authorization and/or EAD generally is terminated on the day of the denial.[46] If the renewal application was timely and properly filed but remains pending beyond the

40 *See* 8 CFR 274a.12(c)(24).
41 *See* 8 CFR 274a.12(c)(26).
42 *See* 8 CFR 274a.13(d)(3).
43 *See* 8 CFR 274a.13(d)(4).
44 *See* DHS, USCIS, *Completing Section 3, Reverification and Rehires, https://www.uscis.gov/i-9-central/complete-correct-form-i-9/completing-section-3-reverification-and-rehires* (last updated July 10, 2020).
45 *See* USCIS' web page at *https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document* (last updated Feb. 11, 2022); *see also* 81 FR at 82456 (AC21 Final Rule).
46 *See* 8 CFR 274a.13(d)(3).

180-day automatic extension period and the employee cannot provide other evidence of current employment authorization, the employee must stop working on the beginning of the 181st day after the expiration of the EAD, and the employer must remove the employee from the payroll.[47] As a result, both the employee and the employer will experience the negative consequences of gaps in employment authorization and/or EAD validity. Since its promulgation in 2016, the automatic extension provision at 8 CFR 274a.13(d) has helped to minimize the risk of these negative consequences for applicants who are otherwise eligible for the automatic extension and their employers.

Recently, however, it has become apparent that the 180-day automatic extension is not enough for a growing number of renewal applicants. Thousands of renewal applications remain pending beyond the 180-day automatic extension period resulting in applicants losing employment authorization and/or EAD validity. The grave situation that applicants and, in turn, their employers are facing generally is not the result of the applicant's actions, but instead the result of several converging factors affecting USCIS operations that have been compounded by the COVID–19 public health emergency. These factors resulted in a significant increase in USCIS processing times for several categories of Form I–765 renewal applications, as described in detail below. DHS has determined that the 180-day automatic extension provision is currently insufficient to protect applicants as was originally intended.

## III. Purpose of This Temporary Final Rule

### A. Overview of Issues Negatively Impacting Form I–765 Processing Times

Prior to 2019, USCIS generally kept pace with the steady flow of Form I–765 filings and met its 3-month internal processing goal. However, in the years leading up to 2019, USCIS began accruing backlogs in adjudications across various other form types owing to shifting priorities, increased form lengths, expanded interview requirements, increased Request for Evidence issuance, and insufficient staffing levels due to a hiring freeze within the Field Operations Directorate beginning December 2019 and one in the Service Center Operations

47 *See* 8 CFR 274a.2(b)(vii) (reverification provision).

Directorate beginning February 2020.[48] Those backlogs in other program areas strained USCIS resources, which, when coupled with USCIS' worsening fiscal situation beginning in late 2019 and continuing into 2020 and part of 2021, hindered USCIS' ability to allocate resources to respond to the increase in Form I–765 filings in a manner that would allow USCIS to continue to meet its 3-month internal processing goal as it historically had. Additionally, strain on USCIS' financial resources, which was due in part to USCIS' inability to update its fee structure since 2016, negatively affected staffing levels and hampered the ability to quickly respond to shifting workload demands. The COVID–19 pandemic exacerbated USCIS' precarious fiscal situation, deepening its fiscal emergency. The pandemic also led to new and significant operational disruptions, reversing any gains the agency had made on existing backlogs; [49] these pandemic-related disruptions impacted adjudications of immigration benefit requests as well as the pipeline of work for which all required pre-adjudicative processing was completed (making forms "adjudication-ready"), including for Form I–765 adjudications.[50] In 2021, before USCIS could recover from these fiscal and operational impacts, USCIS experienced a sudden and dramatic increase in Form I–765 filings due to:

Increased filings in the C09 (pending adjustment) category generally caused by changes in employment-based visa availability, new Temporary Protective Status (TPS) designations and redesignations, and the cyclical nature of the C08 (pending asylum) and C33 (DACA) categories. USCIS has experienced significant Form I–765 backlogs since then.

Presently, Form I–765 processing times vary, with many categories' processing times extending far beyond USCIS' 3-month processing goal for the form type. By December 2021, the median [51] processing time for all initial and renewal Form I–765 applications was 6.5 months, and the median processing time for all Form I–765 renewal applications was 5.4 months. For those renewal applicants within employment authorization categories eligible for the up to 180-day automatic extension of employment authorization provided by 8 CFR 274a.13(d), as of December 2021, USCIS' median processing time was 8.0 months.[52] Given these processing times, DHS recognizes that approximately 87,000 renewal applicants eligible for an automatic extension under 8 CFR 274a.13(d)(1) are, or soon will be, past the 180-day automatic extension period of their employment authorization and/ or EAD validity.

The vast majority of applicants filing renewal Form I–765 applications and who are eligible for the automatic extension of EADs under 8 CFR 274a.13(d) fall under three filing categories: (1) Noncitizens who have properly filed applications for asylum and withholding of deportation or removal (C08); (2) noncitizens who have properly filed applications for adjustment of status to lawful permanent resident under section 245 of the INA, 8 U.S.C. 1255 (C09); [53] and (3) noncitizens who have properly filed applications for suspension of deportation under section 244 of the INA (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the INA, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (C10).[54] As of December 2021, the processing time range (between median and 93rd percentile) for Form I–765 renewal applications filed based on the C08 category was 10.1 to 11.5 months; for the C09 category, 7.7 to 11.6 months; and for the C10 category, 6.1 to 8.6 months. By comparison, this processing time range as of December 2020, for the C08 category, was 5.0 to 6.9 months; for the C09 category, 2.5 to 5.6 months; and for the C10 category, 3.2 to 4.2 months.

TABLE 1—RECENT DRAMATIC GROWTH IN 50TH AND 93RD PERCENTILE PROCESSING TIMES FOR FORM I–765 RENEWAL APPLICATIONS FILED BY TOP THREE FILING CATEGORIES

| Fiscal year [55] | Pending asylum applicants (C08) | Adjustment of status applicants (C09) | Suspension/cancellation applicants (C10) |
|---|---|---|---|
| 2017 | 6.5 to 7.1 months | 4.6 to 6.5 months | 6.3 to 8.4 months. |
| 2018 | 2.8 to 4.4 months | 4.7 to 8.1 months | 7.0 to 9.5 months. |

[48] A U.S. Government Accountability Office report observed that despite receipts remaining steady (between 8 million and 10 million) from fiscal year (FY) 2015 through FY 2019, USCIS' processing times increased through FY 2020, and the overall pending caseload grew an estimated 85 percent, with USCIS having received more than 4 million applications and petitions in the first two quarters of FY 2020, owing to the factors listed above. Factors that affected Form I–765, specifically, will be discussed in further detail below. *See* GAO–21–529, U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload (Aug. 2021), pp. 9, 12, 14, and 20, *https://www.gao.gov/assets/gao-21-529.pdf.* The hiring freezes that began in the Field Operations and Service Center Operations Directorates were eventually subsumed by an agency-wide hiring freeze beginning May 1, 2020, which is discussed in further detail below. USCIS lifted the agency-wide hiring freeze in March 2021.

[49] USCIS had made some progress in addressing these backlogs before the COVID–19 pandemic. In FY 2019, USCIS observed a backlog growth rate of less than 1 percent—the smallest growth in backlogs since 2012. This was due to a 4-percent decrease in receipts, increases in completions (naturalizations, adjustments of status, and nonimmigrant and immigrant worker petitions),

and additional staffing. However, the COVID–19 pandemic reversed any gains USCIS had made.

[50] Other contributing factors include competing priorities, such as litigation obligations and administration priorities, that shifted resources away from Form I–765 adjudications or caused the agency to focus resources on certain categories or subcategories of Form I–765; and policy changes (such as expanding biometrics requirements to certain applicants filing Form I–539, Application to Extend/Change Nonimmigrant Status), which delayed USCIS' ability to approve any Form I–765 relying on an underlying Form I–539 decision. *See* GAO–21–529, U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload (Aug. 2021), pp. 15–20. However, these factors, while relevant, have been mitigated through recent policy changes and, therefore, are no longer a significant cause of gaps in employment authorization for applicants. For example, on May 17, 2021, USCIS temporarily suspended the biometrics requirement for certain Form I–539 applicants to address the processing delays exacerbated by limited Application Support Center (ASC) capacity due to COVID–19. *See* USCIS News Alert, USCIS Temporarily Suspends Biometrics Requirement for Certain Form I–539 Applicants, *https://www.uscis.gov/news/alerts/uscis-temporarily-suspends-biometrics-requirement-for-*

*certain-form-i-539-applicants* (last updated May 13, 2021).

[51] The median processing time represents the time it took to complete 50 percent of the cases completed in a given time period.

[52] The time it took USCIS to complete 93 percent of these cases was 11.4 months. For more information on how USCIS calculates its processing times, see USCIS' web page at *https:// egov.uscis.gov/processing-times/more-info* (last visited Feb. 9, 2022).

[53] Applicants filing a Form I–765 based on a pending LRIF-based adjustment application also use "(c)(9)" as their eligibility category on Form I–765.

[54] In December 2021, these three filing categories made up nearly 95 percent of the renewal EAD receipts filed in categories eligible for the automatic extension of employment authorization. Broken down further among these three categories: The C08 category comprised approximately 58 percent of the renewal EAD receipts filed in categories eligible for the automatic extension, while the C09 category comprised approximately 19 percent and the C10 comprised approximately 18 percent.

[55] In some cases, USCIS' data is based on its fiscal year, beginning on October 1 and ending on September 30 of the reporting period.

AR_002145

TABLE 1—RECENT DRAMATIC GROWTH IN 50TH AND 93RD PERCENTILE PROCESSING TIMES FOR FORM I–765 RENEWAL
APPLICATIONS FILED BY TOP THREE FILING CATEGORIES—Continued

| Fiscal year [55] | Pending asylum applicants (C08) | Adjustment of status applicants (C09) | Suspension/cancellation applicants (C10) |
|---|---|---|---|
| 2019 ............... | 4.1 to 5.2 months ................................... | 5.2 to 7.8 months .................................. | 2.7 to 4.6 months. |
| 2020 ............... | 5.0 to 6.9 months ................................... | 2.5 to 5.6 months .................................. | 3.2 to 4.2 months. |
| 2021 ............... | 10.1 to 11.5 months ............................... | 7.7 to 11.6 months ................................ | 6.1 to 8.6 months. |

With current processing times far exceeding USCIS' normal 3-month goal, the 180 days of additional employment authorization/EAD validity provided for these renewal (and some additional) categories by 8 CFR 274a.13(d) is insufficient.[56] After the additional 180 days is exhausted, many applicants are still waiting for their Form I–765 renewal applications to be approved. Such applicants therefore lose employment authorization and/or their EADs become invalid while the decision on their renewal applications remains outstanding. By December 31, 2021, approximately 66,000 renewal EAD applicants were in this situation. By comparison, in December 2020, approximately 3,300 applicants [57] had Form I–765 renewal applications pending beyond the 180-day automatic extension.[58]

[56] Other renewal categories that fall within 8 CFR 274a.13(d) experiencing processing times in December 2021 that exceed the 3-month goal include EAD applicants filing under 8 CFR 274a.12(a)(5) for individuals granted asylum (6.1 to 10.2 months), (a)(10) for individuals granted withholding of deportation or removal (7.2 to 10.3 months), and (c)(31) for VAWA self-petitioners (6.3 to 13.1 months).

[57] Reasons for delays in case completions for these approximately 3,300 applicants included competing priorities, Requests for Evidence, staffing, and the COVID–19 pandemic.

[58] The 66,000 and approximately 3,300 figures reflect all EAD categories eligible for automatic extension of employment eligibility and/or EAD validity. Therefore, some applicants within this population, namely applicants filing under 8 CFR 274a.12(a) (employment authorization incident to status or circumstance), do not necessarily lose their employment authorization after the 180-day automatic extension period is exhausted. Because their employment authorization is incident to their immigration status or circumstance, these renewal EAD applicants' primary consequence is that their EADs become invalid. Considering that the vast majority (approximately 95 percent as of December 2021) of renewal EAD applicants are those filing under 8 CFR 274a.12(c)(8), (9), and (10), however, the 66,000 and 3,300 figures are presumed to represent largely applicants whose primary consequence is a loss of employment authorization itself. Even so, DHS recognizes harm may be experienced by applicants filing under 8 CFR 274a.12(a) categories as well. While these applicants may have available alternative evidentiary options other than an EAD that they can use to show proof of employment authorization to their employers for Form I–9 completion or for purposes of receiving State or local public benefits (e.g., driver's licenses), DHS recognizes that having no valid EAD may nevertheless cause harm, including job loss.

Without immediate intervention, DHS estimates that the situation will only worsen over time, as each month, thousands of additional EAD renewal applicants are at risk of losing their employment authorization and/or EAD validity despite the 180-day automatic extension period currently provided by regulation. Beginning in calendar year (CY) 2022, DHS estimates that approximately 14,500 or more renewal applicants, the majority of whom are in the C08 pending asylum applicant category, lost or could lose their employment authorization and/or EAD validity *each month* unless immediate action is taken to remedy the situation.

The situation for asylum applicants is especially dire because of the significant time that asylum applicants must wait to become employment-authorized in the first place. Under regulations that were in effect from August 2020 through February 2022, most members of this vulnerable population were not permitted to apply for employment authorization until 365 calendar days had elapsed since the filing of their asylum application.[59] Although this regulation was vacated [60] in February of 2022, by statute, asylum applicants still cannot be approved for initial EADs until their asylum applications have been pending for 180 days.[61] This initial wait time exacerbates the often-precarious economic situations asylum seekers may be in as a result of fleeing persecution in their home countries. Many lacked substantial resources to support themselves before they fled, or spent much of what they had to escape their country and travel to the United States. Those with resources may have been forced to leave what they had behind because they lacked the time to sell property or otherwise gather what they owned. When whole families are threatened, the primary earner may be

[59] *See* Employment Authorization Applications Rule and the Asylum Application, Interview, and Employment Authorization for Applicants Rule ("Broader Asylum EAD Rule"), 85 FR 38532 (June 26, 2020), and preliminary injunction in *Casa de Maryland Inc. et al. v. Chad Wolf et al.*, 8:20–cv–02118–PX (D. Md. Sept. 11, 2020).

[60] *See Asylumworks, et al. v. Alejandro N. Mayorkas, et al.*, No 20–Cv–3815 BAH, 2022 WL 355213 (D.D.C. Feb 7, 2022).

[61] *See* INA 208(d)(2), 8 U.S.C. 1158(d)(2).

the first to travel to the United States to establish a new home before bringing the rest of the family. The cost to travel to the United States is high, as is the relative cost of living. In these circumstances, if the asylum seeker is unable to seek employment for extended periods of time, it can not only negatively impact that individual, but the whole family as well.

For those who have already found jobs to support their needs, the potential for their initial EADs to expire prior to the approval and issuance of a renewed EAD may force them back into instability caused by a gap in the ability to legally work. Some employers, notwithstanding possible violation of INA section 274B governing unfair immigration-related employment practices (8 U.S.C. 1324b), or other laws, may also be hesitant to accept EADs as proof of employment authorization or hire employees who present EADs in the first place if it appears maintaining their employment will be difficult due to potential lapses in employment authorization. Continuous employment authorization during the pendency of an asylum application is vital for asylum seekers in the United States in order to access housing, food, and other necessities. In addition, asylum seekers may need income or employment to access medical care, mental health services, and other resources, as well as to access legal counsel in order to pursue their claims before USCIS or the Executive Office for Immigration Review (EOIR). Access to mental health services is particularly crucial for asylum seekers due to the prevalence of trauma-induced mental health concerns, including depression and post-traumatic stress disorder (PTSD). The physical harm experienced by many asylum seekers necessitates continuous medical care for extended periods of time. Finally, the purpose for which asylum seekers came to the U.S. is to seek long-term protection by receiving asylum. Legal assistance may be key for an asylum seeker to successfully claim asylum,[62] but it is also often expensive.

[62] *See* Transactional Records Access Clearinghouse, *Asylum Grant Rates Climb Under*
Continued

*B. Effect of Operational Challenges on Form I–765 Adjudications*

1. Precarious Fiscal Status in 2020 and Part of 2021

USCIS is a fee-based agency that relies on predictable fee revenue and its carryover from the previous year. USCIS began experiencing fiscal troubles as early as December 2019, when at least one USCIS directorate initiated a hiring freeze.[63] These fiscal troubles were due in part to the fact that USCIS has not been able to update its fee structure since the 2016 Fee Rule[64] (including fees for Form I–765), which does not fully cover the costs of administering current and projected volumes of immigration benefit requests.

USCIS promulgated a new Fee Rule in August 2020 to address this fee/cost disparity.[65] In September 2020, however, the 2020 Fee Rule was enjoined before it took effect and remains under a preliminary injunction.[66] As such, the current fee for Form I–765 remains at $410, the fee set by the earlier 2016 Fee Rule.[67] The 2016 Fee Rule also exempts applicants from paying a fee if filing a Form I–765 to request renewal or replacement under 8 CFR 274a.12(c)(9) (pending adjustment of status application), as well as some additional categories.[68]

The 2020 Fee Rule would have made various changes to USCIS filing fees to help cover the increased cost of adjudicating benefit requests, including a 34 percent increase for the Form I–765

filing fee to $550, and removing fee exemptions for Form I–765 renewals or replacements for applicants filing under 8 CFR 274a.12(c)(9), among other categories.[69] USCIS continues to rely on the fee schedule established in the 2016 Fee Rule, which does not fully account for current costs associated with adjudicating benefit requests. This unsustainable fiscal situation has, among other things, resulted in the inability to fund sufficient new officer positions to handle the heavy adjudication workload,[70] meaning that USCIS was already in a precarious financial position with regard to staffing when the COVID–19 pandemic began.

2. Public Health Emergency

On January 31, 2020, the Secretary of Health and Human Services (HHS) declared a public health emergency under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19, which is caused by the SARS–CoV–2 virus.[71] On February 24, 2021, the President issued a continuation of the national emergency concerning the COVID–19 pandemic.[72] Effective October 15, 2021, HHS renewed the determination that "a public health emergency exists and has existed since January 27, 2020 nationwide."[73] On January 14, 2022, and as a result of the continued consequences of the COVID–19 pandemic, HHS renewed yet again the determination that a public health emergency exists.[74]

As noted above, USCIS was already in a precarious financial situation in 2019. This was severely exacerbated by a significant drop in receipts across many of the most common benefit types at the beginning of the COVID–19 pandemic in spring 2020.[75] The significant drop in revenue USCIS experienced early in the pandemic led the agency to plan for a sweeping furlough of approximately 70 percent of its workforce to avoid financial collapse, including furloughing immigration services officers who adjudicate the Form I–765.[76] To avoid the drastic furlough measures, USCIS employed every available means to preserve sufficient funds to meet payroll and carryover obligations. These measures included drastic cuts for supplies, facilities, overtime, and contractor support services, as well as an agency-wide hiring freeze lasting from May 1, 2020, through March 31, 2021. The loss of overtime funds hindered USCIS' ability to address and mitigate backlogs through use of existing staff, which has been a strategy used successfully in the past to ensure processing times remain within goals. For example, in FY 2019, USCIS used $5.52 million of overtime funds for assigned staff to conduct border case[77] processing after working business hours and on the weekends, instead of assigning more staff to those caseloads during regular work hours, which would have pulled them away from affirmative asylum processing. Through the use of overtime, USCIS was able to continue to maintain its assigned staffing levels to affirmative asylum processing, but this option was not available in 2020, due to USCIS' worsening fiscal situation beginning in late 2019 and continuing into 2020 and part of 2021. USCIS took action to avert a fiscal crisis, including limiting

Biden (2021), *https://trac.syr.edu/immigration/reports/667/* (last updated Nov. 10, 2021) ("Asylum seekers who are represented by an attorney have greatly increased odds of winning asylum or other forms of relief from deportation.").

[63] USCIS' Field Operations Directorate (FOD) initiated a hiring freeze in December 2019; USCIS' Service Center Operations Directorate (SCOPS) did the same starting in February 2020. While both FOD and SCOPS adjudicate Forms I–765, SCOPS adjudicates the vast majority, including all those filed by pending asylum applicants (C08 category).

[64] *See* 81 FR 73292 (Oct. 24, 2016).

[65] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 85 FR 46788 (Aug. 3, 2020) ("2020 Fee Rule"). The 2020 Fee Rule, among other things, adjusted certain immigration and naturalization benefit request fees charged by USCIS, removed certain fee exemptions, and changed the fee waiver requirement.

[66] On September 29, 2020, the U.S. District Court for the Northern District of California in *Immigration Legal Resource Center, et al. v. Wolf, et al.,* 20–cv–05883–JWS, preliminarily enjoined DHS from implementing or enforcing any part of the 2020 Fee Rule.

[67] *See* 81 FR 73292 (Oct. 24, 2016).

[68] *See* 85 FR 46788 (Aug. 3, 2020). Additional categories exempt from the filing fee include 8 CFR 274a.12(a)(8) and (10) and (c)(1), (4), (7), and (16). The category at 8 CFR 274a.12(c)(9) is one of the top categories experiencing unusually long processing times and, therefore, is one of the main focuses of this rule.

[69] *See* 85 FR 46788 (Oct. 2, 2020). As noted above, DHS is preliminarily enjoined from implementing or enforcing any part of this rule.

[70] From FY 2015 through FY 2020, USCIS received a range of approximately 2.0 to 2.3 million Form I–765 filings (seeking both initial EADs and renewal of initial EADs) each fiscal year. In FY 2021, this figure increased to approximately 2.6 million. This increase in Form I–765 filings, which was largely observed in the volume of Form I–765 renewal applications sought in anticipation for automatic extension of EADs, contributed to the formation of backlogs, as discussed further in Section II.C below.

[71] *See* HHS, Determinat ion that a Public Health Emergency Exists (Jan. 31 2020), *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.*

[72] Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID–19) Pandemic, 86 FR 11599 (Feb. 26, 2021); Proclamation 9994 of March 13, 2020, Declaring a National Emergency Concerning the Coronavirus Disease (COVID–19) Outbreak, 85 FR 15337 (Mar. 18, 2020).

[73] HHS, Renewal of Determination that a Public Health Emergency Exists (Oct. 15, 2021), *https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15Oct21.as_yx).*

[74] *See* HHS, Office of the Assistant Secretary for Preparedness and Response, Renewal of Determination that a Public Health Emergency Exists (Jan. 14, 2022), *https://aspr.hhs.gov/legal/PHE/Pages/COVID19-14Jan2022.aspx.*

[75] *See* 2020 USCIS Statistical Annual Report, p. 4: "[During the onset of the COVID–19 pandemic], incoming receipts were 32 percent lower compared to the same time period in FY 2019. By the end of FY 2020, USCIS received about 5% fewer receipts than in FY 2019. Although receipts decreased in some of the most frequently submitted form types, others such as the N–400 (Application for Naturalization) and I–129 (Petition for Nonimmigrant Worker) increased slightly from FY 2019." In addition to the lowest number of receipts in the past 5 years, USCIS also completed the lowest number of benefit requests in the past 5 years. The worst rates of completion were observed during the beginning of the pandemic when USCIS field offices and ASCs were closed to the public. While USCIS attempted to recover by shifting adjudications to form types not requiring in-person appearances, USCIS still completed fewer benefit requests than it received in FY 2020. *See* 2020 USCIS Statistical Annual Report, p. 4.

[76] During this time period, USCIS had an estimated $1.2-billion budget shortfall.

[77] A border case included credible and reasonable fear interviews, as well as Migrant Protection Protocols (MPP) non-refoulement interviews.

spending to salaries and mission-critical activities; making drastic cuts to spending on supplies, facilities, and contractor support services; and eliminating overtime. The loss of contractor support services also hindered USCIS' ability to intake filings efficiently and prepare cases for adjudication by officers. The agency-wide hiring freeze expanded upon individual USCIS components' hiring freezes already in place.

These fiscal issues had a direct impact on staffing, and insufficient staffing levels directly impacted the processing times for Form I–765. In addition to a direct shortage of staff due to hiring freezes, USCIS experienced a noticeable increase in attrition following announcement of a potential furlough that could have impacted nearly 70 percent of employees.[78] Although DHS cannot quantify employees' reasons for leaving, it is likely that the threatened furlough and uncertain fiscal status of the agency played a role. The hiring freeze also meant that the higher-than-normal number of vacancies could not be filled. Additionally, a number of initiatives have taken staff away from their normal duties such as important temporary assignments to the southern border, efforts relating to unaccompanied children, and processing petitions and applications by or on behalf of Afghan evacuees. All these factors contributed to a decrease in Form I–765 completions. For example, in FY 2019, the Service Center Operations Directorate (SCOPS)

allocated 343,399 officer hours to its Form I–765 workload[79] and completed 1,443,235 adjudications (mostly Form I–765 applications filed under 8 CFR 274a.12(c)(8), followed by (c)(33) (granted DACA) and (c)(3)(B) (student post-completion optional practical training (OPT)). By comparison, in FY 2020, SCOPS allocated 327,947 (or approximately 4.5 percent fewer) officer hours to the same workload and subsequently was only able to complete 1,379,745 (or approximately 4.4 percent fewer) adjudications. These reductions were partly attributable to the overall decrease in staff, as well as competing priorities which factor into how existing resources are allocated. At the start of FY 2020, SCOPS had 5,102 employees on board. This diminished to 4,886 at the start of FY 2021 and 4,731 at the start of FY 2022 as the effects of attrition and the hiring freeze continued. This overall decrease of approximately 7.3 percent does not include the additional loss of I–765 adjudication hours that stemmed from SCOPS supporting several programs requesting detailees.[80] The number of detailees temporarily missing from the SCOPS workforce has not been static, but exceeded 200 employees at points during FY 2021, leaving SCOPS staffed at levels less than 89 percent of what existed going into FY 2020. This data does not include contractor hours, which also were severely impacted by USCIS' fiscal situation as USCIS was forced to reduce

the number of contractors available to assist with case processing.

Nonetheless, despite the reduction in officer hours, USCIS was able to maintain its 3-month processing goal up until December 2020, due to a corresponding reduction in Form I–765 receipts. This changed in CY 2021, when USCIS experienced an extraordinary, 2-month surge of Form I–765 filings in spring 2021 and a sustained increase of filings thereafter, which is discussed further in Section C below. Despite the surge of Form I–765 filings, SCOPS was able to allocate only 314,924 officer hours (or approximately 4.0 percent fewer than FY 2020 and approximately 8.3 percent fewer than FY 2019) to its Form I–765 workload and completed only 1,249,548 adjudications (or approximately 9.4 percent fewer than FY 2020 and approximately 13.4 percent fewer than FY 2019) due to insufficient staffing and competing priorities. USCIS was unable to surge additional resources to increase officer hours adjudicating Form I–765 applications because of USCIS' limited resources and the need to manage e other competing priorities in FY 2021. For example, USCIS surged officers to adjudicate employment-based Form I–485 applications to minimize the number of employment-based immigrant visas that would go unused at the end of FY 2021, after an extraordinary number of such unused family-preference visa numbers from FY 2020 "fell across" to the employment-based visa allocation for FY 2021, see generally INA 201(d)(2)(C), 8 U.S.C. 1151(d)(2)(C), due primarily to Department of State consular closures caused by the COVID–19 pandemic.

---

[78] See DHS, USCIS, News Release, *Deputy Director for Policy Statement of USCIS' Fiscal Outlook* (June 25, 2020), *https://www.uscis.gov/news/news-releases/deputy-director-for-policy-statement-on-uscis-fiscal-outlook.*

[79] Form I–765 workload includes requests for initial, renewal, and replacement employment authorization and/or EADs.

[80] A detail is a temporary assignment of an employee to a different position for a specified period, with the employee returning to his or her regular duties at the end of the detail.

TABLE 2—IMPACT OF STEADILY DECREASING STAFFING LEVELS ON SCOPS' FORM I–765 COMPLETIONS

[initial and renewal applications]

| Fiscal year | Officer hours allocated | Form I–765 completions |
|---|---|---|
| 2019 | 343,399 | 1,443,235. |
| 2020 | 327,947 (approximately 4.5 percent fewer than 2019) | 1,379,745 (approximately 4.4 percent fewer than 2019). |
| 2021 | 314,924 (approximately 8.3 percent fewer than 2019 and 4.0 percent fewer than 2020). | 1,249,548 (approximately 13.4 percent fewer than 2019 and 9.4 percent fewer than 2020). |

**Note:** This data does not include contractor hours, which also were severely impacted by USCIS' fiscal situation as USCIS was forced to reduce the number of contractors available to assist with case processing. SCOPS' contractor staff has been reduced by approximately 8.2% since October 1, 2020.

The Field Office Directorate's National Benefit Center (NBC), which also adjudicates a number of Form I–765 applications [81] observed a similar reduction in staff and completions.

TABLE 3—IMPACT OF STEADILY DECREASING STAFFING LEVELS ON NBC'S FORM I–765 COMPLETIONS

[initial and renewal applications]

| Fiscal year | Officer hours allocated | Form I–765 completions |
|---|---|---|
| 2019 | 115,510 | 612,464. |
| 2020 | 112,266 (approximately 2.8 percent fewer than 2019) | 605,105 (approximately 1.2 percent fewer than 2019). |
| 2021 | 102,099 (approximately 11.6 percent fewer than 2019 and 9.1 percent fewer than 2020). | 509,973 (approximately 16.7 percent fewer than 2019 and 15.7 percent fewer than 2020). |

**Note:** This data does not include contractor hours, which also were severely impacted by USCIS' fiscal situation as USCIS was forced to reduce the number of contractors available to assist with case processing.

3. Other Impacts to Operations

In response to the declaration of a public health emergency, USCIS instituted a number of changes to protect USCIS employees and immigration benefit applicants. From March 18 through June 3, 2020, USCIS closed all field offices and application offices to the public, nearly halting all in-person services.[82] At USCIS field offices, officers conduct in-person interviews related to Form I–485, Application to Register Permanent Residence or Adjust Status, as well as Form N–400, Application for Naturalization, to become a U.S. citizen, among other work. At USCIS asylum offices, officers conduct in-person interviews of asylum applicants (using Form I–589, Application for Asylum and Withholding of Removal). Upon reopening to the public, many asylum offices operated at lower capacity than before the halt in in-person services. Interviewing rooms that previously accommodated asylum officers, asylum applicants, interpreters (if present), and attorneys (if present) all in one room, now would accommodate just the asylum officer, with applicants and any other participants each sitting in separate interview rooms and connecting electronically. This setup substantially decreased daily interview capacity.[83]

SCOPS' service centers and the NBC, which are not open to the public, never closed, but all Federal functions that could be accomplished at an alternate location were designated for telework to minimize in-person contact and allow proper social distancing for Federal and contract staff whose work required on-site presence. In the early weeks of COVID–19 restrictions, assignments were adjusted to provide telework-suitable work as logistics relating to industrial hygiene were put in place to expand capacity for on-site functions while providing appropriate protections for on-site workers. Service centers and the NBC continued operations by expanding telework capabilities; however, logistics associated with completing work that could not be conducted at home, such as accepting filings, mailroom activities, and file movement, remained a challenge. There was high absenteeism due to COVID–19 quarantine rules among contractors engaged in receipt and file movement activities, which created "frontlogs" in receipts—delays in entering receipt data into USCIS systems—as well as delays in other areas requiring physical handling of files and mail. Furthermore, Form I–765 generally is adjudicated on

[81] Such as initial and renewal Forms I–765 filed under 8 CFR 274a.12(c)(9) and (10), which experienced a dramatic growth in processing times in 2021, as detailed in this rule.

[82] See, e.g., News Alert, USCIS Temporarily Closing Offices to the Public March 18–April 1 (Mar. 17, 2020), https://www.uscis.gov/news/alerts/uscis-temporarily-closing-offices-to-the-public-march-18-april-1. Some limited emergency in-person services were available upon request during this time.

[83] USCIS has issued a series of temporary final rules that allow asylum offices to increase the use of telephonic interpreters, in order to minimize the impact of this safety measure on the agency's ability to adjudicate asylum applications in a timely manner. See Asylum Interview Interpreter

Requirement Modification Due to COVID–19, 85 FR 59655 (Sept. 23, 2020) (TFR); Asylum Interview Interpreter Requirement Modification Due to COVID–19, 86 FR 15072 (Mar. 22, 2021); and Asylum Interview Interpreter Requirement Modification Due to COVID–19, 86 FR 51781 (Sept. 17, 2021). As described in Section D.1. below, asylum application processing times impact Form I–765 renewal processing because the longer an asylum application is pending, the more times an applicant may need to file Form I–765 to renew employment authorization. If an individual's asylum application is approved, they no longer need to file Form I–765 to obtain employment authorization because asylees are employment authorized incident to status. See 8 CFR 274a.12(a)(5). While some asylees may choose to file Form I–765 using the (a)(5) category to receive

EADs as evidence of their employment authorization, asylum applicants under the (c)(8) category make up approximately 10 times more Form I–765s than asylees under the (a)(5) category. See DHS, USCIS, Form I 765 Application for Employment Authorization All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type (FY 2019–21), https://www.uscis.gov/sites/default/files/document/data/I-765_Application_for_Employment_FY03-21.pdf (last updated Oct 2021). Therefore, USCIS' efforts to minimize the impact of safety measures on the agency's ability to adjudicate asylum applications is helping to reduce the number of asylum applicants making up the pending Form I–765 applicant pool, which is helping to reduce the overall Form I–765 adjudication backlog.

a paper receipt file,[84] and up until 2020, application intake and initial processing generally was handled by Federal contractors, many of whom were terminated due to USCIS' fiscal troubles as detailed above. Proactive adjustments to workspaces, schedules, and file movement practices restored these functions despite a contractor workforce shortfall, but adjustments took approximately 3–5 months to develop and take effect.

USCIS Application Support Centers (ASC), which primarily collect biometrics such as photographs and fingerprints in relation to immigration benefit requests, were similarly impacted by the COVID–19 public health emergency. ASCs were temporarily closed from March 18 through July 12, 2020, and began a phased reopening with limited capacity on July 13, 2020. Under normal circumstances, individuals who must appear at an ASC are scheduled to do so within 3–4 weeks of USCIS receiving the underlying application; however, the lengthy closures created massive appointment backlogs. The ASC appointment backlog reached its peak of 1.4 million in January 2021. Although this backlog has been largely addressed, the downstream effects linger in many work streams.[85] Historically, there have been limited Form I–765 categories that require biometrics submission;[86] however, the Employment Authorization Applications Rule and the Asylum Application, Interview, and Employment Authorization for Applicants Rule ("Broader Asylum EAD Rule"), 85 FR 38532 (June 26, 2020), imposed a biometrics collection

requirement for initial and renewal Forms I–765 in the C08 asylum applicant category—which represents approximately 58 percent of the renewal EAD receipts filed that are eligible for the automatic extension. Consequently, when ASCs were closed, most Form I–765 renewal applications in the C08 category could not be processed.[87] Furthermore, once ASCs reopened, a large number of applications of varying types needed to be rescheduled, yet there were a limited number of ASC appointments available. This led to delays in applicants receiving ASC appointments, which further delayed the processing of their applications, including Form I–765 renewal applications in the C08 category. The delay in biometrics capture created an interruption to adjudications by preventing applications from getting to the "adjudication-ready" stage. Many categories of I–765s are dependent on their own biometrics requirement or a biometrics requirement associated with an underlying benefit, resulting in bottlenecks that slowed overall adjudications and increased processing times. The new biometrics collection requirement for Form I–765 renewal applications in the C08 category thus played a significant role in the downstream effects of ASCs' temporary closures.

In addition, while adjudication of Form I–765 does not generally include an in-person interview, some Forms I–765 are based on pending applications that do involve in-person interviews. With the fiscal and operational constraints outlined above, USCIS had processing delays in adjustment of status applications and asylum applications; applicants seeking employment authorization based on a pending adjustment of status application or asylum application comprise the great majority of the filing population seeking renewal EADs and

eligible for an automatic extension of their EADs under 8 CFR 274a.13(d).[88] Owing to USCIS' inability to adjudicate interview-dependent adjustment of status and asylum applications while its offices were closed, those cases were pending longer than usual, in addition to an influx of new applications. With those underlying applications taking longer to process, the population of applicants who needed to request EAD renewals during the pendency of their primary applications increased.[89]

Even though USCIS reopened its ASCs, field offices, and asylum offices in mid-2020, USCIS still is working to return to pre-pandemic levels of operation, with varying progress across programs. For example, social distancing guidelines result in reduced interview capacity and productivity for some interview-dependent benefit requests, including some adjustment of status and asylum applications. USCIS implemented measures to recapture productivity under social distancing protocols, including video-assisted interviewing, increased use of telephonic interpreters,[90] expanded

---

[84] Although some Form I–765 applications for certain eligibility categories (e.g., (c)(3)(A), F–1 Pre-completion OPT; (c)(3)(B), F–1 Post-completion OPT; and (c)(3)(C), F–1 STEM OPT extension) now can be received and adjudicated in an electronic system, in early 2020, all Form I–765 applications were adjudicated on paper.

[85] USCIS sought to mitigate the impact of this biometrics capture delay by reusing biometrics where possible. See, e.g., USCIS News Alert, USCIS to Continue Processing Applications for Employment Authorization Requests Despite Application Support Center Closures (Mar. 30, 2020), https://www.uscis.gov/news/alerts/uscis-to-continue-processing-applications-for-employment-authorization-extension-requests-despite.

[86] For example, in general, applicants must pay an $85 biometric collection services fee if filing with one of the following eligibility categories: (c)(8) An applicant with a pending asylum application requesting an initial or renewal EAD; (c)(33) Requesting consideration of Deferred Action for Childhood Arrivals (DACA); (c)(35) A principal beneficiary of an approved employment-based immigrant petition who is facing compelling circumstances; (c)(36) A spouse or unmarried dependent child of a principal beneficiary of an employment-based immigrant petition who is facing compelling circumstances; or (c)(37) An applicant for Commonwealth of the Northern Mariana Islands long-term resident status.

[87] However, the U.S. District Court for the District of Maryland's Sept. 11, 2020, preliminary injunction in Casa de Mayland Inc. et al. v. Chad Wolf et al., 8:20–cv–02118–PX (D. Md. Sept. 11, 2020), provided limited injunctive relief to members of two organizations, CASA de Maryland (CASA) and the Asylum Seeker Advocacy Project (ASAP), who file Form I–589 or Form I–765 as asylum applicants. Specifically, the court preliminarily enjoined enforcement of several regulatory changes in the Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications Rule, 85 FR 37502 (June 22, 2020), and the Broader Asylum EAD Rule for CASA and ASAP members, including the requirement to submit biometric information as part of the filing of a Form I–765 based on an asylum application. On February 7, 2022, the U.S. District Court for the District of Columbia in Asylumworks, et al. v. Alejandro N. Mayorkas, et al. vacated these two rules entirely.

[88] See above section entitled "Overview of Issues Negatively Impacting Form I–765 Processing Times."

[89] For example, in 2020, an applicant seeking employment authorization based on a pending adjustment of status application would have obtained an EAD valid for 1 year, if eligible. With processing times for adjustment of status applications extending beyond 1 year, the applicant would have to apply to renew the EAD to obtain employment authorization while their adjustment of status application remains pending. Where adjustment of status applications with an immediately available immigrant visa are processed within the 6-month processing goal, such applicants generally should not have to renew their EAD as they would receive employment authorization incident to their lawful permanent resident status upon approval of their adjustment of status application. In recognition of prolonged processing times for adjustment of status applications, USCIS updated its policy guidance to provide a 2-year validity period for initial and renewal EADs issued based on pending adjustment of status applications. See USCIS Policy Manual, Policy Alert (PA–2021–10), Employment Authorization for Certain Adjustment Applicants (Jan. 9, 2021), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210609-EmploymentAuthorization.pdf. In doing so, USCIS attempted to alleviate the burden on adjustment of status applicants seeking EADs. Unfortunately, USCIS was unable to take similar steps for the asylum applicant population, as it was already providing 2-year validity periods for employment authorization and EADs, the maximum allowed by the Broader Asylum EAD Rule. As of December 2021, the median processing time for affirmative asylum applications (Form I–589) is 55.4 months. As of December 2021, the median processing time for adjustment of status applications (Form I–485) is 13.2 months, however some adjustment applications remain pending much longer because of regression in the cutoff dates used to determine when an immigrant visa is immediately available.

[90] See Asylum Interview Interpreter Requirement Modification Due to COVID–19, 85 FR 59655 (Sept. Continued

work flexibilities for USCIS employees,[91] and remote applicant-centric services such as a pilot remote-attorney participation program.[92] However, the impacts of the operational disruptions in 2020 are still evident in USCIS' prolonged processing times, illustrating USCIS' continued struggle to address the pending cases that accrued when offices were closed while attempting to keep pace with new filings (which, in the case of Form I–765 renewals, unexpectedly surged in 2021, as described below).[93]

Additionally, USCIS continues to provide flexibilities in recognition of the pandemic's ongoing impacts on benefit requestors, which in some cases negatively impact the efficiency of USCIS operations.[94] For example, USCIS continues to provide rescheduling flexibilities for interviews and ASC appointments, limit the number of staff and members of the public that may appear in person at a USCIS office, and provide flexibilities pertaining to responses to Requests for

Evidence (RFEs) and Notices of Intent to Deny (NOIDs) by considering a response received within 60 calendar days after the response due date set in the request or notice before taking any action.[95] While USCIS believes these steps have been critical to address the impacts of the COVID–19 pandemic, these measures have not been implemented without costs. Limiting the number of in-person staff at any given time may reduce the number of interviews USCIS can conduct in any given day, although USCIS is exploring additional alternatives to in-person interviewing that may mitigate this impact. Providing rescheduling flexibilities for interviews and time for responses for RFEs or NOIDs also prolong the officer's adjudication times. The downstream effect of delays in initial file processing, delays at the ASC and field offices, and insufficient staffing levels due to USCIS' fiscal situation in calendar years 2019 and 2020, as well as delays caused in certain workloads due to workforce shifts to ensure timely adjudication of other benefits, contributed to USCIS accruing an overall net backlog[96] of approximately 5.1 million cases as of the end of December 2021, of which 930,000 (approximately 18%) were pending Form I–765 applications.

*C. Sudden Increase in Form I–765 Filings in 2021*

1. Comparing FY 2021 Receipts to Prior Years' Receipts

The most recent contributing factor to the severe backlog and increased processing times for Forms I–765 is a substantial and unprecedented 2-month increase of Form I–765 renewal filings in March and April 2021, and a sustained increase in filings thereafter. In CY 2019, the average number of monthly renewal applications filed for the C08, C09, and C10 categories combined was 46,715. In CY 2020, the average number of monthly renewal applications filed for these three categories was 43,232. In March 2021, the renewal receipt numbers for these three categories spiked 56 percent over the previous month and 76.4 percent over the monthly average total for 2020. In April 2021, the renewal receipt numbers for these three categories remained elevated such that they were 25.6 percent higher than February 2021, and 53.6 percent over the monthly average total for 2020. The March and April 2021 increase in Form I–765 renewal applications was unexpected based on historical filing patterns and appears to be related to litigation.[97]

---

[23, 2020) (TFR); *Asylum Interview Interpreter Requirement Modification Due to COVID–19,* 86 FR 15072 (Mar. 22, 2021); and *Asylum Interview Interpreter Requirement Modification Due to COVID–19,* 86 FR 51781 (Sept. 17, 2021).

[91] As an example, USCIS expanded telework flexibility arrangements under which an employee could perform the duties and responsibilities of such employee's position, and other authorized activities, from an approved worksite other than the location from which the employee would normally work. In addition, certain telework restrictions were lifted (*e.g.,* allowing split shifts, non-standard work hours, and mixing telework and leave) so that caregivers and parents could meet personal and work obligations while working from home.

[92] *See* Impact of Pandemic Response Measures, p. 6, in Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress (Oct. 20, 2021), *https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf.*

[93] In the last three fiscal years, the median processing time across all form types was 8.7 months in FY 2021, 8.3 months in FY 2020, and 6.5 months in FY 2019.

[94] For a detailed description of the many flexibilities and precautionary measures USCIS provides to combat COVID–19, *see* USCIS's website at *https://www.uscis.gov/about-us/uscis-response-to-covid-19* (last updated Mar 30, 2022).

[95] *See* Deadlines for Certain Requests, Notices, and Appeals in the USCIS Response to COVID–19 web page at *https://www.uscis.gov/about-us/uscis-response-to-covid-19* (last updated Mar. 30, 2022).

[96] Backlog is defined as the volume of pending applications that exceed the level of acceptable pending cases. Whether a pending case load is acceptable is pegged to the volume of applications receipted during the target cycle time period (*e.g.,* 5 months). The target cycle time refers to the processing time goal for a given application type. Net backlog is defined similarly to backlog, except that the number of pending applications is reduced to account for cases in active suspense categories (*i.e.,* cases that are deducted from the gross backlog, such as cases with a pending Request for Evidence, cases awaiting visa availability from the Department of State, or cases pending re-examination for an N–400, Application for Naturalization).

[97] This increase in Form I–765 filings may have been driven primarily by litigation and the "frontlog" of applications at the three USCIS lockbox facilities, which receive and process applications and payments in Chicago, Illinois; Phoenix, Arizona; and Lewisville, Texas. On July 20, 2020, Casa de Maryland, Inc. filed suit against then-Acting DHS Secretary Chad Wolf and DHS to enjoin changes to EAD rules for asylum seekers. On September 11, 2021, the U.S. District Court of Maryland issued a preliminary injunction of the new EAD rules. *See Casa de Maryland v. Wolf,* 486 F.Supp.3d 928 (D. Md. Sept. 11, 2020). Consequently, approximately 23,000 applications pending at the USCIS lockbox were rejected in late October 2020 for a failure to pay the required biometrics fee or a failure to provide proof that the applicant was a member of the litigation class. These applications were refiled and, coupled with the prioritization of initial Form I–765 applications under category C08 due to the litigation, led to a redirection of resources away from Form I–765 renewal applications. In addition, as noted above, the lockbox was experiencing a "frontlog" of applications, which led to a processing delay.

TABLE 4—SURGE IN RENEWAL FORM I–765 FILINGS

| Month | C08 category | C09 category | C10 category | Average total |
|---|---|---|---|---|
| February 2021 | 30,857 | 14,661 | 8,367 | 52,885 |
| March 2021 | 52,007 | 19,589 | 10,840 | 82,436 |
| April 2021 | 42,101 | 15,189 | 9,134 | 66,424 |
| May 2021 | 32,751 | 13,332 | 7,887 | 53,960 |

In the eight months following April 2021, the receipt numbers for these categories fell to an average of 52,400 receipts per month, but that was still 21 percent above the average monthly total for CY 2020. The increase in the number and duration of pendency of asylum and adjustment of status applications, which form the basis for the two most populous EAD filing categories eligible

for the automatic extension under 8 CFR 274a.13(d)(1), may have led to this sustained increase in applications for initial and renewal employment authorization (in the C08 and C09 categories, respectively), which further compounded the Form I–765 adjudication backlog.[98]

Specifically, in the years leading up to FY 2022, asylum application receipts

outpaced available resources leading to an increase in pending asylum cases, both in affirmative and defensive filings, as shown in Table 5.[99] The increase in pending asylum cases contributed to the increase in C08 renewal filings in FY 2021, which further impacted the Form I–765 renewal backlog.

TABLE 5—TOTAL ASYLUM CASES PENDING

| | DOJ[100] | USCIS[101] | Total |
|---|---|---|---|
| Total Asylum Cases Pending in: | | | |
| FY 2017 (Sep 2017) | 377,140 | 289,835 | 666,975 |
| FY 2018 (Sep 2018) | 473,510 | 319,202 | 792,712 |
| FY 2019 (Sep 2019) | 608,976 | 339,836 | 948,812 |
| FY 2020 (Sep 2020) | 647,923 | 386,014 | 1,033,937 |
| FY 2022 (Dec 2021) | 628,551 | 432,341 | 1,060,892 |

The number of employment-based adjustment of status applications increased significantly in FY 2021, as well, due to the inordinate number of employment-based visas that became available as a result of unusually low visa usage in other categories in FY 2020 due to the COVID–19 pandemic. At the start of FY 2021, there were approximately 126,000 employment-based adjustment of status applications pending with USCIS. Approximately 313,000 employment-based adjustment of status applications were received during FY 2021, which likely contributed to the increase in C09 initial filings in FY 2021, consequently further taxing USCIS' resources to timely process renewal applications. USCIS also saw significant increases in filings across other benefit request types during CY 2021.[102]

This surge and sustained increase in Form I–765 receipts over the course of

CY 2021 as compared to the previous calendar year compounded what otherwise might have been a moderate Form I–765 backlog and created a substantial spike in processing times. In CY 2021, USCIS received approximately 2,550,000 initial and renewal Forms I–765, which was 22 percent higher than the volume received in CY 2020 (approximately 2,090,000) and 15 percent higher than the volume received in CY 2019 (approximately 2,210,000). Similarly, in CY 2021, USCIS received approximately 1,260,000 Form I–765 renewal applications, which was 21 percent higher than the volume received in CY 2020 (approximately 1,040,000) and 13 percent higher than the volume received in CY 2019 (approximately 1,120,000).

TABLE 5A—INITIAL AND RENEWAL
FORM I–765 FILINGS

| Calendar year | Form I–765 filings | Surge or difference |
|---|---|---|
| 2019 | 2,210,000 | 5 percent lower than 2019. |
| 2020 | 2,090,000 | 15 percent higher than 2019. |
| 2021 | 2,550,000 | 22 percent higher than 2020. |

TABLE 5B—RENEWAL FORM I–765
FILINGS

| Calendar year | Form I–765 filings | Surge or difference |
|---|---|---|
| 2019 | 1,120,000 | 7 percent lower than 2019. |
| 2020 | 1,040,000 | 13 percent higher than 2019. |
| 2021 | 1,260,000 | 21 percent higher than 2020. |

As demonstrated above, calendar years 2020 and 2021 were difficult years for USCIS because unprecedented

[98] USCIS is actively working to address prolonged processing times affecting applications and petitions that form the basis of a Form I–765 filing. These measures are described in further detail in Section D.1 below.

[99] *See* Background, p. 2, in Backlog Reduction of Pending Affirmative Asylum Cases: Fiscal Year 2021 Report to Congress (Oct. 20, 2021), *https://www.dhs.gov/sites/default/files/2021-12/USCIS%20-%20Backlog%20Reduction%20of%20Pending%20Affirmative%20Asylum%20Cases.pdf* ("The affirmative asylum backlog is the result of a prolonged, significant increase in affirmative asylum application filings and credible fear screenings,

which are processed by the U.S. Citizenship and Immigration Services (USCIS) asylum offices. Between FY 2013 and FY 2017, despite significant staffing increases, receipt growth in asylum office workloads outpaced the expansion of asylum office staffing and the establishment of new or expanded facilities needed to support additional staffing growth.").

[100] See Executive Office of Immigration Review Adjudication Statistics, Total Asylum Applications (Jan 19, 2022), *https://www.justice.gov/eoir/page/file/1106366/download*.

[101] Data reflects affirmatively filed I–589 asylum applications and do not include defensive asylum claims before a DOJ EOIR immigration court. See

USCIS, Number of Service Wide Forms, October 1, 2021–December 31, 2021, *https://www.uscis.gov/sites/default/files/document/reports/Quarterly_All_Forms_FY2022_Q1.pdf* (last updated Feb. 2022).

[102] For example, USCIS also encountered large increases of filings of Form I–131, Application for Travel Document, possibly related to the increase in filings of Form I–485, Application to Register Permanent Residence. From CY 2020 to CY 2021, USCIS observed an overall 25.8 percent increase in receipts across form types. Although this represents a substantial increase, there was a 29 percent increase in Form I–765 renewal applications in the auto extension categories.

financial strains led to staffing issues, resulting in an inability to handle the 2-month spike and monthly increase in filings in CY 2021 over CY 2020. The average monthly receipts in 2021 for the automatic extension categories were 60,300, which was 13,500 per month (or 29 percent) higher than 2020 monthly averages. In addition to this higher overall receipt volume in 2021, there was a surge in receipts in March 2021 (88,500) and April 2021 (71,200) that led to a rapid increase in pending applications. On top of the higher receipt volumes, due to staffing issues, the average number of monthly completions in 2021 was 33,900 per month, which was 10,600 per month (or 24 percent) lower than 2020 monthly averages. The combination of higher receipts and lower completions led to increased processing times, which downstream resulted in higher numbers of renewal applications pending past the 180-day automatic extension period.

2. Workforce Planning Shortfall

USCIS normally uses an annual workforce planning process to assess staffing requirements, known as the Staffing Allocation Model (SAM). The SAM is focused on allocating staff to process the anticipated number of new/ incoming receipts for all workloads for the next fiscal year. Workforce planning is based on USCIS estimates for each adjudication workload for the coming year. These workload estimates are established through a cross-disciplinary committee, the Volume Projection Committee, that forecasts receipts on the basis of statistical modeling and any recent policy changes. In 2021, new receipts rose too rapidly to provide new staffing allocations within the SAM for both new receipts and backlog cases. In other words, despite the predictions based on data and historic trends, the Form I–765 filings in FY 2021 were significantly greater than forecasted. USCIS relies on a combination of internal processes and plans to plan for backlog reduction.[103]

*D. Emergency Temporary Solution To Address Current Backlog*

The sudden 2-month increase in Form I–765 renewal filings in March and April of 2021 and sustained overall increase in Form I–765 renewal receipts thereafter prompted USCIS to directly address the growing backlog of Form I–

765 filings. Historically, USCIS had sufficient resources to address growing backlogs by allocating additional officers to a particular workload. However, USCIS was unable to do so in the summer of 2021 due to understaffing, including reduced contracting resources resulting from the prior years' fiscal situation; the broad scope of backlogs across numerous benefit types; and competing priorities, as discussed above. USCIS was, however, able to apply overtime funds to the renewal Form I–765 workload in an attempt to control the growing backlog during the last quarter of FY 2021.[104] Indeed, USCIS observed an increase in Form I–765 renewal completions, however, it was not enough to match the increased volume of receipts and therefore USCIS' responsive measures mitigated but did not halt the backlog growth.[105] Considering the operational constraints described above, USCIS also explored programmatic improvement initiatives and updates to its policy and operational guidance in the summer of 2021 to attempt to address prolonged Form I–765 processing times and their impact. For example, USCIS launched a backlog reduction effort in September 2021 to assess other options available to the agency to address the severe and growing Form I–765 backlogs.[106] It has become apparent to USCIS, however, that its limited resources are insufficient to appropriately address the growing backlogs, with the incoming volume of Form I–765 renewal filings showing no signs of slowing. Further, USCIS has assessed that the conventional measures USCIS had applied (e.g., overtime) and was continuing to explore (e.g., through the backlog reduction effort) will not be able to timely address the impending

loss of employment authorization and EAD validity.

1. Current Measures To Reduce the Backlog and Reduce Processing Times

Addressing Form I–765 processing times is a priority for USCIS. Backlogs in general are a significant concern for the applicants who are applying for benefits with USCIS because, as the backlogs increase, applicants and petitioners experience longer wait times to receive a decision on their benefit requests. This is especially concerning where the backlog involves employment authorization, which is critical to applicants' and their families' livelihoods as well as U.S. employers' continuity of operations. USCIS understands the impact that delays in receiving decisions and documentation have on applicants and petitioners and is striving to address the backlogs and the resulting negative consequences through a number of measures, including but not limited to this TFR.

USCIS continues to recover from the pandemic-related impacts on operations and revenue, leading to a gradually improving fiscal situation, return to stability, and renewed capacity to undertake initiatives to reduce backlogs. USCIS lifted the agency-wide hiring freeze in March 2021. With the hiring freeze lifted, USCIS was able to begin hiring staff in an attempt to return to pre-pandemic staffing levels.[107] Initial hiring was largely internal in order to fill promotional vacancies, with public job announcements to hire from outside USCIS following. This effort's impact is not realized immediately, as it is lengthy, time-consuming, and ongoing.

[103] One such process or plan is the Model for Operational Planning, which considers the backlog and the outlook of future backlogs based on current and future staffing. The primary way staffing for backlog reduction has taken place is through improved efficiencies to current processes as well as appropriations from Congress.

[104] See Section B.2 for more information on USCIS' use of overtime funds as a tool to manage its workload.

[105] For example, USCIS completed 15,004 Form I–765 C08 renewals in July 2021. After applying overtime funds to Form I–765s, USCIS completed 23,987 and 24,267 Form I–765 C08 renewals in August and September 2021, respectively. However, USCIS returned to its prior completion rate in October 2021 (where USCIS completed 13,932 C08 renewals) due to such overtime funds no longer being available in the new fiscal year. USCIS received additional appropriated funding for overtime in FY 2022 to apply toward backlog reduction efforts, but these funds only became available for operational use in early 2022.

[106] See, e.g., USCIS Policy Manual, Policy Alert (PA–2022–07), Updating General Guidelines on Maximum Validity Periods for Employment Authorization Documents based on Certain Filing Categories (Feb. 7, 2022), https://www.uscis.gov/ sites/default/files/document/policy-manual-updates/20220207-EmploymentAuthorization Validity.pdf.

[107] Such a long pause in hiring from May 1, 2020, to March 2021 resulted in approximately 2,000 unfilled vacancies, out of approximately 20,000 positions across the agency. As of November 6, 2021, USCIS estimates the number of vacancies had risen to approximately 3,000 due to primarily internal selections following the hiring freeze, although USCIS did also add some positions as well. USCIS estimates it will take the agency to the end of CY 2022 to fill the current level of vacancies. While USCIS did receive $250 million in funding from Congress for application processing, backlog reduction, and the refugee program in late September 2021, it will take time for such funding to translate to a significant increase in additional officers proficient at adjudicating and completing Form I–765 renewal applications. See Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021). USCIS has identified Form I–765 as well as Form I–485 and Form I–589 (which represent two of the three major filing categories seeking renewal EADs and eligible for automatic extension of the prior EAD) for inclusion in backlog reduction efforts funded in part by appropriations. The $250 million appropriated through Public Law 117–43, however, will only partly fund the 1,316 positions needed for all of USCIS' backlog reduction initiatives; therefore, USCIS continues to seek additional funding as requested in the FY 2022 President's Budget ($345 million).

The hiring process itself is lengthy as it includes posting the job announcement, reviewing resumes, providing qualified candidates' information to the hiring office, assessments, interviews, selections, and background checks prior to a new employee entering on duty. New hires then go through orientation, basic training, duty-specific training and mentoring. The entire process from posting to a new hire reaching full proficiency takes several months.

USCIS is also in the process of developing a new Fee Rule to recoup adjudicatory costs incurred at current levels, and to support the agency's ability to match staffing levels with its workload in a sustainable way. To effect more immediate change with EAD renewals, USCIS reviewed its policies and procedures to update policy guidance,[108] expanded use of overtime hours as funding permitted, and applied innovative approaches to backlog reduction using technology in strategic ways, which initially is showing promising results.[109] In addition, USCIS is focused on addressing prolonged processing times affecting applications and petitions that form the basis of a Form I–765 filing and, therefore, indirectly impact Form I–765 renewal processing times, such as in the case of asylum or adjustment of status applications where a Form I–765 filing is based on the continued pendency of such application.

For example, an applicant seeking asylum is eligible for employment authorization on the basis of the pendency of the asylum application.[110] USCIS currently grants employment authorization based on a pending asylum application in 2-year increments.[111] If an asylum application is pending for up to 5 years or more, as is currently the case for some applications,[112] then an applicant must file to renew employment authorization at least twice. If processing times for asylum applications were reduced to 3 years, the applicant would need only file to renew employment authorization once, saving USCIS adjudicatory resources.

Another area in which USCIS is actively prioritizing its workload is employment-based adjustment of status applications as backlogs in adjudication of these applications also have downstream effects on EAD application adjudications, as described above. While USCIS normally processes approximately 115,000 employment-based adjustment of status applications annually,[113] generally to correspond with the number of available employment-based immigrant visas minus the number typically issued by Department of State annually, USCIS prioritized processing employment-based adjustment applications to maximize available visa usage in FY

2021. By the end of FY 2021, USCIS had processed and approved approximately 172,000 employment-based adjustment of status applications, an increase of approximately 50 percent above the typical baseline;[114] however, approximately 257,000 remained unadjudicated, including approximately 75,000 impacted by priority date retrogressions that may leave them pending for many years, and thereby eligible for C09 EADs over this extended period.[115] To the extent possible, USCIS is committed to prioritizing employment-based adjustment of status applications to utilize the available visa numbers each fiscal year; doing so relieves applicants from filing Forms I–765 to seek renewal EADs while their adjustment of status application remains pending since lawful permanent residents are employment authorized incident to status.[116] Therefore, the more adjustment of status applications USCIS is able to process, the fewer Form I–765 renewal applications USCIS will receive (based on pending INA 245 adjustment of status applications).

DHS expects that USCIS' backlog reduction efforts in these areas will positively impact Form I–765 backlogs by reducing the volume of Form I–765 filings. However, we anticipate that the impact of these backlog reduction efforts will not be immediately felt by applicants with expiring or expired employment authorization. Therefore, DHS has determined that in the interim, urgent action is needed to address the

---

[108] See, e.g., USCIS Policy Manual, Policy Alert (PA–2021–25), Employment Authorization for Certain H–4, E, and L Nonimmigrant Dependent Spouses (Nov. 12, 2021), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20211112-EmploymentAuthorization.pdf. See USCIS Policy Manual, Policy Alert (PA–2021–10), Employment Authorization for Certain Adjustment Applicants (June 9, 2021), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210609-Employment Authorization.pdf. See USCIS Policy Manual, Policy Alert (PA–2022–07), Updating General Guidelines on Maximum Validity Periods for Employment Authorization Documents based on Certain Filing Categories (Feb. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220207-Employment AuthorizationValidity.pdf.

[109] Efforts to improve timely processing and remove bureaucratic hurdles are underway. One of the first initiatives is to automatically identify pending applications that are no longer needed (for example, a Form I–765 based on a pending adjustment application is moot upon the applicant's adjustment of status to that of a lawful permanent resident) and close them, thus eliminating the need for an officer to review and allowing other applications to proceed to adjudication more quickly. While initial results of such initiatives are promising, it is too early to tell what the long-term, sustained impacts on processing times will be. USCIS continues to look for additional areas where systems can be used to identify and complete simple functions that free up officer resources for adjudicative work.

[110] An asylee cannot apply for initial employment authorization earlier than 150 calendar days after the date USCIS or the immigration court accepts the asylum application.

[111] This was the maximum time allowed under regulation until February 7, 2022, when the U.S. District Court for the District of Columbia vacated parts of 8 CFR 274a.12(c)(3) ("Employment authorization may be granted according to the provisions of 8 CFR 208.7 of this chapter in increments to be determined by USCIS but not to exceed increments of two-years."). See Asylumworks. et al. v. Alejandro N. Mayorkas. et al., No. 20–cv–3815, 2022 WL 355213 (D.D.C. Feb. 7, 2022). USCIS is considering what, if any, steps it may take in light of this ruling.

[112] The extended wait time for asylum applications particularly affects many defensive asylum filings in immigration court. (A noncitizen may apply for asylum affirmatively with USCIS or defensively in immigration court.) As of December 31, 2021, there were 628,751 asylum applications pending in immigration courts. See Executive Office for Immigration Review Adjudication Statistics, https://www.justice.gov/eoir/page/file/1106366/download (last visited Apr. 14, 2022). This DOJ data also implies that 156,127 and 90,880 cases were completed in FY2020 and 2021, respectively, or an average of 123,504 cases a year. In the first quarter of FY2022, 42,090 cases were completed. If this rate continues, it would take approximately 4.2 years to complete the adjudication of the total 628,551 asylum cases pending in the courts as of December 31, 2021.

[113] See DHS Office of Immigration Statistics, 2019 Yearbook of Immigration Statistics, Table 6, Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2010 2019 (Sep. 2020), ht tps://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2019/yearbook_immigration_statistics_2019.pdf.

[114] See News Release, USCIS Announces FY 2021 Accomplishments, (Dec. 15, 2021), https://www.uscis.gov/newsroom/news-releases/uscis-announces-fy-2021-accomplishments.

[115] Applicants from China and India seeking adjustment of status based on the employment-based third preference category experienced visa retrogression in their respective filing categories as of October 1, 2021, impacting approximately 75,000 applicants. For more information on visa retrogression, see https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression (last updated Mar. 8, 2018). Based on a rate of approximately 8,000 visa numbers becoming available for these affected categories per year, as was the case in FY 2019, it may take more than 9 years for visas to become available for these approximately 75,000 applicants. In the interest of reducing the burden on both the agency and the public, on June 9, 2021, USCIS increased the maximum validity period for initial and renewal EADs issued to applicants for adjustment of status under INA 245 from 1 year to 2 years based on average processing times. See USCIS Policy Manual, Policy Alert, Employment Authorization for Certain Adjustment Applicants (Jun 9. 2021). https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210609-Employment Authorization.pdf. USCIS' return to its processing goal of 3 months for Form I–765 renewal applications is critically important for such applicants who may rely on timely renewals multiple times.

[116] See 8 CFR 274a.12(a)(1).

plight of a growing number of EAD renewal applicants who have experienced or may in the near future experience a gap in their employment authorization and/or EAD because of USCIS' unprecedented processing times.

2. Existing Automatic Extension Period of Up to 180 Days Temporarily Not Sufficient

DHS is aware of the importance of employment authorization and EADs as evidence of employment authorization for applicants and their families' livelihoods, as well as their U.S. employers' continuity of operations and financial health. DHS is also aware of the potential detrimental impact that gaps in employment authorization may have on an applicant's eligibility for future immigration benefits, should the applicant engage in unauthorized employment during the gap,[117] and on the U.S. employer's responsibilities under the INA. DHS also acknowledges that the substantial increase in backlogs and prolonged processing times across USCIS-administered benefit requests are not the fault of applicants but have had and continue to have significant adverse consequences for applicants and employers awaiting a USCIS decision on pending Form I–765 renewal applications.

As noted, the current 180-day automatic extension under 8 CFR 274a.13(d)(1) for certain applicants who have properly filed Form I–765 for renewal of their employment authorization and/or EADs is an insufficient time period to ensure against lapses in employment authorization and/or EAD validity.[118] In December 2020, the median processing time for Form I–765 renewal applications eligible for the automatic extension was 3.6 months (close to USCIS' processing goals), ranging from 2.5 months to 5 months.[119] At the end of December 2020, there were approximately 3,300 applications whose Form I–765 renewal applications were still pending past their 180-day auto-extension period.

However, Form I–765 processing times and Form I–765 renewal applications pending beyond the 180-

day period increased rapidly in the second half of CY 2021 and continue to increase in CY 2022 despite backlog mitigation efforts. As of December 31, 2021, the processing time for EAD renewal applications (all categories) completed by USCIS ranged from 6.1 months (median) to 10.1 months (93rd percentile) and there were approximately 66,000 applicants whose Form I–765 renewal applications were still pending past their 180-day automatic extension period. This means that, as of December 31, 2021, approximately 66,000 applicants—at no fault of their own and because of circumstances currently faced by USCIS—were not authorized to work and/or no longer had a valid EAD to evidence their employment authorization,[120] potentially jeopardizing their families' livelihoods.

TABLE 6—NUMBER OF FORM I–765 RENEWALS PENDING PAST THEIR 180-DAY AUTO-EXTENSION PERIOD

| Date | Median processing time (months) | Renewals pending past 180-day period |
|---|---|---|
| December 31, 2020. | 3.6 | 3,300 renewal applications (approx.). |
| December 31, 2021. | 8.8 | 66,000 renewal applications (approx.). |

This also means that a large majority of these workers, and their U.S. employers, would not be able to meet the verification or reverification requirement for completion of Employment Eligibility Verification (Form I–9),[121] resulting in terminations

and incurring the costs of finding replacement workers, if possible. If DHS does not immediately increase the 180-day automatic extension period, the total number of applicants with renewal applications pending past the 180-day auto-extension period is expected to increase by approximately 14,500 per month.[122] This estimated monthly increase of 14,500 applicants is based on recent trends.

Although USCIS has been diligently trying to reduce the adjudication backlog and EAD processing times, USCIS is unable to quickly return to its processing goals due to the volume of pending cases, new filings that USCIS continues to receive, and time needed to increase staffing needs to meet existing demands. As of December 31, 2021, USCIS had approximately 520,000 pending EAD renewal requests in automatic extension-eligible categories and continues to receive approximately 55,000 additional Form I–765 applications in automatic extension-eligible categories per month. These additional renewal applications are adding to the current backlog, given that USCIS currently completes approximately 33,000–34,000 such requests per month. Further, as of November 6, 2021, 905 out of 8,721 (or, 10% of) officer positions allocated to the Field Office Directorate (FOD) and the Service Center Operations Directorate (SCOPS) were vacant and USCIS estimates it may take at least until the end of CY 2022 for USCIS to fill such vacancies.[123]

The impact of the prolonged processing times is stark when considering the number of individuals who will lose employment authorization and/or EAD validity each month if immediate action is not taken. As indicated, the total number of renewal applications pending past the 180-day period, which was approximately 66,000 as of December

---

[117] With certain exceptions, if a noncitizen continues to engage in or accepts unauthorized employment, the individual may be barred from adjusting status to that of a lawful permanent resident under INA 245. *See* INA 245(c)(2) and (c)(8), 8 U.S.C. 1255(c)(2) and (c)(8).

[118] *See* section II, Purpose of this Temporary Final Rule.

[119] *See* section II, Purpose of this Temporary Final Rule, Table 1. Recent Dramatic Growth in 50th and 93rd Percentile Processing Times for Form I–765 Renewal Applications Filed by Top Three Filing Categories.

[120] Of the 66,000 applicants, 63,000 fall into the C08, C09, and C10 categories and, therefore, are facing a gap of employment authorization. The remaining 3,000 applicants fall into the following EAD categories: Refugees (A03 under 8 CFR 274a.12(a)(3)), asylees (A05 under 8 CFR 274a.12(a)(5)), and withholding of deportation or removal beneficiaries (A1) under 8 CFR 274a.12(a)(10)). Such applicants are still authorized for employment incident to status but would no longer have a valid EAD. For purposes of this rule's analysis, DHS has determined that it is appropriate to include the 3,000 applicants who are employment authorized incident to status given their reasonable reliance on USCIS' timely issuance of their renewal EADs. Also, it is unknown how many applicants in this group have in their possession acceptable alternative documentation they can show their employers in order to maintain their employment (e.g., Form I–94 or an unrestricted Social Security card together with an unexpired State-issued driver's license pursuant to 8 CFR 274a.2(b)(1)(v)). Moreover, through its public outreach efforts, DHS has learned that job loss has affected this group on account of the lack of sufficient documentation to present to employers for Form I–9 completion.

[121] All U.S. employers must properly complete Form I–9 for each individual they hire for employment in the United States. *See* I–9, Employment Eligibility Verification USCIS web page, *https://www.uscis.gov/i-9* (last updated Apr 13, 2021).

[122] As noted elsewhere in this preamble, the number of applicants who face expiration of the up-to-180-day automatic-extension each month is approximately 30,000. However, as some applicants who are already past the 180-day automatic extension period will receive final adjudication of their application each month, the total number of those in the population past the 180-day period is expected to increase by 14,500 each month rather than by 30,000.

[123] As mentioned above in section II.D.1, USCIS had approximately 3,000 vacancies, 905 of which were officer positions in FOD and SCOPS, the two directorates that adjudicate Form I–765 renewal applications filed in categories eligible for automatic extension of EADs. Even after USCIS fills an Immigration Services Officer (ISO) position, there is a delay between the time of hiring and the time the ISO is fully trained and able to complete adjudications to meet productivity targets.

31, 2021, is expected to increase by approximately 14,500 each month; that monthly figure represents approximately 10,500 asylum applicants, 3,000 adjustment of status applicants, and 1,000 suspension/cancellation applicants per month.

DHS therefore has determined that an automatic extension of up to 180 days at 8 CFR 274a.13(d) is temporarily no longer sufficient to meet its original purpose and goal for which it was implemented: To prevent and/or mitigate the risk of gaps in employment authorization and documentation for a majority of eligible applicants. Due to the presently insufficient staffing levels, which may take USCIS at least until the end of CY2022 to fill and additional time to train, USCIS may be unable to significantly increase its rate of completion in the immediate term, and, therefore, currently may be unable to meaningfully reduce the volume of pending cases while also keeping pace with the inflow of Form I–765 filings. While USCIS will continue to explore ways to improve adjudicative efficiencies in the short and long term, USCIS expects Form I–765 backlogs will continue in the immediate future as it works to implement changes to improve Form I–765 processing efficiencies, hire and train new officers, and take additional steps to reduce the backlog and processing times. This temporary and extraordinary circumstance has created an emergent and urgent situation for noncitizens and U.S. employers as gaps in employment authorization and documentation have a highly detrimental impact on noncitizen workers and their U.S. employers. This is taking place at a time when such employers already are facing unprecedented workforce disruptions due to the COVID crisis, which further underscores the importance of immediate action.[124] While the high

[124] According to the U.S. Bureau of Labor Statistics (BLS), on the last business day of January 2022, there were 11.3 million job openings and 6.3 million unemployed people. *See* U.S. Department of Labor, U.S. Bureau of Labor Statistics, *Job Openings and Labor Turnover—January 2022* (Mar. 9, 2022), *https://www.bls.gov/news.release/pdf/jolts.pdf;* U.S. Department of Labor, U.S. Bureau of Labor Statistics, *The Employment Situation—February 2022* (Mar. 4, 2022), *https://www.bls.gov/news.release/pdf/empsit.pdf.* From June 2021 through January 2022, the ratio of unemployed persons per job opening was below 1.0, meaning that there were more job openings than individuals seeking work. For context, there were roughly 0.8 unemployed persons per job opening in January and February 2020 before COVID. U.S. Department of Labor, U.S. Bureau of Labor Statistics, *Number of unemployed persons per job opening, seasonally adjusted* (Jan. 2007 through Jan. 2022), *https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited Mar. 14, 2022). *See also* Christopher Decker,

unemployment rate has declined significantly, the United States is now experiencing high demand for labor as compared to the available supply of workers. As of February 2022, the labor force participation rate was at 62.3 percent, having recovered about 66 percent of what was lost at height of the COVID–19 pandemic compared with the February 2020 rate of 63.4 percent.[125]

3. Temporary 360-Day Increase Beyond 180 Days Needed for 540-Day Period

DHS has determined that providing additional time beyond the current 180 days during which an eligible applicant's employment authorization and/or EAD are automatically extended is necessary to mitigate the risk to applicants of incurring a lapse in employment authorization or documentation while USCIS works toward reducing processing times.[126] As stated above, USCIS receives approximately 55,000 Form I–765 renewal requests per month and completes approximately 33,000–34,000 requests per month, leading to the growing backlog. Without intervention, this processing rate could result in a median processing time of 14.2 months for all Form I–765 renewals by the end of December 2022. Considering the current range of processing times, a significant number of these renewal applications likely would take longer

*Lurking behind lackluster jobs gain are a stagnating labor market and the threat of omicron,* The Conversation, Jan. 7, 2022, 12:50 p.m. EST, *https://theconversation.com/lurking-behind-lackluster-jobs-gain-are-a-stagnating-labor-market-and-the-threat-of-omicron-174534* Ben Casselman, *More quit jobs than ever, but most turnover is in low-wage work.,* N.Y. Times, Jan. 4, 2022, *https://www.nytimes.com/2022/C1/04/business/economy/job-openings-coronavirus.html;* Lucia Mutikani, *U.S. labor market recovery gaining steam; unemployment rolls smallest in 52 years,* Reuters, Feb. 24, 2022, 11:48 a.m. EST, *https://www.reuters.com/business/us-labor-market-recovery-gaining-steam-unemployment-rolls-smallest-52-years-2022-02-24/.*

[125] *See* U.S. Department of Labor, U.S. Bureau of Labor Statistics, Civilian labor force participation rate (Feb. 2002 through Feb. 2022), *https://www.bls.gov/charts/employment-situation/civilian-labor-force-participation-rate.htm* (last visited Mar. 8, 2022).

[126] DHS is applying this rule to all renewal EAD application categories eligible for automatic extension pursuant to 8 C7R 274a.13(d), even though some of these categories currently experience processing times that do not raise a risk of the applicant experiencing a lapse in employment authorization or documentation. As stated earlier, 95 percent of applications fall within the C08, C09, and C10 categories. DHS has made this decision because it has determined that it would not be operationally practical for USCIS to implement a different approach; making distinctions among categories would cause confusion among employers and employees; and backlogs and processing times may yet increase for these other categories.

than the 14.2-month median time, up to 18 months.[127]

Based on the trend USCIS has observed in the growth of processing times for Form I–765 renewal applications in the past year (see section II.A.Table1 for more details), and USCIS' projection of similar growth through the end of CY 2022,[128] DHS calculated that a temporary increase of 360 days (beyond the 180-day period) for a total of 540 days, or approximately 18 months) is an appropriate increase of the automatic extension period. Such period better reflects current and potential processing times for Form I–765 renewals. By extending the automatic extension period, this TFR therefore is intended to reduce the potential for disruptions in employment authorization and EAD validity for those who otherwise qualify for an automatic extension while USCIS continues to work to reduce its processing times to return to its goal of processing Form I–765 within 3 months.

To determine how long DHS should provide this temporary increased automatic extension period, DHS assessed the pending and incoming volume of Form I–765 renewal filings against USCIS' resources. As of December 31, 2021, USCIS had approximately 520,000 pending EAD renewal requests in automatic extension-eligible categories. To achieve USCIS' processing goal of 3 months,[129] USCIS must keep pace with the incoming volume (in other words, complete approximately 55,000 Form I–765 renewal requests in automatic

[127] The estimated processing time is calculated using the current number of pending renewal applications as of December 31, 2021 (520,000), adding in the estimated 55,000 new incoming receipts each month, and subtracting the 34,000 estimated completions each month to estimate the pending inventory at the end of December 2022. Next, the USCIS cycle time methodology is applied to calculate the processing time statistic (see "Cycle Time Methodology" on the USCIS processing times website at *https://egov.uscis.gov/processing-times/more-info* (last visited Apr 19, 2022)). The upper range value of 18 months is estimated by multiplying the cycle time by 1.3 based on the cycle time methodology. Note that individual offices may have higher or lower processing times, but the general USCIS-wide processing times likely would fall in the 14- to 18-month range.

[128] These projections are based on USCIS processes in place as of December 31, 2021, and do not account for other changes USCIS is exploring outside of this TFR and that may be implemented concurrent with this TFR. USCIS is committed to doing everything possible under the law and current resource availability to mitigate the impact of EAD renewal application processing delays on applicants.

[129] USCIS has determined that a processing time of 3 months for Form I–765 renewals would suffice to prevent lapses in employment authorization for most applicants who are eligible for the up to 180-day automatic extension. *See* 80 FR at 81911 (AC21 NPRM). *See* 81 FR at 82398 (AC21 Final Rule).

extension-eligible categories per month) in addition to reducing the pending volume of renewal requests from 520,000 to 150,000–200,000.[130] USCIS determined that, as of May 4, 2022, the maximum number of officer hours it can devote to Form I–765 renewal requests in the automatic extension-eligible categories is 217,800 per year, based on its resources and capacity. By comparison, USCIS devoted a total of approximately 432,500 officer hours to *all* Form I–765 adjudications in FY 2021.

USCIS calculated that, if it applied 217,800 officer hours at approximately 15 minutes per Form I–765 [131] per month, to keep pace with the incoming flow of 55,000 new renewal requests as well as to reduce the volume of pending requests from 520,000 to 150,000–200,000, it would take USCIS 540 days—or approximately 18 months—to reach its goal of processing Form I–765 renewal applications within 3 months. Therefore, DHS has concluded that the temporary 360-day increase to the automatic extension time period must be in place for 540 days for those with pending renewal applications during this period.

Applicants who file a Form I–765 renewal application after this filing timeframe and who are eligible for an automatic extension of their employment authorization and/or EADs will receive the 180-day automatic extension period currently provided at 8 CFR 274a.13(d)(1). DHS expects that, by the close of the filing timeframe outlined in this temporary final rule, the usual 180-day automatic extension period will be sufficient to prevent applicants filing Forms I–765 renewal applications from incurring a lapse in employment authorization and/or EAD validity, as USCIS expects to have returned to achieving its 3-month processing goal by then.

This temporary final rule applies to three groups of applicants. First, the rule applies to those renewal applicants eligible for the automatic extension who already have filed their renewal Form I–765 application, which remains pending as of the date this rule goes into effect, May 4, 2022, and whose EAD has not expired or whose current up to 180-day auto-extension has not yet lapsed, since this group is at immediate or near term risk of experiencing a gap in employment authorization and/or documentation. Second, the rule applies to new renewal applicants who file Form I–765 during the 18-month period following the rule's publication to avoid a future gap in employment authorization and/or documentation.[132] Third, for those renewal applicants who already are experiencing a gap in employment authorization and/or EAD validity, fairness dictates that such renewal applicants also should receive the benefit of the increase in the automatic extension, to enable them to resume an additional period of employment authorization and/or EAD validity, since they were the first group to have been placed in a detrimental position on account of USCIS' long processing times. For these applicants, this TFR provides that employment authorization and/or validity of their EADs will resume beginning on the date the rule is published in the **Federal Register**, May 4, 2022, and continue for a period of up to 540 days from the date their employment authorization and/or EAD expired, as shown on the face of

the EAD. However, in recognition of Congress' clear intent in the INA regarding unauthorized employment, including the accountability of employers that employ noncitizens who are not authorized to work in the United States,[133] this TFR does not address periods of unauthorized employment.[134] In other words, this rule does not cure any unauthorized employment that may have accrued prior to issuance of the rule.[135]

In addition, DHS has determined that the temporary amendment made by this rule should remain in the Code of Federal Regulations (CFR) for an amount of time sufficient to cover the approximately 18-month period during which the up to 540-day automatic extension will be authorized, plus an additional 720 days so that the regulatory provision remains in the CFR for the entire time that applicants may be relying on this temporary increase to the regular automatic extension period.[136] As such, this TFR will take effect on May 4, 2022, and will be removed from the CFR on October 15, 2025; that is, approximately 3½ years (or 1,260 days) after the rule takes effect, although no new beneficiaries will receive a 540-day automatic extension after October 26, 2023. Further, as is consistent with current guidance, applicants should file a renewal Form I–765 no earlier than 180 days prior to the expiration date of their EAD.

---

[130] USCIS estimates that 150,000–200,000 pending requests translates roughly to a 3-month processing time, as the figure reflects 3 months' worth of Form I–765 renewal receipts.

[131] This figure is based on an analysis of historic rates of completion. Between FY 2019 and FY 2021, the total officer hours for all Form I–765 processing (initials and renewals for all categories, including non-automatic extension categories) ranged from approximately 460,000 (FY 2019) to 420,000 (FY 2021), the equivalent of approximately 38,300 to 35,000 officer hours per month to process approximately 153,200 to 140,000 cases per month. Therefore, each case took on an average of 15-minutes to process. Based on the USCIS Volume Projection Committee forecasts, USCIS expects to receive about 2.2 million Form I–765s in FY 2022 and FY 2023. Using the 15-minute per case factor, and based on the 2.2 million projections, USCIS would need to expend approximately 45,800 officer hours a month to meet incoming demand or increase adjudication efficiencies through hiring, resource allocation, and efficiency gains.

[132] While USCIS expects to return to its 3-month processing goal by the end of the 18-month period, DHS will continue to provide eligible renewal applicants up to 540 days of automatic extension as outlined in this rule throughout the entirety of the 18-month period for ease of administrability, to mitigate the potential for confusion among the regulated public, and in recognition of the potential that circumstances outside of USCIS's control may frustrate this expectation. Providing a set amount of additional automatic extension time for a set time period is the least administratively burdensome approach, allowing the agency to focus its limited resources on addressing the lengthy processing times themselves. Additionally, DHS anticipates that this approach is the least burdensome for the public, including employees and employers as well, since the temporary solution remains clear, can be relied upon, and can be paused for, and otherwise operates in the same way as the existing automatic extension described in 8 CFR 274a.13(d)(1). DHS acknowledges that the utility of the additional automatic extension time may diminish toward the end of the 18-month period (or sooner, if USCIS achieves its processing goals earlier than anticipated, due in part to backlog reduction efforts discussed in Section II.D. , or to other factors yet unknown or a combination of the two). However, DHS believes that such consequence is acceptable and appropriately balances competing policy concerns because shorter processing times ultimately mean applicants will receive a decision on their Form I–765 renewal application sooner and, in that event, will rely less on the automatic extension period.

[133] *See* INA sec. 274A, 8 U.S.C. 1324a.

[134] By way of example, if an applicant timely filed a Form I–765 renewal application that is still pending and the expiration date on the front of the applicant's EAD is June 1, 2021, then the applicant's 180-day automatic extension expired November 28, 2021. If the TFR is published on April 1, 2022, then the applicant's EAD automatically becomes valid from April 1, 2022, up to November 23, 2022, which is 540 days after June 1, 2021, the expiration date on the face of the EAD. If the employee in this example worked without authorization between November 29, 2021, and March 31, 2022, however, the employee and employer may be subject to any consequences outlined in the law.

[135] For example, if an applicant timely filed a Form I–765 renewal application that is still pending and the expiration date on the front of the applicant's EAD is June 1, 2021, then the applicant's 180-day automatic extension expired November 28, 2021. If the TFR is published and effective on April 1, 2022, then the applicant's EAD automatically becomes valid from April 1, 2022, up to November 23, 2022, which is 540 days after June 1, 2021, the expiration date on the face of the EAD. If the employee in this example worked without authorization between November 29, 2021, and March 31, 2022, however, the employee and employer would be subject to any consequences outlined in the law.

[136] 720 days is the amount of time needed to cover the up to 540-day automatic extension and to account for the fact that renewal applicants may file their EAD renewal application up to 180 days before their EAD expires.

## Figure 1. TFR Process Map



### IV. Temporary Regulatory Change: 8 CFR 274a.13(d)(5)

DHS is amending 8 CFR 274a.13(d) to add a new paragraph (5) that will be in effect temporarily until October 15, 2025.[137] Under the new paragraph, DHS is increasing the automatic extension period for employment authorization and/or EAD validity of up to 180 days (described in 8 CFR 274a.13(d)(1)) to a period of up to 540 days for renewal applicants eligible to receive an automatic extension who have a timely filed Form I–765 renewal application pending during the 18-month [138] period beginning May 4, 2022, and ending October 26, 2023. After the 18-month period, automatic extensions of employment authorization and EAD validity will revert to the up to 180-day period for those eligible applicants who timely file renewal Form I–765 applications after October 26, 2023. The increased automatic extension period will apply to eligible renewal applicants who timely file their Forms I–765 on or before the last day of the 18-month period, even if filed prior to May 4, 2022. In addition, for renewal

[137] The rule will be in effect for approximately 3½ years, after which paragraph (d)(5) will terminate automatically. As explained earlier in the preamble, this effective date period, while lengthy, is necessary so that those eligible who file a Form I–765 renewal application on the last available day of the 18-month period during which the increased automatic extension period is available and who qualify for an automatic extension will have the full benefit of the up to 540-day extension period.

[138] For ease of reference, DHS sometimes refers to the approximate time period of 18 months. However, the precise number of days is 540.

applicants whose Forms I–765 remain pending but who are no longer within the up to 180-day automatic extension period on or before May 4, 2022, DHS has determined that, in the interest of fairness, such renewal applicants automatically will resume employment authorization and/or the validity of their EADs beginning on the effective date of this TFR, May 4, 2022, and up to 540 days from the expiration of their employment authorization and/or EAD.[139]

Similar to the 180-day automatic extension period provided by 8 CFR 274a.13(d)(1), the increased automatic extension period of up to 540 days established by this TFR generally will automatically terminate the earlier of up to 540 days after the expiration date of the EAD, or upon issuance of notification of a denial on the Form I–765 renewal request even if this date is after October 26, 2023.

Moreover, 8 CFR 274a.13(d)(5) will remain in the CFR for an additional 720 days after this 540-day period, until October 15, 2025, to ensure that renewal applicants who are already within their up to 540-day automatic extension period as of October 26, 2023, will not get cut off from any remaining employment authorization and/or EAD validity that is over 180 days (the

[139] If a renewal applicant whose employment authorization and/or EAD validity has lapsed on or before the date this rule goes into effect, May 4, 2022, and the lapse is 540 days or more, then such applicant will not receiveany additional employment authorization and/or EAD validity under this rule. DHS anticipates that very few applicants will be in this situation.

normal automatic extension period under 8 CFR 274a.13(d)(1) but instead will be able to take full advantage of the 540-day period.

Similar to 8 CFR 274a.13(d)(4), this TFR provides that an EAD that appears on its face to be expired is considered unexpired under this rule for up to 540 days from the expiration date on the front of the EAD when combined with a Notice of Action (Form I–797C) indicating timely filing of the EAD renewal application and the same employment eligibility category as stated on the facially expired EAD (or in the case of an EAD and I–797C notice that each contains either an A12 or C19 TPS category code, the category codes need not match). While the current provision at 8 CFR 274a.13(d)(4), and, likewise, the provision in this TFR, do not require that qualifying Notices of Action specify the automatic extension period, in practice, USCIS issues a Form I–797C Notice of Action to all renewal applicants with general information regarding who is eligible for an automatic extension and currently includes an explanation of the up to 180-day automatic extension period. On and after May 4, 2022, USCIS plans to issue Form I–797C Notices of Action with an explanation of the up to 540-day automatic extension period. USCIS does not plan to issue updated Form I–797C notices to eligible applicants who filed their Form I–765 renewal application before May 4, 2022. However, even Form I–797C notices that refer to a 180-day automatic extension still meet the regulatory requirements.

**26632** Federal Register / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations

Therefore, individuals who show Form I–797C notices that refer to a 180-day extension, along with their qualifying EADs, still receive the up to 540-day extension under this rule. USCIS will update the web page on the USCIS website that is referenced in the current Form I–797C notice to reflect the change in the automatic extension period. The public should refer to this web page when determining whether a Form I–797C Notice of Action, if presented with the expired EAD, is acceptable for Form I–9 or other purposes, such as to obtain benefits. Employers should attach a copy of the web page with the employee's Form I–9 to document the extension of employment authorization and/or EAD validity. USCIS will also update I–9 Central on the USCIS website to provide employees and employers with specific guidance on Form I–9 completion, including any required notations indicating the above-described extension of employment authorization and/or EAD validity, in such cases. If a benefit-granting agency accepts EADs, then the agency should accept the EADs that are automatically extended under this rule. The up to 540-day extension under this rule applies even if a Form I–797C notice refers to a 180-day extension.

This rule does not modify the current requirements an employer must follow for Form I–9 at 8 CFR 274a.2(b)(1)(vii) that apply to automatic extensions, except that this rule temporarily replaces "180" with "540" in its reference to the maximum number of days for the automatic extension period. Therefore, when an employee chooses to use an EAD and Form I–797C receipt notice as provided under this rule to complete Form I–9 for new employment, the employee and employer should use the extended expiration date to complete Section 1 (if applicable) and Section 2 of the Form I–9 and reverify no later than the date that the automatic extension period expires.[140] For current employment, the employer should update the previously completed Form I–9 to reflect the extended expiration date based on the automatic EAD extension while the renewal is pending and reverify no later than the date that the automatic extension expires.[141] For renewal applicants with pending Forms I–765 who experienced a lapse in employment authorization and/or EAD validity prior

to the effective date of this rule, May 4, 2022, yet resume a period of employment authorization and/or EAD validity under this rule, and are rehired by the same employer, their employers must complete Form I–9 by treating the individual's employment authorization as having previously expired pursuant to 8 CFR 274a.2(c)(1)(ii) but have a choice of either reverifying employment authorization on the employee's Form I–9 or completing a new Form I–9.[142]

Under this Temporary Final Rule, just as under existing 8 CFR 274a.13(d)(3), DHS will retain the ability to otherwise terminate any employment authorization or EAD, or extension period for such employment authorization or document, by written notice to the applicant, by notice to a class of noncitizens published in the **Federal Register**, or as provided by statute or regulation, including 8 CFR 274a.14.[143]

## V. Regulatory Requirements

### A. Administrative Procedure Act

DHS is issuing this rule without prior notice and an opportunity to comment and with an immediate effective date pursuant to the Administrative Procedure Act's (APA's) "good cause" exception. 5 U.S.C. 553(b)(B) and (d)(3). Agencies may forgo notice-and-comment rulemaking and a delayed effective date when a rulemaking is published in the **Federal Register**, because the APA provides an exception from those requirements when an agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B); see also 5 U.S.C. 553(d)(3). Additionally, on multiple occasions, agencies have relied on this exception to promulgate both communicable disease-

related[144] and immigration-related[145] interim rules. The good cause exception for forgoing notice-and-comment rulemaking "excuses notice and comment in emergency situations, or where delay could result in serious harm." Jifry v. FAA, 370 F.3d 1174, 1179 (D.C. Cir. 2004); Am. Fed. of Gov't Emps. v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("As the legislative history of the APA makes clear, moreover, the exceptions at issue here are not 'escape clauses' that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations . . . ."). Furthermore, notice and comment is impracticable under the APA, when an agency finds that due and timely execution of its functions would be impeded by the APA, and for example, an investigation into the facts shows that a new rule must be put in place immediately to avert some type of emergency.[146] Courts have held that impracticability "is inevitably fact- or context-dependent."[147] Although the

---

[144] HHS Control of Communicable Diseases; Foreign Quarantine, 85 FR 7874 (Feb. 12, 2020) (interim final rule to enable the CDC "to require airlines to collect, and provide to CDC, certain data regarding passengers and crew arriving from foreign countries for the purposes of health education, treatment, prophylaxis, or other appropriate public health interventions, including travel restrictions"); Control of Communicable Diseases; Restrictions on African Rodents, Prairie Dogs, and Certain Other Animals, 68 FR 62353 (Nov. 4, 2003) (interim final rule to modify restrictions to "prevent the spread of monkeypox, a communicable disease, in the United States").

[145] See, e.g., Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require a passport and visa from certain H–2A Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming the good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over a 6-month period).

[146] See Util. Solid Waste Activities Grp. v. E.P.A., 236 F.3d 749, 754–55 (D.C. Cir. 2001)(citations omitted) (the Attorney General's Manual explains "that a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in [§ 553], as when a safety investigation shows that a new safety rule must be put in place immediately.).

[147] Mid-Tex Electric Coop. v. FERC, 822 F.2d 1123, 1132 (D.C. Cir. 1987). Examples where courts have found notice-and-comment rulemaking impracticable include: where air travel security

[140] See 8 CFR 274a.2(b)(1)(vii). See also https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/40-completing-section-2-of-form-i-9/44-automatic-extensions-of-employment-authorization-documents-eads-in-certain-circumstances (last updated Nov. 16, 2021).

[141] Id.

[142] See 8 CFR 274a.2(c).

[143] Therefore, for example, in situations where the underlying status that provides employment authorization would expire prior to 540 days, USCIS may include specific information on the applicant's Form I–797C receipt notice as to how long the automatic extension of the individual's EAD will last. More specifically, in the case of a TPS beneficiary who files a Form I–765 for a renewal EAD, such TPS beneficiary would not receive the full 540 days of EAD auto-extension where the relevant TPS country designation expires prior to that 540-day point.

good cause exception is "narrowly construed and only reluctantly countenanced," *Tenn. Gas Pipeline Co.* v. *FERC,* 969 F.2d 1141 (D.C. Cir. 1992). DHS has invoked the exception appropriately in this case given the totality of the circumstances in which this TFR is implemented: [148] Providing advance notice and comment would be impracticable because doing so would result in serious harm, for the reasons set forth below.

As discussed earlier in this preamble, the untenable situation that applicants and their employers are facing is the result of several converging factors affecting USCIS operations that were compounded by the COVID–19 national health emergency. USCIS faced an overall higher level of adjudicatory workload, coupled with insufficient resources to complete the work, which resulted in the significant increase in USCIS processing times for Form I–765 applications (initials and renewals). Staffing shortfalls mean that the workforce cannot keep pace with these operational strains at present, and staffing issues cannot immediately be remedied.[149] While the agency had hoped to overcome the effects of the factors adversely affecting processing times by using operational and other measures, these measures did not produce effects as fast as the agency had hoped, as some of the corrective measures are lengthy, time-consuming, and ongoing. Unfortunately, USCIS' previous financial strains, including a preliminarily enjoined 2020 Fee Rule, continuing workforce shortfalls due to a previously threatened furlough, attrition, a hiring freeze, and an unusual

spike and sustained increase in filings at a rate above that which USCIS can match continue to impact processing times for renewal Forms I–765.

USCIS has been diligently taking steps, many of which had generally been effective in the past, to address these factors and improve adjudicative efficiency after the surge in EAD renewal applications in March and April of 2021, while, at the same time also attending to emergent and other critical demanding obligations of the agency. These steps included applying overtime funds to the Form I–765 renewal workload in an attempt to control the growing backlog, and exploring programmatic improvement initiatives for the adjudication of Form I–765 applications overall. However, although these measures initially showed some success, it has become apparent that USCIS' limited resources are insufficient to address the immediate situation. With the incoming volumes of Form I-765 renewal filings showing no sign of slowing, USCIS assesses that it will not be able to avert the impending crisis of more renewal applicants experiencing gaps in employment authorization and/or documentation, and that such gaps' length in time are growing. As a result, USCIS has determined that until processing times can be reduced significantly, an increase in the automatic extension period is needed as soon as possible to avert imminent harm. This rule is imperative to provide an interim measure for thousands of renewal applicants who are facing imminent job loss through no fault of their own, and thousands who have already experienced a lapse in employment authorization and/or EAD validity despite USCIS' best efforts to employ operational measures to avoid this result.

As explained throughout this preamble, and as of December 31, 2021, the impact is significant. USCIS data show that approximately 66,000 renewal applications remained unadjudicated beyond the automatic extension period of 180 days under 8 CFR 274a.13(d)(1). Therefore, the individuals who filed those renewal applications and relied on the automatic extension to maintain employment already would have experienced job loss as a result of the lack of employment authorization and/or EAD validity. Of the approximately 66,000 renewal applicants in this situation, 58 percent are asylum applicants, a particularly vulnerable population. Continuous employment authorization during the pendency of an asylum application is vital for asylum seekers in the United

States, given that they need employment authorization not just to work but also to access services and other resources required to pursue their asylum applications before USCIS or EOIR, which are often costly. Therefore, this entire group of renewal applicants needs immediate help via this rulemaking so these applicants can regain employment authorization and/or EAD validity and rejoin the workforce in order to continue to make a living to sustain their families.

Given that renewal applications continue to be filed—USCIS receives about 55,000 new renewal Forms I–765 in automatic extension-eligible categories per month—the backlog is expected to increase and, with it, the number of renewal applicants who could lose their ability to be employed and to support themselves and their families.[150] DHS estimates that approximately 14,500 renewal applicants per month will join the group of approximately 66,000 renewal applications who faced a lapse in employment authorization and/or EAD validity as of December 2021.[151] Furthermore, data estimates show that an estimated 266,841 to 375,545 renewal applicants could lose their employment authorization and/or EAD validity over the next 18 months if this rule is not promulgated immediately.

Considering the total population potentially impacted by this rule, DHS estimates that, with the implementation of this rule, approximately $3,098 million in labor earnings for renewal applicants would be stabilized and not forgone.[152] In other words, this rule will preserve an estimated total of $3,098.0 million in labor earnings for the estimated 266,841 to 375,545 affected renewal applicants. Any delay in action such as by providing notice and comment, therefore, would raise the imminent threat and create severe adverse consequences to labor earnings

---

agencies would be unable to address threats posing "a possible imminent hazard to aircraft, persons, and property within the United States," *Jifry* v. *FAA,* 370 F.3d 1174,1179 (D.C. Cir. 2004); if "a safety investigation shows that a new safety rule must be put in place immediately," *Util.* Solid Waste *Activities Grp.* v. *EPA,* 236 F.3d, 749, 755 (D.C. Cir. 2001)(ultimately finding that not to be the case and rejecting the agency's argument); or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of the S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981) (describing that circumstance as "a special, possibly unique, case"). This stance sets a high bar for the agency to meet.

[148] See *National Women, Infants, & Children Grocers Ass'n* v. *Food & Nutrition Service,* 416 F. Supp. 2d 92, 108 (D.D.C. 2006) ["[H]aving examined the totality of circumstances in which the interim rule was promulgated, the Court finds that the FNS' invocation of the good cause exception is justified."].

[149] As explained in the preamble, increasing staffing levels and the agency's capacity are closely tied to the agency's ability to recoup adjudicatory costs through a fee rule, overcoming the effects of the hiring freeze and pandemic related consequences, and backlog reduction efforts. However, none of the efforts undertaken by the agency are realized immediately as these processes are lengthy, time-consuming, and ongoing.

[150] As explained in the preamble, certain applicants within the affected population, including those who are employment authorized incident to status or non-working adults and children, may not necessarily lose their employment authorization after the 180-day automatic extension period is exhausted, but their EADs become invalid so that they can no longer use them for other purposes, such as an identification document or as proof for receiving State or local public benefits to the extent eligible, in addition to not having proof of employment authorization for Form I–9 purposes.

[151] See USCIS' analysis outlined in the preamble at section IV.B, "Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)," regarding the affected population.

[152] Labor earnings includes wages and salaries as well as benefits (e.g., paid leave, supplemental pay, insurance). Amount shown as total present value at a 7 percent discount rate.

and the financial well-being of applicants and their families. DHS believes that with the immediate implementation of this rulemaking, the potential for additional gaps in employment authorization and/or EAD validity, job loss, and financial uncertainty will be reduced significantly for Form I–765 renewal applicants and their families while USCIS works toward implementing its backlog reduction plan to return processing times to the pre-emergency 3-month average.

DHS believes that the imminent and continuing impact on employers' business continuity and related effects caused by gaps in employment authorization and/or EAD validity additionally justify that DHS issue this temporary final rule. The imminent or ongoing gaps in employment authorization and/or EAD validity being experienced by renewal applicants through no fault of their own adversely affect not only applicants and their families, but also employers, which experienced difficulties in maintaining their workforce as a result of the pandemic, and continue to face a variety of challenges as the United States progresses on its path to recovery from the pandemic, such as more job openings than available workers.[153] To ensure continuity of operations, businesses and entities may have made decisions in reliance on the possibility that eligible renewal Form I–765 applicants may receive renewals of employment authorization and documentation (for example, by establishing business contracts, applying for grants, signing leases, and commencing development of product lines). As DHS predicts that it will take approximately 18 months to return to normal processing levels, DHS seeks to mitigate the potential that additional businesses and entities may temporarily be adversely impacted by required terminations as a result of gaps in employment authorization or documentation.

Such adverse impacts on employers and businesses, who have already experienced significant economic harm on account of the pandemic, gives cause to address an emergency situation as quickly as possible to prevent further imminent harm to an increased number of renewal applicants and employers. While the number of businesses affected is unknown, DHS's analysis suggests that, if this rule were not implemented immediately, businesses that employ affected EAD holders would incur approximately

[153] *See* FN 124.

$4,037.6 million in labor turnover costs for the separation and replacement these employees.[154] This amount represents significant cost savings to businesses under this rule. The longer this rule is delayed, the greater the costs to business because of applicants' gaps in employment authorization and/or documentation and the resulting disruptions in business continuity that employers will experience, defeating the very purpose 8 CFR 274a.13(d) and this rulemaking, creating 8 CFR 274a.13(d)(5), seek to prevent.[155] That is, because of the serious harm that would be caused to applicants and employers described throughout this rulemaking, providing notice and comment, as well as a 60-day effective date delay,[156] would expose the public to the harm that 8 CFR 274a.13(d) and this rulemaking are trying to prevent, and would thereby defeat the very purpose of rulemaking.

Furthermore, DHS believes that given the imminent and continuing impact of gaps in employment authorization and/or EAD validity on renewal applicants, their families, employers, and employers' business continuity make following ordinary notice and timing impracticable. As a DHS component agency, one of USCIS' primary missions is to administer immigration benefits, including adjudicating requests for and issuing employment authorization and/

[154] Turnover costs are calculated as a percent of annual salary. Amount shown as total present value, using a 7 percent discount rate.

[155] As explained elsewhere in this preamble, 8 CFR 274.13(d) was proposed in 2016 to mitigate the risk of gaps in employment authorization and required documentation, and its related consequences for eligible renewal applicants and their employers. *See* AC2.: NPRM, 80 FR 81899, 81927. In the AC21 NPRM, DHS explained that it believed the 180-day auto-extension to be a reasonable and effective amount of time to mitigate that risk. *See* 80 FR at 81927 ("DHS believes that this time period [of up to 180 days] is reasonable and provides more than a nple time for USCIS to complete the adjudication process based on USCIS's current 3-month average processing time for Applications for Employment Authorization."). After having received and carefully considered public comments, DHS published the final rule. Thus, the concept of the up to 180-day automatic extension has been tested in the public sphere already and gone through proper rulemaking. This TFR is merely a temporary 18-month deviation from the 180-day timeframe, warranted by this untenable situation.

[156] While the effective cate for a substantive rule under the APA is not less than 30 days, 5 U.S.C. 553(d), this rule is a major rule subject to the Congressional Review Act, codified at 5 U.S.C. 801 through 808. Under 5 U.S.C. 801, a major rule's effective date generally is delayed for at least 60 days. Under the APA and the Congressional Review Act, however, the agency is exempt from the delayed effective date requirements of both acts if the agency provides good cause. *See* 5 U.S.C. 553(d) and 808(2).

or EADs.[157] Under the INA, the Secretary is authorized to take necessary regulatory action to carry out this mission effectively. As established above, the current situation is untenable for renewal applicants and their employers. Given the current processing backlogs and delays, USCIS also predicts that it will take approximately 18 months to revert to normal processing timeframes, a significant portion of which would be taken up by notice and comment rulemaking and the 60-day publication requirement. Thus, given the immediate harm that these backlogs create for renewal applicants and employers alike, the notice and comment requirement, and associated time requirements, would not allow USCIS to timely avert the harms discussed in this rule. Providing notice and comment rulemaking and complying with the 60-day publication requirement is therefore simply impracticable as it would impede USCIS functions, and has a significant impact on applicants and employers.

Additionally, DHS believes that issuing this temporary rule is a reasonable approach to implement this temporary measure, which will be effective for only a finite period. Specifically, the up to 360-day increase of the current 180-day automatic extension period via the amendments to DHS regulations made by this rule are limited to individuals who are seeking a Form I–765 renewal application within the next 18 months from the rule's publication, while the amendments to DHS regulations will only remain in place for a total of 1,260 days (*i.e.*, 3½ years). These time periods are suitable to avert imminent harm to a specific class of individuals and their employers.[158] As demonstrated in the

[157] As of March 1, 2003, the former INS ceased to exist as an agency within the United States Department of Justice, and its functions respecting applications for immigration benefits (such as the adjudication of requests for employment authorization and/or EADs) were transferred to United States Citizenship and Immigration Services in the United States Department of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, sec. 471(a), (Nov. 25, 2002); 68 FR10922 (Mar. 6, 2003). Additionally, under the Homeland Security Act sec. 101(b)(1)(F), 6 U.S.C. 111(b)(1)(F), USCIS, as a DHS component, should exercise this function in a manner that ensures that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland.

[158] Courts have been more inclined to finding good cause for issuance of TFRs if the effect is limited in scope and duration. *See, e.g., San Diego Navy Broadway Complex Coalition v. U.S. Coast Guard,* 2011 WL 1212888, *6 (S.D. Cal. 2011) (finding good cause for issuance of a TFR because agency limited its effect for several months and also explicitly indicated its intent to initiate notice-and-comment rulemaking); *Nat'l Fed'n Emps v. Divine,* 671 F.2d 607 (D.C. Cir. 1982) (finding that OPM's

preamble, extending the automatic extension provision temporarily by up to an additional 360 days for a period of 540 days (*i.e.*, approximately 18 months) directly corresponds to USCIS' data-driven estimates on how long USCIS will need to reduce the processing times of backlogged Form I–765 renewal applications. In addition, DHS has determined that the rule will need to remain in the Code of Federal Regulations for another 720 days so that eligible prior renewal applicants can take advantage of the full up to 360-day increase if necessary, even after the 18-month window for the increase closes.[159] After this period, the amendments made by this rule will expire automatically. Therefore, this rulemaking is limited in time and scope in order to prevent harm to the public.

Bypassing the ordinary APA procedures will allow USCIS immediately to reduce the dire impact the current circumstances create for affected noncitizens and their employers—circumstances that were and continue to be beyond the control of renewal applicants and their U.S. employers. As described above and throughout this preamble, while USCIS has been taking active measures to reduce the backlog and return to its processing goal of an average of 3 months as soon as possible,[160] backlogs and processing times grew to such an extent due to the COVID–19 pandemic's impacts on agency operations and finances, in combination with other factors such as filing surges, staffing shortages, and a sustained increase in the number of filings in other benefit request types such as adjustment of

status and asylum that impact EAD receipts, that those measures were insufficient to avoid the current circumstances.

USCIS expects that its backlog reduction efforts will allow the agency to return to its 90-day processing goal before this TFR expires. In the meantime, this TFR will mitigate harm to individuals, families, and businesses while USCIS works to rebound from the adverse impacts of COVID–19, staffing shortages, and financial strains. A subsequent, extraordinary surge and sustained increase in Form I–765 submissions further undermined those efforts such that the only practicable solution to avoid placing thousands of renewal applicants in the untenable situation of losing employment authorization and/or EAD validity and experiencing employment termination is this time-limited and narrowly drawn rule. Data show that if this rule is implemented without notice and comment, DHS will have mitigated gaps in employment authorizations for virtually all the affected population.[161]

This temporary measure is consistent with the intent of current 8 CFR 274a.13(d). In this rule, DHS is simply temporarily increasing the 180-day timeframe for those already eligible for an automatic extension. DHS neither makes additional categories eligible nor alters existing procedures through this TFR. Therefore, the increase in the automatic extension of employment authorization and/or EAD is not just highly effective but also limited in scope and application. For this additional reason, DHS believes that the good cause exception is properly invoked in this rulemaking.

In sum, for the reasons stated, including the need to be responsive to the operational demands and challenges facing USCIS to reduce its processing times, renewal applicants' needs to avoid gaps in employment and/or documentation, and employers' need to maintain their workforce, DHS believes that, based on the totality of the circumstances in which this TFR is issued, it has good cause to bypass ordinary notice-and-comment procedure for this temporary action, and that moving expeditiously to make this change effective immediately upon publication is in the best interest of the public.

DHS has concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this TFR. Delaying

implementation of this rule until the conclusion of notice-and-comment procedures of section 553(b) and the delayed effective date provided by section 553(d)(3) would be impracticable due to the need to prevent renewal applicants, otherwise eligible for the up to 180-day automatic extension, from experiencing the immediate harm caused by gaps in employment authorization and/or documentation, which would in turn cause imminent harm to their U.S. employers and their ability to maintain their workforce, while USCIS works to reduce adjudicatory processing times and otherwise address the Form I–765 backlogs through various measures.

*B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)*

Executive Order (E.O.) 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and to the extent permitted by law, to proceed if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). In particular, E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Information and Regulatory Affairs (OIRA), within the Office of Management and Budget (OMB), has designated this final rule a significant regulatory action that is economically significant under section 3(f)(1) of E.O. 12866. Accordingly, OIRA has reviewed this regulation.

1. Introduction

As fully detailed in the preamble, this TFR temporarily amends existing DHS regulations to provide that the automatic extension period applicable to expiring employment authorization and/or Employment Authorization Documents (Forms I–766 or "EADs") for certain renewal applicants who have filed Form I–765, Application for Employment Authorization, will be increased from up to 180 days to up to 540 days for a period of 540 days (*i.e.*, approximately 18 months). For those renewal applicants whose 180-day automatic extension of employment authorization and/or EADs (hereinafter may be referred to collectively as "EADs" for ease of reference) have expired by the date this rule goes into effect, this rule provides for an additional period of employment

---

emergency action was within the scope of the "good cause" exception as the agency's action of postponing the open benefits season was required by events and circumstances beyond its control and necessary because not delaying would have been not only impracticable but also potentially harmful; *Council of Southern Mountains, Inc.* v. *Donovan*, 653 F.2d 573 (D.C. Cir. 1981) (upholding Mine Safety and Health Administration rule delaying the effective date without notice and comment).

[159] DHS believes that 720 days is the amount of time needed to cover the up to 540-day automatic extension and to account for the fact that renewal applicants may file their EAD renewal application up to 180 days before their EAD expires.

[160] These measures include staffing increases and reallocations to focus on Form I–765, backlog reduction initiatives that apply technology in strategic ways to more efficiently adjudicate Forms I–765, new monthly completion goals, and policy changes to improve efficiency for the agency and eliminate unnecessary hurdles for applicants. In addition, USCIS is focused on addressing prolonged processing times in other areas impacting Form I–765 overall processing times also, for example, in cases where a Form I–765 filing is based on an underlying benefit request, such as an application for asylum or to adjust to lawful permanent resident status.

[161] *See* USCIS' analysis outlined in the preamble at section IV.B, "Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)."

authorization and EAD validity, beginning on the date the rule goes into effect and up to 540 days from the date their EADs expired as shown on the face of the card. The purpose of this TFR is to reduce the likelihood that certain eligible applicants who qualify for automatic extensions of their expiring EADs will experience gaps in employment authorization and/or EAD validity, and therefore allow earnings stability for individuals and continuity of business operations for their employers.

DHS determines that the population impacted by this TFR consists of three components applicable to the pool of applicants who have renewal Form I–765 applications pending. The first component consists of the pool whose EADs and 180-day auto-extensions have lapsed, and renewal Form I–765 applications still have not been approved as of December 31, 2021—we refer to this group as the "current" population segment. The second component consists of the pool for whom coverage by the current 180-day auto-extension has prevented the lapse of their EADs to date but who would experience a lapse due to expiration of their 180-day auto-extensions in the 120-day period between the date of the analysis and the TFR taking effect.[162] This second group is referred to as "near-term," in context. The third group consists of the "future" population that, without this rule, could experience a lapse in employment during the 18-month period in which the TFR is effective. Because we cannot forecast the future population with precision, we present a range. The baseline population comprising the current, near-term, and future components could range from 301,463 to 423,863. After applying several adjustments described in the "Background and Population" section, we arrive at an adjusted population that could range from 266,841 to 375,545.

Our analysis suggests that virtually all eligible applicants with pending Form I–765 renewal applications who are otherwise eligible for the automatic extension would be covered by the TFR, though we cannot rule out the possibility that some automatically extended EADs might still lapse, as our analysis reveals that over recent months a miniscule share had lapsed for more than 540 days. We expect that the monetized estimates will be beneficial to individuals, and that they will also generate beneficial cost-savings to businesses.

DHS has prepared quantified estimates of the impacts that could be generated by this TFR applicable to the adjusted population. This rule will prevent EAD holders from incurring a loss of earnings ("stabilized earnings"), as under this rule there will be no disruption to their earnings due to a lapsed EAD. Additionally, this rule will generate labor turnover cost savings to businesses that employ the EAD holders, as under this rule there will be no disruption to EAD holders' employment authorization. However, we are unable to ascertain how many individual businesses could be impacted. Additionally, to the extent this rule prevents affected EAD holders' jobs from going unfilled, there will be less impacts to tax transfers from businesses and employees to the Federal Government.

Due to substantial variation in the inputs utilized to estimate the impacts, there is a very wide range in which they could fluctuate. These impacts are summarized in Table 7, where the monetized figures represent the forecast expected value (which is the mean of trial-based simulations) discounted at 7 percent rate of discount for a range based on simulations that account for variations in the components of the impacts. The figures represent the total cost over two years.

TABLE 7—SUMMARY OF IMPACTS
[FY 2020 Values]

Module A.

**EAD Holder Earnings Preserved ("Stabilized Earnings"):**
- *Entities directly affected:* Individual EAD holders.
- *Population:* 266,841 to 375,545 individuals with EAD renewals.
- *Monetized present value estimate (7 percent):* $3,098.0 million.
- *Type:* Stabilized labor income to affected EAD renewal applications; this labor income is a proxy for either prevented transfers from EAD holders to others in the workforce or cost savings to employers for preserved productivity, depending on if employers would have been able to easily find replacement labor for affected EAD holders without this rule.
- *Summary:* Individuals would benefit from being able to maintain their employment without disruption; DHS estimated these savings based on data from recently lapsed EADs and labor earnings, both of which vary within a range.
- Potential preserved employment taxes = $326.9 million (Present Value, 7 percent discount rate); actual amount will depend on how easily businesses would have been able to find replacement labor for affected EAD holders without this rule.

Module B.

**Employer Labor Turnover Cost Savings:**
- *Entities directly affected:* businesses that employ the EAD holders.
- *Population:* Unknown number of businesses; impacts based on 265,987 to 374,343 individuals with EAD renewals.
- *Monetized present value estimate (7 percent):* $4,037.6 million.
- *Type:* Cost-savings.
- *Summary:* There would be cost savings to employers in terms of continuity of business operations due to the worker not being separated; DHS estimated these savings based on information applicable to turnover costs relevant to the annual earnings, both of which vary within a range.

Module C.

**Other Impacts Considered:**
- Individuals impacted would likely benefit from cost-savings accruing to not having to incur the direct costs associated with searching for and obtaining a new job once their renewal EAD that lapsed is eventually approved.
- The estimates of stabilized earnings understate the true impact because they do not factor in the time it would take affected EAD holders to find employment beyond when the lapsed EAD is finally renewed.
- To the extent that individuals' earnings will be maintained, burdens to their support network would be prevented.
- DHS does not expect labor market impacts from this TFR, as the total maximum population that could be impacted is a very small share of the national labor force.
- Avoid opportunity costs to businesses for having to choose the next best alternative to employment of the affected EAD renewal applicant. We do not know if the replacement hire in a next best alternative scenario would have been a comparable substitute (i.e., a productivity or profit charge to employers).

---

[162] The near-term captures the dates of January 1, 2022, to mid-April, 2022, when the TFR is expected to take effect.

Some of the impacts of this rule will depend on whether businesses would have been able to find replacement labor for the positions the affected EAD renewal applicants would have lost if they had experienced a gap in employment without this rule. If businesses would have been able to find replacement labor from the pool of the unemployed, the only monetized cost savings of the rule to society is for preventing costs resulting from labor turnover. If businesses would not have been able to find replacement labor, the monetized cost savings of the rule would also include prevented lost productivity due to a lack of available labor. However, the impacts of this rule to the affected EAD renewal applicants do not depend on whether their employer can find replacement labor. This rule will prevent affected EAD renewal applicants from incurring a loss of earnings.

DHS estimates that stabilized earnings to EAD renewal applicants ranges from $81.3 million to $6,388.6 million with a primary estimate of $1,713.5 million (annualized, 7 percent), depending on the wages the EAD renewal applicants earn, the number of EAD renewal applicants affected, and the duration of the gap in employment authorization that would occur without this rule. DHS uses estimates of the stabilized earnings as a measure of either 1) prevented transfers of these wages from the affected population to others in the labor market, or 2) a proxy for businesses' cost savings from prevented lost productivity, depending on whether businesses would have been able to find replacement labor for affected EAD renewal applicants without this rule.

DHS does not know what the next best labor alternative would have been

for businesses without this rule. Accordingly, DHS does not know the portion of the overall effects of this rule that are transfers or costs savings. To begin, DHS describes the two extreme scenarios, which provide the bounds for the range of effects.

*Scenario 1:* If, in the absence of this rule, all businesses would have been able to easily find reasonable labor substitutes for the positions the EAD renewal applicants would have lost, businesses would have lost little or no productivity. Accordingly, this rule prevents $1,713.5 million (primary estimate annualized, 7 percent) from being transferred from affected EAD renewal applicants to workers currently in the labor force (whom are not presently employed full time) or induced back into the labor force and this rule would result in $0 cost savings to businesses for prevented productivity losses.

*Scenario 2:* Conversely, if all businesses would have been unable to immediately find reasonable labor substitutes for the position the EAD holder filled, then businesses would have lost productivity. Accordingly, $1,713.5 million is the estimated monetized cost savings from this rule for prevented productivity losses and this rule will result n preventing $0 from being transferred from affected EAD renewal applicants to replacement labor. Because under this scenario businesses would not have been able to find replacement labor, the rule may also result in additional cost savings to employers for prevented profit losses; and further, may also prevent a reduction in tax transfer payments from businesses and employees to the government. DHS has not estimated all potential tax effects but notes that

stabilized earnings of $1,713.5 million would have resulted in employment tax losses to the Federal Government (*i.e.,* Medicare and Social Security) of $180.8 million (annualized, 7 percent).

In both scenarios, whether without this rule employers would have been able to find replacement labor or not, DHS assumes that businesses would have incurred labor turnover costs for having to replace affected EAD renewal applicants. Accordingly, DHS estimates the rule will also result in additional labor turnover cost savings to businesses ranging from $232.2 million to $6,666.8 million, with a primary estimate of $2,233.1 million (annualized, 7 percent) depending on the wages the EAD renewal applicants earn, the number of EAD renewal applicants affected, and the replacement cost to employers.

Table 8 below summarizes these two scenarios and the primary estimate of this rule (Tables 8A and 8B capture the impacts at 3 and 7 percent rates of discount, respectively). Because DHS does not know the overall proportion of businesses that would have been able to easily find replacement labor in the absence of this rule, for DHS's primary estimate we assume that replacement labor would have been found for half of all EAD renewal applicants and not found for the other half (*i.e.,* an average of the two extreme scenarios described above). However, as noted previously, December 2021 unemployment and job openings data indicate there are more jobs available than people looking for jobs.[163] Accordingly, we believe the impacts of this rule will most likely skew towards Scenario 2, with the rule resulting in mostly cost savings for employers who would have been unable to fill the jobs of affected EAD renewal applicants without this rule.

TABLE 8A—PRIMARY ESTIMATE—MONETIZED ANNUALIZED IMPACTS AT 3%

[Millions]

| Category | Description | Scenario 1: Replacement labor found for ALL affected EAD holders | Scenario 2: No replacement labor found for affected EAD holders | Primary estimate: Replacement labor found for HALF of affected EAD holders |
|---|---|---|---|---|
| **Transfers** | | | | |
| Stabilized Earnings | Prevented compensation transfers from EAD renewal applicants to other workers. | $1,693.0 | $0 | $846.5 |
| Employment Taxes | Prevented reduction in employment taxes paid to the Federal Government. | 0 | 178.6 | 89.3 |

---

[163] Bureau of Labor Statistics data show that as of December 2021, there were 0.6 unemployed persons per job opening. U.S. Department of Labor, U.S.

Bureau of Labor Statistics: *Number of Unemployed Persons per Job Opening, Seasonally Adjusted* (Jan. 2007 through Jan. 2022), *https://www.bls.gov/*

*charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited Mar. 14, 2022).

**26638**    Federal Register / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations

### TABLE 8A—PRIMARY ESTIMATE—MONETIZED ANNUALIZED IMPACTS AT 3%—Continued

[Millions]

| Category | Description | Scenario 1: Replacement labor found for ALL affected EAD holders | Scenario 2: No replacement labor found for affected EAD holders | Primary estimate: Replacement labor found for HALF of affected EAD holders |
|---|---|---|---|---|
| **Cost Savings** | | | | |
| Labor Turnover | Prevented labor turnover costs to businesses | 2,206.5 | 2,206.5 | 2,206.5 |
| Productivity | Prevented lost productivity to businesses (stabilized earnings used as a proxy). | 0 | 1,693.0 | 846.5 |
| Total Cost Savings | | 2,206.5 | 3,899.5 | 3,053.0 |

### TABLE 8B—PRIMARY ESTIMATE—MONETIZED ANNUALIZED IMPACTS AT 7%

[Millions]

| Category | Description | Scenario 1: Replacement labor found for ALL affected EAD holders | Scenario 2: No replacement labor found for affected EAD holders | Primary estimate: Replacement labor found for HALF of affected EAD holders |
|---|---|---|---|---|
| **Transfers** | | | | |
| Stabilized Earnings | Prevented compensation transfers from EAD renewal applicants to other workers. | $1,713.5 | $0 | $856.7 |
| Employment Taxes | Prevented reduction in employment taxes paid to the Federal Government. | 0 | 180.8 | 90.4 |
| **Cost Savings** | | | | |
| Labor Turnover | Prevented labor turnover costs to businesses | 2,233.1 | 2,233.1 | 2,233.1 |
| Productivity | Prevented lost productivity to businesses (stabilized earnings used as a proxy). | 0 | 1,713.5 | 856.7 |
| Total Cost Savings | | 2,233.1 | 3,946.6 | 3,089.9 |

There are two important caveats to the monetized estimates. First, as the pending caseload evolves over the course of time that this TFR applies to, the pending count and therefore the total number of EADs and individuals associated with them will change. A resultant effect of the caseload changes is that as USCIS works through this backlog, the number of affected EAD renewal applicants and the durations for which EAD renewal applicants may have experienced a lapse in employment without this rule will likely vary from the durations modeled, which was those experienced in December 2021. As a result, DHS acknowledges the uncertainty in the above monetized impacts.

Second, DHS recognizes that non-work time performed in the absence of employment authorization has a positive value, which is not accounted for in the above monetized estimates.[164] For example, if someone performs childcare, housework, home improvement, or other productive or non-work activities that do not require employment authorization, that time still has value. In assessing the burden of regulations to unemployed populations, DHS routinely assumes the time of unemployed individuals has some value.[165] The monetized estimates of the wages this rule preserves are measured relative to a baseline in which individuals lose EADs and the associated income as a result of the problem this rule seeks to address. The monetary value of the wages this rule preserves are savings to the individual, but DHS has considered whether net societal savings may be lower than the sum of the preserved wages to the individuals and whether a more accurate estimate of the net impact to society from losing employment authorization in the absence of this rule might take into account the value of individuals' non-work time, even though this population has lost their authorization to sell their time as labor. Due to the variety of values placed on non-work time, and the additional fact that this non-work time is involuntary, it is difficult to estimate the appropriate adjustment that DHS should make to preserved wages in order to account for the social value of non-work time. Accordingly, DHS recognizes that the net societal savings of this rule may be somewhat lower than those reported below, but they are a reasonable estimate of the impacts to avoiding the costs of lapsed EADs.

[164] Boardman et al., *Cost-Benefit Analysis Concepts and Practice* (2018), p.152

[165] For regulatory analysis purposes, DHS generally assumes the value of time for unemployed individuals is at least the value of the Federal minimum wage.

Pursuant to OMB Circular A–4, DHS has prepared an A–4 Accounting Statement for this rule.

### TABLE 9—OMB A–4 ACCOUNTING STATEMENT

[$ millions, 2020]

[Period of analysis: 2022–2023]

| Category | Primary estimate | | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|---|
| **Benefits:** | | | | | |
| Monetized Benefits | 7% 3% | N/A N/A | N/A N/A | N/A N/A | RIA. |
| Annualized quantified, but un-monetized, benefits | N/A | | N/A | N/A | RIA. |
| Unquantified Benefits | Without this rule, affected EAD renewal applicants who remain eligible for employment authorization would encounter delays in EAD renewals and be unauthorized to work for periods of time. This rule will ensure that these EAD renewal applicants do not experience gaps in employment authorization as a result of USCIS processing delays and can continue to make a living to sustain their families. Accordingly, stabilized earnings for these EAD renewal applicants may also prevent any monetary or other support that would have been necessary from the support network of affected EAD holders during such a period of unemployment. It will also ensure other benefits of holding an EAD or job will continue, such as valid identity documents, or health insurance obtained through an employer. Additionally, this rule will prevent adverse impacts on businesses that would result from required terminations for affected EAD renewal applicants. | | | | RIA. |
| **Costs:** | | | | | |
| Annualized monetized costs | 7% 3% | – $3,089.9 – 3,053.0 | – $232.2 – 229.4 | – $13,055.4 – 13,131.0 | RIA. |
| Annualized quantified, but un-monetized, costs | N/A | | N/A | N/A | RIA. |
| Qualitative (unquantified) costs | In cases where, in the absence of this rule, companies cannot find reasonable substitutes for the labor the affected EAD renewal applicants have provided, affected businesses would also save profits from the productivity that would have been lost. In all cases, companies would avoid opportunity costs from having to choose the next best alternative to employment of the affected EAD renewal applicant. | | | | RIA. |
| **Transfers:** | | | | | |
| Annualized monetized transfers: "on budget" | 7% 3% | 0 0 | 0 0 | 0 0 | RIA. |
| From whom to whom? | N/A | | N/A | | |
| Annualized monetized transfers: stabilized earnings | 7% 3% | 856.7 846.5 | 0 0 | 6,388.6 6,312.4 | RIA. |
| From whom to whom? | This rule will prevent compensation from transferring from affected EAD renewal applicants to other workers. | | | | RIA. |
| Annualized monetized transfers: taxes | 7% 3% | 90.4 89.3 | 0 0 | 674.1 666.1 | RIA. |
| From whom to whom? | This rule will prevent a reduction in employment taxes from companies and employees to the Federal Government (quantified). It would also prevent the transfer of additional Federal, State, and local income tax revenue (unquantified). | | | | RIA. |
| Category | Effects | | | | Source citation (RIA, preamble, etc.) |
| Effects on State, local, and/or tribal governments | This rule will prevent a reduction in State and local tax revenue (unquantified). It will also prevent potential reliance on State or local government-funded support services that may have been necessary with a gap in employment authorization (unquantified). | | | | RIA. |
| Effects on small businesses | This rule does not directly regulate small entities but has indirect cost-saving to small entities that may employ affected EAD renewal applicants. Such businesses will avoid the costs for labor turnover and loss of productivity and profits had they not been able to immediately fill the labor performed by the affected EAD renewal applicant. | | | | RIA, RFA. |

TABLE 9—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, 2020]

[Period of analysis: 2022–2023]

| Category | | | | |
|---|---|---|---|---|
| Effects on wages ......................................... | Preserve access to wages for EAD renewal applicants. | | | RIA. |
| Effects on growth ......................................... | None. | | | RIA. |

## 2. Background and Population

Backlogs across USCIS-administered benefit requests, including employment authorization, have been increasing steadily since FY 2010, due to factors discussed in the preamble. Unforeseen obstacles driven by the COVID–19 pandemic that exacerbated existing financial problems within USCIS, staffing issues, and a surge in FY 2021 EAD filings, have aggravated the situation and caused a recent spike in USCIS processing times. This is especially concerning where the backlog involves employment authorization and documentation, which is critical to applicants' livelihoods and the financial well-being of their families, as well as U.S. employers' continuity of operations. USCIS understands the potential impact that delays in receiving final decisions have on applicants and tackling the backlog and reducing processing times is a priority for DHS.

Currently, applicants in specific categories who are seeking to renew their expiring EADs are eligible for an automatic extension of that employment authorization and/or EAD for up to 180 days if they meet certain requirements. Because of the recent spike in processing times, however, DHS has determined that 180 days is no longer sufficient to prevent gaps in employment authorization and documentation for most eligible applicants. Therefore, DHS will provide an additional 360 days of employment authorization to the existing 180 days (for a total of up to 540 days from the EAD expiration date), automatically provided to certain applicants seeking a renewal of their EADs under 8 CFR 274a.13(d)(1).

In developing the populations examined for this analysis, it is useful to discuss four categories. First, there are applicants whose auto-extended EADs under the relevant categories have lapsed and whose renewal Forms I–765 have since been approved, providing them with a new grant of employment authorization and/or new documentation. Second, there are applicants whose auto-extended EADs have lapsed but renewal Forms I–765 have not yet been approved as of the date of the most recent data applicable to this analysis (December 31, 2021). Third, there are applicants whose EADs are still valid, including being within the 180-day auto-extension period, but whose auto-extension period will expire over the next 120 days, in the timespan leading up to the TFR taking effect (the near-term period captures the date of the analysis, which is January 1, 2022, through mid-April 2022). Fourth are the applicants whose EAD would lapse after the TFR becomes effective if it were not for the TFR. These population components will be considered "past," "current," "near-term," and "future."

In this specific case, we think it is most appropriate to attribute the impacts to the population that is current in terms of being impacted, or that could be impacted in the near-term timespan leading up to the TFR, and the future, when the TFR is in effect. Hence, while we draw on data and information from the pool of applicants whose auto-extended EADs lapsed but whose renewal Forms I–765 applications were subsequently approved, they are not part of the population affected by the rule.

DHS analyzed pending renewal Form I–765 filing and processing information and determined that the current pool of relevant-category Form I–765 renewals that have expired and are pending in a lapse-state of the current analysis stands at 66,077. Furthermore, the near-term population (120-day period starting on January 1, 2022) is 96,786. For the future population, USCIS estimates with about 30,000 additional EADs per month are at risk of lapse without additional adjudication efforts. For the future, we also relied on certain projections about USCIS's efforts to reduce backlogs to make initial estimates. If current adjudication trends hold steady, about 14,500 EADs (10,500 per month for the C08, 3,000 per month C09, and 1,000 for the rest automatic extension-eligible categories) per month would lapse for the duration of the rule's effective timeframe. Over 18 months, that would be 261,000 new applicants who would lose at least one day of employment authorization without this rule. If, however, we assume a linear decrease in processing times such that by the end of the 18 months they were back to more reasonable levels, then about 138,600 individuals would lose employment authorization during the 18-month time frame (500 per month C08, 300 per month C09, and 100 per month for all others at the end of the period) without this rule. Hence, as depicted in Table 10, a range for the future population would be 138,600 to 261,000.

TABLE 10—TFR FUTURE POPULATION PROJECTIONS

| Approx. days | Month | Additional EADs facing lapse each month without additional efforts to reduce lapses | Future low bound | | Future upper bound | |
|---|---|---|---|---|---|---|
| | | | USCIS efforts to reduce lapses, outside of this rule: *linear improvement of 800 each month* | Sum of lapsed EADs | USCIS efforts to reduce lapses, outside of this rule: *no improvement over 18 months* | Sum of lapsed EADs |
| | | (A) | (B) | (A − B) | (C) | (A − C) |
| 30 ........................................ | 1 | 30,000 | 15,500 | 14,500 | 15,500 | 14,500 |
| 60 ........................................ | 2 | 30,000 | 16,300 | 13,700 | 15,500 | 14,500 |

**Federal Register** / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations    **26641**

TABLE 10—TFR FUTURE POPULATION PROJECTIONS—Continued

| Approx. days | Month | Additional EADs facing lapse each month without additional efforts to reduce lapses | Future low bound | | Future upper bound | |
| | | | USCIS efforts to reduce lapses, outside of this rule: linear improvement of 800 each month | Sum of lapsed EADs | USCIS efforts to reduce lapses, outside of this rule: no improvement over 18 months | Sum of lapsed EADs |
| | | (A) | (B) | (A − B) | (C) | (A − C) |
| 90 | 3 | 30,000 | 17,100 | 12,900 | 15,500 | 14,500 |
| 120 | 4 | 30,000 | 17,900 | 12,100 | 15,500 | 14,500 |
| 150 | 5 | 30,000 | 18,700 | 11,300 | 15,500 | 14,500 |
| 180 | 6 | 30,000 | 19,500 | 10,500 | 15,500 | 14,500 |
| 210 | 7 | 30,000 | 20,300 | 9,700 | 15,500 | 14,500 |
| 240 | 8 | 30,000 | 21,100 | 8,900 | 15,500 | 14,500 |
| 270 | 9 | 30,000 | 21,900 | 8,100 | 15,500 | 14,500 |
| 300 | 10 | 30,000 | 22,700 | 7,300 | 15,500 | 14,500 |
| 330 | 11 | 30,000 | 23,500 | 6,500 | 15,500 | 14,500 |
| 360 | 12 | 30,000 | 24,300 | 5,700 | 15,500 | 14,500 |
| 390 | 13 | 30,000 | 25,100 | 4,900 | 15,500 | 14,500 |
| 420 | 14 | 30,000 | 25,900 | 4,100 | 15,500 | 14,500 |
| 450 | 15 | 30,000 | 26,700 | 3,300 | 15,500 | 14,500 |
| 480 | 16 | 30,000 | 27,500 | 2,500 | 15,500 | 14,500 |
| 510 | 17 | 30,000 | 28,300 | 1,700 | 15,500 | 14,500 |
| 540 | 18 | 30,000 | 29,100 | 900 | 15,500 | 14,500 |
| Cumulative Total | | | 138,600 | | 261,000 | |

**Note:** A linear reduction in the monthly shortfall of 14,500, over 18 months is 805.6, rounded to 800 in these projections for simplicity.

We stress that these estimates were not made via a formal modelling or time series analysis approach, as variables could affect the population over time via changes in volumes, processing times, and other factors that are not possible to predict. As such, DHS acknowledges the uncertainties in these estimates, but they represent the potential population for the impact estimates using the best available information at the time of this analysis.

We thus define the broad population baseline (denoted generally as "$P_B$") as the sum of the three components, which, given the range for the future, would lie between 301,463 and 423,863.[166] We next proceed to make a few adjustments to $P_B$. First, for the current population, we parsed out late filers (who are not eligible for the 180-day automatic extension) and some applications that may have lapsed for other reasons not exclusive to the context of the TFR to obtain a narrower population of 65,000.[167]

An assumption that is implicit in the populations developed here is that every individual with a lapsed EAD

would be unauthorized to work. In reality, some of the individuals may be authorized to work—or become authorized to work—incident to status and merely relying upon the EAD to evidence that employment authorization. Others may be relying upon the EAD as a government-issued identity document and not using it to obtain employment. In either instance, USCIS does not know, and is unable to reasonably estimate, how many individuals or what percentages of the populations may be separately employment authorized or otherwise not relying on the EAD to document their employment authorization. It is possible, therefore, that the lower bound estimate of population is overstated.

All the impacts that we estimate quantitatively rely on labor earnings by the relevant individuals with EADs. The assessments of possible impacts rely on the assumption that everyone who was approved for an EAD under the relevant categories entered the labor force. DHS believes this assumption is justifiable because applicants would generally not have expended the direct filing (for the pertinent EAD categories in which there is a filing fee) and time-related opportunity costs associated with applying for an EAD if they did not expect to recoup an economic benefit. Realistically, however, individuals might not be employed for any number of other reasons not specifically relevant

to this action. The national unemployment rate ("$U_R$") as of November 2021, is 4.2 percent.[168] There is constant and considerable job turnover in the labor market even when the unemployment rate is low. Individuals could be unemployed due to this normal turnover or from any number of case-specific factors and conditions. As such, we believe it is reasonable to scale the population to account for unemployment. In addition, not all Form I–765 renewal applications are approved. DHS calculated the applicable Form I–765 renewal approval rate ("$R_A$") for FY 2020 through 2021 filings, which was 92.7 percent.[169] To obtain the adjusted population ("$P_A$") we use the formula: $P_B \times (1 - U_R) \times (R_A)$, which yields a population that could range from 266,841 to 375,545. These population data and associated shares of the totals are presented in Table 11.

[166] 66,077 "current" + 96,786 "near-term" + 138,600 "future" = 301,463 total (low end of the range) 66,077 "current" + 96,786 "near-term" + 261,000 "future" = 423,863 total (high end of the range).

[167] Data provided by DHS, USCIS Office of Performance and Quality (OPQ); Claims 3 and SAS PME; obtained on January 17, 2022.

[168] Source: BLS, The Employment Situation—November 2021, *https://www.bls.gov/news.release/archives/empsit_12032021.pdf* (last visited Dec. 10, 2021).

[169] Calculation was made from EAD filing data, Form I–765, Application for Employment Authorization, Eligibility Category and Filing Type FY 2003 through 2021, *https://www.uscis.gov/sites/default/files/document/data/I-765_Application_for_Employment_FY03-21.pdf* (last updated Oct. 2021). Due to the increase in backlogs, the approval rate was calculated as the number of approvals divided by the sum of approvals and denials, rather than the receipts basis.

Case No. 1:24-cv-00762-CNS    Document 22-2    filed 06/24/24    USDC Colorado    pg
334 of 439

TABLE 11—ESTIMATED TFR POPULATION

| Module A. baseline | Low bound | | Upper bound | |
|---|---|---|---|---|
| Component | Number | Share (percent) | Number | Share (percent) |
| i. Current | 66,077 | 21.9 | 66,077 | 15.6 |
| ii. Near-term | 96,786 | 32.1 | 96,786 | 22.8 |
| iii. Future | 138,600 | 46.0 | 261,000 | 61.6 |
| Total | 301,863 | 100.0 | 423,863 | 100.0 |
| Module B. adjusted | Low bound | | Upper bound | |
| Component | Number | Share (percent) | Number | Share (percent) |
| i. Current | 57,795 | 21.7 | 57,795 | 15.4 |
| ii. Near term | 85,956 | 32.2 | 85,956 | 22.9 |
| iii. Future | 123,091 | 46.1 | 231,794 | 61.7 |
| Total | 266,841 | 100.0 | 375,545 | 100.0 |

Source: USCIS analysis of EAD renewal filing data, provided by DHS, USCIS Office of Performance and Quality (OPQ); data provided 1–1–2022. Estimate for the future population provided by OPQ on 2–3–2022.

The adjusted population captures the population that will incur impacts applicable to both labor earnings for individuals and labor turnover costs to employers. While some information on employment is available through E-Verify (discussed below) we cannot determine how many individual employers would be impacted. The high population bound would represent the maximum number of businesses impacted under a scenario in which each business hired one and only one individual from the population.

There is an important caveat to the adjusted populations upon which DHS will base our estimated impacts. Over time, the backlog and pending pool will evolve according to multiple factors. While we have attempted to account for future changes in the backlog based on the information we have available to us at this time, it is possible that other factors may change that we have been unable to capture such as future surges in renewal applications. Therefore, DHS acknowledges the uncertainty in the above estimated ranges of affected populations and that the number of individuals impacted over the course of time may differ from our adjusted population.

3. Impact Analysis

This section is organized into modules as follows: In Module A, DHS develops earnings levels for the EAD renewal filers.

Module B focuses on labor earnings impacts and is divided into two sections. First, the analytical procedures and results applicable to durations for auto-extended EADs that lapsed but where renewal Form I–765 applications

were since approved are detailed; as described in the preceding section, this portion is not part of the adjusted population affected by this rule, but metrics and data derived from it are vital to the subsequent estimation procedures. Second, the requisite impact simulations for the impacted populations are calibrated, run, and the results presented.

Module C addresses labor turnover cost savings from this rule. Module D collates the monetized impacts and reports the discounted terms, since the TFR will stretch past one year. Module E discusses the impacts from an economic and business perspective, and Module F concludes with consideration of other possible effects.

Since we are dealing with multiple variables, we use abbreviations where possible, as in the above discussion of the population.

Module A. Earnings of EAD Renewal Applicants

We expect two broad types of impacts from this TFR that are estimated and quantified. First, there will be impacts to eligible individual EAD holders in terms of their ability to maintain labor earnings. Second, impacts will accrue to businesses that employ the EAD holders in maintaining continuity of employment and thus avoiding labor turnover costs. A central component of both impacts is the earnings of the EAD renewal filers, which figure prominently into the monetized estimates. An important factor in the estimation procedure requires establishing a range bounded by a lower and upper level.

The Federal minimum wage is $7.25 per hour; however, in this rulemaking,

we rely on the national "effective minimum wage" of $11.80 for the forthcoming estimation procedures, which considers the diverse lower wage bounds practiced across U.S. States.[170]

Because the individuals renewing EADs would be relatively new entrants to the labor force, we would not expect most of them to earn high wages. However, it is likely that some earn wages above the minimum. Because the EADs impacted do not include or require, at the initial or renewal stage, any data regarding wages, DHS has no information from the associated forms concerning earnings, occupations, industries, positions, or businesses that may employ such workers. DHS can add some robustness to the estimates by incorporating actual data concerning the employment of the EAD holders to draw inference on their earnings.

DHS obtained FY 2020 E-Verify ("EV") records for the EAD categories potentially impacted, which yielded 4.71 million records.[171] These records neither distinguish between an EV case for an initial EAD, a renewal EAD, or the EV case result, but they do provide information that we can draw from regarding employment. The data record the North American Industry Classification System (NAICS) code,

[170] See Ernie Tedeschi, *Americans Are Seeing Highest Minimum Wage in History (Without Federal Help)*, N. Y. Times (Apr. 24, 2019), *https://www.nytimes.com/2019/04/24/upshot/why-america-may-already-have-its-highest-minimum-wage.html*. We note that with the wage level applies to 2019, but we do not make an inflationary adjustment because not all minimum wage levels are set to adjust with inflation.

[171] Data were provided by DHS, USCIS Immigration Records and Identity Services Directorate (IRIS), Verification Division; obtained on December 23, 2021.

which is utilized by Federal statistical agencies in classifying business establishments. The EV data does not provide information on job type or occupation, but it does substantiate the NAICS code pursuant to the 3-digit "subsector" level (with a few exceptions).

Analysis of the EV records shows that they disproportionately accrued to a small subset of subsectors. Of one hundred represented subsectors, only four exhibited shares higher than 10 percent—Professional, Scientific, & Technical Services (22.7 percent), Other Information Services (13.3 percent), Administrative and Support Services (13.0 percent), and internet Service Providers, Web Search Portals, and Data Processing Services (11.6 percent). Moreover, the upper quartile is reached with just eleven subsectors. The average individual share across these eleven subsectors was 6.9 percent, while for the entire remainder the individual average was 0.3 percent. Given this concentration, we will center the analysis on these eleven subsectors.

We rescaled the shares of the subsectors according to the total number of records for these eleven subsectors (3.55 million) and obtained the average hourly wage for all occupations within the relevant NAICS codes from BLS. We then calculated a weighting factor input, which is the product of the wage and the rescaled share, and then summed across all rows to obtain a weighted average of $36.78.[172] We applied this figure as the upper earnings bound, noting that it is more than one-third (35.9 percent) higher than the current national average wage weighted across all occupations, of $27.07.[173]

**Module B. Impacts That Could Accrue to Labor Earnings**

**1. Duration Analysis for Previously Lapsed EAD Renewals**

To estimate the impacts that could accrue to labor earnings, DHS extracted adjudication records on 31,676 auto-extended EADs for the relevant categories which had lapsed and where the renewal Form I–765 applications were subsequently approved from June–December 31, 2021.

[172] Additional details are available in the Appendix, which is located in the Docket for this rulemaking on *www.regulations.gov.*

[173] The earnings information for the NAICS codes are found in the "May 2020 National Industry-Specific Occupational Employment and Wage Estimates" in the BLS Occupational Employment and Wage Statistics (OEWS) portal, *https://www.bls.gov/oes/2020/may/oessrci.htm* (last updated Mar. 31, 2021). The national average wage is also found in the above OEWS suite, *https://www.bls.gov/oes/2020/may/oes_nat.htm* (last updated Mar. 31, 2021).

This time frame was chosen to draw recent data in context of the problem set being addressed. For each record, we calculated the duration in calendar days ("$D_L$") applicable to the end of the initial EAD validity date and the eventual approval of the renewal Form I–765 application in cases where the auto-extended EAD had lapsed. The analysis of the lapse-data shows that the durations are not normally distributed and in fact display a strong positive skew; this is because the majority of the pending EADs are resolved within the first 50 days after lapsing. Less than 10 percent of the pending EADs take more than 115 days to be approved. Please see Table 12 below for a breakout of the number of days the EADs have lapsed.

We utilized the Oracle Crystal Ball® Modelling and Simulation Software ("OCB") to analyze the data. OCB indicates that the Gamma density function provides the best fit.[174] The Gamma distribution is a member of the exponential distributions and is applicable in situations where the data displays considerable variance, is restricted to positive values, and is skewed to the right (positively skewed). It is frequently utilized in analyses to predict durations and wait times until future events occur. Overall, the range of the lapse-durations is very high. However, values of more than 360 days have a very small probability, 0.32 percent, of being realized.

To illustrate the feature of the lapse-durations, we provide the associated probability plot in the Appendix (Figure A.2). The value bars are overlayed with the gamma curve, which visually displays a very good fit. In addition, we can see that as the values get to about 180 or so, they asymptotically converge to zero. We have also marked the plot with the mode (the most frequently observed value, of 7), the median, (40.0), and the mean (52.5). The larger mean compared to the median confirms the positive skew, as it is generally indicative that unusually high individual values tend to pull the mean above the median, the latter of which is not significantly impacted by the skew. Figure A.2 is trimmed to 540 days, and shows a marker for 360 days, as the

[174] OCB ranks density fit according to internal routines that evaluate the appropriateness of several tests according to the sample size/population. In this case, the Gamma density function fits the data best based on all continuous distributions subject to a scoring method applicable to the test statistic of the Anderson-Darling (A–D) test, which in this case is 40.84 (it is not however, based on a test of significance. For sample sizes and populations that are large, exact tests of significance based on p-values are generally unreliable in terms of providing evidence in support of the null hypothesis for any distribution).

latter is the maximum lapse duration this rule can prevent as it provides a temporary increase of 360 days beyond the existing 180-day auto-extension period (for a total automatic extension period of 540 days). The value of 360 is at the 99.58th percentile. At this level, there is still almost a zero probability of a lapse in an EAD occurring with this rule's temporary increase to the auto-extension period. The percentiles presented in Table 12 represent the fitted values under the Gamma density curve for $D_L$ up to 360 days.

**TABLE 12—PERCENTILES FOR THE NUMBER OF CALENDAR DAYS BETWEEN WHEN AUTO-EXTENDED EADS EXPIRED AND RENEWAL FORMS I–765 WERE SUBSEQUENTLY APPROVED IN RECENT MONTHS**

["Lapse Duration" in calendar days]

| Percentile | Gamma distribution (calendar days) |
|---|---|
| 0 | 1 |
| 10 | 7 |
| 20 | 13 |
| 30 | 19 |
| 40 | 28 |
| 50 | 40 |
| 60 | 53 |
| 70 | 69 |
| 80 | 88 |
| 90 | 114 |
| 100 | 358+ |

Source: USCIS analysis of EAD data; provided by DHS, USCIS, OPQ, Claims 3 database; obtained on 12–17–2021. Analysis conducted with OCB and SAS VIYA PME.

As the percentiles increase, the durations increase at a consistent rate; however, the upper percentile exhibits a significant jump. This data therefore corresponds to the probability graph in showing that once the 90th percentile is reached, the lapse-durations begin to diverge from the distribution to that point and gravitate to almost zero.

**2. Simulation and Impact Estimation**

The adjusted population ("$P_A$") of 266,841 to 375,545 individuals could incur impacts that would result in stabilized earnings, as there would be no disruption to their earnings under the TFR. For the estimation procedure we account for worker benefits by calculating a benefits-to-wage multiplier using the most recent BLS information detailing the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. DHS relies on a benefits-to-wage multiplier ("$B_M$") of 1.45 and, therefore estimates the full opportunity cost per applicant, including employee

wages and salaries and the full cost of benefits such as paid leave, insurance, retirement, and other benefits.[175] The total rate of compensation for the effective minimum hourly wage is $17.11 ($11.80 × benefits burden of 1.45), which is 62.8 percent higher than the basic Federal minimum wage of $7.25. Burdened for benefits, the weighted average hourly wage (derived from the EV analysis) is $53.33 ($36.78 × benefits burden of 1.45). An hourly benefits-burdened earnings bound of $17.11–$53.33 provides a range that we think is realistic to estimate the impacts for this TFR.

DHS is interested in estimating the mean and a range for the impacts that is likely to be realized. Since the population, earnings, and lapse-

durations all vary within a range, and noting especially high variance of the latter, we employ via OCB a simulation approach. For the earnings and population, we rely on the uniform distribution. This is a discreet distribution which essentially means that any value in the range has the same probability as being selected as any other value. This structure is chosen because we have no evidence or data to suggest that the earnings or population would tend to cluster at either the low or high end of the range. The minimum and maximum level are pursuant to the relative figures in preceding paragraph.

The Gamma distribution is generally continuous in the upper tail. However, because the software is utilized extensively for scenario-specific and

risk management simulations, we can calibrate the forthcoming simulation to exclude choosing values above a certain level, which we tune to the value of 360, as that is the maximum day-lapse duration this rule can prevent.

In addition, we introduce a time scalar ("$T_s$") to account for a typical 8-hour workday and 5-day workweek; the product of $8 \times (5/7)$ is 5.714.[176] Denoting hourly earnings ("$E_H$"), under the "define forecast" toolkit we entered the program: $P_A \times E_H \times B_M \times T_s \times D_L$ and tuned the Gamma distribution for the produced parameters.[177] The tuning features for the system are listed in Table 13, which includes the three-parameters OCB produced for the distribution:

TABLE 13—CALIBRATION FOR STABILIZED EARNINGS ESTIMATION

|  | Minimum | Maximum | Distribution |
|---|---|---|---|
| Population ($P_A$) | 266,841 | 375,545 | Uniform. |
| Fully-loaded Earnings ($E_H \times B_M$) | $17.33 | $53.33 | Uniform. |
| Durations ($D_L$) | 1 | 360 | Gamma:<br>Location: .0017.<br>Scale: 44.57.<br>Shape: 1.16. |

Source: USCIS Analysis.

OCB repeatedly calculates results using a different set of random values from the range of values and probability distributions described in Table 13 above to build a model of possible results. We ran 100,000 randomized seed trials, which is sufficient to generate a 95 percent level of precision in the results. Based on the simulation, the expected value (which is the mean of probabilistic-based forecast values) for stabilized earnings is $3,354.3 million.[178] We also generated a 95 percent certainty range, which reports $159.2 million to $12,506.4 million, noting that the extreme range is due to the high variation in the inputs.[179] A sensitivity analysis that scores the

inputs in terms of how much variation in each contributes to fluctuation in the forecasted values reveals that the vast majority, 90.7 percent, of the variation was driven by variation in the lapse duration-days.

If, without this rule, businesses would not have been able to find replacement labor for the position the affected EAD renewal applicant filled, then the unperformed labor would have resulted in a reduction in taxes from employers and employees to governments. Accordingly, the stabilized earnings derived from this rule, and estimated above, will prevent such a reduction in taxes. It is challenging to quantify Federal and State income tax impacts of

employment in the labor market scenario because individual and household tax situations vary widely as do the various State income tax rates.[180] But DHS is able to estimate the potential contributory effects on employment taxes, namely Medicare and Social Security, which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[181] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated level of tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent.

We estimate the tax impacts on the unburdened earnings basis. Denoting

[175] The benefits-to-wage multiplier is applicable to civilian workers and is calculated as follows: ($38.91 Total Employee Compensation per hour)/ ($26.85 Wages and Salaries per hour) = 1.44916 = 1.45 (rounded). See BLS, Economic News Release, Employer Cost for Employee Compensation (June 2021), Table 1, Employer Costs for Employee Compensation by ownership (dated September 16, 2021, reissued Dec. 17, 2021), https://www.bls.gov/news.release/archives/ecec_09162021.htm (last visited Feb. 23, 2022).

[176] DHS assumes that all EAD renewal applicants are employed full-time; DHS recognizes that some employees may be employed only part-time. DHS recognizes this may result in an overestimate of the below stabilized earnings estimates.

[177] $P_A \times E_H \times B_M \times T_s \times D_L$ = 266,841 to 375,545 Adjusted Population × $11.80 to $36.78 Hourly Earnings × 1.45 Benefits Multiplier × 5.714 Time

Scalar × Gamma Distributed Lapse Duration in Calendar Days.

[178] The certainty level is based on the entire range of forecast values, so the 95 percent certainty range is the range between which 95 percent of forecasted values are expected to fall, regardless of proximity to the mean. Roughly speaking, the 95 percent certainty bound would generally capture the distribution-specific forecast values lying between the 2.5th and 97.5th percentiles.

[179] In one sense, the stabilized earnings impacts are overstated a bit. For some portion of the near-term population, the effective date of the TFR would interrupt their EAD lapse such that the lapse would not be as long as it otherwise would. It would be extremely difficult to attempt to estimate this reality quantitatively, as, over the course of the near-term, EADs would lapse at different points in time and some would be approved prior to the TFR

while others would have their lapse interrupted by it.

[180] https://www.cnbc.com/2021/08/18/61percent-of-americans-paid-no-federal-income-taxes-in-2020-tax-policy-center-says.html (last updated Aug. 20, 2021) and for varying State income tax rates see, https://www.thebalance.com/state-income-tax-rates-3193320 (last updated Jan. 3, 2022).

[181] The various employment taxes are discussed in more detail, see https://www.irs.gov/businesses/small-businesses-self-employed/understanding-employment-taxes (last updated Mar. 14, 2022). See IRS Publication 15, Circular E, Employer's Tax Guide for specific information on employment tax rates (Dec. 16, 2021). https://www.irs.gov/pub/irs-pdf/p15.pdf. Relevant calculation: (6.2 percent Social Security + 1.45 percent Medicare) × 2 employee and employer losses = 15.3 percent estimated public tax impact.

the tax impact "$T_I$" and stabilized earnings "$E_S$," for the three values reported the tax impact is derived as: ($T_I \times E_S$)/$B_M$.[182] If, without this rule, all employers would have been unable to find replacement labor for the position the EAD renewal applicant filled, this rule will prevent a reduction in employment taxes from employers and employees to the Federal Government of \$353.9 million, but could range from \$16.8 million to \$1,319.5 million. The actual value of tax impacts will depend on the number of affected EAD holders that businesses would have been able to easily find reasonable labor substitutes for in the absence of this rule.

### Module C. Labor Turnover Cost Impacts

This TFR is expected to generate a labor turnover cost savings to employers of affected EAD holders. DHS bases the assessment of these costs on the assumption that every EAD applicable to the adjusted population that would have lapsed without this rule would have generated an involuntary separation from an employer, and that the separation is due to no other factors. While DHS cannot estimate how many actual employers would be impacted because DHS does not have employer information for all affected EAD holders, DHS can make an informed estimate of the aggregate scope of the impact, embodied in a cost-savings to the employers.[183]

Employment separations can generate substantial labor turnover costs to employers that can be divided into several components. First are the direct or "hard" costs that involve separation and replacement costs. The separation costs include exit interviews, severance pay, and costs of temporarily covering the employee's duties and functions with other employees, which may require overtime or temporary staffing. The replacement costs typically include expenses of advertising positions, search and agency fees, screening applicants, interviews, background verification, employment testing, hiring bonuses, and possible travel and relocation costs. Once hired, employers face additional training, orientation, and assessment costs.

Second, direct costs involve loss of productivity and possibly profitability

due to operational and production disruptions, which can include errors from other employees that may temporally fill the position. Some analysts have identified a third cost segment, which is a type of indirect cost, which encompasses loss of institutional knowledge, networking, and impacts to work-culture, morale, and interpersonal relationships. This last type of cost is almost impossible to measure quantitatively.[184]

There are numerous studies and reports concerning labor turnover costs ("LTC") available from Human Resource entities which are cited across correspondent literature. Some focus on specific occupations, industries, salary levels, and often measure LTC in slightly different ways. LTC is generally reported as a share (percentage, "$L_C$") of the annual earnings ("$E_A$") or an actual cost per employee for which a percentage can be calculated. Many reports cite a 2012 report published by the Center for American Progress (CAP) that surveyed more than 30 studies that considered both direct (*e.g.*, separation and replacement) and indirect (*e.g.*, loss of institutional knowledge) costs. In Module B above, DHS captures preserved productivity savings had employers not been able to immediately find replacement labor for EAD renewal applicants without this rule. DHS requests comment on how, or if, that measure of productivity may overlap with the types of productivity covered in the CAP report captured here, such as from the substitutability of replacement labor.

The CAP and other reports that we reviewed confirm three central aspects of LTC: (i) That they vary substantially across industries and jobs; (ii) that they tend to grow (in absolute and percentage terms) according to skill level and earnings; and (iii) that they are higher for salaried workers compared to hourly-wage earners.[185] The reporting notes that specialized technical jobs and highly paid jobs in line with senior or executive levels, which involve high levels of education, credentials, and stringent hiring criteria, can generate disproportionately high LTC that can reach more than 100 percent of the

salary—compared to jobs with low educational and technical requirements.[186] However, the CAP survey found that costs tend to range within a bound of 10 percent to around 40 percent of the salary. For example, CAP found despite wide variation and range, for workers earning \$50,000 or less, and for workers earning \$75,000 or less, which, at the time of the study in 2012 corresponded to, the 75th and 90th percentiles of typical earnings, LTC ranged typically from 10 to 30 percent of the salary, clustering at about 21 percent. More recent reports indicate that the typical cost is about one-third of the salary.[187]

DHS could nest the information above into an estimation procedure, but it would be beneficial to examine granular data to hone the estimates for two reasons. First, it would be valuable to quantify the correlation between annual earnings and labor turnover costs and incorporate it in the forecast procedure. Second, it is desirable to obtain a distribution for the data—an average and median could be gathered from the referenced reporting, but there would be a gap in terms of other metrics needed to calibrate a certain distribution. DHS examined a 2020 report by the Washington Center for Equitable Growth, which updated the earlier CAP study results to provide information on about thirty studies on LTC.[188] We selected data points that captured both the annual earnings salary (which the study benchmarked to 2019 levels) and turnover costs. We then culled the data applicable to salary levels more than the maximum in our earnings bound. At 2,080 annual work hours, the unburdened weighted average $E_A$ is \$76,502 (the higher earnings levels also corresponded generally to very high LTC that are outside what we think is

---

[182] We divide by the 1.45 benefits multiplier to account for the fact that employment taxes are calculated based upon wages paid, not including fringe benefits.

[183] We have no basis to say how many employers will be impacted, because any individual employer could have hired more than one of the EAD holders in the population. Therefore, if each individual was hired by one and only one business, the number of employers impacted would converge to the maximum population.

[184] For additional descriptions of the components of labor turnover costs, see "Employee retention: The Real Cost of Losing an Employee," by Gabrielle Smith, PeopleKeep (September 17, 2021), *https://www.peoplekeep.com/blog/employee-retention-the-real-cost-of-losing-an-employee*.

[185] See "There Are Significant Business Costs to Replacing Employees," By Heather Boushey and Sarah Jane Glynn (Nov. 16, 2012), Center for American Progress, *https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/*.

[186] See "This Fixable Problem Costs U.S. Businesses \$1 Trillion," by Shane Mcfeely and Ben Wigert, Workplace (March 13, 2019): *https://www.gallup.com/workplace/247391/fixable-problem-costs-businesses-trillion.aspx*. See also "Dangers of Turnover: Battling Hidden Costs," by Kate Heinz (last updated: March 25, 2020), Built in, *https://builtin.com/recruiting/cost-of-turnover*.

[187] See "The Real Cost of Employee Turnover in 2021," Terra Staffing Group (Nov. 4, 2020), *https://www.terrastaffinggroup.com/resources/blog/cost-of-employee-turnover*. See also "112 Employee Turnover Statistics: 2021 Causes, Cost & Prevention Data," by Louie Andre, Finances Online, *https://financesonline.com/employee-turnover-statistics/#cost*.

[188] See "Improving U.S. Labor Standards and the Quality of Jobs to Reduce the Costs of Employee Turnover to U.S. Companies," By Kate Bahn and Carmen Sanchez Cumming (December 2020), Washington Center for Equitable Growth, at: *https://equitablegrowth.org/wp-content/uploads/2020/12/122120-turnover-costs-ib.pdf*. The data is found in the methodological appendix, located in the Docket for this rulemaking.

**26646**    Federal Register / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations

the reasonable range).[189] We note that we are assuming that the individuals are employed full time, as 2,080 annual work hours corresponds to a five-day work week and 8-hour work-day. We welcome public input on this assumption. Twenty-seven resulting data points were employed for the analysis.[190] While this may be relatively few observations, OCB nevertheless was able to fit a Beta density function to the data, and we are confident in relying on the results. Foremost, the mean of 24.3 percent and the median of 19.8 percent are very similar to the information reported in the studies referenced above and fall within a substantial range, from 4.1 percent to 68.7 percent. Second, on qualitative grounds the Beta distribution is well-suited as a setup. The Beta distribution is also a family member of the exponential distributions and closely resembles the gamma function. It is utilized in situations where there is substantial variance and is discrete at the lower end minimum, further restricted to positive values. First, negative values can be ruled out in context—there cannot be zero cost to an employee separation—and thus a lower tail cutoff to bound to the cost percentage is appropriate. Second, we can reasonably conjecture that the costs would tend to cluster near the lower tail of the distribution (as outlined in the

CAP report), which is amenable to the positive skew of the distribution, reinforced by the data resultant mean being larger than the median.[191] Additionally, the scatterplot (see Appendix, Table A.3) with the fitted least squares line clearly reveals that $L_C$ is an increasing function of the earnings, with a correlation coefficient of 0.661. The Ordinary Least Squares regression indicates that a $1,000 increase in annual earnings leads to a .63 percentage point increase in labor turnover cost ($L_C$).

DHS notes that the studies utilized to develop the turnover cost percentage range are based on diverse studies across a range of industries and that they that measure these costs different ways. DHS welcomes public input concerning the range we rely on as well as the way in which turnover costs are tabulated in terms of direct and indirect costs, including productivity effects.

Based on an average of 2,080 annual work hours, the unburdened effective minimum $11.80 hourly wage maps to annual earnings ($E_A$) of $24,544. We have made an additional adjustment regarding the population. This rule will provide EAD renewal applicants with stabilized earnings for an additional 360 days and will prevent turnover costs for employers of applicants whose EADs will be adjudicated within the 360-day

timeframe of the rule. However, for the 0.32 percent of the population whose EAD renewal application could still be pending after 360 days, this rule will delay the turnover costs, not prevent them. Accordingly, we have scaled the population to exclude 0.32 percent of the population whose EAD could still lapse. DHS also recognizes that a certain number of individuals may have been terminated or chosen to leave irrespective of this rule and, accordingly, this rule won't prevent such turnover. DHS does not have data on the number of EAD renewal applicants that would have been terminated from or left their jobs had they not lost employment authorization. DHS requests comment on data that could be used to make such an adjustment.

We calibrated the Beta distribution for the four parameters produced and under the "define forecast" function, entered the program: $P_A \times E_A \times L_C$ with correlation tuned to 0.661.[192] Nesting the correlation essentially means that if a randomly chosen earnings value is high, there is a higher probability that a high turnover cost percentage will be selected as well and vice versa for lower cost percentages. The tuning features for the system are listed in Table 14, which includes the four parameters for the distribution.

TABLE 14—CALIBRATION FOR TURNOVER COST ESTIMATION

|  | Minimum | Maximum | Distribution |
|---|---|---|---|
| Population ($P_A$) | 265,987 | 374,343 | Uniform. |
| Earnings (annual, $E_A$) | $24,544.0 | 76,502.4 | Uniform. |
| Turnover cost % ($L_C$) | 4.1% | 68.7% | Beta: [193] Minimum: .031. Maximum: .987. Alpha: 1.214. Beta: 4.27. |
| Correlation: Turnover Cost % and Earnings | | | .661 |

Source: USCIS Analysis.

We ran 100,000 randomized seed trials, which is sufficient to generate a 95 percent level of precision in the results and tuned the simulation to cutoff trials with an $L_C$ greater than the

maximum in our sample, of 68.7 percent. Based on the simulation, the expected value is $4,371.6 million, and the 95 percent precision bound results in a range of forecasts between $454.5.0 million to $13,509.3 million.[194]

Module D. Monetized Impacts for the TFR

In Table 15 we collate the undiscounted monetized impacts derived from the above sections.

[189] $36.78 × 2,080 = $76,502. DHS assumes that all EAD renewal applicants are employed full-time; DHS recognizes that some employees may work only part-time. However, the $76,502 represents the maximum of the range and employees who earn less wages, such as those who work part-time, are captured by the lower salaries included in the range for LTC estimates.

[190] For the specific data points used, see the Technical Appendix, located in the Docket for this rulemaking.

[191] OCB indicates that the multiple continuous distributions are appropriate for the data but ranks the Beta distribution highest in terms of goodness of fit with an A–D test statistic of 0.1336. The four produced parameters are as follows: minimum= 0.0314, maximum = .987, alpha = 1.214, Beta = 4.267.

[192] Adjusted Population: × (1–0.32%) of the population whose EAD would be adjudicated after the 540-day auto-extension window × $11.80 to $36.78 Hourly Earnings × Beta Distributed Labor Turnover Cost.

[193] The beta distribution includes two parameters, alpha (α) and beta (β), which control the shape of distribution and thus influence the minimum and maximum values.

[194] When there are correlated assumptions, OCB does not provide sensitivity for the uncorrelated input, which, in this case, is the population. As a result, the sensitivity analysis indicates that the variation in the forecasts was contributed somewhat equally by the cost percentage (56.7 percent) and the annual earnings (42.7 percent).

TABLE 15—SUMMARY OF MONETIZED IMPACT ESTIMATES APPLICABLE TO LABOR EARNINGS AND LABOR TURNOVER

[Undiscounted, in millions]

| | Labor earnings | | | Tax impacts * | | |
|---|---|---|---|---|---|---|
| | Min | Mean | Max | Min | Mean | Max |
| Stabilized earnings | $159.2 | $3,354.3 | $12,506.4 | $16.8 | $353.9 | $1,319.6 |
| Labor turnover | 454.5 | 4,371.6 | 13,509.3 | 0.0 | 0.0 | 0.0 |
| Total | 613.7 | 7,725.9 | 26,015.7 | 16.8 | 353.9 | 1,319.6 |

*If, without this rule, businesses could not find replacement labor for any of the affected EAD holders, the tax impacts shown represent the loss in employment taxes this rule would prevent. The actual amount will depend on how easily businesses would have been able to find replacement labor in the absence of this rule.

Because the TFR will apply to more than one full fiscal year, we also apply a discounting framework to the impacts. Since there is a one-to-one mapping from the population to the impacts, we can derive the yearly allocations directly from the population figures. The approach, encapsulated in Table 16 in step-by-step fashion, builds off the population data in Tables 10 and 11. By grouping the current and near-term populations into year one, and then calculating the portion of the future population attributable to year one, we can logically calculate the year two allocation.

TABLE 16—WORKSHEET FOR IMPACT ALLOCATION ACROSS TWO YEARS

| Population segment | Low population | High population |
|---|---|---|
| A. Current | 57,795 | 57,795 |
| B. Near-term | 85,956 | 85,956 |
| C. Year 1 initial (A+B) | 143,751 | 143,751 |
| D. Future | 123,091 | 231,794 |
| E. Total TFR months | 18 | 18 |
| F. Future by month (D/E) | 6,838 | 12,877 |
| G. Year 1 months | 12 | 12 |
| H. Year 2 months (E − G) | 6 | 6 |
| I. Year 1 addition (G*F) | 82,060 | 154,529 |
| J. Year 1 total (C+I) | 225,811 | 298,280 |
| K. Year 2 (H*F) | 41,030 | 77,265 |
| L. Total (check: J+K) | 266,841 | 375,545 |
| M. Year 1 allocation (J/L) | 84.6% | 79.4% |
| N. Year 2 allocation (K/L) | 15.4% | 20.6% |
| O. Average share: year 1 | 82.0% | |
| P. Average share: year 2 | 18.0% | |

As can be gathered from rows M and N, the allocations are different according to the high and low population. However, the impact estimates already have incorporated the population variation, meaning that we need to rely on a single percentage for the share allocations. Since the shares are close across the population bounds, we average them and apply the resulting figures, of 82.0 percent and 18.0 percent, in order (Rows O and P).

Table 17 provides the allocated impacts according to the allocation derived above, incorporating sub-tables A–C, to account for the average, and low and high ends of the certainty bound in order. Each sub-table is organized into three additional sections, to account for undiscounted terms, and those at 3 percent rate of discount, and a 7 percent rate of discount, in order. We parsed out the stabilized earnings and labor turnover impacts separately, as they will embody different types of impacts.

TABLE 17—MONETIZED EXPECTED VALUE IMPACTS FOR THE TFR

[Millions]

| Undiscounted | Stabilized earnings | Labor turnover | Total | Taxes * |
|---|---|---|---|---|
| **A. Average (Expected Value)** | | | | |
| Year 1 | $2,751.4 | $3,585.8 | $6,337.2 | $290.3 |
| Year 2 | 602.9 | 785.8 | 1,388.7 | 63.6 |
| Total | 3,354.3 | 4,371.6 | 7,725.9 | 353.9 |

**26648**    Federal Register / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations

### TABLE 17—MONETIZED EXPECTED VALUE IMPACTS FOR THE TFR—CONTINUED
[Millions]

| 3% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $2,671.2 | $3,481.4 | $6,152.6 | $281.9 |
| Year 2 | 568.3 | 740.7 | 1,309.0 | 60.0 |
| Total | 3,239.6 | 4,222.1 | 7,461.6 | 341.8 |
| Annualized | 1,693.0 | 2,206.5 | 3,899.5 | 178.64 |

| 7% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $2,571.4 | $3,351.2 | $5,922.6 | $271.3 |
| Year 2 | 526.6 | 686.3 | 1,213.0 | 55.6 |
| Total | 3,098.0 | 4,037.6 | 7,135.6 | 326.9 |
| Annualized | 1,713.5 | 2,233.1 | 3,946.6 | 180.8 |

#### B. Low end of certainty range

| Undiscounted | Stabilized earnings | Labor turnover | Total | Taxes* |
|---|---|---|---|---|
| Year 1 | $130.6 | $372.8 | $503.4 | $13.8 |
| Year 2 | 28.6 | 81.7 | 110.3 | 3.0 |
| Total | 159.2 | 454.5 | 613.7 | 16.8 |
| Average | 79.6 | 227.3 | 306.9 | 8.4 |

| 3% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $126.8 | $361.9 | $488.7 | $13.4 |
| Year 2 | 27.0 | 77.0 | 104.0 | 2.8 |
| Total | 153.8 | 439.0 | 592.7 | 16.2 |
| Annualized | 80.35 | 229.4 | 309.8 | 8.5 |

| 7% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $122.0 | $348.4 | $470.5 | $12.9 |
| Year 2 | 25.0 | 71.4 | 96.4 | 2.6 |
| Total | 147.0 | 419.8 | 566.8 | 15.5 |
| Annualized | 81.3 | 232.2 | 313.5 | 8.6 |

#### C. High End of Certainty Range

| Undiscounted | Stabilized earnings | Labor turnover | Total | Taxes* |
|---|---|---|---|---|
| Year 1 | $10,258.4 | $11,081.0 | $21,339.3 | $1,082.4 |
| Year 2 | 2,248.0 | 2,428.3 | 4,676.4 | 237.2 |
| Total | 12,506.4 | 13,509.3 | 26,015.7 | 1,319.6 |
| Average | 6,253.2 | 6,754.7 | 13,007.9 | 659.8 |

| 3% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $9,959.6 | $10,758.2 | $20,717.8 | $1,050.9 |
| Year 2 | 2,119.0 | 2,288.9 | 4,407.9 | 223.6 |
| Total | 12,078.6 | 13,047.2 | 25,125.7 | 1,274.5 |
| Annualized | 6,312.39 | 6,818.6 | 13,131.0 | 666.1 |

TABLE 17—MONETIZED EXPECTED VALUE IMPACTS FOR THE TFR—CONTINUED

[Millions]

| 7% Discount | Stabilized earnings | Labor turnover | Total | Taxes |
|---|---|---|---|---|
| Year 1 | $9,587.2 | $10,054.4 | $19,943.3 | $1,011.6 |
| Year 2 | 1,963.5 | 1,999.2 | 4,084.5 | 207.2 |
| Total | 11,550.8 | 12,053.7 | 24,027.8 | 1,218.8 |
| Annualized | 6,388.6 | 6,666.8 | 13,289.6 | 674.1 |

*If, without this rule, businesses could not find replacement labor for any of the affected EAD holders, the tax impacts shown represent the loss in employment taxes this rule would prevent. The actual amount will depend on how easily businesses would have been able to find replacement labor in the absence of this rule.

For the discounted figures, the annualized amounts are the average annual equivalence basis. Since the inputs are different for each year, the annualized terms differ across discount rates.

Module E. Economic and Business Impacts

As explained previously, DHS does not know what the next best alternative would have been for businesses without this rule. Accordingly, DHS does not know the proportion of the stabilized labor earnings estimates developed above that would represent cost savings to businesses for prevented lost productivity or are prevented transfer payments from affected EAD holders to replacement labor.[195] These effects are very difficult to quantify and could be influenced by multiple factors, but we will address the possibilities at a conceptual level.

In the cases where, in the absence of this rule, businesses would have been able to easily find reasonable labor substitutes for the EAD renewal applicants, then the impact of this rule is preventing a distributional impact where the earnings of affected EAD holders would be transferred to others, who might fill in for (and presumably replace) the EAD renewal applicants during their earnings lapse. The portion of the total estimate of stabilized income that would represent this prevented transfer payment will depend on the ability of businesses to have found replacement labor in the absence of this rule.

In the cases where, in the absence of this rule, businesses would not have been able to easily find reasonable labor substitutes for the EAD renewal applicants, then the impact of this rule

is preventing an associated loss of productivity for employers. Therefore, the portion of the total estimate of stabilized income that would represent cost savings to employers for prevented productivity losses will depend on the ability of businesses to have found replacement labor in the absence of this rule. In this case, the rule may also result in additional cost savings to employers for prevented profit losses and having to choose the next best alternative to the EAD holder.

DHS does not know what this next-best alternative may be for those companies. However, if the replacement candidate would have been substitutable for the affected EAD renewal applicant to a high degree, the labor performed by the new candidate would not have resulted in changes to profits or productivity. Accordingly, if the replacement labor is highly substitutable, we wouldn't expect this rule to result in cost savings for productivity loss as a result of employing the next available alternative for labor. If, however, the replacement labor is a poor substitute and would have decreased productivity, then this rule will preserve that lost productivity.

The above discussion involves two important points: If employers replaced individuals who faced a lapse in their EAD after the automatic extension with others in the labor force, then once the EAD was eventually reauthorized the EAD holder would need to conduct a new search for a new job. They would thus incur direct costs associated with seeking new employment. In addition, it can take time to establish new employment. According to the Bureau of Labor Statistics, in November 2021 the average duration of unemployment was 28.9 weeks (about 7 months) and the median duration was 12.7 weeks (about 3 months).[196] This has varied historically, according to factors such as

the overall strength of the economy, employment conditions in specific industries, individual search effort, and geographical considerations.[197]

Based on this average search time, in cases where affected EAD renewal applicants would not be able to immediately return to their previous jobs once their EAD is approved, the duration of lapsed earnings this TFR is addressing is likely higher than that we have relied on from the analysis of the data. As a result, search costs and the potential for earnings to continue to lapse even when the individuals affected are able to return to work probably makes our estimated impacts of the amount in stabilized earnings to affected EAD holders smaller than the actual impacts. However, we do not have a method to allocate the job search time to a portion that could be conducted while the EAD was in lapse mode and a portion that would need to be held off until the Form I–765 renewal application was approved and a new EAD issued. Therefore, it would be speculative to try to incorporate these additional factors into a cohesive model and thus we have not quantified them.

Module F. Other Impacts

DHS does not expect material impacts to the U.S. labor market from this TFR. According to the most recent data (applicable to November 2021), the U.S. labor force stands at 162,052,000.[198] The maximum population impacted by the TFR is 375,545, which is only 0.23 percent of the national labor force.

Without this rule, EAD holders who remain eligible for employment authorization would encounter delays

[195] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. See OMB Circular A–4 pages 14 and 38 for further discussion of transfer payments and distributional effects. Circular A–4 (Sept. 17, 2003). https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.

[196] Bureau of Labor Statistics, Employment Situation News Release (November 2021). Table A–12, https://www.bls.gov/news.release/archives/empsit_12032021.htm.

[197] Bureau of Labor Statistics, Duration of Unemployment, Seasonally Adjusted, https://www.bls.gov/charts/employment-situation/duration-of-unemployment.htm (last visited Mar. 9, 2022).

[198] BLS, Employment Situation, Table A–1. Employment status of the civilian population by sex and age. The figure applies to the civilian labor force, seasonally adjusted. https://www.bls.gov/news.release/archives/empsit_12032021.htm (last visited Dec. 14, 2021).

in EAD renewals and either be unauthorized to work for periods of time, or lack documentation reflecting their employment authorization. This rule is not making additional categories eligible for employment authorization; it simply temporarily increases the 180-day timeframe for those already eligible for an automatic extension. It will ensure that these EAD holders do not experience gaps in employment as a result of USCIS processing delays. Accordingly, stabilized earnings for these EAD holders may also relieve the support network of the applicants for any monetary or other support that would have been necessary during such a period of unemployment. This network could include public and private entities, and it may comprise family and personal friends, legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and nongovernmental organizations. DHS believes these impacts would accrue as benefits to the noncitizen EAD holders and their families.

Finally, we have already noted that the goal of this TFR is to prevent EADs from lapsing, and that the 540-day benchmark would cover almost every case. For the small portion that lapsed for more than 540 days, we have already noted that these would embody extreme outliers and may be skewed by data errors. Nevertheless, for purposes of transparency we provide Table 18, which shows the share of EADs that would lapse under several alternatives to the 360-day extension to the existing 180-day benchmark.

TABLE 18—PERCENTAGE OF EADS THAT WOULD LAPSE UNDER ALTERNATIVE EXTENSION-DAY SCENARIOS

| The number of extension days added to the existing 180 | Share that would lapse (percent) |
|---|---|
| 30 | 57.7 |
| 60 | 35.3 |
| 90 | 19.0 |
| 120 | 8.41 |
| 180 | 1.44 |
| 360 | 0.32 |
| 540+ | 0.10 |

It is important to note that our analysis was based on data from June through December of 2021. If processing times and resultant backlogs are higher now, than lapse-durations would potentially also be higher, and the shares affected may be larger than those shown in Table 16.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (i.e., small businesses, small organizations, and small governmental jurisdictions). The RFA's regulatory flexibility analysis requirements apply only to those rules for which an agency is required to publish a general notice of proposed rulemaking pursuant to 5 U.S.C. 553(b) or any other law. See 5 U.S.C. 604(a). As discussed previously, USCIS did not issue a notice of proposed rulemaking for this action. Therefore, a regulatory flexibility analysis is not required for this rule.

## D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of SBREFA by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, et seq. OIRA has determined that this TFR is a major rule as defined by the CRA because it will result in a major increase in costs or prices.[199] DHS has complied with the CRA's reporting requirements and has sent this rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1). As stated in section IV.A of this preamble, DHS has found that there is good cause to conclude that notice, the opportunity for advanced public participation, and a delay in the effective date are impracticable and contrary to the public interest. Accordingly, this rule is effective immediately upon publication.[200]

## E. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private

sector.[201] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule.

In addition, this rule does not contain a Federal mandate as the term is defined under UMRA.[202] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

## F. Executive Order 13132 (Federalism)

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

## H. National Environmental Policy Act

DHS Directive 023–01 Rev. 01 and Instruction Manual 023–01–001 Rev. 01 (Instruction Manual)[203] establish the policies and procedures that DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA.[204]

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not

---

[199] See 5 U.S.C 804(2).

[200] See 5 U.S.C. 808(2).

[201] See 2 U.S.C. 1532(a).

[202] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. See 2 U.S.C. 1502(1) and 658(6).

[203] The Instruction Manual contains the Department's procedures for implementing NEPA and was issued November 6, 2014. Instruction Manual, https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex (last updated Nov. 12, 2021).

[204] 40 CFR parts 1500 through 1508.

require an environmental assessment or environmental impact statement.[205]

The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect.[206] Under DHS NEPA implementing procedures, for an action to be categorically excluded it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[207]

This rule amends 8 CFR 274a.13(d) to temporarily increase the period of time that the employment authorization and/or EADs of certain eligible Form I–765 renewal applicants are automatically extended while their renewal applications remain pending with USCIS. More specifically, this rule provides that the automatic extension period applicable to expiring EADs for certain renewal applicants who have filed Form I–765 will be increased from up to 180 days to up to 540 days.

Amending the current rule to increase the automatic extension period for employment authorization and/or EADs' validity from 180 days to 540 days will not result in any meaningful, calculable change in environmental effect with respect to the number of individuals affected by current EAD renewal requirements. Furthermore, this rule's amendment will not alter immigration eligibility criteria or result in an increase in the number of individuals who will be eligible for employment authorization and/or EADs. Therefore, DHS has determined that the temporary amendment to 8 CFR 274a.13 clearly fits within Categorical Exclusion A3(d) contained in the Instruction Manual because it amends a regulation without changing its environmental effect. Furthermore, DHS has determined that this rule fits within Categorical Exclusion A3(a) contained in the Instruction Manual because DHS considers temporarily increasing the automatic extension period for employment authorizations and/or EADs for certain renewal applicants to be an action of a strictly administrative or procedural nature.

The temporary amendment to 8 CFR 274a.13 is a standalone action to increase an automatic extension period. It is not part of a larger action. This amendment will not result in any major

Federal action that will significantly impact the human environment. Furthermore, USCIS has determined that no extraordinary circumstances exist that would create the potential for significant environmental effects. Therefore, this rule amendment is categorically excluded from further NEPA review.

*I. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[208] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[209] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether his regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy or integrity of the family as an institution.

*J. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 1C4–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320. As this is a TFR that only will increase the duration of an automatic extension of employment authorization and EAD, USCIS does not anticipate a need to update the Form I–765 or to collect additional information beyond that already collected on Form I–765.

**List of Subjects in 8 CFR Part 274a**

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 274a as follows:

**PART 274a CONTROL OF EMPLOYMENT OF ALIENS**

■ 1. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 2. Effective May 4, 2022, through October 15, 2025, amend § 274a.13 by adding paragraph (d)(5) to read as follows:

**§ 274a.13 Application for employment authorization.**

\*    \*    \*    \*    \*

(d) \* \* \*

(5) *Temporary increase in the automatic extension period.* The authorized extension period stated in paragraph (d)(1) of this section, 8 CFR 274a.2(b)(1)(vii), and referred to in paragraphs (d)(3) and (4) of this section is increased to up to 540 days for all eligible classes of aliens as described in paragraph (d)(1) who properly filed their renewal application on or before October 26, 2023. Such automatic extension period will automatically terminate the earlier of up to 540 days after the expiration date of the Employment Authorization Document (Form I–766, or successor form) or upon issuance of notification of a denial on the renewal request, even if such date is after October 26, 2023. Aliens whose automatic extension under paragraph (d)(1) expired before May 4, 2022, will receive an automatic resumption of employment authorization and the validity of their Employment Authorization Document, as applicable, for an additional period beginning from May 4, 2022, and up to 540 days from the expiration of their employment authorization and/or Employment Authorization Document as shown on the face of such document. An Employment Authorization Document that has expired on its face is considered unexpired when combined with a Notice of Action (Form I–797C), which demonstrates that the requirements of paragraph (d)(1) of this section and this paragraph (d)(5) have been met, notwithstanding any notations on such notice indicating an automatic extension of up to 180 days.

---

[205] 40 CFR 1507.3(e)(2)(ii) and 1501.4.

[206] *See* Appendix A, Table 1.

[207] *See* Instruction Manual section V.B(2)(a) through (c).

[208] *See* 5 U.S.C. 601 note.

[209] Public Law 105–277, 112 Stat. 2681 (1998).

**26652**    **Federal Register** / Vol. 87, No. 86 / Wednesday, May 4, 2022 / Rules and Regulations

Nothing in this paragraph (d)(5) will affect DHS's ability to otherwise terminate any employment authorization or Employment Authorization Document, or extension period for such employment authorization or document, by written notice to the applicant, by notice to a class of aliens published in the **Federal Register**, or as provided by statute or regulation, including 8 CFR 274a.14.

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–09539 Filed 5–3–22; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 211, 212, 214, 216, 217, 223, 235, 236, 240, 244, 245, 245a, 248, 264, 274a, 286, 301, 319, 320, 322, 324, 334, 341, 343a, 343b, and 392**

**[CIS No. 2627–18; DHS Docket No. USCIS–2019–0010]**

**RIN 1615–AC18**

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule adjusts certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). It also removes certain fee exemptions, changes fee waiver requirements, alters premium processing time limits, and modifies intercountry adoption processing. USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. Therefore, the Department of Homeland Security (DHS) is adjusting USCIS fees by a weighted average increase of 20 percent, adding new fees for certain immigration benefit requests, establishing multiple fees for nonimmigrant worker petitions, and limiting the number of beneficiaries for certain forms. This final rule is intended to ensure that USCIS has the resources it needs to provide adequate service to applicants and petitioners.

**DATES:** This final rule is effective October 2, 2020. Any application, petition, or request postmarked on or after this date must be accompanied with the fees established by this final rule.

**FOR FURTHER INFORMATION CONTACT:** Kika Scott, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2130, telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Costs and Benefits
    E. Effect on the Department of Justice's Executive Office for Immigration Review (EOIR)
    F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking
II. Background
  A. History
  B. Authority and Guidance
  C. Basis for Fee Adjustments
  D. Final Rule
III. Response to Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. Comments Expressing General Support for the NPRM
  C. Comments Expressing General Opposition to the NPRM
    1. Immigration Policy Concerns
    2. Other General Opposition
    3. Proposed Fees Are Unconstitutional
    4. Rule Will Have Negative Effects on Applicants
    5. Rule Will Have Negative Effects on the Economy and Employers
    6. Comments on the DACA Renewal Fee
  D. Comments on Legal Adequacy of the Rule
  E. Comments on Fee Waivers
    1. Limits on Eligible Immigration Categories and Forms
    2. Fee Waiver Income Requirements
    3. Means-Tested Benefits
    4. Public Charge Rule
    5. Financial Hardship
    6. Public Charge Ground of Inadmissibility and Affidavit of Support Requirements
    7. Discretionary Fee Waivers
    8. Fee Waiver Documentation
    9. Cost of Fee Waivers
    10. Changes to Form I–912, Request for Fee Waiver
    11. Suggestions
  F. Comments on Fee Exemptions
    1. EAD (Form I–765) Exemption
    2. TPS
  G. Comments on Specific Fees
    1. Fees for Online Filing
    2. Biometric Services Fee
    3. Genealogy Fees Forms G–1041, Genealogy Index Search Request, and G–1041A, Genealogy Records Request
    4. Form I–90, Application To Replace Permanent Resident Card
    5. Form I–131, Application for Travel Document, Refugee Travel Documents
    6. Form I–131A, Application for Travel Document (Carrier Documentation)
    7. Form I–192, Application for Advance Permission To Enter as a Nonimmigrant
    8. Form I–193, Application for Waiver of Passport and/or V isa
    9. Form I–290B, Notice of Appeal or Motion
    10. Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant
    11. Form I–485, Application To Register Permanent Residence or Adjust Status
    12. Form I–526, Immigrant Petition by Alien Investor
    13. Form I–589, Application for Asylum and Withholding of Removal Fee
    14. Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600
    15. Form I–601A, Application for Provisional Unlawful Presence Waiver
    16. Form I–751, Petition To Remove Conditions on Residence
    17. Form I–765, Application for Employment Authorization
    18. Form I–817, Application for Family Unity Benefits
    19. Form I–821D, DACA Renewal Fee
    20. Form I–829, Petition by Investor To Remove Conditions on Permanent Resident Status
    21. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))
    22. Forms I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and I–924A, Annual Certification of Regional Center
    23. Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant
    24. Form N–400, Application for Naturalization
    25. Other Naturalization and Citizenship Forms
  H. Comments on Changes to Form I–129, Petition for a Nonimmigrant Worker
  I. Premium Processing
  J. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
  K. Comments on Other General Feedback
  L. Cost Analysis and DHS Rationale for Fee Adjustments
    1. Workload Projections
    2. Completion Rates
    3. USCIS Staffing
    4. Cost Baseline
    5. Alternative Funding Sources
  M. ICE Transfer
  N. Processing Times and Backlogs
  O. Fee Payment and Receipt Requirements
  P. Fees Shared by CBP and USCIS
  Q. Paperwork Reduction Act (PRA) Comment Responses
  R. Statutory and Regulatory Responses
    1. General Comments on the Regulatory Impact Analysis
    2. Methodology Issues
    3. Other Comments on the Cost-Benefit Analysis
    4. Impacts on Lower-Income Individuals and Families
    5. Impacts on Immigrant Populations in Distinct Geographic Areas
    6. Immigrants' Access to Legal and Supportive Services
    7. Impacts to Students From Low Income Families
    8. Impacts on Victimized Groups and Other Vulnerable Populations
    9. Impacts to Industries That Use H–2A Workers
    10. Effects on Other Federal Agencies
IV. Statutory and Regulatory Requirements
  A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)
  B. Regulatory Flexibility Act
    1. Final Regulatory Flexibility Analysis (FRFA)
    a. A Statement of Need for, and Objectives of, the Rule

**Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations    46789**

b. A statement of the Significant Issues Raised by the Public Comments in Respone to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

c. The Response of the Agency to any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Rule, and a Detailed Statement of Any Change Made to the Final Rule as a Result of the Comments

d. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available

e. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

f. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

C. Congressional Review Act
D. Unfunded Mandates Reform Act
E. Executive Order 13132 (Federalism)
F. Executive Order 12988 (Civil Justice Reform)
G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments
H. Family Assessment
I. National Environmental Policy Act (NEPA)
J. Paperwork Reduction Act
K. Signature

**List of Acronyms and Abbreviations**

ABC  Activity-Based Costing
the Act  Homeland Security Act of 2002
ADA  Americans with Disabilities Act
AOP  Annual Operating Plan
APA  Administrative Procedure Act
ASVVP  Administrative Site Visit and Verification Program
ASC  Application Support Center
BLS  Bureau of Labor Statistics
CAA  Cuban Adjustment Act of 1966
CAT  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP  U.S. Customs and Border Protection
CEQ  Council on Environmental Quality
CFO  Chief Financial Officer
CFR  Code of Federal Regulations
CNMI  Commonwealth of the Northern Mariana Islands
CUNY  City University of New York
DACA  Deferred Action for Childhood Arrivals

DHS  Department of Homeland Security
DOJ  Department of Justice
DOL  Department of Labor
DOS  Department of State
EAD  Employment Authorization Document
EB–5  Employment-Based Immigrant Visa, Fifth Preference
EIN  Employer Identification Number
E.O.  Executive Order
EOIR  Executive Office for Immigration Review
FBI  Federal Bureau of Investigation
FDMS  Federal Docket Management System
FOIA  Freedom of Information Act
FPG  Federal Poverty Guidelines
FR  Federal Register
FRFA  Final Regulatory Flexibility Analysis
FVRA  Federal Vacancies Reform Act
FY  Fiscal Year
GAO  Government Accountability Office
GDP  Gross Domestic Product
ICE  U.S. Immigration and Customs Enforcement
IEFA  Immigration Examinations Fee Account
IIRIRA  Illegal Immigration Reform and Immigrant Responsibility Act
INA  Immigration and Nationality Act of 1952
INS  Immigration and Naturalization Service
IRS  Internal Revenue Service
ISAF  International Security Assistance Forces
IT  information technology
LCA  Labor Condition Application
LGBTQ  Lesbian, gay, bisexual, transgender, and questioning
IOAA  Independent Offices Appropriations Act
LIFO  Last In, First Out
LPR  Lawful Permanent Resident
MOAs  Memoranda of Agreement
MPP  Migrant Protection Protocols
NACARA  Nicaraguan Adjustment and Central American Relief Act
NAICS  North American Industry Classification System
NARA  National Archives and Records Administration
NEPA  National Environmental Policy Act
NOID  Notice of Intent to Deny
NPRM  Notice of Proposed Rulemaking
NRC  National Record Center
OIG  DHS Office of the Inspector General
OIRA  Office of Information and Regulatory Affairs
OMB  Office of Management and Budget
PA  Privacy Act
PII  Personally Identifiable Information
PRA  Paperwork Reduction Act of 1995
PRC  Permanent Resident Card
Privacy Act  Privacy act of 1974
Pub. L.  Public Law
RFE  Request for Evidence
RFA  Regulatory Flexibility Act
RIA  Regulatory Impact Analysis
SAVE  Systematic Alien Verification for Entitlements
SBA  Small Business Administration
SCRD  Signature Confirmation Restricted Delivery
Secretary  The Secretary of Homeland Security
SIJ  Special Immigrant Juvenile
SNAP  Supplemental Nutrition Assistance Program

SSI  Supplemental Security Income
Stat.  U.S. Statutes at Large
STEM  Science, Technology, Engineering, and Mathematics
TPS  Temporary Protected Status
TVPA  Trafficking Victims Protection Act of 2000
TVPRA  The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UAC  Unaccompanied Alien Child
UMRA  Unfunded Mandates Reform Act of 1995
U.S.C.  United States Code
USCIS  U.S. Citizenship and Immigration Services
VAWA  Violence Against Women Act
VPC  Volume Projection Committee

**I. Executive Summary**

*A. Purpose of the Regulatory Action*

This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. It also makes changes related to setting, collecting, and administering fees. Fee schedule adjustments are necessary to recover the full operating costs associated with administering the nation's lawful immigration system and safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefit, while protecting Americans, securing the homeland, and honoring our values. This final rule also makes certain adjustments to fee waiver eligibility, filing requirements for nonimmigrant workers, premium processing service, and other administrative requirements.

*B. Legal Authority*

DHS's authority is in several statutory provisions. Section 102 of the Homeland Security Act of 2002 (the Act),[1] 6 U.S.C. 112, and the Immigration and Nationality Act of 1952 (INA) section 103, 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. Further, authority for establishing fees is found in INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants").[2]

[1] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

[2] The longstanding interpretation of DHS is that the "including" clause in INA section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* INA
Continued

*C. Summary of the Final Rule Provisions*

DHS carefully considered the public comments received. This final rule adopts, with appropriate changes, the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on November 14, 2019. *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements;* Proposed rule, 84 FR 62280. This final rule also relies on all the justifications articulated in the NPRM, except as reflected below.

This final rule makes the following changes as compared to the NPRM:

• Does not provide for the transfer of Immigration Examinations Fee Account (IEFA) funds collected by USCIS to U.S. Immigration and Customs Enforcement (ICE). 84 FR 62287; "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements," Proposed Rule; Extension of Comment Period; Availability of Supplemental Information, 84 FR 67243 (Dec. 9, 2019).

• Removes the proposed fee ($275) for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, filed for renewal of Deferred Action for Childhood Arrivals (DACA). 84 FR 62320, 62362; proposed and new 8 CFR 106.2(a)(38).

• Reassigns National Record Center (NRC) costs that do not directly apply to the genealogy program, thereby setting genealogy fees lower than proposed. 84 FR 62315, 62316, 62362; proposed 8 CFR 106.2(c)(1) and (2); new 8 CFR 106.2(c)(1) and (2).

• Realigns $10 million of anticipated IEFA costs for the Office of Citizenship to account for citizenship grants appropriations received via the FY 2019—2020 DHS appropriation bills. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

• Provides a $50 reduction in the fee for Form I–485, Application to Register Permanent Residence or Adjust Status, filed in the future for principal applicants who pay the $50 fee for Form I–589 and are subsequently granted asylum. New 8 CFR 106.2(a)(17)(ii).

• Provides that petitioners for and recipients of Special Immigrant Juvenile (SIJ) classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile

section 286(m), 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

court or a state child welfare agency, may submit requests for fee waivers for Form I–485 and associated forms; and explains the documentation requirement for SIJs. New 8 CFR 106.3(a)(2)(i) and (a)(3).

• Provides that an Afghan or Iraqi Interpreter, an Iraqi National employed by or on behalf of the U.S. Government, or an Afghan National employed by the U.S. Government or the International Security Assistance Forces (ISAF) may submit requests for fee waivers for Form I–485 and associated forms.[3] New 8 CFR 106.3(a)(2)(ii).

• Provides that requestors who meet the requirements of INA section 245(l)(7), 8 U.S.C. 1255(l)(7) may also request a fee waiver for the Forms N–400, N–600, and N–600K. New 8 CFR 106.3(a)(3).

• Also provides that SIJs who are placed in out-of-home care under the supervision of a juvenile Court or a state child welfare agency and Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or ISAF may submit requests for fee waivers for Forms N–400, N–600, and N–600K. New 8 CFR 106.3(a)(2)(i) and (a)(3).

• Clarifies that the Violence Against Women Act (VAWA) self-petitioner classification includes individuals who meet the requirements of INA section 101(a)(51) and anyone otherwise self-petitioning due to battery or extreme cruelty pursuant to the procedures in INA section 204(a) *See* new 8 CFR 106.3(a)(1)(i).

• Consolidates the Director's discretionary provision on fee waivers to remove redundancy. See proposed 8 CFR 106.3(b) and (c); 84 FR 62363 (containing the text that is being consolidated). New 8 CFR 106.3(b).

• Moves proposed 8 CFR 106.3(d)(1) and (d)(2) (not permitting a fee waiver for a requestor who is subject to the affidavit of support, already a sponsored immigrant, or subject to the public charge inadmissibility ground) to 8 CFR 106.3(b)(1) and (b)(2) (governing waivers provided by the USCIS Director), because an affidavit of support and the public charge inadmissibility ground are not applicable to applicants who are otherwise eligible for fee waivers in this rule). New 8 CFR 106.3(b).

[3] As described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006) as amended; section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI (Mar. 11, 2009), as amended, 8 U.S.C. 1101 note; and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008).

• Clarifies the fee waiver request documentation requirements for VAWA, T, and U requestors who may not have access to documentation of household income. New 8 CFR 106.3(f)(5).

• Provides that the fee for forms currently available for online filing with USCIS and filed online will be $10 lower than the fee for the same paper forms. New 8 CFR 106.2(d).

• Requires a separate $30 biometric services fee for Form I–765 filed by pending asylum applicants and applicants for status as a long-term resident from the Commonwealth of the Northern Mariana Islands (CNMI). New 8 CFR 106.2(a)(32)(i).

• Separates fee exemptions for Form I–765 for renewal or replacement of an Employment Authorization Document and clarifies the provisions related to VAWA self-petitioners who are eligible for a fee exemption. New 8 CFR 106.2(a)(32).

• Incorporates a $10 fee for the registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens. *See* old 8 CFR 103.7(b)(1)(i)(NNN), 84 FR 60307 (Nov. 8, 2019); new 8 CFR 106.2(c)(11). The final regulation at 8 CFR 103.2(a)(1) also clarifies that all USCIS fees are generally non-refundable, regardless of whether they apply to a benefit request, another adjudication and naturalization service, or other requests such as H–1B Registration, DACA, Civil Surgeon Designation, and Genealogy requests.

• Updates 8 CFR 244.6(b) to clarify the Temporary Protected Status (TPS) related fee provisions in accordance with the NPRM. *See* 84 FR 62301 (stating that the rule proposed to remove the Form I–765 fee exemption for Temporary Protected Status if the individual is filing an initial TPS application and is under 14 years of age or over 65 years of age).

• DHS will maintain the DACA policy fees as in effect before September 5, 2017, at $410 for employment authorization and $85 for biometric services. New 8 CFR 106.2(a)(32)(vi).

• Makes other minor non-substantive and clarifying changes.

DHS summarizes the final fees in Table 1. The table excludes fees established and required by statute and those that DHS cannot adjust. The table only calculates the change in the current fee. If an applicant, petitioner, or requestor must file additional forms as a result of policy changes in this rule, then the individual changes to a single

fee may not represent the total change
in fees for every circumstance.

### TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES

| Immigration benefit request | Current fee $ | Final fee $ | Change ($) | Percentage change |
|---|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card (online filing) ........... | 455 | 405 | −50 | −11 |
| I-90 Application to Replace Permanent Resident Card (paper filing) ........... | 455 | 415 | −40 | −9 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document ........... | 445 | 485 | 40 | 9 |
| I-129 Petition for a Nonimmigrant worker ........... | 460 | N/A | N/A | N/A |
| I-129CW, I-129E&TN, and I-129MISC ........... | 460 | 695 | 235 | 51 |
| I-129H1 ........... | 460 | 555 | 95 | 21 |
| I-129H2A—Named Beneficiaries ........... | 460 | 850 | 390 | 85 |
| I-129H2B—Named Beneficiaries ........... | 460 | 715 | 255 | 55 |
| I-129L ........... | 460 | 805 | 345 | 75 |
| I-129O ........... | 460 | 705 | 245 | 53 |
| I-129H2A—Unnamed Beneficiaries ........... | 460 | 415 | −45 | −10 |
| I-129H2B—Unnamed Beneficiaries ........... | 460 | 385 | −75 | −16 |
| I-129F Petition for Alien Fiancé(e) ........... | 535 | 510 | −25 | −5 |
| I-130 Petition for Alien Relative (online filing) ........... | 535 | 550 | 15 | 3 |
| I-130 Petition for Alien Relative (paper filing) ........... | 535 | 560 | 25 | 5 |
| I-131 Application for Travel Document ........... | 575 | 590 | 15 | 3 |
| I-131 Refugee Travel Document for an individual age 16 or older ........... | 135 | 145 | 10 | 7 |
| I-131 Refugee Travel Document for a child under the age of 16 ........... | 105 | 115 | 10 | 10 |
| I-131A Application for Travel Document (Carrier Documentation) ........... | 575 | 1,010 | 435 | 76 |
| I-140 Immigrant Petition for Alien Worker ........... | 700 | 555 | −145 | −21 |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) ........... | 930 | 790 | −140 | −15 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) [4] ........... | 585 | 1,400 | 815 | 139 |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) ........... | 930 | 1,400 | 470 | 51 |
| I-193 Application for Waiver of Passport and/or Visa ........... | 585 | 2,790 | 2,205 | 377 |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal ........... | 930 | 1,050 | 120 | 13 |
| I-290B Notice of Appeal or Motion ........... | 675 | 700 | 25 | 4 |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant ........... | 435 | 450 | 15 | 3 |
| I-485 Application to Register Permanent Residence or Adjust Status [5] ........... | 1,140 | 1,130 | −10 | −1 |
| | 750 | 1,130 | 380 | 51 |
| I-526 Immigrant Petition by Alien Investor ........... | 3,675 | 4,010 | 335 | 9 |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) ...... | 370 | 390 | 20 | 5 |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) ...... | 370 | 400 | 30 | 8 |
| I-589 Application for Asylum and for Withholding of Removal ........... | 0 | 50 | 50 | N/A |
| I-600/600A Adoption Petitions and Applications ........... | 775 | 805 | 30 | 4 |
| I-600A Supplement 3 Request for Action on Approved Form I-600A ........... | N/A | 400 | N/A | N/A |
| I-601 Application for Waiver of Ground of Excludability ........... | 930 | 1,010 | 80 | 9 |
| I-601A Provisional Unlawful Presence Waiver ........... | 630 | 960 | 330 | 52 |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) ........... | 930 | 515 | −415 | −45 |
| I-687 Application for Status as a Temporary Resident ........... | 1,130 | 1,130 | 0 | 0 |
| I-690 Application for Waiver of Grounds of Inadmissibility ........... | 715 | 765 | 50 | 7 |
| I-694 Notice of Appeal of Decision ........... | 890 | 715 | −175 | −20 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) ........... | 1,670 | 1,615 | −55 | −3 |
| I-751 Petition to Remove Conditions on Residence ........... | 595 | 760 | 165 | 28 |
| I-765 Application for Employment Authorization (Non-DACA) ........... | 410 | 550 | 140 | 34 |
| I-765 Application for Employment Authorization (DACA only) [6] ........... | 410 | 410 | 0 | 0 |
| I-800/800A Adoption Petitions and Applications ........... | 775 | 805 | 30 | 4 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A ........... | 385 | 400 | 15 | 4 |
| I-817 Application for Family Unity Benefits ........... | 600 | 590 | −10 | −2 |
| I-824 Application for Action on an Approved Application or Petition ........... | 465 | 495 | 30 | 6 |
| I-829 Petition by Investor to Remove Conditions ........... | 3,750 | 3,900 | 150 | 4 |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal [7] ........... | 285 | 1,810 | 1,525 | 535 |
| | 570 | 1,810 | 1,240 | 218 |
| I-910 Application for Civil Surgeon Designation ........... | 785 | 635 | −150 | −19 |
| I-924 Application For Regional Center Designation Under the Immigrant Investor Program ........... | 17,795 | 17,795 | 0 | 0 |
| I-924A Annual Certification of Regional Center ........... | 3,035 | 4,465 | 1,430 | 47 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant ........... | 230 | 1,485 | 1,255 | 546 |
| N-300 Application to File Declaration of Intention ........... | 270 | 1,305 | 1,035 | 383 |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings (online filing) ........... | 700 | 1,725 | 1,025 | 146 |

**46792** Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

TABLE 1—NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES—Continued

| Immigration benefit request | Current fee $ | Final fee $ | Change ($) | Percentage change |
|---|---|---|---|---|
| N–336 Request for Hearing on a Decision in Naturalization Proceedings (paper filing) | 700 | 1,735 | 1,035 | 148 |
| N–400 Application for Naturalization (online filing) | 640 | 1,160 | 520 | 81 |
| N–400 Application for Naturalization (paper filing)⁸ | 640 | 1,170 | 530 | 83 |
| | 320 | 1,170 | 850 | 226 |
| N–470 Application to Preserve Residence for Naturalization Purposes | 355 | 1,585 | 1,230 | 346 |
| N–565 Application for Replacement Naturalization/Citizenship Document (online filing) | 555 | 535 | − 20 | − 4 |
| N–565 Application for Replacement Naturalization/Citizenship Document (paper filing) | 555 | 545 | − 10 | − 2 |
| N–600 Application for Certificate of Citizenship (online filing) | 1,170 | 990 | − 180 | − 15 |
| N–600 Application for Certificate of Citizenship (paper filing) | 1,170 | 1,000 | − 170 | − 15 |
| N–600K Application for Citizenship and Issuance of Certificate (online filing) | 1,170 | 935 | − 235 | − 20 |
| N–600K Application for Citizenship and Issuance of Certificate (paper filing) | 1,170 | 945 | − 225 | − 19 |
| USCIS Immigrant Fee | 220 | 190 | − 30 | − 14 |
| Biometric Services (Non – DACA)⁹ | 85 | 30 | − 55 | − 65 |
| Biometric Services (DACA only)¹⁰ | 85 | 85 | 0 | 0 |
| G–1041 Genealogy Index Search Request (online filing) | 65 | 160 | 95 | 146 |
| G–1041 Genealogy Index Search Request (paper filing) | 65 | 170 | 105 | 162 |
| G–1041A Genealogy Records Request (online filing) | 65 | 255 | 190 | 292 |
| G–1041A Genealogy Records Request (paper filing) | 65 | 265 | 200 | 308 |

### D. Summary of Costs and Benefits

Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs

and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rulemaking has been designated an "economically significant regulatory action" under section 3(f)(1) of E.O. 12866. Accordingly, it has been reviewed by the Office of Management and Budget (OMB). E.O. 13771 directs agencies to reduce regulation and control regulatory costs. Because the estimated impacts range from costs to cost savings, this final rule is considered neither regulatory or deregulatory under E.O. 13771. Details on the estimated impacts of this final rule can be found in the rule's economic analysis, section 2.

This final rule adjusts certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). It also removes certain fee exemptions, changes fee waiver requirements,[11] alters premium processing time limits, and modifies intercountry adoption processing. This final rule removes the proposed fee that was introduced in the NPRM of this rule for Form I–821D;[12]

it does not provide for the proposed transfer of any Immigration Examination Fee Account (IEFA) funds collected by USCIS to ICE;[13] it reassigns the proposed National Record Center (NRC) costs that do not directly apply to the genealogy program, thereby setting genealogy fees lower than proposed;[14] and it now allows for a $10 reduction in filing fee for applicants who file online for forms that are electronically available by USCIS rather than submit paper applications.[15]

The fee schedule that went into effect on December 23, 2016 was expected to yield approximately $3.4 billion of average annual revenue during the FY 2019/2020 biennial period. This represents a $0.9 billion, or 36 percent, increase from the FY 2016/2017 fee rule projection of $2.5 billion. See 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted approximately 5.9 million total workload receipts and 4.9 million fee-paying receipts, excluding biometric services. See 81 FR 26923–4. However, the FY 2019/2020 fee review forecasts approximately 8.5 million total workload receipts and 7.0 million fee-paying receipts, excluding biometric

---

[4] Because the FY 2016/2017 fee review and resulting fee change were based on USCIS's costs for processing inadmissibility waivers and not CBP's costs, the Form I–192 fee remained $585 when filed with and processed by CBP. See 8 CFR 103.7(b)(1)(i)(P); 81 FR 73307.

[5] Currently, there are two fees for Form I–485. See 8 CFR 103.7(b)(1)(i)(U). The $750 fee is applied to "an applicant under the age of 14 years when [the application] is (i) submitted concurrently with the Form I–485 of a parent, (ii) the applicant is seeking to adjust status as a derivative of his or her parent, and (iii) the child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." See 84 FR 62305. With this rule, DHS removes the reduced child fee. See section III.G.11.b. Form I–485 Child Fee. Additionally, DHS adds a $1,080 fee for certain asylum applicants. See section III.G.11.c. Form I–485 Reduced Fee for Asylees and new 8 CFR 106.2(a)(17)(ii).

[6] DHS will maintain the DACA fees at $410 for employment authorization and $85 for biometric services. See section III.C.6. Comments on DACA Renewal Fee of this preamble; new 6 CFR 106.2(a)(32)(vi).

[7] Currently there are two USCISs fees for Form I–881; $285 for individuals and $570 for families. See 8 CFR 103.7(b)(1)(i)(QQ)(1). EOIR has a separate $165 fee. DHS does not change the EOIR fee with this rule.

[8] Currently, there are two fees for paper filing of Form N–400. See 8 CFR 103.7(b)(1)(i)(BBB). This final rule eliminates the reduced fee option for an applicant whose documented income is greater than 150 percent and not more than 200 percent of the Federal poverty level. See section III.G.24.c of this final rule or 84 FR 62317 for the proposed rule.

[9] As explained in this preamble and NPRM, this rule only requires the separate biometric services fee in certain cases. See section III.G.2. Biometric Services Fee of this preamble; 84 FR 62302; new 8 CFR 103.7(a)(2), 106.2(a)(32)(i), and 106.2(a)(37)(iii).

[10] See footnote 6.

[11] Also, in this final rule DHS Consolidates the Director's discretionary provision on fee waivers to remove redundancy. 84 FR 62363. Proposed and new 8 CFR 106.3.

[12] 84 FR 62320, 62362; proposed and new 8 CFR 106.2(a)(2)(38).

[13] 84 FR 62287, 84 FR 67243. This final rule does not transfer funds to ICE. Therefore, DHS removes $207.6 million for ICE from its cost baseline, resulting in lower fees than if DHS pursued the transfer of funds.

[14] 84 FR 62315, 62316, 62362; proposed and new 8 CFR 106.2(c)(1)–(c)(2); new 8 CFR 106.2(c)(1)–(c)(2).

[15] New 8 CFR 106.2(d).

services. This represents a 44 percent increase to workload and a 43 percent increase to fee-paying receipt assumptions.[16]

For the 10-year implementation period of the rule, DHS estimates the annualized costs of the rule to be $13,856,291, annualized at either 3- and 7-percent discount rates. DHS estimates the annualized cost savings to be $6,192,201 to $22,546,053. DHS estimates the annualized net societal costs and savings of the rule to range from costs of $7,664,090 to savings of $8,689,762. Over the 10-year implementation period of the rule, DHS estimates the annualized transfers to the government from applicants/petitioners to be $551,842,481, annualized at either 3- and 7-percent discount rates. Over the same 10-year implementation period of the rule, DHS estimates the annualized transfers of the rule between different groups of fee-paying applicants and/or petitioners to specific form populations is $832,239,426, annualized at either 3- and 7-percent discount rates.

The final revenue increase is based on USCIS costs and volume projections available at the time of the USCIS fee review. A full analysis of these regulatory provisions and their impacts can be found in the stand-alone Regulatory Impact Analysis found in the docket for this rulemaking and in the statutory and regulatory requirements section of this preamble.

### E. Effect on the Department of Justice's Executive Office for Immigration Review (EOIR)

DHS notes possible ancillary effects of this final rule on the fees charged by the Executive Office for Immigration Review (EOIR). In the NPRM, DHS proposed a fee for a Form I–589 filed with DHS only. Whether the fee also will apply to a Form I–589 filed with EOIR is a matter within the jurisdiction of the Department of Justice (DOJ) rather than DHS, subject to the laws and regulations governing the fees charged in EOIR immigration proceedings. 84 FR 62318. DHS does not directly set any fees for DOJ. DHS did not collaborate with DOJ to calculate or incorporate the costs for DOJ adjudication and naturalization services into the USCIS Activity-Based Costing (ABC) model used for this final rule. After the NPRM was published, DOJ published a rule that proposed to increase the fees for

those EOIR applications, appeals, and motions that are subject to an EOIR-determined fee, based on a fee review conducted by EOIR. 85 FR 11866 (Feb. 28, 2020). EOIR also stated that its proposed rule would not affect the fees that have been established by DHS with respect to DHS forms for applications that are filed or submitted in EOIR proceedings. *Id.* at 11871. DOJ did not propose any revisions to 8 CFR 1103.7(b)(4)(ii) in its rule that would change its longstancing use of DHS forms and fees. Rather, EOIR proposed to revise its regulations to make changes conforming to the DHS NPRM, namely the transfer of DHS's fee schedule from 8 CFR 103.7 to the new 8 CFR part 106. *Id.* Consequently, in immigration court proceedings, EOIR will continue to charge fees established by DHS for DHS forms, including the fees that DHS is establishing in this final rule, which include but are not limited to the fees for Form I–485, Application to Register Permanent Residence or Adjust Status; Form I–589, Application for Asylum and Withholding of Removal Fee;[17] and Form I–601, Application for Waiver of Grounds of Inadmissibility.

### F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking

DHS acknowledges the broad effects of the COVID–19 international pandemic on the United States broadly and the populations affected by this rule. USCIS has seen a dramatic decline in applications and petitions during the COVID–19 pandemic which has also resulted in an unprecedented decline in revenue. DHS has no comparable historical data that can be used to project the scope, duration, and total effect this will have on USCIS' revenue. As a result, USCIS is monitoring its revenue collections daily. In April 2020, USCIS projected that USCIS' non-premium revenue for April 2020 through September 2020 would fall approximately 59 percent below USCIS' initial FY 2020 annual operating plan revenue projection based on the dramatic reduction in fees received during the pandemic. The projections show that USCIS would receive $1.1 billion less in non-premium revenue in the second half of the fiscal year than previously forecast.[18] USCIS cannot

absorb that large of a revenue loss and have enough funding to sustain operations at the same level as prior to the pandemic. Therefore, DHS has provided technical assistance identifying for Congress USCIS funding needs to help cover payroll and other fixed costs in FY 2020 ($571 million) and to have enough carryover ($650 million) available during the first quarter of FY 2021 to continue operations while new fees continue to be collected. The additional revenue provided by this rule addresses the difference between the costs of USCIS operations and USCIS revenue for the biennial period as projected at the time of the USCIS fee review. The amount of funding identified in DHS's technical assistance to Congress would restore USCIS' financial situation to its pre-rule status and would not obviate the need for DHS to adjust USCIS' fees to address the projected disparity between costs and revenue identified in this rule.

DHS makes no changes in this rule in response to the pandemic. USCIS considers all available data at the time it conducts its fee review. USCIS conducted most of the FY 2019/2020 fee review in FY 2017, before the emergence of the pandemic. At that time, USCIS did not foresee, and could not reasonably have foreseen, the effects of such a pandemic on USCIS receipt, revenue, or cost projections during the FY 2019/2020 biennial period, and we cannot project the effects at this time. The projections in this rule were based on conventional conditions, and with no way of knowing or being able to predict the long-term effects of COVID–19 at this point, DHS must assume that filing volumes will return to near previous levels within a reasonable period. Thus, DHS proceeds with this rulemaking on the basis of the FY 2019/2020 USCIS fee review and associated projections. Consistent with past practice and as required by the CFO Act, USCIS will evaluate all available data at the time it conducts future fee reviews, including data related to the COVID–19 pandemic and any potential effects on USCIS workload volumes, revenue, or costs. DHS will consider these effects in future fee rules.

### II. Background

#### A. History

On November 14, 2019, DHS published a proposed rule in the **Federal Register** (docket USCIS–2019–

observed receipt patterns for each form during the pandemic. The annual operating plan revenue projections are not the same as the fee rule revenue projections, and revisions to them do not adjust the results of the USCIS fee review.

---

[16] *See* FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum, which is part of the docket for this final rule. DHS revised the volumes to exclude DACA and change fee-paying assumptions for Forms N–400, N–600, and N–600K, as discussed later in this preamble.

[17] No fee would apply where an applicant submits a Form I–589 for the sole purpose of seeking withholding of removal under INA section 241(b)(3), 8 U.S.C. 1231(b)(3), or protection from removal under the regulations implementing U.S. obligations under Article 1 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). *See* 85 FR 11871.

[18] In April 2020, USCIS revised its internal annual operating plan revenue projections based on

0010). *See* 84 FR 62280. In consideration of requests to extend the comment period and to provide additional time for the public to review supplemental information, on December 9, 2019, DHS published a proposed rule; extension of comment period; availability of supplemental information; and extended the comment deadline from December 16, 2019 through December 30, 2019. 84 FR 67243 (Dec. 9, 2019). Then on January 24, 2020, DHS further extended the comment period until February 10, 2020. *See* 85 FR 4243 (Jan. 24, 2020). In addition, DHS announced that it would consider comments received during the entire public comment period, including comments received since December 30, 2019. *Id.* In this final rule, DHS will refer to these three documents collectively as the proposed rule or NPRM.

*B. Authority and Guidance*

DHS issues this final rule consistent with INA section 286(m), 8 U.S.C. 1356(m) and the Chief Financial Officers (CFO) Act, 31 U.S.C. 901–03 (requiring each agency's CFO to review, on a biennial basis, the fees provided by the agency for services it provides and to recommend changes to the agency's fees).

This final rule is also consistent with non-statutory guidance on fees, the budget process, and federal accounting principles. *See* OMB Circular A–25, 58 FR 38142 (July 15, 1993) (establishing federal policy guidance regarding fees assessed by federal agencies for government services);[19] Federal Accounting Standards Advisory Board Handbook, Version 17 (06/19), Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts, SFFAS 4 generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (identifying various classifications of costs to be included and recommending various methods of cost assignment);[20] *see also* OMB Circular A–11 Preparation, Submission, and Execution of the Budget, section 20.7(d), (g) (June 29, 2018) (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees).[21] DHS uses OMB Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in section II.B. of the preamble. DHS also follows the annual guidance in OMB Circular A–11 if it

requests appropriations to offset a portion of IEFA costs.[22]

Finally, this final rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

*C. Basis for Fee Adjustments*

DHS conducted a comprehensive fee review for the FY 2019/FY 2020 biennial period. It identified a projected average annual cost and revenue differential of $1,262.3 million between the revenue anticipated under current fees and the anticipated full cost of providing immigration adjudication and naturalization services. DHS revises the estimated cost and revenue differential to $1,035.9 million in this final rule. In the final rule, DHS has removed $226.4 million of average annual estimated costs related to the immigration adjudication and naturalization services provided by ICE and the Deferred Action for Childhood Arrival (DACA) policy from the budget projection used to calculate the fees in the NPRM. DHS issues this final rule to adjust USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services.

TABLE 2—REVISED IEFA NON-PREMIUM COST AND REVENUE PROJECTIONS COMPARISON

| IEFA Non-Premium Cost and Revenue Projections Comparison | | | |
|---|---|---|---|
| Comparison | FY 2019 | FY 2020 | FY 2019/2020 average |
| Non-Premium Revenue | $3,408,233,376 | $3,408,233,376 | $3,408,233,376 |
| Non-Premium Budget | $4,331,978,119 | $4,556,386,463 | $4,444,182,291 |
| Difference | ($923,744,743) | ($1,148,153,087) | ($1,035,948,915) |

*D. Final Rule*

Following careful consideration of public comments received, DHS made modifications to the NPRM's regulatory text, as described above. Rationale provided in the background section of the NPRM remains valid, except as described in this regulatory preamble. Section III of this preamble includes a detailed summary and analysis of the public comments. Comments and

supporting documents may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov*, docket number USCIS–2019–0010.

**III. Response to Public Comments on the Proposed Rule**

*A. Summary of Public Comments*

DHS received a total of 43,108 public comment submissions in Docket

USCIS–2019–0010 in response to the NPRM.[23] DHS reviewed all the public comments received in response to the NPRM and addresses relevant comments in this final rule, grouped by subject area. The majority of comment submissions were from individual and anonymous commenters. Other commenters included healthcare providers; research institutes and universities; law firms and individual attorneys; federal, state, local, and tribal

[19] Available at *https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf* (last viewed 03/06/2020).

[20] Available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (last viewed 03/06/2020).

[21] Available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/a11_2018.pdf* (last viewed 03/06/2020).

[22] OMB Circulars A–25 and A–11 provide nonbinding internal Executive Branch direction for the development of fee schedules under the Independent Offices Appropriations Act (IOAA) and appropriations requests, respectively. *See* 5 CFR 1310.1.

[23] Of the 43,108 public comment submissions received, 12,114 were posted to

*www.regulations.gov.* The other 30,994 submissions were designated "inactive—do not post" and included form copies, duplicates, and non-germane submissions.

elected officials; state and local government agencies; religious and community organizations; advocacy groups; unions; as well as trade and business organizations. While some commenters wrote that they supported the NPRM, the vast majority of commenters opposed all or part of it.

### B. Comments Expressing General Support for the NPRM

*Comment:* Several commenters expressed general support for the NPRM. Most did not state precise reasons for their support. Examples of the rationale for some of the generally supportive comments include: Fees are a small price to pay for the benefits of immigration; the burden of immigration should fall on the applicants and not on U.S. taxpayers; the fees will discourage fraudulent immigration; USCIS must have funds to operate; and the rule would benefit the U.S. government. A few commenters suggested that fees should be even higher than DHS proposed. One commenter generally supported the proposal and wrote that the methodology used in the biennial fee review was accurate and fully compliant with statutory requirements set forth at INA sections 286(m) and (n), 8 U.S.C. 1356(m), (n). This commenter said the fee review was also compliant with OMB and Federal Accounting Standards Board standards for budgeting and financial management.

*Response:* DHS appreciates that some commenters support the NPRM. However, it has not separately summarized these comments and does not make any changes in this final rule because of them.

### C. Comments Expressing General Opposition to the NPRM

Many commenters generally opposed the NPRM, including the proposed fees, magnitude of the fee adjustments, charging fees in general, and specific proposed policy changes. DHS summarized and responded to the public comments as follows:

1. Immigration Policy Concerns

*Comment:* Many commenters opposed fee adjustments for policy reasons generally suggesting that the fees will be harmful. The comments are summarized as follows:

• Immigration is important to the United States and the NPRM betrays or is contrary to American values.

• USCIS has an enormous and far-reaching impact and it is imperative that USCIS consider the harmful human effects of the proposed fee increases.

• The fee increase is an attack on immigrants and vulnerable populations.

• The fees would especially affect people of color; the rule implements and displays the racial animus that officials have expressed, is designed to keep non-white immigrants out of the U.S., limits people of color from becoming lawful permanent residents or U.S. citizens, and would have a negative effect on the Latin population.

• The rule is cruel, inhumane, nationalistic, fascist, racist, xenophobic, intended to limit voting rights to the wealthy, and deter green card holders from seeking citizenship.

• The fee increases will create financial hardships for low-income immigrants and the increased cost of renewing residency cards would make it more difficult for immigrants to obtain employment or provide proof of their immigration status.

• Low income immigrants will be forced to choose between providing for basic needs and pursuing immigration benefits.

• The fee increase is an attack on the immigrant and refugee communities who already face discrimination, language barriers, lack of services, poverty, marginalization, persecution, trauma, and fear.

• High fees could result in healthcare avoidance and other negative impacts on foreign-born individuals, as well as their U.S. citizen family members.

• The rule would harm LGBTQ or HIV positive noncitizens.

• The rule's adverse and disparate impact on immigrants of color renders the proposed rule arbitrary and capricious in contravention of federal anti-discrimination protections.

• The rule creates roadblocks to the integration of immigrants.

• The rule attempts to establish discriminatory policies that have been judicially enjoined and to prevent fair and equal access to the U.S. immigration system

• The proposed fee increase would prevent many immigrants from seeking and obtaining the right to vote. A commenter questioned whether the increase was intentionally seeking to suppress potential low- and middle-income immigrant voters.

• DHS should remove financial barriers clearly intended to target the poor to encourage people to use the legal immigration process.

• Increased fees and removal of fee waiver categories in the proposed rule would result in more applicants being put into removal proceedings.

• The proposal would worsen USCIS' already bad reputation.

• USCIS is engaging in partisan machinations rather than acting as a neutral federal agency.

• The proposal would increase predatory and fraudulent immigration services scams and USCIS will need to enhance its efforts to combat these harmful practices.

• The proposal would negatively impact familial integrity and family unity and would increase the financial strain on immigrants' household resources that would be better spent on improving the family's welfare.

• The proposal, along with the previous public charge rule, demonstrates DHS' "animus towards low-income immigrants seeking family unity" and urged the agency to instead facilitate family unity regardless of immigrants' finances.

• The proposal would create an "invisible wall" that would block many hard-working noncitizens from accessing immigration benefits and would cause long-term family separation.

*Response:* DHS proposed adjustments to USCIS' fee schedule to ensure full cost recovery. DHS did not target any particular group or class of individuals, or propose changes with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation or to block individuals from accessing immigrant benefits. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This rule is consistent with DHS's legal authorities. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS proposed changes in fee waiver policies to ensure that those who benefit from immigration benefits pay their fair share of costs, consistent with the beneficiary-pays principle as described in the Government Accountability Office report number GAO–08–386SP.[24]

In certain instances, DHS deviates from the beneficiary-pays principle to establish fees that do not represent the estimated full cost of adjudication. For example, DHS proposed a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, when filed with USCIS. This fee deviates from the beneficiary-pays principle by holding the fee well below the estimated

---

[24] GAO, *Federal User Fees: A Design Guide* (May 29, 2008), available at *https://www.gao.gov/products/GAO-08-386SP.* (last accessed Feb. 24, 2020).

**46796**    Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

cost of adjudication. The $50 fee for affirmative asylum filings is not intended to recover the estimated full cost of adjudication. Instead, it is intended to limit the increase of other fees that must otherwise be raised to cover the estimated full cost of adjudicating asylum applications. Fee adjustments are not intended to advance any policy objectives related to influencing the race or nationality of immigrants, deterring immigration and naturalization, or affecting voting.

DHS adjusts the USCIS fee schedule in this final rule to provide for recovery of the estimated full cost of immigration adjudication and naturalization services. DHS notes that the fees are the same for all people who submit benefit requests regardless of their physical, cultural, or individual characteristics. The commenters state that DHS has discriminatory intent or pretext for this rulemaking, but they provide no evidence to support that statement. DHS has complied with all relevant legal and statutory authorities, including the Immigration and Nationality Act (INA) and the Administrative Procedure Act (APA). DHS rejects the claim that its justifications for adjusting the fees are pretextual or intended to obscure its true intent, or that nefarious reasons like voter suppression and racial animus are behind the fee adjustments, and DHS declines to make any changes in this final rule on these bases.

2. Other General Opposition

*Comment:* Many commenters expressed general opposition to the proposed increase in USCIS fees. Commenters stated:

• USCIS should find a way to increase its margins without causing detriment to the populations it serves.

• The NPRM was not justifiable and USCIS should increase its own efficiency instead of charging more and providing less service.

• The rule's objectives are pretextual, and its goal of fully recovering costs is undermined by the series of USCIS policies and practices that increase the agency's costs and inefficiencies. USCIS fails to describe alternatives to those policies and practices in the proposed rule.

• USCIS should not increase fees when it has inefficiencies such as performing three different background and biological checks on a single applicant.

• USCIS policy failings and inefficient resource allocation are creating the need for increased fees. Commenters provided examples such as the following:

○ Failure to revise policies to keep costs within current fees;

○ Failure to hire and train already budgeted staff;

○ Extensive and frivolous use of a Request for Evidence (RFE) and Notice of Intent to Deny (NOID);

○ "Extreme vetting";

○ Lengthy suspension of longstanding premium processing services for certain applications;

○ The current lockbox system;

○ Increased and unnecessary in-person interviews;

○ Ramped up denaturalization efforts;

○ Resources spent litigating improperly denied applications; and

○ Actions that increased appeals and motions.

Many of these commenters said the NPRM does not account for agency inefficiencies resulting from these policies or how increased revenue would mitigate them and that USCIS should end them before seeking additional fees from applicants.

After listing several policy changes leading to USCIS inefficiencies, one commenter said these policies and requiring fee increases would, in key respects, transfer the costs of the agency's own inefficiencies to the public. The commenter also wrote that the NPRM suggests that the agency could expand implementation of at least some of these "misguided measures." The commenter concluded that it is therefore unsurprising that the NPRM fails to provide any meaningful evidence that the changes it proposes would relieve case processing delays or otherwise improve agency performance; rather, the proposed rule assumes that lengthy delays will persist.

*Response:* DHS will continue to explore efficiencies that improve USCIS services. DHS may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly. Nevertheless, USCIS must recover the estimated full cost of providing immigration adjudication and naturalization services, including services provided at no or reduced charge to asylum applicants and other immigrants. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters suggested tax solutions instead of fee increases. One commenter stated that because they were an American, the U.S. government should raise the commenter's taxes instead of raising fees for citizenship applications. Another commenter suggested that the U.S. government should tax large corporations to fund public services. One commenter opposed the regulation

for three reasons: The department managers should be requesting additional funding from Congress to meet legal requirements, reimbursements between USCIS and DHS "are not to be addressed directly by the users of services required to be provided by the executive branch," and the executive branch is required to provide certain services regardless of cost.

*Response:* DHS has no opinion on whether Congress should pass any new laws to address fees for adjudication and naturalization services. However, DHS reiterates that this final rule complies with current laws. Consistent with DHS' statutory authority, user fees are the primary source of funding for USCIS. *See* INA section 286(m), 8 U.S.C. 1356(m). This final rule adjusts those user fees to provide for full cost recovery to USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that new administrative procedures instituted in the last 3 years serve as barriers to naturalization and immigration rather than as security precautions.

*Response:* Under the law, DHS must fund USCIS operations, including the vetting of individuals who want to enter the United States, using fees. The security screening, background checks, and interviews are all vitally necessary to ensuring that bad actors do not exploit the legal immigration system to enter the United States and undertake actions that harm citizens and conflict with our national values. USCIS must carry out those functions as part of the vetting process and these functions are funded by fees.

*Comment:* Some commenters said that USCIS should maintain the current fee schedule as-is and revisit the issue after further review of the efficiency and effectiveness of current policies, or possible review of the U.S. system of immigration policy by future terms of Congress.

*Response:* In its FY 2019/2020 fee review, USCIS estimated that there is a gap of more than $1 billion annually between the revenue collections projected under the previous fee schedule and the resources USCIS needs to meet its operational needs to address incoming workloads. Therefore, if DHS did not adjust fees in this final rule, USCIS' pending caseload would likely continue to grow and applicants and petitioners would experience longer processing times. DHS declines to adopt the commenter's suggestion in this final rule.

## 3. Proposed Fees Are Unconstitutional [25]

*Comment:* Several commenters wrote that the proposed USCIS fee rule violates one or more provisions of the United States Constitution. These comments are summarized as follows:

• By removing fee waivers for most categories of cases, USCIS is conditioning fundamental rights, such as the ability to vote, on the ability to pay, engaging in discrimination prohibited by the Constitution because it affects one race more than another, and using the "beneficiary pays" principle as a pretextual argument to conceal an intent to discriminate against racial minorities.

• Raising the citizenship application fee to over $1,000 is like imposing a "poll" tax on future voters, which is outlawed by the 24th amendment to the U.S. Constitution.

• Naturalization is an especially important immigration benefit, as it is the only one referenced in the Constitution.

• Depriving low-income immigrants of their due process rights through significant economic obstacles to immigration benefits is contrary to the Equal Protection Clause of the 14th Amendment.[26]

• The intent of the rule is unconstitutional because it is intended to directly exclude individuals based on their economic class.

*Response:* DHS is not adjusting the USCIS fee schedule with any undisclosed motivation or intent other than to recover the estimate full cost of adjudication and naturalization services. The new fees are not insubstantial, but DHS disagrees with the commenters' assertions that the fees in this final rule will have an effect on the economic class or number of applicants. DHS has no data that would indicate that the populations noted by the commenters will be precluded from submitting benefit requests. As stated in other parts of this final rule, DHS must study the adequacy of its fee schedule biennially. If this final rule results in a significant reduction in the number of requests submitted for immigration benefits, DHS can adjust to address that result in a future fee rule. Therefore, DHS does not agree that the new fees violate the U.S. Constitution.

[25] For constitutional claims against the $50 asylum fee see the General Comments on the Asylum Fee section of this preamble.

[26] The commenter likely meant the equal protection component of the Fifth Amendment Due Process Clause.

## 4. Rule Will Have Negative Effects on Applicants

*Comment:* Many commenters wrote that the NPRM, including the fee schedule and limited fee waivers, would have negative effects on applicants, including the following:

• Impede legal immigration;

• Block low-income immigrants from achieving citizenship and the associated benefits;

• Disproportionately impact Asian immigrants and Asian Americans;

• Encourage illegal immigration;

• Prevent immigrants from being contributing members of society;

• Cause immigrants to rely on public assistance;

• Make it difficult to become documented;

• Cost DHS more money for deportations;

• Prevent nonimmigrants and their families from accessing the American Dream;

• Make it difficult for immigrants to make a better life for themselves and their families;

• Make it more difficult for immigrant residents in South Carolina to maintain lawful status, secure work authorization, and provide support for their families;

• Make it more difficult for people to immigrate and for lawyers to obtain clients;

• Dissuade citizens and lawful permanent residents (LPRs) from bringing their family members to the U.S and family support is a relevant factor in economic mobility;

• Promote "healthcare avoidance" and exacerbate medical needs when immigrants finally emerge in care systems, resulting in increased costs for the health and human services sectors;

• Cause significant negative effects on Latino immigrants;

• Punish immigrants who did their utmost to obey immigration laws;

• Adversely impact populations already much less likely to apply for and obtain naturalization, such as survivors of domestic violence, sexual assault, and human trafficking. Further discouraging naturalization among these populations would harm their chances of reuniting with family through immediate relative petitions and undermine applicants' sense of security in the United States

• The fee increases making naturalization less accessible for low-income immigrants would yield poor health outcomes among children.

• The proposal, along with other policies, serves to disrupt access to programs that address social

determinants of health and contribute to individuals' and families' well-being.

*Response:* DHS is unable to quantify how many people will not apply because they do not have access to fee waivers and we acknowledge that some individuals will need to save, borrow, or use a credit card in order to pay fees because they may not receive a fee waiver. DHS also recognizes that if individuals borrow or use a credit card, they are likely also responsible for the filing fee, and any additional interest cost accruing on the loan or credit card. DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply. However, DHS disagrees that the fees will result in the negative effects the commenters' suggested. DHS believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs noted by the commenters. Therefore, DHS believes the price elasticity for immigration services is inelastic and increases in price will have no impact on the demand for these services. This is true for all immigration services impacted by this rule. DHS also does not believe that the NPRM is in any way discriminatory in its application and effect. Therefore, DHS declines to make changes in this final rule in response to these comments.

## 5. Rule Will Have Negative Effects on the Economy and Employers

*Comment:* Multiple commenters stated that the NPRM would have negative direct and indirect impacts on local, state, regional and the United States' economy, as well as businesses and employers. These comments are summarized as follows:

• Immigrants provide crucial labor in agriculture, construction, healthcare, hospitality, and other industries, and they need an ample workforce from which to draw.

• Lawful permanent residents becoming citizens is important to the economy of the United States, and those positive economic impacts reach across generations.

• Immigrants can contribute more to the economy with access to legal documentation.

• Higher fees affect lower-skilled laborers who are in demand in several industries. Immigrants are key contributors to the U.S. labor force and the proposed fee change would impede immigration to the detriment of the labor force.

• The rule could cost the United States potential future taxpayers. This impact could result in a long-term economic loss.

• Immigrants are the backbone of industry and the economy, often responsible for significant job creation and innovation.

• An increase in fees will negatively affect U.S. companies that pay immigration fees on behalf of their employees.

• The proposed fee increases will result in the decrease of immigration applications, negatively affecting the government.

• The increased fees will create a financial barrier to protection from deportation and work authorization, thus making it more expensive to participate on the U.S. economy.

• Immigrants will be the primary source of future U.S. labor growth. Limiting working class immigration is contrary to the interests of the U.S. society and economy. Similarly, naturalization boosts American democracy, economy, and diversity.

• Increased fees will negatively affect the U.S. workforce because employees who may be eligible to naturalize will no longer have access to naturalization.

• The fees would be detrimental to immigrant students' success and the nation's economic prosperity.

• Improved immigration status allows low-income immigrants to rise out of poverty and contribute economically to their communities with access to better jobs and opportunities.

• The rule will damage regional and national economies by stymieing immigration and the benefits that flow from it.

• The proposed rule would have a negative ripple effect on U.S. citizens because of the economic benefits derived from immigrants.

• These changes would not only impact individual applicants who may be unable to work due to delays in their pursuit of work authorization, but also family members and employers who may have to lay off valuable employees.

• Immigrant communities in rural areas with high levels of poverty live paycheck to paycheck, and the proposed fee increases would make immigration benefits less accessible to working-class and vulnerable individuals.

• Raising fees would undermine the jobs and wages of domestic workers with limited education performing low-skill jobs.

• The proposed rule would increase unemployment among immigrant workers.

• The proposed fee increases and the revocation of fee waivers would

increase economic and administrative burdens on State and local government workforces.

• The destabilizing effects of barriers to naturalization would create undue financial burdens on municipalities that outweigh any stated benefits of the proposal.

• Immigrant entrepreneurs and small business owners generate "tens of billions of dollars" in business revenue.

• Immigrants make important contributions in research and science. Four of eight Nobel Prize Laureates from the United States in 2019 were foreign born and 34 percent of all Nobel Prize Laureates from the United States were immigrants.

• Scientific discovery is dependent on the ability to travel freely and the rule would limit the ability of scholars to study and work in the United States.

• The proposal would adversely impact the direct care and nursing home industries' abilities to hire and retain sufficient staff. These industries are increasingly reliant on immigrants to staff positions.

• The H–2A program allows the citrus industry with reliable foreign labor. The cost increase for H–2A petitions was excessive and other cost in the industry were also increasing.

• The increased fees, coupled with restrictions to fee waivers, would result in many fewer residents accessing a desired immigration status for which they are eligible simply because they cannot afford to apply.

• Impeding an individual's ability to achieve a secure immigration status because of poverty is unacceptable and unconscionable.

*Response:* DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede or limit legal immigration. DHS's rule is in no way is intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 and has no data that would indicate that the fees for family based benefit requests, lawful permanent residence, and naturalization in this final rule

would prevent applicants from being filed. DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, almost all industries, immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and that welcoming new citizens helps the U.S. economy. DHS acknowledges in its analyses accompanying this rule that the higher fees must be paid by U.S. companies that hire foreign nationals, but DHS has no data that indicates that higher fees will affect the supply of lower-skilled laborers, impede immigration to the detriment of the labor force, result in aliens being unable to work, cause employers to lay off employees, undermine the jobs and wages of domestic workers with limited education performing low-skill jobs, or increase unemployment among immigrant workers. DHS knows that immigrants make important contributions in research, science, and we have no data that supports the assertion that the increased fees and restrictions on fee waivers would result in many fewer residents accessing a desired immigration status for which they are eligible simply because they cannot afford to apply.

*Comment:* A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for affected populations.

*Response:* DHS recognizes the contributions that naturalized citizens make to American society. However, USCIS must fund itself through fees unless DHS receives a Congressional appropriation to do so. DHS does not have any data to establish that these fees, though required, are a significant impediment to naturalization or economic and social mobility. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 (*e.g.* N–400 filing volumes grew from less than 600,000 in FY 2009 to approximately 750,000 in FY 2011; similarly, N–400 filing volumes grew from less than 600,000 in FY 2015 to nearly 1 million in FY 2017). In an effort to apply fees more equitably to the beneficiary of each benefit request, DHS must increase the fee for Form N–400, Application for Naturalization, in this final rule. As stated in the proposed rule and elsewhere in this final rule, DHS performs a biennial review of the fees collected by USCIS and may recommend changes to future fees. DHS declines to conduct further analysis on

this issue or make changes in this final rule in response to this comment.

*Comment:* Many commenters wrote about the benefits of naturalization, the effect of naturalization on the economy and how the current application fee and proposed fee discourages naturalization. These comments are summarized as follows:

• Immigrants contribute to the economy by paying taxes, and they should have easy access to naturalization.

• Naturalization increases support for American political institutions, workforce diversity, strengthens employee productivity and retention, and creates well-informed community members.

• Raising fees for naturalization could discourage immigrants from seeking citizenship, negatively affecting the economy.

• Naturalization is a key driver in allowing immigrants to fully integrate into our society, economically contribute to the U.S. economy.

• Everyone benefits from residents naturalizing.

• Naturalization increases net taxable income, GDP, individual earnings, employment rates, homeownership, federal, state, and city tax revenues, and higher education, etc.

• Naturalization decreases government benefit expenditures.

• Citizenship promotes social benefits, higher rates of health insurance, English proficiency, quality of employment, and buy-in to U.S. democratic principles.

• Naturalization increases engagement in civic life.

• The proposal would increase profits for private companies that benefit from financial obstacles to naturalization.

• In its proposal, DHS incorrectly stated that naturalization applicants will find some way to come up with the fee and failed to prove that the proposal would not shrink revenues due to a reduction in submitted applications.

• The proposed fee increases would place citizenship and the "American dream" out of reach for many immigrants.

• Costs associated with naturalization were already prohibitively high and DHS should refrain from any efforts to make naturalization and other immigration benefits even less accessible.

• Research from the Journal on Migration and Human Security that found there were approximately 9 million LPRs eligible to naturalize and the proposed naturalization fee increase would make naturalization unaffordable

for low-income and working-class people.

• The Immigrant Legal Resource Center and Stanford University's Immigration Policy Lab study demonstrates current fee levels already prevent a considerable share of low-income immigrants from applying for citizenship, as well as a 40 percent increase in application rates when low-income immigrants are given vouchers to cover application fee costs.

• Compliance with immigration and naturalized citizenship laws was already an "arduous and risky" process and USCIS should estimate the impact on compliance for immigrants seeking to follow such laws.

• USCIS should implement a system to account for individuals who cannot afford to comply with immigration and citizenship laws due to the proposed fee increases.

• An analysis from the American Immigration Council shows that the cost of citizenship has become a systemic barrier and the proposal would raise naturalization fees even higher.

• An analysis from the Center for Migration Studies that analyzed 39 percent of those eligible for naturalization live in households with incomes below 150 percent of Federal Poverty Guidelines (FPG) and the proposal would price out naturalization-eligible individuals from pursuing citizenship to the detriment of their families and communities.

• A hypothetical family of four would have to pay an additional $3,115 over a 3-year period to maintain their status and secure citizenship.

• The "road to naturalization eligibility may be lengthy, unpredictable and costly," and the proposed fee increases and changes to fee waiver eligibility would impact immigrants who must file concurrent applications for spousal petitions, work authorizations, and adjustment of status. These changes would cost $4,680 over a 4-year period, an amount the commenter described as "prohibitive."

• Existing costs for immigration benefits already pose challenges for immigrant families and DHS should not increase fees by such an unprecedented amount.

*Response:* DHS recognizes the economic and societal value of nonimmigrants, immigration, and naturalization. DHS agrees that new citizens and naturalization are of tremendous economic and societal value and generally agrees with the points made by, and the studies cited by, commenters. DHS is not adjusting the USCIS fee schedule with an intent to impede, reduce, limit, or preclude naturalization and did not propose to

adjust the USCIS fee schedule to reduce, limit, or preclude immigration in any way for any specific immigration benefit request, population, industry or group, including members of the working class. However, DHS must adjust the USCIS fee schedule to recover the full cost of providing immigration adjudication and naturalization services. While fully aware of the benefits that immigrants provide to society, DHS must fund USCIS with fees unless DHS receives a Congressional appropriation to do so.

DHS acknowledges that the fee for Form N–400, Application for Naturalization is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. The fee for this form is increasing more than for most other forms because DHS has historically held the fee for Form N–400, Application for Naturalization, below the estimated cost to USCIS of adjudicating the form in recognition of the social value of citizenship. Immigration services provide varying levels of social benefit, and previously DHS accounted for some aspect of the social benefit of specific services through holding fees below their cost. However, in this final rule DHS is emphasizing the beneficiary-pays principle of user fees. This approach means that the fee for Form N–400 will now represent the estimated full cost to USCIS of adjudicating the form, plus a proportional share of overhead costs and the costs of providing similar services at reduced or no charge to asylum applicants and other immigrants. In other words, the fee for Form N–400 will now be determined in the same manner as most other USCIS fees. Because DHS has held the fee for Form N–400 below full cost in the past, adjusting to full cost requires an increase in excess of the volume-weighted average increase of 20 percent. If DHS did not increase the fee for Form N–400 this amount, other fees would need to increase further to generate the revenue necessary to recover full cost, including the costs of the N–400 not covered by its fee. DHS believes the increase in the fee for Form N–400 is fully justified. Finally, DHS does not believe the new Form N–400 fee will deter naturalization or that the new fees established in this final rule will prevent immigrants from receiving immigration benefits. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 (*e.g.* N–400 filing volumes grew from less than 600,000 in FY 2009 to approximately 750,000 in FY 2011; similarly, N–400 filing volumes grew

from less than 800,000 in FY 2015 to nearly 1 million in FY 2017). Therefore, DHS declines to make any changes in this final rule in response to this comment.

*Comment:* One commenter stated that the higher fees would result in fewer clients for their advocacy organization. As a result, the group might have to let go of some staff. Another commenter wrote that the proposal would harm its city's efforts to create a welcoming environment for immigrants. The commenter described programs like Citizenship Day in Boston intended to make immigration legal services more accessible and said the proposal would undermine these efforts. The proposed fee changes and elimination of fee waivers would harm agencies that carry out the DOJ's Office of Legal Access Programs mission as those agencies would lose clients as naturalization and other applications become less affordable, resulting in a reduction of funding and potential staff layoffs. The commenter also said these agencies would need to change their informational and educational materials if the proposed rule is implemented, resulting in increased design, printing, and distribution costs.

A commenter stated that while it does not provide direct social or legal services, it frequently fields questions from transgender individuals and their family members, attorneys, and other organizations about government policies and individuals' legal rights, including questions about immigration. The commenter wrote that if the proposed rule is adopted, it will need to expend considerable resources to comprehend and explain changes to the public and will see an increase in requests for information. The commenter said USCIS should also consider the impact of the proposed rule on organizations like theirs, and on organizations that provide direct services to immigrants applying for immigration benefits.

A commenter said the proposal would harm its organization's mission and ability to sustain itself financially. The commenter said 90 percent of its funding comes from the State of Washington's allocation for the Washington New Americans Program and is tied to certain contractual obligations, including that the organization complete 1,000 naturalization applications, host various workshop events, and screen around 2,000 green card holders for eligibility each year, among other conditions. The commenter said its ability to meet these numbers and its success rate would be adversely impacted if the proposed fee increases and elimination of fee waivers

become finalized. One commenter wrote that the proposal would present challenges for non-profit organizations providing legal assistance to low-income immigrants because it would reduce the number of clients who connect with services for which they are eligible, and would require increased outreach by an already overworked staff.

Another commenter wrote that the proposal would interfere with state and local non-profit programs that provide services to help individuals navigate the immigration process. The commenter said that if the proposal is implemented, such programs in Washington State anticipate that the increased demand for fee reimbursement will outpace other services. The commenter wrote that many organizations providing immigration services are dependent on reasonable application fees and would be at risk of disappearing if fees increase above current levels. Another commenter said the proposal would interfere with its organizational mission and would hamper the work done by other non-profit entities serving immigrant communities. The commenter wrote that its organization is funded primarily by city and state grants, with specific funding attached to specific numbers of low-income immigrants served and that the proposal would undermine its ability to meet grant requirements. The commenter said in the previous year it had processed hundreds of applications that it would not have been able to file under the proposed removal of fee waivers for certain application types. Many commenters wrote that the proposed fee increases would deter immigrants from using qualified legal services, an outcome that the commenters stated would complicate USCIS processing. The commenter said that if these actors are left unchecked, they will end up diverting thousands of dollars away from the agency.

Commenters said the proposed fee increases and elimination of fee waivers would disrupt organizations that provide legal assistance and other services to immigrants because of a reduction in the number of clients served, an inability to meet contractual requirements, and loss of financial support through contracts or grants. One commenter said their city partners with immigration legal service organizations to help immigrants secure needed benefits because income-based barriers to such benefits already exist. One commenter said their office assists 1,000 constituents annually who already face burdens navigating the immigration system.

Some commenters suggested that because the fee increases will discourage many immigrants from utilizing qualified legal assistance to assist with applications, USCIS will encounter challenges and inefficiencies in processing due to less complete or less accurate applications being filed. Other commenters wrote that the proposal would increase the prevalence of "notario" fraud and other types of consumer fraud against immigrants, who would be more likely to turn to dishonest providers of legal and other assistance due to the proposed fee increases. Another commenter agreed that the fee increases would decrease immigrants' ability to afford counsel, and referred to a 2014 study from Stanford Law School that found detained immigrants were three times more likely to win deportation cases when they were assisted by attorneys. The commenter also cited research from the New York Immigrant Family Unity Project from November 2017 that demonstrated for every 12 individuals who received counsel under the organization's "universal representation model," [11] would have been deported without access to an attorney. The commenter concluded that non-profit organizations that are already under-resourced will have to step in to provide services if immigrants lack income to hire attorneys. Some commenters suggested that the proposed rule would not only impact immigrant populations, but also legal aid organizations providing services to such populations and students who benefit from programs and clinics designed to support low-income populations.

*Response:* DHS recognizes the value of the various groups that assist individuals navigate its regulations and forms. However, USCIS strives to develop rules and forms that are user-friendly, can be easily completed by the public, and require no legal or professional assistance. As stated before, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation. Previous fee adjustments had no discernible effect on the number of benefit requests filed. This final rule amends fee waiver requirements and divides the Form I–129 into multiple forms, but otherwise makes no major changes to any immigration benefit requests. DHS will continue to explore efficiencies that

improve USCIS services. DHS may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly. Therefore, DHS declines to make any changes in this final rule as a result of these comments.

*Comment:* One commenter cited a Bureau of Labor Statistics study (2017–2018), which indicates that the unemployment rate for foreign-born men (3.0 percent) was smaller than the unemployment rate for native-born men (4.2 percent), as a benefit to the United States.

*Response:* DHS appreciates the comment and agrees that foreign-born workers are dependable employees who are important to the U.S. economy.

### 6. Comments on the DACA Renewal Fee

*Comment:* Many commenters generally opposed higher DACA fees. Commenters stated:

• Current DACA fees are high and an increase to renewal fees would make it difficult for people to afford legal immigration processes.

• It would be unjust to charge students and families to pay more to maintain DACA.

• Many DACA recipients are in school, early in their careers, or have young children, and therefore cannot afford the fee increases.

• DACA fees would make it difficult for individuals to renew their work permits and they could lose the ability to work legally in the United States. The proposed fee increase would cause emotional and financial hardships for the families of DACA recipients.

• DACA fees will suppress/undermine the DACA policy while legal status is undetermined.

• The DACA renewal fee will discourage DACA recipients from seeking citizenship.

• High fees are the reason only 800,000 of the 1.3 million DACA-qualified individuals have requested DACA.

• The fee increases will reduce the number of DACA recipients who are able to renew their deferred action and complete higher education. DACA recipients often live paycheck-to-paycheck and must support family members financially. The renewal fees already present a burden and the proposed increase would exacerbate the hardship.

• DACA is a prerequisite for in-state tuition in many states, and increased fees would cause many DACA recipients to lose their DACA and give up their pursuit of higher education.

• DACA has been instrumental in helping many recipients access better educational and professional opportunities and better support their families.

• Many DACA recipients have lived in the United States since early childhood, and this rule would place them in danger of removal from the only country they consider home.

• DACA recipients have, in some cases, shown to be dedicated to serving their communities through Teach For America.

• Without the contributions of DACA recipients the United States would lose $433.3 billion in GDP and $24.6 billion in Social Security and Medicare contributions.

• DACA renewals should be funded by increased taxes rather than by placing the burden on DACA requestors, who are vulnerable.

• USCIS needs to offer justification for increasing DACA fees from an economic standpoint.

*Response:* In light of the concerns raised by commenters, as well as the recent Supreme Court Decision in *DHS et al* v. *Regents of the Univ. of Cal. et al*, No. 18–587 (S.Ct. June 18, 2020), DHS will not impose a fee for Form I–821D. Therefore, there is no fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, in this final rule, and USCIS will not receive revenue from Form I–821D. DHS has removed the estimated costs and staff directly attributable to the DACA policy from its cost baseline used in its fee calculations for this final rule, consistent with past practice. *See* 81 FR 26903, 26914 (May 4, 2016) (explaining that USCIS excludes from the fee calculation model the costs and revenue associated with programs and policies that are temporary in nature such as DACA). In this final rule, DHS adjusts other fees to recover the anticipated overhead and cost reallocation that the NPRM associated with DACA fees, including Forms I–765 and I–821D.

In light of the recent Supreme Court ruling and attendant changes to DHS' operations relating to the DACA policy DHS will maintain the DACA fees as in effect before the rescission on September 5, 2017 at $410 for employment authorization and $85 for biometric services. New 8 CFR 106.2(a)(32)(vi).

### D. Comments on Legal Adequacy of the Rule

*Comment:* Multiple commenters stated that the rule was arbitrary and capricious, contrary to law, and in violation of the Administrative Procedure Act for various reasons, summarized as follows:

• The fee increase is excessive particularly for naturalization and adjustment of status.

• Fee increases will frustrate the substantive policies promoted in the INA.

• The proposal was a pretext for decreasing legal immigration.

• The fee of $2,000 to change the status of a single family member is a thinly veiled effort to bring the recently enjoined public charge regulations and health insurance proclamation to life and circumvent the judicial injunctions on that rule.

• In emphasizing the beneficiary-pays principle, the rule abandons prior motivations to tailor fees based on users' ability to pay. The 2008 Government Accountability Office (GAO) report to Congress entitled, *Federal User Fees: A Design Guide*, undermines USCIS' sudden switch to the beneficiary-pays principle, and USCIS has elevated the beneficiary-pays principle as a pretext for restricting and deterring legal immigration against the will of Congress.

• The rule's objectives are pretextual, and its goal of fully recovering costs is undermined by the series of USCIS policies and practices that increase the agency's costs and inefficiencies. USCIS fails to describe alternatives to those policies and practices in the proposed rule.

• The proposed rule fails to determine a social good that results from equity among application fees, with no evidence, data, or rational connection between that good and the stated goal of equity.

• The agency failed to adequately describe the terms or substance of the proposed rule in accordance with APA.

• The NPRM's rationale and fee increases are arbitrary because the amount of revenue that would be generated is much bigger than the projected shortfall at USCIS and some fees would increase more than others.

• Not all fees are being changed proportionally or rationally, and some fee decreases and increases appear completely arbitrary and do not align with the agency's reasoning.

• The rule lacks a detailed description of how or why the costs of adjudication have increased so dramatically as to necessitate such a large fee increase.

• The rule cites to INA section 286(m) multiple times for the Congressional mandate that authorizes the DHS to charge fees "at a level that will recover the full costs of adjudication," but fee increases should be supported with details of what those "costs" actually

are, and they should be itemized in a way that clearly justifies the price.

• The public has the right to know the specific details of the projected budget shortfall and how proposed fee changes would be allocated to meet the projected deficit.

• Some fee increases were larger than others.

• It is arbitrary to eliminate fee caps for some but not all categories, and the rationale provided for not limiting fee increases for some benefit requests is inadequate. If limited fee increases were continued for all previously limited requests some proposed fees could increase by as much as $1,185 with the average of those changes being an increase of $12 per immigration benefit request.

• The rule contains clear and measurable hypocrisy in that USCIS claims that prior policy must fall in the face of the agency's newfound insistence on the "beneficiary-pays principle." but it violates this principle for certain form types because USCIS proposes to maintain a 5 percent limit on fee increases without specific justification for each.

• The proposed rule's invocation of the "beneficiary-pays principle" is not made in good faith in that USCIS is still willing to support subsidies for some users (e.g., adoptive parents and religious institutions) and even a high premium on others (e.g., "regional center" investment groups)."regional center" investment groups).

• Contrary to DHS's rationales for the rule, increased fees will not improve USCIS' efficiency or allow the agency to provide better service to applicants.

*Response:* INA section 286(m), 8 U.S.C. 1356(m) authorizes DHS to recover the full cost of providing immigration adjudication and naturalization services, including the cost of services provided at reduced or no charge to asylum applicants and other immigrants through the USCIS fee schedule. This final rule complies with the INA, as DHS estimated the cost of providing immigration adjudication and naturalization services over the biennial period and adjusts USCIS' fee schedule to recover those costs. DHS has explained its rational basis for adjusting USCIS fees in the proposed rule and this final rule. The docket and administrative record document the bases for the changes and show that the fee adjustments in this final rule are not motivated by any purpose other than those expressly stated in this rulemaking. This final rule intends to recover the estimated full cost of providing immigration adjudication and naturalization services and is not a

pretext to implement the Inadmissibility on Public Charge Grounds final rule, as indicated by a commenter. DHS notes that the Public Charge final rule was implemented nationwide on February 24, 2020, after the Supreme Court of the United States stayed the last remaining injunction on that final rule on February 21, 2020.

This final rule also complies with the APA. DHS issued an NPRM in the **Federal Register** on November 14, 2019, and a Supplemental Notice on December 9, 2019. DHS accepted public comments on the proposed rule through February 10, 2020. DHS fully considered the issues raised in the public comments and made some adjustments in response, as detailed in responses throughout this final rule.

DHS disagrees with commenters' assertions that the fees established in this final rule are unjustified because the fees differ in amount or are not being changed "proportionally." In most instances, DHS sets the fees based on the estimated full cost of providing the relevant immigration adjudication or naturalization service. Some services cost USCIS more to provide than others, resulting in fees that differ in relation to how costly the applicable service is. Furthermore, the costs to USCIS of providing a given service may evolve over time in a manner that is different than the cost of providing another service. Thus, when DHS adjusts the USCIS fee schedule, not all fees are adjusted "proportionally." For example, as DHS explains in the NPRM and elsewhere in this rule, DHS determined that it would be appropriate to limit the fee increase for several forms while not limiting the fee increase for other forms to reduce the cost burden placed upon other fee-paying applicants, petitioners, and requestors.

DHS reiterates that this final rule complies with the all current laws. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* Numerous issues permeate the NPRM and result in such a vague rule change as to invalidate the entire proposal. The NPRM fails to disclose the actual weighted average fee increase or fee increases associated with individual form types and many unrelated changes are proposed without supporting documentation for each of these proposed changes. The commenter wrote that other open-ended language in this proposal also improperly subverts the legal requirements of this notice process by granting exclusive powers to the Attorney General to set such fees and fee waiver regulations and create such USCIS forms without future public

notices. The commenter wrote that other open-ended language in this proposal also improperly subverts the legal requirements of this notice process by granting exclusive powers to the Attorney General to set such fees and fee waiver regulations and create such USCIS forms without future public notices.

*Response:* DHS has provided sufficient details of the bases for the fee adjustments in the NPRM, this final rule, and supporting documentation. As clearly stated earlier, the INA authorizes the use of fees for funding USCIS. However, the law does not prescribe a method for USCIS fee setting. As explained in the supporting documentation that accompanies this final rule, USCIS follows guidance provided by OMB Circular A–25 and has leveraged an ABC methodology in the last five fee reviews. USCIS' use of commercially available ABC software to create financial models has enabled it to align with the Federal Accounting Standards Advisory Board's (FASAB's) *Statement of Federal Financial Accounting Standards Number 4* on managerial cost accounting concepts, which provides guidelines for agencies to perform cost assignments in the following order of preference: (1) Directly tracing costs wherever feasible and economically practicable; (2) Assigning costs on a cause-and-effect basis; or (3) Allocating costs on a reasonable and consistent basis.[27]

USCIS is a worldwide operation of thousands of employees with myriad responsibilities and functions. The commenter's expectations of absolute precision are unattainable for setting the fees for such a large organization that provides a wide range of services and immigration benefit requests. DHS has provided rational connection to the law, its needs, policy choices, calculations, and fees established in this final rule, even if the rational basis may require following mathematical calculations and defensible estimates.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters said that the excessive fee increase and limiting fee waivers would indirectly make wealth a dispositive requirement for immigration benefits, effectively adopting a "wealth test" for citizenship and similar immigrant benefits that will deter non-citizens from seeking lawful immigration status in violation of the INA and which the legislature never

---

[27] FASAB, *Statement of Federal Financial Accounting Standards 4,* available at *http:// files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (last viewed 03/06/2020).

intended. A commenter said DHS's proposal to eliminate most fee waivers and exemptions, coupled with dramatic fee hikes for most immigrants, breaks from decades of executive practice and ignores clear Congressional intent to create a fair and accessible immigration system. The commenter said DHS has declined, despite congressional requests, to consider the effect of eliminating reduced fees on applicants for naturalization or to maintain fee waivers for such applicants.

A commenter said USCIS' policy of recovering the full cost of application processing is a choice, not a legal requirement. Specifically, the commenter said USCIS cites INA section 286(m), 8 U.S.C. 1356(m) as the basis of its policy, but this section states merely that the agency "may be set at a level that will ensure recovery of the full costs of providing all such services." Therefore, the statute is permissive, not mandatory. The commenter went on to say that USCIS also cites OMB Circular A–25, but this document is only policy guidance that lacks the force of law and, by its own terms, provides for exceptions to this general policy. The commenter also said that since USCIS has used its discretion to set fees for several forms at levels that would not recover its full costs, it should go further in shifting costs away from applications that would help working immigrant families acquire, maintain, or document lawful status and citizenship. Similarly, another commenter said USCIS is not required by law to recover its costs on the backs of applicants, many of whom are low-income; the relevant section of the INA is permissive, not mandatory.

A commenter said the proposed rule ignores Congressional intent, citing a 2018 House Appropriations Committee report (H. Rep. No. 115–948) and the bipartisan, bicameral conference report accompanying the omnibus appropriations act for Fiscal Year 2019 (H. Rep. No. 116–9), both of which stated that "USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines (FPG), who are not currently eligible for a fee waiver." Although the NPRM states that "USCIS appreciates the concerns of this recommendation and fully considered it before publishing this proposed rule," the commenter said USCIS provides no evidence that it either "appreciates" or "fully

considered" these directives from Congress. Instead, the commenter said the agency is eliminating fee waivers and naturalization fee reductions in direct contravention of Congressional will. A couple of other commenters also cited the same Congressional directives, stating that DHS has ignored these directives without rational explanation.

Another commenter said that, by solely focusing on "full cost recovery" regardless of an immigrant's ability to pay and under the false pretense of equity, DHS is restricting immigration to only those who can afford it. The commenter said this is a "backhanded attempt" to introduce a merit-based immigration system without legislation. The commenter said Congress has already shown it does not wish to enact a merit-based immigration system and the DHS should not be able to go around the will of Congress. Similarly, another commenter said the changes serve to circumvent Congressional oversight of the immigration system by effectively eliminating statutory paths to immigration status by making them unaffordable and inaccessible to those who qualify.

Another commenter said these fees would effectively impose a means test for U.S. residence and citizenship, and that these immigration benefits is of such importance that any related policy should be determined by Congressional legislation. A commenter said a limit should be placed on USCIS' ability to raise fees without Congressional approval, concluding that such policies should only be passed by Congressional authority.

A commenter said the administration is attempting to reshape American immigration policy, ignoring Congress' plenary power and attempting to make the immigration process established by Congress inaccessible to eligible immigrants. Similarly, another commenter said USCIS is imposing financial tests cloaked under the rule-making process to reshape the demographics of the American society by excluding those who are not wealthy and asylum-seekers who are largely from Central America, Latin America, Africa, and Asia.

A commenter said the rule would significantly deter family-based immigration, contrary to Congressional intent. The commenter said that the effect of the rule will promote employment-based immigration at the expense of family-based immigration because immigrants who arrive on employment-based visas are typically well-educated, can speak English proficiently, have sufficient assets, and have solid employment prospects. The

commenter said the effect of the proposed rule will be to favor wealthy or higher-skilled immigrants over families, and in turn reverse over a half century of bedrock immigration policy in the United States. The commenter concluded that Congress did not delegate DHS the authority to implement such sweeping reform of our immigration laws.

Another commenter said Congress needs a clear expenditure plan in order to monitor if the funds are being used as warranted, which is not present in the current proposal. Similarly, a commenter said the proposed fee schedule is inconsistent with statutory framework because it lacks a valid analysis as to how the proposal might achieve the policy objectives it "allegedly would further."

*Response:* DHS adjusts the fees for immigration benefit requests in this final rule to recover the estimated full cost of providing immigration adjudication and naturalization services, as provided by law. In adjusting the fees, DHS is not imposing a "wealth test" or otherwise attempting to erect barriers to immigration and rejects any implication that its justifications for adjusting the fees are pretexts to obscure any other motivation.

INA section 286(m), 8 U.S.C. 1356(m) authorizes DHS to recover the full cost of providing immigration adjudication and naturalization services, including the cost of services provided at no charge to asylum applicants and other immigrants through the USCIS fee schedule. This final rule complies with the INA, as DHS estimated the cost of providing immigration adjudication and naturalization services over the biennial period and adjusts USCIS' fee schedule to recover those costs.

This final rule also complies with the APA. DHS issued an NPRM in the **Federal Register** on November 14, 2019, and a Supplemental notice on December 9, 2019. DHS accepted public comments on the proposed rule through February 10, 2020. DHS fully considered the issues raised in the public comments and made some adjustments in response, as detailed elsewhere in this final rule. DHS provides responses to those comments in this final rule.

*Comment:* One commenter stated that the proposed rule was not ripe for comment, because DHS did not provide a final, definitive set of fees but instead provided a range of potential outcomes that were possible.

*Response:* DHS disagrees that the proposed rule was not ripe for comment. DHS provided multiple options for proposed fee schedules and

explained that the final outcome would be one of the proposed scenarios or another outcome within the range of the alternatives proposed. The fee schedule adopted in this final rule falls within the range of outcomes DHS provided in the NPRM. The policies implemented in this final rule are identical to, or are logical outgrowths of, those contained in the NPRM.

The intent of the comment period provided under the APA is to allow agencies to consider public feedback on proposed rules and make changes as appropriate. Because a single change made in response to public comments may affect multiple fees, it is impossible to provide a final set of fees in an NPRM unless it were to be adopted without any modification, thereby negating the value of public feedback. Therefore, the NPRM was fully ripe for public comment, and DHS declines to make any adjustments in response to this comment.

*Comment:* Two commenters wrote that the NPRM has no force or effect because Mr. Wolf does not have a valid legal claim to the office of DHS Secretary. The commenters detailed the required line of succession required by Executive Order 13753 after the departure of Secretary Nielsen, which according to the commenters should not have led to Mr. McAleenan. The commenters then stated that, even if President Trump lawfully departed from E.O. 13753 when Mr. McAleenan was designated, his authority was limited to 210 days under the Vacancies Act, but Mr. McAleenan purported to serve as Acting Secretary for a year and a half. The commenters stated that, because Mr. Wolf's appointment to Secretary was a result of Mr. McAleenan's unlawful amendment to the order of succession, Mr. Wolf has no valid legal claim to the office of the Secretary, and the action he has taken in promulgating the proposed rule shall have "no force or effect."

Similarly, other commenters said the rule violates the Appointments Clause and the Federal Vacancies Reform Act (FVRA) because it was promulgated under the unlawful authority of Kenneth Cuccinelli. The commenters detailed the requirements of the FVRA and the succession line leading to Mr. Cuccinelli's appointment. The commenters concluded that, since Mr. Cuccinelli has not succeeded to the Acting Director of USCIS position pursuant to the FVRA, his designation was void, and thus, the rule that was proposed under his purported authority should have "no force or effect" and its adoption would be unlawful.

Another commenter said it is improper to issue a significant rule when the authority of DHS and USCIS leadership is in question. The commenter said the significant changes proposed are egregious when the agency lacks confirmed leadership to exercise authority pursuant to the law. The commenter wrote that legal challenges to the authority of agency leadership are currently pending and a letter from the House Committee on Homeland Security to the GAO that questions the legality Chad Wolf's appointment as Acting DHS Secretary and Kenneth Cuccinelli's appointment as Senior Official Performing the Duties of the Deputy Secretary. The commenter wrote that the lack of responsible authorities makes it inappropriate for the agency to make the radical and untested policy shifts it proposes.

*Response:* DHS disagrees that Mr. Cuccinelli was unlawfully appointed in violation of the Appointments Clause or the Federal Vacancies Reform Act. In any event, it is unnecessary to discuss the merits of Mr. Cuccinelli's appointment, because the proposed rule only proposed changes to DHS regulations and requested comments. It did not effectuate any change that would be amount to a final action taken by Mr. Cuccinelli or any DHS official. In addition, neither the NPRM nor this final rule were signed by Mr. Cuccinelli. Thus, while DHS believes that Mr. Cuccinelli is lawfully performing the duties of the Director of USCIS and using the title Senior Official Performing the Duties of Director of USCIS, and the Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, whether that is true is immaterial.

The NPRM was signed by Kevin K. McAleenan and this final rule is signed by Chad F. Wolf, both as Acting Secretary of Homeland Security. Contrary to the comment, Secretary Wolf is validly acting as Secretary of Homeland Security. Under INA section 103(a)(1), 8 U.S.C. 1103(a)(1), the Secretary of Homeland Security is charged with the administration and enforcement of the INA and all other immigration laws (except for the powers, functions, and duties of the Secretary of State and Attorney General). The Secretary is also authorized to delegate his or her authority to any officer or employee of the agency and to designate other officers of the Department to serve as Acting Secretary. *See* 8 U.S.C. 103 and 6 U.S.C. 113(g)(2). The HSA further provides that every officer of the Department "shall perform the functions specified by law for the

official's office or prescribed by the Secretary." 6 U.S.C. 113(f).

On April 9, 2019, then-Secretary Nielsen, who was Senate confirmed, used the authority provided by 6 U.S.C. 113(g)(2) to establish the order of succession for the Secretary of Homeland Security. This change to the order of succession applied to any vacancy. Exercising the authority to establish an order of succession for the Department pursuant to 6 U.S.C. 113(g)(2), superseded the FVRA and the order of succession found in E.O. 13753.

As a result of this change and pursuant to 6 U.S.C. 113(g)(2), Mr. McAleenan, who was Senate confirmed as the Commissioner of CBP, was the next successor and served as Acting Secretary without time limitation. Acting Secretary McAleenan was the signing official of the proposed rule. Acting Secretary McAleenan subsequently amended the Secretary's order of succession pursuant to 6 U.S.C. 113(g)(2), placing the Under Secretary for Strategy, Policy, and Plans position third in the order of succession below the positions of the Deputy Secretary and Under Secretary for Management. Because these positions were vacant when Mr. McAleenan resigned, Mr. Wolf, as the Senate confirmed Under Secretary for Strategy, Policy, and Plans, was the next successor and began serving as the Acting Secretary. Therefore, both the NPRM and this final rule were lawfully signed by the Acting Secretary of Homeland Security.

*Comment:* A commenter opposed the proposal because it would result in family separation and would run counter to the family-based immigration system Congress intended to create through the INA. Another commenter wrote that the proposal conflicts with the principle of family unity because it interferes with the right to choose to live with family members and disrupts the INA's goal of family unity.

*Response:* In adjusting the USCIS fee schedule in this final rule, DHS complies with all relevant legal authorities. DHS does not intend to erect barriers to family unity or reunification. This final rule adjusts the USCIS fee schedule to recover the estimated full cost of providing immigration adjudication and naturalization services.

DHS declines to adjust this final rule in response to these comments.

*Comment:* A commenter wrote that the proposed transfer of $112.3 million in IEFA ICE fees violates the Appropriations Clause of the Constitution. The commenter wrote that the use of the IEFA to fund any activities of ICE circumvented the

Appropriations Clause and other laws that prohibit the transfer of funds without statutory authorization. Another commenter wrote that enactment of the FY 2020 appropriations package in December clarified USCIS' understanding of its Congressional mandate and spending authority, but that the agency had failed to acknowledge this package in its January 2020 notice regarding the fee proposal. The commenter wrote that funding provided by Congress in that bill should have resolved open questions about the fee schedule, and that USCIS' failure to propose a fee schedule based on "no transfer of funding" in its January 2020 notice precludes the public from providing fully informed feedback.

*Response:* DHS is not moving forward with the proposed transfer of IEFA funds to ICE in this final rule. Please see the ICE Transfer Section (Section III.L) of this final rule for more information.

*Comment:* Multiple commenters requested that DHS extend the public comment period to 60 days to allow more time to review the proposed rule and to develop responses. Commenters stated that the length of the NPRM was greater than that of earlier fee rules, but commenters had less time to respond to this rule. Multiple commenters suggested that the timing of the comment period over multiple holidays hindered the ability of the public to respond to the proposed rule.

*Response:* DHS understands that the general policy of the Executive Branch is that agencies should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days, for rules that are determined to be significant by OMB's Office of Information and Regulatory Affairs (OIRA). *See* E.O. 12866, Regulatory Planning and Review, 58 FR 51735 (Oct 4, 1993), Sec. 6(a)(1). (E.O. 12866). However, circumstances may warrant a shorter comment period and the minimum required by the APA is 30-days. 5 U.S.C. 553(d). On January 24, 2020, DHS reopened the comment period for an additional 15-days and accepted public comments through February 10, 2020. *See* 85 FR 4243. Thus, the public was provided a comment period of 61 days to review the NPRM, revised information collections, supporting documents, other comments, and the entire docket contents. In addition, comments received between December 30, 2019, and January 24, 2020, were also considered. As a result, although in three separate notices, the public was afforded more time to comment than

required by E.O. 12866, the APA, and the Paperwork Reduction Act (PRA).

*Comment:* One commenter wrote that USCIS promised to provide public review of its cost model software; however, it did not provide access when the commenter reached out to the provided contact. Later, that same commenter along with several other commenters submitted a comment that referenced a February 3, 2020, meeting during which USCIS hosted a demonstration of its ABC cost-modeling software, as promised in the original proposed rule. A commenter wrote that USCIS gave stakeholders just one week to write comments on the cost-assignment software before the end of the comment period. The commenter said USCIS should never force stakeholders to review and provide a formal response to a complex financial proposal within the space of just one week, and it should not impose such an impossible deadline upon analysis of a sophisticated tool that is the foundation of the rule. A commenter asked why the public's ability to provide informed comment on the software was unfairly limited to an in-person demonstration with no phone or online access, asserting that the process limited the ability of stakeholders to request and analyze relevant information. Another commenter also said USCIS' presentation did not allow meaningful public engagement. Another commenter wrote that none of the information received was made available to the rest of the public, which the commenter said would have generated additional important perspectives.

*Response:* DHS met all requirements under the APA in affording commenters who requested a meeting with DHS to review the ABC software the opportunity to provide public comments. The public was offered a chance to meet with USCIS experts and review the software and every party who requested an appointment to review the software was provided an appointment and a review. DHS did not provide additional time beyond the end of the public comment period for the meeting participants to provide feedback because doing so would have advantaged the feedback of those commenters relative to the rest of the public.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter said DHS has not complied with the Treasury General Appropriations Act by failing to assess whether the proposed rule strengthens or erodes the stability or safety of the family, increases or decreases disposable income or poverty of families

and children, and is warranted because the proposed benefits justify the financial impact on the family.

*Response:* As stated in the Family Assessment Section of this final rule (Section IV.H), DHS does not believe that this rulemaking will have a negative financial impact on families. DHS disagrees with commenter's assertions about the effects of the proposed fees and does not agree that the data provided by the commenter indicates that the fees established in this final rule will affect the financial stability and safety of immigrant families. As stated elsewhere in response to similar comments, based on the number of filings received after past fee increases, DHS does not anticipate that the fees would affect application levels or that it will create barriers to family reunification or stymie noncitizens seeking to adjust their status or naturalize. DHS must have sufficient revenue to operate USCIS or its service to all people who file immigration benefit requests could suffer, persons who are not eligible could improperly be approved for a status, or a person who wants to harm the United States and its residents may not be properly vetted. Thus, the benefits of the fees outweigh the costs they impose.

### E. Comments on Fee Waivers

*Comment:* Many commenters, without providing substantive rationale or supporting data, stated that they oppose the elimination of fee waivers in the rule. Some commenters stated that fee waivers are a matter of public policy and reflect American values. The commenters further stated that the rule would increase dependence on debt to finance applications, the fees are already difficult to pay, and this change will allow only affluent individuals and families to immigrate legally. Commenters indicated that the elimination of almost all fee waivers would cause a substantial burden and prevent large numbers of people from accessing immigration relief and submitting a timely application, and even force applicants to forgo the assistance of reputable and licensed counsel in order to save money to pay the fees.

Commenters also stated that fee waivers should continue to be available for low-income individuals and their elimination would result in financial hardship for immigrant and mixed-status families, resulting in immigrants delaying or losing immigration status due to financial considerations. Commenters also discussed the benefits of fee waivers to immigrants, including helping families to improve their

stability, to financially support themselves, and to fully integrate into their communities while allowing them to allocate funds for higher education. Commenters further stated that fee waivers help families be secure, stable, and financially stronger, and help them integrate into their communities. Commenters stated that the proposed fee increases and elimination of fee waivers would prevent many individuals and families from engaging with the legal immigration system, including putting benefits such as naturalization, lawful permanent residence, and employment authorization out of reach for people who face financial hardship and low-income individuals by serving as a "metaphorical border wall." Commentators indicated that fee waivers are commonly used by low-income and vulnerable immigrants, especially students and their families, and the rule would leave essential immigration benefits accessible primarily to the affluent.

A commenter disagreed with USCIS' statement in the NPRM that changes in fee waiver policy would not impact application volume because research suggests price increases for naturalization applications are a significant barrier for lower income noncitizens. Another commenter provided data from several sources and wrote that immigrants tend to have higher rates of poverty and that fee waivers are an important asset for immigrants looking to maintain legal status. Another commenter stated that fee waivers serve to permit those with an "inability to pay" the same opportunity as others and denying access to fee waivers divides the "opportunity pool." Another commenter wrote that applicants may, instead of going into debt, have to forego other expenses such as housing, childcare, transportation, and healthcare in order to apply. A commenter wrote that the elimination of fee waivers would force families to forego necessities such as food, shelter, transportation, education, and healthcare to pay for proof of lawful status that allows them to work. A commenter wrote that USCIS eliminating the fee waiver altogether for non-humanitarian applications directly contradicts USCIS' previous statements regarding the revision to Form I–912.

*Response:* To align fee waiver regulations more closely with the beneficiary-pays principle, DHS proposed to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver. *See* proposed 8 CFR 106.3.

DHS acknowledges that this is a change from its previous approach to fee setting and believes that these changes will make USCIS' fee schedule more equitable for all immigration benefit requests by requiring fees to be paid mostly by those who receive and benefit from the applicable service. Additionally, DHS believes that making these changes to the fee waiver policy would ensure that fee-paying applicants do not bear the costs of fee-waived immigration benefit requests. DHS does not agree that individuals will be prevented from filing applications or receiving immigrant benefits.

DHS provided notice in its FY 2016/2017 USCIS fee rule that in the future it may revisit the USCIS fee waiver guidance with respect to what constituted inability to pay under the previous regulation. 8 CFR 103.7(c). *See U.S. Citizenship and Immigration Services Fee Schedule,* Proposed Rule, 81 FR 26903–26940 26922 (May 4, 2016). INA section 286(m), 8 U.S.C. 1356(m) authorizes, but does not require, that DHS set fees to recover the full cost of administering USCIS adjudication and naturalization services. That statute also authorizes setting such fees at a level that will recover the costs of services provided without charge, but it does not require that DHS provide services without charge.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters stated that USCIS has neither explained its significant departure from its prior reasoning and practice nor satisfactorily justified limiting fee waivers for naturalization and several other application categories. A commenter stated that the proposed changes concerning fee waivers represents such a "massive and inadequately explained shift in policy" that it would create a crippling burden on low-income immigrants compounded with previous recent fee waiver changes.

*Response:* DHS understands that the NPRM and this final rule represent a change from previous guidance on fee waivers. Due to the cost of fee waivers and inconsistency of current regulations with the beneficiary-pays principle emphasized in the NPRM and this final rule, DHS is limiting fee waivers to immigration benefit requests for which USCIS is required by law to consider a request or where the USCIS Director exercises favorable discretion as provided in the regulation, as well as a few other instances. In addition, DHS is allowing fee waivers for certain associated humanitarian programs

including petitioners and recipients of SIJ classification and those classified as Special Immigrants based on an approved Form I–360 as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces. Although these changes do limit the number of people eligible for fee waivers, as previously discussed, the changes also limit increases to fees for forms that previously had high rates of fee waiver use.

*Comment:* Some commenters provided information specific to a geographic area or political subdivision. One commenter added that reductions in fee waivers would in turn cause sweeping consequences to applicants, safety net programs, and state and county economies. One commenter wrote that the proposal would significantly harm New York as a whole because fee waivers allow indigent and low-income immigrants to obtain lawful status, which puts them on the path to social and economic security. The commenter cited data showing that New York's immigrants account for $51.6 billion of the State's tax revenue and stated that New York would lose much needed support if fewer immigrants were unable to legally work and live in the United States. Another commenter cited data showing that immigrant-led households in Oregon paid $1.7 billion in federal taxes and over $736.6 million in State taxes and stated that the proposed change would prohibit many of these immigrant from fully participating in their local economies. Another commenter calculated the costs a family with an income of 150 percent of the FPG level would face living in Boston, writing that fee waivers are vital to such families maintaining their immigration status or naturalizing.

*Response:* DHS disagrees that the fee waiver regulations in this final rule would prohibit immigrants from participating in local and state economies or affect safety net programs. This final rule does not prevent any person from submitting a benefit request to USCIS or prohibit immigrants from obtaining services or benefits from state or local programs. DHS declines to make changes in this final rule in response to this comment.

*Comment:* Another commenter stated that limiting fee waivers would result in a greater number of applicants delaying submitting applications due to financial hardship. The commenter wrote that applicants would therefore live without authorization for which they are

lawfully eligible for a longer time period, resulting in negative impacts to their financial and emotional security.

*Response:* DHS acknowledges that the changes in the fee waiver provisions may impose a burden on applicants who may have previously been eligible for a fee waiver. However, DHS does not have data indicating that individuals will delay submitting applications and petitions in response to the fee waiver policy changes. USCIS accepts credit cards to pay for a USCIS request sent to one of the USCIS Lockboxes. While DHS acknowledges that the use of a credit card may add interest expenses to the fee payment, a person can generally use a debit or credit card to pay their benefit request fee and does not have to delay their filing until they have saved the entire fee. DHS declines to make changes in this final rule in response to this comment.

*Comment:* A few commenters said that eliminating fee waivers is a racist attempt to prevent immigration from poorer countries. Commenters indicated that eliminating fee waivers would be discriminatory against immigrants who have limited incomes, who are willing to work for everything they get, want a better life for their children, desire to improve their communities, and the rule would put immigration benefits out of reach for people who face financial hardship.

*Response:* DHS changes to fee waiver availability in this rule have no basis in race or discriminatory policies. DHS is not limiting fee waivers to discriminate against any group, nationality, race, or religion, to reduce the number of immigrants, or limit applications for naturalization. Rather, the change is to alleviate the increase of fees for other applicants and petitioners who must bear the cost of fee waivers as previously discussed. DHS does not anticipate a reduction in receipt volumes because of the fee waiver policy changes. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that the curtailment of fee waivers disregards a Senate Appropriations Committees' directive that USCIS was to "report on the policies and provide data on the use of fee waivers for four fiscal years in 90 days," which is not provided in the NPRM.

*Response:* DHS has previously provided the required reports to Congress. The Congressional reporting requirements do not include a limit on USCIS fees or limit the authority of DHS to provide discretionary fee waiver eligibility criteria or guidelines. They also do not require publication in the

NPRM or the **Federal Register** as the commenter implies. Therefore, DHS does not believe this final rule disregards the directive for reporting to Congress and declines to make changes in this final rule in response to these comments.

1. Limits on Eligible Immigration Categories and Forms

*Comment:* Many commenters stated that USCIS should maintain fee waivers for all current categories and that the proposed fee waiver changes would make essential benefits such as citizenship, green card renewal, and employment authorization inaccessible for low-income immigrants.

*Response:* DHS has always implemented USCIS fee waivers based on need and since 2007, has precluded fee waivers for individuals that have financial means as a requirement for the status or benefit sought. *See Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule;* Proposed Rule, 72 FR 4887–4915, 4912 (Feb 1, 2007). As discussed in the NPRM, under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. *See* 84 FR 62298. IEFA fee exemptions, fee waivers, and reduced fees for low income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee-exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay approximately twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request for which someone else did not pay.

In prior years, USCIS fees have given significant weight to the ability-to-pay principle by providing relatively liberal fee waivers and exemptions and placing the costs of those services on those who pay. In the FY 2016/2017 fee rule, DHS noted that the estimated annual dollar value of waived fees and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review. *See* 81 FR 26922 and 73307. DHS set the fees in the FY 2016/2017 fee rule based on these estimates of the level of fee waivers and exemptions by increasing other fees accordingly. To the extent that waivers and exemptions exceed the estimates used to calculate fees, USCIS forgoes the revenue. While DHS acknowledges that the fee adjustments established in this final

rule are not insubstantial to an applicant of limited means, DHS does not believe that they make immigration benefits inaccessible to low income applicants. Thus, DHS will not shift the costs from all low-income applicants to other fee-paying applicants and petitioners in this final rule.

DHS declines to make changes in this final rule in response to these comments.

a. Categories or Group of Aliens

*Comment:* A commenter stated that while USCIS may claim it is not required to waive any fees for vulnerable applicants such as the disabled and elderly, federal laws, such as the Americans with Disabilities Act (ADA) and Rehabilitation Act, do require that fees and benefits are kept within reach of protected and vulnerable populations.

*Response:* DHS disagrees with the commenter's assertion. Section 504 of the Rehabilitation Act, applicable to USCIS, provides that qualified individuals with a disability shall not be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity conducted by a federal executive agency. USCIS immigration benefit request fees are generally applicable and do not violate that provision. Congress did not specifically provide for an immigration benefit request fee exemption or waiver for individuals with disabilities. DHS generally does not assess fees to applicants for any accommodations requested by the applicants for physical access to USCIS facilities when required for interviews, biometrics submission, or other purposes. Therefore, the USCIS fee schedule established in this final rule does not violate the Rehabilitation Act. The ADA does not generally apply to USCIS programs, but to the extent that it provides guidance on the expectations for a Federal agency's accommodations for a qualified individual with a disability, the fees that DHS is establishing in this final rule also fully comply with the ADA.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Commenters stated that the proposed limits on fee waivers would threaten disabled immigrants and deny them access to citizenship. The commenter wrote that disabled lawful permanent residents rely on Supplemental Security Income (SSI), but that LPRs must naturalize within 7 years to sustain this benefit. The commenter stated that removing the naturalization fee waiver would drive

these disabled LPRs to homelessness and desperation, with negative societal consequences and no benefit. A commenter added that LPRs with disabilities lose SSI benefits 7 years after their entry, and, thus, that the proposed rule could deny members of this population access to basic necessities. A commenter wrote that citizens are eligible for SSI, but such benefits are only available to some non-citizens for up to seven years. The commenter wrote that the increase in naturalization fees would "create an insurmountable barrier" for disabled non-citizens to naturalize, and thus creates a "finite timeline" during which a non-citizen can receive important needed benefits like SSI.

*Response:* DHS disagrees that removing the application for naturalization fee waiver would drive disabled applicants into homelessness, despair, or deny them access to citizenship. Normally, if an applicant entered the United States on or after August 22, 1996, he or she is not eligible for SSI for the first 5 years as a lawfully admitted permanent resident, unless he or she is a qualified alien, as provided under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[28] Some categories of aliens who are eligible, including asylees and refugee, may be limited to a maximum of 7 years of SSI. Generally, an alien may apply for naturalization after 5 years as an LPR. This final rule does not prohibit eligible aliens from obtaining SSI benefits or naturalizing. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Commenters stated that fee waivers should be available for both affirmative and defensive asylum seekers. One commenter stated that DHS failed to justify its decision to forgo fee waivers for asylum applications, since the agency did not analyze data from other fee waiver processes to determine whether the fee waivers would offset the cost recovery of the asylum fee. Another commenter said that if fee waivers will offset the revenue from the asylum fee, then the entire fee should be abandoned.

One commenter said that the asylum fee should be established at $366 while allowing Form I–589 applications to be submitted with a fee waiver application, stating that many asylees are able to pay

the full fee. The fee waiver application process would better allow USCIS to detect fraud while serving as a sworn statement of financial status, circumventing the need for universal verification which consumes agency resources.

The fee waiver for asylum applications would, according to this commenter, enable indigent applicants to be granted asylum, upholding the U.S.'s non-refoulement obligations. The commenter also stated that defensive applications should be subject to the same fees as affirmative applications, so long as a fee waiver remains available.

One commenter wrote that the elimination of fee waivers would require immigrants with few economic resources to finance the cost of their own oppression referencing that applicants who have a legal basis for asylum claims will be forced to pay the fees associated with that claim with no discretion or real procedural mechanism for accessing a fee waiver. The commenter indicated that immigrants living in this country often arrived as economic refugees and do not have economic resources, especially given the difficulties in obtaining employment without status. The commenter stated that forcing some of the most marginalized communities to pay, for instance, a $1,170 filing fee (more than 3 weeks wages for a low-income earner) makes a mockery of the country's values.

*Response:* DHS acknowledges the commenters' concerns related to fees and fee waivers for asylum seekers and asylees. As stated in the NPRM and in this final rule, DHS is not providing fee waivers for the $50 asylum application fee. DHS's decision to establish a mandatory $50 fee is justified. The $50 fee would generate an estimated $8.15 million of annual revenue. If DHS permits fee waiver requests, it legitimately assumes that the cost of administering the fee waiver request review process may exceed the revenue, thereby negating any cost recovery achieved from establishment of the fee. *See* 84 FR 62319. Although the INA authorizes DHS to set fees "at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," INA section 286(m), 8 U.S.C. 1356(m), DHS establishes a $50 fee for Form I–589, which is well below the estimated full cost of adjudicating the application.

The statutory authorization for fees allows, but does not require, imposition of a fee equal to the full cost of the services provided. The INA provides

that DHS may impose fees for the consideration of asylum and employment authorization applications that are not to exceed the estimated costs of adjudicating the applications. *See* INA section 208(d)(3), 8 U.S.C. 1158(d)(3).[29] INA section 208(d)(3) also states, "[n]othing in this paragraph shall be construed to require [DHS] to charge fees for adjudication services provided to asylum applicants, or to limit the authority of [DHS] to set adjudication and naturalization fees in accordance with section 286(m)." Thus, DHS is permitted to charge asylum applicants the same fee for employment authorization that it charges all others for employment authorization. The fee for Form I–765 is calculated in accordance with INA section 286(m), 8 U.S.C. 1356(m). DHS considered the effect of a non-waivable fee for the Form I–589 on affirmative asylum seekers and believes that the fee does not create a barrier to asylum for indigent applicants. The imposition of any fees for defensive asylum applications filed with EOIR is a matter that falls within the jurisdiction of the Department of Justice, rather than DHS, subject to the laws and regulations governing fees charged in immigration court proceedings before EOIR. Under those regulations, EOIR charges the fee established by DHS for a DHS form and determines the availability of a fee waiver for a DHS form based on whether DHS allows such a waiver. *See* 8 CFR 1103.7(b)(4)(ii), (c).

Further, the fees align with U.S. international treaty obligations and domestic implementing law. As indicated in the NPRM, DHS believes that the asylum fee may arguably be constrained in amount, but is not prohibited, by the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention") and the 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol").[30] *See* 84 FR 62318–19; 1951 Refugee Convention, 19 U.S.T. 6259,

---

[28] See Title IV of Public Law 104–193, 110 Stat. 2105, 2260–77 (Aug 22, 1996). For information on who is a qualified alien see eligible for SSI, see Under What Circumstances May A Non-Citizen Be Eligible For SSI? available at *https://www.ssa.gov/ssi/spotlights/spot-non-citizens.htm* (last visited June 5, 2020).

[29] This section states, "The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). Such fees shall not exceed the Attorney General's costs in adjudicating the applications. The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments."

[30] 1951 Convention relating to the Status of Refugees, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137; 1967 Protocol relating to the Status of Refugees, *open for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267. Although the United States is not a signatory to the 1951 Refugee Convention, it adheres to Articles 2 through 34 by operation of the 1967 Refugee Protocol, to which the United States acceded on Nov. 1, 1968.

189 U.N.T.S. 137; 1967 Refugee Protocol, 19 U.S.T. 6223, 606 U.N.T.S. 267. The 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, address the imposition of fees on individuals seeking protection, and limit "fiscal charges" to not higher than those charged to their nationals in similar situations. *See* Article 29(1) of the 1951 Refugee Convention, and 1967 Refugee Protocol, as incorporated by reference. Domestic implementing law, which is consistent with international treaty obligations, authorizes the Attorney General to "impose fees for the consideration of an application for asylum, for employment authorization under this section [208], and for adjustment of status under section 209(b)." INA section 208(a)(3), 8 U.S.C. 1158(a)(3). Thus, as provided in the NPRM and in this final rule, no fee waivers are available to asylum seekers in connection with filing Form I–589 or for Form I–765 with USCIS. Notably, unaccompanied alien children in removal proceedings who file an application for asylum with USCIS are exempt from the Form I–589 fee. New 8 CFR 106.2(a)(20).

As proposed in the NPRM and stated in this final rule, DHS exempts applicants filing as refugees under INA section 209(a), 8 U.S.C. 1159(a), from the filing fee for adjustment of status applications (Form I–485). *See* 8 CFR 106.2(a)(17)(iii). Asylees are not exempt from the Form I–485 filing fee, and neither asylees nor refugees are exempt from naturalization fees (Form N–400). The fee waiver regulations are consistent with the INA and international treaty obligations, which allow for the imposition of fees, and do not require that DHS offer these applicants fee waivers. *See* INA section 208(a)(3), 8 U.S.C. 1158(a)(3).

DHS considered extending the fee waiver rules that apply to SIJ, SIVs, T, U and VAWA applicants to asylum seekers, asylees, and refugees. However, in reviewing the data on the number of applicants for various forms, DHS concluded that the populations of asylum applicants, refugees, and asylees are substantial enough that a fee waiver would have caused a greater increase to the I–765 and N–400 fees, for example, thereby increasing the burden upon other applicants. As explained in the NPRM, initial applicants with pending asylum applications, aliens who have not yet established eligibility for asylum, account for approximately 13 percent of the total Form I–765 workload volume forecast. *See* 84 FR 62320. Continuing to exempt this population of aliens which is only

eligible to obtain an EAD due to an asylum application pending for a certain amount of time from the Form I–765 fee or permitting fee waivers would have further increased the proposed fee, meaning that fee-paying EAD applicants would pay a higher amount to fund the cost of EADs for asylum applicants. Therefore, DHS limited fee waiver availability to only those categories of humanitarian programs that had limited populations to avoid increasing other fees. The limitation of fee waiver availability conforms with the beneficiary pays principle, and unlike the asylum seeker, asylee, and refugee population, such limited fee waiver availability does not pass on a significant burden to other applicants.

Notwithstanding these considerations and changes, DHS retains the authority in the final rule for the Director of USCIS to waive any fee if he or she determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. *See* 8 CFR 106.3(b). As provided in the NPFM, USCIS will continue to notify the general public of eligibility for fee waivers for specific forms under this provision through policy or website updates. *See* 84 FR 62300. Individuals who may qualify for such a fee waiver will still need to meet the requirements to request a fee waiver as provided in 8 CFR 106.3(b).

In this final rule, DHS consolidates the provisions regarding the USCIS Director's discretion to provide fee waivers in the proposed 8 CFR 106.3(b) and 8 CFR 106.3(c), as proposed 8 CFR 106.3(b) was redundant.

*Comment:* Multiple commenters wrote that the proposal eliminating the fee waivers would severely affect vulnerable immigrants and survivor-based immigration. Several commenters stated that the elimination of fee waivers will harm the most vulnerable populations, such as domestic violence or human trafficking survivors, and those in times of crisis. One commenter stated fee waivers should be available to individuals seeking humanitarian relief and lacking the ability to pay. Several commenters stated that the elimination of most fee waivers discriminates against immigrants who are low income, elderly, and have disabilities and undermines humanitarian protection for victims of gender-based violence and other crimes. Multiple commenters wrote that eliminating the availability of fee waivers would only create an insurmountable economic barrier to low-income, vulnerable immigrants and lawful permanent residents, such as survivors of domestic violence, sexual

assault, human trafficking, gender-based abuses, and other crimes, as well as their children. A few commenters wrote that access to fee waivers helps survivors and their children rebuild their lives; break free from the cycle of abuse; heal; and protect themselves, their children, and the community. Commenters stated that USCIS should instead focus on ensuring that low-income and other vulnerable immigrants have access to immigration relief for which they are eligible.

One commenter said that access to fee waivers is essential for survivors because it allows them to replace confiscated immigration documents such as permanent resident cards or employment authorization cards. The commenter stated that without fee waivers, survivors would be unable to pay these filing fees and would have to choose between going without these documents or putting their lives in danger to retrieve documents from potentially dangerous situations.

Multiple commenters wrote that while fee waivers for certain survivor-related applications will remain, the proposed rule ignores the fact that survivors may pursue other routes to secure immigration status other than those specifically designed for crime survivors. The commenters stated that, by removing waivers for these other routes, the proposed rule would harm survivors. One commenter indicated for a survivor of family violence, the ability to apply for a fee waiver was crucial to be able to obtain an EAD and gain some financial stability and independence from her abusive spouse. The commenter indicated that, as an example, a fee waiver allows a client to be able to maintain employment eligibility at her minimum wage job. Without the ability to apply for a fee waiver for all related applications the client would have faced additional barriers that would have prohibited her from obtaining financial independence from the abuser and lawful status. One commenter stated that the proposal ignores the fact that survivors of human trafficking may pursue other routes to secure immigration status and in these instances, survivors will no longer have access to fee waivers. Some commenters drew upon their experiences counseling those seeking immigration benefits to underscore their opposition to further restricting access to legal immigration via unaffordable filing fees or the elimination of fee waivers. A commenter said the elimination of fee waivers would place "the majority" of its clients in a precarious position because they do not have funds to pay fees out of pocket and will have to

**46810**    Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

choose between borrowing money and pursuing immigration benefits that would improve their lives. The commenter wrote that many of its clients were "cut off" from financial institutions and described the dangers of borrowing from "predatory lending mechanisms" or from family members who may use the debt owed as "currency for their abusive behavior" in some circumstances. The commenter also said the increased fees for work authorization would leave many immigrants vulnerable to victimization, citing a report from Public Radio International.

Many commenters also wrote that the proposed changes for necessary ancillary forms, including I–765, I–601, I–192, and I–929, would impose significant fee increases that survivors often cannot afford. Another commenter stated that the elimination of fee waivers, combined with the increased fees for N–400, would put those escaping violence in the position of having to choose between expending resources to become a U.S. citizen or covering basic necessities for their families.

A commenter said individuals with U nonimmigrant status or other humanitarian-based immigration benefits should not be "priced out" of remaining with their families. Another commenter said more than 94 percent of domestic violence survivors suffer financial abuse, and many receive some form of means-tested benefits that may preclude them from applying for fee waivers in the naturalization process. The commenter said fee waivers were critical for ensuring such vulnerable individuals have the opportunity to pursue citizenship.

*Response:* DHS is not intending to further harm survivors of domestic violence, human trafficking, or other crimes. In fact, DHS continues to exempt VAWA self-petitioners, individuals who are victims of a severe form of human trafficking and who assist law enforcement in the investigation or prosecution of those acts of trafficking or qualify for an exception (who may qualify for T nonimmigrant status), and individuals who are victims of certain crimes and have been, are being, or are likely to be helpful to the investigation or prosecution of those crimes (who may qualify for U nonimmigrant status) from paying a fee for the main benefit forms: Form I–360 for VAWA, and Forms I–914 and I–918 for T and U nonimmigrants including family members, respectively. *See* 8 CFR 106.2(a)(16)(ii), (a)(45) and (a)(46). DHS believes that maintaining access to fee waivers for these

vulnerable populations mitigates any concern that the increase in certain fees would limit access for protected categories of individuals. In addition, in response to commenters' concerns regarding the ability for the VAWA, T nonimmigrant, U nonimmigrant and Special Immigrant (Afghan and Iraqi translators) populations to pay for the cost of naturalization applications, DHS decided to expand the ability of these populations to apply for a fee waiver for Form N–400, Application for Naturalization, Form N–600, Application for Certificate of Citizenship, and Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. *See* 8 CFR 106.3(a)(3).

*Comment:* One commenter referred to a study from the National Resource Center on Domestic Violence that found means-tested benefits support financial security and independence and are "critically important" for survivors of domestic violence, sexual assault, and human trafficking. The commenter said recipients of means-tested benefits are, by definition, of limited financial means and need these benefits to meet their basic needs. The commenter said restricting the availability of fee waivers would harm survivors of domestic violence and other forms of gender-based violence, and cited research demonstrating the widespread incidence and devastating economic impacts of such violence.

*Response:* DHS does not intend to further harm domestic violence or human trafficking survivors. In fact, the rule continues to exempt those applying for VAWA, T, and U benefits from certain fees and allows them to request fee waivers for other forms as provided by statute. DHS believes that maintaining access to fee waivers for these populations mitigates any concern that the increase in certain fees would limit access for protected categories of individuals. *See* 8 CFR 106.3(a).

*Comment:* A commenter stated that Congress mandated that DHS permit applicants to apply for a waiver of any fees associated with VAWA benefits, T nonimmigrant filings, U nonimmigrant filings, or an application for VAWA cancellation of removal or suspension of deportation. In doing so, Congress recognized that ensuring equal access to immigration protections was crucial for crime survivors to achieve safety and security. Many commenters also wrote that the proposed rule undermines Congressional intent to make humanitarian relief accessible to victims. Another commenter stated that the proposed rule clearly violates

Congressional intent, as reiterated in a December 2019 House Appropriations Committee report, by imposing fees on individuals who have received humanitarian protection and subsequently seek adjustment of status and other immigration benefits which they cannot afford. The commenters said low-income survivors will not apply for benefits due to the barriers they will encounter in demonstrating their eligibility for fee waivers and that the proposed rule "undermines" bi-partisan Congressional intent with respect to VAWA-based relief. Commenters stated that the language runs counter to existing law as Congress did not place any conditions on the availability of fee waivers for survivors when it codified the use of fee waivers for filing a VAWA self-petition, a T nonimmigrant status application or U nonimmigrant status petition, or an application for VAWA cancellation or suspension of deportation. Other commenters wrote that USCIS should automatically waive fees for all forms associated with applications for T nonimmigrant status, U nonimmigrant status, and VAWA self-petitioners to make humanitarian immigration relief accessible to victims.

*Response:* DHS exempts VAWA self-petitioners, applicants for T nonimmigrant status, and petitioners for U nonimmigrant status from paying a fee for the main benefit forms: Form I–360 for VAWA, and Forms I–914 and I–918 for T and U nonimmigrants including family members, respectively. Thus, DHS is making relief accessible to the populations noted by the commenters.

Further, this final rule complies with the law's requirements [31] to permit these applicants to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status. *See* new 8 CFR 106.3(a)(1). DHS agrees that Congress did not place any conditions on the availability of fee waivers for a VAWA self-petition, a T nonimmigrant status application, or U nonimmigrant status petition, or an application for VAWA cancellation or suspension of deportation, but DHS disagrees that any legislation requires or implies or that Congress intended that USCIS provide free adjudications for all of their associated benefit requests. Congress has codified several fee exemptions or fee limits. *See, e.g.,* INA section 328(b)(4), 8 U.S.C. 1439(b)(4) (fee exemption for Military Naturalization Based on Peacetime Service); INA section 244(c)(1)(B), 8

---

[31] *See* INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

U.S.C. 1254a(c)(1)(B) (the registration fee for TPS is limited to $50, although additional fees may be collected for biometrics and associated services, *See* 8 U.S.C. 1254b. Congress has also appropriated funds for adjudication and certain naturalization services. *See, e.g.,* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2020). Congress has not provided for a fee exemption, fee cap, or appropriated funds for VAWA self-petitioners, T nonimmigrant status applicants, and U nonimmigrant status petitioners. To the contrary, the statute directs DHS to allow applications for fee waivers, rather than to waive all such fees, evidencing Congress's intent for DHS to evaluate the individual merits of such requests. DHS appreciates the concerns about affordability, but, while many victim requesters are in poor financial condition, being a victim does not equate to being poor, and DHS may require that the victim requester document eligibility for a fee waiver. Therefore, DHS makes no changes in the final rule as a result of these comments.

*Comment:* Commenters stated that while applications and petitions for survivor-based relief do not have fees, applicants must frequently file ancillary forms whose fees are increasing under the proposed rule or may seek status through other immigration categories. The commenter stated that by eradicating fee waivers for other types of applications and petitions, the proposed rule ignores the facts that survivors of domestic violence, sexual assault, human trafficking, and other gender-based abuses may pursue other routes to secure immigration status which lack such explicit protections. They also noted that fee waivers will no longer be available for any naturalization applications and many other forms in non-survivor based cases, like legal permanent residence applications; work permit applications; and Form I–751, Petition to Remove Conditions on Residence; among others. Another commenter said the final rule would need to more explicitly address the

protections and exemptions for humanitarian visa categories because the proposed rule contained contradictory and confusing language and many potential applicants would not necessarily be aware of special protections to which they are entitled.

Other commenters requested that USCIS withdraw the proposed rule, because it would create barriers to accessing immigration benefits for victims, and immigration benefits are essential for survivors to escape abuse and become self-sufficient after they have been victimized. Commenters stated that the rule ignores survivors of domestic violence, who have a spotty employment history or lack of savings, or both, and survivors of human trafficking, who may spend many months waiting for compensation from litigation or before they are able to recuperate their lost wages.

Other commenters detailed how economic abuse affects survivors' finances, including precluding victims from working, destroying their work uniforms and equipment, preventing them from getting to work or an interview, and other tactics that impact a victim's financial independence and impede their ability to pay filing fees. One commenter specifically noted that VAWA self-petitioners often have limited financial means, are often homeless after escaping their abusers, and suffer from physical and mental health issues. The commenter stated that the little money they do have is needed to help them maintain independence from their abusers and provide for their families. One commenter wrote that USCIS should focus on ensuring vulnerable immigrants have access to immigration relief for which they are eligible. The commenters stated that fee waivers for survivor-based immigration protections have helped survivors improve their lives by allowing them to obtain employment authorization and legal status without having to request funds from their abusers or forgo food or housing in order to pay fees. In the context of VAWA, T, and U applicants, another commenter stated that the fee increases did not take into account areas

of the country, such as the San Francisco Bay Area, where living expenses and housing costs are high. They said such a fee increase also does not consider the mandatory expense of the obligatory medical exam (Form I–693, Report of Medical Examination and Vaccination Record) that in their experience ranges anywhere from $300 to $700 and for which there is no fee waiver.

*Response:* DHS acknowledges the concerns commenters have raised and does not intend to unduly burden any alien, particularly those who have been victimized. To avoid confusion and clarify the applicability of the rule, DHS reiterates that the rule continues to exempt the VAWA, T, and U populations from fees for the main benefit forms and allows them to submit fee waiver requests for any associated forms up to and including the application for adjustment of status, as provided by statute. For example, there are no fees for the following forms: VAWA-based Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Form I–914, Application for T Nonimmigrant Status; and Form I–918, Petition for U Nonimmigrant Status. In addition, VAWA, T, and U filers may submit a request for a fee waiver for associated forms, including Forms I–765, I–131, I–212, and I–601, among other forms.

Additionally, in response to commenters' concerns regarding the ability for the victim population to pay for the cost of naturalization applications, DHS will permit this population to request a fee waiver for Form N–400, Application for Naturalization; Form N–600, Application for Certificate of Citizenship; and Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. The table below provides the full list of forms these applicants and petitioners may apply for that are either exempt from fees or eligible for fee waivers. DHS repeats these applicants, generally, do not have to pay the fees for the initial main benefit forms that provide the immigration status or benefit.

**46812**    Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

TABLE 3—CATEGORIES AND FORMS WITHOUT FEES OR ELIGIBLE FOR FEE WAIVERS

| Category | Main immigration benefit requests [32] | Associated forms |
|---|---|---|
| Violence Against Women Act (VAWA) self-petitioners and derivatives as defined in INA section 101(a)(51) or individuals otherwise self-petitioning for immigrant classification or seeking adjustment of status due to abuse by a qualifying relative [33]. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee for VAWA-based filings). Form I–485, Application to Register Permanent Residence or Adjust Status. Form I–751, Petition to Remove Conditions on Residence. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)). | Form I–131, Application for Travel Document. [34] Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–290B, Notice of Appeal or Motion. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization (no initial fee for principals). [35] Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Victims of Severe Form of Trafficking (T nonimmigrant) [36]. | Form I–914, Application for T Nonimmigrant Status (no fee). Form I–914 Supplement A, Application for Family Member of T–1, Recipient (no fee). Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document. Form I–192, Application for Advance Permission to Enter as a Nonimmigrant. Form I–193, Application for Waiver of Passport and/or Visa. Form I–290B, Notice of Appeal or Motion. Form I–539, Application to Extend/Change Nonimmigrant Status. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization (no initial fee for principals). Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Victims of Criminal Activity (U nonimmigrant) [37]. | Form I–918, Petition for U Nonimmigrant Status (no fee). Form I–918, Supplement A, Petition for Qualifying Family Member of U–1 Recipient (no fee). Form I–918 Supplement B, U Nonimmigrant Status Certification (no fee). Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant. Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document. Form I–192, Application for Advance Permission to Enter as a Nonimmigrant. Form I–193, Application for Waiver of Passport and/or Visa. Form I–290B, Notice of Appeal or Motion. Form I–539, Application to Extend/Change Nonimmigrant Status. Form I–765, Application for Employment Authorization (no initial fee for principals). Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Employment authorization for battered spouses of A, G, E–3, or H nonimmigrants [38]. | Form I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse (no initial fee). | None. |
| Battered spouses or children of a lawful permanent resident or U.S. citizen and derivatives under INA section 240A(b)(2) [39]. | None with USCIS ........................................... | Form I–601, Waiver of Grounds of Inadmissibility. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |
| Temporary Protected Status [40] ... | Form I–821, Application for Temporary Protected Status. Biometric Services Fee. | Form I–131, Application for Travel Document. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization. |
| Special Immigrant Juveniles (SIJ) who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency at the time of filing. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status. | Form I–131, Application for Travel Document. [41] Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–290B, Notice of Appeal or Motion. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form I–765, Application for Employment Authorization. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |

TABLE 3—CATEGORIES AND FORMS WITHOUT FEES OR ELIGIBLE FOR FEE WAIVERS—Continued

| Category | Main immigration benefit requests [32] | Associated forms |
|---|---|---|
| Special Immigrant as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces. | Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant (no fee). Form I–485, Application to Register Permanent Residence or Adjust Status (no fee). | Form I–131, Application for Travel Document (no fee). Form I–290B, Notice of Appeal or Motion (no fee). Form I–765, Application for Employment Authorization (no fee). Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal. Form I–601, Application for Waiver of Grounds of Inadmissibility. Form N–400, Application for Naturalization. Form N–600, Application for Certificate of Citizenship. Form N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. |

Although DHS is increasing fees for various forms to account for the cost of adjudication, the victim populations identified here will be eligible to apply for a fee waiver for most forms if their income is at or below 125 percent of the FPG. As stated previously, the law does not require, and DHS declines to adopt,

[32] Some immigration benefit requests may not have a fee for the specific category.

[33] See INA sections 101(a)(51) and 204(a), 8 U.S.C. 1101(a)(51) and 1154(a); INA section 245(l)(7), 8 U.S.C. 1255(l)(7); Public Law 110–457, 122 Stat. 5044 (Dec. 23, 2008); 22 U.S.C. 7101 *et seq.* This category includes applicants for waivers of the joint filing requirement for Form I–751 based on battery and extreme cruelty; victims of battery or extreme cruelty as a spouse or child under the Cuban Adjustment Act Public Law 99–603, 100 Stat. 3359 (November 6, 1986) (as amended), 8 U.S.C. 1255a; applicants adjusting based on dependent status under the Haitian Refugee Immigrant Fairness Act, Public Law 105–277, 112 Stat. 2681 (October 21, 1998), 8 U.S.C. 1255, for battered spouses and children; and applicants for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881) under the Nicaraguan Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2163 (Nov. 19, 1997), for battered spouses and children.

[34] Currently, fees for Form I–131 are exempt if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007. *See* 8 CFR 103.7(b)(1)(i)(M)(4). However, DHS implements changes to this policy in this final rule as explained in this preamble. New 8 CFR 106.2(a)(7)(iv).

[35] Form I–360 allows a principal self-petitioner to request an EAD incident to case approval without submitting a separate Form I–765. Form I–765 is required for employment authorization requests by derivative beneficiaries.

[36] See INA section 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[37] See INA section 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of certain criminal activity).

[38] See INA section 106, 8 U.S.C. 1105a.

[39] See INA section 240A(b)(2), 8 U.S.C. 1229b(b)(2), and INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

[40] See INA section 244, 8 U.S.C. 1254a.

[41] Currently, fees for Form I–131 are exempt if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007. *See* 8 CFR 103.7(b)(1)(i)(M)(4). However, DHS proposes changes to the policy in this final rule as explained later in this preamble. New 8 CFR 106.2(a)(7)(iv).

the recommendation to automatically waive fees for all forms associated with VAWA, T, and U filings or to withdraw the rule in its entirety. USCIS is funded through fees, and taxpayer dollars are not used to fund USCIS adjudication and naturalization services. The cost associated with app ications and petitions that have been fee waived is paid from fees collected from other benefit requests. DHS believes that maintaining access to fee waivers for these vulnerable populations mitigates any concerns that the increase in the fees will limit access for protected categories of individuals.

As the commenters point out, the law provides specific immigration benefits for those who have been victimized and provides protections and flexibilities for these populations to address their particular concerns. This final rule complies with those provisions.

*Comment:* Another commenter provided statistics describing the economic condition of the population served by non-profit legal service providers in its State and wrote that the proposal would increase the strain on these important organizations. The commenter noted that nearly 90 percent of the 25 legal service providers surveyed in its state-represented applicants for humanitarian immigration benefits, such as VAWA petitions, trafficking victims on T nonimmigrant applications, or asylum applicants. The commenter stated the proposal would create a chilling effect on all clients served by these organizations, regardless of the benefits for which they qualify, and could ultimately jeopardize these organizations' budgets due to a reduction in the number of cases served.

*Response:* As stated previously, DHS appreciates the services that charitable, community based, non-governmental, and non-profit organizations provide to the immigrant community. DHS declines, however, to exempt from fees all forms associated with VAWA, T, and

U filings. Organizations providing services to the VAWA, T, and U population will continue to be able to request fee waivers for forms associated with these filings in addition to a fee exemption for the main benefit request (*i.e.,* Form I–360, Form I–914, and Form I–918 have no fee for these populations).

*Comment:* One commenter stated that the proposed Form I–912 instructions "create additional burdens that are ultra vires to the statute permitting fee waivers for survivor-based cases, notably with the phrase 'due to your victimization.'" The commenter stated that survivors should not have to demonstrate a nexus between their victimization and their lack of income or proof of income. The commenter also stated that this non-statutory requirement is burdensome on survivors, as they may face obstacles obtaining or providing proof of income for reasons that may or may not be related to their victimization and will prevent many survivors from accessing critical benefits. Several commenters said low-income survivors will not apply for benefits due to the barriers they will encounter in demonstrating their eligibility for fee waivers and that the proposed rule undermines bipartisan Congressional intent with respect to VAWA-based relief. Many commenters stated that the additional limits on fee waiver eligibility criteria combined with the stringent documentation requirements for fee waivers (*e.g.,* Form I–912 instructions that survivors need to "demonstrate a nexus between their victimization and lack of income or proof of income) will prevent many survivors from qualifying or applying for fee waivers. A commenter stated that, whether intentional or not, the proposed rule will act as a barrier to status for the crime survivors we serve and, coupled with the stringent documentation requirements for fee waivers, will prevent many survivors from qualifying

for fee waivers." A commenter said the proposed Form I–912 instructions create additional burdens for crime survivors from qualifying for fee waivers, and USCIS should continue to accept applicant-generated fee waiver requests. One commenter said USCIS had received many comments on a previous attempt to modify the fee waiver form from stakeholders concerned about the negative impact those changes would have on immigrant survivors of violence and wrote that the current proposal would make these problems worse. The commenter said survivors of violence would be adversely impacted by the heightened documentation requirements, specifically the provision that survivors would have to demonstrate that their inability to comply with documentation requirements was due to their victimization. The commenter said the proposal failed to reference any exceptions to the vague "victimization" standard despite USCIS' prior recognition that the requirement to provide documentation from the Internal Revenue Service (IRS) would disadvantage immigrant survivors.

*Response:* To obtain a fee waiver, an applicant must demonstrate that he or she is at or below 125 percent of the FPG, meet the other criteria as provided in the rule, and provide the information and evidence available in order to establish eligibility. The applicant need only provide sufficient information to establish why the documentation is not available and not that it is unavailable directly or indirectly as a result of the victimization. The form provides space for explanations and attachments are accepted, but a separate declaration is unnecessary. Although not required by statute, USCIS has provided flexibilities in the instructions for the VAWA, T, and U populations permitting them to submit information regarding their inability to obtain documentation on their income with their fee waiver request. DHS will presume that the inability of this group of applicants to submit certain evidence is the result of the victimization and abuse and not require proof of a nexus between victimization and the inability to pay, but the request must demonstrate inability to pay to the extent necessary for USCIS to grant a discretionary fee waiver. All applicants for a fee waiver are subject to the evidence requirements as provided in the revised form instructions, which include more flexible rules with respect to the groups these comments mention. If individuals are unable to obtain documents without contacting the abuser, they can explain

why they are unable to obtain such documentation and submit other evidence to demonstrate their eligibility. Obtaining information from the IRS in transcripts, a W–2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or lack of income.

*Comment:* A few commenters discussed the processing times for survivor-based forms of immigration protections, citing increased adjudication time for filings such as petitions for U nonimmigrant status and Violence Against Women Act (VAWA) self-petitions. Commenters said slow processing times can lead to increased homelessness, violence, or a return to abusive relationships for victims and that USCIS has failed to address how these fees will improve processing times. One commenter cited several sources and wrote that new fees would not result in improved processing but instead would contribute to, and escalate, violence.

*Response:* DHS understands the commenter's concerns regarding processing times. Processing times are impacted by several factors, and any changes based on the rule would limitedly impact these populations. The rule continues to exempt the VAWA, T, and U populations from certain fees and allows them to submit fee waiver requests for any forms up to adjustment of status. *See* new 8 CFR 106.2(a)(16), (a)(32)(ii), (a)(45) and (a)(46); 8 CFR 106.3(a)(3). In the final rule DHS is permitting a request for a fee waiver on the application for naturalization or certificate of citizenship for these categories. *See* new 8 CFR 106.3(a)(3). DHS disagrees that this final rule would result in increased processing times or contribute to escalating violence on these populations, particularly as the additional resources made available from increased fees may enable USCIS to limit growth in pending caseloads. As DHS states elsewhere in this rule, DHS is adjusting fees in this final rule because they are insufficient to generate the revenue necessary to fund USCIS at levels adequate to meet its processing time goals. The new fees will allow USCIS to hire more people to adjudicate cases and possibly prevent the growth of backlogs.

*Comment:* A commenter stated that the proposed rule is not detailed enough about whether refugees are exempt from fees including the Form I–765 fees and whether asylees and SIJ petitioners and recipients will be eligible for fee waivers. The commenter also stated that DHS fails to understand that individuals are forced to file fee waivers when DHS places fees for benefits out of the reach

of most low to moderate income applicants and that the inability to access identity documents exacerbates homelessness and unemployment, concluding that elimination of fee waivers is arbitrary and capricious.

*Response:* DHS acknowledges the concerns of the commenter related to the availability of fee waivers for refugees and asylees, and other vulnerable applicants and petitioners. DHS will continue to provide a fee exemption for the initial Form I–765 for individuals who were granted asylum (asylees) or who were admitted as refugees. *See* 84 FR 62301. DHS is also continuing to provide a fee exemption to refugees for Form I–485. *See* 84 FR 62360; new 8 CFR 106.2(a)(17)(iii). In addition, the fee that DHS charges for refugee travel documents will continue as a lesser fee, linked to the fee for a U.S. passport book, rather than the estimated full cost of adjudication. *See* 84 FR 62306.

At the USCIS Director's discretion, USCIS may waive or exempt the fee for any form, including those filed by asylees and refugees. *See* 8 CFR 106.3(b), (e). That provision is similar to, but somewhat more limited than, the authority that was in 8 CFR 103.7(d) for the Director of USCIS to provide for the waiver or exemption of any fee if doing so was in the public interest. The new provision provides that the Director determines that such action is an emergent circumstance or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. *See* 8 CFR 106.3(b), (e). As was stated in the NPRM, USCIS will notify the public of the availability of fee waivers for specific forms under this provision through external policy guidance, website updates, and communication materials. *See* 84 FR 62300. Individuals who qualify for such a fee waiver would still need to meet the requirements to request a fee waiver as provided in the new 8 CFR 106.3(b) and (d). In this final rule, DHS consolidated the provisions regarding the USCIS Director's discretion in 8 CFR 106.3(b) and 8 CFR 106.3(c), as the proposed provision in the NPRM, 8 CFR 106.3(b), was redundant.

In response to commenters' concerns, DHS will also allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to submit requests for fee waivers for Form I–485 and associated forms, as well as Forms N–400, N–600, and N–600K. *See* 8 CFR 106.3(a)(2)(i). DHS does not believe that the final rule eliminates fee waivers for

these applicants or blocks access to identity documents.

*Comment:* Several commenters stated that the elimination of fee waivers will harm the most vulnerable populations, such as domestic violence or human trafficking survivors, and those in times of crisis. One commenter stated fee waivers should be available to individuals seeking humanitarian relief and lacking the ability to pay. One commenter suggested that it would make better fiscal sense and would result in better outcomes for USCIS if the agency automatically waives fees for all forms associated with applicants for T nonimmigrant status, petitioners for U nonimmigrant status, and VAWA self-petitioners because fee waivers would facilitate non-profits' efforts to help these applicants file these forms quickly. A commenter wrote that delays in application submission due to limitations on fee waivers would result in delayed justice for individuals because immigration practitioners will be forced to spend more time on each case.

*Response:* DHS acknowledges the commenters' concerns and clarifies that this final rule continues to exempt the VAWA, T and U populations from certain fees and allows them to request fee waivers on other forms as previously discussed. *See* 8 CFR 106.2(a)(16)(ii), (a)(45) and (a)(46), 8 CFR 106.3. Furthermore, in response to concerns expressed by the public, DHS provides in this final rule that those populations may also request a fee waiver for Forms N–400, N–600, and N–600K. *See* 8 CFR 106.3(a)(3). DHS believes that by continuing to provide the opportunity to request fee waivers, the final rule will not unduly burden these populations or delay the submission of their applications and petitions.

*Comment:* A commenter opposed the new form's request for applicants to self-identify as survivors. The commenter stated that most types of humanitarian relief covered by Form I–912 "are subject to certain protections and sanctions" relating to privacy and confidentiality and requested that USCIS clarify that the disclosure of personal information in these sections complies with protections codified at 8 U.S.C. 1367.

*Response:* DHS takes seriously its responsibility to properly protect sensitive information in its possession.[42] DHS follows the Privacy

Act requirements, which apply to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifier particular assigned to the individual. Information from forms is collected and maintained consistent with the Privacy Act of 1974[43] (Privacy Act) and the System of Records Notice (SORN), which identifies the purpose for which Personally Identifiable Information (PII) is collected, from whom and what type of PII is collected, how the PII is shared externally (routine uses), and how to access and correct any PII maintained by DHS.[44] With regard to 8 U.S.C. 1367 protections, DHS remains committed to our obligations under the statute and applies the required protections to all information pertaining to individuals with a pending or approved VAWA, T, or U petition or application, which includes information provided on Form I–912.

*Comment:* Several commenters stated that SIJ petitioners and recipients, a vulnerable group, are missing from USCIS' list of groups retaining access to fee waivers. A commenter stated that this proposal will hinder the ability of juveniles who receive SIJ classification to fully integrate into the United States, due to excessive costs, and that it will result in other unintended consequences, particularly for unaccompanied minors. Such consequences include difficulty finding sponsors and a lower level of legal representation. Commenters further noted that the proposed fee increases would burden SIJ petitioners and recipients who have no means to pay for the fees when applying for adjustment of status. The commenter stated that SIJ petitioners and recipients are children who have suffered abuse, neglect, or abandonment by at least one of their parents. The commenter stated that SIJs benefit immensely from obtaining work authorization, as working lets the SIJs take control over their lives, provide for themselves, and begin to build a brighter future. The commenter stated that adjustment offers them the chance to permanently put down roots in the United States, putting the trauma in their pasts behind them. One

commenter stated that in passing the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA),[45] Congress made amendments to the SIJ statute to provide "permanent protection for certain at-risk children." The commenter further stated that not providing fee waivers to SIJs would preclude at-risk children from accessing fee waivers and thus clearly violate Congressional intent to permanently protect these at-risk children. Another commenter said that the hardship would be particularly acute for those SIJ petitioners in foster care, who have limited or no access to the funds necessary to seek adjustment of status with USCIS.

*Response:* The TVPRA[46] requires DHS to permit certain applicants to apply for fee waivers for "any fees associated with filing an application for relief through final adjudication of the adjustment of status." INA section 245(l)(7), 8 U.S.C. 1255(l)(7), provides that "The Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of this title (as in effect on March 31, 1997)." These provisions do not include SIJ petitioners or recipients. Therefore, DHS is not mandated to allow SIJs to apply for fee waivers. Nevertheless, after considering the commenters' concerns, DHS agrees that SIJ petitioners who are wards of the state are particularly vulnerable. Therefore, DHS will allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to request that the fees for Form I–485 and associated forms be waived. *See* 8 CFR 106.3(a)(2)(i).

In addition, DHS is including Forms N–400, N–600, and N–600K as forms eligible for a fee waiver for multiple categories of applicants. *See* 8 CFR 106.3(a)(3). Table 3 above provides a list of forms eligible for fee waivers based on SIJ classification.

*Comment:* A commenter stated that limits on categories eligible for fee waivers and elimination of a need-based benefit as a way to qualify for a fee

---

[42] *See* generally Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed

strict controls to minimize the risk of compromising the information that is being stored.").

[43] *See* 5 U.S.C. 552.

[44] *See* generally Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[45] *See* The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Public Law 110–457, 112 Stat. 5044 (Dec. 23, 2008).

[46] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA section 245(l)(7), 8 U.S.C. 1255(l)(7).

waiver will have an especially heavy impact on the homeless, who often have difficulty providing required documents and must file applications for replacement of lost or stolen immigration documents.

*Response:* This final rule does not prohibit aliens who are homeless from applying for or receiving a fee waiver if he or she is a member of one of the designated categories.

*Comment:* Multiple commenters opposed lowering the income limit for fee waivers to 125 percent of the FPG as it would disqualify many immigrants, including survivors of crime who are statutorily protected, from receiving fee waivers for immigration benefits. Many commenters stated that the proposed rule fails to acknowledge that immigrants, especially survivors of crimes, often do not have access to financial documents or proof of their income for various reasons, including informal jobs (*e.g.,* babysitting or yard work) that pay cash; the fact that limited earnings do not require taxes to be filed; and that abusers often have control of all financial documents, destroy records, or prevent victims from attaining financial independence. One commenter wrote that since many individuals would not fall within the proposed, narrower financial eligibility criteria, victims of labor trafficking may turn to jobs with exploitative employers or back to traffickers in order to pay the fees for adjustment of status or other ancillary forms.

*Response:* DHS acknowledges that some applicants may no longer qualify for fee waivers if their income was higher than 125 percent of the FPG but lower than 150 percent of the FPG. However, many applicants may otherwise have income below 125 percent and, therefore, still qualify. Consistent with the statute, this final rule specifically permits aliens described in the TVPRA, including those seeking benefits under VAWA, as well as T and U nonimmigrants,[47] to request fee waivers for "any fees associated with filing an application for relief through final adjudication of the adjustment of status." [48] The TVPRA provision requires DHS to allow these applicants to request fee waivers; however, the TVPRA does not require fee exemptions or set the FPG level for waivers. DHS declines to make changes in this final rule in response to this comment.

[47] *See* title II, subtitle A, sec. 201(d)(3), Public Law 110–457, 122 Stat. 5044 (2008); INA section 245(l)(7), 8 U.S.C. 1255(l)(7).
[48] *See id.*

b. Fee Waivers for Specific Forms

*Comment:* Commenters opposed eliminating the fee waiver for naturalization, as well as lawful permanent residence, employment authorization, and other applications. Numerous commenters opposed the proposed elimination of fee waivers for Form I–90, Form I–765, Form I–485, forms for applicants exempt from the public charge inadmissibility ground, Form I–751, and naturalization and citizenship-related forms.

*Response:* DHS is not eliminating all fee waivers for Forms I–485 and I–765 and is allowing fee waiver requests for certain humanitarian programs for naturalization and citizenship related forms as applicable. *See* 8 CFR 106.3(a). *See* Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers. DHS will continue to accept fee waiver requests from applicants who meet the requirements of INA section 245(l)(7), 8 U.S.C. 1255(l)(7). *Id.* As explained in the NPRM, the INA requires DHS to permit fee waiver requests from certain immigrant categories and for certain forms; limiting fee waiver requests reduces the fee increases for all immigration benefits and places the fee costs on the benefit recipient instead of an unrelated party.

DHS notes, however, that the law requires DHS to "permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 101(a)(15)(T), 101(a)(15)(U), 106, 240A(b)(2), and 244(a)(3) (as in effect on March 31, 1997)." DHS appreciates that aliens will often file multiple requests simultaneously or shortly after each other, including requests for asylum, SIJ classification, T nonimmigrant status, U nonimmigrant status, humanitarian parole, or deferred action. However, that a request may be filed simultaneously with a status included in section 245(l)(7), 1255(l)(7), or while it is pending, does not make such a request an "application for relief" "associated with filing" for the purposes of fee waiver eligibility under that provision of law. USCIS will generally reject a fee waiver request and the associated benefit request that asserts that it is "associated" and eligible for a fee waiver simply because it is simultaneous or filed while another benefit request is pending.

DHS will not make changes to its fee waiver regulations in this final rule in response to these comments.

*Comment:* A few commenters said the Form I–90 should remain fee waivable,

as the form is necessary to renew permanent resident cards. The commenters stated that without the fee waiver, applicants would be unable to renew their status and escape poverty. A commenter wrote that eliminating a fee waiver option for an I–90 would be "egregious." The commenter stated that immigrants with expired legal status or employment authorization often get caught in a vicious cycle of being unable to prove they have permission to work, preventing them from earning funds to cover filing fees and thus perpetuating their inability to procure work authorization.

Several commenters stated that removing fee waivers for forms such as the I–90 and the N–565 would prevent or significantly delay applicants from being able to apply for and maintain employment. The commenters stated that the change could likewise prevent applicants from having proof of their eligibility for certain public benefits, as many applicants, especially survivors of crime and homeless immigrants, have primary documents that have been stolen, lost, or destroyed, often by abusers.

*Response:* DHS disagrees that eliminating the fee waivers for the I–90 would be "egregious," or that it will prevent or significantly delay applicants from being able to apply for and maintain employment. Applicants would still be eligible to obtain proof of status, and public benefit granting agencies have access to the Systematic Alien Verification for Entitlements (SAVE) program which validates an alien's immigration status. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that children should not be subject to fees for Form I–485 or for EAD applications while their asylum or adjustment of status application is pending because doing so would impose multiple hardships. The commenter stated that EADs serve as a de facto identification document and are frequently a precursor to obtaining access to state and federal services, as well as access to a social security number, which is a common prerequisite for enrolling in school, obtaining health insurance, or receiving preventative care.

A commenter wrote that senior citizens have extremely limited financial situations but are often able to renew their Permanent Resident cards or apply for citizenship with a fee waiver. The commenter stated that eliminating this fee waiver, while also raising the form fees, would put these applications out of reach.

*Response:* DHS disagrees that this final rule prevents asylees, children, or seniors from obtaining documentation of status. Immigrants are provided a stamp in their passports that they can use as documentation of lawful permanent resident status upon adjustment of status or their entry into the United States as a lawful permanent resident. Further, an alien's LPR card, which provides documentation of LPR status, and therefore employment eligibility, is generally valid for 10 years. For those without approved status, applicants may use their receipt notices to identify they have applied for the applicable immigration status. Schools, insurance companies, and doctors' offices should not require a permanent resident card or an employment authorization document from a child and DHS cannot adjust the fees for obtaining such documents based on such unofficial uses and unnecessary requirements. Further, DHS disagrees that this final rule imposes greater burdens on these aliens accessing public benefits or services. Public benefit granting agencies verify the immigration status of aliens through the SAVE program. DHS declines to make changes in this final rule on the basis of these comments.

*Comment:* A commenter wrote that it is unjust to allow fee waivers for Form I–751 for VAWA self-petitioners but not for individuals who are submitting a waiver for joint spousal filing of Form I–751 due to battery or cruelty by the U.S. citizen spouse. A commenter said the petition to remove conditions on residence should remain accessible, especially for survivors of domestic violence. Similarly, a few commenters stated that, if USCIS were to eliminate fee waivers for Form I–751, some victims of violence could be subject to deportation or to the threats of their abusers.

*Response:* DHS recognizes the concerns of commenters and clarifies that this final rule continues to allow an individual to request a fee waiver when he or she is filing a waiver of the Form I–751 joint filing requirement because they were subject to battery or extreme cruelty. *See* 8 CFR 106.3(a). The term "VAWA self-petitioner" as defined in INA section 101(a)(51)(C), 8 U.S.C. 1101(a)(51)(C), includes individuals filing a waiver of the joint filing requirement based on battery or extreme cruelty. Thus, USCIS will continue to accept requests for fee waivers for Form I–751 when filed with a waiver of the joint filing requirement based on battery or extreme cruelty, as provided by statute.

*Comment:* A few commenters stated that eliminating fee waivers for work authorization applications would cause further harm to asylum seekers. At least one commenter stated that elimination of fee waivers for asylum seekers would have a disproportionately negative impact on the people who most need asylum. Another commenter wrote that individuals with pending asylum cases before USCIS are required to renew their employment authorization every year, and without fee waivers, employment authorization filing fees would cut significantly into their paychecks and make it more difficult for them to provide for their families. Another commenter said USCIS should neither eliminate the waiver of the initial filing fee for Form I–765, Application for Employment Authorization, nor increase the filing fee. The commenter further stated this would make it harder for asylum seekers to apply for an EAD.

*Response:* DHS acknowledges the concerns of the commenters related to asylum seekers applying for EADs. Charging a fee for adjudication services is in line with INA section 208(d)(3), which provides that "[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title." Noncitizens are generally required to pay adjudication fees, and asylum seekers, in particular, are subject to several statutory and regulatory requirements that carefully regulate the circumstances under which they may qualify for employment authorization, including a mandatory waiting period before they may even apply for employment authorization. USCIS is continuing to provide a fee exemption for the initial Form I–765 filing for individuals who were granted asylum (asylees) or who were admitted as refugees. Therefore, there is no fee waiver request necessary for asylees filing an initial Form I–765. Asylees and refugees will generally continue to be required to pay the fee for renewal EADs. Finally, as a point of clarification, DHS notes that, at the time of publication of this rule, the validity period for an EAD for asylum seekers is two years (not one year, as asserted by the commenter) which should be sufficient time for asylum seekers to factor the required renewal EAD fee into their budget. Therefore, for the reasons above, DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters opposed the elimination of fee waivers, including for Form I–765, which would unfairly limit the access to immigration benefits for students who cannot afford their request for employment authorization.

*Response:* USCIS must incur the costs of adjudicating a Form I–765 submitted by a student, and DHS does not believe it should shift that cost to other fee payers. Moreover, certain nonimmigrant students are required to establish the financial means to support themselves for the duration of their stay. *See* 8 CFR 214.2(f)(1)(i)(B); *see also* 8 CFR 214.2(m)(1)(i)(B). That requirement also applies to students who are eligible to request employment authorization for pre- and post-completion training programs. Therefore, DHS believes that this final rule would not cause undue burdens to student visa holders. DHS declines to make changes in this final rule in response to these comments.

### c. Form N–400 Fee Waivers

*Comment:* Numerous commenters said that USCIS should maintain existing fee waivers for naturalization applications, especially given the proposed increase of naturalization fees. Citing a 2017 Report to Congress, several commenters stated that naturalization is one of the most frequently requested application types for fee waivers and that over 500 of their clients a year would probably forgo the opportunity to become citizens of the United States if the proposed rule were adopted. Commenters wrote that removal of fee waivers will price many individuals out of naturalization and would discourage individuals from applying for fee waivers and citizenship. Citing various studies, a few commenters detailed how fee waivers increased naturalization rates. Citing to the USCIS Fee Waiver Policies and Data, Fiscal Year 2017 Report to Congress, USCIS (Sept. 17, 2017), a commenter stated because of the benefits of naturalization, the naturalization application is one of the form types most frequently associated with fee waiver requests. Several commenters emphasized the importance of fee waivers to naturalization, citing the number of applicants who qualify for fee waivers through City University of New York's CUNY Citizenship Now! program. One commenter stated that CUNY Citizenship Now!, which runs one of the most prominent citizenship and naturalization clinics in New York, reports that 54.8 percent of naturalization applicants they assist qualify for fee waivers, while the same is true for 75.6 percent of Form N–600

applicants and 65.8 percent for Form I–90 applicants.

An individual commented that the proposed naturalization fee increase would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization. Commenters also cited a 2018 Stanford Immigration Policy Lab study from Hainmueller et al. in stating that the application fees discourage naturalization. Other commenters cited the same study and stated that offering "fee vouchers" increased naturalization application rates by about 41 percent or from 37 percent to 78 percent. Several commenters wrote that immigrants want to naturalize, citing the Migration Policy Institute figures on rising annual rates of naturalization. Commenters also cited a Yasenov et al. study demonstrating that the introduction of Form I–912 waivers had the greatest impact on naturalization applicants with low levels of income and education. A commenter cited a surge of naturalization applications before a fee increase in 2008 as evidence of the role of fees in naturalization decisions.

A few commenters stated that, since naturalization is one of the form types for which fee waivers are most frequently submitted, the change would have a profound negative impact on vulnerable immigrants, including asylum seekers, who must naturalize to obtain legal rights. A commenter stated that 2.1 million immigrants are eligible for naturalization in the State of California, of whom 1 million individuals would be severely impacted by a rise in the cost of an application fee and 768,024 live in Los Angeles County. Other commenters also provided figures on the numbers of immigrants eligible for naturalization in Minnesota, and Washington. Other commenters provided similar figures for programs in California, Michigan, Boston, Houston, and New York. A commenter cited a *Fortune* article stating that, in 2017, almost 40 percent of naturalization applications received a fee waiver.

Commenters wrote that 9 million permanent residents are eligible for citizenship across the United States, citing an Office of Immigration Statistics publication, a study by Warren and Kerwin, and a Pew Research paper. A few commenters wrote that, of these, 3 million are under 150 percent of the FPG, 1 million are between 150 and 200 percent of FPG, and 1.7 million are between 200 and 300 percent FPG. Another commenter cited a 2014 University of Southern California study in concluding that over half of naturalization applicants would lose

access to waivers as a result of the proposed rule.

Some commenters wrote that without fee waivers, applicants for naturalization would take longer to apply or not apply and this would also hinder state and local governments' efforts to facilitate naturalization. Some commenters stated that fee waivers have been essential to increasing naturalization and that they pay for themselves many times over. A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for impacted populations.

*Response:* DHS agrees that the naturalization application is one of the forms affected by the limitation of the fee waivers. Fees for other applicants and petitioners must increase to recover the cost of adjudicating fee-waived applications and petitions. In this final rule, DHS limits the availability of fee waivers for Form N–400 to mitigate the additional cost burden that other fee-paying applicants must bear. This is consistent with the beneficiary-pays principle emphasized throughout the NPRM and this final rule. If USCIS continued to accept fee waiver requests for Form N–400 under the previous eligibility criteria, the fee would be higher than established in this final rule. The reduction in the availability of fee waivers for Form N–400 is not intended to discourage, deter, or otherwise limit access to naturalization for any group, category, or class of individual. In response to public comments received on the NPRM, DHS is expanding the immigration benefit requests for which it will accept fee waiver requests from statutorily protected populations to include Forms N–400, N–600, and N–600K, and to certain SIJs and Afghan and Iraqi interpreters as described elsewhere in this final rule. DHS believes that expanding fee waiver eligibility mitigates concerns that the fee increase for Form N–400 unduly burdens or otherwise prevents naturalization for these populations.

DHS acknowledges that the fee for Form N–400 increases in this final rule by more than most other forms. The large fee increase for Form N–400 is because DHS previously held the fee for Form N–400 below the full estimated cost of adjudication. In this final rule, DHS emphasizes the beneficiary-pays principle and declines to hold the fee for Form N–400 artificially low. DHS believes that increasing the Form N–400 fee to the estimated full cost of its adjudication will alleviate the increased

burden of higher fees placed upon other immigration benefits.

*Comment:* Some commenters stated that eliminating fee waivers for naturalization and other form types most frequently associated with fee waiver requests undermines Congressional intent. Commenters stated that Congress has called on USCIS to keep the pathway to citizenship affordable and accessible, and opposed the proposed elimination of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee.

*Response:* USCIS appreciates the concerns of this recommendation and fully considered it before publication. Nevertheless, DHS determined that the current trends and level of fee waivers are not sustainable. Work that USCIS provides for free or below cost affects other fee-paying applicants by making their fees higher, so DHS can recover USCIS' full cost. DHS is trying to make the USCIS fee schedule more consistent with the beneficiary-pays principle. As shown in the supporting documentation that accompanies this final rule, the number and dollar value of approved fee waiver requests has remained high during periods of economic improvement. That indicates that, as the economy declines the number of fee waiver requests could increase to a level that could threaten the ability of USCIS to deliver programs without disruption. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that the NPRM violates Congressional intent since USCIS has not supplied any data, research, or other actual factual evidence to show whether the current naturalization fees would be "a barrier to naturalization for those earning between 150 percent and 200 percent FPG," let alone the effect of the proposal to significantly increase the naturalization fees and eliminate fee waivers.

*Response:* DHS is unaware of any statute that requires DHS to document that the fees it establishes to recover USCIS' costs will not be a barrier to naturalization. DHS has complied with the economic analysis requirements of Executive Orders. There is no legal requirement to comply with language in a Congressional briefing that does not become law, aside from cooperation with the Congressional oversight function. DHS has carefully considered Congress' view of these issues, as well as the statutory and fiscal limitations under which USCIS operates and declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters noted that without fee waivers many naturalized citizens who required waivers to become citizens would not have been able to afford to apply for naturalization and that a high percentage of applicants currently use or apply for waivers.

*Response:* DHS recognizes the commenters' concerns. However, as stated elsewhere throughout this final rule, USCIS must recover its costs through user fees. DHS does not believe that current high levels of fee waiver usage are sustainable. Further, DHS believes that it would be equitable for fee-paying applicants to continue to bear the high costs of fee waiver usage through the fees that they pay. DHS declines to make changes in this final rule in response to these comments.

2. Fee Waiver Income Requirements

*Comment:* Many commenters opposed restricting the income requirements from 150 percent of FPG to 125 percent because such a restriction would be unjustified, especially since no estimates were provided as to how many people it would impact. Many commenters stated that lowering the standard to 125 percent will negatively affect many in cities and states across the country who are unable to pay fees and still have a very low income. Household income does not take into account the dramatically different costs of living throughout the country, complex living arrangements (such as mixed-status households or households supporting family members in another country), or the variety of circumstances that may render individuals unable to pay fees. One commenter stated that the income requirement would negatively impact many individuals because even those above the 125 percent FPG are unable to provide for their daily essentials due to the high cost of living in Los Angeles County. A commenter went on to state that the income standard should be tied to an inability to pay particular fees at the time of application since fee waiver consideration is focused on an individual's financial circumstances at that particular point.

*Response:* As provided in the NPRM, because of the costs of fee waivers, and because the current fee waiver regulations are inconsistent with the beneficiary-pays principle, DHS proposed to limit fee waivers to immigration benefit requests for which USCIS is required by law to consider a fee waiver or where the USCIS Director decides a fee waiver should be available. *See* 8 CFR 106.3.

As the commenters point out, and as explained in the NPRM, USCIS issued policy guidance in 2011 to streamline fee waiver adjudications and make them more consistent across offices and form types nationwide. *See* Policy Memorandum, PM–502–0011.1, *Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule:* Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9 AFM Update AD11–26 (Mar. 13, 2011) ("2011 Fee Waiver Policy"). The 2011 Fee Waiver Policy provided that USCIS would generally waive fees for applicants who are receiving a means-tested benefit, have a household income at or below 150 percent of the FPG, or were experiencing financial hardship. The 2011 Fee Waiver Policy interpreted 8 CFR 103.7(c) regarding what would be considered inability to pay and the evidence required. The 2011 Fee Waiver Policy established the 150 percent of the FPG income level that the commenters recommended retaining, but that policy was not binding on USCIS officers and the three criteria were not codified as a regulation. DHS proposed in the NPRM to codify an income level based on the FPG that would be a binding requirement for future fee waivers.

DHS recognizes that the FPG are not responsive to differences in the cost of living around the nation. However, DHS establishes the fee waiver eligibility criterion of household income of less than 125 percent of FPG in this final rule because it is consistent with the income necessary to provide an affidavit of support necessary to sponsor an immigrant. *See* 8 CFR 106.3(c). Furthermore, DHS does not generally provide special consideration for residents of a particular geographic area.

DHS believes that these changes will make the fee increase more equitable for all immigration benefit requests by requiring fees for services to be paid by those who benefit. In addition, DHS believes that making these changes to the fee waiver policy will ensure that fee-paying applicants do not bear the increasing costs of application fees being waived. In response to public comments received on the NPRM, DHS is expanding the immigration benefit requests for which it will accept fee waiver requests from statutorily protected populations to include Forms N–400, N–600, and N–600K. Although DHS acknowledges that the rule reduces the number of applicants eligible for fee waivers, DHS does not agree that aliens will be prevented from filing application or receiving immigrant benefits.

*Comment:* A few commenters wrote that "equity is not a federal policy goal"

and USCIS fails to recognize that encouraging exemptions and waivers for individuals in vulnerable circumstances or who are unable to pay fees would actually advance equity. The commenter stated that 125 percent of the FPG is not an appropriate marker to whether an individual can afford to pay a large fee on top of normal living expenses and so the fee waiver qualification threshold should remain at 150 percent of poverty level, "to serve as an apt indicator of whether a potential applicant for naturalization or other benefits can afford to support him- or herself and, in addition, to pay significant application fees of hundreds or thousands of dollars." Another commenter stated that DHS rationalized that 125 percent is an appropriate marker for FPG because it is the minimum required to qualify as a sponsor for an intending immigrant. The commenter stated that these situations are not comparable because sponsoring an immigrant may not cost very much, and sponsored immigrants are generally authorized to work and do not actually rely upon sponsors for subsistence. The commenter stated that in contrast, when determining eligibility for a fee waiver, USCIS must consider whether an individual can afford to pay a large fee on top of their normal living expenses, and it is therefore appropriate that FPG remain at 150 percent.

Several commenters provided figures of the numbers of clients they serve who are below the 150 percent FPG line and qualify for waivers. A commenter specifically calculated the costs that a family at the 150 percent FPG limit would face living in Boston, writing that fee waivers are vital to such families maintaining their immigration status or naturalizing.

One commenter cited a study of 21 cities which showed that 33 percent of those eligible to naturalize had incomes up to 150 percent of FPG. The study also found that 16 percent of LPRs eligible to naturalize of Mexican origin have incomes between 150 and 200 percent FPG, compared to 8 percent of European-origin immigrants eligible to naturalize. The commenter used this data to support their comment that the income requirements would reduce or eliminate access to citizenship for all but the wealthy and privileged.

*Response:* The 150 percent of the FPG threshold currently used for fee waiver eligibility is higher than the threshold used in the public charge inadmissibility and affidavit of support contexts. DHS has decided that limiting fee waivers to households with incomes at or below 125 percent of the FPG is appropriate because it would be consistent with other determinants of

low income or financial wherewithal used in USCIS adjudications, such as the affidavit of support requirements under INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a. *See* 8 CFR 106.3(c). DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that USCIS should respect the rights of veterans to petition for a fee waiver for spouses and children regardless of income.

*Response:* DHS appreciates the sacrifices of members of the Armed Forces and veterans. USCIS charges no Form N–400 fee to an applicant who meets the requirements of INA sections 328 or 329 with respect to military service as provided by the law. *See* 8 CFR 106.2(b)(3(c). In addition, there is no Form N–600 fee for any application filed by a member or veteran of any branch of the U.S. Armed Forces. *See* 8 CFR 106.2(b)(63(c). DHS proposed adjustments to USCIS' fee schedule to ensure full cost recovery. DHS did not target any particular group, or class of individuals or propose changes with the intent to deter requests from any immigrants based on their financial or family situation or to block individuals from access immigrant benefits. With limited exceptions as noted in the NPRM and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This rule is consistent with DHS's legal authorities. See INA section 286(m), 8 U.S.C. 1356(m). DHS proposed changes in fee waiver policies to ensure that those who benefit from immigration benefits pay their fair share of costs, consistent with the beneficiary-pays principle as described in the Government Accountability Office report number GAO–08–386SP. In addition, there is no law that requires a fee waiver or exemption for spouses or children of members of the Armed Forces or veterans. DHS declines to make changes in this final rule in response to these comments.

### 3. Means-Tested Benefits

*Comment:* A commenter recommended that USCIS use proof of receipt of a means-tested public benefit as evidence to demonstrate inability to pay the prescribed fee under the new rule.

*Response:* The commenter is requesting that USCIS continue to follow guidance that USCIS issued

under its previous fee waiver regulations. Before 2010, USCIS allowed fee waiver applicants to submit requests in a variety of ways and undertook a holistic analysis of the applicant's finances to determine ability to pay. 75 FR 58974. In 2010, DHS decided that the USCIS fee waiver process would benefit from standardization. *Id.* By the 2010 rule DHS amended 8 CFR 103.7(c) to provide, on a discretionary basis, fee waivers for certain services, subject to two conditions: (1) "he applicant is "unable to pay" the fee; and (2) a "waiver based on inability to pay is consistent with the status or benefit . . . ." 8 CFR 103.7 c)(1). DHS also required that waives requests be in writing and state the reasons for and provide evidence in support of the claim of inability to pay. *Id.* at 103.7(c)(2). After the 2010 rule, DHS developed a new form to facilitate the fee waiver process: Request for Fee Waiver, Form I–912 [49] *See* Agency Information Collection Activities: Form I–912; New Informa ion Collection; Comment Request, 75 FR 40846 (July 14, 2010). USCIS also published the 2011 Fee Waiver Po icy providing further guidance as o adjudication of fee waiver requests. The 2011 guidance provided that as proof of inability to pay under 8 CFR 103.7(c), USCIS would accept: (1) Evidence of receipt of a means-tested benefi ; (2) evidence of household income at or below 150 percent of the FPG; or (3) evidence of financial hardship.

In the NPRM, DHS proposed multiple changes to the then-existing fee waiver regulations, explained our need to and reasoning for doing io, and in accordance with the Paperwork Reduction Act, posted the proposed revised Form I–912, Request for Fee Waiver, and its instructions in this final rule's docket for the public to review and comment on its information collection requirements. *See* 84 FR 62296–62301, and 62356. The proposed regulations for fee waivers provided that DHS would provide on a discretionary basis, fee waivers for certain services, subject to the following conditions: (1) A waiver of fees would be limited to aliens with annual household incomes at or below 125 percent of the FPG; (2) a waiver of fees would not be provided to a requestor who is seeking an immigration benefit for which he or she: Is subject to the affidavit of support requirements under INA section 213A, 8 U.S.C. 1183a, and is already a sponsored immigrant as defined in 8 CFR 213a.1, or is subject to the public charge

inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182(a)(4); and (3) a request for a fee waiver must be submitted on the form prescribed by USCIS in accordance with the form instructions. Proposed 8 CFR 106.3(d); 84 FR 62363.

DHS is adopting the general fee waiver eligibility guidelines as proposed with a clarification. New 8 CFR 106.3. Proposed 8 CFR 106.3(d)(1) and (d)(2) (not permitting a fee waiver for a requestor who is subject to the affidavit of support, already a sponsored immigrant, or subject to the public charge inadmissibility ground) are not applicable to applicants who are statutorily eligible for fee waivers or those additional immigration benefit requests (SIV and certain SIJ applicants) that we are making eligible for a fee waiver in this final rule. Therefore, DHS removed those limitations from the general fee waiver provision and included it in 8 CFR 106.3(b) governing waivers provided by the USCIS Director. New 8 CFR 106.3.

By removing the more ambiguous term "inability to pay" in favor of more clearly defined, straightforward requirements, DHS is imposing on the fee waiver request process greater consistency and equity. Receipt of any means-tested benefit would no longer automatically satisfy the new regulation's requirements for demonstrating inability to pay. USCIS has also considered if means-tested benefits that are awarded using 125 percent of the FPG would be acceptable evidence of the 125 percent of the FPG household income requirement in addition to the other criteria in new 8 CFR 106.3(d). However, implementing that criterion would require USCIS to determine the income requirements that all jurisdictions across the United States use to determine eligibility for each means-tested benefit. In addition, USCIS would be required to continually monitor those requirements for any changes by individual jurisdictions and programs. Therefore, DHS has determined that such a policy would be unnecessarily burdensome for USCIS to administer and decided not to revise the Form I–912 instructions to permit any usage of a means-tested benefit as evidence for a fee waiver.

*Comment:* One commenter noted that using the Paperwork Reduction Act to introduce a revised fee waiver form, with new requirements, in October 2019 in lieu of using a NPRM and then eliminating fee waivers in this rule, was a waste of the public's time to review both documents. A few commenters stated that eligibility based on receipt of a means-tested benefit was due to be

---

[49] The form is now called Form I–912, Request for Fee Waiver.

eliminated by the revised fee waiver form challenged in *City of Seattle* v. *DHS*, 3:19–cv–7151–MMC (N.D. Cal., filed Oct. 31, 2019) but the court in that case preliminarily enjoined the revised fee waiver form on a nationwide basis, thereby affecting USCIS' plans to constrict eligibility standards for fee waivers. Other commenters stated that USCIS has already eliminated the means-tested benefit criterion for fee waivers, which drastically limited access to immigration benefits, and that the proposed rule narrows the criteria for fee waivers even further and eliminates the financial hardship criterion entirely which means 400,666 individuals annually would be detrimentally affected. Another commenter stated that changes in Form I–912 and fee waiver requirements in the NPRM are an attempt to get around the injunction of the 2019 fee waiver rules because it eliminates fee waivers for most applicants. The commenter stated that the proposal seeks to restrict legal immigration and naturalization for poor and non-white people. Another commenter recommended that while the Form I–912 revision is enjoined by the U.S. District Court for the Northern District of California, USCIS should request public comment on a new proposed Form I–912 that maintains options to demonstrate qualification through receipt of means-tested benefits, financial hardship, or income of up to 150 percent of the FPG. The commenter wrote that USCIS is required by the injunction to restart the information collection request clearance process anew for a revised Form I–912 that conforms to the Court's decision. The commenter wrote that the Form I–912 proposed with the USCIS's November 14, 2019 NPRM does not meet the Court's specifications, and USCIS may not move forward with implementation of this revised Form I–912 based on the present notice-and-comment process.''

*Response:* These comments refer to the effort by USCIS to revise the USCIS policy guidance on fee waivers. On September 28, 2018, USCIS published a 60-day notice in the **Federal Register** requesting comments on the then-proposed revised Form I–912 and instructions and posted the documents for review in docket USCIS–2010–0008 at *www.regulations.gov*. *See* 83 FR 49120 (Sept. 28, 2018). The revisions to Form I–912, Request for Fee Waiver, revised the evidence USCIS would consider in evaluating inability to pay, required federal income tax transcripts to demonstrate income, and required use of the Form I–912 for fee waiver requests. USCIS complied with the

Paperwork Reduction Act and the Office of Information and Regulatory Affairs, OMB (OIRA) approved the form changes on October 24, 2019.[50] On October 25, 2019, USCIS published the revised Form I–912 and instructions, along with corresponding revisions to the USCIS Policy Manual and a Policy Alert. The revised Form and Manual took effect on December 2, 2019.

DHS did not consider this rulemaking's impact when undertaking the Form I–912 revisions that took effect on December 2, 2019, because DHS was proposing comprehensive reforms to fee waivers which were not certain to occur and the rulemaking was separate and independent of the form and policy change that took effect on December 2, 2019. USCIS was forgoing hundreds of millions of dollars each year to fee waivers, and it decided not to wait for the comprehensive DHS fee rulemaking while it continued to forgo increasing amounts of revenue as more fees were waived. 84 FR 26138 (June 5, 2019). Nonetheless, on December 11, 2019, the U.S. District Court for the Northern District of California held that the Form I–912 revisions that took effect on December 2, 2019 required notice and comment rulemaking to effectuate, and the revised Form I–912, the Policy Manual revisions, and an October 25, 2019 Policy Alert announcing the revisions were preliminarily enjoined nationwide. *See* Order Granting Pls.' Mot. for Nationwide Prelim. Inj., *City of Seattle* v. *DHS*, 3:19–cv–7151–MMC (N.D. Cal., Dec. 11, 2019). By stipulation of the parties and as agreed to by the court, that injunction will remain in place pending publication of this final rule. The injunction in *City of Seattle* does not impose any requirements on subsequent revisions of the Form I–912 nor otherwise affect USCIS's ability to move forward with implementation of the Form I–912 revised in accordance with the notice-and-comment process completed by this rulemaking. In fact, the injunction in *City of Seattle* contemplates that the 2019 fee waiver policy changes were lawful but for compliance with the procedures required by the Administrative Procedure Act that are met by publication of this final rule.

*Comment:* Commenters stated that proving household income through USCIS' process is needlessly burdensome, intended to discourage applications, and that the fee waiver application process and 125 percent FPG limit is duplicative with means-

testing requirements for other government programs where individuals have already passed a thorough income eligibility screening by government agencies. Several commenters specifically requested maintaining the means-tested benefits criterion as it is the least burdensome and most accessible application criterion for vulnerable immigrant populations.

*Response:* DHS understands that removing the means-tested benefit criterion will require people to obtain different documentation than they previously would have to establish eligibility for a fee waiver. DHS agrees that the burden will increase but has determined that the documentation required to establish income is the best approach to establish eligibility. DHS does not believe that the burden that will be imposed by the new requirements is excessive for a requestor to receive the free adjudication of his or her immigration benefit request. USCIS is 96 percent funded by fees and must charge fees to cover its costs. Although the means-tested benefits criterion will no longer be an option under the revised fee waiver regulations, eligible applicants may request fee waivers under the criterion of having income at or below 125 percent of the FPG. Thus, staff and volunteers at nonprofit community organizations should already be familiar with the remaining criterion for fee waiver eligibility. DHS has considered the burden on applicants and those that provide them aid and determined that the benefits of the policy change exceed the potential additional burden. DHS disagrees that its fee waiver income requirements are duplicative with state means-tested benefit requirements because, as stated earlier, many public benefits have different income thresholds for eligibility in different states. Therefore, DHS has determined that relying on a consistent income threshold and not using a means-tested benefits for eligibility will best provide consistency in applying the requirements.

## 4. Public Charge Rule

*Comment:* Comments stated that DHS claims that USCIS uses 125 percent of the FPG as the standard for public charge and affidavit of support purposes and cites 8 CFR 212.22(b)(4)(i)(A), but DHS's proposed public charge rule is currently enjoined. The commenters state that because of court orders, USCIS has not been using 125 percent of the federal poverty guidelines as the standard for public charge purposes to date, and this rule is an improper attempt to codify the enjoined public charge rule.

---

[50] The approved package is available at *https:// www.reginfo.gov/public/do/PRAViewICR?ref_ nbr=201910-1615-006#* (last visited Feb. 17, 2020).

*Response:* On February 24, 2020, DHS implemented the Inadmissibility on Public Charge Grounds Final Rule nationwide after the Supreme Court of the United States stayed the last remaining injunction.[51] In addition, the 125 percent of the FPG threshold is not only used in public charge inadmissibility determinations, but also is the standard by which the sufficiency of an affidavit of support is based, as established by Congress under INA section 213A, 8 U.S.C. 1183a. As provided in the NPRM, USCIS generally uses 125 percent of the FPG as the minimum income threshold to be considered a positive factor in the totality of the circumstances in public charge inadmissibility determinations as the threshold. Congress also identified 125 percent of FPG as a threshold for establishing the sufficiency of the affidavit of support under INA section 213A, 8 U.S.C. 1183a. The threshold for fee waiver eligibility under previous regulations of 150 percent of the FPG was higher than the threshold used in the public charge inadmissibility and affidavit of support context. DHS believes limiting fee waivers to households with incomes at or below 125 percent of the FPG, as set forth in this final rule, and aligning the fee waiver rule with the public charge inadmissibility rule and the affidavit of support requirements set forth in INA sections 212(a)(4) and 213A, 8 U.S.C. 1182(a)(4) and 1183a, will best provide consistency in applying the income requirements in immigration benefit administration.

5. Financial Hardship

*Comment:* One commenter wrote that the proposed elimination of fee waiver eligibility based on extraordinary hardship (sic financial hardship) was not explained and is alarming and unjustified. USCIS does not acknowledge or explain its apparent decision to cease accepting evidence or granting fee waivers related to temporary illness and injury, recessions, bankruptcy, or any other of the myriad situations that may render qualified people unable to pay fees but that cannot be characterized as natural disasters. The commenter wrote that this change would prevent deserving individuals from accessing immigration and naturalization benefits and violate the principles of due process that govern rulemaking and other federal administrative action.

*Response:* DHS believes that a provision for financial hardship is unnecessary as past fee waivers

requested using the financial hardship criterion were minimal, accounting for only 1.2 percent of all requests. A detailed distribution of the approved Fee Waiver Requests can be found in the RIA. *See* Section D, Tables 5–8. While DHS acknowledges that the fee adjustments established in this final rule are not insubstantial to an applicant of limited means, DHS does not believe that they make immigration benefits inaccessible to low income applicants who have financial hardships. DHS is therefore not making changes based on this comment.

6. Public Charge Ground of Inadmissibility and Affidavit of Support Requirements

*Comment:* Several commenters disagreed with USCIS' claim that it would be appropriate to restrict household income criteria to 125 percent FPG to be consistent with the public charge inadmissibility final rule and the statutory and regulatory requirement applicable to affidavit of support, writing that they are separate and unrelated legal concepts. Multiple commenters opposed the proposal to make fee waivers unavailable to applicants who are subject to the public charge ground of inadmissibility, those who are subject to the affidavit of support requirement under INA section 213A, 8 U.S.C. 1183a, and those who are already sponsored immigrants. The commenters stated that the proposal would disproportionately harm low- and moderate-income families, including many immigrant survivors and their children. Many commenters stated that most family-sponsored immigrants must supply an affidavit of support regardless of income. They stated that, because the affidavit of support contract terminates only after specific criteria are met (*e.g.*, sponsored immigrant becomes a U.S. citizen, dies, or departs the United States), barring these immigrants from receiving fee waivers would result in an additional barrier for low-income immigrants regardless of their actual need and would have a disproportionate effect on low-income Asian immigrants and U.S. citizens of Asian descent, especially as most Asian immigrants become permanent residents through family sponsorship and require affidavits of support. A commenter wrote that the proposal will further punish people who have the misfortune of poor health, are struggling to survive, and have chronic, severe pain. The commenter wrote that such individuals are too sick to work full-time and require an affidavit of support from family members or friends. A few commenters

expressed worry that barring fee waivers for individuals subject to the public charge ground of inadmissibility would add more strain on an already overburdened legal service providers to low-income immigrants, resulting in a general decrease in capacity of pro bono services. A few commenters stated that there is no burden on USCIS to continue processing fee waiver applications for immigrants subject to affidavit of support nor any basis to disqualify those subject to affidavits of support from receiving fee waivers.

*Response:* DHS agrees that, in general, family sponsored immigrants are subject to the public charge ground of inadmissibility and are required to submit a sufficient affidavit of support under INA section 213A, 8 U.S.C. 1883a, and therefore may not be eligible to request a fee waiver under this final rule. The NPRM generally limited fee waiver eligibility to those statutorily eligible for fee waivers, which are limited to VAWA, T, U and TPS applicants. Family and employment related benefit requests were not generally included as being eligible for fee waivers in the NPRM. As discussed in the NPRM, under IIRIRA, certain immigrant categories are required to submit an enforceable affidavit of support executed by a sponsor.[52] Although sponsors are not required to assist an alien with fees associated with immigration benefits, sponsors generally must demonstrate that they are able to maintain the sponsored alien at an annual income of not less than 125 percent of the FPG.[53] INA section 213A, 8 U.S.C. 1183a, formalized requirements of a legally enforceable affidavit of support, specified who is eligible to be a sponsor, which aliens require an Affidavit of Support Under Section 213A of the INA, the scope of a sponsor's obligations, and how the affidavit may be enforced.[54] These provisions were intended to "encourage immigrants to be self-reliant in accordance with national immigration policy." [55] DHS believes it is inconsistent with the affidavit of

[51] *See Wolf* v. *Cook County,* 140 S.Ct. 681 (2020).

[52] *See* INA sections 212(a)(4) and INA 213A, 8 U.S.C. 1182(a)(4), and 1183a. See also Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

[53] *See* INA section 213A. A sponsor who is on active duty (other than active duty for training) in the U.S. armed forces and who is petitioning for a spouse or child only has to demonstrate the means to maintain an annual income equal to at least 100 percent of the FPG.

[54] See INA section 213A, 8 U.S.C. 1183a. See Section 551 of the IIRIRA, Public Law 104–208, 110 Stat. 3009 (1996).

[55] See H.R. Rep. 104–828, at 241 (Sept. 24, 1996) (Conf. Rep.).

support requirements to allow this population to request fee waivers.[56]

Further, the current fee waiver regulation allows people who are applying for immigration benefits for which a public charge inadmissibility determination is not made—advance permission to enter as a nonimmigrant, a waiver for passport and/or visa, adjustment of status, or a waiver of the grounds of inadmissibility—to file a fee waiver request. *See* 8 CFR 103.7(c)(4) (stating that certain fees may be waived "only for an alien for which a determination of their likelihood of becoming a public charge under section 212(a)(4) of the Act is not required at the time of an application for admission or adjustment of status").

The rule provides that an alien who is subject to the affidavit of support requirements under INA section 213A, 8 U.S.C. 1183a, or is already a sponsored immigrant as defined in 8 CFR 213a.1 unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse; or subject to the public charge inadmissibility ground under INA section 212(a)(4), 8 U.S.C. 1182(a)(4) is not eligible for a fee waiver. See New 8 CFR 106.3(b). DHS declines to make any changes in this final rule in response to these comments.

*Comment:* One commenter stated that the proposal would place an unnecessarily cumbersome requirement on those who are already receiving some form of assistance and require additional assistance in order to improve their immigration status. Another commenter stated that many survivors of crime and domestic violence would be negatively impacted because many survivors receive CalWORKS, a California public benefits program.

A commenter stated that the proposal is unfair and discriminatory because it could severely affect the naturalization process based on receiving public benefits, even if this occurred years before an application for citizenship. The commenter also stated that temporary assistance in a time of hardship should not be an opportunity for any country to deny its people the path to citizenship.

*Response:* This final rule does not prevent individuals from requesting or receiving any public benefits, as defined in, PRWORA, 8 CFR 212.21(b), or other provision, for which they are eligible. Further, this final rule does not consider the receipt of public benefits as part of the eligibility requirements. Instead,

DHS would look to the immigrant or nonimmigrant category the alien holds or is seeking and their income in order to determine whether he or she qualifies to submit a fee waiver request.

DHS notes that VAWA self-petitioners as defined under INA section 101(a)(51) and anyone otherwise self-petitioning due to battery or extreme cruelty pursuant to the procedures in section 204(a), 8 U.S.C. 1101(a)(51) and 1154(a), T nonimmigrants, U nonimmigrants, battered spouses of A, G, E–3, or H nonimmigrants, battered spouses or children of a lawful permanent resident or U.S. citizen as provided under INA section 240A(b)(2), and TPS applicants are generally not subject to the public charge inadmissibility provision or the affidavit of support requirements. Therefore, under this final rule, these applicants are not precluded from requesting a fee waiver. *See* 8 CFR 106.3. Furthermore, certain Special Immigrant Juveniles and Afghan and Iraqi translators are also not precluded from requesting a fee waiver under this final rule, as they are not subject to the public charge inadmissibility determination or the affidavit of support requirement.[57] *Id.* DHS has updated the provision to clarify these aliens are not subject to these eligibility requirements. See new 8 CFR 106.3(c).

*Comment:* Multiple commenters said that, because abusive spouses may be the sponsor holding the affidavits of support, it was critical to keep fee waivers available to those subject to the affidavit of support under INA section 213A, 8 U.S.C. 1183a. The commenter wrote that doing so would help ensure that immigrant survivors are not compelled to return to their abusers to seek immigration benefits.

*Response:* An applicant under the VAWA provisions is generally not subject to the affidavit of support requirements.[58] In addition, fee waiver requests do not require information regarding the income of an abusive spouse. DHS believes that its continued provision of fee waivers for VAWA, T, and U categories mitigates any concerns that changes to fee waiver eligibility will unduly burden or otherwise harm the victims of abusive spouses. See Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers. DHS declines to make changes in this final rule in response to these comments.

7. Discretionary Fee Waivers

*Comment:* Several commenters opposed narrowing discretionary authority that would prevent many family-based immigrants from receiving fee waivers and would disadvantage recipients of certain humanitarian benefits, such as Special Immigrant Juveniles (SIJs) and Cuban Adjustment Act applicants.

Some commenters said the proposed limitations on the Director's discretion to grant fee waivers are arbitrary and unsupported by any evidence. The commenters stated that no explanation, data, or examples were provided indicating why the concern over the Director having too much discretion requires changing well-established precedent. Another commenter stated that the rule does not provide a basis for the guidelines of how the Attorney General shall determine which designated group of victims of calamities will be granted access to fee waivers.

*Response:* In this final rule, DHS retains the authority in the regulations for the Director of USCIS to waive any fee if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. DHS notes that the Director's discretionary provision has never been and is not intended for whole categories of aliens to request fee waivers directly to the Director. *See* 75 FR 58974 (encouraging those who believe that they have a sufficiently sympathetic case or group of cases in any type of benefit request to submit a request to their USCIS local office for a waiver under 8 CFR 103.7(d)). The discretionary provision is meant to provide for discrete and limited fee waivers when there are emergent circumstances. *See* 75 FR 33464. DHS has further consolidated the Director's discretionary provisions as it is not limited by category but is also not intended to allow for individual applications from broad categories of individuals. In addition the provisions regarding eligibility were consolidated to clarified who may not qualify based on the alien being subject to the affidavit of support requirements under section 213A of the Act or already a sponsored immigrant as defined in 8 CFR 213a.1 (unless the applicant is seeking a waiver of the joint filing requirement to remove conditions on his or her residence based on abuse), or being subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

---

[56] See Div. C, Title V of Public Law 104–208, 110 Stat. 3009, 3009–670 (September 30, 1996).

[57] *See* INA sections 212 a)(4) and 213A,8 U.S.C. 1182(a)(4) and 1183a. *See also* 8 CFR 212.23(a)(4) and (10).

[58] *See* INA section 212(a)(4)(E)(i), 8 U.S.C. 1182(a)(4)(E)(i). *See also* 8 CFR 212.23(a)(20).

Further, DHS does not believe that the rule disadvantages recipients of humanitarian benefits. For example, DHS believes that the imposition of a fee or a lack of a fee waiver does not infringe upon the ongoing protections offered by the Cuban Adjustment Act of 1966 (CAA). The CAA allows Cuban natives or citizens living in the United States who meet certain eligibility requirements to apply to become lawful permanent residents.[59] Applicants under the CAA have previously paid fees. Under the CAA, a native or citizen of Cuba who has been inspected and admitted or paroled into the United States and who has been physically present in the United States for at least one year may apply for permanent residency in the United States. An alien under the CAA submits Form I–485, Application to Register Permanent Residence or Adjust Status, and does not need to file a visa petition or have an immigrant visa immediately available to him or her.[60] Generally, when an alien has a pending Form I–485, he or she may apply for employment authorization by filing a Form I–765, Application for Employment Authorization.[61] For this reason, DHS believes that aliens who benefit from the CAA have unique advantages compared to other humanitarian populations, such as asylum seekers, who may have to wait months or years before being eligible to apply to become a lawful permanent resident. The CAA does not prohibit the charging of fees for applicants, and DHS believes that the imposition of a fee or a lack of a fee waiver does not infringe upon the ongoing protections that the CAA affords to qualified individuals.

As provided in the NPRM, USCIS will continue to notify the general public of eligibility for fee waivers for specific forms under 8 CFR 106.3 through policy or website updates. Individuals who may qualify for such a fee waiver will still need to meet the requirements to request a fee waiver as provided in 8 CFR 106.3(b) and (d).

As discussed above, in response to commenters' concerns, DHS will allow petitioners for and recipients of SIJ classification who, at the time of filing, have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, to submit requests for fee waivers for Form I–485 and associated forms, as well as Forms N–400, N–600, and N–600K. *See*

Table 3: Categories and Forms Without Fees or Eligible for Fee Waivers.

*Comment:* A few commenters wrote that, at a minimum, USCIS should allow a proactive application process for discretionary fee waivers. These would allow individuals to alert USCIS to their need for a waiver of an application fee rather than having to wait to receive an invitation from USCIS first.

*Response:* DHS has clarified the USCIS Director's fee waiver provision at 8 CFR 106.3(b) and 106.3(c) in this final rule because it was not necessary to have a separate section authorizing the Director to waive fees for groups or individuals. See new 8 CFR 106.3(b). Proposed 8 CFR 106.3(c) could be used to grant group or individual fee waivers. thus proposed 8 CFR 106.3(b) was redundant. As provided in new 8 CFR 106.3(b), the Director of USCIS may authorize the waiver, in whole or in part, of a form fee required by 8 CFR 106.2 that is not otherwise waivable under this section, if the Director determines that such action is an emergent circumstance, or if a major natural disaster has been declared in accordance with 44 CFR part 206, subpart B. New 8 CFR 106.3(b) authorizes the Director to designate a group eligible for fee waivers as appropriate. As previously indicated, DHS notes that the Director's discretionary provision has never been and is not intended for whole categories of aliens to request fee waivers directly to the Director. *See* 75 FR 58974. Although many applicants may believe they personally need a waiver of an application fee, the discretionary provision is meant to provide for discrete and limited fee waivers when there are emergent circumstances and the other eligibility requirements are met. Therefore, DHS is maintaining the provision that individuals may not directly submit requests for fee waivers to the USCIS Director.

*Comment:* The commenter stated that the proposal to make Form I–765 fee waivers discretionary for affirmative asylum seekers may cause additional burdens for low-income households.

*Response:* DHS acknowledges the commenter's concern; however, as stated in the NPRM and in this final rule, fee waivers for the Form I–765 will not be available to asylum seekers. *See* 84 FR 62296–62301. USCIS is continuing to provide a fee exemption for the initial Form I–765 filing for individuals who were granted asylum (asylees) or who were admitted as refugees. Therefore, there is no fee waiver request necessary for asylees filing an initial Form I–765. Asylees and refugees will generally continue to be

required to pay the relevant fee for renewal EADs. As indicated previously, DHS has clarified the provisions regarding the USCIS Director's discretion as it relates to fee waivers in 8 CFR 106.3(b), as the individual provision in the proposed 8 CFR 106.3(b) was redundant.

8. Fee Waiver Documentation

*Comment:* A commenter recommended that USCIS expand the types of documentary evidence accepted in support of fee waiver applications. Several commenters stated that applicants should not be required to procure additional new documents, such as federal tax transcript, to demonstrate household income. The commenters stated that, obtaining a transcript would substantially complicate the process of applying for a fee waiver because individuals may not have access to a computer and several days to six weeks or more may be required to wait on delivery via the mail. Some commenters indicated that the proposal creates a burdensome new requirement that many applicants will be unable to meet, either because it's too difficult to obtain the documentation or because they were too poor to file taxes with a foreign government.

*Response:* USCIS currently requests copies of income tax returns from applicants requesting fee waivers. Tax transcripts are easily requested through the Internal Revenue Service (IRS) website or paper filing and are free to taxpayers. USCIS cannot accept incomplete copies of tax returns or copies that are not signed or submitted to the IRS to support fee waiver requests, because they may not validly reflect the applicant's household income. USCIS believes that the proposed change will reduce its administrative burden for fee waiver processing and reduce the number of fee waiver requests that are rejected because of improper documentation, inadequate information, and no signatures for household members. In terms of the non-filing letter from the IRS, USCIS is concerned about not receiving documentation of no-income. Therefore, obtaining information from the IRS in transcripts, a W–2, or proof of non-filing, if applicable, is sufficient documentation to establish the necessary income or no income. DHS believes that, while this might place a small additional burden on applicants, the change will ultimately benefit applicants by mitigating future rejections and ensuring that fees are waived for deserving applicants.

*Comment:* A commenter stated the proposed changes would increase the

---

[59] See *https://www.uscis.gov/greencard/caa* (last accessed 03/10/2020).

[60] See Public Law 89–732 (1966).

[61] See *https://www.uscis.gov/greencard/caa* (last accessed 03/10/2020).

inefficiencies in processing fee waiver requests, place an unnecessary burden on the Internal Revenue Service (IRS) for requests for documentation from immigrants, and add burden on USCIS increasing the complexity of adjudicating fee waiver requests. Plus, USCIS would need to continuously track the IRS transcript request processes.

*Response:* As part of its regular operations, the Internal Revenue Service (IRS) provides customer service including providing tax transcripts. Tax transcripts can be obtained by calling the IRS or submitting a request online, through the mail or by fax. As the IRS, and other federal, state, and local agencies regularly provide information and services to their customers as part of their daily operations, the proposed form changes should have a minimal impact on them. The Department of the Treasury was provided with the proposed and final rule to review, and they did not object to the requirement for the tax transcript.

*Comment:* A commenter stated that requiring separate fee waiver submissions for derivative family members was overly burdensome and provided USCIS data to demonstrate that survivors applying for humanitarian protections frequently included derivative family members in their applications. Many commenters stated that requiring each applicant to submit their own form when applying for fee waivers imposes a large, duplicative burden on applicants. Commenters recommended that family members should be allowed to continue submitting a single fee waiver application with all relevant information collected in one location. Another commenter said survivors applying for humanitarian protections frequently included derivative family members in their applications and provided USCIS data to demonstrate this fact.

*Response:* Over 90 percent of the fee waiver requests filed were for individual applicants [62] and many other forms are already required to be submitted individually. Therefore, DHS does not believe that requiring Form I–912 for each applicant or petitioner in a household will unduly burden applicants. The change will reduce the number of fee waiver requests that are rejected for failure to obtain all signatures of included family members. DHS has determined that the benefit of fewer rejections exceeds the small

increase in burden that this change may add for a small percentage of fee waiver requests.

*Comment:* A commenter recommended that USCIS continue to allow use of applicant generated, nonform fee waiver requests and objected to option of a written statement being eliminated for Form I–918, Petition for U Nonimmigrant Status.

*Response:* Adjudicating ad hoc fee waiver requests has proven to be difficult for USCIS cue to the varied quality and information provided in ad hoc letter requests. Form I–912 is easy to complete, and it provides standardization that will assist USCIS in our review of requests. In addition, there is no filing fee for Form I–918. Therefore, DHS declines to make changes in this final rule in response to this comment and will require submission of Form I–912 to request a fee waiver.

### 9. Cost of Fee Waivers

*Comment:* Many commenters stated that DHS' application of the beneficiary-pays principle is arbitrary, capricious, unsupported, and unjustified. Commenters indicated that restricting the income requirements from 150 percent of FPG to 125 percent is unjustified, especially because DHS did not estimate how many people the change would affect. Multiple commenters opposed the beneficiary-pay model as it would not be a fair or just system, writing that it ignores the inequities that exist across incomes and that the ability-to-pay model has been working for years. A commenter wrote that DHS' justification that the use of fee waivers haves increased in a good economy was faulty writing that DHS cited statistics for USCIS fee waivers from FY 2008 to 2011—a period of economic recession. Another commenter said that DHS' argument that fee waivers have become too costly to sustain fails to account for recent fee increases or indicate whether fee waiver volume has changed. The commenter wrote that fee waivers between 2016 and 2017 did not increase and the NPRM does not acknowledge the recent decline in fee waivers in FY 2018.

*Response:* DHS explained in the NPRM that fee waivers had increased to unmanageable levels and that DHS had to do something to curtail the amount of free services being provided by USCIS. In prior years, USCIS' fees have given significant weight to the ability-to-pay principle and shifted the costs of certain benefit requests to other fee payers. In the FY 2016/2017 fee rule, DHS noted that the estimated annual forgone revenue from fee waivers and

exemptions has increased markedly, from \$191 million in the FY 2010/2011 fee review to \$613 million in the FY 2016/2017 fee review.[63] *See* 81 FR 26922 and 73307. In the FY 2016/2017 NPRM, DHS estimated that the increase in fee waivers accounted for 9 percent of the 21 percent weighted average fee increase. *See* 81 FR 26910. In the same NPRM, DHS provided notice that in the future it may revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). *See* 81 FR 26922.

In this final rule, DHS is aligning USCIS' fees more closely to the beneficiary-pays principle. Without the changes to fee waiver policy implemented in this final rule, fees would increase by a weighted average of 30 percent, which is 10 percent more than in the fee schedule implemented in this final rule. In an effort to mitigate the total weighted average fee increase and preserve equitable distribution of costs for adjudication and naturalization services, DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters stated that USCIS' justification to make the fee schedule more equitable with the beneficiary-pays approach fails to consider the effect on applicants or benefits resulting from fee waivers. A few commenters stated that setting fees at full cost recovery would be inadequate as it does not take into account the benefits side of the equation, such as the added earnings of citizenship relative to prior earnings as a legal immigrant. The commenters stated that including benefits would show that all costs are indeed paid and covered.

A few commenters wrote that USCIS has taken actions that increase operating costs (*e.g.,* extreme vetting, re-interviewing individuals, enhanced background checks, decrease in staffing) which the department now seeks to pass onto the public via the beneficiary-pays principle and by eliminating fee waivers.

*Response:* Consistent with historical practice, this final rule sets fees at a level to recover the estimated full operating costs of USCIS, the entity within DHS that provides almost all immigration adjudication and

---

[62] *See* Tables 10–11. Distribution of Total Approved Applicants per Fee Waiver Request (Form I–912) in the RIA.

[63] Since USCIS includes a projection for fee waivers/fee exemptions when setting its fees to recover full cost, it does not forgo revenue unless the total dollar amount of actual fee waivers/fee exemptions exceeds the projected amount that was included in the fee setting process. The dollar amount of actual fee waivers/fee exemptions in excess of the projected amount included in the fee setting process is considered foregone revenue.

naturalization services. *See* Homeland Security Act of 2002, Public Law 107–296, sec. 451, 116 Stat. 2142 (Nov. 26, 2002) (6 U.S.C. 271). The statute authorizes recovery of the full costs of providing immigration adjudication and naturalization services. As provided in the NPRM and RIA, the fees account for all anticipated operational costs and adjudicative actions based on the best information available at the time USCIS conducted the FY 2019/2020 fee review.

DHS considered the effects of the revised fee schedule on applicants and petitioners, as documented in the RIA, Final Regulatory Flexibility Analysis (FRFA), SEA and relevant sections of this final rule. As noted elsewhere in this preamble, DHS is not required to conduct a cost-benefit analysis of the impacts on all applicants of each change in a fee or change in USCIS fees or fee-related regulations. As stated elsewhere in this preamble,[64] DHS is required by OMB Circular A–4 to include all total projected costs, benefits, and transfers annualized and monetized over a specified implementation period, which for this final rule is 10 years. The final rule intends to merely recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services, including services provided without charge to asylum applicants and other immigrants.

However, this rule sets fees to offset USCIS costs to provide immigration adjudication and naturalization services at an adequate level. DHS anticipates that applicants and petitioner will consider the potential benefits, including the potential for increased earnings as noted by the commenter, weigh those benefits against the cost of applying, including the fee, and decide if the benefits outweigh the costs. DHS believes that many LPRs will determine that the benefits of naturalization, including the prospect of additional earnings, exceed the cost of the fee for Form N–400.

*Comment:* Another commenter wrote that there are errors and a lack of supporting documentation in the NPRM. They stated that this lack of information made it impossible to verify or understand calculations that USCIS relies on to justify the proposed changes to the fee waivers. The commenter provided the following examples and criticisms:

64 Section IV A, Statutory and Regulatory Requirements, Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs).

• "In the FY 2016/2020 fee review, USCIS determined that without changes to fee waiver policy, it would forgo revenue of approximately $1,494 million."—supporting document states foregone revenue for 2017 was $367,243,540.

• "The proposed fee schedule estimates $962 million forgone revenue from fee waivers and fee exemptions."—no supporting documents.

• "The difference in forgone revenue is $532 million."—no supporting documents.

• "Without changes to fee waiver policy, fees would increase by a weighted average of 31 percent, which is 10 percent more than in the proposed fee schedule."—no supporting documents.

• "As shown in the supporting documentation for this rule, the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement. That indicates that, should the economy worsen, the number of fee waiver requests will increase to a level that could threaten the ability of USCIS to deliver programs without disruption."—While there is supporting documentation for this statement, its meaning is unclear as no analysis is given comparing the fee waiver usage to economic performance.

• "In the FY 2016/2017 fee rule, DHS noted that the estimated annual foregone revenue from fee waivers and exemptions has increased markedly, from $191 million in the FY 2010/2011 fee review to $613 million in the FY 2016/2017 fee review."

• USCIS miscalculated the surcharge needed to add onto other fees to make up for lost revenue.

*Response:* All examples cited by the commenter do not directly impact fee calculations. Rather they are byproduct estimates of multiple operational data elements including fees, workload receipts, and fee-paying receipts. Additional information on the historical dollar value of approved fee waiver requests is located in the supporting documentation that accompanies this final rule. Additionally, DHS used the best available information at the time it conducted the FY 2019/2020 fee review to calculate fees and does not calculate a surcharge to add onto other fees. Instead, it estimates the total cost of performing USCIS' anticipated workload by form and divides those costs by the estimated fee-paying volume for each form.

Regarding the commenter's question about the volume of fee waiver requests increasing during periods of a good economy, as indicated in the NPRM,

DHS determined that the current trends and level of fee waivers are not sustainable. As shown in the supporting documentation that accompanies this final rule, the number and dollar value of approved fee waiver requests has remained high during periods when the U.S. economy was improving. As the economy worsens, the number of fee waiver requests could increase to a level that could threaten the ability of USCIS to deliver programs without disruption. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter wrote that USCIS data is incomplete as it only shows fee waiver trends through FY 2017 and requested the data on fee waiver approval rates for the past two fiscal years be released.

*Response:* The NPRM contained information USCIS had available at the time it conducted the FY 2019/2020 fee review. It provides more than adequate data upon which to base the fee waiver regulatory changes made in this final rule. However, in response to the commenter and to demonstrate that fee waiver levels remain high, DHS has included FY 2018 and FY 2019 fee waiver data in the supporting documentation that accompanies this final rule for informational purposes. DHS has also included the actual dollar value of approved fee waiver requests for FY 2013–FY 2019.

**10. Changes to Form I–912, Request for Fee Waiver**

*Comment:* One commenter recommended that USCIS revert to and retain the previous version of Form I–912 (03/13/2018 edition).

*Response:* DHS declines to revert to the previous version of the form as this final rule establishes revised criteria for eligibility. The Form I–912 version submitted with this final rule incorporates the relevant provisions.

*Comment:* One commenter recommended that USCIS restore helpful language in instructions and forms that clarifies that applicants need only meet one of multiple possible grounds of qualification for a fee waiver and clarify that applicants only need to provide documentation for one basis. A commenter also noted that the proposed Form I–912 contains provisions that are difficult to understand, citing the request for applicants to include "a receipt number" (Part 1, Question A) as an example. One commenter recommended that Part 1, Question 1.A's instruction should be changed to, "[i]f available, provide the receipt number" as the applicant may not yet have a receipt number.

*Response:* DHS clarified the provision regarding the basis of eligibility for a fee waiver by indicating that the applicants should select the basis for qualification. DHS added a clarification to the form to indicate that the receipt number is only required if the applicant has already been provided with a receipt number.

*Comment:* One commenter stated that Part 1, "Question 1.B's new guidelines allowing fee waivers for those impacted by a disaster are unclear. The form states in Part 1 that in order to be eligible, these applicants must have an annual household income at or below 125 percent of the FPG. They must then provide information about their income in Part 3, discussed in more detail below. However, in Part 3, number 11 they are asked to provide information about their expenses, debt, or losses incurred in the disaster. It is unclear why this additional information is needed, if the applicant has already been required to document their income at or below 125 percent of the FPG. This information request does not fit into the eligibility guidelines based on income and is not relevant to USCIS' adjudication. We recommend either deleting item 11 in Part 3, or expanding the eligibility guidelines to include financial hardship for those impacted by a disaster who are unable to document low income. The same commenter later noted that "Question #11 is redundant, as stated above, and we recommend that it be deleted."

*Response:* DHS agrees that an applicant or petitioner impacted by a disaster who is otherwise eligible for a fee waiver would only need to provide documentation of income at or below 125 percent of the FPG and would not need to provide evidence of expenses, debt, or losses incurred in the disaster. DHS has removed the additional question from the form.

*Comment:* One commenter stated that Part 3 asks for gross income, but neither the form nor the instructions define the term. 'Gross income' needs to be explained, especially for those who are not able to simply refer to the "gross income" line on their tax return. We recommend that USCIS define 'gross income' on the form just below the heading for Part 3 and in the corresponding instructions. The commenter also recommends that Part 3., Question 6 explicitly instruct applicants where to find gross income.

*Response:* Gross income includes wages, dividends, capital gains, business income, retirement distributions as well as other income

without any adjustments.[65] This clarification has been added to Form I–912 instructions.

*Comment:* One commenter recommended increasing the chart in Part 3., Question 4 from four (4) spaces total for listing household members to six (6) spaces, along with instructions above the chart for what to do if the applicant needs more spaces. Alternatively, they also recommend providing the chart again in Part 7. for those who need more space to list household members.

*Response:* Requestors should use the Additional Information section if more space is required. DHS is not modifying the form in response to this comment. Adding additional charts or rows will unnecessarily increase the form length.

*Comment:* Commenters recommended explicitly instructing applicants that they need to attach a copy of their federal income tax transcripts.

*Response:* DHS has added an additional form instruction to indicate that requestors should provide income tax return transcripts.

*Comment:* One commenter stated that Part 3., Question 10 "is a catch-all for describing special circumstances. Applicants could easily miss it. We recommend adding a new item number after 10 for those who have no income or are homeless to describe their circumstances, *e.g.,* '[i]f you have no income and/or are homeless, you may use this space to provide additional information.'"

*Response:* To limit the burden on applicants, DHS will not be adding a question. However, question 10 has been updated to clarify that the space may be used for additional information which may include a statement about lack of income. Although a homeless person without income would generally qualify for a fee waiver based on income at or below 125 percent of the FPG, being homeless does not make an applicant eligible for a fee waiver.

### 11. Suggestions

*Comment:* A few commenters suggested alternatives to narrowing the requirements for fee waivers and changing their standards of evidence including limiting fee waivers allowed for specific applications (for example the first 25,000 fee waivers for Form I–90), have a lottery for fee waivers (for example: For those paying with credit card they can be entered in a lottery and if chosen the application is free, if not,

then the card will be charged); offer fee reductions; and lower the threshold to 150 percent or 175 percent instead. A few commenters stated that partial fee waivers, with mechanisms such as reduced fees, sliding scale fee schedules, and family caps, should be used to facilitate applications from low- and middle-income immigrants. Several commenters wrote that USCIS should retain the previous fee waiver eligibility criteria.

*Response:* DHS recognizes that filing fees are a burden for some people of limited financial means. However, as previously stated, the cost of fee waivers and reduced fees are borne by all other fee payers, because they must be transferred to those who pay a full fee to ensure full cost recovery. DHS believes that it is more equitable to base fees on the beneficiary-pays principle. Thus, USCIS takes a relatively careful position with respect to transferring costs from one applicant to another through the expansion of fee waiver eligibility and discounting fees. To set fees at various levels based on income, as suggested by the commenter, would require deviation from the underlying fee-setting methodology and require some of the costs for those applications to be reassigned to other benefit requests. Therefore, DHS did not incorporate a reduced fee, sliding scale, or family cap in this final rule or the other suggestions provided by commenters.

*Comment:* Others suggested USCIS set a higher limit of at least 200 percent instead of 125 percent FPG.

*Response:* DHS will not adopt the suggestion to increase the income requirement to 200 percent of the poverty line. As previously discussed, DHS selected the 125 percent of the FPG threshold as it is consistent with the income threshold in other areas related to immigration benefit adjudication, the public charge inadmissibility rule, and affidavit of support requirements under INA section 213A, 8 U.S.C.1183a, and 8 CFR 212.22(b)(4).

### F. Comments on Fee Exemptions

*Comment:* One commenter opposed USCIS' proposal to remove most fee exemptions and to formalize limits to its discretion to provide fee exemptions. The commenter stated that USCIS failed to provide any rationale to justify this regulatory constraint. The commenter said narrowing the regulatory authority of the Director of USCIS to receive requests and waive fees for a case or specific class of cases would unnecessarily tie the hands of future policymakers. The commenter also stated that it is unclear how this

---

[65] See IRS, Definition of Adjusted Gross Income, available at *https://www.irs.gov/e-file-providers/ definition-of-adjusted-gross-income* (last visited March 7, 2020).

**46828**     Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

authority would be exercised and how USCIS would adequately publicize any such exercise of discretion.

*Response:* DHS authorized the USCIS Director to approve and revoke exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c) in 2010. *See* old 8 CFR 103.7(d); 75 FR 58, 961, 58990. Since then, that provision has been implemented effectively without providing publicly available guidance for how a person may request that the Director exercise that authority for an individual who feels like he or she is worthy of special consideration by the Director. USCIS receives several million fee-paying requests per year and to permit an individual to request a fee waiver from the Director using authority

that may only be delegated to one other person could result in an unmanageable level of requests. USCIS has approved waiver eligibility and group exemptions in the case of natural disasters or significant USCIS errors. DHS explained in the proposed rule that it was concerned that the current authority provides too much discretion to a future Director to expand fee exemptions and waivers beyond what may be fiscally sound and shifting burden to just a few fee payers. In the 2010 fee rule, DHS stated that it thought the limits that it was imposing in that rule on fee waivers would ensure that fee waivers are applied in a fair and consistent manner, that aliens who are admitted into the United States will not become public charges, and that USCIS will not shift an unreasonable amount of costs to other

fee-paying benefit requests.[66] Unfortunately, that goal was not achieved, and as stated in the NPRM, the current level of fee waivers is not sustainable. *See* 84 FR 62300. Thus, prescribing a limit in the regulations on the ability of future Directors to waive or exempt fees on a discretionary basis was determined to be necessary. Nevertheless, based on the use of 8 CFR 103.7(d) by Directors since 2010, the restrictions are consistent with the relief that has been provided; thus new 8 CFR 106.3(b) and (c) is not a major departure from how that provision has been applied.

Table 4 below provides a list of filing fee exemptions as provided in the rule. See new 8 CFR 106.2.

TABLE 4—FILING FEE EXEMPTIONS [67]

| Form [66] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–90, Application to Replace Permanent Resident Card. | Applicant who has reached his or her 14th birthday and the existing card expires after his or her 16th birthday. | N/A | 8 CFR 106.2(a)(1) | 8 CFR 264.5(a). |
| I–102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document. | For nonimmigrant member of the U.S. Armed Forces. | Initial Filing | 8 CFR 106.2(a)(2)(i) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| | For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component. | Initial Filing. | 8 CFR 106.2(a)(ii). | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| | For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement. | Initial Filing | 8 CFR 106.2(a)(ii) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. | For filing Form I–129CWR, Semiannual Report for CW–1 Employers. | N/A | 8 CFR 106.2(a)(4)(B)(iii) | 8 CFR 106.3(e)(5)—Agreement between U.S. government and other nations. |
| I–129F, Petition for Alien Fiancé(e). | For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130. | N/A | 8 CFR 106.2(a)(5)(ii) | Previous regulations at 8 CFR 103.7(b)(1)(i)(K). |
| I–131, Application for Travel Document. | Applicants who filed USCIS Form I–485 on or after July 30, 2007, and before October 2, 2020 and paid the Form I–485 fee. | Any application | 8 CFR 106.2(a)(7)(iv) | Required by regulations in effect at the time the request was filed. |
| | Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(7)(iv) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| I–360 Petition for Amerasian, Widow(er), or Special Immigrant. | • A petition seeking classification as an Amerasian; <br> • A self-petition for immigrant classification as an abused spouse or child of a U.S. citizen or lawful permanent resident or an abused parent of a U.S. citizen son or daughter; or <br> • A petition for special immigrant juvenile classification; or <br> • A petition seeking special immigrant visa or status an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(16) | Policy based on INA section 245(l)(7). |
| Form I–485, Application to Register Permanent Residence or Adjust Status. | Applicants for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Interpreter, or Iraqi National employed by or on behalf of the U.S. Government or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(17)(iii) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| | Applicants filing as refugees under INA section 209(a). | Any application | | Previous 8 CFR 103.7(b)(1)(i)(U)(3). |

[66] 75 FR 58973.

[67] In general, USCIS exempts a fee for an application or request to replace a document based on USCIS error.

[68] Some supplemental forms may not have fees as the fees are part of the main form, including Form I–130A, Supplemental Information for Spouse

Beneficiary, Form I–485 Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–539A Supplemental Information for Application to Extend/Change Nonimmigrant Status.

[69] If more than one Form I–600 is filed during the Form I–600A approval period on behalf of

beneficiary birth siblings, no additional fee is required.

[70] No additional fee for a Form I–800 is required when filing for children who are birth siblings.

[71] Re-registration applicants must still pay the biometric services fee.

TABLE 4—FILING FEE EXEMPTIONS[67]—Continued

| Form[66] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–485 Supplement A, Adjustment of Status under Section 245(i). | When the applicant is an unmarried child less than 17 years of age, when the applicant is the spouse, or the unmarried child less than 21 years of age of a legalized alien and who is qualified for and has properly filed an application for voluntary departure under the family unity program. | N/A | 8 CFR 106.2(a)(17)(iv) | INA section 245(i). |
| I–290B, Notice of Appeal or Motion. | For an appeal or motion for denial of a petition for a special immigrant visa from an individual for a special immigrant status as an Afghan or Iraqi Interpreter, or Iraqi or Afghan National employed by the U.S. Government or the International Security Assistance Forces ("ISAF"). | Any application | 8 CFR 106.2(a)(14)(ii) | National Defense Authorization Act for Fiscal Year 2008, Public Law 110–181 (Jan 28, 2008) and Omnibus Appropriations Act, 2009 Public Law 111–8 (Mar. 11, 2009). |
| I–539, Application to Extend/Change Nonimmigrant Status. | Nonimmigrant A, G, and NATO | | 8 CFR 106.2(a)(19) | 8 CFR 106.3(e)(5)—Agreement between the U.S. government and other nations. |
| I–589, Application for Asylum and for Withholding of Removal. | Applications filed by unaccompanied alien children who are in removal proceedings. | | 8 CFR 106.2(a)(20) | Public Law 110–457, 122 Stat. 5044 (2008). |
| I–600, Petition to Classify Orphan as an Immediate Relative[69]. | First Form I–600 filed for a child on the basis of an approved Application for Advance Processing of an Orphan Petition, Form I–600A, during the Form I–600A approval or extended approval period. | | 8 CFR 106.2(a)(21)(i) | Previous 8 CFR 103.7(b)(1)(i)(Y), (Z). |
| I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/ I–600. | Filed in order to obtain a first extension of the approval of the Form I–600A or to obtain a first time change of non-Hague Adoption Convention country during the Form I–600A approval period. | | 8 CFR 106.2(a)(23)(i)(A) | Previous 8 CFR 103.7(b)(1)(i)(Y), (Z). |
| I–765, Application for Employment Authorization. | Refugee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(B) | Policy. |
| | Paroled as refugee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(B) | Policy. |
| | Asylee | Initial EAD | 8 CFR 106.2(a)(32)(ii)(C) | Policy. |
| | N–8 or N–9 nonimmigrant | Initial EAD | 8 CFR 106.2(a)(32)(ii)(G) | 8 CFR 106.3(e)(5)—Agreement between the U.S. government and another nation or nations. |
| | Victim of severe form of trafficking (T–1 nonimmigrant). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(D) | Policy based on INA section 245(l)(7). |
| | Victim of qualifying criminal activity (U–1 nonimmigrant). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(E) | Policy based on INA section 245(l)(7). |
| | Dependent of certain government and international organizations, or NATO personnel. | Initial EAD Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(F) 8 CFR 106.2(a)(32)(iv)(C) | Based on 106.3(e)(5)—An agreement between the U.S. government and another nation or nations. |
| | Taiwanese dependent of Taipei Economic and Cultural Representative Office TECRO E–1 employees. | Initial EAD, Renewal EAD, Replacement EAD. | N/A | 8 CFR 106.3(e)(5)—An agreement between the U.S. government and another nation or nations. |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(D) of the Act (Applicant adjusting under the Cuban Adjustment Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on INA section 245(l)(7). |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(E) of the Act (Applicant adjusting based on dependent status under the Haitian Refugee Immigrant Fairness Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on through INA 245(l)(7). |
| | VAWA Self-Petitioners as defined in section 101(a)(51)(F) of the Act (Applicant adjusting under the Nicaraguan Adjustment and Central American Relief Act for battered spouses and children (principal) who has a pending adjustment of status application (Form I–485)). | Initial EAD | 8 CFR 106.2(a)(32)(ii)(I) | Policy based on INA section 245(l)(7). |
| | Applicant for Special Immigrant Status based on an approved Form I–360 as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces ("ISAF"). | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(J) | Public Law 110–181 (Jan 28, 2008) and Public Law 111–8 (Mar. 11, 2009). |
| | An applicant who filed USCIS Form I–485 on or after July 30, 2007 and before [INSERT EFFECTIVE DATE OF 2018/2019 FEE RULE] and paid the Form I–485 filing fee. | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(ii)(A) | Required by regulations in effect when form was filed. |
| | Principal VAWA Self-Petitioners who have approved petitions pursuant to section 204(a) of the Act. | Initial EAD | 8 CFR 106.2(a)(32)(ii)(H) | Policy based on INA section 245(l)(7). |
| | Any current Adjustment of Status or Registry applicant filed for adjustment of status on or after July 30, 2007, and before [INSERT EFFECTIVE DATE OF 2018/2019 FEE RULE] and paid the appropriate Form I–485 filing fee. | Initial EAD, Renewal EAD, Replacement EAD. | 8 CFR 106.2(a)(32)(iv)(A) | Required by regulations in effect when form was filed. |
| | Request for replacement Employment Authorization Document based on USCIS error. | Replacement EAD | 8 CFR 106.2(a)(32)(iii) | 8 CFR 106.3(e)(6). |
| I–765V, Application for Employment Authorization for Abused Nonimmigrant Spouse. | Any applicant | N/A | 8 CFR 106.2(a)(32)(v) | Policy based on INA section 245(l)(7). |
| I–800, Petition to Classify Convention Adoptee as an Immediate Relative[70]. | The first Form I–800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, during the Form I–800A approval period. | Initial Filing | 8 CFR 106.2(a)(33)(i) | 8 CFR 103.7(b)(1)(i)(JJ), (LL). |
| Form I–800A Supplement 3, Request for Action on Approved Form I–800A. | Filed in order to obtain a first extension of the approval of the Form I–800A or to obtain a first time change of Hague Adoption Convention country during the Form I–800A approval period. | N/A | 8 CFR 106.2(a)(35)(i)(A) | 8 CFR 103.7(b)(1)(i)(JJ)(1). |

TABLE 4—FILING FEE EXEMPTIONS [67]—Continued

| Form [68] | Eligibility category | Reason for filing (if applicable) | Final rule regulation section | Statutory or regulatory authority if applicable |
|---|---|---|---|---|
| I–821, Application for Temporary Protected Status [71]. | Any applicant | Re-registration | 8 CFR 106.2(a) | INA section 245(l)(7). |
| I–821D, Consideration of Deferred Action for Childhood Arrivals. | Any requestor | | 8 CFR 106.2(a)(38) | Policy decision based on *DHS et al.* v. *Regents of the Univ. of Cal. et al.*, No. 18-587 (S.Ct. June 18, 2010). |
| I–914, Application for T Nonimmigrant Status. | Any applicant | N/A | 8 CFR 106.2(a)(45) | Policy but based on INA section 245(l)(7). |
| I–918, Petition for U Nonimmigrant Status. | Any applicant | N/A | 8 CFR 106.2(a)(46) | Policy but based on INA section 245(l)(7). |
| N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA). | An applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied. | N/A | 8 CFR 106.2(b)(2) | *See* INA secs. 328(b)(4), 329(b)(4). |
| N–400, Application for Naturalization. | An applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service. | N/A | 8 CFR 106.2(b)(3) | *See* INA secs. 328(b)(4), 329(b)(4). |
| N–565, Application for Replacement Naturalization/Citizenship Document. | Application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error. | N/A | 8 CFR 106.2(b)(5)(ii) | Policy based on 8 CFR 106.3(e)(6). |
| Form N–600, Application for Certificate of Citizenship. | Member or veteran of any branch of the U.S. Armed Forces. | N/A | 8 CFR 106.2(b)(6) | Based on National Defense Authorization provisions. |
| Other—Claimant under section 289 of the Act. | Claimant | N/A | 8 CFR 106.2(c)(9) | INA 289. |

## 1. EAD (Form I–765) Exemption

*Comment:* A commenter stated that DHS should not charge a fee for applications for employment authorization for individuals granted withholding of removal, indicating that it violates United States treaty obligations under Article 17 of the Refugee Convention. Individuals who have been granted withholding of removal have been found by an immigration judge to meet the legal definition of a refugee, and are authorized to remain lawfully in the United States for as long as that status continues, citing to INA section 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.16, 1208.24. The commenter indicated that the U.S. Supreme Court has recognized that withholding of removal is the mechanism by which the United States implements its obligation under Article 33 of the Refugee Convention to ensure that refugees are not returned to a place where they will face persecution, citing to *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987). The commenter wrote that just as much as asylees, individuals granted withholding of removal have a right, under Article 17(1) of the Refugee Convention, to obtain authorization to work on the most favorable terms that the United States allows to nationals of a foreign country. The commenter also indicated that Australia only charges the equivalent of 25 U.S. dollars—half of what DHS proposes to charge for asylum applications.

Another commenter said the imposition of a fee for work authorization for those individuals who have been granted withholding of removal is in conflict with the U.S. legal obligations. The commenter said such individuals have an urgent, recognized humanitarian need to live and work in the United States, and therefore, USCIS should continue its historic practice of exempting these individuals from work authorization fees.

*Response:* DHS is continuing to provide a fee exemption for the initial Form I–765, Application for Employment Authorization, for individuals who were granted asylum (asylees) or who were admitted as refugees, consistent with Article 17(1) of the 1951 Convention relating to the Status of Refugees (as incorporated in the 1967 Protocol relating to the Status of Refugees). *See* 84 FR 62302; 8 CFR 106.2(a)(32)(ii)(B). Consistent with past practice, asylees and refugees submitting a Form I–765 for EAD renewals will generally be required to pay the relevant fee. *See* 8 CFR 106.2(a)(32).

However, DHS is not providing a fee exemption for initial requests for an EAD for individuals granted withholding of removal. *See* 84 FR 62301. Fees associated with access to protection and work authorization do not jeopardize United States compliance with its non-refoulement obligations under Article 33 of the 1951 Refugee Convention. The United States ensures compliance with non-refoulement obligations not through the asylum process, but through the withholding of removal provisions, currently codified at section 241(b)(3) of the INA. *See* v. *Stevic,* 467 U.S. 4 )7 (1984). USCIS uses the Form I–589 solely to adjudicate affirmative applications for asylum. It is immigration judges, within the Department of Justice, who evaluate withholding of removal claims in the context of removal proceedings before them. The asylum process "does not correspond to Article 33 of the 1951 Convention, but instead corresponds to Article 34" of the 1951 Refugee Convention, which provides that party states "shall as far as possible facilitate the assimilation and naturalization of refugees." *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987) (quotation marks omitted). As the Supreme Court has recognized, Article 34 is "precatory" and "does not require [an] implementing authority actually to grant asylum to all those who are eligible." *Id.* Further, although the United States is a party to the 1967 Refugee Protocol, which incorporates both Articles 33 and 34 of the 1951 Refugee Convention, the Protocol is not self-executing. *See, e.g., Stevic,* at 428 n.22. It is the withholding statute at INA section 241(b)(3) and the asylum statute at INA section 208 that, respectively, constitute the U.S. implementation of these treaty obligations. Nothing in either of these two provisions precludes the imposition of a filing fee for asylum applications or work authorization for those granted withholding of removal. Imposition of asylum application and work authorization filing fees are fully consistent with United States domestic implementing law and Article 17 of the 1951 Refugee Convention, which relates to refugees engaging in employment. *See Weinberger* v. *Rossi,* 456 U.S. 25, 34 (1982) (noting the general presumption that United States law conforms to U.S. international treaty obligations). DHS has further clarified the immigrant categories eligible for fee exemptions and clarified which renewal and

replacement EAD are eligible for fee exemptions. *See* new 106.2(a)(32).

## 2. TPS

*Comment:* Another commenter stated that fee exemption limitations would be especially harmful to TPS applicants. The commenter added that USCIS is planning to charge TPS applicants a separate biometric service fee, even though the proposal bundles that cost for every other category of benefit applicant. The commenter concluded by saying TPS applicants would be required to pay $570 to obtain TPS protections and begin to earn an income, which is unaffordable.

*Response:* In this final rule, DHS removes the Form I–765 fee exemption in 8 CFR 244.6(b) for TPS if the individual is an initial TPS registrant and is under 14 years of age or over 65 years of age, and DHS establishes a biometric services fee of $30 for TPS applicants and re-registrants. As we stated in the NPRM, DHS is removing the fee exemption because application fees from other form types have always been used to fund the costs of processing fee-exempt filings. Continuing to exempt these populations from paying associated fees would result in the costs of their requests being borne by the other proposed fees. Thus, DHS determined that initial TPS registrants under 14 years of age or over 65 years of age should pay for their own EAD.

The biometric services fee that TPS applicants and re-registrants must pay is changed from $85 to $30, a reduction of $55 per filing. This $30 fee, which will be required regardless of age, reflects the cost of providing biometric services to TPS applicants and re-registrants. *See* new 8 CFR 244.17(a). This biometric services fee will partially offset the increase in the fee or the removal of the fee exemption for Form I–765, Application for Employment authorization, so that the total cost of applying for Temporary Protected Status and requesting employment authorization for those who would not have been exempt from the Form I–765 fee is increasing from $545[72] to $630 for initial TPS applicants.[73] The cost of re-registering for TPS and requesting employment authorization will increase

from $495[74] to $58C.[75] DHS notes that TPS applicants and re-registrants may request fee waivers. *See* 8 CFR 106.3.

The commenter correctly noted that DHS did not incorporate the cost of biometrics into the cost of Form I–821, Application for Temporary Protected Status. In this final rule, DHS incorporates the cost of providing biometric services into the underlying fee for most applications and petitions. However, the maximum fee for Form I–821, Application for Temporary Protected Status is set in legislation at $50 for initial TPS applicants and $0 for re-registrants. *See* INA section 244a(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). Therefore, DHS is not able to increase the fee for Form I–821 and cannot incorporate the cost of biometrics into the form fee. Thus, DHS maintains a separate biometric services fee for TPS registrants and re-registrants and requires the biometric services fee for re-registrants under age 14 to recover the full cost of providing such services. New 8 CFR 106.3(a) 37)(iii) and 244.17(a).

DHS declines to make changes in this final rule based on this comment. DHS also notes that 8 CFR 244.6(b) is updated to be consistent with new 8 CFR 106.2 and 106.3 in relation to the Form I–765 fees for TPS.

### G. Comments on Specific Fees

### 1. Fees for Online Filing

*Comment:* A few 545 suggested that, rather than just raising the fees, USCIS should focus on processing times and becoming more efficient, stating that the process is "severely paper intensive" and could benefit from a more streamlined electronic process. One commenter cited a 2005 report from DHS Office of the Inspector General (OIG) which found that USCIS information technology (IT) systems were primarily paper-based and duplicative, and that USCIS' ability to process immigration benefits was inefficient. Another commenter stated that USCIS has done little to shift to digital applications despite prior fee hikes. One commenter said paper filing is extremely laborious for petitioners, and that many of the concerns that led USCIS to propose higher fees and beneficiary limits could be solved by implementing electronic filing. Another commenter outlined the benefits of moving to electronic process, including cost savings and the ability for "essential workers to arrive on time."

One commenter stated that USCIS has failed to deliver promised improvements to its online filing abilities and other modernization initiatives that would result in more streamlined operations. The same commenter stated that in 2019, legal service providers still reported many challenges in utilizing USCIS online filing systems, and that modernization continues to be pushed on to USCIS customers even to the detriment of customer service. A commenter wrote that they were concerned about USCIS moving to online filing based on their experiences with the Department of State's National Visa center; they were frustrated by software glitches and processing issues (*e.g.*, lost documents, erroneous file rejection, lack of information after lengthy waits on hold) which the commenter said should be addressed before fees are raised. One commenter stated if USCIS wants to save money, it should stop requiring an endless flow of paperwork. The commenter provided a list of forms that businesses in the CNMI must fill out when new employees are hired and stated that the redundancy wasted both their and USCIS' time and resources. The commenter referred to a bill from Congressman Sablan that would give long-term CW Visa personnel permanent status and stated their hope that there will not be constant paperwork required for those requests.

*Response:* On March 13, 2017, the President signed Executive Order 13781, entitled "Comprehensive Plan for Reorganizing the Executive Branch."[76] The order instructed the Director of OMB to propose a plan to improve the efficiency, effectiveness, and accountability of the Executive Branch. The resulting June 2018 OMB Report, "Delivering Government Solutions in the 21st Century" recognized that an overarching source of government inefficiency is the outdated reliance on paper-based processes and prioritized the transition of Federal agencies' business processes and recordkeeping to a fully electronic environment.[77] The report noted that Federal agencies collectively spend billions of dollars on paper management, including the processing, moving, and maintaining of large volumes of paper records and highlighted the key importance of data, accountability, and transparency.[78]

---

[72] Total of $545 equals $50 for Form I–821 plus $85 biometric services fee plus $410 for Form I–765.

[73] Total of $630 equals $50 for Form I–821 plus $30 biometric services fee plus $550 for Form I–765.

[74] Total of $495 equals $85 biometric services fee plus $410 for Form I–765.

[75] Total of $580 equals $30 biometric services fee plus $550 for Form I–765.

[76] E.O. 13781, 82 FR 13959 (Mar 16, 2017).

[77] OMB, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* 18 (2018), available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.*

[78] *Id.* at 100.

Even more significantly, it cites USCIS' electronic processing efforts as an example of an agency initiative that aligns with the prioritized reforms.[79]

DHS understands that, while USCIS has embraced technology in its adjudication and recordkeeping, it remains bound to the significant administrative and operational burdens associated with paper submissions. The intake, storage, and handling of paper require tremendous operational resources, and the information recorded on paper cannot be as effectively standardized or used for fraud and national security, information sharing, and system integration purposes. Technological advances have allowed USCIS to develop accessible, digital alternatives to traditional paper methods for handling requests. Every submission completed online rather than through paper provides direct and

immediate cost savings and operational efficiencies to both USCIS and filers—benefits that will accrue throughout the immigration lifecycle of the individual and with the broader use of online filing and e-processing.

As various online functions are developed, USCIS makes them available to the public, providing the option of engaging with USCIS either online or on paper. DHS recognizes that, if presented with optional new technology, people adopt new practices at varying rates.[80] In this case, the complexity of the immigration benefit request system may exacerbate the tendency toward the status quo. Those familiar with paper-based forms and interactions may feel there is no reason to change a method that has worked for them.

DHS agrees that transitioning to e-processing for benefit requests is an important step in improving the service

and stewardship of USCIS and to promote the objectives of the Government Paperwork Elimination Act, E-Government Act, and E.O. 13781.[81] Therefore, and in response to the public comments, USCIS has calculated the amount of upfront cost savings that it recognizes from an online versus paper filing in the current environment and determined that it saves approximately $7 per submission. To encourage the shift of those capable of filing online into the electronic channel and increase the usage of USCIS e-processing for those forms for which online filing is currently available, DHS will set the fees for online filing at an amount $10 lower than the fees established in this final rule for filing that form on paper. New 8 CFR 106.3(d).[82] *See* Table 5: Fees for Online Filing for a comparison of paper and online filing fees.

### TABLE 5—FEES FOR ONLINE FILING

| Immigration benefit request | Online filing fee | Paper filing fee | Difference |
|---|---|---|---|
| I–90 Application to Replace Permanent Resident Card | $405 | $415 | $10 |
| I–130 Petition for Alien Relative | 550 | 560 | 10 |
| I–539 Application to Extend/Change Nonimmigrant Status | 390 | 400 | 10 |
| N–336 Request for Hearing on a Decision in Naturalization Proceedings | 1,725 | 1,735 | 10 |
| N–400 Application for Naturalization | 1,160 | 1,170 | 10 |
| N–565 Application for Replacement Naturalization/Citizenship Document | 535 | 545 | 10 |
| N–600 Application for Certificate of Citizenship | 990 | 1,000 | 10 |
| N–600K Application for Citizenship and Issuance of Certificate | 935 | 945 | 10 |
| G–1041 Genealogy Index Search Request | 160 | 170 | 10 |
| G–1041A Genealogy Records Request | 255 | 265 | 10 |

DHS adjusts USCIS' fee schedule in this final rule to ensure it recovers the estimated full cost of providing immigration adjudication and naturalization services. USCIS' cost baseline reflected in this final rule accounts for the costs of intake and adjudication of applications received online and on paper. To provide for full cost recovery, DHS adjusts the fees for filing applications on paper when online filing is available to be higher than those fees would be in the absence of the lower fees for online filing. The increased revenue anticipated from the higher fees for those forms when filed on paper will offset the reductions in revenue anticipated from the lower fees for online filing. USCIS will further evaluate the effects of these changes in future biennial fee reviews.

As for the comments directed at the Department of State (DOS) online processing, USCIS has no control over the efficacy of DOS systems. DHS may learn from the DOS issues, however, and will, of course, work to minimize any glitches.

*Comment:* Some commenters wrote that switching to online filing would create a barrier to immigrants without access to technology, and the option should exist to choose between e-filing and paper submissions.

*Response:* USCIS does not require that any immigration benefit request be filed online. Filing on paper remains a valid option. However, this final rule specifies that forms currently eligible for online filing will be $10 more if filed on paper.

*Comment:* A few commenters recommended USCIS maintain the current fees for processing Form I–129 petitions for H–2A beneficiaries until the online Electronic Immigration System (ELIS) can be established and USCIS can conduct a robust analysis to more accurately determine an appropriate fee schedule consistent with Federal guidelines for user fees.

*Response:* USCIS must recover its full cost of providing immigration adjudication and naturalization services. DHS adjusts the fees for forms that are currently eligible for online filing to be $10 lower if filed online than the fee for the same forms filed on paper to reflect the known cost-savings to USCIS of receiving an application electronically. DHS declines to delay adjusting the fee for Form I–129H2A

[79] *Id.* at 101–02.

[80] Brian Kennedy & Cary Funk, Pew Research Group, *28 percent of Americans are 'strong' early adopters of technology* (July 12, 2016), *available at* http://www.pewresearch.org/fact-tank/2016/07/12/28-of-americans-are-strong-early-adopters-of-technology/; Charlie Wells, The Wall Street Journal, *Forget Early Adopters: These People are Happy to*

*Be Late* (Jan. 26, 2016), *available at* https://www.wsj.com/articles/forget-early-adopters-these-people-are-happy-to-be-late-1453827437.

[81] *See* President's Management Council, Executive Office of the President, *President's Management Agenda 7* (2018). *available at* https://www.whitehouse.gov/wp-content/uploads/2018/04/ThePresidentsManagementAgenda.pdf.

[82] U.S. Customs and Border Protection accepts USCIS Forms I–192 and I–212 online. Available at https://www.cbp.gov/travel/international-visitors/e-safe (last viewed Mar. 27, 2020). However, USCIS has no data on the cost of online filing with CBP. Therefore, this $10 online fee reduction applies to USCIS forms submitted to USCIS only.

because USCIS must recover its full costs.

DHS does not provide for a lower online filing fee for Form I–129H2A in this final rule. As described above, DHS is increasing the fees for filing an application on paper above the level it would otherwise establish when the application is also eligible for online filing. This will provide for full cost recovery by USCIS. However, because online filing is not yet available for Form I–129H2A, DHS cannot increase the fee for a paper filing to offset the anticipated reduction in revenue from a lower fee for online filing and still provide for full cost recovery. If DHS raised the fee for filing Form I–129H2A on paper in anticipation of future online filing and a lower fee for filing online, USCIS would recover revenue in excess of its estimated full cost of adjudication until such time as online filing and a lower online filing fee are available. Thus, DHS cannot establish lower fees for online filing for Form I–129H2A, or any other applications for which online filing is not yet available, and still provide for full cost recovery. DHS may consider a lower fee for Form I–129H2A if filed online in future rulemakings if Form I–129H2A is available for online filing.

## 2. Biometric Services Fee

*Comment:* One commenter questioned why USCIS would forego approximately $220,884,315 in biometric services fee revenue. The commenter added that the NPRM allows for biometric services fees for TPS applicants and those filing EOIR forms; therefore, there should continue to be a fee for this service. The commenter concluded that if DHS implements this proposal, it will be confusing for applicants, attorneys, and government staff to implement and it will lead to delays in proper filing of applications and petitions. The same commenter recommended that USCIS use the biometric services fee to supplement fraud investigations or consider raising this fee in order to provide additional revenue.

*Response:* The commenter misunderstands DHS's approach to recovering the estimated full cost of providing biometric services. Although DHS eliminates the separate biometrics service fee of $85 for many application types in this final rule, it establishes fees for most forms to reflect the estimated full cost of adjudication, including the cost of biometric services that are typically associated with that form. Thus, DHS will continue to recover the cost of providing biometric services, but it will do so by adjusting form fees to reflect the total cost of an

adjudication, including providing biometric services. DHS will not forego any revenue associated with the biometric services fee because of this change.

DHS believes that this change in its method of recovering the cost of biometric services will provide benefits to applicants and USCIS. Most applicants and petitioners will no longer need to determine if they must submit a separate biometric services fee in addition to the fee for their request. DHS believes that this will reduce confusion among requestors and decrease rejections for incorrect fees. Fewer rejections for incorrect fees should increase administrative efficiency for USCIS. As provided in new 8 CFR 103.17, DHS is also establishing a separate biometric services fee for additional requests for which it could not include the costs to USCIS of administering biometric services in the ABC model used for the NPRM. First, DHS codified revised 8 CFR 208.7(a)(1)(i), which requires that biometrics be submitted for an application for employment authorization from an applicant for asylum or to renew such an EAD. See Asylum Application, Interview, and Employment Authorization for Applicants, 85 FR 33532, 38626 (June 26, 2020); new 8 CFR 208.7(a)(1)(i). That rule takes effect on August 25, 2020. Second, on February 19, 2020, USCIS implemented the Commonwealth of the Northern Mariana Islands (CNMI) long-term resident status program. It was created by the Northern Mariana Islands Long-Term Legal Residents Relief Act. 48 U.S.C. 1806(e)(6).[83]

Applicants must file Form I–955, Application for CNMI Long-Term Resident Status, together with Form I–765, Application for Employment Authorization, by August 17, 2020. When the CNMI long-term resident status program was established, USCIS required that a biometric services fee be submitted with the Form I–765.[84] Because the CNMI long-term resident program and fee NPRM were under development simultaneously, DHS was unable to include the cost of biometric

<hr>

[83] *See,* CNMI Long-Term Resident Status, available at *https://www.uscis.gov/working-united-states/cnmi-long-term-resident-status* (last reviewed/updated Feb. 19, 2020).

[84] *See* USCIS Form I–765, Application for Employment Authorization, page 23 (stating, "Special Instructions for Applicants for Commonwealth of the Northern Mariana Islands (CNMI) Long-Term Resident Status—(c)(37). All applicants under this category must pay the biometric services fee of $85. The biometric services fee and the filing fee for the I–765 application cannot be waived."). Available at *https://www.uscis.gov/i-765.*

services for CNMI long-term resident program in the ABC model for the NPRM. Therefore, the fee for Form I–765 does not include the costs for that service. DHS proposed new 8 CFR 103.17 in contemplation of the need for a separate fee in the future if biometric services was required by regulations or policy, but where the costs had not been considered in setting the benefit request fee. As a result, and consistent with the actions taken for TPS, EOIR forms, and in accordance with new 8 CFR 103.17, DHS requires that CNMI long-term resident applicants and applicants for asylum who are applying for employment authorization submit a $30 biometric services fee with their Form I–765. 8 CFR 106.2(a)(32)(i)(A), (B).

*Comment:* One commenter opposed a separate biometric services fee for TPS applicants, stating that USCIS is breaching Congress's $50 cap on TPS filing by imposing a separate biometric fee.

*Response:* The commenter is correct in stating that the fee for Form I–821, Application for Temporary Protected Status, is statutorily limited to $50 for initial TPS applicants and $0 for re-registrants. *See* INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B). However, the commenter is incorrect in stating that charging TPS applicants and re-registrants a separate biometric services fee constitutes a breach of any statute. DHS has specific statutory authority to collect "fees for fingerprinting services, biometric services, and other necessary services" when administering the TPS program. *See* 8 U.S.C. 1254b.

Before this final rule, all TPS applicants and re-registrants aged 14 years and older were subject to the $85 biometric services fee, in addition to any applicable fees for Forms I–821 and I–765. Therefore, adjusting the biometric services fee for TPS applicants and re-registrants to $30 represents a $55 reduction in the biometric services fee that these individuals may pay. DHS also notes that TPS applicants and re-registrants may apply for fee waivers based on eligibility criteria established by USCIS.

In this final rule, DHS removes the Form I–765 fee exemption in 8 CFR 244.6(b) for TPS if the individual is an initial TPS registrant and is under 14 years of age or over 65 years of age, and DHS establishes a biometric services fee of $30 for TPS applicants and re-registrants. As we stated in the NPRM, DHS is removing the fee exemption because fees from other form types have always been used to fund the costs of processing fee-exempt filings. Continuing to exempt these populations

from paying associated fees would result in the costs of their requests being borne by the other proposed fees. Thus, DHS determined that initial TPS registrants under 14 years of age or over 65 years of age should pay their own Form I–765 fee and biometric services fee. The biometric services fee that TPS applicants and re-registrants must pay is changed from $85 to $30, a reduction of $55 per filing. This $30 fee, which will be required regardless of age, reflects the cost of providing biometric services to TPS applicants and re-registrants. *See* new 8 CFR 244.17(a).

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A few commenters stated that including a biometrics screening and fee for children under 14 is unnecessary and that it is inappropriate to charge a single fee for Form I–485 that includes the cost of biometrics to both adults and children under 14 years of age who do not submit biometric information. A few commenters stated that imposing a biometric services fee where USCIS does not capture biometric data would deter families from entering the United States as a unit.

*Response:* As explained previously, DHS will expand the collection of biometric information for TPS re-registrants under the age of 14, remove the biometrics fee exemption from 8 CFR 244.17(a), and revise the form instructions for Form I–821 to require a $30 biometrics service fee from every TPS registrant regardless of age. *See* 84 FR 62303 and 62368. This change assigns the costs of TPS applications and re-registrations to those who benefit from them. DHS uses biometrics beyond criminal history background checks to include identity management and verification in the immigration lifecycle. Therefore, biometrics will be collected without age limitation, although it may be waived at DHS's discretion.

DHS also acknowledges that this final rule increases the fees for children under 14 years old who file an I–485 concurrently with a parent filing an I–485 by eliminating the reduced I–485 child fee. This final rule establishes the fee for Form I–485, Application to Register Permanent Residence or Adjust Status, at $1,130 for all applicants.

The commenters correctly wrote that the Form I–485 fee established in this final rule includes the average cost of biometric services associated with processing those applications. The inclusion of biometric services reduces the average cost of Form I–485 and the final fee established in this final rule. Processing a given application may be more or less costly than processing another application of the same type

because of the evidence and other factors that adjudicators may consider. Therefore, DHS establishes its fees, unless otherwise noted, at a level sufficient to recover the estimated full cost of adjudication. DHS calculated the Form I–485 fee to reflect the full cost of adjudication, including the average cost of biometric services associated with those applications.

DHS declines to make changes in this final rule in response to these comments.

3. Genealogy Fees, Forms G–1041, Genealogy Index Search Request, and G–1041A, Genealogy Records Request

*Comment:* Numerous commenters generally opposed increasing fees for genealogy search and records requests. Other commenters, many identifying themselves as professional genealogists and/or individual family genealogists, opposed the proposed increased fees, stating that they oppose the fee increase for the following reasons:

• No other government record or research request fees are close to the proposed increased costs.

• The 500 percent fee hike is unjustified, especially after fees tripled 3 years ago.

• The NPRM did not present data or specifics to substantiate the costs. DHS cannot claim such fees are necessary to cover costs when USCIS did not provide cost analysis to support the claim. The proposed fees for G–1041 and G–1041A are arbitrary and capricious.

• The nature of genealogical research often requires broad investigation, requiring several search and record requests.

Some commenters stated that the reasoning presented in the NPRM does not make sense, and expressed doubt that the cost of providing these services could possibly have risen enough in 3 short years to justify an increase of this magnitude, including:

• Workload volume submitted in Tables 1 and 5 are the same and do not indicate any increase in workload after the increase in fee schedules;

• Table 4 shows a combined total increase of only 7,200 requests in the last three years;

• Table 24 shows how costs will be *reduced* to the agency by decreasing the administrative burden through electronic versions of records;

• The proposal provides no real basis of comparison of real costs;

• DHS does not currently have enough data to estimate the effects for small entities; and

• The expected use in the next fiscal year shows almost no impact to USCIS.

*Response:* DHS recognizes commenters' concerns regarding the scope of the fee increases for Forms G–1041 and G–1041A in the NPRM. The proposed increase reflected changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. In response to public comments on the proposed genealogy fee increases, USCIS further refined the methodology used to estimate genealogy program costs. Based on the refined methodology, this final rule establishes a fee for Form G–1041, Genealogy Index Search Request, when filed online as $160 and $170 when filed on paper. Using the same methodology refinement, DHS establishes a fee for Form G–1041A, Genealogy Records Request, when filed online as $255 and $265 when filed by paper.

INA section 1356(t)(1) authorizes DHS to set the genealogy fee for providing genealogy research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget. Nor does USCIS discretely identify and track genealogy program expenditures. The same office that researches genealogy requests, the National Records Center, also performs other functions, such as FOIA operations, retrieving, storing, and moving files. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. The projected costs included a portion of Lockbox costs, genealogy contracts, and other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *See* 81 FR 26919. This estimation methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS is correcting that in this rule.

In FY 2018, USCIS incorporated the genealogy program into the National Records Center (NRC). This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program. DHS estimated the costs of the genealogy program using this methodology for the first time in its FY 2019/2020 fee review

and subsequently proposed to base the fees for Forms G–1041 and G–1041A on these revised cost estimates. DHS did not apply cost reallocation to the fees for Forms G–1041 and G–1041A. DHS believes that these revised cost estimates and fees reflect more accurately the true costs to USCIS of operating the genealogy program than the previous indirect estimation methodology.

As requested by public comments received on the NPRM, USCIS examined the proposed genealogy fees, and decided to further refine its cost estimation for the genealogy program. For this final rule, USCIS reviewed the costs attributable to the NRC to identify those that directly support the genealogy program. USCIS determined that some NRC costs do not directly support the genealogy program and are not attributable to Forms G–1041 and G–1041A. USCIS removed the non-attributable costs to the genealogy program from its cost estimates for Forms G–1041 and G–1041A. USCIS maintained its genealogy program cost estimates a proportional share of NRC overhead costs based on the number of staff at the NRC supporting the genealogy program. Thus, USCIS reduced its estimate of the genealogy program's total cost by $0.9 million. In this final rule, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $160, the fee for a paper filed G–1041 as $170, the fee for Form G–1041A, Genealogy Records Request, when filed online as $255, and the fee for a paper filed G–1041A as $265 to reflect its revised, lower cost estimates directly attributable to the USCIS genealogy program. To the extent that DHS will no longer recover a full proportionate share of the NRC's costs via fees for Forms G–1041 and G–1041A, USCIS will recover those costs through the fees assessed for other immigration benefit requests.

DHS appreciates the public's feedback on the USCIS genealogy program and has implemented changes in this final rule in response to these comments.

*Comment:* Some commenters claimed that taxpayers have already paid to acquire, manage, and store these records. Taxpayers already support the government substantially and should not be charged for access to records.

*Response:* DHS understands the commenters' concerns regarding the potential for duplicative payment. However, USCIS does not receive taxpayer funds for the genealogy program, nor do taxes pay for the acquisition, management, or storage of records in USCIS' custody. Therefore, DHS must recover the estimated full

cost of the genealogy program, including managing and storing records, via USCIS' fee schedule.

When DHS receives a request for genealogical records, it must identify whether USCIS possesses relevant records, retrieve, and review them for release where appropriate. These activities incur costs beyond the general costs of record management and storage that DHS incorporates into other immigration benefit request fees via the Records Management activity. USCIS estimates the costs of the genealogy program via the Research Genealogy activity, as shown in the Cost Objects section of the supporting documentation that accompanies this final rule. Therefore, DHS establishes fees for Forms G–1041 and G–1041A to recover these additional costs. DHS has explicit authority to recover the costs of providing genealogical services via genealogy fees. *See* 8 U.S.C. 1356(t).

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Some commenters opposing the fee increase focused on income and ability-to-pay, such as the following:

• The increased fees would be far beyond the financial means of most average Americans and make it impossible for genealogists and families to make and pay for requests. Only the rich and wealthiest would be able to access these records.

• Many individuals doing genealogy research tend to be older and on limited income.

• A few commenters said that 2018 data from the Federal Reserve Board indicated that the proposed increased fees would place access to Federal public records beyond the financial capabilities of an estimated 40 percent of Americans. Many commenters stated that records should be easily obtainable to all and not used to generate revenue for the government.

*Response:* DHS recognizes the concerns of commenters and acknowledges the substantial increase in the fees for Forms G–1041 and G–1041A. In response, USCIS refined its cost estimation methodology for the genealogy program as described above. In this final rule, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $160, the fee for a paper filed G–1041 as $170, the fee for Form G–1041A, Genealogy Records Request, when filed online as $255, and the fee for a paper filed Form G–1041A as $265 to reflect its revised, lower cost estimates for operating the USCIS genealogy program.

In this final fee rule, DHS emphasizes the beneficiary-pays principle. Consistent with its approach to most other fees addressed in this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level that reflects the estimated full cost of providing those services. DHS does not establish these fees to limit access to genealogical records, and they do not augment government tax revenue. DHS declines to require other individuals filing immigration benefit requests to subsidize users of the genealogy program.

*Comment:* Multiple commenters stated that the proposed fee increases for record requests seems to be a punishment for citizens who want access to ancestors' records. Multiple individuals stated that USCIS would be "holding them hostage" by demanding exorbitant and unjustified fees to access documents on immigration ancestors. The commenters wrote that these records should already be publicly accessible under the law.

*Response:* DHS rejects the characterization of the proposed fees as a way to punish or hold hostage individuals who seek records related to their ancestors via the USCIS genealogy program. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). DHS is not motivated by any other consideration and declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that USCIS most likely has indices of all files in digital form, therefore the time required to type a name into a computer, read the result, and email it to the requester is a matter of minutes and the salary and benefits of the employees do not justify a fee of $240. A few commenters stated that USCIS should publish the figures for the "actual out-of-pocket costs" of searching indices and providing copies of records found and the estimate of the number of requests likely to be processed so that the public can judge whether the fees are appropriate to the cost of providing the service.

*Response:* DHS acknowledges that USCIS possesses indices of many different types and series of records. These indices aid USCIS in efficiently identifying records that may be related to a given genealogical request. However, to fulfill genealogical records requests, USCIS incurs costs beyond identifying records that may be relevant

to a particular inquiry. In addition to identifying relevant records, USCIS must retrieve the relevant records and manually review them before release to ensure compliance with federal privacy statutes. In addition to these direct costs, USCIS also incurs overhead costs associated with storing and managing the records, including relevant facilities costs. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041, Genealogy Index Search Request, to be $160 when filed online and the total cost of completing a paper Form G–1041, Genealogy Index Search Request, to be $170. Therefore, DHS establishes the fee for Form G–1041 as $160 when filed online and a paper filed Form G–1041 as $170. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041A, Genealogy Records Request, to be $255 when filed online and the total cost of completing a paper Form G–1041A, Genealogy Records Request, to be $265. Therefore, DHS establishes the fee for Form G–1041A as $255 when filed online and the fee for a paper filed Form G–1041A as $265.

*Comment:* Many commenters stated that it was vital to be able to obtain records and family artifacts held in files about their ancestors' immigration to the United States and path to becoming Americans. A commenter stated that the records provide information that genealogists often cannot find in any other extant record. Some commenters said public access and researching genealogy helps educate themselves, their children, and other generations on important parts of immigration history, such as the Chinese Exclusion Act and the Holocaust. Multiple commenters wrote "an informed and educated citizenry is essential for our democracy to continue to prosper." A few commenters said studies show that children perform better in school if they know about their ancestors. A few commenters wrote that genealogy research is an integral part of the Church of Jesus Christ of Latter-day Saints and the proposed increase in fees would be a burden to those of that faith. Some commenters said that Daughters of the American Revolution and Native Americans search records to confirm applications for memberships. Ancestral history projects research American slaves brought to South Carolina and Virginia. A fee increase would negatively affect legitimate organizations that keep detailed, complete, and accurate records of American history and would forestall

efforts to complete the histories of minority citizens. A few commenters stated that USCIS genealogy records contain information no longer found in Europe, where the Nazis destroyed records during World War II.

*Response:* DHS recognizes the importance of genealogical records and the connections they can provide to immigrant ancestors. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at a level sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). The fees established in this final rule are intended to recover the estimated full cost of providing genealogical record services and are not motivated by any other consideration. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters wrote that the information provided is essential as part of an application process to those pursuing dual citizenship.

*Response:* DHS recognizes the value of genealogical records to individuals who are pursuing dual citizenship. However, as an agency funded primarily through user fees, USCIS must recover the full cost of the services it provides. Consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize individuals requesting genealogical services from USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few individuals stated that affordable access to genealogy is important to helping determine genetic medical problems and allowing family members to take preactive precautions that foster improved public health as well as substantial cost-savings by federal and state financial medical services.

*Response:* DHS recognizes that individuals may value and request genealogical records for many different reasons. However, DHS is not aware of any data demonstrating the monetary value of health information that may be derived from such records. Consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize individuals requesting genealogical services from USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Several commenters stated that the proposed fees are far from advancing the goals of the USCIS

Genealogy Program and instead would likely be the demise of the program. Some commenters wrote that the proposed increase in fees would price-out and prevent researchers from accessing records, significantly reducing the number of requests for documents, and essentially closing down USCIS' Genealogy Program. Many commenters stated that the proposed increase in fees appears intentionally designed to put an end to people using the Genealogy Program. Numerous commenters addressed how the hefty charges for the initial research, regardless of whether USCIS identified any records, would be by itself a substantial deterrent to genealogical research.

*Response:* DHS acknowledges the substantial increase in fees for Forms G–1041 and G–1041A in this final rule. In this final rule, DHS established the fees for Forms G–1041 and G–1041A to recover the estimated full cost to USCIS of providing genealogical services. In setting these fees, DHS is not motivated by any other consideration. DHS does not intend to discourage individuals from requesting genealogical records, to deter genealogical research, or to eliminate the USCIS genealogy program. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters wrote that the proposed change would be in violation of the Freedom of Information Act (FOIA). Some further commented that the proposed fees are inexplicable given that USCIS often directs a majority of requests to the FOIA program for processing. Several commenters questioned how there could be a charge, other than standard FOIA fees, if the information is available via FOIA. Some commenters wrote that a charge of $240 to simply search an index is unacceptably high compared to standard DHS cost and timeframes for FOIA requests because this fee would equal 6 hours of searching the Master Index, when index searches should usually be able to be completed in an hour or less, undercutting the intent of the FOIA.

*Response:* There is no conflict between the Freedom of Information Act and DHS' operation of the USCIS genealogical program. Nor is USCIS constrained in establishing fees for its genealogical services to the levels established under FOIA. USCIS formerly processed requests for historical records under USCIS' Freedom of Information Act (FOIA)/Privacy Act (PA) program but the demand for historical records grew dramatically. Because the records were not subject to FOIA exemptions, that

process was not the most suitable for genealogy request. *See Establishment of a Genealogy Program;* Proposed rule, 71 FR 20357–20368 (April 20, 2006). The genealogy program was established to relieve the FOIA/PA program from burdensome requests that require no FOIA/PA expertise, place requesters and the Genealogy staff in direct communication, provide a dedicated queue and point of contact for genealogists and other researchers seeking access to historical records, and cover expenses through fees for the program. and, reduce the time to respond to requests. *Id* at 20364. In this final rule, DHS establishes the fees for Forms G–1041 and G–1041A at levels sufficient to recover the estimated full cost of providing access to genealogical records, as provided for by law. *See* INA section 286(t), 8 U.S.C. 1356(t). In this final rule, using the refined methodology described above, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041, Genealogy Index Search Request, to be $160 when filed online and the total cost of completing a paper Form G–1041, Genealogy Index Search Request, to be $170. Therefore, DHS establishes the fee for Form G–1041 as $160 when filed online and a paper filed Form G–1041 as $170. In this final rule, DHS estimates the total cost, including applicable indirect costs, of completing Form G–1041A, Genealogy Records Request, to be $255 when filed online and the total cost of completing a paper Form G–1041A, Genealogy Records Request, to be $265. Therefore, DHS establishes the fee for Form G–1041A as $255 when filed online and the fee for a paper filed Form G–1041A as $265.

DHS appreciates the commenters' concerns regarding differences between the FOIA process and the genealogical index search and records request processes. Before 2017, the USCIS staff who processed FOIA requests also processed some genealogical records requests, particularly records from 1951 or later. However, USCIS moved the genealogical program to the NRC in 2017. Since that time, dedicated USCIS genealogical staff process all genealogical records requests. Commenters are mistaken in stating that the genealogy program sends appropriately filed genealogy requests through the FOIA process. DHS acknowledges that both FOIA requests and genealogical records requests are subject to review under the Privacy Act of 1974 to ensure that USCIS does not inappropriately release information to third parties. However, USCIS'

genealogy program is distinct from the FOIA program and the fees DHS establishes for Forms G–1041 and G–1041A reflects the estimated full cost of only the USCIS genealogy program. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Numerous commenters stated that USCIS needs to comply with its own retention schedules and send appropriate records to NARA, as required by law. Multiple commenters wrote that requests for documents, such as A-files, visa and registry files, and alien registration forms, should already be at NARA per law and for a minimal cost. Some commenters wrote that NARA could manage records more efficiently, accessed more freely, and reproduced more economically, as preserving and providing access to historical records of the federal government is one of NARA's core missions and areas of expertise. Many commenters requested information on USCIS' plan and timeline to move all the records to NARA for release.

*Response:* DHS acknowledges that many records in USCIS' possession are due to be transferred to NARA under its existing records retention schedules. USCIS strives to adhere to its records retention schedules and transfer files to NARA expeditiously when records are eligible for transfer. Unfortunately, issues such as incomplete/non-existent file indices or other operational difficulties may inhibit and delay such transfers. USCIS works with NARA to address all such issues and expects to transfer more files to NARA in the near future. DHS agrees that NARA is the appropriate repository for permanently retained records. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* Many commenters stated that implementation of increased fees should not occur without careful explanation and discussion of alternatives. Several commenters suggested alternatives, including rolling back or reducing fees for record requests, aligning an increase with inflation rates, charging less for family genealogy, allowing NARA to provide free or much lower cost access to the files, digitizing all documents and allowing access on-line, transferring records to an appropriate repository, and/or limiting USCIS holdings to non-historical records. A commenter suggested that all pre-1948 indices and records be copied to NARA, following a federal government census rule that information can be disclosed after 72 years. A few commenters wrote that encouraging requests via electronic submissions for index searches and

documents, as stated in the proposed rule, and digitization of records is worthy, as it should result in lower fees, greater efficiency, and ease of use, not the reverse.

*Response:* DHS appreciates and agrees with the commenters' reasoning that filing index search requests and records request online increases efficiency and, all else equal, reduces the cost to USCIS of providing the associated services. To reflect these reduced costs, in this final rule, DHS implements a fee of $160 for Form G–1041, Genealogy Index Search, when filed online and a fee of $170 for a paper filed Form G–1041. Similarly, DHS implements a fee of $255 for Form G–1041A, Genealogy Records Request, when filed online and a fee of $265 for a paper filed Form G–1041A. The difference between the fee for a form filed online and a form filed on paper represents the estimated reduction in cost to USCIS of providing the relevant service.

DHS also appreciates commenters' suggestions to reduce the fees for record requests. As described above, in response to public comments received on its NPRM, USCIS further refined its cost estimation methodology for the genealogy program. These refinements reduced the estimated cost of the USCIS genealogy program by $0.9 million, leading to a commensurate reduction in the fees for Forms G–1041 and G–1041A from the levels proposed in the NPRM.

DHS evaluated alternatives to increasing the genealogy fees. Unfortunately, alternative approaches such as increasing the fees for Forms G–1041 and G–1041A by the rate of inflation would not enable USCIS to recover the estimated full cost of providing genealogical services. Such an approach would require other immigration benefit requestors to subsidize the USCIS genealogy program. As stated elsewhere, consistent with the beneficiary-pays principle emphasized throughout this final rule, DHS declines to require other immigration benefit requestors to subsidize the USCIS genealogy program.

*Comment:* A couple of commenters suggested other changes to the proposed fees, including basing the cost on the number of pages and time for staff to prepare the records for transmission as well as using some of the new funds to fix problems that exist with managing records at USCIS (*e.g.,* losing indexes or records, staffing issues). A few commenters wrote that if a search returns no information, then USCIS should not charge a fee or should issue a partial refund.

*Response:* DHS understands the commenters' suggestions. However,

USCIS must recover the cost of its operations through user fees. DHS is setting the fees for Form G–1041 and G–1041A at levels that represent the estimated full cost to USCIS of providing genealogical services. These fees represent the estimated average cost of completing an index search or a records request. USCIS does not track or differentiate the costs incurred based on the number of pages of documents involved in a request, nor does USCIS track the time each individual genealogy request requires. Charging a la carte fees as suggested would be burdensome to administer because we would need to track the time spent on every request and invoice for payment. That system would not function properly, or efficiently or provide for full cost recovery. DHS declines to adopt the commenters' suggestion to establish the fees for Forms G–1041 and G–1041A using this method.

Furthermore, DHS incurs costs associated with index searches and records requests regardless of whether DHS ultimately identifies relevant records that can be provided to the requestor. Refunding the fee for Form G–1041 and G–1041A that do not result in records or information provided to the requestor would defy the principles of full cost recovery. DHS declines to require other applicants and petitioners to subsidize the cost of processing Forms G–1041 and G–1041A when those requests do not identify information for release to the requestor.

*Comment:* Several commenters suggested repealing the tax cuts implemented by President Trump that resulted in a substantial budget deficit instead of implementing the proposed increase in fees.

*Response:* The USCIS genealogy program is funded by user fees, consistent with statutory authority. *See* INA section 286(t), 8 U.S.C. 1356(t). DHS is adjusting the fees for Forms G–1041 and G–1041A to reflect USCIS' estimated full cost of providing the relevant services.

*Comment:* One commenter said that although immigration fees should not increase, non-immigration related genealogical search fees should increase to recover those costs.

*Response:* DHS thanks the commenter for their input but declines to adopt the recommendation. DHS is adjusting the fees for Forms G–1041 and G–1041A to reflect USCIS' estimated full cost of providing the relevant services.

4. Form I–90, Application To Replace Permanent Resident Card

*Comment:* A commenter stated that the $40 reduction would not lead to any

real financial relief to LPRs who want to apply for naturalization when the citizenship fees will increase by 83 percent. The commenter stated that, due to long processing times, many citizenship applicants must, for all practical purposes, pay the fees for both Forms I–90 and N–400, which total $1,585, in order to keep green cards up to date. The commenter said it failed to see how this "miniscule" reduction in Form I–90 fees helps the agency accomplish its goals.

*Response:* In this final rule, DHS adjusts the fee for Form I–90, Application to Replace Permanent Resident Card, to $405 when filed online and the fee for a paper filed Form I–90 to $415. Most applicants for Form I–90 must pay the current $455 fee plus an $85 biometric services fee, thus making the total current fees $540. These amounts represent USCIS' estimated full cost adjudicating Form I–90, including the cost of providing similar services without charge to asylum applicants and other immigrants. In setting these fees, DHS intends to achieve full cost recovery for USCIS, as provided in law, while emphasizing the beneficiary-pays principle of user fees. DHS is not motivated by any other consideration in establishing these fees, thus, we did not consider any interplay between the fees for Forms I–90 and N–400 in the NPRM, nor do we in the final rule. The new fee for Form I–90 of $405 when filed online represents a $50 decrease from the previous fee of $455. The new fee for a paper filed Form I–90 of $415 represents a $40 decrease from the previous fee of $455. The new fees include the cost of biometric services, thus making the total decrease $135 when filed online or $125 when filed on paper. These adjustments reflect efficiencies USCIS has achieved in adjudicating Form I–90, thereby reducing the estimated cost of adjudication. The lower fee for Form I–90 when filed online reflects the estimated cost savings to USCIS of receiving the application online. These fee adjustments are intended to ensure that the fees accurately reflect the estimated full cost of adjudication. DHS declines to make any adjustments in response to this comment.

*Comment:* Another commenter said, by not only increasing the N–400 fee but also reducing the Form I–90 fee, the proposed rule would further discourage Form N–400 applicants from naturalizing and obtaining the full benefits of citizenship for both themselves and our nation. Similarly, another commenter said decreasing the Form I–90 fee while increasing the Form N–400 fee appears to be a conscious

policy decision by USCIS to keep LPRs from applying for U.S. citizenship.

*Response:* DHS acknowledges that this final rule establishes increased fees for Form N–400 ($1,160 if filed online and $1,170 if filed on paper) while reducing the fees for Form I–90 ($405 if filed online and $415 if filed on paper) DHS does not intend to discourage naturalization and is not motivated by any consideration other than achieving full cost recovery while emphasizing the beneficiary-pays principle in establishing these fees. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter said that the Form I–90 fee decrease is puzzling considering the current processing and adjudication of the corresponding benefits. The commenter said a simple renewal of a permanent resident card currently takes up to 11 months, wondered why issuing a new card takes that long, and it seems unlikely that these processing times will improve with a decreased fee.

*Response:* DHS acknowledges that USCIS' processing times for Form I–90 have exceeded it goals. However, USCIS has achieved efficiencies in adjudicating Form I–90 that have reduced the relative cost per adjudication. Thus, in this final rule DHS implements a fee for Form I–90, Application to Replace Permanent Resident Card, of $405 when filed online and a $415 fee for a paper filed Form I–90. DHS appreciates the implication that it may charge more for Form I–90, but to maintain consistency with full cost recovery, DHS declines to make any adjustments in this final rule in response to this comment.

5. Form I–131, Application for Travel Document, Refugee Travel Documents

*Comment:* A commenter stated that comparing Form I–131, Application for Travel Document, to a passport to set the fee for refugee travel documents is inappropriate because passports are valid for 10 or 5 years versus the 1 year for the Refugee Travel Document. The commenter recommended that refugee travel documents be valid for longer than a year for this reason and because other countries often require that travel documents be valid for 6 months beyond the expected period of stay. Furthermore, the commenter stated that adult U.S. passport renewals do not include a $35 execution fee, implying that DHS should not consider the execution fee in establishing the fee for a refugee travel document.

*Response:* DHS declines the commenter's request to extend the validity length of refugee travel documents (RTD). DHS did not propose

changes to the validity length of the RTD that is codified at 8 CFR 223.3(a)(2) and, besides the commenter, we do not think the public would think that an increase to the validity length of an RTD would be a subject open for public comment in a rule dealing primarily with fees. The fee for an RTD is linked to the fee for a passport because Article 28 of the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), and the 1967 U.N. Protocol Relating to the Status of Refugees "the 1967 Refugee Protocol"), which, by reference, adopts articles 2 through 34 of the 1951 Refugee Convention, requires state parties to issue documents for international travel to refugees lawfully staying in their territory and that fees charged for such documents shall not exceed the lowest scale of charges for national passports. *See* United Nations Protocol Relating to the Status of Refugees, Jan. 13, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 1967 Refugee Protocol. Consistent with past practice, DHS is increasing the fee for Form I–131, Application for Travel Document, when requesting a refugee travel document by $10, the amount of increase in the cost of a U.S. passport for $145 for adults and $115 for children. However, the term of an approved RTD is not related to that of a passport, and it will not be changed in this rule.

6. Form I–131A, Application for Travel Document (Carrier Documentation)

*Comment:* A few commenters opposed the fee increase for Form I–131A. One of these commenters questioned why the fee is being increased by $435, or 76 percent, when USCIS would only have to reimburse the Department of State (DOS) with $385 to replace lost documents. A commenter asked if DHS had considered the effect of this "massive" fee increase on a vulnerable population. Some commenters claimed DOS would not have to be reimbursed if USCIS international offices had not been closed.

*Response:* DHS acknowledges that the $1,010 fee established in this final rule for Form I–131A, Application for Travel Document (Carrier Documentation), represents a substantial increase of $435 relative to the previous fee. Consistent with full cost recovery and the beneficiary-pays principle emphasized throughout this final rule, the new fee of $1,010 represents USCIS' estimated full cost of adjudicating Form I–131A, including the cost of providing similar services to asylum applicants and other immigrants without charge, at the time of USCIS' FY 2019/2020 fee review.

Before Form I–13.A was published, USCIS had completion rate data specific to providing carrier boarding documents. However, DHS did not use that completion rate data to establish a separate Form I–131A fee when it published Form I–131A. Instead, DHS set the Form I–131A fee to be the same as for other travel documents. Establishing Form I–131A and requiring fee payment using *Pay.gov* standardized requirements that were somewhat different or informal before the creation of Form I–131A. While not discussed in the FY 2016/2017 fee rule, DHS believed that the standardized Form I–131A might reduce the completion rate, and the cost, of the workload. When USCIS conducted its FY 2019/2020 fee review, it separated completion rate data for Forms I–13 and I–131A and proposed separate fees. At this point, Form I–131A existed for several years, so the completion rate data reflect the standardized process. Thus, we are setting a more accurate fee to reflect the full cost of adjudicating Form I–131A. The final fee for Form I–131A reflects the cost of USCIS processing, including the costs of USCIS reimbursement to DOS for action taken on behalf of USCIS. At the time of its FY 2019/2020 fee review, USCIS did not yet have sufficient information regarding office closures and the transfer of responsibilities between USCIS and the DOS to accurately reflect anticipated changes in the average cost of adjudicating Form I–131A. Thus, any potential cost savings related to the reduction in the number of offices USCIS maintains abroad are not included in this final rule. USCIS will incorporate all newly available information in its next fee review.

Commenters who claimed that USCIS would not need to reimburse the Department of State had it maintained its previous international presence are mistaken. USCIS reimburses DOS for all work performed on its behalf. This includes work performed on behalf of USCIS in locations where USCIS is not present and in locations where USCIS has an office. As USCIS has never had a presence in all countries where an individual may need to file Form I–131A, DOS has always adjudicated some Forms I–131A on behalf of USCIS. Altering USCIS's international presence did not change this operational necessity. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter wrote that DHS failed to apprise stakeholders of its reasoning for the substantial increase to the Form I–131A fee. The commenter added that there is no justification for

charging LPRs for the privilege of returning to their homes, jobs, and families.

*Response:* DHS disagrees with the commenter's assertion that DHS failed to explain or justify the fee increase for Form I–131A. In the NPRM, DHS explained that in the FY 2016/2017 fee review, USCIS calculated a single fee for Forms I–131 and I–131A. *See* 84 FR 62306 (Nov. 14, 2019). DHS clarified that in the FY 2019/2020 fee review, USCIS calculated a separate fee for Form I–131A to reflect differences between Form I–131 and Form I–131A, including the fact that Form I–131A is adjudicated abroad, where costs are typically greater than the cost of adjudicating an equivalent form domestically. This differentiation between Form I–131 and Form I–131A is consistent with the beneficiary-pays principle of user emphasized throughout the NPRM and this final rule, as it ensures that the fee an applicant pays better reflects the estimated full cost to USCIS of adjudicating the application. DHS declines to make changes in this final rule in response to the comment.

*Comment:* One commenter claimed these new fees are an attempt prevent LPRs from becoming U.S. citizens.

*Response:* DHS rejects the claim that its decision to adjust the fee for Form I–131A to $1,010 is motivated by any consideration other than USCIS achieving full cost recovery. The fee of $1,010 represents USCIS' estimated full cost of adjudicating Form I–131A, including the cost of providing similar services to asylum applicants and other immigrants without charge, at the time of USCIS' FY 2019/2020 fee review. DHS declines to make changes in this final rule in response to this comment.

7. Form I–192, Application for Advance Permission To Enter as a Nonimmigrant

*Comments:* A commenter said it did not oppose a fee increase associated with Form I–192 but wrote that the fee increase is quite high for an application fee that, if approved, grants entry to the U.S. for a relatively short time. The commenter said the proposal would cost Canadian citizens $1,400 on average and questioned whether USCIS was considering increasing the duration of authorized presence in the U.S. to a minimum of 5 years and a maximum of 10 years.

Many commenters suggested that the $485 or 52 percent increase for fees related to visa applications for victims of crime and victims of trafficking in persons is "outrageous." A commenter wrote that the proposal to raise the Form I–192 fee defeats the purpose of

**46840**     Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

the U-visa, which protects victims of
crime. The commenter wrote that
raising fees to make this protection
inaccessible to victims of crime runs
counter to Congress' intent to provide
protection to such victims for
"compelling humanitarian and public
policy/safety reasons." Another
commenter stated that the $485 increase
for Form I–192 was particularly steep
for U nonimmigrant status petitioners
who often have medical bills related to
being victims of crimes and who may
not work before the submission of the
application.

A few commenters said that raising
the fee for Form I–192 may make it
harder, if not impossible, for survivors
of crime to petition for U nonimmigrant
status. One commenter suggested that
because survivors of domestic violence
often have suffered financial abuse and
survivors of human trafficking often
have suffered financial exploitation,
they will likely be unable to pay the
fees.

A commenter indicated that the
increase in the filing fee for Form I–192,
combined with the elimination of a fee
waiver for this form, would effectively
eliminate a statutorily available waiver
of inadmissibility for many applicants
and prevent those inadmissible
immigrants from obtaining status.

Multiple commenters stated that the
NPRM ignores the fact that many
applicants for survivor-based relief must
also file ancillary forms that do have
fees, including Form I–192.

*Response:* DHS acknowledges a
considerable increase of the fee for Form
I–192, Application for Advance
Permission to Enter as a Nonimmigrant.
The new fee established in this final
rule represents the estimated full cost of
adjudication. [85] *See* INA section 286(m),
8 U.S.C. 1356(m). As with other USCIS
fees, the fee amount is derived from the
cost to USCIS of providing the relevant
service; the fee is not related to the
duration of the benefit received.
Therefore, DHS did not evaluate
potential changes in the duration of
authorized presence as part of this final
rule.

DHS recognizes the commenters'
concerns regarding vulnerable
populations, particularly applicants for

T nonimmigrant status and petitioners
for U nonimmigrant status, who use
Form I–192. Consistent with its
commitment to preserve access to
required fee waivers for populations
identified in statute, the fee for Form I–
192 will remain waivable for those
seeking T and U nonimmigrant status,
provided that those applicants file Form
I–912, Request for Fee Waiver and
demonstrate that they meet the requisite
criteria for approval. *See* 8 CFR 106.3.
DHS believes that maintaining access to
fee waivers for these populations
mitigates any concerns that the fee
increase for Form I–192 would limit
access to protections.

DHS declines to make changes in this
final rule in response to these
comments.

*Comment:* Another commenter stated
that most of its clients who are pursuing
T or U nonimmigrant status must file
supplemental forms that often have very
high fees, including Form I–192. The
commenter indicated that most of the
issues disclosed require very little, if
any, further adjudication from USCIS,
and, therefore, the fee is unnecessary
and unfair.

*Response:* USCIS data also indicates
that most aliens pursuing T and U
nonimmigrant status must file Form I–
192. Those aliens may request a fee
waiver. DHS disagrees that Form I–192
requires little effort by USCIS. USCIS
evaluates the evidence regarding the
inadmissibility charges present
(immigration violations, criminal issues,
potential fraud, etc." and the alien's
responses and evidence provided to
address those charges. Depending on the
number of inadmissibility grounds and
complexity of the individual filing,
those adjudications may require
considerable time and resources.

In many cases, aliens file Form I–192
with U.S. Customs and Border
Protection, which adjudicates those
filings. In the NPRM, DHS explained
that USCIS had incorporated cost and
workload volume information from CBP
into its cost model to determine a single
fee for Form I–192 that reflects the
estimated full average cost of
adjudicating Form I–192 for CBP and
USCIS. *See* 84 FR 62321.

DHS declines to make changes in this
final rule in response to the comment.

*Comment:* One commenter stated that
Form I–192 was created to encourage
eligible individuals to complete the
immigrant visa process abroad, promote
family unity, and improve
administrative efficiency.

*Response:* Form I–192, Application
for Advance Permission to Enter as a
Nonimmigrant, is not part of the
immigrant visa process. It appears that

the commenter may have confused
Form I–192 with Form I–601A,
Application for Provisional Unlawful
Presence Waiver. DHS declines to make
changes in this final rule in response to
the comment.

**8. Form I–193, Application for Waiver
of Passport and/or Visa**

*Comment:* One commenter said that
the proposed 377 percent fee increase
for Form I–193 is "startling." Another
commenter stated that the 377 percent
increase is "outrageous" given the time
and effort required to fill out and
adjudicate the form with just one page
of content. The commenter also stated
that a small number of applicants use
the form to travel, usually in
extenuating circumstances beyond the
control of the applicant. As such, it is
unlikely that there would be a high
incidence of fraud or abuse to justify
such a fee increase. The commenter also
said that it is unreasonable to expect
applicants to pay the $2,790 fee on the
spot.

*Response:* DHS acknowledges a
substantial increase in the fee for Form
I–193. In its NPRM, DHS explained that
USCIS incorporated cost and workload
volume information from CBP into its
ABC model to determine a single fee for
Form I–193 that reflects the estimated
full average cost of adjudicating Form I–
193 for CBP and USCIS. *See* 84 FR
62321. CBP adjudicates most filings of
Form I–193 and incurs a majority of the
costs associated with adjudication. As
documented in the NPRM, in FY 2017
CBP incurred an estimated $18.0
million in costs to adjudicate filings of
Form I–193. This final rule establishes
the fee for Form I–193 at a level
sufficient to recover the full average
estimated cost of adjudication for both
USCIS and CBP.

DHS declines to make changes in this
final rule in response to these
comments.

**9. Form I–290B, Notice of Appeal or
Motion**

*Comment:* A commenter stated that
increasing the fee for Form I–290B
places U-visa petitioners at risk of not
being able to exercise their due process
rights and threatens their ability to
appeal or reopen their petition. Another
commenter recommended that USCIS
fully refund the filling fee for Form I–
290B if the agency determines, after
adjudicating, that the underlying
petition denial was the result of clear
USCIS error.

*Response:* DHS recognizes the
importance of maintaining access to
Form I–290B to ensure that individuals
have the ability to appeal or file a

---

[85] In accordance with INA section 286(m), 8
U.S.C. 1356(m), USCIS total costs include the cost
of similar services provided without charge to
asylum applicants and other immigrants, which
encompass fee exemptions, waivers, and setting
fees below the amount suggested by the model.
Throughout the remainder of this rule, when USCIS
refers to the estimated full costs of adjudication, in
the interest of the economy of words and improving
readability, that term includes the cost of services
provided without charge to asylum applicants and
other immigrants in accordance with the INA.

motion to reopen or reconsider a decision. In recognition of this, DHS deviated from the beneficiary-pays principle to transfer some of the costs for adjudicating Form I–290B to all other fee payers. The proposed fee for Form I–290B was far below the estimated cost to USCIS of processing I–290B filings, an increase of only 5 percent. *See* 84 FR 62293. In this final rule, DHS adjusts the fee for Form I–290B from $675 to $700, an increase of approximately 3.7 percent. Furthermore, in the NPRM, DHS clarified that Form I–290B would remain fee-waivable for VAWA self-petitioners, applicants for T nonimmigrant status and petitioners for U nonimmigrant status, petitioners, and T nonimmigrant status applicants. *See* 84 FR 62297. DHS believes that maintaining access to fee waivers for vulnerable populations mitigates any concerns that the fee increase for Form I–290B would limit access for protected categories of individuals.

In general, USCIS does not refund a fee or application regardless of the decision on the application. There are only a few exceptions, such as when USCIS made an error which resulted in the application being filed inappropriately or when an incorrect fee was collected.

DHS declines to make changes in this final rule in response to these comments.

**10. Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant**

*Comment:* Multiple commenters opposed the proposed fee increase for Form I–360, stating that it would harm the ability of religious organizations to petition for their workers. Commenters stated that this would impact the non-profit organizations associated with these religious workers and the communities that they support.

*Response:* DHS recognizes the importance of maintaining access to Form I–360 for individuals and organizations. In recognition of this, DHS proposed in the NPRM to deviate from the beneficiary-pays principle, transfer some of the costs for adjudicating Form I–360 to all other fee payers, and hold the fee for Form I–360 far below the estimated full cost to USCIS of processing I–360 petitions, proposing to increase the fee by only 5 percent. *See* 84 FR 62293. The fee to recover full cost would have exceeded $5,500.[86] Such a high fee would place an unreasonable burden on petitioners. In this final rule, DHS adjusts the fee for

86 *See* the FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation in the docket for more information.

Form I–360 from $435 to $450, an increase $15 or approximately 3.4 percent as discussed in the proposed rule. DHS declines to make changes in this final rule in response to these comments.

**11. Form I–485, Application To Register Permanent Residence or Adjust Status**

a. Debundling Interim Benefits

*Comment:* Multiple commenters wrote that the proposed debundling of interim benefits led to excessive fees. Many commenters stated that the steep increase in fees, along with the elimination of waivers will make adjustment of status unattainable for many low-income and working-class people. A few commenters said this change would create a catch-22 where immigrants with low income can afford to apply to adjust but cannot afford to seek employment authorization. A commenter stated that the proposed change would force highly skilled workers to pay $1,075 more for dual-intent visas than H–1B or L–1 dual-visa applicants. Other commenters wrote that charging fees for concurrently filed ancillary Forms I–765 and I–131 with Adjustment of Status applications, along with renewals, would create a perverse incentive for USCIS to delay interim benefit and Form I–485 adjudications in order to receive additional funds. A few commenters wrote the proposed changes would force immigrants out of the legal immigration system. Other commenters added that this change could contribute to family separation. A commenter claimed USCIS ignores the fact that children will need to have a travel authorization, and therefore will still need to file Form I–131 for advance parole. One commenter stated this change will deny immigrants the path to citizenship. Another commenter said USCIS' purpose is an attempt to discourage families from being able to afford to apply for legal permanent residence.

*Response:* DHS acknowledges the total cost increase for adjustment of status applicants who request interim benefits. The fees DHS establishes in this final rule accurately reflect the estimated full cost of adjudicating those applications, including the cost of providing similar services to asylum applicants and other immigrants without charge. USCIS did not realize the operational efficiencies envisioned when it introduced bundled filings for interim benefits and adjustment of status applications, which was implemented to address the same commenter accusation of a revenue incentive. *See* 72 FR 4894 (stating,

"This creates the perception that USCIS gains by processing cases slowly."). USCIS has no data to indicate that it takes less time to adjudicate interim benefits bundled with an I–485 than it does to adjudicate standalone I–131 and I–765 filings. Therefore, DHS declines to adopt the commenters' recommendation to continue bundled adjustment of status filings; this final rule eliminates bundling.

Individuals applying for adjustment of status are not required to request a travel document or employment authorization. With bundled interim benefits, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price. Debundling allows individuals to pay for only the services actually requested. Thus, many individuals may not pay the full combined price for Forms I–485, I–131, and I–765.

DHS and USCIS are not profit-seeking entities. Neither benefit from delays in Form I–485 adjudications that may result in individuals filing for additional interim benefits. USCIS would use any revenue received to fund immigration adjudication services and minimize future fee increases.

After adjusting the results of the FY 2019/2020 fee review to account for removal of the ICE transfer, exclusion of the DACA renewal fee, and other changes, DHS establishes the fee for Form I–131, Application For Travel Document, as $590 and the fee for Form I–765, Application for Employment Authorization as $550.

b. Form I–485 Child Fee

*Comment:* Some commenters opposed this provision because of its effect on families and children. A commenter said this NPRM would burden families who would be required to pay an increased total cost for multiple concurrent adjustments and create barriers for low-income and working-class individuals. Another commenter said this change would have a negative effect of children and youth, either delaying their ability to unite with family or deterring it completely.

*Response:* DHS acknowledges a substantial increase in the fee for Form I–485 for child applicants who are under 14 years old and are filing with at least one parent. Consistent with the beneficiary-pays principle of user fees emphasized throughout this final rule, DHS adjusts the fee for all Forms I–485, except those filed by refugees, to $1,130 to reflect the estimated full cost of adjudication. This fee represents an increase of $380 relative to the previous fee of $750. DHS declines to make

changes in this final rule in response to these comments.

*Comment:* A commenter cited USCIS' justification for removal of the reduced fee for children because processing them is not distinguished by age. The commenter stated that, if the completion rate is influenced by time to adjudicate (*e.g.,* conduct background checks), this would likely be shorter for children. The commenter said USCIS has not provided data or analysis to address this concern, and that its an extreme hike for a small portion of applications.

*Response:* USCIS used the data available at the time when it conducted the FY 2019/2020 fee review to determine the fee for Form I–485. USCIS does not have data to support the commenter's contention that that the time required to adjudicate a Form I–485 (*i.e.,* the completion rate) is less for a child's application than for an adult's application, because USCIS data does not separate Form I–485 adjudications by the age of the applicant. *See* 84 FR 62305 and 81 FR 73301. Therefore, USCIS calculated the estimated average cost of adjudicating all Forms I–485. In this final rule, DHS adjusts the fee for all Forms I–485, except those filed by refugees, to $1,130 to reflect the estimated full cost of adjudication.

DHS declines to make changes in this final rule in response to the comment.

c. Form I–485 Reduced Fee for Asylees

*Comment:* Multiple commenters highlighted the cost to asylum applicants and asylees of filing Form I–589, Form I–765, and if granted asylum, Form I–485 to adjust status. A commenter stated, "Regarding asylee Form I–485 applications, this proposed rule would cause a significant harm to be placed on those who have come to the United States after fleeing persecution in their country of origin. After waiting years for an asylum interview and sometimes more than a year after that interview for a grant of asylum, an asylee should not have any additional obstacles placed on their path to obtaining a green card, which they will use to show their lawful presence and employment authorization. This proposed change is an unnecessary impediment to asylees' integration in our society and economy." Another commenter wrote that the elimination of fee waivers for adjustments of status, including asylees, runs counter to the intent of Congress and will create a significant barrier that will prevent many asylees from regularizing their immigration status. Another commenter reiterated that the high fees for Form I–485 and ancillary benefits and the elimination of fee

waivers will make adjustment of status unattainable for many low-income and working class people, particularly asylees. The commenter stated that increasing the overall cost of adjustment of status would undermine family unity and prevent many low-income individuals from becoming permanent residents.

*Response:* DHS recognizes the additional burden placed on asylum applicants with the introduction of a $50 fee for Form I–589 in this final rule. Therefore, DHS establishes in this final rule a reduced fee of $1,080 for Form I–485 when filed by an individual who has been granted asylum after having paid the $50 fee for Form I–589 as a principal applicant. *See* new 8 CFR 106.2(a)(16)(ii). The reduced fee will be available to otherwise qualifying individuals regardless of whether USCIS or EOIR ultimately granted the asylum claim. DHS reiterates, as it did in the NPRM and this final rule, that DHS does not intend to deter asylum applications with the introduction of the $50 fee for Form I–589. DHS believes that effectively refunding the Form I–589 fee for approved asylees when they adjust will ensure that individuals with legitimate asylum claims do not experience a net increase in cost through the time they adjust status to that of lawful permanent resident as a result of the new fee for Form I–589.

DHS provides in this final rule that only one Form I–485 reduced fee filing will be available per Form I–589 fee paid. This approach ensures that USCIS will only provide a single $50 discount for each Form I–589 filing that ultimately results in a grant of asylum, meaning that the total value of fee reductions available to Form I–485 applicants will match the value of Form I–589 fees collected from those applicants. DHS makes the reduced fee available only to the principal applicant on an approved Form I–589 for which the $50 fee was paid. The reduced fee Form I–485 may not be transferred from the principal applicant to derivatives listed on the same Form I–589 or to other derivative beneficiaries. If DHS provided all individuals granted asylum the opportunity to file Form I–485 with a reduced fee, the ultimate value of the fee reductions could exceed the value of the revenue generated from the Form I–589 fee, resulting in a net cost to USCIS that must be passed on to other fee payers. Similarly, DHS provides that an individual qualifying for the Form I–485 reduced fee may file Form I–485 only once utilizing the reduced fee. If USCIS accepts a Form I–485 filed with the reduced fee and subsequently denies the application, that applicant may reapply

as permitted but will not qualify for the reduced fee on any subsequent filing. This ensures that the value of the fee reductions will not exceed the value of the Form I–589 fees paid by the affected applicants. If USCIS rejects a Form I–485 filed by an asylee with a reduced fee, the applicant will not have used their single reduced fee filing, and the applicant may reapply and qualify for the reduced fee.

DHS did not change its cost projections, volumes forecasts, or revenue anticipated from Form I–485 in this final rule in response to the introduction of the reduced fee for Form I–485. DHS does not anticipate receiving any Form I–485 filings during the FY 2019/2020 biennial period for this fee rule that are eligible for the reduced fee. This reflects the fact that asylum applicants will begin to pay the $50 fee for Form I–589, a pre-requisite to qualify for the reduced fee Form I–485, as of the effective date of this final rule. Those asylum applicants must have their claims adjudicated and approved before becoming eligible to adjust status one year after their asylum claim was granted. Thus, DHS does not anticipate any reduced fee Form I–485 filings until more than 1 year after the effective date of this final rule. Furthermore, because DHS anticipates no reduced fee filings during FY 2019/2020, USCIS anticipates no costs during FY 2019/2020 associated with charging less than the estimated full cost of adjudication of Form I–485 that must be reallocated to other fee-paying applicants. Therefore, no fees increase in this final rule as a result of the introduction of the reduced fee Form I–485, and the fee for Form I–485 would remain $1,130 even in the absence of the reduced fee. USCIS will evaluate the Form I–485 reduced fee in future fee reviews using all available data at that time, consistent with its evaluation of all other fees.

d. Other Form I–485 Comments

*Comment:* A commenter said USCIS' proposed changes to Supplement A to Form I–485 have no justification. The commenter said USCIS proposes removing from the Supplement A form the instruction that there is no fee for certain persons. The commenter stated that USCIS is making it even more difficult for applicants to identify the few instances where they are not obligated to pay large fees. The commenter wrote that the change would obfuscate the fact that some individuals are exempted from paying the fee by statute, leading fewer people to apply because they would erroneously believe they must pay the fee. The commenter

also wrote that the provision creates a way for USCIS to re-investigate granted adjustments under INA section 245(i), 8 U.S.C. 1255(i), going back more than 20 years, resulting in potentially stripping lawful permanent residents of their status.

*Response:* DHS erroneously stated in the NPRM that it proposed deleting text from Form I–485, Supplement A, related to those categories of adjustment applicants who are not required to pay the $1,000 sum. No such text appears on the form itself, but rather is found in the instructions. DHS will retain the language concerning the exceptions from paying the INA section 245(i), 8 U.S.C. 1255(i) sum in the Instructions for Form I–485 Supplement A, and in the rule.

*Comment:* A commenter recommended phasing in the increased Form I–485 fee over several years. A commenter recommended that the validity period of employment authorization and advance parole for dependent children also be increased from 1 to 2 years.

*Response:* In this final rule, DHS adjusts the fee for all Form I–485 applications, except those filed by refugees, to $1,130 to reflect the estimated average full cost of adjudication. DHS declines to adopt the commenter's suggestion of phasing in the increased fee over time, because USCIS would not be able to achieve full cost recovery during the phase-in period. DHS also declines to adopt the recommendation to extend the validity period of employment authorization and advance parole for dependent children.

*Comment:* A commenter opposed deleting language regarding 245(i) penalty fee exemptions from the regulations.

*Response:* In this final rule, DHS includes language in 8 CFR 106.2(a)(17) detailing the categories of applicants for adjustment of status under INA section 245(i), 8 U.S.C. 1255(i) who are not required to submit the $1,000 sum per the statute.

*Comment:* One commenter said that the increased fee for the Form I–485, when considered in combination with the separate fees for the Form I–765 and Form I–131, will have negative impacts on industries that use the Employment-Based Third Preference Unskilled Workers (Other Work) category, such as meat/poultry processers, home healthcare providers, hospitality/lodging employees.[87] The commenter

---
[87] See USCIS, *Employment-Based Immigration: Third Preference EB–3*, available at https://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-third-

assumes that the rate of pay for workers in those industries is not as high as in other fields and the fees represent a larger percentage of those worker's wages.

*Response:* The NFRM emphasizes the beneficiary-pays principle. DHS believes that a single fee for Form I–485 will reduce the burden of administering separate fees and better reflect the estimated full cost of adjudication. By making the filing fee equal for all applicants, whether they are family-based or employment-based, the cost of adjudication for the benefit of each individual applicant will be sustained by that applicant, and other applicants are not burdened with subsidizing the cost of adjudication. In this final rule, DHS adjusts the fee for all Form I–485 applications, except those filed by refugees and certain Special Immigrants, to $1,130 to reflect the estimated average full cost of adjudication. *See* 8 CFR 106.2(a)(17)(iii).

Requiring fees paid for each renewal of interim benefits, such as employment or travel authorization, also aligns with the beneficiary-pays principal by preventing other applicants from being burdened with fees for benefits they do not wish to receive or subsidizing fees for benefits for which they do not apply. The fee increases associated with Form I–485 and interim benefits are not exclusive to employment-based applicants and therefore are not adjusted based on the filing category or rate of pay of workers.

DHS declines to make changes in this final rule in response to the comment.

12. Form I–526, Immigrant Petition by Alien Investor

*Comment:* A commenter said the fee review for EB–5 forms, such as Form I–526, failed to meet the objectives of ensuring USCIS has adequate resources and to recover the full operating costs of administering the national immigration benefits system. The commenter said the fee increase for Form I–526 was too low to balance the workload increase reported by USCIS and would not reverse the current ' critically inadequate" service associated with this form. The commenter also said the fee increase was too low given that this fee is paid by affluent immigrant investors "who value time." The commenter cited USCIS data to demonstrate that the processing time associated with Form I–526 had increased since 2016 and wrote that time spent processing this application was likely to increase due to the EB–5 Immigrant Investor Program

---
*preference-eb-3* (last reviewed/updated March 27, 2020).

Modernization regulation that went into effect on November 21, 2019. *See* 84 FR 35750. The commenter wrote that the 9 percent increase in the fee for this form suggests that USCIS considers the 3–4-year processing time for this form to be acceptable. However, the commenter also wrote that USCIS' projected workload volume for Form I–526 was "three times too high" considering data from 2018–2019. The commenter said the EB–5 Immigrant Investor Program Modernization regulation would dampen demand for use of this form and suggested that the number of form receipts for 2020 would be less than the 5,000 average annual receipts from 2018–2019. The commenter wrote that due to this overestimation of the number of Form I–526 receipts, the fee analysis "overestimates revenue and underestimates receipt fees needed to cover costs." The commenter said that if the number of Form I–526 receipts is closer to 4,000, the $16 million in revenue would not provide enough financial resources to cover costs and provide adequate service. The commenter suggested that USCIS had failed to consider the future workload associated with "thousands" of Form I–526 submissions that are still pending from previous years in its fee analysis, and that the agency should account for "an environment of long backlogs and falling receipts" in revising the fee for this form. The commenter reiterated that the current processing time for this form was far too long and stated that the agency should consider targeting more reasonable processing times for this form, such as the 240-day target recently suggested in the U.S. Senate. Another commenter wrote that USCIS had overestimated the workload volume associated with Form I–526.

*Response:* In its fee reviews, USCIS evaluates the estimated cost of processing all incoming workloads to determine the fees necessary to recover full cost. USCIS does not consider the cost of processing existing pending workloads in setting fees, as setting fees on that basis would place the burden of funding the processing of previously received applications and petitions on future applicants. Thus, DHS declines to include the cost of all pending Form I–526 workload in this analysis and final rule.

DHS acknowledges that USCIS' volume projections for Form I–526 in the FY 2019/2020 fee review substantially exceed the receipts in FY 2018 and FY 2019. As with other forms, USCIS created its volume projections for Form I–526 using the best information available at the time it conducted the FY 2019/2020 fee review. The commenter is

correct in stating that if USCIS has overestimated the receipt volume for Form I–526, then it has also overestimated the amount of revenue that the revised Form I–526 fee will generate. Such a scenario would also imply that USCIS had overestimated the total amount of costs to be recovered, as fewer staff would be necessary to adjudicate the newly received Forms I–526. However, it is possible that, as the commenter contends, if USCIS overestimated the anticipated volume of Form I–526 filings, it underestimated the Form I–526 fee that would be necessary to recover the full cost of adjudication. USCIS will review and reevaluate all fees during its next biennial fee review. If USCIS determines that the fee is insufficient to recover full cost, DHS may adjust the fee through a future rulemaking.

DHS acknowledges that current processing times for Form I–526 extend far beyond its processing time goals. DHS believes that adjusting USCIS fees to provide for full cost recovery constitutes the best means of addressing resource constraints that have led to growth in pending caseloads. DHS declines to make changes in this final rule in response to the comment.

Form I–539, Application To Extend/Change Nonimmigrant Status

*Comment:* A commenter opposed the proposed fee increase for Form I–539 because it would pose a financial burden to clients who are survivors of violence and U nonimmigrants.

*Response:* DHS acknowledges that this final rule increases the fee for Form I–539 to $390 if filed online and $400 if filed on paper. However, DHS disagrees with the commenter's assertion that the fee increase for Form I–539 would unduly burden U nonimmigrants. In its NPRM, DHS clarified that those seeking or holding T and U nonimmigrant status would remain eligible to apply for fee waivers for Form I–539 and other associated forms. *See* 84 FR 62297. DHS believes that maintaining access to fee waivers for these vulnerable populations mitigates any concerns that the increase in the fee for Form I–539 would limit access for protected categories of individuals. DHS declines to make changes in this final rule in response to the comment.

13. Form I–589, Application for Asylum and Withholding of Removal Fee

*Comment:* Multiple commenters generally opposed charging asylum applicants a fee. Commenters stated:

• DHS should not expect people fleeing harm and in need of protection to pay a fee.

• These individuals often have few economic resources, the few resources that they do have are necessary for survival.

• They should not endure the added burden of a fee to gain asylum and other immigration services.

• Asylum seekers joining family in the United States are often financially dependent on their family members, and an asylum fee would create an additional burden on their families.

• Asylum should not be based on an applicant's socio-economic status.

• Fees would be detrimental to survivors of torture, impacting their mental health and well-being by obstructing access to live and work in the United States.

• A $50 fee would further endanger asylum seekers' health and safety.

• DHS should consider asylum seekers' humanity and suggested that the rule dehumanized the issue.

• Commenters rejected the notion that those seeking asylum represent a cost that the nation must recoup.

• If the revenue from these fees were being used to assistence to those seeking asylum, they would be less opposed to the fee increases.

• DHS did not provide adequate justification for charging an asylum fee.

*Response:* DHS acknowledges the humanitarian plight of legitimate asylum seekers. In recognition of the circumstances of many of these applicants, DHS establishes a $50 fee for Form I–589 for most applicants (unaccompanied alien children in removal proceedings who file Form I–589 with USCIS are not required to pay the fee). DHS expects that charging this fee will generate some revenue to offset adjudication costs, but DHS is not aligning the fee with the beneficiary-pays principle, because the estimated cost of adjudicating Form I–589 exceeds $50. As DHS stated in its NPRM, it does not intend to recover the full cost of adjudicating asylum applications via the Form I–589 fee. *See* 84 FR 62318. Instead, DHS establishes a $50 application fee to generate some revenue to offset costs. DHS will recover the additional costs of asylum adjudications (via cost reallocation) by charging other fee-paying applicants and petitioners more, consistent with historical practice and statutory authority. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS does not intend to discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families.

In the NPRM, DHS provided substantial justifications for establishing an asylum application fee. DHS explained that USCIS has experienced a continuous, sizeable increase in the affirmative asylum backlog over the last several years. DHS explored ways to alleviate the pressure that the asylum workload places on the administration of other immigration benefits and determined that a minimal fee would mitigate fee increases for other immigration benefit requests. *See* 84 FR 62318. DHS estimated the cost of adjudicating Form I–589 and considered asylum fees charged by other nations. DHS also considered the authority provided in INA section 208(d)(3), various fee amounts, whether the fee would be paid in installments over time or all at once, if the fee would be waivable, and decided to establish a minimal $50 fee.

As stated in the NPRM, DHS believes that the fee can be paid in one payment, would generate revenue to offset costs, and not be so high as to be unaffordable to an indigent applicant. *See* 84 FR 62319. Further, DHS has provided the advance notice of and the reasons for the change in its longstanding policy as required by the APA. This change will only apply prospectively to asylum applications filed after the effective date of this final rule.

Nevertheless, as a result of the concerns raised by commenters, DHS is providing in this final rule that Form I–485 filed in the future for principal asylum applicants who pay the Form I–589 fee of $50 and are granted asylum and apply for adjustment of status will pay a fee that is $50 less than other Form I–485 filers. *See* new 8 CFR 106.2(a)(17)(ii). DHS will provide only one reduced fee per Form I–589 filing fee paid. If a Form I–485 filing with a $50 reduced fee is denied, USCIS will not accept future discounted I–485 filings from the same applicant. That is because DHS anticipates a one-to-one relationship between the fees collected and discounts provided. If an approved principal asylee were to file multiple Forms I–485 with the reduced fee, it could illogically result in the $50 fee for Form I–589 causing a net revenue loss to USCIS. DHS will not deviate from its primary objective of this final rule to set fees at a level necessary to recover estimated full cost by allowing multiple I–485 reduced fee filings. Unaccompanied alien children in removal proceedings who filed Form I–589 with USCIS, and thus did not pay the Form I–589 fee, are not eligible to file Form I–485 with the reduced fee.

*Comment:* Additional commenters on the asylum fee generally opposed the

proposed fees for asylum indicating that the proposal runs counter to U.S. ideals, and stated:

• The United States has no precedent in international law to charge for asylum, the fee does not support the humanitarian interests of the United States, would be against the values of the United States and Congressional intent, and our moral and constitutional obligation to provide sanctuary to those who need it.

• The United States would become one of only four countries to charge such a fee if DHS implemented the proposal.

• Processing asylum requests is a fundamental right guaranteed by international agreements to which the United States adheres.

• The United States should endeavor to resolve, rather than exacerbate, humanitarian crises and the U.S. is required under domestic and international law to provide refuge to people fleeing violence and seeking protection in the United States.

• Significant changes to the conditions of asylum services should be carried out by Congress, and not through administrative processes.

• Charging a fee for asylum requests is discrimination and an attempt to block legal immigration of people of color and/or non-wealthy backgrounds.

• The right to seek and to enjoy asylum from persecution is enshrined in the United Nations Universal Declaration of Human Rights of 1948 and supported by the 1951 Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees.

• The United States is obligated to accept asylum seekers under international and domestic law, and therefore should not refuse asylum seekers because of an inability to pay the fee. Thus, the proposed asylum fees would be a dereliction of legal duty and violate the 1951 Refugee Convention, which prevents signatory countries from taking any action that would "in any matter whatsoever" expel or return a refugee to a place where his or her life or freedom would be threatened."

• The creation of an asylum fee suggests that the United States will shy away from international problems rather than confront them.

• One commenter said that under the Universal Declaration of Human Rights, the United States is obligated by international law to accept refugees and accord them certain rights and benefits, such as access to courts.

• A fee for asylum violates the INA and that Congress did not intend to authorize fees for asylum applicants, but instead intended that the cost services to asylum seekers should be paid by fees from the IEFA.

*Response:* DHS disagrees with commenters' assertions that an asylum fee violates the INA, that there is no precedent in international law for charging a fee for asylum applications, and that charging a fee is discriminatory and against the values, morals, and Constitution of the United States. DHS also disagrees that the United States is required to provide asylum to those fleeing violence and seeking protection, as the United States non-refoulement obligations are met by the statutory withholding of removal provisions at INA section 241(b)(3). Asylum is a discretionary benefit available to those who meet the definition of a refugee and who are not otherwise ineligible.

Although the United States is a party to the 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), which incorporates Articles 2 through 34 of the ¹951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), the Protocol is not self-executing. *See INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984). The asylum statute at INA section 208 and withholding of removal statute at INA section 241(b)(3) constitute the U.S. implementation of international treaty obligations related to asylum seekers. The asylum provisions of the INA do not preclude the imposition of a filing fee for asylum applications. INA section 208(d)(3), 8 U.S.C. 1158(d)(3) specifically authorizes the Attorney General to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application.

Furthermore, DHS believes that the asylum fee may arguably be constrained in amount, but a fee is not prohibited by the 1951 Refugee Convention, 1967 Refugee Protocol, United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, refers to the imposition of fees on those seeking protection, and limits "fiscal charges" to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests. Thus, a $50 fee for asylum applications is in line with international and domestic law.

DHS also considered the asylum fees charged by other nations, including Australia, Fiji, and Iran. A $50 fee is in

line with the fees charged by these other nations. DHS further believes that the $50 fee would not require an applicant to spend an unreasonable amount of time saving to pay the fee.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* With regard to the Form I–589 fee and the fee for an initial Form I–765 filed by an asylum applicant, commenters stated:

• Asylum seekers should not have to pay for an asylum application or an associated work permit because they are not authorized to work for months once in the United States and would have no way of earning money to pay for the fees.

• Asylum seekers in detention, who earn at most $1 a day would have no way to pay the $50 fee.

• Asylum seekers are not allowed to work more than 4 hours a day and are thus unable to pay increased fees.

• Asylum seekers who are poor or need to "quickly flee situations of peril or harm" would be harmed by the asylum fee proposal, and that such individuals would not be able to earn enough money to pay asylum fees once in detention.

• Asylum seekers are often minors with no means to support themselves and therefore cannot afford an asylum fee.

*Response:* DHS acknowledges the commenters' concerns about asylum seekers' ability to pay the fees for the asylum application and associated EAD. DHS considered the effect of the fees on asylum seekers and believes the fees would not impose an unreasonable burden on applicants or prevent asylum seekers from seeking protection or EAD. DHS also acknowledges that the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, provides a range of protections for unaccompanied alien children. As such, DHS excluded unaccompanied alien children in removal proceedings, a particularly vulnerable population, from the imposition of the $50 asylum application fee.

The services that USCIS provides at no cost or below cost impacts the final fees imposed on other fee-paying applicants. However, DHS seeks to make the USCIS fee schedule more equitable for all applicants and petitioners in this final rule. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that asylum seekers provide services to the United States, such as investments in their education and pay taxes, that DHS

**46846**    Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

should consider before increasing asylum fees. Several commenters stated that DHS should not raise asylum fees because asylum seekers are important to the U.S. economy and workforce.

*Response:* DHS acknowledges that asylum seekers invest in their educations and pay taxes like other immigrants do. When considering whether to increase or establish new fees, including fees for asylum seekers, USCIS examined its recent budget history, service levels, and immigration trends, and also assessed anticipated costs, revenue, and operational demands. USCIS has experienced a continuous, sizeable increase in the affirmative asylum backlog and explored ways to alleviate the pressure that the asylum workload places on USCIS. As stated in the NPRM, DHS does not intend to recover the estimated full cost of adjudicating asylum applications via the Form I–589 fee. 84 FR 62318. DHS will recover the additional costs of asylum adjudications (via cost reallocation) by charging other fee-paying applicants and petitioners more for other types of applications.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Many commenters addressed gender-based violence as a reason for women and girls fleeing their countries of origin to seek asylum in the United States. Another commenter stated that an asylum fee will disproportionately impact women and minorities. Several commenters discussed domestic violence survivors who rely on asylum status and work authorization for protection. Some commenters said that young people flee sexual and physical violence, and even torture. One commenter said survivors often have no support systems in the U.S. and therefore face homelessness and economic hardship, which are two of the three most urgent and prevalent systemic challenges, confronting immigrant women in the U.S. A couple of commenters said the asylum seekers who flee domestic violence are often eligible for asylum as well as other types of humanitarian immigration benefits, such as U nonimmigrant status. In certain instances, it makes sense for survivors to apply for different types of relief simultaneously as they may get access to work authorization faster under one type of relief, which, in turn, can help them avoid being financially dependent on their abuser. Therefore, the commenter said an asylum fee may force survivors to choose between different types of immigration relief to their detriment. A commenter discussed rates of gender-based violence in El Salvador, Honduras, Guatemala,

Venezuela, and China and concluded that sexual violence survivors seeking asylum in the U.S. are often doing so as a last resort because there is little hope of finding protection and safety from their abusers and assailants in their home countries. Therefore, an asylum fee would make it virtually impossible for the most vulnerable immigrant survivors of horrific domestic and sexual abuse to live free from the violence of their abusers. A commenter discussed the gender-based and gang violence that causes people to flee their countries and claimed that the $50 asylum fee would serve to enable smugglers and traffickers to pay the fees for asylum seekers to extort their help in smuggling enterprises.

*Response:* DHS recognizes the challenges that gender-based violence survivors face when fleeing from the violence of their abusers. This final rule establishes the Form I–589 fee at only $50 because DHS believes it is not an unreasonable amount. DHS disagrees that the fee forces applicants to choose between applying for different forms of relief or protection and enables smugglers and traffickers to extort applicants. DHS does not believe that establishing an asylum application fee of $50 unduly burdens or harms any applicants. DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefit requests and concluded that the $50 fee for asylum applications is warranted. The approximate cost of adjudicating an asylum application is $366. A $50 fee is well below the full cost of adjudicating the application. Moreover, the asylum application fee is in line with international treaty obligations under the 1951 Refugee Convention, as incorporated by reference in the 1967 Refugee Protocol, and domestic implementing law.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter stated that USCIS is promising the same inadequate service it has been providing in the past few years and is asking immigrant and refugee families to pay more to not get their applications processed. The commenter stated that the proposal to charge for asylum applications contradicts the 2005 Notice of Adjustment of the Immigration Benefit Application Fee Schedule which states, "fees collected from persons filing immigration benefit applications and petitions are deposited into the Immigration Examinations Fee Account and are used to fund the full cost of providing immigration benefits,

including the full cost of providing benefits such as asylum and refugee admission for which no fees are assessed."

*Response:* DHS acknowledges the concerns of the commenter related to delays in the processing of applications. DHS has experienced a continuous, sizeable increase in the affirmative asylum backlog over the last several years. One of the ways in which DHS seeks to alleviate the pressure of the increasing workload on the administration of immigration benefits is to charge a $50 fee for asylum applications. The fee will generate some revenue to help offset costs. As far as the 2005 notice is concerned, it described the asylum fee requirements, but does not preclude the establishment of a fee.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters wrote that they question the statutory authority to charge a fee to asylum applicants. Commenters stated that United States is obligated to accept asylum seekers under international and domestic law, and therefore should not refuse asylum seekers because of an inability to pay the fee. One commenter wrote that charging an asylum fee would have global consequences effecting the standard of care and rule of law in humanitarian protections. Comments stated that the United States has no precedent in international law to charge for asylum, a fee for asylum applications is discriminatory, and a fee for asylum is against the values of the United States.

*Response:* DHS recognizes the vulnerable situations of many individuals who apply for asylum. DHS considered all of the points the commenters raised when deciding to establish an asylum application fee. INA section 208(d)(3), 1158(d)(3) specifically authorizes the Attorney General to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application. As stated in the NPRM, DHS considered the authority provided in INA section 208(d)(3), whether the fee would be paid in installments or over time, and various fee amounts. DHS decided to establish a $50 fee because it could be paid in one payment, would generate some revenue to offset costs, and not be so high as to be unaffordable to even an indigent alien. 84 FR 62320. Thus, the lack of resources that asylum applicants possess and the burdens that they face contributed to DHS's decision to establish a minimal $50 fee.

Furthermore, DHS disagrees that there is no precedent in international law for charging an asylum application fee. DHS believes that the asylum application fee may arguably be constrained in amount, but a fee is not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Convention and the 1967 Refugee Protocol, as incorporated by reference, refers to the imposition of fees on those seeking protection, and limits "fiscal charges" to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests.

*Comment:* One commenter stated that if asylum seekers have to pay for their own initial Employment Authorization Document (EAD), it is likely that asylees will not apply for an EAD, which may be used against them when USCIS adjudicates their asylum application.

*Response:* DHS infers that the commenter is suggesting that asylum applicants will pursue unauthorized employment rather than pay the Form I–765 fee to lawfully obtain an EAD, and that will result in USCIS denying their application because they worked in the U.S. without authorization. DHS expects that asylum applicants will not pursue such an option and instead find a lawful way to pay the fee. As DHS noted in the NPRM, initial applicants with pending claims of asylum are a large workload volume for USCIS. In this final rule, DHS emphasizes that the person receiving the benefit should pay the fee. While DHS appreciates the need for asylum seekers to obtain lawful employment while their applications are pending, Congress has made it clear that fees primarily fund USCIS. After analyzing the costs of EADs for asylum applicants and considering the other factors raised by the commenters, DHS maintains its position that asylum applicants should pay the fee for the initial and renewal EADs.

*Comment:* Some commenters wrote that the fee for asylum applications would cause the U.S. to break its treaty obligations and contradicts the intent of the 1980 Refugee Act. Some commenters agreed and more specifically stated that the proposal would conflict with Congressional intent to offer humanitarian assistance to those fleeing persecution regardless

of national origin, race, age, gender, or financial status. A commenter said requiring asylum applicants to pay a fee violates the principle of non-refoulement because it would likely result in the expulsion of potential refugees merely on the basis of their financial status, and since the imposition of the asylum application fees would also be a barrier to apply for relief under the Convention Against Torture, it also conflicts with U.S. treaty commitments. Multiple commenters indicated an inability to pay the proposed fee would hinder asylum seekers' ability to apply for asylum and gain needed protection, thereby forcing asylum seekers to return to their country of origin to face further persecution and even death. A commenter wrote that the asylum fee proposal would increase the number of cases sent to immigration courts because individuals would not have the funds to pay for asylum applications. A few commenters stated that the unprecedented fee would restrict life-saving access to the legal system.

A commenter provided a lengthy comment on the 1951 Refugee Convention and the Refugee Act of 1980, stating that courts have interpreted the federal regulations establishing the asylum process and the INA as creating a constitutionally protected right to petition the United States for asylum. This in turn triggers the safeguards of the Fifth Amendment's Due Process Clause. The commenter said, because the proposed fee would operate as complete bar to some asylum seekers' ability to exercise their constitutionally protected right to petition for asylum, it violates the guarantee of due process that accompanies that right. The commenter stated that the rule should therefore be rejected. The commenter also said DHS has also failed to consider Article 32 of the 1951 Refugee Convention, which provides that refugees shall be expelled only pursuant to a decision reached in accordance with due process of law. The commenter said the United States cannot recognize the right to apply for asylum as a component of due process for the purposes of its own Constitution while contending that Article 32 of the 1951 Refugee Convention can be satisfied without such a guarantee. Similarly, the commenter said DHS neglects Article 3's guarantee of equal protection by facially discriminating among refugees based on wealth and disparately affecting refugees based on national origin or race. Another commenter spoke of several court cases that set due process and equal

protections precedent for asylees: (1) *Mathews* v. *Eldridge*, 424 U.S. 319 (1976), (2) *Griffin* v. *Illinois*, 351 U.S. 12, 19 (1956), (3) *Smith* v. *Bennett*, 365 U.S. 708 (1961), and (4) *Burns* v. *State of Ohio*, 360 U.S. 252, 258 (1959).

Some commenters pointed to the 1994 asylum reform initiative, which sought to impose a $130 fee on asylum applicants but was withdrawn following extraordinary opposition from the public. The argument that won then is applicable now, the commenter wrote, and that charging for an asylum application is contrary to United States international obligations to permit refugees to seek asylum in the United States and in violation of 8 U.S.C. 1158(a)(1).

Several commenters noted that the vast majority of signatories to the 1951 Refugee Convention or 1967 Refugee Protocol do not charge an asylum fee. Multiple commenters wrote that the U.S. would become just the fourth nation to charge fees for asylum. Similarly, a commenter stated only three countries currently charge a fee for asylum because such a policy is "universally considered" dangerous, discriminatory, and wrongheaded. Similarly, several comments stated that the United States has been a world leader in refugee protection for a long time and wrote that if the U.S. begins charging fees for asylum, other nations may choose to follow suit. The commenters described this outcome as "disastrous" given the increasing need for refugee resettlement worldwide. A commenter wrote that imposing a fee for asylum seekers is not feasible and would break with international precedent by denying such individuals access to "a universal human right." A commenter suggested there was a global consensus for rejecting fees for refugees and asylum seekers and wrote that any additional barriers to asylum adjudication could result in "even more deaths." Another commenter expounded on this point and questioned why USCIS neglected to discuss why most nations do not charge fees for asylum. The commenter also requested that USCIS "investigate the context of migration" in the nations that do charge fees for asylum, and said that, of these, only Australia was another "Western" nation. One commenter stated that charging a fee for asylum would place the U.S. "in the same position as countries that abuse human rights" and would contravene the work the U.S. has done to become a leader in refugee protection. A few commenters said that a fee for Form I–589 would make the United States the first, and only, country to charge asylum applicants to

access protection with no possibility of fee waiver.

One commenter wrote that Australia's direct cash assistance to asylum seekers has no equivalent in the United States. Another commenter added that Australia, whose policies towards asylum seekers have garnered international criticism, charges half of what DHS proposes to charge for asylum applications. A commenter noted that the United States will now have harsher asylum regulations than Iran, whose policies allow asylum seekers to obtain a fee waiver.

*Response:* DHS disagrees that the establishment of an asylum application fee is in violation of United States international treaty obligations, the principle of non-refoulement, and domestic implementing law. Although the United States is a party to the 1967 Refugee Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention, the Protocol is not self-executing. *See, e.g., Stevic,* at 428 n.22. The asylum statute at INA section 208 and withholding of removal statute at INA section 241(b)(3) constitute the U.S. implementation of international treaty obligations related to asylum seekers. DHS believes that the asylum application fee may arguably be constrained in amount but is not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), United States constitution, or domestic implementing law. Article 29(1) of the 1951 Refugee Convention, and as incorporated by reference in the 1967 Refugee Protocol, refers to the imposition of fees on refugees, and limits "fiscal charges" to not higher than those charged to nationals of a given country for similar services. A $50 fee is reasonably aligned with the fees charged to U.S. nationals for other immigration benefit requests. Moreover, INA section 208(d)(3), 8 U.S.C. 1158(d)(3), specifically authorizes DHS to impose a fee for the consideration of an asylum application that is less than the estimated cost of adjudicating the application. The approximate cost of an asylum application is $366. Thus, a $50 fee for asylum applications is in line with U.S. international treaty obligations and domestic implementing law.

DHS disagrees with the commenters' assertions that a $50 fee would operate as a complete bar on asylum seekers' ability to apply for asylum and access to equal protection and due process of law. The commenter refers to Article 32 of the 1951 Refugee Convention, which

provides that "[t]he expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law.' The commenter also refers to Article 3 of the 1951 Refugee Convention, which states that the provisions of the Convention shall apply "to refugees without discrimination as to race, religion, or country of origin." DHS believes that the establishment of a minimal fee of $50 to apply for asylum is not cost-prohibitive or overly burdensome for asylum seekers. This final rule does not bar asylum seekers from filing asylum applications. Also, charging a $50 fee for an asylum application does not restrict an asylum seeker's access to a decision reached in accordance with due process of law or discriminate against refugees.

Moreover, DHS does not intend to recover the estimated full cost of adjudicating the asylum application, as the fee amount is well below the approximate full cost of $366 for adjudicating an asylum application. DHS maintains that charging a fee for asylum applications will help alleviate the pressure that the growing asylum workload places on the administration of other immigration benefits and would generate some revenue to help offset costs.

As discussed in the NPRM, DHS requested a report from the Law Library of Congress on fees charged to asylum applicants by countries that are a party to the 1951 Refugee Convention and/or its 1967 Refugee Protocol. The Law Library of Congress surveyed the 147 signatory countries to the 1951 Refugee Convention and/or the 1967 Refugee Protocol, and of 147 countries, identified three countries that charge a fee for initial applications for asylum or refugee protection. DHS considered the asylum fees charged by other nations, including Australia, Fiji, and Iran, and the $50 fee is in line with the fees charged by these other nations. *See* 84 FR 62319.

DHS disagrees with commenters' assertions that charging a fee for asylum would place the United States in the same position as countries that abuse human rights and would contravene the work the United States has done to become a leader in refugee protection. DHS acknowledges the comments related to the policies of other nations, such as Australia and Iran. Each nation has its own unique needs and different asylum workloads. Given the growing scale of the affirmative asylum workload in the United States DHS explored ways to alleviate the pressure of the affirmative asylum workload. DHS believes that establishing a minimal fee

of $50 for Form I–589 would help USCIS generate revenue and offset costs, as well as mitigate fee increases for other immigration benefit requests.

*Comment:* Some commenters said the asylum application fee, Migrant Protection Protocols (MPP), CBP "metering," and "safe third country agreements" are counter to the international legal principle of non-refoulement and indicate a clear effort on the part of the administration to dismantle asylum in the United States.

*Response:* The commenter's concerns regarding MPP, CBP "metering", and safe third country agreements are outside of the scope of this rulemaking and DHS provides no response to those subjects in this final rule. DHS believes that fees associated with access to asylum and work authorization in the United States are not prohibited by the 1951 U.N. Convention Relating to the Status of Refugees ("1951 Refugee Convention"), 1967 U.N. Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), United States constitution, or domestic implementing law, and do not run counter to the principle of non-refoulement. Article 29(1) of the 1951 Refugee Convention, and as incorporated by reference in the 1967 Refugee Protocol, refers to the imposition of fees on refugees seeking protection, and limits "fiscal charges" to not higher than those charged to nationals of a given country for similar services, but does not bar the imposition of such fiscal charges. The $50 fee is reasonably aligned with the fees charged to United States nationals for other immigration benefit requests. INA Section 208(d)(3) authorizes the imposition of fees for asylum applications. The asylum application fee is in line with domestic implementing law and does not contravene international treaty obligations.

*Comment:* Some commenters suggested that migration patterns in the U.S. are unique and questioned whether the proposed rule was a racist and xenophobic response to increasing levels of immigration from Latin America. Some commenters discussed the characteristics of common countries of origin for asylees. Two commenters wrote that the asylum fee provision would impact thousands of Asian immigrants, and provided data from FY 2017 that shows 27,759 Chinese immigrants and 4,057 Indian immigrants applied for asylum, accounting for 12 percent and 2.9 percent of asylum seekers. Another commenter stated that approximately 1.5 million Africans have left Africa for the United States or Europe since 2010,

according to the United Nations, and that Nigeria was the seventh most represented country of origin for affirmative asylum cases filed in the U.S. from 2016–2018 according to a DHS report. Another commenter claimed that the asylum fee is indicative of xenophobia and racial animus toward those from Mexico and Central America, as Mexico, Haiti, El Salvador, Honduras, and Guatemala, respectively, had the highest denial rates of the 10 nationalities with the most asylum decisions between 2012 and 2017 (according to a 2018 report by CNN). The commenter claimed that high denial rates for people from these countries are partly due to the inaccessibility of legal assistance, and higher fees will exacerbate the disparity. One commenter stated that if the United States is not willing to address the root causes of migration, it cannot also place a fee on asylum seekers fleeing the violence and poverty of the countries that the U.S. refuses to aid.

*Response:* DHS disagrees that the asylum application fee is a racist and xenophobic response to increasing levels of migration and acknowledges the concerns of the commenters related to asylum seekers fleeing violence and poverty. Asylum is a discretionary benefit available to those who meet the definition of a refugee and are otherwise eligible. DHS recognizes that many legitimate asylum seekers face poverty and violence and considered the challenging circumstances that many asylum seekers face when deciding to establish a minimal fee of $50. The fee is well below the cost of adjudicating the asylum application, which is consistent with INA section 208(d)(3). The establishment of an asylum application fee is not animated by racism or xenophobia, but rather, it is animated by a need to respond to the increasing affirmative asylum workload and generate some revenue to offset costs. USCIS must address these issues regardless of the myriad factors that contribute to individuals claiming asylum in the United States.

*Comment:* Some commenters discussed the impact of an asylum fee on children. One commenter said the proposed rule disregards the best interests of children, as it would charge unaccompanied children for applying for asylum, writing that children should not have to shoulder the burden of the large backlog of cases and slow processing of immigration applications. One commenter said that 56 percent of the applications from Central America were filed by unaccompanied children, many of whom are fleeing the most high-volume countries of origin and are

in danger without the help of the U.S. Another commenter noted that derivative applicants who do not file independent asylum applications cannot assert their own, independent claims. Many asylum-seeking families submit individual applications for all family members to pursue every possible avenue of relief for all family members. The cost per application will have a negative impact on these families. Multiple commenters wrote that applying a fee to asylum applications could result in deportations or compel vulnerable children and families to return to countries they fled, risking continued persecution or death. Several commenters pointed out that asylum seekers are in danger of human trafficking and other crimes, and that the asylum fee bars them from the protections that legal status affords. A few commenters stated that asylum should only be based on evidence of perceived or actual persecution and not whether asylum seekers have financial assets. A commenter suggested the asylum fee proposal was "cruel and inhumane" and that asylum seekers should not have to prioritize asylum fees over feeding their families.

*Response:* DHS acknowledges the commenters' concerns about the potential effects of the asylum application fee on children and their families. DHS recognizes that the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, provides a range of protections for unaccompanied alien children. DHS excludes unaccompanied alien children in removal proceedings, a particularly vulnerable population, from the imposition of a $50 asylum application fee. 8 CFR 106.2(a)(20).

DHS acknowledges the commenters' concerns about asylum seekers' ability to pay fees for multiple asylum applications depending on the circumstances of principal and derivative applicants, including children. DHS considered the effect of a fee on asylum seekers and believes it would not impose an unreasonable burden on applicants or prevent asylum seekers from seeking protection. The services that USCIS provides at no or below cost impacts the fees imposed on other fee-paying applicants. DHS seeks to make the USCIS fee schedule more equitable for all applicants and petitioners. Nevertheless, DHS considered the challenges that asylum seekers face and establishes an asylum application fee that is well below the cost of adjudicating the application.

*Comment:* Multiple commenters discussed the very limited resources

with which asylum seekers come to the U.S., and the resulting inaccessibility of transportation, housing, healthcare, and other necessities. Several commenters noted that asylum seekers are ineligible for public assistance programs unless and until they are granted asylum, and they rely on nonprofit and community resources for housing, basic toiletries, school supplies, clothing, and public transportation. The commenters claim that the asylum fee unjustly burdens those who need resources and support the most. One commenter cited a Human Rights Watch publication to claim that asylum seekers' financial resources often fail to cover the bare necessities of life, such as food, medicine, and shelter. Another commenter said that many asylum seekers do not have financial resources because of "the nature of flight from perilous situations," and wrote that asylum seekers are considered "non-qualified" immigrants for the purposes of qualification for federal public assistance.

One commenter said that USCIS claims the $50 fee is large enough to produce a revenue stream while small enough to remain affordable. The commenter cited a Washington Post article that discusses the extreme poverty of asylum seekers to emphasize the inability of these people to pay any fee, no matter how small. Another commenter added that USCIS should take into account $50 as a percentage of Gross National Income (GNI) in asylees' home countries, citing World Bank and TRAC Immigration data. A commenter wrote that the $50 fee for asylum would not be a deterrent for some asylum seekers, but that the "calculus is not so simple" for others who will not be able to afford the fee. The commenter provided anecdotes about the personal backgrounds of asylum seekers to provide context about the challenging financial situations many asylum seekers or refugees face.

*Response:* DHS acknowledges the challenges that asylum seekers face, including extreme poverty and limited access to resources. In recognition of these circumstances, DHS establishes a minimal $50 fee for Form I–589 for most applicants (unaccompanied alien children in removal proceedings who file Form I–589 with USCIS are not required to pay the fee). DHS considered various fee amounts and whether the fee would be paid in installments over time. DHS has established a minimal $50 fee that can be paid at one time, would not require an applicant to save for an unreasonable amount of time, would generate revenue to offset costs, and would not be so high as to be

unaffordable to an indigent applicant. *See* 84 FR 62319. DHS does not intend to recover the full cost of adjudicating asylum applications via the Form I–589 fee. DHS will recover the additional costs of asylum adjudications by charging other fee-paying applicants and petitioners more. DHS does not intend to discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families.

*Comment:* A commenter stated that this NPRM functions under the "deterrence paradigm" to prevent asylum seekers from coming to the United States. They claimed that such deterrence policies do not work, citing a report by the American Immigration Council which showed that comprehensive knowledge of the dangers and possible futility of seeking asylum had little impact on the intentions of Hondurans to seek asylum in 2014.

*Response:* DHS does not intend to deter legitimate asylum seekers from filing asylum applications via the $50 asylum application fee. The goals behind establishing a $50 asylum application fee include alleviating the pressure of the growing affirmative asylum workload on the administration of other immigration benefit requests and generating some revenue to offset costs. DHS believes the minimal fee of $50 is not unreasonably burdensome and does not prevent legitimate asylum seekers from submitting asylum applications.

*Comment:* A few commenters indicated that the $50 fee does not mitigate the fee increase of other immigration benefit requests. One of these commenters stated that since DHS will still rely on other benefit requesters to cover the costs of the asylum process, as authorized by Congress, the decision to charge an asylum fee is unacceptable.

A few commenters reasoned that, because the process costs around $300 per applicant, a $50 fee would not meaningfully address the deficit associated with asylum adjudication but would still be prohibitively expensive for vulnerable people. One commenter added that this is an arbitrary departure from the "full cost" standard required for federal agencies, and that USCIS should charge applicants the full cost of adjudicating the application.

One commenter cited the Asylum Division's quarterly statistics, which indicate that DHS experienced a 40 percent decrease in affirmative filings between 2017 and 2018. The commenter stated that USCIS is unable to alleviate a growing backlog despite a drop in affirmative filings. Two commenters cited a Migration Policy Institute study

which shows that many factors contributing to the backlog are the result of U.S. policies.

*Response:* DHS carefully assessed the costs associated with the adjudication of asylum applications and other types of immigration benefit requests and concluded that the $50 fee for asylum applications is warranted. A minimal fee would mitigate the fee increase of other immigration benefit requests. DHS also relied on INA section 208(d)(3), which provides that "fees shall not exceed the Attorney General's costs in adjudicating" the asylum application. The approximate cost of adjudicating an asylum application is $366, and thus, the fee is below the full cost of adjudicating the application. The lower fee amount represents DHS's efforts to balance the needs and interests of USCIS in generating some revenue to offset costs against the socio-economic challenges faced by some asylum seekers.

DHS acknowledges the comments related to the growing affirmative asylum backlog, which played into DHS's decision to establish an asylum application fee. USCIS has taken several actions to address the affirmative asylum backlog, including: Identifying and employing strategies to maximize efficiencies in case processing across workloads; increasing adjudicative capacity by expanding its field office workforce and continuing significant facilities expansion; and reverting to reform scheduling, also known as Last In, First Out (LIFO) scheduling, which involves scheduling the most recently filed applications for interviews ahead of older filings. *See* USCIS announcement on Last in, First Out scheduling (January 2018), available at *https://www.uscis.gov/news/news-releases/uscis-take-action-address-asylum-backlog.* LIFO scheduling has contributed to a decrease in the growth of the asylum backlog. Even though USCIS has taken a range of measures to address the backlog, the number of pending affirmative asylum cases remains high.

*Comment:* One commenter cited a 2011 New York Immigrant Representation Study to say that with decreased ability to support themselves, asylum seekers would be far less likely to afford legal counsel and therefore have less chance of prevailing on their asylum claims.

*Response:* DHS believes that a minimal fee of $50 will not prevent asylum seekers from securing legal counsel or affect their chance of prevailing on their asylum claims. Asylum seekers may secure legal counsel as needed to assist them with

the asylum application process. This final rule does not hinder or affect asylum seekers' access to counsel. With or without legal counsel, asylum applicants are given the opportunity to provide the information needed for an adjudicator to make a decision about their eligibility for asylum. DHS declines to make any changes in this final rule in response to the comment.

**14. Form I–600A/I–600 Supplement 3, Request for Action on Approved Form I–600A/I–600**

*Comment:* A commenter supported changes in the handling of Hague Adoption Convention Transition Cases, commenting that their personal experience in the adoption process had been very difficult. The commenter stated that having a prescribed system would be an improvement.

*Response:* DHS appreciates the support for the changes in handling intercounty adoption cases and agrees that the prescribed system is an improvement upon previous practice.

**15. Form I–601A, Application for Provisional Unlawful Presence Waiver**

*Comment:* Multiple commenters opposed increasing the fee for Form I–601A because it would harm family unity, discourage the use of consular processing, and undermine the use of Form I–601A to improve efficiency.

*Response:* DHS recognizes that Form I–601A can aid family unity and improve administrative efficiency through the use of consular processing. However, DHS disagrees with the commenters' contention that the fee increases enacted in this final rule for Form I–601A, from $630 to $960, undermines those goals. DHS adjusts the fee for Form I–601A to reflect the estimated full cost of adjudication. If DHS did not adjust fee to provide for USCIS to recover full cost, USCIS would be unable to devote sufficient resources to adjudication to limit the growth of pending caseload, thereby undermining the goals of family unity and efficient processing.

DHS declines to make adjustments in this final rule in response to these comments.

*Comment:* A commenter opposed the fee increase for Form I–601A because such waivers have allowed thousands of immigrants to pursue lawful permanent residence through consular processing. The commenter said the proposed increase for this waiver application, in conjunction with the costs of consular processing, would discourage immigrants from seeking lawful status and place them at risk of removal and long-term separation from their families.

*Response:* DHS recognizes that the provisional waiver process has enabled family unity and the use of consular processing to gain lawful permanent residence. However, DHS disagrees with the commenter's assertion that the fee increase for Form I–601A will discourage immigrants from seeking lawful status or result in long-term separation for families. DHS believes that the fee increase of $330, from $630 to $960, likely represents a small portion of the overall cost of utilizing consular processing to pursue lawful permanent residence. DHS also notes that noncitizens with an approved Form I–601A still trigger the unlawful presence ground of inadmissibility found in INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) upon departure.

DHS declines to make changes in this final rule in response to the comment.

### 16. Form I–751, Petition To Remove Conditions on Residence

*Comment:* Multiple commenters wrote regarding increases in the fee for Form I–751. Commenters wrote that the fee for Form I–751 would cause individuals who are unable to afford the new fee failing to petition to remove the conditions on their permanent residence, thereby losing their conditional lawful permanent resident status.

*Response:* DHS recognizes the importance of Form I–751 to individuals in conditional lawful permanent resident status. However, DHS disagrees with the commenters' contention that the fee increase for Form I–751, from $595 to $760, will render Form I–751 unaffordable to these individuals. Conditional lawful permanent residents have nearly two years between gaining that status and the 90-day period in which they are required to file Form I–751, during which they are able to work and save to afford the fee, or they may pay with a credit card. DHS adjusts the fee for Form I–751 to reflect the estimated full cost of adjudication and declines to make adjustments in this final rule in response to these comments.

*Comment:* Many commenters indicated the Form I–751 fee increase and elimination of the fee waiver would make it more difficult for low-income families to file timely and could have severe consequences, including the conditional resident's loss of lawful status and the risk of being placed into removal proceedings. A commenter stated that the unbundling and resulting increase in the fee for adjustment of status and ancillary applications, and the increased fee for provisional waivers could prevent low-income individuals

from applying for immigration benefits. The commenter asked that USCIS hold current fees in place or increase the fees by a modest amount. One commenter said the proposed change would affect many older applicants who maybe be on fixed incomes, as well as people in single-income households.

*Response:* DHS acknowledges the changes in fee waiver eligibility and the increase in the fee for Form I–751 implemented in this final rule will render the process of removing conditions on lawful permanent resident status more expensive for individuals. However, DHS disagrees with the commenters' contention that the fee increase for Form I–751, from $595 to $760, will render Form I–751 unaffordable to these individuals. Conditional lawful permanent residents have nearly two years between gaining that status and the 90-day period in which they are required to file Form I–751, during which they are able to work and save to afford the fee.

DHS declines to adjust this final rule in response to these comments.

### 17. Form I–765, Application for Employment Authorization

*Comment:* A commenter wrote that Form I–765 fees are causing students to consider leaving the United States following graduation, removing talented workers from the U.S. economy and tax base. The commenter stated that the proposal would further disincentivize foreign students from studying in the United States. A commenter also wrote that the proposed fee increases could impede immigrant student's career advancement.

*Response:* DHS acknowledges the sizeable increase in the Form I–765 fee implemented in this final rule, adjusting the fee from $410 to $550. DHS adjusts the fee for Form I–765 to reflect the estimated full cost of adjudication. Although DHS recognizes that this fee increase imposes an additional burden on nonimmigrant students seeking employment authorization for Optional Practical Training, off-campus employment under the sponsorship of a qualifying international organization, or due to severe economic hardship, DHS is unaware of data to support the commenter's contention that fee for Form I–765 serves to deter students from coming to the United States. DHS declines to exempt students from the increased filing fee because USCIS must determine the student's eligibility under the applicable regulations at the time of application and the fee is necessary to recover the full costs of the adjudication. DHS does not believe the fee is an unreasonable burden for

students who need employment-based training. DHS believes that employment in the United States will continue to appeal to individuals despite an increase of $140 in the cost of applying for an EAD.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Multiple commenters opposed the change to charge asylum applicants for their first Form I–765, Application for Employment Authorization. The comments are summarized as follows:

• Charging asylum seekers for the first work permit creates a "catch 22" situation where people cannot work so cannot afford to pay their asylum fees and may incentivize people to work illegally.

• USCIS should not charge $50 for asylum applications and further charge for an EAD while asylum cases are pending.

• Requiring individuals who are not authorized to work to pay such a substantial fee to acquire work authorization is cruel and counterintuitive.

• Asylum seekers have historically not been charged for their initial EAD because their flight from their country of origin leaves them in dire financial situations, and they often lack family support in the United States to assist them.

• Requiring asylum applicants to pay for an initial EAD before they have authorization to work will worsen the already precarious situation of a vulnerable population.

• People subject to the fee have already spent substantial time and money to get to the United States, have likely spent time in immigration detention, and have not been authorized to work since leaving their home country.

• USCIS should continue to exempt asylum seekers from fees associated with EADs because these individuals would not be able to afford fees before they can legally work. It did not make sense to charge asylum seekers for work permits before being granted protection.

• The EAD fee for asylum seekers will act as an unjust deterrent for asylum seekers.

• To levy an asylum fee in conjunction with the EAD fee was beyond contemplation and abominable and questioned how the government could expect asylum-seekers to obtain funds to cover these costs.

• The proposal was far from benign and employers could pay this work permit fee.

• This fee will force asylum applicants into seeking unauthorized

work, putting them at a higher risk of exploitation, placing an undue burden on investigative agencies, and ultimately putting those applicants in danger of facing further consequences for attempting to work without authorization.

• A fee for an initial work permit is illogical, because the U.S. benefits from self-sufficiency of asylum seekers and should therefore want to expedite the employment authorization process.

• It will burden local communities and service providers that must provide social services to asylum applicants unable to work.

• Local communities will suffer lost wages and tax revenue, as well as the labor that would otherwise be provided by asylees.

• State, local, community, and religious organizations will attempt to cover the EAD fee for asylum seekers, straining their resources and preventing them from serving more people.

• Preventing asylum seekers from authorized work restricts them from lawfully paying a fee for asylum.

• Allowing asylum seekers to have work authorization benefits local economies by asylum seekers paying taxes, filling skills gaps, and building the workforce.

• Asylees often bring a wide range of skills and experience and are useful to many businesses, and that the proposal would deny U.S. businesses of the opportunity to hire these workers.

• Nearly 65 percent of the asylum seekers in the commenter's program arrive in the U.S. with experience in STEM and healthcare fields.

• Employers would have difficulty finding labor substitutes if asylum seekers were kept out of the workforce. USCIS should conduct additional analysis on the impact of new fees for employment authorization.

• USCIS has not calculated the losses to tax revenue and the broader economy associated with a reduced number of asylees in the U.S.

• Asylees often come to the U.S. with in-demand skills, including skills that would be useful in the healthcare and information technology sectors, and the USCIS should estimate the costs borne to employers who would use asylees.

*Response:* DHS acknowledges the concerns of the commenters related to the requirement of a fee ($550) for initial filings of Form I–765 for applicants with pending asylum applications. Initial EAD applicants with pending asylum applications account for a large volume, approximately 13 percent, of the Form I–765 workload forecast and DHS has decided to no longer provide this service for free. Charging initial Form I–

765 applicants with pending asylum applications allows DHS to keep the fee for all fee-paying EAD applicants lower. Asylum applicants will pay no more and no less than any other EAD applicant (except for those who are eligible for a fee waiver) for the same service.

DHS is acting in compliance with Section 208(d)(3) of the INA, which provides that, "[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m)." DHS believes that charging asylum applicants for EADs does not impose an unreasonable burden on asylum seekers. This final rule does not impose or seek to impose any obligation on the part of employers, states, or community or religious organizations to pay the Form I–765 fee. Also, this final rule does not seek to burden local communities or service providers. DHS declines to make changes in this final rule in response to these comments.

USCIS disagrees that charging asylum seekers for the first work permit creates a conflict between contradictory conditions where aliens cannot work to pay their asylum fees and may incentivize people to work illegally. No asylum applicant may receive employment authorization before 180 days have passed since the filing of his or her asylum application. INA section 208(d)(2), 8 U.S. C. 1158(d)(2); 8 CFR 208.7(a)(1). This requirement has been in effect for over twenty years. *See,* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Section 604, Public Law 104–208; see also 62 FR 10337. Thus, an asylum seeker is unlikely to come to the United States expecting to be authorized to work immediately. Asylum seekers can, and do, rely on their own means, as well as family or community support to economically sustain themselves in the United States during the period of time that they are not employment authorized.

*Comment:* Several commenters wrote that if asylum seekers are unable to obtain employment authorization, they may be unable to pay for legal counsel, which will make it more difficult for them to prevail on the asylum applications. One commenter cited "Accessing Justice: The Availability & Adequacy of Counsel in Immigration Proceedings," a study that showed that among non-detained individuals in immigration court, those with counsel saw success in 74 percent of cases

compared with 13 percent of those unrepresented.

*Response:* DHS recognizes the economic challenges faced by asylum seekers. However, DHS does not believe that charging asylum seekers for a work authorization application will prevent them from obtaining legal counsel. DHS does not believe that the EAD fee is unduly burdensome for asylum seekers. Furthermore, DHS is acting within the scope of its statutory authority to establish fees for adjudication services, in accordance with INA sections 208(d)(3) and 286(m). DHS declines to make changes in response to these comments.

*Comment:* A commenter stated that fee exemptions for EAD applications by asylees should apply not only to initial applications, but also renewals. The commenter said the original rationale was that the initial EAD lasts for 2 years, and it was expected that asylees would be granted lawful permanent residence within that two-year period. Currently, however, the processing times for permanent residence by asylees range up to 26 months, so the commenter said USCIS should eliminate the fee for applications for renewal of employment authorization filed by asylees.

*Response:* DHS acknowledges the concerns related to processing times for EADs and adjustment of status applications. DHS does not believe that the fee for renewal EAD filings will present an insurmountable burden for asylees. Asylees are employment authorized incident to their status. DHS will continue to exempt asylees from the initial Form I–765 fee. However, considering that they are employment authorized incident to their status as an asylee and the EAD is matter of convenience and not necessary for ongoing employment, asylees submitting I–765 renewal applications will be required to pay the relevant fee, unless the asylee filed for adjustment of status on or after July 30, 2007 and before October 2, 2020 and paid the Form I–485 filing fee. DHS declines to adjust this final rule in response to these comments.

*Comment:* One commenter suggested that initial asylum applicants seeking employment authorization should be exempt from fees. Instead, they propose that the Form I–765 fee should increase by $10 to offset the cost.

*Response:* DHS appreciates the commenter's suggestion. DHS considered continuing to exempt asylum applicants from paying for their first Form I–765 filing. However, to more closely align with the beneficiary-pays principle, DHS declines to require other fee-paying applicants to subsidize

the cost of adjudicating the initial EAD applications of asylum applicants. DHS declines to adopt the change suggested by this commenter.

*Comment:* One commenter pointed out that work-eligible unaccompanied children need access to EADs in order to access housing, food, and clothing. Many minors reach adulthood before their Form I–589 application is adjudicated, losing access to foster care and other financial support, leaving them as reliant on work as adult applicants. Another commenter said that women and children will be particularly affected by the EAD application fee and stated that a fee waiver is necessary for these applications. Given that asylum seekers do not have access to social welfare benefits, women are especially at risk of hunger, abuse, homelessness, trafficking, and other coercive employment practices. This commenter cited data from the Women's Refugee Commission which emphasizes the benefits of employment for women who have experienced trauma, as many asylees have.

*Response:* DHS acknowledges that asylum applicants need access to employment authorization. DHS does not believe that this final rule hinders or prevents asylum seekers from applying for employment authorization. DHS believes that the EAD fee is not unduly burdensome for asylum seekers and is acting within the scope of its statutory authority to establish fees for adjudication services, in accordance with INA sections 208(d)(3) and 286(m). Regarding unaccompanied alien children (UAC), a UAC may be in the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR) or residing with a sponsor. *See* 8 U.S.C. 1232(b) and (c). A UAC should not need an EAD for an identity document, and to the extent that they do, the sponsor for the UAC is generally responsible for his or her Form I–765 fee. After turning 18, the same policy considerations for charging them for the Form I–765 apply as for charging all adults.

*Comment:* A few commenters claimed that the processing time for EAD applications is too long as is, and the new Form I–765 fee will present an unsurmountable burden. Doubling the waiting period, along with the $490 fee, presents an unjust financial hurdle for many asylum seekers and will prevent them from attaining self-sufficiency through work.

*Response:* DHS acknowledges that the fee and waiting period for the initial EAD may be an economic challenge for some asylum applicants, but DHS

disagrees that it is insurmountable or unduly burdensome. Many asylum seekers spend thousands of dollars to make the journey to the United States. It is not unduly burdensome to require that asylum seekers plan and allocate their financial resources to pay a fee that all other noncitizens must also pay. USCIS must incur the costs of adjudicating Form I–765 submitted by an asylum seeker, and DHS does not believe it should shift that cost to other fee payers. Charging a fee for adjudication services is in line with INA section 208(d)(3), which provides that "[n]othing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 1356(m) of this title." DHS declines to make changes in this final rule in response to these comments.

**18. Form I–817, Application for Family Unity Benefits**

*Comment:* A commenter said the fee decrease for Form I–817 is puzzling in light of the current processing and adjudication of the corresponding benefits because this form currently experiences inordinate delays for processing.

*Response:* DHS acknowledges that processing times for many forms, including Form I–817, have exceeded USCIS' processing time goals. DHS is setting the fee for Form I–817 at the level sufficient to recover the estimated full cost of adjudicating USCIS's anticipated workload receipt volumes. DHS hopes to be able to devote sufficient resources to Form I–817 adjudication to reduce pending caseload. DHS declines to make any adjustments in this final rule in response to the comment.

**19. Form I–821D, DACA Renewal Fee**

*Comment:* Many commenters wrote that they opposed the Form I–821D DACA renewal fees. Commenters stated that increasing DACA fees would make it difficult for individuals to renew their work permits and individuals could lose the ability to work legally in the United States. Commenters highlighted that many DACA requestors are students and may have difficulty paying the proposed fee in addition to the fee for filing Form I–765. Commenters wrote that the proposed fee increase would cause emotional and financial hardships for the families of DACA recipients. Commenters stated that the imposition of a fee for DACA would constitute an attempt to terminate the DACA program.

Some comments stated that the Supreme Court might decide the future of the DACA program in the next few months; therefore, DACA recipients should not pay more for an uncertain benefit.

*Response:* DHS will not impose the proposed Form I–821D, Consideration of Deferred Action for Childhood Arrivals fee. It is not included in this final rule. USCIS will not receive any revenue from Form I–821D. Therefore, DHS removed the marginal costs directly attributable to the DACA policy from its cost baseline that informs the fee calculations for this final rule. The revenue DHS anticipated from the Form I–821D DACA fee in its NPRM to recover costs associated with overheads and cost reallocation will be collected through adjustments to the other fees addressed in this final rule.[88] DACA requestors will continue to pay the fees in place before September 5, 2017, $410 for Form I–765, Application for Employment Authorization, as well as a separate biometric services fee of $85.

*Comment:* Multiple commenters suggested that the ability to receive immigration protection and work authorization under DACA is crucial for immigrant survivors of domestic and sexual violence. The commenters cited a DOJ special report from December 2014 which indicates that women between the ages of 18 and 24 experience the highest rate of rape and sexual assault when compared to women of other age groups. The commenters stated that because most DACA requestors are young immigrants, the DACA eligible population is particularly vulnerable to violence and abuse.

One commenter said that increasing the DACA renewal fee by 55 percent will jeopardize the employment of domestic abuse survivors. The commenter stated that when a DACA holder is a victim of domestic violence and becomes eligible for U nonimmigrant status, it is important that they be able to renew their DACA and related work permits while they wait for their U nonimmigrant status so that can remain employed and not have to

---

[88] Although DHS requires DACA requestors to continue paying the fee for Form I–765, it has removed all DACA workload and fee-paying volume projections from USCIS' ABC model due to our decision to not impose a fee for Form I–821D in this final rule, consistent with Scenario D of the NPRM and the FY 2016/2017 fee rule. In its rules to establish USCIS fees, DHS has generally not relied on revenue from sources that are temporary in nature, including DACA. *See* 81 FR 73312. Including temporary programs in the model would allocate fixed costs and overhead to these programs, thereby introducing financial risk because USCIS would not be able to recover full cost if they are discontinued.

financially rely on their abusers. The commenter stated that processing time for petitions for U nonimmigrant status is between 52.3 and 53 months.

*Response:* DHS will not impose a fee for Form I–821D in this final rule. However, DACA requestors will continue to be required to submit Form I–765 for an EAD. To request a DACA renewal, DHS will continue to require the $410 Form I–765 fee and the $85 biometric services fee that were in effect before September 5, 2017. Furthermore, DHS reiterates that Form I–918 has no fee and Form I–192 remains fee waivable for U nonimmigrant status petitioners.

DHS declines to make changes in this final rule in response to these comments.

**20. Form I–829, Petition by Investor To Remove Conditions on Permanent Resident Status**

*Comment:* A commenter said the fee review for EB–5 forms, such as Form I–829, failed to meet the objectives of ensuring USCIS has adequate resources and to recover the full operating costs of administering the national immigration benefits system. The commenter said the modest 4 percent increase for Form I–829 fee is clearly too low for adequate service and noted that despite the form having a statutory requirement to be adjudicated within 90 days of filing, the processing time for this form is currently between 22 and 45 months.

*Response:* DHS acknowledges that processing times for many forms, including Form I–829, have exceeded the goals established by USCIS. Furthermore, DHS acknowledges its obligation to adjudicate Form I–829 filings within 90 days of the filing date or interview, whichever is later. *See* INA section 216(c)(3)(A)(ii), 8 U.S.C. 1186b(c)(3)(A)(ii). In this final rule, DHS adjusts the fee for Form I–829 to $3,900 to reflect the estimated full cost of adjudication. In estimating the full cost of adjudication, USCIS considers the costs to adjudicate incoming workloads and does not consider the resources necessary to adjudicate existing pending caseloads. If USCIS considered the cost to adjudicate existing, pending caseloads in its fee reviews, this would require future immigration benefit requestors to subsidize the cost of adjudicating previously received applications and petitions. DHS will not require future applicants and petitioners to subsidize the adjudication of existing, pending caseloads.

DHS declines to make changes in this final rule in response to the comment.

**21. Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA))**

*Comment:* A commenter said that the NPRM provided no explanation for the 532 percent fee increase for Form I–881. The commenter questioned if adjudication had changed drastically to justify the fee increase. Similarly, a couple commenters stated that USCIS' justifications did not explain the fee increase and the proposal was contrary to the purpose of the Nicaraguan Adjustment and Central American Relief Act (NACARA).

*Response:* DHS disagrees with the commenters' contention that DHS failed to explain or justify the fee increase for Form I–881. This final rule adjusts the fee for Form I–881 from $285 for individuals or $570 for families to a single fee of $1,810. As stated in the NPRM, DHS has not adjusted the fee for Form I–881 since 2005. Thus, the fee has not reflected USCIS' estimated full cost of adjudication since that time. The large increase results from a need for the fee to recover its proportionate share of USCIS' estimated full costs. In this final rule, DHS adjusts the fee for Form I–881 to reflect the estimated full cost of adjudication.

DHS declines to make change in this final rule in response to these comments.

**22. Forms I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and I–924A, Annual Certification of Regional Center**

*Comment:* A commenter said the filing fee for Form I–924 is "already vastly out of proportion" with the work required to process the form. The commenter said the current fee of $17,795 may be appropriate for entities seeking a new regional center designation or an approval of an exemplar Form I–526 petition but is not reasonable for smaller-scale changes like a change to a regional center's name, ownership, or organizational structure. The commenter suggested there should be a much lower fee to accompany such minor changes (which are mandatory notifications to USCIS).

Another commenter said the fee adjustment for Forms I–924 and I–924A fails to meet the agency's stated objectives of adjusting fees to ensure USCIS has the necessary resources to provide adequate service to applicants and can recover the full operating costs associated with administering the immigration benefits system.

*Response:* DHS acknowledges that there may be a difference between the cost of adjudicating a Form I–924 filing that requests a new regional center designation and a filing that amends an existing regional center. However, DHS does not have data to document the difference in effort and cost between different types of Form I–924 filings. Thus, DHS estimated the full cost of adjudication for Form I–924 based on an estimate of the average level of effort required to adjudicate Form I–924. As noted in the rule initially establishing the $17,795 for this form, the proposed fee "was determined using USCIS's standard fee-setting methodology, based on the number of hours required to adjudicate Form I–924. These adjudications require economists and adjudications officers to thoroughly review extensive business documents, economic impact analyses, and other project-related documents." [89]

DHS disagrees with the commenter's contention that the fee for Form I–924 is too low to provide adequate service. In its fee review, USCIS estimated that the fee for Form I–924 necessary to reflect the full, estimated cost of adjudication would be less than the existing fee of $17,795. In recognition of the resources available to I–924 filers and to limit the fee increases for other form types, DHS decided to maintain the fee for Form I–924 at the current level of $17,795 in this final rule.

DHS declines to make changes in this final rule in response to these comments.

**23. Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant**

*Comment:* Multiple commenters suggested the proposed $1,285 or 559 percent increase in the Form I–929 fee is excessive. The commenters stated that the petition benefits crime victims' family members. A commenter said the proposed fee would create a financial hardship for immigrant families and the proposed rule ignores the fact that survivors of domestic violence, sexual assault, and human trafficking may desperately need timely processing of ancillary applications to escape and overcome abuse. Another commenter said the proposed increase would inhibit a vulnerable population from reuniting with spouses, children, and in the case of minors, parents—directly in tension with congressional intent. A commenter indicated this increase would make applying extremely difficult for individuals who have

---

[89] USCIS, *U.S. Citizenship and Immigration Services Fee Schedule,* 81 FR 73292, 73310 (Oct. 24, 2016).

qualified family members. A commenter stated that it is important to incentivize individuals to come forward and report when they have been the victim of a crime and by keeping derivative applications for U-visa applicants affordable, USCIS would ensure that agencies prioritize public safety and family unity.

*Response:* DHS recognizes the importance of Form I–929 for promoting family unity for U nonimmigrants and their family members. In recognition of this importance, and consistent with its commitment to maintain fee waiver availability of statutorily protected classes of individuals, DHS proposed in the NPRM to continue to make the fee for Form I–929 waivable for those who file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility criteria. *See* 84 FR 62297. In this final rule, DHS reaffirms that the fee for Form I–929 will remain waivable for petitioning U nonimmigrants or lawful permanent residents who file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility criteria. DHS believes that maintaining access to fee waivers for this vulnerable population mitigates any concerns that the increase in the fee for Form I–929 would inhibit family unity.

In this final rule, DHS establishes the fee for Form I–929 as $1,485 to reflect the estimated full cost of adjudication, which includes the anticipated cost of fee waivers for Form I–929. DHS recognizes that this represents a significant increase of $1,255 in the fee. DHS notes that this increase is due, in part, to its commitment to preserve access to fee waivers for certain vulnerable populations. Because DHS anticipates that many filers will meet the fee waiver criteria, USCIS must charge fee-paying applicants more to recover the cost of processing fee-waived forms.

DHS declines to make changes in this final rule in response to these comments.

24. Form N–400, Application for Naturalization

a. N–400 Fee Increase

*Comment:* Some commenters stated that USCIS does not have statutory authority for raising the naturalization fees.

*Response:* DHS disagrees that USCIS does not have the statutory authority to raise naturalization fees. The Form N–400 fee adjustment is consistent with INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full

costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants") [90] and the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees). Currently, there are no statutory provisions that require USCIS to limit the naturalization application fee. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* Many commenters stated that Congress has asked USCIS to keep citizenship affordable, consistent with Congressional intent, USCIS has historically followed this directive by using other fees to subsidize naturalization fees, and that the proposed increase in naturalization fees and removal of fee waivers violates Congressional intent. A commenter provided quotations from 2010 and 2016 rulemakings stating this policy objective and wrote that USCIS is arbitrarily departing from the policy of reducing economic barriers to naturalization. Commenters also cited the U.S. Code's citizenship criteria and noted the absence of economic status. Commenters cited the 2019 DHS Appropriations Act and a recent Congressional Committee report in making this argument and especially opposing the removal of fee waivers for Form N–400. A commenter also cited Consolidated Appropriations Acts from 2012, 2017, and 2019 as evincing Congressional intention to reduce financial barriers to naturalization. The commenter also quoted a Senate Committee report from 2015 and House Committee report from 2020 to the same effect. Another commenter provided two House of Representatives reports from 2018 and 2019 also writing that the proposal contravenes Congressional intent.

Multiple commenters stated that the proposal "undermir[es] the special consideration that obtaining U.S. citizenship deserves." A commenter wrote that USCIS irrationally dismissed Congressional instructions to remove barriers to naturalization by relying on a principle of "self-sufficiency" that USCIS asserts without support. Another

commenter stated that USCIS acknowledged its departure from Congressional intent, and that its stated justification—a "hypothetical concern" that waivers could disrupt services—is insufficient. A commenter stated that, while reducing the subsidy provided by other immigration fees to naturalization may be appropriate, it is cynical of USCIS to use naturalization fees to fund ICE while making no commitment to reducing the months-or-years-long wait times for citizenship interviews. A commenter provided a citation to a USCIS statement reaffirming the special consideration given for naturalization in making fee determinations.

A commenter stated that increasing naturalization fees would impact families and that DHS must therefore perform a "family policymaking assessment," citing a 1998 Omnibus Appropriations Act. The commenter wrote that N–400s are the forms most likely to impact immigrant families.

A commenter wrote that the Northern District of California issued a nationwide preliminary injunction, effective December 2, 2019, barring USCIS from limiting access to naturalization for LPRs.

Two commenters cited the United Nations Declaration of Human Rights' statement that the right to a nationality also includes the right to "change [one's] nationality," and therefore there should be no arbitrary barriers that prevent naturalization.

One commenter cited a 2012 Migration Policy Institute study which found that the United States lags behind other English-speaking countries in naturalization rates, writing that these countries have made active attempts to encourage naturalization. A few commenters emphasized the role of naturalization in providing personal security for immigrants, particularly those who are in danger of worker exploitation without the full legal rights of citizenship. A commenter requested that DHS more thoroughly analyze the costs of impeding access to naturalization, which include long-term reduced economic and social mobility for impacted populations.

*Response:* DHS recognizes the importance of naturalization to individual beneficiaries and American society as a whole. However, there are no specific provisions in the law (including the INA or the United Nations Declaration of Human Rights) that require USCIS to set fees to encourage individuals to obtain U.S. citizenship.

In response to comments, DHS provides that the fee for Form N–400 will remain fee waivable for VAWA self-

---

[90] The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

petitioners T and U nonimmigrants, SIJ petitioners and recipients who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency, and Special Immigrant Afghan and Iraqi translators. DHS is aware of the United Nations' Universal Declaration of Human Rights, and we agree with the declaration's article 15 which provides that everyone has the right to a nationality and no one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.[91] Congress has authorized DHS to fund USCIS naturalization services from fees, and does not fund USCIS through appropriations. *See* INA section 286(m), 8 U.S.C. 1356(m). Our fees are set using notice and comment rulemaking as permitted by law and we provide a robust explanation of the need for the fees and respond to public comments. Furthermore, the fee for an application for naturalization will be $1,170 and fee waivers will be available to VAWA, T, U, SIJ and Afghan/Iraqi SIV applicants. *See* new 8 CFR 106.2(b)(3) and 106.3(a)(3). DHS recognizes that some applicants would need to pay for the fees absent a fee waiver but does not believe the increase will prevent people from filing for naturalization. As previously indicated, USCIS monitors the proportion of lawful permanent residents who naturalize over time and this tracking has a high degree of accuracy and the most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.

*Comment:* An individual commenter stated that the rule's justification—that fee increases are needed to cover costs— does not support the Form N–400, Application for Naturalization, fee increase. The commenter wrote that USCIS' projected cost increases are only 13 or 20 percent and the proposal would raise fees by 60 percent.

*Response:* DHS acknowledges that the fee for Form N–400, Application for Naturalization, is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. DHS is raising the fee for Form N–400 from $640, plus the $85 biometric services fee, if applicable, to a total fee including biometric services fee of $1,160 if filed online or $1,170 if filed on a paper application. The estimated average fee of $1,165 is $445,

or 61.4 percent, above the previous combined cost of Form N–400 and the biometric services fee.

The fee for this form is increasing more than for most other forms because DHS has historically held the fee for Form N–400 below the estimated cost to USCIS of adjudicating the form in recognition of the social value of citizenship. However, in this final rule DHS is emphasizing the beneficiary-pays principle for establishing user fees. This means that the fee for Form N–400 will now represent the estimated full cost to USCIS of adjudicating the form, plus a proportional share of overhead costs and the costs of providing similar services at a reduced or no charge to asylum applicants and other immigrants. In other words, the fee for Form N–400 will now be determined in the same manner as most other USCIS fees. Because DHS has held the fee for Form N–400 below full cost in the past, adjusting to full cost requires an increase in excess of the volume-weighted average increase of 20 percent. If DHS did not increase the fee for Form N–400 this amount, other fees would need to increase further to generate the revenue necessary to recover full cost, including the costs of Form N–400 not covered by its fee. Thus, DHS believes the increase in the fee for Form N–400 is fully justified.

*Comment:* Many commenters opposed the proposed fee increase by comparing its 60 percent increase against the 4 percent inflation rate over the same period. A commenter recommended that DHS raise the fee for Form N–400 to $737.70, to account for inflation. A commenter wrote that DHS should base naturalization fee increases on inflation only. Another commenter stated that, adjusted for inflation since its original price in 1985, the citizenship application should cost $85, rather than the $725 it currently is or the proposed $1,170. Likewise, another commenter cited a Stanford News article in commenting that the inflated price of naturalization applications should only be $80.25. Another commenter stated that, if inflated since 1994, the current naturalization fee would be $95. Another commenter recommended that naturalization fees be set at a percentage of the taxable income reported by applicants over the past 2 years. A commenter stated that the proposed naturalization fee increases should be phased in over a number of years in order to reduce its burden on applicants.

*Response:* DHS appreciates the recommendations but neither adjusting the fee for Form N–400 by inflation nor phasing the fee increase in gradually

over time would result in sufficient revenue to recover the cost of adjudicating and processing Form N– 400. DHS is increasing the fee for Form N–400, Application for Naturalization, to recover the full cost of adjudication. The revenue generated by the previous fee is insufficient to recover the full cost of adjudication. DHS held the current N–400 fee at less than the cost of adjudication when it last adjusted the fee on December 23, 2016. *See* 81 FR 73307. In this final rule, DHS emphasizes the beneficiary-pays principle of user fees so that applicants will be primarily responsible for covering the cost of adjudicating their applications. This requires an increase in the fee for Form N–400 to $1,160 for online filing or $1,170 for paper filing. Phasing in the increase over multiple years would require increasing other fees by greater amounts to generate the revenue necessary to cover the costs not recovered due to the lower Form N–400 fee. Therefore, DHS declines to adopt the commenters' suggestions.

*Comment:* A commenter stated that the fees for Forms N–400 and N–600 should not be more than $500, and indicated that DHS should decrease the fees so that more immigrants can afford to apply without relying on a fee waiver. The commenter stated that the fee increase is a hardship and referenced refugees, Special Immigrant Visas, and Afghan/Iraqi interpreters should pay lower fees for humanitarian reasons.

*Response:* Charging a limited fee shifts the cost of processing and adjudicating those benefits to other applicants and petitioners, which is not equitable given the significant increase in Form N–400 filings in recent years.[92] The new fees for Forms N–600 and N– 400 implement the beneficiary-pays principle, which ensures that those individuals who receive a benefit pay for the processing of the relevant application, petition, or request. The N– 400 fees of $1,160 if filed online and $1,170 if filed on paper are set to recover the full cost of adjudicating the Form N–400.[93] In addition, DHS has provided in the final rule that certain Afghan/Iraqi interpreters are eligible for N–400 fee waivers, provided that they file Form I–912, Request for Fee Waiver, and meet the fee waiver eligibility requirements. *See* 8 CFR 106.3.

---

[91] *See* Universal Declaration of Human Rights, Available at *https://www.ohchr.org/EN/UDHR/ Documents/UDHR_Translations/eng.pdf* (last viewed March 16, 2020).

[92] Based on filing volume trends in recent years, USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* NPRM Table 4: Workload Volume Comparison.

[93] For more information, see Appendix VII: Final Fees by Immigration Benefit Request that accompanies this final rule.

*Comment:* An individual commenter stated that the rule's justification—that fee increases are needed to cover costs—does not support the naturalization fee increase. The commenter wrote that USCIS' projected cost increases are only 20 percent and the proposal would raise fees by 60 percent.

*Response:* As stated in the NPRM, in crafting prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[94] DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N–400 filings in recent years.[95] Therefore, DHS proposes to no longer limit the Form N–400 fee to a level below the cost of adjudication, thereby mitigating the fee increase of other immigration benefit requests and implementing the beneficiary-pays principle. In this final rule, DHS institutes a $1,160 fee for Form N–400 if filed online and a fee of $1,170 if filed on paper to recover the full cost of adjudicating the Form N–400, as well as the cost of similar service provided without charge to asylum applicants and other immigrants.[96]

DHS acknowledges that the fee for Form N–400, Application for Naturalization, is increasing by a greater percentage than the total increase in USCIS costs and the average increase in fees generally. DHS is raising the fee for Form N–400, Application for Naturalization, from $640, plus the $85 biometric services fee, if applicable, to a fee of $1,160 if filed online or $1,170 if filed on a paper application. The estimated average fee of $1,165 is $445, or 61.4 percent, above the previous combined cost of Form N–400 and the biometric services fee.

*Comment:* Multiple commenters requested that USCIS ensure that naturalization remain affordable. A commenter stated that the cost and fees are a significant amount and discourages immigrants from applying to become US citizens. The commenter cited to a 2015 Pew Research Center asked Mexican green-card holders additional 13 percent of Mexican and 19 percent of non-Mexican lawful

immigrants identified financial and administrative barriers, mainly the cost of naturalization. Two commenters said that barriers to naturalization disproportionately endanger Mexican workers, who are more likely to experience worker exploitation and four times more likely to die in the workplace than U.S.-born workers. Another commenter indicated that the naturalization fee amounted to a month's gross income for an immigrant and therefore would make it too difficult to afford citizenship applications. Another commenter indicated that the naturalization fee represents 50 to 100 percent of a foreign resident's monthly income. A commenter questioned the naturalization application fee increased based on 2 hours of work and asked about the hourly wage or a week's salary for a typical American household. Another commenter opposed USCIS' rationale, writing that while it may receive more naturalization applications, naturalization adjudication levels remain flat despite receipt increases. An individual commented that the proposed naturalization fee increase would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization. Another individual described the extent of the fee's burden by comparing it against the average income of immigrants.

A commenter wrote that the proposal would act as a barrier to immigrants with middle or lower class income and cited an analysis from the Pew Research Center that found immigrants age 16 and over who arrived in the U.S. in the past five years had median annual earnings of $24,000, and those who arrived in the U.S. in the last ten years had median annual earnings of $32,000. The commenter cited another analysis from the same organization showing the U.S. foreign-born population was 44.4 million in 2017, and that 800,000 immigrants applied for naturalization in 2018. One commenter provided citations to various sources detailing the widespread lack of adequate savings among many Americans, particularly black and Latino households, and that the proposal would deprive families of the ability to work and pursue opportunities. The commenter said the proposal would cause "irreparable harm" to families forced out of the legal immigration system by unaffordable fees.

*Response:* DHS understands that the increase for the naturalization application may affect those applying. As explained in the NPRM, in crafting

prior fee rules, DHS reasoned that setting the Form N–400 fee at an amount less than its estimated cost and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration.[97] DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N–400 filings in recent years.[98] Therefore, DHS will no longer limit the Form N–400 fee, thereby mitigating the fee increase of other immigration benefit requests and implementing the beneficiary-pays principle. In this final rule, DHS institutes a fee of $1,160 for Form N–400 if filed online and a fee of $1,170 if filed on a paper form to recover the full cost of adjudicating the Form N–400.[99]

*Comment:* A commenter faulted USCIS' economic model for the Form N–400 fee increases. The commenter wrote that USCIS increased the activity-based cost (ABC) model baseline with no explanation, failed to account for fee waivers, increased the model output for Form N–400 by 18 percent, and failed to account for the cost-savings of online Form N–400 filings. A commenter stated that the proposal belies its "beneficiary-pays" principle by charging naturalization applicants a higher amount than the cost of processing of their own applications, subsidizing other immigration-related expenditures. Likewise, another commenter wrote that the proposal arbitrarily departs from past practice of capping the "model output" increase to 5 percent, setting the new level at 18–19 percent. A commenter wrote that the proposed naturalization fee increase could actually be detrimental to USCIS finances, as fewer immigrants would apply. The commenter faulted USCIS' rationale as failing to discuss operational effectiveness despite increasing fees beyond projected processing volume increases and failing to justify a $745-per-hour processing cost for naturalization applications—a cost exceeding that charged by private lawyers to corporate clients. The commenter also cited Government Finance Officers Association guidelines in writing that high-demand benefits are made affordable by government entities,

[94] *See, e.g.,* 75 FR 33461; 81 FR 26916.
[95] Based on filing volume trends in recent years. USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* Table 4: Workload Volume Comparison.
[96] For more information, see Appendix VII: Final Fees by Immigration Benefit Request of the supporting documentation that accompanies this final rule.

[97] *See, e.g.,* 75 FR 33461; 81 FR 26916.
[98] Based on filing volume trends in recent years. USCIS forecasts an increase of 82,827 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* NPRM Table 4: Workload Volume Comparison.
[99] For more information, see Appendix VII: Final Fees by Immigration Benefit Request of the supporting documentation that accompanies this final rule.

*Response:* DHS understands the commenter's concerns regarding the effect the fee increase on USCIS' financial well-being. DHS recognizes that, if the increase in fee for Form N–400 discouraged significant numbers of individuals from naturalizing, USCIS could realize less revenue than with a lower fee for Form N–400. However, DHS believes that most individuals will continue to value American citizenship, even if it is more expensive to naturalize. In the wake of past increases in the fee for Form N–400, USCIS has not experienced a decline in application volumes. DHS does not anticipate that Form N–400 application volumes will decrease following the fee increase in this final rule.

DHS notes that the critiques of its ABC model misunderstand what model outputs represent, how they incorporate fee waivers, and how they translate into final fees. DHS never limits the model output for any form type. The model output represents the estimated fee-paying unit cost for a given form. Meaning, the model output would recover the full cost of adjudicating that form type, given the anticipated fee-paying rate for that form. However, given that DHS determined to limit the fee increase for certain form types, USCIS must reallocate costs that will not be recovered by the lower, limited fees to other form types. Thus, the fees for most form types are greater than the calculated model outputs in order to generate revenue sufficient to cover the cost of adjudicating form types with fees held below the model output and ensure that USCIS achieve full cost recovery overall. DHS acknowledges that, in past fee rules, DHS has limited the increase in the fee for Form N–400 below the model output for that form. This choice forced other fee-paying applicants to pay higher fees and bear the cost of generating the revenue that was not recovered from the Form N–400 fees because of the lower fee. In the NPRM, DHS noted that it no longer believes this approach to setting the fee for Form N–400 is equitable, given high volumes of Form N–400 filings, the significant amount of costs other fee-paying applicants would have to bear if DHS limited the increase in fee for Form N–400, and its emphasis on the beneficiary-pays principle of user fees. Therefore, DHS disagrees that this change in practice is arbitrary.

The commenter is mistaken in calculating the cost per hour to process Form N–400 as $745. As with all USCIS fees, the fee for Form N–400 reflects not only the direct costs of processing an individual Form N–400 filing but also the cost of providing similar services at

no or reduced charge to asylum applicants and other immigrants. Furthermore, each fee incorporates costs related to USCIS overheads and general administrative costs. In this final rule, DHS establishes a fee of $1,160 for Form N–400 if filed online and a fee of $1,170 if filed on paper to reflect the full cost to USCIS of processing these filings. DHS believes it has fully justified these fees.

*Comment:* Another commenter faulted DHS' abandonment of the "ability-to-pay" principle, asking for more transparency as to the changes in N–400 trends and how other applicants subsidized naturalization. The commenter also stated that DHS' assumption that applicants will continue to submit applications regardless of their eligibility for a fee waiver is unfounded. The commenter provided another citation to the proposal where DHS appears to recognize that removing fee waivers would impact application decisions, and then states that it cannot predict the proposal's impact on applications. A different commenter stated that, in a footnote, USCIS indicates that the true intent of the proposal is to impose a "self-sufficiency" principle and impose barriers to naturalization contrary to Congressional intent. A commenter also stated that when President Johnson signed the Immigration and Naturalization Act of 1965 into law, it ushered in our modern era with a more equitable system.

*Response:* The quote of President Johnson cited by the commenter referred to the elimination of the previous quota system that had severely restricted the number of people from outside Western Europe who were allowed to immigrate to the United States. The 1965 Act did not discuss the fees for naturalization. The 1965 Act did not provide for specific fee exemptions or waivers. DHS considered the self-sufficiency principles as established by Congress along with other provision of the law and the added cost to other fee-paying applicants and petitioners. DHS believes that it is neither equitable nor in accordance with the principle of self-sufficiency that Congress has frequently emphasized, to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee.

*Comment:* A commenter contrasted the proposed rule against a speech from Vice President Pence where he stated, "America has the most generous system of legal immigration in the history of the world," writing that the proposal would be inconsistent with this statement. The

commenter also provided statistics of the number of immigrants who naturalize in the United States against higher figures from Australia, Canada, and the United Kingdom.

*Response:* DHS does not agree that this final rule is inconsistent with the Vice-President's statement.[100] The statement did not include any references to fee or fee waivers or exemptions, instead the statement references the ability of different people with different backgrounds to be able to naturalize. The rate of naturalization has increased over the years and DHS does not believe that this final rule would have a significant effect on the number of people filing Form N–400.

*Comment:* A commenter claimed that USCIS has failed to provide the evidence necessary for the agency to save money by no longer providing printed N–400 forms for people with low technology literacy, requiring them to access the forms at public libraries and community organizations. The commenter wrote that USCIS has failed to account for the impact those savings had on the agency's budget, as well as on the ability of LPRs to submit their naturalization applications.

*Response:* As the commenter points out, DHS is encouraging applicants to file online when they can, moving toward modernizing all of our services, minimizing the use of paper, and increasing agency efficiency through technology. It requires 10 days to receive forms after ordering them from the phone and mail service, as opposed to immediate access via the website. All USCIS forms are easily accessible by visiting the USCIS website, and applicants may either file electronically or download the form and submit it in paper format according to the form instructions. If an individual visits a USCIS office, we will direct them to digital tools and USCIS Contact Center phone number. Understanding some individuals may not have access to the digital tools, our staff will make them aware of resources, such as libraries that offer free computer online services, including many that offer a Citizenship Corner. USCIS works closely with accredited community-based organizations and local libraries to provide access to information and computers. Public libraries can be a resource for immigration information, and many have a Citizenship Corner where the public can visit and learn more about the citizenship process

[100] Remarks by Vice President Pence at Naturalization Ceremony, July 4, 2019, available at *https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-naturalization-ceremony* (last visited March 9, 2020).

libraries may also have computers that the public may use to access forms, complete, and print them. USCIS has enjoyed a costs savings from reducing the storage and mailing of paper forms, as well as destroying unused stocks of paper forms when versions changed, but not enough of a savings to have an appreciable effect on the new fees in this final rule.

*Comment:* A commenter recommended several alternatives to the proposed fee increases, including bundling fees for Forms I–90 and N–400, offering premium processing at a fee, offering tiered pricing for Form N–400, and offering fee reductions based on applicant's income taxes. A commenter suggested that USCIS adopt a sliding scale application fee for naturalization based on income. Another commenter suggested a payment installment plan for immigrants who cannot pay the full amount at once, as well as micro-loans. The commenter also suggested the creation of a citizenship foundation similar to that which funds the National Park Service.

*Response:* As previously indicated, DHS recognizes that filing fees are a burden for some people of limited financial means. Creating and maintaining a new system of tiered pricing, family caps, installments plans, or micro-loans would be administratively complex and would require even higher costs than in the NPRM. Such payment systems would require staff dedicated to payment verification and necessitate significant information system changes to accommodate multiple fee scenarios for every form. The costs and administrative burden associated with implementing such a system would require additional overall fee revenue. However, as previously stated, the cost of fee waivers and reduced fees are borne by all other fee payers because they must be transferred to those who pay a full fee to ensure full cost recovery. DHS believes that it is more equitable to align with the beneficiary-pays principle. Thus, USCIS takes a relatively careful position with respect to transferring costs from one applicant to another through the expansion of fee waiver eligibility and discounting fees. To set fees at various levels based on income, as suggested by the commenter, would require deviation from the underlying fee-setting methodology and require some of the costs for those applications to be reassigned to other benefit requests. Therefore, DHS did not incorporate a reduced fee, sliding scale, or family cap in this final rule or the

other suggestions provided by commenters.

*Comment:* One commenter took issue with the use of terms like "moral turpitude" and "good moral character" since these terms lack a legal definition. The commenter said the proposed fee increases would prevent many LPRs from pursuing citizenship, and that the lack of a legal definition for certain terms would increase the amount of time individuals are at risk of losing legal status.

*Response:* DHS did not propose a change to the eligibility provisions for benefit requests such as adjustment of status to lawful permanent resident or naturalization, for which a "crime involving moral turpitude" and "good moral character" may be relevant statutory terms. Therefore, we are not including changes to those terms in the final rule.

b. Effect on Naturalization Applicants

*Comment:* Many comments offered various comments on the effects of the proposed naturalization fee increase on naturalization applicants. Commenters wrote that the new fees:

• Would prevent residents from seeking citizenship, citing data on financial and administrative barriers as bars to naturalization.

• Will not just delay, but ultimately prevent low income and poor immigrants from naturalizing, and the U.S. is engaging in implicit racism, citing the U.S.'s history of denying citizenship based on race.

• The proposal would punish immigrants who did their utmost to obey immigration laws.

• The proposal would harm the Latino community—more than half of the immigrants currently eligible to naturalize are Latino while 71 percent of the population that face the greatest barriers to naturalization are Latino.

• Naturalization fees are a significant bar to Mexican immigrants becoming U.S. citizens with 13 percent of Mexican and 19 percent of non-Mexican lawful immigrants identifying financial and administrative barriers, mainly the cost of naturalization, as a reason preventing their naturalization.

• 2.1 million immigrants are eligible for naturalization in the state of California, and the new fee would severely affect 1 million Californians including 768,024 that live in Los Angeles County.

• The proposal would increase immigrants' dependence on predatory financing in order to support their naturalization applications.

• Would harm eligible parents of U.S. children who will either have to pay a

higher fee or forgo naturalization, subjecting themselves and their children to the stresses of uncertain status.

• The mental health problems and traumas faced by children of undocumented parents would be exacerbated.

• The increase is harmful—the United States Census Bureau reported that between 1970 and 2010 the percentage of foreign-born populations who naturalized decreased from 64 percent to 44 percent, A 20 percent decrease in 40 years is a drastic drop and one reason for this is due to the increased in prices for naturalization applications.

• Naturalization provides personal security for immigrants, particularly those who are in danger of worker exploitation without the full legal rights of citizenship.

• Citizenship helps members of immigrant communities to feel secure enough to report crime, which improves neighborhood safety.

• Limiting working class immigration would be contrary to the interests of the U.S. society and economy.

• Naturalization boosts American democracy, economy, and diversity.

• Everyone benefits from residents naturalizing, citing a study showing that naturalization increases net taxable income and GDP.

• Naturalization increases individual earnings. A San Francisco Pathways to Citizenship Initiative study program's participants used financial assistance to afford the naturalization application fee. The funds provided by the city to support such fees "would be depleted almost immediately" if the proposed rule goes into effect.

• Citizenship promotes social benefits, such as English proficiency, quality of employment, and buy-in to U.S. democratic principles.

• Naturalization improves immigrant language skills.

• If half of LPRs naturalized, GDP would increase between $37 and $52 billion annually.

• LPRs must navigate many hurdles to naturalize, and that at a certain point, the United States misses out on the benefits of high naturalization rates because of these hurdles. Naturalization boosts American democracy, economy, and diversity, citing a Catholic Immigration Network study.

• Naturalization increases civic engagement, naming many naturalized citizens who have gone on to hold elected office.

• A 2015 Urban Institute study shows that naturalization increased individual earnings by 8.9 percent, employment rates by 2.2 percent, and

homeownership by 6.3 percent, with the earnings and employment improvements resulting in \$5.7 billion of additional income in the 21 cities studied and increases home ownership and incomes.

• If eligible immigrants naturalized, federal, state, and city revenues would increase by \$20 billion while New York City government benefit expenditures would decrease by \$34 million.

• A 2015 Urban Institute study demonstrates that if just half of eligible immigrants in the United States naturalize, it would increase GDP by \$37–52 billion, annually, and if all eligible immigrants in 21 U.S. cities naturalized, home ownership would increase by more than 45,000 people and an additional \$2 billion in tax revenue would be recognized.

• A 2002 Bratsberg et al. study showed that naturalization led to wage increases as observed in the same individuals over time.

• A 2012 Migration Policy Institute study shows naturalization contributes to increased economic growth through consumer spending.

• Several show the current application fee discourages naturalization, and that naturalization positively impacts wages, the economy, and immigrants' integration into society.

• A 2019 Migration Policy Institute study shows that naturalized citizens over the age of 25 have similar levels of post-secondary education to U.S.-born citizens and that, through naturalization, these immigrants can better integrate into and contribute to their local communities. The naturalization fee increases have caused the number of immigrants eligible to naturalize but not doing so to 9 million, and the proposal would diminish U.S.-specific human capital.

• A 2019 Center for Migration Studies paper shows the impact of naturalization on college degree attainment, English-language skills, employment in skilled occupations, healthcare, poverty level, and home ownership.

*Response:* DHS appreciates and acknowledges all of the positive aspects of naturalization. DHS does not intend for the new fees to prevent individuals from applying for naturalization, that they require applicants to depend on predatory financing to pay naturalization application fees, and we do not believe the rule will have those effects. Therefore, DHS declines to make any changes in this final rule on these bases.

USCIS monitors the proportion of lawful permanent residents who naturalize over time. This analysis has

a high degree of accuracy because it uses administrative data rather than survey data (as the Census does) to assess changes in naturalization patterns. The most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.[101] DHS does not have any data that indicates that this trend would change.

*Comment:* A commenter stated that all asylees rely on naturalization for the right to petition for certain family members. The commenter stated that with the additional financial burden of naturalization fees, family reunification for asylees will be delayed or prevented.

*Response:* DHS recognizes that asylees may petition for family members after completing the naturalization process. DHS wants every person eligible to apply for naturalization to submit an application. Likewise, we encourage anyone eligible to petition for the immigration of qualifying family members. DHS does not believe that asylees would be unduly burdened by naturalization fees and does not agree that naturalization fees would prevent or delay family reunification for asylees. DHS is also unaware of any specific statutory provision requiring DHS to provide naturalization applications to asylees with limited fees. DHS declines to make any changes in this final rule in response to this comment.

*Comment:* Another commenter stated that the NPRM would further disadvantage people with disabilities and chronic mental health conditions, contrary to Congressional intent to make immigration benefits available to eligible noncitizens regardless of disability. The commenter wrote that, in addition to the increased naturalization fees, people with disabilities and chronic mental health conditions often must pay to appeal erroneous findings by USCIS officers who conduct naturalization interviews with no medical training and make assumptions regarding their clients' disabilities.

*Response:* DHS is adjusting its fees in this final rule to recover the estimated full cost of providing adjudication and naturalization services. As the commenter suggests, DHS is applying the fees in this final rule to all applicants regardless of whether having a disability or not. The comment seems to equate physical disability and mental health conditions with poor financial

condition, but DHS does not know that to generally be the case, and DHS is not basing fee policies on that assumption but rather emphasizing the beneficiary-pays principle. Further, USCIS monitors the proportion of lawful permanent residents who naturalize over time. This analysis has a high degree of accuracy because it uses administrative data rather than survey data (as Census does) to assess changes in naturalization patterns. The most recent published analysis shows that the proportion of LPRs naturalizing increased over time from the 1970s to 2004, despite the increase in the naturalization fee over that time period.[102] DHS declines to make changes in this final rule in response to the comment.

### c. N–400 Reduced Fee

*Comment:* Commenters stated that the fee waiver and partial fee waiver would be eliminated for families with income between 150 percent and 200 percent of the poverty level and almost eliminated for everyone else. A commenter indicating the eliminating the reduced fee for people with incomes from 150 to 200 percent of the FPG would make it too difficult for immigrants to afford citizenship. An individual commenter mentioned the fee waiver and partial fee waiver system strengthened by the Obama administration, and stated that this rule would eliminate these options for families with income between 150 percent and 200 percent of the poverty level and almost eliminate waivers for everyone else.

*Response:* DHS acknowledges that eliminating the reduced fee for the naturalization application will limit the number of people who receive a reduced fee and slightly increase the number of people who are required to pay the full fee. However, few applicants have requested the reduced fee since its creation and significantly fewer applicants than predicted took advantage of the reduced fee option. In other words, the reduced fee option was not widely received, and DHS does not believe its elimination will significantly hinder the number of people who cannot pay the full fee established in this final rule.

The estimated total number of approved reduced fee requests in fiscal year 2017 was 3,624 (0.83 percent). The total number of denied reduced fee requests was 733. In total, DHS estimates the annual number of requests for a reduced Form N–400 fee that

---

[101] *See* USCIS, Trends in Naturalization Rates: FY 2014 Update (November 2016), available at *https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports/Trends-in-Naturalization-Rates-FY14-Update.pdf.*

[102] *See* USCIS Trends in Naturalization Rates: FY 2014 (November 2016) Update, available at *https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports/Trends-in-Naturalization-Rates-FY14-Update.pdf.*

would be filed absent the proposed change is 4,357 (0.6 percent). For comparison, the total number of Form N–400 filed in fiscal year 2017 was 581,998. *See* Table 38 in the RIA.

DHS proposes to eliminate the reduced fee in order to recover the estimated full cost for naturalization services. In addition, eliminating the Form I–942 will reduce the administrative burden on the agency to process the Form I–942. USCIS would recover the cost of adjudicating Form N–400 and not transfer Form N–400 costs to other form fees.

### d. Case Processing

*Comment:* A commenter wrote that the proposed naturalization fee increase is not supported by any improvement in quality of services. It added that, in 1998, INS announced a fee increase but claimed that it would only follow a reduction in the backlog and acceleration of processing speeds. The commenter contrasted this statement against the current backlog of 700,000, cited from a 2019 Colorado State Advisory Committee paper. The commenter also provided a lengthy quotation from a 2017 OIG report stating that USCIS has introduced operational inefficiencies as processing times doubled and naturalization interviews were cancelled. The commenter mentioned the suspension of InfoPass services specifically as an example of diminished customer service.

A commenter wrote that the proposal would compound policies made at the local level which are already increasing barriers to naturalization, such as the USCIS field office in Seattle's 2019 decision to shift caseloads to offices more than 142 or 174 miles away.

A commenter provided figures of the LPRs eligible to naturalize and the backlogs in Denver and that the fee increase will further deter eligible adults from naturalizing.

A commenter claimed that without increasing fees, with automation and management reforms, the Form N–400 processing period in their region has decreased to an average of less than 12 months, undermining the necessity of a fee increase.

*Response:* DHS does not believe the rule changes will delay processing or deny access. USCIS will adapt and change its process as necessary to avoid or minimize any delays in case processing. Nevertheless, by enabling USCIS to hire more employees to process requests, including requests on hand, USCIS also believes the new fees will help reduce backlogs.

### 25. Other Naturalization and Citizenship Forms

*Comment:* A commenter opposed the Form N–600 fee increase, writing that USCIS would receive more revenue and avoid administrative difficulties if the fee were reasonable. A commenter opposed the fee increase for Forms N–600 and N–535 [sic] stating that no explanation has been provided to explain why those increases are necessary.

*Response:* DHS disagrees with this comment. DHS calculated the estimated cost to USCIS of adjudicating Form N–600. This change aligns more closely with the beneficiary-pays principle to ensure that individuals who receive an immigration benefit or service from USCIS bear the cost of providing that benefit or service. Therefore, DHS believes the fee as established is reasonable based on USCIS costs.

*Comment:* A commenter stated that the Form N–600 fee is especially cruel as it has been inflated for years, "not getting their certificate of citizenship limits their college options, and most families have more than one child."

*Response:* DHS disagrees that the fees for Forms N–600 and N–600K were inflated for years. As noted in the FY 2016/2017 fee rule, the current fees for Forms N–600 and N–600K assumed that approximately one third of applicants would receive a fee waiver. *See* 81 FR 73928. To recover full cost, DHS set the fees for Forms N–600 and N–600K at a level for fee-paying applicants to cover the cost of fee-waived work. *Id.*

In this fee rule, the fees for Forms N–600 and N–600K are decreasing mainly because of the proposed limitation of fee waivers, which will enable greater cost recovery for several form types and limit the need for cost reallocation to fee-paying applicants. The proposed fees provide for the full recovery of costs associated with adjudicating the forms. In addition, DHS is providing fee waivers for the humanitarian categories for Forms N–400, N–600, and N–600K.

In addition, not obtaining a certificate of citizenship does not limit a person's college options because there are other means to establish citizenship. Upon meeting the requirements of INA 320, children of U.S. citizens automatically acquire U.S. citizenship. Applying for a certificate of citizenship is only one means to acquire proof of such citizenship. Applicants who acquired U.S. citizenship may also obtain a passport to establish proof of citizenship. Further, some colleges permit nonimmigrants and lawful permanent residents to attend college.

*Comment:* Commenters opposed the proposed fees for the following naturalization and related forms:
• N–300, Application to File Declaration of Intention;
• N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA); and
• N–470, Application to Preserve Residence for Naturalization Purposes.

These commenters stated that immigrants who need to file these special forms would face additional barriers to naturalization.

Commenters indicated that some immigrants use Form N–300 in order to work in certain states. The proposed rule would increase this fee by 389 percent, to $1,320 or five weeks of minimum wage take-home pay.

Some immigrants use Form N–336 to file an appeal if their naturalization application is denied by USCIS. The proposed rule would increase this fee by 151 percent, to $1,755 or seven weeks of minimum wage take-home pay. The commenter stated that USCIS provided no justification for its Form N–336 fee increase and that the increase would especially affect the most vulnerable populations by charging a total of $2,925 to navigate a faulty system.

Some immigrants use Form N–470 if they plan to work abroad for a U.S. company, university, or government agency before applying for U.S. citizenship. The proposed rule would increase this fee by 351 percent, to $1,600 or six weeks of minimum wage take-home pay.

The comment stated that in all of these cases, immigrants living in the United States could be prevented from increasing their income, obtaining the right to vote, and reuniting with family members abroad because they are unable to afford the proposed naturalization fees.

*Response:* Consistent with full cost recovery and the beneficiary-pays principle emphasized throughout this final rule, the new fees represents USCIS' estimated full cost of adjudicating the forms at the time of USCIS' FY 2019/2020 fee review. USCIS used all available data at the time it conducted its fee review to estimate the full cost of adjudication for benefit requests. DHS does not believe that the changes in the fees will limit the ability of noncitizens to obtain the required documentation to be eligible to work if qualified.

*H. Comments on Changes to Form I–129, Petition for a Nonimmigrant Worker*

*Comment:* Multiple commenters objected to the increase in fees for

petitions requesting O and P
nonimmigrant status. Commenters
highlighted the increased costs and
burdens to U.S.-based petitioners,
including non-profit organizations,
small entities, and cultural institutions.
Some commenters objected to treating
petitions for O and P visa classifications
differently, as DHS proposed to create
Form I–129O for entities to petition for
O visa classification and Form I–
129MISC to petition for P visa
classification and other categories of
nonimmigrant visas. A commenter
wrote that the proposed Form I–
129MISC would only further delay P-
visa classification processing, especially
as P, Q, R, and H–3 visa classifications
are vastly different. Another commenter
said the I–129MISC classifications are
so vastly different that there is a higher
risk that an officer will apply certain
criteria to the P visa classification that
is only applicable to another
classification. A few commenters stated
Form I–129MISC is an inappropriate
option for P visa classification and
instead suggest combining P visa
classification form with Form I–129O or
creating a separate P visa classification
form to replicate I–129O with minor
modifications.

*Response:* DHS acknowledges
similarities between the uses of O and
P nonimmigrant visa classifications.
However, USCIS currently records time
per adjudication (*i.e.*, completion rates)
for Form I–129 petitions requesting O
visa classification discretely so we are
able to calculate a separate fee for the
O nonimmigrant classification. Time
spent adjudicating petitions requesting
P visa classification are aggregated with
the time spent adjudicating all of the
nonimmigrant classifications requested
using the new Form I–129MISC. Thus,
USCIS is unable to distinguish the time
spent adjudicating petitions requesting
P nonimmigrant workers from the time
spent on adjudicating requests for the
other types of workers included in Form
I–129MISC, and therefore we have not
calculated a separate fee for the P
classification. Therefore, DHS declines
commenters' suggestions to charge the
same amount for petitions requesting O
nonimmigrant classification and P
nonimmigrant classification and
implements fees based on data that
show adjudications of O nonimmigrant
petitions require more staff, and are
therefore more costly, than
adjudications of petitions for
nonimmigrant classifications that may
be requested using Form I–129MISC.
DHS will revisit the fees for all of the
new Forms I–129 that are created in this
rule in the next biennial fee review.

*Comment:* Commenters on the effect
of the religious worker program stated:
• That the proposed changes to Form
I–129 unduly burden religious
organizations because religious workers
have limited means to petition for R
nonimmigrants, hindering their ability
to provide pastoral care while
respecting vows of poverty.
• Petitioners requesting R
nonimmigrant workers currently pay a
$460 fee for Form I–129. Under the
proposal, the fee would be $705, a $245
or 53 percent increase.
• The steep fee increases would have
a chilling effect on U.S. religious
workers and would burden religious
orders and their vital work in American
communities.
• International religious workers
provide critical pastoral care and social
services for American parishioners and
communities.
• These fees would
disproportionately affect small religious
organizations that serve a charitable
function in our society.

*Response:* In this final rule, DHS
adjusts the fees for all types of Form I–
129 to reflect the estimated full cost of
adjudication. DHS does not believe that
the fee increases implemented in this
final rule will impose unreasonable
burdens on petitioners, churches,
religious organizations, or small entities
who wish to petition for a
nonimmigrant religious worker. DHS
realizes that many religious workers
have limited means and some take a
vow of poverty, but the R–1 religious
worker does not petition for his or her
own employment and is not responsible
for paying the Form I–129 fee, because
the organization is required to submit
Form I–129 and pay the fee. DHS
declines to make changes in this final
rule in response to these comments.

*Comment:* One commenter noted that
the changes to the way USCIS reviews
and adjudicates H–1B petitions have
resulted in slower processing times,
shifting standards for approval of
petitions, and an increase in Requests
for Evidence (RFEs).

*Response:* DHS is unsure how the
commenter thinks changes in H–1B
nonimmigrant adjudications impact this
rulemaking. DHS is breaking the Form
I–129 into several forms that will focus
the information collected and
instructions on the nonimmigrant
category. DHS anticipates that this will
result in more efficient completion and
adjudication of the forms and declines
to make changes in this final rule in
response to the comment.

*Comment:* Many commenters called
the 25-person limit for Form I–129
petition for H–2A, O, or P performers

"arbitrary." A few commenters stated
that USCIS fails to provide any
information or data supporting the 25-
person limit or increased fees. One
commenter questioned how USCIS
determined their per worker/petition
cost because it would cost the same to
have a petitioner with one beneficiary as
it would to have a petitioner with 25
beneficiaries. A few commenters
suggested that the proposed 25-
beneficiary cap as applied to arts
ensembles would multiply costs for arts
organizations and would preclude them
from considering larger performing
groups. The commenters also said the
25-beneficiary cap would create "new
risks for USCIS confusion" and
unnecessary processing delays. A
commenter suggested that O- and P-
nonimmigrant classifications also limit
the numbers of beneficiaries on a single
petition, reasoning that USCIS should
not apply the same fee for cases with
fewer beneficiaries. Some commenter's
stated that the separating of I–129 will
create confusion and delays.

*Response:* DHS disagrees with
commenters that the separating of Form
I–129 will create confusion and delays.
USCIS is limiting the number of named
beneficiaries to 25 that may be included
on a single petition for H–2A, H–2B, H–
3, O,[103] P, Q, E, and TN workers. As
previously discussed in section I of the
preamble of the NPRM, limiting the
number of named beneficiaries
simplifies and optimizes the
adjudication of these petitions, which
can lead to reduced average processing
times for a petition. Because USCIS
completes a background check for each
named beneficiary, petitions with more
named beneficiaries require more time
and resources to adjudicate than
petitions with fewer named
beneficiaries. This means the cost to
adjudicate a petition increases with
each additional named beneficiary.
Thus, limiting the number of named
beneficiaries may ameliorate the
inequity of petitioners filing petitions
with low beneficiary counts who
effectively subsidize the cost of
petitioners filing petitions with high
beneficiary counts.

DHS acknowledges similarities
between the uses of O and P
nonimmigrant classifications. Annual
receipt data for each nonimmigrant
classification petitioned for on Form I–
129 can be found in the Regulatory
Impact Analysis throughout Section (K)
and more specifically Table 7. However,

[103] While O–1 petitions are limited to a single
named beneficiary, a petition for O–2 nonimmigrant
workers may include multiple named beneficiaries
in certain instances. *See* 8 CFR 214.2(o)(2)(iii)(F).

Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations   46863


USCIS currently records time per adjudication (*i.e.* completion rates) for Form I–129 petitions requesting O nonimmigrants discretely, but records time spent adjudicating petitions requesting P nonimmigrants aggregated form such that it is combined with the time spent adjudicating all classes of nonimmigrant classifications that may be requested using the new Form I–129MISC. Thus, USCIS is unable to distinguish the time spent adjudicating petitions requesting P nonimmigrants from the time spent on adjudicating requests for the other types of visas included in Form I–129MISC. Therefore, DHS cannot charge a separate fee for P nonimmigrants or charge the same amount for petitions requesting O and P nonimmigrants. DHS implements fees based on data that show adjudications of O nonimmigrant petitions require more staff, and are therefore more costly, than adjudications of petitions for nonimmigrant workers that may be requested using Form I–129MISC. The evidence suggests that the additional fee in this final rule does not represent a significant economic impact on these entities.

*Comment:* A few commenters wrote that applicants with one or two beneficiaries are subsidizing applications with multiple beneficiaries, which could further diminish, if not eliminate, farmers' margins. A few commenters indicated that limiting petitions to 25 named beneficiaries and requiring farmers to file separate petitions would create an immense paperwork burden; multiplying the costs to access the H–2A program; and increasing the workload for USCIS as well as for farmers who produce labor intensive agricultural commodities.

*Response:* DHS agrees that petitions with one or two named beneficiaries subsidize petitions with greater numbers of named beneficiaries, because petitions with fewer named workers require less time to process but pay the same fee. In this final rule, DHS adjusts the fees for all types of Form I–129 to reflect the estimated average cost of adjudication for the relevant form. Setting the fee at the level of the average cost necessarily entails some cross-subsidization between petitions that are less costly to adjudicate and those that are more costly to adjudicate.

DHS data indicates that the limit of 25 named beneficiaries per petition established in this final rule will significantly limit the amount of cross-subsidization between petitions with few named workers and many named workers. Previously a single petition might contain a single named worker or

hundreds of named workers, implying a high level of cross-subsidization, given the disparity between the cost of adjudicating a petition with a single named worker and the cost of adjudicating a petition with hundreds of named workers. Limiting the number of named beneficiaries per petition to 25 effectively limits the amount of cross-subsidization per petition, because it limits the maximum disparity in the number of background checks to 24 (25 − 1) and overall cost of adjudications between petitions.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters suggested a flat application fee with an add-on fee per beneficiary.

*Response:* DHS considered and rejected the approach suggested by the commenter. Past experience has demonstrated to DHS the complexity of administering sliding scale fees. DHS believes that the system implemented in this final rule of limiting an individual petition to a maximum of 25 named beneficiaries minimizes the administrative complexity, while also clearly delineating the cost for individual petitioners. DHS acknowledges that this system continues cross-subsidization between petitions that include few named beneficiaries and those that include 25 named beneficiaries, but DHS determined that 25 was a logical number because USCIS immigration services officers could generally adjudicate a petition with 1–25 named workers in 2 hours. 34 FR 62309. DHS believes that the administrative simplicity of this system outweighs concerns about cross-subsidization.

*Comment:* Some commenters generally opposed limiting the number of H–2A beneficiaries and increasing fees. One commenter opposed the fee changes for named and unnamed beneficiaries. The commenter stated DHS lacks a large amount of data, including the amount of time and effort required to process these petitions. Several commenters expressed support for USCIS lowering the fees for unnamed I–129 petitions, but opposed increasing the fees for a Form I–129 with named beneficiaries. One commenter stated that USCIS' justification for separating fees for named and unnamed petitions are valid, but due to the significantly higher filing fee for petitions filled with a named worker, petitioners will be incentivized to file unnamed worker petitions and require significantly more resources to be expended by the State Department in order for workers to obtain their visas.

A commenter stated that the department failed to explain why it does not discuss an option of using improved technology to reduce processing time for named beneficiary petitions.

*Response:* In this final rule, DHS establishes the fee for each Form I–129 subtype at the estimated average cost of adjudication. DHS used all available data at the time it conducted its fee review to estimate the cost of adjudication for Form I–129 subtype. DHS disagrees with the commenter who wrote that USCIS did not have sufficient data.

DHS acknowledges that some petitioners may choose to file petitions for unnamed workers with a lower fee than petitions for named workers with a higher fee. However, choosing to petition for unnamed workers also incurs additional costs associated with consular processing. Furthermore, in some instances, petitioners may need to submit petitions for named workers. Thus, DHS does not believe its changes to the fee structure for petitions with named and unnamed beneficiaries will substantially change petitioner behavior.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that members of its trade association would face a 529 percent increase in filing costs because of the proposed Form I–129H2A changes. The commenter stated that this change is contrary to Congressional intent and that USCIS' justification relies on it performing duplicative background checks on workers who have already been vetted by the Department of State. A few commenters doubted that USCIS could use background checks to determine whether workers have left the country for 3 months after 3 years, reasoning that CBP officials do not record land-based departures from the country. One commenter suggested USCIS develop an entry and exit system to help track the amount of time a worker has spent in and out of the country and having an online system should expedite the process and allow USCIS and the petitioner to get an approval at a more efficient speed. Another commenter said that forgoing the full background check and instead just doing a shorter update background check on petitions for workers who already possess a visa and who are already in the United States could save extraordinary amounts of time, money, and effort.

*Response:* USCIS must conduct full background checks on named workers and does not merely check to determine how much time the worker has spent

outside of the United States. In this final rule, DHS establishes the fee for Form I–129H2A at the level estimated to represent the full cost of adjudication. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters generally opposed the changes to the Form I–129 and its fees as it applies to the arts, writing that artists should be treated better and the arts should be promoted. A commenter stated that the proposal would diminish the quality of arts in the United States, as artists would be unable to afford to tour and make a living from their craft. Commenters indicated that the proposal would harm local communities, small businesses, and non-profits, as artists would be unable to afford to perform here. A commenter wrote that artists' contribution to the U.S. market is greater than what they actually "earn," mentioning that artists help draw in international demand. Commenters also stated that international artists provide a vital service in promoting cultural exchange and U.S. soft diplomacy. A commenter wrote that its art school teaches Scottish music, and hindering the school's ability to procure Scottish talent would operate to the detriment of the school, its students, and the community it serves. One commenter stated their organization already navigates significant uncertainty in gaining approval for petitions, due to lengthy processing times, uneven application of statutes and policies, and extensive and even unwarranted requests for further evidence to support petitions. The commenter stated that the proposed fees would only exacerbate these issues for performers. A few commenters said this NPRM would make it harder for their businesses to hire foreign musicians. Some commenters said the proposal would create financial barriers that will harm U.S. arts organizations and the local economies these organizations support. The commenters stated that if artists are unable to come to the U.S., the public will be denied the opportunity to "experience international artistry." One commenter that provides legal services to overseas artists and performance groups wrote that the proposal would negatively impact their business and its clients, many of whom are small businesses.

*Response:* DHS agrees with the commenters' views of the arts a vitally important and beneficial. Nevertheless, the fees DHS establishes in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and

naturalization services. DHS does not intend to deter or unduly burden petitioners requesting workers in the arts, but any preferential treatment provided to petitioners for performers and musicians is borne by other petitioners, applicants, and requestors. DHS declines to require other applicants and petitioners subsidize the cost of petitioning for workers in the arts.

*Comment:* Some commenters discussed the rule's impact on farmers and the H–2A program. Several commenters said their use of H–2A workers allows them to have trained and trusted labor that has been properly vetted through the USCIS system. Likewise, several commenters said the proposed increase of H–2A filing fees would be especially harmful considering the difficulty farmers have obtaining enough and dependable domestic workers. A commenter stated that the proposed increase of H–2A filing fees would contravene the Executive Order on Buy American and Hire American. In contrast, one commenter expressed support for increased fees and rationalized that fees would improve their ability to compete with farms that spend less on labor and make it more appealing for farms to consider hiring citizens.

*Response:* In this final rule DHS adjusts the fees for all types of Form I–129 to reflect the estimated full cost of adjudication. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Multiple commenters referenced an OIG report titled "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors." A few commenters said USCIS uses this report as justification for their proposed changes, but they claimed the audit separates filings into small (1–10), medium (11–40) and large (more than 40) and does not suggest limiting the number of beneficiaries to specifically 25. One commenter said the report explicitly refrains from recommending a change in fees, noting that collecting more detailed cost data will be critical for USCIS to "inform its H–2 petition fee setting activities." Another commenter quoted the report saying that a "flat fee is not consistent with Federal guidelines that beneficiaries pay for the full (or actual) cost of services provided or that established user fees be based on costs and benefits."

*Response:* DHS appreciates commenters' references to the report by the DHS Office of the Inspector General. As stated in the NPRM, DHS establishes separate fees of forms for different types of Form I–129 filings to distinguish the different cost of adjudicating different

kinds of petitions. DHS believes that the changes implemented in this final rule, including establishing a maximum limit of 25 named beneficiaries per petition, and differentiated fees based on whether a petition requests named or unnamed workers, are consistent with and responsive to the recommendation of the DHS OIG report.

Consistent with the recommendations highlighted by commenters, DHS used detailed cost data to distinguish between the average cost of adjudicating petitions with named and unnamed beneficiaries where applicable. In establishing different fees that distinguish the differences in the average cost of adjudication, DHS addresses concerns that the previous flat fees were not consistent with the beneficiary-pays principle of user fees.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters stated that USCIS does not provide any data, evidence, or information in its proposed rule regarding the costs associated with conducting site visits through the Administrative Site Visit and Verification Program (ASVVP). The commenters added that USCIS has failed to articulate how these site visit costs are not already covered by the $500 Fraud Prevention and Detection Fee and other related fees submitted by petitioners for certain categories of nonimmigrant workers, such as for certain H–1B and L workers. One commenter concluded that USCIS must disclose this data so that the public can fully evaluate whether the increased fees that USCIS is proposing accurately encompass the ASVVP costs associated with adjudicating certain categories of nonimmigrant workers.

*Response:* DHS disagrees with the commenter's assertion that DHS failed to provide any data related to the costs of the ASVVP program. In the supporting documentation published on November 14, 2019 to accompany the NPRM, DHS identified $5.4 million in payroll and travel costs of the ASVVP program. As DHS described in the NPRM, USCIS attributed these costs to the relevant form types in proportion to their share of the total ASVVP costs of $5.4 million. Form I–129H1 received $3.6 million of these costs while Form I–129L received $0.6 million, Form I–129MISC received $1.0 million, and Form I–360 received $0.1 million. These figures do not sum to $5.4 million due to rounding.

USCIS cannot use revenue from the statutory Fraud Prevention and Detection Fee to cover the costs of the ASVVP program. USCIS scopes all

activities funded by the Fraud Detection and Prevention Fee outside of its fee reviews, because DHS is unable to adjust the fee by rulemaking. Furthermore, USCIS, by statute, does not retain the entirety of the Fraud Detection and Prevention Fee. As explained in the NPRM, the USCIS FY 2019/2020 fee review, like previous fee reviews, estimates the costs to be recovered by fees deposited into the Immigration Examinations Fee Account. Unlike the fees addressed in this rulemaking, the Fraud Detection and Prevention Fee is not deposited into the IEFA. Instead, that revenue is deposited into the Fraud Detection and Prevention Account and is used for different purposes beyond the scope of this final rule. DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter opposed the increased L–1 application fees and took issue with USCIS' rationale that the fee is based on "the completion rate for the average of L–1 petitions." The commenter stated that if USCIS diverted resources away from adjudicating L–1 petitions, imposing adjudicatory criteria unauthorized by INA or USCIS regulations, and issuing unnecessary, duplicative RFEs, the completion rate for L–1 nonimmigrants would return to its historical norm.

*Response:* USCIS used the most recent data available at the time it conducted the FY 2019/2020 fee review. Contemplating alternatives suggested by the commenter are beyond the scope of this rulemaking. DHS declines to make changes in this final rule in response to the comment.

*Comment:* A few commenters wrote to oppose the fee increases for transitional workers in the Commonwealth of the Northern Mariana Islands (CNMI). These commenters stated the proposed fees would put a financial burden on businesses and the economic development of CNMI. A commenter wrote that the CNMI was still recovering from recent disasters and noted that the economy had barely stabilized after Super Typhoon Yutu hit in October of 2018. The commenter referred to a U.S. Department of the Interior report that documented the shortage of U.S.-eligible workers affecting businesses in the Commonwealth and said the proposed fee increase of 53 percent for Petitions for a CNMI-only Nonimmigrant Transitional Worker would place a financial burden on businesses still recovering from disasters. The commenter requested that the increase for this petition be tabled, citing the provisions of U.S. Public Law 110–229 that detailed Congress' intent to grant

the Commonwealth as much flexibility as possible in maintaining existing businesses and other revenue sources.

*Response:* In this final rule, DHS establishes fees that reflect the average cost of adjudication. DHS declines to make other applicants and petitioners subsidize petitions for transitional workers in the CNMI and does not make changes in response to these comments.

*I. Premium Processing*

*Comment:* Multiple commenters opposed the proposal to lengthen the timeframe for USCIS to take an adjudicative action on petitions filed with a request for premium processing from 15 calendar days to 15 business days. Commenters stated that the proposed change would reduce the level of service that USCIS provides to petitioning entities and delay the arrival of greatly needed workers, thereby imposing an economic cost on petitioners. Multiple commenters said the relaxation of the premium processing deadline would result in slower adjudication, higher prices, and slowed hiring.

*Response:* DHS acknowledges that some petitioners may wait up to four or more days longer for USCIS to take an adjudicative action on a petition for which a petitioner has requested premium processing service. DHS further acknowledges that this may result in slightly longer waits for workers for petition ng entities. However, DHS disagrees that adjusting the timeframe for adjudicative action on a petition for which premium processing service has been requested from 15 calendar days to 15 business days would meaningfully harm petitioning entities. DHS was not able to quantify the estimated cost to petitioning entities of these additional delays.

DHS is adjusting the timeframe for premium processing for multiple reasons. The current timeframe does not consider the days on which USCIS staff are unavailable to adjudicate cases, such as when there is a federal holiday or inclement weather preventing employees from coming to work. Therefore, a surge in applications may coincide with a period when USCIS staff have substantially less than 15 working days to receipt and adjudicate a petition with premium processing. In the past, there have been instances when USCIS was unable to adjudicate all of the petitions for which petitioners requested premium processing within the 15-calendar day timeframe. This led USCIS to refund the premium processing fee for petitions that were not adjudicated within 15 calendar days

and to temporarily suspend premium processing service. DHS believes that extending the premium processing timeframe from 15 calendar days to 15 business days will allow USCIS adequate time to take adjudicative action on petitions and will provide petitioners with a consistent and predictable experience. Therefore, DHS declines to adopt the commenters' suggestions.

*Comment:* Multiple commenters said that the premium processing delay would harm American businesses that face workforce gaps and that the cost of premium processing service reduces arts organizations' budgets for other activities. The commenters wrote that the change to the premium processing timeline would exacerbate these inefficiencies and increase uncertainty. Additionally, it would only further lower USCIS' accountability standards. A commenter similarly stated that increasing the premium processing timeframe would adversely impact businesses that pay premium processing fees because of their urgent workforce needs, and they suggested that further delays to the processing timeline would have a "chilling effect" on the overall process. One comment stated that changing the premium processing time will deter businesses from doing business in the United States. Another commenter added that in many cases, the issuance of an RFE is a stalling technique and that if DHS premium processing regulations to be 15 business days instead to calendar days that senseless and unnecessary RFEs will not continue.

*Response:* DHS understands that sometimes a petitioning employer needs USCIS to take quick adjudicative action. However, as stated in the NPRM, DHS believes that changing from calendar days to business days may reduce the need for USCIS to suspend premium processing for petitions during peak seasons. This may permit USCIS to offer premium processing to more petitioning businesses each year. DHS believes the possibility that a petitioner requesting premium processing service may need to wait a few additional days for adjudicative action is a small cost to impose for being able to expand premium processing to more requests and reduce the likelihood of future suspensions of premium processing service. DHS does not think additional days will reduce the desire of businesses to request premium processing. DHS also disagrees with the assertion that USCIS issues RFEs as a stalling tactic. USCIS officers issue RFEs, in their discretion, to provide the petitioner an opportunity to supplement

the record when eligibility has not been established. USCIS officers do not send RFEs just because they are near the 15-day maximum time for action.

*Comment:* Commenters requested that USCIS reinstate the "traditional expedite" option for non-profits that seek to enhance the cultural and social interest in the United States.

*Response:* USCIS has implemented an expedite policy for certain petitions in the past. Whether a petitioner seeks to enhance the cultural and social interest in the United States may have been considered when USCIS decided to favorably exercise its discretion when considering expedite requests. However, expedited processing is a policy that is implemented using guidance and not governed by regulations. DHS is amending USCIS' fees and fee-related regulations in this final rule that require notice and comment rulemaking to effectuate. Petitioners do not pay a fee when submitting an expedite request, and the decision to grant or deny an expedite request does not affect the fees required for the underlying petition. Thus, expedite policy is outside the scope of this rulemaking. DHS may consider whether to provide expedited processing for certain petitions based on its workload in other areas and ability to meet promised deadlines. Also, depending on the immigrant or nonimmigrant classification sought, the petitioner may request premium processing service by filing Form I-907 and paying the associated fee. This final rule, though, makes no changes in response to this comment.

*Comment:* A commenter asked if DHS would consider the additional revenue received by USCIS from higher premium processing fees as another revenue stream.

*Response:* DHS understands that the commenter is suggesting that USCIS consider additional revenue from higher premium processing fees. The INA permits DHS to charge and collect a premium processing fee for employment-based petitions and applications. The fee revenue must be used to provide certain premium-processing services to business petitioners and to make infrastructure improvements in the adjudications and customer service processes. By statute, the premium processing fee must be paid in addition to any applicable petition/application fee. The statute provides that DHS may adjust this fee according to the Consumer Price Index. *See* INA section 286(u), 8 U.S.C. 1356(u); Public Law 106–553, App. B, tit. I, sec. 112, 114 Stat. 2762, 2762A–68 (Dec. 21, 2000). DHS increased the USCIS premium processing fee in both

2018 and 2019. *See* 33 FR 44449 (Aug 31, 2018) (increasing the fee to reflect inflation from $1,225 to $1,410); 84 FR 58303 (Oct. 31, 2019) (increasing the fee from $1,410 to $1,440).

DHS regularly considers if USCIS' premium processing fee should be adjusted considering the rate of inflation, cost, and revenue needs. DHS prefers to adjust the premium processing fee outside of rules, like this one, that adjust fees comprehensively based on USCIS' full costs recovery model. The primary reason is because the premium processing fee may be adjusted by inflation; notice and comment rulemaking is not required. *See* 84 FR 58304. In addition, USCIS regularly analyzes whether to remove eligible categories based on its ability to meet demand or designate new benefit requests as eligible for premium processing in accordance with previous 8 CFR 103.7(e); new 8 CFR 106.4. For example, DHS recently determined that a few categories of employment authorization documents qualify as employment-based petitions and applications for business customers under INA section 286(u), 8 U.S.C. 1356(u). Thus, USCIS is considering permitting premium processing requests for qualifying categories of employment authorization that may be requested on USCIS Form I-765. When and if USCIS decides to provide premium processing for additional requests, USCIS will announce on its website, those requests for which premium processing may be requested, the dates upon which such availability commences and ends, and any conditions that may apply. New 8 CFR 106.4(e). This final rule, though, makes no changes in response to this comment and adjusts only USCIS' non-statutory, non-premium processing fees that DHS has the authority to adjust for full cost recovery via public notice and comment rulemaking.

*J. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)*

*Comment:* DHS received many comments on the change in how DHS interprets the statutory language in Public Law 114–113 to change the benefit requests to which the fee would apply. The comments are summarized as follows:

• USCIS lacks the authority to create such a fee increase and that only Congress has this authority.

• USCIS lacks the authority to reinterpret language from Public Laws 111–230 (2010) and 114–113 (2015) and that the proposal invents ambiguity that does not exist with respect to the

extension of the $4,000 or $4,500 fee to extension petitions.

• Extending the Public Law 114–113 fee for qualifying H–1B and L–1 petitions is contrary to Congressional intent and represents an effort to deter legal immigration from certain countries. DHS's interpretation of Public Law 114–113 is inconsistent with the agency's historical regulatory interpretation.

• Congress set the amounts and parameters for the fees and Public Law 111–230 (2010) and Public Law 114–113 (2015) do not support the revisions.

• Congress' consistent reenactment of the statute without changing the statute's meaning with respect to when the fee is required suggests Congressional intent that the scope of the 9–11 Response fee continue.

• Examples of Congress' use of the language in Public Law 114–113 demonstrate that the DHS interpretation is not consistent with the intent of Congress.

• Congress provided clear and unambiguous language instructing DHS that the additional fee be combined with the fraud prevention and detection fee and the proposed change is an effort to thwart the plain instruction of Public Law 114–113.

• Language from Public Laws 111–230 and 114–113 support that the current statutory language was not ambiguous and the addition of the word combined in 2015 in Public Law 114–113 was not merely a clarifying edit as stated in the NPRM and Congress' actions over the past decade make it clear that the filing fee does not apply to extension petitions.

• Federal courts would not grant *Chevron* deference to the agency's effort to reinterpret the word combined because it is a non-complex, nontechnical word in common public usage and the agency does not have special expertise in determining the definition of combined.

• This interpretation is not only correct, it is mandated by the statutory language.

• Congress limited the circumstances requiring the 9–11 Response fee to only those for an application for admission and this language does not naturally apply to applicants for extension of time, for an amendment to terms, or for a change in status.

• The fees would negatively affect employers because it would require them to pay the fee multiple times for the same employee because the duration of an approval may be less than one year.

• Companies that hire from countries like India, where beneficiaries may wait

for an immigrant visa number for decades, would have to file extensions until the worker becomes a permanent resident.

• Because USCIS routinely limits the expiration date of Form I–797 approval notices to the end date of the specific contract, resulting in short approval periods, employers will be forced to file extension petitions once the Statement of Work is renewed, incurring new filing and legal fees. The fee would result in employers opting not to hire or extend nonimmigrant employees which would have negative impacts on workers, companies, and the overall economy. H–1B and L–1 workers benefit the economy by increasing business efficiency, reducing costs for specialized work, and filling workforce gaps.

*Response:* DHS disagrees with the commenters' assertions that the statutory language is unambiguous or that DHS does not have the authority to interpret the statutory language. The statutory text refers to, among other things, an increase to H–1B and L–1 filing and fraud prevention and detection fees. Such fees are typically collected by DHS, either by USCIS upon the filing of an H–1B or L–1 petition or by CBP for certain visa-exempt L–1 nonimmigrants. The statutory text clearly shows that Congress intended DHS, in addition to the U.S. Department of State, to administer Public Law 114–113 and collect the associated fees. Such authority is also consistent with the general authority provided to DHS under INA section 214(a) and (c)(1), 8 U.S.C. 1184(a) and (c)(1), as well as, by incorporation, the specific authority provided in INA section 214(c)(12), 8 U.S.C. 1184(c)(12). DHS also explained in the NPRM how the statutory text is ambiguous, and that explanation remains unchanged.

DHS understands that it must provide a valid explanation of its changed position and provide a reasoned explanation for disregarding facts that underlay the prior policy. *See Encino Motorcars, LLC,* v. *Navarro,* 136 S.Ct. 2117, 2125 (2016). DHS acknowledges the commenters' concerns about the effect of our change in interpretation on petitioning employers, and that the statute is open to different interpretations. However, DHS is providing considerable advance notice of this change to those affected by it, and the fee will only apply to future petitioners after the effective date of this final rule. DHS may change its initial interpretation when engaging in rulemaking and consider different interpretations when deciding to continue with a current policy. *See, Chevron, U.S.A., Inc.* v. *Natural*

*Resources Defense Council, Inc.* 467 U.S. 837, 863 (1984). As we stated in the NPRM, DHS believes that the Public Law 114–113 fee should apply to all extension of stay petitions because that interpretation gives meaning to all of the statutory text. That interpretation is also the most consistent with the goal of the statute to ensure employers that overly rely on H–1B or L nonimmigrant workers' pay an additional fee by making the fee applicable to petitions, including extensions of H–1B or L status, filed by employers that meet the statute's 50 employee/50 percent test, regardless of whether or not the fraud fee also applies. 84 FR 62322. In other words, the fee should apply to all H–1B or L–1 petitions, whether for new employment or an extension of stay. Consequently, DHS makes no changes in response to these comments.

*Comment:* A commenter requested that USCIS reinstate policy memoranda related to deference, such as the 2004 USCIS Memorandum, The Significance of a Prior CIS Approval of a Nonimmigrant Petit on in the Context of a Subsequent Determination Regarding Eligibility for Extension of Petition Validity. The commenter also requested that USCIS enforce 8 CFR 214.2(1)(14)(i) to provide appropriate deference to officers' prior decisions regarding L–1. The commenter wrote that this would mitigate the need for fee increases for L1-nonimmigrant petition filings.

*Response:* DHS has no intent to reinstate the 2004 memo in this fee rule. This final rule is focused on establishing appropriate fees for different nonimmigrant worker classifications and not altering existing evidentiary requirements, such as those found at 8 CFR 214.2(l)(14)(i). Consequently, the changes suggested by this commenter were not mentioned or proposed in the NPRM and are outside the scope of this final rule.

### K. Comments on Other General Feedback

*Comment:* Commenters wrote that fees should be raised based on inflation or social security cost of living increases, and that fee increases would be unnecessary if USCIS trained its officers.

*Response:* As explained in the NPRM and this final rule, DHS adjusts USCIS' fee schedule to ensure full cost recovery. DHS cannot guarantee that future inflation rates or social security cost of living adjustments applied to fees will yield sufficient revenue to ensure full cost recovery. In other words, adjusting fees by inflation or social security cost of living adjustments may be insufficient to recover the full

cost of providing adjudication and naturalization services. As a result, DHS rejects the notion that fees should be raised based on inflation or social security cost of living increases and will continue to comply with the CFO Act by evaluating fees on a biennial basis and recommending adjustments to USCIS' fee schedule, as necessary.

*Comment:* A commenter opposed scenario A and stated that it would be unreasonable for the agency to compel the public to evaluate six different scenarios. The commenter added that, in order for the final rule to be valid, it must include only the fee schedule that the public was given adequate time to evaluate, and the agency may not use the final rule to codify a "suite of alternative fee schedules" that it can switch between at will without public comment.

*Response:* DHS stated in the NPRM that subject to certain limitations, the proposed fees may change in the final rule based on policy decisions, in response to public comments, intervening legislation, and other changes. 84 FR 62327. To reduce the uncertainty that such conditions present to the affected public, USCIS proposed six fee scenarios that lay out what the fees would be if certain conditions materialize and present a range of fees. *Id.* DHS disagrees that the public is incapable of reviewing and commenting on multiple proposed fee scenarios. The fee schedule adopted in this final rule falls within the range of the six scenarios. The policies implemented in this final rule are the same, or are logical outgrowths of, those contained in the NPRM.

The intent of the comment period provided under the APA is to allow agencies to consider public feedback on proposed rules and make changes as appropriate. Because a single change made in response to public comments may affect multiple fees, it is impossible to provide a final set of fees in a NPRM unless it were to be adopted without any modification, thereby negating the value of public feedback. DHS declines to make any adjustments in the final rule in response to these comments.

*Comment:* A commenter said the severability provision suffers from "logical outgrowth" concerns, stating that it would do nothing to protect a final rule if key provisions of the proposed rule changed so much in the final rule that the public was not given fair notice. In contrast, a commenter stated they "wholly" agreed with the severability provision because the provisions each part function independent of other provisions. The commenter supported codifying the

intent that provisions be severable to protect the goals of the proposed rule.

*Response:* DHS is unsure of the relationship between a logical outgrowth and severability to which the commenter refers. DHS is making no changes in this final rule that the public would not view as a possibility based on the contents of the proposed rule. DHS realizes that many parts of this final rule are interrelated, but most are severable and can be implemented independently from the remainder of this final rule's provisions.

DHS declines to make any adjustments in the final rule in response to these comments.

*Comment:* A commenter wrote that DHS should allow applicants to elect their delivery method for their secure document. DHS failed to justify why the agency is adopting Signature Confirmation Restricted Delivery (SCRD) to deliver secure documents, and DHS should publish a notice in the **Federal Register** each time USCIS proposes to add SCRD to any additional document beyond Permanent Resident Cards, Employment Authorization Cards, and Travel Booklets. One commenter supported SCRD as the sole method of delivery for secure documents. Another commenter wrote that it is an unnecessary burden to place on low-income or rural residents to travel to the post office or arrange to hold a secure document for pick-up.

*Response:* USCIS may use the United States Postal Service (USPS) Secure Confirmation Restricted Delivery (SCRD) service for delivery of all USCIS secure identification documents: Permanent Resident Card, Employment Authorization Document, and Travel Document Booklets once this final rule is effective. New 8 CFR 103.2(b)(19)(iii)(A). USCIS already uses SCRD when documents are returned by USPS as undeliverable after being sent by Priority Mail with Delivery Confirmation. USCIS plans to use only USPS initially for SCRD when appropriate because only the USPS can deliver to post office boxes and military addresses (*i.e.*, APO addresses). Other delivery services like FedEx or UPS would just leave the package on the doorstep, require a signature, or require it to be picked up. In addition, the current application process does not support choosing a different delivery method, although DHS is exploring more delivery methods as a future capability.

USPS's Signature Confirmation Restricted Delivery (SCRD) product requires the addressee to provide proof of identification and sign for delivery of their secure document. Applicants may also designate an agent to sign on their behalf, by notifying USPS and completing PS Form 3801, Standing Delivery Order, or PS Form 3801–A, Agreement by a Hotel, Apartment House, or similar. SCRD permits USCIS and applicants to track their document utilizing the USPS website up to when the document is delivered. The authority for USCIS to use the SCRD process will improve tracking and accuracy of delivery and will improve resolution of questions from applicants. Recipients will also have the ability to change their delivery location by going to the USPS website and selecting "hold for pickup" to arrange for pickup at a post office at a date and time that suits them. It is not unnecessarily cumbersome or unreasonable to expect document recipients to undertake the time and expense to ensure that documents as important as those issued by USCIS get into the right people's hands.

*L. Cost Analysis and DHS Rationale for Fee Adjustments*

*Comment:* Many commenters stated that USCIS proposed a 21 percent fee increase without evidence that it will improve immigration benefit services. Some commenters suggested that USCIS should find ways to revise the NPRM and include data that would make the connection between fee and efficiency increases in the adjudication process, as currently there is no evidence linking the two. Other commenters wrote that USCIS should rescind inefficient policies rather than increase fees to subsidize them, higher fees pass the costs of USCIS inefficiency to the public, fee hikes are not justified because USCIS has a record long processing times, and needs to revert to its prior procedures for processing cases before increasing fees.

*Response:* As explained in the NPRM, USCIS considered all cost and operational data that was available at the time it conducted the FY 2019/2020 fee review, including data related to potential cost-saving measures. It does not account for recent cost-saving initiatives for which data was not yet available at that time. However, USCIS will evaluate and incorporate any relevant cost-savings data into its next biennial fee review. To the extent that potential process efficiencies are recognized in the next biennial fee review, cost-savings may lessen the impact of future fee adjustments.

Similarly, DHS recognizes that certain USCIS policies may increase the cost of completing its work. USCIS accounted for those cost increases where it had data available at the time it conducted the FY 2019/2020 fee review. It does not account for recent policy initiatives that may increase costs for which data were not available at the time of the FY 2019/2020 fee review. In its next biennial fee review, USCIS will continue the practice of using all available data to determine total costs and appropriate fees to recover those costs.

DHS believes that USCIS policies are necessary for the agency to effectively achieve its mission and fulfil statutory mandates. USCIS faithfully adheres to immigration law and carefully considers the pros, cons, costs, and ramifications of all policy initiatives it undertakes. In its FY 2019/2020 fee review, USCIS estimated total costs to the agency of providing immigration adjudication and naturalization services. In the NPRM and this final rule, DHS has fully explained and justified the cost increases that necessitate USCIS fee adjustments.

*Comment:* Another commenter criticized USCIS' use of the ABC model to predict the cost of adjudicating forms. The commenter wrote that the model predicts different costs in 2019 compared to 2016 with no explanation, USCIS increased the ABC model baseline with no explanation and USCIS' explanation for "low volume reallocation" is used as a pretext for the Department's policy priorities.

*Response:* USCIS' cost projections for the FY 2019/2020 biennial period have increased relative to the FY 2016/2017 biennial period. However, DHS disagrees with the commenter's assertion that it provided no explanation of the change in USCIS' costs between 2016 and 2019. The NPRM provides USCIS' FY 2018 AOP amount used as a baseline to inform FY 2019/2020 cost projections. It also explains projected cost increases over the FY 2019/2020 biennial period from that FY 2018 baseline, including the need for additional staff, pay adjustments for existing staff, and other net additional costs. *See* 84 FR 62286 (Nov. 14, 2019). Additionally, DHS clarifies that USCIS' ABC model does not predict costs. Instead, it assigns cost projections to operational activities and then to immigration benefit requests as explained in the supporting documentation that accompanies this final rule.

DHS categorically denies that "low volume reallocation" or "cost reallocation" is a pretext with any intent other than to exercise its discretion to limit the fee for certain applications and petitions in recognition that fees set at the ABC model output for these forms would be overly burdensome and possibly unaffordable for the affected

applicants, petitioners, and requestors.[104] In its discretion, DHS determined that it would be appropriate to limit the fee increase for the following forms, while also rounding to the nearest $5 increment:

• Form I–290B, Notice of Appeal or Motion,

• Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant,

• Form I–600, Petition to Classify Orphan as an Immediate Relative,

• Form I–600A, Application for Advance Processing of an Orphan Petition,

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600,

• Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative,

• Form I–800A, Application for Determination of Suitability To Adopt a Child From a Convention Country, and

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

In the NPRM, DHS explained that limiting the fee increase for these forms requires DHS to shift the costs to other fee-paying applicants, petitioners, and requestors via increased fees for other forms. If USCIS did not perform cost reallocation, then fees for other applications and petitions would be lower than those implemented in this final rule, and USCIS would not recover its estimated full cost of providing immigration adjudication and naturalization services. As explained in the NPRM, DHS determined that it would deviate from previous fee rules by not limiting the fee increase for the following forms:

• Form I–601A, Provisional Unlawful Presence Waiver,

• Form I–765, Application for Employment Authorization,

• Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant,

• Form N–300, Application to File Declaration of Intention,

• Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings,

• Form N–400, Application for Naturalization, and

• Form N–470, Application to Preserve Residence for Naturalization Purposes.

DHS outlined in its NPRM that other fees would be lower in recognition of

additional revenue anticipated from the fee increases for these forms. The primary objective of not limiting the fee increase for these forms is to reduce the cost burden placed upon other fee-paying applicants, petitioners, and requestors.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters attended a February 3, 2020 meeting with USCIS to observe the ABC cost modeling software. In follow-up comments, the attendees said that many questions remain outstanding about how USCIS developed its proposal. Many of their follow-up comments were the same as those made by other commenters, which are responded to in other sections of this preamble. Some of their comments were unique due to observations of the software, including:

• Why have the costs for Form N–400s risen so dramatically,

• Can USCIS explain the 900 line items in the budget,

• Scenario modeling other than references to the six Scenarios A–F as described in the proposed rule, and

• USCIS explained that cost reallocation takes place outside of the ABC model but did not show the spreadsheet.

*Response:* In its NPRM, DHS provided the public with an opportunity to request an appointment to view the ABC software that USCIS uses to help calculate immigration benefit fees. *See* 84 FR 62281. The purpose of the February 3, 2020 meeting was to provide an overview of the software and demonstrate how it works. In other words, USCIS allowed these public commenters (who requested an appointment) to view the software and showed them how it leverages operational data inputs (*i.e.,* FY 2019/2020 cost baseline, receipt volume projections, and completion rates) to determine the activity costs and fee-paying unit costs that inform proposed fees. A discussion regarding cost increases associated with Form N–400 and a detailed explanation of each USCIS budget line item was outside the scope of this meeting, which was focused on the ABC software. USCIS officials did not provide deliberative materials or supplemental information to these public commenters that is not in the record for the NPRM and in the docket. Although briefly discussed, the public commenters did not specifically ask USCIS officials during the meeting to view the separate spreadsheet used to calculate cost reallocation. However, as explained in the supporting documentation that accompanies this final rule, cost reallocation is simply the

process USCIS uses to reassign costs to each form fee to ensure full cost recovery. Total reassigned costs are the sum of the products of the fee-paying volume and model output for those forms with fees held below the model output, less the sum of the products of the fee-paying volume and the final fees for those same forms. Explained another way, a spreadsheet assigns the cost of limited fee increases or workload without fees to the fees that DHS does not limit for various policy reasons. We call this process cost reallocation. USCIS multiplies the fee-paying receipt forecast by the model output for each form. This calculates a total cost for that form. For the fees that DHS does not limit, we use the total cost for each form to reallocate the cost of limited fee increases or workload without fees. As a result, forms with the highest cost receive a larger share of cost reallocation. While terminology may have been different,[105] this is the same process that DHS used in the previous three fee rules. *See* 84 FR 62294. DHS believes that assigning more costs to forms with the highest cost is in line with the beneficiary pays principal emphasized throughout this rule.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Another commenter discussed information needed, but not provided at the meeting (even upon request in some cases) in order to understand how the software works. Because USCIS has failed to provide stakeholders with the opportunity to analyze the entire set of relevant information that USCIS has used to calculate the proposed new fees, the commenter opposed the entire new rule and requested that USCIS continue using the current fee schedule until USCIS provides access to the "FULL SET" of information it used and enough organized time to submit comments.

*Response:* The purpose of the February 3, 2020 meeting was to provide an overview and demonstration of the ABC software that USCIS uses to calculate immigration benefit fees. As was offered in the NPRM, USCIS officials provided the attendees with complete information on the inputs for the fee calculations and explained how the software works. An attendee posed several questions that would have

---

[104] DHS may reasonably adjust fees based on value judgments and public policy reasons where a rational basis for the methodology is propounded in the rulemaking. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

[105] Previous proposed IEFA fee schedules referred to limited fee increases as "low volume reallocation" or "cost reallocation." The FY 2016/2017 proposed fee schedule used both phrases. *See* 81 FR 26915. The FY 2010/2011 and FY 2008/2009 proposed fee schedules used the phrase "low volume reallocation." *See* 75 FR 33461 and 72 FR 4910, respectively.

AR_002261

required USCIS to provide deliberative information, granular assumptions underlying all aspects of the USCIS budget, an in-depth explanation of particular fee adjustments, and policy rationale associated with the Form N–400 fee (in excess of what is in the NPRM and supporting documentation). The questions asked went beyond the software demonstration, would have expanded the meeting considerably, and would have provided the attendee additional information that was not relevant. DHS believes that all relevant information is readily available in the NPRM and supporting documentation.

DHS declines to make changes in this final rule as a result of the comment.

1. Workload Projections

*Comment:* Multiple commenters stated that USCIS used unreasonable workload receipt projections in its cost model. One commenter cited figures in Table 5 of the NPRM detailing the average annual fee-paying receipts projection and said that they do not reflect the stated subtotals and grand totals. Similarly, another commenter said USCIS has not explained the source for its data on volume projections entered into the ABC model. Commenters also highlighted concerns with projected workload and fee-paying receipts for certain individual form types such as Form I–526.

*Response:* DHS acknowledges that workload receipt volume projections used in the FY 2019/2020 fee review did not materialize in FY 2019 exactly as forecasted. USCIS' Volume Projection Committee (VPC) developed workload volume projections for the FY 2019/2020 fee review in FY 2017. The VPC considers all available data at the time it finalizes projections, including statistical forecasts for each form, analysis of recent trends, and consideration of future policy initiatives that are known at that time. The VPC integrates this information with subject matter expertise and judgement to provide unified receipt volume projections by form type for use in the biennial fee review and other operational planning purposes.

Certain filing trends have changed since USCIS forecasted the FY 2019/2020 fee review workload and fee-paying receipt volumes. USCIS simply cannot predict all filing changes that will affect actual receipt volumes. USCIS used the best information available at the time it conducted the FY 2019/2020 fee review to develop workload and fee-paying receipt volume forecasts.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Some commenters stated that USCIS based its workload receipt forecasts on limited and unrepresentative data, using data only from June 2016 to May 2017. Commenters stated that USCIS did not explain why it chose this period. A commenter also said that USCIS' fee-paying volume assumptions reflect "filing trends and anticipated policy changes," but it is not clear how USCIS accounted for these factors. Another commenter said that projected volumes do not account for current processing times. Estimates used FY 2016–2017 data, but processing times have increased since then.

*Response:* The commenters are generally mistaken. DHS did not use a single 12-month period of data to project anticipated workloads for the FY 2019/2020 biennial period. To establish workload projections, USCIS' VPC always evaluates the best available information, including historical application volumes and trends, including data that extend far beyond a single 12-month period. For example, USCIS used 10 years of data to estimate Form I–90 renewals. In accordance with this procedure, USCIS evaluated all available information at the time it conducted the FY 2019/2020 fee review to establish its workload projections for the biennial period. *See* 84 FR 62289. Therefore, DHS rejects the claims that its volume forecasts are unsubstantiated.

USCIS did use data from the June 2016 to May 2017 period to estimate a proportion of individuals who pay the filing fee by form type. In its NPRM, DHS referred to this proportion as "fee-paying percentage." *See* 84 FR 62290. DHS used this data to calculate fee-paying volumes for each form type under current policy and to estimate the effects of policy changes in the NPRM. DHS used data from the June 2016 to May 2017 period because it was the most current data available at the time USCIS conducted the FY 2019/2020 fee review and using a full year of data can smooth out fluctuations that may occur from month to month. DHS believes that use of this data is correct and appropriate and declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that the NPRM does not make clear whether projected receipts only include new applications anticipated in 2020, or also includes applications in the backlog.

*Response:* DHS reiterates that all workload figures in this final rule are projected volumes and do not include

existing pending caseload. 84 FR 62288 (stating that revenue estimates were based on *projected* volumes).

*Comment:* A commenter who attended the February 3, 2020 software review meeting at USCIS stated that evidence does not support the projected figure for future Form N–400 filings. The commenter stated that receipts may decrease because of the fee increase and elimination of fee waivers. The NPRM says USCIS adjudicated 830,673 Forms N–400 in FY 2016/2017 and expects to adjudicate 913,500 in the FY 2020–21 biennium. The commenter understood from the meeting that USCIS "surveyed its staff," but said it does not know how staff came up with the application volume data to arrive at their volume projections. The commenter questioned USCIS' assertion that they will receive more N–400s than in the previous year given the drastic fee increases the agency seeks.

*Response:* DHS used the best information available at the time USCIS conducted the FY 2019/2020 fee review to develop receipt volume projections. The VPC considered all relevant statistical forecasts, recent trend analysis, and subject matter expertise. It also considered the potential effects of future policy changes. The VPC does not survey staff generally. Instead, the VPC considers input of subject matter experts in conjunction with statistical forecasts to determine a final volume forecast.

2. Completion Rates

*Comment:* A commenter wrote that USCIS should use completion rates to estimate all activity costs as was done in the previous USCIS fee rulemaking. A commenter wrote that the NPRM provides only some completion rates, but the information by itself is not useful in assessing justifications for proposed fee increases. A commenter wrote that Table 6 in the NPRM demonstrates that completion rates for most forms are as low as 1–2 hours, indicating that most forms include fees at a cost of hundreds of dollars an hour. A commenter wrote that the completion rates for Form N–400 with a filing fee of \$1,170 come out to a cost of \$745.22 an hour, whereas an EB–5 form for a wealthy investor includes a filing fee of \$4,015 at a rate of \$464 an hour. The commenter asked why it costs USCIS so much less to work on Form I–526, which is a much more complicated and time consuming petition requiring very specialized and more experienced officers, than that required to adjudicate Form N–400. Other commenters also mentioned the disparate hourly rates between Form N–400 and EB–5 workload, stating that the proposed fees

are not supported by the costs of completion and that the cost per completion rate for these forms shows the fees are a wealth test.

*Response:* It is not accurate to say that USCIS used completion rates to estimate all activity costs in the previous rulemaking. In the last three fee rules, USCIS used completion rates to assign costs from the Make Determination activity to individual cost objects (*i.e.,* forms). USCIS continued this approach in the FY 2019/2020 fee review. The fees DHS enacts in this final rule are based on the same methodology that was used in previous fee rules.

DHS understands the skepticism induced by simply dividing a form's proposed fee by the completion rate in an attempt to estimate the hourly processing cost. However, the calculation performed by the commenter does not accurately represent the per hour cost of adjudicating a particular form. Such a calculation presumes that all costs are associated with the Make Determination activity and ignores the costs associated with other activities, such as the Issue Document activity, that are not based on completion rates. In addition, all fees greater than the model output (*i.e.,* receive cost reallocation) represent the full amount of both the estimated cost of adjudicating the form and other costs associated with providing similar services at no or reduced charge to asylum applicants and other immigrants. USCIS' fees must recover estimated full costs, not just the direct costs to adjudicate forms.[106]

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter criticized USCIS for not disclosing actual case completion per hour statistics in the NPRM or supporting documentation.

*Response:* DHS provided completion rates (hours per completion) in Table 6 of the NPRM. *See* 84 FR 62292. Appendix Table 10 of the supporting documentation that accompanies this final rule also includes them.

*Comment:* A commenter wrote that USCIS does not explain whether prior year expenses used in calculations for immigration application fees under Section IV(B) include activities that courts later enjoined, or whether the calculation included legal costs related to litigating the issues in court. If so, the

commenter asked that USCIS recalculate expense and completion rates.

*Response:* As explained in the NPRM, proposed fees are informed by cost projections for the FY 2019/2020 biennial period. *See* 84 FR 62888. DHS does not use prior year expenses to calculate immigration benefit request fees. Additionally, as stated in the supporting documentation that accompanies this final rule, USCIS does not track actual costs by immigration benefit request. Therefore, DHS does not believe that an additional explanation is necessary and declines to make changes in this final rule in response to the comment.

### 3. USCIS Staffing

*Comment:* Multiple commenters wrote that the NPRM seeks to justify fee increases by a need for more staffing, yet USCIS has employees performing enforcement work for ICE and CBP. Other commenters supported the addition of employees to improve USCIS case processing times.

*Response:* In response to the migration crisis at the United States southern border, USCIS did provide staff on detail to ICE for clerical assistance in the creation and management of immigration case files. USCIS detailed the staff to ICE without reimbursement as provided in law. *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Public Law 116–26, tit. III (Jul. 1, 2019). This temporary support to ICE represented a miniscule proportion of total USCIS staff. Marginal costs associated with this effort are not in this final rule, as USCIS did not assume an additional staffing requirement for this workload in the FY 2019/2020 fee review. Additionally, DHS does not assign USCIS employees to perform enforcement work for ICE and CBP.

DHS proposed to hire additional USCIS employees for the reasons stated in the NPRM. USCIS estimates that it must add an additional 1,960 positions in FY 2019/2020 (relative to FY 2018 authorized staffing levels) to address incoming workload.[107] However, the fee schedule that has been in place since December 23, 2016 is insufficient to fund this additional staffing requirement. The total estimated staffing requirement of 20,820 in this final rule

represents an increase of 6,277 or 43 percent from the FY 2016/2017 fee rule (14,543). DHS believes that this estimate is lawful and fully justified based on the best information available to USCIS at the time it conducted the FY 2019/2020 fee review.

*Comment:* Another commenter said USCIS indicates that it uses a staffing model to predict needs based on workload receipts and target processing times, but USCIS has not identified target processing times or described its method for calculating workload receipts, other than to explain that a committee looked at trends and models. Further, the commenter said it is not clear what outputs that staffing model generated.

*Response:* DHS uses multiple, different techniques to forecast USCIS' workloads. Ultimately, the VPC reviews, deliberates, and reaches a final consensus on every forecast, as described in the NPRM and elsewhere in this final rule. DHS uses these workload forecasts as inputs to Staffing Allocation Models, which determine the estimated staffing requirements for USCIS. DHS outlines USCIS' total estimated IEFA authorized staffing requirement by directorate in Appendix Table 7 of the supporting documentation that is in the docket for this final rule. *See* 84 FR 62281. DHS declines to make changes in this final rule as a result of the comment.

*Comment:* A commenter said USCIS needs to fill important open positions in order to address significant backlogs, citing a 2019 USCIS report to Congress.

*Response:* DHS concurs with this commenter's statement. This is one reason why DHS is adjusting USCIS' fees in this final rule. DHS believes that the final fees will yield additional revenue that USCIS can use to hire and fill additional positions necessary for adjudicating incoming workload. The ability to adjudicate incoming workload may help USCIS mitigate future backlog growth.

*Comment:* A commenter wrote that USCIS does not explain why the NPRM includes funding for a 44 percent increase in staffing levels from FY 2016/2017, or why this increase was not anticipated in the 2016 fee rule just 3 years earlier. The same commenter stated that USCIS should at the very least provide the public with a version of fee review supporting documentation Appendix Table 6 that goes back 10 years, broken down by directorate, and actual staffing numbers for each fiscal year. Similarly, another commenter said USCIS fails to explain why the increase of 5,000 in staff from 2018 to 2019 is merited.

---

[106] *See* FY 2019/2020 Immigration Examinations Fee Account Fee Review Supporting Documentation with Addendum, which is part of the docket for this final rule. It provides more information on how USCIS conducted the fee review and defines the activities in it.

[107] This represents 138 fewer positions than reflected in the NPRM due to the removal of estimated additional staff associated with DACA. See the Form I–821D, DACA Renewal Fee section for additional information regarding why DHS is not implementing a fee for Form I–821D in this final rule.

**46872**    Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

*Response:* DHS articulated in the NPRM that, "This additional staffing requirement reflects the fact that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown." *See* 84 FR 62286. Although USCIS used all available data at the time it conducted the FY 2016/2017 fee review, it necessarily used historical data and trends to inform its projections. USCIS was unable to foresee these additional staffing needs at the time it implemented the FY 2016/2017 fee rule because of nearly unprecedented growth in workloads such as credible fear and affirmative asylum. Furthermore, USCIS could not perfectly anticipate all policy and operational changes that influence adjudication times.

USCIS cannot afford the estimated staffing requirement necessary to address its incoming workload under the previous fee structure. If USCIS maintains current staffing levels, DHS believes that backlogs would grow. Therefore, DHS adjusts USCIS' fees in this final rule to generate additional revenue that may be used to fund staff that will adjudicate incoming workload and potentially mitigate or stabilize future backlog growth.

DHS declines to make changes in this final rule in response to these comments.

### 4. Cost Baseline

*Comment:* Multiple commenters claimed that DHS did not adequately explain the growth in USCIS costs from the FY 2016/2017 fee rule and that DHS failed to provide justifications for 57 percent of the increase in costs from the previous fee rule. A commenter stated that USCIS dismisses the option of reducing projected costs with a single sentence and is a "fatal defect" in the NPRM. Other commenters said that in overstating workload volumes, DHS overestimated the costs to be recovered by USCIS' fee schedule.

*Response:* In its NPRM, DHS highlighted changes from USCIS' FY 2018 Annual Operating Plan (AOP) to the FY 2019/2020 cost baseline. *See* 84 FR 62286. The authorized staffing levels and FY 2018 AOP costs are higher than FY 2016/2017 fee rule projections. After the FY 2016/2017 fee rule became effective on December 23, 2016, USCIS funded additional staff and other agency initiatives through a combination of additional revenue resulting from higher fees and available carryover funds. Per Figure 4 of the supporting documentation that accompanies this final rule, USCIS expected to draw down its carryover funds in FY 2019 and FY 2020 because base operating costs were projected to exceed incoming revenue. In other words, USCIS forecasted an annual operating deficit in both years. DHS determined that USCIS

cannot sustain recurring annual operating deficits of this magnitude and continue to fund itself in this manner, necessitating an adjustment to the fee schedule based on the results of the FY 2019/2020 fee review.

As detailed in the NPRM, a primary driver of cost growth from the FY 2018 AOP to the FY 2019/2020 cost baseline is payroll for on-board and new staff. *See* 84 FR 62286. This staff is necessary to process the projected workload receipt volume, which exceeds USCIS' current workload capacity. Strategic investments in staffing may help USCIS mitigate or stabilize future backlog growth. Furthermore, net additional costs include non-pay general expense enhancements for requirements such as secure mail shipping for permanent resident cards and other secure documents ($27 million), USCIS headquarters consolidation ($32 million), increased background checks ($18 million), IT modernization efforts ($32 million), customer engagement center ($23 million), and inflationary increases for contracts. This final rule does not transfer funds to ICE or implement new DACA fees. Therefore, DHS removed $207.6 million for ICE and $18.7 million of DACA costs in this final rule. Table 6 is a revised crosswalk summary from the FY 2018 AOP to the FY 2019/2020 cost baseline used to inform the fee schedule in this final rule.

### TABLE 6—REVISED COST BASELINE PROJECTIONS

[FY 2019/2020 fee review IEFA non-premium budget (in millions)]

| | |
|---|---|
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585.6 |
| Plus: Net Spending Adjustments | 217.2 |
| Total Adjusted FY 2018 IEFA Non-Premium Budget | 3,802.8 |
| Plus: Transfer to ICE | |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 280.2 |
| Plus: Net Additional Costs | 249.0 |
| Total Adjusted FY 2019 IEFA Non-Premium Budget | 4,332.0 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 218.6 |
| Plus: Net Additional Costs | 5.8 |
| Total Adjusted FY 2020 IEFA Non-Premium Budget | 4,556.4 |

DHS did not overstate its projected costs for recovery via USCIS' fee schedule. Generally, whenever an overestimate of workload and/or fee-paying receipts materialize, proposed fees are often understated. For example, assume there is a total cost estimate of $100.00 for an agency to recover via one user fee. If there were 100 projected fee-paying applicants to assign a total cost estimate of $100.00 to, then the proposed fee would be $1.00. However,

if the actual fee-paying receipt volume materialized at half or 50, then the proposed fee should have been double or $2.00 to recover full cost because there were fewer fee-paying applicants to absorb the $100.00. Using this same example, even if the $100.00 was high due to an overestimate of volume projections and it should have been only $80.00 (to account for a notional marginal cost change), the proposed fee would remain $2.00 ($80.00/50 = $1.60

or $2.00 when rounded to the nearest whole dollar).[108] As previously explained, USCIS uses the best information available at the time it conducts biennial fee reviews.[109]

---

[108] In reality, a lower receipt volume often does not produce a cost reduction within the span of a two-year period due to fixed costs associated with facilities, staff, and other overhead.

[109] OMB Circular A–25 clarifies that "full cost shall be determined or estimated from the best available records of the agency, and new cost

Forecasts may not materialize exactly as initially projected due to many factors. Consequently, USCIS reevaluates its fees on a biennial basis and makes adjustments, if necessary.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter stated that USCIS rests the proposed new fees on the outcome of a budget model but gives little indication of how it derived the budget in the first place. For example, USCIS states that the budget is derived from the FY 2018 AOP, but it is not clear from the proposal and supplemental material what estimates, assumptions, or operating practices this plan embodies or why this plan is relevant (instead of a more recent plan or actual operating figures). In addition, the commenter said USCIS states that its budget reflects an "adequate level of operations," plus "funding for [certain] enhancements," but does not explain either concept. The commenter also said the proposal does not give commenters a full understanding of other aspects of the budget, including the ICE funds transfer, staff salaries and benefits, what assumptions are driving the estimates of budget growth, how much carryover USCIS is budgeting for or how that affects the proposed fees, and how USCIS plans to use premium processing revenue or why such revenue does not offset any of the fees that USCIS proposes based on its non-premium budget.

*Response:* As explained in the supporting documentation that accompanies this final rule, USCIS establishes an AOP (detailed budget execution plan) at the beginning of each fiscal year that is consistent with the annual spending authority enacted by Congress. The FY 2018 AOP is USCIS' basis for the FY 2019/2020 cost baseline, which informs proposed fees in the NPRM and final fees in this final rule. DHS clarifies that USCIS considers an "enhancement" to be additional funding in excess of the base annual operating plan. This estimated additional funding (*i.e.,* cost projections) are outlined in both the NPRM and Cost Baseline section of this final rule.

Information and assumptions about USCIS' carryover are located in the IEFA Non-Premium Carryover Projections section of the supporting documentation that accompanies this final rule. Additionally, premium processing revenue, as explained in the Premium Processing section of this final

accounting systems need not be established solely for this purpose."

rule, may only be used for limited purposes as provided by law.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters identified differences between their estimate of USCIS' expenditures in FY 2018–2019 and DHS' cost estimates for those years in the NPRM. The commenters contended that DHS appears to have substantially overstated USCIS' FY 2018–2020 costs. Additionally, commenters noted that USCIS' FY 2019–2021 congressional justifications convey lower amounts than DHS' cost estimates in the NPRM.

*Response:* The commenters' conclusion that USCIS' FY 2018–2019 actual expenditures are less than its cost estimates for those years in the NPRM is correct. Furthermore, the commenters' observation that USCIS' FY 2019–2021 congressional justifications requested less budgetary authority than the cost estimates for those years in the NPRM is also correct. However, contrary to the commenters' assertions, this does not mean that DHS overstated USCIS' costs or that USCIS does not need to collect the amount of revenue it identified in the NPRM.

DHS developed cost estimates for addressing projected incoming workloads during the FY 2019/2020 period. As identified in the NPRM, USCIS is unable to fully fund its estimated budgetary requirements (*i.e.,* FY 2019/2020 cost baseline or cost projections) via the existing fee schedule, thereby necessitating fee adjustments in this final rule. Thus, USCIS expended less in FY 2018–2019 than its cost projections for addressing incoming workloads precisely because it did not have sufficient available resources to meet its estimated budgetary requirements. Similarly, the congressional justifications cited by the commenters reflect USCIS' estimates, at different points in time, of the funds it would be able to execute based on anticipated resources available to the agency under current policy and fees, rather than the cost projections of addressing incoming workloads forecasted during the FY 2019/2020 fee review. Therefore, DHS's NPRM cost projections differ from actual expenditures and congressional justifications because they reflect USCIS' estimated budgetary requirements to fully address projected incoming workloads as of a particular point in time.

Given that USCIS did not have available resources equivalent to its estimated budgetary needs in FY 2018 and 2019, it was not able to hire the number of staff estimated by its Staffing

Allocation Models. The underfunding of USCIS' requirements increased processing times and backlogs. USCIS' fee schedule must recover the estimated costs of addressing incoming workloads to ensure that it has sufficient resources to operate and limit the future growth of processing times and backlogs.

DHS declines to make adjustments in this final rule in response to these comments.

*Comment:* Similarly, a commenter stated that the NPRM uses opaque and invalid budget assumptions and neither the proposed rule nor the commenter's meeting with USCIS have provided any way for the public to adequately understand, much less analyze, future costs and revenue estimates. The commenter said cost and revenue baselines are not aligned, as USCIS is using two completely different time periods to inform its proposed fee rule: A relatively antiquated time period (June 2016 to May 2017) as the baseline for revenues, and a relatively recent time period (FY 2018) as the baseline for costs. The commenter characterized this as "perplexing" given that USCIS surely knows its actual costs and revenues for any prior fiscal year. The commenter also detailed their analysis that concluded that projected costs and revenues do not match actual costs and revenues, which the commenter said raises several issues that USCIS must explain to the public.

*Response:* DHS disagrees with the commenter's contention that USCIS' budget assumptions are opaque and invalid. The commenter is incorrect in stating that USCIS used two different time periods to determine revenue and cost projections for the FY 2019/2020 fee review and that the revenue and cost baseline are not aligned. DHS used data from June 2016 to May 2017 to determine one data element, fee-paying percentages, that informed its FY 2019 and FY 2020 revenue forecasts. This is only one data input among several that USCIS considers in forecasting revenue. DHS maintains that its use is appropriate. Furthermore, USCIS used the same data to inform the FY 2018 AOP, insofar as it was also an input into the FY 2018 USCIS revenue forecast.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter wrote that there is an especially great burden on USCIS to disclose a full and transparent accounting for why it requires an average annual budget of $4.67 billion, as the role of the agency's cost-modeling software is simply to accept this number "as a received truth" and allocate it among all of the various form types. This commenter said USCIS provides

almost no explanation for why it is projecting such high costs, especially when the agency's actual costs in FY 2018, 2019, and 2020 were so much lower than its own projections.

*Response:* DHS acknowledges that USCIS' actual expenditures in FY 2019 were less than the projected costs in this final fee rule. Furthermore, the commenter is correct in stating that the FY 2019 and FY 2020 cost projections in the NPRM exceed the total budget authority requested for USCIS in the Congressional Justifications that accompany the President's annual budget proposal for those years. This reflects the fact that the revenue generated under the previous USCIS fee schedule was insufficient to adequately fund the agency's needs. The President's budget proposal did not request authority for USCIS to spend money that it was not expecting to have. The difference between the cost projections and actual USCIS expenditures across this time manifested in backlog growth and unmet operational needs. It does not reflect inaccurate projections of the cost to USCIS of fully funding its operational requirements.

DHS has fully explained and justified USCIS' projected costs to meet its operational requirements and address its projected workload. Therefore, DHS declines to make changes in this final rule in response to the comment.

*Comment:* Commenters stated that, during a meeting with USCIS Office of the Chief Financial Officer, the group discussed the timing and availability of information in the FY 2019/2020 fee review. A commenter stated that the cost-modeling software uses information from 2017, which precedes most of the notable USCIS policy changes of the past 3 years. The commenter stated that USCIS apparently attempts to predict how costs for a given form type will change in the future, but there has been no comprehensive modeling of the many recent developments that would tend to reduce agency costs and put downward pressure on user fees.

The commenter stated that USCIS does not appear to have accounted for many recent policy changes because data was not available "at the time it conducted this fee review." The commenters wrote that more recent data could change the number of people applying for immigration benefits, and thus USCIS' budget estimates and fee calculations. Another commenter stated that the rule does not suggest that USCIS has estimated and accounted for the combined effect of these multiple initiatives, nor could it have done so comprehensively as the Administration's adoption of new

initiatives that could affect the number of people seeking immigration benefits has continued even since April 2019 when USCIS completed its fee review and November 2019 when DHS published the NPRM. The commenter said this also raises serious questions about whether the fee review complies with the statutory requirement for USCIS to conduct such a review and make recommendations based on the relevant "costs incurred." The commenter said the proposal's reliance on 2018 cost projections is unreasonable. The commenter said more recent data and projections were available or could have been if USCIS had waited just a bit longer, and USCIS provides no reason that 2018 figures are more relevant. The same commenter said the proposal is additionally unreasonable because it is based on projections for FY 2019 and FY 2020, a period that has nearly passed. The commenter said USCIS should have based its modeling on more recent data and projected results for the time period when any new fee rule would be in effect.

A commenter wrote that USCIS excludes savings and benefits already realized such as efficiencies gained through investments in information technology, closures of international offices, and lower refugee intake. Similarly, a commenter wrote that the RIA fails to present data and evidence on a number of recent changes designed to reduce costs, including limiting the availability of printed study materials, no longer providing printed Forms N–400, centralizing all customer inquiries and complaints in a call center, and introducing electronic filing for many benefits.

*Response:* DHS acknowledges that it did not incorporate cost increases or savings from policy initiatives for which data was not available at the time USCIS conducted the FY 2019/2020 fee review. DHS rejects the implication that it inappropriately failed to account for future policy initiatives. DHS must adjust USCIS fees through notice and comment rulemaking which, especially for a rule with a billion-dollar impact, is a lengthy process that requires policy planning, analysis, a proposed rule, reading and responding to comments, and a final rule. DHS must publish a final rule that only makes changes that are a logical outgrowth from the proposed rule, and a totally new budget with minor changes in costs or savings cannot be substituted between the proposed and final rules, although we adjust for substantial sums based on intervening legislation as we did for appropriated funds for ICE and the

Citizenship and Integration Grant Program discussed elsewhere. The immigration policy environment changes so frequently that if USCIS were to delay finalizing a fee review until cost data was available for all future policy initiatives, DHS would be unable to adjust fees timely, thereby posing a fiscal risk to USCIS. Biennial fee reviews must reflect USCIS' cost projections as of a particular point in time as best can be determined. The same logic applies to other operational metrics including completion rates, revenue forecasts, and workload projections. USCIS always leverages the best information available at the time it conducts a biennial fee review, but it necessarily results in some costs or savings realized or to be realized not being incorporated in the final fees simply due to the passage of time for rule development and finalization.

In recognition of the constantly evolving immigration policy environment and its obligations under the INA and the CFO Act, USCIS regularly conducts biennial fee reviews. The two-year review mandate in the CFO Act forces fee setting agencies to address the effects of just these sorts of policy and practice changes on their fees; otherwise, bureaucratic inertia could cause an agency to not address the soundness of their fees versus costs and services. As it is, the two-year period provides agencies with a reasonable period within which to regularly address such issues, subject to the time constraints of notice and comment rulemaking previously mentioned. To the extent that the recent policy initiatives identified by the commenters affect USCIS' costs, those effects will be captured in USCIS' next biennial fee review. If the totality of new initiatives reduces USCIS' costs, it may result in lower fees in the future for applicants and petitioners.

DHS declines to make changes in this final rule in response to the comments.

*Comment:* A commenter wrote that their own estimates suggest USCIS is attempting to increase revenue by around 49 percent over current revenue projections based on estimated growth in applications. The commenter said this is an extraordinary amount of revenue extracted from its most vulnerable users.

*Response:* DHS is unable to replicate the commenter's estimate and does not know the source or validity of these calculations. Regardless, as explained in the NPRM and this final rule, DHS must adjust USCIS' fees to recover the estimated full cost of providing adjudication and naturalization services. DHS declines to make changes

in this final rule in response to this comment.

*Comment:* A commenter said that USCIS states that it recognizes revenue when work is completed, asserting that the implications of this accounting principle on USCIS' budget and fee modeling is not clear but could be quite significant. For example, the commenter said it is unclear whether revenue estimates are based on actual cash flow or the amount of revenue that is recognized in a current year or if USCIS' budget is inflated with the costs of processing applications for which USCIS received a fee in a prior year.

*Response:* DHS clarifies that all figures in the USCIS fee review, NPRM, and this final rule reflect projected costs, workload and associated revenue for the FY 2019/2020 biennial period. DHS did not overstate or inflate the USCIS' cost baseline because it does not include workload for which USCIS received a fee in a prior year.

DHS declines to make changes in this final rule in response to the comment.

### 5. Alternative Funding Sources

*Comment:* Commenters wrote that funding for USCIS should come from another source. Multiple commenters indicated that Congress should provide appropriations to USCIS to decrease the burden on immigrants. Some commenters also indicated that USCIS did not consider the $10 million appropriation for citizenship grants in setting its fees.

*Response:* As stated in the NPRM, fees have funded USCIS since its inception. Approximately 97 percent of USCIS' annual funding comes from fees. USCIS must rely on fees until the law changes or Congress appropriates funding. For FY 2019 and FY 2020, Congress appropriated $10 million for the Citizenship and Integration Grant Program. *See* Consolidated Appropriations Act, 2019, Public Law 116–6, div. A, tit. IV (Feb. 15, 2019) and Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2020). At the time USCIS conducted the FY 2019/2020 fee review, Congress had not appropriated $10 million for the Citizenship and Integration Grant Program. As a result, USCIS did not expect to receive the appropriations in FY 2019 or FY 2020. Therefore, USCIS' FY 2018 AOP and FY 2019/2020 fee review cost baseline accounted for these funds in the IEFA non-premium budget. In this final rule, DHS clarifies that $10 million (IEFA non-premium funds; not appropriated funds) remains in the cost baseline for other agency initiatives. However, USCIS does not assign $10 million to only naturalization-related

forms (*i.e.,* N–336, N–400, N–565, N–600, and N–600K) in its final ABC model because Congress appropriated funds for the Citizenship and Integration Grant Program. Instead, USCIS reassigns $10 million of non-premium funds to other fee-paying forms, thereby reducing the costs assigned to and final fees for naturalization-related forms.

DHS declines to make any changes in this final rule in response to these comments.

### M. ICE Transfer

*Comment:* Many commenters wrote that they disagree with the proposed transfer of USCIS IEFA funds to ICE. They provided a number of reasons for their objections. Another commenter concluded that eliminating the revenue transfer to ICE enforcement would reduce USCIS' claimed need to eliminate ability-to-pay waivers.

*Response:* DHS removed the transfer of IEFA funds to ICE from this final rule because Congress appropriated $207.6 million to ICE in FY 2020. *See* Consolidated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019). DHS may fund activities conducted by any component of the department that constitute immigration adjudication and naturalization services using the IEFA. *See* INA section 286(m), (n), 8 U.S.C. 1356(m), (n). Nevertheless, the fees established by this final rule are not calculated to provide funds to ICE.

*Comment:* A commenter suggested that USCIS use the money currently spent on detention by ICE to instead streamline and simplify the application process.

*Response:* Congress appropriates funds for ICE Enforcement and Removal Operations. Those funds are not available for use by USCIS. DHS declines to make changes in this final rule in response to this comment.

*Comment:* A commenter wrote that recent legislative action suggested USCIS would abandon the plan to transfer funds to ICE, so the commenter asked that USCIS confirm in its final rule that it does not have the authority to transfer IEFA fun ls to ICE collected.

*Response:* DHS may fund activities conducted by any component of the department that constitute immigration adjudication and naturalization services using the IEFA. *See* INA section 286(m), (n), 8 U.S.C. 1356(m), (n). DHS removed the transfer of IEFA funds to ICE from this final rule because Congress appropriated $207.6 million to ICE in FY 2020. *See* Conso idated Appropriations Act, 2020, Public Law 116–93, div. D, tit. IV (Dec. 20, 2019).

The fees established in this final rule are not calculated to provide funds to ICE.

### N. Processing Times and Backlogs

*Comment:* A commenter wrote that USCIS should focus on the processing times and becoming more efficient. The commenter also suggested that USCIS could benefit from a more streamlined electronic process. One commenter wrote that electronic filing glitches, lost documents, erroneous rejections, and lengthy holds should be addressed before fees are raised. One commenter said USCIS should increase filing technology and training of Service Officers to ensure they have the legal knowledge of the regulations and have the platform to adjudicate cases efficiently. The commenter said technology allocations should specifically focus on electronic filing systems that can reduce processing times and make document and forms submission from U.S. employers seamless.

*Response:* DHS strives to save money, be efficient, and process all requests in a timely manner while maintaining the integrity of the United States immigration system. USCIS agrees with commenters that electronic filing, processing, and record keeping for immigration benefit requests is likely to provide operational efficiencies that could aid USCIS in better using its existing resources and potentially reduce processing times and backlogs. Although USCIS is aggressively moving to expand e-processing to more form types, its current operational needs dictate that it must increase fees to cover projected costs. If USCIS realizes operational efficiencies through the expansion of electronic benefit request filing and processing, those cost savings will be reflected in upcoming fee reviews and may result in future fees that are lower than they would have been in the absence of such efficiencies. Training, software, and equipment costs are part the IEFA budget. USCIS encourages its employee to discuss with their supervisor if they believe that they lack the resources necessary to do their jobs.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Many commenters who opposed the NPRM noted that immigration benefit request backlogs and processing times have increased under the current administration despite a fee increase in December 2016. Many commenters stated that since 2010, USCIS increased filing fees by weighted averages of 10 percent and 21 percent but has not achieved any

associated improvement in processing times, backlogs, or customer service. Commenters cited reports stating that during that same period USCIS' backlog has increased by more than 6,000 percent and that the overall average case processing time increased 91 percent between 2014 and 2018. Commenters wrote that fees should not increase until USCIS improves its efficiency and management. Commenters wrote that an increase in fees must be accompanied by improvement in processing times, reduced backlogs, improved customer service, and services that do not discriminate against the working class, low-income applicants, and others who face financial hardships.

*Response:* DHS recognizes the continued growth of USCIS case processing backlogs since it last adjusted the USCIS fee schedule on December 23, 2016. *See* 81 FR 73292 (Oct. 24, 2016). The fees established at that time proved insufficient to fund USCIS at the level necessary to prevent growth in case processing backlogs. USCIS' costs grew more than expected at that time because of disproportionate growth in humanitarian workloads that did not generate revenue, increased adjudicative time requirements per case for many different workloads (*i.e.,* increased completion rates), additional staff, and other factors.

DHS is adjusting fees in this final rule because they are insufficient to generate the revenue necessary to fund USCIS at levels adequate to meet its processing time goals. Adjustments to USCIS' fee schedule will generate more revenue to fund the operational requirements necessary to meet projected incoming workloads and prevent further deterioration in processing times. The new fees will allow USCIS to hire more people to adjudicate cases and possibly prevent the growth of backlogs. USCIS will continue to explore possibilities for business process efficiencies. Future fee adjustments will reflect any efficiencies realized by USCIS.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter suggested that USCIS should internally review its processes and determine how they might be streamlined before increasing fees. A few commenters stated that increased RFEs and mandatory in-person interviews, among other policies, are labor intensive and should be addressed to decrease the backlog before fees are increased.

*Response:* USCIS continually evaluates its processes and pursues efficiencies to the greatest extent possible. As explained in the NPRM,

USCIS considered a l cost and operational data that was available at the time it conducted the FY 2019/2020 fee review, including potential process efficiencies. It does not account for recent process efficiencies for which data was not yet available at the time. However, USCIS will evaluate and capture any relevant cost-savings data for process efficiencies during its next biennial fee review. To the extent that potential process efficiencies are recognized in the next biennial fee review, cost-savings may lessen the impact of future fee adjustments.

DHS declines to make changes in this final rule in response to the comment.

*Comment:* A commenter said an increase in fees would only further burden those who seek services and are repeatedly met with inefficiency, long wait times, and the inability to get answers. This commenter said USCIS has taken away services, such as the ability to make InfoPass appointments online, and rerouted those inquiries to Customer Service Center where wait times to receive calls back make emergency situations that require an InfoPass appointment even more frustrating. Another commenter also mentioned the difficulty in making InfoPass appointments as an example of how USCIS services have declined in recent years due to mismanagement. Commenters said USCIS should end policies and practices that raise fees to support the continued administration of backlog-expanding policies and practices.

*Response:* USCIS continually evaluates potential operational efficiencies. Reductions in the use of in-person appointments through InfoMod enable USCIS to redirect resources to adjudication, potentially improving overall customer service. USCIS evaluates and incorporates all available information on both cost-savings and cost increases as part of its biennial fee reviews, including the effects of policy changes and their impact on operational processes. This final rule adjusts USCIS' fee schedule to recover the estimated full cost of providing immigration adjudication and naturalization services; removing or reconsidering all USCIS policies and practices is beyond the scope of this rulemaking.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* Another commenter noted that USCIS' only concrete plan was to spend money on reducing fraud, which would not efficiently reduce the backlog.

*Response:* DHS disagrees with the commenter's statement that its only

concrete plan is to spend more money on reducing fraud. USCIS intends to use revenue from the fees to fund multiple initiatives, including increased staffing across the agency. DHS adjusts USCIS' fee schedule in this final rule to recover the estimated full cost of providing immigration adjudication and naturalization services for anticipated incoming workloads. USCIS does not incorporate the cost of addressing existing pending caseloads in its biennial fee reviews, as it would be inequitable to require new applicants and petitioners to pay for the cost addressing previously submitted applications and petitions for which USCIS already collected fees. To the extent fee adjustments result in additional revenue for USCIS, those additional resources may help limit future growth in pending caseload. DHS declines to make changes in this final rule in response to the comment.

*Comment:* Some commenters noted USCIS' failure to implement the recommendations of the USCIS Ombudsman's Report, which provides a number of recommendations for improving adjudication times. One of these commenters said DHS's failure to consider, address, or implement recommendations from other federal government offices is telling, asserting that these changes are simply intended to make the asylum process more challenging for asylum applicants, and to deter asylum applicants.

*Response:* DHS notes that one of the USCIS Ombudsman's recommendations is to address delays in processing Form I–765 by ensuring sufficient staffing resources are available to provide for timely adjudication. DHS adjusts USCIS' fee schedule in this final rule, including the fee for Form I–765, to provide for the recovery of full estimates of the costs of providing immigration adjudication and naturalization services. The Ombudsman did not recommend an increase in the Form I–765 fee; however, adjusting the fee schedule will enable USCIS to devote more resources, including staffing, to the adjudication of all applications and petitions, including Form I–765. DHS reiterates that it does not intend to make the asylum process more complicated.

DHS declines to make changes in this final rule in response to these comments.

*O. Fee Payment and Receipt Requirements*

*Comment:* Multiple commenters opposed the proposal to allow DHS to require the payment of certain fees by particular methods, as described in the relevant form instructions. Commenters

wrote that any potential future requirement to pay fees through electronic means such as *Pay.gov* would limit the ability of individuals who lack access to bank accounts or credit cards to apply for immigration benefits. Commenters also wrote that requiring payment through electronic means would restrict the availability of immigration benefits for individuals who lack computer and internet access. Commenters stated that it is important to maintain the ability to pay fees using cashier's checks and money orders, because they are available to individuals without access to other banking services, such as a credit card. Another commenter cited data from the New York City Department of Consumer and Worker Protection, which found that less than two-thirds of immigrant households in New York have access to products such as checking and savings accounts and that 11 percent are unbanked and 22 percent are underbanked. A few commenters cited Federal Deposit Insurance Corporation numbers in writing that the proposal would inhibit the immigrant portion of the "unbanked" and "underbanked" households in the United States from applying.

Multiple commenters said prohibiting cashier's checks or money orders would disproportionately affect low-income immigrants and a few commenters indicated it would impose a substantial burden on asylum seekers. One commenter said 85 percent of the immigrant clients they help need to use money orders, and this provision would negatively affect them. Commenters said the proposal would lead to wide scale confusion and inefficiency among immigrant and advocacy groups and requested that USCIS continue to accept cashier's checks and money orders.

*Response:* In this final rule, DHS does not restrict the method of payment for any particular immigration benefit request. This final rule clarifies the authority for DHS to prescribe certain types of payments for specific immigration benefits or methods of submission. DHS does not have data specific to USCIS benefit requestors' access to the internet and/or banking but understands that particular populations submitting requests may have attributes that make access to a bank account more or less challenging DHS acknowledges that some requestors may not use banks or use them on a limited basis for a number of reasons. However, any person who can purchase a cashier's check or money order from a retailer can just as easily purchase a pre-paid debit card that can be used to

pay their benefit request fee.[110] In addition, since 2018 requesters can use a credit card to pay for a USCIS form filing fee that gets sent to and processed by one of the USCIS lockboxes, or split the fees between more than one credit card.[111] The credit card used does not have to be the applicant's; however, the person who is the owner of the credit card must authorize use of his or her credit card. Therefore, DHS believes that requiring the use of a check, credit, or debit card will not prevent applicants or petitioners from paying the required fees. In addition, resources such as libraries offer free online services, access to information and computers that the public may use to access forms, complete, print or submit them. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

DHS declines to make changes in this final rule in response to these comments.

*Comment:* A few commenters raised concerns about nonrefundable fees and rejecting checks over 365 days old, which they said were listed in the NPRM without explanation. The commenters stated that relevant fees should be refundable in certain situations, including when an applicant's health or family conditions have changed or when an immigrant is denied on a clear USCIS error.

*Response:* DHS provided a complete explanation of its reasoning behind its proposed stale check or refund requirements. *See* 84 FR 62295 and 62296. In addition, DHS is continuing its policy to issue fee refunds if there is a clear USCIS error, but we will not codify that discretionary practice as a requirement on USCIS. DHS declines to make changes in this final rule in response to these comments.

*Comment:* One commenter suggested that USCIS should publish any restriction of payment in the **Federal Register**. The commenter also suggested that USCIS should accept financial instruments regardless of their age and, if it does not process, give applicants 14 days to correct any payment errors. The commenter wrote that USCIS should not be rejecting applicants because of payment problems unknown to them or out of their control.

*Response:* DHS declines to publish any change in acceptable payment instruments in the **Federal Register**. However, where DHS limits acceptable instruments locally, nationwide, or for certain USCIS benefit requests, it issues multiple communications and provides sufficient advance public notice to minimize adverse effects on any person who may have plans to pay using methods that may no longer be accepted.[112] As far as the age of payment instruments, as stated in the NPRM, USCIS generally accepts and deposits payments dated up to one-year before they are received although 6 months old is a general standard often followed in the financial services industry. *See* 84 FR 62295. Because of the large volume of payments that USCIS receives on a daily basis, handling dishonored payments adds unnecessary administrative burden to its intake process. Assigning employees to handle defective payments and, as suggested by the commenter, holding filings and billing for fees that were not properly submitted, is an opportunity cost to USCIS because those employees could otherwise adjudicate immigration benefit requests. DHS believes that it is the responsibility of the remitter to submit proper fees. USCIS will take ameliorative action if a payment error is caused by the agency. However, USCIS has no obligation to insulate filers from a payment problem caused by the requester's financial institution, agent, lawyer, third party check validation service, or similar parties. DHS makes no changes in response to these comments.

### P. Fees Shared by CBP and USCIS

*Comment:* One commenter suggested that previous fee reviews failed to account for the actual adjudication costs of these forms. They questioned if CBP costs were accounted for in previous fee reviews.

*Response:* DHS acknowledges that previous adjustments to the USCIS fee schedule did not account for CBP costs for instances where CBP uses the same form as USCIS. DHS set those fees using USCIS costs and CBP collected the fee that was established. This final rule refines the fee calculation by considering CBP costs and workload volumes in establishing the fees for shared forms. However, CBP workload volumes and associated revenue are backed out from the fee schedule shown in the NPRM and this final rule because

---

[110] See, e.g., Visa Prepaid Cards, at *https://usa.visa.com/pay-with-visa/cards/prepaid-cards.html* (last viewed 2/24/20).

[111] *See* USCIS Expands Credit Card Payment Option for Fees *https://www.uscis.gov/news/news-releases/uscis-expands-credit-card-payment-option-fees.*

[112] *See, e.g.,* USCIS Updates Fee Payment System Used in Field Offices, available at *https://www.uscis.gov/news/news-releases/uscis-updates-fee-payment-system-used-field-offices* (Last Reviewed/Updated: 3/07/2019).

AR_002269

**46878**  Federal Register / Vol. 85, No. 149 / Monday, August 3, 2020 / Rules and Regulations

that revenue is not available to USCIS for the purposes of funding its immigration adjudication and naturalization services. This ensures that USCIS' projected revenue matches its estimated costs of adjudication.

*Comment:* A commenter said that the hike in fees shared by CBP and USCIS are drastic and unjustified because the cost to legalize status will rise to thousands of dollars per person.

*Response:* DHS recognizes that adjustments to the fees for forms shared by USCIS and CBP represent a sizeable increase in the cost of those forms. However, the fees adopted in this final rule represent the estimated full cost of adjudication. DHS declines to make changes to the final fee schedule on the basis of this comment.

*Comment:* Another commenter questioned why the NPRM did not include more recent information regarding CBP costs and suggested that if CBP needs the revenue, they should have their own higher fees or fund their operations through annual appropriations.

*Response:* DHS used the most recent CBP data available at the time USCIS conducted the FY 2019/2020 fee review. It includes cost and workload volume information from FY 2017 as the basis for FY 2019/2020 projections. This is consistent with the data used to develop all other workload and cost projections represented in the fee schedule. The fees set in this final rule that affect CBP are only those forms that USCIS prescribes, but CBP shares for certain functions. DHS has determined that it is appropriate to set the fees for these forms at a level sufficient to ensure that both USCIS and CBP recover the estimated full cost of adjudication, including the cost of providing similar services at no charge to other immigrants. Therefore, DHS makes no changes in this final rule in response to the comment.

*Q. Paperwork Reduction Act (PRA) Comment Responses*

*Comment:* Multiple commenters noted that the increased requirements and additional evidence required for filing the Form I–912, Request for Fee Waiver should increase the time burden to applicants. This includes one commenter who noted that the submitted "Instructions for request for fee waiver" states that the form will take 1 hour and 10 minutes per response, but the currently approved form states it would take 2 hours and 20 minutes. The commenter said USCIS did not provide rationale on why the newly revised form would take half the time when it has not been simplified. A commenter stated

that the proposed changes to Form I–912 would present burdens to applicants with increased evidence requirements and repetitious and extraneous information collection. The commenter recommended that USCIS revert and retain the previous version of Form I–912.

*Response:* DHS agrees that it used an outdated burden estimate in the NPRM. In this final rule, DHS has updated the estimated time burden for Form I–912 from 1 hour and 10 minutes to the currently approved 2 hours and 20 minutes.

*Comment:* One commenter noted that using the Paperwork Reduction Act to introduce a revised fee waiver form, with new requirements, in October 2019 in lieu of using a NFRM and then eliminating fee waivers in this rule, was a waste of the public's time to review both documents. A few commenters stated that eligibility based on receipt of a means-tested benefit was due to be eliminated, but the case *City of Seattle,* a court placed a nation-wide injunction on that action, thereby affecting USCIS' plans to constrict eligibility standards for fee waivers. USCIS has already eliminated the means-tested benefit criteria for fee waivers, which drastically limited access to immigration benefits. The proposed rule narrows the criteria for fee waivers even further and eliminates the financial hardship criteria entirely which means 400,666 individuals annually, about the population of Tampa, FL, would be detrimentally impacted. Another commenter stated that the fee increases are an attempt to get around the currently enjoined 2019 fee waiver rules because it eliminates fee waivers for most applicants. The commenter stated that the proposal seeks to restrict legal immigration and naturalization for "poor and non-white people." Another commenter recommended that while the Form I–912 revision is enjoined by the U.S. District Court for the Northern District of California that USCIS request public comment on a new proposed Form I–912 that maintains options to demonstrate qualification through receipt of means-tested benefits, financial hardship, or income of up to 150 percent of the federal poverty level. The commenter wrote that USCIS is required by the injunction to restart the information collection request clearance process anew for a revised I–912 form that conforms to the Court's decision. The commenter wrote that because the version of the Form I–912 published as supporting material to USCIS's November 14, 2019 NPRM, for which comment periods with a cumulative total length of slightly more than 60

days are now ending, does not meet the Court's specifications, USCIS may not move forward with implementation of this revised I–912 based on the present notice-and-comment process."

*Response:* The comment refers to the effort by USCIS to revise the USCIS policy guidance on fee waivers. On September 28, 2018, USCIS published a 60-day notice in the **Federal Register** requesting comments on the revised Form I–912 and instructions and posted the documents for review in docket USCIS–2010–0008 at *www.regulations.gov.* 83 FR 49120 (Sept. 28, 2018). The revisions to the fee waiver form revised the evidence USCIS would consider in evaluating inability to pay, required federal income tax transcripts to demonstrate income, and required use of the Form I–912 for fee waiver requests. USCIS complied with the Paperwork Reduction Act and the Office of Information and Regulatory Affairs, OMB (OIRA) approved the form changes on October 24, 2019.[113] On October 25, 2019, USCIS published the revised Form I–912 and instructions, along with corresponding revisions to the USCIS Policy Manual and a Policy Alert. The revised form and manual took effect on December 2, 2019.

DHS did not consider this rulemaking's impact on that policy change because DHS was proposing comprehensive reforms to fee waivers which were not certain to occur, and the rulemaking was separate and independent of the October 25, 2019, form and policy change. USCIS was losing hundreds of millions of dollars each year to fee waivers and it decided not to wait for the comprehensive DHS fee rulemaking while it continued to "forgo increasing amounts of revenue as more fees are waived." 84 FR 26138 (June 5, 2019). Nonetheless, on December 11, 2019, the revised Form I–912 was preliminarily enjoined, nationwide, by the U.S. District Court for the Northern District of California. *See* Order Granting Pls.' Mot. for Nationwide Prelim. Inj., *City of Seattle* v. *DHS,* 3:19–cv–7151–MMC (N.D. Cal., Dec. 11, 2019). By stipulation of the parties and as agreed to by the court, that injunction will remain pending publication of this final rule. The injunction does not require that USCIS may only revise the Form I–912 in a way that conforms to the Court's decision. Nonetheless, while this final rule is not affected by *City of Seattle,* the decision in that case only requires that the October 25, 2019 fee waiver policy

[113] The approved package is available at *https:// www.reginfo.gov/public/do/PRAViewICR?ref_ nbr=201910-1615-006#* (last visited Feb. 17, 2020).

changes required notice and comment rulemaking to effectuate. DHS is conducting notice and comment rulemaking with this final rule and the *City of Seattle* injunction does not prevent USCIS from moving forward with implementation of the Form I–912 revision in accordance with this rulemaking.

*Comment:* Several commenters stated that the proposed rule also fails to comply with a federal agency's requirements under the Paperwork Reduction Act by failing to provide the public with a 60-day opportunity to comment on the collection of information under the proposal. One commenter states that "when proposed rule was initially published on November 14, 2019, it provided 60 days for the public to submit comments on draft forms and instructions. USCIS then posted no fewer than 145 such documents on *regulations.gov* for public review. Then, on December 9, 2019, published another proposed rule that reduced the period for public comments on draft forms and instructions to only 45 days. This clear breach of the Paperwork Reduction Act (PRA) leaves insufficient time for the public to adequately comment on the massive volume of form changes proposed by the agency. USCIS must therefore extend the comment period for PRA review by at least another 30 days." Another commenter stated that "while the extension notice of December 9, 2019 extends the public comment period, it simultaneously shortens it for the related forms, in violation of the Paperwork Reduction Act.[114] The extension notice states: DHS also notes and clarifies the comment period for the information collection requests (forms) that the proposed rule would revise in accordance with the Paperwork Reduction Act. The comment period for the NPRM will end on December 30, 2019, including comments on the forms DHS must submit to OMB for review and approval under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–12. The NPRM contained erroneous references to comments being accepted for 60 days from the publication date of the proposed rule. The commenter requests that the public comment period be open for 60 days.

*Response:* DHS regrets any erroneous references in the NPRM. Nevertheless, as the commenters have indicated, DHS published the proposed revisions to the information collection requirements for public comment for a cumulative period

of more than 60 days. Thus, DHS has complied with the public comment period requirements of 5 CFR 1320.11 for the information revisions associated with this rule.

*Comment:* A commenter wrote that the collection of a valid domestic address for named workers in a Form I–129 petition is duplicative given that USCIS conducts a background check for named beneficiaries listed on Form I–129. The commenter also wrote that USCIS "failed to articulate in its proposed rule why this new question is necessary."

*Response:* DHS disagrees with the comment that this question is duplicative. Providing a valid domestic address for the beneficiary helps USCIS to conduct the background check and otherwise ensure the integrity of the information provided on the Form I–129. In addition, USCIS will use a beneficiary's U.S. address to notify them if USCIS denies a request to change status or extend stay.

*Comment:* A commenter wrote that, "USCIS [should] adopt a timeline that allows for a sufficient grace period and does not conflict with high-volume filing seasons" when implementing the new forms and recommended a six-month grace period. The commenter wrote that USCIS should consider high-volume filing seasons, for which petitioners prepare months in advance, noting that "refusing to accept a prior version of a form during that time could cause undue burden on the public."

*Response:* DHS will not adopt the recommendation to provide a minimum six-month grace period before the new forms are mandatory for submission. DHS does not believe that requiring use of the new forms immediately will cause undue burden on the public. The proposed forms essentially incorporate the same information as the previous forms, but the new forms are shorter because they are focused on the specific nonimmigrant classification. In addition, DHS believes the public has had sufficient notice of the proposed forms. DHS first published the NPRM on November 14, 2019, subsequently extended the comment period on December 9, 2019, and the rule is not effective until 60-days after publication. USCIS will consider high-volume filing seasons when establishing the implementation process for these new forms.

*Comment:* A commenter wrote, "about the inclusion of E-Verify questions on each of the new [Forms I–129], even when participation in E-Verify is not mandated for participation in nonimmigrant program *(sic)*, as it could be used inappropriately to target

employers for enforcement action." The commenter recommended that USCIS either remove the E-Verify questions from forms where it is not mandated, or add language to the form instructions to say that ". . . these questions are optional and are not outcome determinative, such that if a petitioner leaves the information blank it will not result in a rejection." The commenter also pointed out a typographical error.

*Response:* USCIS does not accept the recommendation to remove E-Verify-related questions on Forms I–129 where participation is not mandated. Petitioners who choose not to participate in E-Verify are not required to enroll in the system; only those who are already enrolled will need to provide E-Verify information. Requiring the petitioner's name as listed in E-Verify, as well as their E-Verify Company Identification Number or Client Company Identification Number, if applicable, protects the interests of U.S. workers by preventing fraud and abuse of E-Verify and employment eligibility rules. Having this information on all of the I–129 versions maximizes E-Verify's reliability and integrity by confirming that certain categories of employees who are authorized for employment with a specific employer incident to status are working for the employer specified on the petition.

USCIS Form Instructions indicate that all questions should be answered fully and accurately. They also provide direction to write "N/A" or "None" when a question doesn't apply to the applicant, petitioner, requestor or beneficiary.

USCIS reviewed all of the new I–129 forms and corrected typographical errors related to the E-Verify questions.

*Comment:* A commenter pointed out that on Form I–129H1, ". . . in Part 2. Information about this Petition, question 1, Item 1D repeats Item #1C. It appears it should read 'Free Trade, Chile (H–1B1).'" The commenter also wrote that they recommended ". . . that Part 5. Basic Information About the Proposed Employment and Employer, questions 9 and 10 be struck as they ask for information that is beyond what is required for eligibility for H–1B status.

*Response:* USCIS has updated Form I–129H1, Part 1., Item Number 1, Item 1D. Regarding Part 5., Item Numbers 9 and 10, these questions relate to the "experience required for the position" and "special skills" for the position, both of which are relevant to determining if the wage level selected on the Labor Condition Application (LCA) corresponds to the position as described in the petition. Per 20 CFR 655.705(b), while the U.S. Department

---

[114] Paperwork Reduction Act of 1995, Public Law 104–13, §451(b), 110 Stat. 163 (1995) (codified at 44 U.S.C. 3501 *et seq.*)].

of Labor "administers the labor condition application process," the U.S. Department of Homeland Security (DHS) "determines whether the petition is supported by an LCA which corresponds with the petition."

Petitioner's responses to these questions provide USCIS with a more complete picture of the requirements for the proffered position. This may help to reduce RFEs on this topic, as USCIS officers will have additional information when initially adjudicating the case.

*Comment:* A commenter wrote that they appreciated that ". . . specific program requirements have been laid out in the instructions . . ." for the new Form I–129H2A and Form I–129H2B that ". . . will be helpful for newer employers, agents, and attorneys." The commenter objected, however, to the ". . . additional requirements for each program that have not been previously required that are either burdensome or too broad" and that USCIS could ascertain them ". . . through its own systems . . ." The commenter also indicated that, ". . . Part 6. Petitioner and Employer Obligations, question 14, which requires the H–2A petitioner and each employer to consent to "allow Government access" to the H–2A worksite is overly broad and goes beyond 8 CFR 214.2(h)(5)(vi) which only requires consent to "allow access to the site by DHS officers."

*Response:* The data collections included in Form I–129H2A and Form I–129H2B have a regulatory basis. While they might technically be ascertainable through USCIS systems, this would result in substantially greater operational burdens and, hence, greater expense being passed onto petitioners. It is also reasonable that petitioners should properly be on record whether the relevant requirements are met.

Regarding the Petitioner and Employer Obligations, Item Number 14, USCIS has changed the language to "DHS access."

*Comment:* A commenter wrote that the requirement on Form I–129H2B for the petitioner ". . . to provide evidence of why substitution is necessary and that the requested number of workers has not exceeded the number of workers on the approved temporary labor certification . . ." could be ". . . burdensome on the petitioner and delay processing." The commenter also suggested that Form I–129H2A and I–129H2B be reviewed for consistency, noting that helpful language about what evidence to provide appeared in one of these forms but not in the other.

*Response:* The H–2B Substitution regulation at 8 CFR 214.2(h)(6)(viii) states that to substitute beneficiaries

who were previously approved for consular processing but have not been admitted with aliens who are currently in the United States the petitioner shall file an amended petition with fees at the USCIS Service Center where the original petition was filed, with a statement explaining why the substitution is necessary and evidence that the number of beneficiaries will not exceed the number allocated or the approved temporary labor certification, such as employment records or other documentary evidence to establish that the number of visas sought in the amended petition were not already issued. Thus this requirement is clearly supported by the regulations.

USCIS has reviewed the forms for consistency and updated Form I–129H2B to include the appropriate note under Part 3., Item Number 24.

*Comment:* A commenter wrote that proposed Form I–129MISC ". . . would make applications for R nonimmigrant workers less efficient and more confusing." The commenter stated that, "The current version of the form is organized and follows a clear structure . . ." but that ". . . the proposed revised Form I–129 moves from one topic to another, not following a logical progression." The commenter also wrote that, ". . . certain questions are redundant and . . . broaden the scope of the question needlessly."

*Response:* The comment does not specify how the organization fails to follow the progression of the regulation. Notably, the new Form I–129MISC structure contains much of the eligibility information in the main petition. The R Supplement is limited to questions about the beneficiary's family, the relationship between the foreign and U.S. organizations, and the attestation, including attestation regarding secular employment, as required by R–1 regulations. 8 CFR 214.2(r)(8). Plus, petitioners no longer must search through lengthy instructions that do not apply to their petition.

*Comment:* One commenter wrote that on Form I–129MISC, "Part 1, Question #10 does not include an option to select "Not Applicable" if a Social Security number is not available."

*Response:* USCIS has added an "(as applicable)" parenthetical to the U.S. Social Security Number field on the form. Per USCIS Form Instructions, all questions should be answered fully and accurately. Any questions that do not pertain to the applicant, petitioner, requestor or beneficiary should be answered with "N/A" or "None," according to the instructions.

*Comment:* A commenter noted that, "Part 2, Question #3 requests that a

petitioner for amended status provide the receipt number of the petition they seek to amend. However, in Part 3, Question #17, the petitioner would have to enter the receipt number again. This is repetitive. There are several bases for classification in which a previous receipt number would be necessary for adjudication." The commenter ". . . recommend[ed] that USCIS consolidate and only request a receipt number once for any basis that would be applicable."

*Response:* On Form I–129MISC, Part 2 relates to information about the basis for the filing (new employment, continued employment, change of status, or amended petition), and, if an amended petition, asks for the receipt number of the petition being amended. Part 3, on the other hand, seeks information about the beneficiary, requesting the most recent petition or application number for the beneficiary. These requests are not necessarily duplicative as a previous receipt number does not always mean the filing is an amended petition. Eliminating the question about the receipt number of the petition to be amended in Part 2 would make matching the amended petition with the original petition more burdensome.

*Comment:* A commenter wrote that, "Part 4, Questions #9 and #10 ask if the beneficiary has ever been granted or denied the classification requested. The current version of the form limits the scope of these questions to the last 7 years. By removing the time limitation on this question, USCIS is requesting information that may be overly burdensome for petitioners and beneficiaries to provide, if the information has been lost over time. Information beyond 7 years is also unnecessary for USCIS' adjudication, as that time period would necessarily encompass enough time to demonstrate that a beneficiary who had spent the maximum 5 years in a previous R–1 status had spent the requisite one year outside the United States to be eligible for readmission."

*Response:* USCIS notes that P–1A individual athletes have a 10-year admission period when your account for their initial and extension period of stay while other P categories may have their period of stay extended in one-year increments. 8 CFR 214.2(p)(14). While the R–1 classification does have a 5-year limit, USCIS will count only time spent physically in the United States in valid R–1 status toward the 5-year maximum period of stay, and an R–1 may be able to "recapture" time when he or she has resided abroad and has been physically present outside the United States for the immediate prior year. 8 CFR

214.2(r)(6).[115] Thus the time the beneficiary may have been in R–1 status in the United States may be longer than the immediately preceding 7 years in some scenarios. USCIS does not believe the questions to be overly burdensome since we are not initially requiring supporting evidence.

*Comment:* A commenter pointed out a typographical error in Part 5., Question #6 of Form I–129MISC. "'If the answered 'No' . . .' should be 'If you answered 'No'.''

*Response:* USCIS has corrected this typographical error.

*Comment:* A commenter wrote that, "R–1 Classification Supplement Section 1, Question #18 has been revised to provide less context and detail for this request for information about secular employment. Specifically, the phrase '[i]f the position is not a religious vocation . . . has been removed, making the question much broader than the previous version. This broad question is more difficult for petitioners to answer and could result in answers that create more confusion for adjudicators."

*Response:* In the R–1 Classification Supplement, Section 1, Item Number 18, removal of the phrase "[i]f the position is not a religious vocation . . ." aligns the question to the relevant regulatory text. Specifically, the regulation at 8 CFR 214.2(r)(8)(xi) requires the prospective employer to attest "[t]hat the alien will not be engaged in secular employment," without regard to the type of religious worker position that the beneficiary will hold. As to the commenter's concern that the revised wording creates a "much broader" question that is more difficult to answer, we note that it remains a yes or no question, requiring further explanation only if the prospective employer answers "no" to the required statement.

*R. Statutory and Regulatory Responses*

1. General Comments on the Regulatory Impact Analysis

*Comment:* One commenter cited the APA and Supreme Court precedent, stating that the asylum fee is such a departure from prior policy that the agency must provide a "reasoned analysis for the change." The commenter wrote that the agency provided no evidence, analysis, or discussion to support its conclusions, and that under the APA and Executive Orders 12866 and 13563, USCIS failed

to identify and evaluate all potential economic and non-economic costs and ensure that those costs are outweighed by benefits and that the regulations impose the least burden to society. The commenter wrote that E.O. 12866 requires agencies to assess all costs and benefits and should select those approaches that maximize benefits (including potential economic, environment, public health and safety), and other disadvantages; distributive impacts, and equity.

*Response:* DHS has identified and evaluated potential economic and non-economic costs as summarized in table 7 of the Executive Orders 12866 and 13563 sections of this rule, table 1 of the Regulatory Impact Analysis, and in the Small Entity Analysis document. As stated in multiple places in this final rule, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. DHS is not changing USCIS fees with the intent to deter requests from low-income immigrants seeking family unity or deterring requests from any immigrants based on their financial or family situation. DHS will continue to explore efficiencies that improve USCIS services and may incorporate corresponding cost savings into future biennial fee reviews and rulemakings accordingly.

*Comment:* Multiple commenters generally stated that the RIA does not accurately analyze the impact of reduced economic activity generated by immigrants as a result of more arduous immigrant requirements under this rule. Some commenters requested that USCIS analyze whether reduced administrative costs as a result of increased fees would be offset by a reduction in the economic value generated by immigrants due to more costly fees. Similarly, a commenter wrote that the proposed rule does not account for the harm posed by increased naturalization fees such as reduced wages, broken families, and increased vulnerability to domestic violence.

*Response:* DHS notes that previous fee increases in 2007, 2010 and 2016 have had no discernible effect on the number of filings that USCIS received.[116]

DHS recognizes the contributions that naturalized citizens make to American society. However, USCIS must fund itself through fees. DHS does not have any data to establish that these fees, though required, are a significant impediment to naturalization or economic and social mobility. As stated in the proposed rule and elsewhere in this final rule, DHS performs a biennial

review of the fees collected by USCIS and may recommend changes to future fees. DHS reviewed research cited by commenters as evidence that the cost increases discussed in the rule would be a barrier to immigration and found no evidence to support the conclusion that the fee changes would have a quantifiable causal effect on wages, family cohesion or domestic violence. DHS declines to conduct further analysis on this issue or make changes in this final rule in response to this comment.

DHS recognizes the economic and societal value of nonimmigrants, immigration, and naturalization. DHS agrees that new citizens and naturalization are of tremendous economic and societal value and generally agrees with the points made by, and the studies cited by, commenters. DHS is not adjusting the USCIS fee schedule to impede, reduce, limit, or preclude naturalization and did not propose to adjust the USCIS fee schedule to reduce, limit, or preclude immigration in any way for any specific immigration benefit request, population, industry or group, including members of the working class.

DHS acknowledges that some individuals will need to save, borrow, or use a credit card in order to pay fees because they may not receive a fee waiver. DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply. However, DHS disagrees that the fees will result in the negative effects the commenters' suggested. DHS believes that immigration to the United States remains attractive to millions of individuals around the world and that its benefits continue to outweigh the costs noted by the commenters. DHS also does not believe that the NPRM is in any way discriminatory in its application and effect. DHS did not target any particular group or class of individuals. Therefore, DHS declines to make changes in this final rule in response to these comments.

*Comment:* A commenter wrote that the RIA does not consider the costs to the families and communities of asylum seekers who will need to help cover fees for indigent individuals.

*Response:* DHS did not consider the costs to the families and communities of asylum seekers, who will need assistance with fees for indigent individuals who are more likely to be asylum seekers. DHS expects that charging this fee will generate some revenue to offset adjudication costs but is not aligning with the beneficiary-pays

---

[115] *See* Procedures for Calculating the Maximum Period of Stay for R–1 Nonimmigrants, available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2012/March/R-1_Recapture_%20AFM_Update_3-8-12.pdf.*

[116] *See* RIA, Section M: Fee Waivers.

principle, as the estimated cost of adjudicating Form I–589 exceeds $50. DHS recognizes that these families and communities will have to find a way to pay, whether through their communities, friends, loans, or credit cards. DHS discusses the impact of the asylum fee and determines that some applicants may no longer apply for asylum in Section P, Charge a Fee for Form I–589 Application for Asylum and for Withholding, of the final RIA. DHS notes that some applicants would be able to find other means to pay for this application fee, such as borrowing money or using a credit card. DHS is not able to estimate the effect of the new $50 fee on asylum applicants who may not be able to afford the new fee and cannot accurately or reliably predict how many applicants would no longer apply for asylum as result of the $50 fee.

*Comment:* Multiple commenters wrote that USCIS failed to sufficiently analyze the price elasticity or price sensitivity of naturalization applications, and as a result total agency revenue could actually decrease due to reduced naturalization applications from higher fees under the proposed rule. One commenter cited research demonstrating that subsidizing naturalization fees for low income individuals increased applications by 41 percent. A commenter wrote that USCIS argues that the lack of a fee waiver will not affect the number of requests filed, however research shows that fee waiver standardization increased applications for low income immigrants. A commenter wrote that USCIS fails to produce an incremental analysis considering the difference in money flow between the original situation and the proposed changes.

*Response:* DHS acknowledges that one randomized control trial mentioned by the commenter observed a 41 percent increase in applications for naturalization amongst immigrants randomly selected to have their filing fees paid by an outside party. Commenters cited another study's findings that standardization of the fee waiver process, and incorporation of the FPG for determining eligibility resulted in the largest increases in naturalization rates for low-income immigrants. While DHS acknowledges immigrants facing financial challenges encounter added difficulty paying filing fees, these studies highlight the impact of removing fees entirely on many immigrants who would not have naturalized without full subsidization or waiver, thus these effects are not informative of price sensitivity in the context of this rule.

DHS has not omitted data describing the price sensitivity to fees, rather, the agency has no data describing the myriad complex and changing unobservable factors that may affect each immigrant's unique decision to file for a particular immigration benefit. DHS notes that previous fee increases in 2007, 2010 and 2016 have had no discernible effect on the number of filings that USCIS received.[117]

*Comment:* A commenter wrote that USCIS failed to present an accurate analysis of increased administrative processing costs under the proposed rule, wherein "hundreds of thousands" of means-tested applicants will begin submitting fee waiver requests under the household income basis.

*Response:* Based on the OIDP survey, as described in the RIA, approximately 16.36 percent of all fee waiver applications become ineligible by lowering the income criteria from 150 percent to 125 percent of the FPG. As a result, DHS estimates about 22,940 fewer fee waiver applications will be eligible for a fee waiver according to the approval eligibility criterion to limit fee waivers to households with income at or below 125 percent of FPG. *See* 8 CFR 106.3. Therefore, DHS disagrees that USCIS failed to present an accurate analysis of increased administrative processing costs under the proposed rule.

*Comment:* A commenter wrote that the RIA suggests that USCIS cannot reliably predict the number of asylum applicants who would be deterred by the proposed rule's $50 fee, but then argues it would be a smaller number without providing any data to back the claim.

*Response:* As stated in the NPRM RIA and in this Final Rule RIA (Section P), DHS agrees with the commenter that USCIS cannot reliably estimate the numbers of asylum applications who may not be able to afford the $50 fee for Form I–589. DHS does not believe that the new fee will deter asylum applications, and the commenter provides no data to support its claim that it will.

### 2. Methodology Issues

*Comment:* Some commenters had issue with the timelines used in the RIA. A commenter wrote that the proposed rule covers a 10-year implementation period, but USCIS' calculations do not show the impact of fees on workload over a 10 year period. A commenter wrote that the RIA uses receipts from June 2016 to May 2017 to make revenue projections for FY 2019/2020, however USCIS does not explain why this time frame is used or why it

doesn't align with the Federal government's fiscal quarters.

*Response:* The calculations in this rule's RIA estimate the annual amounts of each proposed change in Table 1. In further detail of each proposed change, transfers, costs, or cost savings are displayed in relation to the affected population. USCIS then shows the total costs over 10-years discounted at 3 percent and 7 percent (*see* RIA Section 2—Total Estimated Transfers and Costs of Regulatory Changes) as suggested by regulatory in guidance. *See* Circular A–4, (Sept. 17, 2003).[118] The preamble of this rule bases receipt and revenue projection data covering two years due to the biennial fee study. This study is repeated and analyzed every two years. However, USCIS does not choose to alter its fee schedule through regulation every two years. Therefore, the impacts in the RIA cover a longer timeline to estimate the perpetual impacts of this rule.

*Comment:* A commenter provided the following criticism of the methodologies and data used by USCIS in developing the RIA:

• USCIS estimates 1 hour and 10 minutes to complete Form I–912 when the actual OMB approved burden is 2 hours and 20 minutes.

• USCIS states that data on fee waiver requests were not available due to limitations, but the agency does not explain what their limitations are.

• USCIS used fee waiver data from lockbox facilities in October 2017 but does not report any data related to the surveys and provides no insight into why data for just one month was appropriate for cost projections.

*Response:* DHS agrees with the commenter that the time burden estimate utilized in the proposed rule was incorrect. For this final rule, USCIS has accounted for the new burden places on applicants as the current time burden for Form I–912 of 1 hour and 10 minutes to 2 hours and 20 minutes under this rule. The cost calculations for the final rule have been updated accordingly. DHS used data that was collected from a statistically valid random sample from October 2, 2017 to October 27, 2017 on approved fee waivers. Using a standard statistical formula based on the average annual fee waiver population, DHS determined that a random sample size of 384 applications was necessary to yield statistically significant results with a 95 percent confidence level and a 5 percent confidence interval. USCIS analyzed

---

[117] *See* RIA, Section M: Fee Waivers

[118] Available at: *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.* (Sept. 17, 2003) (last viewed April 2, 2020).