## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:24-cv-00762-CNS**

**SAMANTHA MOODY,**
**AMERICAN IMMIGRANT INVESTOR ALLIANCE,**
**and IT SERVICE ALLIANCE,**

      Plaintiffs,

v.

**ALEJANDRO MAYORKAS,** *in his official capacity as Secretary*,
United States Department of Homeland Security; and
**UR M. JADDOU,** *in her official capacity as Director*,
United States Citizenship and Immigration Services

      Defendants.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## AND BRIEF IN SUPPORT

---

i

## **TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………….………...ii

TABLE OF AUTHORITIES……………………………………………….…………….….iii

INTRODUCTION……………………………………………………….……...…………1

STATEMENT OF UNDISPUTED MATERIAL FACTS……………………………………...2

STATUTORY BACKGROUND……………………………………………………….……8

    A. Immigration Examination Fee Account…………...............………………….……………8

    B. THE EB-5 Investor Visa Program...........……………………………………...……...9

    C. THE REFORM AND INTEGRITY ACT OF 2022....………………………...…………10

PROCEDURAL HISTORY....………………………...….……………………................……11

STANDARD OF REVIEW...............................……………………………..………12

ARGUMENT...............................…………………................……...………14

    A. The Final Rule is Contrary to the Reform and Integrity Act of 2022 …...............…..14

    B. The Asylum Program Fee Is Arbitrary, Capricious, And Not In Accordance With Law............…………………..........................................................……………16

        i. USCIS Arbitrarily Used Employers' *Net Revenue* to Claim an Asylum Program Surcharge on Top of Fee Increases for the Adjudication of Benefits Would Have A Negligible Impact...........................................………........16

        ii. USCIS Arbitrarily Used Net Revenues to Determine Certain Petitioners had More Ability to Pay and Disproportionally Fund Asylum Adjudications.......17

    C. The Record Underlying the Final Rule's Reasoning is Insufficient, and USCIS' Rulemaking is Defective....................................................………........22

CONCLUSION..................................………….......................................…….......27

## <u>TABLE OF AUTHORITIES</u>

### <u>CASE LAW</u>

*Air Transp. Ass'n of Am. v. F.A.A.*,
    169 F.3d 1 (D.C. Cir. 1999)........................................................................................23

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014)..................................................................................23

*Am. Fed. of Gov't Emps. v. FLRA*,
    470 F.3d 375 (D.C. Cir. 2006) ...................................................................................14

*American Radio Relay League, Inc. v. Federal Communication Commission*,
    524 F.3d 227(D.C. Cir. 2008)…………………………….....................................24, 25

*Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*,
745 F.2d 677 (D.C.Cir.1984)…………………………………………….........................23

*Calloway v. Harvey*,
    590 F. Supp. 2d 29 (D.D.C. 2008)..............................................................................12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
    467 U.S. 837, 104 S. Ct. 2778 (1984).................................................................12, 13

*Civitas Capital Management LLC, et al. v. Mayorkas et al.*,
    3:24-cv-00984-L, ECF No. 20 at 9 (N.D. Tx., Sept. 16, 2024).......................................9

*Clifton Power Corp. v. FERC*,
    88 F.3d 1258 (1996)...................................................................................................20

*Da Costa v. Immigr. Inv. Program Off.*,
    80 F.4th 330 (D.C. Cir. 2023) .................................................................................6, 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120, 120 S. Ct. 1291 (2000) .......................................................................13

*Grayscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023).............................................................................16, 17

*High Country Conservation Advocates v. United States Forest Serv.*,
    951 F.3d 1217 (10th Cir. 2020) .................................................................................14

*IRS v. FLRA*,
    963 F.2d 429 (D.C.Cir.1992) ..........................................................................14

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .......................................................................................14

*Little v. Barreme*,
    6 U.S. (2 Cranch) 170, 2 L. Ed. 243 (1804) ..................................................14

*Loper Bright Enterprises v. Raimondo*
    144 S. Ct. 2244 (2024) .............................................................................12, 13

*Lyons v. USCIS*,
    2023 WL 144879 (S.D.N.Y. Jan. 10, 2023) .....................................................5

*Morrison v. Olson*,
    487 U.S. 654 (1988) .......................................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983) .........................................................12, 16

*New Mexico Health Connections v. United States Dep't of Health & Human Servs.*,
    946 F.3d 1138 (10th Cir. 2019) .....................................................................11

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
    248 F.3d 1277 (10th Cir. 2001) .....................................................................12

*N.M. ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) .......................................................................22

*Skidmore v. Swift & Co.*,
    323 U. S. 134, 65 S. Ct. 161 (1944) ..............................................................13

*W. Virginia v. Env't Prot. Agency*
    142 S. Ct. 2587 (2022) ..................................................................................13

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................................................15

*Wyandotte Nation v. Nat'l Indian Gaming Comm'n*,
    437 F. Supp. 2d 1193 (D. Kans. 2006) ..........................................................16

## FEDERAL LAW

5 U.S.C. § 553 ...............................................................................2, 22, 23

5 U.S.C. § 705....................................................................................................1

5 U.S.C. § 706(2)............................................................................................2, 12

6 U.S.C. § 251.................................................................................................25

6 U.S.C. § 291(b)........................................................................................22, 26

8 U.S.C. § 1153(b)(5) ...................................................................................9, 14

8 U.S.C §1186b...........................................................................................3, 5

8 U.S.C. § 1356(m).................................................................................2, 8, 22

31 U.S.C. § 902..............................................................................................2, 3

*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 199, Department of Commerce Appropriations Act, 1991,*
    Pub. L. No. 101-515 (Nov. 5, 1990)..............................................................8

*Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993,*
    Pub. L. No. 102-395 (1992)........................................................................9

*EB-5 Reform and Integrity Act of 2022* ("RIA"),
    Pub. L. No. 117-303, 136 Stat. 49 (Mar. 15, 2022)............................................1, *passim*

*Immigration Act of 1990,*
    Pub. L. No. 101-649, § 121(b)(5), 104 Stat. 4978..........................................9

*Homeland Security Act of 2002*
Pub. L. 107-296 (November 25, 2002)............................................22, 24, 25, 26

## FEDERAL REGULATIONS

8 C.F.R. § 106.1(f) ........................................................................................8

8 C.F.R. § 106.2(c)(13) ..................................................................................8

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ....................................................................................12

## **FEDERAL REGISTER**

69 Fed. Reg. 5088 (2004)...............................................................4

72 Fed. Reg. 4890 (2007)...............................................................4

75 Fed. Reg. 33448 (2010)..............................................................4

81 Fed. Reg. 26904 *et. seq.* (May 4, 2016)........................................4

81 Fed. Reg. 73311.......................................................................5

81 Fed. Reg. 73292 (Oct. 24, 2016)..................................................5

85 Fed. Reg. 46788 (Aug. 3, 2020)...................................................5

85 Fed. Reg. 46854 (Aug. 3, 2020)...................................................5

88 Fed. Reg. 402 *et. seq.* (Jan. 4, 2023).......................................1, 3

88 Fed. Reg. 404.........................................................................23

88 Fed. Reg. at 417......................................................................25

88 Fed. Reg. at 420...................................................................6, 7

88 Fed. Reg. at 557.......................................................................6

89 Fed. Reg. 6194 *et. seq.* (Jan. 31, 2024)..........................1, *passim*

89 Fed. Reg. at 6212....................................................................15

89 Fed. Reg. at 6239......................................................................7

89 Fed. Reg. at 6246....................................................................17

89 Fed. Reg. at 6332................................................................18, 19

89 Fed. Reg. at 6334....................................................................18

89 Fed. Reg. at 6357-58...............................................................21

89 Fed. Reg. at 6361....................................................................17

89 Fed. Reg. at 6363-65.............................................................................7, *passim*

89 Fed. Reg. at 6285-87.......................................................…......2, *passim*

89 Fed. Reg. 20101 (Mar. 21, 2024)...........................................…........1

## ADMINISTRATIVE POLICIES

*EB-5 Immigrant Investor Process,* U.S. Citizenship and Immigration Services, https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-process.................... 9

*Form I- 956F, Application for Approval of an Investment in a Commercial Enterprise, U.S. Citizenship and Immigration Services,* https://www.uscis.gov/i-956f.....................10

*USCIS,* Policy Manual, vol. 6, pt. E, Ch. 4, https://www.uscis.gov/policy-manual/volume-6-part-e-chapter-4..........................................................................19

## **INTRODUCTION**

By and through counsel, Plaintiffs submit the following motion for summary judgment and brief pursuant to the case management plan. ECF 20, 21.  This Court should exercise its authority under the Administrative Procedure Act ("APA"), to set aside the Final Rule that changed the fees United States Citizenship and Immigration Services ("USCIS") charges to applicants for immigration benefits. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected,* 89 Fed. Reg. 20101 (Mar. 21, 2024) ("Final Rule"); AR 616-1397.[1] The Final Rule became effective on April 1, 2024. AR 616.

The Final Rule should be set aside for at least three reasons:

**First**, the Final Rule arbitrarily, capriciously and unlawfully imposes fees in violation of *The EB-5 Reform and Integrity Act of 2022*, Pub. L. No. 117-303, 136 Stat. 49 (Mar. 15, 2022) ("RIA"). ECF 1 at ¶ 7, 81-96, 176; 5 U.S.C. § 705. In the RIA, Congress required DHS to complete a fee study on or before March 15, 2023, and then correlate the new fees for EB-5 related petitions and applications to processing times for the adjudication of such petitions and applications (referred to herein as "performance-based fees"). RIA § 106(a), (b). Congress also directed USCIS to adjust the fees it charges to "achieve efficient processing" within 60 days of the fee study. *Id.* Defendants, Alejandro Mayorkas, in his official capacity as Secretary of the Department of Homeland Security ("DHS"), and Ur M. Jaddou, in her official capacity as USCIS Director, admit that the

---

[1] The Notice of Proposed Rulemaking ("NPRM") is found at U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402 et. seq. (Jan. 4, 2023); AR 1-202.

performance-based fee study, due March 15, 2023, was not done in accordance with the RIA. 89 Fed. Reg. at 6286-87. As of the date of filing this opening statement, it still has not been done. The Final Rule is contrary to law and procedure. 5 U.S.C. § 706(2).

**Second**, the Final Rule instituted an Asylum Program Fee on certain petitioners based on inconsistent models to assess petitioners' "ability to pay." Defendants arbitrarily used revenues of businesses to impose the new Asylum Program Fee and net income to reduce or waive fees altogether. The different calculations used to test an "ability to pay" fees for immigration benefits is arbitrary and capricious. 5 U.S.C. § 706(2).

**Third**, Defendants provided incomplete and misinformation that did not satisfy the requirement to provide adequate public notice and an opportunity for public comment. 5 U.S.C. § 553.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      USCIS is entirely funded by fees. AR 9805, 9811-9815.

2.      Congress authorized DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of  the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m); AR 9819

3.      Further, 31 U.S.C. § 902 requires the Chief Financial Officer of each agency to  "review, on a biennial basis, the fees . . . imposed by the agency for services . . . it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services." 31 U.S.C. § 902(a)(8).

4.      USCIS reviewed its fees for the FY 2022/2023 biennial period and claimed

2

that its fees did not cover the full costs of services provided, in part because "[m]ost of the fees [had] not changed since 2016 despite increased costs of federal salaries and inflation costs for other goods and services." Final Rule, 89 Fed. Reg. at 6,195; AR 617.

*5.* in January 2023, USCIS issued a proposed rule to adjust fees for most of its immigration request forms, such as employment-based visa petitions. *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 88 Fed. Reg. 402. (Jan. 4, 2023); AR 1-202.

6. After the notice-and-comment period, USCIS issued the Final Rule on January 31, 2024, with an effective date of April 1, 2024. Final Rule, 89 Fed. Reg. 6,194; AR 616-823.

7. Plaintiff Samantha Moody is a citizen of Canada but resides in Telluride, Colorado. **Exhibit A, Declaration of Samantha Moody** at ¶1.

8. She is an EB-5 investor and holds conditional permanent residency. Id.

9. Pursuant to the terms of 8 U.S.C §1186b(d)(2)(B), Plaintiff Moody must file a Form I-829 within 90 days of the expiration of her conditional status on February 20, 2026.

10. Plaintiff IT Service Alliance (ITServe) is the nation's largest trade group representing small- and medium-sized information-technology companies. **Exhibit B, ITServe Comment for Proposed Rule** at 2.

11. Plaintiff ITServe has over 2,200 member companies and 21 chapters spread around the country.

12. ITServe's members rely on the H-1B visa to fill shortages of highly skilled workers in the IT sector of the economy.

13.    Plaintiff American Immigrant Investor Alliance (AIIA), founded in April 2021, is a Washington D.C.-based 501(c)(4) non-profit to inform, educate, and advocate on behalf of all EB-5 investors from around the world. **Exhibit C, Declaration of Ishaan Khanna** at ¶ 8, *see also* **Exhibit E, AIIA Comment for Proposed Rule.**

14.    Prior to the Final Rule, USCIS had never charged a surcharge to fund the adjudication of asylum, nor made a select group pay a surcharge or extra fee. 69 Fed. Reg. 5088 (2004); 72 Fed. Reg. 4890 (2007); 75 Fed. Reg. 33448 (2010).

15.    For the 2016 Final Rule, DHS explicitly stated that "fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions, as well as providing similar benefits to asylum and refugee applicants and certain other immigrants at no charge." 81 Fed. Reg. 26,904, 26,908 (May 4, 2016).

16.    The Final Rule charges more for visa categories used by businesses and investors because USCIS has determined they have a greater ability to pay and ability to subsidize other categories. The table below shows the change in fees under the Final Rule:

| Form | Current Fee | Final Rule New Fee | Percentage of Increase |
|---|---|---|---|
| I-965G Regional Center Annual Statement | $3,035 | $4,470 | 47% |
| I-956 Regional Center Designation Application | $17,795 | $47,695 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | 168% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | 154% |

| I-526/I-526E Immigrant Petition by Standalone/Regional Center Investor | $3,675 | $11,160 | 204% |
|---|---|---|---|

89 Fed. Reg. at 6198-6205 (Table 1); AR 620-624.

17. EB-5 related applications and petitions already were some of, if not the, highest fees across USCIS' entire product lines. *Id*.

18. However, through the Final Rule, USCIS raised them even higher. *Id*.

19. In 2016, the Agency expressed its commitment to "improving operational efficiencies while enhancing predictability and transparency in the adjudication process" by raising Form I-526 fees to $3,675 from the prior $1,500. 81 Fed. Reg. 73292, 73311.

20. Since at least 2012, USCIS stated publicly that its goal for I-526 adjudications was six months or less. *See Lyons v. USCIS, No. 21-CV-3661 (JGK),* 2023 WL 144879, at *3 (S.D.N.Y. Jan. 10, 2023).

21. Further, USCIS' statutory deadline and, therefore, obligated goal for I-829 processing was, and still is, 90 days. 85 Fed. Reg. 46788, 46854 (Aug. 3, 2020); 8 U.S.C. § 1186b(d)(3).

22. In June 2021, Congress let the EB-5 Regional Center Program – which had been subject to legislative extensions since its inception – expire.[2]

23. It remained dormant for approximately nine months and many stakeholders (including Plaintiff AIIA) took part in lobbying and negotiations to resuscitate the program. ECF 9-3; RIA § 106.

---

[2] *See EB-5 program reauthorization failed in Senate with one vote short,* eb5investors.com, June 24, 2021, *available at* https://www.eb5investors.com/blog/eb5-visa-reauthorization-failed/ (*last accessed* Oct. 9, 2024).

24.    Congress required USCIS to fix its abysmal processing times. RIA § 106(a),(b) (requiring a performance-based fee study to be completed "[n]ot later than 1 year after the date of the enactment of this Act."); AR 19.

25.    The RIA was the first major immigration legislation to be passed in a decade, and the history of the Act shows the seriousness and intent of Congress to reign in the agency's ballooning processing times. *See, e.g., Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 344 (D.C. Cir. 2023) (discussing "troubling backlog of petitions waiting for USCIS adjudication" and USCIS' "increasingly sluggish pace of adjudication"); AR 19.

26.    Approximately one year elapsed between the passage of the RIA (March 15, 2022) and publication of the Notice of Proposed Rulemaking on January 4, 2023. 88 Fed. Reg. at 420; AR 19.

27.    USCIS had not completed the fee study as Congress directed. *Id*.

28.    In the Proposed Rule giving rise to the Final Rule, DHS admitted that it had not complied with the performance-based fee study required by the RIA. 88 Fed. Reg. at 420; AR 19.

29.    DHS stated:

> [D]espite the changes in the law and program, DHS has proposed fees in this rule based on the currently projected staffing needs to meet the adjudicative and administrative burden of the Immigrant Investor Program Office pending the fee study required by section 106(a) of the EB-5 Reform and Integrity Act of 2022.

88 Fed. Reg. at 557; AR 156.

30.    To date, USCIS has yet to publish Form I- 526E processing times, indicating it does not know the quantum of resources needed to clear the existing case load. DHS "propose[d] new fees for the EB-5 program forms in this rule using the full cost recovery

model . . .that we have used to calculate those fees since the program's inception and not the fee study parameters and processing time frames required by the EB-5 Reform and Integrity Act of 2022." 88 Fed. Reg. at 420; AR 19.

31.    The Agency did not consider the Congressionally mandated processing time to fee analysis. 89 Fed. Reg. at 6239; AR 661.

32.    DHS stated:

> The EB-5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB-5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and complete the adjudications within certain time frames. *See* Public Law 117-103, sec. 106(b). DHS has begun the fee study required by the EB-5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages.

*Id.*; *see also* 89 Fed. Reg. at 6286-87; AR 708-09.

33.    In the Final Rule, DHS deviated from prior policy and imposed a new surcharge it deemed the "Asylum Program Fee." 89 Fed. Reg. at 6198; AR 630, 9809.

34.    The Asylum Program Fee imposes a surcharge for petitioners for employment-based immigration benefits that range between $300 to $600 per benefit request that will allegedly be used to fund the adjudication of DHS's asylum program. 89 Fed. Reg. 6195-96, 6208, 6363; AR 617-18, 630, 9809.

35.    This surcharge was enacted on top of increases ranging from 145% to over 300% for immigration benefits filed by employers with over 25 employees. *Id.*; *see* 89 Fed. Reg. at 6198-6204; AR 620-24.

36.    In the Final Rule, DHS lowered the Asylum Program Fee from $600 to $300

for small employers (defined as those having 25 or fewer full-time equivalent employees) filing Form I-129. *Id*.

37.     As finalized, "[t]he [Asylum Program] fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE employees); and $600 for all other filers of Forms I-129 and I-140." 89 Fed. Reg at 6195-96 (*citing* 8 C.F.R. § 106.1(f) and 106.2(c)(13); AR 617-618.

38.     DHS "determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners *who have more ability to pay*, as opposed to shifting those costs to all other fee payers." 89 Fed. Reg. at 6208 (emphasis added); AR 630.

<u>**STATUTORY BACKGROUND**</u>

**A.  Immigration Examinations Fee Account**

By statute, fees charged to petitioners "may be set at a level that will ensure recovery of the full cost of providing all such services, including the cost of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m). The fees remain in an Immigration Examinations Fee Account ("IEFA"). 8 U.S.C. § 1356(m). "Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge." *See* Pub. L. No. 101-515, § 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990).

**B. The EB-5 Investor Visa Program**

The employment-based, fifth preference immigrant visa ("EB-5") was first created in 1990 as "an employment-based visa program for noncitizens who invest in a job-creating enterprise." *See Da Costa at* 334 (citing Immigration Act of 1990, Pub. L. No. 101-649 § 121(b)(5), 104 Stat. 4978, 4989 (codified at 8 U.S.C. § 1153(b)(5)). It was

8

originally based on the direct employment of U.S. workers, but two years later, Congress created an additional path: "Under the Regional Center Program, EB-5 petitioners 'pool[ ] their investments with 1 or more qualified immigrants' into 'a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth, including prospective job creation and increased domestic capital investment.'" *Da Costa*, 80 F.4th 330 at 335 *(citing Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993,* Pub. L. No. 102-395, § 610, 106 Stat. 1828, 1874-75 (1992); 8 U.S.C. § 1153(b)(5)(E)(i)). This accordingly allowed for the larger aggregation of immigrant capital, as well as introducing U.S.-based stakeholders (i.e., Regional Centers and their operators) into the EB-5 ecosystem.[3]

For immigrant investors, EB-5 immigration is a three-step process: 1) the filing of a preference petition (Form I-526 or Form I-526E), (2) the acquisition of two-year conditional residency by securing an immigrant visa abroad with the Department of State or adjusting status with USCIS, and (3) the removal of conditions of residency through the filing of Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status.[4] For business entities to become designated by Regional Centers, they must file Form I-956, Application for Regional Center Designation. In order for designated Regional Centers to be able to offer qualifying job-creating projects to potential investors,

---

[3] *See Civitas Capital Management LLC, et al. v. Mayorkas et al.,* 3:24-cv-00984-L, ECF No. 20 at 9 (N.D. Tx., Sept. 16, 2024).
[4] *See, e.g., EB-5 Immigrant Investor Process,* U.S. Citizenship and Immigration Services, available at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-immigrant-investor-process(last accessed Oct. 9, 2024).

they must file Form I-956F, Application for Approval of an Investment in a Commercial Enterprise.[5]

### C. The Reform and Integrity Act of 2022

Relevant to the instant Motion, in the RIA, Congress required DHS to complete a fee study by March 15, 2023 and correlate new fees for EB-5 related petitions and applications to achieve efficient processing times. RIA § 106(a), (b). Congress required USCIS to utilize the "fee study" to set new fees for services provided under the EB-5 program "at a level sufficient to ensure the full recovery <u>only</u> of the costs of providing such services, including the cost of attaining the goal of completing adjudications, on average, not later than" 90 to 240 days, depending on the nature of the petition. *Id.* at § 106(b) (emphasis added). Specifically, Congress instructed USCIS to set the Forms I-526/I-526E fees to cover "the cost of completing adjudications, on average, not later than . . . 240 days after receiving a petition." RIA at § 106(b)(4).

### <u>PROCEDURAL HISTORY</u>

On March 19, 2024, Plaintiffs filed a three-count Complaint challenging aspects of the Final Rule. ECF 1. In the Final Rule, USCIS modified the fees charged for the adjudication of immigration benefits and a created a new "Asylum Program Fee" for certain employers and self-petitioners for employment-based benefits. AR 620-626. Plaintiffs Moody and AIIA moved to preliminary enjoin the rule because the new fees for

---

[5] *See, e.g., Form I- 956F, Application for Approval of an Investment in a Commercial Enterprise, U.S. Citizenship and Immigration Services, available at https://www.uscis.gov/i-956f (last accessed* Oct. 9, 2024); *see also* RIA § 103(b)(1) for additional form filings required for Regional Center employee background checks and annual certification, among others.

immigrant investors plainly violated the RIA, which required USCIS to conduct a fee study and set fees thereafter to ensure certain processing times for adjudication of benefits. ECF 11.

On March 29, 2024, the Court denied Plaintiffs' motion to enjoin the Final Rule and USCIS implemented the new fee schedule and Asylum Program Fee as of April 1, 2024. ECF 17. The Court concluded Plaintiffs had not established that Plaintiffs Moody or AIIA would suffer irreparable harm absent relief or that the balance of hardships weighed against stopping the Final Rule from becoming effective. ECF 17 at 6-11.

On May 24, 2024, Defendants filed an Answer. ECF 19. The parties subsequently proposed a case management plan for the production of the administrative record and final disposition of this case through motions for summary judgment, which this Court granted. ECF 20, 21.

## STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(a) if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." D.C. COLO. LCivR 56.1(a); CIV Practice Standard 7.1D. Summary judgment is the mechanism courts typically take to resolve cases arising under the APA. *See New Mexico Health Connections v. United States Dep't of Health & Human Servs*., 946 F.3d 1138, 1161 (10th Cir. 2019) ("[t]he court employs summary judgment to 'decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review") (*quoting Calloway v. Harvey*, 590 F. Supp. 2d 29, 36 (D.D.C. 2008)).

Under the APA, courts must set aside agency action if it "fails to meet statutory,

procedural or constitutional requirements, or . . . is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001) (quotation omitted); 5 U.S.C. § 706(2). Agency action is arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856 (1983). Courts "will uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned," but will not "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quotations omitted).

With regard to matters of statutory interpretation, the Supreme Court recently overturned *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S. Ct. 2778 (1984). *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266-67 (2024). For the preceding forty years, Courts applied a two-step framework when considering an agency's interpretation of law. Under the first step, courts looked at whether the language of the statute was plain or ambiguous. *Chevron*, 467 U.S. at 842-43. If the language was plain, the language of the statute controlled. *Id*. If the statute were ambiguous, courts would defer to the interpretations of the agency so long as the interpretations were reasonable. *Id.; but see W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (specifically rejecting "'expansive construction of the statute' [when] 'Congress could not have intended to delegate' such a sweeping and consequential

authority 'in so cryptic a fashion.'") (*quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160, 120 S. Ct. 1291 (2000) (describing and applying the Major Question Doctrine as an exception to *Chevron*).

The Supreme Court overturned *Chevron* deference. *Loper Bright*, 144 S. Ct. at 2273. In *Loper Bright*, Chief Justice Roberts, writing for the 6-3 majority, held "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id*. While the Court may look to agency interpretations for guidance, there is no mandatory deference afforded to the agency. *Id*. A non-mandatory form of "*Skidmore* deference" is the appropriate standard to evaluate agency regulations after *Loper Bright*. *Id.* at 2267. In *Skidmore v. Swift & Co.*, 323 U. S. 134, 140, 65 S. Ct. 161 (1944), the Court explained "[t]he weight of such a judgment in a particular case," would "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

## ARGUMENT

### A. The Final Rule is Contrary to the Reform and Integrity Act of 2022

The Final Rule is contrary to law and procedure as Defendants set EB-5 fees without complying with the *Reform and Integrity Act of 2022*. The Executive has a duty to faithfully execute the laws. See U.S. Const. art. II, § 3. *Little v. Barreme,* 6 U.S. (2 Cranch) 170, 177-78, 2 L. Ed. 243 (1804) (stating that, because the President has the "high duty . . . to 'take care that the laws be faithfully executed,'" he must enforce a law in accordance with congressional commands where Congress has "prescribed . . . the manner in which [the] law shall be carried into execution"); *see Morrison v. Olson, 487* U.S. 654, 689-90

(1988) ("The analysis contained in our removal cases is designed . . . to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."). In accordance with this duty, "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

The Final Rule unlawfully imposes increased fees for EB-5 investors and Regional Center applicants. AR 620-26. In the RIA, Congress directed that "[n]ot later than 1 year after the date of the enactment of this Act, the Director of U.S. Citizenship and Immigration Services shall complete a study of fees charged in the administration of the program described in sections 203(b)(5) and 216A of the Immigration and Nationality Act (8 U.S.C. 1153(b)(5) and 1186b)." RIA § 106(a), 136 STAT. 1103-1104. When Congress requires an agency to perform a particular analysis, a failure to do so is arbitrary and capricious. *High Country Conservation Advocates v. United States Forest Serv.*, 951 F.3d 1217, 1227 (10th Cir. 2020) (noting that the NEPA required a particular analysis and completion of an agency action was arbitrary and capricious because the agency failed to perform the analysis). Congress intended fees to be set based on the fee study due on or before March 15, 2023. Defendants acted contrary to law and changed the EB-5 related fees without completing the mandatory fee study and relating the fees to the congressionally mandated timetables for decisions on investor applications and petitions for benefits. RIA § 106(a), (b*); see Am. Fed. of Gov't Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is 'illogical on its own terms,' the [action]

14

is arbitrary and capricious.") (*quoting IRS v. FLRA*, 963 F.2d 429, 439 (D.C.Cir.1992)).

Comments to the proposed rule identified that DHS must complete the fee study prior to resetting fees. 89 Fed. Reg. at 6286; AR 707. DHS admitted that it ignored the RIA's deadline for the fee study but claims Congress did not intend for the performance-based study to be a condition precedent to increasing EB-5 fees. 89 Fed. Reg. at 6287; AR 708. The fees are now structured to expropriate fees from investment-based petitioners and EB-5 Filers by allocating increases to fees well in excess of the 26.37% increase (or lower) applied for other categories of immigration benefit petitions and applications. 89 Fed. Reg. at 6212; AR 634. For immigrant investors, fees have risen 100% or more. *Id.*; AR 620-26. The agency's claim that Congress permitted it to repeatedly raise fees without conducting the performance-based fee study is contradicted by the plain language of RIA § 106 (a), (b), and (c). Notably, subsection (c) limits the agency's discretion to raise fees in excess of those that were to be set by subsections (a) and (b). The fees for investors and Regional Centers in the Final Rule violate the RIA and Defendants lack discretion to ignore the statutory requirement to complete a fee study completed by March 15, 2023, with fees then tied to performance. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) ("The [agency] may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."); *Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d 1193, 1206 (D. Kans. 2006) (invalidating an agency regulation that effectively nullified a section of the statute). Accordingly, the Final Rule should be set aside because it has set fees for EB-5 investors without using the statutory processing time to fee analysis. *See State Farm,* 463 U.S. at 43.

15

**B. The Asylum Program Fee Is Arbitrary, Capricious, And Not In Accordance With Law**

**i. USCIS Arbitrarily Used Employers' *Net Revenue* to Claim an Asylum Program Surcharge on Top of Fee Increases for the Adjudication of Benefits Would Have A Negligible Impact**

The Final Rule violates "a fundamental principle of administrative law that agencies must treat like cases alike." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023). In the Final Rule, DHS uses net income to assess certain petitioners' ability to pay fees for immigration benefits, but uses net revenues to assess the ability of selected petitioners to pay the newly created Asylum Program Fee. The two different economic calculations provide arbitrary and capricious calculations for the "ability to pay" for immigration benefits. In particular, DHS uses "income" or "net income" to justify decreases or waivers of fees, but DHS uses "net revenues" or "sales revenues" to justify increases and the Asylum Program Fee. The use of two different calculations represents the quintessence of arbitrary and capricious decision-making.

**ii. USCIS Arbitrarily Used Net Revenues to Determine Certain Petitioners had More Ability to Pay and Disproportionally Fund Asylum Adjudications**

To arrive at the surcharge rates and increased fees for benefit adjudications, USCIS arbitrarily switched between "net income" to "sales revenues" or "net revenues" when deciding which petitioners were able to fund the adjudications of asylum applicants. 89 Fed. Reg. at 6198-6204; AR 62-26. DHS did not treat like cases alike and did not evaluate the income of small entities and petitioners when increasing fees and imposing the Asylum Program Fee. AR 783-84. The disparate treatment of petitioners for immigration benefits is the hallmark of arbitrary decision making. *Grayscale*, 82 F.4th at 1242. The arbitrary and capricious use of two different economic calculations manipulated

16

the stated purpose of the rule, which was to strike a balance using both beneficiary-pays and ability-to-pay principles. 89 Fed. Reg. at 6246; AR 668. "Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay." *Id*. The beneficiary-pays model calculates fees on the cost to adjudicate a benefit for the one seeking it. *Id*. While DHS purported to use a blended "beneficiary-pays" and "ability-to-pay" methodology, the devil is in the details: DHS used *net or low income* to justify a waiver or exclusion of fees and *sales revenues* or *assumed wealth* for doubling or trebling fees for petitioners and small businesses, including members of ITServe. AR 783-87.

The Small Entity Analysis contained within the Final Rule demonstrates the arbitrariness of the fee increases on small employers with over 25 or more employees. AR 783-87; *see also* AR 1187-1397. Table 12a and 12b of the Final Rule set forth DHS's breakdown of how many entities will be responsible for the Asylum Program Fee and in what amounts. 89 Fed. Reg. at 6361-62; AR 783-84. Table 13 provided, *inter alia*, the upward rise in costs due to the final fee increases ranging from a 145.7% increase at the low end to 331.5% increase at the highest end. 89 Fed. Reg. at 6363; AR 785. "To calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported *sales revenue* of that entity." [6] *Id*. "DHS is increasing the fees for Forms I–129, I–140 and H–1B Registration from their current amounts in this rule and establishing an Asylum Program Fee, while providing

_____

[6]  DHS used the same revenue-based model to set the fees and calculate the impact to employers with less than 25 employees. 89 Fed. Reg. at 6363-65, Tables 15, 16a, & 16b.

discounts for small employers and nonprofits. DHS declines to base the fees on the salary of the beneficiary because doing so would be very difficult to administer." 89 Fed. Reg. at 6334; AR 756. DHS used the sales revenue to demonstrate the proposed fee increases and Asylum Program fee would have a negligible impact on the *revenues* to the small entities. 89 Fed. Reg. at 6363-64 (Table 14a); AR 785-87.

DHS did not explain why net income was considered the best measure to calculate "ability to pay," but chose net revenues or salary to justify the rate of the Asylum Program Fee of employers or a self-petitioner. At the very least, the choice was not rationally explained to the public. Throughout the fee rule, DHS explained the importance of using a petitioner's income to set fees. 89 Fed. Reg. 6332, 6243; AR 754, 665 (DHS is aware of the potential impact of fee increases on low income and economically disadvantaged individuals and is sympathetic to these concerns."). DHS's used "income" or "net income" when justifying decreases or waivers is a rational basis to calculate a petitioner's ability or inability to pay. *Id*. The calculation of the Asylum Program Fee on top of fee increases using small entities' *net revenue* projections and not *net income* was arbitrary, speculative, and produced misleading calculations of small employers' and self-petitioners' ability to pay.

Using "net revenue" or "sales revenue" rather than "net income" or "net assets," went against established DHS and USCIS practices, as well as common sense. Net revenue does not account for the operating and necessary day-to-day expenditures of a small entity, including the "Cost of Goods Sold," operating expenses, depreciation and amortization costs, or interest or taxes paid. These costs can be extraordinary, variant, and make an exceptional impact on an entity's ability to pay increased fees. Put a

separate way, just as a household may earn high wages and have little savings after their paying their cost-of-living expenses, a business may have high sales revenues with little net income after operating expenses. USCIS understood and used net income has the proper barometer for petitioners' ability to pay. 89 Fed. Reg. 6332, 6243; AR 754, 665.

USCIS's choice to depart from its policy and base an entity's ability to pay using "net revenue" inexplicably differs from other USCIS use of "ability-to-pay" calculations. For example, when determining the ability to pay the proffered wage of employers filing Form I-140, the factors in determining ability to pay only include "net income" and "net assets."[7] Yet, when assessing the impact of the filing fee increases on employers filing Form I-140, DHS instead calculated the impact on "net revenue" to measure a petitioner's "ability to pay." The use of two different calculations, which measure fundamentally different things, is arbitrary and USCIS promulgated an unexplained, irrational, and misleading determination of a petitioner's "ability to pay" for an Asylum Program Fee. 89 Fed. Reg. at 6363-64; AR 785-87.

Federal courts have recognized the material differences between the use of revenues and income when determining the financial health of a company. In *Clifton Power Corp. v. FERC*, the Court concluded that it was arbitrary and capricious for the Federal Energy Regulatory Commission to consider "gross revenues only" when determining "the plaintiff's ability to pay fines." 88 F.3d 1258, 1268 (1996). Here, USCIS similarly made an arbitrary choice to rely on "net revenue" or "sales revenue" only when calculating an entity's ability to pay an Asylum Program Fee in addition to fees for

---

[7] *See USCIS,* Policy Manual, vol. 6, pt. E, Ch. 4, https://www.uscis.gov/policy-manual/volume-6-part-e-chapter-4 (*last accessed* Oct. 9, 2024).

particular benefits. Where, as here, the calculation used to determine an entity's ability to pay does not account for operating costs, taxes, and other necessary expenses, it fails to accurately assess the revenue available to that entity to pay fees. USCIS acted arbitrarily in basing fees on net revenues. *Clifton Power Corp*., 88 F.3d at 1268.

The use of sales revenue is nonsensical because it does not consider all the relevant factors to calculate the ability to pay into the profit and free cash flow of a company that best addresses an ability to pay; both a company and a non-profit may generate high revenues or sales and have a 0% profit margin, net income, and thus the same ability to pay. DHS never addressed the relevant factors and analyzed the public comments that raised the arbitrariness of basing the Asylum Program Fee on the sales revenue of a small entity rather than net income. 89 Fed. Reg. at 6285; AR 707 ("DHS has accounted for the direct costs of the Asylum Program fee, and our data indicates that the Asylum Program Fee will not have the deleterious effects on multiple parts of U.S. economy that the commenters state that it will."); *id.* (DHS considered the suggestion but declines to limit the number of times an entity must pay the Asylum Program Fee for a specific beneficiary because determining if the fee exemption applied at intake would require a check of systems to determine if the beneficiary had a fee paid for them in the past, and that would delay intake and processing and add to USCIS cost."); 89 Fed. Reg. at 6357-58; AR 779-80 DHS conceded that gross revenues was "one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities."  89 Fed. Reg. at 6358; AR 780 (*citing Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy*). However, USCIS specifically chose net income as the proper marker for the blended

model between beneficiary-pays and ability-to-pay model for fees and the imposition of the Asylum Program Fee. Changing to a gross revenue analysis for a select group of businesses and petitioners disproportionately charged a surcharge was arbitrary, capricious, and irrational. The use of two different equations to calculate "ability to pay" was arbitrary and led to an irrational choices about how certain petitioners could afford to pay a surcharge, the Asylum Program Fee, in addition to the increased fees for their own requests for immigration benefits.

The Final Rule changed past practice of a shared responsibility to fund asylum adjudications to target a select portion of employment-based actors based on capricious calculations that manipulated the calculation of their "ability to pay." DHS misled the public to target businesses in lieu of spreading the burden across all types as they had previously, and they irrationally used net revenues to hide the true impact of the irrational choice. The Final Rule does not offer a reasoned explanation for why sales revenues would show an entity's "ability to pay."  The Final Rule is dismissive of the burden placed on individuals who will be charged a penalty each time they seek an employment-based immigration benefit. DHS did not have sufficient explanation to support its decision to have employment-based applicants fund the adjudication of asylum applications.

## C. The Record Underlying the Final Rule's Reasoning is Insufficient, and USCIS' Rulemaking is Defective.

An inescapable component of rulemaking under § 553 is that data relied on by an agency in formulating final rules must be provided to the public when a proposed rule is released. *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 708 (10th Cir. 2009) ("Informed public input can hardly be said to occur when major impacts of the adopted alternative were never disclosed.") The agency has deprived the public of that right to informed input

and this Court should order vacatur.

The INA, 8 U.S.C.§ 1356(m), directs the agency to set "fees for providing adjudication and naturalization services… at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." The key terms in that section are "adjudication" and "recovery." Congress provided further context to the adjudication services USCIS may charge for in the *Homeland Security Act of 2002*, where it separated adjudication and enforcement actions, the latter being delegated to Immigration and Customs Enforcement. *Compare* Pub. L. 107-296 (November 25, 2002) §§ 441 and 451(b). This wall between adjudicatory and enforcement functions was fortified in § 471(b), codified at 6 U.S.C. § 291(b), which prohibits any form of recombining these authorities (adjudication and enforcement) under the same subagency. Thus, fees collected under the Final Rule must be strictly limited to recovering the cost of adjudication: the purpose designated by Congress for these fees.

Determining the agency's costs, and the recovery amount, necessarily requires the agency to examine the historical volume of fee-based applications and project future volumes based on historical trends. The public cannot provide informed comments without this raw data and the methodology the agency intends to use when forecasting expenses. Such data must certainly be relied upon by the agency in formulating its final fee structure, as failure to consider such a critical factor would render the agency's decision arbitrary and capricious. *See Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data, or on data that, critical

degree, is known only to the agency.")

Rulemaking is defective, and final rules unsustainable, if "an agency's failure to disclose *critical* material, on which it relies, deprives commenters of a right under § 553 'to participate in rulemaking.'" *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 D.C. Cir. 2014) (*citing Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999) (citing *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 684-85 (D.C.Cir.1984)).

Here USCIS told the public that the raw data supporting the rule was available for review upon appointment. 88 Fed. Reg 404; AR 3. Interested parties were provided with a phone number to contact if they wished to examine the data. *Id.*; *see also* AR 9823. However, USCIS never answered the phone. AR 9823. Finally, after using back channels an appointment was secured to view the data by Plaintiff ITServe's expert: Stephen G. Bronars, Ph.D. *See* **Exhibit D, Declaration of Stephen G. Bronars, Ph.D**. At the appointed time, the agency refused to provide access to the critical data it intended to rely on to set fees in the final rule, instead, the agency provided a very general explanation of the program. *Id.*

Left only with the limited release of the data and vague descriptions of the agency's methodology, Dr. Bronars conducted an evaluation of the rationale. In addition to the agency's failure to provide the raw data on fee-based applications, it also failed to disclose the data the agency used to arrive at the increased rates using its "Activity Based Cost" ("ABC") formula. The ABC formula consists of "Resource Drivers" (which give the cost of performing certain activities in the course of processing activities) and "Activity Drivers" (which are used to allocate these costs to the immigration benefits offered by the agency).

However, the data that the agency relied upon to arrive at these figures was withheld from the public. As Dr. Bronars states, if this data had been provided "it would allow [him] to examine how they have changed over time and consider whether there was such a change that could justify the large fee increases that are put forth in the Final Rule." *See* **Exhibit D** at 2. Dr. Bronars also notes that vital "information about the statistical models and methods used to forecast visa requests, as these are also important inputs for the methodology used by the USCIS and DHS to determine the fees that would be required to recover costs." *Id.* At every turn, the data underlying the agency's fee setting formula is absent from the record and was not provided for the public in the proposed rule.

Courts have ruled that such failures, and refusals, to provide critical data during rulemaking are fatal flaws requiring vacatur. *American Radio Relay League, Inc. v. Federal Communication Commission*, 524 F.3d 227, 238-40 (D.C. Cir. 2008). In *American Radio,* an FCC notice of proposed rulemaking provided the public with redacted copies of studies and data. The agency's final rule relied upon the redacted data which it had refused public access to. *Id.* at 240. The D.C. Circuit held that the redacted and refused data was "a central source of the data of [the FCC's] determinations." *Id.* at 238. As such, the notice was defective, and the final rule was vacated.

This case has the same terminal flaw in *American Radio.* The agency withheld the critical data it intended to rely on when creating fees. It then promulgated the Final Rule based on data unknown to the public, thereby destroying the right to provide informed comments.

It should be noted that legitimate and Congressionally authorized activities are funded, limited, and accounted for under the Fraud Detection and Prevention Account

("FDPA"). However, the agency has allocated funds to enforcement actions in contravention of Congress' prohibition at 6 U.S.C. § 251, HAS § 441. That section transfers to ICE "all functions performed under the following programs, and all personnel, assets, and liabilities pertaining to such programs…[t]he investigations program." Yet, under the IEFA the agency funds its Fraud Detection and National Security Directorate, which it states is charged with "investigating" fraud or violations[8].

USCIS, FY 2023 Annual Statistical Report, at pg. 28. This directorate employs 2,054 investigators as of FY 2024. DHS USCIS Budget Overview, FY 2024 Congressional Justification., at pg. CIS-IEFA-8. Funding FDNS using the IEFA and not the FDPA robs the public of adjudicators who are actually furthering the mission of the agency:

---

[8] The agency attempts to evade the prohibition on using funds for enforcement by stating that "...Congress gave USCIS limited investigative responsibilities when it created FDNS." The thin read USCIS rests its authority to fund enforcement activities is found, not in the statute, but in a conference report to an appropriations bill. 88 Fed. Reg. 417, note 26; AR 16. The agency's representation of this grant of authority is at odds with the actual language of the conference report which stated:

> Congress recommended that DHS establish an organization 'responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner prior to granting immigration benefits.'

*See* Conference Report to accompany H.R. 4567 [Report 108–774], "Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005," p. 74, available at https://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-

The conference report's suggestion is merely a request for USCIS and ICE to communicate information necessary for ICE to fulfill its mission. It did not provide a new grant of authority to DHS to combine functions of ICE and USCIS or otherwise abrogate of the 6 U.S.C. § 291(b).

adjudications. Congress placed both financial and jurisdictional restraints on USCIS's creation of a law enforcement directorate such as FDNS, and Congress explicitly delegating that authority to ICE, at HSA § 441. The agency has violated these fiscal and jurisdictional restraints and seeks to fund its unlawful activity off the backs of those seeking immigration benefits.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

Dated: October 9, 2024                                     Respectfully submitted,

*/s/ Jesse M. Bless*
Jesse M. Bless
Bless Litigation LLC
6 Vineyard Lane
Georgetown, MA 01833
Phone: (781) 704-3897
Email: jesse@blesslitigation.com

*/s/ Jonathan D. Wasden*
Jonathan D. Wasden
Wasden Law
9427 Goldfield Lane
Burke, VA 22015
Phone: (843) 872-4978
Email: jon@wasden.law

*/s/ Matthew T. Galati*
Matthew T. Galati
The Galati Law Firm, LLC
8080 Old York Road, Suite 204
Elkins Park, PA 19027
Phone: (215) 310-0231
Email: matt@galati.law

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

Undersigned counsel certify that on October 9, 2024, the forgoing motion was filed through the Court's CM/ECF system, which will transmit an email notification and electronic hyperlink of that filing to the Court. As the United States Attorney's Office for the District of Colorado has not made an appearance in the case a copy of the foregoing will be served on their office by certified mail. Additionally, a copy of the foregoing will be provided to the civil Chief via email at: kevin.traskos@usdoj.gov as well as U.S. Department of Justice attorney, Madeline M. McMahon at: Madeline.M.McMahon@usdoj.gov.

Respectfully submitted,

*/s/ Jesse M. Bless*
Jesse M. Bless
Bless Litigation LLC
6 Vineyard Lane
Georgetown, MA 01833
Phone: (781) 704-3897
Email: jesse@blesslitigation.com

*/s/ Jonathan D. Wasden*
Jonathan D. Wasden
Wasden Law
9427 Goldfield Lane
Burke, VA 22015
Phone: (843) 872-4978
Email: jon@wasden.law

*/s/ Matthew T. Galati*
Matthew T. Galati
The Galati Law Firm, LLC
8080 Old York Road, Suite 204
Elkins Park, PA 19027
Phone: (215) 310-0231
Email: matt@galati.law

*Attorneys for the Plaintiffs*