**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| SAMANTHA MOODY, *et al.*, | |
| Plaintiffs, | Case No. 1:24-cv-00762-CNS |
| v. | Judge Charlotte N. Sweeney |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary, United States Department of Homeland Security, *et al.*, | |
| Defendants. | |

<u>**DEFENDANTS' RESPONSE BRIEF**</u>

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.    2024 Fee Rule ............................................................................................. 2

II.   EB-5 visa program ...................................................................................... 3

III.  H-1B visa program ...................................................................................... 6

IV.   Asylum Program Fee .................................................................................. 7

V.    This lawsuit ................................................................................................. 8

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ........................................................................................................ 11

I.    Plaintiffs lack Article III standing to challenge any part of the Rule, except the Form I-829 fee. ............................................................................... 11

      A.    Plaintiffs must demonstrate Article III standing as to each Rule provision. ................................................................................... 11

      B.    Plaintiff ITServe lacks organizational or associational standing. .............. 13

      C.    Plaintiff AIIA has not articulated any legally cognizable organizational harm, and the only member it has identified is harmed only by the Form I-829 fee. ......................................................... 14

      D.    Plaintiff Moody's injury is limited to the Form I-829 fee. ........................... 16

II.   In analyzing the merits, the Court should disregard Plaintiffs' extra-record evidence. ................................................................................... 17

III.  The RIA did not preclude DHS from adjusting EB-5 fees. .................................. 19

IV.   USCIS acted reasonably in using gross revenue to determine the economic impact of the Asylum Program Fee on small entities.......................... 21

V.    USCIS included all critical factual information in the Proposed Rule, and Plaintiffs had a full and fair opportunity to comment meaningfully. ..................... 29

VI.   USCIS permissibly uses the Immigration Examinations Fee Account to help fund its Fraud Detection and National Security Directorate. ....................... 35

VII.  Any relief should be appropriately limited. .......................................................... 38

i

A.    Universal vacatur is not available under the APA, or even if
available, it is not required. ..................................................................... 38

B.    The Court could instead remand without vacatur.................................... 40

C.    Alternatively, the Court could grant declaratory or injunctive relief. ......... 42

D.    The Rule is severable. ............................................................................. 43

CONCLUSION ......................................................................................................... 44

## INTRODUCTION

The EB-5 visa program provides a pathway for noncitizens who invest significant sums in U.S.-based commercial enterprises—around $1 million—to obtain lawful permanent residence. The H-1B program allows employers to bring foreign workers in specialty occupations such as software developers or engineers to work temporarily in the United States, as long as the employers pay wages high enough to not depress wages for similarly employed U.S. workers. Like many immigration benefits, EB-5 and H-1B visa petitions involve fees. In January 2024, the U.S. Department of Homeland Security ("DHS"), United States Citizenship and Immigration Services ("USCIS"), promulgated a final rule, after full notice and comment, that restructured its filing fees related to the EB-5 and H-1B programs, along with many other programs used by millions of petitioners and applicants. The Rule raises fees for some forms, lowers others, and also codifies fee waivers and exemptions for some forms for low-income individuals, human trafficking and domestic violence victims, current active service members, and others.

Plaintiffs—two organizations representing EB-5 investors and H-1B employers in the IT industry and one individual EB-5 investor—seek to vacate and enjoin the entire Rule, but they have not met their burden of proving they have Article III standing to do so. Further, their various arguments fail on the merits. First, in enacting the EB-5 Reform and Integrity Act of 2022 ("RIA"), Congress provided that USCIS was not required to use the new fee-setting parameters in the RIA until USCIS completed a new fee study, which USCIS is still working on. In the meantime, nothing in the RIA prohibits USCIS from setting fees under its preexisting statutory authority, 8 U.S.C. § 1356(m). Second, USCIS reasonably used two different, well-established measures to assess two different things:

(1) impacts of the Rule on small businesses and (2) individuals' ability to pay fees. Third, USCIS disclosed sufficient information regarding how it calculated the costs it needed to cover with user fees for the public to make meaningful comment. Finally, USCIS permissibly included the costs of its fraud detection-related work. Assessing whether information submitted is truthful is an inherent part of adjudicating whether a business or an individual is eligible for any immigration benefit.

Even if Plaintiffs were successful in any of their merits arguments, the universal remedy they seek is grossly disproportionate to the harms they have alleged, as this Court already found in denying Plaintiffs' motion for temporary restraining order ("TRO") earlier in this case. Should the Court be inclined to grant relief, it should instead choose a more measured alternative, such as remand without vacatur or other tailored relief that addresses the specific violations and harms Plaintiffs have proven without affecting the rights of millions of immigration benefit applicants who are not before this Court.

## BACKGROUND[1]

### I.     2024 Fee Rule

USCIS is almost entirely funded by fees.[2] Congress authorized DHS, of which USCIS is a component, to charge fees for adjudication and naturalization services at a

---

[1] In accordance with the Court's October 24, 2024 order, ECF No. 25, Defendants construe Plaintiffs' motion for summary judgment as an opening brief and thus do not respond to Plaintiffs' statement of undisputed facts. *See also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) (describing summary judgment motion procedures, including statements of undisputed facts, as "inconsistent with the standards for judicial review of agency action under the APA," as APA cases "must be processed *as appeals*").

[2] In FY 2021, 96% of USCIS's funding came from fees. U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6194, 6195 (Jan. 31, 2024) ("Rule" or "Final Rule").

level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). These fees are deposited in the Immigration Examinations Fee Account (IEFA) in the Treasury. *Id.* In addition, 31 U.S.C. § 902(8) requires the Chief Financial Officer of each agency, including DHS, to "review, on a biennial basis, the fees . . . imposed by the agency for services . . . it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services."

USCIS duly reviewed its fees for the FY 2022-2023 biennial period and determined that its fees did not recover the full costs of services provided. "Most of the fees [had] not changed since 2016 despite increased costs of federal salaries and inflation costs for other goods and services." 89 Fed. Reg. at 6195. Consequently, in January 2023, USCIS proposed to adjust fees for almost all of its forms, related to many different immigration requests, ranging from employment-based visa petitions to adoption visa petitions to genealogy record requests. U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402 (Jan. 4, 2023) ("Proposed Rule"). After the notice-and-comment period, USCIS issued the Final Rule on January 31, 2024. The Rule went into effect on April 1, 2024. Final Rule, 89 Fed. Reg. at 6194.

## II.   EB-5 visa program

One of many employment-based visa programs covered by the Rule is the EB-5 visa program, which permits noncitizens to apply for lawful permanent resident status

(colloquially, a "green card") in the United States by making an investment of $1,050,000 ($800,000 for certain targeted employment areas or infrastructure projects) in a U.S.-based new commercial enterprise that creates at least ten jobs for United States workers. 8 U.S.C. § 1153(b)(5)(A), (C).[3] These visas are called "EB-5 visas" because they are the "fifth employment-based visa category available to foreign nationals." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 335 (D.C. Cir. 2023). A prospective EB-5 investor must first submit a Form I-526 (Immigrant Petition by Standalone Investor) or a Form I-526E (Immigration Petition by Regional Investor). *Id.* at 336; 8 C.F.R. §§ 106.2(a)(25), 204.6(a). Upon approval of the Form I-526, investors living abroad can apply for a visa through the Department of State to permit them to seek admission to the United States as a two-year conditional lawful permanent resident, while an investor physically present in the United States can apply to adjust their status with USCIS and obtain two-year conditional lawful permanent resident status using Form I-485 (Application to Register Permanent Residence or Adjust Status). *Da Costa*, 80 F.4th at 336; 8 U.S.C. § 1186b(a)(1); 8 C.F.R. §§ 216.1, 245.2(a)(3). If granted conditional lawful permanent resident status, during the 90 days before the two-year period expires, the investor may file a Form I-829 (Petition by Investor to Remove Conditions on Permanent Resident Status) to remove the conditions on their permanent resident status. 8 U.S.C. § 1186b(d)(2); 8 C.F.R. § 216.6(c). On the Form I-829, the investor must, in general,

---

[3] Before the RIA was enacted in 2022, Pub. L. No. 117-103, Div. BB, 136 Stat. 49, 1070 (2022), the required amount was $1,000,000, or $500,000 for certain rural areas or areas with high unemployment. 8 U.S.C. § 1153(b)(5)(B)-(C) (2022); 8 C.F.R. § 204.6(f) (July 24, 2019).

demonstrate that he or she has invested the requisite amount of capital over the required period of time and created the requisite number of jobs. 8 U.S.C. § 1186b(d)(1).

In the EB-5 program, private entities may be designated by DHS to serve as "regional centers," which pool individual EB-5 investors' money within certain geographic areas. *Id.* § 1153(b)(5)(E). Once designated, a regional center must "[c]ontinue to meet" statutory requirements and "[p]rovide USCIS with updated information annually, and/or as otherwise requested by USCIS." 8 C.F.R. § 204.6(m)(6). Regional centers file—and pay fees in connection with—various forms with USCIS, including application forms to be designated (Form I-956), approval applications for each project they sponsor (Form I-956F), and annual statements (Form I-956G). *See* 8 U.S.C. § 1153(b)(5)(E), (F), (G); *Delaware Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1200 (D.C. Cir. 2024) (discussing USCIS forms).

Due to concerns "that the regional center program was susceptible to fraud and abuse," *Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-CV-02487-VC, 2022 WL 2290594, at *2 (N.D. Cal. June 24, 2022) (describing concerns),[4] Congress passed the RIA, which the President signed into law on March 15, 2022. Pub. L. No. 117-103, Div. BB, 136 Stat. 49, 1070. The RIA made various changes to the EB-5 program to improve its integrity. *See EB5 Holdings, Inc. v. Jaddou*, 717 F. Supp. 3d 86, 92 (D.D.C. 2024).

The RIA also required DHS to conduct a fee study within one year and, not later than 60 days after the completion of the study, to set fees for EB-5-related immigration

---

[4] *See also Delaware Valley Reg'l Ctr., LLC v. DHS*, 678 F. Supp. 3d 73, 77 (D.D.C. 2023) ("Apparently, the original program was rife with fraud and raised national security concerns."), *aff'd*, 106 F.4th 1195 (D.C. Cir. 2024); *cf. Liu v. SEC*, 591 U.S. 71, 77 (2020) (describing securities fraud enforcement action brought by SEC to stop a scheme to defraud foreign investors under the EB-5 program).

benefit requests. *See* Pub. L. No. 117-103, § 106(a)-(b), 136 Stat. at 1104. The statute sets out certain parameters for setting those fees, including setting goals for adjudicating certain EB-5 forms within certain timeframes, "on average," *id.* § 106(b), and limiting the amount that can be charged "to contribute to the coverage or reduction of the costs of processing or adjudicating" no-fee or low-fee applications to "an amount that is equal to the amount paid by all other fee-paying applicants," *id.* § 106(c). The RIA explicitly provides that "[n]othing in this section may be construed to require any modification of fees before the completion of—(1) the fee study . . . ; or (2) regulations promulgated by [DHS], to carry out [§ 106(b)-(c)]." *Id.* § 106(f). DHS has begun the fee study required by the RIA and has begun drafting a rule setting fees relating to this program. 89 Fed. Reg. at 6374.

### III.  H-1B visa program

The H-1B visa program is another program covered by the fee Rule at issue here. "H-1B visas are temporary worker visas for those who work in a 'specialty occupation,'" such as software developers or engineers. *United States v. Kalu*, 791 F.3d 1194, 1198 (10th Cir. 2015); 8 U.S.C. § 1101(a)(15)(H)(i)(b); 89 Fed. Reg. at 6369 (listing top ten industries that use Form I-129 to petition for H-1B visas). For an individual to obtain an H-1B visa, a sponsoring employer must first file a Labor Condition Application with the U.S. Department of Labor. 8 U.S.C. § 1182(n)(1). The employer must then petition USCIS using Form I-129 (Petition for a Nonimmigrant Worker) to classify its prospective employee as eligible for the H-1B classification. *Kalu*, 791 F.3d at 1198; 8 U.S.C. § 1184(c)(1). H-1B petitions generally may be granted in increments of up to 3 years, up to a maximum of six years, with some exceptions. *Id.* § 1184(g)(4); 8 C.F.R. §§ 214.2(h)(9)(iii)(A)(1), (13)(iii)(A), (D)-(E). To prevent downward pressure on wages of

6

U.S. workers, petitioning employers must pay H-1B workers at least the prevailing wage for their occupation in the geographic area where they work or the actual wage the employer pays its other workers in that occupation, whichever is higher. 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.731.

## IV.    Asylum Program Fee

The Rule establishes a new Asylum Program Fee to be paid by employers who file the following forms:

- **Form I-129 (Petition for a Nonimmigrant Worker).** Form I-129 is used by those seeking H-1B and certain other temporary work visas for their employees. 8 C.F.R. § 214.2(h)(2).

- **Form I-129CW (Petition for a CNMI-Only Nonimmigrant Transitional Worker).** Form I-129CW is used by employers to petition to employ a Commonwealth of the Northern Mariana Islands-Only Transitional Worker, a classification specific to the Commonwealth. *See* 8 C.F.R. § 214.2(w); *Lilles v. J.C. Tenorio Enter., Inc.*, No. 1:22-CV-00017, 2024 WL 3203307, at *2 (D. N. Mar. I. June 28, 2024) (describing program).

- **Form I-140 (Immigrant Petition for Alien Worker)**. Form I-140 is used by those seeking EB-1, EB-2, or EB-3 immigrant visas, which generally allow certain types of professional and skilled workers to obtain lawful permanent resident status based on their employment. *See Soc'y of Divine Word v. USCIS*, 683 F. Supp. 3d 799, 804 (N.D. Ill. 2023); 8 U.S.C. § 1153(b)(1)-(3).

89 Fed. Reg. at 6391 (codified at 8 C.F.R. § 106.2(c)(13)).

DHS established the Asylum Program Fee as a way to mitigate the scope of the fee increases in the Rule for individual applicants and petitioners. 88 Fed. Reg. at 451. The agency determined that the Asylum Program Fee is an effective means of shifting some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. *Id*. The fee is set at $0 for nonprofits; $300 for small employers (defined as firms or individuals who have 25 or fewer full-time employees), and $600 for all other filers of Forms I-129, I-129CW, or I-140. 89 Fed. Reg. at 6391; *see also id*. at 6195-96.

## V. This lawsuit

On March 19, 2024, Plaintiffs filed this lawsuit, seeking judicial review of the Rule under the Administrative Procedure Act ("APA").[5] ECF No. 1. On March 29, the Court denied Plaintiffs' last-minute request for a TRO to prevent the Rule from going into effect on April 1. Order Denying TRO, ECF No. 17. The Court found that Plaintiffs had not shown irreparable harm because, among other things, the only harm alleged by Plaintiffs— payment by two individual EB-5 investors of an additional $5,775 to file a Form I-829— was not "great, especially in comparison to the amount . . . invested." *Id.* at 7. Additionally, Plaintiffs' potential harm did not "outweigh the potential injury to Defendants" and to the public, as an injunction would cost USCIS approximately $3.1 million in revenue each day

---

[5] Although Count I of Plaintiffs' complaint alleges a violation of the Anti-Deficiency Act, 31 U.S.C.A. § 1341, *see* Compl. ¶¶ 157-66, ECF No. 1, that statute contains no private right of action.  *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) ("No private right of action for declaratory, mandatory or injunctive relief exists under the Anti–Deficiency Act.") (citation omitted); *accord Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1194 (D. Utah 2004), *appeal dismissed*, 455 F.3d 1094 (10th Cir. 2006). Defendants therefore analyze this claim as one that is maintained under the APA.

and would likely have an "extremely high" adverse effect on USCIS's other operations, "given that USCIS is almost entirely funded by the collection of fees." *Id.* at 9-10.

Defendants subsequently answered the Complaint and the Court adopted the parties' proposed Joint Case Management Plan ("JCMP"). ECF Nos. 19, 20, 21. Pursuant to the JCMP, Defendants filed the administrative record on June 24, 2024. ECF No. 22 ("AR"). The JCMP set a deadline of September 11, 2024 for filing motions to complete and/or supplement the administrative record, but Plaintiffs did not file any such motion.

On October 9, 2024, Plaintiffs filed a motion for summary judgment. ECF No. 23. The Court granted the parties' joint motion to construe the motion as an opening brief. ECF No. 25. Plaintiffs make four arguments: (1) the EB-5 fees violate the RIA; (2) the agency should not have used gross revenue to assess employers' ability to pay the Asylum Program Fee; (3) the agency failed to release adequate data to the public during the comment period; and (4) the agency improperly included fraud prevention costs in estimating the costs it needed to cover using user fees. As demonstrated below, these claims are without merit. The Court should reject Plaintiffs' challenge to the Rule.

## STANDARD OF REVIEW

The APA "governs judicial review of agency actions." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). In APA cases, "the district court 'sits as an appellate tribunal.'" *Karim v. Allen*, No. 21-CV-2861-WJM-KLM, 2023 WL 4624896, at *1 (D. Colo. July 19, 2023) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)); *Olenhouse*, 42 F.3d at 1580. "'The entire case on review is a question of law,' and a court should only consider 'arguments about the legal conclusion to be drawn about the agency action.'" *Karim*, 2023 WL 4624896, at *1

(quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

When reviewing agency action under the APA, a court may set aside a rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B)–(F). In determining whether a rule is in accordance with law, "the court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[6] As for whether an agency action is arbitrary, capricious, or an abuse of discretion, the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Id.* at 2261 (citing 5 U.S.C. § 706(2)(A)); *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020) (the standard of review "is narrow" and "very deferential to the agency") (quotation omitted). The reviewing court "presume[s] that an agency action is valid unless the party challenging the action proves otherwise," *id.*, and "will 'uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors,'" *Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1153 (10th Cir. 2019) (quoting *Wolfe v. Barnhart*, 446 F.3d 1096, 1100 (10th Cir. 2006)).

---

[6] *Loper Bright* overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), which held that courts should defer to an agency's reasonable interpretation if a statute was ambiguous. 144 S. Ct. at 2261. But Defendants do not seek deference based on ambiguity in a statute. Rather, Defendants here advance the best interpretation of the relevant statutes based on their experience administering them.

Because "[t]he harmless error rule applies to judicial review of administrative proceedings," *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1443 (10th Cir. 1992), a plaintiff bears the burden of showing that any alleged agency error was harmful. *Elec. Clouds, Inc. v. FDA*, 94 F.4th 950, 966 (10th Cir. 2024).

## ARGUMENT

The Court should reject Plaintiffs' challenge to the Rule. As an initial matter, Plaintiffs IT Service Alliance ("ITServe") and American Immigrant Investor Alliance ("AIIA") have not met their burden to prove that they have Article III standing to challenge any part of the Rule. And Plaintiff Samantha Moody at most has standing to challenge only the Form I-829 fee. Plaintiffs' claims also fail on the merits.

I.    **Plaintiffs lack Article III standing to challenge any part of the Rule, except the Form I-829 fee.**

A.    **Plaintiffs must demonstrate Article III standing as to each Rule provision.**

As with any other claim, a plaintiff bringing an APA challenge must demonstrate it has Article III standing. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Each of the three standing elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the merits stage, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* (citation omitted).

"Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A plaintiff that has standing to challenge one provision of a rule nonetheless "may lack standing to challenge *other* provisions of that [rule]." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020); *Blum v. Yaretsky*, 457 U.S. 991 (1982) (plaintiff had standing to challenge one aspect of statute but not others). Accordingly, a "court must analyze Plaintiffs' standing to challenge each *provision* of law at issue." *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019) (per curiam) (emphasis added).

Organizations may demonstrate standing "in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotations omitted). To establish standing under the second theory (associational standing), an organization must demonstrate, among other things, that at least one of its members has "standing to sue in their own right." *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1230 (10th Cir. 2001).

The three Plaintiffs in this case—an organization representing IT companies employing H-1B workers, an organization representing individual EB-5 investors, and an individual EB-5 investor—seek to strike down the entire Rule. *See* Compl. Prayer for Relief; Pls.' Opening Br. at 22, ECF No. 23 ("OB"). But they have not proven that they have standing to seek such relief. The Rule sets over 100 different fees for numerous forms used in various visa programs, not just the H-1B and EB-5 programs, and provides for fee waivers and exemptions for low-income families, domestic violence and human

trafficking victims, members of the Armed Forces, and other applicants for immigration benefits. But the only harm for which Plaintiffs have competent evidence is Plaintiff Moody's upcoming payment of the Form I-829 fee. Plaintiffs' (unproven) allegations extend only to payment of fees for other forms used by H-1B and EB-5 petitioners. No Plaintiff has alleged, for example, that they file adoption visa petitions (Form I-800) or applications to be designated as civil surgeons (Form I-910), which are among the many fees addressed in the Rule. Thus, Plaintiffs ITServe and AIIA do not have standing at all. Plaintiff Moody has standing only as to Form I-829.

## B. Plaintiff ITServe lacks organizational or associational standing.

ITServe has not demonstrated organizational or associational harm. It has neither alleged nor proven any harm to itself. Rather, ITServe alleges that it has over 2,000 members and that its members pay H-1B fees, including the Asylum Program Fee. *See* Compl. ¶¶ 19, 113-128.[7] But ITServe cannot rely on its large number of members to establish some statistical possibility that it has members who have suffered concrete injury. It must "identify members who have suffered the requisite harm—surely not a difficult task . . . when so many thousands are alleged to have been harmed." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Since ITServe has not identified any members, the Court cannot assure itself that ITServe has members with Article III standing as to the Asylum Program Fee, let alone any of the other provisions in the Rule.[8]

---

[7] ITServe relies on Exhibit B, ECF No. 23-3, to prove its allegations. *See* OB at 3. Defendants object to Exhibit B. Exhibit B has not been authenticated. Fed. R. Evid. 901. Also, it purports to be ITServe's comment on a different rule, and thus is not part of the administrative record for the Rule being challenged here. *See supra* Part II.

[8] In *Speech First, Inc. v. Shrum*, a plaintiff organization submitted pseudonymous declarations from its members Student A, Student B, and Student C, which the court

The Court should thus dismiss ITServe's claims as another court has done in a similar case. *ITServe All., Inc. v. Nielsen*, No. 3:18-CV-1823-K, 2019 WL 2539240, at \*4-5 (N.D. Tex. Feb. 11, 2019) (dismissing ITServe's complaint in part because ITServe failed to identify any injured members). Because the Asylum Program Fee is not paid by EB-5 investors, the Court should dismiss that claim entirely.

### C. Plaintiff AIIA has not articulated any legally cognizable organizational harm, and the only member it has identified is harmed only by the Form I-829 fee.

AIIA has not demonstrated organizational or associational standing either. AIIA's theory of organizational harm is not legally cognizable. AIIA alleges it will lose member-donors because (1) "[h]igher fees means less disposable income for potential members" and (2) member-donors "trusted our messaging that a fee study would happen before USCIS raised fees" and USCIS not doing so caused AIIA "reputational harm." Khanna Decl. ¶¶ 17, 19, ECF No. 23-4; *see also* Compl. ¶ 112. Adopting AIIA's theories would dramatically expand Article III standing doctrine, allowing any organization that takes donations to challenge any government action that affects potential donors' disposable income or allowing any lobbying group that incorrectly predicted what the government would do to challenge the government's action. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024) (rejecting a theory of standing that "would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like—an approach to standing that this Court has consistently rejected as flatly inconsistent with Article III").

---

found sufficient to show that "there [is] a particular person who is injured, not just a statistical probability that some member would suffer an injury." 92 F.4th 947, 952 (10th Cir. 2024). Here, however, ITServe has not identified any particular members, pseudonymously or otherwise.

AIIA's theories of harm also fail in the specific circumstances of this case. "[T]he line of causation between the [alleged] illegal conduct and injury" are "too speculative" and "too attenuated" here, as AIIA's theories of harm "'rely on speculation about the unfettered choices made by independent actors'"—AIIA's members—who "'are not before the courts.'" *Id.* at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The Rule has been in effect now for over seven months, but AIIA has not offered any evidence that members have actually stopped donating due to the Rule. Instead, AIIA has recycled its co-founder Ishaan Khanna's declaration from March 2024, before the Rule went into effect, which predicts what its members will do. Khanna Decl. ¶ 19. But it is not "sufficiently predictable" that AIIA members would react this way to the Rule. *All. for Hippocratic Med.*, 602 U.S. 383. AIIA's members are individuals who must invest nearly a million dollars to obtain an EB-5 visa. Facing a fee increase of a few thousand dollars, such an individual might simply absorb the cost or may choose to cut some other expense. As for reputational harm, while AIIA's prediction about what USCIS would do regarding EB-5 fees in the Rule proved incorrect, AIIA's own declaration describes its success in other advocacy projects, which surely shows its value to members and potential members. Khanna Decl. ¶¶ 10-14. No reasonable person would expect a lobbying group to correctly predict what the government will do every time. At bottom, AIIA has policy and legal objections to higher EB-5 fees but "under Article III of the Constitution, those kinds of objections alone do not establish a justiciable case or controversy in federal court." *All. for Hippocratic Med.*, 602 U.S. at 396. Even if they were, they do not give AIIA standing to challenge any part of the Rule other than fees associated with individual EB-5 investors.

With regard to associational standing, AIIA has identified just one member affected by the Rule, Kanishka Malik, who had to file a Form I-829 between April 15 and July 14, 2024. Malik Decl. ¶ 12, ECF No. 9-2. However, Plaintiffs have not provided any evidence that Malik actually did so. Nor does Malik sue to enjoin the Rule on his own behalf.  In addition, regardless of whether Malik actually paid the fee or missed his window, Plaintiffs have not shown that he is likely to pay another Form I-829 fee in the future. Thus, he no longer has standing to seek prospective relief against future collection of Form I-829 fees, and neither does AIIA. *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998) ("To receive forward-looking injunctive or declaratory relief . . . , it is insufficient for [plaintiff] to claim that she was harmed by the policy in the past."). AIIA has not identified any other members who have been harmed by any other part of the Rule.[9]

### D.  Plaintiff Moody's injury is limited to the Form I-829 fee.

The only fee Plaintiff Moody alleges she will be paying is the Form I-829 fee, like Malik. Moody also complains of processing times for various forms that she filed in the past, which have already been adjudicated in her favor. Moody Decl. ¶¶ 3-5, 7, ECF No. 9-1. She claims that she has "significant apprehension and anxiety" about further "delays in my immigration journey," *id*. ¶¶ 8, 12-13, but Plaintiffs do not challenge processing delays in this suit, only the fees themselves, *see* Compl. ¶¶ 157-191, and "a bare allegation of anxiety is not a cognizable, concrete injury," *Garland v. Orlans, PC*, 999 F.3d 432, 438 (6th Cir. 2021). Accordingly, these complaints are insufficient to support standing. Moody does not allege any cognizable harm from the Rule other than her

---

[9] Khanna does not assert any individual harm from the Rule. *See* Khanna Decl. ¶ 2 ("it has been years since my EB-5 immigration process has concluded"). AIIA also has not identified any regional center members with standing to challenge the regional center fees. Khanna concedes that regional centers are not AIIA's "direct constituency." *Id.* ¶ 18.

payment of the Form I-829 fee, and thus lacks standing to challenge any other part of the Rule.

* * * *

For these reasons, Plaintiffs ITServe and AIIA have no standing. Moody has no standing to challenge any other part of the Rule, aside from the Form I-829 fee.[10]

## II.   In analyzing the merits, the Court should disregard Plaintiffs' extra-record evidence.

Before addressing the merits, Defendants raise one additional preliminary issue. In considering the merits of an APA claim, the district court's review of the agency's action "is limited to the administrative record." *N.M. Health Connections v. HHS*, 946 F.3d 1138, 1161-62 (10th Cir. 2019). "The complete administrative record consists of all documents and materials directly or indirectly considered by the agency." *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1160 (10th Cir. 2022). None of the five documents attached to Plaintiffs' motion is part of the administrative record, as they were not submitted to the agency and therefore the agency had no chance to consider them during the rulemaking process. Specifically:

---

[10] Plaintiffs may argue that they are harmed by lower fees for others because those lower fees are subsidized by the higher fees paid by H-1B and EB-5 investors. But if the lower fees for others were declared unlawful, the agency is not necessarily required to increase those fees, or to lower the fees paid by H-1B or EB-5 petitioners. Depending on the circumstances at that time, the H-1B or EB-5 fees could remain the same or be even higher. *Cf. DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (rejecting taxpayer's attempt to challenge a tax credit provided to a third party because "the decision of how to allocate any such savings [from striking down the tax credit] is the very epitome of a policy judgment committed to the broad and legitimate discretion of lawmakers, which the courts cannot presume either to control or to predict") (internal quotation marks and citation omitted).

- **Moody and Khanna Declarations (Ex. A, C, ECF Nos. 23-2, 23-4).** The Moody and Khanna declarations were not submitted to the agency during the rulemaking process. Both are dated March 25, 2024, two months after the Rule's publication.

- **ITServe Comment (Ex. B, ECF No. 23-3).** ITServe submitted this comment to DHS in connection with another rulemaking, not the Rule at issue in this case.

- **Bronars Expert Report (Ex. D, ECF No. 23-5).** Dr. Bronars' "expert report" was not submitted to the agency during the rulemaking process. It is dated September 10, 2024, seven months after the Rule's publication.

- **AIIA Comment (Ex. E, ECF No. 23-6).** The document filed by Plaintiffs is not an accurate copy of the comment that AIIA submitted to DHS during the comment period. It contains new sentences in paragraphs 3 and 4 that did not appear in the original. *Compare* ECF No. 23-6 *with* Ex. 1 (true copy).[11] The Court should disregard the new version that Plaintiffs submitted.

Because none of these documents is part of the administrative record, the Court should disregard each of them in analyzing the merits of Plaintiffs' APA claims.

To the extent Plaintiffs seek to belatedly supplement the administrative record, Plaintiffs missed their opportunity. Defendants filed the administrative record on June 24, 2024, in accordance with the Joint Case Management Plan. ECF No. 21. Plaintiffs' deadline to move to complete and/or supplement the administrative record was

---

[11] All comments submitted in this rulemaking are part of the administrative record. *See* AR Index Appendix B, at 155, ECF No. 22 (listing "Comment Submitted by American Immigrant Investor" along with other comments). Defendants have attached a copy of the comment AIIA submitted to USCIS as Exhibit 1 for the Court's convenience. The comment is also available at https://www.regulations.gov/comment/USCIS-2021-0010-6596.

September 11, 2024, *see id.* ¶ 6.C, but Plaintiffs never filed such a motion. The Court should thus disregard Plaintiffs' untimely, extra-record evidence. *See Espinoza v. U.S. Dep't of Just.*, 20 F. Supp. 3d 1094, 1103 n.5 (D. Colo. 2013) (declining to consider extra-record evidence attached to opening brief where plaintiff had not filed a timely motion to supplement).

### III.   The RIA did not preclude DHS from adjusting EB-5 fees.

Turning to the merits, the Court should reject each of Plaintiffs' arguments. Plaintiffs first argue that the RIA prohibits USCIS from adjusting fees related to the EB-5 program until USCIS completes the fee study and sets fees based on certain average processing time goals in the RIA. Pub. L. No. 117-103, Div. BB, § 106(a)-(c), 136 Stat. at 1104; OB at 15. Defendants recognize that the RIA directed the agency to complete an EB-5 fee study by March 15, 2023 and a fee rule 60 days later, and that the fees be subject to different parameters than DHS uses under 8 U.S.C. § 1356(m). USCIS has been working and is still working on the fee study and fee rule, along with numerous other rulemaking projects intended to address significant time-sensitive national issues such as disaster relief and migration, all with limited staff. Such rules affect millions of people other than EB-5 investors.[12]

Defendants do not agree, however, that the RIA prohibits USCIS from modifying EB-5 fees pursuant to its 8 U.S.C. § 1356(m) authority in the interim. Plaintiffs completely leave out of their opening brief the "Rule of Construction" Congress included in RIA § 106(f), which provides that "[n]othing in this section may be construed to require any

---

[12] *See* 89 Fed. Reg. at 6239, 6287; Reginfo.gov, Unified Agenda of Regulatory and Deregulatory Actions, Agency Rule List - Spring 2024, DHS, https://perma.cc/WZ4R-RUVA.

modification of fees *before the completion of—(1) the fee study . . . ; or (2) regulations promulgated by* [*DHS*]*, to carry out* [*§ 106(b)-(c)*]." Pub. L. No. 117-103, Div. BB § 106(f), 136 Stat. at 1105 (emphasis added). That is, Congress did not intend to require DHS to use the new parameters in § 106(b)-(c) to set fees until the fee study and new fee rule are both completed. Nor did the RIA prohibit USCIS from using its existing authority under § 1356(m) to adjust fees before the fee study and rule were completed.

The ongoing pendency of the EB-5 fee study and rule does not deprive USCIS of authority to set fees using its § 1356(m) authority in the meantime because the RIA nowhere imposes such a consequence. Contrary to Plaintiffs' argument, OB at 15, this interpretation does not ignore or nullify the RIA. An agency missing a statutory deadline is a "not uncommon occurrence when," as here, "heavy loads are thrust on administrators." *Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998). And it is well known that "rulemaking is a lengthy process, often taking years." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 823 F.3d 641, 649 (D.C. Cir. 2016). The Supreme Court has repeatedly held that "if a statute does not specify a consequence for noncompliance with statutory timing provisions"—which the RIA does not—"the federal courts will not in the ordinary course impose their own coercive sanction," such as depriving the agency of its power to act. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993)); *see also Biodiversity Assocs. v. U.S. Forest Serv. Dep't of Agric.*, 226 F. Supp. 2d 1270, 1304-05 (D. Wyo. 2002) (denying plaintiffs' request to enjoin agency from holding timber sales because agency missed statutory deadline for updating a forest management plan). Congress is presumed to be aware of such precedent when it enacts statutory deadlines. *Barnhart*,

537 U.S. at 160. Because Congress did not specify consequences if DHS did not meet the deadlines in the RIA, and in fact included the "Rule of Construction" provision explicitly not requiring USCIS to modify fees before completing the fee study and rule, it is clear that Congress did not intend for USCIS to be bound by the new fee-setting parameters in the interim, even if USCIS missed the deadline.

Moreover, the processing-time goals in RIA § 106(b) show that Congress intended to encourage USCIS to process EB-5 petitions faster.[13] To deprive USCIS of fee funding needed to process EB-5 petitions while USCIS is still working on the RIA fee study and rule goes against that purpose. Plaintiffs' argument should be rejected as contrary to both Congress's intent and case law.

## IV. USCIS acted reasonably in using gross revenue to determine the economic impact of the Asylum Program Fee on small entities.

Plaintiffs' second argument—that the agency erred in considering only businesses' gross revenues, and not their expenses, in setting the Asylum Program Fee while considering low-income individuals' "net income" in determining their ability to pay fees—

---

[13] Section 106(b) directs DHS to set EB-5 fees based on "the costs of providing such services, including the cost of attaining the goal of completing adjudications, on average, not later than":

- 180 days after receiving Form I-956 (Application for Regional Center Designation);
- 180 days after receiving Form I-956F (Application for Approval of an Investment in a Commercial Enterprise);
- 90 days after receiving Form I-956F in a targeted employment area;
- 240 days after receiving Form I-526 Immigrant Petition by Standalone Investor) or Form I-526E (Immigration Petition by Regional Investor);
- 120 days after receiving Form I-526 or I-526E in a targeted employment area; and
- 240 days after receiving Form I-829 (Petition by Investor to Remove Conditions).

should also be rejected.[14] As a preliminary matter, USCIS has broad discretion to set filing fees. The INA does not mandate any particular methodology for determining those fees, but rather expressly authorizes USCIS to charge up to "a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m); *Loper Bright*, 144 S. Ct. at 2263 ("In a case involving an agency . . . the statute's meaning may well be that the agency is authorized to exercise a degree of discretion.").

USCIS has not abused its discretion nor acted arbitrarily or capriciously in how it evaluated impacts on businesses and individuals' ability to pay. As explained in the Rule, gross revenue is a well-established measure for determining the impact of regulatory change on small business entities. Moreover, USCIS did consider varying fees for employment-based visas based on businesses' labor costs, but reasonably rejected those ideas as administratively difficult and unnecessary. Plaintiffs thus err in contending that USCIS acted unreasonably in utilizing gross revenue in its determination of the regulatory impact of the Asylum Program Fee on small business entities. *See* OB at 16-21. Moreover, as demonstrated below, USCIS's consideration of individuals' "net income" for some fee waivers and discounts is reasonable. USCIS compares a household's

---

[14] In their brief, Plaintiffs complain that the agency considered businesses' "sales revenue" or "net revenues." OB at 16-20. The Rule primarily uses the term "gross revenue" when discussing the impact on small entities. *See, e.g.*, 89 Fed. Reg. at 6356 n.300, 6357 & nn.302, 306. Thus, Defendants will do the same here. Similarly, it is not entirely clear what Plaintiffs mean when they refer to an individual's "net income," but Defendants use "net income" here to mean income minus living expenses. *See* OB at 18-19 (referring to cost of living expenses). In other contexts, "net income" for an individual may have different meanings, such as gross salary minus taxes.

adjusted gross income[15] to the Federal Poverty Guidelines (which originated historically from an estimate of how much a family needed to pay for food and other costs, a "net income" concept). The Guidelines are a well-established tool for determining an individual or household's eligibility for government benefits. USCIS therefore acted reasonably in utilizing the Guidelines when making one determination (determining the eligibility of individual applicants for fee waivers), and in using gross revenue when making a different determination (determining the impact of the Asylum Program Fee on small entities).

USCIS acted reasonably in using gross revenue as a measure of examining the regulatory impact of a regulation on small entities, as recommended by the Small Business Administration ("SBA"), and the agency explained why it used that measure in its determination. As the Rule explains, the SBA has stated that one accepted measure for determining if a regulation has a significant economic impact on affected small entities is to examine the gross revenue of the entities in a particular sector. *See* 89 Fed. Reg. at 6356-57 (citing *SBA Office of Advocacy: A Guide for Government Agencies, How to Comply With the RFA* 19, AR 7460, and stating that "the impact could be significant if costs exceed 1% of gross revenue").[16] The Rule explains that "DHS believes this measure is the most useful for the [final regulatory flexibility analysis], based on the available data

---

[15] Under the federal tax code, the "gross income" of an individual means all income from whatever source derived, 26 U.S.C. § 61(a), but in the case of a trade or business means gross receipts, *id*. § 6501(e)(1)(A)(i). The concept of "adjusted gross income" applies solely to individuals rather than to business entities, and refers to gross income minus certain allowable deductions. *Id*. § 62(a).

[16] The SBA Guide is also available at https://advocacy.sba.gov/2017/08/31/a-guide-for-government-agencies-how-to-comply-with-the-regulatory-flexibility-act/.

for the relevant small entities." 89 Fed. Reg. at 6357.[17] As discussed in the Rule's Small Entity Analysis, USCIS information collections do not include employers' revenue, number of employees, profit, or labor costs. *See* AR 519. Consequently, USCIS augments its available administrative data by procuring third-party data that can be matched to a statistically representative sample of affected Employer Identification Numbers ("EINs") to obtain industry classification codes, revenue and number of employee estimates used to better understand proposed policies' impacts. *See id*. These revenue and employee estimates are then matched to SBA size-standards to identify impacted entities considered "small" within their respective industries. *See id*. at 519-20. Consistent with other Small Entity Analyses, USCIS uses multiple separate third-party data sources to minimize errors associated with entities such as non-profits that might be systematically missing from certain third-party sources. *See id*. at 519. The Small Entity Analysis assumed entities with no available revenue or employment estimates are small. *Id*. at 520.

To model the economic impact, USCIS estimated the total costs associated with the fee increases for each small entity and divided that amount by the reported gross revenue of each entity. *See* 89 Fed. Reg. at 6363, 6365. For small entities with more than 25 full-time employees, USCIS determined that the average economic impact ranged from 0.01 to 0.59 percent, and that 91% of these entities would experience an economic impact of less than 1 percent. *Id*. at 6363. Additionally, for small entities with 25 or fewer

---

[17] Although the specific context of this explanation was in response to comments regarding the Rule's effect on farms that rely on USCIS's H-2A program for temporary agricultural workers, the explanation applies as well to USCIS's overall determination whether the Rule has a significant economic impact on all affected small entities.

full-time employees, USCIS determined that the average economic impact ranged from 0.06 to 0.45 percent, that the average impact on all such entities was 0.39 percent, and that 89.2% of these entities would experience an economic impact of less than 1 percent. *Id*. at 6365. Based in part on this analysis, USCIS decided to set the Asylum Program Fee at $0 for nonprofits, $300 for businesses with 25 employees or less, and $600 for businesses with more than 25 employees. *Id*. at 6195-96, 6391.

USCIS acted reasonably when it used gross revenue in its calculations of the economic impact of the Asylum Program Fee on the affected small entities and ultimately in setting the Fee. USCIS considered suggestions to structure fees based on employers' costs. For example, one commenter suggested that fees should increase for skilled international workers who earned over $100,000 annually. (Salary, of course, is a labor cost for employers.) The agency "decline[d] to base the fees on the salary of the beneficiary because doing so would be very difficult to administer." *Id*. at 6336. The Rule also pointed out that, "if an employer cannot afford USCIS fees, then it is unlikely that they would be able to afford to employ the beneficiary of their petition." *See id*. at 6291. An H-1B employer must pay at least a prevailing wage to the employee it is sponsoring, which, for IT workers, is often a six-figure annual salary. *See* AR 4511 ("The median compensation of beneficiaries with approved [H-1B] petitions increased by 9.3 percent, from $108,000 in FY 2022 to $118,000 in FY 2022."); AR 4528-29 (data on annual compensation by occupation). The Asylum Program Fee ranges from $0 to $600 and would generally be paid every 3 years for each H-1B worker.

Methodologically, even if USCIS were able to procure revenue and operating cost information for purposes of estimating profit, labor costs, or additional data (*e.g.,* data

used to model the differences between two statistically identical small entities located just across state lines from one another), it should be noted that missing data severely undermines the objective efforts—detailed extensively throughout the Small Entity Analysis—to eliminate the serious errors created when explanatory data is missing not-at-random. *See generally* AR 515-601.

USCIS also sensibly compared an individual applicant's adjusted gross income to the Federal Poverty Guidelines as one measure of his or her ability to pay. In basing an applicant's fee waiver eligibility on his or her inability to pay, USCIS did not establish new policy but instead simply codified Fee Waiver Policy criteria it had already established in 2011. *See* 88 Fed. Reg. at 457, 89 Fed. Reg. at 6232-33. Under these previously established criteria, an applicant is eligible for a fee waiver for specified forms upon demonstrating that he or she (1) is receiving a means-tested benefit, (2) had a household income at or below 150 percent of the Federal Poverty Guidelines, or (3) is experiencing extreme financial hardship. *Id*. The Proposed Rule explained that in proposing to codify these criteria, and based on input from stakeholders, USCIS considered using different measures of an applicant's ability to pay than the Federal Poverty Guidelines. 88 Fed. Reg. at 457. However, the agency decided to propose relying on these guidelines for determining income thresholds for fee waiver purposes for several reasons: namely, because the use of the guidelines, which are updated annually, ensures a consistent national standard for income thresholds; because their use promotes consistency among other federal programs that use the guidelines as eligibility criteria (such as Medicaid); and because codifying the use of the guidelines since USCIS first started using them as eligibility criteria more than a decade ago would limit confusion. *Id*. at 457-58. The Final

Rule adopted this proposal and codified USCIS's pre-existing practice, based among other things on support from commenters who agreed with USCIS's continued use of the guidelines "to determine income thresholds for fee waiver purposes because it is a recognized national standard also used by other Federal programs." 89 Fed. Reg. at 6257.

In sum, the Rule explained that USCIS is codifying its already-established policy of basing eligibility of an applicant for a fee waiver for filing certain forms on whether, among other things, he or she has an adjusted gross income at or below 150% of the Federal Poverty Guidelines. Because the Federal Poverty Guidelines are a recognized national standard also used by other federal programs in determining eligibility for benefits, USCIS acted rationally in using this well-established standard for determining an individual applicant's eligibility for a fee waiver. The agency also acted rationally in using a different established measure in the course of making a different determination: namely, whether the Rule would have a significant impact on small entities.

No authority cited by Plaintiffs support their contention that in taking these actions, USCIS acted inconsistently with the APA. Initially, Plaintiffs misplace their reliance on the two cases they cite because neither case concerns agency rulemaking, which is governed by 5 U.S.C. § 553. Instead, the cited cases involve judicial review of agency orders, which is governed by 5 U.S.C. § 555: specifically, a Securities and Exchange Commission ("SEC") order denying approval for listing a new product for securities trading, and a Federal Energy Regulatory Commission ("FERC") order assessing a fine.

*Grayscale Investments, LLC v. SEC*, 82 F.4th 1239 (D.C. Cir. 2023), is far afield from this case. *Greyscale* involved SEC's failure to explain its differential treatment of

different investment products. Specifically, SEC had allowed two investment funds holding cryptocurrency futures contracts to be listed on national securities exchanges, but it had declined to allow a third fund to be so listed. *Id*. at 1242-44. Unlike *Grayscale*, however, this case does not involve an agency that is "articulat[ing] legal standards on a case-by-case basis" but has "[f]ail[ed] to distinguish prior orders in similar cases," *id*. at 1245 (citation omitted), but instead involves agency rulemaking. And in any event, here, "[t]he distinctions made by the agency [are] relevant to the action and [have been] rationally explain[ed]." *Id*. at 1245-46 (citation omitted).

Nor is *Clifton Power Corporation v. FERC*, 88 F.3d 1258 (D.C. Cir. 1996), relevant here. The portion of *Clifton* cited by Plaintiffs involves review of an agency's findings of fact under the substantial-evidence standard. *See id*. at 1265 ("We thus accept the Commission's findings of fact unless they are unsupported by substantial evidence on the record as a whole.") (citation omitted). In proposing to fine a company for failing to comply with an agency order, FERC made findings of fact based on the company's gross revenues, but its final order failed to consider record evidence regarding the company's inability to pay the fine. *Id*. at 1267-69. The D.C. Circuit explained that it was unnecessary to decide whether a company's ability or inability to pay was an appropriate consideration in assessing a fine under the relevant statute, the Federal Power Act. *Id*. at 1267. Instead, it held that in light of FERC's responsibility to base its penalty assessments under that Act on substantial evidence, it was arbitrary and capricious for FERC to consider the company's gross revenues while ignoring record evidence regarding its net revenues. *Id*. at 1267-68. By contrast with *Clifton*, which concerned substantial-evidence review of an agency's findings of fact made in an order, this case involves arbitrary-and-capricious

review of agency rulemaking. And in any event, the D.C. Circuit "emphasize[d] the narrowness of [its] ruling," "conclud[ing] only that it was arbitrary and capricious *in this case* for [FERC] having initially based its proposed penalty . . . on gross revenues, not to consider record evidence regarding Clifton's operating expenses and net revenues." *Id.* at 1268 (emphasis added). Contrary to Plaintiffs' contention, the D.C. Circuit's narrow ruling—limited to the case's facts—does not even stand for any general principle that an agency acts contrary to the APA if it considers gross revenues in the course of assessing a fine under the Federal Power Act, much less if the agency makes a determination under the APA whether a regulation will have a significant economic impact on a group of affected small entities.

## V. USCIS included all critical factual information in the Proposed Rule, and Plaintiffs had a full and fair opportunity to comment meaningfully.

Plaintiffs also erroneously contend that the Rule violated the APA's notice-and-comment requirement because USCIS allegedly did not provide adequate details regarding how it determined (1) the historical volume of fee-based applications and projected future volumes of such applications, including visa requests; and (2) the increased fee rates using its "Activity Based Cost" ("ABC") formula. OB at 21-24. This contention presumes that the APA obligates agencies to solicit comments on virtually every piece of potentially relevant factual information. But the APA imposes no such standard, and in any event, Plaintiffs have shown no prejudice by not accessing the "raw data" underlying the agency's determination of the past and future volumes of fee-based applications or its methodology of determining the proposed fee rates. *Id.* at 23.

The APA's text contemplates only a *"[g]eneral* notice of proposed rule making," including "either the terms or substance of the proposed rule or a *description* of the

*subjects* and *issues*." 5 U.S.C. § 553(b) (emphases added). The text of Section 553(b)—which is phrased at a high level of generality—does not fit with Plaintiffs' apparent expectation that all of the raw data used by USCIS in forecasting the past and future volume of fee-based applications, or in its methodology for determining the amount of proposed rate increases, must be disclosed during the comment period. Nor does it square with the Supreme Court's holding that Section 553 of the APA "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (citation omitted).

To be sure, the APA requires that "interested persons" have "an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). Courts have "interpreted this requirement to mean that an agency must make at least the most critical factual material that is used to support the agency's position on review public." *Air Transp. Ass'n v. USDA*, 37 F.4th 667, 677 (D.C. Cir. 2022) (citation omitted). However, "[t]o succeed on this argument, [plaintiffs] must demonstrate that they were prejudiced by the withholding of this data." *Id*.

Here, USCIS provided a range of information illuminating how it determined the historical volume of fee-based applications and projected the future volumes of such applications (including visa requests), as well as how it used its ABC formula to determine the amount of the increased fee rates. The Proposed Rule explained in detail the elements of the FY 2022-2023 fee review, which was conducted to determine whether USCIS's pre-existing fee structure was sufficient to recover the agency's operating costs.

*See* 88 Fed. Reg. at 426-455. After USCIS reviewed the bases for its cost projections, revenue projections, and projected shortfall, *id*. at 428-32, it explained the methodology it used to make these calculations. *See id*. at 432-54. Specifically, the agency explained that it uses ABC, a business management tool that assigns resource costs to operational activities and then to products or services, in order to create financial models that determine the cost of each major step towards processing immigration benefit services. *Id*. at 432. This is the very same methodology that USCIS has used in its past five fee reviews. *Id*. The Proposed Rule also discussed major parameters of the fee review, such as volume data (both projections of the total annual number of immigration benefit requests USCIS will receive and of the number of applicants that will pay a fee when filing requests for benefits) and completion rates (the adjudicative time required to render decisions on specific benefits requests). *Id*. at 432-46, 446-50.

Additionally, the electronic docket that Plaintiffs accessed contained hundreds of pages of supporting information that explained USCIS's methodology in conducting its fee review. *See* AR 208-615; OB at 23. This information included further explanation of the methodology for the fee review, *see* AR 214-28; a discussion of the operational metrics that the fee review used, *see* AR 257-67, a fee review model documentation that provided functional and technical descriptions of the inputs, outputs, and mechanics of the ABC model used by USCIS in the fee review process, *see* AR 302-51. And crucially, the agency explained for commenters the nature of its two-step cost assignment process. First, USCIS assigns costs (resources) to immigration benefit processing activities using "resource drivers," *i.e.*, by analyzing which resources (such as full-time employees) perform each activity and to what degree. *Id*. at 306. Second, the agency assigns activities

to individual immigration benefit requests using "activity drivers," *i.e.*, by analyzing what portions of activity costs are associated with each benefits request. *Id*. USCIS listed both the number of resource drivers and the dollar amount that its methodology allocated to each driver, *id*. at 308-09, and explained at length how it assigns costs to relevant activities, *id*. at 308-12. The agency also listed all of the activity drivers, *id*. at 313-14, and explained how it allocates activity costs to immigration benefits requests using workload volume estimates, *id*. at 313-18.

This extensive body of technical information was more than sufficient to allow for informed public comment during the notice-and-comment period regarding the past and projected future volumes of USCIS fee-based applications and the methodology used by the agency to determine the amount of USCIS operating costs to be allocated to each benefit request, and the proposed increased fees. USCIS thus made available to Plaintiffs "the most critical factual material that [wa]s used to support the agency's position on review." *Air Transp. Ass'n*, 37 F.4th at 677; *see also Solite Corp. v. EPA*, 952 F.2d 473, 484-85 (D.C. Cir. 1991) (no procedural error where agency used supplementary data, not disclosed during the comment period, which expanded on and confirmed information in the proposed rulemaking); *Air Transp. Ass'n v. Civil Aeronautics Bd.*, 732 F.2d 219, 223-24 (D.C. Cir. 1984) (no procedural error where agency relied on internal staff studies, not disclosed during comment period, where the agency disclosed its methodology and no major changes in the final rule occurred).

In any event, Plaintiffs "must demonstrate that they were prejudiced by the withholding of this data," *Air Transp. Ass'n*, 37 F.4th at 677, but they have failed to do so. To establish prejudice, Plaintiffs must show that they were unable to comment

meaningfully on how USCIS determined both the historical volume of fee-based applications and the future volume of such applications, as well as the methodology by which USCIS determined the amount of the increased fee rates. However, Plaintiffs simply note in conclusory fashion that if they had received the raw data, their putative expert witness could have "examine[d] how they ha[d] changed over time and consider[ed] whether there was such a change that could justify the . . . fee increases" in the Rule. OB at 24. Not only is Plaintiffs' reliance on untimely, extra-record evidence inappropriate in this APA case, *see supra* Part II, but Plaintiffs fail to explain how the extensive materials available in the record were insufficient to allow them to comment meaningfully on whether the agency had justified its proposed fee increases, or to show how the inclusion of raw data would have addressed this purported insufficiency. If such a conclusory statement could demonstrate prejudice, then a litigant could always show prejudice simply by contending that the absence of any particular material in the record prevented it from considering whether that material could justify the agency's proposed rule. That is not the law. *See Air Transp. Ass'n*, 732 F.2d at 223-24 n.11 (plaintiff was not denied opportunity to make meaningful comments during agency rulemaking where plaintiff did "not explain what it would have said had it been given earlier access to [internal] staff studies" used to calculate a new agency fee schedule); *Solite Corp.*, 952 F.2d at 484-85 (agency satisfied notice-and-comment requirements where its "methodology . . . did not change significantly from the proposed notice to the final rule, and petitioners had ample opportunity to criticize [the agency's] approach").

The case law cited by Plaintiffs does not advance their argument. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683 (10th Cir. 2009), found that

an agency had failed to conduct a sufficient environmental impact statement before opening up certain lands for development. *See id*. at 703-08. Explaining that an agency "must prepare a supplemental assessment if '[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns,'" *id*. at 705 (quoting 40 C.F.R. § 1502.9(c)(1)), the Tenth Circuit held that the failure to do so was not harmless error because "BLM's communication with the public . . . was no substitute for the substantive analysis required by section 1502.9(c)(1)(i)," *id*. at 708. Plaintiffs misplace their reliance on *Richardson* because this case does not turn on the substantive requirements of the National Environmental Policy Act's implementing regulations. So too, the error at issue in *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973), was not an alleged failure to disclose critical data but instead the fact that the EPA had "made no written submission to the additional comments made by [the] petitioners" after the court had remanded to the agency to consider the additional comments. *Id*. at 394; *see also id*. at 392-95. And *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), simply restates the D.C. Circuit's "critical material" standard that, as shown above, Defendants have satisfied.

Finally, *American Radio Relay League v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), is inapposite. In that case, the FCC had promulgated a rule concluding that the risks that new high-speed technologies would cause harmful interference to licensed radio operators were manageable. *Id*. at 232. The D.C. Circuit held that the FCC could not rely on the deliberative process privilege to redact from disclosure portions of five scientific studies "represent[ing] preliminary or partial results or staff opinions that were part of the deliberative process," where the unredacted portions of the studies "appear[ed] to contain

34

information in tension with the Commission's conclusion that [the new technologies'] acknowledged interference risks are manageable" *Id*. at 237, 238 (citation and internal punctuation omitted). The court stressed that "[t]he narrowness of our holding under section 553 of the APA is manifest," and that that holding turned on the specific factual circumstance that "[i]ndividual pages relied upon by the [FCC] reveal that the unredacted portions are likely to contain evidence that could call into question the Commission's decision to promulgate the rule." *Id*. at 239. By contrast, USCIS did not withhold deliberative portions of scientific studies and Plaintiffs do not identify any part of the record that appears to be in tension with the agency's factual determinations. In any event, *American Radio* does not establish any new standard but instead again reiterates the D.C. Circuit's "critical material" standard that, as shown above, USCIS has satisfied here.

## VI. USCIS permissibly uses the Immigration Examinations Fee Account to help fund its Fraud Detection and National Security Directorate.

Finally, in passing, Plaintiffs incorrectly contend that DHS may not use funding from IEFA to fund in part USCIS's Fraud Detection and National Security Directorate ("FDNS") but instead must rely solely on funding from the Fraud Prevention and Detection Account ("FPDA").[18] OB at 24-26. Plaintiffs' argument takes the form of the following syllogism: (a) in the Homeland Security Act of 2002, Congress transferred all investigative work exclusively to ICE; (b) FDNS's work involves "investigations"; (c) IEFA can only be used for adjudications; and therefore, (d) IEFA funds cannot be used to fund FDNS. This syllogism's conclusion is wrong because its premises are incorrect.

In 2002, the Homeland Security Act ("HSA") "generally assigned INS's adjudicative functions to USCIS and its investigative program to the subagencies that would become

---

[18] *See* 8 U.S.C. § 1356(v) (establishing FPDA).

ICE and CBP." *Mestanek v. Jaddou*, 93 F.4th 164, 171 (4th Cir. 2024) (citing 6 U.S.C. §§ 251(4), 271(b)); *see also* 6 U.S.C. § 291(b). But as the Fourth Circuit recently explained, the notion that "this general division of labor" created "a hardline prohibition . . . finds no support in the statutory text." *Mestanek*, 93 F.4th at 171; *see also Kamat v. USCIS*, No. 2:23-CV-01133-JHC, 2024 WL 342304, at *9 n.4 (W.D. Wash. Jan. 30, 2024) ("[T]he unambiguous text of the Homeland Security Act of 2002 does not preclude USCIS from allocating resources to investigations related to its adjudications."), *vacated on other grounds,* No. 24-618, 2024 WL 3100288 (9th Cir. June 18, 2024).

Although the HSA initially assigned the "investigations program" and certain other functions specifically to the "Under Secretary for Border and Transportation Security," Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 (Nov. 25, 2002), Congress amended that statute in 2016, replacing "Under Secretary for Border and Transportation Security" with "Secretary," Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, Title VIII, § 802(g)(1)(B)(v)(I), 130 Stat. 122, 212 (Feb. 24, 2016) (codified as amended at 6 U.S.C. § 251). Further, Congress has granted the DHS Secretary the authority to administer and enforce the Immigration and Nationality Act of 1952 and to delegate "any of the Secretary's functions to any officer, employee, or organizational unit of the Department." *See* 6 U.S.C. § 112(b)(1); 8 U.S.C. § 1103(a)(1). In turn, the DHS Secretary has delegated much of this authority to USCIS. DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003), https://www.hsdl.org/c/view?docid=234775 ("USCIS Delegation"). One authority specifically delegated to USCIS is the authority to "*investigate* alleged civil and criminal violations of the immigration laws, *including but not limited to alleged fraud* with respect

to applications or determinations within [USCIS] and make recommendations for prosecutions, or other appropriate action when deemed advisable." *Id.* § II.I (emphasis added).

As the Rule explains, FDNS's activities fall squarely within this delegation of authority to USCIS and not within the bucket of "investigations" work in 6 U.S.C. § 251. *See* 89 Fed. Reg. at 6247-48. Detecting fraud is an inherent part of adjudicating benefits, as USCIS must determine whether the information provided to it is truthful to determine whether an individual or a business is eligible for the benefit. FDNS was established in 2004 in response to a congressional directive "agree[ing] to the Administration's request to increase the funds available for benefit fraud enforcement by decreasing the funds available to [ICE] from the examinations fee account, and leaving those resources available to [USCIS]." H.R. Rep. No. 108-774, at 74 (2004) (Conf. Rep.), *as reprinted in* 2004 U.S.C.C.A.N. 1198, 1242. Congress provided that "[t]hese resources are to fund the Office of Fraud Detection and National Security (FDNS) Unit," which "is responsible for developing, implementing, directing, and overseeing the joint [USCIS]-ICE anti-fraud initiative, and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner prior to granting any immigration benefit." *Id.*

FDNS enhances both national security and the integrity of the legal immigration system by: (1) identifying threats to national security and public safety posed by those seeking immigration benefits; (2) detecting, pursuing, and deterring immigration benefit fraud; (3) identifying and removing systemic vulnerabilities in the process of the legal immigration system; and (4) acting as USCIS's primary conduit for information sharing and collaboration with other governmental agencies. 89 Fed. Reg. at 6247. FDNS also

oversees a strategy to promote a balanced operation that distinguishes USCIS's administrative authority, responsibility, and jurisdiction from ICE's criminal investigative authority. *Id*. Thus, Plaintiffs are simply mistaken in contending that IEFA funds may not be used to fund the work of FDNS.

\* \* \* \*

Because none of Plaintiffs' claims have merit, the Court should dismiss Plaintiffs' Complaint.

## VII.    Any relief should be appropriately limited.

Even if the Court were to credit one or more of Plaintiffs' merits arguments, it should not vacate the Rule in its entirety as Plaintiffs suggest. OB at 22, 24. Rather, it should tailor the remedy to fit the nature of the APA violation and harm shown by Plaintiffs.

### A.    Universal vacatur is not available under the APA, or even if available, it is not required.

To begin, the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek.[19] *See* OB at 24. As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport

---

[19] By universal vacatur, Defendants refer to a remedial order that is understood to operate against the rule itself and render the rule void and without legal effect, as opposed to an order that is limited to declaring the rule inapplicable or enjoining application of the rule to the plaintiffs before the court.

to identify any applicable "special statutory review proceeding," § 703 affords them only declaratory or injunctive relief. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

Defendants recognize that the Tenth Circuit has described "[v]acatur of agency action" as "a common" and "often appropriate" form of relief entered by district courts. *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1048 (10th Cir. 2023) (citation omitted). But even if vacatur were authorized by the APA, the Tenth Circuit recognizes "it is not the only permissible remedy." *Id.* Vacatur is a form of "equitable relief," and "so, upon a balance of the equities, vacatur may not be appropriate in all cases." *N.M. Health Connections v. HHS*, 340 F. Supp. 3d 1112, 1176-77 (D.N.M. 2018) (cleaned up) (collecting cases). That comports with longstanding precedent that a statute authorizing remedies, especially equitable remedies, should be interpreted consistent with "the traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Indeed, the APA explicitly states that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702.

Here, universal vacatur would be inequitable. Vacating the Rule in its entirety would cause enormous consequences for millions of individuals seeking immigration benefits across many programs besides the H-1B and EB-5 visa programs. Universal

vacatur would be grossly disproportionate to the harm alleged by a single individual EB-5 investor (the only harm proven by Plaintiffs), and to the limited nature of the Rule's alleged flaws. The Court should instead choose a more measured alternative to universal vacatur, such as remand without vacatur or declaratory or injunctive relief tailored to the parties.

### B.  The Court could instead remand without vacatur.

The Tenth Circuit recently adopted the D.C. Circuit's *Allied-Signal* approach to determining whether vacatur or remand without vacatur is more appropriate. This determination depends on two factors: (1) "the seriousness of the agency action's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." *Diné*, 59 F.4th at 1049 (cleaned up); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). "A strong showing of one factor may obviate the need to find a similar showing of the other." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019). In *Allied-Signal*, which also involved user fees, the D.C. Circuit found that the agency did not adequately explain how it was able to determine that one subset of users, but not another, was able to pass on the cost of the fees to others. The court remanded without vacatur "because of the possibility that the Commission may be able to justify the Rule" on remand and because of the disruptive consequences of vacatur. 988 F.2d at 151. The court noted that the agency would need to refund fees already collected and "would be unable to recover those fees under a later-enacted rule." *Id*. (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988)).

Here, Plaintiffs bring a similar challenge to the Asylum Program Fee, alleging that the agency did not adequately explain its determination that certain petitioners could

afford to pay fees while others could not. OB at 18, 21. If the Court were to agree with Plaintiffs, it should remand without vacatur. Like in *Allied-Signal*, it "is conceivable that the Commission may be able to explain" its reasoning on remand. 988 F.2d at 151. The same disruptive consequences of vacatur that concerned the D.C. Circuit are also present here. *Id.*; *see Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 102 (D.D.C. 2018) (remanding without vacatur where the agency failed to consider additional revenues, resulting in the agency setting higher pilotage rates), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020).

Remand without vacatur would also be appropriate if the Court were to determine the agency improperly included fraud enforcement costs in the cost basis underlying the fee schedule. S*ee Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995) (remanding without vacatur where the agency failed to explain which components were part of the drug diversion control program to be supported by registration fees); *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1184 (D.C. Cir. 1994) (remanding without vacatur where the agency failed to adequately explain the cost basis for its fee schedule).

The same is true if the Court were to agree with Plaintiffs that the agency did not provide sufficient data to the public during the comment period. Plaintiffs chiefly rely on *American Radio* to support that particular claim and to support vacatur. *See* OB at 24. But in *American Radio*, the D.C. Circuit remanded the rule to the agency *without* vacatur, so that the agency could afford a reasonable opportunity for public comment on the studies at issue. *Am. Radio*, 524 F.3d at 242 (remanding the rule to the agency and citing *Allied-Signal* and two other cases that remanded without vacatur). Plaintiffs' assertion that "the final rule was vacated," OB at 24, is incorrect.

**C. Alternatively, the Court could grant declaratory or injunctive relief.**

Another alternative to vacatur would be declaratory relief. A declaratory judgment ensures that the invalid portions of the Rule cannot be applied to Plaintiffs, without affecting others not before the Court. 28 U.S.C. § 2201(a) ("[A]ny court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . . [and] such declaration shall have the force and effect of a final judgment or decree."); *Kentucky v. Fed. Highway Admin.*, No. 5:23-CV-162-BJB, 2024 WL 1402443, at *18 (W.D. Ky. Apr. 1, 2024) (a declaratory judgment under 28 U.S.C. § 2201 "binds the parties alone—unlike vacatur or a nationwide injunction").

A third alternative would be a narrowly tailored injunction. Plaintiffs do not meet the requirements for a permanent injunction, for largely the same reasons the Court found Plaintiffs was not entitled to a TRO. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (listing criteria for permanent injunction, which are largely the same as those for a TRO); *see also* Order Denying TRO at 5-6 (listing criteria); *id*. at 7-8 (finding Plaintiffs' alleged harm was not irreparable because it was neither "great" nor unrecoverable); *id*. at 10 (finding that enjoining the entire Rule would likely have "extremely high" adverse impact on USCIS and other immigration benefit petitioners). But if the Court nevertheless were to choose to implement an injunction, it should do so in a limited way that resolves the harm proven by Plaintiffs while avoiding interference with the rights of third parties.

For instance, if the Court were to find that the agency used the wrong parameters to set EB-5 fees and the only harm Plaintiffs have proven is the additional $5,775 that Moody must pay when filing Form I-829, then the declaratory relief or injunction should be limited to Moody and her Form I-829 fee, without, for example, depriving domestic violence victims or active service members—parties not before this Court—of a fee

42

exemption. *See* 89 Fed. Reg. at 6217-19 (listing fee exemptions codified in the Rule). This approach is more consonant with Article III and equitable principles. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934; *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (injunctions must be no broader than "necessary to provide complete relief to the plaintiffs") (citation omitted).

### D.  The Rule is severable.

To the extent Plaintiffs continue to claim that the Rule is not severable, Pls.' Mot. For TRO at 17-18, ECF No. 9, that is incorrect. "[R]egulations—like statutes—are presumptively severable: If parts of a regulation are invalid and other parts are not, [courts] set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together." *Bd. of Cnty. Commissioners of Weld Cnty., Colo. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023). Here, DHS clearly intends for the Rule to be severable, as it included a severability clause. 8 C.F.R. § 106.6 ("The provisions of this part are separate and severable from one another."). Where, as here, a regulation contains a severability clause, "the judicial inquiry is straightforward." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020). "At least absent extraordinary circumstances"—and Plaintiffs have not identified any—"the Court should adhere to the text of the severability . . . clause." *Id.*

Plaintiffs have not disputed that DHS intended for the Rule to be severable. Pls' Mot. for TRO at 17 (acknowledging Final Rule's "claim[] that each portion of the regulation is severable"). Rather, their sole argument against severability is that the EB-5 fee

43

increases were "intended to subsidize fees for other categories," and that without the EB-5 fees, "the intended surplus caused by the redistribution would not exist." *Id.* at 18. But DHS is in the best position to determine whether it can maintain its other operations without the Form I-829 fee increase, not Plaintiffs. As DHS has explained:

> [I]f DHS were prohibited from collecting any new fee for any reason, DHS believes this rule is structured so that a stay, injunction or vacatur of a fee set by this rule could be narrowly tailored to remedy the specific harm that a court may determine exists from the specific fee or fees challenged. USCIS would be able to continue operations, perhaps at a reduced level or by shifting resources in the absence of the fee until DHS is able to conduct new rulemaking to re-set fees and correct the deficiencies that resulted in the court order. Operating without one or a few of the new fees would be preferable to an invalidation of all the new fees, which would [cause] great disruption and deterioration of USCIS operations.

89 Fed. Reg. at 6237.

## CONCLUSION

For these reasons, the Court should reject Plaintiffs' challenge to the Rule. Even if the Court were to agree with one or more of Plaintiffs' merits claims, the Court should not vacate the entire Rule but rather remand without vacatur or grant relief tailored to the nature of the legal flaw and specific harms proven by the Plaintiffs.


Dated: November 8, 2024                Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       BRIGHAM J. BOWEN
                                       Assistant Branch Director

                                       */s/ Cynthia Liao*
                                       CYNTHIA LIAO (CA Bar No. 301818)
                                       DANIEL RIESS (TX Bar No. 24037359)
                                       Trial Attorneys
                                       United States Department of Justice

Civil Division, Federal Programs Branch
1100 L St. N.W.
Washington, DC 20005
Tel: (202) 531-1325
Fax: (202) 616-8470
cynthia.f.liao@usdoj.gov

*Counsel for Defendants*