IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 24-cv-00762-CNS

SAMANTHA MOODY,
AMERICAN IMMIGRANT INVESTOR ALLIANCE and
IT SERVICE ALLIANCE,

       Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary, United States Department of Homeland Security and
JOSEPH B. EDLOW, in his official capacity as Director, United States Citizenship and Immigration Services,

       Defendants.[1]

---

## ORDER

---

United States Citizenship and Immigration Services (UCSIS)—an agency of the United States Department of Homeland Security (DHS)—has many responsibilities. Among them is the responsibility to collect fees for various immigration applications and benefits. At issue in this case is whether UCSIS properly promulgated a final rule restructuring its filing fees for EB-5 and H1-B visa applicants.

The Court's discussion of this issue proceeds in three parts. First, the Court describes this case's legal, factual, and procedural background. Second, it sets forth the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Noem and Directory Edlow are automatically substituted as parties in this action.

legal standard for claims—like Plaintiffs' claims in this case—brought under the Administrative Procedure Act (APA). Third, the Court analyzes Plaintiffs' claims under that standard, including whether Plaintiffs have standing to challenge the final rule at issue. The Court's discussion leads to this conclusion: Plaintiffs have met their standing burden only as to certain provisions of the final rule and its promulgation, and Plaintiffs have shown entitlement to limited relief based on how UCSIS improperly promulgated its final rule in violation of the APA.

## I.     BACKGROUND

### A.  Legal Background

USCIS is tasked with charging fees and administering applications for immigration and naturalization services. USCIS determines fee amounts for immigration filings and is funded primarily by these fees. *See, e.g.,* 89 Fed. Reg. 6194, 6195 (Jan. 31, 2024).[2] To ensure financial solvency, Congress requires USCIS to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). USCIS processes over 100 different types of immigration applications, including but not limited to employment visas, student visas, asylum applications, and naturalization processes. *See* 89 Fed. Reg. at 6198–6202. USCIS is required to review finances for

---

[2] The effect of the notice of proposed rulemaking as to potential changes to this rule are discussed further below. *See generally* ECF No. 40-1.

services on a biennial basis to ensure all costs are covered and make recommendations for future fee changes. *See* 31 U.S.C. § 902(8).

USCIS administers EB-5 and H-1B visas. The EB-5 visa permits noncitizens to apply for lawful permanent resident status in the United States in exchange for a $1,050,000 investment in a commercial enterprise based in the United States that creates at least ten jobs. *See* 8 U.S.C. §§ 1153(b)(5)(A), (C). The EB-5 visa program imposes three basic requirements. *First*, applicants must submit a petition as an investor. *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 335 (D.C. Cir. 2023) ("[T]he first step in the application process is to file with USCIS a petition, called a Form I-526, for classification as an approved investor."). *Second*, they must submit a visa application to become a two-year conditional lawful permanent resident. *See id. Third*, approximately two years after receiving conditional lawful permanent resident status, applicants must submit a petition to remove the conditions as to their lawful permanent resident status. *See id.* ("In a final step, after approximately one year and nine months as a conditional lawful permanent resident, the noncitizen may apply to remove the conditional basis of their lawful permanent resident status."); 8 U.S.C. §§ 1186b(a)(1), (d)(2). The final application that removes these permanent residency conditions is a Form I-829.

The H-1B visa permits workers in "specialty occupations" to obtain temporary worker visas through the sponsorship of their employer. The H1-B visa imposes two basic requirements. *First*, an applicant's sponsoring employer must file a Labor Condition Application with the Department of Labor. *Second*, the sponsoring employer must petition

USCIS to have the applicant classified as eligible for an H-1B visa using the Form I-129. *See* 8 U.S.C. § 1182(n)(1); 8 U.S.C. § 1184(c)(1).

On March 15, 2022, Congress passed the EB-5 Reform and Integrity Act of 2022 (the Act) to improve the integrity and processing times for EB-5 visas. *See, e.g.,* Pub. L. No. 117-103, Div. BB, 136 Stat. 49, 1070. As part of the Act, Congress required USCIS to complete a fee study regarding fees imposed by USCIS onto visa applicants. Based on the fee study results, the Act required USCIS to create and adhere to new EB-5 application fees and visa applicant processing deadlines. *See* Pub. L. No. 117-103 § 106(b).[3] The Act specified that the fee study must be completed by March 15, 2023. The Act further specified that its provisions did not "require any modification of fees before the completion" of the fee study. Pub. L. No. 117-103 § 106(f)(1). Pending completion of the fee study, USCIS remained responsible for setting fees for all immigration applications and petitions. *See, e.g.,* 8 U.S.C. § 1356(m).

Since the Act's passage, USCIS completed its required biennial review for fiscal years 2022–2023. In this review, USCIS determined that its visa application fees were set at levels that did not fully recover the cost of services USCIS provided. *See* 89 Fed. Reg. at 6195. In January 2023—and prior to completion of the fee study—USCIS issued a proposed rule detailing and proposing adjusted fees for immigration services and visa applications. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402 (Jan. 4,

---

[3] The parties' arguments concerning this requirement are discussed further below in the Court's analysis of Plaintiffs' APA claims.

2023). USCIS held a notice-and-comment period, during which it solicited requests and feedback from the public and made available the sources informing its proposed fee changes. On January 31, 2024, after the notice-and-comment period's end, USCIS issued the at-issue final rule regarding these fee changes (the Final Rule). This Final Rule went into effect April 1, 2024.[4]

In February 2025—after briefing in this lawsuit was completed—USCIS completed the Act's required fee study. *See* ECF No. 32-1. "DHS propose[d] to adjust EB-5 fees based on the results of the fee study" through a proposed rule. *Id*. DHS also noted that the fee adjustments in the Final Rule—issued prior to completion of the fee study—"did not implement [the Act's] requirements." *Id.* The proposed rule that followed the fee study's completion did not invalidate the fees set out in the Final Rule. It simply offered notice of DHS's intention to subsequently amend EB-5 fees. *See id*.

On October 23, 2025, DHS issued a notice of proposed rulemaking as to EB-5 fees, fundamentally seeking to change them. *See* ECF No. 40-1 at 1. In this notice, DHS acknowledged completion of the fee study. *Id.* at 26 ("DHS conducted an EB-5 specific fee study, as required by the EB-5 Reform Act."). The notice-and-comment period regarding this notice and DHS's proposed rule extends to December 22, 2025. *Id.* at 1 ("Written comments must be submitted on this proposed rule on or before December 22, 2025.").

\* \* \*

---

[4] The Final Rule also established an Asylum Program Fee system, setting forth fees for employers who file certain immigration forms. The Asylum Program Fee was designed to shift fee expenses to those with a greater ability to pay for fees. For instance, under system, non-profit organizations paid $0 for certain filings; small employers with fewer than 25 full-time employees paid $300; and larger employers paid $600.

In sum, the Act passed in 2022. It demanded that USCIS conduct a fee study. Prior to completing this study, USCIS issued a proposed rule regarding the adjustment of E-B5 visa fees. It then issued a final rule regarding those fee adjustments. In February 2025—after it issued its final rule—USCIS completed the Act's fee study. In October 2025, USCIS then issued a new, proposed rule premised on the fee study's conclusions.

## B. Factual Background

This factual background is drawn predominantly from this case's administrative record and the parties' supporting evidentiary submissions. *See generally* ECF No. 23 (AR); Awad *v. Kerry*, 257 F. Supp. 3d 1016, 1018 (N.D. Ill. 2016).

Plaintiff Samantha Moody is a citizen of Canada but resides in Telluride, Colorado. ECF No. 1 at ¶ 17. She is an EB-5 investor and holds conditional permanent residency. *Id.* Pursuant to the terms of 8 U.S.C §1186b(d)(2)(B), Ms. Moody must file a Form I-829 within 90 days of the expiration of her conditional status on February 20, 2026. *Id.*; *see also* ECF No. 9-1 ¶ 9 ("My deadline to submit Form I-829 is February 20, 2026.").[5]

Plaintiff American Immigrant Investor Alliance (the Alliance), founded in April 2021, is a 501(c)(4) non-profit based in Washington D.C. established to inform, educate, and advocate on behalf of all EB-5 investors from around the world. ECF No. 1 ¶ 18. Plaintiffs identified a single Alliance member, Kanishka Malik, who filed an I-829 form on June 17, 2024. ECF No. 9-2; ECF No. 27-2.[6] Mr. Malik is a citizen of India and holds a conditional

---

[5] The Court may consider Plaintiff Moody's statements made in connection with the parties' TRO briefing. *See, e.g., Lanard Toys Ltd. v. Novelty Inc.*, 511 F. Supp. 2d 1020, 1025 (C.D. Cal. 2007).

[6] Plaintiffs submitted a receipt regarding Mr. Malik's payment of Form I-829 fees in connection with their reply brief. Explained further below, the Court may properly consider this receipt, and the supplemental declaration of Jagadeesh Mosali, that Plaintiffs submitted in reply.

permanent residency in the United States. ECF No. 1 at ¶ 1. Mr. Malik immigrated to the United States as an EB-5 investor. *Id.*

Plaintiff IT Service Alliance (ITServe) is the nation's largest trade group representing small- and medium-sized information-technology companies (collectively with the Alliance, the Institutional Plaintiffs). ECF No. 1 at ¶ 19. Plaintiff ITServe has over 2,200 member companies and 21 chapters spread around the country. *Id.* ITServe's members rely on the H-1B visa to fill shortages of highly skilled workers in the IT sector of the economy. *Id.* Mr. Mosali is ITServe's National President. *See* ECF No. 27-1 at 1.

### C. Procedural History

Plaintiffs filed this lawsuit on March 19, 2024, bringing claims under the APA and Antideficiency Act. *See* ECF No. 1 at 26–31; ECF No. 17 at 4 (summarizing Plaintiffs' claims). On March 25, 2024, Plaintiffs filed a temporary restraining order motion, seeking to "maintain the status quo" until the Court could review their APA claims. ECF No. 9 at 7 (citation modified); *see also id.* at 24–25 (seeking injunctive relief to "prevent Defendants . . . from implementing or enforcing" the Final Rule and "order Defendants to preserve the status quo pending" merits adjudication). The Court denied Plaintiffs' TRO motion. *See generally* ECF No. 17. On June 24, 2024, Defendants filed the administrative record. ECF No. 22. And on October 9, 2024, Plaintiffs filed their merits brief, seeking relief only as to their APA claims. *See generally* ECF No. 23.[7] After response and reply briefs were filed, Defendants also filed a sur-reply. ECF Nos. 26–27, 31.

---

[7] On October 24, 2024, the Court granted the parties' request to treat Plaintiffs' summary judgment motion as an opening brief. *See* ECF No. 25 (citing D.C.COLO.LAPR. 16.1(d)).

On February 6, 2025, Plaintiffs filed their Notice of Defendants' Completion of the EB-5 Fee Study and Unlawful Prior EB-5 Fee Adjustment. ECF No. 32. On October 22, 2025, Plaintiffs filed their Notice of New Regulatory Authority, ECF No. 39, pertaining to USCIS's "amend[ment] of 8 C.F.R § 287 via a Final Rule," *id.* at 1 (citation modified). On October 23, 2025, Plaintiffs filed their Notice Re: Proposed Rulemaking, ECF No. 40, as to DHS's October 23, 2025 notice of proposed rulemaking regarding EB-5 fee adjustments, ECF No. 40-1.

## II.    LEGAL STANDARD

The Administrative Procedure Act, *see* 5 U.S.C. §§ 701–706, "governs judicial review of agency actions," *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation modified). Under it, courts may "set aside [an] agency's action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 706(2)(A)); *see also* § 706(2)(B)–(F) (providing other bases for setting aside agency action). While judicial review under the APA prohibits a court from "subsitut[ing] its judgment for that of [an] agency," *San Luis Valley Ecosystem Council v. Dallas*, 759 F. Supp. 3d 1135, 1145 (D. Colo. 2024), an agency must fundamentally "articulate a satisfactory explanation for its action," *id.* (citation modified).

## III.    ANALYSIS

Plaintiffs challenge the Final Rule on three bases:

- The Final Rule, particularly its imposition of EB-5 visa fees, is "contrary" to the Act;

- The Asylum Program Fee is "arbitrary, capricious, and not in accordance with law"; and

- The "record underlying" the Final Rule's reasoning "is insufficient, and USCIS's rulemaking is defective."

ECF No. 23 at 20, 23, 28. After addressing the threshold matter regarding Plaintiff's standing, the Court considers these arguments in turn below.

## A. Standing

Defendants challenge Plaintiffs' standing in this case, arguing that they lack standing "to challenge any part of the [Final] Rule, except the Form I-829 fee." ECF No. 26 at 14 (citation modified). Plaintiffs disagree, arguing that the Institutional Plaintiffs have associational standing, *see* ECF No. 27 at 3, and Plaintiff Moody has standing herself, *id.* at 7. Having reviewed the parties' standing arguments, the Court concludes that Plaintiffs, explained further below, have standing, but only to the extent they challenge specific fees imposed by the Act, such as the Form I-829 fee, and Asylum Program Fees.

The parties agree on the basic doctrinal framework governing the Court's standing analysis. *See* ECF No. 26 at 14; 27 at 8. Fundamentally, to "establish standing," a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). The Court applies these basic principles below, analyzing the Institutional Plaintiffs' and Plaintiff Moody's standing in turn, mindful of the nuances attendant to standing analyses in the APA context. *See, e.g., Gutierrez v. Saenz*, 606 U.S. ----, 145 S. Ct. 2258, 2269 (2025) (Barrett, J., concurring).

### i.    *Evidentiary Submissions*

Before explaining why Plaintiffs have met their standing burdens, the Court must address an issue Defendants raise in their sur-reply: whether Plaintiffs may meet their standing burden by using a declaration and receipt submitted along with their reply brief. *See* ECF No. 31 at 1 ("With their reply brief, Plaintiffs *belatedly* submitted two documents in an attempt to support Article III standing." (citation modified)). The Court agrees with Defendants that Plaintiffs submitted a supplementary declaration in connection with their reply brief that Plaintiffs contend "remove[s] any doubt" that ITServe has standing, as well as a receipt from Mr. Malik's $9,525 payment of a Form I-829 fee. ECF No. 27 at 4; *see also* ECF No. 27-1. But Plaintiffs' submission of this declaration, as well as the receipt, neither of which were included in the administrative record, is permissible in order to show that Plaintiffs have met their standing burdens.[8]

The Court first considers the propriety of Plaintiffs' reply brief supplemental declaration. In assessing whether a plaintiff may submit standing declarations or other evidence along with reply briefs, courts consider whether the plaintiff "thought it had established standing" when it submitted its original brief, a supplemental declaration "did not raise an entirely new theory of standing," "injury and causation are patently obvious" from the declaration, and the opposing party "suffer[s] no prejudice" from the declaration's submission. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 112 (D.C. Cir. 2021).

---

[8] Plaintiffs' efforts to supplement the administrative record—distinct from their supplementation to underscore their *standing*—are discussed further below. *See, e.g., Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997) ("We therefore consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction.").

Consideration of these factors confirms Plaintiffs' supplemental declaration may be properly considered by the Court.

*First*, Plaintiffs thought they had "established standing" at the time they filed their opening brief. *Blinken*, 4 F.4th at 112. For example, Plaintiffs argue that "DHS . . . doubl[ed] or trebl[ed] fees for petitioners and small businesses, including *members of ITServe.*" ECF No. 23 at 24 (citation modified). Indeed, advancing merits arguments as to Plaintiffs' APA claims necessarily assumes that they have standing to do so.

*Second,* the supplementary declaration does not "raise an entirely new theory" of standing. *Blinken*, 4 F.4th at 112. The declaration of Jagadeesh Mosali, a "member of ITServe" and its "National President," states that "our expenses have increased dramatically under the new rule and creates the very real risk of pricing us out of the market." ECF No. 27-1 at ¶¶ 1, 9. This representation is consistent with Plaintiffs' opening arguments. *See, e.g.,* ECF No. 23 at 15, 24. Indeed, Plaintiffs' briefing confirms that the supplemental declaration was submitted simply to "shore up [Plaintiffs'] initial" standing theories. *Blinken*, 4 F.4th at 112 (citation omitted). *See also Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018) ("[T]he court has the discretion to consider new evidence presented on reply, particularly if the new evidence appears to be a reasonable response to the opposition." (citation modified)).

*Third*, injury and causation are "patently obvious" on the face of Plaintiffs' supplementary declaration. Mr. Mosali connects injury—increased expenses—to the Final Rule. *See* ECF No. 27-1 at ¶ 9; *see also id.* at ¶ 10 ("Redbud, and other IT

staffing/consulting businesses, shoulder all of the risk and burdens in the H-1B program.").

*Fourth*, the Court discerns no prejudice that Defendants will suffer if the Court considers the supplemental declaration. *See Blinken*, 4 F.4th at 112. Indeed, Defendants make no prejudice arguments in their sur-reply. *See generally* ECF No. 31. Thus, after reviewing the parties' briefs, and considering the nature of Defendants' sur-reply, the Court concludes that Defendants will suffer no prejudice by the Court's consideration of Plaintiffs' supplemental declaration.

Accordingly, and for the reasons set forth above, the Court exercises its discretion to consider Plaintiffs' supplemental declaration. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."); *Am. Fed'n of Gov't Emps., AFL-CIO v. United States Off. of Pers. Mgmt.*, No. C 25–01780 WHA, --- F. Supp. 3d ----, 2025 WL 2633791, at *10 (N.D. Cal. Sept. 12, 2025) ("The reviewing court may therefore consider extra-record evidence when determining whether plaintiffs can establish standing." (citation modified)). For substantially the same reasons, the Court exercises its discretion to consider the supplemental Form I-829 receipt from Kanishka Malik, an Alliance member, submitted with Plaintiffs' reply brief. *See generally* ECF No. 27-2. The receipt is consistent with Plaintiffs' standing theories, presents patently obvious evidence of injury and causation, and the Court's consideration of the receipt in its standing analysis will not

prejudice Defendants. *See, e.g., Blinken*, 4 F.4th at 112; *Hodges*, 351 F. Supp. 3d at 1249; *Warth*, 422 U.S. at 501.

Of course, given that the Court will consider Plaintiffs' declaration and receipt, the Court—in its analysis of the parties' standing arguments—will also consider the standing arguments advanced in Defendants' sur-reply, including their challenges to the substantive effects of the supplemental declaration and receipt in the Court's standing analysis.

### ii.    ITServe

Defendants contend that Plaintiff ITServe lacks "organizational or associational standing." ECF No. 26 at 16. Plaintiffs disagree, arguing that they have met their standing burdens as to Plaintiff ITServe—specifically that Plaintiff ITServe has standing to "bring suit on behalf of its members." ECF No. 27 at 3 (citation modified). *See, e.g.,* ECF No. 27 at 3. The Court agrees with Plaintiffs, but only to the extent that Plaintiff ITServe has standing to "challenge the increased fees for H-1B nonimmigrant visas and the Asylum Program Fees." *Id.*

***Associational Standing.*** As the parties' briefing shows, standing analyses change where a plaintiff is an organization or association. *See, e.g.,* ECF No. 26 at 16; ECF No. 27 at 3. To enjoy associational standing—in other words, standing to "bring suit on behalf of its members"—the Institutional Plaintiffs must show "(1) at least one of its members would have standing to sue in the member's own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Speech First, Inc. v. Shrum*,

92 F.4th 947, 949 (10th Cir. 2024) (citation modified); *see also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs have made such a showing as to Plaintiff ITServe's challenge to the "increased fees for H-1B nonimmigrant visas and the Asylum Program Fees." ECF No. 27 at 3. Plaintiffs have submitted evidence showing that Mr. Mosali, an ITServe member and Chief Executive Officer of "Redbud IT Solutions," ECF No. 27-1 at 1, has paid increased fees due to the Final Rule, *id.* at 2. *See also id.* ("In addition to the increased base filing fees, Forms I-129 and Forms I-140 are subject to a new Asylum Program Fee of $600."); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 200 (2023) ("[O]rganizational standing . . . asks whether an organization's *members* have standing."). This evidence is sufficient to show that one ITServe member—here, Mr. Mosali—would have standing to sue "in [his] own right." *Speech First*, 92 F.4th at 949. It is also clear from the record that the interests ITServe seeks to protect—ensuring clients can receive cost effective placement of H1-B visa holders with partnering companies—is germane to its purpose—representing small and medium-sized information technology companies. *See generally* ECF No. 27-1. And assertion of Plaintiffs' claims does not require Mr. Mosali to participate in this lawsuit himself. *See Speech First*, 92 F.4th at 949.

*Member's Standing.* Further, as indicated above in the Court's discussion of Mr. Mosali's supplemental declaration, he himself can establish an injury—payment of fees—that the Final Rule caused, and his injury may be redressed by the Court's resolution of whether the Final Rule properly adjusted fees, in light of the Act's fee study requirement.

*See Blinken*, 4 F.4th at 111 ("An association has standing if at least *one member* can establish injury, causation, and redressability." (citation modified)); *Fair Admissions*, 600 U.S. at 200; *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153–54 (1970) ("The Administrative Procedure Act grants standing to a person aggrieved by agency action within the meaning of a relevant statute. That interest, at times, may reflect aesthetic, conservational, and recreational' as well as economic values." (citation modified))[9]

Of course, the Court's standing conclusion as to Plaintiff ITServe's challenge to specific matters—the increase of specific H-1B visa fees and Asylum Program Fees—does not demonstrate that Plaintiff ITServe has standing to challenge all of the Final Rule and *all* of the fees it imposed. *See TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross." (citation modified)).[10] On this point, the Court agrees with

---

[9] Of course, the APA does not permit claims for monetary damages. *See, e.g., Qiu v. Chertoff*, 486 F. Supp. 2d 412, 421 (D.N.J. 2007) ("The APA explicitly precludes money damages against the government."). But, as is so often the case, there is nuance to this preclusion. Where, as here, plaintiffs seek injunctive relief through an APA claim, *see* ECF No. 1 at 31, it is no bar to their standing or the merits of their claim if injunctive relief may be relief "that would [eventually] require the payment of money by the federal government." *Bowen v. Massachusetts*, 487 U.S. 879, 894 (1988) (citation modified); *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 206 (D.D.C. 2025) ("[A]n order undoing agency action is not an order for money damages." (citation modified)). Any downstream consequence that may result in, for example, reimbursement, does not change the concern that Plaintiffs' APA claims place front of mind: whether the Final Rule's promulgation was arbitrary and capricious, or contrary to law. *See* § 706(2); *Bowen*, 487 U.S. at 910 ("But to the extent that the District Court's judgment engenders this result [of reimbursement], this outcome is a mere *by-product* of that court's primary function of reviewing the Secretary's interpretation of federal law." (citation modified)); *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 244 (D.D.C. 2025) ("That the specific relief sought here—preventing the government from terminating the contract for retaliatory reasons—may result in a monetary payout does not convert it into a claim for money damages."); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) ("[A] district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." (citation modified)). In making these observations, the Court expresses no opinion on the propriety of any ultimate monetary award to Plaintiffs in this action.

[10] For example, the Final Rule revised fees attendant to "I-129 Petition[s] for O Nonimmigrant workers," AR at 621, and refugee travel documents, *id.* at 622. Plaintiff do not argue—nor can they—that they have standing to challenge these and numerous other fees unrelated to their claims.

Defendants. *See* ECF No. 31 at 2. However, the Court notes—as the parties appear to agree—that Plaintiffs' standing to challenge specific fees and fee structures is not jeopardized or undermined by their lack of standing to challenge other parts of the Final Rule. *See, e.g., Brandywine, Inc. v. City of Richmond, Kentucky*, 359 F.3d 830, 835 (6th Cir. 2004) ("[A] plaintiff may have standing to challenge some provisions of a law, but not others." (citation modified)); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) ("[P]laintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law." (citation modified)). And to the extent that Defendants argue Plaintiff ITServe lacks standing as to the H1-B registration fees because it was not "challenged in the Complaint [and] thus is not properly before this Court," ECF No. 31 at 1, the Court disagrees. Reading Plaintiffs' allegations in their entirety, they have alleged sufficient factual content beyond the lone paragraph Defendants cite to place their H-1B fee challenges before the Court. *See, e.g.,* ECF No. 1 at 24–25.

Accordingly, and for the reasons set forth above, Plaintiff ITServe has standing— in Plaintiffs' own words—"to challenge the increased fees for H-1B nonimmigrant visas and the Asylum Program Fees." ECF no. 27 at 3; ECF No. 31 at 2.

### iii.    The Alliance

Defendants contend that the Alliance "has not demonstrated organizational or associational standing either." ECF No. 26 at 17. Plaintiffs disagree, arguing that they have met their standing burdens as to the Alliance's "challenge [to] the increase[d] fees the [Final] Rule imposes on immigrant investors." ECF No. 27 at 4. The Court agrees with

Plaintiffs, but only to the extent that—consistent with their own arguments—the Alliance has standing to challenge provisions in the Final Rule that resulted in payment of inflated fees due to UCSIS's fee adjustments prior to conducting the fee study. *Id.* at 5 ("[Mr. Malik] was required to pay $9,525 without receiving the intended benefit of expeditious processing times that Congress intended to result from the fee study.").

For substantially the same reasons that the Court concluded ITServe had standing to challenge specific actions, so too does the Court conclude that the Alliance has standing to sue because its members, including Mr. Malik, paid increased fees that "injured [Alliance] membership." ECF No. 27 at 6. Fundamentally, Plaintiffs have shown that an Alliance member, Mr. Malik, paid increased fees as the result of the Final Rule, promulgated and finalized without completion of the Act's required fee study: He filed a Form I-829 in June 2024, incurring the attendant filing fee.[11] *See* ECF No. 27-2; ECF No. 9-2 at 2 ("The additional filing fees present a hardship for me . . . ."). Defendants acknowledge this. *See* ECF No. 31 at 2 ("[T]he Malik receipt shows that [the Alliance] has one member who paid an increased fee for Form I-829."). This is sufficient to show that Mr. Malik incurred an injury caused by UCSIS's fee adjustments made without completion of the fee study that are clearly redressable for the improperly calibrated and charged fees. *See, e.g., Blinken*, 4 F.4th at 111. Thus, Mr. Malik has standing to sue in his own right, *see, e.g., Speech First*, 92 F.4th at 949, and the record is clear that the interests the Alliance seeks to protect—those of EB-5 investors and visa applicants—are germane to

---

[11] The Court reiterates that while Mr. Malik suffered monetary harm, such harm flows from the unlawful promulgation of the Final Rule.

its purpose—advocating on behalf of and educating EB-5 investors worldwide, *see id.* *See also* ECF No. 1 at ¶ 18.

Accordingly, Plaintiffs have met their standing burden as to the Alliance. But, as with ITServe, the Court agrees with Defendants that the Alliance's standing is limited to past payment of EB-5 visa fees specifically, rather than standing to challenge the entirety of the Final Rule and the wide range of fees it adjusted prior to the fee study's completion. *See, e.g.,* ECF Nos. 33 at 2; 31 at 2; ECF No. 26 at 18-19. This limitation is consistent with Plaintiff's own standing arguments raised in reply. *See* ECF No. 27 at 6 ("To say members of [the Alliance], like Mr. Malik, suffer no injury from the failure of UCSIS to complete the fee study and *double fees untethered* to efficient processing, is preposterous." (citation modified)).

### iv.    *Plaintiff Moody*

Finally, the Court considers Plaintiff Moody's standing. Defendants essentially concede that Plaintiff Moody has standing to mount an APA claim based on the Final Rule, the promulgation of which resulted in the Form I-829 fee she incurred. *See* ECF No. 26 at 19 ("Plaintiff Moody's injury is limited to the Form I-829 fee."). But even without this concession, the Court is satisfied, and agrees with Plaintiffs that that Plaintiff Moody has suffered an injury—her Form I-829 fee payment—caused by UCSIS's fee adjustments in the Final Rule, and that is redressable.

The Court makes two related observations. *First*, the Court agrees with Defendants that the promulgation of revised fee structures following the fee study's completion *could* foreclose any prospective, injunctive relief that Plaintiff Moody seeks, and essentially

18

moot her APA claim. *See, e.g.,* ECF No. 33 at 2. But as discussed further below, given that a final rule *based* on the fee study has not yet been promulgated, the fee study's completion alone does not moot Plaintiffs' claims. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("[A] case becomes moot only when it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." (citation modified)); *Beals v. Jay*, Case No. CIV–15–922–C, 2017 WL 9253801, at *4 (W.D. Okla. May 10, 2017), *report and recommendation adopted*, Case No. CIV–15–922–C, 2017 WL 2799307 (W.D. Okla. June 28, 2017) ("Because Plaintiff has received the injunctive relief he requested, his claim for injunctive relief is moot.").

*Second*, as to relief Plaintiff Moody seeks premised on "[adjudication] delays and related harms," ECF No. 27 at 8, the Court disagrees with Defendants that this complicates or forecloses Plaintiff Moody's standing to challenge the fees based on the Final Rule that she has already incurred. *Cf.* ECF No. 26 at 19. This is not an instance where, unlike the authority Defendants marshal in support of their argument that the nature of Plaintiff Moody's injuries forecloses standing, Plaintiff Moody is *only* alleging "confusion and anxiety" as the bases for her claims. *Garland v. Orlans, PC*, 999 F.3d 432, 437 (6th Cir. 2021) (["The plaintiff's] alleged injuries are not concrete enough to support standing. [The] complaint alleges two injuries—confusion and anxiety."). To the extent that Defendants' arguments bear on the Court's analysis of Plaintiffs' claims, such arguments go more toward the *relief* to which Plaintiff Moody may be entitled based on the parties' evidentiary submissions as well as the doctrinal framework under which Plaintiffs press their claims. And whether Plaintiff Moody is *entitled* to any relief based on

the nature of her claims demands a separate analysis from the one the Court now undertakes in addressing the threshold issue of Plaintiff Moody's *standing*: whether she has suffered any concrete injury, caused by Defendants, that may be redressable. *See, e.g., TransUnion*, 594 U.S. at 425; *Ercole v. LaHood*, No. 07–CV–2049 (JFB) (AKT), 2010 WL 1286317, at *9 (E.D.N.Y. Mar. 30, 2010).

* * *

In sum, ITServe, the Alliance, and Plaintiff Moody have standing to the extent explained above. And because Plaintiffs have met their standing burdens, the Court proceeds to analyze the merits of Plaintiffs' APA claims.

### B. Merits

Recall that Plaintiffs challenge the April 2024 Rule on three bases:

- The Final Rule is "contrary" to the Act due to its imposition of certain fees;

- The Asylum Program Fee is "arbitrary, capricious, and not in accordance with law"; and

- The "record underlying" the April 2024 Rule's reasoning "is insufficient, and USCIS's rulemaking is defective."

ECF No. 23 at 20, 23, 28. The Court considers these arguments in turn.

### i.    *Evidentiary Submissions*

As a preliminary matter, the Court must address Defendants' argument that its merits analysis is limited to the administrative record. *See* ECF No. 26 at 20. The Court agrees with Defendants that a review of the docket confirms Plaintiffs have submitted material beyond the administrative record. *Compare* ECF No. 22, *with* ECF No. 23. And because this evidence is outside the administrative record, Defendants' argument goes,

the Court cannot consider it. *See* ECF No. 26 at 20; *id.* at 21 ("Because none of these documents is part of the administrative record, the Court should disregard each of them in analyzing the merits of Plaintiffs' APA claims."). The Court agrees with Defendants. Plaintiffs have not met their burden of showing that consideration of evidence outside of the administrative record is proper.[12]

Courts' analyses of APA claims are typically limited to the parties' administrative record. *See, e.g., Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001) ("[J]udicial review is ordinarily confined to the administrative record." (citation modified)); *New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019). But, while an exception to this rule, record supplemental in APA cases is permissible. *See Calloway v. Harvey*, 590 F. Supp. 2d 29, 37 (D.D.C. 2008) ("Supplementation of the administrative record is the exception, not the rule."). However, to satisfy this exception, the party seeking to supplement must demonstrate one of the following "circumstances": that the agency "deliberately or negligently excluded documents that may have been adverse to its decision"; "background information" is necessary to "determine whether the agency considered" all relevant factors; or where "the agency failed to explain administrative action so as to frustrate judicial review." *Univ. of Colorado Health v. Azar*, 486 F. Supp. 3d 185, 200 (D.D.C. 2020), *on reconsideration in part sub nom. Univ. of Colorado Health at Mem'l Hosp. v. Becerra*, 531 F. Supp. 3d 10 (D.D.C. 2021).

---

[12] The Court distinguishes the impermissibility of supplementing the administrative record with evidence attendant to the *merits* of Plaintiffs' claims from supplementation to establish standing. Indeed, *Blinken* was an APA case, *see* 4 F.4th at 114, and concluded a district court abused its discretion by "striking the supplemental declarations," *id.* at 113, submitted to establish standing.

Plaintiffs have not met their burden of showing any one of these circumstances exists. *See id.* In their reply brief, Plaintiffs offer no response to Defendants' argument that Plaintiffs' extra-record evidentiary submissions are improper. *Compare* ECF No. 27, *with* ECF No. 26 at 20. Nor, as Defendants observe, did Plaintiffs ever move to supplement the administrative record. *Id.* at 21; *see also Espinoza v. United States Dep't of Just.*, 20 F. Supp. 3d 1094, 1103 (D. Colo. 2013). Regardless, judicial review of Defendants' actions is possible based on the record before the Court. *Cf. American Federation*, 2025 WL 2633791, at *7 ("The 'administrative record' submitted by the government is a sham. It does not facilitate judicial review: It frustrates it.").

## ii.    *Final Rule & Contrariness to Act*

The parties' arguments as to the Final Rule's compliance with the Act are easily summarized. Plaintiffs contend that the Final Rule is contrary to the Act—and therefore contrary to law—because Defendants "changed the EB-5 related fees without completing the [Act's] mandatory fee study and relating the fees [accordingly.]" ECF No. 23 at 21. Defendants counter that—even "recognizing that the [Act] directed [USCIS] to complete an EB-5 fee study by March 15, 2023 and a fee rule 60 days later"—the Act did not prohibit USCIS to "modif[y] EB-5 fees . . . in the interim." ECF No. 26 at 22; *see also* ECF No. 40-1 at 5 ("The [Act] also directed DHS to conduct a fee study and set fees for EB-5 program-related immigration benefit requests.").

In support of this argument, Defendants cite § 106(f) of the Act, which provides:

(f) RULE OF CONSTRUCTION REGARDING MODIFICATION OF FEES.—
Nothing in this section may be construed to require any modification of fees before the completion of—
    (1) the fee study described in subsection (a)

Pub. L. No. 117-103, 138 Stat. 49, 1070.

The Court disagrees with Defendants that § 106(f) defeats Plaintiffs' argument that the visa fees set—and imposed—by the Final Rule are contrary to the Act. *See, e.g.,* ECF No. 23 at 21; AR at 616–626. As Plaintiffs observe, § 106(b) unambiguously states that "not later than 60 days after the *completion* of the [fee] study under subsection (a), [USCIS] *shall set fees* for services provided under sections 203(b)(5) and 216A of such Act (8 U.S.C. 1153(b)(5) and 1186b) at a level sufficient to ensure the full recovery only of the costs of providing such services . . . ." Nothing in § 106(f) absolves USCIS of this requirement—complete the fee study *before* setting fees—or grants permission to disregard it, as § 106(f) simply states USCIS is not required to modify fees before completing the required fee study. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("Congress says in a statute what it means and means in a statute what it says there." (citation modified)).

At bottom, § 106(b) imposes a mandatory requirement: complete the fee study, then, after doing so, set fees for USCIS services. Defendants acknowledge as much. *See* ECF No. 26 at 22; *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 485 (2001) ("[An agency] may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."). The Court declines to interpret a provision that doesn't impose a requirement—*no need to do anything before completing the fee study*, Congress said to UCSIS—as *permitting* USCIS to *do something* before completing § 106(b)'s required fee study, and therefore in contravention of § 106(b) itself. *See* ECF No. 26 at 23; *but see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("Whatever

respect an Executive Branch interpretation was due, a judge certainly would not be bound to adopt the construction given by the head of a department." (citation modified)). In other words, not requiring one task—modification of fees—is not the same as granting permission to do so in the face of a separate and clear requirement—setting fees *after* and *based on* the fee study's results. *See Whitman*, 531 U.S. at 485. The Court agrees with Plaintiffs that adopting Defendants' contrary position would fundamentally and improperly change these provisions' meaning. *See* ECF No. 27 at 11–12 ("Congress did not authorize USCIS to set fees without completing the fee study . . . the provision [of] § 106(f) clarifies that USCIS did not have to modify fees prior to the fee study or regulations." (citation modified)); *Loper Bright*, 603 U.S. at 385 ("When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress[.]" (citation modified)); *F.B.I. v. Abramson*, 456 U.S. 615, 633 (1982) ("A judge must not rewrite a statute, neither to enlarge nor to contract it." (citation modified)) (O'Connor, J., dissenting).

* * *

Congress telling USCIS to *hang tight* while the mandatory fee study was being completed doesn't mean USCIS could do whatever it liked until the study was completed. Moreover, the Court is under no obligation to adopt USCIS's incorrect interpretation of § 106(f). *See, e.g., Loper Bright*, 603 U.S. at 386. It follows, for the reasons set forth above, that USCIS acted contrary to the Act, and therefore acted contrary to law. *See* § 706(2); *Loper Bright*, 603 U.S. at 391.[13]

---

[13] Because the Court concludes that USCIS acted contrary to law in implementing the visa fees in the Final Rule prior to completion of the fee study, it need not reach Plaintiffs' argument that USCIS acted unlawfully because "the record underlying the Final Rule's reasoning [was] insufficient, and USCIS's rulemaking [was] defective." ECF No. 23 at 28 (citation modified). *See* § 706(2) (stating "reviewing court . . . shall . . . hold

### iii.    *Asylum Program Fees*

Plaintiffs' argument that the Asylum Program Fee is "arbitrary, capricious, and not in accordance with law," ECF No. 23 at 23, proceeds in two parts. *First*, Plaintiffs argue that USCIS arbitrarily used employers' net revenue "to claim an asylum program surcharge on top of fee increases for the adjudication of benefits would have a negligible impact." *Id* (citation modified). *And second*, that USCIS "arbitrarily" used net revenues to determine "certain petitioners had more ability to pay and disproportionately fund asylum applications." *Id.* (citation modified). But Plaintiffs' briefing reveals their arguments are reducible to a core concern: that the Asylum Program Fee is the result of a flawed—i.e., arbitrary and capricious—calculation method. *See, e.g., id.* ("To arrive at the surcharge rates and increased fees for benefit adjudications, USCIS arbitrarily switched between 'net income' to 'sales revenues' or 'net revenues' when deciding which petitioners were able to fund the adjudications of asylum applicants. DHS did not treat like cases alike . . . ."); *id.* at 25 ("DHS did not explain why net income was considered the best measure to calculate 'ability to pay,' but chose net revenues or salary to justify the rate of the Asylum

---

unlawful and set aside agency action . . . found to be . . . not in accordance with law [or] without observance of procedure as required by law"); *Gilbert Equip. Co. v. Higgins*, 709 F. Supp. 1071, 1084 (S.D. Ala. 1989), *aff'd sub nom. Gilbert Equip. Co. v. Higgins*, 894 F.2d 412 (11th Cir. 1990) ("Section 706 of the Administrative Procedure Act provides six separate standards of judicial review of agency actions."); *Cheavens v. Pub. Serv. Corp. of Colorado*, Civil Action No. 14–cv–03374–WJM–KMT, 2016 WL 11383981, at *3 (D. Colo. Feb. 8, 2016), *report and recommendation adopted*, 176 F. Supp. 3d 1088 (D. Colo. 2016) ("[Section] 706(2) has six subparts upon which a plaintiff can choose to rely in challenging an agency action."). And because the Court need not reach this argument, the Court likewise declines to address the parties' arguments as to Fraud Detection and Prevention Account Funding, *see* ECF No. 26 at 38, which in any event Plaintiff appears simply to advance in support of this "insufficient reasoning" argument. *See* ECF No. 23 at 31 ("It should be *noted* that legitimate and Congressionally authorized activities are funded, limited, and accounted for under the [FDPA] . . . ." (citation modified)).

Program Fee of employers or a self-petitioner.")[14] For the reasons explained below, the Court disagrees and rejects Plaintiffs' APA challenge to the Asylum Program Fee.

Certainly, "[a] fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). And "if [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Id.* (citation modified). But this "fundamental norm," *id.*, does not prohibit an agency from drawing distinctions between cases or individuals. An agency may treat "similarly situated parties differently" so long as it "provide[s] an adequate explanation" for doing so. *Chadmoore Commc'ns, Inc. v. F.C.C.*, 113 F.3d 235, 242 (D.C. Cir. 1997). *See also Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." (citation modified)); *Sorenson Commc'ns, Inc. v. F.C.C.*, 659 F.3d 1035, 1045 (10th Cir. 2011) ("To comply with the APA, the agency must examine the relevant data and articulate a satisfactory explanation

---

[14] The parties' subsequent briefing confirms the fundamental nature of Plaintiffs' challenge to the Asylum Program Fee. *Compare* ECF No. 26 at 24–25 ("Plaintiffs' second argument—that the agency erred in considering only businesses' gross revenues, and not their expenses, in setting the Asylum Program Fee while considering low-income individuals' 'net income' in determining their ability to pay fees—should also be rejected." (citation modified)), *with* ECF No. 27 at 11 ("Using gross revenues to assess businesses' 'ability to pay' while using net income to assess individuals' 'ability to pay' fees and business' 'ability to pay' employees was arbitrary and capricious" (citation modified)). Further, the Court notes that where Plaintiffs refer to "sales revenue" and "net revenue," the Final Rule and Defendants refer to "gross revenue." *See* ECF No. 26 at 25 n.22. Notwithstanding the mismatch between how the parties refer to and characterize aspects of the Asylum Program Fee, the outcome of the Court's analysis remains the same: The Asylum Program Fee is not the improper result of an arbitrary and capricious agency action.

for its action including a rational connection between the facts found and the choice made." (citation modified)).

The Court agrees with Defendants that USCIS adequately explained "how it evaluated impacts on businesses and individuals' ability to pay" fees and therefore did not act arbitrarily and capriciously. ECF No. 26 at 25. In reaching its conclusions that Plaintiffs challenge under the APA, UCSIS explained in its "Small Entity Analysis (SEA) for the [USCIS] Fee Schedule Proposed Rule" that it proposed the Asylum Program Fee because the Fee "[was] an effective way to shift some costs to requests that [were] generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers applicants/petitioners." AR 525. USCIS explained that it determined the Asylum Program Fee by "calculating the amount that would need to be added to the fees for Form I-129 and Form I-140 to collect the Asylum Processing IFR estimated annual costs." *Id.* USCIS considered Form I-129 "economic impacts on small entities with revenue data," *id.* 527, and concluded that "[a]mong the 289 small entities with reported revenue data, 90.4 percent experienced an economic impact of less than 1 percent with the exception of 9.6 percent" of small entities, *id.* 528. *See also id.* ("The average impact on the 289 small entities with revenue data was 0.57 percent."); 89 FR 6194 at 6356 ("In the SEA . . . DHS calculated the estimated economic impact of the fee increase on a sample of small entities. Guidelines provided by the [Small Business Association] allows for the use of 1 percent of gross revenues in a particular industry . . . as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities."). *Cf.* ECF No. 23 at 26 ("USCIS's choice to

depart from its policy and base an entity's ability to pay using 'net revenue' inexplicably differs from other USCIS use of 'ability-to-pay' calculations . . . . The use of two different calculations, which measure fundamentally different things, is arbitrary . . .").

At bottom, the Court agrees with Defendants that, after reviewing the Final Review and its analysis and explanation of the Asylum Program Fee, it is not an arbitrary and capricious agency action. *See, e.g.,* ECF No. 26 at 27–29. Plaintiffs contend that USCIS has previously used a "different assessment"—employers' net income—in calculating employers' ability to pay, ECF No. 27 at 12, but presuming this accurately describes past practices, such practices do not bear on the adequacy of the agency's reasoning as to how it calculated the Asylum Program Fee in the Final Rule specifically. Especially where USCIS was not drawing inexplicable or unexplained exceptions to fee payments for entities in its Asylum Program Fee analysis. *See, e.g., Westar Energy*, 473 F.3d at 1241 ("If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases."); *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("*Unexplained inconsistency* is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice . . . ." (citation modified)). In other words, such a "departure," ECF No. 27 at 12, standing alone is an insufficient basis for the Court to conclude that USCIS acted arbitrarily and capriciously—nor does this constitute an impermissible inconsistency *within* the reasoning USCIS provided as to its Asylum Program Fee calculations.

Moreover, Plaintiffs fail to persuade that USCIS's economic calculations, *see* ECF No. 23 at 23, were so deficient as to run afoul of the APA, particularly where USCIS reached its Asylum Program Fee calculations following a reasoned analysis of, among other things, entities' estimated total costs for fee increases "divided [by] the sales revenue of" those entities," AR 527. *See also id.* n.22 ("Total Impact on Entity = (Number of Petitions Submitted Per Entity x $X Amount of Fee Increase / Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided."); *Sorenson Commc'ns, Inc. v. F.C.C.*, 659 F.3d 1035, 1045 (10th Cir. 2011) ("[An] agency must examine the relevant data and articulate a satisfactory explanation for its action including a *rational connection* between the facts found and the choice made." (citation modified)).[15] For example, Tables 12a and 12b in the Final Rule provide a "summary of the fees in the final rule," 89 FR 6194 at 6361, after which the Final Rule explains—consistent with the Small Entity Analysis—that "[t]o calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported sales revenue of that entity," *id.* at 6363. *Cf.* ECF No. 23 at 24.

* * *

At bottom, Plaintiffs disagree with the outcome of Defendants' Asylum Program Fee analysis. *See, e.g.,* ECF No. 23 at 25 ("At the very least, the choice was not rationally explained to the public."). But the Court's review of the Asylum Program Fee, and whether

---

[15] For this same reason, the Court rejects Plaintiffs' contention that the "Small Entity Analysis contained within the Final Rule demonstrates the arbitrariness of the fee increases on small employers with over 25 or more employees." ECF No. 23 at 24.

its imposition amounts to an arbitrary and capricious agency action, looks to the evidence marshaled in its support and, at bottom, whether USCIS has shown its work in how it calculated and then imposed the Asylum Program Fee. Applying these principles, the Court agrees with Defendants that, given the rationale behind the Asylum Program Fee may "reasonably be discerned," *In re FCC 11-161*, 753 F.3d 1015, 1041 (10th Cir. 2014) (citation modified), it has. *See* ECF No. 26 at 25; *Sokol World Ent., Inc. v. Small Bus. Admin.*, No. 21–cv–2385 (TSC), 2025 WL 870323, at *6 (D.D.C. Mar. 20, 2025) (finding agency gave a "reasonable justification" for decision and "provided a reasoned explanation that enabled the court to discern the path the agency took" (citation modified)).[16] Accordingly, Plaintiffs' APA challenge to the Asylum Program Fee fails, as it is not the result of arbitrary and capricious agency action.

### C. Relief

Finally, having determined that the Final Rule's promulgation of EB-5 visa fees pursuant to § 106 of the Act violated the APA, the Court must determine what relief is proper. *See, e.g., Asylum Seeker Advoc. Project v. United States Citizenship & Immigr. Servs.*, Civil Case No. SAG–25–03299, --- F. Supp. 3d ----, 2025 WL 3029552, at *9 (D. Md. Oct. 30, 2025). Defendants contend that any relief should be "limited." ECF No. 26 at 41. The Court agrees to the extent that, as explained above, Plaintiffs lack standing to challenge the entirety of the Final Rule, and failed to show that the Asylum Program Fees were the result of arbitrary and capricious agency action, and thus that vacatur of the

---

[16] The Court also agrees with Defendants that, to the extent Plaintiffs challenge individual applicant calculations, "USCIS sensibly compared an individual applicant's adjusted gross income to the Federal Poverty Guidelines as one measure of his or her ability to pay." ECF No. 26 at 29; *see also* 89 Fed. Reg. at 6232.

entire Final Rule is improper. *Cf. Barr*, 591 U.S. at 627. In a similar vein, the Court agrees with Plaintiffs that they are entitled to relief, but only as to those portions of the Final Rule that run afoul of the APA—and only in the form of a stay. *See, e.g.,* ECF No. 27 at 14; *Barr*, 591 U.S. at 627; 5 U.S.C. § 705.

Pursuant to § 705, a stay of the Final Rule's imposition of EB-5 fees—those promulgated and imposed *prior to* and without the guidance of § 106's mandatory fee study—is appropriate. Staying the imposition of such fees strikes an appropriate balance between staying agency action that is both arbitrary and capricious and contrary to law, and maintaining intact the vast majority of the Final Rule, which Plaintiffs either lack standing to challenge or have failed to show is the result of arbitrary and capricious agency action. And to the extent such a stay poses any harm to Defendants, this harm is minimal, as the notice and comment period for a revised fee rule based on the fee study ends December 22, 2025, and presumably a final rule properly promulgated consistent § 106 will follow—both bringing the imposition of EB-5 fees into accordance with law and, from the Court's current perspective, likely mooting Plaintiffs' claims.

The Court makes one final observation. The parties' briefs did not enjoy the benefit of the United States Supreme Court's recent guidance as to the proper scope of injunctive relief. *See Trump v. CASA, Inc*., 606 U.S. 831, 847 (2025). But, as *CASA* stated explicitly and *Asylum Seeker Advocacy Project* persuasively observed, *CASA*'s limitations on universal injunctive relief do not limit federal courts' authority to "vacate federal agency action." 2025 WL 3029552, at *9 (citing *CASA*, 606 U.S. at 847 n.10). Accordingly, a stay

of the Final Rule's EB-5 fee imposition is proper on the merits, and the scope of this relief is consistent with both the APA and binding Supreme Court precedent.

## IV.    CONCLUSION

Consistent with the above analysis, the Court STAYS IN PART Defendant USCIS's Final Rule. *See* 89 Fed. Reg. 6194. The Court further orders the parties to file a joint status report on or before January 12, 2026.

DATED this 12th day of November 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge